UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE WASHINGTON MUTUAL, INC.
SECURITIES LITIGATION

This Document Relates to:  ALL ACTIONS

No. 2:08-md-1919 MJP
Lead Case No. C08-387 MJP

**CLASS ACTION COMPLAINT**

JURY DEMAND

**CONSOLIDATED CLASS ACTION COMPLAINT**

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

# TABLE OF CONTENTS

I.  OVERVIEW OF THE ACTION ............................................................................2

II.  THE CLAIMS ASSERTED IN THE COMPLAINT ........................................7

III.  JURISDICTION AND VENUE ..........................................................................7

IV.  THE PARTIES......................................................................................................8

    A.  Plaintiffs .....................................................................................................8

        Lead Plaintiff ..............................................................................................8

        Additional Named Plaintiff ........................................................................9

    B.  The Exchange Act Defendants...................................................................9

        Washington Mutual, Inc. ............................................................................9

        The Officer Defendants...............................................................................12

        The Controller Defendants..........................................................................14

        The Audit Committee and Finance Committee Defendants ......................14

    C.  Relevant Non-Parties ................................................................................16

        First American Corporation ........................................................................16

        Lenders Services Inc. .................................................................................18

V.  CLASS ACTION ALLEGATIONS ....................................................................18

VI.  FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ........................22

    A.  WaMu and Its Core Home Lending Business............................................22

    B.  WaMu Abandons Customary Lending and Business Practices in Favor of
        Much Riskier Loan Products and Company Policies ...............................24

        1.  WaMu's Risky, Nontraditional Loan Products...........................28

        2.  WaMu Aggressively Pushed Risky Loans on Borrowers for
            Defendants' Gain ..........................................................................33

        3.  Defendants Discontinued Effective Risk Management During
            the Class Period.............................................................................41

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page i

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

C.    Defendants Secretly Corrupted WaMu's Appraisal Process ................................51

    1.    The Pivotal Role of Appraisals in WaMu's Core Lending Business.........54

    2.    Appraisals Relating to WaMu Loans Were Governed by Strict
        Rules Designed to Maintain Appraisal Integrity and Accuracy ...............57

        a.    WaMu's Appraisals Were Required to Be Fair, Accurate,
             and Unbiased..................................................................................57

        b.    Federal Regulations Required that WaMu's Directors and
             Senior Officers "Develop, Implement, And Maintain"
             Appropriate Appraisal Policies for WaMu ....................................58

        c.    Defendants Were Specifically Advised of Governing Appraisal
             Standards and Were Instructed by WaMu's Regulators to Take
             Appropriate Actions to Meet Those Standards..............................60

    3.    Defendants Secretly Caused Appraisals Relating to WaMu Loans
        to be Improperly Inflated ..........................................................................62

        a.    Numerous WaMu-affiliated Persons Witnessed WaMu's
             Systematic Manipulation of the Appraisal Process ......................65

        b.    Numerous eAppraiseIT-affiliated Persons Witnessed WaMu's
             Systematic Manipulation of the Appraisal Process ......................73

        c.    Documents Obtained by the New York Attorney General
             and the Allegations of the NYAG Complaint Further Confirm
             That Senior WaMu Management Directed WaMu's Wrongful
             Appraisal Practices........................................................................93

        d.    Numerous LSI-affiliated Persons Witnessed WaMu's
             Systematic Manipulation of the Appraisal Process ......................97

        e.    Expert Analysis of Relevant Housing Data Also
             Evidences WaMu's Improper Appraisal Inflation During
             the Class Period...........................................................................103

D.    WaMu's Underwriting Standards Were  Secretly Weakened at
    Defendants' Direction......................................................................................107

    1.    Underwriting Standards for WaMu's "Prime" Loans Were
        Deficient...................................................................................................109

        a.    WaMu's "Prime" Loans Were of Lesser Quality than
             WaMu Disclosed........................................................................109

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page ii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

b.  WaMu's Underwriting Standards for Its So-Called "Prime" Loans Were Irresponsibly Permissive ..........................................114

c.  WaMu's Option ARM Underwriting Was Dangerously Deficient..................................................................125

2.  WaMu Also Secretly Implemented Dangerously Permissive Underwriting Practices for Its Subprime Lending ...................................130

3.  WaMu Inappropriately Incentivized Its Underwriters To Approve Loans By Basing Their Compensation On Loan Volume Without Regard To Loan Quality .........................................................143

4.  Expert Analysis of Relevant Data Further Establishes that WaMu's Underwriting Standards Throughout the Class Period Were Deficient ..............................................................145

E.  WaMu's Financial Statements Violated GAAP and SEC Regulations Prohibiting False and Misleading Public Filings ..................................147

1.  GAAP and Other Governing Accounting Standards That WaMu Claimed to Follow Established Clear Rules Concerning How WaMu Should Have Reserved for Loan Losses ......................................150

2.  WaMu and the Officer Defendants Disregarded Governing Accounting Rules and Standards .........................................155

a.  Defendants Knowingly Failed to Appropriately Account for the Company's Option ARM Loans in Provisioning for WaMu's Allowance ..................................................159

b.  The Deteriorating Quality of WaMu's Loans Also Indicates that WaMu's Allowance For Loan & Lease Losses Was Materially Understated Throughout the Class Period.................165

3.  The Company's GAAP Violations Resulted in Materially Misstated Financial Statements................................................168

4.  During the Class Period, the Company's Internal Controls Over Financial Reporting Were Ineffective......................................172

VII.  ADDITIONAL ALLEGATIONS CONFIRMING THE OFFICER DEFENDANTS' SCIENTER ..............................................................176

A.  Prior to Start of the Class Period, WaMu Had Tried to Convince the OTS to Exempt the Company from Certain Federal Appraisal Regulations.......179

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page iii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

B.    Witnesses Observed the Officer Defendants Discuss and Acknowledge
Material, Undisclosed Problems With WaMu's Lending...................................180

C.    The Officer Defendants Received Regular Reports Detailing Significant
and Widespread Problems with WaMu's Loans..................................................185

D.    The Officer Defendants Had Ready Access to  and Control of the
Company's Internal Reporting............................................................................191

E.    The Officer Defendants Knew of or Recklessly Disregarded WaMu's
Lax Underwriting Guidelines Because Such Guidelines Were Centrally
Established and Controlled .................................................................................196

F.    The Officer Defendants' Extensive Industry Experience Supports a Strong
Inference of Scienter .........................................................................................198

G.    The Officer Defendants Were Motivated by Their Performance-Driven
Compensation to Overstate the Company's True Financial Condition ...............200

H.    Insider Stock Sales by Defendant Killinger During the Class Period Were
Highly Unusual and Suspicious..........................................................................202

    1.    Defendant Killinger's Stock Sales Increased Tremendously During
        the Class Period.......................................................................................202

    2.    Defendant Killinger's 10b5-1 Trading Plan and Trading Patterns
        Further Demonstrate the Suspicious Nature of His Selling....................206

    3.    The Increase in Stock Sales at the Same Time as WaMu Initiated
        Major Stock Buybacks Further Demonstrates Their Suspicious
        Nature.......................................................................................................209

VIII.  DEFENDANTS' MATERIALLY MISLEADING OMISSIONS AND
   FALSE STATEMENTS .........................................................................................211

A.    False & Misleading Statements Concerning Third Quarter 2005 Results...........211

B.    Defendants' False & Misleading Statements at WaMu's 2005 New York
Investor Day.......................................................................................................215

C.    False & Misleading Statements Concerning Fourth Quarter & Year-End
2005 Results.......................................................................................................218

D.    False & Misleading Statements Concerning First Quarter 2006 Results ...........225

E.    Defendants' False & Misleading Statements at the May 18, 2006, Lehman
Brothers Ninth Annual Financial Services Conference and the June 1,
2006 Sanford C. Bernstein & Co. Strategic Decisions Conference....................230

F.      False & Misleading Statements Concerning Second Quarter 2006 Results ........233

G.      Defendants' False & Misleading Statements at WaMu's 2006 Investor Day And at the  Lehman Brothers 4th Annual Conference ................................237

H.      False & Misleading Statements Concerning Third Quarter 2006 Results ..........241

I.      Defendants' False & Misleading Statements at the Merrill Lynch & Goldman Sachs Financial Services Conferences ...................................................245

J.      False & Misleading Statements Concerning  Fourth Quarter & Year-End 2006 Results .....................................................................................................248

K.      False & Misleading Statements Concerning First Quarter 2007 Results ...........256

L.      False & Misleading Statements Concerning Second Quarter 2007 Results ........261

M.      Defendants' False & Misleading Statements at the Lehman Brothers 5th Annual Financial Services Conference ...............................................................266

N.      False & Misleading Statements In The Company's October 5, 2007 Press Release ...............................................................................................................268

IX.     THE TRUTH ABOUT WAMU'S FINANCIAL CONDITION BEGINS TO EMERGE ...............................................................................................................269

X.      LOSS CAUSATION ...............................................................................................299

XI.     PRESUMPTION OF RELIANCE ..........................................................................304

XII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ...........................................306

XIII.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ................................306

        FIRST CLAIM FOR RELIEF ................................................................................306

        SECOND CLAIM FOR RELIEF ............................................................................315

        THIRD CLAIM FOR RELIEF ................................................................................319

                The Audit Committee ..............................................................................320

                The Finance Committee ...........................................................................322

XIV.    CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT ...............................324

        A.      Securities Act Defendants .......................................................................328

                1.      The Washington Mutual Defendants .........................................328

2. The Auditor Defendant ..................................................................332

3. The Underwriter Defendants................................................................333

B. Background ............................................................................................338

 1. WaMu Curbs Risk Management Efforts in Furtherance of Increasing Loan Volume..................................................................340

 2. The Company Caused Appraisal Values for its Loans to be Inflated......341

 3. WaMu Adopted Deficient Underwriting Standards .............................346

 4. The Company's Financial Results Were Not Stated in Compliance With GAAP..................................................................349

 5. Deloitte Failed to Audit WaMu in Accordance with GAAS ................351

C. The August 2006 Offering and the September 2006 Offering ...........356

 1. The August 2006 Offering Documents and September 2006 Offering Documents Misstated the Company's Lending Practices.........357

 2. The August 2006 Offering Documents and September 2006 Offering Documents Contained Untrue Financial Results ....................359

 3. The August 2006 Offering Documents and September 2006 Offering Documents Contained Untrue Statements Regarding the Effectiveness of WaMu's Internal Controls ...........................................362

D. The October 2007 Offering...................................................................364

 1. The October 2007 Offering Documents Misstated the Company's Lending Practices..................................................................365

 2. The October 2007 Offering Documents Contained Untrue Financial Results..................................................................367

 3. The October 2007 Offering Documents Contained Untrue Statements Regarding the Effectiveness of WaMu's Internal Controls..................................................................370

 4. The October 2007 Offering Documents Contained Material Omissions Regarding the NYAG Complaint...........................................371

E. The December 2007 Offering ...............................................................372

 1. The December 2007 Offering Documents Misstated the Company's Lending Practices ................................................................373

Lead Plaintiff's            Bernstein Litowitz Berger & Grossmann LLP
Consolidated Securities Complaint         1285 Avenue of the Americas
No. 2:08-MD-1919 MJP           New York, NY  10019
Page vi                  (212) 554-1400

2.   The December 2007 Offering Documents Contained Untrue Financial Results .......................................................................374

3.   The December 2007 Offering Documents Contained Untrue Statements Regarding the Effectiveness of WaMu's Internal Controls..................................................................................376

FOURTH CLAIM FOR RELIEF ..................................................................377

FIFTH CLAIM FOR RELIEF ........................................................................382

SIXTH CLAIM FOR RELIEF........................................................................384

XV.   PRAYER FOR RELIEF ................................................................................386

XVI.   DEMAND FOR JURY TRIAL .....................................................................387

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page vii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

The allegations set forth in this Consolidated Class Action Complaint (the "Complaint") are based on the investigation undertaken by Lead Counsel on behalf of Lead Plaintiff, Ontario Teachers' Pension Plan Board. This investigation has included, among other things: review and analysis of internal, non-public Washington Mutual, Inc. ("Washington Mutual," "WaMu," or the "Company") documents obtained through the investigation; detailed interviews with numerous former employees of WaMu and other persons with knowledge of the events alleged herein; analyses by experts in the fields of banking regulation, mortgage finance, accounting, and loss causation; analyses of hundreds of millions of loan records reported by WaMu pursuant to the Home Mortgage Disclosure Act ("HMDA"); review of WaMu and other relevant company filings with the Securities and Exchange Commission ("SEC"); review of guidance issued by the federal banking regulatory authorities; examination of WaMu's communications with the Office of Thrift Supervision ("OTS"); examination of generally accepted accounting principles in the United States ("GAAP"); review of the WaMu and other relevant websites; and examination of WaMu and other relevant company press releases, news articles and analyst reports. The bulk of this information – such as witness statements from former WaMu insiders and non-public WaMu documents and analysis of key WaMu data – was not previously available, or disclosed, to the investing public. The results of the investigation on behalf of Lead Plaintiff are discussed throughout this Complaint.

## I.      OVERVIEW OF THE ACTION

1.      Washington Mutual has long held itself out as a conservative savings and loan company, subject to rigorous controls and standards, run by a group of officers who manage the Company in a manner intended to make it attractive to institutional investors and others. Although the Company is involved in other banking activities, WaMu's home loan business has

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 2

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

long been the primary driver of its business success. For instance, for the years 2006 and 2007, just under 70% of WaMu's net interest income was generated by residential real estate loans and related products and over 60% of WaMu's overall average assets were generated by residential real estate loans and related products. As those figures make clear, WaMu's success in recent years had come to depend largely on its home loan business. To help ensure the legitimacy and longevity of that business, WaMu and its senior officers touted a number of safeguards and protections they were actively managing within the Company for that very purpose, including:

- *An Authoritative Risk Management Approach and Group*. The Company supposedly used an effective approach to Risk Management that prevented it from taking unwarranted risks (and thereby imposing such risks on investors) and which involved giving WaMu's Risk Management Group authority to keep in check those within the Company who may be incentivized to take on more risk than would be in the Company's long-term interest (including certain sales personnel).

- Fair, Credible Appraisals. The use of reliable home appraisals is critical in the home loan business, because without credible appraisals the extent to which the home loans at issue are adequately collateralized is unknown. Furthermore, accurate appraisals are needed to assess the likelihood of default by the borrower. As WaMu's disclosures explain, home loans with loan-to-value ("LTV") ratios of greater than 80 percent "expose the Company [and thus investors] to greater risk" than loans with lower LTV ratios. Without credible appraisals, the LTV ratios for home loans issued by the Company would be subject to manipulation, and borrowers could be issued larger mortgages than they could realistically repay. The Company supposedly issued

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 3

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

loans that were the product of only fair, reliable, and independent appraisals, and therefore investors could rely on WaMu's purportedly low LTV ratios.

• <u>High Underwriting Standards</u>.  These are the quality control standards used to determine whether to make loans to borrowers.  WaMu has claimed it maintains the highest underwriting standards intended to minimize the credit risk involved in lending sums to borrowers.

• <u>Appropriate Allowances for Loan Losses</u>.  This is to represent a calculation of incurred credit losses inherent in the Company's loan portfolios as of a given date. WaMu proclaimed that it followed all appropriate accounting standards in this area, and that it also had successfully developed statistical forecasting models to help it appropriately calculate the "Allowance" every quarter.

These facts, as disclosed by WaMu and its officers, helped assure investors that the Company's results in the home loan business were credible and reliable because of WaMu's conservative approach to the business.

2.    Only recently has the truth regarding WaMu's business begun to emerge, causing enormous losses for investors in WaMu securities.  Lead Plaintiff's investigation has uncovered massive volumes of information never before available to the investing public, all of which sheds light on the true nature and condition of WaMu's business.  This information is based on an unprecedented number of detailed statements of former insiders at WaMu and related companies, who themselves observed the true conduct and condition of the Company.  The first-hand observations of just under ninety (90) witnesses discussed below are further supported by internal, non-public documents obtained by Lead Counsel through its investigation, as well as detailed expert analyses in several areas.  In short, the information uncovered by Lead Plaintiff's

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 4

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

investigation shows that WaMu is and has been a vastly different Company than portrayed by WaMu and its Officers in recent years.  For instance, contrary to WaMu's disclosures:

- <u>Lack of Risk Management</u>.  Internal WaMu materials and many detailed witness statements confirm that in recent years Risk Management has been relegated to a toothless "supportive role" rather than the authoritative policing role it supposedly maintained.  This has allowed management at the highest levels to increase the level of risk assumed by the Company without informing investors of this critical fact.

- <u>Systematically Inflated Appraisals</u>.  Numerous percipient witnesses as well as detailed expert analysis of WaMu data confirm that WaMu has been systemically corrupting and influencing the appraisal process such that it has been inflating appraisals issued both in-house and those obtained from supposedly independent third-parties.  This includes, but goes far beyond, information disclosed by the New York Attorney General concerning WaMu's corrupt appraisal practices.

- <u>Dangerously Permissive Underwriting Standards</u>.  Detailed statements from many former WaMu employees and others directly involved, along with internal WaMu documents and expert analysis of WaMu data, show that the Company has been using dangerously lax underwriting standards.  WaMu's abandonment of acceptable underwriting standards extended to both "prime" home mortgages as well as "subprime" loans.  This has been to the detriment of both investors and borrowers.

- <u>Woefully Inadequate Allowances for Loan Losses</u>.  Internal WaMu materials, numerous percipient witnesses, and detailed expert analysis all show that WaMu's

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 5

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    Allowance was "under-provisioned" from the third quarter of 2005 through the fourth

2    quarter of 2007 by amounts often in the hundreds of millions of dollars.

3        3.    By October 17, 2007 the Company could no longer continue to completely hide

4    the truth about – and consequences resulting from – its secret, unlawful and high-risk activities.

5    WaMu also could no longer fully conceal that its portfolio of supposedly high-quality home

6    loans was tainted with substantially impaired assets and, therefore, was suffering from losses not

7    reasonably expected by the investing public in light of WaMu's prior disclosures.  From October

8    17, 2007 through July 23, 2008, the Company shocked the market in a series of disclosures each

9    partially revealing the true condition of WaMu's home loan business and loan portfolios.  During

10   this time, WaMu's common stock plummeted as the truth emerged, from a share price of $33.07

11   on October 17, 2007 to $4.65 per share on July 23, 2008 – an 86% decline in the course of only

12   months.

13       4.    Consistent with the Private Securities Litigation Reform Act, these facts are

14   discussed in detail in this Complaint.  All of the witness statements, internal documents, and

15   expert analyses discussed in detail in this Complaint have, of course, been obtained without the

16   benefit of discovery.  Despite the substantiated and detailed nature of the allegations presented

17   herein, when one high-level executive who recently departed WaMu was informed by Lead

18   Counsel of the nature and substance of the allegations to be included in this Complaint, he

19   responded: "that's only the tip of the iceberg."  In any event, the facts discussed below show that

20   WaMu's disclosures to the investing public in recent years are entirely contrary to the true

21   condition of the Company.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 6

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

## II.    THE CLAIMS ASSERTED IN THE COMPLAINT

5.      Lead Plaintiff asserts two sets of claims on behalf of the Class (as defined in ¶51). The first set of claims arises from allegations of securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against those defendants, including WaMu and certain former and current officers, who made materially false and misleading statements that caused the prices of WaMu securities to be artificially inflated over the course of the Class Period, October 19, 2005 through July 23, 2008.  Lead Plaintiff also asserts control-person claims under Section 20(a) of the Exchange Act.  A chart identifying the parties named under each Exchange Act claim is attached as Appexdix 2.

6.      The second set of claims arises under Sections 11 and 12 of the Securities Act of 1933 (the "Securities Act") against those defendants who are alleged to be statutorily liable under a theory of strict liability and/or negligence for materially untrue statements and misleading omissions made in connection with the Registration Statement and Offering Documents (defined below at ¶817) for a series of securities offerings WaMu conducted between August 2006 and December 2007 (the "Offerings").  Through those Offerings, WaMu raised a total of $4.8 billion. Lead Plaintiff also asserts control-person claims under Section 15 of the Securities Act.  The claims arising under the Securities Act are addressed in Section XIV of the Complaint.  A chart identifying the parties named under each Securities Act claim is attached as Appexdix 3.

## III.    JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o); and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 7

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

8.      This Court has jurisdiction pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. §§ 1331 and 1337.

9.      Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and 28 U.S.C. § 1391(b) and (c).   Many of the acts and transactions constituting the violations of the law alleged herein occurred in this District.   In addition, WaMu maintains its corporate headquarters and principal executive offices in this District and did so throughout the Class Period.

10.     Venue is also proper in this District pursuant to the Transfer Order by the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), dated February 21, 2008, whereby the MDL Panel transferred all securities, derivative, and ERISA actions related to "factual questions arising from alleged misrepresentations or omissions concerning WaMu's financial condition" to this District for pre-trial purposes.

11.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## IV.     THE PARTIES

### A.      Plaintiffs

### Lead Plaintiff

12.     Lead Plaintiff Ontario Teachers' Pension Plan Board ("Ontario Teachers") is the largest single-profession pension plan in Canada.   Ontario Teachers invests the pension plan's assets and administers the pensions of approximately 278,000 active and retired teachers in Ontario.   As of December 31, 2007, Ontario Teachers held more than C$108 billion (approximately US$105 billion) in net assets.   Ontario Teachers purchased 5,484,937 shares of

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 8

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Washington Mutual common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as the result of the violations of the federal securities laws alleged herein.

13.     By Order dated May 7, 2008, the Honorable Marsha J. Pechman, United States District Court Judge for the Western District of Seattle, appointed Ontario Teachers as Lead Plaintiff for this litigation.

### Additional Named Plaintiff

14.     Plaintiff Brockton Contributory Retirement System ("Brockton") is one of 106 contributory retirement systems for public employees within the Commonwealth of Massachusetts.  Brockton purchased WaMu's 7.250% subordinated notes due November 1, 2017 ( the "7.250% Notes") on the Offering that was announced on October 25, 2007 and conducted on behalf of Washington Mutual on or about October 29, 2007.  Brockton suffered damages as a result of the federal securities law violations alleged herein.   Lead Plaintiff and Plaintiff Brockton are collectively referred to as "Plaintiffs."

### B.     The Exchange Act Defendants[1]

### Washington Mutual, Inc.

15.     Defendant Washington Mutual is a Washington corporation, with its executive and business segment headquarters located at 1301 Second Avenue, Seattle, Washington 98101.  At all relevant times, WaMu was a savings and loan holding company with two banking subsidiaries and numerous nonbank subsidiaries.[2]  As a savings and loan holding company, WaMu (including

---

[1]  Defendants named in the Securities Act claims are set forth in Section XIV below.

[2]  WaMu's subsidiaries include, among others, Washington Mutual Bank, formerly known as Washington Mutual Bank FA, and Washington Mutual Preferred Funding LLC. Consistent with the Company's Forms 10-K for the years 2005 through 2007, the definition of Washington

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 9

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   its banking subsidiaries) is subject to regulation by the Office of Thrift Supervision ("OTS").

2   WaMu was founded in 1889 as the Washington National Building Loan and Investment

3   Association, and it is the largest savings and loan association in the country.

4       16.    WaMu has four operating segments: the Home Loans Group, the Retail Banking

5   Group, the Card Services Group and the Commercial Group.  Of particular relevance to the

6   allegations of the Complaint are the Company's Home Loans and Retail Banking Groups.  As set

7   forth in the Company's Form 10-K for the year-ended December 31, 2006 (the "2006 Form 10-

8   K"), the primary activities of the Home Loans Group include: (1) the origination and servicing of

9   home loans; (2) the fulfillment and servicing of home equity loans and lines of credit; (3)

10  managing the Company's capital market operations, which includes the buying and selling of all

11  types of real estate secured loans in the secondary market; and (4) holding the Company's held

12  for investment portfolio of home loans, home equity loans and home equity lines of credit made

13  through the Company's subprime mortgage channel.

14      17.    Within WaMu's Home Loans Group, WaMu's subprime mortgage channel

15  originates, purchases, and holds for investment home loans and home equity loans issued to

---

Mutual includes its subsidiaries.  For example, in its Form 10-K for the year ended December 31, 2006, WaMu specifically defined itself to include its subsidiaries, stating:

 With a history dating back to 1889, Washington Mutual, Inc. (together with its subsidiaries, "Washington Mutual," the "Company", "we", "us", or "our") is a consumer and small business banking company with operations in major U.S. markets. Based on its consolidated assets at December 31, 2006 the Company was the seventh largest among all U.S.-based bank and thrift holding companies.

*       *       *

When we refer to "the Company," "we," "our" and "us" in this Annual Report on Form 10-K, we mean Washington Mutual, Inc. and subsidiaries.  When we refer to Parent, we mean Washington Mutual, Inc.

WaMu's Forms 10-K for the years ended December 31, 2005 and December 31, 2007 included substantially similar statements.

---

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 10

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

subprime borrowers. In particular, WaMu originates subprime loans through its subprime division, known as "Long Beach Mortgage" ("LBM") until January 1, 2006 and known thereafter as the Company's "specialty mortgage lending" channel, or purchases such loans from lenders who are generally recognized as subprime lenders. WaMu's subprime channel was originally part of the Company's Commercial Group, but was moved to the Home Loans Group in 2006. As of December 31, 2006, WaMu's subprime mortgage channel loans held for investment totaled $20.77 billion, of which $4.40 billion were originated by LBM and $16.37 billion were purchased from outside subprime lenders.

18. The primary activities of WaMu's Retail Banking Group include: (1) offering a comprehensive line of deposit and other retail banking products and services to consumer and small businesses; (2) holding both the Company's portfolio of home loans held for investment and the substantial majority of its portfolio of home equity loans and lines of credit (but not the Company's portfolio of mortgage loans originated or purchased through the subprime mortgage channel); (3) originating home equity loans and lines of credit; and (4) providing investment advisory and brokerage services, sales of annuities and other financial services.

19. In addition to its operating segments noted above, WaMu maintained a "Corporate Support/Treasury and Other" business segment during the Class Period which, among other things, managed the Company's: (1) interest rate risk, liquidity position, and capital; (2) enterprise-wide identification, measurement, monitoring, control, and reporting of credit, market, and operational risk; (3) community-lending and investment activities; (4) impact of changes in the unallocated allowance for loan losses; (5) net impact of fund transfer pricing for loan and deposit balances; and (6) transfers of loans from the Retail Banking Group to the Home Loans Group.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 11

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

20.     At all relevant times, WaMu was listed on the NYSE, where its stock was publicly traded under the symbol "WM."  As of January 31, 2007, there were over 880 million shares of WaMu common stock outstanding.

**The Officer Defendants**

21.     Defendant Kerry K. Killinger ("Killinger") has served as the Company's Chief Executive Officer since 1990 and as a member of the Company's Board of Directors (the "Board") since 1988.  Killinger also served as the Company's President from 1988 through 2004, and as Chairman of the Board from 1991 until June 30, 2008.  Killinger has also served as a member of the Company's Executive Committee since its creation in 1990, and as Chair of the Corporate Development Committee since its creation in 1997.  Killinger joined WaMu in 1982 and, from 1982 until his appointment as President in 1988, he held numerous positions, including executive vice president; senior vice president for financial management, research, investor relations and corporate marketing; and member of a three-person Office of the President.  From 2005 through 2007, Killinger received over $33 million in total compensation, including at least $7 million in bonus compensation.

22.     Defendant Thomas W. Casey ("Casey") has served as Executive Vice President and Chief Financial Officer of WaMu since October 2002.  Casey has also served as a member of the Executive Committee since 2002, overseeing the Company's corporate finance, strategic planning and investor relations functions.  From 2005 through 2007, Casey received over $11 million in total compensation, including at least $3 million in bonus compensation.

23.     Defendant Stephen J. Rotella ("Rotella") has served as WaMu's President and Chief Operating Officer since January of 2005.  In this position, Rotella is responsible for overseeing the Company's retail banking, home loans, credit card, and commercial lines of

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 12

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

business, as well as the Company's technology group and day-to-day administration. Rotella has also served on the Executive Committee since joining the Company in 2005 and, from March 2005 to August 2005, he served as the Acting Head of the Home Loans Group. Rotella has extensive financial, business, and industry experience. From 2005 through 2007, Rotella received over $29.7 million in total compensation, including at least $6.9 million in bonus compensation.

24. Defendant Ronald J. Cathcart ("Cathcart") served as Executive Vice President and Chief Enterprise Risk Officer of WaMu from December 2005 until April 2008. In this position, Cathcart was responsible for overseeing the credit, market, operational, and compliance risk functions for the Company. Cathcart also served as a member of the Executive Committee from December 2005 to April 2008. During 2007, Cathcart received at least $1.9 million in compensation.

25. Defendant David C. Schneider ("Schneider") has served as Executive Vice President and President of Home Loans since August 2005. In this position, Schneider is responsible for overseeing all aspects of the Company's home lending operations, with responsibility for the group's overall business strategy and its production and servicing channels. Schneider has also served as a member of the Executive Committee since August 2005. Schneider has extensive financial, accounting, business, and industry experience. During 2005, Schneider received $2.3 million in total compensation, including at least $492,000 in bonus compensation.

26. Defendants Killinger, Casey, Cathcart, Rotella, and Schneider are referred to herein collectively as the "Officer Defendants."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 13

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1

**The Controller Defendants**

2      27.    Defendant John F. Woods ("Woods") served as Senior Vice President and

3  Controller for WaMu from December 2005 until March 2007.  In this position, Woods managed

4  WaMu's Corporate Accounting and Financial Reporting divisions and served as the Company's

5  principal accounting officer.  In March 2007, Woods became the Chief Financial Officer of

6  WaMu's Home Loan Group.

7      28.    Defendant Melissa J. Ballenger ("Ballenger") joined WaMu in August 2006 as

8

9  Senior Vice President and Assistant Controller.  Ballenger became Controller in March 2007,

10  serving as the Company's principal accounting officer.

11      29.    Defendants Woods and Ballenger are referred to herein collectively as the

12  "Controller Defendants."

13
**The Audit Committee and Finance Committee Defendants**
14
15      30.    Defendant Anne V. Farrell ("Farrell") served as a director of the Company from

16  1994 through April 2008.  During her tenure as a director, Farrell served on several committees

17  including the Finance Committee (2004-2008); the Governance Committee (1997-2004 and

18  2006-2008); and the Corporate Relations Committee (1997-2008, Chair 1997-2006).

19      31.    Defendant Stephen E. Frank ("Frank") has served as a director of the Company

20  since 1997, and since July 1, 2008, as Chairman of the Board.  During his tenure as a director,

21
   Frank has served on several committees, including the Audit Committee (1997-present, Vice
22
   Chair 2001-2004, and Chair 2004-present); the Finance Committee (2001-present); the Human
23
24  Resources Committee (2002-present); and the Corporate Development Committee (2002-

25  present).

26

27

28

32.     Defendant Thomas C. Leppert ("Leppert") has served as a director of the Company since September 2005. During his tenure as a director, Leppert has served on several committees including the Audit Committee (2005-present); the Governance Committee (2005-present, Chair 2008-present); and the Corporate Relations Committee (2005-present, Chair 2007-2008).

33.     Defendant Charles M. Lillis ("Lillis") has served as a director of the Company since June 2005.  During his tenure as a director, Lillis has served on several committees including the Finance Committee (2005-present); the Human Resources Committee (2005-present); and the Corporate Development Committee (2005-present).

34.     Defendant Phillip D. Matthews ("Matthews") has served as a director of the Company since 1998.  During his tenure as a director, Matthews has served on several committees, including the Audit Committee (2001-2007); the Finance Committee (2001-2004); the Governance Committee (1998-present); the Human Resources Committee (2004-present); and the Corporate Development Committee (2006-present).

35.     Defendant Regina Montoya ("Montoya") has served as a director of the Company since April 2006.  During her tenure as a director, Montoya has served on the Finance Committee (2006-present) and the Corporate Relations Committee (2006-present, Chair 2008-present).

36.     Defendant Michael K. Murphy ("Murphy") has served as a director of the Company since 1985.  During his tenure as a director, Murphy has served on several committees, including, among others, the Audit Committee (2004-present); the Finance Committee (2001-present, Chair 2001-2004); and the Corporate Relations Committee (2000-present).

37.     Defendant Margaret Osmer-McQuade ("Osmer-McQuade") has served as a director of the Company since 2002.  During her tenure as a director, Osmer-McQuade has

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 15

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

served on several committees, including, among others, the Finance Committee (2002-present); the Governance Committee (2002-present); and the Human Resources Committee (2005-present).

38.     Defendant Mary E. Pugh ("Pugh") served as a director of WaMu from 1999 until April 2008.  During her tenure as a director, Pugh served on several committees, including the Finance Committee (2001-2008, Chair 2004-2008) and the Corporate Relations Committee (2000-2008).

39.     Defendant William G. Reed, Jr. ("Reed") has served as a director of the Company since 1970.  During his tenure as a director, Reed has served on several committees, including the Audit Committee (from at least 1996-present); the Finance Committee (2004-present); and the Governance Committee (from at least 1996-present, Chair from at least 1996-2008).  Reed has also served as a director for WaMu subsidiary, Washington Mutual Bank.

40.     Defendant Orin C. Smith ("Smith") has served as a director of the Company since July 2005.  During his tenure as a director, Smith has served on the Audit Committee (2005-present), the Governance Committee (2005-present), and the Finance Committee (Chair 2008-present).

## C.     Relevant Non-Parties

### First American Corporation

41.     First American Corporation ("First American") is organized under the laws of California and has its executive offices at 1 First American Way, Santa Ana, California 92707.

42.     First American operates in all fifty states, except Iowa.  First American provides appraisal services to mortgage lenders, real estate agents, investors, and other businesses requiring valuations of real property.  According to First American's website, it provides "quality

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 16

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

settlement services that rank number one in their industries, including appraisal and property valuation."

43.   First American's consolidated revenue in 2006 and 2007 was $8.5 and $8.2 billion, respectively.  These amounts reflected revenue for First American and all of its controlled subsidiaries.   Significantly, according to First American's 2008 Form 10-K, operating revenues for its Property Information segment increased 23.5% from 2006 to 2007, in large part from growth in the appraisal division.

44.   At all times relevant to this Complaint, First American eAppraiseIT ("eAppraiseIT"), a Delaware Corporation, was a wholly-owned subsidiary of First American. eAppraiseIT is a provider of real estate valuation products and services.  On its webpage, eAppraiseIT touts its nationwide presence and "extensive experience and knowledge in both the valuation and lending arenas."

45.   According to its website, eAppraiseIT offers both traditional valuation services, including desk and field reviews, as well as on-line and electronic valuation services.  First American, which discusses eAppraiseIT as part of its public reporting in 2006, highlighted its purportedly unbiased, third party evaluations through eAppraiseIT, which it claimed aided real estate professionals, home owners, and lenders to accurately determine value and mitigate risk.

46.   WaMu first contracted with eAppraiseIT in April 2006 to conduct appraisals that previously had been handled by a large, in-house WaMu staff.  On November 1, 2007, the State of New York filed suit against the First American and eAppraiseIT (the "NYAG Complaint"), alleging that WaMu had handpicked appraisers and otherwise manipulated the appraisal process through eAppraiseIT to increase values in appraisal reports related to WaMu loans.  The NYAG Complaint further alleges that while publicly touting its independence, eAppraiseIT was directed

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 17

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

by First American to continue the fraudulent conduct and allow WaMu to artificially boost appraisal values at WaMu's behest.

47.    According to the NYAG Complaint, eAppraiseIT conducted more than 260,000 appraisals for WaMu, receiving over $50 million from WaMu.  WaMu suspended its relationship with eAppraiseIT late in the Class Period, on or about November 2007.

**Lenders Services Inc.**

48.    Lenders Services Inc. ("LSI") provides appraisal, title, and closing services to residential mortgage originators and is a competitor of eAppraiseIT.  Since 2003, LSI has been a Fidelity National Financial subsidiary.

49.    LSI is headquartered in Coraopolis, Pennsylvania, and, as of June 2008, had more than 600 employees.  LSI has seven main business services, including Property Valuation, which consists of traditional and automated appraisals.

50.    As explained in detail herein, starting in mid-2006, like eAppraiseIT, LSI provided significant appraisal services to WaMu pursuant to an agreement between WaMu and LSI.

**V.    CLASS ACTION ALLEGATIONS**

51.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired securities issued by WaMu and its subsidiaries and that traded on an efficient market,[3] during the period from October 19, 2005 through July 23, 2008 (as defined above the "Class Period"), and were damaged thereby (the "Class").  Excluded from the

---

[3]  This excludes, for instance: (i) purchasers of certificates of deposit offered by WaMu or its subsidiaries; and (ii) purchasers of pass-through securities that are not general obligations of WaMu.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 18

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of WaMu, the Auditor Defendant, or any of the Underwriter Defendants during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; (vi) purchasers of the equity securities issued by WaMu in connection with the $7 billion capital issuance pursuant to the agreements entered into by and among TPG Capital and WaMu and other investors as announced by the Company on April 8, 2008 (the "TPG Deal"), to the extent that such purchasers acquired and/or converted their securities pursuant to the Registration Statement filed with the SEC on or about May 2, 2008 and as described in the Form SC 13D filed with the SEC on July 3, 2008 as well as in the Company's April 15, 2008 and July 2, 2008 press releases[4]; and (vii) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

52.    The Class is so numerous that joinder of all Class members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, WaMu's common stock was actively traded on the NYSE, which is an efficient market.  As of January 31, 2007, there were over 880 million shares of WaMu common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be determined through appropriate discovery, Lead Plaintiff believes that Class members number in at least the hundreds of thousands.

---

[4]  These purchasers are excluded as atypical of the Class due, at least in part, to the distinct rights and opportunities afforded them in connection with the TPG Deal.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 19

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

53.     The claims of Plaintiffs are typical of the claims of other Class members. Plaintiffs and all Class members acquired their WaMu securities shares on the open market or pursuant to the Offerings and sustained damages as a result of Defendants' conduct alleged herein in violation of the federal securities laws.

54.     Lead Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

56.     There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members.  Such common questions of law and fact, include, among others:

        (a)     Whether Defendants violated the federal securities laws;

        (b)     Whether documents, press releases and public statements made by the Defendants during the Class Period concerning the Company's financial and operational position, including statements concerning the Company's financial results, contained misstatements of material fact or omitted to state material facts necessary in order to

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 20

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    Whether WaMu's SEC filings issued during the Class Period which contained financial information (*i.e.* its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;

(d)    Whether the market prices of WaMu securities during the Class Period were artificially inflated due to the material misrepresentations complained of herein;

(e)    Whether with regard to claims under the Exchange Act, certain of the Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    Whether the Offering Documents (as defined below) contained material misstatements or omitted to state material information; and

(g)    Whether Class members have sustained damages and, if so, the appropriate measure thereof.

57.    Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

58.    The names and addresses of record owners of WaMu securities purchased on or traceable to the Offerings and during the Class Period are available from records maintained by WaMu or its transfer agent.  Notice may be provided to such record owners via first class mail, using techniques and a form of notice similar to that customarily used in securities class actions.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 21

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

## VI.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    WaMu and Its Core Home Lending Business

59.    The focus of this action, WaMu's residential lending business, was a driving force of WaMu's overall operations during the Class Period.  It is beyond dispute that WaMu's lending operations were a significant contributor to the Company's income and also generated a substantial portion of the Company's assets.  For example, in both its 2006 Form 10-K, filed with the SEC on March 1, 2007, and its 2007 Form 10-K with SEC, filed on February 29, 2008, the Company stated that almost 70% of its net interest income was generated by residential real estate loans and related products.  Similarly, in its Forms 10-K for 2006 and 2007, WaMu also stated that over 60% of the Company's overall average assets were generated by residential real estate loans and related products.

60.    Throughout the Class Period, WaMu originated – that is, "sold" to its borrowers – residential loans through its retail and wholesale lending operations, which were primarily issued through WaMu's Home Loans and Commercial Groups.

61.    As a requirement to a WaMu home loan becoming effective, or "closing," WaMu had to underwrite and approve the loan.  That is, WaMu must ensure that the borrower qualifies for the loan product in question under the Company's underwriting standards, based upon documentation of the borrower's credit history and score, income, debt level, and other factors.  As explained in detail in Section VI.C below, a critical requirement in residential loan underwriting is the home appraisal, which is supposed to be an independent assessment of the market value of the real estate pledged by the borrower as collateral against the WaMu loan.

62.    After originating home loans, WaMu either (a) retained the loans as investments in its "held for investment" portfolio, which generally were reflected as assets in the Company's

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 22

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

public financial reports and in other information disseminated to the public; or (b) held such loans for sale, and, accordingly, securitized or otherwise sold off such loans to third parties in due course, primarily through the Capital Markets Division of WaMu's Home Loans Group ("WaMu Capital Corp.").

63.     As noted above, WaMu reported significant income from its home lending operations during the Class Period.  With regard to its loans "held for investment," however, as explained in detail in Section VI.E, WaMu was also required to maintain and publicly report a reserve amount for probable losses related to such loans (for example, losses from WaMu borrowers defaulting on their obligations to make mortgage payments).  WaMu referred to its loss reserve as its Allowance for Loan and Lease Losses (the "Allowance").  WaMu's Allowance was one of only five "earnings drivers" that the Company discussed each quarter, and was a critical metric for investors because, as the Company's 2006 Form 10-K explained, "[t]he [Allowance] represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date."  As explained in greater detail in Section VI.E, below, WaMu was required to periodically reassess and adjust its Allowance, or "provision," for any such loan and lease losses.  Increases in the Allowance reduce, dollar for dollar, WaMu's earnings because such charges are recorded as an expense.  Therefore, WaMu's reported Allowance was directly linked to net income and the Company's earnings per share.

64.     Throughout the Class Period, WaMu made representations and warranties concerning the quality of WaMu's loans to third-party purchasers of its residential loans.  The quality of WaMu's loans was, for readily-apparent reasons that include expected return and risk concerning such loans, important to third-party purchasers of WaMu loans.  In the event that such purchasers were to determine that the Company had breached its representations and

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 23

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    warranties, or if a borrower defaulted early in the term of the loan, such purchasers may hold

2    WaMu accountable for losses related thereto by requiring WaMu to repurchase the loans.  WaMu

3    was also required to maintain an appropriate reserve for such losses.

4
5         **B.**     **WaMu Abandons Customary Lending and Business Practices in Favor of Much Riskier Loan Products and Company Policies**

6
7    65.    In 2005, WaMu publicly announced, for the first time, its landmark, ambitious

8    five-year plan for the Company.  According to a February 28, 2005 press release, WaMu's plan

9    called for "[t]ransforming the company's mortgage business and maintaining a leading national

10   position in mortgage lending," while also "[m]aintaining risk management as a top priority."

11   66.    WaMu's new plan coincided with the ascendancy of a new senior management

12   regime at WaMu.  While Defendant Killinger maintained his long-standing position as both CEO

13   and Chairman of WaMu's Board, in January of 2005, Defendant Rotella joined the Company as

14   President and Chief Operating Officer.  Defendant Rotella became the acting president of the

15   Home Loans Group in March as well.  In July of 2005, Defendant Schneider was appointed as

16   the President of the Home Loans Group.  By the end of 2005, among other changes in senior

17   management, the Company also installed a new Chief Enterprise Risk Officer, Defendant

18   Cathcart, and a new Controller, Defendant Woods.

19
20   67.    At the same time, as detailed below, the Company began to promote riskier loan

21   products to both prime borrowers (*i.e.*, as discussed in Section VI.D.1, borrowers who appeared

22   to be substantially creditworthy) and subprime borrowers, while reducing the share of traditional,

23   fixed rate loans it originated.  Specifically, during the Class Period, the Company focused

24   heavily on originating loan products, such as WaMu's "flagship" product, the Option ARM loan,

25   and subprime loans that were "nonconforming"; that is, they did not meet the specifications

26
27
28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 24

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

required by the government-sponsored entities ("GSEs"), such as Freddie Mac or Fannie Mae. Traditionally, the GSEs provided liquidity to the home mortgage market by purchasing conforming loans and, in certain cases, securitizing the loans. Conforming loans impose certain standards, such as specific debt-to-income ratio limits and documentation requirements. Nonconforming loans, on the other hand, may be for much larger dollar amounts than conforming loans and made to less credit-worthy buyers. Because these nonconforming loans were riskier, WaMu could charge much higher interest rates and fees for their origination.

68.     While WaMu acknowledged publicly that it had altered its loan origination mix in favor of generating more loans with higher profit margins, WaMu and the other Defendants did not come close to revealing the full extent of WaMu's actual plans and business practices during the Class Period. As explained below, with the start of the Class Period, WaMu's concerted efforts to transform itself from a sleepy savings and loan into a high-margin bank began to include highly questionable and unlawful practices directed by the Officer Defendants. These practices were implemented by the Officer Defendants to artificially fuel the growth that WaMu craved for their own personal short-term gain, all at the expense of WaMu investors.

69.     The truth gleaned through Lead Plaintiff's investigation is the result, in part, of numerous interviews with former employees who themselves witnessed the wrongdoing alleged herein. These include former employees of WaMu, eAppraiseIT, and LSI. These witnesses are referred to as Confidential Witnesses or "CWs," each with its own unique identifying number. Appendix 1 provides a summary of relevant information concerning each CW, including, as appropriate, the position(s) held by each CW, the time period during which each CW was employed, and a general description of the duties and responsibilities of the CW, if relevant. As Judge Posner recently noted in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 712

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 25

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1
2
3
4
5
6

(7th Cir. 2008), where confidential witnesses are "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify . . . the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions." Furthermore, should the Court so request, Lead Counsel will provide the identity of the confidential witnesses to the Court *in camera*.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

70.    Former long-time WaMu employees have described how, around the start of the Class Period, WaMu's most senior management in Seattle abandoned fundamental concepts of underwriting and risk management in order to satisfy the Officer Defendants' hunger for ever-greater loan volume. For example, CW 1, who worked at WaMu for over 17 years from 1991 until April 2008 as a Due Diligence Director in the Transaction Management Group in Anaheim and Fullerton, California, explained how, beginning in 2006, management in Seattle lost "sight of the basic tenants of underwriting and risk." Indeed, as a Due Diligence Director, CW 1 was responsible, among other duties, for all aspects of the due diligence process regarding prime, Alt–A, and subprime mortgages for the Company's held for investment portfolio. A key aspect of CW 1's role at the Company was to ensure that effective processes were in place to identify, assess, and quantify existing and emerging risks and offer solutions to mitigate those risks. CW 1 stated that the results of these analyses and suggested solutions to mitigate risks were reported to senior management in Seattle. CW 1 explained how, notwithstanding the reporting structure that was in place, beginning in 2006, with the Company's focus on amplifying loan volume in an effort to generate more money, management in Seattle abandoned "the basic tenants of underwriting and risk." Specifically, CW 1 explained that WaMu's senior management was so intent on increasing loan volume and on acquiring and securitizing more mortgages that

28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 26

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

management in Seattle disregarded the "warning signs" and "several red flags" apparent to them, even in early 2006, of the "increased risks that the Company was entering into."

71.    CW 1 further stated that the significant problems at WaMu resulted from senior management choosing to ignore the basic structure and safeguards that were already in place in furtherance of their own ambition for growth and the monetary rewards it brought to them.

72.    Other long-time WaMu employees echoed CW 1's sentiments, albeit from their own roles and vantage points within the Company.  For example, Confidential Witness 2 worked at WaMu for over twelve years, from 1995 until 2008.  From 2005 to 2008, CW 2 was employed as an Underwriting Supervisor by WaMu in Bellevue, Washington.  Prior to that time, CW 2 worked as a Senior Credit Analyst with WaMu from 2003 through 2005, and prior to that role CW 2 was a Senior Loan Coordinator with WaMu from 1997 to 2003.  CW 2 observed a marked deterioration in WaMu's underwriting standards and practices for the Company's prime loans starting in 2005, subsequent to WaMu's hiring of Defendant Rotella as President and Chief Operating Officer of WaMu in early 2005.  According to CW 2, she and other long-time WaMu employees could "sense the change" initiated by the Officer Defendants.  Regarding the increased risks the Company was taking on at the Officer Defendants' behest, CW 2 observed that "common sense took a vacation."  Similarly, CW 3, a former WaMu Assistant Vice President and Branch Manager in California from 1996 until early 2008, described WaMu's loan approval process after 2005 as "very scary."    In particular, CW 3 stated that, starting in 2005, the Company's loan approval process became "very lenient" and allowed employees to do "whatever" was necessary "to get a loan approved."    CW 3 described the Company's widespread leniency as disturbing, stating, "[i]t was very scary to me at the company to see these types of things going on."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 27

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

73.    Consistent with the observations of these insiders and other described below, throughout the Class Period, WaMu, at the direction of the Officer Defendants, secretly inflated appraisal values in connection with its lending, materially loosened its underwriting standards without disclosure, and also discontinued appropriate risk management that was supposed to be in place to prevent such policies.  In addition to these practices, Defendants, in violation of law and GAAP, caused WaMu to under-reserve for losses that were probable – if not entirely foreseeable – in light of the foregoing highly reckless practices.   These facts are described in further detail below.

### 1.    WaMu's Risky, Nontraditional Loan Products

74.    In order to maximize the Company's loan volume and the appearance of growth and profitability, WaMu strayed from traditional, high-quality, and fixed-rate lending to promote instead numerous types of nontraditional loans.  Principal among WaMu's exotic loans were its Option ARM loans, a form of adjustable rate mortgage (ARM) loans (a loan where, instead of a fixed rate of interest, the interest rate is periodically adjusted over the term of the loan based on indices such as Treasury securities or the London Interbank Offered Rate ("LIBOR")).  As explained in greater detail below, Option ARM loans were unique among ARM loans in that they give the borrower the option each month to make either a full, interest-only, or a "minimum payment."  ***Option ARMs were WaMu's self-proclaimed "flagship product" and made up the majority of WaMu's "prime" mortgage originations during the Class Period, as well as the majority of the loans in WaMu's "held for investment" portfolio of loans.***[5]   Chart 1 below illustrates that throughout the Class Period, Option ARM loans ***always*** made up more than fifty

---

[5]  Throughout this Complaint, emphasis has been added unless otherwise stated.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 28

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   percent of WaMu's held for investment loan portfolio.  For example, as illustrated below, in the

2   fourth quarter 2006, Option ARM loans comprised $63.6 billion – or 64% – of WaMu's entire

3   $99.5 billion loan portfolio.



**Chart 1:  Option ARM Loans as a Proportion
of WaMu's Single-family "Prime" Residential Portfolio**

($ billions)

■ Option ARM Loans
■ All Other Loans

| | 3Q'05 | 4Q'05 | 1Q'6 | 2Q'06 | 3Q'06 | 4Q'06 | 1Q'07 | 2Q'07 | 3Q'07 | 4Q'07 | 1Q'08 | 2Q'08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Option ARM | $67.8 | $71.2 | $71.2 | $69.2 | $67.1 | $63.6 | $58.1 | $53.5 | $57.9 | $58.9 | $58.1 | $55.8 |
| All Other | $43.8 | $42.9 | $52.6 | $56.0 | $54.0 | $35.9 | $35.4 | $35.0 | $48.0 | $51.5 | $35.2 | $52.5 |

75.     WaMu's Option ARM minimum payment option is based on the interest rate

charged during the introductory period, and is almost always significantly lower than the loan's

fully-indexed payment rate.  The fully-indexed rate is calculated using an index rate plus a

margin.  When the introductory or "teaser" period ends, typically after a period of several

months, the contractual interest rate charged on the loan increases to the fully-indexed rate and

adjusts monthly to reflect movements in the index.  For example, a teaser rate of 1.75% on a

$350,000, 30-year loan would yield an initial monthly payment of approximately $1,250.  Once

the rate adjusts to the fully-indexed rate on the same loan, for example, to a rate of 7.0%, the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 29

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    monthly payment would increase from $1,250 to a monthly payment of approximately $2,329 –

2    an approximate monthly increase for the borrower of over $1,079, or nearly twice borrower's

3    initial payment.

4        76.    If a WaMu Option ARM borrower continues to make only a minimum monthly

5    payment after the introductory period ends, his or her payments may not be sufficient to cover

6    the interest accrued on his or her loan.  This results in so-called "negative amortization" of the

7    Option ARM loan as unpaid interest is deferred and added to the loan's principal balance.

8    During the Class Period, WaMu "capped" the amount of negative amortization on its Option

9    ARM loans from 100% to 125% of the original loan balance.  So if a WaMu borrower reaches

10   the negative amortization cap (or at least every 60 months), the borrower's WaMu loan was

11   subject to "recasting," where a new minimum monthly payment is calculated that is sufficient to

12   fully repay the principal balance of the loan, including any theretofore deferred interest, over the

13   remainder of the loan term using the fully-indexed rate then in effect.

14       77.    WaMu booked negative amortization amounts on its Option ARM loans as

15   deferred interest earnings on its income statement, ***thereby reporting non-cash income created

16   solely from a borrower's failure to pay full interest.*** As a result, explained Confidential Witness

17   4, a former account executive for LBM in New Jersey for more than four years from April 2003

18   to September 2007, Option ARM loans were known internally at WaMu as "the portfolio

19   product" because WaMu could keep its Option ARM mortgages in-house on the Company's

20   books and record the deferred interest from them as income.  During the Class Period, the unpaid

21   Option ARM principal balance, which was recorded by WaMu as non-cash income, rose from

22   $76 million in the third quarter 2005 to $1.7 billion in the fourth quarter 2007.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 30

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

78.     During the Class Period, as alleged in detail below, the Company falsely represented that it was managing the Company's risk associated with its Option ARM products by ensuring compliance with appropriate underwriting standards, appropriately monitoring loan performance and conducting risk modeling procedures, when in fact it was not doing so.  For example, although the Company claimed that it did not offer Option ARM loans to subprime borrowers, as alleged in greater detail below, WaMu in fact issued Option ARM loans to borrowers with credit scores as low as 540, when any credit score below 660 is generally considered subprime.  Moreover, as discussed below, WaMu inappropriately underwrote many of its Option ARM loans at the loan's introductory interest rate, rather than, as the Officer Defendants continually represented throughout the Class Period, at the loan's fully-indexed interest rate.  In other words, WaMu often qualified its Option ARM borrowers based their ability to pay temporary, very low "teaser" interest rates rather than the much higher interest rates that would be in place for the overwhelming majority of the Option ARM loan term.

79.     WaMu also offered stated-income loans, which are mortgages in which the lender does not verify the borrower's income by examining their pay stubs, W-2s, bank statements, tax documents or other records.  Instead, WaMu simply asked the borrower for his or her income and took any such representations at face value.  Due to the lack of verification, stated-income loans are particularly risky.  While these loans were initially intended for self-employed borrowers with good credit, WaMu extended them even to subprime borrowers.   Similarly, "no-doc" or "low-doc" loans refer to loan products offered to borrowers that require little to no documentation from the borrower.   When these loans were extended to borrowers with purportedly good credit who simply did not wish to offer documentation, WaMu referred to them as "Alt-A" loans.  These types of loans were often called "liar loans."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 31

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

80.    WaMu extended <u>subprime mortgage loans</u>, which are mortgages that are offered to relatively less creditworthy borrowers, and, like the various non-traditional ARM products described above, typically cannot be sold to GSEs such as Fannie Mae and Freddie Mac. Subprime lending is risky for lenders due to the frequently poor credit histories of subprime borrowers, and the higher interest rates that typically are charged for such loans.  Throughout the Class Period, the Company falsely stated in its annual SEC filings that it mitigated credit risk in its subprime lending through careful underwriting.

81.    In addition to the types of exotic and risky loans described above, WaMu also offered loans that did not require a down payment, so-called "<u>100% LTV loans,</u>" and "<u>80/20 loans</u>" (where the buyer took out two loans, one for the 80% of the purchase price and another for 20% of the purchase price, to avoid requiring the borrowers to obtain paying private mortgage insurance ("PMI")); "<u>hybrid ARMs</u>," where the initial interest rate is fixed for some period of time, usually two to five years, and then "floats," or changes according to an established banking index, thereafter; <u>home equity lines of credit ("HELOCs")</u>, which allowed homeowners to leverage existing equity in their homes by borrowing money either through a first or second lien loan or line of credit; <u>WaMu mortgage plus™ loans</u>, introduced in April 2007, which combined a first mortgage and HELOC into a single loan, among other features; and <u>interest-only ("IO")</u> payment loans, which required borrowers to pay an amount sufficient only to cover the amount of interest accrued in the previous month, and then after a predetermined period of time (usually 5 years), the payment is reset to allow the loan to fully-amortize over its remaining life.

82.    Although WaMu and the Officer Defendants claimed that WaMu issued the loans described above only to borrowers that WaMu deemed qualified after "rigorous" underwriting

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 32

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

for each of these exotic loan products, as can be seen throughout this Complaint, as a matter of policy the Company in fact actively took undisclosed, unlawful and unsafe measures to increase its volume of such loans.

### 2. WaMu Aggressively Pushed Risky Loans on Borrowers for Defendants' Gain

83.    WaMu, at the direction of the Officer Defendants, established a system of financial rewards for originating higher-risk loans, and corresponding negative consequences for those who did not toe the Company line.  As explained immediately below, WaMu loan production personnel were compensated based on loan volume without any regard to loan quality, and were paid even more for originating riskier loans, including Option ARM loans. WaMu's employees, accordingly, targeted more and more borrowers who were less able to afford the loan payments they would have to make, and many of whom had no realistic ability to meet the obligations incident to the loans they were sold.

84.    WaMu's loan volume-based compensation policies were explained – and openly questioned – by a number of former WaMu employees contacted in the course of Lead Plaintiff's investigation.  As Confidential Witness 5, a former Senior Underwriter, Credit Risk Manager, and Credit Quality Manager at WaMu's Bellevue, Washington wholesale and retail loan fulfillment center from 2003 until February 2008, explained with regard to WaMu's loans, "[t]he more you slammed out, the more you made."

85.    Also, Confidential Witness 6, Senior Loan Consultant with WaMu from 2005 to 2007, observed that sometimes loan originators were surprised by what loans they could get approved; however, as a loan officer, if CW 6 could personally earn $2,000 - $3,000 by closing a loan, then CW 6's only concern was getting the loan approved.  The lesson learned within WaMu, according to CW 6, was: "Once you get paid, you don't care what happens."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 33

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

86.    Other former employees agreed that the primary factor driving WaMu's mortgage lending practices was to produce as much volume as possible.  Confidential Witness 7, who was a Closing Loan Coordinator in Bethel Park, Pennsylvania, from 2003 until July 2007, stated that WaMu's priority regarding loans was "always quantity rather than quality."  According to CW 7, during the Class Period, the Bethel Park branch regularly closed an "insane" volume of loans per day.  WaMu could meet these volume expectations only by neglecting traditional underwriting standards – as CW 7 put it, "[i]f you flew by the seat of your pants and didn't look at everything, you could get it done."  Consistent with the reports of numerous other former WaMu employees, CW 7 reported that WaMu management constantly pressured underwriters to close as many loans as possible.  Underwriters were given the freedom to waive many conditions for approval of loans, such as required assets and debt-to-income requirements.  According to CW 7, WaMu managers "tried to appease the loan officers" and underwriters "definitely waived conditions they should not have waived."  CW 7 observed that the branch head was most concerned with "look[ing] good among her peers" by "hitting certain numbers every month."  WaMu rewarded high-performing loan officers with "fabulous vacations" if they made their numbers.  CW 7 summed up the culture at WaMu as follows:  "It was all about sell, sell, sell."

87.    Loan originators were not only compensated for volume without regard for quality – they were paid more for originating loans that carried higher profit margins for the Company and had commensurately higher credit risk.  For example, Confidential Witness 8, a Senior Loan Consultant with WaMu at Riverside, CA, from 2005 through December 2007, reported that, "every year [WaMu] came out with a new commission outline and [WaMu's] extra commissions for teaser rate loans."  Further, according to CW 8, occasionally WaMu would send out emails to loan originators about commission "specials."  One of WaMu's "specials," CW 8

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 34

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

recalls, was to give loan originators extra commissions for Option ARM loans. In addition, WaMu paid additional commissions for non-conforming loans. According to CW 8, at WaMu "[i]t's not about what's best for the client; it's about what's best for the Company." CW 8, who served as a Senior Loan Consultant for the Company from September 2005 until December 2007, also noted that WaMu's higher risk loans always came with increased commissions.

88.    Similarly, Confidential Witness 9, a former Senior Loan Coordinator for WaMu's Home Loan Center in Bethel Park, Pennsylvania from February 1998 through September 2007, elaborated on WaMu's volume-based compensation for its loan originators. CW 9 stated that "WaMu's top priority was to get as many loans closed as quickly as they could close and not worry – they just wanted the volume, and it didn't seem to matter how they got it . . . . Everybody just wanted their chunk of the money."

89.    CW 9 recalled that near the end of 2006, WaMu started rapidly introducing new programs – "[second loans] were constantly being thrown in with all the firsts . . . it seemed every file was coming over with a second attached," which led to high combined LTV ratios for loans issued to WaMu borrowers. CW 9 explained that during the Class Period, "[I]t got really bad. You saw a lot of Adjustable Rate Mortgages – we always had them, but they were not a big item, and then all of a sudden they became real popular, then everything that was coming in was an ARM loan with a second attached – I could see why people were losing their homes – all it was greed, you could see it in the loan officers." CW 9 also noted that "a lot" of the borrowers "didn't even understand what [an ARM] was" and CW 9 would "feel bad for the customers."

90.    According to CW 9, not only did loan coordinators receive bonuses for loans they closed, but CW 9 understood that if loan officers did not meet their loan volume quota, WaMu fired them.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 35

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

91.    In fact, intense pressure from WaMu management to close loans – WaMu's "stick" – went hand-in-hand with WaMu's rich incentives for its salespeople to originate the maximum number of loans possible.  As numerous former WaMu employees reported below, WaMu management leaned heavily on WaMu's personnel to "close" loans at all costs.  In other words, WaMu management pressured its employees to do whatever was necessary – including, as set forth below, disregarding Company underwriting policies and approving wide-ranging exceptions to underwriting guidelines – to close loans.  According to Confidential Witness 10, a Loan Coordinator/Mortgage Processor for WaMu in 2007, there was a Company-wide culture that required WaMu employees to do "whatever it took to get loans closed."  WaMu managers would constantly convey to WaMu underwriters and salespeople that they had to "push, push, push" to close loans.

92.    CW 10 reported that WaMu loan originators were instructed by their WaMu managers that if there were problems with underwriters in getting loans closed to bring loan files to WaMu managers – WaMu's policies encouraged loan production management to see to it that the loan went through.

93.    Similarly, Confidential Witness 11, a Senior Loan Coordinator with WaMu in San Antonio from November 2006 to June 2007, recalled "tremendous pressure from the sales guys to approve loans" and that, with the involvement of WaMu management, even questionable loans "usually got taken care of one way or another."  CW 11 further explained that WaMu's loan sales personnel and their managers were "above [WaMu's] loan processors," and therefore WaMu's loan processors "were supposed to yield to whatever their needs were."

94.    Confidential Witness 12, a former Loan Consultant for WaMu in Riverside, California, reported that because of WaMu's additional incentive compensation, WaMu

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 36

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

salespeople undertook particularly aggressive tactics to sell Option ARM loans. As CW 49 put it, "WaMu's biggest things are ARMs – they push those things like cotton candy." According to CW 12, "most borrowers" who came to WaMu "wanted the fixed rate loans." Thus, selling Option ARM loans required "pushing" them. According to CW 12, this "pushing" was done in a "nasty" way. WaMu loan officers would fail to educate the borrower, so that Option ARM loan borrowers "would think they were paying the fully-indexed rate, when they were only paying a portion of the interest" because the loan consultants did not explain the programs thoroughly. WaMu loan consultants were under "a lot of pressure" from their managers to promote and sell Option ARM loans. CW 12's conscience limited CW 12 to originating only "one or two" Option ARM loans because CW 12 was so opposed to these "risky" loans. As a result, CW 12 was frequently reprimanded by CW 12's managers at WaMu.

95.     Likewise, Confidential Witness 13, a Sales Manager with WaMu for twenty years until October 2006, was "bothered" by the fact that WaMu incented loan officers to push Option ARM loans on WaMu loan applicants. According to CW 13, WaMu managers also received increases in their bonuses if they closed a certain percentage of Option ARM loans. According to CW 13, the incentives to promote and close Option ARM loans remained "pretty consistent" over the Class Period: it was clear to WaMu sales managers that WaMu wanted to "drive" as many borrowers as possible into Option ARM loans.

96.     Indeed, it was not unusual for WaMu to fail to educate borrowers on the dangers of Option ARM loans. This was so notwithstanding Defendant Killinger's statement that, "[w]e understand that the best mortgage customer is a well-informed borrower and that's why we focus on providing clear, understandable disclosures for our customers and ongoing training for our sales force. . . . [T]he quality of our option ARM portfolio remains strong."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 37

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

97.    In truth, WaMu customers were confused by the Company's complex and ever-changing loan products and were often convinced to commit to adjustable-rate loans with the misunderstanding that the "teaser" rate was the loan's rate for its entire length.    Indeed, according to CW 7, who was a Closing Loan Coordinator in Bethel Park Pennsylvania, WaMu's Option ARM products "were not explained properly to the buyer, so they didn't know the rate was going to go up."  CW 5 believed that the "majority" of Option ARM loan borrowers did not understand that their payment would increase from the initial teaser rate.

98.    Confidential Witness 14 was an employee at WaMu from 1993 to 2006 and was a "Senior Trainer" from 2000-2004, training employees on processing, closing, underwriting, leadership, products, and pricing.    CW 14 found the products WaMu was pushing to be problematic, particularly the Option ARM.    According to CW 14, Option ARM loans were suitable only for rental, non-owner occupied properties or for "savvy investment people who play the stock market."    However, many of the WaMu sales people in CW 14's class did not understand the concept of negative amortization and could not explain it to borrowers.    Contrary to their public statements, the Company was more concerned with increasing loan volume than ensuring that borrowers actually understood the terms of their loans and therefore that the loans were being originated to borrowers who could not repay them.

99.    Indeed, a WaMu presentation on Option ARM loans, obtained through Lead Plaintiff's investigation, makes it clear that WaMu's focus was not on the borrower's understanding of the loan's terms or ability to repay the loan.  The presentation was entitled: "Washington Mutual Option ARM: At last a mortgage that puts your clients in control of their monthly payments."    The WaMu presentation announces that appropriate "Option ARM Candidates" are:

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 38

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

- Savvy Investors
- **_First Time Home Buyers_**
- High Income Earners
- **_Self Employed Borrowers_**
- **_Retired Borrowers_**
- Real Estate Agents

In other words, contrary to its public statements, WaMu pushed its Option ARM loans on borrowers regardless of their sophistication and income levels or stability.

100.    In addition, WaMu sought to sell exotic loans to borrowers who did not want or need such loans, but were convinced to take them by WaMu salespeople.  CW 7 recalls that Donna Krall, a WaMu Retail Operations Director, visited the Bethel Park, Pennsylvania branch and impressed upon the loan officers the importance of "pushing" home equity loans.  According to CW 7, Krall "put the pressure on" loan officers to "try to talk [borrowers] into home equity loans.  Instead of mortgage insurance, they would push two loans."  Because of the Company's compensation promotions, these second loans meant "monetary gain for the loan officers." Indeed, according to CW 7, these home equity loans regularly failed the regular audits performed by WaMu on selected loans – WaMu "never got to the point where the [home equity] loans were passing the audits."  However, home equity loans, like all second liens, were particularly dangerous if made to non-creditworthy borrowers.  These loans are typically reserved for borrowers with good to excellent credit scores.  However, CW 6 recalls a WaMu "First Lien Home Equity" product that focused specifically on non-owner or investment properties, or typically second homes. For that product, according to CW 6, WaMu was providing loans that equaled 90% of the total value of the homes in question.  CW 6 called this standard "unheard of" in the industry and extremely risky.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 39

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

101.    WaMu's LBM employees were also compensated for increasing loan volume, not for decreasing, or even considering, credit risk.  Confidential Witness 15 was a First Vice President in the Capital Markets Group at WaMu Capital Corp. in New York, New York, from October 2004 until December 2007.  CW 15 was in charge of Investor Relations, and responsible for working with the various investors in the securitized subprime products being structured and issued by the capital markets area.  CW 15 reported directly to Doug Potolsky and, as a senior management level employee, had close interaction with David Schneider and other senior executives within the Home Loans Group.  According to CW 15, WaMu specifically compensated the account executives and the underwriters at WaMu's LBM based on the volume of loans that they brought in and closed, with no consideration in their compensation structure relating to the quality of those loans.  According to CW 15, this practice led to many questionable tactics to simply increase loan volumes.

102.    Based on their direct experience with WaMu during the Class Period, former employees described WaMu's residential mortgage operations as "crooked" and "underhanded." For example, CW 16, a former WaMu employee from 1999 to 2006, who held numerous positions including Senior Appraisal Coordinator for properties located in California, Florida, Texas and Washington, said that WaMu's  "residential mortgage side was very crooked." Specifically, CW 16 stated that the residential mortgage division was especially underhanded in Orange County and Southern California, where, according to CW 16, WaMu "raped and robbed the people," especially Latinos.  CW 16 further explained that WaMu's residential mortgage operations were so crooked that "many WaMu employees absolutely refused to get their residential loans through WaMu."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 40

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

### 3. Defendants Discontinued Effective Risk Management During the Class Period

103.    Just as the Company was deliberately shifting toward higher-margin, high-risk loan products, WaMu and the Officer Defendants made an equally deliberate choice to shift the Company's risk management focus from being a "regulatory burden" to a sales-supporting, "customer service" role.

104.    According to the Company's regulatory filings, WaMu's Enterprise Risk Management supposedly:

> works with the lines of business to establish appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance. Significant risk management policies approved by the relevant management committees are also reviewed and approved by the Audit and Finance Committees [of the Board]. Enterprise Risk Management also provides objective oversight of risk elements inherent in the Company's business activities and practices and oversees compliance with laws and regulations.

Beginning in the fourth quarter of 2005, Defendant Cathcart was the head of WaMu's Enterprise Risk Management. When Defendant Cathcart was hired in November 2005 to lead Enterprise Risk Management, Defendant Killinger announced, "Ron has a proven track-record in developing and leading risk management organizations . . . . He is a seasoned professional with a deep understanding and familiarity with all facets of risk management." Cathcart replaced James Vanasek, who had been the Company' Chief Enterprise Risk Officer since 2004.

105.    As part of the Company's initiative – as led by the Officer Defendants – to transform WaMu into a high-growth, high margin business, WaMu secretly discontinued appropriate risk management practices during the Class Period. As explained in detail below, WaMu's risk management operations were purposefully pulled back, starting in late 2005, to such a degree that WaMu's risk management systems and personnel could no longer effectively protect the Company's investors from the increased risks that WaMu and the Officer Defendants

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 41

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

began to take on no later than the start of the Class Period. These looming risks then manifested themselves in several ways, including WaMu's highly irresponsible, volume-driven home lending, and its attendant wrongful appraisal and underwriting practices. Significantly, as explained in Section VI.E, even when WaMu's risk management teams identified critical problems with WaMu's business and accounting practices and brought those matters to the attention of WaMu's senior management, appropriate remedial actions were not taken.

106.    Confidential Witness 17 served as a Senior Vice President of WaMu's Enterprise Risk Management group from August 2001 until he chose to leave WaMu in September 2006. CW 17 came to WaMu in 2001 with over fifteen years of significant risk management and quantitative modeling experience at other major financial institutions. CW 17 managed a team at WaMu of approximately 35 quantitative analysts involved in various risk management functions, including compliance, performance measurement, quantitative analysis and risk reporting, and model validation. In general, CW 17 explained, his group had overall responsibility for establishing risk management policies, corporate governance and reporting frameworks. CW 17 explained that until WaMu began to cause its risk management policies and practices to deteriorate in late 2005, he was responsible for "enhancing the Company's quantitative modeling capabilities." CW 17 explained that his group's original purpose was to establish and maintain "a high-level of quantitative analysis through the institution" but, as explained below, those efforts were "undermined when [Defendant] Cathcart took over the group in 2006."

107.    CW 17 confirmed that, with efforts that began in late 2005 and that were largely spearheaded by Defendant Cathcart, WaMu "diverted from its original mandate" to guard against risk. For example, CW 17 explained that Defendant Cathcart managed "a specific initiative to move the risk management functions down into [WaMu's] business units," which, for example,

led to the establishment of a risk management group within WaMu's Home Loans Group. CW 17 explained that this development led to unqualified individuals heading various risk management functions at WaMu, and that this practice, among other practices and policies discussed below, "undermined the entire purpose of the Enterprise Risk Management initiative initiated by William Longbrake and Jim Vanasek [prior to late 2005] to adequately manage risk within the organization."

108. The detrimental effects of WaMu's new policies that began in late 2005 concerning risk management were well known to WaMu's senior management. CW 17 stated that as the Company took on higher risk activities, the risk guidelines established by his group "specifically quantified the increased level of risk that the Company was undertaking." However, according to CW 17, under the new structure implemented by Defendant Cathcart, the role of WaMu's risk management segment was supposed to be "advisory" only, and therefore warnings from Risk Management were not only discouraged, but were "very much ignored" under Defendant Cathcart's leadership.

109. Indeed, CW 17 explained that WaMu regularly compiled "Risk Reports" that "could be generated on a daily basis," and that the purpose of WaMu's Risk Reports was to verify that the Company as a whole was within guidelines ultimately established by WaMu's Board of Directors. According to CW 17, WaMu's Risk Reports were distributed "probably on a weekly basis" to all of WaMu's "C-level executives, including WaMu's President [Defendant Rotella], WaMu's Chief Risk Officer [Defendant Cathcart] and WaMu's CFO [Defendant Casey]," and were similarly provided to WaMu's Board of Directors on a quarterly basis.

110. *CW 17 explained that various Risk Reports were delivered to WaMu's senior management – including at least Defendants Rotella, Cathcart and Casey – during 2006*

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 43

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*"specifically quantified the fact that the Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines."* Indeed, CW 17 stated that *"the quantitative risk metrics pertaining to the loan portfolios fell out of the designated ranges on various occasions,"* but *WaMu's senior management – including Defendants Rotella, Casey and Cathcart – chose to "simply ignore" those clear and direct warnings.*

111. For example, CW 17 stated that in 2006, he specifically raised with Defendants Casey and Cathcart that the way in which WaMu's Home Loans Group was analyzing its subprime portfolio for risk was "just stupid," as such analyses "specifically violated the specific policies outlined by [WaMu's Risk Management] group," including disregarding the analytical models and methods that were supposed to be utilized to conduct WaMu's analyses of its loans. However, when CW 17 raised these issues directly with WaMu's senior management, his pleas for corrective was action were "simply overruled" by Defendants Casey and Cathcart. Because his efforts to implement adequate risk controls were rebuffed by the highest level executives at WaMu, CW 17 explained that "there was nothing that he could do about it."

112. Similarly, Confidential Witness 18, a Vice President in WaMu's Commercial Risk Department from April 2003 until June 2006, experienced WaMu's systematic marginalizing of the role and authority of WaMu's Risk Management. Before working at WaMu, CW 18 had earned a Masters in Business Administration and possessed nearly twenty years of experience in the banking industry, including significant experience acting as a risk management professional at the Federal Deposit Insurance Corporation.

113. During his tenure at WaMu, CW 18 witnessed a Company-wide shift in focus from strong credit management to a more "aggressive" posture toward risk. Indeed, this shift in credit culture was mandated by executives at the highest levels of the Company. CW 18 reported

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 44

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

that in fourth quarter of 2005, several of WaMu's credit risk managers from around the country were flown by WaMu to Seattle to attend a special meeting of WaMu's credit risk management. This meeting, which was held at the Washington Mutual Leadership Center, was headed by then-Chief Enterprise Risk Officer James A. Vanasek.  Vanasek informed the Company's credit risk managers that WaMu's senior management (which CW 18 understood to include the Officer Defendants) had concluded that the Company planned to be more "aggressive" in its lending and provisioning practices. According to CW 18, WaMu's risk managers were told that they were expected to cooperate with the Company's efforts to "push the envelope."   Shortly after delivering news of WaMu's new policy to WaMu's senior risk managers, Vanasek – who CW 18 described as WaMu's "incarnate risk management policy" while he was at WaMu – left the Company.

114.   The Officer Defendants' decision to marginalize WaMu's risk management function is also documented in an internal WaMu memorandum, obtained through Lead Plaintiff's investigation, dated October 31, 2005 (the "October 31, 2005 Memo").  The October 31, 2005 memo was authored by Melissa Martinez, WaMu's Chief Compliance and Risk Oversight Officer at the time, and apparently was circulated to all of WaMu's risk management personnel (including members of senior management).  CW 18 recalled receiving this memo and has confirmed that the October 31, 2005 Memo was circulated to other risk managers at WaMu. CW 18 further stated that such memos were understood by WaMu's risk managers to reflect company policy that WaMu employees were required to follow.

115.   The October 31, 2005 Memo explicitly states that WaMu's risk management functions were being guided through a "cultural change" and a "behavioral change internally." *Significantly, the October 31, 2005 Memo announced that, moving forward, risk management*

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 45

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*at WaMu must occupy a "customer service"-type function, rather than impose a "regulatory burden" on other Company segments.* According to CW 18, the October 31, 2005 Memo was intended to signal to WaMu's risk managers that they should "lay off" of those at WaMu who brought in revenue. Moreover, CW 18 stated that the message was heard loud and clear by WaMu's risk managers, who felt compelled by WaMu to become less vigilant about acting to identify and control risk at the Company.

116. As WaMu's risk management policies shifted in response to these directives from WaMu's senior management, CW 18 found himself increasingly disturbed by WaMu's new, much more lenient policies concerning risk management. In particular, he was troubled by several instances in which he refused to "bend the rules" or "look the other way" at the direction of WaMu management concerning risky lending practices. CW 18 raised these issues repeatedly, but his pleas for attention were ignored, and his attempts to prevent the risky practices from occurring were countermanded by his managers. Ultimately, CW 18 even went so far as to write to Defendant Rotella in early 2006 about his serious concerns about WaMu's increasingly lax and inappropriate risk policies. Defendant Rotella acknowledged receiving CW 18's written concerns, but the only consequence to his whistle-blowing that CW 18 observed was that WaMu fired him in June 2006.

117. Numerous other former WaMu employees have confirmed that the Company's risk management infrastructure and policies significantly deteriorated beginning in the latter half of 2005, at the direction of WaMu's senior management (including the Officer Defendants). Confidential Witness 19, former Senior Vice President, Compliance Manager, from 1997 through 2007, observed that the Company's risk management practices deteriorated significantly in late 2005 as its business plan contemplated significant increases in higher-risk lending.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 46

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

118.    According to CW 19, James Vanasek had previously sought to create a sound risk management structure at the Company.  CW 19 noted that Vanasek started to pull employees from the divisional credit and compliance areas up to a corporate or enterprise level, actions that CW 19 considered "very brave" because they were not strongly supported within the divisions or within the Company as a whole.  Vanasek ultimately established and directed Enterprise Risk Management, which was responsible for providing overall corporate risk oversight over each of the different business segments.  CW 19 claimed that Vanasek also had a keen interest in developing stronger home lending oversight.

119.    CW 19 attributed the decline in credit risk management to Defendant Cathcart's assumption of the role of Chief Risk Officer.  CW 19 explained that while Defendant Cathcart had previous professional experience in interest-rate risk management, he had little or no experience in overall compliance risk.  According to CW 19, Defendant Cathcart had no understanding of overall compliance risk, "did not want to learn it, and generally did not care for it."  CW 19 recalled that Defendant Cathcart was very focused on analytics and essentially unwound any progress that Vanasek had made in establishing an effective compliance and credit risk function within WaMu as a whole.  According to CW 19, Defendant Cathcart began to cut staff that managed compliance issues and created a large group of "analytics people" that did a lot of analysis that was "essentially irrelevant."

120.    Specifically, CW 19 recalled weekly staff meetings with the various compliance divisions where Gregory Imm, Senior Compliance Officer from the Home Loans Group, would "be very vocal" with Defendants Cathcart and Schneider about issues within the Home Loans Group concerning compliance and credit risk deficiencies, but Defendant Cathcart did not act upon the issues presented at such meetings.  Additionally, CW 19 reported that there were

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 47

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  weekly divisional meetings where both the senior compliance and credit risk officers would meet

2  with the operational heads.  In the case of WaMu's Home Loans segment, CW 19 explained that

3  Defendant Schneider held weekly meetings where Imm and Mark Hillis, Senior Credit Risk

4  Manager, would routinely report on any compliance and credit risk deficiencies.  In addition,

5  CW 19 recalled that the divisional compliance officers routinely provided reports directed to

6  Defendant Cathcart detailing any compliance issues surfacing within the divisions.  These

7  "tracking reports" maintained an "issues log" as well as action items.  CW 19 explained that each

8  of the compliance groups performed routine sample testing of loan products to determine any

9  compliance issues, if any, and these formed the basis of the compliance reports.  CW 19

10 summarized that, despite some of the specific issues taking place in the real estate and mortgage

11 markets in general during the Class Period, he believes that WaMu's "current predicament" is the

12 result of  "internal issues within WaMu" that "involve the lack of risk management" and

13 disregard for known problems, for which CW 19 attributes responsibility directly to Defendant

14 Cathcart

15        121.    Other witnesses confirm that WaMu deliberately restructured the Company's risk

16 management operations to function in more of a "support role" to loan production than as an

17 independent check against credit risk.  For example, Confidential Witness 20, who was a

18 Division Finance Officer and Senior Manager of Internal Controls with WaMu from 2002 until

19 December 2007, reported that at WaMu, in each division, the credit risk officers reported to the

20 President of that group.  In WaMu's Home Loans segment, Credit Risk Officer Cheryl Feltgen

21 reported directly to Defendant Schneider.  Thus, according to CW 20, Defendant Schneider had

22 extensive control over risk management within the Home Loans Group.  CW 20 attributed this

23 structure to Defendant Rotella's efforts to restructure credit risk reporting.  Confidential Witness

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 48

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

18 similarly lamented that Defendant Rotella was charged with managing both loan production and risk management in his role as WaMu's President and COO.  CW 18 explained that at most banks, credit risk officers report directly to the board of directors, rather than giving control over the Company's profits and for the Company's risk management to the same person, which presented a clear and irreconcilable conflict in CW 18's view.

122.    These hidden, risk-inducing changes took place throughout the Company's risk management structure.  Confidential Witness 5, a former Vice President and Senior Credit Quality Manager, from 2005 until February 2008 and was a "Senior Credit Risk Manager" from April 2004 through March 2005.  The Credit Risk program existed at WaMu only from spring of 2004 through spring of 2005 during which time, CW 5's group of Credit Risk Analysts analyzed proposed exceptions to the underwriting guidelines for WaMu's more complex loans.  CW 5 indicated that the group reviewed all those loans that had been declined by an underwriter and other loans that were considered complex or high risk.  According to CW 5, these high-risk loans included Federal Housing Administration ("FHA") loans, where the FHA guarantees loans for high-risk buyers, and first-time buyers purchasing a home under programs that provided for high LTV ratios.

123.    Importantly, CW 5 emphasized that during this timeframe, the Credit Risk Management program reported to Mark Hillis, while underwriters reported to Mark Brown.  According to CW 5, the Credit Risk program was beneficial because it helped to separate the exception process on specific and discreet high-risk loans from the constant pressure on underwriters to close loans by whatever means.  CW 5 further stated that members of the Credit Risk team could not be pressured as easily as underwriters and that they had the time to focus on

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 49

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    answering why an exception could or could not be made, as opposed to being overwhelmed by

2    the customer service mandate under which WaMu's underwriters were forced to operate.

3         124.    Confidential Witness 21 observed that WaMu's risk management was markedly

4    deficient while he was with the Company.  CW 21 was a Vice President and Senior Market Risk

5    Manager from 2005 through 2006.  CW 21 reported that although WaMu was attempting in 2005

6    to establish a presence in mortgage securitizations among the larger Wall Street banks, WaMu

7    did not yet possess the necessary sophisticated risk management systems.  CW 21 emphasized

8    the importance of having such systems in place before embarking on high-risk lending with the

9    goal of profiting through mortgage securitizations.  CW 21 reported that more standard risk

10   management systems maintained by other large institutions are deliberately independent.  In

11   these systems, there is a defined trade-off between risk and profit, such that clearly established

12   limits are put in place to limit exposure or risk that a bank is willing to undertake.  However,

13   according to CW 21, at WaMu the overall risk management model was deliberately set up to be a

14   more "cooperative" model between those who managed risk and the business units themselves

15   whose primary concern was to generate business.  According to CW 21, under the "more

16   cooperative model" established by WaMu, risk management served a more informative, less

17   regulatory function, such that the underlying goal was simply to "let's find a way to get things

18   done."  The trade-off at WaMu was clearly in favor of generating business.

19        125.    This profits-over-risk management approach was confirmed by CW 22 a

20   Residential Conduit Bulk Purchase Due Diligence Manager, Credit Operations Manager I, at

21   Washington Mutual Mortgage Securities Corporation in Florence, South Carolina from January

22   until October 2007.  CW 22 conveyed that WaMu "had a culture where the role of risk

23   management was subordinate to the objectives of the sales people," who "ran the show and

28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 50

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

they're not qualified to run the show." CW 22 explained that at WaMu there was a very negative perception of credit professionals and that, although the credit risk department was supposed to be independent of any influences of other departments within the company, the WaMu office in New York was "calling the shots" as to what loans were approved and not approved. CW 22 explained that at other companies' credit departments where CW 22 had worked before in CW 22's prior twelve years of experience in the mortgage industry, credit managers were allowed to make the decisions regarding credit risk. However, at WaMu that was simply not the case. CW 22 recalled that it was very disappointing to have WaMu employees, who had no experience in underwriting, due diligence, or credit risk, making and reversing credit decisions. At WaMu, CW 22 observed, the salespeople were in control of the entire process and management forced the Company's credit risk management professionals to take a subservient role to WaMu's sales objectives.

### C.    Defendants Secretly Corrupted WaMu's Appraisal Process

126.    During the Class Period, WaMu inappropriately, secretly, and broadly manipulated real estate appraisals related to its home loans business. As detailed below, WaMu's undisclosed illicit appraisal inflation practices involved, among other things:

- Direct and indirect exertion of intense pressure from WaMu personnel – including loan production (*i.e.*, sales) personnel – on appraisers to "hit" higher appraisal values;

- WaMu's refusal to use licensed appraisers other than those who WaMu sales personnel hand-picked for so-called "preferred" appraiser lists;

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 51

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

- WaMu policies designed to force appraisers to accede to WaMu's requests to raise appraisal values; and

- WaMu's systematic misuse of requests for reconsideration of value (so-called "ROVs") when independent appraisals did not "hit" values desired by WaMu.

These improper practices were pervasive during the Class Period.

127.    As alleged in great detail herein, Defendants' hidden appraisal practices caused WaMu to originate loans that had artificially low (*i.e.*, favorable) loan-to-value (defined above as "LTV") ratios and loans that otherwise never would have been approved at all.

128.    Defendants' efforts to rig the real property appraisal process relating to WaMu's loans were designed to artificially increase loan origination volume and therefore increase growth and revenue related to WaMu's core business – residential lending – and thereby make WaMu's financial condition appear healthier that it actually was.

129.    In addition, WaMu's undisclosed appraisal inflation had the effect of exposing WaMu shareholders to substantial undisclosed risk, including increased credit risk.  As explained in WaMu's 2006 Form 10-K:  "Credit risk is the risk of loss arising from . . . the availability and quality of collateral."  Thus, by misrepresenting the value of underlying loan collateral through its program of appraisal manipulation, WaMu exposed shareholders to a substantial undisclosed risk of loss from WaMu loans in WaMu's "held for investment" portfolio and to a substantial undisclosed risk on loans originated by WaMu and "held for sale" (that is, sold to third parties or securitized), due to a contingent risk of loss upon the exercise of recourse upon default of such loans or the discovered violation of the representations and warranties associated with such loans, both of which would force WaMu to repurchase such loans.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 52

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

130.    Indeed, as discussed in Section VIII, the Officer Defendants frequently referred to purportedly low LTV ratios concerning the Company's portfolios of loans to reassure investors that the Company was not taking on an inordinate amount of credit risk.  According to Defendant Rotella, the Company's reported LTV ratios gave the Company a "measure of protection against losses going forward, because we do have a fair amount of cushion in those portfolios on average."

131.    Also, as explained in greater detail in Section VI.E, to make matters worse, WaMu under-reserved for loan losses, at least in part, based upon misstated collateral values resulting from its publicly undisclosed, systematic appraisal manipulation.  This is because, as stated in WaMu's 2006 Form 10-K, "[t]he estimation of the allowance [for loan and lease losses] is based on a variety of factors, including. . . the estimated value of underlying collateral. . . ."

132.    WaMu's shocking misconduct concerning appraisals began to come to light publicly when the NYAG Complaint was filed on November 1, 2007.  The NYAG Complaint is available at http://www.oag.state.ny.us/press/2007/nov/EA%20Complaint.pdf.  Although the NYAG Complaint named only First American and eAppraiseIT as defendants, the New York Attorney General's office made clear that: "Washington Mutual has not yet been sued [by the New York Attorney General's office] because of questions over federal jurisdiction."  *See New York Widens Inquiry on Mortgages,"* New York Times, November 8, 2007.  In fact, on November 7, 2007, NYAG Cuomo broadened his attack on the Company by announcing the expansion of his investigation into WaMu's fraudulent appraisal practices to include an examination of the loans that WaMu sold to Fannie Mae and Freddie Mac, the nation's two biggest providers of mortgage financing.  Specifically, NYAG Cuomo stated:

> The integrity of our mortgage system depends on independent
> appraisers.  ***Washington Mutual compromised the fairness of this***

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 53

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*system by illegally pressuring appraisers to provide inflated values.* Every company that buys loans from Washington Mutual must be sure that the loans they purchased are not corrupted by *this systemic fraud*.

133.    The New York Attorney General office's scathing criticism of WaMu's appraisal practices arises from facts confirmed through Lead Plaintiff's investigation.  As one Confidential Witness, CW 23 – a regional manager in WaMu's appraisal department from 1999 until September 2006 who then worked in a senior appraisal management position at eAppraiseIT from September 2006 until August 2007 – proclaimed, WaMu's conduct concerning appraisals was much worse than eAppraiseIT's.  Indeed, the investigation undertaken on behalf of Lead Plaintiff has revealed that WaMu's secret policies and practices of inappropriate appraisal manipulation were deliberate, institutionalized, and widespread.

**1.    The Pivotal Role of Appraisals in WaMu's Core Lending Business**

134.    Appraisals are used to measure a property's estimated market value.  Typically, a real estate appraisal entails both an analysis of the subject property (often including a physical inspection) as well as an analysis of market conditions, including the values of recent real estate transactions involving similar properties, commonly referred to within the industry as "comparables" or "comps."

135.    Because home loans typically cannot be originated without an appraisal, a fundamental part of the home loan origination and underwriting process is the use of a valid, independent appraisal.  Appraisals are typically paid for by the borrower.

136.    Fair and accurate appraisals are of paramount importance to home borrowers because an appraisal that inaccurately reflects the value of a borrower's home as too high can cause that borrower to incur an amount of loan debt that is in excess of the borrower's actual needs and ability to pay and that is also unjustified by the market value of the borrower's home.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 54

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

The result of an inflated appraisal, therefore, is significant additional risk for the borrower – including an increased risk of default on the loan (and ultimately, the borrower's loss of the loan collateral – the borrower's home).

137.    Federal regulations likewise stress the importance of appraisals to WaMu and its home lending business:

> The soundness of a savings association's mortgage loans and real estate investments, and those of its service corporation(s), depends to a great extent upon the adequacy of the loan underwriting used to support these transactions. ***An appraisal standard is one of several critical components of a sound underwriting policy because appraisal reports contain estimates of the value of collateral held or assets owned.***

12 C.F.R. § 564.8(a) (Emphasis in original.)

138.    Indeed, independent appraisals were supposed to be used to determine reliable LTV ratios for loans originated by WaMu. As WaMu explained in its 2005 Amended Form 10-K, "[t]he loan-to-value ratio measures the ratio of the original loan amount to the appraised value of the collateral at origination." Thus, the LTV ratio is directly dependent on appraisal value, and any error or fraud related to an appraisal will necessarily affect the LTV ratio. Artificially increased appraisals lead to artificially ***decreased*** LTV ratios, which make a company's loan portfolios look less risky than they are in reality.

139.    WaMu directly and repeatedly acknowledged the paramount role of real estate appraisals to its home lending business in its public disclosures. For example, in its Amended 2005 Form 10-K, WaMu emphasized the critical importance of appraisals and LTV in predicting loan performance (and therefore in measuring and controlling for risk), stating:

> The Company's experience shows that debt-to-income ratios are less predictive of loan performance than credit scores and loan-to-value ratios, which the Company believes are the two key determinants in forecasting future loan performance.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 55

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

The Company and the Officer Defendants made statements to the same effect as those in the preceding paragraph throughout the Class Period (for example in WaMu's 2006 and 2007 Form 10-Ks and in quarterly financial statements throughout the Class Period).

140.    WaMu also explained the following about LTV ratios in its Amended 2005 Form 10-K, and in substantially similar statements in its public filings during the Class Period:

> Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination.
>
> *        *        *
>
> Typically, borrowers requesting financing with loan-to-value ratios of greater than 80 percent without government guarantees are required to purchase private mortgage insurance ["PMI"] from a third party. In the event of default, the Company can recover losses from the private mortgage insurer. Alternatively, under certain loan programs, qualifying customers can elect to pay a higher interest rate to the Company in lieu of paying for private mortgage insurance. This higher interest rate is expected to compensate the Company for the incremental credit risk inherent in lending to borrowers without private mortgage insurance.

Therefore, manipulations that are intended to lower LTV ratios significantly increase credit risk by allowing lenders to avoid purchasing PMI or paying a higher interest rate that would have resulted from a true, higher LTV ratio, which would have been reflected in the borrower's loan file absent the appraisal manipulation by WaMu and the Officer Defendants.

141.    In addition to WaMu's and the Officer Defendants' misleading written misrepresentations concerning WaMu's LTV ratios, as set forth below in Section VIII, in earnings calls and at investor conferences, these Defendants repeatedly touted the Company's purportedly conservative LTV ratios throughout the Class Period.

142.    As WaMu admitted, according to a New York Times article dated November 2, 2007, "[I]nflated appraisals are contrary to [WaMu's] interests."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 56

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

143.    While WaMu and the Officer Defendants, through their omissions and material misrepresentations, created the misleading impression that WaMu's loans were sound and the product of fair, reliable and independent appraisals (and, that, therefore WaMu's credit quality was good), as set forth in Section VIII, and as alleged in detail below it is clear that Defendants' statements were materially false and misleading when made in light of the facts known to or recklessly disregarded by Defendants.

> **2.    Appraisals Relating to WaMu Loans Were Governed by Strict Rules Designed to Maintain Appraisal Integrity and Accuracy**

144.    WaMu is regulated by, among other agencies, the OTS, and must comply with rules, guidelines and procedures designed to protect the integrity of the lending process, and in particular, appraisals.  *See*, *e.g.*, 12 C.F.R. § 564 et seq.

145.    At all times during the Class Period, Title 12 of the United States Code of Federal Regulations set forth regulations and standards pertaining to real estate appraisals.  WaMu's lending activities that required appraisal services constituted "regulated transactions," which are defined to include real-estate related financial transactions involving any OTS-regulated institution.  12 C.F.R. § 564.2.

> **a.    WaMu's Appraisals Were Required to Be Fair, Accurate, and Unbiased**

146.    According to federal regulations in effect throughout the Class Period (and through the present time), an appraisal must be "a written statement ***independently and impartially*** prepared by a qualified appraiser setting forth an opinion as to the market value of an adequately described property as of a specific date(s), supported by the presentation and analysis of relevant market information." 12 C.F.R § 564.2.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 57

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

147.    Moreover, under the minimum appraisal standards set forth in 12 C.F.R. §564.4, all appraisals in regulated transactions must conform with Uniform Standards of Professional Appraisal Practice ("USPAP") unless other principles require stricter standards.

148.    USPAP is issued by the Appraisal Foundation, a private nonprofit organization. USPAP guides the conduct of both appraisers and their customers, and reflects the minimum industry standard for providers and consumers of appraisals. USPAP is intended to promote a high level of public trust in the appraisal practice by ensuring that appraisal services are meaningful, accurate and not misleading.   Moreover, USPAP guidelines emphasize that *the objectives of the client must never affect the appraiser's independence or objectivity*. *See* USPAP, Statement on Appraisal Standards No. 9 (SMT-9) (2005), available at http://www.coylelynch.com/USPAP%202005.pdf.

149.    Prior to hiring eAppraiseIT and LSI to conduct appraisals on its behalf, WaMu maintained its own department of in-house staff appraisers.   Provisions in the Code of Federal Regulations that regulated WaMu's conduct in its capacity as a participant in such federally-regulated transactions state, among other things, that an in-house or "staff" appraiser at a lending institution "*must be independent of the lending, investment, and collection functions. . . .*"  12 C.F.R. § 564.5(a).

> **b.    Federal Regulations Required that WaMu's Directors and Senior Officers "Develop, Implement, And Maintain" Appropriate Appraisal Policies for WaMu**

150.    In recognition of the dependence of the "soundness of [WaMu's] mortgage loans and real estate investments" on WaMu's appraisals, WaMu's directors and officers were required to "develop, implement, and maintain appraisal policies to ensure that appraisals reflect

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 58

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  professional competence and to facilitate the reporting of estimates of market value upon which

2  savings associations may rely to make lending decisions."  12 C.F.R. 564.8.

3      151.    Specifically, federal regulations applicable to WaMu throughout the Class Period

4  required the Officer Defendants (among other senior executive and directors) to:

- **Develop written appraisal policies,** subject to formal adoption by WaMu's board of directors, **to "ensure that adequate appraisals are obtained and proper appraisal procedures are followed consistent with the requirements of [federal regulations]"**;

- **Develop and adopt guidelines and institute procedures pertaining to the hiring of appraisers to perform appraisal services for WaMu consistent with the requirements of federal regulations.** Such guidelines were to "set forth specific factors to be considered by management" in connection with hiring appraisers to perform services for WaMu; and

- **"[R]eview on an annual basis the performance of all approved appraisers used within the preceding 12-month period for compliance** with (i) the savings association's appraisal policies and procedures; and (ii) the reasonableness of the value estimates reported."

12 C.F.R. § 564.8(c).

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 59

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

2

3

                  **c.**      **Defendants Were Specifically Advised of Governing Appraisal Standards and Were Instructed by WaMu's Regulators to Take Appropriate Actions to Meet Those Standards**

4

5

6

7

8

9

      152.    In addition to the governing rules and regulations discussed above, on March 22, 2005, federal regulators – including the OTS, which regulates WaMu – published guidance directly applicable to WaMu on appraisals, entitled "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions" (the "2005 Interagency Appraisal Guidelines").

10

11

12

13

14

15

16

      153.    In fact, according to documents posted on the OTS website, on March 22, 2005, OTS sent a letter to the Chief Executive Officers of the institutions that it regulated, including WaMu, enclosing the 2005 Interagency Appraisal Guidelines (the "2005 OTS Cover Letter"). A true and correct copy of the 2005 OTS Cover Letter and the accompanying 2005 Interagency Appraisal Guidelines are attached hereto as Appendix 4 and are also available online at: http://www.ots.treas.gov/docs/2/25213.pdf.

17

18

      154.    Therefore, Defendant Killinger personally received, and should have reviewed, a copy of the 2005 OTS Cover Letter and the 2005 Interagency Appraisal Guidelines.

19

20

      155.    The 2005 OTS Cover Letter sent to Defendant Killinger instructed, in relevant part, as follows:

21

22

23

24

25

> ***Savings associations' board of directors and management should review the [2005 Interagency Appraisal Guidelines]*** in conjunction with the OTS appraisal regulations, the Interagency Appraisal and Evaluation Guidelines (October 1994), and the Interagency Statement on Independent Appraisal and Evaluation Functions (October 2003). ***Internal policies and procedures should ensure that, among other considerations, the savings association's appraisal and evaluation function is safeguarded from internal influence and interference from the loan production staff.***

26

27

28

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

156.    Therefore, (and for the additional reasons discussed herein), WaMu and the Officer Defendants, among other WaMu senior executives and directors, were on notice of their obligations to ensure that WaMu was conducting fair and accurate appraisals.  In fact, as set forth below, WaMu and the Officer Defendants were given detailed instructions about how the Company's appraisal process should work and who was permitted to be involved in that process.

157.    Specifically, the 2005 Interagency Appraisal Guidelines "apply to all real-estate-related financial transactions regardless of size or whether loans are for a regulated institution's own portfolio, held for sale, or held in asset-backed conduits."   Furthermore, the 2005 Interagency Appraisal Guidelines mandate, among other things, that:

- *Loan production staff should not select appraisers.*    (Loan production staff "consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume.")

- *Loan production staff should not be involved in developing or maintaining lists of appraisers,* and that any such list of appraisers should be the subject of periodic evaluation to maintain independence.

- *Upon engaging an appraisal, "information provided by the regulated institution should not unduly influence the appraiser or in any way suggest the property's value."*

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 61

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

- Prior to making a final credit decision, *"regulated institutions should perform a compliance review on all appraisals to confirm that they comply with the minimum appraisal standards. . . .."*

158.    Moreover, the Interagency Statement on Independent Appraisal and Evaluation Functions (October 2003) that is directly referenced in 2005 Interagency Appraisal Guidelines, in a section entitled "Appraisal and Evaluation Compliance Reviews," warns that:

> An institution's appraisal and evaluation program must maintain effective internal controls that promote compliance with program standards and the agencies' appraisal regulations and Guidelines. Internal controls should, among other criteria, confirm that appraisals and evaluations are reviewed by qualified and adequately trained individuals *who are not involved in the loan production processes.*

159.    Similarly, the Interagency Appraisal and Evaluation Guidelines (October 1994) that are specifically referenced in the 2005 OTS Cover Letter, state in a section titled "Independence of the Appraisal and Evaluation Function," that: "Because the appraisal and evaluation process is an integral component of the credit underwriting process, it should be isolated from influence by the institution's loan production process."

160.    The guidelines and principals described above were unambiguous and fundamental to WaMu's core business of residential lending. Yet, as alleged in detail below, WaMu systematically violated or circumvented each of these clear requirements and instead took inappropriate steps to influence and inflate appraisals.

**3.      Defendants Secretly Caused Appraisals
Relating to WaMu Loans to be
Improperly Inflated**

161.    At the start of the Class Period through mid-2006, WaMu generally utilized in-house appraisers to perform appraisals on properties for which WaMu originated loans. WaMu's in-house appraisal functions raised concern from federal regulators because, as apparent from the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 62

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

2005 Interagency Appraisal Guidelines discussed above, banks and other lending institutions that both originated and issued appraisals for the same loans faced potential conflicts of interest concerning appraisal values.

162.    As discussed below, this concern was particularly warranted with respect to WaMu, as the Officer Defendants' policies caused appraisal values generated by WaMu's in-house appraisers to be artificially inflated.  Indeed, evidence, including statements from several witnesses with direct knowledge of WaMu's in-house appraisal practices, confirms that WaMu systematically manipulated the appraisal process to increase appraisal values from at least the start of the Class Period until WaMu outsourced its appraisals to supposedly-independent appraisal companies in the Summer of 2006.

163.    Starting in July 2006, WaMu outsourced the vast majority of its residential lending appraisal work to two purportedly-independent appraisal companies, eAppraiseIT and LSI.  Ostensibly, these companies were to protect the integrity of the appraisal process and eliminate the avenues that had previously existed to inflate appraisal values when appraisals were conducted "in-house" at WaMu.

164.    The appraisal process WaMu began in July 2006 appeared outwardly to function as follows:    Either eAppraiseIT or LSI would receive an appraisal order from WaMu. eAppraiseIT or LSI would then independently select an independent appraiser, provide the necessary information to the appraiser, and then, once the appraisal was complete, report the impartial results to WaMu.  However, from the very initiation of outsourcing its appraisal work, WaMu corrupted the appraisal process by persisting in practices designed to increase appraisal values whenever necessary to produce more WaMu loans.  Indeed, as described below, along with other practices designed to increase appraisal values, WaMu required that eAppraiseIT and

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 63

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

LSI use only appraisers for WaMu loans from a pre-selected, limited list that was created and continually vetted by WaMu sales personnel (*e.g.*, WaMu loan consultants and brokers and their managers). As noted above, eAppraiseIT alone performed at least 260,000 appraisals for WaMu at a cost of $50 million during the Class Period.

165. Throughout the Class Period, WaMu, in direct contradiction of the regulations and guidelines discussed above, secretly and systematically exerted pressure on appraisers to increase appraisal values for the purpose of "hitting" values unsupported by the true market value of the real estate collateral in question. These practices included improper contact and pressure from WaMu loan production (*i.e.*, sales) personnel directed at appraisers to "hit" the higher appraisal values that WaMu and its loan production team desired, the widespread use of unjustified requests for reconsideration of value ("ROVs"), policies designed to encourage appraisers to accede to WaMu's requests to raise appraisal values, and WaMu's refusal to work with licensed appraisers other than those who **WaMu loan production staff hand-picked** for so-called "preferred" appraiser lists.

166. As confirmed by evidence provided by numerous former employees of WaMu, eAppraiseIT, and LSI and other sources of information detailed below, with the knowledge or reckless disregard of the Officer Defendants, in-house appraisers at WaMu, and later appraisers obtained by WaMu through eAppraiseIT and LSI, were routinely and improperly caused to inflate appraisal values in furtherance of Defendants' goal of increasing loan volume to inflate the Company's earnings.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 64

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**a.    Numerous WaMu-affiliated Persons**
**Witnessed WaMu's Systematic**
**Manipulation of the Appraisal Process**

167.    Percipient witnesses who were affiliated with WaMu have explained in great detail the corrupt appraisal patterns and procedures used by WaMu with the Officer Defendants' knowledge or reckless disregard.

168.    CW 24 worked for WaMu for 5 years, during the last 4 years of which, from 2002 until October 2006 (approximately four months after the Company had outsourced the majority of its appraisal work to eAppraiseIT and LSI), CW 24 was a Senior Appraisal Coordinator.  As a Senior Appraisal Coordinator, CW 24 served as a liaison between WaMu loan officer/brokers (*i.e.*, loan production staff) and WaMu appraisers and was responsible for, among other things, helping to originate residential loans for the Southeastern United States.

169.    CW 24 explained that, from 2005 through October 2006, WaMu significantly increased pressure to exaggerate appraisal values.  Indeed, CW 24 stated that the push by WaMu to inflate appraisals was a constant problem throughout the Class Period:  both in-house and outside appraisers working for WaMu regularly complained to CW 24 about WaMu requiring "a certain value" to make loans "work."  As explained by CW 24, appraisal inflation occurred through the widespread use of ROVs on appraisals that had been completed and by loan production staff regularly influencing appraisers through direct contact intended to pressure them.

170.    According to CW 24, "ROVs were done constantly" by WaMu to try to increase appraisal values during the Class Period.  In fact, CW 24 stated that, when comparing an equal number of loans that were processed in CW 24's WaMu offices, the number of ROVs for WaMu in-house appraisals doubled or tripled during in the Class Period compared with ROVs requested

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 65

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

prior to the Class Period, from 2002 through 2004. As a result, CW 24 explained that WaMu assigned additional staff to deal with the increasing ROVs. Moreover, CW 24 stated that, around 80% of the time when a ROV was requested by WaMu, the appraisal value was increased.

171.    CW 24 stated that when WaMu began to outsource its appraisals to eAppraiseIT and LSI, the amount of ROVs requested by WaMu loan production increased by at least three or four times the levels experienced before the start of the Class Period. CW 24 attributed this sharp increase to the fact that WaMu was not initially able to "wheel and deal" quite as easily with outside appraisals staff as it had with its in-house appraisers, and therefore sometimes had to use the appearance of more formal channels to influence appraisers to inflate value.

172.    Also throughout the Class Period, CW 24 stated that when she called appraisers in the normal course of business, the appraisers she contacted very frequently complained about being pressured by WaMu production personnel (loan officers or brokers) to use more comps or find other ways to increase appraisal values. This happened despite that fact that, as CW 24 stated and as dictated by relevant regulations and guidelines, it was unlawful for loan production staff to contact appraisers directly.

173.    Overall, CW 24 reported that, from 2002 to 2006, WaMu's practice was to inflate appraisal values whenever possible using the methods described above and, when those avenues were unavailable for any reason, to find other ways to increase appraisal values in furtherance of the Officer Defendants' goal of closing more loans. As CW 24 stated, if WaMu "could find a loophole to make the value work, they would do it."

174.    Similarly, CW 25, a loan consultant at WaMu Home Loans in Maryland from September 2003 until November 2005, described the appraisal process at WaMu as "corrupt" and "dysfunctional." Specifically, CW 25 stated that, during his time at the Company, even through

the appraisal process was handled internally through loan coordinators, the loan officer who brought in the loan was typically able to request a specific appraiser. CW 25 also explained that in the event that a loan officer was provided an appraisal value that the loan officer deemed unsuitable, that loan officer could and would request an ROV. Indeed, CW 25 stated that WaMu loan officers regularly put a great deal of pressure on the loan coordinators and demanded that initial appraisal values be reevaluated if unacceptable to them

175.    Overall, CW 25 stated that the appraisal process at WaMu was "dysfunctional." CW 25 reported that appraisers received kickbacks from loan consultants to "hit" value on appraisals. CW 25 said that he complained to management that the appraisal process at WaMu was corrupt, but that nothing was changed, and his job was threatened on many occasions in response to his complaints of appraisal corruption.

176.    CW 26 was a Loan Coordinator with the Freedom Crossing Trail (Jacksonville, FL) WaMu offices from July 2005 through September 2007. In that capacity, CW 26 was responsible for processing loan paperwork and ordering appraisals, including through eAppraiseIT and LSI, related to WaMu loans. CW 26 stated that management was always "on top of" loan coordinators such as [herself] to "make loans go through," and specifically that the pressure from management caused **WaMu loan consultants** to "work with appraisers to try to make loans go through." This activity was improper under the relevant standards for appraisals, including the 2005 Interagency Appraisal Guidelines.

177.    In response to the pressure from management, CW 26 stated that if, for example, a first appraisal resulted in an LTV ratio above 80%, WaMu loan consultants would try to get an appraiser to increase the appraisal value to reduce the LTV ratio below 80% by increasing the appraisal value. CW 26 explained that this unjustified increase would obviate the need for the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 67

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

borrower to purchase private mortgage insurance, and would therefore increase the overall likelihood of WaMu closing such loans. As explained above, this practice served to create a hidden increase of credit risk for such loans.

178. CW 9 was a Senior Loan Coordinator for WaMu's Home Loan Center in Bethel Park, Pennsylvania from February 1998 until September 2007. As a senior loan coordinator, CW 9 "processed the loans from beginning to end, and dealt with attorneys, title companies, customers, loan officers, and realtors." CW 9's office processed loans from all over the United States and focused on New York, New Jersey and Connecticut.

179. CW 9 stated that during the Class Period, everyone in her office was experiencing intense pressure from WaMu management to close loans. CW 9 stated that loan coordinators such as herself received bonuses based on the amount of loans they closed. Apparently, this was not enough of an enticement to close as many loans as the Officer Defendants desired, as CW 9 explained that once a week she and others would be called into meetings with more senior managers and would be grilled on the details of any loans that did not close. According to CW 9, this pressure "was coming from the very top, the managers had to listen to the head manager, who had to listen to corporate." CW 9 added that the pressure in the Company to close loans was so intense, it almost caused her to have a "nervous breakdown."

180. CW 9 explained that until late 2006, WaMu had "a team who did [the appraisals], but the Company "phased that away late 2006/early 2007" and, as a result, "laid off a lot of people." After WaMu outsourced the bulk of its appraisal services, there were "only a couple of people" handling appraisals at WaMu in what was called the Appraisal Resource Center ("ARC").

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 68

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

181.    CW 9 observed that, beginning around September 2006, "loan officers were submitting more ROVs" and that loan and appraisal values were higher than they had been.  CW 9 stated that during this time, "the loans and the values were all high – I just thought that 'maybe this is the way things are done now.'"

182.    CW 10 was a Loan Coordinator/Mortgage Processor for WaMu in Jacksonville, Florida from March 2007 until she was laid off in December 2007.  As a loan coordinator, CW 10 processed mortgage loan application, including gathering the necessary loan documents from customers, ordering appraisals, and then sending the files to underwriting.

183.    CW 10 said that everyone at WaMu was under constant pressure from upper management to "hit numbers."  That pressure to "push, push, push" was widely understood to mean that WaMu employees needed to do "whatever it took to get loans closed," according to CW 10.

184.    According to CW 10, appraisals were ordered through WaMu's OptisValue system.  When CW 10 ordered an appraisal, CW 10 would include an estimated value of how much the home in question was "worth," which was available from WaMu information systems.  At times, CW 10's managers, who knew the appraisal values that would be needed to close particular loans, would direct CW 10 to include proposed appraisal values to transmit along with the appraisal order to the appraisers.  After WaMu's proposed appraisal values were included with the appraisal orders, CW 10 stated, the appraisal work would be assigned to an appraiser through eAppraiseIT or LSI.

185.    CW 10 remarked that sometimes the value needed for WaMu loans to close "would be there and sometimes it wasn't."  CW 10 estimated that 90% of the time, CW 10 would need to submit an ROV along with some additional information – like added comps or "anything

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 69

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

to try to help to get the value you needed it to be." According to CW 10, the appraisal value would be *increased* after an ROV request.

186.    CW 10 felt that, overall, WaMu loan appraisal values were inflated. CW 10 is aware that senior managers in her WaMu branch had meetings with eAppraiseIT and LSI two or three times during CW 10's tenure with the Company. WaMu employees understood that these managers wanted to meet with the outside appraisers because, according to CW 10, as far as WaMu was concerned the outside "appraisals were coming out too low." WaMu also wanted a quicker turnaround time from the appraisers. CW 10 believes that there were meetings of this sort at least in June or July of 2007, and again in October 2007. One of CW 10's managers, Kim Ivey, reported on these meetings during morning or afternoon "huddles." Ivey told CW 10 and other WaMu employees that *WaMu management had met with eAppraiseIT and LSI to demand less resistance against WaMu's efforts to obtain higher appraisal values and that eAppraiseIT and LSI were going to "do everything possible within reason to accommodate [WaMu's] needs in terms of the appraised values."*

187.    CW 27 began his career as an appraiser in 1990 at a bank WaMu bought in 1997, after which CW 27 worked as a staff and production appraiser for WaMu from 1997 to 1999. Thereafter, CW 27 continued to handle WaMu appraisals as an independent contractor. When WaMu started outsourcing appraisals in the summer of 2006, CW 27 continued to perform WaMu appraisals as an approved appraiser with eAppraiseIT, as he had already been on a WaMu "approved appraiser" list. CW 27 conducted appraisals on behalf of WaMu through LSI as well.

188.    Even though CW 27 was "approved" on a list created by WaMu, CW 27 felt that there should have been no need for such approved appraiser lists, because all appraisers are licensed.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 70

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

189.    CW 27 reported that while conducting appraisals on behalf of WaMu through eAppraiseIT, he was often contacted directly by WaMu brokers and loan officers (*i.e.*, loan production staff).

190.    CW 27 explained that if he did not increase appraisal value in response to an ROV from WaMu, WaMu required CW 27 to provide detailed explanations about why he ***did not*** change the value. CW 27 stated that, for example, if he had been provided with six or seven new comps with a WaMu ROV, he was required to comment on each of them, explaining why he would not use each comp. In contrast, no explanations were necessary when the initial appraisal value was changed in response to a ROV. In addition, even after CW 27 refused to increase the appraisal value in response to an ROV, WaMu would sometimes send another ROV with even more comps and, on several occasions, WaMu sent multiple ROVs on the same appraisal. CW 27 stated that it was his experience that the comps WaMu offered with the ROVs were irrelevant, either because they were too old or were outside of the subject property's area. CW 27 said that most of the time the ROVs WaMu submitted were ridiculous, a waste of time and "a bunch of baloney."

191.    CW 28 was an Appraisal Field Manager for WaMu in Columbia, MD from November 2003 until September 12, 2006. CW 28 was part of a three person management team responsible for the management of appraisal-related services for WaMu's retail and wholesale lending in Maryland, Virginia and the District of Columbia. CW 28 hired internal appraisers for WaMu and oversaw the review of appraisals of loans through WaMu's wholesale channel.

192.    CW 28 would mediate appraisal issues and valuation disputes raised by the sales staff. CW 28 stated that there were "daily struggles" to try to keep the line drawn between the sales staff's "objectives" and those of the appraisers. During the Class Period, according to CW

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 71

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    28, the scale was clearly tipped in favor of loan production at WaMu and closing loans, as "sales

2    staff had a lot of clout" in these "constant battles" concerning appraisals and value.

3        193.    Often, CW 28 noted, the sales staff would submit ROVs.  According to CW 28

4    sometimes loan production had "something they could offer [WaMu's in-house appraisers]" in

5    connection with an ROV, but other times the ROV would be submitted without any additional

6    information supporting an increase in appraisal value.  CW 28 noted that WaMu personnel at his

7    level could make changes to an appraisal report directly in WaMu's system and remarked that the

8    system itself was flawed.

9        194.    Confidential Witness 29 worked as an Underwriter with WaMu from 2002

10   through 2006 in Portland, Oregon, with one of WaMu's highest-producing teams in Oregon.  In

11   that capacity, CW 29 "saw a lot of loan volume" and also "saw a lot of things that weren't right."

12   As an underwriter, CW 29 recalled "seeing numerous questionable appraisals for WaMu's loans."

13   However, CW 29 stated that WaMu supervisors would "get upset with underwriters for looking

14   at the appraisals" and "independently raising any issues with the appraisal values."  As a result,

15   CW 29 explained, "if a loan application did not already note that there was a problem with the

16   appraisal value, then underwriters were not supposed to acknowledge it."  Rather, underwriters

17   were told "do not look at that – the appraiser said it was okay."  As a result, CW 29 reported that,

18   "across the board," appraisal values were high at WaMu.  CW 29 stated that, "We were amazed

19   as underwriters."

20       195.    In addition to being reprimanded for bringing appraisal problems to the attention

21   of WaMu management, CW 29's supervisors also repeatedly dismissed CW 29's unease related

22   to other issues bearing on borrowers' credit-worthiness.  As set forth in detail in Section VI.D,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 72

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

below, "rather than hearing out" CW 29's and other underwriter's concerns, WaMu management "always backed the loan officers."

196.    Although WaMu's LBM loans typically were not originated with appraisals sourced by WaMu or LBM, but instead arrived with an appraisal accompanying the loan documents provided by the mortgage broker who initiated an LBM loan, even LBM employees were familiar with the widespread appraisal inflation practices of their colleagues at WaMu.  For example, CW 30, an account executive at LBM from 2004 through November 2007, stated that WaMu was "definitely aggressive with appraisals" and that WaMu therefore "seemed to get a lot of values."  Indeed, CW 30 stated that such inflation was a "running joke" within the mortgage broker community.

### b.    Numerous eAppraiseIT-affiliated Persons Witnessed WaMu's Systematic Manipulation of the Appraisal Process

197.    Percipient witnesses who were affiliated primarily with eAppraiseIT during the period in question have also explained in great detail the corrupt appraisal patterns and procedures used by WaMu with the Officer Defendants' knowledge or reckless disregard.

198.    CW 31 was recruited by WaMu as a staff appraiser in June 2003.  In February 2004, the Company laid off CW 31.  However, WaMu assured CW 31 that it would be "business as usual," with the only difference being that CW 31 would now do his appraisal work as a contractor for WaMu and that CW 31 would make more money doing so.

199.    CW 31 stated that WaMu laid off its appraisal staff in several rounds over the several of years beginning in 2004.  For example, CW 31 explained that a number of experienced employees were laid off in February 2004 along with CW 31.  CW 31 indicated that WaMu simply turned the former WaMu staff appraisers into contract appraisers through eAppraiseIT

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 73

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

and LSI.  CW 31 was one of the first people to become a WaMu "preferred appraiser" at eAppraiseIT, starting immediately after his layoff.  CW 31 also began contracting with LSI a couple of months later.  While eAppraiseIT only gave CW 31 WaMu assignments, LSI provided CW 31 with work from WaMu and other banks.  CW 31 reported that he performed "at least twenty appraisals per month" on behalf of WaMu from 2004 through November 2007, when WaMu ceased ordering appraisals through eAppraiseIT.

200.    CW 31 reported to CW 23, an Appraisal Manager at both WaMu and eAppraiseIT. CW 23 was employed as a manager at WaMu until WaMu laid him off in September 2006 in connection with the Company's outsourcing of its appraisal business, after which he went to work for eAppraiseIT.  According to CW 31, this was a significant conflict of interest because CW 23 essentially retained the same authority CW 23 had at WaMu and continued to decide which appraisers should perform WaMu's work.  As CW 31 explained, when CW 23 "went to eAppraiseIT, he took his 'black book' with him and he brought all of the appraisers that used to work for him at WaMu on as 'preferred appraisers.'"  According to CW 31, other WaMu managers also became management at eAppraiseIT after WaMu's layoffs.

201.    CW 31 stated that for WaMu, "***it was all about LTV***," and therefore WaMu dictated appraisal values that it needed to satisfy the LTV ratios it desired – typically, LTV values below 80%.  CW 31 specifically explained that if WaMu needed an 80% LTV, and the borrower needed a $364,000 loan, then WaMu required an appraisal reflecting a value of at least $455,000, irrespective of the market value of the real estate in question.

202.    CW 31 explained that ***WaMu had a practice of noting the value it wanted for a home on its initial appraisal request***.  CW 31 explained that, for instance, a WaMu appraisal order would arrive with WaMu's estimated value for the collateral of $455,000.  CW 31 further

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 74

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

explained that under such circumstances, if the appraiser valued the property at an amount lower than WaMu's estimated value, then the appraiser would receive an ROV request.  CW 31 stated that a significant number of eAppraiseIT appraisers "were simply coming in at the estimated value to avoid getting an ROV."

203.    Regarding ROVs, CW 31 explained that if he did not agree to the appraisal value WaMu wanted, WaMu would send a ROV form to him.  CW 31 would then have to review the appraisal and "see if he was able to change the value."  CW 31 noted that sometimes WaMu would provide him with new information about the home in question, such as additional comps or information about purported upgrades on the home in question.  CW 31 further explained that if he did not an increase the appraisal value in response to an ROV, WaMu would require him to provide additional information and do extra work to defend his original value.  CW 31 stated that because of WaMu's onerous policy, many appraisers would simply increase value rather than deal with the additional work.  Moreover, when CW 31 refused to increase the appraisal value for WaMu, he often received a phone call from WaMu or CW 23 indicating that the ROV request had been escalated.  Indeed, CW 31 reported that ***if a WaMu loan officer complained strongly about an appraiser not cooperating with the Company, the appraisers knew that they would not receive further work from WaMu.***

204.    According to CW 31, although WaMu loan officers were not supposed to contact appraisers directly, they nonetheless would frequently call or email eAppraiseIT appraisers after receiving a copy of an appraisal.  CW 31 explained that WaMu loan officers contacted CW 31 frequently about appraisal values.  Specifically, CW 31 explained that if WaMu did not believe that an appraised value was high enough for a loan to go through, CW 31 would get a call from either an employee at eAppraiseIT or sometimes the WaMu loan officer, asking if CW 31 "could

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 75

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  help them out with value." Occasionally, CW 31 stated, CW 23 would call to ask CW 31 to look

2  at an appraisal again or CW 23 would provide CW 31 with additional information related to an

3  appraisal.

4      205.    CW 31 explains that he lost business because he was "trying to do the right

5  thing." Specifically, CW 31 stated that WaMu curtailed CW 31's workload because CW 31

6  refused to "change value" on several appraisals. CW 31 explained that one central unspoken rule

7  – that WaMu would cut an appraiser out of WaMu's preferred list if he did not increase appraisal

8  values – was crystal clear to appraisers: "when an appraiser's business was cut off, you knew it

9  was because you were not playing their game." CW 31 stated that, for example, WaMu would

10  request a change in value if the true market value of a home reflected in an appraisal "came in"

11  at $500,000, but WaMu needed $525,000 for its loan to close. CW 31 gave an example of an

12  appraisal for a property that CW 31 refused to change the value on for WaMu in February 2007,

13  which he believes resulted in WaMu punishing him by reducing his workload. CW 31 recalled

14  that the property in question was in Santa Ana, CA, and was worth close to $1 million. CW 31

15  stated that WaMu wanted the appraisal value increased by at least $100,000, but likely closer to

16  $400,000. Despite WaMu's repeated requests, CW 31 refused to change the appraisal value

17  because he looked at the appraisal and did additional research and was therefore certain that the

18  initial appraisal was correct. As a result of his refusal, WaMu started to reduce CW 31's

19  workload.

20      206.    According to CW 31, around May or June of 2007, eAppraiseIT "got nervous and

21  sent out blanket emails to appraisers saying 'Please contact us if a loan officer ever contacts you;

22  they are not allowed to contact you,' but the damage was already done." CW 31 believed that

23  eAppraiseIT started sending such emails to "cover their tracks" in the face of the New York

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 76

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1    Attorney General's office's investigation.  CW 31 stated, however, that such emails "came out

2    too late, because the loans with inflated appraisal values had already gone through."

3    207.    CW 23 worked as a Regional Manager in WaMu's Appraisal Department from

4    1999 until September 2006.  In September 2006, CW 23 went to work for eAppraiseIT and

5    stayed there until August 2007.  At eAppraiseIT, CW 23 was the Area Manager for Southern

6    California and reported to Peter Gailitis, eAppraiseIT's nationwide Chief Appraiser.  CW 23

7    noted that in addition to him, eAppraiseIT hired six appraisal managers from WaMu.

8

9    208.    As set forth below, based on his first-hand experiences and knowledge, CW 23

10   believes "that the [New York Attorney General's] suit is backwards" because WaMu's appraisal

11   practices were improper and largely responsible for the misconduct alleged in the NYAG

12   Complaint.  Indeed, CW 23 observed significant problems created by WaMu in connection with

13   the appraisals that it outsourced.  As explained below, CW 23 indicated that WaMu's senior

14   management was aware of WaMu's dubious practices, and in many cases directed them.  CW

15   23's experiences with WaMu while at eAppraiseIT evidence WaMu's desire to subvert

16   appropriate appraisal standards and processes in favor of increasing loan originations.  As CW 23

17   put it, *"The Sales Department has a voice in Washington Mutual because they generate the*

18   *income – the Sales Department drove Washington Mutual."*  Moreover, CW 23 felt that there

19   was an "obvious disconnect" between what WaMu senior management was saying publicly

20   about appraisals and what the Company was doing "in the field."  Prior to outsourcing, CW 23

21   maintained that many of the same undisclosed problems existed, although the practices escalated

22   in degree, if not kind, once WaMu outsourced its appraisals.

23

24   209.    CW 23 explained that his first six months after he began working with

25   eAppraiseIT were "full of turmoil" for many reasons.  In particular, CW 23 pointed to WaMu's

26

27

28

1    insistence on using appraisers from a "preferred" list chosen predominately by WaMu's loan

2    sales personnel.

3        210.    According to CW 23, during the initiation of WaMu's outsourcing, WaMu

4    informed eAppraiseIT that eAppraiseIT had to use WaMu's panel of appraisers.  According to

5    CW 23, the appraiser panel became a source of contention between the two companies.  CW 23

6    recounted that eAppraiseIT initially opposed WaMu dictating which appraisers eAppraiseIT

7    could assign, but WaMu stood firm, insisting that eAppraiseIT use WaMu's selected appraisers.

8    According to CW 23, the list of appraisers who could handle WaMu appraisals was ultimately

9    called the "preferred list," but the name changed several times.   According to CW 23,

10   eAppraiseIT and LSI received the same preferred appraiser lists from WaMu.

11       211.    CW 23 explained that eAppraiseIT was concerned about many aspects of WaMu's

12   "preferred" list of appraisers, including the list's very name.  CW 23 stated that eAppraiseIT

13   worried about the perceptions of "preferred" over regular appraisers and the resulting possibility

14   of litigation.  CW 23 further stated that eAppraiseIT was also concerned about how the so-called

15   "preferred" appraisers would be coded into eAppraiseIT's computer management systems.  In

16   sum, CW 23 explained that eAppraiseIT was fearful of liability, loss of contract, and litigation.

17   For these reasons, CW 23 stated that, at various times, WaMu's list was referred to as

18   "preferred," "proven," and "approved." CW 23 could not recall the order in which these names

19   were used, but stated that as time went on WaMu and eAppraiseIT "attempted to make the list

20   sound more and more generic."  As detailed below, these cosmetic changes to the names given to

21   WaMu's hand-picked lists of appraisers were discussed at the highest levels of WaMu and

22   eAppraiseIT.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 78

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

212.    CW 23 revealed that the original list of appraisers that WaMu provided to eAppraiseIT was created with the WaMu Sales Department's input and approval.  According to CW 23, as the list was sent through WaMu's Sales Department before making its way over to eAppraiseIT, WaMu freely added appraisers known to "hit value, do favors, etc."  In addition, according to CW 23, WaMu instructed eAppraiseIT that eAppraiseIT could not use its own staff appraisers for WaMu appraisals, a situation that eAppraiseIT found to be unacceptable.  CW 23 stated that to address this, eAppraiseIT hired numerous former WaMu in-house staff appraisers.  However, CW 23 explained, some of these appraisers were still not included by WaMu on its list, causing substantial disagreements between eAppraiseIT and WaMu.  In particular, CW 23 noted that eAppraiseIT questioned why WaMu refused to add certain eAppraiseIT staff appraisers that had worked for WaMu for 10 years or more onto WaMu's list; likewise, the list included appraisers that CW 23 felt very uncomfortable retaining.  According to CW 23, eAppraiseIT promptly informed WaMu that WaMu's list was flawed and that many of the appraisers listed needed to be removed.  Nevertheless, according to CW 23, with WaMu's explicit knowledge and consent, the first list "had remained in effect for about six months."  CW 23 stated that it was his understanding that there was direct communication between eAppraiseIT and the head of WaMu's Mortgage Division regarding the problems created by WaMu's "preferred list."

213.    During the first six months that WaMu and eAppraiseIT worked together, according to CW 23, the Appraisal Management Department at eAppraiseIT would regularly receive phone calls from WaMu instructing eAppraiseIT to add or remove appraisers from WaMu's list.  According to CW 23, anyone at WaMu who had eAppraiseIT's phone number could call and order a change to the list – it was "wide open."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 79

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

214.    CW 23 stated that, particularly during the first six months when WaMu's list of appraisers was "wide open" to its loan production personnel, **"appraisers were being removed for not hitting value**." As a result, CW 23 explained, even after the process was modified, appraisers feared being removed from WaMu's list and therefore not receiving work.

215.    CW 23 explained that during that first six months of WaMu's outsourcing to eAppraiseIT, daily conference calls were conducted between WaMu and eAppraiseIT to address various issues. Among the issues discussed during those calls, CW 23 stated that during those calls, eAppraiseIT raised "how inappropriate" WaMu's procedures were of allowing any WaMu employee to modify the list of appraisers WaMu required eAppraiseIT to use, among other issues. According to CW 23, Maryann Garfield, a Vice President and Senior Appraiser at eAppraiseIT, participated in the daily conference calls with the WaMu panel, along with approximately five people from WaMu's Appraisal Panel, including the head of the appraisal group at WaMu. CW 23 stated that these daily conference calls "focused a great deal on how to manage the appraiser list, how to add and subtract appraisers, and what to call the list." CW 23 felt that Garfield was always "very strong," and she frequently said in their preparations for the calls that eAppraiseIT had to "push back" on the unreasonable demands. According to CW 23, during these calls, Garfield would inform the WaMu's representatives in a businesslike manner that she believed that WaMu's practices concerning which appraisers were added or subtracted to WaMu's list and WaMu telling eAppraiseIT which appraisers to use were wrong.

216.    CW 23 also stated that several of these daily conference calls included both eAppraiseIT and LSI, although WaMu did try to separate the companies when discussing certain issues. In addition, CW 23 explained that WaMu tried to pit the two companies against each other and referred to this tactic as the "Champion Challenger." For example, according to CW

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 80

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

23, WaMu would goad eAppraiseIT by suggesting that LSI was performing better in certain areas than eAppraiseIT was, and vice versa. WaMu was able to get eAppraiseIT to agree to their demands by using this tactic.

217.    According to CW 23, many of WaMu's loan officers were very unhappy when WaMu decided to outsource its appraisal function because they were unsure whether they could continue to drive through loans as they had with WaMu's in-house appraisers. Some WaMu loan officers threatened to quit unless they were offered "sweetheart deals" or WaMu assured them that they could continue with business as usual, according to CW 23. In response, CW 23 stated that WaMu's high producing loan consultants were placed on a preferred list and received some preferred treatment with respect to appraisals. For instance, these loan consultants had a guaranteed "turn time."

218.    CW 23 understands that WaMu had an actual procedure in place documenting the existence of and governing WaMu's list of high-producing loan consultants receiving even more preferential treatment than standard WaMu loan consultants regularly received. In fact, CW 23 stated, there was a "loan consultant counsel" at WaMu that met to discuss issues that affected WaMu's loan consultants, including appraisals. WaMu's "loan consultant counsel" served as an avenue for WaMu loan consultants to offer WaMu managers feedback. Indeed, WaMu's "loan consultant counsel" met regularly at set times with WaMu's senior management, according to CW 23, including "the head of WaMu's Mortgage Division."

219.    According to CW 23, after the first six months of WaMu outsourcing appraisals to eAppraiseIT (or approximately January 2007), WaMu created a second list with rules about how appraisers could be added and removed from WaMu's list. However, according to CW 23, WaMu's second list was still improper as it *again* received input and approval from WaMu's

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 81

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Sales Department, although this time only by WaMu regional managers and above.  Therefore, according to CW 23, WaMu loan officers would only have to pass their requests on to their regional managers to add or remove appraisers to or from WaMu's "preferred" appraiser list.  Also at this time, CW 23 stated that only WaMu regional managers had the authority to add or remove an appraiser by phone, which they could do at least once a month.

220.    CW 23 also said that WaMu's ROV process was problematic.  According to CW 23, WaMu had a set process in place where the loan officer could send the appraisal back with additional data or comps.  CW 23 explained that when requesting an ROV, WaMu had to provide written documentation of the request.

221.    According to CW 23, in theory, WaMu was only supposed to have one opportunity for an ROV:  if WaMu disagreed with an appraisal value, it was supposed to explain to eAppraiseIT why and provide necessary additional data for eAppraiseIT to research.  CW 23 stated that 60% to 70% of the ROVs that he received from WaMu were frivolous and did not include any meaningful or specific new information.  He described many of the ROV requests from WaMu as follows:  "My house is better than you said it was" or "How could you appraise it so low."  Nevertheless, CW 23 explained that the reality was that additional ROVs – even ROVs that had no new information – could be requested until WaMu was satisfied.  In addition, as explained by CWs 31, 23, 42, it was actually eAppraiseIT's and LSI's appraisers that were often forced to justify in detailed writing all reasons why they would decline to increase appraisal values.

222.    CW 23 explained that the ROV process for WaMu "was so easy,"  and certainly easier for a WaMu loan officer to submit an ROV than to go to his or her client and inform the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 82

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

client that the client's loan would not close, which would have been contrary to the frequent promises WaMu loan consultants made to their client that loans would "hit value" and close.

223.    Initially, when WaMu's appraisal outsourcing started, CW 23 stated that he was receiving quite a few ROVs from WaMu – over 100 a day just for Southern California – which he described as "chaotic." Every ROV from CW 23's area had to go through him, and CW 23 explained that at one point he was therefore focused only on ROVs. According to CW 23, eAppraiseIT began to push back on WaMu concerning ROVs, and the number of ROVs from WaMu began to slowly decrease after about 6 months.

224.    CW 23 explained that he typically would review ROV requests before forwarding them to appraisers. Many times, CW 23 felt that ROV requests were unwarranted, but because he could not tell for certain from his desk, he would still send the requests to the responsible appraisers for further review. If the appraiser did not feel that the value should be changed, the appraiser would return the ROV request to CW 23. In such circumstances, CW 23 would then inform WaMu of the appraiser's decision to decline WaMu's ROV request.

225.    According to CW 23, WaMu had a long-standing policy that appraisal managers could review appraisals and take responsibility for the value increase if they disagreed with values reflected in initial appraisals, but eAppraiseIT did not follow this procedure because it was worried about the legality of such practices.

226.    Although CW 23 was supposed to "be a gatekeeper to the appraisers," appraisers still received calls directly from WaMu loan officers. CW 23 explained that while he tried to discourage this contact, the appraisers were so worried about their livelihood that they generally did not refuse it. CW 23 said that there was definitely an implication that if appraisers did not meet "WaMu's standard," they would be removed from WaMu's list and would not receive work.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 83

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   According to CW 23, it was common knowledge among appraisers who performed work for

2   WaMu that if they were on WaMu's preferred list, they were "still in business."  However, if they

3   were cut, they would need to find new sources of work.

4       227.    WaMu employees also inappropriately contacted CW 23 directly.  According to

5   CW 23, "everyone at WaMu knew [him]," and certain WaMu employees knew how to contact

6   him.  CW 23 stated that it was improper to handle things in this manner, but that "it was just how

7   things worked."  CW 23 explained that he would get resistance from WaMu when he would deny

8   values in response to such contact from WaMu.

9       228.    CW 23 also noted that in 2006 and 2007, home values were typically declining.

10  According to CW 23, if an appraiser marked "declining" on an appraisal report (noting the fact

11  that market values for other homes in the area were declining), then the underwriter for that loan

12  was supposed to automatically "cut" the maximum LTV allowed for the loan by 5% (*e.g,* from an

13  allowed LTV ratio of 80% to 75%) — a change "that would kill the loan."  CW 23 stated that "a

14  lot of appraisers were gun-shy because WaMu was blackballing appraisers, fees were being cut,

15  and a lot of people were not getting work."  Therefore, according to CW 23, many appraisers

16  were intimidated by WaMu into marking "stable" on appraisals even when they knew the value

17  to be declining and that "declining" was the appropriate designation.  CW 23 said that appraisers

18  working for WaMu felt this pressure during his entire tenure at eAppraiseIT.

19      229.    CW 32 worked for eAppraiseIT in Danvers, MA from March 2004 to March

20  2007, starting as a Customer Service Representative ("CSR") and becoming a Business Analyst

21  around 2005.  As a CSR, CW 32 handled phone calls from appraisers and clients regarding

22  questions about appraisal reports and appraisal status.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 84

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

230.   CW 32 understood that WaMu had used certain appraisers before the Company outsourced appraisal work to eAppraiseIT, under the guise that eAppraiseIT was supposed to be unbiased and uninfluenced by WaMu.  However, CW 32 observed that WaMu began setting up a panel of appraisers made up of those same appraisers it had been using in the first place.  CW 32 further learned that those appraisers were even being managed by the same people that had managed them previously at WaMu, and that eAppraiseIT was hiring these managers directly from WaMu.  CW 32 first heard about these practices from his boss Susan Ramey, who was in charge of the Appraisal Management Department, which oversaw the eAppraiseIT appraisers.

231.   CW 32 explained that neither CW 32 nor Ramey understood how WaMu's "situation with eAppraiseIT" was any different or better than WaMu's in-house appraisal practices before WaMu elected to outsource its appraisal work.  CW 32 stated that the general sense at eAppraiseIT was, "WaMu is this big, powerful company that can give us a lot of business so get them and then afterwards appease them."  Because of this dynamic, according to CW 32, "*[eAppraiseIT] really did bend over backwards to do basically anything WaMu wanted*."

232.   CW 33 worked at eAppraiseIT in Beaverton, Oregon in 2007, and reported to Cheryl Henderson, eAppraiseIT's manager of incoming and outgoing calls for WaMu.

233.   CW 33 was initially responsible for following up with appraisers in several states about past due reports, after which she started handling inbound and outbound calls with WaMu loan officers and appraisers.  While some WaMu loan officers called to check on the status of the appraisal reports or other routine matters, however, CW 33 stated that many WaMu loan officers called eAppraiseIT because they were dissatisfied with appraisal values and insisted that the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 85

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    appraisal reports were wrong.  CW 33 dealt mostly with WaMu loan officers, but the WaMu

2    branch managers also called CW 33 to complain about appraisal values.

3        234.    CW 33 explained that WaMu loan officers would ask to speak directly with

4    appraisers.  Although CW 33 was not allowed to provide a WaMu loan officer with an

5    appraiser's number, the WaMu loan officers sometimes said that they already had the appraiser's

6    number and were going to call the appraiser directly.  Additionally, CW 33 explained that after

7    the appraisal report actually came in, many WaMu loan officers contacted the appraisers directly

8    to challenge the appraisal values because at that point, the WaMu loan officers had access to the

9    appraisers' numbers from the appraisal reports.

10       235.    If WaMu disagreed with the value of an appraisal, CW 33 explained, WaMu could

11   submit an ROV, which was then supposed to include three to five comps that supported a higher

12   value.  If the appraiser did not feel that the new comps were comparable, he would return the

13   same value as before.  At that point, CW 33 stated that some WaMu loan officers would send the

14   file to a different appraiser, who they would also pressure to increase the initial appraisal value.

15       236.    CW 33 further expressed that only "preferred appraisers" could handle WaMu

16   business, and appraisers were removed from the "preferred list" if an appraiser did not perform

17   according to WaMu's expectations.

18       237.    CW 34 was a real estate appraiser for eAppraiseIT from June 2006 to December

19   2007.  Like most of eAppraiseIT's appraisers, CW 34 worked from home and received her work

20   orders electronically.  CW 34 reported to Peter Gailitis, eAppraiseIT's Chief Appraiser, who CW

21   34 believes was terminated by eAppraiseIT around the third quarter 2007.  CW 34 also noted that

22   CW 23 managed eAppraiseIT's appraisers.

238.    Initially, almost all of CW 34's work came from WaMu.  Around June or July of 2007, CW 34's WaMu appraisal orders dropped from 15-20 orders a week to two orders a month. CW 34 stated that shortly after CW 34's workload had dropped, CW 23 held a conference call with all of eAppraiseIT's west coast appraisers to inform the appraisers that their workload had plummeted because WaMu had decided to use only "selected" appraisers.  According to CW 34, CW 23 explained that WaMu was no longer classifying eAppraiseIT appraisers as "preferred." CW 34 stated that this was primarily due to the eAppraiseIT appraisers not "bringing in the value of homes" that WaMu wanted.

239.    CW 34 also explained that ultimately WaMu cut her off from doing appraisals because she refused to increase appraisal values in response to WaMu ROVs.  Specifically, on several occasions, WaMu demanded to know why CW 34 did not use certain comps and supplied different comps for CW 34 to use.  CW 34 refused to use those comps because they were either outside of the relevant geographic area or because they were too old to be relevant.  For example, some of the comps provided to CW 34 by WaMu were over a year old, dating back to when home values were higher, or were within a wealthier neighborhood.  According to CW 34, concerning ROVs, WaMu typically urged an increase in value of at least $20,000-$25,000 for homes that CW 34 appraised in the $500,000 range.  CW 34 refused to change the value of such appraisals and, after a few outright refusals to change value on the basis of WaMu's inappropriate comps, WaMu completely cut off CW 34 from WaMu business.

240.    CW 35 served as an eAppraiseIT Customer Service Representative and an eAppraiseIT Account Manager for WaMu, working out of the Poway, California location.  CW 35 received and processed appraisal requests for Washington, Oregon, and some areas of California, and then found appraisers in the local area to handle the request.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 87

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

241.    According to CW 35, WaMu was extremely particular regarding who did the appraisals for WaMu loans.  CW 35 was instructed to "do his best" to find an appraiser on WaMu's list.  If CW 35 was unable to do so, CW 35 was required to get WaMu's permission to use an appraiser not on the list.  Specifically, he said that when he could not find a WaMu preferred appraiser, CW 35 was forced to call WaMu and explain to WaMu that a WaMu-preferred appraiser in the area was not available, but that another appraiser on eAppraiseIT's list "could do the appraisal by the turnaround time [that WaMu required]."  CW 35 also had to ask whether WaMu had any recommended appraisers in the area.  If WaMu did have recommendations, CW 35 was required to add the recommended appraisers to the eAppraiseIT panel and to WaMu's preferred appraisers list.

242.    According to CW 35, once an appraiser rendered the appraisal value, WaMu frequently disagreed with the value.  CW 35 explained that the arrangement between WaMu and eAppraiseIT allowed a WaMu loan officer to send to eAppraiseIT an ROV at no cost to WaMu, and that WaMu loan officers would often include additional comps to support the value that they were looking for.  CW 35 would then send the appraisal back to the original appraiser.  Many appraisers, CW 35, recalled, disliked this practice because they felt that they should not have to increase the value of the property simply because the WaMu loan officer provided some additional comps.  And, according to CW 35, many of the appraisers felt that WaMu's practices were "against the rules."  Indeed, CW 35 recalled that WaMu placed a great deal of pressure on appraisers to raise appraisal value.  For example, if an eAppraiseIT appraiser was not willing to use WaMu's comps, the WaMu loan officer would call CW 35's department and complain that the "appraiser was inadequate."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 88

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

243. According to CW 35, eAppraiseIT appraisers would sometimes refuse to raise appraisal values on the basis of WaMu's comps. To circumvent these refusals, WaMu required eAppraiseIT to keep Appraisal Business Managers, or ABMs, onsite at CW 35's location. CW 35 stated that these ABMs, or even eAppraiseIT's Vice President of Operations, would review the appraisals when the appraiser refused to raise the value on an ROV, and often they would call the appraisers to "guide them through on how to raise the value." CW 35 noted that if, even after the ABMs or the Vice President of Operations "guided" the appraiser, the appraiser still would not raise the value, eAppraiseIT would often simply find a new appraiser to handle the appraisal.

244. CW 35 confirmed that when WaMu complained about an appraiser, eAppraiseIT had to remove that appraiser from the eAppraiseIT panel and the WaMu preferred list. CW 35 recalled appraisers being removed because WaMu did not like the comps they used and the appraiser was not willing to increase the value when WaMu loan officers complained.

245. CW 35 recalled that "95%" of the appraisers on WaMu's preferred list had formerly worked at WaMu as appraisers and, because of this prior relationship, WaMu loan officers would often contact their former colleagues at eAppraiseIT directly. According to CW 35, all contact should have gone through CW 35's department, but WaMu loan officers would often call the appraiser directly to pressure the appraiser to raise appraisal value. CW 35 recalled that "loan officers seemed to be dictating more than Appraisal Panel Management was." Indeed, CW 35 actually overheard telephone calls in which WaMu loan officers yelled at eAppraiseIT upper management including Peter Gailitis, eAppraiseIT's Chief Appraiser, to "fix appraisals because WaMu was not getting the value it wanted."

246. CW 35 reported that there were many more ROVs for WaMu than for any other customer. eAppraiseIT received 100-200 ROVs a day, if not more, for WaMu. CW 35

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 89

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

personally handled 15-20 ROVs each day for WaMu.  Typically, CW 35 recalled, if a ROV on an appraisal that had been done by an appraiser on the eAppraiseIT panel was then sent to a WaMu panel appraiser, the value increased.

247.    CW 35 described eAppraiseIT's relationship with WaMu as follows: "Most of the time, we tried to bend over backwards and do whatever we could to help them."  CW 35 said that some of WaMu's requests "went against appraisal laws and appraiser ethics," but, because of the severe pressure placed upon eAppraiseIT by WaMu, eAppraiseIT would "always try to find a way around this problem to help WaMu."

248.    CW 36 worked in eAppraiseIT's Appraisal Management Department from October 2006 to August 2007.  CW 36 reported to Sue Ramey, eAppraiseIT's appraisal management supervisor and handled the recruiting of appraisers and tried to "to satisfy. . . WaMu's demands for appraisals."

249.    CW 36 explained that "WaMu was eAppraiseIT's biggest client, and the appraisers on WaMu's preferred list got all of its work." According to CW 36, eAppraiseIT "had to fulfill more and more of WaMu's demands each week," and WaMu placed "additional demands" on eAppraiseIT "all the time."

250.    According to CW 36, eAppraiseIT management discussed how some of WaMu's demands on eAppraiseIT were unethical.  In particular, CW 36 stated that Sue Ramey and her boss (in quality control appraisal management) said that they did not approve of WaMu's appraisal demands and that eAppraiseIT needed to "push back" on WaMu.  However, according to CW 36, Ramey was not in a position to actually do so.  CW 36 believes that eAppraiseIT was willing to acquiesce to WaMu's demands because WaMu was eAppraiseIT's biggest client; according to CW 36, other eAppraiseIT employees shared his view.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 90

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

251.    CW 36 stated that 90% of the appraisers WaMu preferred were appraisers that WaMu had contracted with in the past, and most were formerly employed by WaMu. CW 36 explained that WaMu could remove appraisers from any of its preferred lists at its whim, and that *every week WaMu would send eAppraiseIT a list of appraisers to add and appraisers to remove.* According to CW 36, "WaMu did not provide reasons for the changes; the Company merely stated who it was willing to work with."

252.    Approximately one month before CW 36 left eAppraiseIT, CW 36 was reassigned to handle WaMu ROVs. According to CW 36, WaMu was generally asking for higher values on appraisals in connection with its ROVs, and CW 36 would have to speak to WaMu loan officers about why they were ordering a new appraisal. Also, sometimes appraisers would call CW 36 to complain about ROVs (also called rebuttals) they received. In some instances, CW 36 stated, the appraisers had already received multiple rebuttals because they were not "coming in at the right value," and the appraisers felt that WaMu would continue to rebut them until they agreed to increase the value.

253.    CW 37 served at eAppraiseIT as a Customer Service Representative in Poway, California from June 2005 to October 2007. CW 37 was in charge of the priority service clients, or high profile loan officers at WaMu. In this capacity, CW 37 served "about sixty" WaMu priority service clients.

254.    CW 37 confirmed that WaMu would "contact appraisers directly to discuss any issues because they were accustomed to doing so in the past." According to CW 37, even after WaMu's outsourcing was firmly established (*i.e.*, after six months or so) appraisers would call CW 37 to complain that WaMu continued to contact them directly. CW 37 believed that WaMu was using this "tactic" in order to manipulate appraisal values. Indeed, CW 37 explained that

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 91

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    although WaMu loan officers "sometimes contacted the appraiser to check on status, *most of the*

2    *time they called to scream about the value" being too low.*

3        255.    CW 37 also explained that appraisers working on behalf of WaMu "would get an

4    estimated value for home purchases" that would influence their valuation decisions.

5        256.    CW 38 worked at eAppraiseIT as a Customer Service Representative in 2006.

6    During this time, CW 38 worked with WaMu, and explained that WaMu was a central reason that

7    she left eAppraiseIT.  CW 38 stated that WaMu made "too many demands," some of which CW

8    38 found to be unethical.  For example, CW 38 stated that WaMu loan officers would call

9    eAppraiseIT to demand that appraisals be completed in a shorter time frame than policy dictated.

10   In addition, CW 38 complained that *WaMu would demand increases in appraisal values,*

11   *frequently by requesting an ROV or submitting a rebuttal.*

12       257.    CW 38 explained that if a WaMu loan officer was dissatisfied with an

13   eAppraiseIT appraiser's denial of an ROV or if a loan was riding on an appraisal, WaMu's

14   request would be escalated above that appraiser's level.

15       258.    CW 38 stated that WaMu wanted to pick its own appraisers by name for each

16   individual appraisal, but eAppraiseIT would not allow that.  According to CW 38, eAppraiseIT

17   did, however, agree to send appraisals only to those on the WaMu's preferred list as a

18   compromise.

19       259.    CW 38 also stated that WaMu loan officers sometimes called eAppraiseIT

20   directly; CW 38 stated that in response, she always informed WaMu loan officers not to call the

21   appraisers directly.

22       260.    Due to her experiences at eAppraiseIT, CW 38 "walked out in the middle of lunch

23   one day and never looked back."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 92

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

2    **c.    Documents Obtained by the New York**
    **Attorney General and the Allegations of**
3    **the NYAG Complaint Further Confirm**
    **That Senior WaMu Management Directed**
4    **WaMu's Wrongful Appraisal Practices**

5    261.    Lead Plaintiff's investigation has adduced facts, alleged herein, that show

6    WaMu's systematic manipulation of appraisals during the Class Period.  The NYAG Complaint,

7    which is available online at: http://www.oag.state.ny.us/press/2007/nov/EA%20Complaint.pdf, is

8    consistent with the factual allegations herein.  Indeed, various internal, non-public documents

9    quoted in the NYAG Complaint that offer additional, corroborating evidence of Defendants'

10   direct involvement in the appraisal manipulation alleged herein are set forth below.

11   262.    A *New York Times* article dated November 2, 2007 – one day after the NYAG

12   Complaint was filed – explained that the NYAG Complaint was, according to New York

13   Attorney General Andrew Cuomo, filed only after "investigators had spent nine months

14   interviewing hundreds of mortgage industry executives and poring over millions of documents

15   obtained through subpoenas."  The November 2, 2007 *New York Times* article further explained

16   that the NYAG Complaint was, at least in part, "built on e-mail messages obtained through a

17   subpoena to First American."

18   263.    Consistent with Lead Plaintiff's investigation, the NYAG Complaint alleges that

19   contemporaneous with WaMu outsourcing its appraisal business to eAppraiseIT and LSI,

20   WaMu's loan production staff often complained that the appraisal values provided by

21   eAppraiseIT appraisers were not as high as WaMu wanted (as they had with WaMu's in-house

22   appraisers), and as a result WaMu acted to increase appraisal values through improper means.

23   264.    According to the NYAG Complaint, on August 9, 2006, eAppraiseIT's President

24   communicated to WaMu executives that "[w]e need to address the ROV issue . . . . Many lenders

25

26

27

28

in today's environment . . . have no ROV issue. The value is the value. I don't know if WaMu production will go for that . . . . The WaMu internal staff we are speaking with admonish us to be certain we solve the ROV issue quickly or we will all be in for some pretty rough seas."

265.    According to the NYAG Complaint, only one week later, on August 15, 2006, eAppraiseIT's Executive Vice President advised eAppraiseIT's President in writing that WaMu's loan officers would often pressure WaMu's internal appraisal field managers for an "extra few thousand," or "tell[] them specifically what they needed," or would "ask for several ROVs on the same property."

266.    According to the NYAG Complaint, by email dated September 29, 2006, a WaMu executive wrote to eAppraiseIT's senior executives to define eAppraiseIT personnel's responsibilities as to ROVs and value disputes:

> . . . the four appraisers/reviewers would be directly involved in escalations dealing with: ROVs, Valuation issues where the purchase price and appraised value differ with no reconciliations/justifications by the appraiser, Value cuts which we continue to receive from your third party reviewers (Wholesale), *proactively making a decision to override and correct the third party appraiser's value or reviewer's value cut*, when considered appropriate and supported . . . .

(Emphasis in NYAG Complaint.)    According to the NYAG Complaint, the "four appraisers/reviewers" were former WaMu employees that WaMu had pushed eAppraiseIT to hire in supervisory positions.  Thus, according to this document cited in the NYAG Complaint, WaMu sought to ensure, through pressure on eAppraiseIT, that appraisals came in at the high values that WaMu wanted.

267.    According to the NYAG Complaint, in February 2007, WaMu directed eAppraiseIT to stop using eAppraiseIT's usual panels of staff and fee appraisers to perform WaMu appraisals. Instead, according to the NYAG Complaint, WaMu demanded that eAppraiseIT use a "proven panel" of appraisers selected by WaMu loan origination staff, who

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 94

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

were chosen because they provided high values.  According to the NYAG Complaint, during this time a WaMu Vice President in the Appraisal Oversight group explained, in an email to eAppraiseIT about an ROV for a "low value," that "[t]his is an example of the issue that has caused sales pushing for a 'proven appraiser' process."

268.    According to the NYAG Complaint, in February 2007, eAppraiseIT "simply capitulated to WaMu's demands":  in an email on February 22, 2007, eAppraiseIT's President told senior executives at First American "***we have agreed to roll over and just do it.***" According to the NYAG Complaint, eAppraiseIT's President explained that "we were willing to live with the change if [WaMu] would back us up with the appraisers and tell them that simply because they are rated as Gold Preferred does not mean that they can grab all the fees. [WaMu] agreed." Indeed, according to the NYAG Complaint, eAppraiseIT's President wrote about steps necessary to implement WaMu's plan, and also WaMu's desire to "stop the noise" surrounding WaMu's need to increase appraisal values that led to the changes:

> [eAppraiseIT] should have Wamu write the introduction letters to their appraisers, set the stage and let us do our magic . . . . I assured her the noise from retail will stop . . . . She brought up the fact that Wamu knows this means little money to no money for [eAppraiseIT] and LSI and [WaMu] will fix that in the near future. But for now they need to stop the noise or none of us will be around. I believe her.

269.    Also according to the NYAG Complaint, by email dated February 22, 2007, eAppraiseIT's President explained to senior executives at First American WaMu's motives for demanding a "proven panel" of appraisers:

> We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's "Proven Appraisers" . . . . We will pay their appraisers whatever they demand. ***Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV.***

(Emphasis in NYAG Complaint.)

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 95

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

270.    According to the NYAG Complaint, in an email dated March 1, 2007, eAppraiseIT's President told WaMu executives:

> Recently, we have been notified that Lending would like us to use more of their "Proven Appraisers" versus appraisers off our pre-selected appraiser panel. It seems the amount of Reconsideration of Value (ROV) requests associated with our appraisers far exceeds those initiated when a WaMu proven appraiser completes a file. Said differently, **Wamu proven appraisers bring the value in a greater majority of the time** with minimal involvement of the vendor, sales and Appraisal Oversight. **I am fine with that, of course, and will happily assign Wamu orders to Wamu proven appraisers instead of eAppraiseIT's approved panel appraiser whenever possible.**

(Emphasis in NYAG Complaint.)

271.    In addition, according to the NYAG Complaint, on April 4, 2007, eAppraiseIT's Executive Vice President wrote an email to senior eAppraiseIT executives regarding eAppraiseIT's legal liability for using WaMu's "proven list."    According to the NYAG Complaint, the eAppraiseIT EVP explained that appraiser independence is chiefly:

> **the lender's responsibility since the OCC [Office of the Comptroller of the Currency]/OTS only pertain to lenders.** However, we as an AMC need to retain our independence from the lender or it will look like collusion. Imagine a simple mortgage broker saying he will give us the work if we use his "proven" appraiser. We say no. This is very similar to that except they are very big. . . .

> So the push back to WAMU needs to be (assuming we want to do this some day), eAppraiseIT needs to choose the appraisers, not WAMU. Where it gets **really** clear that eAppraiseIT is NOT choosing is the proven idea because they always go first and MUST be selected unless there is a specific reason why not. **eAppraiseIT is clearly being directed who to select. The reasoning that there are fewer ROVs is bogus for many reasons including the most obvious – the proven appraisers bring in the values.**

> Fun, eh??

272.    Furthermore, according to the NYAG Complaint, on May 29, 2007, eAppraiseIT's Executive Vice President communicated the problems in the eAppraiseIT/WaMu relationship in a letter to a WaMu senior executive as follows:

In the first quarter of 2007, the sales group of WAMU began to insist they choose the appraisers mostly due to their concerns about 'low values.' eAppraiseIT encouraged WAMU to resist these pressures if possible. However, WAMU decided to go with what came to be called the "proven" list of appraisers recommended by sales. . . .

The use of the "proven panel is challenging for eAppraiseIT in two ways: A. Financially – The proven panel is paid a minimal [sic] of 20% more than the eAppraiseIT panel. B. Risk Management – the possibility of collusion between the loan officers and appraisers is increased when eAppraiseIT does not control the selection. In addition, eAppraiseIT is concerned with any possible lender pressure or perception of lender pressure when the only way to get on the WAMU "proven" panel is through the loan officer.

According to the NYAG Complaint, despite the "possibility of collusion" raised by eAppraiseIT, the only change made in response to the message quoted above was that on June 7, 2007, a WaMu executive directed eAppraiseIT to change the name of the Proven List for the following reasons: "Name change from 'proven appraiser' and/or use of the moniker 'PAL' list is discontinued, under direction of the WaMu legal department. We are utilizing a more generic term acceptable w/in regulatory guidelines and industry standards."  Thereafter, according to the NYAG Complaint, the Proven Appraiser Panel was simply renamed the "WaMu Select" panel.

273.    The detailed allegations of the NYAG Complaint, including the internal WaMu and eAppraiseIT documents quoted in the NYAG Complaint and set forth herein, further show that WaMu and the Officer Defendants knew or recklessly disregarded WaMu's blatant appraisal interference, notwithstanding Defendants' portrayal to the public that WaMu's business practices were entirely above board.

**d.    Numerous LSI-affiliated Persons Witnessed WaMu's Systematic Manipulation of the Appraisal Process**

274.    As detailed by numerous persons affiliated primarily with LSI during the Class Period with percipient knowledge of WaMu's dealings with LSI, the systematic, improper

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 97

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

interference with the appraisal process by WaMu in its efforts to increase appraisal values whenever possible was not restricted to WaMu's internal practices or the Company's interactions with eAppraiseIT. In fact, these witnesses explain in detail that WaMu also inappropriately caused appraisals sourced through LSI to be improperly inflated through the same tactics used to pressure eAppraiseIT and its appraisers.

275. According to CW 39, a member of LSI's appraisal management team for WaMu from August 2006 through February 2007, WaMu was LSI's largest client. CW 39 stated that LSI was forced to give priority to appraisers from a WaMu "preferred appraisal" list for its appraisals.

276. According to CW 39, WaMu frequently attempted to steer appraisal values upward by (1) submitting ROVs, (2) through WaMu loan officers contacting appraisers directly, and (3) by WaMu loan officers requesting to work with specific appraisers because "they knew each other."

277. CW 39 remarked that although WaMu loan officers contacting LSI was "illegal," it happened frequently. CW 39 also characterized WaMu's efforts to dictate which specific appraisers should be used as "illegal," and as a practice that LSI would acknowledge but re-construe as a "recommendation" from WaMu. CW 39 stated that when WaMu made such a demand, he typically would use the appraiser "recommended" by WaMu.

278. CW 40 worked at LSI as a Customer Service Representative and Reviewer during 2007 through 2008. CW 40's contact with WaMu was through LSI's Client Services division, which was responsible for servicing LSI's business relationship with WaMu.

279. CW 40 explained that WaMu representatives were often unhappy when property comparables came in at values lower than WaMu desired. Under such circumstances, CW 40

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 98

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

was instructed by LSI Client Services to call the appraiser and instruct him to look for "better" comps.

280.     According to CW 40, sometimes when CW 40 would contact appraisers to request that they use "additional comps," the appraisers would refuse, stating that they had "already used the best comps and that there were no other good comps out there."  In these cases, an LSI supervisor would contact the appraisers and inform them that they have to find additional comps reflecting higher values or they would not get paid.

281.     CW 40 also stated that he received approximately 5-10 ROVs per week from WaMu, and that this number may have been understated because ROVs were often reclassified at LSI so that it would not appear that WaMu was asking for multiple ROVs.  However, even with this adjustment, CW 40 stated that he has received appraisals back from WaMu as many as three times that seek ROV.  In addition, according to CW 40, appraisers were required to provide "elaborate details" about anything that they found to lower the value of a home they were appraising for a WaMu loan, although no such requirements were imposed to increase the value of an appraisal.

282.     CW 40 confirmed that LSI appraisals for WaMu were accomplished by using appraisers from a "preferred list' dictated by WaMu, and that only certain appraisers were to be used in specific areas.  In fact, CW 40 stated that LSI was occasionally forced by WaMu to pay an appraiser more because WaMu did not want LSI to use the appraiser that was in the area.  For example, CW 40 stated that WaMu would insist on using a "preferred" appraiser twenty miles from a property, as opposed to a licensed appraiser who was not on WaMu's list but who was located "right down the street" from the property to be appraised.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 99

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

283.    CW 41, a Customer Service Representative at LSI during 2007, confirmed that LSI appraisers would often call her to complain that WaMu representatives were calling them directly, which was against policy and required a phone call to her supervisor.  According to CW 41, while she was at LSI this would happen approximately twice a day.

284.    Similarly, CW 42, who worked at LSI during 2007 in Customer Relations and who serviced WaMu confirmed that WaMu required LSI to use only "preferred appraisers," the list of which was dictated by and amended upon specific requests (sometimes one name at a time) by WaMu, and that there were problems with WaMu personnel calling appraisers directly. In addition, CW 42 also dealt with systematic requests from WaMu for ROVs.  Indeed, CW 42's group at LSI handled "a ton of reviews" requested by WaMu.

285.    CW 42 explained that, concerning ROV requests from WaMu, if WaMu was unhappy with the value initially appraised, the appraisal report was returned to the original appraiser.  If the original appraiser did not change the value to a higher value acceptable to WaMu, then the appraisal could be sent to a different appraiser.  According to CW 42, the new appraiser would not go out to the subject property again; he would merely review the appraisal report.

286.    CW 42 also explained that if an appraiser hired on behalf of WaMu refused to increase an appraisal value, the appraiser would have to provide very good documentation justifying this refusal and submit a letter explaining his reasoning.  Thus, explained CW 42, most of the time when pressured by WaMu, the appraisers agreed to increase appraisal values.

287.    In fact, according to CW 42, appraisers hired on behalf of WaMu routinely would accede to increases in value of at least $5,000-10,000 when pressured by WaMu.  CW 42 also

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 100

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

observed that there were "ways around a lot of different things out there" that could be used to create much larger increases in appraisal values as well.

288.    CW 43, an Appraisal Services Representative for LSI's WaMu team in 2006, observed first hand that WaMu would solicit repeat appraisals and ROVs from LSI when the first appraisal did not provide WaMu with the property value it sought.  CW 43 noted that WaMu would pursue its request to increase value with the first appraiser, or subsequent appraisers if necessary, until WaMu got the "value necessary to make the loan."  According to CW 43, most of the time, a second appraiser would give in and provide WaMu an appraisal reflecting the property value it desired.  CW 43 commented, with respect to WaMu's use of "preferred appraisers," that she found it "strange" and "wrong" that WaMu used its own designated appraisers instead of "an independent party."

289.    CW 44, who served as a Customer Service Specialist at LSI in 2006 and who serviced WaMu, also stated that WaMu loan consultants regularly called him to complain about LSI appraisals coming in at values lower than they desired.

290.    CW 45 worked in LSI Client Services from November 2006 through December 31, 2007.  While at LSI, CW 45 served on both the Bank of America and the WaMu teams.

291.    From November 2007 until he left the company, CW 45 handled ROVs requested by WaMu.  CW 45 was transferred to the WaMu team after LSI experienced a spike in business from WaMu after what CW 45 described as the "incident" with eAppraiseIT, referring to the filing of the NYAG Complaint.

292.    According to CW 45, there was a huge amount of pressure from WaMu on appraisers to "bring in values."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 101

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

293.    CW 45 confirmed that WaMu caused LSI to use only appraisers from a "preferred appraiser" list for WaMu appraisals. CW 45 did not know of any "preferred appraisers" that did not have a prior relationship with WaMu.  Therefore, CW 45 concluded that the "preferred appraiser" list was, in effect, a way for WaMu to select its appraiser, albeit through LSI as a "middleman," since any appraiser on the "preferred" list was pre-selected by WaMu.

294.    CW 45 explained that if the value on an appraisal did not "come in" at the value WaMu desired, WaMu could request an ROV and send in additional comps.  The loan file would then be returned to the original appraiser, who would determine whether a value increase was warranted.  CW 45 stated that appraisers typically said that they could not use someone else's comps and needed to use their own, but they would be pressured to consider the comps provided by WaMu.  According to CW 45, WaMu sometimes requested ROVs on a single property 3 or 4 times if WaMu was dissatisfied with the true appraisal value.

295.    CW 45 further stated that although WaMu should have handled everything relating to appraisals with LSI through the customer service department, WaMu instead would often contact appraisers directly – something CW 45 called a "common practice" by WaMu.  By way of example, CW 45 explained that CW 45 would call an appraiser to discuss the status of a WaMu ROV, and the appraiser would mention that he had already spoken with the WaMu loan officer or already had received the new comps.

296.    CW 45 also stated that if WaMu could not succeed in pressuring an appraiser to increase value, WaMu would often then try to switch to a different appraiser in hopes of getting the value WaMu wanted, or would request a different type of appraisal, such as a less-comprehensive "desk" or "filed" review.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 102

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

297. In addition, CW 45 stated that when WaMu transferred more business to LSI in response to the NYAG complaint, LSI received outstanding ROVs that WaMu had pending with eAppraiseIT. According to CW 45, WaMu simply brought all the eAppraiseIT ROVS over to LSI when WaMu severed ties with eAppraiseIT. Moreover, CW 45 observed that WaMu ordered ROVs from LSI on appraisals that had been conducted by eAppraiseIT. CW 45 could not comprehend how LSI ROVs on files transferred from eAppraiseIT were still considered ROVs since LSI did not perform the original appraisal, but they were handled as such. In other words, WaMu required LSI to perform ROVs on any appraisals that had been performed by eAppraiseIT to try to increase the value of those loans, even though WaMu knew that eAppraiseIT had been sued by the New York Attorney General for inflating appraisal values.

### e. Expert Analysis of Relevant Housing Data Also Evidences WaMu's Improper Appraisal Inflation During the Class Period

298. Lead Plaintiff's investigation of WaMu's lending practices includes the analysis of vast amounts of raw data collected about WaMu and other lenders that reveals WaMu's lending practices compared to those of its peer lending companies (the "Peer Group"). Lead Counsel retained experts in the field of banking regulation and mortgage finance to analyze data produced by WaMu and its Peer Group to the U.S. Department of Housing & Urban Development pursuant to the Home Mortgage Disclosure Act (defined above as "HMDA"). The complex analysis undertaken on behalf of Lead Plaintiff required the use of mainframe computer systems and custom programming by experts to compile and analyze over ten gigabytes of data consisting of millions of observations of raw HMDA data pertaining to every loan originated by WaMu and the Peer Group from 2005 through 2007. This amount of data would constitute over 1.3 million pages if it were produced in paper form.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 103

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

299.    To identify WaMu's Peer Group, Lead Plaintiff's experts determined the top lenders by lending volume in the United States for each calendar year from 2005 through 2007. These lenders compare directly and fairly to WaMu in that they have a national footprint for originating home mortgage loans and produce similar volumes of prime loans.  The Peer Group includes twelve other lending institutions such as Bank of America, Chase Manhattan, Countrywide, Indymac, and JP Morgan Chase.  Chart 2 below identifies each of the members of the Peer Group, along with the average number of loans originated per year by each of WaMu's peers.

**Chart 2: Average Annual Loan Originations
WaMu and Peer Group**



300.    Lead Plaintiff's experts then analyzed WaMu's lending practices compared to its Peer Group utilizing the HMDA data.  Specifically, mortgage lenders are required in their HMDA reports to reveal the basis for their denial of loan applications.  These reasons for denial take the form of nine "denial codes": (1) insufficient collateral; (2) debt-to-income ratio; (3) employment history; (4) credit history; (5) insufficient cash; (6) unverifiable information; (7) credit application incomplete; (8) mortgage insurance denied, and; (9) "other."   Insufficient

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 104

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

collateral is another way of saying that the appraisal of the home at issue did not hit a level sufficiently high to justify the requested mortgage.

301.    This analysis of HMDA data reflected in Chart 3, below, further corroborates other aspects of Lead Plaintiff's investigation set forth herein related to the Officer Defendants' pervasive manipulation of appraisals to increase appraisal values related to WaMu loans.  Indeed, the chart below shows that, on a nationwide basis, appraisal values created much less of a barrier to extending credit for WaMu than it did to WaMu's Peer Group:  WaMu denied loans based upon "insufficient collateral" at a significantly lower rate than WaMu's Peer Group did throughout the Class Period.



**Chart 3: Percentage of Mortgages Denied by WaMu Compared With Its Peer Group Based on "Insufficient Collateral"**

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| WaMu | 6.52% | 6.18% | 12.68% |
| WaMu's Peer Group | 22.43% | 21.04% | 25.55% |

**HMDA Data Year**

302.    The data summarized above is the result of a thorough analysis of the enormous volume of HMDA data concerning loan application denials for one-to-four family residences. This annual HMDA data set consisted of millions of loan denials.  Lead Plaintiff's experts

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 105

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    eliminated from consideration any declined loan where the lenders failed to offer a denial code,

2    leaving only those loans where at least one denial code was used.  If "collateral" is shown as a

3    reason for denial, then that loan was recorded as declined based on insufficient collateral for the

4    loan which is directly correlated to the value reflected in the property appraisal.  That is, if a

5    property appraises at a value too low for the loan in question, then the "collateral" denial code is

6    used.

7

8         303.    Because, as explained above, one of the denial codes is "credit application

9    incomplete," Lead Plaintiff's experts refined their analysis and findings to control for this

10   potential bias, which exists because an appraisal is unlikely to be requested (and paid for) if a

11   borrower's credit application is incomplete.  To determine whether this bias affected the above

12   findings, Lead Plaintiff's experts re-analyzed the HMDA data without any loan data included

13   that registered "credit application incomplete" in any of the three denial code fields.

14

15        304.    Also, since the HMDA data contains information on the state, county, and census

16   tract level as Federal Information Processing Standards (FIPS) codes, Lead Plaintiff's experts

17   took the additional step of only comparing WaMu denials to those of its Peer Group in the same

18   census tract.  By way of background, there are more than 65,000 census tracts in the United

19   States.  The size of a census tract varies by population; in a large urban area like Seattle, a census

20   tract may be the size of only a few city blocks.  In order to produce a robust analysis, Lead

21   Plaintiff's experts used data only from those census tracts where there were at least six loan

22   denials from WaMu and six loan denials from the Peer Group in a single census tract.

23

24        305.    Finally, in the interests of producing a fair representation of these findings, Lead

25   Plaintiff's experts weighted each census-tract level difference by the number of loans WaMu

26   declined in that census tract.  Thus, for those census tracts where WaMu denied twenty loans,

27

28

that census tract is given greater weight in the result than a census tract where WaMu made only six loan denials.  In so doing, Lead Plaintiff's experts were able to create a weighted-difference analysis between WaMu and its Peer Group, reducing volatility in the findings by (a) controlling for the volume of lending done both by WaMu and its Peer Group in a census tract; (b) using only those census tracts in which WaMu and its Peer Group denied at least six loan applications each; and (c) weighting the resulting differences by the WaMu denial count in each census tract so that differences between geographical areas are fairly represented.

306.    In sum, the analysis of relevant HMDA data undertaken on behalf of the Lead Plaintiff clearly reveals that, on a census tract by census tract basis, for each year of the Class Period, appraisal values posed little hurdle for WaMu to originate loans compared to its peer lenders.  Consistent with the other facts discussed above and throughout this Complaint, this analysis (based on raw data from WaMu and its peers) shows that WaMu was obtaining more favorable appraisals, and was thus less constrained in offering large volumes of loans, when compared with WaMu's Peer Group during the Class Period.

### D.    WaMu's Underwriting Standards Were Secretly Weakened at Defendants' Direction

307.    Unbeknownst to the members of the Class, the Officer Defendants caused WaMu's underwriting standards to significantly deteriorate during the Class Period.  In fact, the Officer Defendants created a false and misleading appearance of restrictive, quality-focused underwriting at WaMu through their many public statements.

308.    As explained above, underwriting is a critical component of every loan, because it acts as a form of quality control by which the loan originator is able to enforce its policies for approving or disapproving loans pursuant to its guidelines.  Throughout the Class Period, WaMu

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 107

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

did not disclose the specifics of its underwriting guidelines to the investing public, but instead treated such information as proprietary.

309.    Nevertheless, as discussed in Section VIII, the Officer Defendants regularly discussed WaMu's purportedly strong underwriting standards in public filings, earnings calls, and investor conferences.   In particular, Defendants misrepresented that the Company's underwriting for its "prime" loans was uniformly strong and that the Company took great care to confirm the credit-worthiness of its Option ARM and subprime borrowers.  For example, in the Company's 2005 and 2006 Forms 10-K, the Company stated: "[t]he Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans." Similarly, in speaking of the Company's Option ARM portfolio, the Officer Defendants claimed that "The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures."   The Officer Defendants repeatedly stated that "[c]redit quality continues to surpass [the Officer Defendants'] expectations," that the Company maintained "disciplined credit underwriting," that "on the credit front, we continue to be in excellent shape," and that the Company's "credit quality remains strong."

310.    Indeed, throughout the Class Period, WaMu touted the fact that it supposedly adhered to so-called "Responsible Residential Lending Principles" that WaMu had formulated in 2001.  These Principles, which WaMu distributed publicly through its website and other media, announced that WaMu "is committed to . . . setting the highest standards for responsible lending."   One of the first Principles set forth by WaMu was that WaMu purportedly *"only extend[s] credit to borrowers who have demonstrated to us the ability to repay the loan."*

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 108

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

311.    As detailed below, numerous former WaMu employees with direct knowledge of WaMu's underwriting policies and practices and WaMu management's involvement in establishing such policies and practices confirm that, unbeknownst to investors, with the Officer Defendants' knowledge or reckless disregard, WaMu abandoned appropriate and asserted underwriting standards for its loans in favor of underwriting policies designed to allow WaMu to increase the volume of loans it could originate and therefore inflate the Company's earnings.

### 1.    Underwriting Standards for WaMu's "Prime" Loans Were Deficient

312.    The Officer Defendants consistently emphasized to the public that the Company's "prime" loans were of "high quality" and attributed any of the Company's credit problems to the Company's subprime channel.  For example, at the Company's 2006 Investor Day held in September 2006, Defendant Cathcart claimed the Company had "maintained conservative lending standards" in the Company's prime and home equity portfolios that resulted in "high quality loans."

313.    However, as shown below based on numerous detailed reports from former WaMu employees who had direct, contemporaneous knowledge of the Company's actual underwriting practices, the Company's inappropriately sales-driven underwriting pervaded its home loans product line – not just its subprime loans, but also WaMu's so-called "prime" loans.

### a.    WaMu's "Prime" Loans Were of Lesser Quality than WaMu Disclosed

314.    During the Class Period, WaMu made regular public statements distinguishing between WaMu's "prime" and "subprime" loans.  For example, the Company periodically reported its volumes of prime and subprime mortgage loans produced and sold, the volumes of

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 109

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  prime and subprime loans held for investment, and the value of the Company's credit-sensitive

2  retained (or "residual") interests in securitized prime and subprime loans.

3      315.    However, Defendants' statements that purported to distinguish between WaMu's

4  "prime" and "subprime" loans were false and misleading because WaMu, during the Class

5  Period, did not adhere to industry standards for classifying loans, although Defendants'

6  statements on such matters created the false impression that WaMu had followed strict

7  underwriting guidelines for its "prime" loans and therefore originated and held "prime" loans

8  that were of high quality.

9      316.    In the mortgage and consumer lending industry, the most widely accepted

10  measure of borrower creditworthiness is the borrower's Fair Issac Credit Organization ("FICO")

11  credit score.  According to FICO, most lenders base loan approval on the credit score of the

12  borrower; it is "the industry's most trusted source."

13      317.    FICO scores are key determinants of whether a given borrower will be classified

14  as "prime" or "subprime."  FICO is the most commonly used credit score and during the Class

15  Period, Fitch Ratings termed FICO scores the "best single indicator" of mortgage default risk.  In

16  fact, in its 2005 Amended Form 10-K among other class period filings, WaMu describes credit

17  scores as "a useful measure for assessing the credit quality of a borrower."  The Company further

18  states that the credit score is one of two key determinants "in forecasting future loan

19  performance."    As explained above in Section VI.C, WaMu stated that the other "key

20  determinant" in forecasting future loan performance is the loan's LTV ratio.

21      318.    A FICO score can range from 300 to 850 and is calculated based on payment

22  history, amounts owed to creditors, length of credit history, new credit sources, and types of

23  credit used.  Generally, the higher the FICO score, the better the borrower's credit and the lower

the risk of default. According to Fair Isaac, approximately 27% of the U.S. population has a FICO score between 750 and 799, 27% has a score below 650, and 15% has a score below 600.

319.    According to the Expanded Guidance for Subprime Lending Programs, issued jointly by the Officer of the Comptroller for Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation and the Officer of Thrift Supervision on February 2, 2001, subprime borrowers generally have a FICO score of 660 or below. This Expanded Guidance was sent to CEOs such as WaMu CEO Defendant Killinger by both the FDIC and the OTS. The Expanded Guidance lists various credit characteristics of subprime borrowers, including: payment delinquencies, charge-offs, judgments and bankruptcies. Such borrowers "may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories." As expressly pointed out in the guidance, subprime loans "have a higher risk of default than loans to prime borrowers." The Expanded Guidance states that loans should be classified as subprime in accordance with the guidelines and other applicable Agency guidelines.

320.    Standard & Poor's, one of the leading securities rating agencies and self-proclaimed "single authoritative source of unbiased equity analysis and opinion" states that it considers "prime borrowers to have a FICO credit score of 660 or above."

321.    Freddie Mac, a GSE, issues a Single-Family Seller/Servicer Guide which states that "FICO scores are an effective tool in evaluating a Borrower's credit reputation . . .Freddie Mac has identified a strong correlation between Mortgage performance and FICO scores." For single-family homes, Freddie Mac views a FICO score of 660 or above as "likely to have an acceptable credit reputation." A FICO score of 620 to 660 is viewed as "an indication that the Borrower's willingness to repay and ability to manage obligations as agreed are uncertain." A

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 111

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1   FICO score of below 620 "should be viewed as a strong indication that the Borrower's credit

2   reputation is not acceptable[.]"

3      322.    Throughout the Class Period, Washington Mutual publicly stated that its prime

4   loan borrowers had high FICO scores.  For example, during WaMu's 2006 Investor Day

5   Conference held on September 7, 2006, Defendant Cathcart stated that the home equity portfolio,

6   primarily generated through retail banking channels, has an average FICO score at origination of

7   734.  Defendant Cathcart also commented on the Option ARM loan product, which he said is

8   "not made available to subprime borrowers," stating that the portfolio has a weighted average

9   FICO score of 708.

10      323.    WaMu's claims of high FICO scores for its prime home equity portfolio and

11  Option ARMs continued throughout 2006 and 2007.  During the Lehman Brothers 10th Annual

12  Financial Services Conference on May 16, 2007, Defendant Killinger reported that the prime

13  residential portfolio, two-thirds of which is Option ARM loans, has an average FICO score of

14  708.  The Option ARM customers are reported to have an average FICO score of 700.

15      324.    But, according to confidential witnesses who worked for WaMu at the time, those

16  publicly-reported FICO scores were not correct or were misleading at best.  In fact, CW 46, who

17  was a Loan Consultant for WaMu in New York from 2003 to 2006, stated that during the Class

18  Period, borrowers with credit scores as low as 540 were approved for "prime" loans.  Other

19  witnesses have also confirmed that WaMu's so-called "prime" loans often were to borrowers

20  with subprime FICO scores.

21      325.    CW 47 worked with WaMu from 1997 to February 2008.  From late 2005 until

22  February 2008, CW 47 worked for WaMu as a Negotiated Transaction Manager in South Florida.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 112

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

During 2004 through 2005, CW 47 served as a Credit Quality Manager and an Area Underwriting Manager responsible for the east coast.

326.    According to CW 47, WaMu made regular "FICO exceptions" on Option ARM loans, a supposedly "prime" product. CW 47 stated that until the summer of 2007, a borrower could receive a low-documentation Option ARM loan from WaMu with a 620 FICO score.  In fact, CW 47 recalls a meeting in 2003 with the former Home Loans Chief Credit Officer Mark Hillis during which Hillis predicted that. within five years, 85% of WaMu ARM borrowers would not be able to afford their mortgage.

327.    Similarly, CW 2 worked for WaMu from 2005 to February 2008 as an Underwriting Supervisor.  CW 2 also held several positions with the Company from 1995 to 2005 including Senior Credit Analyst Officer, Senior Loan Coordinator and Telephone Banker. According to CW 2, beginning in 2005, WaMu lowered the required FICO score on prime loans. While before 2005, a FICO score of around 700 was required, between 2005 and 2007 the minimum FICO score requirement was 620 – 40 points below the recognized threshold between prime and subprime borrowers.

328.    Through Lead Plaintiff's investigation, Lead Plaintiff has obtained a training document for subprime loan production employees that was revised and updated in September 2007.  The document is a WaMu PowerPoint presentation entitled "Specialty Lending UW [Underwriter] HLCA [Home Loans Credit Authority] Training," revised September 26, 2007.  In the training document, WaMu explains which loan applications are eligible for "specialty lending consideration," (*i.e.*, subprime) as opposed to being considered a prime loan.  The presentation makes clear that, regardless of borrowers' credit history or actual potential to repay a loan, if the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 113

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

borrower WaMu targets for one of its "prime" loans has a FICO score over 619, that borrower would be considered a "prime" borrower.

329.    In one stunning example, the Company instructed in an internal WaMu document to its underwriters during the Class Period that if a borrower applies for a "5/1 Amortizing ARM" and the borrower had a bankruptcy "less than 4 years ago," but has a FICO score of 621, WaMu will consider that borrower prime.  Even with a recent bankruptcy and a weak FICO score, WaMu would classify such borrowers as "prime" based on its loose guidelines and to the exclusion of any other credit risk considerations (as explained above, a borrower with a FICO score below 660 is typically considered a subprime lender).

**b.**    **WaMu's Underwriting Standards for Its<br>So-Called "Prime" Loans Were<br>Irresponsibly Permissive**

330.    Highly experienced mortgage underwriters who worked at WaMu during the Class Period were shocked by how lenient WaMu was in its lending.  Confidential Witness 48 was a Senior Underwriter in the Washington Mutual Wholesale loan fulfillment center in Lake Success, New York, from June 2005 through February 2008.  CW 48 had twenty-plus years of experience underwriting home loans, beginning at Chemical Bank and moving on to Chase and Wells Fargo before joining WaMu in June 2005.  When CW 48 arrived at WaMu, CW 48 was stunned to find that WaMu's supposedly "A paper" (*i.e.*, prime loans) consisted of loans made to borrowers with credit scores in the 500s, high LTV ratios, and Option ARM loans.  CW 48 reported that there was "only so much you could do" with the loans she underwrote, because they met WaMu's lenient underwriting guidelines and CW 48 did not want to discriminate among borrowers by denying loans to some borrowers who met WaMu's loose guidelines merely because CW 48 did not think that borrower could actually repay the loan that WaMu had sold.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 114

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

331.    Similarly, Confidential Witness 49 was appalled by the lenient standards in place at WaMu.  CW 49 served as a Senior Underwriter with WaMu through a private mortgage insurance company.  CW 49 reported that WaMu's reputation in the mortgage industry was that "if you had a pulse, WaMu would give you a loan."  CW 49 stated that the underwriting guidelines at WaMu "changed every minute. . . .  You would literally be getting an email every second that the guidelines changed or would have a pissed off account executive at your desk asking why the loan can't go through."  Often, CW 49 reported, loans would be taken away from her to be approved by another underwriter who was not as conscientious.  CW 49 often saw active or approved loans in the system that CW 49 had refused to underwrite and were ultimately signed off on by someone else. According to CW 49, "They would give it to one of their 'lead underwriters' to approve."

332.    Before the loan came to CW 49's desk, it could be automatically underwritten through a computer program, modeled after Fannie Mae's "Desktop Underwriter" ("DU") program.  CW 49 explained that while anything outside of these guidelines would require a manual underwriting process, loans that could be underwritten using the DU system could be approved by a loan processor without any involvement from an underwriter.  CW 49 recalled that regularly, if a loan was rejected by the computer, the loan consultant would repeatedly re-enter the loan's information, changing the information a little each time, "tweak[ing] the system."

333.    Confidential Witness 50, who served as a Loan Consultant with WaMu from 2001 to 2007, recalled that in 2005 WaMu's underwriting guidelines loosened dramatically, particularly with regard to Option ARM loans.  CW 50 experienced that as WaMu "pushed" Option ARM loans, "[a]nyone got approved for [Option ARMs]."  Indeed, according to CW 50, WaMu's underwriting standards for Option ARM loans were among its most lenient.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 115

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

334.    CW 9, who, as noted above, served as a Senior Loan Coordinator with WaMu from 1998 through 2007, explained that exceptions to the underwriting guidelines were made often during the Class Period.  CW 9 recalled, "I saw underwriting managers and other managers waive a lot [of supposed underwriting rules]."  According to CW 9, everyone in the branch felt pressure from WaMu management to close loans.  "Once a week you'd go in with your manager, [and he'd say] 'why didn't this loan close, why didn't that one close?'"  CW 9 said the pressure "was coming from the very top, the managers had to listen to the head manager, who had to listen to corporate."  CW 9 added, "I almost had a nervous breakdown."

335.    According to CW 9, the underwriting guidelines were "constantly changing" and there were "a lot of them.  Over the last year, when we were booming, [the guidelines] changed a lot."  The underwriting procedures progressively loosened and "got really bad in 2006."  WaMu's "top priority was to get as many loans closed as quickly as they could close and not worry – they just wanted the volume, and it didn't seem to matter how they got it."  CW 9 felt that WaMu employees were "greedy" and that the borrowers suffered as a result.  CW 9 concluded, "[w]e could never figure it out why people came to us [for loans]."

336.    Various witnesses with direct experience in WaMu's prime underwriting operations have explained that during the Class Period, exceptions to WaMu's stated, already low prime underwriting guidelines were the rule.

337.    As observed by CW 2, who worked for WaMu from 1995 through 2008, most recently as a Assistant Vice President Credit Level 3, Underwriting Supervisor, no exception to the underwriting guidelines was needed for many questionable loans, because WaMu's "guidelines were so generous."  However, for those loans that did not fit within the loose guidelines of WaMu's underwriting standards, exceptions were encouraged and readily available.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 116

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

338.    Indeed, Confidential Witness 51, a Senior Underwriter at the WaMu home loan center in Lake Success, New York from 2007 to 2008, stated that guideline exceptions were "part of the norm . . . it was so commonplace to go outside of the guidelines."  Even when underwriting exceptions were sent to management for approval, CW 51 observed, the exceptions "were always approved, so it was just business as usual and something that they were comfortable with."

339.    Confidential Witness 5, who was a Senior Credit Quality Manager with WaMu from March 2005 through February 2008, observed that the true problem with the credit quality of WaMu's "prime" loans was that WaMu's prime underwriting "standards" were actually viewed by WaMu as little more than suggested guidelines:  WaMu's loan consultants were encouraged by WaMu to obtain exceptions to the underwriting guidelines throughout the Company whenever necessary to close more loans.

340.    Confidential Witness 52, an underwriting Team Manager with WaMu from 2004 through 2007, was in charge of working through loan problems with more junior underwriters when they could not resolve the issue on their own.  CW 52 could authorize an exception or escalate underwriting issues up to management.  CW 52 estimated that exceptions to the underwriting guidelines occurred 30-40% of the time.  According to CW 52, the types of exceptions "varied so much" from "accepting certain income documentation – or lack thereof – to credit score exceptions . . . there [were] tons of exceptions."

341.    Confidential Witness 53, a Senior Loan Processor in Pittsburgh from 2004 through 2006 and again in 2007, agreed that WaMu's loans were exception-ridden: "You could pretty much get an exception on any loan you wanted to."  If CW 53 did not agree that the appropriate conditions to approve a loan were met, CW 53 would send the loan back to the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 117

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

underwriter.  If the underwriter did not accept the loan, "usually" the in-house managers would accept the loan.  Occasionally, particularly problematic loans would be escalated to upper management.  According to CW 53, in those cases, WaMu management would approve it because WaMu management "just wanted to get loans through, close loans.  It didn't matter if the loan was good or it wasn't good."

342.    As discussed further above, Confidential Witness 47 was a long-time WaMu employee whose final position with the Company was as a Negotiated Transaction Manager.  As a Negotiated Transaction Manager, CW 47 was one of four senior underwriters with the Company charged with approving exceptions to WaMu underwriting guidelines for loans greater than $3 million and exceptions beyond those that WaMu underwriting managers were allowed to make.  CW 47 relayed that she and others in her position at WaMu were required to make numerous exceptions to WaMu's stated underwriting guidelines.  Indeed, CW 47 stated that the Negotiated Transaction Managers would be under a great deal of pressure to approve certain loans, especially where loan consultants had "important relationships."  Those loans for which CW 47 and the other Negotiated Transaction Managers refused to make exceptions, even after being pressured, were referred up WaMu's chain of command to Mark Brown, National Underwriting Manager, or Cheryl Feltgen, Division Executive Chief Risk Officer for approval where, as CW 53 described, the exception ridden loans would readily be approved.  In this regard, CW 47 said, WaMu was willing to make greater FICO exceptions on Option ARM loans than on fixed rate loans.

343.    Confidential Witness 11 confirmed the widespread use of underwriting exceptions at WaMu.  According to CW 11, a former Senior Loan Coordinator who was responsible for evaluating the acceptability of loan applications at WaMu from November 2006 to mid-2007,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 118

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    "[w]e used to make exceptions that were not justified."  CW 11 recalled that some WaMu loan

2    originators were able to generate "huge amounts of loans" by making exceptions to underwriting

3    guidelines.

4        344.    Confidential Witness 54 further confirmed that the Company's "prime" loans had

5    significant credit problems inherent in their underwriting.  CW 54 spent over seven years with

6    WaMu, most recently serving as a Credit Risk Supervisor in Jacksonville, Florida from 2004

7    until March 2007.  As a Credit Risk Supervisor, CW 54 managed sixteen people involved in the

8    auditing of post-closed loans, which involved the analysis and validation of credit and additional

9    information processed through each of the loan processing centers, acting as a "validation of the

10   front-end process."  CW 54 explained that the credit risk area consisted of approximately sixty-

11   eight individuals who reviewed a random sample size of 10% of all loans underwritten

12   throughout each of the WaMu loan processing centers.  They were not involved in any analysis

13   of loans pertaining to LBM or any loans acquired by WaMu from third-party lenders.  CW 54

14   remembers that all loans that she were analyzed were "prime."

15       345.    Through the use of an internal system program called "END," 10% of the loans

16   from each loan processing center were selected for review on a monthly basis, and they would

17   validate the specific information pertaining to each individual loan.  CW 54 was surprised by the

18   many loans that were approved, yet were ultimately identified by the group as "problem loans."

19   While the loans were designated as prime, the audit would routinely find information suggesting

20   that there were significant credit issues with various loans.  For example, CW 54 indicates that

21   while the loan files might designate high credit scores, the audit would routinely identify

22   borrowers that did not maintain the credit worthiness to qualify for the loans that they had

23   already been approved, such as borrowers with credit scores as low as 525.  Those types of errors

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 119

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  were constantly being identified by the auditing group, which would subsequently forward those

2  problem loans to either the risk mitigation or risk management departments.  CW 54 recalled that

3  WaMu senior management, including Cheryl Feltgen, Chief Credit Officer for the Home Loans

4  Group, received and reviewed this information.

5

6      346.  One of the primary causes for the errors located by CW 54's group was that

7  WaMu underwriters relied heavily upon the Company's "Optis" system, which was an internal

8  "auto-approve" program that allowed many loans to be approved without any significant level of

9  due diligence on the borrowers.  CW 54 pointed out that the purpose of Optis was simply to

10  make it easier to approve a higher volume of loans, rather than to perform a thorough due

11  diligence on each borrower.

12      347.  According to CW 29, a WaMu underwriter in Portland Oregon from 2002 through

13  2006, WaMu's biggest problems were ARM products and stated-income loans.  CW 29 explained

14  that even when "borrowers were simply not qualified," WaMu's loose underwriting guidelines

15  allowed borrowers to meet stated-income loan guidelines because of their credit scores.  For

16  example, CW 29 recalled multiple times where underwriters wanted to lower the stated income

17  on the loan application, based on an evaluation of the borrower's actual circumstances, but

18  WaMu would not allow such revisions.  CW 29 reported, "It seemed that with any stated

19  [income] loan, $5,000 was the magic number that loan consultants would put on applications as

20  monthly income. It got to be a joke after a while."   As a result, CW 29 said that stated income

21  loans were commonly referred to at WaMu as "lie-to-me loans."

22

23

24      348.  In addition, with regard to stated-income loans, during CW 29's tenure at WaMu,

25  the Company began to accept a job description in lieu of proof of employment.  Underwriters

26  objected to this practice because a job description is not sufficient proof that a person is

27

28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 120

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

employed and holds that position.  CW 29 recalled that the borrower's job description did not even have to be produced by the borrower's employer or have to be on their employer's letterhead:  "it was sufficient to print out a job description found online."  Thus, in addition to allowing borrowers to state their income without being required to show any proof, according to CW 29, WaMu similarly allowed borrowers to state their employment without requiring any further verification.

349.    Regarding the problems WaMu began to have with loan losses, according to CW 29, "all the underwriters we have here in town have a joke:  We laugh and say it was all those 'lie to me loans' that were done."  CW 29 explained, "[w]e knew it was all the loans we did that we would see foreclosures on."

350.    Confidential Witness 8 also found WaMu's policy of offering "stated-income" loans particularly troublesome.  According to CW 8, WaMu began to issue more stated income loans in 2006 and 2007.  CW 8 recalled that "Ten or fifteen years ago, a stated income loan was called a 'liar's loan' by Fannie Mae. Then they brought it back."  CW 8 said that often on stated income loans, there was "no due diligence to verify income." Depending on the borrower's FICO score, WaMu may not ask to see any additional information. "If there was someone with a great FICO score, they didn't ask for anything else. Sometimes the FICO score and the appraisal were the only things they looked at."  CW 8 saw an "increase in early payment defaults" that CW 8 attributed to WaMu making loans to borrowers who "were qualified for something on a stated income that they couldn't pay for."

351.    Confidential Witness 55 worked for WaMu as a Senior Underwriter for non-prime loans from October 2003 to May 2007 and as an underwriter for prime loans from October 2007 to March 2008.  CW 55 stated that 100% stated-income loans were the biggest product for

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 121

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

the Company.  Even 100% stated-income loan files where CW 55 found fraud were "pushed through" by WaMu management.  For instance, CW 55 found loan applications containing fraudulent W-2s, letters purporting to state income, bank statements and business licenses, but WaMu managers would still approve the loans even after being advised that borrower documentation was not in order.

352.    Confidential Witness 56, who was a Retail Bank Loan Underwriter in Pleasanton, California from 2007 to April 2008, experienced that WaMu's underwriting guidelines were "really loose" and "anyone could get a loan."  CW 56 compared her experience at WaMu with CW 56's prior employment at Countrywide Bank, recalling that Countrywide had standards mandating, for example, that a borrower possess a debt-to-income ratio ("DTI") of 38 to 40 percent.  In contrast, CW 56 recalled, "WaMu let you go up to 65 or 67 percent DTI."

353.    Furthermore, WaMu often designated loans as "fully documented" when, in fact, the loans had limited to no documentation of income or assets.  Confidential Witness 57 was a Trader in WaMu's Capital Markets Group in Seattle, Washington from 2002 until October 2007.  CW 57 was responsible for coordinating sales of Alt-A loans originated by WaMu to the secondary market.  CW 57 managed the information pertaining to loans underwritten by WaMu and sold to large institutional investors.  Due diligence by these institutional investors often revealed that individual loans that had been designated as fully documented, actually had limited or no documentation.  These situations were monitored because it affected the eventual pricing of the loans in the secondary market.  WaMu was supposed to be incorporating "up to 3/8 of a point," or 0.375%, for the "documentation relief."  The frequency with which this occurred made CW 57's job more difficult to effectively price and manage the sale of many bulk whole loan portfolios to institutional buyers.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 122

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

354.    As discussed below, these "liar's loans" were also prevalent in the Company's subprime operations, where the Company made loans to borrowers with admittedly poor credit, based on assets and income for which the Company did not seek documentation.

355.    Even the "conforming," supposedly standard prime loans that WaMu sold to GSEs had substantial defects as a result of WaMu's overly permissive underwriting.  For example, through its investigation, Lead Plaintiff obtained a non-public reported entitled "Loan Disposition Summary" for a December 2005 pool of "conforming" WaMu loans sold to Freddie Mac.  These summaries indicated that for the $145 million pool of ostensibly conforming WaMu loans, over one third of the loans were rated 2W, or had "material exceptions waived."  These exceptions related directly to the credit-worthiness of the borrower, with large categories of exceptions relating, *inter alia*, to appraisals, borrower's income, borrower's assets, and credit history.

356.    Similarly Confidential Witness 58 was Assistant Vice President of Credit Due Diligence in WaMu's Capital Markets Group from 2005 through January 2007.  CW 58 was responsible for performing due diligence on pools of loans being sold into the secondary market by WaMu.  The pools included prime and Alt-A loans.

357.    CW 58 said that "a lot" of the loans in these pools were Option ARMs which had "neg am-ed to 125% LTV."  In fact, CW 58 said, "We'd sell entire pools like that."  CW 58 also related that the Company would pool "stated" Option ARM loans at 125% LTV as long as the borrower had a certain FICO score.  CW 58 verified that the vast majority of these toxic loans were originated by WaMu.

358.    CW 58 explained that, during the due diligence process for pools of loans to be sold or securitized into the secondary market, the due diligence group analyzed only a certain

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 123

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

percentage, typically 10-15%, of the loans.  Loans that did not conform to the buyer's requirements would be "kicked out."  Some loans were then to be "re-pooled" at a later date in hopes that it would not be picked out for due diligence and could "skate[] through."  CW 58 stated that if a loan was truly not sellable to third parties because of nonconformity with appropriate underwriting standards, it then became part of WaMu's own held-for-investment portfolio.

359.    CW 58 participated in monthly national conference calls and would voice concerns to WaMu management, including Mark Brown, National Underwriting Manager, about the types of loans that WaMu was originating.  CW 58 said that during the last six months of CW 58's tenure with the company, CW 58 was very vocal about her concerns over the types of loans that WaMu was originating.

360.    CW 58 said that "WaMu would get pissed about the loans in their portfolio." Further, CW 58's group was "getting heat" from WaMu management over why these unsellable loans were increasingly being left in WaMu's "held for investment" portfolio.  Juanita Gephardt, Vice President of Warehouse Management/Due Diligence at Washington Mutual Bank, would often complain to CW 58 and ask "How come you can't sell the loans?" CW 58 would respond that it was because "they are broken."  CW 58 said that CW 58 began to notice an increase in loan "kick-outs," or rejections based on nonconformity (i.e., poor underwriting) starting in July of 2006, around the time when CW 58's unit was moved from Seattle, WA to Florence, SC.  At that time, CW 58's group was increased from a staff of five to a staff of fifteen, so as to "try to help clear issues" on rejected loans.

361.    CW 58 recalled that WaMu's senior management received a report entitled the "PURT report," which broke down all loans rejected by branch and detailed the reason why the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 124

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

loans had been rejected.  CW 58 said that the PURT report was updated weekly and "went to the upper management."

362.    CW 59 served at WaMu beginning in 2001, and acted as a Senior Risk Analyst in the Risk Analytics Group at WaMu from April 2007 until June 2008.  According to CW 59, in general, the Risk Analytics Group conducted credit risk analyses on the various portfolios managed by the separate business units at WaMu, including home loans, commercial loans and credit card portfolios, including analyses of financial results, delinquency and loss trends, performance drivers and correlation analysis pertaining to economic trends.

363.    CW 59 explained that the Risk Analytics Group focused on the analysis of such issues as delinquencies, cure rates and vintage analysis of the loan portfolios.  CW 59 explained that the most notable issue that was consistently discussed in WaMu internal management meetings pertained to the Option ARMs portfolios, including the fact that there were trends being observed by WaMu insiders of increasing default rates of Option ARM loans that WaMu originated in 2006.

### c.    WaMu's Option ARM Underwriting Was Dangerously Deficient

364.    Several of WaMu's former employees observed how WaMu's lenient underwriting standards negatively impacted the quality of the Company's Option ARM loans.  As discussed above, Option ARM loans are adjustable-rate mortgage loans that give the borrower the option each month to make a fully-amortizing, interest-only, or minimum payment, and to amortize any unpaid interest onto the principal of the loan (referred to as "negative amortization").  WaMu offered a low "teaser" rate for an introductory period of the loan, which automatically adjusted to a much higher rate, the "fully-indexed" rate, after a set period of time, or after a certain amount of unpaid interest had been amortized onto the principal.  By way of an example, the teaser rate

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 125

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

for such a loan could be 2% for one year, after which the rate would increase to a fully indexed rate of 9% or thereabouts.

365.    These loans, with the inherently risky feature of negative amortization and potential payment shock when the interest rates automatically adjusted, were made all the more dangerous by sales and underwriting at WaMu that did not ensure that a borrower was knowledgeable of the complex nature of the loan and that did not ensure that borrowers had sufficient income and assets to pay the loan at the fully-indexed rate.  Indeed, as set forth above, CW 47 recalled a 2003 conversation with Mark Hillis, WaMu's former Retail and Home Loans Chief Credit Officer, in which Hillis prophesied that *within five years, 85% of WaMu's ARM borrowers would not be able to afford their mortgage*.  However, these loans were WaMu's "flagship product" and provided huge, short-term profit margins to the Company, and according to CW 47, the Company was actually willing to make *greater FICO exceptions* for Option ARM products than for other loans.

366.    Because WaMu's Option ARM loans were of particular concern to investors who wanted to make certain that the Company was not underwriting high-risk loans with potentially high profit margins, at the expense of massive future credit losses, Defendants regularly and falsely reassured investors of the strength of the Company's underwriting for Option ARM loans.  In specifically addressing concerns about the Company's Option ARM portfolio, Defendant Cathcart stated during WaMu's 2006 Investor Day, "At origination, WaMu focuses on an effective underwriting process and borrower disclosures through our experienced sales force and broker channels."  As detailed in Sections VI.B and VI.C, this was untrue.

367.    Furthermore, Defendants stated, repeatedly and falsely, that the Company underwrote its Option ARM loans to the fully-indexed rate, thus helping to prevent payment

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 126

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

shock when the "teaser" rate ended.  For example, on a January 18, 2006, earnings call for fourth quarter and full year 2005, Defendant Rotella emphasized that "***an important fact is we underwrite every loan at the fully indexed rate***.  And so that's an important thing to note from a credit perspective."  Defendant Killinger continued this deception at a November 16, 2006, investors conference: "Our option ARM portfolio quality is also very good . . . . This quality reflects the option ARM underwriting which evaluates the borrower's ability to make the loans' fully amortizing payments, even though they are allowed to make a much lower initial payment." Defendant Killinger continued in this vein, announcing definitively: "Let me make one clear point. ***In our underwriting on option ARMs we underwrite to the fully indexed rate, we never underwrite to the teaser rate***. And so, again, we don't see this as having a significant impact on the underwriting for us."

368.    This claim was particularly crucial to investors, as Defendants knew, because the monthly payment for borrowers at the fully-indexed rate could be a dramatically higher burden than the monthly payment at the initial, teaser rate.   Although a borrower may be able to repay a loan at a 2% interest rate for an initial teaser period, once the interest rate automatically adjusted to the fully-indexed rate that could be 9.95%, if not higher, repayment could be impossible for the borrower.  The difference in monthly payments between these two rates is astronomical.   For a $200,000, 30-year loan, a borrower may be able to pay $740 a month at a 2% interest rate. However, once the loan reset to a 9.95% interest rate, the borrower would suddenly be faced with a monthly payment of $1750 – an increase in monthly expenses of over $1000, or over 235% of the original payment.  If the loan is underwritten only to ensure that the borrower able to afford a $740 monthly payment, rather than the fully-indexed rate, then the financial shock of the reset could easily force the borrower into default, causing credit losses to WaMu.  However, if WaMu

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 127

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

had originally underwritten the loan to ensure that the borrower could pay $1750 a month and merely offered the teaser rate of 2% as an enticement to borrow from WaMu, then the credit risk would be much lower.

369.    This credit risk is exacerbated by the fact that WaMu's Option ARM loans provided borrowers with the option to make only a "minimum payment" of an amount less than the currently-due interest, not including the principal due.  In other words, WaMu's Option ARM loans allowed the borrower to negatively amortize some part of the accruing interest and add it to the principal of the loan.  However, once the negatively amortized interest, together with the principal, reached 125% of the amount of the original loan (or 110% for part of the Class Period), the loan would be "recast" at a much higher interest rate and then amortize over the remaining term of the loan.  This means that after the recasting event, the borrower would be required to repay the original loan balance, in addition to all interest deferred, at a higher interest rate.  In other words, borrowers were left in a worse financial position than before they were issued the loan.

370.    For example, if after three years a borrower hit the 125% negative amortization cap of a $200,000, 30-year loan (a total of $250,000), the borrower's monthly payments would recast to reflect a fully-indexed rate of (for example) 9.95%, amortized for the remainder of the loan.  In this instance, the borrower's initial teaser rate may have been $740, but their monthly payment for the remaining twenty-seven years would be $2225.

371.    Thus, underwriting Option ARM loans to the teaser rate is incredibly dangerous from a credit standpoint and has extremely negative implications for the borrower.  It is also contrary to what WaMu told the investing public it was doing.  Yet, that is exactly what WaMu did.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 128

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

372.    Confidential Witness 60, a Retail Loan Consultant with WaMu from 2002 through 2007, reported that **until late 2007**, WaMu had underwritten its Option ARM loans to ensure only that the borrower could make monthly payments at the "teaser" rate.  When, in late 2007, the Company changed its guidelines to finally require its underwriters to underwrite the loans to the fully-indexed rate, it was a major change for the underwriters.  CW 60 observed that, "At the time the loans started falling out of favor, they started underwriting based on the index rate and it just snowballed from there."

373.    Confidential Witness 61, a WaMu Retail Loan Consultant in Kensington, Maryland from 2001 through December 2007, confirmed that WaMu underwrote Option ARM loans to the teaser rate, rather than the fully-indexed rate.  In 2007, according to CW 61, WaMu's new guidelines resulted in fewer borrowers being able to qualify for Option ARM loans based on the fully-indexed rate.

374.    Confidential Witness 62, a Senior Underwriter at the WaMu's Lake Success, New York branch from June 2005 until February 2008, confirmed that during the Class Period, WaMu underwrote Option ARM loans to the teaser rate, rather than the fully-indexed rate.  Confidential Witness 12, a former Loan Consultant for WaMu in Riverside, California, also confirmed that WaMu underwrote its Option ARM loans to the "teaser" rate, rather than the fully-indexed rate.

375.    Witnesses in other divisions of WaMu also have confirmed that WaMu underwrote its Option ARM loans to their "teaser" rates, at least until August 2007.  According to Confidential Witness 1, a Due Diligence Director in the WaMu Transaction Management group in Anaheim and subsequently Fullerton, California, who spent over 17 years with WaMu from 1991 until 2008, WaMu required loans that it purchased from third parties to conform with underwriting guidelines that WaMu applied to the loans that it originated.  CW 1 explained that

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 129

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

this meant that the due diligence on loans that WaMu was purchasing from other lenders was performed based on an "overlay" of WaMu's underwriting guidelines over the third party loans and that any loans that did not conform to WaMu's own underwriting guidelines were supposed to be excluded from WaMu's purchases of loans originated by third parties.  Thus, WaMu periodically updated its "Bulk Seller Guide" to conform with WaMu's own underwriting requirements, including in August 2007.  Until August 1, 2007, WaMu did not require its own Option ARM loans to be underwritten to the loans' fully-indexed (rather than "teaser") rate, contrary to the Officer Defendants' numerous public statements, and likewise did not impose such a requirement on loans purchased from third parties.  This is confirmed by a document obtained in the course of Lead Plaintiff's investigation authored by WaMu and entitled "Mortgage Securities Corp. Seller Guide Update – Announcement Concerning Qualifying Rate and Qualifying Payment for Hybrid ARM, IO, and Option ARM Products."  That document indicates that, effective August 1, 2007, WaMu Option ARM loan underwriting shifted to require qualification for such loans only at the fully-indexed rate.

### 2. WaMu Also Secretly Implemented Dangerously Permissive Underwriting Practices for Its Subprime Lending

376.    Throughout the Class Period, WaMu made loans to "subprime" borrowers through its subprime channel, LBM.  In 2006, LBM was consolidated into the Home Loans Group, and Company's subprime lending (formerly LBM) was referred to in the Company's SEC filings as WaMu's "specialty mortgage finance operations."  This reorganization did nothing to modify WaMu's subprime lending practices.

377.    Although WaMu itself does not specifically define "subprime" borrowers, subprime loans are generally made to borrowers with lower FICO scores who could not normally

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 130

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

obtain prime loans.  Because subprime borrowers' credit scores indicated that they were less creditworthy than WaMu's "prime" borrowers, WaMu was able to charge much higher interest rates and fees on these subprime loans.  However, WaMu also assured investors that although loans were being made to borrowers with low FICO scores, the Company's purportedly rigorous underwriting standards guarded against excessive credit risk to the Company.  For example, the Company's Amended 2005 Form 10-K announced that, "[t]he Company seeks to mitigate the credit risk in [WaMu's subprime] portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans."  As set forth below, WaMu made a similar reassurance in its 2006 Form 10-K.

378.    Furthermore, in July 2006, Defendant Rotella claimed that with regard to the Company's subprime lending, "we're being quite careful and making any changes we need to make in our credit policies as we move forward, but our sense of things are – things are in pretty good shape."  As the Class Period progressed, at WaMu's 2006 Investor Day, in September 2006, Defendant Schneider claimed that:

> On subprime, we have seen, as others have seen, some early payment default and repurchase activity.  We saw most of that occur for us in late '05, Q4 '05, and first quarter of '06.  We *reserved for it appropriately* and we have also, in second quarter of '06, *tightened up a number of our underwriting guidelines*, and you can see that in our numbers."
>
> In fact, we think *we've lost probably a percentage or so of market share over the past year as a result of tightening some of the credit guidelines in our subprime business*.  And we think that was the *prudent* thing to do and actually we think we're ahead of many of our competitors here.

379.    The FDIC issued specific warnings regarding subprime lending to mortgage lenders as early as 1993 and extending throughout the Class Period.  For example, in 1999, the Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the OTS (the "Agencies") jointly issued the Interagency Guidance on

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 131

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Subprime Lending, which gave extensive guidance to subprime lenders regarding risk management and appropriate credit loss reserving. The guidance noted, "*If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound.*"

380.    However, just as in the Company's prime and Option ARM lending, the Company covertly instituted extremely loose subprime lending guidelines so that WaMu employees could push subprime loans through. This occurred at the direction of the Officer Defendants. Confidential Witness 63 served as a former National Underwriting Manager of WaMu's LBM beginning in September 2006 and a Regional Operations Manager for LBM prior to that position. According to CW 63, Defendant Schneider, President of the Home Loans Group, and his management team were particularly focused on preserving LBM's growth. This was because, CW 63 observed, LBM was considered by the Officer Defendants to be the "golden child" of WaMu; although it did not account for the preponderance of WaMu's overall earnings, it had a much higher growth rate and higher growth potential than WaMu's other divisions. CW 63 reported that WaMu was therefore eager to produce a high volume of loans through LBM. Moreover, WaMu's Capital Markets group, which CW 63 described as the "magic center in Manhattan that told you what your profits were," demanded a continuous stream of LBM loans.

381.    Confidential Witness 64, a longtime employee of LBM, noted a shift in underwriting philosophy in 2005 toward increasing loan volume at all costs. CW 64 was an Account Executive for LBM in New Jersey from 1998 until October 2007. When CW 64 first joined the subprime business, LBM relied on "common sense underwriting" and was not exclusively focused on credit scores. Subprime loan originators wanted to know about the borrower rather than relying strictly on a number. As time went on, LBM came to rely more on

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 132

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

score and less on common sense. Over the years, the borrower needed to produce less and less documentation and FICO scores became more important than verifying income for WaMu. CW 64 noted the change from a "know your borrower" focus to a credit score focus beginning in the 2005 timeframe. In response, "volume really went through the roof."

382. LBM met WaMu's needs by pushing through every loan it could close, through whatever means necessary. Confidential Witness 65 a Senior Underwriter for LBM in Dallas, Texas, from 2004 through April 2007, reported that on occasion CW 65 would express concerns over funding some of the loans underwritten to her manager, Lisa Wagner, Vice President and Loan Fulfillment Site Manager, but Wagner's "direction from corporate" was simply to fund loans. CW 65 said that LBM's underwriting guidelines became "ridiculously" loose toward the end of 2005. The division's goal was to break "funding records."

383. CW 65 also reported that at month-end team meetings, it would often be discussed about how the Company was trying to increase volume by loosening up guidelines and getting more "borrowers to fit." Once per quarter, either Defendant Killinger or Defendant Rotella would issue internal e-mails and pre-recorded statements detailing the structure of the guidelines and explaining that the company was changing the guidelines in an attempt to increase volume.

384. CW 65 recalled that some of the "crazier" programs at WaMu's LBM included stated-income W-2 wage earners, a program that started in 2005. Stated-income programs, to the extent that lenders accepted them, were traditionally reserved for self-employed borrowers with significant assets. At LBM, these "liar's loans" were common, including for those who were not self-employed. LBM would also accept 100% financing, stated borrowers with FICO scores as low as 500. Another program CW 65 questioned was the self-employed borrower "three letters

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 133

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

of reference" program. Within this program, a borrower would only have to submit three letters of reference from anyone for whom they supposedly worked. CW 65 said there was no attempt made to verify the information in the letters. CW 65 related that some of the accepted letters were laughable, including statements such as: "So-and-so cuts my lawn and does a good job." FICO scores ranged from 500-620 but CW 65 said that if LBM salespeople had a borrower with a 620, they were "hooping and hollering" about having a borrower with good credit.

385.    CW 65 also relayed that borrowers could get a loan with no established FICO score merely by providing "three alternative trade lines." An "alternative trade line" was anything that did not appear on the borrower's credit report, including documentation of car insurance payments, verification of rent paid, or a note from a person claiming the borrower had repaid a personal debt. For first-time home borrowers, as long as the borrower had a "verification of rent" from anybody – a family member or a friend – and LBM could verify a phone number, the letter was accepted. CW 65 commented, "It was just a disaster." CW 65 said that LBM originated a "good chunk" and a "a significant amount," of these types of problematic loans. Furthermore, CW 65 said, that these loans made up the majority of first payment defaults ("FPDs") in the end of 2006. CW 65 was extremely knowledgeable about the causes of FPDs in LBM because CW 65 was a member of an "FPD task force" commissioned to audit FPDs and determine "what went wrong."

386.    Confidential Witness 66 served as an LBM Senior Underwriter in the Chicago area from 2004 through September 2007. CW 66 felt that there were significant flaws in the Company's underwriting procedures. CW 66 described the culture of LBM as: "it was just do it." CW 66 further explained that "There were really no restrictions to approve a loan," and some "really bad loans" went through the office. Just as former WaMu employees reported from

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 134

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

the prime side, CW 66 also stated that WaMu's attitude in its subprime lending was "push, push, push," and WaMu management did not care about underwriting guidelines. Confidential Witness 30, an Account Executive with LBM in New Jersey and Philadelphia from 2004 until September 2007, agreed: "[LBM's] underwriting guidelines were pretty much an exception as it is." In other words, the LBM underwriting guidelines were incredibly permissive so that more loans could close.

387. A particular example stood out in CW 66's mind as paradigmatic of LBM's concern for loan volume over credit quality. As LBM was a wholesale company, it received loans from brokers through various loan officers. CW 66 was responsible for reviewing the file and ensuring that there was no fraud. While reviewing the assets and credit in one file, CW 66 realized that the "customer" (broker) was flipping properties. CW 66 thoroughly investigated the broker and realized that he was perpetrating an extensive fraud on his borrowers that was not only illegal, but dramatically raised the credit risk of the loans that the broker "flipped." CW 66 collected all of the supporting documentation and brought the findings to Wendy Allbee, an LBM team manager. Allbee informed the Assistant Vice President over all sales associates, Terry Headberg, of CW 66's findings. CW 66 told them that CW 66 was going to decline the loan, not only because the broker was targeting seniors and minorities, but also because these loans would obviously lead to a great deal of defaults and foreclosures. Allbee, with the support of other LBM management, overturned the decision and approved the loan, pointing out that the broker gave WaMu a lot of loans.

388. According to CW 66, even the few loans that LBM underwriters refused to approve were regularly pushed through by WaMu's LBM management regardless. For example, according to CW 66, Alvida Marchuk, an Assistant Vice-President, had to approve the file if the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 135

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

team manager and an underwriter were in disagreement, and Marchuk always pushed loans through. CW 66 explained that loans were pushed through because that is what senior management was forcing LBM to do. According to CW 66, "There were so many exceptions." LBM allowed LTV ratio exceptions, and the "rate exceptions were ridiculous." WaMu allowed even the salespeople to give interest-rate exceptions to borrowers to push loans through.

389. CW 66 also reported that LBM pushed borrowers into loans with negative amortization features and interest-only loans. CW 66 explained that on LBM's interest-only loans, the borrower pays only interest for two years, but after two years, the payments go up. The borrower's monthly payment could increase from $1000 a month to $2000, but (as with WaMu's prime ARM products, as described above) LBM would qualify the borrowers based only on the interest-only payment of $1000.

390. According to CW 66, LBM did not have its own Human Resources Department; it shared WaMu's. CW 66 said that many people at LBM tried to relay the numerous issues with LBM's borrowers to WaMu management by contacting WaMu Human Resources, but their concerns were always ignored. In addition, to CW 66's knowledge, several LBM employees contacted WaMu corporate headquarters about these dubious practices.

391. CW 66 said, "[w]e did a lot of underhanded stuff" because senior management was forcing us to do so. Every underwriter that CW 66 knew who had a problem with LBM over a decision made on a file was written up, not because they made a bad decision but rather because Sales did not like their decision. CW 66 said: "Basically Sales is what ran Long Beach Mortgage, it wasn't the Operations part."

392. Confidential Witness 67 served as a Quality Assurance Manager in the LBM Loan Fulfillment Center ("LFC") in Dallas, Texas from November 2005 until his termination in

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 136

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

August 2007.  In this capacity, CW 67 was involved in the post-funding review of subprime loans for the purpose of establishing that funded loans were meeting regulatory and company compliance policies.

393.    CW 67 explained that the Quality Assurance group in Dallas performed a monthly audit on a random selection of subprime loans from the various loan origination centers around the country.  CW 67's group reviewed the loans to identify "events" that included notable issues pertaining to underwriting.  This analysis was not focused on loan-specific issues, but instead concerned Company-wide trends within these "events" that might suggest necessary changes in WaMu's underwriting guidelines, compliance standards, or other systems.  The group attempted to determine the cause of these events so that it could be addressed from an operational standpoint.

394.    CW 67 observed that, despite the extensive analysis that the group performed to determine the root causes for Company-wide loan problems, WaMu ignored the results of that analysis.  According to CW 67, there was "a lot of analysis but not a lot of action."  CW 67's group continued to identify the same problematic trends again and again without the Company taking any steps to address the causes.  CW 67 did not fault CW 67's managers for their lack of action, stating that they could not have pushed any harder to get the Company to address the potential risks that were being identified.  Unfortunately, CW 67 said, WaMu "just ignored" them.

395.    The issues identified by CW 67's group, which WaMu ignored, included issues relating to the underwriting guidelines.  As a result, CW 67 felt that despite his group's efforts to mitigate the risks pertaining to LBM's underwriting guidelines, the underwriting guidelines were "just a joke."  For example, CW 67 reported that a customer with a 550 FICO score might

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 137

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

borrow one loan up to 80% on the value of a home, then simply get another loan for the remaining 20%. CW 67 observed that no other lending institution would issue a 100% loan to borrowers with such low credit standings and then be "surprised" when that borrower defaulted. Indeed, according to CW 67, "everyone" at WaMu was well aware that those types of loans were permitted on a regular basis. Despite CW 67's best efforts to mitigate those risks, WaMu's ultimate objective was simply to approve loans. According to CW 67, although WaMu was "going through the motions" to present a façade of legitimate quality control, in reality there was nothing but a "free for all to approve loans by the thousands."

396.    Confidential Witness 68 was a Wholesale Mortgage Underwriter at the LBM loan processing center located in Lake Oswego, Oregon from August 2005 until December 2006. CW 68 first joined Washington Mutual in Lake Oswego in 2003 as a Senior Credit Analyst and subsequently joined the operations of LBM in 2004 as a Senior Loan Coordinator, ultimately becoming a Wholesale Mortgage Underwriter. In this capacity, CW 68 was responsible for examining all loan applications submitted by various mortgage brokers to review accuracy of information, adherence to underwriting guidelines, and to determine fraud risk, credit history, employment and income calculations pertaining to subprime loan applications.

397.    CW 68 said that at LBM there was always a sense of "working the underwriting guidelines" to close loans, rather than to mitigate the Company's credit risk. CW 68 maintained that underwriters were continuously taking great liberties in interpretation of the guidelines and providing exceptions to any application that did not fit the guidelines precisely. CW 68 said that there was simply an environment in the loan processing center to "approve, approve, approve" and that any exception that was needed to approve a loan was not only done, but it was "sought after." CW 68 felt that the Company consistently pressured its underwriters to "find a way to

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 138

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

make it work." CW 68 estimated that perhaps only 1% of all loans submitted were actually rejected.

398.    CW 68 felt that Company management consistently encouraged underwriters to get loans closed to stay competitive and to maintain their market share.  CW 68 said that the underwriters believed that they were supposed to be there to protect the bank from making bad decisions but, unfortunately, there was no real focus on the quality of the loans that were being approved.  According to CW 68, CW 68's colleagues at LBM were very disappointed about the decisions that were being made by WaMu about loan quality, but they were resigned to simply "keep their heads down."

399.    Similarly, Confidential Witness 69, a Senior Underwriter for WaMu in Livermore, CA from 2003 to September 2007, agreed that not only were LBM's guidelines loose, but LBM was also willing to make numerous exceptions to its already-loose guidelines.  CW 69 said that if LBM's competitors could not approve a loan, it was known to send the loan to LBM and they would make an exception to get the loan through.  CW 69 said that guidelines were "loose to the point of disbelief." LBM accepted 500 FICO scores with bankruptcies.  CW 69 described LBM's lending approach as follows: "If [potential borrowers] were breathing and had a heart beat, you could probably get the loan done."

400.    Confidential Witness 70 served as a Senior Underwriter for WaMu's LBM in Denver, CO from 2002 until November 2007.  During that time, CW 70 underwrote loans from around the country.    CW 70 recalled that, over time, WaMu's underwriting guidelines progressively loosened more and more.  During CW 70's final eighteen months with WaMu, the Company reached the point where it was regularly pushing through loans that had been evaluated by underwriters and rejected.  Typically, if an underwriter declined a file, the file would be

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 139

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

escalated and then sales manager would discuss the loan with the underwriting manager. To CW 70 and the other underwriters at WaMu, it seemed that "sales was putting more and more pressure on underwriting." CW 70 said that "[s]ales ran things at WaMu because they were the ones 'bringing in the business.'" According to CW 70, sales drove what happened inside WaMu, even to the detriment of the quality of the loans.

401.    CW 70 recalled that LBM encouraged underwriters to make numerous exceptions to its underwriting guidelines. CW 70 recalled that numerous loans with more than two exceptions on the same loan were pushed through. Even when underwriters refused to sign off on loans, WaMu gave mid-level managers who had never underwritten a loan before the authority to override the underwriters' decisions. CW 70 observed that these decisions had predictable effects – many of the files began to appear as first payment defaults.

402.    Confidential Witness 71 observed the same practices at LBM during the Class Period. CW 71 was an Underwriter for LBM in Englewood, Colorado, from September 2005 through December 2006; prior to that position, CW 71 was a Senior Loan Coordinator with WaMu from 2003-2004. CW 71 would often use tools like Lexis/Nexis in an attempt to uncover fraud in loan applications but many times was admonished by CW 71's manager, who cautioned that CW 71 was "digging too deep" and to "just go ahead" and do the deal. Laura Ranum, CW 71's team manager, actually left LBM because she did not agree with the way loans were underwritten. CW 71's new manager was more "sales oriented" and would often grant exceptions to the guidelines, with his "Let's do the loan" mantra.

403.    Confidential Witness 72 observed that "in the heyday [at LBM], everything was getting approved." CW 72 was an account executive for LBM in New York from 2004 to December 2007. According to CW 72, everything at LBM was "very lenient." For example,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 140

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1    LBM originated loans with 106% LTV ratios (intended to cover the closing costs) with FICO

2    scores as low as 575.  CW 72 said that a borrower could also get a loan with little documented

3    credit, such as a single credit line with Sears for $500.

4        404.    Confidential Witness 73 worked for WaMu's LBM as an underwriter in 2006 –

5    CW 73 decided to quit her job at WaMu's LBM after only three months because of "how loose

6    WaMu's underwriting guidelines were."  Compared with CW 73's previous experience in

7    mortgage underwriting, going to work for LBM was a "hard transition."  Certain issues were

8    particularly egregious to CW 73, including the fact that LBM did not require purportedly self-

9    employed borrowers to have a tax preparer or CPA certification.  LBM accepted three letters of

10   reference from the borrower's clientele as sufficient to prove the borrower's credentials.

11   According to CW 73, underwriting that included verifying the borrower's employment was not

12   the priority at LBM; instead, the sales side "really had control" and was "in cahoots with

13   management."

14

15

16       405.    CW 73 recalled that, although CW 73 did not underwrite Option ARM loans, it

17   was generally known among underwriters at WaMu that WaMu's prospective Option ARM

18   borrowers were qualified at the teaser rate.

19       406.    Confidential Witness 74 served as an underwriter for WaMu's LBM in Atlanta,

20   Georgia from 1994 until May 2006.  CW 74 reported that, in 2006, the "[underwriting]

21   guidelines began to change drastically." CW 74 felt that the Company was "changing programs

22   to make loans fit better."  CW 74 recalled numerous loans that LBM should not have granted, but

23   the edict from management was to do what it took to "get it to fit."

24

25       407.    CW 74 confirmed that many of the loans that LBM issued were stated-income

26   loans.  At LBM, if an underwriter did not feel comfortable signing off on a loan, an LBM

27

28

1    manager often would.  These practices, CW 74 recalled, resulted in greater and greater numbers

2    of foreclosures and early payment defaults beginning in 2006.

3    408.    Confidential Witness 75 worked as underwriter in WaMu's subprime division in

4    Plantation, Florida, during 2006.  During that time, CW 75 recalls, "things started going

5    downhill and rules got more lenient."  Among WaMu employees, "Rumors started to fly that [the

6    Company was] starting to lose it."  Indeed, the overriding theme during CW 75's tenure with

7    WaMu was "when push came to shove" WaMu's way of thinking was "let's push things

8    through."

9    409.    CW 75 became increasingly aware during her time at WaMu that most of WaMu's

10    loans that she would underwrite were stated-income income loans, with only a "VOE," or

11    verification of employer, required.  CW 75 recalled, "It could be from their mother; we wouldn't

12    know on our end.  It's a stated deal and we couldn't ask for more documents even though [we

13    felt it necessary].  It became a joke."  In sum, in CW 75's experience at WaMu, "A lot of things

14    were signed off on that I didn't think should have been."

15    410.    Confidential Witness 76 worked for LBM from 2004 through 2007 as a loan

16    processor in Anaheim, California.  In CW 76's experience in the mortgage-lending industry, CW

17    76 felt that LBM's underwriting guidelines were particularly lenient.  For example, CW 76

18    recalled that, at a mortgage-lending company where CW 76 had previously worked, even stated-

19    income loans required certain minimum FICO scores and proof of assets.  However, LBM did

20    not require even these basic credentials from borrowers to grant a stated-income loan.  LBM did

21    not require proof of assets, even when lending to individuals with low credit scores.

22    411.    For those loans for which CW 76 or the loan underwriter was not comfortable

23    with the documentation, their LBM superiors would review the file.  In CW 76's experience,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 142

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

"somehow [LBM management] would find a way to make it work." This differed dramatically from CW 76's experience at prior mortgage-lending companies. At CW 76's prior company, "if a loan was dead, it was dead." On the other hand, at LBM, management would do whatever it took to fit the borrower into a loan.

> **3.    WaMu Inappropriately Incentivized Its
> Underwriters To Approve Loans By
> Basing Their Compensation On Loan
> Volume Without Regard To Loan Quality**

412.    To make matters worse, in addition to WaMu's intense pressure to push loans on unsuspecting borrowers and its relaxed underwriting standards to facilitate the closing of such loans, underwriters, who were supposedly the Company's "gatekeepers" of loan credit quality, were also incented by WaMu to approve an enormous volume of loans without regard to loan quality. Confidential Witness 69, a Senior Underwriter with WaMu in Livermore, California, from 2003 through September 2007, confirmed that loan underwriters received commissions based upon volume of loans underwritten and closed, with no concern given to any credit losses the underwriters could prevent.

413.    According to Confidential Witness 5, who served as Senior Credit Quality Manager from March 2005 until February 2008, after having served as a WaMu Senior Underwriter from 2003 through 2004, underwriters received massive bonuses for underwriting a high volume of loans without any regard to quality. According to CW 5, underwriters were required to underwrite a minimum of nine loans a day, and any loans underwritten in excess of that number provided for bonus payments. Indeed, certain senior underwriters earned in excess of $100,000 annually because of these bonuses; some underwriters received monthly bonus payments of $5,000 for underwriting a high volume of loans.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 143

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

414.    In fact, according to Confidential Witness 47, a long-time employee of WaMu who left after twenty-four years with the Company, WaMu was so focused on incenting underwritings and removing any barriers to closing loans that loan delinquency data was not provided to underwriters.  According to CW 47, WaMu's senior management believed that if underwriters knew about underwriting problems that led to problem loans, notwithstanding their exorbitant volume-based bonuses, WaMu's underwriters would "by nature" have tightened up WaMu's lending standards – but that did not happen at WaMu.

415.    CW 15 worked for Washington Mutual as first vice president and director of investor relations for the capital markets group at WaMu Capital Corp. in New York from October 2004 until December 2007.  According to CW 15, underwriters were compensated on the volume of loans brought in and closed, with no consideration being given to the quality of the loans.

416.    CW 77 worked for LBM from 1992 to November 2007 as a loan processor, underwriter, and loan default and fraud analyst.  CW 77 noted that underwriters were paid for each loan they reviewed.  As a result, CW 77 reported that LBM underwriters "would groan" if anything – including analyzing information crucial to the underwriting process – prevented them from quickly pushing loans through.

417.    Confidential Witness 18, a Vice President in WaMu's Commercial Risk Department from April 2003 until June 2006, reported that decisions regarding measures of compensation came from "the top," and would be determined at the Executive Vice President Level, at a minimum.  According to CW 18, at a minimum Defendant Rotella certainly was aware of, if not taking an active role in, decisions made to compensate WaMu employees based on loan volume without regard to credit quality.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 144

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**4.    Expert Analysis of Relevant Data Further Establishes that WaMu's Underwriting Standards Throughout the Class Period Were Deficient**

418.    Lead Plaintiff's investigation of WaMu's underwriting practices includes the analysis of vast amounts of raw data collected by WaMu and other lenders revealing WaMu's lending practices compared to those of its peer lending companies (defined above as the "Peer Group"). For the analysis discussed below, experts in the field of banking regulation and mortgage finance employed a similar methodology as that used to produce the analysis of loan application denials, discussed above at ¶¶298-305. In both analyses, over ten gigabytes of raw HMDA data were examined, on a census tract by census tract level, to produce a robust comparison of WaMu with its Peer Group.

419.    In the analysis below, Lead Plaintiff's experts examined the average loan amount to income levels of approved loan applications by WaMu, compared with its Peer Group. Chart 4, below, shows that WaMu's loans reflected much higher "loan to income" ratios than its Peer Group. Loan to income is a significant measure of credit risk, as borrowers who incur debt that is relatively high compared to their income levels have an increased risk of defaulting on their loans, as WaMu even acknowledged in its public statements: For example, in its 2006 Form 10-K, the Company announced, "In the underwriting of loans, one of many factors the Company considers when deciding whether to approve or decline a loan is the applicant's debt-to-income ratio." Clearly, a home loan of several hundred thousand dollars would represent a significant component of a typical borrower's overall debt.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 145

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

**Chart 4: Average Annual Residential Loan Amount to Borrower Income for WaMu and Its Peer Group**



| | Calendar Year 2005 | Calendar Year 2006 | Calendar Year 2007 |
|---|---|---|---|
| WaMu | 2.93 | 2.86 | 2.82 |
| CW | 2.60 | 2.55 | 2.61 |
| WF | 2.57 | 2.48 | 2.47 |
| BofA | 2.39 | 2.48 | 2.58 |
| JPM | 2.39 | 2.51 | 2.47 |
| NCITY | 2.67 | 2.54 | 2.57 |
| SUN | 2.51 | 2.51 | 2.67 |
| CITI | 2.59 | 2.61 | 2.65 |
| INDY | 2.75 | 2.75 | 2.96 |
| 1stH | 2.59 | 2.62 | DATA NOT AVAILABLE |
| ABN | 2.54 | 2.53 | DATA NOT AVAILABLE |
| GMAC | 2.56 | 2.48 | DATA NOT AVAILABLE |
| LEH | 2.31 | 2.36 | DATA NOT AVAILABLE |

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 146

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

As shown above in Chart 4, Wamu lent relatively more money to borrowers (compared with the income of those borrowers) than any of its peers for 2005 and 2006.  For example, in 2006, for a borrower that earned $100,000 per year, WaMu would lend $286,000 on average, whereas its next highest-lending peer in that year, IndyMac Bank, was willing to lend to that same borrower only $275,000.  In 2007, WaMu was surpassed in its aggressive lending only by IndyMac Bank. (On July 11, 2008, IndyMac Bank was placed into conservatorship by the FDIC and on August 1, 2008 filed for bankruptcy protection.)

*    *    *

420.    In sum, in contrast to WaMu's and the Officer Defendants' portrayal of WaMu's "conservative" underwriting standards, as evidenced by the detailed reports from former WaMu employees, as well as the internal WaMu documents discussed above, and expert analyses described above, it is clear that it is clear that WaMu secretly caused its underwriting standards to deteriorate during the Class Period.

### E.    WaMu's Financial Statements Violated GAAP and SEC Regulations Prohibiting False and Misleading Public Filings

421.    WaMu, in reporting its financial results during the Class Period, made numerous false statements of material fact and omitted to state material facts necessary to make its reported financial position and results not misleading.  As set forth below, WaMu published financial statements and information that violated generally accepted accounting principles ("GAAP") and SEC Regulations prohibiting false and misleading public disclosures.

422.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices. The SEC has the statutory authority to promulgate GAAP for public companies, and has delegated that authority to the Financial Standards Accounting Board ("FASB").

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 147

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

423.    The SEC requires public companies to prepare their financial statements in accordance with GAAP.  In fact, as set forth in SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  SEC Regulation S-X (17 C.F.R. § 210.10-01(a)(5)) also requires that interim financial statements comply with GAAP and "shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading."

424.    As set forth below, longstanding and fundamental GAAP precepts required WaMu and the Officer Defendants to establish a reserve for incurred credit losses resulting from borrowers defaulting on their obligations to make monthly mortgage payments or when it was probable that borrowers would do so.  WaMu referred to this loss reserve as its Allowance for Loan and Lease Losses ("Allowance").

425.    WaMu's Allowance was a critical metric for investors, for which management was directly responsible.  As described in a December 2006 "Interagency Policy Statement on the Allowance for Loan and Lease Losses," issued jointly by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation ("FDIC"), the National Credit Union Administration, and the OTS (collectively, the "Agencies"):

> The [Allowance] represents one of the most significant estimates in an institution's financial statements and regulatory reports. Therefore, each financial institution has a responsibility for ensuring that controls are in place to consistently determine the [Allowance] in accordance with GAAP, the institution's stated policies and procedures, and relevant supervisory guidance.

426.    Indeed, the Company's 2006 Form 10-K explained, "[t]he [Allowance] represents management's estimate of incurred credit losses inherent in the Company's loan and lease

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 148

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

portfolios as of the balance sheet date."   Moreover, the Allowance was one of six "earnings drivers" that the Company discussed each quarter.   During those discussions, the Officer Defendants consistently touted the soundness of WaMu's Allowance, such as during a May 18, 2006 conference call, when Defendant Killinger announced: "The next target is on the credit front. . . .   Certainly we can come back in the Q&A if you want to talk more about credit; but credit for us is [in] excellent shape, and I feel very comfortable with where we are from management of that credit as well as the reserving."

427.   The Allowance was reported on the Company's balance sheet as a reduction to assets.  As loans were "charged off" as losses against the Allowance, the Allowance was reduced. In order to properly account for the worsening credit quality of its loan portfolio, WaMu was required under GAAP to record periodic provisions (which WaMu referred to as its "provisions for loan and lease losses"or its "provision for loan losses") to increase its reserve to reflect its estimate of incurred or probable credit losses.   Under GAAP, a provision for loan and lease losses is recorded as an expense, which reduces pre-tax earnings on a dollar-for-dollar basis. Thus, WaMu's reported Allowance was directly linked to net income and the Company's earnings per share

428.   However, as explained below, during the Class Period WaMu's accounting for its Allowance violated fundamental principles of GAAP and the SEC regulations.   Throughout the Class Period, in furtherance of their efforts to disguise the negative impact that the deteriorating credit quality of the Company's home mortgage loans was having on the Company's financial condition, WaMu and the Officer Defendants, among other things, improperly accounted for the impairment of WaMu's loan portfolio by materially understating WaMu's provisioning for loan

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 149

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

and lease losses, and thereby overstated WaMu's net income and earnings per share and understated WaMu's Allowance.

        **1.**        **GAAP and Other Governing Accounting Standards That WaMu Claimed to Follow Established Clear Rules Concerning How WaMu Should Have Reserved for Loan Losses**

429.    WaMu repeatedly represented that it accounted for its Allowance for its portfolio of home mortgage loans in accordance with GAAP, and, in particular, Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("SFAS 5").  SFAS 5, which was issued over thirty years ago and has been applicable to *every* annual and interim financial statement *every* public company has issued for *every* fiscal year beginning after July 1, 1978, states:

> An estimated loss for loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.    The amount of loss can be reasonably estimated.

(Emphasis in original.)

430.    In the context of lending, Statement of Financial Accounting Standards No. 114, "Accounting By Creditors for Impairment of a Loan" ("SFAS 114"), which was issued in May 1993 – over fifteen years ago – provides a definition of  "impairment" for individual loans under GAAP that is also instructive for pooled loans: "A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 150

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

431.    Further, the American Institute of Certified Public Accountants' (AICPA) *Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies* (the "AICPA Guide"), which was originally issued in 2004 and updated in 2007, instructs that although SFAS 5 indicates that losses should be recognized only once the events causing the losses have occurred, there is an important caveat flowing from that rule: "***if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the*** <u>***date of loan origination***</u>."

432.    These fundamental GAAP provisions underpin the "Expanded Guidance for Subprime Lending Programs," issued by the Agencies in 2001, which several years before the beginning of the Class Period provided guidance specific to reserving for subprime loans:

> The [Allowance] required for subprime loans should be sufficient to absorb at least all estimated credit losses on outstanding balances over the current operating cycle, typically 12 months. ***The board of directors and management are expected to ensure that the institution's process for determining an adequate level for the [Allowance] is based on a comprehensive and adequately documented analysis of all significant factors. The consideration of factors should include historical loss experience, ratio analysis, peer group analysis, and other quantitative analysis, as a basis for the reasonableness of the [Allowance].*** To the extent that the historical net charge-off rate is used to estimate expected credit losses, it should be adjusted for changes in trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter such experience. ***The allowance should represent a prudent, conservative estimate of losses that allows a reasonable margin for imprecision.***

433.    The SEC also provides direct guidance on the proper accounting for loan losses. SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" ("SAB 102"), which was issued in July 2001, also several years ***before*** the Officer Defendants' improper activities at issue here, states in pertinent part: "***It is critical that loan loss allowance methodologies incorporate management's current judgments about***

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 151

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   *the credit quality of the loan portfolio through a disciplined and consistently applied process*."

2 Therefore, pursuant to SAB 102, a loan loss allowance methodology generally should

3 "*[c]onsider all known relevant internal and external factors that may affect loan collectability* .

4 . . [and] be based on current and reliable data[.]"

5       434.    SAB 102 expressly provides that "[f]actors that should be considered in

6 developing loss measurements" include:

7

8         1.      Levels of and trends in delinquencies and impaired loans;

9         2.      Levels of and trends in charge-offs and recoveries;

10         3.      Trends in volume and terms of loans;

11         4.      Effects of any changes in risk selection and underwriting standards, and
12              other changes in lending policies, procedures, and practices;

13         5.      Experience, ability, and depth of lending management and other relevant
14              staff;

15         6.      National and local economic conditions;

16         7.      Industry conditions; and

17         8.      Effect of changes in credit concentrations.

18 As discussed below, the Officer Defendants failed to appropriately take into account the above

19 factors in provisioning for the Company's Allowance.

20       435.    The SEC further states in SAB 102 that "[f]or many entities engaged in lending

21 activities, the allowance and provision for loan losses are significant elements of the financial

22 statements. Therefore, the staff believes it is appropriate for an entity's management to review,

23 on a periodic basis, its methodology for determining its allowance for loan losses."  Thus, in

24 addition to evaluating loans for impairment at origination, lenders are expected to reevaluate

25 their reserving methodology, and therefore their loans or loan portfolios for impairment, every

26 financial reporting period thereafter.

27

28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 152

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

436.    SAB 102 also approvingly references SEC Financial Reporting Release ("FRR") 28 §401.9 ("FRR 28"), "Accounting for Loan Losses by Registrants Engaged in Lending Activities," which was issued in December 1986 – over twenty years ago (and approximately 15 years before SAB 102 was issued).   FRR 28 states, in pertinent part, that "[b]ecause the allowance [for loan and lease losses] and the related provision are ***key elements of financial statements of registrants engaged in lending activities, it is critical that those judgments be exercised in a disciplined manner that is based on and reflective of adequate detailed analysis of the loan portfolio***."

437.    In addition to the foregoing standards, according to the AICPA Guide, § 9.17:

Loan evaluations by management (and tests of such by independent accountants to the extent they are performed as part of the engagement) should avoid the following:

*Collateral myopia.* This is the failure to see beyond collateral values to a financial weakness in the borrower. . . .

*Inadequate collateral appraisals.*  This is the failure to critically review appraisals to understand the methods employed, assumptions made, and limitations inherent in the appraisal process, including undue reliance on management appraisals.

438.    Throughout the Class Period, WaMu and the Officer Defendants did not reveal that they were deviating significantly from the requirements of the foregoing accounting standard, and also made materially false and misleading statements about the Company's Allowance and the methodologies used to review and adjust it.  Rather, WaMu represented that it was following appropriate accounting rules and that, among other things, the Company's management reviewed its models for loan losses for reasonableness, and, on a quarterly basis, updated the assumptions used in those models.  In addition, according to the Company's 2006 Form 10-K, WaMu supposedly generally evaluated for impairment its loans held in portfolio on a collective basis "using statistical forecasting models that estimate default and loss outcomes

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 153

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data." Based on this statistical modeling, the Company represented, WaMu allocated a certain percentage of its provision for loan losses to its different loan product categories (*e.g.*, home loans, credit card loans, commercial loans).

439. Additionally, the allocated portion of WaMu's Allowance was supplemented by an unallocated allowance, which, according to WaMu, was supposedly based upon several factors, including "national and local economic trends and conditions, industry conditions within portfolio segments, recent loan portfolio performance, loan growth and concentrations, changes in underwriting criteria, and the regulatory and public policy environment."

440. Indeed, as Defendant Killinger trumpeted in a December 13, 2006, conference call with investors:

> When we do our reserving, I will tell you that we factor in the existing book of business; what the current delinquencies are; we make assumptions about housing price declines and the economy; and we develop models about what we think is going to happen to delinquencies, ultimate charge-offs. And those things are, clearly, rising right now. And then we back that into what's the appropriate amount of embedded losses in that portfolio, and that determines our reserving. We do that every quarter.

441. According to the Company's 2006 Form 10-K, the Finance Committee of the Company's Board of Directors oversaw the Company's credit risk management activities. The members of the Finance Committee during the Class Period included Defendants Farrell, Frank, Lillis, Montoya, Murphy, Osmer-McQuade, Pugh, and Reed. Further, according to the Company's 2006 Form 10-K, the Company's Enterprise Risk Management committee, which was chaired by the Company's Chief Enterprise Risk Officer, Defendant Cathcart, was responsible for "oversee[ing] the identification, measurement, monitoring, control and reporting of credit, market and operational risks." The Company's 2006 Form 10-K explained that

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 154

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

> Enterprise Risk Management works with the lines of business to establish appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance.  Significant risk management policies approved by the relevant management committees are also reviewed and approved by the Board, Audit, and Finance Committees.

As discussed above, CW 18 reported that, in 2005, the Company's Chief Enterprise Risk Officer, James Vanasek (who retired shortly thereafter), expressly informed the Company's credit risk officers that the Company had decided to become more aggressive in its credit provisioning. Thus, the Officer Defendants began under-provisioning WaMu's Allowance at the same time that the Company was secretly causing its loan underwriting standards, appraisal practices, and credit controls to deteriorate.

### 2.    WaMu and the Officer Defendants Disregarded Governing Accounting Rules and Standards

442.    Rather than follow appropriate accounting standards for its Allowance, the Company failed to apply even the most rudimentary of GAAP's provisions or to follow the SEC's guidance, as explained in SAB 102 and by the agencies through their guidance.  Indeed, the Company repeatedly failed to increase its provisioning of its Allowance in light of "levels of and trends in delinquencies and impaired loans . . . trends in volume and terms of loans . . . . [and] effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices," as it was required to do.

443.    As the Officer Defendants knew, during the Class Period, WaMu had, among other things: (1) significantly loosened its underwriting guidelines; (2) encouraged wholesale exceptions to those loosened guidelines through explicit emphasis on loan quantity over quality; (3) compensated its employees based upon loan volume without regard to borrowers' credit quality; (4) pressured appraisers (initially its in-house appraisers and then its outside appraisers) to inflate the appraisal value of the underlying collateral of its loans, thereby undermining the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 155

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

entire foundation for evaluating the credit quality of its loan portfolio; and, (5) relegated its credit risk management to an optional, "consultative" role, rather than the gatekeeping function it was supposed to provide.

444.    Because of these facts, which were known to the Officer Defendants (but concealed from the investing public) the Officer Defendants were required under GAAP and SEC guidelines to increase the Company's provisioning for its Allowance in a manner commensurate with the decreasing credit quality of WaMu's home mortgage products.  Instead, the Officer Defendants, in order to conceal their activities and to inflate the Company's reported net income, maintained the Company's provisioning at a level more appropriate for a loan portfolio made up of loans unimpaired by the practices and problems detailed above.

445.    Thus, in violation of SFAS 5, SFAS 114, SAB 102 and the AICPA Guide, the Company did not factor in the "effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices" when provisioning for its Allowance.  Rather, the Officer Defendants ignored underwriting quality and the quality of the underlying collateral for its loans.  As shown in Chart 5 below, this resulted in a shocking increase very late in the Class Period of the Company's provisioning levels in the third and fourth quarters 2007 and beyond:

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 156

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1
2
3
4
5
6
7
8
9
10
11
12

**Chart 5: WaMu's Allowance And Provision for Loan & Lease Losses Over Time, Q1 2005 - Q2 2008**



13  As Chart 5 indicates, the Company's Allowance was suppressed during most of the Class Period

14  (after taking into account the increase during the fourth quarter of 2005 associated with the

15  Company's acquisition of Providian, a large credit card company) until the truth about the

16  Company began to emerge.  The stable and relatively low levels of the Allowance before the

17  truth about WaMu's loan quality began to emerge further helped create the appearance of a

18  healthy loan portfolio at WaMu and that WaMu's provision for loan and lease losses was

19  appropriately calculated to replenish the Allowance as loan charge-offs depleted the Allowance.

20  However, WaMu's deteriorated underwriting standards and unlawful appraisal practices had

21  caused WaMu to hold for investment a large amount of substandard loans that were, in effect,

22  time bombs that the Company and the Officer Defendants knew were bound to "explode,"

23  particularly WaMu's signature Option ARM loans.  In the third quarter of 2007, the Company

24  could no longer continue to hide the impairment of the loans it held and had no choice but to

25
26
27
28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 157

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

finally begin to increase its Allowance - the resulting impacts continued to be felt by investors well into 2008.

446.    Further, as discussed in detail below, as early as **September 2005,** WaMu and the Officer Defendants knew or were reckless in disregarding that WaMu's Loan Performance Risk Model (the "LPRM") – the "fundamental" model whereby the Company calculated the appropriate provision for the Allowance – ***did not account for and did not accurately predict the financial impact of recognized material risk factors concerning WaMu's loan portfolio.*** However, as explained below, WaMu and the Officer Defendants did not disclose or act to finally correct these issues for at least ***nine months*** after the problems with the LPRM were fully documented and reported internally at WaMu.  In addition, WaMu and the Officer Defendants did not appropriately adjust WaMu's LPRM periodically to take into account the actual, undisclosed deteriorating performance of the Company's loan portfolio during the Class Period, as they should have.

447.    The deterioration of the credit quality of WaMu's loans was neither outside of the Company's control nor was it unforeseeable to management.  Indeed, the opposite is true: WaMu increasingly underwrote high-risk loans with loose underwriting standards and inflated appraisals, which it knew were impaired, while under-provisioning its Allowance.  Further, the Officer Defendants knew, or were reckless in not knowing, that the LPRM did not incorporate certain basic and key assumptions regarding WaMu's loans.  The Officer Defendants ignored clear impairment indicators of WaMu's loans both at the point of origination and during subsequent reporting periods, causing its reported financial position and results to be materially misstated throughout the Class Period in violation of GAAP and the other authorities referenced above.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 158

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1
2
3

     **a.**     **Defendants Knowingly Failed to Appropriately Account for the Company's Option ARM Loans in Provisioning for WaMu's Allowance**

4
5
6
7
8
9
10
11
12

     448.   As discussed at ¶¶330-375, the Officer Defendants repeatedly downplayed the risk inherent in WaMu's Option ARM portfolio by, among other things, falsely stating that the loans were underwritten to their fully-indexed rate and that the LTV ratios for WaMu's loans, which as explained above were directly related to the appraisal values of the homes that were the collateral for WaMu's loans, offered the Company a sufficient cushion against loan default. However, as internal, non-public documents that WaMu attempted to shield from outside scrutiny reveal, the Officer Defendants were knowingly failing to reserve at the appropriate rates for WaMu's Option ARM loans, the largest component of WaMu's held for investment portfolio.

13
14
15
16
17
18
19

     449.   The Company's 2006 Form 10-K (and in substantially similar language, the Company's 2005 Form 10-K) claimed that, in evaluating the loan performance of its Option ARM loans in order to determine appropriate reserves for incurred losses, the Company took into account "[t]rends in loan performance and risk attributes such as loan-to-value ratios, credit scores, *negative amortization*, minimum payment adjustments, degree of minimum payment utilization, and geographic concentrations[.]"

20
21
22
23
24
25
26
27

     450.   However, an internal, non-public document obtained through Lead Plaintiff's investigation reveals that, as of September 2005, the Officer Defendants were aware that the Company was not accurately assessing the risk of the Company's Option ARM loans.  This document was dated September 2005 and entitled "Corporate Risk Oversight Report: Allowance for Loan & Lease Losses Methodology of Washington Mutual Bank." (the "CRO Report")  The CRO Report, not including its cover sheet, is fourteen pages and consists mostly of single-spaced text.  On each page, the document is marked "***Confidential***:  The contents of this report are for

28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 159

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

internal management purposes only and are not to be disclosed except to those persons who require the information in the performance of their duties." (Emphasis in original.)  The CRO Report described the objectives of the report as follows:

> Corporate Risk Oversight (CRO) has conducted a process review of the [Allowance].  The review focused on the evaluation of the following elements:
>
> •    [Allowance] model assumptions and controls[,]
>
> •    [Allowance] governance,
>
> •    [Allowance] documentation and supporting policies[.]

451.    The CRO Report states that the "goal of the [Allowance] team is to forecast ***expected losses over the upcoming four years***[.]"   (Emphasis in original.)   The results of WaMu's internal review of the methodologies that WaMu used to establish its Allowance, as revealed in the CRO Report, are damning.

452.    The CRO Report details many alarming deficiencies concerning WaMu's Allowance methodology and other management and operational issues.   Several of these material problems are explained in connection with the Complaint's discussion of WaMu's deficient internal controls, below; however, perhaps the most alarming finding in the CRO Report, which the CRO Report mandated required to be "presented to management in writing" and for which the CRO Report requested "management to provide a written response" because of its grave implications concerned WaMu's LPRM.  Specifically, the CRO Report revealed that WaMu's loss model was materially deficient:

> ***The predictive performance of <u>Loan Performance Risk Model (LPRM) is untested on products with the potential to negatively amortize.  Given recent production and interest rate trends, negative amortization is a major and growing risk factor in our portfolio.</u>***

453.    In other words, WaMu's LPRM, the model upon which the Company estimated the credit losses for the loans in its portfolio and based its Allowance, did not account for the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 160

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

performance of the Company's Option ARM loans, which the Company knew to be generally high-risk loans.

454.    In response to the CRO Report, on November 1, 2005, WaMu management submitted a written "Review Response" from Joe Mattey, Senior Vice President of Portfolio, to "Corporate Risk Oversight," with a carbon copy to James Vanasek, Chief Enterprise Risk Officer; Hugh Boyle, Chief Risk Officer; and Melissa Martinez, Chief Risk Oversight Officer and Chief Compliance Officer (the "CRO Report Response").  The CRO Report Response was marked "Confidential – Internal Use Only" on each page by WaMu.

455.    Concerning the significant defects identified in WaMu's LPRM, the CRO Report Response admitted that:

> [T]he documentation of the validation of LPRM did not provide a specific analysis of the ability of LPRM to reflect the higher risks of potentially negatively amortizing loans as distinct from loans without such potential.  And, that documentation did not specifically analyze the ability of this model to reflect how losses might increase on Option ARM and Flex loans as interest rates increase.

456.    To respond to this known hazard, the CRO Report Response prepared by WaMu's management simply stated that the LPRM would be "enhanced," with a target completion date of *June 30, 2006 – an amazing nine months after the Allowance methodology deficiencies were identified and documented in writing in the CRO Report*.

457.    Notwithstanding the fact that WaMu did not have a functioning model in place to evaluate the Company's risk of loss from loans with the potential to negatively amortize (*e.g.*, WaMu's Option ARM loans), the Company maintained and even increased the proportion of Option ARM loans in its home loan portfolio without adjusting its Allowance appropriately. Indeed, as discussed *supra* in Section VI.D, the Company encouraged its salespeople and mortgage brokers with whom the Company worked to sell ever greater numbers of Option ARM loans through bonus incentives.  As noted above in ¶74, Chart 1, Option ARM loans dominated

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 161

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

WaMu's single-family residential portfolio from the fourth quarter 2005 throughout the Class Period.

458.    Indeed, growing rates of negative amortization on the Company's Option ARM loans should have required the Officer Defendants to, at a minimum, materially increase the Allowance, even if only through the unallocated portion of the Allowance, during the Class Period, especially given the increased risks admittedly related thereto by WaMu.  During the Class Period, as the Officer Defendants knew, many borrowers were only making the minimum payments on Option ARMs, meaning that they were not even paying the then currently-due interest.  Thus, during the Class Period, WaMu recorded significant amounts of negative amortization (*i.e.*, the difference between the payment made and the full payment to pay all interest due) from Option ARMs as deferred revenue (*i.e.*, interest income) and, correspondingly, increased the balance due on negatively-amortizing loans.  In fact, the number of WaMu's Option ARM borrowers who were paying less than the amount necessary to pay currently-due interest and principal of their loans increased steadily during the Class Period, both as a percentage of total loans in WaMu's portfolio and as a percentage of the total value of the loans in WaMu's portfolio, as illustrated by Chart 6 below.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 162

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400



459.     While the reported increase in interest income from negative amortization presented the impression that the Company's results were strong, in fact, the enormous accumulated negative amortization on these loans was a red flag to the Officer Defendants that those loans were trending towards delinquency and default. Moreover, as soon as WaMu's Option ARM borrowers reached the specified, pre-set negative amortization caps, which would force them to start fully repaying the loan, those borrowers, who then owed substantially more than they had initially borrowed, were at even greater risk of failing to make their loan payments.

460.     However, WaMu and the Officer Defendants did not appropriately address the dangerous nature of WaMu's Option ARM loans when determining and allocating the Company's Allowance. As WaMu knew, its Option ARM loans performed much more similarly to the Company's subprime portfolio than to standard prime loans. For example, between 2006 and 2007, the percentage increases in net charge-offs in the Company's non-subprime loans

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 163

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

(including Option ARM loans) and the Company's subprime loans were 420% and 432%, respectively. However, rather than provisioning for Option ARM loans (and other so-called "prime" WaMu loans) at a rate similar to that for the Company's subprime portfolio, the Officer Defendants evaluated them for impairment as part of their prime Home Loans portfolio and provisioned for Option ARM loans at a much lower rate.

461. Likewise, although Option ARMs comprised over half of the Company's so-called "prime" loan portfolio throughout the Class Period, the allowance allocated to the prime loan portfolio was disproportionately low. As illustrated in Chart 7 below, in 2007, WaMu's Allowance allocated to the entire home loans category was $322 million, or 0.29% percent of the value of the prime loan category. This percentage contrasts sharply with the allocated Allowance for the subprime channel, which, while inadequate, was $643 million, or 3.45% of the value of the subprime loan category in 2007.



Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 164

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1

2

3

        **b.**     **The Deteriorating Quality of WaMu's Loans Also Indicates that WaMu's Allowance For Loan & Lease Losses Was Materially Understated Throughout the Class Period**

4

5

462.    In violation of SAB 102, the Officer Defendants did not adequately consider the

Company's "levels of and trends in delinquencies and impaired loans" in provisioning for loan

6

7

losses.  As confirmed by the Company's reported loan delinquencies, and by numerous

8

confidential witnesses, which are discussed above in Sections VI.B, VI.C, and VI.D, the quality

9

of the Company's loan portfolio was steadily worsening over time.  The deteriorating quality of

10

WaMu's loans is illustrated by the rising number of "nonaccrual loans," or home mortgage loans

11

that were over ninety days past due on payments.  Instead of increasing the Allowance in

12

compliance with GAAP and SEC guidelines to properly account for the rapidly deteriorating

13

quality of WaMu's loan portfolio, beginning in the third quarter of 2005, the Officer Defendants

14

actually ***decreased*** the Allowance relative to the number of nonaccrual loans that were

15

accumulating in the Company's portfolio.  This contrast is illustrated in Chart 8, below.  While

16

the third and fourth quarters of 2005 show an increase of the Allowance as a percentage of

17

nonaccrual loans, during those two quarters the Company experienced one-time events, unrelated

18

to WaMu's loosened underwriting standards and overstated appraisals, that increased WaMu's

19

provisioning for those two quarters.  Specifically, in the third quarter 2005, $37 million of the

20

$52 million provision, or over 70%, consisted of Hurricane Katrina-related costs.  Similarly, in

21

the fourth quarter 2005, the Company accounted for the acquisition of Providian, a credit card

22

company, by increasing the provision dramatically; that quarter, $195 million, or over 60%, of

23

the $316 million provision related to that acquisition.  While the Providian acquisition may have

24

continued to influence the provisioning of reserves in early 2006, the effect was *de minimis*

25

compared to the substantial additional provision in the fourth quarter of 2005.

26

27

28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 165

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400





**Chart 8: WaMu's Allowance as a Percentage of Total Loans in Portfolio and as a Percentage of Nonaccrual Loans**

463.     In further violation of SAB 102, the Officer Defendants did not appropriately consider the Company's "levels of and trends in charge-offs and recoveries" in provisioning for the Allowance.  Incredibly, as discovered through Lead Plaintiff's investigation, the Company's fundamental model for calculating the appropriate level at which to provision the Allowance, in addition to its other defects that were known to WaMu and the Officer Defendants that were set forth in the CRO Report, WaMu's LPRM ***was not calibrated to reflect actual loan performance***. Confidential Witness 78, who served as an Assistant Vice President / Analyst II in the Risk Analytics Group at WaMu from January 2006 until January 2008, discovered this fact during the summer of 2007 when CW 78 worked on a project analyzing the credit parameters of new loans that were considered to be the highest risk loans.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 166

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

464.    In connection with that research, CW 78's analyst team decided to use WaMu's LPRM, which, as CW 78 recalled, was a "key tool" in calculating the Allowance's requirements. In CW 78's project, this analysis was then correlated with actual performance data for different groups of loans over comparable periods. The goal of the exercise was to examine expected losses for these riskiest of loans.

465.    However, CW 78 explained that when the analyst team performed regression analyses of the data using the LPRM as a predictive tool, the LPRM clearly "showed a level of 'charge-offs' that was lower than the actual historical data." According to CW 78, the LPRM consistently understated loan delinquency when held up to WaMu's actual empirical data. When CW 78 questioned why the LPRM consistently produced such problematic results, CW 78 was informed that *the LPRM had not been calibrated for almost eighteen months to reflect actual loan performance data*.

466.    The consequences of this failure were devastating. During the Class Period, in addition to the increases in nonaccrual loans, the Company's charge offs and foreclosed assets also steadily increased. For example, net charge-offs in home mortgage loans increased from $36 million in the third quarter of 2005, to $166 million as of June 30, 2007, and then to $1.97 billion in the second quarter of 2008. Similarly, foreclosed assets increased from $256 million in the third quarter of 2005, to $330 million as of June 30, 2007, and then to $1.156 billion in the second quarter of 2008. Furthermore, as discussed by numerous percipient witnesses, both first payment defaults (defined above as "FPDs") and early payment defaults ("EPDs") were a growing and alarming problem for the Company throughout the Class Period. The LPRM, the Company's fundamental model for calculating the appropriate levels at which to provision the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 167

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1    Allowance, simply failed to take into account all loan performance data from the winter of 2005

2    onward – precisely when the loans broadly began to fail.

3                    **3.    The Company's GAAP Violations**
                          **Resulted in Materially Misstated**
4                        **Financial Statements**

5            467.    In addition to the trends evident in the rising rate of nonaccrual loans, net charge-

6    offs, and negative amortization from quarter to quarter, the Officer Defendants were aware that

7    the credit quality of the remainder of WaMu's loan portfolio was rapidly deteriorating as a result

8    of, among other things, the Company's loosened underwriting standards and the use of inflated

9    appraisals in the credit review process.    The insufficiency of the Officer Defendants'

10   provisioning for loan losses was partially disclosed in the third quarter of 2007, when the

11   Company suddenly announced guidance for its fourth quarter loan loss provision of $1.1-$1.3

12   billion.    The actual loan loss provision for the fourth quarter of 2007, as announced by the

13   Company on January 17, 2008, was over $1.5 billion – a quarterly provision greater than the

14   2007 full-year provision publicly projected by the Company at the beginning of that year.

15           468.    According to an analysis of publicly-available information, the amount by which

16   the Officer Defendants under-provisioned the Company's Allowance during the Class Period was

17   massive.    In each of the six quarters prior to the Class Period, the Company maintained its

18   Allowance at no less than 81.58% of the Company's total nonaccrual real estate loans.    During

19   the Class Period, the Officer Defendants drastically reduced the Company's Allowance as a

20   percentage of nonaccrual loans to a low of 41.27%.    Because the Officer Defendants caused the

21   Company to weaken its underwriting guidelines, the Allowance as a percentage of nonaccrual

22   loans should have been increased, rather than reduced, during the Class Period.    Even assuming

23   the proper Allowance level as a percentage of delinquencies during the Class Period was the

historic low of 81.58% in the first quarter 2005 (although it should have been higher because the Company had substantially deviated from its underwriting standards and engaged in improper appraisal practices during the Class Period), the amount of the Allowance understatement – and corresponding manipulation of publicly-reported income – is set forth in Chart 9 below.

| Chart 9 : Minimum Amount By Quarter By Which WaMu's Allowance Was Under-Provisioned ||
| Quarter | Deficiency (Overage) |
| --- | --- |
| Q1'06 | $90,000,000 |
| Q2'06 | $60,000,000 |
| Q3'06 | $241,000,000 |
| Q4'06 | $171,000,000 |
| Q1'07 | $398,000,000 |
| Q2'07 | $472,000,000 |
| Q3'07 | $733,000,000 |
| Q4'07 | $579,000,000 |
| Q1'08 | ($755,000,000) |
| Q2'08 | ($2,219,000,000) |

Chart 9 indicates that, under this conservative analysis, the Company actually **over provisioned** in the first and second quarter of 2008.  This results from the Company's increasingly massive "catch up" provisions beginning in the third quarter of 2007.  If the Company had been provisioning at appropriate levels throughout the Class Period, such as maintaining its Allowance at 81.58% of nonaccrual loans throughout the Class Period, then the Allowance would have already been at a more appropriate level to address the Company's ongoing losses, and the Company would not have had to suddenly and dramatically increase its Allowance.

469.    As discussed above in ¶462, during the third and fourth quarters of 2005, the Company reported special one-time events (Hurricane Katrina-related costs and the acquisition of the Company's credit card operations, respectively) that make it impossible to determine, from publicly-available information, how much the Officer Defendants were actually under-

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 169

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    provisioning the Allowance for those two quarters.  However, as the Officer Defendants'

2    misconduct with regard to its risk management, underwriting, and appraisal practices began in

3    the third quarter 2005, upon information and belief, the Allowance was materially understated

4    for the third and fourth quarter 2005, as well.

5         470.    As indicated by Chart 9 above, the Officer Defendants understated the Company's

6    Allowance by tens or hundreds of millions of dollars in each quarter and billions of dollars in

7    total.  The understatement of the Allowance had a dollar-for-dollar impact on the Company's

8    reported pre-tax income during the Class Period.  (The effect on net income would be reduced by

9    the Company's effective tax rate.)  Thus, the Company reported misleading income amounts

10   during each quarter of the Class Period in violation of GAAP.

11        471.    As a result of the Officer Defendants' manipulation of the Company's Allowance,

12   WaMu reported artificially inflated net income in each quarter during the Class Period.  Chart 10

13   shows the net effect, by quarter, of the Officer Defendants' minimum manipulation of the

14   provision for loan and lease losses on the Company's publicly reported net income.  The

15   manipulation of the Company's reserves is shown on a non-cumulative basis for each quarter

16   (*i.e.*, the understatement in a particular quarter is not included in subsequent quarters.)  Because

17   the Officer Defendants had caused the Company to diminish its underwriting standards and to

18   inflate appraisals during the Class Period, WaMu should have increased its reserves during the

19   Class Period to take into account the lower credit quality of its home loan portfolio.  Thus, the

20   table sets forth an extremely conservative analysis of the overstatement of the Company's net

21   income manipulation based on the extremely conservative assumptions set forth in ¶468.

| Chart 10: Estimated Effect of the Officer Defendants' Allowance Manipulation on Net Income* | | | | |
|---|---|---|---|---|
| Reporting Period | Net Income Reported | Minimum Allowance Understatement | Effect on Net Income | % Difference |
| 1Q'06 | $985,000,000 | ($90,000,000) | ($33,000,000) | 3% |
| 2Q'06 | $767,000,000 | ($60,000,000) | ($49,000,000) | 6% |
| 3Q'06 | $748,000,000 | ($241,000,000) | ($157,000,000) | 21% |
| 4Q'06 | $1,058,000,000 | ($171,000,000) | ($110,000,000) | 10% |
| 1Q'07 | $784,000,000 | ($398,000,000) | ($164,000,000) | 21% |
| 2Q'07 | $830,000,000 | ($472,000,000) | ($265,000,000) | 32% |
| 3Q'07 | $186,000,000 | ($733,000,000) | ($592,000,000) | 318% |
| 4Q'07 | ($1,867,000,000) | ($579,000,000) | ($291,000,000) | 16% |

*Quarterly effective tax rate calculated from annual tax rates disclosed in the Company's Form 10-K for year ending December 31, 2007.

472.    Accordingly, during the Class Period, WaMu's Allowance was materially misstated in violation of GAAP and SEC guidelines.  The Company's Allowance failed to take into account the adverse performance of WaMu's loans due to the deteriorating underwriting standards and false appraisals for those loans.  Thus, the Officer Defendants violated GAAP and ultimately caused the Company to understate its liabilities and overstate its reported net income.

473.    Sharon Sabba Fierstein, a Certified Public Accountant with over twenty years of accounting experience (including significant mortgage financing and audit management experience) has been retained by Lead Counsel in connection with Lead Plaintiff's investigation to evaluate WaMu's accounting practices.  Ms. Fierstein's opinion concerning WaMu's accounting practices is attached as Appendix 5 (the "Fierstein Declaration").  As explained in the Fierstein Declaration, for nearly ten years, Ms. Fierstein served as the Executive Vice President, Treasurer and Chief Financial Officer of a mortgage banking company.  Prior to that, Ms. Fierstein was an Audit Manager for Deloitte Haskins & Sells (a predecessor of Deloitte &

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 171

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Touche LLP), which included a two-year special assignment where she served as Secretary to the International Auditing Practices Committee for the International Federation of Accountants. In that position, Ms. Fierstein contributed to the design and drafting of International Auditing Guidelines and other technical papers. Additionally, Ms. Fierstein is currently the President of the New York State Society of CPAs and serves as a council member as a New York State delegate to the American Institute of CPAs. Ms. Fierstein's Curriculum Vitae is attached to Appendix 5. Having analyzed various publicly-available information concerning WaMu and having reviewed the information in this Complaint (including the internal WaMu documents referred to in this Complaint), as set forth in greater detail in her Declaration, it is Ms. Fierstein's opinion that WaMu materially under-provisioned its Allowance during the Class Period in a manner that is inconsistent with GAAP and SEC guidelines, and that WaMu lacked adequate internal controls during the Class Period.

### 4. During the Class Period, the Company's Internal Controls Over Financial Reporting Were Ineffective

474. The Officer Defendants concealed the inadequacy of WaMu's internal controls throughout the Class Period by falsely representing to investors that the Company's internal controls over financial reporting were effective. As discussed below in Section VIII, throughout the Class Period, Defendants Killinger and Casey each repeatedly and falsely certified the design, operation and effectiveness of WaMu's internal controls in the Company's annual and quarterly financial statements. However, the Company's purported control environment failed to ensure that the financial statements issued during the Class Period were reliable or in compliance with applicable laws. Rather, the Officer Defendants focused on increasing loan volume origination without regard to the quality of such loans in an effort to reach aggressive market

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 172

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

share goals without taking the steps required under GAAP and SEC guidelines to account properly for their activities. The control environment shaped by the Officer Defendants – including its sidelining of WaMu's Risk Management segment – resulted in ineffective internal controls with respect to the Company's financial reporting process and allowed the Officer Defendants to misstate materially the Company's financial statements.

475. The lack of effective internal controls enabled the Officer Defendants to lower WaMu's underwriting standards to such a point that it issued high-risk loans including Option ARM, Alt-A, and subprime loans without determining whether and to what extent the borrowers could actually repay the loans. Additionally, the lack of effective internal controls allowed senior management and others at WaMu to pressure in-house and third-party appraisers into inflating the value of the underlying collateral of the Company's loans. As discussed above, because of WaMu's ineffective internal controls over financial reporting, the Company did not appropriately account for the credit risk inherent in the Company's massive portfolio of Option ARM loans.

476. Further, WaMu's ineffective internal controls over financial reporting allowed the Company to ignore the growing trends of delinquent loans when modeling for its Allowance. The CRO Report detailed a number of other ways, beyond WaMu's failure to address the fundamental aspects of Option ARM loans in its Allowance methodology (and specifically, in the Company's LPRM), that WaMu's Allowance methodology and other controls critical to WaMu's financial reporting were dangerously unsound well into the Class Period. Many of these issues relate directly to senior management's oversight of the Allowance methodology. Although designated by the CRO Report as matters requiring "[u]rgent management attention and aggressive corrective actions" and "prompt attention," the Company did not propose to address

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 173

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

many of the fundamental defects addressed in the CRO Report until the end of March 2006 – *at the earliest*.

477.   For example, the CRO Report observes that:

The LPRM does not adequately account for justification for the unallocated allowance.  Specific limitations noted in Q2 2005 for LPRM include:

- *payment shock to Flex and Option ARM borrowers* if Fed Funds Rate continues to increase

- *negative amortization potential of Home Loans portfolio*

- the increasing concentration of speculative buyers in the housing market

- decreasing portfolio collateral improvements through a shift in borrower behavior from loans emphasizing debt amortization to one of managing payment terms and cash flow

- Regulator-imposed constraints on more exotic loan products which could reduce liquidity in the housing market.

As noted above, the unallocated portion of WaMu's Allowance was based upon factors including "national and local economic trends and conditions, industry conditions within portfolio segments, recent loan portfolio performance, loan growth and concentrations, changes in underwriting criteria, and the regulatory and public policy environment."  WaMu's failure to document justifications for the unallocated portion of the Company's Allowance, the CRO Report suggests, increases "improper use of the models, or incomplete assessment of the unallocated portion[.]"

478.   Further, the CRO Report states under the subject of "Management Oversight & Reporting" that the groups responsible for maintaining internal controls lacked even adequate guidelines to accomplish their oversight functions:

The Credit Reserves Committee has been established for the purpose of providing oversight of the reserve and provisioning methodologies, models, assumptions, and more, yet guidelines detailing how this is to be accomplished are not available.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 174

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1
2

Furthermore, the Loss Modeling Working Group, responsible for providing reports and analysis to aide the Committee in determining the adequacy of the [Allowance], lacks formal guidelines for this process.

3

479.    In addition, the CRO Report goes on to provide "additional detail" regarding this

4

failure, explaining that WaMu's internal control failures meant that in addition to lacking

5
6

effective guidelines, WaMu's Credit Reserves Committee was not being provided with sufficient

7

information to discharge it duties – which jeopardized compliance with GAAP and Agency

8

guidance:

9

Failure to provide the Committee with specific information and data (including adjustments, assumptions, changes/adjustments in methodology, etc.) and comparison over an extended period of time (not only quarter-to-quarter) could result in decisions without adequate analysis, or decisions based on quarterly minutiae rather than long-term trends and performance. The process of determining reserve adequacy would also be adversely impacted if the Committee does not include representatives with significant and specific knowledge of each of the portfolios reviewed.

10
11
12

13

The Committee should be provided with information that is robust enough, covering a prolonged period of time, to ensure that all the risks have been surfaced and thoroughly vetted in determining the adequacy of reserves for the bank and individual loan portfolios. The information must include the underlying assumptions made throughout the process, allowing management to regularly challenge and adjust the assumptions to reflect changes in the portfolios' risk characteristics. A method should be included to track any changes made from period to period and historically, preventing significant deviation from the expected evolution of the process. Furthermore, the standards and guidelines should ensure that the Committee consists of appropriate subject matter expertise relative to each of the business models or portfolios being reviewed. ***This would help comply with Interagency Guidance which calls for verification and review for GAAP conformance and supervisory guidance by a party independent from the [Allowance] estimation process.***

14
15
16
17
18
19
20

21

The CRO Report therefore "strongly" recommended that the Company take steps toward

22

addressing these glaring inadequacies by establishing "formal standards and guidelines" for the

23

Credit Reserves Committee and the Loss Modeling Working Group, including "what types of

24

reporting and analyses [are] necessary for sufficiently determining the adequacy of the reserves."

25

The CRO Report emphasized that such guidelines are "essential in providing transparency in the

26

[Allowance] process, both internally and externally."   Shockingly, the CRO Report Response

27
28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 175

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    prepared on behalf of WaMu's management proposed to respond to the issues related to

2    "Management Oversight & Reporting" by March 31, 2006.   Yet, WaMu and the Officer

3    Defendants never revealed these shocking failures of internal controls to the investing public.

4        480.    Because of management's failure to maintain effective internal controls over

5    financial reporting, as discussed above at ¶¶474-481, WaMu and the Officer Defendants were

6    able to conceal the deteriorating condition of WaMu's loan portfolio from the investing public by

7    not provisioning for its Allowance in a manner appropriate for such a poor-quality loan portfolio

8    and to materially misstate the Company's assets and earnings.

9        481.    Management's assessment of internal controls over financial reporting was a

10   critical statement for investors because it provided (false) assurance that the Company's financial

11   statements were reliable and in compliance with applicable laws. However, during the Class

12   Period, WaMu did not properly assess its internal controls over financial reporting.

13   **VII.    ADDITIONAL ALLEGATIONS CONFIRMING**
     **THE OFFICER DEFENDANTS' SCIENTER**

14       482.    At all relevant times, the Officer Defendants acted with scienter in making

15   material omissions of fact and materially false and misleading statements during the Class

16   Period.  Each of the Officer Defendants had actual knowledge that the statements he made were

17   false and misleading, or acted with reckless disregard for the truth or falsity of those statements,

18   as demonstrated by the allegations above, and the additional substantial direct and circumstantial

19   facts and evidence below supporting a strong inference of scienter for each of the Officer

20   Defendants.  Numerous facts and circumstances support a strong inference of scienter on the part

21   of each of the Officer Defendants, including the facts and circumstances below, among others

22   detailed in this Complaint:

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 176

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

2        •       The extensive regulation which the Company was subject to and the

3   Officer Defendants' responses to such regulation support a strong inference of scienter.

4   For example, Defendant Killinger personally received instructions from the OTS

5   regarding his, the other Officer Defendants', and the Board's responsibilities with regard

6   to the Company's appraisal practices.    As evidenced by, among other things,

7   communications between WaMu's senior management and federal regulatory authorities

8   regarding WaMu' responsibilities in its appraisal practices, the Officer Defendants were

9   involved in setting the Company's appraisal policies and practices.    Furthermore, as

10  discussed above, before and during the Class Period, the federal banking regulatory

11  authorities issued direct guidance for lending institutions on the appropriate manner in

12  which to account for subprime and other high-risk lending.    Of course, the Officer

13  Defendants and the Company were also subject to regulation by the SEC concerning,

14  among other things, their communications with the investing public (including their

15  financial reporting) and their accounting practices, which are the foundation of the legal

16  claims made in this Complaint.    In connection with those regulations, Defendants

17  Killinger and Casey each signed sworn certifications that WaMu maintained adequate

18  internal controls and presented its financial statements in accordance with GAAP at the

19  end of every quarterly reporting period, when that was not true.

20        •       On every conference call and at every investor conference during the

21  Class Period, the Officer Defendants spoke and purported to fully and fairly address

22  questions regarding the Company's home mortgage lending operations.    As shown

23  below, the Officer Defendants carefully prepared for such events with detailed

24

25

26

27

28

1    information concerning the Company's true state of affairs and agreed upon what they

2    would – and would not – reveal to investors about WaMu's business affairs.

3        •    As discussed in detail above, WaMu's home mortgage lending operations

4    were a pillar of the Company and a vital source of its income and planned growth.  Not

5    surprisingly, the Officer Defendants played a significant role in dictating and monitoring

6    the Company's home lending policies and practices.  In fact, the Officer Defendants also

7    either directed or were warned about and aware of the Company's gross deficiencies in

8    risk management and the Company's many deficiencies with regard to the quality of the

9    loans that it underwrote and originated, all of which contributed to the Company's

10   deteriorated loan quality.  In addition to the allegations above, as detailed below, the

11   Officer Defendants: (1) participated in regular meetings in which the Company's risk

12   management and loan performance were questioned and criticized; (2) were personally

13   warned of the Company's deteriorating risk management and accounting standards; and,

14   (3) received numerous reports which were specifically compiled for review by the Officer

15   Defendants and the Board reflecting trends in WaMu's business operations, including

16   loan portfolio performance analyses that identified and addressed the root causes of the

17   deteriorating performance of the Company's loans.  In addition, as discussed below, the

18   Officer Defendants supervised the Company's underwriting guidelines and were kept

19   abreast of changes in such guidelines.

20       •    In addition, the Company's and the Officer Defendants' improper

21   accounting for the Allowance support a strong inference of scienter on the part of all the

22   Officer Defendants.    As admitted by the Officer Defendants, who used credit

23   provisioning for the Allowance as one of WaMu's main "earnings drivers" each quarter,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 178

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1
2
3
4
5
6
7
8

the Allowance was a critical metric for investors.  Furthermore, the Officer Defendants' improper accounting for the Allowance materially affected several key line items on the Company's income statement and balance sheet, including net income, assets, and earnings per share.  The applicable GAAP provisions and SEC guidelines, as discussed above, fundamental principles that have been in force for years (SFAS 5, the main GAAP provision applicable to the Company's home mortgage lending, became effective in 1978).

9
10
11

•       As discussed below, each of the Officer Defendants' extensive experience in the mortgage banking industry also supports a strong inference that each Officer Defendant acted with scienter.

12
13
14

A.       **Prior to Start of the Class Period, WaMu Had Tried to Convince the OTS to Exempt the Company from Certain Federal Appraisal Regulations**

15
16
17
18
19
20
21
22

483.    Through its then-Chief Credit Officer, Mark Hillis, on May 4, 2005, WaMu made an unprecedented and apparently unsuccessful written request to the OTS (the "Appraisal Exemption Request") to decrease the Company's federally-mandated appraisal obligations. Lead Counsel obtained WaMu's Appraisal Examination Request in the course of its investigation. WaMu's Appraisal Exemption Request is further evidence of scienter, as it shows a desire on the part of WaMu and its senior management to avoid appraisals in connection with the Company's home lending.

23
24
25
26
27

484.    The Appraisal Exemption Request was an attempt by WaMu to set aside certain requirements for what then-Chief Credit Officer Hillis described in WaMu's request as "full appraisals in conjunction with certain federally related real estate related transactions."  More specifically, in the Appraisal Exemption Request, WaMu sought to do away with the requirement

28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 179

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

of independent appraisals for all of its real estate transactions valued under $500,000 – or at least double the existing and then-applicable "*de minimis*" appraisal exemption amount.

485.    WaMu offered various arguments in support of its stand against appraisals requirements.  Among other things, in the Appraisal Exemption Request, WaMu asserted that the requirement for appraisals in connection with federal lending transactions was "obsolete" under many circumstances and that appraisals were inferior to "newer valuation technologies."  WaMu summed up its position in support of an unprecedented repeal of then-and-currently existing appraisal requirements for the Company's lending business as follows:

> Because the $250,000 transaction value exemption contributes a significant competitive disadvantage to Agency-regulated financial institutions, without a commensurate contribution to the safety and soundness of those institutions, ***Washington Mutual Bank strongly recommends that the de minimus*** [sic] ***exemption [for mandatory appraisals] be raised to at least $500,000 for loans secured by residential real estate.***

WaMu's request for appraisal exemptions from the OTS in mid-2005 apparently was denied.  As detailed above, instead the Company found other ways to avoid full and fair appraisals by choosing to disregard governing appraisal rules and regulations.

## B.    Witnesses Observed the Officer Defendants Discuss and Acknowledge Material, Undisclosed Problems With WaMu's Lending

486.    Numerous former WaMu employees have confirmed that WaMu senior management, including the Officer Defendants, was acutely aware of the undisclosed problems from which WaMu suffered but which were not disclosed to the investing public, including those WaMu insiders whose accounts are detailed below.

487.    As reported by Confidential Witness 79, each of the Officer Defendants was intimately involved in discussing and analyzing WaMu's loan performance, at a minimum for much of 2006, in preparation for the Company's 2006 Investor Day held on September 6 and 7,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 180

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

2006.  CW 79 was employed at WaMu as a Senior Operations Excellence professional from October 2002 until December 2007.  From July 2006 through December 2006, CW 79 reported directly to Defendant Cathcart in WaMu's Enterprise Risk Management Group.

488.    CW 79's primary responsibility during the time that CW 79 worked directly for Defendant Cathcart was to assist Defendant Cathcart and the other Officer Defendants in preparing for WaMu's 2006 Investor Day.  Indeed, CW 79's time was "100% devoted" to preparation for the 2006 Investor Day from July until early September 2006.  Specifically, during this period, CW 79 regularly attended meetings among and between Defendants Killinger, Casey, Rotella, Cathcart, and Schneider, all discussing information that the Officer Defendants knew about the Company's financial health, risk exposure, and how, and to what degree, to present information about those topics to investors.  One of CW 79's most important responsibilities was to ensure that all relevant information was available to the Officer Defendants.  According to CW 79, there was "a tremendous amount of pressure in preparing for the [2006 Investor Day] presentation."

489.    According to CW 79, Defendant Cathcart presided over a monthly Enterprise Risk (or "Executive Risk") Committee meeting, for which CW 79 served as the secretary.  The attendees of this meeting included Defendants Killinger, Casey, Rotella, Schneider, as well as each of the business units' President, Chief Financial Officer, and Chief Risk Officer.  CW 79 described these meetings as "a forum where all aspects of risk across the bank were discussed, including credit, market and operational risk."  Because the Enterprise Risk Committee was "formally sanctioned" by WaMu's Board of Directors, CW 79 recalled that its meetings were typically held in WaMu's main boardroom.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 181

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

490.     At these monthly meetings, CW 79 explained that the Officer Defendants engaged in detailed discussions regarding the Company' risk exposure, specifically focused on the allocation of risk to each WaMu business unit's product lines.  CW 79 further explained that, in preparation for such meetings, the business units would have previously provided to other executive committees of the Board their financial forecasts or projections, and that during the meetings of the Executive Risk Committee these financial forecasts were reviewed in detail for the purpose of allocating risk across the Company.  CW 79 cited as examples of this intensive review the Executive Risk Committee's acknowledgement of particularly high risk in its loan portfolio relating to specific geographic regions, such as California, and the Executive Risk Committee's discussion of minimum FICO scores for WaMu's particular loan products.

491.     Further, more informal meetings among the Officer Defendants – convened specifically to discuss the 2006 Investor Day preparation – occurred regularly according to CW 79.  These meetings occurred, as CW 79 recalled, in several locations, including Defendant Rotella's office and the WaMu Investor Relations office near Defendant Casey's office.  In the days leading up to the 2006 Investor Day presentation, the Officer Defendants and CW 79 primarily met in Defendant Cathcart's office.

492.     CW 79 recalled that from the start of CW 79's participation in meetings with the Officer Defendants in July 2006, the focus for the 2006 Investor Day presentation was on the Company's risk profile because of heightened investor and media scrutiny on a possible increase in WaMu loan defaults.  CW 79 stated that in preparing for that presentation, the Officer Defendants were highly focused on deciding what they would and would not reveal to investors.  Defendants Cathcart, Killinger, Rotella, and Casey discussed on numerous occasions the default rates within the Company's loan portfolios, and in particular WaMu's Option ARM and subprime

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 182

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

loans, in the meetings that CW 79 attended. According to CW 79, at these meetings, the Officer Defendants discussed a substantial amount of detailed information regarding levels of delinquencies concerning many of WaMu's specific loan product types, but the Officer Defendants elected not to disclose such information to the public. CW 79 specifically stated that Defendants Cathcart, Killinger, Rotella, and Casey discussed deterioration in the mortgage industry in general and the problems with WaMu's own portfolios in particular, adding that the Officer Defendants' objective for their public statements was to mitigate perceived problems with the Company's loans by highlighting the fact that subprime lending represented a relatively small percentage of WaMu's overall loan portfolio and overall bank assets.

493.    As a result of these discussions, according to CW 79, the Officer Defendants decided to focus their discussion on "the weakening state of the housing market because 'they saw what was coming.'" In addition, according to CW 79, the Officer Defendants specifically discussed the need to avoid making any statements that might give rise to liability under the federal securities laws. After responses to anticipated questions were agreed upon by the Officer Defendants, the final meetings held in Defendant Cathcart's office, involving Defendants Killinger, Cathcart, Rotella, and Casey, were all primarily focused on addressing who of the four would answer different types of questions that might arise from Defendant Cathcart's presentation.

494.    CW 79 stated that as a result of the analysis conducted in preparation for Investor Day 2006, Defendant Killinger reached the conclusion that he wanted to deemphasize the importance of subprime to WaMu going forward. According to CW 79, Defendant Killinger specifically discussed his decision to deemphasize subprime as a percentage of the total loan

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 183

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1 portfolio and of the bank's total assets during the Executive Risk Committee meetings attended

2 by CW 79.

3      495.   CW 79 specifically noted that Defendant Schneider would not have been able to

4 adjust the Company's lending practices as they related to risk without the knowledge and consent

5 of Defendants Killinger, Cathcart, Casey, and Rotella.   In other words, Defendants Killinger,

6 Cathcart, Casey and Rotella as well as Defendant Schneider were knowledgeable and involved in

7 establishing and approving the Company's lending policies and guidelines.

8

9      496.   Confidential Witness 80 reported similar face-to-case interactions with the Officer

10 Defendants, specifically Defendant Casey, in which he was directly informed that the Company's

11 risk management and accounting standards had dangerously deteriorated, with material effects

12 on the Company's financial statements.   CW 80 was a Senior Vice President for Accounting

13 Policy at Washington Mutual from June 2006 until November 2007.  CW 80 came to WaMu with

14 twenty years of experience in the lending field, including senior positions at some of WaMu's

15 direct competitors in the home lending business and after serving as a safety and soundness

16 examiner at the Federal Reserve Board in Washington D.C.  CW 80 is currently employed at a

17 federal regulatory housing agency.

18

19      497.   CW 80 explained that as SVP and head of accounting policy, he reported to

20 Washington Mutual's Controller, initially Defendant Woods, and after Woods transferred to

21 WaMu's Home Loans segment in early 2007, to Defendant Ballenger.  CW 80 noted that he

22 managed a staff of five at WaMu.  In this function, CW 80 had significant interaction with

23 Defendant Cathcart and the Enterprise Risk Group Defendant Cathcart headed, and that he also

24 interacted regularly with Cliff Rossi, WaMu's Chief Risk Officer, until Rossi left WaMu in

25 September 2007.  In addition, CW 80 stated that he had "significant interaction" with WaMu's

26

27

28

Chief Financial Officer, Defendant Casey. CW 80 believed that many of WaMu's accounting policies and practices were improper, including those related to the Company's compliance with GAAP, and SFAS 5 in particular, and noted that his relationship with Defendant Casey "progressively worsened due to disputes over accounting policy."

498.     CW 80 explained that WaMu's risk management function lacked independence, specifically because Defendant "Casey appeared to exert greater influence over the loan loss process as opposed to it being independently managed." Moreover, CW 80 believed that WaMu's "reserving process was diminished as the finance function exerted greater control," and marginalized those who were qualified to analyze and calculate WaMu's reserves.

499.     Further, CW 80 shared his opinion that "senior management at Washington Mutual are contemptuous of their regulator [the OTS]."

C.     **The Officer Defendants Received Regular Reports Detailing Significant and Widespread Problems with WaMu's Loans**

500.     The Officer Defendants also received various regular and special reports concerning WaMu's lending practices and loan performance from across the Company. Confidential Witness 78 served as an Assistant Vice President in the Risk Analytics Group at WaMu from January 2006 until January 2008. The Risk Analytics group conducted credit risk analyses on the various portfolios managed by the separate business units at WaMu, including home loans, commercial loans and credit card portfolios. CW 78's group was involved in conducting overall analyses of WaMu's portfolios, including analysis of financial results, delinquency and loss trends, performance drivers and correlation analysis pertaining to economic trends. In particular, as discussed below, CW 78's group compiled monthly reports analyzing WaMu's credit risk exposure across the Company, which was then distributed directly to

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 185

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1  Defendants Schneider and Cathcart, and a summary version of the same report, which was

2  compiled for the Board.

3      501.    CW 78 explained that the Risk Analytics Group consisted of approximately

4  twenty-five professionals and was headed by Tim Bates, Vice President & the head of Credit

5  Information Strategy and Systems, who reported directly to Hugh Boyle, Chief Risk Officer,

6  who, in turn, reported to Defendant Cathcart.  In general, CW 78 explained that the Risk

7  Analytics Group gathered data from the Company's Fidelity MSP system, the primary

8  information system concerning WaMu's portfolio of home loans, and compiled such information

9  into WaMu's Enterprise Data ("ED") warehouse, a database maintained by the Enterprise Risk

10 group.  The Risk Analytics Group was then responsible for the analysis of the data to identify

11 any relevant trends affecting the Company as a whole.

12     502.    The Risk Analytics Group focused mostly on WaMu's "held for investment"

13 portfolio, although CW 78 recalled that one notable exception pertained to WaMu's Option ARM

14 loan securitizations, as CW 78 claimed that the Risk Analytics Group did conduct a significant

15 amount of analysis on Option ARM loans overall "when it started to become a big deal."

16     503.    CW 78 recalled that one of the most important aspects that came up during CW

17 78's tenure with the Risk Analytics Group concerned the issue of negative amortization as it

18 pertained to Option ARMs.  In addition, CW 78 reported that the Risk Analytics Group identified

19 noticeable trends in defaults, in particular with Option ARM products and with Alt-A "no doc"

20 loans in general.  "Once real estate valuations started to turn in 2006," CW 78 reported that there

21 was a "significant focus on defaults as they pertained to specific geographic areas."

22     504.    The information noted above and other information that CW 78 was in charge of

23 collecting was officially compiled and regularly reported to the Officer Defendants.  Among

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 186

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

other reports, CW 78 stated that her group compiled a monthly report called the "Credit Risk Review" that was distributed to all of the business groups, including Defendants Schneider and Cathcart. CW 78 stated that the Credit Risk Review Reports produced by her team focused on, amongst other things, WaMu's "riskier products," including Option ARM loans. These reports occasionally focused on WaMu's loan portfolio at the loan level, examining issues like LTV, FICO scores, "no-doc" versus full loan documentation, and other loan characteristics, adding that such analysis frequently was performed concerning WaMu's negative amortization (i.e., Option ARM) loans.

505.    In addition, according to CW 78, the Risk Analytics Group also compiled a "Credit Highlights Report," an abridged version of the more detailed Credit Risk Review report, which was compiled specifically for WaMu's Board of Directors.

506.    Indeed, this information was widely available to WaMu management across the Company. CW 15 was a First Vice President in the Capital Markets Group at WaMu Capital Corp. in New York, New York, from October 2004 until December 2007. CW 15 reported directly to Doug Potolsky and was in charge of Investor Relations, where CW 15 was responsible for working with the various investors in the securitized subprime products being structured and issued by WaMu's capital markets division. CW 15 was a senior management level employee with close interaction with Defendant Schneider and other senior executives responsible for WaMu's Home Loans segment.

507.    CW 15 stated that loan defaults "were always well monitored at WaMu" and, within the Company, "everyone was aware of the negative trends that started to appear in 2005." CW 15 stated that WaMu's management knew about, but never acknowledged, the negative trends that were being witnessed concerning first payment defaults on WaMu's loans. Indeed,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 187

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1  CW 15 claimed that WaMu's "loan servicing area was doing a good job tracking the defaults that

2  were taking place."

3         508.    Similarly, Confidential Witness 81 served as Staff Accountant in WaMu's Home

4  Loans Group in Vernon Hills, Illinois from May 2006 until May 2008.  CW 81 was involved in

5  various accounting functions within the group, including in the allocation of mortgage loans

6  between "held for sale and "held for investment."  CW 81's group maintained the accounting for

7  the entire loan portfolio of the Home Loans division, including the specific allocation of the

8  portfolio into broader categories (*i.e.*, prime, Alt-A, subprime) as well as more specific categories

9  such as by loan type.

10        509.    Part of CW 81's responsibilities included managing accounting adjustments

11 pertaining to non-accrual loans.  As part of this responsibility, CW 81 was involved in the

12 generation and analysis of monthly, quarterly and yearly reports for specific loan types, including

13 (i) Adjustable Rate loans, (ii) Interest Only loans, (iii) Fixed Rate loans and (iv) Hybrid loans.

14 Partly as a result of this regular reporting, CW 81 recalled that WaMu senior management,

15 including Defendant Schneider, were "always aware" of what was occurring with respect to the

16 overall loan portfolio.

17        510.    For example, CW 54 who, as described above, performed monthly audits on the

18 Company's "prime loans," reported that the results of the group's analysis were provided to John

19 Truong in Seattle, who was then responsible for integrating such information into management

20 reports that were specifically provided to WaMu's most senior management.  CW 54 stated that

21 the information regarding loan performance certainly reached senior management, including

22 Defendant Schneider.

511.    The Officer Defendants also closely monitored LBM's loan performance throughout the Class Period.  CW 63 who, as explained above, served as National Underwriting Manager of LBM, participated in LBM's working level credit policy committee, which transmitted weekly recommendations on methods to reduce FPDs to the Executive Credit Policy Committee, which included Defendant Schneider.  LBM's lax underwriting had resulted in increasing defaults and delinquencies, including FPDs and early payment defaults (defined above as "EPDs").  FPDs were defaults that occurred before the borrower made even one monthly payment.  EPDs were typically loans in which the borrower may have made one or two monthly payments but then failed to continue making their monthly payments.

512.    The Executive Credit Policy Committee included Defendant Schneider and Cheryl Feltgen, Division Executive Chief Credit Risk Officer.  The working level committee included Mark Brown, Senior Vice President and National Underwriting Manager; Susan Sinn, Wholesale Nonprime Operation Manager; Arlene Hyde, Division Executive Prime and Nonprime Wholesale Lending; Alex Park, Senior Vice President, Senior Credit Officer - Subprime; Denise McCrainey, Credit Policy Administrator; and Doug Potolsky, Senior Vice President, Subprime Capital Markets.  The committee also included Jay Weisbrod, LBM Production Manager, who CW 63 described as extremely vocal in his opposition to any changes to underwriting guidelines.

513.    CW 63 explained that the working level credit policy committee's recommendations were communicated to WaMu's Executive Risk Committee (defined above) by Alex Park.  CW 63 stated that the weekly written recommendations included three sales and revenue items:  (1) impact upon production; (2) estimate of benefits in reducing FPDs; and, (3) effect upon competition.  The weekly document for the Executive Committee's review was

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 189

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  prepared by Alex Park and Denise McCrainey.  Likewise, communications from the executive

2  level to the working level policy committee were transmitted through McCrainey.

3      514.    In addition to monitoring EPDs and FPDs, according to Confidential Witness 82,

4  WaMu regularly received reports from a group of WaMu employees (rather than LBM

5  employees) dedicated to reviewing a percentage (typically around 20%) of LBM's loans to

6  monitor LBM's loan underwriting.  CW 82 was an employee of LBM from 2001 until October

7  2006, serving as an Underwriter and later becoming a Quality Assurance Manager.  CW 82

8  initially reported to Amy Marcussen, Senior Vice President of Operations.  After Marcussen left

9  the company, CW 82 reported to Mamie Reynoso, Vice President of National Quality Assurance

10  Manager.

11      515.    LBM's President, Troy Gotschall, and Marcussen had initially approached CW 82

12  concerning leading a quality assurance group to monitor LBM's loan underwriting, but the

13  position ultimately was given to another LBM employee.  Nevertheless, CW 82 received reports

14  from the newly formed group, which he forwarded to LBM's Loan Servicing Center managers.

15  The reports listed findings on specific loan files, such as "stated income: not reasonable."  The

16  LBM managers receiving the reports through CW 82 had a certain number of days to go through

17  the loan files in question and respond to the findings in the reports.  According to CW 82, WaMu

18  corporate headquarters received these reports as well.  CW 82's quality assurance group had to

19  respond to the WaMu unit concerning these reports, which in return had to respond to corporate.

20  If CW 82 did not respond promptly, his boss would call and "give [him] hell."

21      516.    According to CW 83, who was a Senior Default Foreclosure Loan Specialist with

22  WaMu's LBM in Chatsworth, California from 2002 to September 2006, WaMu senior

23  management had complete and constant access to information regarding the rising levels of

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 190

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

defaulting LBM loans.  According to CW 83, her department received statistics every month that showed the number of FPDs from the prior month.  According to CW 83, the numbers were consistently decreasing until 2005 when defaults jumped.  CW 83 said that at one point the defaults were at 5-6% but eventually increased to 14%.  They seemed to "jump all at once – at the end of 2004, they were at 6-7% and, although they may have increased slightly, did not go over 9%."  Starting in 2005, according to CW 83, FPDs just "seemed to go up and up."

517.    Beginning in 2005, according to CW 83, WaMu held meetings monthly to discuss new products and to "go over the numbers from the prior month."  Additionally, according to CW 83, "Town Hall Meetings" with WaMu corporate executives, including Defendant Killinger, were held every three to six months.  Prior to the start of the Class Period, according to CW 83, members of corporate management would merely congratulate the department on the department's efforts to reduce delinquencies.  However, according to CW 83, by late in 2005 these meetings had taken on a new tone:  WaMu corporate executives would update WaMu employees on the state of defaults and reassure them that the Company was "not going anywhere."  According to CW 83, corporate headquarters also sent emails, reiterating that despite increased loan defaults, the Company was "not going anywhere."

### D.    The Officer Defendants Had Ready Access to and Control of the Company's Internal Reporting

518.    Further, in addition to the reports specifically compiled for the Officer Defendants' review, detailed information related to the Company's loan origination, including standards implemented and exceptions to underwriting guidelines, was automated and readily available to the Officer Defendants as senior executives of the Company.

519.    Confidential Witness 84 reported that the Company's Fidelity MSP system (discussed above), was the primary resource which tracked all aspects of the loans being

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 191

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

processed by WaMu.  CW 84 was exceedingly familiar with the Fidelity MSP system relied upon by WaMu.  CW 84 spent almost twenty years at WaMu, most recently serving as a Senior Accountant in Vernon Hills, Illinois from April 2006 until February 2008.  CW 84 explained that the Fidelity MSP system was set up to conduct queries with respect to any relevant aspects pertaining to the loans.  Specifically, CW 84 explained that the system allowed a user to perform data mining and generate any number of different reports based on any specific characteristic pertaining to the product type (*e.g.*, fixed rate, adjustable rate, ARM), specific information pertaining to the loan and the borrower (*e.g.*, FICO scores, LTV, loan purpose, appraised value), and information pertaining to the loan status (*e.g.*, defaults, principal outstanding).  CW 84 believed that anyone in credit risk management, transaction management, trading and the other main divisions within Home Loans had access to and could generate reports via the Fidelity system.  CW 84 commented that the information, through Fidelity, was readily available to those in senior management and accounting, and that the many negative trends that were starting to take place were well-known.

520.    Similarly, Confidential Witness 85, who served as a Staff Accountant in Home Loans Accounting in Vernon Hills, Illinois from April 2006 until February 2008, reported that the accounting groups of the Company relied upon the Fidelity MSP system.  Specifically, CW 85 formed part of the "real estate owned" ("REO") accounting group, a group of five individuals that handled the reconciliation of accounts pertaining to mortgage loans that had gone into foreclosure.  Reconciliations were required to reflect the sale of real estate properties that were owned by the Company as the result the foreclosures.

521.    CW 85 recalled that the REO group maintained a separate database of information generated from information feeds from WaMu's Fidelity MPS system operated within the Home

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 192

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Loans Group, explaining that any number of specific reports could be generated through the Fidelity system to identify various characteristics of defaulted or foreclosed loans. CW 85 further explained that the database maintained by WaMu's REO group provided specific data pertaining to the foreclosed loans, such as various loan types (i.e., Option ARM, conforming, Alt-A, subprime) and various loan characteristics such as product type and specific details pertaining to the borrower. CW 85 jokingly added that reports were not even necessary to recognize the increase of subprime loans that were being foreclosed and processed through REO during CW 85's tenure.

522.    CW 85 explained that on a monthly basis, the REO group prepared extremely detailed "Loan Loss Severity Reports" pertaining to foreclosures and including quantitative analyses of WaMu's foreclosures. According to CW 85, these reports should have been used by WaMu to evaluate and fund WaMu's loss reserve.

523.    In addition to the Fidelity MSP system, the Company specifically and separately tracked and monitored all exceptions made to the underwriting guidelines. Confidential Witness 86 served as an underwriting manager for WaMu/LBM in Englewood, CO from May 2007 to February 2008. Previously, CW 86 held the position of underwriter from May 2005 to May 2007. CW 86 worked for LBM until October 2007 when CW 86 "transferred to the prime side [of WaMu]." CW 86 explained that whenever exceptions were made to WaMu's underwriting guidelines, an exception approval sheet would be signed and placed in a file. Additionally, exceptions were documented in two different systems, WaMu's loan origination system ("LOS") and in a database of loans that contained comments on the loan. The same system was in place for both WaMu's subprime and prime underwriting, and, according to CW 86, the Company tracked exceptions through reports generated by this system. Specifically, according to CW 86,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 193

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    the Company's system was used to generate "umpteen reports," including underwriting

2    exception reports.  CW 86 stated that WaMu's management could "pull up reports on anything"

3    using the system that tracked underwriting exceptions.

4        524.    Confidential Witness 69 served as a senior underwriter for WaMu in Livermore,

5    CA from July 15, 2003 to September 2007.  CW 69 also acted as senior underwriting manager at

6    WaMu from February 2007 until September 2007.  According to CW 69, WaMu's corporate

7    management in Seattle had a system for tracking exceptions to underwriting guidelines that it

8    reviewed and shared with WaMu's senior management.  CW 69 began to see these underwriting

9    exception reports during the time that CW 69 acted as senior underwriting manager, but had

10   never seen them prior to that point as WaMu's underwriters were never kept informed about how

11   the loans they had underwritten were actually performing until directly before CW 69's departure

12   in late 2007.  According to CW 69, during the Class Period WaMu's underwriting exception

13   reports were very detailed and included the borrower's FICO score, loan amount, the exception

14   that was being requested, "compensating factors" to supposedly "justify" the exception, and the

15   percentage of underwriting exceptions per geographic or sales region.  According to CW 69, both

16   WaMu Loan Fulfillment Center ("LFC") managers and WaMu's corporate managers in Seattle

17   regularly received these exception reports.

18       525.    CW 69 was sent to Chicago by WaMu around August 2006 for an internal WaMu

19   meeting concerning WaMu's increasing loan defaults, which thirty or so other WaMu employees

20   attended (a corporate risk manager, the top managers of LBM, regional WaMu managers, and a

21   couple of WaMu loan fulfillment managers).  CW 69 was the only underwriter present.  Prior to

22   the August 2006 meeting, even as a senior underwriter CW 69 had not realized that defaults were

23   a problem at the Company.

526.    In early to mid 2007, WaMu assigned CW 69 to a specific project to track FPDs at WaMu.  A WaMu LFC manager asked CW 69 to present the data he collected through graphs, percentages, and pie charts so that it could be presented to WaMu senior management, including WaMu Vice Presidents, Regional Managers, and the LFC manager.    WaMu corporate management provided the raw data needed for the project.  Until this point, CW 69 had not seen any FPD or EPD reports.  These reports showed which types of loans were not performing well.  According to these reports, the biggest problems at CW 69's LFC were higher LTVs and lower FICO scores, stated income products, and the use of bank statements for calculating income.  CW 69 stated that it was recognized that FPDs and EPDs were the result of poor underwriting standards:  for example, the Company would take twelve months of personal bank statements and divide the deposits by twelve to arrive at the borrower's income; similarly, for limited documentation loans, the Company would look at six months worth of bank statements and divide by six to arrive at the borrower's supposed income.

527.    Similarly, the Company tracked all information related to loan delinquencies.  Confidential Witness 87 spent over 20 years with WaMu or its predecessor banks, most recently serving as a Default Specialist in Vernon Hills, Illinois from August 2003 until August 2007.  CW 87 first joined Sears Mortgage in September 1988 until that company was acquired by PNC, which was itself acquired by WaMu in approximately 2001.  As a Default Specialist, CW 87 was involved in working with borrowers to try to rectify foreclosures and to dispose of the properties held by WaMu as the result of foreclosures.  CW 87 recalled that most of the loans that CW 87's group worked with as default specialists were loans underwritten by WaMu itself, and were not loans underwritten by Long Beach Mortgage or any loans purchased through third-party lenders.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 195

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

528.  CW 87 recalled receiving reports from WaMu's loan servicing operations in Jacksonville, Florida summarizing the loans that had gone into default, adding that there were clearly increasing levels of defaults and foreclosures beginning in mid-2005.  CW 87 said that, among CW 87's colleagues at WaMu, there it was hardly a secret that the levels of loan defaults at WaMu were increasing during the Class Period, stating that at the Company, "everyone knew it."

> **E.    The Officer Defendants Knew of or Recklessly Disregarded WaMu's Lax Underwriting Guidelines Because Such Guidelines Were Centrally Established and Controlled**

529.  Because WaMu's underwriting guidelines directly affected the value and credit quality of WaMu's loans – and therefore were fundamental to WaMu's overall financial condition – WaMu's senior management closely monitored and managed WaMu's prime and subprime home lending underwriting guidelines and operations.

530.  As explained below through the reports of numerous former WaMu employees, because WaMu's underwriting guidelines and product offerings were managed at the highest levels of the Company, the Officer Defendants knew, or were reckless in not knowing, that throughout the Class Period, while the Company increased its credit risk exposure by offering exotic, high-risk loans, the Company was also secretly causing its underwriting guidelines and procedures to become exceptionally loose.

531.  Confidential Witness 88 was a Vice President and Manager of the Policies & Procedures Administration Group.  CW 88 was based in WaMu's Irvine, California corporate offices from 2004 until March 2007.  CW 88's group's primary function was maintaining the central repository for Washington Mutual's Conventional Underwriting Guidelines ("CUG") and Product Pricing Guidelines ("PPG").  CW 88's role and responsibilities were Company-wide.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 196

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

532.    According to CW 88, WaMu's Credit Policy Review Group, headed by Michelle Joans, WaMu's Vice President of Credit Policy, set forth the underwriting guidelines in the CUG. Joans was assisted by approximately seven or eight assistants from around the country, in some cases working in WaMu's regional loan fulfillment centers.  CW 88 described WaMu's process for making any change to its underwriting guidelines as "regimented" and dependent upon review and approval from WaMu senior management.  Specifically, for any change to be made to WaMu's CUGs, a "Communication Request" would be submitted to CW 88's group.  According to CW 88, any Communication Requests concerning WaMu's underwriting guidelines required at least a Senior Vice President's review and signature.  For example, CW 88 said a WaMu office in Texas could submit a request seeking to permit increased LTV limits on WaMu's super jumbo loans or modifications to the terms of a stated income policy, but such a request would require a Senior Vice President's signature.

533.    Once a "Communication Request" regarding WaMu's underwriting guidelines was received with requisite senior-level sign off, a document was created that consisted of the original guideline and the proposed guideline reflecting changes requested in a "Communication Request" or otherwise, marked with "tracked changes," and  that document was reviewed by at least one member of each of the following groups: the Credit Policy Committee, a management committee that directly reported to the Audit Committee of WaMu's Board, the Legal Department, and WaMu's Compliance Department.  CW 88 explained that proposed underwriting guideline changes were then discussed in conference calls in which members of each of these groups would present their positions.  According to CW 88, WaMu's underwriting guidelines could be changed only if the proposed changes to WaMu's underwriting guidelines received the management-level approval set forth above, but CW 88 also stated that WaMu's

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 197

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

loan production management frequently "pushed" for changes in WaMu's underwriting guidelines during such conference calls and were effective in overriding concerns raised by WaMu's legal, compliance or credit departments.

534.    In addition to these reports, according to Confidential Witness 18, WaMu's risk management group would regularly audit the company's underwriting guidelines and those audit reports would be submitted to the Company's Chief Enterprise Risk Officer, Defendant Cathcart. Those audit reports would review all aspects of WaMu's underwriting guidelines for risk.  It was CW 18's understanding that Defendant Cathcart was then responsible for reporting the results of those internal audits concerning WaMu's underwriting guidelines to the Officer Defendants and to WaMu's Board.

535.    WaMu senior management also directly monitored, created, and modified underwriting guidelines at LBM.  Confidential Witness 89 was a First Vice President and Operations Manager with responsibilities for LBM nationwide from 2006-2007.  From 2005-2006, CW 89 was the Regional Operations Manager responsible for the California market. According to CW 89, any and all changes to the underwriting guidelines of LBM were made by LBM's Credit Policy Committee.  According to Confidential Witness 63, who served as National Underwriting Manager of LBM beginning in September 2006 and was a Regional Operations Manager for LBM prior to that position, the Credit Policy Committee at LBM reported weekly to the WaMu Executive Credit Policy Committee, which included Defendant Schneider.

### F.    The Officer Defendants' Extensive Industry Experience Supports a Strong Inference of Scienter

536.    The Officer Defendants possessed extensive industry, accounting and/or finance experience and education sufficient to understand and alert them to the serious consequences to the Class of the fraud they were directing at WaMu:

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 198

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

- Defendant Killinger joined WaMu in 1982 and held numerous senior positions at WaMu, including executive vice president; senior vice president for financial management, research, investor relations and corporate marketing; and, served as a member of a three-person Office of the President.  Defendant Killinger also holds bachelor's and Master of Business Administration degrees.

- Among other jobs, Defendant Casey, from 1997 until he joined WaMu, served as Vice President of the General Electric Company and Senior Vice President and Chief Financial Officer of GE Insurance.  Prior to joining GE, Defendant Casey worked for Coopers & Lybrand from 1984 until 1990 as an audit supervisor focusing on the financial services industry.  Defendant Casey holds a bachelor's degree in accounting.

- Prior to joining WaMu, among other positions, Defendant Rotella served as a member of the JP Morgan Chase executive committee, Chief Executive Officer of Chase Home Finance, and as Executive Vice President of JP Morgan Chase.  In these positions, Defendant Rotella was responsible for JP Morgan Chase's residential lending and he also oversaw related capital markets, portfolio management, marketing, credit, human resources, finance and legal activities.  Defendant Rotella holds a bachelor's degree in economics and a Master's of Business Administration in finance.

- Defendant Cathcart was Executive Vice President of Retail Risk Management for Canadian Imperial Bank of Commerce from 2002 to 2005, and prior to that served in a variety of senior risk management positions at Bank One.

- Defendant Schneider, among other jobs in the lending and financial services industries, served as President and Chief Operating Officer of CitiMortgage, Inc. from 2001 to 2005, and was Executive Vice President of Retail Banking for Old Kent Financial Corporation

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 199

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

from 1997 to 2001.  Defendant Schneider holds a bachelor's degree in accounting and a

Master's of Business Administration degree and he is also a licensed CPA.

### G. The Officer Defendants Were Motivated by Their Performance-Driven Compensation to Overstate the Company's True Financial Condition

537.  Defendants Killinger, Casey, Rotella, Cathcart and Schneider also had both

motive and opportunity to perpetrate fraud.  Each of the Officer Defendants had a tremendous

stake in driving WaMu to meet certain financial benchmarks during the Class Period, since each

of these Officer Defendants' annual bonuses was dependant on WaMu meeting certain goals and

objectives.  According to WaMu's proxy statements from the years 2005 through 2007, the

Officer Defendants' incentive-based pay was based largely on – 75%, 85% and 90% for fiscal

years 2005, 2006 and 2007, respectively – achieving certain financial performance measures,

including, among others: (a) increasing WaMu's earnings per share; (b) decreasing WaMu's non-

interest expense; and (c) increasing WaMu's non-interest income (for 2007 only).  The chart

below details the annual bonuses these Defendants gained – over and above their salaries – by

maximizing these metrics, including the bonuses they received after their fraudulent scheme

began to be revealed in 2007.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 200

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

| Chart 11: Officer Defendants and Annual Bonuses | | | |
|---|---|---|---|
| Officer Defendant | 2005 Bonus | 2006 Bonus | 2007 Bonus |
| Killinger | $3,555,000 | $4,074,000 | $1,189,000[6] |
| Rotella | $2,896,057 | $3,142,800 | $912,800 |
| Casey | $1,303,548 | $1,356,060 | $391,200 |
| Cathcart | N/A | Not Disclosed | $153,220 |
| Schneider | $492,914 | Not Disclosed | Not Disclosed |

538.    The Officer Defendants attempted to continue this pattern of windfalls even after their scheme was exposed and the Company's true financial situation was revealed.  On March 3, 2008, the Company announced that the 2008 bonus targets and performance measures for the Company's executives would exclude loan loss provisions and foreclosure expenses from the calculation of executive bonuses.  Specifically, the performance measures included, among other metrics, the "Company's 2008 net operating profit, weighted at 30%, calculated as operating profit before income taxes and excluding the effects of (i) loan loss provisions other than related to our credit card business; and (ii) expenses related to foreclosed real estate assets.  This plan was ultimately abandoned due to intense shareholder criticism and objection.

539.    Moreover, partly as a result of the bonus awards received during the Class Period, Defendants Killinger, Rotella, Casey, Cathcart, and Schneider reaped significant overall compensation for each of the years during the Class Period.  These Defendants received total compensation as follows:

---

[6] Per the Company's 2007 Compensation Proxy, Officer Defendant Killinger did not accept the 2007 Cash Bonus of $1,189,900 he was entitled to under the 2007 EPS, 2007 NIE and 2007 NII performance measures set in the 2007 Compensation 8-K.  However, the 2007 Compensation Proxy also disclosed that the *forgone bonus would still be counted toward Defendant Killinger's post-retirement benefits*. Therefore, because Officer Defendant Killinger received a benefit from the Cash Bonus, it is included in determining the percentages of direct compensation tied to financial performance.

| Chart 12: Officer Defendants and Annual Compensation | | |
|---|---|---|
| **Officer Defendant** | **2005 Compensation** | **2006 Compensation** | **2007 Compensation** |
| **Killinger** | $13,719,571 | $14,245,859 | $5,250,770 |
| **Casey** | $4,368,422 | $4,565,581 | $2,440,646 |
| **Rotella** | $17,419,664 | $8,452,994 | $3,926,531 |
| **Cathcart** | N/A | Not Disclosed | $1,961,984 |
| **Schneider** | $2,340,607 | Not Disclosed | Not Disclosed |

### H.    Insider Stock Sales by Defendant Killinger During the Class Period Were Highly Unusual and Suspicious

540.    The Class Period sales of WaMu stock by Defendant Killinger were highly unusual, and therefore suspicious, as measured by (1) the amount and percentage of shares sold, (2) comparison with Defendant Killinger's own prior trading history and that of other insiders, and (3) the timing of the sales. Such sales therefore provide strong evidence of scienter.

541.    To evaluate Defendant Killinger's selling activity, experts retained by Lead Counsel used publicly available trading data reported on Defendant Killinger's behalf to the SEC on the SEC's Form 4.  Lead Counsel, through experts, analyzed the trading by insiders that occurred during the Class Period and during the equal-length period immediately preceding the Class Period, beginning January 13, 2003 and ending October 17, 2005 (the "Control Period"). As demonstrated below, Defendant Killinger's Class Period sales were extremely large and highly unusual.

### 1.    Defendant Killinger's Stock Sales Increased Tremendously During the Class Period

542.    As reflected in the following table, the amount of shares Defendant Killinger sold during the Class Period were extraordinarily large, and at a relatively high price:

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 202

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

| Chart 13: Defendant Killinger's Class Period Sales of WaMu Stock | | |
|---|---|---|
| Class Period Sales (Shares) | Class Period Sales (Dollars) | Average Share Price |
| 301,688 | $13,102,027 | $43.43 |

543.    In addition to being massive in absolute terms, sales by Defendant Killinger during the Class Period were extraordinary when compared to his own prior selling activity, and when compared to the selling activity of other, less well-placed and knowledgeable insiders.

544.    A comparison of the sales by Defendant Killinger during the Control and Class period is set forth in the below chart:



Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 203

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

As set forth in Chart 14, Defendant Killinger's sales increased more than 226% during the Class Period, from approximately $4 million prior to the Control Period to more than $13.1 million during the Class Period.

545. The contrast between Defendant Killinger's sales prior to the Class Period (referred to as the "Control Period," January 13, 2003 through October 17, 2005) and the Class Period is equally striking when measured in shares sold, rather than dollars, as set forth in the following chart:



By this measure, Defendant Killinger increased his sales by 230% in the Class Period, compared to the Control Period before the Class Period.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 204

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

546.    The increase in Defendant Killinger's selling is even more striking when compared to the sales pattern of other WaMu employees, who lacked Defendant Killinger's knowledge of the Company's true finances and operational condition. As a group, WaMu employees that are not named as defendants under Lead Plaintiff's claim for violations of Section 10(b) of the Exchange Act (i.e., securities fraud) sold shares worth $35.8 million during the Class Period, a decrease of 50% compared with the Control Period. By contrast, as noted above, Defendant Killinger increased his selling more than 225%, to more than $13.1 million:



547.    The contrast between Defendant Killinger and less senior WaMu insiders not alleged to have actively played a role in the fraud at WaMu is equally acute when calculated on

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 205

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  the basis of the number of shares sold. While Defendant Killinger's sales increased 230%, non-

2  Defendants' sales, collectively, actually *decreased by half*:



3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

19          **2.      Defendant Killinger's 10b5-1 Trading
20                  Plan and Trading Patterns Further
21                  Demonstrate the Suspicious Nature of His
                  Selling**

22          548.    In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides

23  that a person will be deemed to have traded "on the basis of" material, nonpublic information if

24  the person engaging in the transaction was "aware of" that information at the time of the trade.

25  Previously, courts had split on whether simple possession of material, nonpublic information at

26  the time of the trade was a sufficient basis for imposing liability, and some courts had held that

27
28

liability attached to a trade only if the insider "used" inside information in making the trade. *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, at 51,727 (Aug. 24, 2000).

549.    To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Trading Plans"). *See id.* at 51,727-28. Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability only if it is entered into by an insider "before becoming aware" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

550.    Defendant Killinger instituted a 10b5-1 Trading Plan on or around February 6, 2006, approximately four months after the start of the Class Period and after, as alleged in this Complaint, Defendant Killinger was aware of inside information concerning WaMu's true, deteriorating financial condition. Defendant Killinger's first 10b5-1 Trading Plan allowed him to sell up to 150,000 WaMu shares. Defendant Killinger executed 3 sales of approximately 50,000 shares each in three separate installments pursuant to his first 10b5-1 Trading Plan. Once Defendant Killinger completed those sales, he initiated a second 10b5-1 Trading Plan in October 2006 in order to double his insider sales, with another three installments of sales of around 50,000 WaMu shares each, for a grand total of over 300,000 shares sold.

551.    The pattern of Defendant Killinger's suspicious sales is reflected in the chart below, which also shows WaMu's common stock price at the time of Defendant Killinger's sales:

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 207

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   As illustrated by Chart 18, above, Defendant Killinger suspiciously instituted his 10b5-1 Plans

17   around four months after the start of the Class Period and concluded his 10b5b-1 plans in May

18   2007, shortly before WaMu's stock price began to plummet when the market began to learn of

19   WaMu's true financial condition starting with WaMu's surprise October 17, 2007 announcement

20   that it would be increasing its reserves.  Moreover, Defendant Killinger concluded his stock sales

21   before the NYAG Complaint was filed concerning WaMu's unlawful appraisal practices, but

22   suspiciously during the course of the New York Attorney General's investigation into such

23   improper appraisal practices.   Indeed, as set forth above, the NYAG Complaint was filed after

24   the Attorney General's office conduct a nine-month investigation.   Accordingly, Defendant

25   Killinger was able to unload his WaMu shares at prices that reflected artificial inflation in

26

27

28

1    WaMu's stock price due to the fraud that WaMu, Defendant Killinger and the other Officer

2    Defendants orchestrated.

3        552.    Defendant Killinger's pattern of sales is just as unusual when comparing the total

4    value of the shares sold:



Chart 19: Price vs. Total Value of Shares Sold in Defendant Killinger's 10B5-1 Plans

3.    **The Increase in Stock Sales at the Same
       Time as WaMu Initiated Major Stock
       Buybacks Further Demonstrates Their
       Suspicious Nature**

        553.    Defendant Killinger's high rate of sales during the Class Period is particularly

suspicious because it occurred while WaMu was repurchasing significant amounts of its own

shares from the market.

554.    WaMu's first stock buyback program – for up to $100 million in WaMu stock – was adopted on October 18, 2005 (the "2005 Buyback Program").  Defendant Killinger commented on the 2005 Stock Buyback Program on November 15, 2005, at the WaMu New York Investor Day, saying, "Now today we are especially interested in share repurchase because we believe the current stock price does not reflect our long term growth opportunities as well as the growing value of our unique franchise."  However, notwithstanding Defendant Killinger's pronouncements regarding the Company's long-term growth opportunities, he went on to institute the first of his 10b5-1 trading plans on February 7, 2006.  Over the next few months, Defendant Killinger went on to sell his WaMu stock in 50,000 share increments during the 2005 Stock Buyback Program, for total profits of $6,648,247.

555.    On July 18, 2006, WaMu announced a second buyback of approximately $150 million in stock.  Defendant Killinger discussed this repurchase plan on the Company's second quarter 2006 earnings call on July 19, 2006, commenting that the Board "approved a new 150 million share stock repurchase plan. We expect to actively utilize that authority as we find our stock to be a very attractive investment compared to other asset investment alternatives."  Again notwithstanding his comments regarding the health of the Company's stock, thereafter Defendant Killinger renewed his 10b5-1 trading plan for an additional 150,000 shares of WaMu stock. Defendant Killinger's sales under his 10b5-1 Trading Plans continued during this period for an additional 150,000 shares at a profit of $6,453,780.

556.    Thus, at exactly the time Defendant Killinger was sharply increasing his personal sales of WaMu stock, he was causing the Company to engage in repurchases of its own stock. The immediate consequence of the buybacks was to support the Company's share price, and the ultimate effect was to secure large profits on Defendant Killinger's own sales during the Class

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 210

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    Period, while the Company, and through it, the Class, suffered massive losses on the shares

2    WaMu repurchased.

### VIII.  DEFENDANTS' MATERIALLY MISLEADING OMISSIONS AND FALSE STATEMENTS

#### A.    False & Misleading Statements Concerning Third Quarter 2005 Results

557.    On October 19, 2005, the first day of the Class Period, WaMu issued a press release announcing its financial results for the quarter ending September 30, 2005.  In this press release, WaMu reported that, for the third quarter 2005, the Company had net income of $821 million, or $0.92 per diluted share, and total assets of $333.6 billion.  In commenting on the Company's "solid" performance, Defendant Killinger stated: "Our solid third quarter earnings reflected excellent retail banking household growth driven by our long track record of industry leading customer service, as well as our ability to adjust to a challenging interest rate environment . . . .  ***The results also highlight our continued focus on balanced growth, earnings diversity and risk management***."

558.    In this press release, the Company also reported that its provision for loan and lease losses was $52 million, compared to $56 million in the fourth quarter 2005, bringing the Company's total Allowance for Loan and Lease Losses to $1.26 billion.  The Company noted that the provision consisted of: (i) $37 million that was a one-time special provision related to Hurricane Katrina, and (ii) $15 million related to the Company's ongoing risk management practices.

559.    On that same day, the Company held an earnings call with investors to discuss the third quarter 2005 results.  On the call, Defendant Killinger announced that the Board of Directors had elected to increase the cash dividend by $0.01 to $0.49 per share.  In addition, Defendant Killinger discussed the Company's Home Loans Group, stating that it had "performed

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 211

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

well, despite a much more competitive pricing environment.  Loan volume was a solid $48 billion, up 7% from the second quarter."  "Looking ahead," Defendant Killinger declared, "we believe we can effectively manage our credit quality by *continuing to be disciplined and vigilant in our underwriting standards, our portfolio management, and our reserving methodology*."  Indeed, Defendants touted the credit quality of the Company's loan portfolio and the Company's risk management efforts repeatedly.  On that same earnings call, Defendant Casey claimed, "Our credit performance continues [to be] very good . . . *We continue to proactively manage our credit risk, and are taking steps now to reduce potential future exposure*."

560.    Further, on the third quarter 2005 earning call Defendant Casey reassured investors that the overwhelming majority of the Company's Option ARM portfolio had LTV ratios below 80%.  He noted that, despite an increase in negative amortization in the Company's Option ARM portfolio, "only about 8% of current portfolio of option ARMs had [LTV ratios] at origination in excess of 80%.  Less than 2% of the portfolio had LTV [ratios] at origination above 90%."

561.    On or about November 7, 2005, the Company filed with the SEC a Form 10-Q for the period ending September 30, 2005, which was signed by Defendant Casey (the "Third Quarter 2005 Form 10-Q").  The Third Quarter 2005 10-Q repeated the financial results set forth in the Company's October 19, 2005 press release and earnings conference call.  The Third Quarter 2005 Form 10-Q also stated that "[t]he Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 212

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

562.    The Third Quarter 2005 Form 10-Q included signed certifications by Defendants Killinger and Casey stating, in pertinent part:

(1)    I have reviewed this quarterly report on Form 10-Q of Washington Mutual, Inc.;

(2)    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report.

563.    Additionally, in signing these attestations, Defendants Killinger and Casey certified that they had designed, established, and maintained an effective system of internal controls and procedures over the Company's financial reporting that is "effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934."

564.    The Third Quarter 2005 Form 10-Q also contained a description of the Company's risk management efforts as follows:

Enterprise Risk Management works with the lines of business to establish *appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance*. Significant risk management policies approved by the relevant management committees are also reviewed and approved by the Board, Audit, and Finance Committees. Enterprise Risk Management also provides *objective oversight of risk elements inherent in the Company's business activities and practices* and oversees compliance with laws and regulations, and reports periodically to the Board of Directors.

565.    Defendant Killinger's statements in WaMu's 2005 third quarter earnings release and earnings call regarding the quality of WaMu's underwriting standards, including that the Company was "disciplined and vigilant in [its] underwriting standards," were false and

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 213

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

misleading when made.  The Company's statements during the third quarter 2005 press release and earnings call and the Third Quarter Form 10-Q regarding the quality of the Company's credit risk management were also false and misleading when made.  The Company omitted from the Third Quarter Form 10-Q the material facts that, as set forth in detail above and as reported by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants caused the Company's credit risk management to deteriorate significantly.  The Company also omitted from the Third Quarter Form 10-Q the material facts that, along with the aforementioned deterioration in the Company's risk management, WaMu's loan underwriting standards were dangerously relaxed, and WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to maximize WaMu's loan volume.  The Company's undisclosed, lenient underwriting standards had caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers.  Further, as detailed above, the Company's loan-volume-focused incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, had caused WaMu, through its personnel, to sell and approve riskier loans without adequately considering the quality of such loans.  In addition, as discussed above, the Company failed to disclose that WaMu secretly had pressured its appraisers to inflate the stated value of the homes underlying these loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors.

566.    Finally, Defendants Killinger's and Casey's certifications in the Third Quarter 2005 Form 10-Q that the Company's financial results were reported in accordance with GAAP and that the Company maintained adequate internal controls were each materially false and misleading when made.  As explained above, during the Class Period, the Company's internal

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 214

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

controls over financial reporting suffered from significant deficiencies and material weaknesses because of, among other things, the Company's failure to address material deficiencies in its risk management, loss modeling methodology and other failures of internal controls (including those identified above in connection with Plaintiffs' allegations regarding WaMu's CRO Report). Moreover, rather than appropriately accounting for the Company's lax underwriting standards and inflated appraisals (thus signaling to the market how dangerously exposed the Company was to credit risk) or disclosing the known failures in its internal controls and Allowance methodology, the Officer Defendants caused the Company to under-provision its Allowance for Loan Losses throughout the Class Period, causing the Company's net income, earnings per share, and total assets to be overstated.

### B.  Defendants' False & Misleading Statements at WaMu's 2005 New York Investor Day

567.  On November 15, 2005, the Company hosted an Investor Day Conference in New York.  At that conference, Defendant Killinger highlighted the Company's underwriting and reserving methodologies, stating that these practices minimized the Company's credit exposure and would protect investors from the inevitable downturn in the market:

> ***On credit risk. We have excellent processes, policies, underwritings, standards and reserving methodologies in place and they have served us very well for quite some time.*** . . . Now you have heard my conservative voice on the housing market for several quarters now. We were concerned that housing prices appeared over extended in many markets around the country and we felt that the housing market was likely to cool. ***To prepare for this possibility we elected to selectively reduce credit risk this year*** . . . .

> Now these actions may have limited near term profitability but they help protect us from a softer housing market if that were to occur.

At the same conference, Defendant Killinger again emphasized the Company's ongoing risk management efforts, stating "***I think proper credit management does not wait until there is a major problem and then say what do I do, running around with my – like my head's cut off. . .***

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 215

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*. . And so I think good credit management is all about what do you before the problem is there[.]*" Similarly, at the Investor Day Conference, Defendant Schneider announced: "In addition, *we've maintained effective risk management processes*. This is clearly a top priority for us. We've invested a significant amount in terms of talent and technology in building risk management[.]"

568.     Defendant Schneider also represented that the Company had tightened its underwriting guidelines for its Option ARM product, "a mainstay of Washington Mutual for a number of years[.]" Specifically, Defendant Schneider said, "[w]e've done a few things to improve our margins [for Option ARM loans] . . . . Those combined with some tightening of underwriting guidelines primarily around the investor property will ensure that we can generate higher margins and receive the required returns on the product."

569.     The Company also emphasized the quality of its subprime underwriting practices at the Investor Day Conference. Specifically, Craig Chapman, President of the Commercial Group, the division of the Company that housed Long Beach Mortgage prior to 2006, addressed WaMu's "prudent" growth in the subprime area and "disciplined" subprime operations, stating: "*we allow no rate exceptions in the process*. Our pricing is controlled centrally. It's distributed through the network. There is process in place and triggers so that no loans can – there are no rate exceptions, I mean, on loans." Chapman also stressed that, with respect to the Company's adjustable-rate mortgages, "*we underwrite these loans at a fully indexed rate*. Even our [interest-only] loans are underwritten on 30-year amortizing and not at any introductory rates or just interest only rates."

570.     Defendants Killinger's and Schneider's statements at the 2005 Investor Day Conference regarding the quality of WaMu's underwriting standards and the quality of the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 216

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Company's credit risk management were also false and misleading when made. As set forth above and as attested to by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants caused the Company's credit risk management to deteriorate significantly. Moreover, instead of proactive risk management that was a "top priority," as Defendant Killinger claimed that the Company maintained, in fact WaMu's risk management group had been marginalized and lacked authority. Indeed, as explained above, even when the Company's risk management identified serious problems at the Company relating directly to the Company's financial health, such warnings were ignored by WaMu and the Officer Defendants.

571. The Company also omitted the material facts that, along with the aforementioned deterioration in the Company's risk management, WaMu's loan underwriting standards were dangerously relaxed, and WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting policies in order to maximize WaMu's loan volume. The Company's undisclosed, lenient underwriting policies had caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers. Further, as detailed above, the Company's loan-volume-focused incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, had caused WaMu, through its personnel, to sell and approve riskier loans without adequately considering the quality of such loans. In addition, as discussed above, the Company failed to disclose that WaMu had secretly pressured its appraisers to inflate the stated value of the homes underlying these loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 217

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

572.    Furthermore, contrary to Chapman's statements to the investing public, WaMu's growth in subprime lending was not "prudent"; instead, it was driven by highly aggressive lending practices, through which WaMu issued high-risk mortgages to unqualified borrowers with poor credit.  Directly contrary to Defendants' statements, the Company had not maintained "proper" or "effective" credit risk management, and the Company had loosened its underwriting guidelines in its attempt to spur growth.  Further, Chapman's explicit comments regarding the purported fact that WaMu did not allow rate exceptions and underwrote its adjustable rate mortgages to the fully-indexed rate were false and misleading when made.  In fact, as explained above, the Company had encouraged many so-called "exceptions" to its already loose underwriting guidelines.  For example, as discussed by CW 66, above, even salespeople were allowed to grant rate exceptions at WaMu's LBM.  Moreover, the Company had, in fact, been underwriting its adjustable-rate mortgages (including its Option ARM loans) to the "teaser" rate, rather than the fully-indexed rate.

573.    Analysts responded favorably to the Company's third quarter 2005 earnings announcement.  In a D.A. Davidson & Co. report dated October 20, 2005, analyst Jim Bradshaw remarked that although the Company faced margin pressure, it "maintain[ed] decent year-over-year growth by controlling costs and growing the balance sheet while enjoying strong credit quality."  Bradshaw also commented that "credit quality remains very good."

C.    **False & Misleading Statements Concerning Fourth Quarter & Year-End 2005 Results**

574.    On January 18, 2006, WaMu issued a press release announcing its financial results for the quarter and year-ended December 31, 2005.  In this press release, WaMu reported that, for the fourth quarter 2005, the Company's reported net income was $865 million, or $0.85 per diluted share, an increase of 12 percent on a per share basis from the fourth quarter of 2004

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 218

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

and, for the full year 2005, the Company's reported net income was $3.43 billion, or $3.73 per diluted share, an increase of 14% from 2004.  In the press release, Defendant Killinger commented on the Company's favorable financial results, stating: "Despite the challenging environment, especially in the home loans business, we delivered solid performance . . . . Our strategies are sound and we continue to execute on our growth and productivity initiatives.  In addition, *our risk management efforts are on track*[.]"

575.    On that same day, the Company held an earnings call with investors to discuss the fourth quarter and full year 2005 results. On the call, Defendant Killinger emphasized the Company's "solid quarters earnings" and its "solid performance," pointing out that the Company delivered such positive results despite the "challenges that faced [the Company]" including a difficult housing and interest rate environment.   In fact, Defendant Killinger announced that "[r]eflecting our positive outlook for the future and continued solid performance, I am pleased to announce that our board of directors once again increased the cash dividend by a penny to $0.50 per share and this represents the 42nd consecutive quarter that the cash dividend has been increased."

576.    During this call, Defendants Killinger, Casey, and Rotella also reassured investors about the Company's credit performance and that the Company was actively protecting itself against credit risks and losses.  For example, Killinger noted that the Company "continue[s] to experience very good credit performance."  Similarly, Defendant Casey stated that "[o]ur credit quality continued to be strong for most of 2005, but *we continued to proactively manage our portfolio to minimize credit risk* understanding that a more difficult environment may be ahead of us."  Defendant Rotella addressed WaMu's credit management practices on a loan-specific basis, stressing that for the Company's Option ARM loans: "*an important fact is we underwrite*

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 219

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1    *every loan at the fully indexed rate.  And so that's an important thing to note from a credit*

2    *perspective*."

3    577.    Similarly, at a Citigroup Financial Services Conference held on January 31, 2006,

4    Defendant Rotella continued to tout the Company's risk management activities and stated that

5    "[o]n the credit side, you can see we had a pretty good year. We feel like we are in good shape."

6    In particular, Rotella assured investors and analysts who attended the conference that the

7    Company appropriately handled the credit risk related to its Option ARM loans.  When investors

8    questioned him about the Company's exposure to "exotic" loans and asked how the Company

9    mitigated its exposure to these loans, Defendant Rotella responded that "[t]he credit quality on

10   those products has been quite good," that the Company does a "good job of trying to fit the right

11   customer to that mortgage," and with regard to the Company's "pretty substantial balance sheet

12   of option ARM products," the Company has evaluated the credit risk appropriately and "feel[s]

13   pretty good about the credit risk."

14   578.    On or about March 15, 2006, WaMu filed with the SEC a Form 10-K for the

15   fourth quarter and fiscal year ended December 31, 2005.  On August 9, 2006, the Company filed

16   a Form 10-K/A with the SEC for the fourth quarter and fiscal year ended December 31, 2005

17   (these two filings are collectively referred to as the "2005 Form 10-K").  The 2005 Form 10-K

18   was signed by Defendants Killinger, Casey, Farrell, Woods, Frank, Pugh, Leppert, Reed, Lillis,

19   Smith, Matthews, Stever, Murphy, Wood, and Osmer-McQuade and reiterated the materially

20   false financial results that had been announced in the January 18, 2006 press release and earnings

21   call.

22   579.    In the 2005 Form 10-K, the Company also reported a full-year provision for loan

23   and lease losses of $316 million in 2005, compared with a provision of $209 million in 2004.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 220

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

According to the 2005 Form 10-K, this higher provision included $195 million that was related to the Company's acquisition of the Company's new credit card operations in the fourth quarter. The remaining provision related to the Company's ongoing risk management efforts was $121 million. The Company also reported total assets as of December 31, 2005, of $343.6 billion.

580. In the 2005 Form 10-K, WaMu emphasized the Company's underwriting standards, announcing that, "[t]he Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans." Similarly, WaMu promoted the quality of the credit risk management of the Company's Option ARM loan portfolio, claiming that, "The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures."

581. In addition, throughout the 2005 Form 10-K, WaMu repeatedly underscored that loan-to-value ratios were a "***key determinant of future performance***," stating:

> Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees ***expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination***. . . . ***This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure***.

582. WaMu assured investors that because credit risk was reduced when home loans had LTV ratios of less than eighty percent, the Company closely monitored its home loans with LTV ratios of greater than eighty percent. As of December 31, 2005, WaMu claimed that home loans with this increased credit risk profile amounted to $9.01 billion, and home equity loans with this increased credit risk profile amounted to $12.3 billion of the Company's $229.6 of loans held in portfolio. According to the Company's 2005 Form 10-K, "Substantially all of these

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 221

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

loans were made to subprime borrowers, including $6.91 billion of purchased subprime loans. Total home loans with these features accounted for 10% of the Company's home loan volume in 2005." Further, the 2005 Form 10-K stated that regarding the Company's Option ARM loans, "current loan-to-value ratios have generally improved – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option."

583.   The 2005 Form 10-K stated that "[t]he Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

584.   Defendants Killinger and Casey signed certifications attesting to the accuracy of the information contained in the 2005 Form 10-K. These attestations were in substantially the form set forth in ¶562 above. Additionally, in signing these attestations, Defendants Killinger and Casey certified that they had designed, established, and maintained an effective system of internal controls over the Company's financial reporting.

585.   Defendants' statements in WaMu's 2005 Form 10-K that the Company was/had "mitigate[d]" or "manage[d]" its exposure to credit risk through "ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures" were each materially false and misleading when made. Further, Defendants Killinger's, Casey's, Rotella's, and Schneider's statements in the press release, earnings call, and at the financial services conference regarding the Company's credit risk management and Option ARM lending, including that the Company does a "good job of fitting" Option ARM loans with the appropriate customers, were also false and misleading when made. The Company omitted from the 2005 Form 10-K the material facts that, as set forth in detail above and as reported by numerous

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 222

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants had caused the Company's credit risk management to deteriorate significantly. For example, as set forth above, the Officer Defendants and the Company had repeatedly ignored both direct warnings and reports from senior WaMu risk management managers that the Company was operating outside of its supposed risk limits. The Company also omitted from the 2005 Form 10-K the material facts that, at the same time, the Officer Defendants had caused WaMu's loan underwriting standards to become dangerously relaxed. Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to maximize WaMu's loan volume. The Company's undisclosed, lenient underwriting standards had caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers. Further, as detailed above, the Company's loan-volume-focused incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, had caused WaMu, through its personnel, to sell and approve riskier loans without adequately considering the quality of such loans. In addition, as discussed above, the Company failed to disclose that WaMu had secretly pressured its appraisers to inflate the stated value of the homes underlying WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors.

586. Defendant Rotella's statement that the Company's Option ARM loans were underwritten to their fully-indexed interest rate was also materially false and misleading when made, because as set forth above, the Company had a policy of underwriting its Option ARM loans only to determine whether the borrower could pay the "teaser" monthly payment, rather than the fully-indexed payment, thus significantly increasing the risk of default. This

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 223

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

misrepresentation was material because, as the Officer Defendants were aware and as discussed above, borrowers who were qualified for the loan at and only able to pay the monthly minimum payment were much more likely to default.

587.   The Company's statements regarding LTV ratios, including the reported LTV ratios in the 2005 Form 10-K (including the statement that "current loan-to-value ratios have generally improved – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option), and Defendant Rotella's comments regarding LTV ratios at the January 31, 2006 financial services conference, were materially false and misleading when made, because as set forth above, the Company had been secretly inflating the appraisal values of the collateral underlying its home mortgage loans.  This inflation materially understated the LTV ratios of the Company's loans.

588.   Finally, Defendants Killinger's and Casey's certifications in the 2005 Form 10-K that the Company's financial results were reported in accordance with GAAP and that the Company maintained adequate internal controls were each materially false and misleading when made.  As explained above, during the Class Period, the Company's internal controls over financial reporting suffered from significant deficiencies and material weaknesses because of, among other things, the Company's failure to address material deficiencies in its risk management, loss modeling methodology and other failures of internal controls (including those identified above in connection with Plaintiffs' allegations regarding WaMu's CRO Report). Moreover, rather than appropriately accounting for the Company's lax underwriting standards and inflated appraisals (thus signaling to the market how dangerously exposed the Company was to credit risk) or disclosing the known failures in its internal controls and Allowance

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 224

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

methodology, the Officer Defendants caused the Company to under-provision its Allowance for Loan Losses throughout the Class Period, causing the Company's net income, earnings per share, and total assets to be overstated.

589.    Analysts responded favorably to WaMu's statements regarding the Company's credit quality.  For example, in a report dated January 19, 2006, Jim Bradshaw from D.A. Davidson & Co. reported that although in the fourth quarter of 2005 the Company's earnings per share missed analysts' consensus estimates, the Company's guidance for the 2006 loan loss provision indicated sound underlying credit quality.  As the report noted, "Higher operating costs and lower-than-expected revenue related to mortgage banking operations drove EPS below our expectations.  This was partially offset by superior credit quality."

### D.    False & Misleading Statements Concerning First Quarter 2006 Results

590.    On April 18, 2006, WaMu issued a press release announcing its financial results for the quarter ending March 31, 2006.  In this press release, WaMu reported that, for the first quarter 2006, the Company had net income of $985 million, or $0.98 per diluted share and total assets of $348.7 billion.  Commenting on the Company's financial results, Defendant Killinger stated: "We are very pleased with our first quarter results . . . .  The company's strong performance demonstrates the benefits of our continued diversification and enhanced operational focus."

591.    In this press release, the Company also reported that its provision for loan and lease losses was $82 million, compared to $217 million in the fourth quarter 2005.  The Company praised this performance, claiming that it was a direct result of the Company's credit quality.  Specifically, the Company stated that the "*[l]ower provision reflects continuing strong*

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 225

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    ***credit quality*** " and "***[s]trong credit quality results in lower provisioning***." (Emphasis in

2    original.)

3        592.    On that same day, the Company held an earnings call with investors to discuss the

4    first quarter 2006 results. On the call, Defendant Killinger emphasized the Company's "very

5    good financial results across most of [the Company's] operations, despite the difficult interest

6    rate environment," and emphasized that the Company was "intensely focused on quickly and

7    effectively adjusting our operations to improve profitability in this more-challenging, lower-

8    lending volume environment." Defendant Killinger also announced that, for the 43rd

9    consecutive quarter, the Board was raising the quarterly dividend by $0.01 per share, to $0.51.

10       593.    While the Officer Defendants noted that the interest rate environment continued to

11   challenge the Company's Home Loans business, they repeatedly praised the purportedly strong

12   credit quality of the Company's loan portfolio and commented on the Company's sound

13   performance. For example, Defendant Casey stated, "Turning to credit, we are pleased with the

14   ongoing strong credit performance of our portfolio. The economy remains strong, and the

15   quality of our portfolio continues to be fairly stable, with only a slight increase in non-

16   performing assets." In explaining the Company's earnings driver guidance, Defendant Casey

17   stated, "***Credit quality continues to surpass our expectations***. Given the good credit quality and

18   provision level of this quarter, we are revising our credit provision outlook downward to $650 to

19   $750 million." In addition, when analysts specifically asked about the rising trends of

20   repurchases in the Company's subprime portfolio, Defendant Casey discounted the existence of

21   any such trend, claiming, "it's actually trending down. I think the – what we saw in the fourth

22   quarter was a little spike. We have taken necessary actions to reduce that kind of exposure, and

23   we feel very good about where we are right now. We don't see that kind of trend continuing."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 226

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

594.    At the Company's annual shareholders meeting, also held on April 18, 2006, Defendant Casey continued to assure shareholders of the strength of the Company's loan portfolio, announcing, "Our credit provision was below our original expectation, reflecting our disciplined credit underwriting and a favorable credit environment."    Casey also told shareholders that, "Lastly, our risk management strategy continues to [be] effective and our credit quality remains strong."

595.    At the D.A. Davidson & Co. Financial Services Conference on May 9, 2006, Defendant Rotella continued to reassure investors of the Company's strong credit quality, with non-performing assets at a "terrific" level and that the Company was "prudent in [its] credit extension."  Defendant Rotella explained that despite the slowing housing market, the Company had seen "little evidence of any real deterioration in the consumer," but that the Company was closely monitoring the credit quality of the Company's loan portfolio through its enterprise risk management group, which gave an "independent view of how [the Company was] doing on credit risk."  Defendant Rotella also touted the Company's "cushion of protection against losses going forward" in its loan portfolio provided by the portfolio's purportedly-low LTV ratios.

596.    On or about May 10, 2006, the Company filed with the SEC a Form 10-Q for the period ending March 31, 2006, which was signed by Defendants Casey and Woods.  On August 10, 2006, the Company filed a Form 10-Q/A with the SEC for the quarter ended March 31, 2006, which was signed by Defendant Casey (these two filings are collectively referred to as the "First Quarter 2006 Form 10-Q").

597.    The First Quarter 2006 10-Q repeated the financial results set forth in the Company's April 18, 2006 press release and earnings conference call.  The First Quarter 2006

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 227

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Form 10-Q also stated that "[t]he Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

598.    Defendants Killinger and Casey signed certifications attesting to the accuracy of the information contained in the First Quarter 2006 Form 10-Q.  These attestations were in substantially the form set forth in ¶562 above.   Additionally, the First Quarter 2006 Form 10-Q stated that "[t]here have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."

599.    WaMu's statements in the Company's 2006 first quarter earnings release that the Company's lower loan loss provision for the quarter was a result of "strong credit quality" were false and misleading when made.  Further, Defendants Killinger's, Casey's, and Rotella's statements in the earnings call and at the D.A. Davidson Financial Services Conference regarding the Company's superior credit quality and underwriting, including the statement that the Company maintained "disciplined credit underwriting," also were false and misleading when made.  The Company omitted from the First Quarter 2006 Form 10-Q the material fact that, as set forth in detail above and as reported by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Company's risk management efforts had deteriorated and were deficient throughout the Class Period.  The Company also omitted from the First Quarter 2006 Form 10-Q the material facts that, as set forth above and as reported by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants had caused the Company's credit risk management to deteriorate significantly.  For example, as set forth above, the Officer Defendants and the Company had repeatedly ignored both direct warnings and reports from senior WaMu risk management

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 228

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

managers that the Company was operating outside of its supposed risk limits. Furthermore, the Company's underwriting standards, as described in detail above, were inappropriately permissive and lax. Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to maximize WaMu's loan volume. The Company's undisclosed, lenient underwriting standards had caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers. In addition, as detailed above, the Company's loan-volume-focused incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, had caused WaMu, through its personnel, to sell and approve riskier loans without adequately considering the quality of such loans. Further, as discussed above, the Company failed to disclose that WaMu had secretly pressured its appraisers to inflate the stated value of the homes underlying WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors.

600. Finally, the Company's statements in the 2006 First Quarter Form 10-Q that the Company's financial results were reported in accordance with GAAP and that the Company maintained adequate internal controls were each materially false and misleading when made. As explained above, during the Class Period, the Company's internal controls over financial reporting suffered from significant deficiencies and material weaknesses because of, among other things, the Company's failure to address material deficiencies in its risk management, loss modeling methodology and other failures of internal controls (including those identified above in connection with Plaintiffs' allegations regarding WaMu's CRO Report). Moreover, rather than appropriately accounting for the Company's lax underwriting standards and inflated appraisals (thus signaling to the market how dangerously exposed the Company was to credit risk) or

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 229

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

disclosing the known failures in its internal controls and Allowance methodology, the Officer Defendants caused the Company to under-provision its Allowance for Loan Losses throughout the Class Period, causing the Company's net income, earnings per share, and total assets to be overstated. Furthermore, as discussed above, in the first quarter of 2006 WaMu under-provisioned the Company's loss reserves by an estimated amount of at least $90 million, or 52%. WaMu's GAAP violations had the effect of overstating the Company's reported net income for first quarter 2006 by an estimated amount of at least $33 million, or 3%. Likewise, the Company's diluted earnings per share was overstated by an estimated amount of at least $0.03 for the first quarter 2006.

601.    Analysts responded favorably to WaMu's statements regarding the Company's credit quality. For example, Bradley Ball from Citigroup in a report dated April 18, 2006, noted that in the Company's first quarter of 2006, "*[t]he main source of strength was in credit* . . . . While management tweaked guidance to reflect changing market conditions – incl[uding] a lower for longer NIM [net interest margin] and higher MSR hedging cost, *improved credit* and expense management should offset . . . . . our full year EPS estimates are unchanged."

### E.    Defendants' False & Misleading Statements at the May 18, 2006, Lehman Brothers Ninth Annual Financial Services Conference and the June 1, 2006 Sanford C. Bernstein & Co. Strategic Decisions Conference

602.    On May 18, 2006, Defendant Killinger attended the Lehman Brothers Ninth Annual Financial Services Conference, where he repeated his false statements regarding the purported strength of the Company's loan portfolio. For example, Defendant Killinger dismissed concerns about credit, stating "The next target is on the credit front. . . . Certainly we can come back in the Q&A if you want to talk more about credit; but credit for us is [in] excellent shape, and *I feel very comfortable with where we are from management of that credit as well as the*

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 230

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    *reserving*."  Further, speaking on the Company's risk management efforts, Defendant Killinger

2    announced, "So I would say this is a point in the [housing] cycle in which you control what you

3    can; you get the ship in good shape[.]"

4        603.    On June 1, 2006, Defendant Killinger attended the Sanford C. Bernstein & Co.

5    Strategic Decisions Conference, where he continued to reassure investors of the strong credit

6    quality of the Company's loan portfolio, stating, "***on the credit front, we continue to be in***

7    ***excellent shape***."  In addition, in response to a question regarding negative amortization and

8    credit quality, Defendant Killinger declared that he had been "a resident bear" on housing from

9    "over a year" before, stating that the Company began to take "more conservative actions at that

10    time."  After touting the Company's "defensive actions" taken in response to Defendant

11    Killinger's concerns about "speculative activity" in the market, Defendant Killinger downplayed

12    concerns about negative amortization, stating, "in our existing portfolio of option ARMs, our

13    average FICO score is about a 710 and our loan to value at originations was 71%. And based on

14    today's market price we estimate that the loan to value of the portfolio is about 57%."  Defendant

15    Killinger also lauded the Company's experience with these exotic loans, stating, "The other

16    comment I would make is that we have experience of marketing and managing portfolios of

17    adjustable rate loans for well over 20 years; and we have the data about how these loans

18    performed through various parts of the economic cycle and so far the performance has been right

19    in line with expectations and I just haven't seen anything to cause us any particular concerns."

20        604.    Defendant Killinger's statements at the Lehman Brothers Financial Services

21    Conference and the Sanford C. Bernstein & Co. Strategic Decisions Conference regarding the

22    Company's superior credit quality, underwriting, and reserving were false and misleading when

23    made.  Defendant Killinger's statements regarding the Company's supposed preparedness for a

1  housing turndown, the LTV ratios in the Company's Option ARM portfolio, and the Company's

2  careful approach in marketing and managing the exotic Option ARM loans were also false and

3  misleading when made.  As set forth above and as reported by numerous Confidential Witnesses,

4  stating in 2005 and continuing throughout the Class Period, the Company's risk management

5  efforts had deteriorated and were deficient throughout the Class Period.  during 2005 and

6  throughout the Class Period, the Company's risk management efforts had deteriorated and were

7  grossly deficient throughout the Class Period.  For example, as set forth above, the Officer

8  Defendants and the Company repeatedly ignored both direct warnings and reports from senior

9  WaMu risk management managers that the Company was operating outside of its supposed risk

10  limits.  Further, WaMu did not employ strict or prudent underwriting standards during the Class

11  Period.  In fact, as detailed above, the Officer Defendants caused WaMu's loan underwriting

12  standards to become dangerously relaxed.  Moreover, as detailed above, starting in 2005, WaMu

13  encouraged its employees to make exceptions to the Company's already lenient underwriting

14  guidelines in order to produce a greater volume of loans.  The Company's undisclosed, lenient

15  underwriting policies and practices caused the Company to increase materially its loss exposure

16  by originating loans to less qualified borrowers.  Further, the Company's loan-volume-based

17  incentive structures and the culture created by WaMu's senior management, including the Officer

18  Defendants, caused WaMu's salespeople to originate more loans without regard to the quality of

19  such loans.  Further, as discussed above, WaMu secretly pressured its appraisers to inflate the

20  stated value of the homes underlying these loans, thus manipulating the LTV ratios for WaMu's

21  mortgages and exposing the Company to much greater credit risk than was disclosed to

22  investors.  Additionally, as discussed above, internal, non-public documents obtained through

23  Lead Plaintiff's investigation reveal that the Company was not capable of assessing or

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 232

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

adequately controlling its credit risk with regard to the Company's Option ARM loans.  Thus, Defendant Killinger's comments reassuring investors that the Company's Option ARM portfolio was not a danger were false and misleading when made.

### F.    False & Misleading Statements Concerning Second Quarter 2006 Results

605.    On July 19, 2006, WaMu issued a press release announcing its financial results for the quarter ending June 30, 2006.  In this press release, WaMu reported that, for the second quarter 2006, the Company had net income of $767 million, or $0.79 per diluted share and total assets of $350.7 billion.  In this press release, the Company also reported that its provision for loan and lease losses was $224 million, compared to $82 million in the first quarter 2006.  The Company explained that this heightened provision was primarily the result of the Company's new credit card business and attributed the remainder to "a modest increase in the level of charge-offs, as well as incremental loan growth."  The allocated provision for the Retail Banking Group and the Home Loans Group, where the prime residential portfolio and the subprime portfolio resided, respectively, totaled only $38 million, compared with the $417 million provision allocated to the Card Services Group.

606.    On that same day, the Company held an earnings call with investors to discuss the second quarter 2006 results. On the call, Defendant Killinger announced a "major acceleration point in the ongoing transformation of our business," which included a $2.6 billion sale of mortgage servicing rights and other adjustments.  Defendant Killinger placed great emphasis on the steps taken, saying, "Now, I can't overemphasize the significance of these actions for us. Improving our operating efficiency, reducing the market volatility of our earnings and refocusing our Home Loans units on higher margin businesses will increase the core profitability of the Company. And this will position us even better for the leverage which is inherent in our business

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 233

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  model when the interest rate environment improves." Without those adjustments, Defendant

2  Killinger announced that earnings per share would have been $0.94, compared with $0.95 a

3  share in the second quarter of 2005. Once again, Defendant Killinger announced that for the

4  44th consecutive quarter the Board was raising the quarterly dividend by $0.01 per share, to

5  $0.52.

6  607.    On that earnings call, while the Officer Defendants continued to note the

7  challenging interest rate environment in which the Company operated, Defendant Casey touted

8  the "***strong ongoing stability and strength of the [loan] portfolio***," announcing that "[*c*]***redit***

9  ***quality continues to be strong***" and that "Option ARMs continue to be a good, strong leader for

10  us." Defendant Rotella agreed that, with regard to the subprime portfolio, Defendants "[felt] like

11  we've got the right pricing and the ***right credit profile in the marketplace***," while Option ARMs

12  "continue[d] to be [the Company's] flagship product." In response to specific inquiries regarding

13  deterioration in the credit quality of the subprime portfolio, Defendant Rotella downplayed any

14  degradation in credit quality and noted the Company's careful monitoring of its loan portfolio,

15  replying:

16
>       Generally, we think the consumer is healthy. . . . And we fell [sic] pretty good
>       about that as the quarters have developed. So we don't see anything significant
>       happening in the sector. . . . With that said, we're being quite careful and making
>       any changes we need to make in our credit policies as we move forward, but our
>       sense of things are – things are in pretty good shape.

17  608.    On or about August 9, 2006, the Company filed with the SEC a Form 10-Q for the

18  period ending June 31, 2006, which was signed by Defendants Casey and Woods. (the "Second

19  Quarter 2006 Form 10-Q"). The Second Quarter 2006 10-Q repeated the financial results set

20  forth in the Company's July 19, 2006 press release and earnings conference call. The Second

21  Quarter 2006 Form 10-Q also stated that "[t]he Company's financial reporting and accounting

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 234

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

609.    Defendants Killinger and Casey signed certifications attesting to the accuracy of the information contained in the Second Quarter 2006 Form 10-Q.  These attestations were in substantially the form set forth in ¶562 above.   Additionally, the Second Quarter 2006 contained a statement confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶563 above.

610.    The Company's statements in WaMu's 2006 second quarter earnings release and Defendants Killinger's, Casey's, and Rotella's statements during the 2006 second quarter earnings call regarding the "strong ongoing stability and strength of the portfolio," that the "consumer is healthy," and that the Company had the "right credit profile in the marketplace," were false and misleading when made.  The Company omitted from Second Quarter 2006 Form 10-Q the material facts that, as set forth in detail above and as reported by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants had caused the Company's credit risk management to deteriorate significantly.  For example, as set forth above, the Officer Defendants and the Company had repeatedly ignored both direct warnings and reports from senior WaMu risk management managers that the Company was operating outside of its supposed risk limits.   Furthermore, the Company's underwriting standards, as described in detail above, were inappropriately permissive and lax. Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to maximize WaMu's loan volume.  The Company's undisclosed, lenient underwriting standards had caused the Company to increase materially its loss exposure by originating loans to less qualified

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 235

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   borrowers.    In addition, as detailed above, the Company's loan-volume-focused incentive

2   structures and the culture created by WaMu's senior management, including the Officer

3   Defendants, had caused WaMu, through its personnel, to sell and approve riskier loans without

4   adequately considering the quality of such loans.    Further, as revealed in detail above, the

5   Company failed to disclose that WaMu secretly had pressured its appraisers, including, as

6   discussed above, its third-party appraisers, to inflate the stated value of the homes underlying

7   WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the

8   Company to much greater credit risk than was disclosed to investors.

9   611.    Finally, Defendants Killinger's and Casey's statements in the 2006 Second

10  Quarter Form 10-Q that the Company's financial results were reported in accordance with GAAP

11  and that the Company maintained adequate internal controls were each materially false and

12  misleading when made.    As explained above, during the Class Period, the Company's internal

13  controls over financial reporting suffered from significant deficiencies and material weaknesses

14  because of, among other things, the Company's failure to address material deficiencies in its risk

15  management, loss modeling methodology and other failures of internal controls (including those

16  identified above in connection with Plaintiffs' allegations regarding WaMu's CRO Report).

17  Moreover, rather than appropriately accounting for the Company's lax underwriting standards

18  and inflated appraisals (thus signaling to the market how dangerously exposed the Company was

19  to credit risk) or disclosing the known failures in its internal controls and Allowance

20  methodology, the Officer Defendants caused the Company to under-provision its Allowance for

21  Loan Losses throughout the Class Period, causing the Company's net income, earnings per share,

22  and total assets to be overstated.    Furthermore, as discussed above, in the second quarter 2006

23  WaMu under-provisioned the Company's loss reserves by an estimated amount of at least $60

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 236

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

million, or 21%.  WaMu's GAAP violations had the effect of overstating the Company's reported net income for second quarter 2006 by an estimated amount of at least $49 million, or 6%.  Likewise, the Company's diluted earnings per share was overstated by an estimated amount of at least $0.05 for the second quarter 2006.

>    **G.    Defendants' False & Misleading Statements at**
>    **WaMu's 2006 Investor Day And at the**
>    **Lehman Brothers 4th Annual Conference**

612.    At the Company's annual Investor Day conference, held on September 6 and 7, 2006, the Officer Defendants continued to laud the credit quality of WaMu's loan portfolios and the Company's "***strong underwriting***," "***conservative lending standards***," "***rigorous credit standards***," and "***a disciplined credit culture***."  Specifically, regarding the Company's Option ARM portfolio, Defendant Cathcart noted that, "At origination, WaMu focuses on an effective underwriting process and borrower disclosures[.]"  Hence, "[w]ith respect to the borrower, the portfolio quality is very sound."  In fact, Defendant Cathcart discounted the effect of negative amortization and its impact on the Company's risk exposure due to WaMu's effective underwriting, explaining that, "Even after maximum negative amortization and with no home price appreciation, the portfolio should remain well secured and the borrower should have sufficient equity to refinance, should they choose to do so."  Defendant Cathcart concluded that, for Option ARM borrowers, "WaMu controls the underwriting, so we have the opportunity to evaluate the borrower at the time of origination.  Overall, we are comfortable with this portfolio."

613.    At the Company's Investor Day, the Officer Defendants also emphasized their preparation for the softer housing market that mortgage lenders widely were experiencing.  Specifically, Defendant Killinger stated, "For WaMu, a slowdown in housing will no doubt lead

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 237

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

to higher delinquencies and credit cost, and again, we factor that into our planning. However, as I alluded to earlier, we began planning for this quite some time ago, took a number of defensive actions. And so, I believe that we are very well positioned, regardless of what happens in the housing market."  Defendant Schneider stated:

> On subprime, we have seen, as others have seen, some early payment default and repurchase activity.  We saw most of that occur for us in late '05, Q4 '05, and first quarter of '06.  We *reserved for it appropriately* and we have also, in second quarter of '06, *tightened up a number of our underwriting guidelines*, and you can see that in our numbers."

> In fact, we think we've lost probably a percentage or so of market share over the past year as a result of tightening some of the credit guidelines in our subprime business.  And we think that was the prudent thing to do and actually we think we're ahead of many of our competitors here.

614.    Defendant Rotella, stressing his own personal experience through many housing cycles, announced that although it was a challenging mortgage environment, the Officer Defendants "[felt] good about the fact that we've been aggressive in controlling what we can control. Frankly, we've been ahead of the market in my perspective."  Further, Defendant Cathcart, in an in-depth presentation regarding the Company's purportedly thorough risk management, noted, "we have been watching our credit profile diligently for the last two years, and we've been making strategic choices to prepare for the environment we currently find ourselves in."

615.    At the Investor Day, analysts questioned the Officer Defendants regarding the Company's decision to use third-party appraisers.  In response, the Officer Defendants explained that the Company's decision was made because it gave the Company "better quality."  Defendant Killinger added, "there's a very strong governance process over those external appraisers."

616.    On September 13, Defendant Killinger participated in the Lehman Brothers 4th Annual Conference.    At that conference, Defendant Killinger made numerous false and

1  misleading statements concerning the Company's credit portfolio and underwriting, including

2  stating that "**on the credit front, we're in excellent shape**," which Defendant Killinger attributed

3  to the purported fact that "**we have been preparing for a more difficult environment for some**

4  **time**."  Defendant Killinger emphasized that the Company had "**started to prepare for a slowing**

5  **period**" by taking a number of steps to unload high-risk assets, "**as well as having appropriate**

6  **level of reserving**."    With regard to the threat of negative amortization to income quality,

7  Defendant Killinger stated, "Well, the entire amount of negative amortization in this portfolio is

8  only 69 basis points. So the way I look at it from a credit side is I have a loan-to-value against

9  current value of houses of around 56%; 69 basis points is a very, very small fraction of that total

10 exposure to that level of properties."

11

12      617.    Defendants Killinger's, Rotella's, Schneider's, and Cathcart's statements in

13 WaMu's Investor Day and at the Lehman Brothers' conference regarding the Company's "strong

14 underwriting," "conservative lending standards," including the Company's supposed "rigorous

15 credit standards," "disciplined credit culture," that credit was "in excellent shape," and that the

16 Company's purported LTV ratios would cushion the Company from credit risk in its Option

17 ARM portfolio, were false and misleading when made.  As set forth above and as attested to by

18 numerous Confidential Witnesses, stating in 2005 and continuing throughout the Class Period,

19 the Company's risk management efforts had deteriorated and were grossly deficient throughout

20 the Class Period.  For example, as set forth above, the Officer Defendants and the Company

21 repeatedly ignored both direct warnings and reports from senior WaMu risk management

22 managers that the Company was operating outside of its supposed risk limits.  Further, WaMu

23 did not employ strict or prudent underwriting standards during the Class Period.  In fact, as

24 detailed above, the Officer Defendants caused WaMu's loan underwriting standards to become

dangerously relaxed. Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to produce a greater volume of loans. The Company's undisclosed, lenient underwriting policies and practices caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers. Further, the Company's loan-volume-based incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, caused WaMu's salespeople to originate more loans without regard to the quality of such loans. Further, as discussed above, the Company failed to disclose that WaMu secretly pressured its appraisers, including, as discussed above, its third-party appraisers, to inflate the stated value of the homes underlying WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors.

618. Further, Defendants Killinger's, Rotella's and Cathcart's statements at the Investor Day and at the Lehman Brothers conference that the Company had been monitoring the credit quality of its portfolio for any weaknesses and were preparing for the housing crisis, were "aggressive in controlling what [the Company could] control," "tightening guidelines" and had been preparing the Company by "having the appropriate level of reserving" were false and misleading when made. Rather, as noted above, the Company had dangerously relaxed the cornerstone of loan origination over which it had the most control – that is, WaMu's underwriting. Indeed, the Company ostensibly did not have control over appraisal values for the collateral for its loans, and yet, as explained above, it improperly influenced that process in order to improperly attain low LTV ratios and close more loans. In addition, the Company's risk management efforts had deteriorated and were deficient throughout the Class Period. For example, as set forth above, the Officer Defendants and the Company repeatedly ignored both

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 240

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

direct warnings and reports from senior WaMu risk management managers that the Company was operating outside of its supposed risk limits.  Further, as discussed above, the Company did not have the "appropriate level of reserving" during the Class Period because, as the Officer Defendants knew or recklessly disregarded, the Company did not posses an adequate method for determining its Allowance, nor did the Allowance appropriately account for the deteriorating credit quality of its loans caused by the Company's fraudulent underwriting, improper appraisal and poor risk management practices.  Moreover, as explained by CW 79, who personally met with Defendants Killinger, Cathcart, Rotella, and Casey in preparation for the Company's annual Investor Day held in September 2006, during which Defendants made numerous false and misleading statements, and as discussed above, Defendants Killinger, Cathcart, Rotella, and Casey were fully aware of or recklessly disregarded the poor and degenerating credit quality of WaMu's loan portfolio when they made those statements.

###    H.    False & Misleading Statements Concerning Third Quarter 2006 Results

619.    On October 18, 2006, WaMu issued a press release announcing its financial results for the quarter ending September 30, 2006.  In this press release, WaMu reported that, for the third quarter 2006, the Company had net income of $748 million, or $0.77 per diluted share and total assets of $348.9 billion.  In this press release, the Company also reported that its provision for loan and lease losses was $166 million, compared to $224 million in the second quarter 2006.  The Company emphasized that "Credit exposure continues to be proactively managed," and the "Company conservatively manages [its] balance sheet."

620.    On that same day, the Company held an earnings call with investors to discuss the third quarter 2006 results. On the call, Defendant Killinger announced, "Despite the challenging environment impacting the mortgage banking industry, we feel good about the proactive steps we

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 241

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

have taken.  Our portfolio remains in very good shape and non-performing assets remain very low."  Indeed, Defendant Killinger again emphasized that they had been preparing for a slowing housing market for several years: "The housing market is clearly weakening with the pace of housing price appreciation slowing in most regions of the country.  . . .  [H]owever, we began preparing for this possibility quite some time ago and took defensive actions to strengthen our portfolio.  So we believe we are well prepared to weather the more difficult credit environment."  Once again, Defendant Killinger announced that the Board was raising the per share dividend by $0.01 a share for the 45th consecutive quarter, to $0.53.

621.    According to Defendant Casey, the Company conscientiously monitored the Company's reserving for credit losses.  During the Company's third quarter 2006 earnings call, Defendant Casey similarly stressed, "We do reviews of our provision throughout the year and our [Allowance for Loan and Lease Losses] every single quarter and this quarter was no different from any other quarter. We continue to look at all of our loss factors and the performance of underlying portfolio and continually make adjustments."

622.    Defendant Killinger continued to stress the quality, in particular, of the Company's Option ARM portfolio.  In the earnings call on October 18, 2006, Defendant Killinger highlighted the Company's years of experience with the Option ARM product:

> We have more than 20 years experience underwriting and originating option ARM loans through many market cycles.  We understand that the best mortgage customer is a well-informed borrower and that's why we focus on providing clear, understandable disclosures for our customers and ongoing training for our sales force. . . . [T]he quality of our option ARM portfolio remains strong.

623.    Further, Defendant Killinger emphasized that the Company underwrote its Option ARM loans to the fully-indexed rate, stating: "Let me make one clear point. In our underwriting

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 242

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

on option ARMs we underwrite to the fully indexed rate, we never underwrite to the teaser rate. And so, again, we don't see this as having a significant impact on the underwriting for us."

624.    On or about November 9, 2006, the Company filed with the SEC a Form 10-Q for the period ending September 30, 2006, which was signed by Defendants Casey and Woods.  (the "Third Quarter 2006 Form 10-Q").   The Third Quarter 2006 10-Q repeated the financial results set forth in the Company's October 18, 2006 press release and earnings conference call.  The Third Quarter 2006 Form 10-Q also stated that "[t]he Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

625.    Defendants Killinger and Casey signed certifications attesting to the accuracy of the information contained in the Third Quarter 2006 Form 10-Q.  These attestations were in substantially the form set forth in ¶562 above.   Additionally, the Third Quarter 2006 Form 10-Q contained a statement confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶563 above.

626.    WaMu's and Defendant Killinger's statements in WaMu's 2006 third quarter earnings release and during calls with investors, claiming that "credit exposure continues to be proactively managed," that the "Company conservatively manages [its] balance sheet," that the "portfolio remains in very good shape," and that regarding credit, the Company was "in great shape," and "in very good shape" were false and misleading when made.  Further, Defendant Killinger's numerous statements stressing the Company's efforts to prepare for a housing crunch were false and misleading when made.  The Company omitted from the Third Quarter Form 10-Q the material facts that, as set forth above and as reported by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants had caused

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 243

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

the Company's credit risk management to deteriorate significantly. For example, as set forth above, the Officer Defendants and the Company had repeatedly ignored both direct warnings and reports from senior WaMu risk management managers that the Company was operating outside of its supposed risk limits. Furthermore, the Company's underwriting standards, as described in detail above, were inappropriately permissive and lax. Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to maximize WaMu's loan volume. The Company's undisclosed, lenient underwriting standards had caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers. Further, as detailed above, the Company's loan-volume-focused incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, had caused WaMu, through its personnel, to sell and approve riskier loans without adequately considering the quality of such loans. Further, as revealed in detail above, the Company failed to disclose that WaMu secretly had pressured its appraisers, including, as discussed above, its third-party appraisers, to inflate the stated value of the homes underlying WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors.

627.    Additionally, Defendant Casey's statements regarding their purported method for determining the Company's provision for loan and lease losses, as well as Defendants' statements in the 2006 Third Quarter Form 10-Q that the Company's financial results were reported in accordance with GAAP and that the Company maintained adequate internal controls were each materially false and misleading when made. As explained above, during the Class Period, the Company's internal controls over financial reporting suffered from significant deficiencies and material weaknesses because of, among other things, the Company's failure to

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 244

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1  address material deficiencies in its risk management, loss modeling methodology and other

2  failures of internal controls (including those identified above in connection with Plaintiffs'

3  allegations regarding WaMu's CRO Report). Moreover, rather than appropriately accounting for

4  the Company's lax underwriting standards and inflated appraisals (thus signaling to the market

5  how dangerously exposed the Company was to credit risk) or disclosing the known failures in its

6  internal controls and Allowance methodology, the Officer Defendants caused the Company to

7  under-provision its Allowance for Loan Losses throughout the Class Period, causing the

8  Company's net income, earnings per share, and total assets to be overstated. Furthermore, as

9  discussed above, in the third quarter 2006, the Officer Defendants under-provisioned the

10  Company's loss reserves by an estimated amount of at least $241 million, or 59%. WaMu's

11  GAAP violations had the effect of overstating the Company's reported net income for third

12  quarter 2006 by an estimated amount of at least $157 million, or 21%. Likewise, the Company's

13  diluted earnings per share was overstated by an estimated amount of at least $0.16 for the third

14  quarter 2006.

### I.  Defendants' False & Misleading Statements at the Merrill Lynch & Goldman Sachs Financial Services Conferences

628.    On November 16, 2006, Defendant Killinger attended a Merrill Lynch Banking &
Financial Services Conference. At that conference, Defendant Killinger stressed the quality of
the Company's Option ARM portfolio, noting that "Our option ARM portfolio quality is also
very good[.]" At the same conference, Defendant Killinger again emphasized, "I'm telling you
from our 20 – over 20 years' experience in the option ARM product that [negative amortization]
is – has not historically been a significant factor for us and we're very comfortable, again, where
we are with our loan-to-value." At the conference, Defendant Killinger repeatedly attributed the
quality of its Option ARM portfolio to the Company's practice of underwriting the Option ARM

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 245

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

loans to their fully amortizing payments. For example, Defendant Killinger stated: "Our option ARM portfolio quality is also very good . . . . This quality reflects the option ARM underwriting which evaluates the borrower's ability to make the loans fully amortizing payments, even though they are allowed to make a much lower initial payment."

629.    On December 13, 2006, Defendant Killinger also attended a Goldman Sachs Financial Services CEO Conference, where he once again stressed the Company's preparation for changes in the housing environment, stating that, "On the credit front, we're in very good shape[.]" Defendant Killinger continued,

> Clearly our credit performance has been outstanding over the last several years. This is in part because we started preparing some time ago for a more difficult credit environment. If anything, I can be accused of being too conservative. And perhaps we could have maximized our profitability even more by taking on more credit risk through this period of very benign credit. But we want to stay ahead of the curve, be a little more conservative."

630.    At the Goldman Sachs conference, Defendant Killinger further claimed to consider relevant data regarding loan delinquencies and defaults, as well as the general mortgage environment, when provisioning for loan losses: "On the credit provisioning assumptions, we have assumed in our models all of the data that we see so far, which is an assumption of a slowing economy and increasing delinquencies in most categories, especially in things like sub-prime and in some of the other mortgage products." In response to specific inquiries regarding the Company's loan loss provisioning, Defendant Killinger again stated,

> When we do our reserving, I will tell you that we factor in the existing book of business; what the current delinquencies are; we make assumptions about housing price declines and the economy; and we develop models about what we think is going to happen to delinquencies, ultimate charge-offs. And those things are, clearly, rising right now. And then we back that into what's the appropriate amount of embedded losses in that portfolio, and that determines our reserving. We do that every quarter."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 246

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

631.    Defendant Killinger's statements at the Merrill Lynch and Goldman Sachs financial services conferences regarding the quality of the Company's loan portfolios were false and misleading when made.  Further, Defendant Killinger's numerous statements stressing the Company's efforts to prepare for a housing crunch were false and misleading when made.  As set forth above and as attested to by numerous Confidential Witnesses, stating in 2005 and continuing throughout the Class Period, the Company's risk management efforts had deteriorated and were grossly deficient throughout the Class Period.  For example, as set forth above, the Officer Defendants and the Company repeatedly ignored both direct warnings and reports from senior WaMu risk management managers that the Company was operating outside of its supposed risk limits.  Further, WaMu did not employ strict or prudent underwriting standards during the Class Period.  In fact, as detailed above, the Officer Defendants caused WaMu's loan underwriting standards to become dangerously relaxed.  Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to produce a greater volume of loans.  The Company's undisclosed, lenient underwriting policies and practices caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers.  Further, the Company's loan-volume-based incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, caused WaMu's salespeople to originate more loans without regard to the quality of such loans.  Further, as discussed above, the Company failed to disclose that WaMu secretly pressured its appraisers, including, as discussed above, its third-party appraisers, to inflate the stated value of the homes underlying WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 247

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

632.    Additionally, Defendant Killinger's comments at the Goldman Sachs' conference regarding the quality of the Company's reserving were materially false and misleading.  For example, as set forth above, Defendant Killinger knew or recklessly disregarded but failed to disclose the material fact that, well into 2006, WaMu's key model for calculating the appropriate provisions for the Allowance, the LPRM, was not designed or able to account properly for losses on Option ARM loans and other WaMu products with the potential to "negatively amortize," and thus the Company's evaluation of incurred and probable loan losses was materially understated.  Defendant Killinger also knew or recklessly disregarded but omitted the material fact that the LPRM did not take into account the ongoing deteriorating loan quality of the Company's loan portfolio in calculating incurred and probable losses.

### J.    False & Misleading Statements Concerning Fourth Quarter & Year-End 2006 Results

633.    On January 17, 2007, WaMu issued a press release announcing its financial results for the quarter and year-ended December 31, 2006.  In this press release, WaMu reported that, for the fourth quarter 2006, the Company's reported net income of $1.06 billion, or $1.10 per diluted share, compared with net income of $865 million, or $0.85 per diluted share, in the fourth quarter of 2005.  For the full year 2006, the Company's reported net income was $3.56 billion, or $3.64 per diluted share, compared with a net income of $3.43 billion, or $3.73 per diluted share, in 2005.  The Company reported total assets as of December 31, 2006, of $346.3 billion.  WaMu also reported that its provision for loan and lease losses for the fourth quarter 2006 was $344 million, $95 million of which the Company attributed to the Company's on-balance sheet credit card receivables.  The full-year 2006 loan loss provision of $816 million, an increase of $500 million over the 2005 provision that the Company stated in its earnings release was "primarily due to the addition of the company's credit card business acquired Oct. 1, 2005."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 248

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

In the press release, Defendant Killinger stated that the Company's "outlook for 2007 reflects the strategic actions we took in 2006 to prepare the company for the future. Those decisive actions have positioned us well to deliver stronger operating performance in 2007."

634.    On that same day, the Company held an earnings call with investors to discuss the fourth quarter and year-end 2006 results. During this call, the Officer Defendants noted the difficult environment for mortgage lenders, but, in doing so, Defendant Killinger emphasized the Company's preparedness due its strict underwriting practices, among other things. Specifically, Defendant Killinger explained:

> As you'll recall I have been pretty pessimistic on the housing market for the last couple of years, and really felt that the market was overheated and was likely to be slowing at some point, and so both the combination of that and also from a strategic standpoint we've been diversifying our mix of businesses . . .*We tightened underwriting*, we decreased production volume by about half in the subprime area taking ourselves down from the sixth largest originator all the way down to ten, and we decreased the subprime portfolio you were asking about by about $2.4 billion over the last twelve months, and I think the important thing is that as the housing market has softened as expected, what I have really seen is a continued very good performance out of most parts of the portfolio.

Defendant Killinger reassured investors that, although the Company had stated its intention to focus on higher-margin mortgage products in the past, it had promised to do so only in a "prudent manner." In addition, Defendant Killinger also announced that for the 46th consecutive quarter the Board was raising the quarterly dividend by $0.01 a share, to $0.54.

635.    After the Company's earnings announcement on January 17, 2007, the stock price of the Company's common shares rose from a close of $44.06 on January 16 to $45.31 on January 26.

636.    At the Citigroup 2007 Financial Services Conference held on January 30, 2007, Defendant Killinger continued to falsely reassure investors that the credit quality of the Company's loan portfolio "continue[d] to be in very good shape," specifically emphasizing the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 249

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

"high quality" of the Company's prime loans, the "very good" quality of the Option ARM portfolio, and the "very high quality" of the home equity portfolio. Defendant Killinger explicitly attributed the high credit quality of these loans to the low LTV ratios associated with those loan portfolios.

637.    Further, Defendant Killinger underscored the Company's "rigorous[] adher[ence] to [its] minimum FICO threshold" in its subprime portfolio. In response to a question regarding the Company's charge-offs in its subprime portfolio, Defendant Killinger downplayed the importance of the charge-offs, explaining that the Company's subprime portfolio had been decreasing in size and claiming that "when you're not originating new ones at the same level and are letting the portfolio run up, you get a natural increase in [charge offs]."

638.    On or about March 1, 2007, WaMu filed with the SEC a Form 10-K for the fourth quarter and fiscal year ended December 31, 2006 (the "2006 Form 10-K"). The 2006 Form 10-K was signed by Defendants Killinger, Casey, Farrell, Woods, Frank, Montoya, Pugh, Leppert, Reed, Lillis, Smith, Matthews, Stever, Murphy, and Osmer-McQuade.

639.    In the 2006 Form 10-K, the Company reiterated the financial results set forth in the January 17, 2007, press release and earnings call. The Company also reported a full-year provision for loan and lease of $816 million in 2006, compared with a provision of $316 million in 2005. According to the 2006 Form 10-K, this higher provision was "substantially the result of the Company's entry into credit card lending that resulted from the Providian acquisition and the ensuing growth in the on-balance sheet credit card portfolio, which accelerated during the fourth quarter of 2006." The Company announced dividends declared per common share of $2.06 and total assets of $346.3 billion.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 250

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

640.    In the 2006 Form 10-K, WaMu touted the Company's underwriting standards for its Option ARM portfolio, claiming that, "[t]he Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures."    The Company went on to claim that, beginning in mid-December 2005, the Company's underwriting process for its Option ARM portfolio involved calculating the applicant's debt-to-income ratio using only the fully-indexed rate, rather than an undefined "administratively set rate" used in 2004 and 2005.

641.    In the 2006 Form 10-K, the Company announced improved credit risk management practices, stating:  "In 2006, the Finance Committee of the Board of Directors approved a set of credit risk concentration limits. These limits facilitate a more rigorous and quantitative framework that better enables the credit risk management function to proactively manage credit risk."

642.    The 2006 Form 10-K also emphasized that the Company's underwriting practices for its subprime mortgages, stating: "As part of Long Beach Mortgage's underwriting process, loan application and appraisal packages are reviewed to ensure conformity with the Company's stated credit guidelines. . . . . Similarly, all purchases from Subprime Lenders must satisfy the Company's stated credit guidelines."

643.    In its 2006 Form 10-K, WaMu also repeatedly emphasized that loan-to-value ratios were a "***key determinant of future performance***," repeating the statements made in the 2005 Form 10-K related above in ¶581 above.  The Company again assured investors that because credit risk was reduced when home loans had loan-to-value ratios of less than eighty percent, the Company closely monitored its home loans with loan-to-value ratios of greater than

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 251

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

eighty percent.  As of December 31, 2006, home loans with this increased credit risk profile amounted to $7.48 billion and home equity loans with this increased credit risk profile amounted to $15.5 billion of the Company's $224.96 of loans held in portfolio.  According to the Company's 2006 Form 10-K, "[s]ubstantially all of these loans were made to subprime borrowers, including $5.56 billion of loans purchased from recognized subprime lenders.  Total home loans with these features accounted for 16% of the Company's home loan volume in 2006," which was an increase over the 10% of home loans with these features in 2005.

644.    Defendants Killinger and Casey signed certifications attesting to the accuracy of the information contained in the 2006 Form 10-K  These attestations were in substantially the form set forth in ¶562 above.    Additionally, the 2006 Form 10-K contained a statement confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶563 above.

645.    The Company's statement in WaMu's 2006 Form 10-K that the Company "actively manage[d]" its exposure to credit risk through "ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures" was materially false and misleading when made.  The Company's claims in the 2006 Form10-K that it underwrote its Option ARM loans to the fully-indexed rate were also false and misleading when made.  Further, Defendant Killinger's statements in the earnings call that the Company's home mortgage loan and home equity loan portfolios were of "high quality" and "very high quality," respectively, were also false and misleading when made.  The Company omitted from the 2006 Form 10-K the material facts that, as set forth in detail above and as reported by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants had caused the Company's credit risk management to deteriorate

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 252

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

significantly. For example, as set forth above, the Officer Defendants and the Company had repeatedly ignored both direct warnings and reports from senior WaMu risk management managers that the Company was operating outside of its supposed risk limits. Furthermore, the Company's underwriting standards, as described in detail above, were inappropriately permissive and lax. Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to maximize WaMu's loan volume. The Company's undisclosed, lenient underwriting standards had caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers. Further, as detailed above, the Company's loan-volume-focused incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, had caused WaMu, through its personnel, to sell and approve riskier loans without adequately considering the quality of such loans. Further, as revealed in detail above, the Company failed to disclose that WaMu secretly had pressured its appraisers, including, as discussed above, its third-party appraisers, to inflate the stated value of the homes underlying WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors.

646.    The Company's claims in the 2006 Form 10-K that it underwrote its Option ARM loans only to the fully-indexed rate were also false and misleading when made, because, as discussed above, WaMu underwrote its Option ARM loans to the "teaser" rate well into 2007.

647.    WaMu's claim to improved credit risk management "through a more rigorous and quantitative framework" was false and misleading when made. The Company failed to disclose the material fact that, as set forth above, the Company's risk management structure was deliberately ineffective throughout the Class Period in limiting the Company's credit loss

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 253

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

exposure, as the Company had placed increased focus on loan origination volume at the expense of rigorous risk management. Moreover, as reported by numerous percipient witnesses, many of the Company's quantitative models were defective (such as the Company's LPRM, which was responsible for projecting the Company's loan losses) and those analyses that did function frequently revealed problems about the Company's loan quality and financial condition that were not disclosed to the public.

648. The Company's reported LTV ratios in its 2006 Form 10-K and Defendant Killinger's comments at the January 30, 2007 financial services conference regarding the Company's LTV ratios during 2006 were materially false and misleading when made, because, as set forth above, the Company had been secretly inflating the appraisal values of the collateral underlying its home mortgage loans. This inflation materially understated the LTV ratios of the Company's loans.

649. Finally, Defendant Killinger's and Casey's statements in the 2006 Form 10-K that the Company's financial results were reported in accordance with GAAP and that the Company maintained adequate internal controls were each materially false and misleading when made. As explained above, during the Class Period, the Company's internal controls over financial reporting suffered from significant deficiencies and material weaknesses because of, among other things, the Company's failure to address material deficiencies in its risk management, loss modeling methodology and other failures of internal controls (including those identified above in connection with Plaintiffs' allegations regarding WaMu's CRO Report). Moreover, rather than appropriately accounting for the Company's lax underwriting standards and inflated appraisals (thus signaling to the market how dangerously exposed the Company was to credit risk) or disclosing the known failures in its internal controls and Allowance methodology, the Officer

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 254

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Defendants caused the Company to under-provision its Allowance for Loan Losses throughout the Class Period, causing the Company's net income, earnings per share, and total assets to be overstated.  Furthermore, as discussed above, for year end 2006 the Officer Defendants under-provisioned the Company's loss reserves by an estimated amount of at least $562 million, or over 40%.  WaMu's GAAP violations had the effect of overstating the Company's reported net income for fourth quarter 2006 by an estimated amount of at least $110 million, or 10%, and full year 2006 by at least $349 million, or 10%.  Likewise, the Company's diluted earnings per share was overstated by an estimated amount of at least $0.11 for the fourth quarter 2006, and $0.35 for the full year 2006.

650.    Analysts responded favorably to the Company's statements regarding the Company's credit quality.  Although all analysts noted the difficult mortgage environment in which the Company operated, the Officer Defendants' reassurances that the Company had prepared for these negative events by tightening underwriting practices were well-received.  For example, Erin Swanson of Morningstar observed that "all is not smooth sailing" given the "softening" in the industry; however, "[t]hat said, we think WaMu's management team anticipated this slowdown and began taking steps to position its balance sheet for tougher times.  During 2006, WaMu sold all of its subprime mortgage originations, tightened its underwriting, and reduced its subprime portfolio by $2.4 billion."  Swanson raised the fair value estimate of WaMu by $5 a share.

651.    Indeed, the Company's stock price demonstrated this favorable reaction, rising from a close of $44.06 on January 16, 2007, to close at $45.35 on January 24, 2007, an increase of almost 3%.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 255

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

K.    **False & Misleading Statements
Concerning First Quarter 2007 Results**

652.    On April 17, 2007, WaMu issued a press release announcing its financial results for the quarter ending March 31, 2007. In this press release, WaMu reported that, for the first quarter 2007, the Company had net income of $784 million, or $0.86 per diluted share and total assets of $319.9 billion. In the press release, Defendant Killinger praised the Company's performance, stating, "[o]verall, we delivered solid results in the first quarter despite the challenging interest rate environment and slowing housing market."

653.    In this press release, the Company also reported that its provision for loan and lease losses was $234 million, down from to $344 million in the fourth quarter 2006. The Company noted that although the subprime portfolio had deteriorated, the prime portfolio had improved.

654.    On that same day, the Company held an earnings call with investors to discuss the first quarter 2007 results. Defendant Killinger stressed that "While we're not at our full earnings potential, I am pleased with the solid results delivered by our team, despite a quarter that was challenged by a number of environmental factors. We had an inverted yield curve, and slowing housing markets and unprecedented deterioration in the subprime mortgage business." Further, Defendant Killinger stated, "In home loans, which felt the brunt of the environmental challenges during the quarter, we were encouraged by improved performance in our prime lending business." On the call, Defendant Killinger announced, "reflecting these results and the company's strong financial position, the Board once again increased the quarterly cash dividend, for the 47th consecutive quarter, by $0.01, to $0.55 cents per share."

655.    Defendant Killinger stressed the positive performance of the Company's prime portfolio, claiming that the Company was "seeing encouraging signs with the improvement in the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 256

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

prime business that we saw in the first quarter, and with the steps that we've taken into the subprime area of increasing pricing, improving underwriting, that we are starting to see that show up in the way of early signs of credit on the 2007 production looks much better than '06, so that's encouraging." Defendant Killinger went on to observe, "I would view the first quarter of having been profitable for our prime part of the business. It was offset[,] more than offset[,] by the losses in the subprime area, and as the subprime area comes back to more of a normalcy, I think that we can certainly expect the home loan unit to get back to profitability and the current expectation for us is later in the year, rather than getting specific on one quarter or the other."

656.    Defendant Casey again highlighted the improved standards supposedly imposed on the Company's subprime channel, stating "With regard to pricing and underwriting standards in the subprime area, as Kerry mentioned, we've been working on this for quite some time. We've reduced our volume significantly and in the first quarter, we have significantly increased our pricing and *decreased our risk profile that we're willing to underwrite to*, and so we think all those factors taken together will make this business a little more profitable. *We are being selective with our underwriting.*" Defendant Rotella concurred, stating, "we have absolutely no plans to shut down our subprime channel. *We have, as you've heard, since the beginning of last year been tightening credit in that part of our business*. You heard the volume numbers were down 51% year on year and volume and we feel pretty good about the credit box we're playing in right now, but we're cautious as the market goes through this rationalization."

657.    Also on April 17, the Company held its annual shareholders meeting in Seattle. At the shareholders meeting, Defendant Killinger continued to attribute the Company's credit problems to WaMu's to industry-wide problems, stating, "the softening housing market, a flat yield curve, aggressive credit competition, drove a rapid increase in subprime loan

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 257

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

delinquencies[.]"   In response to those "problems," Defendant Killinger announced that the Company had purportedly ***"tightened credit guidelines***," and that the Company was seeing "firming" in underwriting for subprime loans.   Going forward, Defendant Killinger promised investors that WaMu would "***carefully manage our credit***."   Similarly, Defendant Casey reassured investors that the Company was being "very disciplined" in growing the Company's balance sheet and were monitoring trends in the housing market and in nonperforming assets "very closely" and would "continue to take proactive steps ***to effectively manage our risks***." Defendant Rotella also added that the Company was "tighten[ing] credit" in the subprime sector.

658.    On or about May 10, 2007, the Company filed with the SEC a Form 10-Q for the period ending March 31, 2007, which was signed by Defendants Casey and Ballenger.  (the "First Quarter 2007 Form 10-Q").   The First Quarter 2007 Form 10-Q repeated the financial results set forth in the Company's April 17, 2007 press release and earnings conference call.  The First Quarter 2007 Form 10-Q also stated that "[t]he Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

659.    Defendants Killinger and Casey signed certifications attesting to the accuracy of the information contained in the First Quarter 2007 Form 10-Q.   These attestations were in substantially the form set forth in ¶562 above.   Additionally, the First Quarter 2007 Form 10-Q contained a statement confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶563 above.

660.    The First Quarter 2007 Form 10-Q again reiterated the Company's stated belief that "loan-to-value ratios are one of the two key determinants in determining future loan performance."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 258

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

661.    Defendants Rotella's and Casey's statements in WaMu's 2007 first quarter earnings release, during its earnings call, and during the shareholders meeting regarding the Company's actions in "tightening credit," "decreas[ing] [the Company's risk profile," and the Company's purported practice of "being selective with our underwriting" in the subprime channel since the beginning of 2006 were false and misleading when made.  Further, Defendants Killinger's, Casey's, and Rotella's statements at the shareholders meeting attributing the Company's losses to only industry-wide factors were materially false and misleading when made.  The Company and the Officer Defendants failed to disclose in the First Quarter 2007 Form 10-Q and during the earnings release, the earnings call and the shareholders meeting the material facts that, as set forth in detail above and as reported by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants had caused the Company's credit risk management to deteriorate significantly.  For example, as set forth above, the Officer Defendants and the Company had repeatedly ignored both direct warnings and reports from senior WaMu risk management managers that the Company was operating outside of its supposed risk limits.   Furthermore, the Company's underwriting standards, as described in detail above, were inappropriately permissive and lax.   Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient underwriting guidelines in order to maximize WaMu's loan volume. The Company's undisclosed, lenient underwriting standards had caused the Company to increase materially its loss exposure by originating loans to less qualified borrowers.  Further, as detailed above, the Company's loan-volume-focused incentive structures and the culture created by WaMu's senior management, including the Officer Defendants, had caused WaMu, through its personnel, to sell and approve riskier loans without adequately considering the quality of such

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 259

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

loans. Moreover, as revealed in detail above, the Company failed to disclose that WaMu secretly had pressured its appraisers, including, as discussed above, its third-party appraisers, to inflate the stated value of the homes underlying WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages and exposing the Company to much greater credit risk than was disclosed to investors. Also, Defendants Rotella's and Casey's statements regarding the Company's subprime operations were false and misleading because the Company failed to disclose that the cause of credit losses in the subprime portfolio was the Company's undisclosed improper underwriting practices.

662. Finally, Defendants Casey's and Killinger's statements in the 2007 First Quarter Form 10-Q that the Company's financial results were reported in accordance with GAAP and that the Company maintained adequate internal controls were each materially false and misleading when made. As explained above, during the Class Period, the Company's internal controls over financial reporting suffered from significant deficiencies and material weaknesses because of, among other things, the Company's failure to address material deficiencies in its risk management, loss we delivered solid results modeling methodology and other failures of internal controls (including those identified above in connection with Plaintiffs' allegations regarding WaMu's CRO Report). Moreover, rather than appropriately accounting for the Company's lax underwriting standards and inflated appraisals (thus signaling to the market how dangerously exposed the Company was to credit risk) or disclosing the known failures in its internal controls and Allowance methodology, the Officer Defendants caused the Company to under-provision its Allowance for Loan Losses throughout the Class Period, causing the Company's net income, earnings per share, and total assets to be overstated. Furthermore, as detailed above, in the first quarter 2007 WaMu under-provisioned the Company's loss reserves by an estimated amount of

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 260

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

at least $398 million, or 63%. WaMu's GAAP violations had the effect of overstating the Company's reported net income for first quarter 2007 by an estimated amount of at least $164 million, or 21%. Likewise, the Company's diluted earnings per share was overstated by an estimated amount of at least $0.18 for the first quarter 2007.

663.    The Company's stock price jumped at the Company earnings release, rising from a close of $40.73 on April 16, 2007, to close at $42.77 on April 20, 2007, an increase of 5%.

### L.    False & Misleading Statements Concerning Second Quarter 2007 Results

664.    On July 18, 2007, WaMu issued a press release announcing its financial results for the quarter ending June 30, 2007. In this press release, WaMu reported that, for the second quarter 2007, the Company had net income of $830 million, or $0.92 per diluted share and total assets of $312.2 billion. In the press release, Defendant Killinger praised the performance, stating, "We delivered record growth in our retail banking, credit card and commercials businesses during the second quarter. Our Home Loans' results improved from the first quarter and we are targeting a return to profitability by the end of the year."

665.    In this press release, the Company also reported that its provision for loan and lease losses was $372 million, up from $234 million in the second quarter 2007. In the press release, the Company noted that the performance of the Company's home loans portfolio had improved over the second quarter, noting that "Home Loans shows improvement in a difficult environment," and "Prime business continues to improve."

666.    On that same day, the Company held an earnings call with investors to discuss the second quarter 2007 results. Defendant Killinger announced that "We also saw improvement in the performance of our home loans group, despite continued pressure from the challenging rate environment and ongoing weakness in the subprime mortgage market as well as continued

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 261

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

erosion in the housing market."  Further, Defendant Casey stated, "While we anticipate that we will see higher [nonperforming assets] across all of our home loan portfolios, ***we expect losses in the prime loans to be much lower due to the lower LTVs and high FICO profile of our prime portfolio***."

667.    Defendant Killinger again underscored the Company's professed attempts to mitigate the Company's credit risk, stating "You know it's been over two years since we first began talking to you about housing prices becoming inflated and the highs risk of a slow down in housing with price declines in some parts of the country.  As a result, we started to take actions to minimize our exposure, including ***tightening our underwriting***[.]"

668.    Defendant Casey reiterated the quality of the Company's provisioning for credit losses, stating

> Keep in mind that the provisions is a – has been building for quite some time, we have been providing above charge-offs for the last five quarters.  This is not something that immediately is reflected.  We are actually looking at this over quite some time so we have been building for this.  We are trying to give some perspective that we expect charge-offs to continue.  But keep in mind that our provision models and our reserving model taken into account all of this information.  One other thing to keep in mind is that the balance sheet did not grow this quarter, in fact loans were down, which is also contributing to that provision level.  And then finally, I just point you to the allowance as a percentage of total assets in the health for investment portfolio, it actually went up from 71 basis points to 73.

669.    Defendant Casey again emphasized the Company's planning in the same call, stating, "I'm trying to give you an indication that we do factor in this deterioration of these ratios into our provisioning and reserving guidance that we have given you," and, later:

> [W]e're trying to anticipate and project provisions well before we actually see the actual escalation like we're seeing now. These reserve models are capturing lots of different factors. The current delinquencies and MPAs, you must keep in mind that they go 30-day delinquency and 60-[day] delinquency, we are already picking them up in our models, so that early stage delinquency information has already been picked up, and that's why you're seeing the reserves of those charge-offs in the previous quarters.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 262

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

So when you actually see the higher charge-off, what you are starting to see is just the evolution of that maturity of that delinquency rate that we're putting into our models. And that's why we provisioned above charge-offs in the past, because the charge-off hadn't come yet, yet we anticipated it. So there's – it's – I think it's incorrect to be thinking that charge-offs and provisions should be linked. There's a lot more factors that come into and it's built over a longer period of time based on early indicators of loss as opposed to the ultimate charge-off which is sometimes 180 days after we're seeing the early stage delinquency.

670.    On the earnings call, Defendant Killinger touted the Company's leadership role in the industry with regard to underwriting standards. Specifically, Defendant Killinger stated:

From my point of view, I think too much money, and some would say just irrational money, did flood the mortgage market, particularly in the subprime area over the last two years, and I think this caused underwriting standards to decline, credit spreads to narrow, volumes to surge, and now not unexpectedly delinquencies and losses to sore. This was a real concern of ours, and where we took a lot of defensive **actions beginning about two years ago, like tightening underwriting**, selling off our '04 and '05 residuals, delayed our plans to grow the subprime portfolio, . . . .

I think now what we're seeing is, some underwriting discipline starting to return, credit spreads are widening, and marginal players are leaving the industry. And I that think this gives us an opportunity to gradually increase our loan portfolios, with much improved risk adjusted returns. So I think – I do think we're watching the subprime area very carefully. We think the industry has a lot more to go in terms of tightening underwriting to be appropriate for today's underwriting environment. **That's why I mentioned the initiatives that we have taken to help lead the industry to what we think is much more prudent and appropriate underwriting standards at this point in the cycle**. In assuming we start to see credit quality improve because of these underwriting initiatives, and if we see credit spreads widen and good opportunities to take assets in our portfolio, we would like to start accelerating the – the growth of our balance sheet again.

671.    On the second quarter 2007 earnings call, Defendant Casey again emphasized the quality of the Company's Option ARM portfolio, stating, "There's really – we feel very good about our option ARM portfolio and how it has performed. It's a very high FICO and low LTV portfolio."

672.    On or about August 9, 2007, the Company filed with the SEC a Form 10-Q for the period ending June 30, 2007, which was signed by Defendants Casey and Ballenger (the "Second Quarter 2007 Form 10-Q"). The Second Quarter 2007 Form 10-Q repeated the financial results set forth in the Company's July 18, 2007 press release and earnings conference call. The Second

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 263

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Quarter 2007 Form 10-Q also stated that "[t]he Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

673.    Defendants Killinger and Casey signed certifications attesting to the accuracy of the information contained in the Second Quarter 2007 Form 10-Q.  These attestations were in substantially the form set forth in ¶562 above.   Additionally, the Second Quarter 2007 Form 10-Q contained a statement confirming the adequacy of the Company's internal controls over financial reporting in substantially the form set forth in ¶563 above.

674.    Defendants Killinger's and Casey's statements in WaMu's 2007 second quarter earnings call of the Company's practice of "tightening credit," the Company's purported "actions to minimize [the Company's] exposure, including tightening [the Company's] underwriting," and implementing "prudent and appropriate" underwriting were false and misleading when made. Further, [Defendants'] statements in the earnings call that the Company had taken a leadership role in the industry regarding tightening credit quality were false and misleading when made. The Company omitted from the Second Quarter 2007 Form 10-Q the material facts that, as set forth in detail above and as reported by numerous Confidential Witnesses, starting in 2005 and continuing throughout the Class Period, the Officer Defendants had caused the Company's credit risk management to deteriorate significantly.  For example, as set forth above, the Officer Defendants and the Company had repeatedly ignored both direct warnings and reports from senior WaMu risk management managers that the Company was operating outside of its supposed risk limits.  Furthermore, the Company's underwriting standards, as described in detail above, were inappropriately permissive and lax.   Moreover, as detailed above, starting in 2005, WaMu encouraged its employees to make exceptions to the Company's already lenient

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 264

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    underwriting guidelines in order to maximize WaMu's loan volume.    The Company's

2    undisclosed, lenient underwriting standards had caused the Company to increase materially its

3    loss exposure by originating loans to less qualified borrowers.    In addition, as detailed above, the

4    Company's loan-volume-focused incentive structures and the culture created by WaMu's senior

5    management, including the Officer Defendants, had caused WaMu, through its personnel, to sell

6    and approve riskier loans without adequately considering the quality of such loans.    Further, as

7    revealed in detail above, the Company failed to disclose that WaMu secretly had pressured its

8    appraisers, including, as discussed above, its third-party appraisers, to inflate the stated value of

9    the homes underlying WaMu's loans, thus manipulating the LTV ratios for WaMu's mortgages

10   and exposing the Company to much greater credit risk than was disclosed to investors.

11       675.    Defendant Casey's comments in the April 17, 2007, earnings call regarding the

12   Company's LTV ratios during second quarter 2007 were materially false and misleading when

13   made, because as set forth above, the Company was secretly inflating the appraisal values of the

14   collateral underlying its home mortgage loans.    This inflation materially understated the reported

15   LTV ratios of the Company's loans.

16       676.    Additionally, Defendant Casey's statements regarding WaMu's purported method

17   for determining its provision for loan and lease losses, as well as Defendants Killinger's and

18   Casey's statements in the Second Quarter 2007 Form 10-Q that the Company's financial results

19   were reported in accordance with GAAP and that the Company maintained adequate internal

20   controls were each materially false and misleading when made.    As explained above, during the

21   Class Period, the Company's internal controls over financial reporting suffered from significant

22   deficiencies and material weaknesses because of, among other things, the Company's failure to

23   address material deficiencies in its risk management, loss modeling methodology and other

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 265

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

failures of internal controls (including those identified above in connection with Plaintiffs' allegations regarding WaMu's CRO Report).  Moreover, rather than appropriately accounting for the Company's lax underwriting standards and inflated appraisals (thus signaling to the market how dangerously exposed the Company was to credit risk) or disclosing the known failures in its internal controls and Allowance methodology, the Officer Defendants caused the Company to under-provision its Allowance for Loan Losses throughout the Class Period, causing the Company's net income, earnings per share, and total assets to be overstated.  Furthermore, as detailed above, in the second quarter 2007 the Officer Defendants under-provisioned the Company's loss reserves by at least $472 million, or 56%.  WaMu's GAAP violation had the effect of overstating the Company's reported net income for second quarter 2007 by at least $265 million, or 32%.  Likewise, the Company's diluted earnings per share was overstated by at least $0.30 for the second quarter 2007.

### M.    Defendants' False & Misleading Statements at the Lehman Brothers 5th Annual Financial Services Conference

677.    On September 10, 2007, Defendants Killinger and Casey attended the Lehman Brothers 5th Annual Financial Services Conference, where Defendant Killinger continued to falsely assure investors that beginning "over two years" before, the Company had begun taking "proactive steps" to prepare for a decline in housing prices.  According to Defendant Killinger, these steps included "a series of major underwriting changes in our home loans lending guidelines."  Defendant Killinger also touted the Company's purportedly-low LTV ratios in its home loan portfolio and the "attractive" returns seen on Option ARM loans and other adjustable-rate mortgages, noting that "the credit quality in these loans is good."

678.    Defendant Killinger went on to disclose that, while he was not updating the Company's guidance, the Company anticipated that the provision for loan losses for the full-year

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 266

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

2007 "could be approximately $500 million greater" than the full year guidance the Company provided in July 2007 of $1.5 billion to $1.7 billion.  Defendant Killinger attributed this heightened provision to a "near perfect storm" in housing conditions and rising interest rates.

679.   The investing public accepted Defendant Killinger's false assurances that the Company had taken multiple "proactive steps" to prepare for difficult housing conditions and that general conditions were to blame for the Company's anticipated heightened provision for loan and lease losses.  Indeed, on this news, WaMu's stock price rose from a closing price of $34.74 per share on September 10, 2007 to a closing price of $35.56 per share on September 13, 2007, and eventually rose to close at $38.32 per share on September 19, 2007.

680.   Defendant Killinger's statements at the Lehman Brothers Financial Services Conference were materially false and misleading in that he continued to mislead investors into thinking that the credit quality of the Company's loan portfolio was strong.  In reality, the quality of the Company's loan portfolio was poor and the Company had not tightened its underwriting standards  Furthermore, the low LTV ratios touted by Defendant Killinger were the result of fraudulently inflated appraisal values, thus exposing the Company to massive undisclosed credit risk.

681.   In addition, Defendant Killinger's statements were materially false and misleading in that Defendant Killinger attributed the decline in the Company's earnings and the increase in the Company's loan loss provisions to market conditions, rather than to the Company's improper lending and accounting practices and faulty credit risk management. As set forth above, WaMu's underwriting standards substantially deteriorated during the Class Period which resulted in poor quality loans, increased delinquencies and non-accruals, and a massively understated loan loss provision.  In truth, the anticipated increase in the Company's loan loss

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 267

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

provision for the third quarter was driven by those undisclosed underwriting and appraisal practices, rather than, as Killinger and Casey described, "market forces."

### N.     False & Misleading Statements In The Company's October 5, 2007 Press Release

682.     On October 5, 2007, the Company issued a press release entitled "Washington Mutual Q3 Net Income Impacted by Market and Credit Environments," pre-announcing the Company's third quarter 2007 results.   In this press release, WaMu disclosed that the Company's net income for the quarter would decline by approximately 75% from the same quarter during the prior year, and blamed this decline on "a weakening housing market and disruptions in the secondary market."  WaMu further explained that one of the primary reasons for the Company's earnings decline was that the Company's loan loss provision for the third quarter was expected to increase to approximately $975 million due to "ongoing weakness in the housing market, primarily as it affects subprime and home equity loans, as well as growth in the company's loan portfolio."

683.     In announcing these disappointing financial results, Killinger falsely reassured investors about the Company's financial position, explaining that WaMu was strong and well-position for improved results the following quarter.  Specifically, Killinger stated: "While we're disappointed with our anticipated third quarter results, we look forward to an improved fourth quarter as we continue to see good operating performance in our Retail Banking, Card Services and Commercial Group businesses."   Killinger also assured investors that the Company was financially stable, stating:  "The company continues to have the liquidity and capital necessary to grow the company's businesses and support its current dividend, as it continues to execute its long-term strategic plans."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 268

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

684.    The investing public accepted Defendant Killinger's assurances that the Company was financially sound and that market conditions were to blame for the Company's third quarter performance.  Indeed, on this news, WaMu's stock price rose from $35.06 per share on October 5, 2007 to $35.61 per share on October 8, 2007 and remained in the $35 per share range for the remainder of the week.

685.    WaMu's October 5, 2007 press release, and Defendant Killinger's statements therein, were materially false and misleading in that they falsely attributed the decline in the Company's earnings and the increase in the Company's loan loss provisions to market conditions, rather than undisclosed risks inherent to the Company's loan origination process.  As set forth above, WaMu's underwriting standards had substantially deteriorated during the Class Period which resulted in poor quality loans, increased loan delinquencies and defaults, and a materially understated Allowance.  In truth, the increase in the Company's loan loss provision for the third quarter was substantially driven by the Company's undisclosed risky and unlawful risk management, underwriting and appraisal practices detailed above, rather than merely by market forces.  The October 5, 2007 press release also misrepresented the full extent of the Company's loss exposure resulting from the Company's inflated appraisal values and lenient underwriting standards and thus, misrepresented the true amount of the provision that WaMu should have recorded under GAAP.

686.    Additional false and misleading statements are discussed in the Section below.

## IX.    THE TRUTH ABOUT WAMU'S FINANCIAL CONDITION BEGINS TO EMERGE

687.    After the close of trading on October 17, 2007, less than two weeks after Killinger assured the market about the Company's financial health and outlook, WaMu disclosed that, contrary to the "improved fourth quarter" described in the October 5 press release, the Company

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 269

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

in fact expected its loan loss provision to grow to as much as **$1.3 billion** in the fourth quarter 2007. Specifically, during a conference call that day, Defendant Casey revealed that the Company's best estimate for the full year 2007 provision was "between $2.7 and $2.9 billion," which Defendant Killinger explained resulted in a fourth quarter 2007 loan loss provision of "$1.1 billion to $1.3 billion." Moreover, in a press release issued that same day, the Company disclosed that, for the first time in 48 consecutive quarters or 12 years, WaMu was not increasing its stock dividend. Instead, that dividend would remain at $0.56 per share, the same amount paid the prior quarter. During the conference call and in the press release, WaMu also announced that its nonperforming assets increased to $5.5 billion, or to 1.65% of the assets held at quarter-end as compared to $4.0 billion and 1.29% from the prior quarter. Further, the Company reported $4.6 billion in nonaccrual loans and a total Allowance of $1.9 billion, or 41.3% of nonaccrual loans, as compared to the prior quarter when the Company reported $3.3 billion in nonaccrual loans and a total Allowance of $1.6 billion, or 47.6% of nonaccrual loans.

688.    In response, numerous analysts downgraded their ratings of WaMu, citing concerns over the Company's ability to maintain its dividend and the Company's projections for an increased loan loss provision in the fourth quarter. For example, on October 18, 2007, Punk Ziegel & Company issued a report lowering its rating of WaMu from "Buy" to "Sell," explaining: "This extreme move is being taken because [we] do not believe that the Company will be allowed to maintain its dividend and because there is no visibility as to when the company's loan loss issues will dissipate…While these numbers are troubling, of greater concern is the expectation that the loan losses in the fourth quarter will exceed those of the third quarter." Similarly, in an October 18, 2007 report, HSBC Global Research lowered its recommendation to "Neutral" from "Overweight," citing management's guidance of a "Q4 loan loss provision of

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 270

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

USD1.1bn to USD1.3bn," and stating that it "is likely to go a long way toward wiping out Q4 earnings.  We have to admit that a 75% increase, USD1.2 bn, in the full year loan loss provision estimate from July to October is disconcerting."   Friedman, Billings, Ramsey & Co., Inc. ("FBR") also issued a report on October 18, 2007, downgrading WaMu to "Underperform" from "Market Perform."   In doing so, FBR stated: "We believe [WaMu's] new provision guidance, which now ranges from $2.7B-2.9B, will result in the market beginning to factor in a dividend cut in the next few quarters, which would put downward pressure on the stock.  Due to the increase in provision guidance, we are reducing our FY07 EPS estimate to $2.35 from $2.48 and our FY08 EPS estimate to $2.00 from $3.05."

689.    The Company's disclosures caused WaMu's common stock to plummet, declining almost 8% from a closing price of $33.07 per share on October 17, 2007 to a closing price of $30.52 per share on October 18, 2007, on heavy reported trading volume of 36,476,764 shares – more than *six times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before this first partial disclosure).   The price of WaMu stock continued to trend downward, declining another almost 5% to close at $29.09 per share on October 19, 2007, on significant reported trading volume of 31,543,300 shares.  This disclosure resulted in a two day market capitalization loss of nearly *$4 billion*.

690.    Defendants prevented an even steeper decline, however, by falsely blaming the Company's performance on "weakening in the housing market" and "capital markets disruption" and assuring investors that the Company was financially strong with "appropriate capital and sources of liquidity." Accordingly, the complete truth about the Company's improper lending, accounting and credit risk management practices was not revealed to investors.  Defendants

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 271

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

further mitigated the impact of WaMu's October 17 disclosures by falsely minimizing the full extent of the Company's loss exposure resulting from the Company's lending practices and therefore, misrepresenting the amount of the provision that WaMu was required to record under GAAP.  As set forth above, this increased provision was grossly insufficient, both in terms of adequately provisioning for the third quarter 2007 as well as in redressing the cumulative understatement of the Company's Allowance throughout the Class Period.  Accordingly, the Company's October 17 press release and earnings call were materially false and misleading, and only partially disclosed the Company's true condition.

691.    Only two weeks after the Company successfully concealed the truth about its lending practices by blaming its performance on secondary market disruption – investors were shocked by revelations about WaMu's improper manipulation of appraisal values.  Specifically, on November 1, 2007, New York Attorney General Cuomo filed a lawsuit against First American and its subsidiary eAppraiseIT alleging that Washington Mutual pressured these companies into fraudulently inflating the appraisals used in Washington Mutual's loan origination process (defined above as the "NYAG Complaint").  Eric Corngold, New York's Deputy Attorney General for Economic Justice explained the allegations in the NYAG Complaint as follows: "Simply put, First American and eAppraiseIT signed over their independence to Washington Mutual, so that *Washington Mutual's loan staff could illegally hand-pick the appraisers who would hit the numbers that Washington Mutual wanted.*"

692.    In response to these allegations, the price of WaMu stock dropped $2.13 per share, or almost 8%, from a closing price of $27.88 per share on October 31, 2007 to a closing price of $25.75 per share on November 1, 2007, on heavy reported trading volume of 33,179,008 shares – *5.7 times greater* than the average daily trading volume of WaMu common stock from

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 272

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

693.    The Company attempted to mitigate the impact of the disclosures contained in the NYAG Complaint by issuing a broad-based denial, falsely asserting that it did not have any motivation to manipulate appraisal values.  Specifically, in a press release issued on November 1, the Company stated:  "We have absolutely no incentive to have appraisers inflate home values.  In fact, inflated appraisals are contrary to our interests.  We use third-party appraisal companies to make sure that appraisals are objective and accurate."  The Company also announced that it was suspending its relationship with eAppraiseIT until it had time to further investigate the situation.

694.    Notwithstanding the Company's denials, the Company's stock price continued to decline as analysts sought to quantify the severity of the allegations in the NYAG Complaint.  For example, on November 2, 2007, *Market Watch* published an article quoting Frederick Cannon, an analyst with Keefe Bruyette & Woods.  In this article, Cannon questioned WaMu's assertion that it had no incentive to inflate the appraised value of homes that it lends against and stated that the NYAG Complaint "could create big problems" and "raises an issue of considerable risk to Washington Mutual."  Cannon further stated that, "[i]n a worst-case scenario – in which inflated appraisals were systemic throughout WaMu – the lender might need to set aside an extra $2.1 billion, or $1.57 per share, of reserves."  Among other things, this analysis underscores the enormous significance (and obvious materiality) of WaMu's practice of inflating appraisals to its financial condition.  Moreover, on this same day, WaMu's regulatory agency, OTS, disclosed that it was "actively looking into" the allegations of appraisal manipulation at WaMu.  On this news, WaMu's stock price dropped $1.94 per share, or 7.5%, to close at $23.81

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 273

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

per share on November 2, 2007, on significant reported trading volume of 31,041,898 shares –
more than *five times greater* than the average daily trading volume of WaMu common stock
from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before
the Company's first partial disclosure)..   Moreover, this disclosure of WaMu's appraisal
manipulations caused WaMu's stock price to drop to its lowest closing price since September
2000 and resulted in a two day market capitalization loss of more than *$3 billion*.

695.    On November 7, 2007, Attorney General Cuomo broadened his attack on the
Company by announcing the expansion of his investigation into WaMu's fraudulent appraisal
practices to include an examination of the loans that WaMu sold to Fannie Mae and Freddie Mac,
the nation's two biggest providers of mortgage financing.  Specifically, Attorney General Cuomo
stated:

> The integrity of our mortgage system depends on independent appraisers.
> ***Washington Mutual compromised the fairness of this system by illegally
> pressuring appraisers to provide inflated values***.  Every company that buys loans
> from Washington Mutual must be sure that the loans they purchased are not
> corrupted by this ***systemic fraud***.

Attorney General Cuomo further disclosed that his office had subpoenaed Fannie Mae and
Freddie Mac, seeking information on the mortgage loans that Fannie Mae and Freddie Mac had
purchased from WaMu, among other banks, and that Fannie Mae and Freddie Mac agreed to his
demand that they "retain an Independent Examiner, subject to the Attorney General's approval,
to conduct a total review of all Washington Mutual . . . appraisals and mortgages purchased by
the companies."

696.    That same day, WaMu announced that the Company's loan loss provision could
exceed $1.3 billion in the first quarter 2008.  Specifically, at WaMu's 2007 Annual Investor Day
Conference, in which Defendants Killinger, Cathcart, Schneider, Casey and Rotella all
participated, the Company disclosed that it expected the "first quarter 2008 provision to be

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 274

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

similar or slightly higher than" the $1.1 billion to $1.3 billion range of the Company's fourth quarter 2007 loan loss provision.  The Company also revealed that nonperforming assets and charge-offs in the Company's single family residential portfolio increased and that "roll rates into 60 and 90 day delinquencies are much higher, as fewer borrowers the ability to refinance or quick sale their way out of trouble."

697.    These revelations by Attorney General Cuomo and the Company caused WaMu stock to drop *more than 17%*, to close at $20.04 on November 7, resulting in a single day market capitalization loss of *more than $3.5 billion*.  Moreover, the reported trading volume on this news was unusually heavy, involving 68,642,699 shares – almost *twelve times greater* than the average trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

698.    Defendants again succeeded, however, in mitigating the impact of these disclosures by falsely blaming the "downturn of the housing market and capital market disruptions" for the Company's financial performance while assuring investors of the Company's stability and the "stronger credit quality" of the Company's single family residential portfolio. Defendants continued to deny any manipulation of appraisal values for loans originated by WaMu.

699.    For example, speaking at the Investor Day Conference, Defendant Killinger emphasized that "[t]he key point here is that since the [single family residential] portfolio has stronger credit quality and lower LTVs, we expect these nonperforming loans will lead to significantly lower net charge offs than the subprime mortgage channel and home equity portfolios."  Killinger also added that "our risk is contained [and] our underwriting is sound." Similarly, Defendant Schneider pointed out that, because of the Company's "prudent

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 275

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

underwriting standards as well as tighter guidelines for markets where we have concerns about house prices," the Company had "a 17 percentage point reduction in loans with LTVs higher than 80." WaMu also defended its appraisal practices and claimed, at the conference as well as in a press release issued that same day, that the appraisals performed by eAppraiseIT were subject to strict quality control programs, were required to be "prepared in compliance with the Uniform Standards of Professional Appraisal Practice" and were required to be "prepared without fraud or negligence." These misstatements and false denials succeeded in concealing from investors the full extent of the Company's loss exposure arising from WaMu's undisclosed and improper lending practices and deficient risk management.

700. Nonetheless, analysts lowered their earnings estimates citing the Company's uncertain legal and financial situation. For example, in a November 7 report titled "Cutting Estimates on More Uncertain Outlook," Fox-Pitt Kelton Cochran Caronia Waller ("Fox-Pitt") stated: "WM's investor day highlighted the uncertainties facing the company on a variety of fronts – credit, margin, market improvement and legal/regulatory." Similarly, in a November 7 report, Bear Stearns lowered its 2008 EPS estimates for WaMu, noting: "We also believe that today's statements by New York Attorney General Andrew Cuomo that Fannie Mae and Freddie Mac have agreed to hire examiners to look through loans they purchased from WaMu for potentially inflated or otherwise fraudulent appraisals signals an increased level of legal and regulatory risk for WaMu."

701. Analysts continued to voice concern over WaMu's uncertain legal and financial predicament on November 8, 2007. For instance, on this date, Merrill Lynch issued a report, observing that "[a]nother shoe drops on WM" and stating: "Concern over rising cyclical credit costs is being compounded by recent news alleging WM of participating in or being victim of

appraisal fraud. If true, the potential for further losses would add significant risk to the earnings outlook for WaMu and possibly its capital adequacy. The crux of the problem is quite simple and possibly pervasive." Regarding the effect of inflated appraisals on the Company's balance sheet, Merrill Lynch commented, "[r]ough estimates suggest that WM could witness after-tax losses of $1.05-$1.70 [per share], possibly as high as $3.80 in a worse case scenario, resulting from the possible forced repurchase of loans underwritten with faulty appraisals." The report explained, "*[l]osses on loans with fraudulent appraisals would likely be higher than normal, given the defective nature of the loan*. Assuming most appraisal fraud events would likely arise in weak housing markets, the related incidence of loss would likely be higher as well." Merrill Lynch further added: "This injects significant uncertainty into the WM story, one which could potentially have meaningful downside to both WaMu's earnings and reputation, in our view." Bear Stearns also issued a report on November 8, 2007, stating: "We found WaMu's disclosure of the increases in 'roll rates,' or the percentage of borrowers who move from one month delinquent to two and three months delinquent, rather alarming." Significantly, even though Bear Stearns found the Company's increased delinquency rates to be concerning, this increase was the materialization of the Company's undisclosed and improper lending practices. Indeed, as set forth above, the Company's fraudulent appraisal and underwriting practices resulted in the Company originating an ever-increasing number of loans to buyers who were not able to repay their loans and became delinquent in their payments to WaMu, causing the Company's delinquency rates to increase and the quality of WaMu's loan portfolio to become increasingly weaker.

702. This analysis of the news release on November 7 caused WaMu's stock price to decline another 3%, dropping from a close of $20.04 per share on November 7 to close at $19.39

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 277

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

per share on November 8, on heavy reported trading volume of 55,602,134 shares – **11.8 times greater** than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

703.    On November 9, 2007, the Company filed with the SEC a Form 10-Q for the quarter ended September 30, 2007 (the "Third Quarter 2007 Form 10-Q"), which was signed by Defendants Casey and Ballenger and included certifications by Defendants Killinger and Casey. The Third Quarter 2007 Form 10-Q repeated the financial results set forth in the Company's October 17, 2007 press release, including that the Company's provision for loan and lease losses was $967 million for the quarter and that the Company was not increasing its quarterly dividend. The Third Quarter 2007 Form 10-Q continued to conceal the Company's improper lending, and accounting practices and deficient risk management. It also failed to disclose the true extent of the Company's loss exposure.

704.    On November 21, 2007, Moody's Investors Service downgraded the ratings of 34 tranches on seven Alt-A deals issued by WaMu in 2006 and late 2005, and placed under review for possible downgrade another 8 tranches from these same deals. Moody's negative rating actions were taken because of higher than anticipated rates of delinquency, foreclosure and real estate owned ("REO") property in the underlying collateral relative to credit levels. Like delinquencies and foreclosures, REO properties are problematic for lenders – and raise concern for investors and analysts – because they are properties owned by a lender, such as WaMu, after an unsuccessful sale at a foreclosure auction, which typically happens when the property up for sale at the auction is worth less than the total amount owned to the bank. On this news, WaMu's stock fell almost 4%, from a closing price of $17.99 per share on November 20, 2007 to a

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 278

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

closing price of $17.34 per share on November 21, 2007, on reported trading volume of 23,448,628 shares – more than *four times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

705.    On December 10, 2007, after the close of market, WaMu issued a press release that once again contradicted its prior assurances to investors.  Specifically, the Company announced that it was slashing its quarterly dividend from $0.56 per share to just $0.15 per share and increasing its loan loss provision guidance for the fourth quarter 2007 and first quarter of 2008.  The Company also announced a major "resizing" of its homes loans business and a $2.5 billion offering of convertible preferred stock, and that it would take a $1.6 billion after-tax charge against goodwill associated with its home loans business during the fourth quarter 2007.

706.    With respect to its increased loan loss provision guidance, the Company disclosed that it expected its fourth quarter 2007 provision to be $1.5 to $1.6 billion, more than 25% higher than the $1.1 to $1.3 billion guidance the Company had given one month earlier.  The Company also announced that it expected that its first quarter 2008 loan loss provision would be "in the range of $1.8 to $2.0 billion" and that its loan loss provision for each quarter of 2008 would be similar, if not higher, than the expected first quarter 2008 provision.  The Company was therefore projecting a full year 2008 loan loss provision of approximately $7.2 to $8.0 billion, more than double the estimated $3.1 to $3.2 billion loan loss provision it expected to record for 2007, and almost *ten times* the $816 million loan loss provision the Company recorded for 2006.

707.    In terms of its "resizing" of its home loans business, the Company disclosed that it planned to make the following adjustments:

- Discontinue any remaining lending through its subprime mortgage channel;

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 279

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

- Close approximately 190 of its 336 home loan centers and sales offices;

- Close nine of its Home Loan processing and call centers;

- Eliminate approximately 2,600 of its Home Loans positions, or about 22% of its Home Loans staff;

- Eliminate approximately 550 corporate and other support positions; and

- Close WaMu Capital Corp., its institutional broker-dealer business, as well as its mortgage banker finance warehouse lending operation.

The actions taken in connection with the Company's "resizing" highlight the substantial and material impact that the Company's improper lending practices had on the Company's financial and operational condition. As a result of the Company's enormous (and not fully disclosed) loss exposure due to the Company's fraudulent lending practices and deficient risk management efforts, WaMu was forced virtually to shut down its home lending business. By taking such drastic measures – which included closing its subprime business, closing almost 60% of its home loan and sales offices, terminating more than 3,000 employees and closing its mortgage warehouse lending operation – WaMu was implicitly acknowledging that the growth and profitability that the Company had experienced in its lending operations were dependant, at least in part, on the Company's fraudulent lending practices, including the issuance of high-risk loans to unqualified borrowers and the manipulation of appraisals.

708.    In response to these disclosures, the Company's stock fell over $2.46 per share, or more than 12%, from a close of $19.88 per share on December 10 to close at $17.42 per share on December 11, on enormous reported trading volume of 152,826, 497 shares – more than *26 times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 280

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

709.    In addition, the Company's December 10 announcements further unnerved analysts who raised more questions and concern over the Company's earnings prospects and loss exposure.  For instance, that same day Moody's cut WaMu's rating two notches to Baa2, the second lowest investment grade, from A3, questioning whether WaMu could return to profitability before 2010 and noting "its view that credit losses from WaMu's mortgage operations will be noticeably higher than previously estimated."  Also on December 10, Fitch Ratings downgraded WaMu to "A-" from "A" citing "worsening asset quality."  Citigroup Global Markets issued a report on December 11, cutting its 2007, 2008 and 2009 earnings estimates for WaMu and noting that: "While we expected some of these measures would be needed, the magnitudes are generally worse."  Similarly, D.A. Davidson & Co. issued a report on December 11, noting that: "On the surprise front: WM once more guided credit costs higher" and that the Company's latest disclosure "essentially wipes out EPS for both" 2007 and 2008.

710.    A December 11 report issued by Morgan Stanley Research also lowered the Company's earnings outlook, stating that: "WaMu's moves to strengthen capital and reserves strikes us as a positive, although the magnitude of the new loss guidance for 2008 is disconcerting."  Stifel Nicolaus also issued a report on December 11, revising its earnings projections downward and stating that: "We were not surprised WaMu cut the dividend and announced a capital raise…The magnitude of the cut, however, was somewhat more than we had expected."  The Stifel Nicolaus report further added:

> That WaMu would have to increase provisions was also not surprising.  What was unclear was the timing, and one big question remaining is just how much pain is WaMu pulling forward with its projected ~$3.5B provision in the next two quarters?  We believe the answer is 'Not all of it.'  We estimate lifetime losses remaining on the current mortgage portfolio at ~$7.7B, suggesting the higher 4Q07 and 1Q08 provisions are a good start, but not the end of the pain.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 281

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

711.    Moreover, some analysts began to speculate that, contrary to the Company's repeated statements, WaMu's increasing losses might be the result of poor underwriting by the Company.    Specifically, Fox-Pitt issued a report on December 11, 2007, downgrading the Company to "In Line from Outperform."    In doing so, the report stated that "the size of [WaMu]'s expected credit losses is now far larger than we had expected" and noted that WaMu could also be "suffering from poor underwriting quality."

712.    Similarly, in a report issued that same day, Morgan Stanley questioned the Company's evaluation of its credit risk, because "the rapid deterioration in the housing environment and **questions about WaMu's loan products, geographic concentration, and underwriting make it difficult to bracket the downside**."    Further, the NYAG Complaint continued to resonate as a danger to WaMu's future financial prospects, as noted in a December 11 Citigroup Global Markets report issued that same day, which changed its rating from Hold to Sell "based on the rapid increase in provisioning which dampens future growth prospects as well as future increased uncertainty with regard to the NY attorney general's appraisal inquiry."

713.    Other analysts noted the Company's dangerous concentrations in risky loan products, such as a Credit Suisse report issued on December 14 that observed, "Higher than expected losses are driven by deterioration in its subprime, home equity, option ARM and credit card portfolios."    As a result of these disclosures, analysts began to voice concerns over WaMu's credibility, as the Credit Suisse report commented:  "As a result of numerous upward revisions to management's credit expectations in the past couple of months, we believe management's credibility is questionable."

714.    As analysts continued to report on the Company's December 10 disclosure over the following days, WaMu's stock price dropped even lower, falling to a low of $15.59 per share

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 282

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

by December 13, 2007, for a total drop of more than 22%, resulting in a three day market capitalization loss of approximately *$3.7 billion*.

715.    Notwithstanding the partial disclosure of the Company's true condition, the Company's December 10 press release was a materially false and misleading statement because it continued to conceal the Company's improper lending practices and the full extent of the loss exposure confronting the Company.  In fact, the Company's true loan loss provision was far more significant than the Company was willing to disclose at that point.

716.    On December 21, 2007, before the open of the market, *The Wall Street Journal* reported that the SEC had launched an inquiry into the Company's mortgage lending practices. According to *The Wall Street Journal,* the SEC was focused on whether "the company properly accounted for its loans in financial disclosures to investors of the company."  WaMu confirmed the SEC's inquiry, but once again attempted to diminish the impact of this revelation by issuing a statement denying any wrongdoing: "After spending a month and a half investigating these allegations, we can say with confidence that there has been no systematic effort by WaMu to inflate home appraisals."  Despite the Company's mitigation efforts, following this news, shares of WaMu stock dropped as low as $13.76 per share in mid-day trading on December 21, 2007, and closed at $14.10 per share, on significant reported trading volume of 39,575,807 shares. News of the SEC's inquiry resulted in a one day decline of almost 4% and topping off a 28% drop in price since the beginning of the month.

717.    On January 17, Gradient Analytics ("Gradient") issued a report, analyzing impairment risk at fifteen publicly traded lenders, including Washington Mutual.  In this report, Gradient stated that, as a result of its analysis, it continued to believe that WaMu was "the most at-risk firm among large capitalization lenders."  Gradient further reported that: "in our

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 283

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

estimation, WaMu's prior loan loss provisions have been insufficient to establish a reserve that fully accounts for the level of nonperforming loans" and that if WaMu "were to establish a reserve that reflects the likelihood that nonperforming loans will continue to increase for at least the next year," WaMu could have to record an impairment charge of "as much as $15.3 billion."

718.    In response to this disclosure, the Company's stock fell 7%, from a closing price of $13.39 per share on January 16, 2008 to closing price of $12.46 per share on January 17, 2008, on significant reported trading volume of 47,279,787 shares.

719.    After the close of the market on January 17, 2008, the Company announced its first annual loss since 1994 and its first quarterly loss since 1997.  Specifically, the Company issued a press release that evening reporting its earnings for the quarter and year ended December 31, 2007, which included a net loss of $1.87 billion, or $2.19 per share, for the fourth quarter 2007, and a net loss of $67 million, or $0.12, for the full year 2007.  The press release also confirmed the Company's prior announcement of a paltry dividend of $0.15 per share and that the Company's loan loss provision for the quarter was $1.53 billion, within the $1.5 to $1.6 billion guidance provided by management in December.  The Company also announced that its allowance was $2.57 billion at year end.

720.    That same evening, the Company held a conference call to discuss its fourth quarter and year end 2007 financial results.  Defendants Killinger, Casey and Rotella participated in the call.  In discussing the Company's financial results, these defendants again blamed the Company's financial performance on the "turmoil" and "unprecedented challenges in the mortgage and credit markets," and not the Company's improper lending, and accounting practices and deficient risk management.  Indeed, the Company's January 17 disclosures, which only partially revealed the Company's true financial condition, continued to conceal the full

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 284

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

magnitude of the Company's loss exposure and the full size of the Company's loan loss provision that was yet to be recorded.

721.    Analysts responded to WaMu's earnings release cautiously, somewhat relieved that the financial results were consistent with the Company's recent guidance, but still concerned about the Company's remaining loss exposure.  For example, on January 17, 2008, Fox-Pitt issued a report titled, "A Sigh Of Relief" which, while cutting 2008 earnings estimates to a loss of $1.49 per share from $1.19 per share, positively noted that "management did not change its estimate of provision costs for '08" and "we are comfortable that '08 will represent the peak in credit provision costs."  Similarly, Credit Suisse issued an analyst report on January 17, lowering its 2008 earnings per share estimate and noting that "[w]e remain cautious on WaMu shares."  Credit Suisse also stated that: "Credit quality deterioration exhibited few signs of abating in Q4 with [nonperforming assets] up 30% sequentially and 154% year over year.  This was well above our expectations."

722.    Similarly, on January 18, 2008, Citigroup Global Markets issued a report, lowering its earnings estimates for 2008 and 2009, and noting: "We remain cautious on WM's shares during this period of elevated credit cost & business uncertainty."  Citigroup further stated that: "We think WM has effectively boxed its mortgage and credit market related risk exposure, helping contain potential future charges and loss levels.  Nevertheless, its exposures remain sizeable and will likely continue to dampen earnings and profitability."  In noting that WaMu's shares were trading below tangible book value, a Punk Ziegel & Company report issued on January 22 observed, "The stock sells where it does because most investors feel confident that the company will be forced to take additional significant write-offs against its holdings of sub-prime and negative amortization loans."  Similarly, a report by Merrill Lynch, issued on January

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 285

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

23, stated that, "the credit problems inherent in [WaMu's] . . . balance sheet[] are likely to forestall a near-term recovery or acquisition."

723. On February 29, 2008, the Company filed with the SEC its Form 10-K for the year ended December 31, 2007, which was signed by, among others, Defendants Killinger, Casey and Ballenger and included certifications by Defendants Killinger and Casey. On May 22, 2008, the Company filed with the SEC its Form 10-K/A for the year ended December 31, 2007 (together, these filings are collectively referred to as the "2007 Form 10-K"). The 2007 Form 10-K repeated the financial results set forth in the Company's January 17 press release. Most significantly, the 2007 Form 10-K continued to conceal the Company's improper lending, and accounting practices and deficient risk management practices as well as the true extent of the Company's loss exposure.

724. On March 3, 2008, Fitch Ratings downgraded $2.3 billion worth of WaMu mortgage pass-through certificates backed by first lien subprime mortgages originated by WaMu. Fitch based its downgrade on "the deteriorating performance of [WaMu's mortgage] pools from 2007, 2006 and late 2005 with regard to continued poor loan performance and home price weakness." On this news, WaMu's stock price fell $1.15, or more than 7.7%, from an opening price of $14.80 per share on March 3 to a closing price of $13.65 per share on March 3, on substantial reported trading volume of 48,349,043 shares – more than *eight times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

725. On March 6, 2008, Standard & Poor's downgraded the Company's long-term credit rating to "BBB" from "BBB+" because of credit concerns. Similarly, Dominion Bond

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 286

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Rating Service Limited ("DBRS") downgraded all long-term debt ratings of WaMu and its subsidiaries to BBB (high) from A (low) citing concerns that "credit losses in the Company's residential mortgage portfolio will continue to increase at an accelerated pace given the fact that WaMu's portfolio has significant exposure to high loan-to-value second mortgages and to the regions that have experienced the most significant depreciation in house prices (such as California and Florida)." At the same time, DBRS also lowered its short-term debt ratings of WaMu from R-2 (high) to R-1 (low). In lowering the Company's debt ratings, DBRS noted that the "trend on all ratings remains Negative." Following this news, the Company's stock price plunged 8% from a closing price of $12.80 per share on March 5, 2008 to a closing price of $11.76 per share on March 6, 2008, on significant reported trading volume of 53,366,618 shares – more than **nine times greater** than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's partial disclosure)

726. On March 7, 2008, *The Wall Street Journal* reported that WaMu was approaching private-equity funds, sovereign-wealth funds, and other investors about possible cash infusions. On that same day, Merrill Lynch stated in a report that it expected the Company to report losses of as much as $11.2 billion through 2009 as more borrowers defaulted on home loans. On this news, the Company's stock price fell another 9%, dropping to a close of $10.71 per share on March 7, on massive reported trading volume of 110,506,154 shares – almost **nineteen times greater** than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure)

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 287

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

727.    After the close of the market on March 7, 2008, Fitch Ratings lowered it ratings on the Company citing "a variety of internal and external sources" who predicted that WaMu's first quarter 2008 earnings, along with earnings of other United States banks, will show "rapid deterioration" in its home equity loans portfolio.    In addition, Fitch pointed out that "[a]pproximately 37% of WM's total loan portfolio comprises residential mortgage and home equity loans in California," a state where properties "appear to be deteriorating at a faster pace than those in more stable markets."    WaMu's stock price fell more than 6% on this news to close at $10.04 per share on March 10, on reported trading volume of 73,738,572 shares – *12.6 times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

728.    On March 14, 2008, WaMu's stock price dropped almost 13%, on significant reported trading volume of 84,670,239 shares, after Moody's downgraded the Company's senior unsecured debt rating from Baa2 to Baa3, one level above junk status.    In lowering its rating, Moody's explained that it "believes that remaining lifetime losses on [WaMu's residential mortgage loan] portfolio will be higher than previously expected" and that "WaMu's required provisioning is likely to be greater than $12 billion and that full year 2008 net losses could eliminate the company's approximately $6 billion capital cushion above regulatory well capitalized minimums."    Moody's also placed a negative outlook on all WaMu entities.

729.    On March 17, 2008, WaMu's stock price fell further as investors continued to respond to Moody's March 14 downgrade and became concerned about the Company not having any viable buyout prospects in the wake of JP Morgan Chase & Co.'s purchase of Bear Stearns Cos.    Indeed, as reported by *Bloomberg News* on March 17, before the open of the market,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 288

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

"shares of Washington Mutual are dropping in premarket trading, as the sale of Bear Stearns Cos. and a downgrade from Moody's Investors Service pressure the savings and loan stock."  Later that day, *Bloomberg News* further reported that WaMu "fell to its lowest since 1995 on waning prospects for takeover" as JP Morgan's "$240 million purchase of Bear Stearns Cos. removed one of the largest potential buyers from the market."  As a result of this news, WaMu's stock price dropped almost 13%, falling from a close of $10.59 per share on March 14 to close at $9.24 per share on March 17.  This disclosure also sparked massive reported trading volume, involving more than 109,266,368 shares – ***18.7 times greater*** than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

730.    On March 27, 2008, Lehman Brothers issued a report setting forth revised estimates for the Company's 2008 financial results, including an earnings loss of $2.84 per share and a loan loss provision increase to $10 billion.  The report also estimated that the Company would need to set aside $5 billion in 2009 for loan losses, and would incur $6 billion in charge-offs in 2008 and $7 billion in charge-offs in 2009.  On this news, WaMu's stock price dropped more than 8% on reported trading volume of 44,246,517 shares – ***7.6 times greater*** than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

731.    Thereafter, on April 4, 2008, Keefe Bruyette & Woods issued a report doubling its 2008 estimated loss for WaMu to $3.15 per share from $1.45 per share.  This report also noted that, mortgage and other credit losses may keep WaMu from turning an annual profit before 2010.  Following these downward earnings revisions, WaMu stock fell 12%, to close at $10.17 per share on April 4, on significant reported trading volume of 67,901,502 shares – ***11.6 times***

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 289

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

732.    On April 7, 2008, reports circulated that a group led by private equity firm TPG was close to a deal to invest $5 billion in WaMu, an investment that was viewed as necessary in order for WaMu's to alleviate its pressing capital requirements.  After the close of the market on April 7, additional reports circulated, stating that, in connection with this deal, WaMu was exiting its wholesale lending business.

733.    On April 8, 2008, the Company announced its disappointing first quarter 2008 results, including that the Company suffered a net loss of $1.1 billion, or $1.40 per share, and that the quarterly dividend was reduced from $0.15 to $0.01.  The Company also disclosed that the loan loss provision increased to $3.5 billion, almost double what the Company stated it would be on December 10, 2007.  On this same day, the Company also stated that it was closing all 186 of its stand-alone home loan offices nationwide and eliminating approximately 3,000 jobs as part of the closings.  The Company also officially announced that it would raise $7 billion in capital through a direct sale of equity securities to an investment vehicle managed by TPG Capital.  While this news provided additional insight into the Company's financial condition, it nonetheless continued to understate the size of the Company's loss exposure and the reasons why the Company was in this precarious financial position, including its need to accept $7 billion in a deal that was described by *The Wall Street Journal* as "punitive" as it could result in the Company nearly doubling its shares outstanding, a massive dilution for existing shareholders.

734.    On this news, the WaMu's stock price dropped 10%, to close at $11.81 per share on April 8, 2008, on massive reported trading volume of 180,896,539 shares – more than *32*

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 290

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure). Indeed, even though the market viewed WaMu's capital infusion as an overall positive, the market found the Company's first quarter financial results to be worrisome and indicative of increased loss exposure. For example, Citigroup Global Markets issued a report on April 8, observing that:

> The ultimate success of this new investment in WM will be determined over time as the current credit crisis unfolds. Since the magnitude of the mortgage-related losses remain unknown (Moody's recently estimated 'base-case' cumulative losses of $12 billion) and visibility remains poor, we believe that earnings growth and profitability will likely remain under pressure through the end of 2009.

Similarly, on this same date, Merrill Lynch issued a report, upgrading the stock to "Neutral" and noting that: "Losses will likely be elevated for next few years, suggesting further financial stress cannot be ruled out. However, the current capital injection should allow enough cushion to prevent further shortfalls."

735. The market price of WaMu's common stock continued to decline as analysts voiced concern over WaMu's financial outlook. For example, on April 9, 2008, Stifel Nicolaus issued a report, stating:

> The key question is whether the worst is now behind the company. With the capital infusion and [management] actions, liquidity risk has certainly been reduced and WaMu should survive. However, we remain concerned that mortgage losses are just beginning and we believe it will be difficult for the company to return to profitability. Our new 2008 and 2009 estimates are [a loss of $1.90] and $0.15, respectively.
>
> *      *      *
>
> With significant uncertainty in the outlook and very little to be optimistic about in our view, we maintain our Hold rating on the shares.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 291

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

736.     Similarly on April 11, 2008, Goldman Sachs issued a report, recommending that its clients short-sell WaMu stock because it estimated that WaMu has "$17 to $23 billion of embedded losses in its current book of business" and forecasted "a "$14b provision charge in 2008."  Goldman Sachs further estimated that WaMu may lose $3.30 per share in 2008.  On this news, WaMu's stock fell more than 4%, from a closing price of $11.42 per share on April 10 to a closing price of $10.95 per share on April 11, on heavy reported trading of 55,243,132 shares – more than **9 times greater** than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

737.     In a report issued on April 16, 2008, Chris Brendler of Stifel Nicolaus questioned the Company's ability to return to profitability, observing, "as [management] struggles to right the sinking ship, we are increasingly questioning the value of [WaMu]'s remaining franchise. ***The home loan business is broken, the loan portfolio is a disaster***. . . ."

738.     On April 29, 2008, WaMu announced that Defendant Cathcart left the Company.

739.     On May 12, 2008, WaMu the filed with the SEC its Form 10-Q for the quarter ended March 31, 2008 (the "First Quarter 2008 Form 10-Q"), which was signed by Defendants Casey and Ballenger and included certifications by Defendants Killinger and Casey.  The First Quarter 2008 Form 10-Q repeated the financial results set forth in the Company's April 8, 2008 press release.  The First Quarter 2008 Form 10-Q continued to conceal the Company's improper lending and, accounting practices and deficient risk management as well as the true extent of the Company's loss exposure.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 292

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

740.     On June 2, 2008, WaMu announced that, effective July 1, 2008, the Company was stripping Defendant Killinger of his title of Chairman of the Board, and that Director Defendant Stephen Frank would replace him in the position of Chairman.

741.     On June 9, 2008, the market gained a much fuller understanding of the magnitude and severity of the loss exposure facing WaMu.   On this date, UBS Investment Research published a detailed analyst report, concluding, after an "extensive credit analysis of WM's balance sheet," that cumulative losses on WaMu's mortgage portfolio will likely total close to $21.7 billion through 2011, between 12.5 to 44% greater than the loss guidance of $12 to $19 billion that the Company provided to the market in April 2008.   Moreover, with respect to its $21.7 billion loss estimate, UBS observed that it might still be too low, stating:  "The attributes of WM's remaining loan portfolio and broader economic weakening mean our bias is that losses could be worse than our projection."   This report also estimated that WaMu would record $24.2-$24.7 billion in incremental loan loss provisions between now and 2010.   This report also concluded that WaMu would endure losses of $4.45 per share in 2008 and of $1.60 per share in 2009.

742.     On this news, the market price of WaMu common stock plummeted from its close of $7.53 per share on June 6, 2008 to $6.25 per share on June 9, 2008, a one day drop of 17%, on huge reported trading of 130,204,161 shares – *more than 22 times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

743.     Similarly, on June 24, 2008, Lehman Brothers issued a report predicting that WaMu would suffer mortgage losses in excess of the Company's April 2008 loss guidance of $12 to $19 billion over the next 3 to 4 years.   Specifically, Lehman Brothers' report estimated that

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 293

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

WaMu's "lifetime real estate mortgage losses will be in the $21 billion to $28 billion range." On this news, the market price for WaMu's common stock dropped almost 3%, from a closing price of $5.96 per share on June 23, 2008 to a closing price of $5.80 per share on June 24, 2008, on substantial reported trading volume of 50,637,751 shares – *8.7 times greater* than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).

744.     On July 14, 2008, Lehman Brothers issued another analyst report, further confirming its estimate of $21 billion to $28 billion for WaMu's lifetime real estate mortgage losses and predicting that "WM will take a $4B provision in the 2Q08, building reserves to $6.9B, producing another large loss for the quarter." Moreover, the report estimated that WaMu would report a loss of $1.48 per share in the second quarter because: "As Washington Mutual builds reserves to cover these losses, it should remain unprofitable until credit costs normalize" around the second half of 2009. Significantly, on July 14, 2008, *Bloomberg News* reported on this analyst report, observing that Lehman Brothers' earnings forecast was more dire than other analysts' forecasts because, according to poll of 13 analysts, "the average estimate is for a loss of 92 cents a share."

745.     On that same day, Ladenburg Thalmann analyst Richard Bove issued a report, questioning WaMu's financial viability and ability to stay afloat. In particular, Bove reported that WaMu was on the edge of "the danger zone." With this further news concerning the magnitude of the Company's loss exposure, and its implications for WaMu's financial condition, the market price of WaMu's common stock plummeted 35%, from a closing price of $4.95 per share on July 11, 2008 to $3.23 per share on July 14, 2008, on record reported trading volume trading volume of 210,678,306 shares – *more than 36 times greater* than the average daily

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 294

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1  trading volume of WaMu common stock from October 19, 2005 (the first day of the Class

2  Period) until October 16, 2007 (the day before the Company's first partial disclosure).

3      746.    After the close of the market on July 14, 2008, in an attempt to mitigate any

4  further drops in the price of its common stock – which could have dire consequences for the

5  thrift's survival – WaMu issued a press release, claiming that the Company's was sufficiently

6  capitalized and had excess liquidity of more than $40 billion.  The Company's mitigation efforts

7  were successful.  As a result of this press release, the market price of WaMu's stock rebounded

8  slightly, rising to $5.92 per share in the days following this announcement.  This was a false and

9  misleading disclosure because the Company failed to disclose its improper lending and,

10  accounting practices and deficient risk management as well as the true extent of the Company's

11  loss exposure.

12      747.    After the markets closed on July 22, 2008 and less than ten days after it

13  misleadingly calmed concerns about the Company's financial strength, WaMu once again

14  shocked the market.  Specifically, WaMu announced its second quarter 2008 financial results,

15  including that the Company suffered a net loss of $3.3 billion, more than 65% greater than the

16  Company's first quarter 2008 net loss of $1.14 billion, driven by a significant increase in its loan

17  loss reserves.  On a diluted per share basis, the Company reported a loss of $3.34 per share

18  (excluding a one-time earnings reduction related to the Company's issuance of capital in

19  connection with the TPG deal).  The Company further announced that it increased its loan loss

20  reserves by $3.74 billion to $8.46 billion and that it took a $5.9 billion loan loss provision in the

21  quarter, an increase of 40% from the $3.5 billion provision that the Company recorded in the first

22  quarter 2008.  In explaining its increased loan loss provision, the Company stated that,

23  "approximately one third of the second quarter provision for loan losses related to significant

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 295

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

changes in key assumptions the company used to estimate incurred losses in its loan portfolio." Specifically, the Company shortened the time period used to evaluate defaults for its prime mortgage portfolio to one year from three years "to reflect the evolving risk profile of the loan portfolio and adjusted its severity assumptions for all single family mortgages to reflect the continuing decline in home prices."

748.    In addition, WaMu announced that its unpaid mortgages, foreclosed homes and other nonperforming assets continued to increase during the second quarter. For example, WaMu stated that its net charge-offs rose to $2.17 billion from $1.37 billion in the prior quarter and nonperforming assets increased $2 billion, representing 3.62% of total assets compared with 2.87% at the end of the prior quarter. WaMu also announced that it expected cumulative losses in its residential mortgage portfolio to total $19 billion, the high end of its previous guidance, and that 2008 would be the peak year for provisioning.

749.    Also on July 22, WaMu held a conference call to discuss the Company's second quarter 2008 financial results. Defendants Killinger and Casey participated in the call along with WaMu's new Chief Enterprise Risk Officer John McMurray. During the call, Killinger, Casey and Murray reviewed the results set forth in the Company's press release. They also explained that, in 2008, the Company's Option ARM loans experienced the fastest rise in delinquency rates and that they expected "other prime loans, which are mostly 5 and 7 year hybrids, to follow Option ARMs closely." According to McMurray, home equity loans and subprime mortgages had experienced high delinquency rates during the late 2006 to late 2007 time period. Moreover, during the call, the Company announced that it "significantly reduced our production of new mortgages and tightened underwriting standards against our loan portfolio." Similarly, the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 296

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Company also announced it had "eliminated negatively amortizing products including the Option ARM from our product line."

750.    The market reacted swiftly to this news, driving down the stock price 20% from a closing price of $5.82 per share on July 22, 2008 to a closing price of $4.65 per share on July 23, 2008, on massive reported trading volume of 208,124,873 shares – ***more than 35 times greater*** than the average daily trading volume of WaMu common stock from October 19, 2005 (the first day of the Class Period) until October 16, 2007 (the day before the Company's first partial disclosure).  Indeed, Dominion Bond Rating Service Limited and Standard & Poor's downgraded WaMu's ratings.  Moody's placed WaMu and its bank subsidiary on review for a downgrade to junk status.  Piper Jaffray downgraded WaMu to "Sell" and Merrill Lynch cut the Company's rating to "Underperform."   Similarly, during an interview with Susie Gharib on the Nightly Business Report, Ladenburg Thalmann analyst Richard Bove described WaMu's position as follows:

> It's in very bad shape…when you take a look at its non-performing assets, they went up by $2 billion in the quarter.  So despite the fact that they wrote off $2 billion in bad loans, they actually still increased the non-performing assets by $2 billion, which means that the non-performing assets are growing at a faster pace than they can write them off.  That is not a good sign.

751.    With the Company's release of its second quarter 2008 financial results, the market gained a much greater understanding of the Company's loss exposure and financial condition.  As a result, at least in part, of the disclosures set forth above, from October 17, 2007 until July 23, 2008, as the magnitude and severity of the Company's loss exposure caused by its improper lending and accounting practices and deficient risk management was revealed piecemeal to the investing public, the Company's stock price dropped from $33.07 per share to $4.65 per share, a decline of more than 85%.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 297

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

752.    The price of WaMu's other securities also fell as a result, at lease in part, of the disclosures of the Company's improper lending practices, poor quality loans and loss exposure. For example, on November 1, 2007, when Attorney General Cuomo filed the NYAG Complaint, alleging that WaMu had engaged in unlawful appraisal practices (as set forth above), the market price of WaMu's depositary shares representing 1/40,000[th] interest in a share of Series K Perpetual Non-Cumulative floating rate preferred stock (the "Series K Stock") fell 7%, from $21.64 per share on October 31, 2007 to $20.10 per share on November 1, and dropped another 6.5% to $18.81 per share on November 2, 2007 as analysts tried to quantify the severity of the allegations.  WaMu's debt securities also dropped, on average, 1% on this news.  Similarly, on November 7, 2008, when Attorney General Cuomo announced the expansion of his investigation of WaMu's appraisal practices and the Company announced that its loan loss provision could exceed $1.8 billion in the first quarter 2008 (as set forth above), WaMu's Series K Stock fell almost 8%, from $18.30 per share on November 6, 2007 to close at $16.88 per share on November 7, 2007, and dropped another 2% to close at $16.57 per share on November 8, 2007. WaMu's debt securities also dropped, on average, 2% on this news.   Additionally, on March 6, 2008, when numerous rating agencies downgraded WaMu because of credit concerns (as set forth above), WaMu's Series K Stock dropped 5%, its shares of 7.75% Series R Non-Cumulative Perpetual Convertible Preferred Stock (the "Series R Stock") dropped 7% and its debt securities dropped, on average, 2.8%.  In another example, on July 14, 2008, when analysts predicted that WaMu would suffer lifetime real estate mortgage losses between $21 billion and $28 billion and seriously questioned the Company's viability as a result of these losses (as set forth above), WaMu's Series K Stock dropped 36%, its Series R Stock dropped 24%, and its debt securities dropped, on average, 8%.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 298

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

753.    Thus, as the truth about the consequences of WaMu's improper lending and accounting practices and loss exposure was revealed to the market, the market price of WaMu's securities declined substantially.  For example, the market price of the Series K Stock declined 68%, from $23.49 per share on October 17, 2007 to $7.53 per share on July 23, 2008.  The market price of WaMu's Series R Stock fell 51%, from $991.25 per share on December 12, 2007 (first available pricing data for this security) to $485.98 per share on July 23, 2008.  The market price of WaMu's 5.5% notes due August 24, 2011 also dropped, declining almost 21%, from $100.79 per note on October 18, 2007 to $80.00 per note on July 23, 2008.  Similarly, the market price of WaMu's 7.25% notes due November 1, 2017 dropped almost 28%, from $99.41 per note on October 29, 2007 to $71.99 per note on July 23, 2008.  The market price of WaMu's 7.250% Notes also declined during the Class Period.

## X.    LOSS CAUSATION

754.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Throughout the Class Period, the market prices of WaMu securities were inflated by the material omissions and materially false and misleading statements made by the Company and the Officer Defendants, identified above, and, as a result, Plaintiffs and the Class purchased WaMu securities at artificially inflated prices. When the truth about WaMu was revealed to the market and investors, the price of WaMu's securities declined in response, as the artificial inflation caused by WaMu's and the Officer Defendants' material omissions and false and misleading statements was removed from the price of WaMu's securities, thereby causing substantial damage to Plaintiffs and other members of the Class.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 299

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

755.    Indeed, during the Class Period, WaMu common stock traded as high as $46.48 per share on June 1, 2006, and closed at $35.20 per share just days before the Company's October 17, 2007 conference call and press release, when the first partial disclosures about WaMu's true condition were made. Over the next eight and a half months, in response to several additional partial disclosures that revealed more about the Company's true financial condition, the market reacted, and WaMu's stock price partially corrected as WaMu's stock price was significantly driven downward.  The Company and the Officer Defendants mitigated the impact of those disclosures and prevented the full truth about WaMu from being revealed by making contemporaneous false and misleading statements that minimized and denied the facts being revealed to the market.  As the market gained a more complete understanding of the magnitude of the loss exposure facing WaMu and the implications for WaMu's financial condition, the price of WaMu's common stock plummeted to $4.65 per share on July 23, 2008.  As a result, at least in part, of the truth emerging about the Company's improper lending practices, poor quality loans, and loss exposure, the market price of WaMu common stock fell more than $28 per share, from $33.07 per share on October 17, 2007 to $4.65 per share on July 23, 2007.  The price of WaMu's other equity and debt securities also fell, at least in part, as a result of the disclosures of the Company's improper lending practices, poor quality loans, and loss exposure.

756.    The specific dates of the adverse disclosures and the corresponding declines in the price of WaMu securities are set forth above in Section IX above.

757.    It was entirely foreseeable to WaMu and the Officer Defendants that concealing from investors the Company's improper lending and accounting practices would artificially inflate the price of WaMu securities.  It was similarly foreseeable to the Company and the Officer Defendants that the ultimate revelation of that misconduct, and of the Company's true

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 300

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   condition, would cause the price of WaMu securities to drop significantly as the inflation caused

2   by their misstatements was corrected.  Accordingly, the conduct of the Company and the Officer

3   Defendants, as alleged herein, proximately caused foreseeable losses and damages to Plaintiffs

4   and members of the Class.

5       758.    Specifically, the misleading omissions and statements detailed above falsely

6   assured investors, among other things, that WaMu employed "***prudent***," "***conservative,***"

7   "***disciplined***" and "***tightened underwriting standards***;" that WaMu had  "***rigorous credit***

8   ***standards***," "***strong credit quality***" and an "***effective***" "***risk management strategy***;" an

9   "***appropriate level of reserving***" and ***designed, established and maintained an effective system***

10  ***of internal controls.***   Those statements were materially false and misleading due to the

11  Company's undisclosed origination of high-risk loans, improper appraisal and lending practices,

12  use of dangerously lax underwriting standards, deficient credit risk management, inadequate

13  provisioning for loan losses, failure to maintain effective internal controls, and failure to report

14  its financial statements in accordance with GAAP during the Class Period.

15      759.    WaMu and the Officer Defendants' material omissions and materially false and

16  misleading statements caused the market to believe that the Company's loss exposure was

17  contained and properly managed; caused the Company's financial reporting to be in violation of

18  GAAP; and conveyed the impression that the Company was financially stronger and more

19  profitable than it actually was.  The prices of WaMu's securities during the Class Period were

20  affected by those omissions and false statements, and were artificially inflated as a result thereof.

21  Thus, the precipitous declines in the value of WaMu's securities purchased by the Class were a

22  direct, foreseeable and proximate result of the partial disclosures of WaMu's true condition and

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 301

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

of the July 22, 2008 disclosure which more fully revealed the magnitude of the Company's loss exposure and true financial condition.

760.    Moreover, the fact that WaMu's unlawful appraisal and improper lending practices, deficient risk management, and inadequate provisioning for loan loss reserves triggered investigations by the New York Attorney General, the SEC and the OTS was also an entirely foreseeable consequence of the misconduct complained of herein.

761.    Although not necessarily because of the detailed facts set forth above concerning loss causation, as further indicia of the adequacy of loss causation as pled by Lead Plaintiff, Lead Counsel has obtained an expert opinion and analysis from an experienced loss causation expert regarding this matter. Chad Coffman is an expert on loss causation in the securities class action context, economic damages and securities valuation.  He has been retained by Lead Counsel in connection with Lead Plaintiff's investigation to evaluate the economic impact of WaMu's allegedly false statements to the investing public on the market price of WaMu's securities, including the causal linkage between the revelation of the truth about WaMu and the economic harm suffered by WaMu investors by the decline in the price of those securities.  Mr. Coffman's opinion concerning these issues is attached hereto as Appendix 6 (the "Coffman Declaration").

762.    As explained in the Coffman Declaration, Mr. Coffman is the President and a founder of Winnemac Consulting, LLC ("Winnemac"), a firm specializing in the application of economics, finance, statistics, technology, securities valuation, and accounting principles in the areas of securities fraud damages, valuation, labor discrimination, antitrust, intellectual property and securities trading practices.  Prior to founding Winnemac in March 2008, Mr. Coffman was a Principal at Chicago Partners, LLC.  Mr. Coffman spent twelve years at Chicago Partners, and was responsible for conducting and managing large and complex litigation consulting matters

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 302

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

across a wide variety of disciplines, including securities valuation and damages, labor discrimination and anti-trust. Mr. Coffman has conducted loss causation and damages analyses for numerous securities actions arising under Section 10(b) of the Exchange Act and Section 11 of the Securities Act, including for some of the largest securities actions in history, such as the *Enron*, *WorldCom*, *Parmalat* and *Tyco* securities class actions. Mr. Coffman has also been engaged numerous times as a valuation expert both in and out of the securities litigation context, on behalf of plaintiffs, defendants, and director and officer insurance policy carriers. Mr. Coffman has also worked for prominent mediator and former Judge, the Honorable Daniel Weinstein (Ret.), providing neutral expert analysis and input in securities litigations and other matters. Mr. Coffman holds a Bachelor of Arts, *magna cum laude,* in economics from Knox College and a Masters in Public Policy from the University of Chicago.

763.    As explained in the Coffman Declaration, based upon his review of publicly-available information concerning WaMu and the allegations in the Complaint (including the disclosures and analyst reports set forth in Section IX), it is Mr. Coffman's expert opinion that Lead Plaintiff has (i) set forth a coherent economic theory of how and why the alleged misconduct caused the market prices of WaMu securities to be inflated; and (ii) provided a specific, logical and economically coherent theory of the causal linkage between the disclosures of the truth about WaMu, the resultant declines in the market prices of WaMu securities and the losses incurred by Plaintiffs and the Class. In short, Mr. Coffman's expert opinion establishes that loss causation has been adequately asserted in this action for purposes of this stage of the case.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 303

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

## XI.    PRESUMPTION OF RELIANCE

2    764.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of*

3    *Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are

4    predicated in part upon material omissions of fact that Defendants had a duty to disclose.

5    765.    In the alternative, Plaintiffs are entitled to a presumption of reliance on

6    Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market

7    doctrine because, at all relevant times, the market for WaMu securities was open, efficient and

8    well-developed for the following reasons, among others:

9

10    (b)    WaMu's common and preferred stock met the requirements for listing, and

11        were listed and actively traded on the NYSE, a highly efficient and

12        automated market;

13    (c)    The average daily trading volume for WaMu common stock during the

14        Class Period was 14,778,603 shares;

15

16    (d)    WaMu's debt securities, such as its notes and bonds, were actively traded

17        on multiple exchanges and the Over the Counter Market, all highly

18        efficient markets;

19    (e)    WaMu's securities, including its debt securities, were rated by Moody's,

20        Standard & Poor's and Fitch Ratings;

21

22    (f)    WaMu was followed by numerous securities analysts employed by firms

23        including Bear Stearns & Co. Inc.; Citigroup, Inc.; Credit Suisse; D.A.

24        Davidson & Co.; Fox-Pitt Kelton Cochran Caronia Waller; Freidman,

25        Billings, Ramsey & Co., Inc.; Lehman Brothers; Merrill Lynch, Pierce,

26        Fenner & Smith Inc.; Morningstar, Inc.; Punk Ziegel & Company; and

27

28

Keefe, Bruyette & Woods, among others, who wrote reports about the Company and the value of its securities that were publicly available and entered the public marketplace. Indeed, there was extensive securities analyst coverage of WaMu during the Class Period.

(g)     WaMu regularly communicated with public investors through established market communication mechanisms, including through regular press releases, which were carried by national and international news wires, and through other wide ranging public disclosures, such as communications and conferences with investors, the financial press and other similar reporting services.

(h)     As a public company, WaMu filed periodic public reports with the SEC;

(i)     WaMu met the SEC's requirements to register debt and equity securities filed on Form S-3 and, in fact, filed a Form S-3 in connection with the Offerings, among other SEC filings, as set forth in Section XIV, below;

(j)     There is substantial and regular pricing available for WaMu's securities. In addition to there being significant pricing data available for WaMu's debt securities that traded on exchanges, there is also substantial pricing date available for WaMu's debt securities that traded on the Over the Counter Market. Specifically, there is an average of greater than ten pricing sources for those securities that did not trade on any exchange.

766.     As a result of the foregoing, the market for WaMu securities promptly digested current information regarding WaMu from all publicly available sources and reflected such information in the price of WaMu's securities. Under these circumstances, purchasers of WaMu

securities during the Class Period suffered similar injury through their purchase of WaMu

securities at artificially inflated prices and a presumption of reliance applies.

## XII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

767.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false or misleading statements pleaded in

this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing

facts and conditions.  In addition, to the extent certain of the statements alleged to be false or

misleading may be characterized as forward-looking, they were not adequately identified as

forward-looking statements when made, and there were no meaningful cautionary statements

identifying important facts that could cause actual results to differ materially from those in the

purportedly forward-looking statements.  To the extent that the statutory safe harbor is intended

to apply to any forward-looking statements pleaded herein, WaMu and the Officer Defendants

are liable for those false forward-looking statements because at the time each of those forward-

looking statements was made, each of these Defendants had actual knowledge that the particular

forward-looking statement was materially false or misleading.  In addition, to the extent any of

the statements set forth above were accurate when made, they became inaccurate or misleading

because of subsequent events, and WaMu and the Officer Defendants failed to update those

statements which later became inaccurate.

## XIII.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

**For Violations of Section 10(b) of The Exchange Act and Rule 10b-5**
**(Against Defendants WaMu, Killinger, Casey, Cathcart, Rotella and Schneider)**

768.    Plaintiffs repeat and re-allege each and every allegation contained above as if

fully set forth herein.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 306

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

769.    During the Class Period, Defendants WaMu, Killinger, Casey, Cathcart, Rotella and Schneider disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

770.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of WaMu securities during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, these Defendants' public statements, including SEC filings, concerned, among other things, the Company's loan quality risk management appraisal policies and practices, underwriting policies and practices, understatements of the Company's loan loss provision and Allowance and overstatements of the Company's net income, earnings per share and assets.

771.    These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a severely

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 307

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, WaMu's financial results, including but not limited to WaMu's net income, earnings per share and assets, improper lending and accounting practices, deficient risk management, and inadequate loan loss provisions; (ii)  artificially inflate and maintain the market price of WaMu securities; and (iii) cause Plaintiffs and other members of the Class to purchase WaMu securities at artificially inflated prices.

772.    Defendant WaMu is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

i.        WaMu's press release of October 19, 2005;

ii.       WaMu's Form 10-Q, filed with the SEC on November 7, 2005;

iii.      WaMu's press release of January 18, 2006;

iv.      WaMu's Form 10-K, filed with the SEC on March 15, 2006;

v.       WaMu's press release of April 18, 2006;

vi.      WaMu's Form 10-Q, filed with the SEC on May 10, 2006

vii.     WaMu's press release of July 19, 2006;

viii.    WaMu's Form 10-Q, filed with the SEC on August 9, 2006;

ix.      WaMu's Form 10-Q/A, filed with the SEC on August 10, 2006;

x.       WaMu's Form 10-K/A, filed with the SEC on August 9, 2006;

xi.      WaMu's press release of October 18, 2006;

xii.     WaMu's Form 10-Q, filed with the SEC on November 9, 2006;

xiii.    WaMu's press release of January 17, 2007;

xiv.    WaMu's Form 10-K, filed with the SEC on March 1, 2007;

xv.     WaMu's press release of April 17, 2007;

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 308

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

xvi.     WaMu's Form 10-Q, filed with the SEC on May 10, 2007;

2

xvii.    WaMu's press release of July 18, 2007;

3

xviii.   WaMu's Form 10-Q, filed with the SEC on August 9, 2007;

4

xix.     WaMu's press release of October 5, 2007;

5

xx.      WaMu's press release of October 17, 2007;

6

xxi.     WaMu's press release of December 10, 2007;

7

xxii.    WaMu's press release of January 17, 2008;

8

xxiii.   WaMu's press release of April 8, 2008; and

9

xxiv.    WaMu's press release of July 14, 2008.

10     773.    WaMu is also liable for the false and misleading statements made in the

11  Registration Statement filed with the SEC on Form S-3AR on January 9, 2006; the prospectus

12  supplements dated August 21, 2006, and filed with the SEC on Forms 424B2 on August 21, 2006

13  and August 22, 2006, respectively, and on Form 424B5 on August 23, 2006; prospectus

14  supplements dated September 11, 2006, and filed with the SEC on Form 424B2 and Form 424B5

15  on September 11, 2006 and September 13, 2006, respectively; and prospectus supplements dated

16  October 25, 2007, and filed with the SEC on Form 424B2 and Form 424B5 on October 25, 2007

17  and October 29, 2007, respectively; and the prospectus supplements dated December 10, 2007

18  and December 11, 2007, and filed with the SEC on Form 424B5 on December 11, 2007 and

19  December 13, 2007.  These filings were materially false and misleading because, among other

20  reasons, they included materially misstated financial results and/or incorporated by reference

21  Forms 10-Q and Form 10-K that materially misstated WaMu's financial results.

22

23     774.    WaMu is further liable for the false and misleading statements made by WaMu

24  officers in press releases and during conference calls and at conferences with investors and

25

26

27

28

analysts, as alleged above, as the makers of such statements and under the principle of respondeat superior.

775.    Defendants Killinger, Casey, Cathcart, Rotella and Schneider, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Company, each of these Defendants was able to and did control the content of the public statements disseminated by WaMu.    These Defendants had direct involvement in the daily business of the Company and participated in the preparation and dissemination of the WaMu's false and misleading statements, as set forth in ¶771 above.

776.    In addition, Defendants Killinger, Casey, Cathcart, Rotella and Schneider are liable for, among other material omissions and false and misleading statements, the false and misleading statements they made and/or signed as follows:

Defendant Killinger:

i.    Defendant Killinger signed Forms 10-K (for the years ended December 31, 2005 through 2007); the Registration Statement filed with the SEC on Form S-3AR on January 9, 2006; and certifications in Forms 10-K and Forms 10-Q (for the quarter ended September 30, 2005 through the quarter ended March 30, 2008, including for the years ended December 31, 2005 through 2007).

ii.    Defendant Killinger made statements during numerous conference calls and conferences during the Class Period, including: the 3rd Quarter 2005 WaMu Earnings Conference Call (10/19/2005); the WaMu 2005 New York Investor Day (11/15/2005); the 4th Quarter 2005 WaMu Earnings

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 310

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Conference Call (1/18/2006); the1st Quarter 2006 WaMu Earnings Conference Call (4/18/2006); the Stanford C. Bernstein & Co. Strategic Decisions Conference (6/1/2006); the 2nd Quarter 2006 WaMu Earnings Conference Call (7/19/2006); WaMu's 2006 Investor Day (9/6/2006 and 9/7/2006); Lehman Brothers 4th Annual Conference (9/13/2006); the 3rd Quarter 2006 WaMu Earnings Conference Call (10/18/2006); the Merrill Lynch Banking & Financial Services Conference (11/16/2006); the Goldman Sachs Financial Services CEO Conference (12/13/2006); the 4th Quarter 2006 WaMu Earnings Conference Call (1/17/2007); the CitiGroup 2007 Financial Services Conference (1/30/2007); the 1st Quarter 2007 WaMu Earnings Conference Call (4/17/2007); Lehman Brothers 5th Annual Financial Services Conference (9/10/2007); the 3rd Quarter 2007 WaMu Earnings Conference Call (10/17/2007); WaMu's 2007 Annual Investor Day Conference (11/7/2007); and, the 4th Quarter 2007 WaMu Earnings Conference Call (1/17/2008).

iii.    Defendant Killinger made statements in and was directly responsible for other statements made in WaMu press releases filed with the SEC as Form 8-Ks, including on the following dates among others: 10/19/2005; 1/18/2006; 4/18/2006; 7/19/2006; 10/18/2006; 1/17/2007; 4/17/2007; 7/18/2007; 10/5/2007; 10/17/2007; 11/1/2007; 12/10/2007; 12/21/2007; 1/17/2008; and, 4/8/2008.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 311

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

Defendant Casey:

2    iv.    Defendant Casey signed Forms 10-K (for the years ended December 31,

3          2005 through 2007); the Registration Statement filed with the SEC on

4          Form S-3AR on January 9, 2006; and certifications in Forms 10-K and

5          Forms 10-Q (for the quarter ended September 30, 2005 through the quarter

6          ended Match 30, 2008, including for the years ended December 31, 2005

7          through 2007).

8

9    v.    Defendant Casey made numerous statements during conference calls and

10         conferences during the Class Period, including: the 4th Quarter 2005

11         WaMu Earnings Conference Call (1/16/2006); the 1st Quarter 2006 WaMu

12         Earnings Conference Call (4/18/2006); the 2006 WaMu Shareholder

13         Meeting (4/18/2006); the 2nd Quarter 2006 WaMu Earnings Conference

14         Call (7/19/2006); the 3rd Quarter 2006 WaMu Earnings Conference Call

15         (10/18/2006); the 1st Quarter 2007 WaMu Earnings Conference Call

16         (4/17/2007); the 3rd Quarter 2007 WaMu Earnings Conference Call

17         (10/17/2007);    WaMu's 2007 Annual Investor Day Conference

18         (11/7/2007); and, the 4th Quarter 2007 WaMu Earnings Conference Call

19         (1/17/2008).

20

21    Defendant Cathcart:

22    vi.    Defendant Cathcart made statements in and was directly responsible for

23         other statements made during conference calls and conferences with

24         investors and analysts, including from October 19, 2005 through April 29,

25

26

27

28

2008, and including WaMu's 2006 Investor Day (9/6/2006 and 9/7/2006) and WaMu's 2007 Annual Investor Day Conference (11/7/2007).

Defendant Rotella:

vii.    Defendant Rotella made statements in and was directly responsible for other statements made during conference calls and conferences with investors and analysts during the Class Period, including: the 4th Quarter 2005 WaMu Earnings Conference Call (1/18/2006); the D.A. Davidson & Co. Financial Services Conference (5/9/2006); WaMu's 2006 Investor Day (9/6/2006 and 9/7/2006); the 1st Quarter 2007 WaMu Earnings Conference Call (4/17/2007); WaMu's 2007 Annual Investor Day Conference (11/7/2007); and, the 4th Quarter 2007 WaMu Earnings Conference Call (1/17/2008).

Defendant Schneider:

viii.    Defendant Schneider made statements in and was directly responsible for other statements made during conference calls and conferences with investors and analysts during the Class Period, including the WaMu 2005 New York Investor Day (11/15/2005); WaMu's 2006 Investor Day (9/6/2006); and WaMu's 2007 Annual Investor Day Conference (11/7/2007).

777.    As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

778. Specifically, the above allegations establish a strong inference that these Defendants knew or should have known that WaMu's reported annual financial results for the years 2005 through 2007, as filed with the SEC in WaMu's Forms 10-K and other SEC filings, and its reported quarterly financial results for the quarters starting with the third quarter 2005 through the first quarter of 2008, and disseminated to the investing public, were materially misstated and were not presented in accordance with GAAP, and that WaMu did not have adequate internal controls, as represented to the public in, for example, the Form 10-K issued for the years-ended December 31, 2005, December 31, 2006 and December 31, 2007.

779. The allegations set forth above establish a strong inference that these Defendants acted with scienter in misrepresenting the quality of the Company's loans, lending and accounting practices, credit risk management and, consequently, the financial condition of the Company during the Class Period. The allegations pertaining to the overall extent and widespread nature of the fraud at WaMu, which resulted in the enormous loss exposure to the Company and material overstatements of net income, among other key measures, establish a strong inference that Defendants WaMu, Killinger, Casey, Cathcart, Rotella and Schneider acted with scienter in misrepresenting the Company's financial condition during the Class Period.

780. Plaintiffs and the Class have suffered damages in that they paid artificially inflated prices for WaMu securities. Plaintiffs and the Class would not have purchased WaMu securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

781. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of WaMu securities during the Class Period.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 314

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

**SECOND CLAIM FOR RELIEF**

**For Violations of Section 20(a) of The Exchange Act**
**(Against Defendants Killinger, Casey, Cathcart, Rotella, Schneider, Woods and Ballenger)**

782.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

783.    This Count is asserted against Defendants Killinger, Casey, Cathcart, Rotella, Schneider, Woods and Ballenger for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

784.    As alleged in detail above, WaMu committed a primary violation of the federal securities laws, through its knowing and/or reckless dissemination of materially false and misleading statements and omissions throughout the Class Period.

785.    During their tenures as officers and/or directors of WaMu, each of these Defendants was a controlling person of WaMu within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of WaMu, these Defendants had the power and authority to cause WaMu to engage in the wrongful conduct complained of herein.  As set forth in detail, above, the Defendants named in this Count were able to and did control, directly and indirectly, exert control over WaMu, including the content of the public statements made by WaMu during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

786.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Killinger, Casey, Cathcart, Rotella and Schneider had direct involvement in the day-to-day operations of the Company and in WaMu's financial reporting and accounting functions.  Each of these Defendants was also directly involved in providing false

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 315

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

information and certifying and/or approving the false financial statements disseminated by WaMu during the Class Period. Further, as detailed above, Defendants Killinger, Casey, Cathcart, Rotella and Schneider had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.

787.    Defendant Killinger served as WaMu's Chairman of the Board from 1991 until June 30, 2008. In addition, Defendant Killinger has served as WaMu's CEO since 1990 and as President from 1988 through 2004. In this dual capacity as the senior manager of the Company and as the head of the Board, Defendant Killinger had ultimate control over the actions of WaMu.

788.    According to WaMu's Forms 10-K for 2005 through 2007, Defendant Killinger "established the Executive Committee in 1990 to facilitate and coordinate decision making and communication among the most senior executive officers of the Company who, as a committee, determine the Company's strategic direction." Defendants Killinger, Casey, Rotella and Schneider participated as members of the Executive Committee throughout the Class Period. Defendant Cathcart was a member of the Committee from December 2005 until April 2008. As alleged in detail, in Sections VI and VII, above, these Defendants controlled and managed WaMu's policies, practices and overall business.

789.    Furthermore, Defendants Killinger, Casey, Cathcart, Rotella and Schneider all received various written and oral reports from different divisions of the Company on a routine basis. The Officer Defendants' knowledge of and participation in the Company's affairs through the various reports they received and/or had access to are described in Sections VI and VII, above.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 316

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

790.    Defendant Woods served as WaMu's Controller and principal accounting officer from December 2005 until March 2007.  Defendant Ballenger has served as the Company's Controller and principal accounting officer since March 2007.  In the position of Controller, Defendants Woods and Ballenger had direct involvement in the day-to-day operations of the Company and in WaMu's financial reporting and accounting functions.

791.    Confidential Witness 80 served as a Senior Vice President for WaMu's Accounting Policy group from June 2006 to November 2007.  In this position, CW 80 reported directly to Defendant Woods and then to Defendant Ballenger.  According to CW 80, Defendant Woods and Ballenger were responsible for reviewing and setting WaMu's accounting policies. In addition, according to CW 80, Defendants Woods and Ballenger participated in regular meetings with other senior WaMu managers (including Defendants Casey and Cathcart) concerning WaMu's accounting policies and practices, including WaMu's Allowance. Defendants Ballenger and Woods also controlled the contents of and had direct involvement in the presentation and/or manipulation of the false financial reports including within the Company's filings with the SEC.  This is evidenced by the fact that these Defendants signed many of the false financial statements at issue herein.  For example, Woods signed the Company's Form 10-Ks for the years ended December 31, 2005 and December 31, 2006 and Form 10-Qs for the quarters ended March 31, 2006, June 30, 2006 and September 2006. Similarly, Ballenger signed the Company's Form 10-K for the year ended December 31, 2007 and the Forms 10-Q for the quarters ended March 31, 2007, June 30, 2007 and September 30, 2007.  Thus, the Defendants Ballenger and Woods controlled the Company's accounting practices and were directly involved in the preparation and discrimination of the Company's financial results, including the materially false and misleading statements contained therein.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 317

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

792.   By reason of their positions as officers of WaMu, and more specifically as controlling officers – as can be seen by their corresponding ability to influence and control WaMu – each of these Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions, these Defendants had access to adverse non-public financial information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.  Moreover, each of the Defendants was also involved in providing false information and certifying and/or approving the false financial statements disseminated by WaMu during the Class Period.  Each of these Defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and ad the ability to prevent the issuance of the statements or cause the statements to be corrected.

793.   As set forth above, WaMu violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint.  By virtue of their positions as controlling persons of WaMu and as a result of their own aforementioned conduct, the Defendants named in this Count are liable pursuant to Section  20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired WaMu securities.  Moreover, as detailed above, during the respective times these Defendants served as officers of WaMu, each of these Defendants is culpable for the material misstatements and omissions made by WaMu, including such misstatements in the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 318

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Company press releases, Forms 10-K, Forms 10-Q, Offering Documents and Registration Statements.

794.    As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of WaMu securities.

## THIRD CLAIM FOR RELIEF

### For Violations of Section 20(a) of The Exchange Act
### (Against Audit Committee and Finance Committee Defendants)

795.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

796.    This Count is asserted against the Audit Committee and Finance Committee for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

797.    During their tenure as directors of WaMu, each of these Defendants was a controlling person of WaMu within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as directors and Finance Committee members and/or Audit Committee members of WaMu, these Defendants had the power and authority to cause WaMu to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by WaMu during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

798.    WaMu maintains both an Audit Committee and a Finance Committee, each composed of certain Board members, that reports to WaMu's full Board of Directors.  As detailed in Section IV above, at some time during the Class Period, Defendants Frank, Leppert, Lillis,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 319

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Matthews, Murphy, Reed and Smith (the "Audit Committee Defendants") each participated as a member of the Audit Committee.  As detailed in Section IV above, at some time during the Class Period, Defendants Farrell, Frank, Montoya, Murphy, Osmer-McQuade, Pugh, Reed and Smith (the "Finance Committee Defendants") each participated as a member of the Finance Committee.

799.    According to WaMu's Forms 10-K for 2006 and 2007, the "Board of Directors, assisted by the Audit and Finance Committees on certain delegated matters, oversees the Company's monitoring and controlling of significant risk exposures, including the Company's policies governing risk management."

800.    As set forth below, each of these Defendants had the power to control and/or influence the particular practices and conduct giving rise to the securities violations alleged herein, and exercised the same.  In their capacities as directors of WaMu, during their tenure these Defendants each signed certain of the Company's filings, including the Company's Forms 10-K for the years ended December 31, 2005 through December 31, 2006, the Offering Documents (as defined below in ¶816) and/or the Registration Statements (as defined below in ¶816), and therefore had the power and authority to control the statements made in such filings. As a result, these Defendants, as a group and individually, were controlling persons within the meaning of Section 20(a) of the Exchange Act.

## The Audit Committee

801.    According to WaMu's Proxy Statements for 2005 through 2008, the Audit Committee performed the following functions: (1) assisted with the oversight of the integrity of the Company's financial reporting process and financial statements and systems of internal controls; (2) assisted with the oversight of the Company's compliance with legal and regulatory requirements; (3) selected and retained the independent auditor, and reviewed its qualifications,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 320

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

independence and performance; (4) selected the general auditor, and assisted with the oversight of the performance of the Company's internal audit function; and, (5) approved and monitored the administration of policies addressing management of operational risk.

802.    According to the Audit Committee Charter available on the Company's website, the Audit Committee shall meet with management and the independent auditor to review and discuss the quarterly report on Form 10-Q and the annual report on Form 10K, including:

> the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations," the annual financial statements and the report of the independent auditor thereon, and significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; recommended adjustments arising from the audit; ***the adequacy of internal controls over financial reporting, including any special steps adopted in response to any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting*** identified during the course of the annual audit and the adequacy of disclosures about changes in internal controls over financial reporting; access to required information; the adequacy of the disclosure of off-balance sheet transactions, arrangements, ***obligations and relationships in reports filed with the SEC***; and the appropriateness of the presentation of any pro forma financial information included in any report filed with the SEC.

803.    In addition, the Audit Committee Charter states that with regard to legal compliance/enterprise risk, the Committee shall, among other things:

> Consult with the Company's chief legal officer and chief enterprise risk officer concerning legal and regulatory matters that may have a significant impact on the Company's financial statements, compliance policies or programs[.] . . .

> Have such meetings with management as the Committee deems appropriate to discuss significant risk exposures facing the Company and to discuss the steps that management has taken to monitor and control such exposures, including the Company's guidelines and policies governing risk assessment and risk management.

804.    According to WaMu's Forms 10-K for 2005 through 2007, the Audit Committee also approves the Operational Risk Management Policy which "establishes the Company's operational risk framework and defines the roles and responsibilities for the management of operational risk."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 321

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

805.    As a result of their positions as Audit Committee members, over and above their positions as Board members, each of the Audit Committee Defendants is liable as a control person of WaMu within the meaning of Section 20(a) of the Exchange Act.

## The Finance Committee

806.    According to WaMu's Proxy Statements for 2005 through 2008, the Finance Committee performed the following functions: (1) monitored investments and dispositions of loans and financial instruments, and significant purchases and dispositions of real property acquired by the Company (excluding the Company's premises or other real property acquired for use by the Company); (2) approved and monitored the administration of policies addressing the Company's allocation of capital and the Company's management of market and credit risk; (3) monitored the development and implementation of strategies that guide the Company's financial management activities; and, (4) reviewed and made recommendations with respect to the payment of dividends, the issuance and repurchase of equity, and the issuance and retirement of debt.

807.    WaMu's Finance Committee Charter, available on the Company's website, further describes the duties of the Committee as including among other things, the duty to:

> Monitor the development and implementation of strategies that guide the Company's financial management activities, including capital, funds, liquidity, interest rate risk and credit risk management[.] . . .

> Monitor aspects of financial activities of the Company's key subsidiaries that are material to the Company's business and its return on its investment in these subsidiaries.

808.    WaMu's Forms 10-K for 2005 through 2007 state that the Finance Committee has oversight over the framework for the Company's credit risk management activities.  In fact, in its 2006 Form 10-K WaMu states that "[i]n 2006, the Finance Committee…approved a set of credit

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 322

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

risk concentration limits." In addition, the Finance Committee oversees the administration of the Company policy on asset/liability management.

809. According to a March 27, 2008 shareholder letter by the CtW Investment Group ("CtW"), CtW met with members of the WaMu Board and senior management in early 2008 prior to the Company's April 15 Annual Meeting. CtW states that Company representatives:

> pointed out that Finance Committee meetings had been restructured in 2005 to increase focus on matters of significant concern and reduce time devoted to routine matters; *that the Committee had been receiving reports on the housing market regularly since 2005*; that management had incorporated an assumption of zero house price appreciation for 2006 and 2007; *and that the Committee had heard from outside experts, such as BlackRock, Standard & Poors, and Goldman Sachs, on various matters, including mortgage servicing rights and credit losses*.

810. In response to the CtW letter, WaMu filed a Schedule 14A on April 3, 2008 stating that "*our entire board are and have been actively engaged in formulating and overseeing management's implementation of risk management policies*." In addition, the Company outlined the steps it had taken to mitigate risk since 2004, including increased diversification into retail banking and credit card business, the selling of subprime mortgage channel volume and Option ARM home loans, the selling of mortgage servicing rights and "tightening subprime underwriting standards...."

811. As a result of their positions as Finance Committee members, over and above their positions as Board members, each of the Finance Committee Defendants is liable as a control person of WaMu within the meaning of Section 20(a) of the Exchange Act.

812. By reason of their positions as directors of WaMu, and more specifically as members of the Audit Committee and/or the Finance Committee, each of the Audit Committee and Finance Committee is a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to direct the management and activities of the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 323

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions, these Defendants had access to adverse non-public financial information about the Company including, among others things, its risk management and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

813.    As set forth above, WaMu violated Section 10(b) of the Exchange Act by its acts and omissions alleged in this Complaint. By virtue of their positions as controlling persons of WaMu and as a result of their own aforementioned conduct, the Audit Committee and Finance Committee are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class who purchased or otherwise acquired WaMu securities. Moreover, as detailed above, during the respective times these Defendants served as directors of WaMu, each of these Defendants is culpable for the material misstatements and omissions made by WaMu, including such misstatements in the Company press releases, Forms 10-K, Forms 10-Q, the Offering Documents and Registration Statement.

814.    As a direct and proximate result of these Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of WaMu securities.

## XIV.    CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

815.    In the allegations and claims set forth in this part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶51 above, except that Plaintiffs explicitly disclaim subpart [g] of ¶56 from

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 324

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

these Securities Act allegations).    Plaintiffs' Securities Act claims are not based on any allegations of knowing or reckless misconduct on behalf of the Defendants named in the Fourth through Sixth Claims for Relief.  Plaintiffs' Securities Act claims do not allege, and do not sound in, fraud, and Plaintiffs specifically disclaim any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act.  To avoid an (unfounded) argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize facts also stated above.

816.    This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years after each of the four offerings described herein.

817.    Specifically, the Securities Act Defendants (set forth below) conducted four securities offerings on behalf of WaMu during the Class Period (referred to collectively as the "Offerings"), through which the Company raised approximately **$4.8 billion**.  The Offerings were conducted pursuant to a prospectus and shelf registration statement, filed with the SEC on Form S-3AR on January 9, 2006 (the "Registration Statement").  As set forth in the Registration Statement, the Company could issue debt securities, preferred stock, and depositary shares through the issuance of a prospectus supplement without filing a new registration statement for each offering.  The Offerings at issue are as follows:

- The August 2006 Offering:  On or about August 24, 2006, WaMu conducted a public offering of approximately **$900 million** of notes, including $500 million of floating rate notes due August 24, 2009 (the "Floating Rate Notes") and $400 million 5.50% notes due August 24, 2011 (the "5.50% Notes"). The August 2006

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 325

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Offering was marketed and sold to the public through the materially false Registration Statement and prospectus supplements dated August 21, 2006, and filed with the SEC on Forms 424B2 on August 21, 2006 and August 22, 2006, respectively, and on Form 424B5 on August 23, 2006 (the "August 2006 Prospectus," together with the Registration Statement, the "August 2006 Offering Documents"). In connection with this Offering, WaMu raised approximately $897.85 million before expenses.

- <u>The September 2006 Offering</u>: On or about September 18, 2006, WaMu conducted a public offering of 20,000,000 depositary shares, with each depositary share representing $1/40,000^{th}$ interest in a share of Series K perpetual non-cumulative floating rate preferred stock (defined above as the "Series K Stock") for a maximum aggregate offering price of **$500 million**. The September 2006 Offering was marketed and sold to the public through the materially false Registration Statement and prospectus supplements dated September 11, 2006, and filed with the SEC on Form 424B2 and Form 424B5 on September 11, 2006 and September 13, 2006, respectively, (the "September 2006 Prospectus," together with the Registration Statement, the "September 2006 Offering Documents"). The Series K Stock is listed on the NYSE under the symbol "Wm PrK." In connection with this public Offering, WaMu raised approximately $495.5 million before expenses.

- <u>The October 2007 Offering</u>: On or about October 25, 2007, WaMu announced a public offering of **$500 million** of 7.250% subordinated notes due November 1, 2017 (defined above as the "7.250% Notes"). The October 2007 Offering was

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 326

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

marketed and sold to the public through the materially false Registration Statement and prospectus supplements dated October 25, 2007, and filed with the SEC on Form 424B2 and Form 424B5 on October 25, 2007 and October 29, 2007, respectively, (the "October 2007 Prospectus," together with the Registration Statement, the "October 2007 Offering Documents"). In connection with this Offering, WaMu raised approximately $494.39 million before expenses.

- The December 2007 Offering:   On or about December 17, 2007, WaMu conducted a public offering of 3,000,000 shares of 7.75% Series R Non-Cumulative Perpetual Convertible Preferred Stock (the "Series R Stock"), for a maximum aggregate offering amount of *$3.0 billion*. The December 2007 Offering was marketed and sold to the public through the materially false Registration Statement and prospectus supplements dated December 10, 2007 and December 11, 2007, and filed with the SEC on Form 424B5 on December 11, 2007 and December 13, 2007 (the "December 2007 Prospectus," together with the Registration Statement, the "December 2007 Offering Documents"). The Series R Stock is listed on the NYSE under the symbol "Wm PrR." In connection with this Offering, WaMu raised approximately $2.9 billion after expenses.

The Registration Statement, the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents, and the December 2007 Offering Documents are collectively referred to herein as the "Offering Documents."

818.   As discussed in more detail below, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 327

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

### A.    Securities Act Defendants

819.    The Securities Act claims are asserted against the Company, all signatories to the Offering Documents, all members of WaMu's Board of Directors at the time of the filing of the materially untrue Offering Documents, the Underwriter Defendants (defined below), Deloitte & Touche LLP ("Deloitte"), WaMu's outside auditor during the Class Period, and those officers who were controlling persons of WaMu.    Each of these Defendants is statutorily liable under Sections 11, 12 and/or 15 of the Securities Act for the materially untrue statements contained in WaMu's Offering Documents, including WaMu's materially false and misleading financial statements incorporated therein.

### 1.    The Washington Mutual Defendants

820.    <u>Washington Mutual</u>:  As set forth above in ¶¶15-20, at all relevant times hereto, WaMu had four primary operating segments: the Home Loans Group, the Retail Banking Group, the Card Services Group and the Commercial Group.    The functions and operations of the Company's Home Loans and Retail Banking Groups are explained above at ¶¶17-19.    WaMu was the issuer of the Floating Rate Notes, the 5.50% Notes, the Series K Stock, the 7.250% Notes, and the Series R Stock offered pursuant to the Offerings.

821.    <u>Kerry K. Killinger</u>:  As set forth above in ¶21, Killinger has served as the Company's Chief Executive Officer since 1990 and as a member of the Company's Board since 1998, including as Chairman of the Board from 1991 until June 30, 2008.    Killinger signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.    Killinger was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents, and the December 2007 Offering Documents.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 328

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

822.   <u>Thomas W. Casey</u>:  As set forth above in ¶22, Casey has served as Executive Vice President and Chief Financial Officer of WaMu since October 2002.  Casey signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.

823.   <u>John F. Woods</u>:  As set forth above in ¶27, Woods served as Senior Vice President and Controller for Washington Mutual from December 2005 until mid-2007.  Woods signed the Company's Registration Statement, which was then incorporated into each of the Offering Documents.

824.   <u>Melissa J. Ballenger</u>:  As set forth above in ¶28, Ballenger served as Senior Vice President and Assistant Controller and later as Controller at WaMu.  Ballenger signed the Company's Forms 10-Q for the quarters ended March 31, 2007 and June 30, 2007 which were incorporated by reference into the October 2007 Offering Documents and the December 2007 Offering Documents.  Ballenger also signed the Company's Form 10-Q for the quarter ended September 30, 2007 which was incorporated into the December 2007 Offering Documents.

825.   <u>Anne V. Farrell</u>:  As set forth above in ¶30, Farrell served as a director of the Company from 1994 through April 2008.  Farrell signed the Company's Registration Statement which was then incorporated into each of the Offering Documents.  Farrell was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

826.   <u>Stephen E. Frank</u>:  As set forth above in ¶31, Frank has served as a director of Company since 1997, and since July 1, 2008, Chairman the Board.  Frank signed the Company's Registration Statement which was then incorporated into each of the Offering

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 329

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Documents.  Frank was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

827.   <u>Thomas C. Leppert</u>:  As set forth above in ¶32, Leppert has served as a director of the Company since September 2005.  Leppert signed the Company's Registration Statement which was then incorporated into each of the Offering Documents.  Leppert was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

828.   <u>Charles M. Lillis</u>:  As set forth above in ¶33, Lillis has served as a director of the Company since June 2005.  Lillis signed the Company's Registration Statement which was then incorporated into each of the Offering Documents.  Lillis was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

829.   <u>Phillip D. Matthews</u>:  As set forth above in ¶34, Matthews has served as a director of the Company since 1998.  Matthews signed the Company's Registration Statement which was then incorporated into each of the Offering Documents.  Matthews was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

830.   <u>Regina Montoya</u>:  As set forth above in ¶35, Montoya has served as a director of the Company since April 2006.  Montoya was a member of the Board at the time of the filing of the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 330

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

the December 2007 Prospectus. Montoya also signed the Company's Form 10-K for the year ended December 31, 2006, which was expressly incorporated by reference into the October 2007 Offering Documents and the December 2007 Offering Documents.

831.    <u>Michael K. Murphy</u>:  As set forth above in ¶36, Murphy has served as a director of the Company since 1985. Murphy signed the Company's Registration Statement which was then incorporated into each of the Offering Documents. Murphy was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

832.    <u>Margaret Osmer-McQuade</u>:    As set forth above in ¶37, Osmer-McQuade has served as a director of the Company since 2002. Osmer-McQuade signed the Company's Registration Statement which was then incorporated into each of the Offering Documents. Osmer-McQuade was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

833.    <u>Mary E. Pugh</u>:  As set forth above in ¶38, Pugh served as a director of WaMu from 1999 until April 2008. Pugh signed the Company's Registration Statement which was then incorporated into each of the Offering Documents. Pugh was also a member of the Board at the time of the filing of the August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

834.    <u>William G. Reed, Jr.</u>:  As set forth above in ¶39, Reed has served as a director of the Company since 1970. Reed signed the Company's Registration Statement which was then incorporated into each of the Offering Documents. Reed was also a member of the Board at the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 331

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   time of the filing of the August 2006 Offering Documents, the September 2006 Offering

2   Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

3       835.   <u>Orin C. Smith</u>:  As set forth above in ¶40, Smith has served as a director of the

4   Company since July 2005.  Smith signed the Company's Registration Statement which was then

5   incorporated into each of the Offering Documents.  Reed was also a member of the Board at the

6   time of the filing of the August 2006 Offering Documents, the September 2006 Offering

7   Documents, the October 2007 Offering Documents and the December 2007 Offering Documents.

8       836.   <u>James H. Stever</u>:   Stever has served as a director of the Company since 1991.

9   Stever signed the Company's Registration Statement, which was then incorporated into each of

10  the Offering Documents.  Stever was also a member of the Board at the time of the filing of the

11  August 2006 Offering Documents, the September 2006 Offering Documents, the October 2007

12  Offering Documents and the December 2007 Offering Documents.

13      837.   <u>Willis B. Wood, Jr.</u>:  Wood served as a director of the Company from 1997

14  through April of 2006.  Wood signed the Company's Registration Statement, which was then

15  incorporated into each of the Offering Documents.  Willis also signed the 2005 Form 10-K,

16  which was incorporated into the August Offering Documents and the September Offering

17  Documents.

18                          **2.      The Auditor Defendant**

19      838.   Deloitte has served as WaMu's outside auditor since at least 1997.  Deloitte issued

20  unqualified opinions on the Company's financial statements and management's assessment of

21  internal controls throughout the Class Period and, of particular relevance to the Securities Act

22  claims, for the full years 2005 and 2006.  On January 3, 2006, Deloitte consented to the

23  incorporation by reference in the Registration Statement of its auditor report dated March 7, 2005

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 332

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

relating to WaMu's consolidated financial statements for the year ended December 31, 2004. Moreover, Deloitte consented to the incorporation by reference into the August 2006 Prospectus and the September 2006 Prospectus of its unqualified auditor's report, dated March 8, 2006, for the year ended December 31, 2005. Specifically, under the caption "Experts" in each of these Prospectuses, WaMu stated that the financial statements set forth in the 2005 Form 10-K were "incorporated herein by reference, and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing." Similarly, Deloitte consented to the incorporation by reference into the October 2007 Prospectus and the December 2007 Prospectus of its unqualified auditor's report, dated February 26, 2007, for the year ended December 31, 2006. In each of these Prospectuses, WaMu stated that the financial statements set forth in the 2006 Form 10-K were "incorporated herein by reference, and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing." Deloitte maintains its national headquarters at 1633 Broadway, New York, New York 10019.

### 3.    The Underwriter Defendants

839.    <u>Goldman, Sachs & Co.</u> ("Goldman Sachs") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering, underwriter and joint bookrunner for the September 2006 Offering, and underwriter and joint book-running manager for the December 2007 Offering. Pursuant to the Offering Documents, Goldman Sachs sold and distributed $176 million of the 5.50% Notes, $220 million of the Floating Rate Notes, 3,700,000 shares of the Series K Stock, and 300,000 shares of the Series R Stock to the investing public. Goldman Sachs was paid at least $10.2 million for its underwriting services in connection with

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 333

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

the Offerings. Goldman Sachs' headquarters are located at 85 Broad Street, New York, New York 10004.

840. <u>Morgan Stanley & Co. Incorporated</u> ("Morgan Stanley") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering, underwriter and joint bookrunner for the September 2006 Offering, underwriter and joint book-running manager for the October 2007 Offering, and underwriter and joint book-running manager for the December 2007 Offering. Pursuant to the Offering Documents, Morgan Stanley sold and distributed $176 million of the 5.50% notes, $220 million of the Floating Rate Notes, $112.5 million of the Notes, 3,700,000 shares of the Series K Stock, and 990,000 shares of the Series R Stock to the investing public. Morgan Stanley was paid at least $31.2 million for its underwriting services in connection with the Offerings. Morgan Stanley's headquarters are located at 1585 Broadway, New York, New York 10036.

841. <u>Credit Suisse Securities (USA) LLC</u> ("Credit Suisse") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering, underwriter and co-manager for the September 2006 Offering, underwriter and joint book-running manager for the October 2007 Offering, and underwriter and joint book-running manager for the December 2007 Offering. Pursuant to the Offering Documents, Credit Suisse sold and distributed $16 million of the 5.50% Notes, $20 million of the Floating Rate Notes, $112.5 million of the 7.250% Notes, 500,000 shares of the Series K Stock, and 300,000 shares of the Series R Stock to the investing public. Credit Suisse was paid at least $9.4 million for its underwriting services in connection with the Offerings. Credit Suisse's headquarters are located at 11 Madison Avenue, New York, New York 10010.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 334

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

842.  <u>Deutsche Bank Securities Inc</u>. ("Deutsche Bank") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Deutsche Bank sold and distributed $16 million of the 5.50% Notes, $20 million of the Floating Rate Notes, and 60,000 shares of the Series R Stock to the investing public.  Deutsche Bank was paid at least $1.8 million for its underwriting services in connection with the Offerings.  Deutsche Bank's United States headquarters are located at 60 Wall Street, New York, New York 10005.

843.  <u>Lehman Brothers Inc.</u> ("Lehman Brothers") is an investment bank and acted as underwriter and joint book-running manager for the August 2006 Offering, underwriter and joint bookrunner for the September 2006 Offering, underwriter and joint book-running manager for the October 2007 Offering, and underwriter and joint book-running manager for the December 2007 Offering.  Pursuant to the Offering Documents, Lehman Brothers sold and distributed $16 million of the 5.50% Notes, $20 million of the Floating Rate Notes, $112.5 million of the 7.250% Notes, 3,700,000 shares of the  Series K Stock, and 990,000 shares of the Series R Stock to the investing public.  Lehman Brothers was paid at least $30.8 million for its underwriting services in connection with the Offerings.  Lehman Brothers' headquarters are located at 745 Seventh Avenue, New York, New York 10019.

844.  <u>UBS Securities LLC</u> ("UBS") is an investment bank and acted as underwriter, sole structuring advisor and joint bookrunner for the September 2006 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, UBS sold and distributed 7,400,000 shares of the Series K Stock and 60,000 shares of the Series R Stock to the investing public.  UBS was paid at least $3.2 million for its underwriting services in connection with the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 335

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Offerings.  UBS' United States headquarters are located at 677 Washington Boulevard, Stamford, Connecticut 06901.

845.  <u>Banc of America Securities LLC</u> ("Banc of America") is an investment bank and acted as underwriter and co-manager for the September 2006 Offering.  Pursuant to the Offering Documents, Banc of America sold and distributed 500,000 shares of the Series K Stock to the investing public.  Banc of America was paid at least $100,000 for its underwriting services in connection with the September 2006 Offering.  Banc of America's headquarters are located at 9 West 57th Street, New York, New York 10019.

846.  <u>J.P. Morgan Securities Inc.</u> ("J.P. Morgan") is an investment bank and acted as underwriter and co-manager for the September 2006 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, J.P. Morgan sold and distributed 500,000 shares of the Series K Stock and 60,000 shares of the Series R Stock to the investing public.  J.P. Morgan was paid at least $1.9 million for its underwriting services in connection with the Offerings.  J.P. Morgan's headquarters are located at 270 Park Avenue, New York, New York 10017.

847.  <u>Barclays Capital Inc.</u> ("Barclays") is an investment bank and acted as underwriter and joint book-running manager for the October 2007 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Barclays sold and distributed $112.5 million of the 7.250% Notes and 60,000 shares of the Series R Stock to the investing public.  Barclays was paid at least $2.1 million for its underwriting services in connection with the October 2007 Offering.  Barclays' United States headquarters are located at 200 Park Avenue, New York, New York 10166.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 336

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

848.  <u>Keefe, Bruyette & Woods, Inc.</u> ("Keefe, Bruyette") is an investment bank and acted as underwriter and co-manager for the October 2007 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Keefe, Bruyette sold and distributed $25 million of the 7.250% Notes of Washington Mutual and 12,000 shares of the Series R Stock to the investing public.  Keefe, Bruyette was paid at least $435,000 for its underwriting services in connection with the Offerings.  Keefe, Bruyette's headquarters are located at 787 7th Avenue, New York, New York 10019.

849.  <u>Cabrera Capital Markets</u>, LLC ("Cabrera Capital") is an investment bank and acted as underwriter and co-manager for the October 2007 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Cabrera Capital sold and distributed $12.5 million of the 7.250% Notes and 12,000 shares of the Series R Stock to the investing public.  Cabrera Capital was paid at least $397,500 for its underwriting services in connection with the Offerings.  Cabrera Capital's headquarters are located at 10 South La Salle Street, Suite 1050, Chicago, Illinois 60603.

850.  <u>The Williams Capital Group, L.P.</u> ("Williams Capital") is an investment bank and acted as underwriter and co-manager for the October 2007 Offering and underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Williams Capital sold and distributed $12.5 million of the 7.250% Notes and 12,000 shares of the Series R Stock to the investing public.  Williams Capital was paid at least $397,500 for its underwriting services in connection with the Offerings.  Williams Capital's headquarters are located at 650 Fifth Avenue, 11th Floor, New York, New York 100019.

851.  <u>Citigroup Global Markets, Inc.</u> ("Citigroup") is an investment bank and acted as underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Citigroup

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 337

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

sold and distributed 60,000 shares of the Series R Stock to the investing public.  Citigroup was paid at least $1.8 million for its underwriting services in connection with the December 2007 Offering.  Citigroup's headquarters are located at 388 Greenwich St., New York, NY 10013.

852.    Greenwich Capital Markets, Inc. ("Greenwich"), also referred to as RBS Greenwich Capital in the December 2007 Offering Documents, acted as an underwriter for the December 2007 Offering.  Greenwich sold and distributed 60,000 shares of the Series R Stock to the investing public.  Greenwich was paid at least $1.8 million for its underwriting services in connection with the December 2007 Offering.  Greenwich's headquarters are located at 1101 30th Street, NW, Suite 500, Washington, DC 20007.

853.    BNY Capital Markets, Inc. ("BNY") is an investment bank and acted as underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, BNY sold and distributed 12,000 shares of the Series R Stock to the investing public.  BNY was paid at least $1.8 million for its underwriting services in connection with the December 2007 Offering.  BNY's headquarters are located at One Wall Street, 18th Floor, New York, NY 10286.

854.    Samuel A. Ramirez & Company, Inc. ("Ramirez & Co.") is an investment bank and acted as underwriter for the December 2007 Offering.  Pursuant to the Offering Documents, Ramirez & Co. sold and distributed 12,000 shares of the Series R Stock to the investing public.  Ramirez & Co. was paid at least $360,000 for its underwriting services in connection with the December 2007 Offering.  Ramirez & Co.'s headquarters are located at 61 Broadway, 29th Floor, New York, N.Y. 10006.

### B.    Background

855.    WaMu provided financing to homeowners in the form of home mortgages and "second-lien" products such as home equity loans and home equity lines of credit.  These loans

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 338

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

were either held by WaMu for investment ("in portfolio") or sold to investors in whole loan sales or securitizations.

856.     The quality of the loans originated by WaMu, and in particular the risk level of WaMu's loans, was crucial to determining, among other things, the value of the loans on the Company's balance sheet and the extent of the loss exposure facing the Company for such loans. The Company was required under generally accepted accounting principles (defined above as "GAAP") to evaluate on a regular basis the quality of the loans in its portfolio as part of the financial statement preparation process.  If the Company determined that the loans were impaired for any reason, including because of credit risk, it was required to increase, or "provision," its Allowance for Loan and Lease Losses (defined above as the "Allowance") as a reserve against incurred and probable future losses inherent in the Company's loans held in portfolio.  However, as set forth below, WaMu failed to properly provision against the Company's incurred and probable losses because it did not take into account the Company's ineffective risk management, unreliable appraisal practices, high-risk loan products, and deteriorating underwriting practices.

857.     Indeed, in 2005, the Company embarked on a systemic change in practices and policies whereby WaMu emphasized growing loan volume (and thus profits) over loan quality and balanced, prudent growth.  This change was manifested in several ways, including: (1) relegating the Company's risk management efforts to focus on supporting the loan production staff, rather than acting as a gatekeeper for loan quality and a protector against loan losses; (2) forcing both in-house and third-party appraisers to inflate appraisal values; (3) originating greater volumes of exotic and high-risk loans and; (4) loosening the Company's underwriting standards. As explained below in greater detail, each of these actions was taken to allow WaMu to close ever-greater volumes of loans and to make the Company appear more profitable than it was.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 339

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

858.    As a result of WaMu's drive towards growth, the risks inherent the Company's loan portfolio were dramatically heightened.  However, as discussed below, the Company did not provision the Allowance at the levels necessary to match these heightened risks.  This failure resulted in the Company's financial statements being materially misstated.  In particular, since provisions for the Company's Allowance reduce the Company's pre-tax income on a dollar-for-dollar basis, the Company's failure to properly provision its Allowance caused the Company's net income and earnings per share to be overstated.  As set forth below, the misstatement of these financial results was material.

### 1.    WaMu Curbs Risk Management Efforts in Furtherance of Increasing Loan Volume

859.    Effective risk management efforts were necessary to ensure that the Company originated loans that were not susceptible to a high degree of losses.  However, the Company relegated its risk management personnel to a secondary "support" role to loan production, rather than as a primary safeguard against unsafe lending that would cause the Company to incur greater losses.  By doing so, WaMu removed controls against extremely risky lending practices.  Moreover, rather than have risk management personnel report directly to the Board of Directors or an independent executive officer, WaMu placed Defendant Schneider in charge of **both** the Company's Home Loans' risk management operations and the Company's Home Loans' lending operations (*i.e.*, sales).

860.    Additionally, the Company's ineffective risk management approach allowed management to misuse the Loan Performance Risk Model (defined above as the "LPRM"), the key model used by the Company to predict losses, and thus provided the main input as to the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 340

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  appropriate manner in which to provision the Allowance. The LPRM used by WaMu during the

2  Class Period failed to accurately predict losses in at least two important ways.

3      861.   First, as indicated by an internal report entitled "Corporate Risk Oversight Report:

4  Allowance of Loan & Lease Losses Methodology of Washington Mutual Bank" (defined above

5  as the "CRO Report") and dated September 2005, the LPRM did not appropriately analyze for

6  risk of losses in the Company's Option ARM loans, or other loans with the potential for

7  "negative amortization." By way of background, WaMu's Option ARM loans allowed the

8  borrower to choose to pay less than the total accrued interest and principal on a loan each month.

9  If the borrower chose a lesser payment, then the difference between the lesser payment and the

10 total due would be added to the principal balance of the loan, thus "negatively amortizing." This

11 had a material impact on the Company's evaluation of risk for losses on its loans, because Option

12 ARM loans comprised over half the Company's prime loan portfolio, and, due to the optional

13 payment structure, were high-risk loan products.

14     862.   Second, according to Confidential Witness 78, as of summer 2007, the LPRM had

15 not been calibrated to reflect actual loan performance data for over *eighteen months*. This had

16 the material effect that, in modeling for losses on its loans, the Company was not taking into

17 account the actual deterioration that the Company's loan portfolio experienced over the course of

18 2006 and 2007, which, as a result of the Company's appraisal and underwriting practices, was

19 significant during this time.

### 2.   The Company Caused Appraisal Values for its Loans to be Inflated

20     863.   Beginning in 2005, the Company pressured its in-house appraisers to inflate the

21 home loan values for loan applications submitted to the Company. In mid-2006, the Company

22 started outsourcing its appraisals to two supposedly independent third-party appraisal companies,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 341

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

First American Corporation through its subsidiary, eAppraiseIT, and Lenders Services Inc. (defined above as "LSI"). Despite this change to using third-party appraisers, the Company continued to exert pressure to inflate appraisal values.

864.    These inflated appraisals allowed the Company to claim lower loan-to-value (defined above as "LTV") ratios; *i.e.*, the loan amount was lower relative to the appraised value of the collateral for the loan. This also had the effect of creating the illusion that the homeowner's equity in the collateral was greater. Generally, the greater the homeowner's equity, the lower the risk associated with that loan. Conversely, the lower the homeowner's equity, the higher the risk associated with that loan. Thus, the value of the appraisal in the loan file is critical to determining the LTV ratio and the associated risk of default in the loan.

865.    In its Form 10-K for 2006 and, in substantially similar language in its Form 10-K for 2005, WaMu acknowledged that the lower the equity a homeowner has in his or her home, the greater the risk of the borrower:

> Home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent also expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of risk is higher when borrowers have less equity in their homes.

866.    WaMu also acknowledged that it used LTV ratios to determine the default risk of loans held in portfolio. Because loans with high LTV ratios carry a greater risk of nonperformance, the Company must provision at higher rates for the Allowance.

867.    Former WaMu and eAppraiseIT employees confirm WaMu's improper appraisal practices. Indeed, as former appraisers of WaMu have reported, inflation of appraisal values was commonplace at WaMu beginning in 2005. CW 24, a former WaMu employee who spent four years working as a Senior Appraisal Coordinator, recalled that starting in 2005, WaMu began to

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 342

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

significantly increase pressure on appraisers to exaggerate appraisal values. Specifically, as a Senior Appraisal Coordinator, CW 24 served as a liaison between WaMu loan officer/brokers (*i.e.*, loan production staff) and WaMu appraisers and, in this position, received regular complaints from both in-house and outside appraisers about WaMu requiring "a certain value" to make loans "work." Indeed, CW 24 explained that the push by WaMu to inflate appraisals was a constant problem throughout the Class Period.

868.    Similarly, CW 25, who was a loan consultant at Washington Mutual Home Loans in Maryland from September 2003 until November 2005, recalled that when a WaMu loan officer brought in a loan application, typically the WaMu loan officer was able to request a specific appraiser. CW 25 explained that in the event that a loan officer was provided an appraisal value that the loan officer found unacceptable, the loan officer could request a "reconsideration of value" (defined above as "ROV") in which the loan officer could provide a different set of comparables to a WaMu "master appraiser" to reevaluate the loan. CW 25 stated that WaMu loan officers regularly put a great deal of pressure on the loan coordinators and demanded that initial appraisal values be reevaluated if unacceptable to them.

869.    CW 25 recalled that, at WaMu, in-house appraisers received kickbacks from loan consultants to "hit" value on appraisals. Despite CW 25's complaints to management about the appraisal process at WaMu, WaMu management did nothing to change the situation. Indeed, CW 25's job was threatened on many occasions in response to CW 25's complaints of appraisal corruption.

870.    CW 31 who was a contract appraiser with eAppraiseIT after leaving WaMu as an in-house appraiser, also confirmed that WaMu pressured appraisers to inflate appraisal values. Specifically, CW 31 stated that WaMu dictated appraisal values that it needed to satisfy the LTV

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 343

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

ratios it desired.  CW 31 explained that WaMu pressured the third-party appraisers by (i) badgering them to meet the Company's desired appraisal values, and (ii) ceasing to hire appraisers who did not bring in the inflated appraisal value that WaMu desired.

871.    WaMu's improper appraisal practices have been further confirmed by New York State Attorney General Andrew Cuomo.  Specifically, on November 1, 2007, Attorney General Cuomo filed a complaint against First American Corporation and eAppraiseIT (defined above as the "NYAG Complaint"), which details how WaMu pressured appraisers to inflate appraisal values.  The NYAG Complaint was filed after "investigators had spent nine months interviewing hundreds of mortgage industry executives and poring over millions of documents obtained through subpoenas," according to a November 2, 2007 *New York Times* article.

872.    Indeed, the NYAG Complaint alleges, on the basis of numerous internal emails, including emails between WaMu and eAppraiseIT, that WaMu executives pressured eAppraiseIT to increase the appraised value of homes and that eAppraiseIT improperly allowed WaMu's loan production staff to hand-pick appraisers who brought in appraisal values high enough to permit WaMu's loans to close.  Additionally, the NYAG Complaint alleges that WaMu repeatedly pressured eAppraiseIT appraisers to change appraisal values that were too low to permit loans to close.

873.    As with eAppraiseIT, WaMu also inflated appraisal values through LSI another purportedly independent appraisal service company.  For example, according to CW 39, a member of LSI's appraisal team management for WaMu from August 2006 through February 2007, LSI was forced to give priority to appraisers from a WaMu "preferred appraisal" list for its appraisals.  CW 39, recalled that WaMu often pressured LSI appraisers to raise appraisal values

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 344

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

by frequently submitting ROVs by contacting appraisers directly, and by WaMu loan officers requesting to work with specific appraisers because "they knew each other."

874.  According to CW 39, the practice of WaMu loan officers contacting LSI appraisers directly, which CW 39 described as "illegal," occurred frequently.  CW 39 also believed that WaMu's efforts to dictate which specific LSI appraisers should be used for WaMu loans was "illegal."  According to CW 39, LSI acknowledged the impropriety of the practice, but re-construed it as a "recommendation" from WaMu.

875.  Indeed, WaMu's appraisal practices were inconsistent with Federal Regulations and guidelines that govern such conduct.  In fact, on March 22, 2005, federal regulators – including the OTS, which regulates WaMu – published guidance directly applicable to WaMu on appraisals, entitled "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions" (defined above as the "2005 Interagency Appraisal Guidelines").  The 2005 Interagency Appraisal Guidelines, which apply to "all real-estate-related financial transactions" mandate, among other things, that:

- Loan production staff should not select appraisers.

- Loan production staff should not be involved in developing or maintaining lists of appraisers, and that any such list of appraisers should be the subject of periodic evaluation to maintain independence.

- Upon engaging an appraisal, "information provided by the regulated institution should not unduly influence the appraiser or in any way suggest the property's value."

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 345

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

- Prior to making a final credit decision, "regulated institutions should perform a compliance review on all appraisals to confirm that they comply with the minimum appraisal standards. . . .."

Thus, WaMu's appraisal practices did not conform with the governing regulations and guidelines.

876.    WaMu's practice of inducing appraisers, both in-house and third-party appraisers, to overvalue the real estate underlying WaMu loans caused an increased and material risk of loss for loans held in the Company's portfolio.

### 3.    WaMu Adopted Deficient Underwriting Standards

877.    Throughout the Class Period, WaMu further increased the Company's loss exposure and the poor quality of the loans held in the Company's portfolio by loosening its underwriting standards in order to close more loans. Contrary to WaMu's statements in its SEC filings, discussed below, the Company instituted extremely loose underwriting guidelines for increasingly risky loan products and routinely allowed exceptions to those already-loosened standards to generate greater loan volume. Further, WaMu incentivized its salespeople, underwriters, and management to close a higher volume of loans, with increased bonuses for the more exotic, high-risk loans without any regard for the quality of the loans originated.

878.    Numerous former WaMu employees describe how, during the Class Period, WaMu was focused on generating ever-increasing volumes of high-risk loans, repeatedly stressed quantity without regard to quality, and abandoned prudent underwriting practices to accomplish these goals. For example, Confidential Witness 2, who worked at WaMu from 1995 until 2008, most recently as an Underwriting Supervisor from 2005 until 2008, explained that no exception to WaMu's underwriting guidelines was needed for many risky loans, because WaMu's

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 346

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

"guidelines were so generous."  Moreover, CW 2 further added that for those loans that did not fit within the loose guidelines of WaMu's underwriting standards, exceptions to WaMu's already-loose guidelines were always readily available.  Additionally, Confidential Witness 51, a Senior Underwriter at the WaMu home loan center in Lake Success, New York from 2007 to 2008, agreed that guideline exceptions were "part of the norm . . . it was so commonplace to go outside of the guidelines."  Even when exceptions were sent to management for approval, CW 51 observed that the exceptions "were always approved, so it was just business as usual and something that they were comfortable with."

879.    Confidential Witness 52, an underwriting Team Manager with WaMu from 2004 through 2007, estimated that exceptions to the underwriting guidelines occurred 30-40% of the time.  According to CW 52, the types of exceptions "varied so much" from "accepting certain income documentation – or lack thereof – to credit score exceptions . . . there [were] tons of exceptions."

880.    Confidential Witness 66, a Senior Underwriter at WaMu's subprime-lending subsidiary, Long Beach Mortgage (defined above as "LBM") from 2004 through September 2007 explained that LBM also utilized loose and exception-ridden underwriting guidelines.  CW 66 stated that there were significant flaws in the LBM's underwriting procedures and described the culture of LBM as "just do it."  Indeed, CW 66 explained, "There were really no restrictions to approve a loan," and some "really bad loans" went through the office.  The attitude at WaMu was "push, push, push."

881.    WaMu's lenient lending environment was particularly dangerous in underwriting for the Company's high-risk Option ARM and Alt-A loans.  As mentioned above, Option ARM loans are adjustable-rate mortgage loans that give the borrower the option each month to make a

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 347

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

fully-amortizing, interest-only or minimum payment, and to amortize any unpaid interest onto the principal of the loan.  WaMu offered a low "teaser" rate for an introductory period of the loan, which automatically adjusted to a much higher rate, known as the "fully-indexed" rate, after a set period of time, or after a certain amount of unpaid interest had been amortized onto the principal.   Contrary to its repeated public representations, the Company underwrote these loans to the "teaser" rate rather than the fully-indexed rate, greatly increasing the chance that once the loan payments were required at the fully-indexed rate, the loans would default.

882.    Confidential Witness 62, a senior underwriter at WaMu's Lake Success, New York office from June 2005 until February 2008, confirmed that during the Class Period, WaMu underwrote Option ARM loans to the teaser rate, rather than the fully-indexed rate.

883.    Indeed, a document published by WaMu's loan securitization channel entitled "Mortgage Securities Corp. Seller Guide Update – Announcement Concerning Qualifying Rate and Qualifying Payment for Hybrid ARM, IO, and Option ARM Products" confirms that WaMu had been allowing Option ARM loans to be underwritten to their "teaser" rate until August 2007.

884.    Further, WaMu compensated its employees, including its underwriters, based on the number of loans that the employees closed, without regard to the quality of those loans. According to Confidential Witness 5, who served as Senior Credit Quality Manager from March 2005 until February 2008, after having served as a WaMu Senior Underwriter from 2003 through 2004, underwriters received large bonuses based upon the number of loans they had underwritten.  According to CW 5, underwriters were required to underwrite a minimum of nine loans a day, and any loans underwritten in excess of that number provided for bonus payments. Indeed, certain senior underwriters earned in excess of $100,000 annually because of these bonuses.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 348

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

885.    In fact, according to Confidential Witness 47, a long-time employee of WaMu who left after twenty-four years with the Company, WaMu was so focused on incenting underwriters to close a greater volume of loans that loan delinquency data was not provided to underwriters.  According to CW 47, WaMu's senior management believed that if underwriters knew which underwriting problems led to greater delinquencies and defaults, WaMu's underwriters would "by nature" tighten up WaMu's lending standards.

### 4.    The Company's Financial Results Were Not Stated in Compliance With GAAP

886.    The Company failed to properly account for the material increases in risk associated with its lending practices.  As set forth above, during the Class Period, WaMu had, among other things, (1) discontinued effective risk management practices; (2) pressured its appraisers to inflate the appraisal values for the collateral underlying its loans; (3) significantly loosened its underwriting guidelines, (4) encouraged wholesale exceptions to those guidelines through explicit emphasis on loan quantity over quality; and (5) compensated its employees based upon loan volume without regard to loan quality.  By not taking these high-risk practices into consideration when accounting for the Company's incurred and probable loan losses, WaMu violated GAAP.

887.    Specifically, the Company violated Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" (defined above as "SFAS 5").  SFAS 5, a fundamental GAAP principle which was issued over thirty years ago, states that:

> An estimated loss for loss contingency . . . shall be accrued by a charge to income if **both** of the following conditions are met:
>
> a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 349

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.       The amount of loss can be reasonably estimated.

(Emphasis in original.)

888.    The SEC provides further guidance on the proper accounting for credit risk and loan losses. SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" (a defined above as "SAB 102"), which was issued in July 2001, states in pertinent part: "It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process . . . . A registrant's loan loss allowance methodology generally should . . . [c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] be based on current and reliable data[.]"

889.    In violation of GAAP and SEC guidelines, WaMu failed to take into account the undisclosed, poor quality, and high-risk nature of the Company's loan portfolio as well as all known internal factors that would affect loan collectability, including the Company's dubious underwriting and appraisal activities, when provisioning its Allowance.

890.    Indeed, an internal document obtained through Lead Plaintiff's investigation shows that until as late as June 30, 2006, and possibly later, the Company had no method for determining the losses inherent in its Option ARM loans and thus appropriately provisioning for such losses.  Specifically, the CRO Report explicitly states that the Company's fundamental model for evaluating losses, known as the "LPRM" "is untested on products with the potential to negatively amortize."  Because Option ARM loans constituted well over half the Company's loan portfolio during the Class Period and, because of their structure, are high-risk products, this

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 350

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

failure to account for negative amortization had enormous negative impact on the Company's financial statements.

891.    Further, WaMu, through the LPRM, did not account for deteriorating loan performance during the Class Period at all.  As Confidential Witness 78 reported, in the summer of 2007, a WaMu analyst who worked in calibrating the LPRM to calculate losses inherent in WaMu's loan portfolio, and thus how much to provision the Allowance, informed CW 78 that the LPRM had not been calibrated to reflect actual loan performance for eighteen months.  Defaults, delinquencies, and foreclosures, all of which rose steadily during the Class Period, were thus not considered at all when provisioning the Allowance.

892.    These failures to account for negative amortization and for deteriorating loan performance exacerbated the already deficient and improper accounting for the Company's loan portfolio.  Defendants' improper risk management, underwriting, and appraisal practices during the Class Period (1) caused the Company's Allowance and loan loss provisions to be materially understated during the Class Period; (2) caused WaMu to report financial results that were in violation of GAAP; (3) caused certain of the Company's reported financial information, including net income, earnings per share and assets to be materially overstated throughout the Class Period; and (4) rendered Defendants' statements about the adequacy of the Company's internal controls, incorporated by reference into the Offering Materials, materially false and misleading.

### 5.    Deloitte Failed to Audit WaMu in Accordance with GAAS

893.    In addition to WaMu's false representations regarding the Company's compliance with GAAP, Deloitte also falsely represented that the Company's financial results were presented in compliance with GAAP.  Specifically, in certifying WaMu's 2005 and 2006 financial

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 351

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

statements, Deloitte falsely represented that those financial statements were prepared in accordance with GAAP and that Deloitte's audits were conducted in accordance with Generally Accepted Auditing Standards ("GAAS").[7]    When an auditor represents that a company's financial statements conform in all material respects with GAAP, the auditor "indicates [his] belief that the financial statements taken as a whole are not materially misstated." AU § 312.[8] Indeed, "[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with [GAAP]."  AU § 312.

894.    Deloitte's statements were untrue because its audits did not conform to GAAS and, therefore, Deloitte had no reasonable basis to represent that WaMu's financial statements fairly presented the Company's financial position and results of operations in conformity with GAAP.  In issuing unqualified audit opinions on WaMu's financial statements, Deloitte failed to comply with the professional standards dictated by GAAS.

895.    GAAS General Standard No. 3 requires an auditor to exercise due professional care in the performance of the audit and preparation of the report.  (AU § 150.01).  Deloitte violated General Standard No. 3 by, among other things, disregarding (i) the improper pressure

---

[7]  The Public Company Accounting Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms.  On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, *Generally Accepted Auditing Standards*, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003.  All references to GAAS hereinafter include the standards of the PCAOB.

[8]  GAAS includes Statements on Auditing Standards ("SAS") issued by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA"), which are codified in *AICPA Professional Standards* under the prefix "AU."

WaMu exerted on its in-house and third party appraisers to inflate appraisal values to close more loans; (ii) the Company's abandonment of, and deviation from, its underwriting guidelines to originate ever-increasing volumes of loans; and (iii) the Company's relegation of its credit risk management to a secondary role, all of which reduced the quality of loans in WaMu's portfolio, significantly increased WaMu's loss exposure and necessitated the establishment of a much higher Allowance and provisions for loan losses. Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Company's Allowance and provisions for loan losses were insufficient and, consequently, the Company had overstated its net income, earnings per share, and the value of its assets in violation of GAAP.

896.    GAAS Standard of Fieldwork No. 1 requires an auditor to plan the audit, which "involves developing an overall strategy for the expected conduct and scope of the audit." AU § 311.03. This requires understanding the entity's business sufficiently to identify areas of risk. AU §311.06. Deloitte violated Standard of Fieldwork No. 1 by, among other things, failing to plan and conduct an audit that would include identifying and assessing WaMu's areas of risk, specifically, the quality of its loan originations and lending practices, and the performance of its loans, including rates of delinquencies and foreclosures and levels of nonperforming assets and negative amortization. Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Company was originating high-risk loans in violation of its underwriting guidelines, that the Company was inflating appraisal values, and that those loans were frequently and increasingly experiencing increasing rates of delinquencies, and foreclosures. Deloitte would have also uncovered that WaMu was experiencing increasing levels of nonperforming assets and negative amortization.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 353

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

897.     GAAS Standard of Fieldwork No. 2 requires that an auditor have a sufficient understanding of the company's internal controls to properly plan the audit, assess audit risk, and to determine the nature, timing and extent of the tests performed.     Further, while it is management's responsibility to establish and maintain internal controls, AU § 110.03, the independent auditor is responsible for rendering an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting.     PCAOB Auditing Standards ("AS") No. 2, An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of the Financial Statements, ¶4.

898.     Deloitte violated Standard of Fieldwork No. 2 and the requirements of AS No. 2 by disregarding the fact that WaMu routinely violated its underwriting guidelines and pressured appraisers to inflate appraisal values.     GAAS, specifically, the AICPA Audit & Accounting Guide for Depository and Lending Institutions, Ch. 8, ¶132 required that Deloitte review loan origination files to determine the Company's compliance with those guidelines.     In addition, Deloitte violated Standard of Fieldwork No. 2 because it disregarded that WaMu's loss modeling methodology did not (i) appropriately analyze and capture the risk of losses in the Company's Option ARM loans or other loans with the potential to negatively amortize and (ii) take into account the actual deterioration that was experienced in the Company's loan portfolio during the course of 2006 and 2007.     Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that WaMu's internal controls over financial reporting were so ineffective that the Company's financial statements were not fairly presented in accordance with GAAP.

899.     GAAS Standards of Fieldwork Nos. 2 and 3 require that an independent auditor obtain, through inspection, observation, inquiries and confirmations, competent, sufficient

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 354

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

evidential matter to afford a reasonable basis for its opinion. AU § 150.02. Deloitte violated Standard of Fieldwork Nos. 2 and 3 by, among other things, failing to obtain evidence that WaMu had adequately provisioned for its substantial loss exposure that resulted from the Company's improper underwriting and appraisal practices and ineffective risk management. Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that WaMu's reported Allowance and provisions were insufficient and that the Company had failed to account for the high-risk, low-quality loans it issued, in violation of GAAP.

900.    GAAS also requires an auditor to evaluate "the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole," AU § 342.04, thus requiring Deloitte to review the assumptions and estimates concerning, among other things, the risks of default, delinquency and foreclosure attendant to WaMu's high-risk loan originations. Deloitte violated this duty by, among other things, disregarding WaMu's failure to take into account its aggressive origination practices and accompanying increase in the Company's risk of default, delinquency and foreclosures. Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have reached was that the estimates underlying WaMu's accounting were unreasonable.

901.    Standard of Reporting No. 4 requires an auditor to express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed. AU § 150.02. As a result of Deloitte's violations of GAAS set forth above, it also violated the Standard of Reporting No. 4 because Deloitte had an insufficient basis to express an unqualified opinion on its 2005 and 2006 audits of WaMu. Accordingly, as set forth below, Deloitte's public statements concerning those audits were untrue, and contained omissions of material facts.

1

## C.    The August 2006 Offering and the September 2006 Offering

2      902.    On or about August 24 2006, WaMu conducted the August 2006 Offering,

3  consisting of the Floating Rate Notes and the 5.50% Notes.  The Company raised $897.85

4  million in capital from this offering, which it used for general corporate purposes, including

5  providing funding to its subsidiaries and repurchasing shares of the Company's stock.

6      903.    The August 2006 Offering was conducted pursuant to the August 2006 Offering

7  Documents, which incorporated by express reference several of WaMu's public filings, including

8  its Form 10-K/A for the fiscal year ended December 31, 2005 (the "2005 Form 10-K"), which

9  was audited by Deloitte and certified as being in conformance with GAAP, and its Forms 10-Q

10  for the quarters ended March 31, 2006 (the "First Quarter 2006 Form 10-Q") and June 30, 2006

11  (the "Second Quarter 2006 Form 10-Q").  The 2005 Form 10-K was signed by Defendants

12  Killinger, Casey, Farrell, Woods, Frank, Pugh, Leppert, Reed, Lillis, Smith, Matthews, Stever,

13

14  Murphy, Wood, and Osmer-McQuade.  The un-amended First Quarter 2006 Form 10-Q and the

15  Second Quarter 2006 Form 10-Q were signed by Defendants Casey and Woods.  The Form 10-

16  Q/A for the first quarter 2006 was signed by Defendant Casey alone.

17

18      904.    As noted above, Goldman Sachs, Morgan Stanley, Credit Suisse, Deutsche Bank,

19  and Lehman Brothers served as joint book-running managers for the August 2006 Offering.

20      905.    Additionally, on or about September 18, 2006, WaMu conducted the September

21  2006 Offering of the Series K Stock.  The Company raised $495.5 million in capital from this

22  offering, which it used for general corporate purposes, including, among other things,

23

24  repurchasing shares of the Company's stock.

25      906.    The September 2006 Offering was conducted pursuant to the September 2006

26  Offering Documents, which incorporated by express reference several of WaMu's filings made

27

28

after the date of the Registration Statement pursuant to Sections 13(a), 13(c), 14, or 15(d), including its 2005 Form 10-K, which was audited by Deloitte and certified as being in conformance with GAAP, and its First Quarter 2006 Form 10-Q and Second Quarter 2006 Form 10-Q.

907.    As noted above, UBS, Goldman Sachs, Lehman Brothers, and Morgan Stanley served as joint book-running managers for the September 2006 Offering.  Banc of America, Credit Suisse, and J.P. Morgan served as co-managers for the September 2006 Offering.

908.    WaMu made numerous material misstatements and omissions in the August 2006 Offering Documents and the September 2006 Offering Documents regarding its financial results, compliance with GAAP, credit risk management, and underwriting and appraisal practices. These statements misinformed investors in the August 2006 and September 2006 Offerings regarding the soundness of the Company's evaluation of the risk of its loan portfolios, which had grave implications for the reliability of its financial statements, and rendered the August 2006 Offering Documents and the September 2006 Offering Documents materially untrue and misleading.

      **1.**      **The August 2006 Offering Documents and September 2006 Offering Documents Misstated the Company's Lending Practices**

909.    To start, the August 2006 Offering Documents and September 2006 Offering Documents misstated the Company's lending practices.  Specifically, with regard to the Company's underwriting of loans, the 2005 Form 10-K stated that, "[t]he Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans." The 2005 Form 10-K further represented that: "The Company actively manages the credit risk

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 357

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures."

910.    In addition, in discussing its lending operations in the 2005 Form 10-K, WaMu repeatedly stated that LTV ratios were a "key determinant of future performance," stating:

> Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. . . . This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure.

911.    The Company's statements in the 2005 Form 10-K, which were incorporated into the August 2006 Offering Documents and the September 2006 Offering Documents, regarding its risk management, underwriting, and appraisal practices were materially false and misleading because the Company was, in fact, lowering its underwriting standards and issuing loans that were increasingly unlikely to be repaid.  The Company did not comply with its underwriting standards and underwrote high-risk loans to borrowers who were not able to repay such loans and made exceptions to its underwriting guidelines as a matter of course.   Indeed, the Company omitted from the August 2006 Offering Documents and the September 2006 Offering Documents the key facts that, during the third quarter of 2005, the Company had loosened underwriting standards and increased its exceptions to those underwriting standards in order to increase loan volume.  In addition, the Company did not adequately manage its risk.  As set forth above, starting in 2005, WaMu relegated its risk management to a secondary "support" role.  WaMu also had deficient risk management in that its loan loss modeling methodology did not appropriately analyze or capture the Company's Option ARM loans and did not reflect the actual loan deterioration that the Company experienced during 2006.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 358

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

912.    Moreover, the statements in the Company's 2005 Form 10-K regarding its use of LTV ratios in its underwriting as "key determinants of future performance" were false and misleading because the Company was systematically inflating the appraisal values of the real estate collateral underlying its loans, which materially distorted the LTV ratios for the Company's home loans.  Thus, the LTV ratios that the Company relied on were misstated and, as such, were not accurate "determinants of future performance."  Moreover, the Company failed to disclose its widespread practice of pressuring appraisers, both in-house appraisers and third party appraisers, to overstate appraisal values so that the Company could close more loans.  The omission of the Company's improper appraisal practices from the August 2006 Offering Documents and the September 2006 Offering Documents rendered these Offering Documents materially misleading.

**2.    The August 2006 Offering Documents and September 2006 Offering Documents Contained Untrue Financial Results**

913.    The August 2006 Offering Documents and September 2006 Offering Documents also contained materially misstated financial results for WaMu for 2005 and the first half of 2006.  These included material understatements of the Company's Allowance and provision for loan losses and material overstatements of the Company's net income, earnings per share and assets that resulted directly from the Company's undisclosed lending practices and deterioration in the quality of the WaMu's loans.

914.    In the 2005 Form 10-K, WaMu reported that for the full year 2005, the Company's reported net income was $3.43 billion, or $3.73 per diluted share.  The Company also reported a full-year provision for loan and lease losses of $316 million and total assets as of December 31, 2005, of $343.6 billion.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 359

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

915.    The August 2006 and September 2006 Offering Documents also incorporated by express reference the First Quarter 2006 Form 10-Q and Second Quarter 2006 Form 10-Q.  The Company's First Quarter 2006 Form 10-Q reported net income of $985 million, diluted earnings per common share of $0.98, an Allowance of $1.6 billion and assets of $348.6 billion.  The Company's Second Quarter 2006 Form 10-Q reported net income of $767 million, diluted earnings per common share of $0.79, an Allowance of $1.7 billion, and assets of $350.9 billion.

916.    In addition, the 2005 Form 10-K, the First Quarter 2006 Form 10-Q, and the Second Quarter 2006 Form 10-Q falsely certified that: "The Company's financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ('GAAP')."

917.    These statements concerning the Company's financial results and compliance with GAAP were materially untrue and misleading.  Specifically, the Company's reported financial results in the August 2006 Offering Documents and the September 2006 Offering Documents misrepresented the value of the Company's net income, earnings per share, Allowance, provision for loan and lease losses and assets because the Company failed to properly account for the increased risks of default that accompanied the Company's departure from its lending standards, including its improper appraisal and underwriting practices.  The Company, in loosening its underwriting guidelines and inflating the value of the appraisals underlying its loan portfolio, materially understated its Allowance, and materially inflated the Company's reported earnings and net income.

918.    Further, the Company failed to disclose the material fact that well into 2006 WaMu's key model for calculating the appropriate provisions for the Allowance, the LPRM, was not designed or able to account properly for losses on Option ARM loans, and thus the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 360

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Company's evaluation of incurred and probable loan losses was materially understated. WaMu also omitted from the August 2006 Offering Documents and the September 2006 Offering Documents the material fact that the LPRM did not take into account the ongoing deteriorating loan quality of the Company's loan portfolio in calculating incurred and probable losses.

919. Thus, the Company's certification of these financial statements as being presented in conformity with GAAP was also false and misleading.

920. Deloitte, WaMu's auditor, also issued a materially untrue and misleading report in connection with the Company's 2005 financial statements. Specifically, Deloitte audited the Company's year-end 2005 financial statements contained in the 2005 Form 10-K and issued an unqualified auditor's report on WaMu's consolidated statement of financial condition as of December 31, 2005, and the related consolidated statements of income, stockholders' equity and comprehensive income, and of cash flows for the year ended December 31, 2005.

921. Deloitte's auditor's report, dated March 8, 2006, stated in pertinent part:

We have audited the accompanying consolidated statements of financial condition of Washington Mutual, Inc. and subsidiaries (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of income, stockholders' equity and comprehensive income, and of cash flows for each of the three years in the period ended December 31, 2005.

*    *    *

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2005 and 2004, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America.

922. Deloitte's unqualified auditor's report was incorporated into the August 2006 Offering Documents and September 2006 Offering Documents. Specifically, the August 2006 Offering Documents and the September 2006 Offering Documents incorporated by reference

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 361

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Deloitte's reports, stating that it was "so incorporated in reliance upon the report of [Deloitte] given upon their authority as experts in accounting and auditing."

923.    Deloitte's unqualified auditor's report, as included in the 2005 Form 10-K, was materially untrue and misleading because, as explained above, the Company's consolidated financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP.  Moreover, in certifying WaMu's 2005 financial statements, Deloitte falsely represented that its audits were conducted in accordance with GAAS.

> **3.    The August 2006 Offering Documents and September 2006 Offering Documents Contained Untrue Statements Regarding the Effectiveness of WaMu's Internal Controls**

924.    The August 2006 Offering Documents and September 2006 Offering Documents also contained materially untrue and misleading statements regarding the effectiveness of WaMu's internal controls over financial reporting.  Specifically, in the Company's 2005 Form 10-K, management reported on the effectiveness of WaMu's internal controls.  In this report, which falsely concluded that the Company maintained effective internal controls over financial reporting, the Company stated:

> Management assessed the effectiveness of the Company's internal control over financial reporting, including safeguarding of assets as of December 31, 2005. . . . Based on this assessment, management believes that, as of December 31, 2005, the Company maintained effective internal control over financial reporting, including safeguarding of assets.

925.    The First Quarter 2006 Form 10-Q and the Second Quarter 2006 Form 10-Q also included materially untrue statements regarding the effectiveness of WaMu's internal controls.  For example, in the First Quarter 2006 Form 10-Q, the Company falsely represented that WaMu maintained effective internal controls over financial reporting, stating:

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 362

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1
2
3
4
5
6

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant, and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls. There have not been any changes in the Company's internal control over financial reporting during the first quarter of 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

7     The Company made the same representation, using substantially similar language, in the Second

8     Quarter 2006 Form 10-Q.

9     926.    The Company's statements certifying WaMu's internal controls were false and

10    misleading because the Company's extremely loose underwriting and its practice of artificially

11    inflating appraisal values, demonstrate that the Company's internal controls were materially

12    deficient.  Contrary to these repeated internal control certifications, the Company was operating

13    without adequate controls in place to ensure compliance with the Company's underwriting and

14    appraisal standards. Further, WaMu was operating without policies and appropriate methodology

15    in place to ensure the soundness of its valuation of its assets and its Allowance, which, as set

16    forth above, was materially understated at the time of the August 2006 and September 2006

17

18    Offerings and during the Class Period.  These failures demonstrate serious deficiencies in the

19    Company's internal controls and contributed to materially distorting the Company's reporting of

20    financial data.

21

22    927.    In addition, the 2005 Form 10-K also included an unqualified auditor's report by

23    Defendant Deloitte opining on the effectiveness of WaMu's internal control over financial

24    reporting.  This report, dated March 8, 2006, stated as follows:

25    We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Washington Mutual, Inc. and subsidiaries (the "Company") maintained effective internal control over financial reporting as of December 31, 2005, based on

26

27

28

criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. . . .

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"). . . .  Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

*    *    *

In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

928.    Deloitte's report on WaMu's internal controls was likewise materially false and misleading.  For the reasons explained herein, the Company's internal controls were materially deficient.

### D.    The October 2007 Offering

929.    On or about October 25, 2007, WaMu announced the October 2007 Offering, an Offering consisting of the 7.250% Notes.  The Company raised $494.39 million in capital from this Offering, which it used for general corporate purposes, including providing funding for subsidiaries.

930.    The October 2007 Offering Documents incorporated by reference several of WaMu's public filings, including its Form 10-K for the fiscal year ended December 31, 2006 (the "2006 Form 10-K"), which was audited by Deloitte and certified as in conformance with GAAP, and its Forms 10-Q for the quarters ended March 31, 2007 (the "First Quarter 2007 Form 10-Q")

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 364

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

and June 30, 2007 (the "Second Quarter 2007 Form 10-Q"). The 2006 Form 10-K was signed by Defendants Killinger, Casey, Farrell, Woods, Frank, Montoya, Pugh, Leppert, Reed, Lillis, Smith, Matthews, Stever, Murphy, and Osmer-McQuade. The First Quarter 2007 Form 10-Q and the Second Quarter 2007 Form 10-Q were signed by Defendants Casey and Ballenger.

931.    As noted above, Barclays, Credit Suisse, Lehman Brothers, and Morgan Stanley served as joint book-running managers for the October 2007 Offering. Keefe, Bruyette; Cabrera Capital; and Williams Capital served as co-managers for the October 2007 Offering.

932.    WaMu made numerous material misstatements and omissions in the October 2007 Documents regarding its financial results, compliance with GAAP, credit risk management, and underwriting and appraisal practices. These statements misinformed investors in the October 2007 Offering regarding the soundness of the Company's evaluation of the risk of its loan portfolios, which had grave implications for the reliability of its financial statements., and rendered the October 2007 Documents materially untrue and misleading.

> **1.     The October 2007 Offering Documents Misstated the Company's Lending Practices**

933.    In the 2006 Form 10-K, the Company again claimed to mitigate risk in its high-risk Option ARM and subprime lending in substantially the same language used in the 2005 Form 10-K, discussed above in ¶¶909-910. Further, the Company went on to claim that,

> In the underwriting of loans, one of many factors the Company considers when deciding whether to approve or decline a loan is the applicant's debt-to-income ratio. The Company's underwriting process for Option ARM loans has historically involved calculating an applicant's debt-to-income ratio using an administratively set interest rate. Prior to 2004, the administratively set rate approximated the then-prevailing fully-indexed rate. . . . The administratively set rate was adjusted upward in October 2005 and, beginning in mid-December 2005, was replaced with a fully-indexed rate that adjusts monthly for changes in the index rate.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 365

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

934.    Additionally, the 2006 Form 10-K again repeated the Company's claim that loan-to-value ratios were a "key determinant of future performance" that the Company used to predict losses, in substantially the same language as that used in the 2005 Form 10-K.

935.    The Company's statements in the 2006 Form 10-K, which were incorporated into the October 2007 Offering Documents, regarding its risk management, underwriting, and appraisal practices were materially false and misleading because the Company was, in fact, lowering its underwriting standards and issuing loans that were increasingly unlikely to be repaid.  The Company did not comply with its underwriting standards and did not actively manage its risk.  The Company underwrote high-risk loans to borrowers who were not able to repay such loans and made exceptions to its underwriting guidelines as a matter of course.  Indeed, the Company omitted from the October 2007 Documents the key facts that, during the third quarter of 2005, the Company loosened underwriting standards and increased its exceptions to those underwriting standards in order to increase loan volume.  In addition, the Company did not adequately manage its risk.  As set forth above, starting in 2005, WaMu relegated its risk management to a secondary "support" role.  WaMu also had deficient risk management in that its loan loss modeling methodology did not appropriately analyze or capture the Company's Option ARM loans and did not reflect the actual loan deterioration that the Company experienced during 2006 and 2007.

936.    Moreover, the statements in the Company's 2006 Form 10-K regarding its use of LTV ratios in its underwriting as "key determinants of future performance" were false and misleading because the Company was systematically inflating the appraisal values of the real estate collateral underlying its loans, which materially distorted the LTV ratios for the Company's home loans.  Thus, the LTV ratios that the Company relied on were misstated and, as

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 366

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

such, were not accurate "determinants of future performance." Moreover, the Company failed to disclose its widespread practice of pressuring appraisers, both in-house appraisers and third party appraisers, to overstate appraisal values so that the Company could close more loans. The omission of the Company's improper appraisal practices from the October 2007 Offering Documents rendered these Offering Documents materially misleading.

### 2. The October 2007 Offering Documents Contained Untrue Financial Results

937.    As noted above, the October 2007 Offering Documents incorporated by reference the Company's 2006 Form 10-K, as well as the First Quarter 2007 Form 10-Q and the Second Quarter 2007 Form 10-Q. The 2006 Form 10-K reported net income of $3.56 billion, or $3.64 per diluted share. In this filing, the Company also reported total assets as of December 31, 2006, of $346.3 billion and that its provision for loan and lease losses for 2006 was $816 million.

938.    Further, as noted above, the October 2007 Offering Documents incorporated by reference the First Quarter 2007 Form 10-Q and the Second Quarter 2007 Form 10-Q. The Company's First Quarter 2007 Form 10-Q reported assets of $319.9 billion, net income of $784 million, diluted earnings per common share of $.86, and an Allowance of $1.5 billion. The Company's Second Quarter 2007 Form 10-Q reported assets of $312.2 billion, net income of $830 million, diluted earnings per common share of $.92, and an Allowance of $1.6 billion.

939.    In addition, the 2006 Form 10-K, the First Quarter 2007 Form 10-Q, and the Second Quarter 2007 Form 10-Q each falsely certified the Company's financial statements conformed with GAAP, in substantially the same language as that in ¶916 above.

940.    In addition to the Company's SEC filings it incorporated by reference into the October 2007 Offering Documents, the Company disclosed in the October 2007 Offering Prospectus that the Company's financial condition was dramatically weakened for the quarter

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 367

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

ending September 30, 2007.  The Company blamed its financial condition on several elements, including "adverse developments in the mortgage lending business (and in the housing market more generally) and related volatility and liquidity constraints in the capital markets since June 30, 2007."

941.    These statements concerning the Company's financial results and compliance with GAAP were materially untrue and misleading.  In reality, the Company's reported financial results in the October 2007 Offering Documents misrepresented the value of the Company's net income, earnings per share, Allowance, provision for loan and lease losses and assets because the Company failed to properly account for the increased risks of default that accompanied the Company's departure from its lending standards, including its improper appraisal and underwriting practices.  The Company, in loosening its underwriting guidelines and inflating the value of the appraisals underlying its loan portfolio, materially understated its Allowance and materially inflated the Company's reported earnings and net income.  Specifically, in 2006 the Company under-provisioned the Company's Allowance by at least $562 million, or over 40%. This GAAP violation had the effect of overstating the Company's reported net income for full year 2006 by at least $349 million, or 10%.  The Company's diluted earnings per share was overstated by at least $0.35 for the full year 2006.

942.    Further, for the first quarter of 2007, WaMu under-provisioned the Company's loss reserves by at least $398 million, or 63%, and overstated the Company's reported net income by at least $164 million, or 21%.  The Company's diluted earnings per share was overstated by at least $0.18 for the first quarter 2007.   In the second quarter 2007, WaMu under-provisioned the Company's loss reserves by at least $472 million, or 56%, and overstated the

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 368

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Company's reported net income by at least $265 million, or 32%. The Company's diluted earnings per share was overstated by at least $0.30 for the second quarter 2007.

943. Further, the Company failed to disclose the material fact that well into 2006 WaMu's key model for calculating the appropriate provisions for the Allowance, the LPRM, was not designed or able to account properly for losses on Option ARM loans, and thus the Company's evaluation of incurred and probable loan losses was materially understated. WaMu also omitted from the October 2007 Offering Documents the material fact that the LPRM did not take into account the ongoing deteriorating loan quality of the Company's loan portfolio in calculating incurred and probable losses.

944. The Company's statements attributing its losses to a market-wide upheaval were also materially false and misleading. At no point in the October 2007 Offering Documents did the Company discuss how its deteriorated underwriting standards and its inflated appraisals undermined its financial condition, caused its losses, and caused its Allowance to be materially understated.

945. Thus, the Company's certification of these financial statements as being presented in conformity with GAAP was also false and misleading.

946. Defendant Deloitte issued a materially untrue and misleading unqualified auditor's report, dated February 26, 2007, in connection with the Company's 2006 financial statements. This report, which was included in to the Company's 2006 Form 10-K and incorporated by reference in the October 2007 Offering Documents, contained the same or substantially similar language as that included in Defendant Deloitte's unqualified auditor's opinion included in the Company's 2005 Form 10-K and quoted above in ¶921.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 369

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

947.    Deloitte's unqualified auditor's report was incorporated into the October 2007 Offering Documents.  Specifically, the October 2007 Offering Documents incorporated by reference Deloitte's reports, stating that it was "so incorporated in reliance upon the report of [Deloitte] given upon their authority as experts in accounting and auditing."

948.    Deloitte's unqualified auditor's report, as included in the 2006 Form 10-K, was materially untrue and misleading because, as explained above, the Company's consolidated financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP.  Moreover, in certifying WaMu's 2006 financial statements, Deloitte falsely represented that its audits were conducted in accordance with GAAS.

> ### 3.    The October 2007 Offering Documents Contained Untrue Statements Regarding the Effectiveness of WaMu's Internal Controls

949.    The October 2007 Offering Documents also contained materially untrue and misleading statements regarding the effectiveness of WaMu's internal controls over financial reporting.  Specifically, in the Company's 2006 Form 10-K, management reported on the effectiveness of WaMu's internal controls.  In the same or substantially similar language as that stated in the 2005 Form 10-K, reported above at ¶924 above, the Company certified that it has created and maintained a system of effective internal controls over financial reporting.

950.    The First Quarter 2007 Form 10-Q and the Second Quarter 2007 Form 10-Q, which were also incorporated by reference into the October 2007 Offering Documents, also included materially untrue certifications regarding the effectiveness of WaMu's internal controls in substantially the same language as that found in ¶925 above.

951.    The 2006 Form 10-K included an unqualified auditor's report by Deloitte, opining on the effectiveness of WaMu's internal control over financial reporting.  This report, dated

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 370

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

February 26, 2007, stated in language the same or substantially similar to that in ¶927 above, that WaMu had maintained effective internal controls over financial reporting as of December 31, 2006.

952.    The Company's statements certifying WaMu's internal controls were false and misleading because the Company's extremely loose underwriting and its practice of artificially inflating appraisal values, demonstrate that the Company's internal controls were materially deficient.  Contrary to these repeated internal control certifications, the Company was operating without adequate controls in place to ensure compliance with the Company's underwriting and appraisal standards. Further, WaMu was operating without policies and appropriate methodology in place to ensure the soundness of its valuation of its assets and its Allowance, which, as set forth above, was materially understated at the time of the October 2007 Offerings and during the Class Period.  These failures demonstrate serious deficiencies in the Company's internal controls and contributed to materially distorting the Company's reporting of financial data.

953.    Further, Deloitte's report on WaMu's internal controls was likewise materially false and misleading.  For the reasons explained herein, the Company's internal controls were materially deficient.

### 4.    The October 2007 Offering Documents Contained Material Omissions Regarding the NYAG Complaint

954.    The October 2007 Offering was announced on October 25, 2007, six days before the Attorney General Cuomo filed the bombshell complaint alleging collusion between WaMu and its third-party appraisers.  Upon the disclosure of the Attorney General's allegations, the price of WaMu common stock dropped from a close of $27.88 per share on October 31, 2007 to a closing price of $23.81 per share on November 2, 2007, a drop of $4.07, or almost 15%.  The

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 371

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

price of the 7.250% Notes (as well as WaMu's other securities discussed herein) also dropped from the disclosure of this news. The Company never disclosed that the imminent filing of the NYAG Complaint would expose its collusion with its third-party appraisers, an explosive fact of which, on information and belief, the Company was aware. The Attorney General's allegations and the effect WaMu's dubious appraisal practices were certain to have on the market for WaMu stock, were material facts that should have been disclosed to investors.

### E.    The December 2007 Offering

955.    On or about December 17, 2007, WaMu conducted the December 2007 Offering, an offering consisting of the Series R Stock.    The Company raised $2.9 billion in capital from this secondary offering. The Company intended to contribute up to $1 billion of the proceeds from the December 2007 Offering to Washington Mutual Bank, WaMu's principal bank subsidiary, as additional capital, and retain the remainder for general corporate purposes.

956.    The December 2007 Offering Documents incorporated by reference several of WaMu's public filings, including the 2006 Form 10-K, which was audited by Deloitte and certified as in conformance with GAAP, and its Forms 10-Q for the quarters ended March 31, 2007 (the "First Quarter 2007 Form 10-Q"), June 30, 2007 (the "Second Quarter 2007 Form 10-Q"), and September 30, 2007 (the "Third Quarter 2007 Form 10-Q").    The December 2007 Offering also incorporated several of the Company's Current Reports filed on Form 8-K, including the Current Report for December 10, 2007.  As noted above, the 2006 Form 10-K was signed by Defendants Killinger, Casey, Farrell, Woods, Frank, Montoya, Pugh, Leppert, Reed, Lillis, Smith, Matthews, Stever, Murphy, and Osmer-McQuade.  The First Quarter 2007 Form 10-Q, the Second Quarter 2007 Form 10-Q, and the Third Quarter 2007 Form 10-Q were signed by Defendants Casey and Ballenger.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 372

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

957.    As noted above,  Lehman Brothers and Morgan Stanley acted as representatives of the underwriters, and, together with Credit Suisse and Goldman Sachs, served as joint book-running managers for the December 2007 Offering.

958.    The December 2007 Offering Documents contained numerous false and misleading statements related to the Company's underwriting practices and financial statements. As noted above, the December 2007 Offering Documents incorporated by reference the 2006 Form 10-K, as well as First Quarter 2007 Form 10-Q, the Second Quarter Form 10-Q, and the Third Quarter 2007 Form 10-Q.  Each of these filings contained false and misleading statements. Additionally, the December 2007 Prospectus was rife with false and misleading statements regarding the Company's underwriting practices and the causes of the Company's losses.  In each of these documents, the Company omitted numerous key facts that were necessary to make statements in the December 2007 Offering Documents not misleading.

### 1.    The December 2007 Offering Documents Misstated the Company's Lending Practices

959.    The statements in the Company's 2006 Form 10-K falsely described the Company's risk management and underwriting practices, as discussed in ¶¶933-936 above.

960.    The Company also discussed its Option ARM loans and specifically referred investors to "Management's Discussion and Analysis of Financial Condition and Results of Operations – Credit Risk Management" in the 2006 Form 10-K.  The referenced portion states, in pertinent part:

> In 2006, the Finance Committee of the Board of Directors approved a set of credit risk concentration limits. These limits facilitate a more rigorous and quantitative framework that better enables the credit risk management function to proactively manage credit risk.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 373

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

961.    The Company's statements in the 2006 Form 10-K, which were incorporated into the December 2007 Offering Documents, regarding its risk management and underwriting were materially false and misleading because the Company was, in fact, lowering its underwriting standards and issuing loans that were increasingly unlikely to be repaid.  The Company did not comply with its underwriting standards and did not actively manage its risk.  The Company underwrote high-risk loans to borrowers who were not able to repay such loans and made exceptions to its underwriting guidelines as a matter of course.   Indeed, the Company omitted from the December 2007 Documents the key facts that, during the third quarter of 2005, the Company loosened underwriting standards and increased its exceptions to those underwriting standards in order to increase loan volume.  The Company also omitted to state that it had relegated its credit management function to a secondary "support" role and that its loan loss methodology did not appropriately analyze the actual deterioration of the Company's loan quality at least until summer 2007.

### 2.    The December 2007 Offering Documents Contained Untrue Financial Results

962.    As discussed above in ¶¶937-945, in its 2006 Form 10-K WaMu and Defendant Deloitte made repeated false and misleading statements regarding the Company's financial condition, including misstating the Company's Allowance, thus inflating net income and total assets.  The financial statements reported in the First Quarter 2007 Form 10-Q and the Second Quarter Form 10-Q were similarly misstated.

963.    Additionally, the Third Quarter 2007 Form 10-Q, which was also incorporated into the December 2007 Offering Documents, reported assets of $330.1 billion, net income of $186 million, diluted earnings per common share of $0.20, a provision for loan and lease losses of $967, and an Allowance of $1.5 billion.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 374

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

964.    The December 2007 Prospectus contained numerous false and misleading statements regarding the Company's financial condition and the causes for the losses the Company suffered in the fourth quarter of 2007.  The Company attributed its "challenges" to "continuing disruptions in the mortgage and capital markets" and "continued deterioration in the mortgage markets and declining housing prices[.]"  Further, under "Risk Factors," WaMu stated that the Company's liquidity may be affected by "circumstances beyond [the Company's] control."  The circumstances that were supposedly beyond the Company's control included "significant volatility in the subprime secondary mortgage market."  Further, the Company stated that:

> Economic conditions that negatively affect housing prices and the job market have resulted, and may continue to result, in a deterioration in credit quality of our loan portfolios, and such deterioration in credit quality has had, and could continue to have, a negative impact on our business.

965.    These statements concerning the Company's financial results and compliance with GAAP were materially untrue and misleading.  Specifically, the Company's reported financial results in the December 2007 Offering Documents misrepresented the value of the Company's net income, earnings per share, Allowance, provision for loan and lease losses and assets because the Company failed to properly account for the increased risks of default that accompanied the Company's departure from its lending standards, including its improper underwriting practices.  The Company failed to disclose that, in loosening its underwriting guidelines, WaMu materially understated its Allowance and materially inflated the Company's reported earnings and net income.  As discussed above at ¶¶941-942, these practices resulted in the Company's reported net income, assets, and diluted earnings per share being overstated for full-year 2006, first quarter 2007 and second quarter 2007.  Additionally, the financial statements reported for the third quarter 2007 were similarly misstated.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 375

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

966.    Further, the Company's statements in the December 2007 Prospectus, attributing WaMu's losses to a market-wide upheaval, were also materially false and misleading.  At no point in the December 2007 Offering Documents did the Company discuss how its deteriorated underwriting standards materially undermined its financial condition, caused its losses, and caused its Allowance to be materially understated.

### 3.    The December 2007 Offering Documents Contained Untrue Statements Regarding the Effectiveness of WaMu's Internal Controls

967.    The December 2007 Offering Documents contained the same materially untrue and misleading statements regarding the effectiveness of WaMu's internal controls over financial reporting as did the October 2007 Offering Documents, discussed above at ¶¶949-950. Specifically, in the Company's 2006 Form 10-K, First Quarter 2007 Form 10-Q and Second Quarter 2007 Form 10-Q, which were also incorporated by reference into the October 2007 Offering Documents, all contained materially untrue certifications regarding the effectiveness of WaMu's internal controls in substantially the same language as that found in ¶¶924-925 above. Similarly, the Third Quarter 2006 Form 10-Q contained the same or substantially similar certification of internal controls.

968.    As discussed above, the 2006 Form 10-K included an unqualified auditor's report by Deloitte, opining on the effectiveness of WaMu's internal control over financial reporting.

969.    The Company's statements certifying WaMu's internal controls were false and misleading because the Company's extremely loose underwriting demonstrates that the Company's internal controls were materially deficient.  Contrary to these repeated internal control certifications, the Company was operating without adequate controls in place to ensure compliance with the Company's underwriting standards. Further, WaMu was operating without

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 376

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    policies and appropriate methodology in place to ensure the soundness of its valuation of its

2    assets and its Allowance, which, as set forth above, was materially understated at the time of the

3    December 2007 Offering and during the Class Period.  These failures demonstrate serious

4    deficiencies in the Company's internal controls and contributed to materially distorting the

5    Company's reporting of financial data.

6        970.    Further, Deloitte's report on WaMu's internal controls was likewise materially

7    false and misleading.  For the reasons explained herein, the Company's internal controls were

8    materially deficient.

9

10

11                        **FOURTH CLAIM FOR RELIEF**

12    **For Violations of Section 11 of the Securities Act In Connection With
The Offerings Against Defendants WaMu; Killinger; Casey; Woods; Farrell;
Frank; Leppert; Lillis; Matthews; Montoya; Murphy; Osmer-McQuade; Pugh; Reed;
Smith; Stever; Wood; Deloitte; Goldman Sachs; Morgan Stanley; Credit Suisse; Deutsche
Bank; Lehman Brothers; UBS; Banc of America; J.P. Morgan; Barclays; Keefe, Bruyette;
Cabrera Capital; Williams Capital; Citigroup; Greenwich; BNY; and Ramirez & Co.**

13

14

15

16        971.    Plaintiffs repeat and reallege each and every allegation above relating to the

17    Securities Act claims as if fully set forth herein.  Defendants' liability under this Claim for Relief

18    is predicated on the participation of each Defendant in conducting the Offerings pursuant to the

19    Registration Statement, which contained untrue statements and omissions of material fact.  This

20    Claim for Relief does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or

21    motive are specifically excluded.  For purposes of asserting this and their other claims under the

22    Securities Act, Plaintiffs do not allege that Defendants acted with intentional, reckless or

23    otherwise fraudulent intent.

24        972.    This claim is brought pursuant to Section 11 of the Securities Act against

25    Defendants WaMu; Killinger; Casey; Woods; Farrell; Frank; Leppert; Lillis; Matthews;

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 377

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Montoya; Murphy; Osmer-McQuade; Pugh; Reed; Smith; Stever; Wood; Deloitte; Goldman Sachs; Morgan Stanley; Credit Suisse; Deutsche Bank; Lehman Brothers; UBS; Banc of America; J.P. Morgan; Barclays; Keefe, Bruyette; Cabrera Capital; Williams Capital; Citigroup; Greenwich; BNY; and Ramirez & Co. (collectively, the "Section 11 Defendants"), on behalf of members of the Class who purchased or otherwise acquired the securities issued pursuant and/or traceable to the Offerings and were damaged by the acts alleged herein.  This claim is based solely in strict liability and negligence.

973.    Defendant WaMu was the issuer, within the meaning of Section 11 of the Securities Act, pursuant to the Offering Documents, including the Registration Statement, (defined in ¶817, above) of the registered securities set forth below.

974.    As discussed above, in August 2006, WaMu issued and sold to investors $500 million of floating rate notes due August 24, 2009, and $400 million of 5.50% Notes due August 24, 2011.  Defendants Goldman Sachs, Morgan Stanley, Credit Suisse, Deutsche Bank, and Lehman Brothers were statutory underwriters for these registered securities, as admitted in the August 2006 Offering Documents.

975.    As discussed above, in September 2006, WaMu issued and sold to investors $500 million of depositary shares, each representing a 1/40,000th interest in a share of Series K Perpetual Non-Cumulative Floating Rate Stock.  Defendants UBS, Goldman Sachs, Morgan Stanley, Credit Suisse, J.P. Morgan, Banc of America, and Lehman Brothers were statutory underwriters for these registered depositary shares, as admitted in the September 2006 Offering Documents.

976.    As discussed above, in October 2007, WaMu issued and sold to investors $500 million of 7.250% subordinated notes due November 1, 2017.  Defendants Barclays; Credit

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 378

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Suisse; Lehman Brothers; Morgan Stanley; Keefe, Bruyette; Cabrera Capital; and Williams Capital were statutory underwriters for these registered securities, as admitted in the October 2007 Offering Documents.

977.    As discussed above, in December 2007, WaMu issued and sold to investors $3 billion of the Series R Stock.  Defendants Lehman Brothers; Morgan Stanley; Credit Suisse; Goldman Sachs; Barclays; Citigroup; Deutsche Bank; J.P. Morgan; Greenwich; UBS; BNY; Cabrera Capital; Keefe, Bruyette; Ramirez & Co.; and Williams Capital were statutory underwriters for the registered securities, as admitted in the December 2007 Offering Documents.

978.    Defendants Killinger, Casey, Woods, Farrell, Frank, Leppert, Lillis, Matthews, Murphy, Osmer-McQuade, Pugh, Reed, Smith, Stever, and Wood each signed the Registration Statement, which was then updated and incorporated into the Offering Documents, as a senior officer and/or director of WaMu within the meaning of Section 11 of the Securities Act. Defendant Montoya was a director at WaMu at the time of the filing of the Offering Documents.

979.    Deloitte consented to the incorporation of its unqualified auditor's report regarding WaMu's financial statements into the Offering Documents, including the Registration Statement.  Specifically, Deloitte consented to the incorporation into the August 2006 Offering Documents and the September 2006 Offering Documents of its unqualified auditor's report on WaMu's financial statements included in the Company's 2005 Form 10-K.  Deloitte consented to the incorporation into the October 2007 Offering Documents and the December 2007 Offering Documents of its unqualified auditor's report on WaMu's financial statements included in the Company's 2006 Form 10-K.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, the Offering Documents included, but were not limited to, the facts

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 379

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

that: (i) the financial statements that Deloitte certified as being presented in conformity with GAAP were not presented in conformity with GAAP, and (ii) Deloitte's audits, which it attested were conducted in accordance with GAAS, were not conducted in accordance with GAAS.

980.     The registered securities described in this Count were issued and sold pursuant to the Offering Documents.  All purchases of the registered securities after the issuance of the August 2006 Offering Documents are traceable to the August 2006 Offering Documents.  All purchases of the registered securities after the issuance of the September 2006 Offering Documents are traceable to the September 2006 Offering Documents.  All purchases of the registered securities after the issuance of the October 2007 Offering Documents are traceable to the October 2007 Offering Documents.  All purchases of the registered securities after the issuance of the December 2007 Offering Documents are traceable to the December 2007 Offering Documents.

981.     The Offering Documents, including the Registration Statement, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

982.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Offering Documents, which misrepresented or failed to disclose the material adverse facts alleged in connection with Plaintiffs' Securities Act claims, as set forth above.

983.     In connection with offering the registered securities to the public and the sale of those securities, the Section 11 Defendants, directly or indirectly, used the means and

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 380

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

instrumentalities of interstate commerce, the United States mails and a national securities exchange.

984.    As the issuer of the registered securities, WaMu is strictly liable for the untrue statements of material fact and material omissions described herein.

985.    None of the other Section 11 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

986.    Class members did not know, nor in the exercise of reasonable diligence could have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

987.    As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of the Floating Rate Notes and the 5.50% Notes pursuant to the August 2006 Offering Documents, the Series K Stock pursuant to the September 2006 Offering Documents, the 7.250% Notes pursuant to the October 2007 Offering Documents and/or the Series R Stock pursuant to the December 2007 Offering Documents.  By reason of the conduct alleged herein, each Defendant violated Section 11 of the Securities Act.

988.    By reason of the foregoing, the Section 11 Defendants are liable to the members of the Class who acquired registered securities pursuant to or traceable to the Offering Documents.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 381

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

989.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the issuance of the Offering Documents.

## FIFTH CLAIM FOR RELIEF

**For Violations of Section 12(a)(2) of the Securities Act In Connection With
The Offerings Against Defendants WaMu; Goldman Sachs; Morgan Stanley;
Credit Suisse; Deutsche Bank; Lehman Brothers; UBS; Banc of America; J.P. Morgan;
Barclays; Keefe, Bruyette; Cabrera Capital; Williams Capital; Citigroup; Greenwich;
BNY; and Ramirez & Co**

990.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein. For the purposes of this Count, Plaintiffs assert only strict liability and negligence claims, and expressly exclude from this count any allegations of fraud or reckless or intentional misconduct, and expressly exclude from this Count any allegations of fraud or reckless or intentional misconduct.

991.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77k, against Defendant WaMu, as well as Defendants Goldman Sachs; Morgan Stanley; Credit Suisse; Deutsche Bank; Lehman Brothers; UBS; Banc of America; J.P. Morgan; Barclays; Keefe, Bruyette; Cabrera Capital; Williams Capital; Citigroup; Greenwich; BNY; and Ramirez & Co. (the "Underwriter Defendants"), on behalf of members of the Class who purchased or otherwise acquired WaMu securities pursuant and/or traceable to the Offering Documents, including the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and December 2007 Prospectus,  and were damaged by acts alleged herein.

992.    By means of the Offering Documents, including the August 2006 Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and December 2007 Prospectus, and by using the means and instruments of transportation and communication in interstate commerce

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 382

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    and of the mails, Defendant WaMu and the Underwriter Defendants, through public offerings,

2    solicited and sold WaMu securities to members of the Class.

3        993.    The Offering Documents, including the August 2006 Prospectus, the September

4    2006 Prospectus, the October 2007 Prospectus and December 2007 Prospectus, were materially

5    misstated, omitted to state facts necessary to make the statements made not misleading, and

6    concealed or failed to adequately disclose material facts as alleged herein.

7

8        994.    None of the Underwriter Defendants made a reasonable investigation or possessed

9    reasonable grounds for the belief that the statements contained in the Offering Documents,

10   including the August 2006 Prospectus, the September 2006 Prospectus, the October 2007

11   Prospectus and the December 2007 Prospectus, were accurate and complete in all material

12   respects.   Had they exercised reasonable care, these Defendants would have known of the

13   material misstatements and omissions alleged herein.

14

15       995.    Members of the Class purchased WaMu securities by means of the materially

16   misstated Offering Documents.  At the time they purchased shares in the Offerings, no member

17   of the Class knew, or by the reasonable exercise of care could have known, of the material

18   misstatements in and omissions from the Offering Documents, including the August 2006

19   Prospectus, the September 2006 Prospectus, the October 2007 Prospectus and December 2007

20   Prospectus the Offering Documents were materially misstated, omitted to state facts necessary to

21   make the statements made not misleading and concealed or failed to adequately disclose material

22   facts as alleged herein.

23

24       996.    By virtue of the conduct alleged herein, WaMu and the Underwriter Defendants

25   violated Section 12(a)(2) of the Securities Act.

26

27

28

Lead Plaintiff's                                         Bernstein Litowitz Berger & Grossmann LLP
Consolidated Securities Complaint                        1285 Avenue of the Americas
No. 2:08-MD-1919 MJP                                     New York, NY  10019
Page 383                                                 (212) 554-1400

997.    Accordingly, members of the Class who purchased or otherwise acquired WaMu securities have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their securities to WaMu and the Underwriter Defendants. And, members of the Class who have sold their WaMu securities issued in or traceable to the Offerings are entitled to recissory damages.

998.    This claim is brought within one year after the discovery of the misstatements and omissions contained in the Offering Documents and within three years after the Offerings.

## SIXTH CLAIM FOR RELIEF

**For Violations of Section 15 of the Securities Act In Connection With
The Offerings Against Defendants Killinger, Casey, Woods, Ballenger, Farrell, Frank,
Leppert, Lillis, Matthews, Montoya, Murphy, Osmer-McQuade, Pugh, Reed, Smith,
Stever, and Wood**

999.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein, and expressly exclude from this Count any allegations of fraud or intentional misconduct.

1000.    This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Killinger, Casey, Woods, Ballenger, Farrell, Frank, Leppert, Lillis, Matthews, Montoya, Murphy, Osmer-McQuade, Pugh, Reed, Smith, Stever, and Wood, on behalf of members of the Class who purchased or otherwise acquired WaMu securities pursuant and/or traceable to the Offering Documents and were damaged by acts alleged herein.  For the purposes of this Count, Plaintiff asserts only strict liability and negligence claims and expressly disclaims any allegation of fraud or intentional misconduct.

1001.    At all relevant times, Defendants Killinger, Casey, Woods, Ballenger, Farrell, Frank, Leppert, Lillis, Matthews, Montoya, Murphy, Osmer-McQuade, Pugh, Reed, Smith,

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 384

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Stever, and Wood were controlling persons of the Company within the meaning of Section 15 of the Securities Act. As set forth herein, because of their positions in the Company and/or their stock ownership, and/or because of their positions on the WaMu Board, Defendants Killinger, Casey, Woods, Ballenger, Farrell, Frank, Leppert, Lillis, Matthews, Montoya, Murphy, Osmer-McQuade, Pugh, Reed, Smith, Stever, and Wood had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the unlawful acts and conduct alleged herein.

1002. Specifically, Defendants Killinger, Casey, Woods and Ballenger each served as an executive officer of WaMu. Defendant Killinger served as WaMu's Chief Executive Officer and Chairman of its Board; Defendant Casey served as its Chief Financial Officer; and Defendant Woods served as its Senior Vice President and Controller; and Defendant Ballenger served as Senior Vice President and Assistant Controller and Controller. As such, at all times relevant, Defendants Killinger, Casey, Woods and Ballenger each participated in the operation and management of the Company, conducted and participated, directly and indirectly, in WaMu's business affairs and mortgage-lending operations. These Defendants also participated in the preparation and dissemination of the Offering Documents, certain of the financial statements incorporated by reference therein and/or otherwise participated in the process necessary to conduct the Offerings. Because of their positions of control and authority as senior officers of WaMu, each of these Defendants were able to, and did, control the contents of certain or all the Offering Documents and the financial statements incorporated by reference therein, which contained materially false financial information.

1003. Similarly, at all times relevant, Defendants Farrell, Frank, Leppert, Lillis, Matthews, Montoya, Murphy, Osmer-McQuade, Pugh, Reed, Smith, Stever, and Wood served as

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 385

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Directors on WaMu's Board at the time the Offerings were conducted and/or at the time that the Registration Statement was signed.  As directors of a publicly-owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to WaMu's financial condition and results of operations.  These Defendants each signed the Registration Statement; signed the 2005 Form 10-K which was incorporated by reference into the August 2006 Offering Documents and the September 2006 Offering Documents; signed the 2006 Form 10-K which was incorporated by reference into the October 2007 Offering Documents and the December 2007 Offering Documents; and/or were Directors at the time the Offerings were conducted, the Offering Documents were disseminated to the investing public and the Registration Statement became effective.  Thus, these Defendants controlled the contents and dissemination of the Offering Documents.

1004.  By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Defendant WaMu, each of the Defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired WaMu securities pursuant to or traceable to the Offering Documents.  As a direct and proximate result of the conduct of these Defendants, members of the Class suffered damages in connection with their purchase or acquisition of the securities.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.  Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 386

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

B.  Declaring and determining that the Defendants violated the federal securities laws as charged above;

C.  Awarding Plaintiffs and the Class compensatory damages;

D.  As to the claims set forth under the Securities Act (Sections 11, 12(a)(2) and/or 15), awarding rescission or a recessionary measure of damages;

E.  Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

F.  Awarding such other relief for the benefit of the Class as this Court may deem just and proper.

## XVI.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 387

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

2   Dated:  August 5, 2008

Respectfully Submitted,

3   BERNSTEIN LITOWITZ BERGER &
        GROSSMANN LLP

4

5   By: /s/ Chad Johnson
    Chad Johnson (*pro hac vice*)

6   Hannah Ross (*pro hac vice*)

7   Jerald Bien-Willner (*pro hac vice*)
    Katherine M. Sinderson (*pro hac vice*)

8   1285 Avenue of the Americas
    New York, New York  10019

9   Tel:    (212) 554-1400

10  Fax:    (212) 554-1444
    Email: chad@blbglaw.com

11          hannah@blbglaw.com
            jerryb@blbglaw.com

12          katherine@blbglaw.com

13  ***Counsel for Lead Plaintiff***

14  ***Ontario Teachers' Pension Plan Board***
    ***and Lead Counsel for the Class***

15

16

17  BYRNES & KELLER LLP
    Bradley S. Keller, WSBA# 10665

18  Jofrey M. McWilliam, WSBA# 28441
    1000 Second Avenue, Suite 3800

19  Seattle, Washington  98104
    Tel:    (206) 622-2000

20  Fax:    (206) 622-2522
    Email: bkeller@byrneskeller.com

21          jmcwilliam@byrneskeller.com

22

23  ***Liaison Counsel for the Class***

24

25

26

27

28

Lead Plaintiff's
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 388

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE WASHINGTON MUTUAL, INC.
SECURITIES LITIGATION

This Document Relates to:  ALL ACTIONS

No. 2:08-md-1919 MJP
Lead Case No. C08-387 MJP

**CLASS ACTION COMPLAINT**

JURY DEMAND

**APPENDIX TO CONSOLIDATED CLASS ACTION COMPLAINT**

Appendix
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

**List of Appendices:**

1.  Confidential Witness List and Key

2.  Summary of Claims Brought Pursuant to the Securities Exchange Act of 1934

3.  Summary of Claims Brought Pursuant to the Securities Act of 1933

4.  2005 OTS Cover Letter and the Accompanying 2005 Interagency Appraisal Guidelines

5.  Declaration of Sharon S. Fierstein

6.  Declaration of Chad Coffman

Appendix
Consolidated Securities Complaint
No. 2:08-MD-1919 MJP
Page 2

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

# APPENDIX 1

## Confidential Witness List and Key

| CW | Company | Tenure | Position(s) |
|---|---|---|---|
| 1 | Washington Mutual | 1991 – 2008 | Due Diligence Director |
| 2 | Washington Mutual | 1995 - 2008 | Telephone Banker; Senior Loan Coordinator; Senior Credit Analyst; Assistant Vice President Credit Level 3, Underwriting Supervisor |
| 3 | Washington Mutual | 1996 - 2008 | Assistant Vice President & Branch Manager |
| 4 | Long Beach Mortgage | 2003 – 2007 | Account Executive |
| 5 | Washington Mutual | 2003 – 2008 | Senior Credit Risk Manager; Senior Credit Quality Manager |
| 6 | Washington Mutual | 5/2007 – 12/2007 | Senior Loan Consultant |
| 7 | Washington Mutual | 2003 – 2007 | Closing Loan Coordinator |
| 8 | Washington Mutual | 2005 – 2007 | Senior Loan Consultant |
| 9 | Washington Mutual | 2/1998 – 9/2007 | Senior Loan Coordinator |
| 10 | Washington Mutual | 3/2007 – 12/2007 | Loan Coordinator / Mortgage Processor |
| 11 | Washington Mutual | 2007 | Senior Loan Coordinator |
| 12 | Washington Mutual | 2003 - 2007 | Loan Consultant |
| 13 | Washington Mutual | 1986 – 2006 | Sales Manager |
| 14 | Washington Mutual / Long Beach Mortgage | 1993 – 2006 | Loan Closer; Loan Coordinator; Underwriter; Operations Manager; Loan Set-Up and Delivery Team Manager |
| 15 | Washington Mutual | 2004 - 2007 | First Vice President and Director of Investor Relations, New York |
| 16 | Washington Mutual | 1999 – 2006 | Senior Administrative Assistant; Executive Assistant; Senior Appraisal Coordinator |
| 17 | Washington Mutual | 2001 – 2006 | Senior Vice President, Enterprise Risk Management |
| 18 | Washington Mutual | 2003 – 2006 | Vice President, Commercial Risk |
| 19 | Washington Mutual | 1983 – 2007 | Senior Vice President, Compliance Manager |
| 20 | Washington Mutual | 2002 – 2007 | Division Finance Officer, Senior Manager |
| 21 | Washington Mutual | 2005 – 2006 | Vice President and Senior Market Risk Manager |

**Confidential Witness List and Key**

| CW | Company | Tenure | Position(s) |
|----|---------|--------|-------------|
| 22 | Washington Mutual | 2007 | Credit Risk Manager in the Capital Markets Group |
| 23 | Washington Mutual | 1999-9/2006 | Regional Manager in WaMu's Appraisal Department |
|    | eAppraiseIT | 9/2006 – 8/2007 | Senior Appraisal Manager at eAppraiseIT |
| 24 | Washington Mutual | 2001-2006 | Senior Appraisal Coordinator |
| 25 | Washington Mutual | 9/2003 – 11/2005 | Loan Consultant |
| 26 | Washington Mutual | 2005 – 2007 | Loan Coordinator |
| 27 | Washington Mutual | 1997 – 1999 | Staff and Production Appraiser for WaMu |
|    | eAppraiseIT and Lenders Services Inc. | 1999 – 2006 | WaMu-approved appraiser with eAppraiseIT and Lenders Services Inc. on an independent-contractor basis |
| 28 | Washington Mutual | 11/2003 – 9/2006 | Appraisal Field Manager |
| 29 | Washington Mutual | 2002 – 2006 | Senior Underwriter |
| 30 | Long Beach Mortgage | 2004 – 9/2007 | Account Executive |
| 31 | Washington Mutual | 6/2003 – 2/2004 | Staff Appraiser |
| 32 | eAppraiseIT | 3/2004 – 3/2007 | Customer Service Representative, Business Analyst |
| 33 | eAppraiseIT | 2007 | Liaison between eAppraiseIT appraisers and WaMu |
| 34 | eAppraiseIT | 2006 – 2007 | Real Estate Appraiser |
| 35 | eAppraiseIT | 2006 – 2007 | Customer Service Representative / Account Manager |
| 36 | eAppraiseIT | 10/2006 – 8/2007 | Appraisal Management Department |
| 37 | eAppraiseIT | 6/2005 – 10/2007 | Customer Service Representative |
| 38 | eAppraiseIT | 2006 | Customer Service Representative |
| 39 | Lenders Services Inc. | 8/2006 – 2/2007 | Appraisal Management Team |
| 40 | Lenders Services Inc. | 2007 – 2008 | Customer Service Representative and Reviewer |
| 41 | Lenders Services Inc. | 2007 | Appraisal Management Team and Client Services |
| 42 | Lenders Services Inc. | 2007 | Costumer Relations |

**Confidential Witness List and Key**

| CW | Company | Tenure | Position(s) |
|---|---|---|---|
| 43 | Lenders Services Inc. | 2006 | Appraisal Services Representative |
| 44 | Lenders Services Inc. | 2006 | Customer Service Specialist |
| 45 | Lenders Services Inc. | 11/2006 – 12/2007 | Client Services |
| 46 | Washington Mutual | 2003 – 2006 | Sales Assistant; Loan Consultant |
| 47 | Washington Mutual | 1997 – 2008 | Operations Manager; Credit Quality Manager; Area Underwriting Manager responsible for the East Coast; Negotiated Transaction Manager |
| 48 | Washington Mutual | 2005 – 2008 | Senior Underwriter Level V |
| 49 | Washington Mutual (through a private mortgage insurance company) | 2007 | Contractual Senior Underwriter |
| 50 | Washington Mutual | 2001 – 2007 | Mortgage Loan Consultant |
| 51 | Washington Mutual | 2007 – 2008 | Senior Underwriter |
| 52 | Washington Mutual | 2004 – 2007 | Underwriting Team Manager / Due Diligence Analyst |
| 53 | Washington Mutual | 2004 – 2006; 3/2007-8/2007 | Senior Loan Processor |
| 54 | Washington Mutual | 2000 – 2007 | Credit Risk Supervisor |
| 55 | Washington Mutual | 2003 – 2008 | Senior Underwriter Non-Prime |
| 56 | Washington Mutual | 2007 – 2008 | Underwriter |
| 57 | Washington Mutual | 2002 – 2007 | Trader |
| 58 | Washington Mutual | 2005 -2007 | Assistant Vice President, Credit Due Diligence for Capital Markets |
| 59 | Washington Mutual | 2001 – 2008 | Senior Risk Analyst in Risk Analytics Group |
| 60 | Washington Mutual | 2002 – 2007 | Retail Loan Consultant |
| 61 | Washington Mutual | 2001 – 2007 | Retail Loan Consultant |
| 62 | Washington Mutual | 2005-2/2008 | Senior Underwriter |
| 63 | Washington Mutual and Long Beach Mortgage | 2001 – 2007 | Vice President, National Underwriting Manager |
| 64 | Long Beach Mortgage | 1998 – 2007 | Account Executive |
| 65 | Washington Mutual and Long Beach Mortgage | 2004 – 2007 | Senior Underwriter |
| 66 | Washington Mutual | 2004 – 2007 | Senior Mortgage Underwriter |
| 67 | Long Beach Mortgage | 2005 – 2007 | Quality Assurance Manager |
| 68 | Long Beach Mortgage | 2003 – 2006 | Wholesale Mortgage Underwriter |
| 69 | Long Beach Mortgage | 2003 – 2007 | Senior Underwriter |

**Confidential Witness List and Key**

| CW | Company | Tenure | Position(s) |
|---|---|---|---|
| 70 | Long Beach Mortgage | 2002 – 2007 | Senior Underwriter |
| 71 | Washington Mutual<br><br>Long Beach Mortgage | 2003 – 2004<br><br>2005 - 2006 | Senior Loan Coordinator |
| 72 | Long Beach Mortgage | 2004 – 2007 | Account Executive |
| 73 | Long Beach Mortgage | 2006 | Underwriter |
| 74 | Long Beach Mortgage | 2004 – 2006 | Underwriter |
| 75 | Washington Mutual | 2006 | Underwriter |
| 76 | Washington Mutual<br><br>Long Beach Mortgage | 2007<br><br>2004 – 2007 | Loan Processor, WaMu Specialty Lending; Senior Loan Coordinator, Long Beach Mortgage |
| 77 | Long Beach Mortgage | 1992 – 2007 | Vice President, Operations Manager, Loan Center |
| 78 | Washington Mutual | 2006 – 2008 | Assistant Vice President / Analyst II, Risk Analytics Group |
| 79 | Washington Mutual | 2002 – 2007 | Senior Operations Excellence, Capital Markets; Senior Operations Excellence, Enterprise Risk Management |
| 80 | Washington Mutual | 2006 – 2007 | Senior Vice President, Accounting Policy |
| 81 | Washington Mutual | 2006 - 2008 | Staff Accountant, Home Loans Group |
| 82 | Washington Mutual | 2001 – 2006 | Quality Assurance Manager |
| 83 | Washington Mutual | 2001 – 2006 | Senior Foreclosure Loan Specialist |
| 84 | Washington Mutual | 1989 – 2008 | Senior Accountant |
| 85 | Washington Mutual | 2006 – 2008 | Staff Accountant in Home Loans Accounting |
| 86 | Washington Mutual | 2005 – 2008 | Underwriting Manager |
| 87 | Washington Mutual | 1988 – 2007 | Default Specialist III |
| 88 | Washington Mutual | 2003 – 2007 | Vice President and Manager, Policies & Procedure Administration Group |
| 89 | Long Beach Mortgage | 2004 – 2007 | First Vice President, Area Operations Manager |

# APPENDIX 2

## SUMMARY OF CLAIMS BROUGHT PURSUANT TO THE
## SECURITIES EXCHANGE ACT OF 1934

| DEFENDANTS | FIRST CLAIM FOR RELIEF §10(b) | SECOND CLAIM FOR RELIEF §20(a) | THIRD CLAIM FOR RELIEF §20(a) |
|---|---|---|---|
| **THE COMPANY DEFENDANT** | | | |
| Washington Mutual, Inc. | X | | |
| **THE OFFICER DEFENDANTS** | | | |
| Killinger, Kerry K. | X | X | |
| Casey, Thomas W. | X | X | |
| Cathcart, Ronald J. | X | X | |
| Rotella, Stephen J. | X | X | |
| Schneider, David C. | X | X | |
| **THE CONTROLLER DEFENDANTS** | | | |
| Woods, John F. | | X | |
| Ballenger, Melissa J. | | X | |
| **THE AUDIT COMMITTEE AND FINANCE COMMITTEE DEFENDANTS** | | | |
| Farrell, Anne V. (F) | | | X |
| Frank, Stephen E. (A, F) | | | X |
| Leppert, Thomas C. (A) | | | X |
| Lillis, Charles M. (A) | | | X |
| Matthews, Phillip D. (A) | | | X |
| Montoya, Regina (F) | | | X |
| Murphy, Michael K. (A, F) | | | X |
| Osmer-McQuade, Margaret (F) | | | X |
| Pugh, Mary E. (F) | | | X |
| Reed, William G., Jr. (A, F) | | | X |
| Smith, Orin C. (A, F) | | | X |

(A) indicates membership on WaMu's Audit Committee during the Class Period
(F) indicates membership on WaMu's Finance Committee during the Class Period

# APPENDIX 3

## SUMMARY OF CLAIMS BROUGHT PURSUANT TO THE
## SECURITIES ACT OF 1933

| DEFENDANTS | FOURTH CLAIM FOR RELIEF §11 | FIFTH CLAIM FOR RELIEF §12(a)(2) | SIXTH CLAIM FOR RELIEF §15 |
|---|---|---|---|
| **THE WASHINGTON MUTUAL DEFENDANTS** | | | |
| Washington Mutual, Inc. | X | X | |
| Killinger, Kerry K. | X | | X |
| Casey, Thomas W. | X | | X |
| Woods, John F. | X | | X |
| Farrell, Anne V. | X | | X |
| Frank, Stephen E. | X | | X |
| Leppert, Thomas C. | X | | X |
| Lillis, Charles M. | X | | X |
| Matthews, Phillip D. | X | | X |
| Montoya, Regina | X | | X |
| Murphy, Michael K. | X | | X |
| Osmer-McQuade, Margaret | X | | X |
| Pugh, Mary E. | X | | X |
| Reed, William G., Jr. | X | | X |
| Smith, Orin C. | X | | X |
| Stever, James H. | X | | X |
| Wood, Willis B., Jr. | X | | X |
| Ballenger, Melissa J. | | | X |
| **THE AUDITOR DEFENDANT** | | | |
| Deloitte & Touche LLP | X | | |

**SUMMARY OF CLAIMS BROUGHT PURSUANT TO THE**
**SECURITIES ACT OF 1933**

| DEFENDANTS | FOURTH CLAIM FOR RELIEF §11 | FIFTH CLAIM FOR RELIEF §12(a)(2) | SIXTH CLAIM FOR RELIEF §15 |
|---|---|---|---|
| THE UNDERWRITER DEFENDANTS | | | |
| Goldman, Sachs & Co. | X | X | |
| Morgan Stanley & Co. Incorporated | X | X | |
| Credit Suisse Securities (USA) LLC | X | X | |
| Deutsche Bank Securities Inc. | X | X | |
| Lehman Brothers Inc. | X | X | |
| UBS Securities LLC | X | X | |
| Banc of America Securities LLC | X | X | |
| J.P. Morgan Securities Inc. | X | X | |
| Barclays Capital Inc. | X | X | |
| Keefe, Bruyette & Woods, Inc. | X | X | |
| Cabrera Capital Markets, LLC | X | X | |
| The Williams Capital Group, L.P. | X | X | |
| Citigroup Global Markets, Inc. | X | X | |
| Greenwich Markets, Inc. | X | X | |
| BNY Capital Markets, Inc. | X | X | |
| Samuel A. Ramirez & Company, Inc. | X | X | |

# APPENDIX 4



**Office of Thrift Supervision**
Department of the Treasury        *Managing Director, Examinations, Supervision, and Consumer Protection*

1700 G Street, N.W., Washington, DC  20552 • (202) 906-7984

March 22, 2005

**MEMORANDUM FOR:**    **CHIEF EXECUTIVE OFFICERS**

**FROM:**        Scott M. Albinson

**SUBJECT:**        Frequently Asked Questions (FAQ) on the Agencies'
            Appraisal Regulations and Related Guidance

The Office of Thrift Supervision (OTS), Office of the Comptroller of the Currency, Board of
Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, and National
Credit Union Administration (the agencies) are issuing the attached FAQ document in response
to questions from federally regulated institutions on the agencies' real estate appraisal standards.
The FAQ topics address existing standards and include selecting individuals to perform
appraisals and evaluations, ordering appraisals, accepting transferred appraisals, appraisal
reviews, and evaluation development.

Savings associations' board of directors and management should review the FAQ in conjunction
with the OTS appraisal regulations[1], the Interagency Appraisal and Evaluation Guidelines[2]
(October 1994), and the Interagency Statement on Independent Appraisal and Evaluation
Functions (October 2003)[3].  Internal policies and procedures should ensure that, among other
considerations, the savings association's appraisal and evaluation function is safeguarded from
internal influence and interference from the loan production staff.  Savings associations are also
reminded that independence is compromised when an institution uses an appraiser who is
recommended by the borrower or allows the borrower to select the appraiser.

For further information regarding the FAQ, contact Debbie Merkle, Project Manager,
Credit Risk Policy at (202) 906-5688.

Attachment

---

[1]  12 CFR Part 564.

[2]  TB55a, Interagency Appraisal and Evaluation Guidelines, dated October 27, 1994
(http://www.ots.treas.gov/docs/8/84042.pdf).

[3]  CEO Letter #184, Independent Appraisal and Evaluation Functions, dated October 27, 2003,
(http://www.ots.treas.gov/docs/2/25184.pdf).

**Office of the Comptroller of the Currency
Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of Thrift Supervision
National Credit Union Administration**

Frequently Asked Questions on the Appraisal Regulations
and the Interagency Statement[1] on
Independent Appraisal and Evaluation Functions
March 22, 2005

The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the National Credit Union Administration (the agencies) prepared this document in response to questions from federally regulated institutions (regulated institutions) on existing standards for selecting appraisers, ordering appraisals, accepting transferred appraisals, and other related topics.  It should be reviewed in conjunction with the agencies' appraisal regulations, the "Interagency Appraisal and Evaluation Guidelines" (interagency guidelines), dated October 27, 1994, and the joint statement "Independent Appraisal and Evaluation Functions" (independence statement), dated October 28, 2003.

### SELECTING AN APPRAISER AND ORDERING AN APPRAISAL

1. *Do the interagency guidelines and independence statement apply for ordering and reviewing appraisals if the collateral property is residential (mortgage or home equity) rather than commercial?*

   **Answer:** The agencies' guidance applies to both commercial and residential transactions. While the guidance does not differentiate between commercial and residential transactions, a regulated institution's appraisal policy and practices may differ for certain transactions.  The regulated institution needs to consider the type of transaction when ordering appraisals, selecting appraisers, and reviewing appraisals.  The transaction type should influence the type of appraisal that the regulated institution orders and whether the appraisal is eligible for a compliance review or should receive a comprehensive, analytical review prior to the credit decision.  Moreover, for all lending activity, a regulated institution should ensure that independence is maintained when selecting appraisers, ordering appraisals, and reviewing appraisals.

2. *A regulated institution plans to make a construction loan to a tract developer to build 10 homes.  Is it permissible for the developer to order appraisals on the properties and use them to support the construction loan request?  Could the developer select an appraiser from*

---

[1] See OCC: AL 2003-9; FRB:  SR letter 03-18; FDIC: FIL-84-2003; OTS: CEO letter 184; and NCUA: LTCU 03-CU-17.

*the lender's approved appraiser list and in turn submit the appraiser's name to potential permanent lenders?*

**Answer:** No, the regulated institution may not accept a borrower-ordered appraisal and may not allow the borrower to select an appraiser from its approved appraiser list.

3. *Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?*

**Answer:** The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff.

Loan production staff should not select appraisers. However, in a small or rural institution or branch, the only individual qualified to analyze the real estate collateral may also be a loan officer, other officer, or director of the institution. To ensure their independence, such lending officials, officers, and directors should abstain from any vote or approval involving loans for which they engaged the appraiser, reviewed the appraisal, or performed an evaluation.

4. *What information should the regulated institution provide to the appraiser upon engagement?*

**Answer:** The regulated institution should provide the property's address, its description, and any other relevant information. The regulated institution may also provide a copy of the sales contract for purchase transactions. However, the information provided by the regulated institution should not unduly influence the appraiser or in any way suggest the property's value. The regulated institution and the appraiser should agree on the scope of the appraisal in advance, consistent with the Uniform Standards of Professional Appraisal Practice (USPAP) and the agencies' appraisal regulations and interagency guidelines.

5. *When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided the list is not under their control?*

**Answer:** Yes, loan production staff may use a revolving, board-approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. Staff responsible for the development and maintenance of the list should be independent of the loan production process. In developing the list, a regulated institution should consider the knowledge and expertise of the selected appraiser for a given assignment. For example, the list should indicate the qualifications of the appraiser to perform appraisals in particular markets and on various types of residential property transactions. If the next available name on the list is not selected, the departure should be properly documented in the credit file. The administrative procedures should include a process for qualifying an appraiser for initial placement on the list as well as for periodic monitoring of the appraiser's performance to assess whether to retain an appraiser on the list. Further, there should be periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that controls exist to ensure independence.

6. *Must the individual appraiser, rather than the appraisal firm, sign and accept the terms of an engagement letter for it to be considered valid?*

   **Answer:** The agencies have no specific requirements with respect to who signs and accepts the engagement letter. The appraiser, however, must sign the certification page of the appraisal report.

7. *Are appraisers required to disclose whether they have been engaged to appraise a given property in the past or is this information confidential?*

   **Answer:** The agencies' appraisal regulations do not require that the regulated institution obtain information from appraisers as to whether they have previously appraised a given property. However, the regulations do require when engaging a fee appraiser that the regulated institution ensures that the appraiser has no direct or indirect interest, financial or otherwise, in the property or the transaction. The regulated institution should ask relevant questions of an appraiser to ensure that the appraiser is independent of the transaction and capable of rendering an unbiased opinion.

8. *When ordering appraisals, can a staff appraiser or an appraisal company affiliated with the regulated institution be considered independent since the regulated institution compensates them?*

   **Answer:** Yes, if a staff appraiser prepares an appraisal, that appraiser must be independent of the lending, investment, and collections functions and not involved in the approval of the transaction. When fee appraisers from an affiliated appraisal company prepare appraisals, similar independence standards apply.

## ACCEPTING A TRANSFERRED APPRAISAL

9. *Can a regulated institution accept an appraisal from a prospective borrower and determine its acceptability based on a review?*

   **Answer:** No, a regulated institution cannot accept a borrower-ordered appraisal.

10. *Can an appraisal be transferred from one lender to another and, if so, under what circumstances?*

    **Answer:** A regulated institution may accept an appraisal transferred from another regulated institution or from a financial services institution (that is, a non-regulated institution), provided 1) the appraiser is engaged directly by the institution transferring the appraisal, 2) the appraiser has no direct or indirect interest in the property or transaction, 3) the existing appraisal or evaluation remains valid, and 4) the regulated institution determines that the appraisal conforms to the agencies' appraisal requirements and interagency guidelines and is otherwise appropriate. (A financial services institution describes entities that provide services in connection with real estate lending transactions on an ongoing basis.)

Regulated institutions are expected to perform a more thorough review when accepting an appraisal from another financial services institution to confirm that the appraisal complies with the regulation and has sufficient information to support the lending decision. Moreover, the regulated institution accepting the appraisal should determine whether appropriate documentation is available to confirm that the financial services institution (not the borrower) ordered the appraisal.

11. *Can a regulated institution accept an appraisal prepared by an appraiser who was engaged by a loan broker?*

   **Answer:** The agencies' appraisal regulations allow a regulated institution to accept an appraisal prepared by an appraiser engaged by another financial services institution, including a loan broker. This is allowed as long as the regulated institution has appropriate controls in place to ensure that the appraiser is acting on behalf of the financial services institution, the appraisal conforms to the requirements of the regulation and is otherwise acceptable, and the appraiser is independent from the borrower. Regulated institutions should review broker-ordered appraisals thoroughly to ensure that the appraisal complies with the regulation and meets the quality standards required by the institution's appraisal policies.

12. *May an appraisal be readdressed to a regulated institution from the borrower or another institution?*

   **Answer:** A regulated institution cannot accept an appraisal that has been readdressed or altered by the appraiser with the intent to conceal that the original client was the borrower. Readdressing appraisals to conceal the original client, whether the client is a borrower or another financial services institution, is misleading and violates the agencies' regulations and USPAP.

13. *May an appraisal be routed from one lender to a regulated institution via the borrower?*

   **Answer:** A regulated institution cannot accept an appraisal from the borrower unless the regulated institution can confirm that the appraisal was in fact ordered by another regulated institution or financial services institution. In accepting the appraisal, the regulated institution must also confirm that the appraiser is independent of the transaction and that the appraisal conforms to the agencies' appraisal regulations and is otherwise acceptable.

14. *Can a borrower pay the appraiser directly for an appraisal that is ordered by the lender?*

   **Answer:** Since the regulated institution has engaged the appraiser for its services, the regulated institution should be the party to remit payment to the appraiser. The regulated institution may seek reimbursement from the borrower for the cost of the appraisal. However, the borrower may not recommend an appraiser to the institution or select the appraiser.

4

*15. Can an appraiser deliver an appraisal report to more than one lender assuming the appraisal has been ordered by one of the lenders?*

**Answer:** The agencies' appraisal regulations do not address whether an appraiser can deliver an appraisal report to more than one lender. The case may depend upon the provisions of the engagement letter. For example, the lender may specify in the engagement letter that the appraisal may be provided to another financial institution if the lender decides not to go forward on the loan. In the case of a syndicated loan, a lead lender is usually responsible for engaging the appraiser and providing copies of the appraisal to the other participating financial institutions. With regard to standards of confidentiality, USPAP directs an appraiser to be aware of, and comply with, all confidentiality and privacy laws and regulations applicable in an assignment.

*16. Can the regulated institution accept an appraisal prepared by an appraiser who is a family member of the loan broker who engaged him/her?*

**Answer:** The agencies' appraisal regulations do not address family relationships between the appraiser and the person who engages the appraiser. However, the agencies' appraisal regulations do not permit a regulated institution to accept an appraisal in which the appraiser has a direct or indirect interest, financial or otherwise, in the property or the transaction. Therefore, the regulated institution should review appraisals where a potential conflict of independence may exist and should accept the appraisal only if it can determine that the appraiser is independent of the transaction.

*17. Can the regulated institution accept an appraisal prepared by an appraiser who is engaged by a financial services institution with whom the appraiser has an affiliated business relationship?*

**Answer:** The business relationship between the financial services institution and the appraiser may not necessarily violate the independence requirement of the agencies' appraisal regulations. However, the agencies' appraisal regulations do not permit a regulated institution to accept an appraisal in which the appraiser has a direct or indirect interest, financial or otherwise, in the property or the transaction. The regulated institution should evaluate the financial services institution's controls to ensure independence and that there is appropriate separation of responsibilities and reporting lines between the appraiser and the financial services institution's lending function.

*18. How can a regulated institution ensure appraiser independence when accepting an appraisal prepared for a financial services institution?*

**Answer:** Documentation (that is, an engagement letter) should be available to indicate that the financial services institution (not the borrower) ordered the appraisal and that the appraiser has no direct or indirect interest, financial or otherwise, in the property or the transaction. The original lender's engagement letter to the appraiser should be made part of the appraisal report to provide additional information on the identity of the client in order to ensure independence in the appraisal process.

## REVIEWING APPRAISALS

*19. Should all appraisals undergo a compliance review?*

**Answer:** Yes, prior to a final credit decision, regulated institutions should perform a compliance review on all appraisals to confirm that they comply with the minimum appraisal standards as outlined in the agencies' appraisal regulations, the interagency guidelines, and the independence statement. Loan administration files should document this compliance review, which may be in checklist or narrative format. In addition, certain appraisals should be reviewed more comprehensively to assess the technical quality of the appraiser's analysis prior to making a final credit decision. The regulated institution should establish guidelines for a more detailed, technical review based on transaction risk, transaction size, or other criteria. (See "Program Compliance" in the interagency guidelines.)

*20. Can a regulated institution approve a loan subject to receipt and review of an appraisal, or must the appraisal be obtained and reviewed prior to making the final decision?*

**Answer:** A regulated institution may grant conditional approvals to prospective borrowers before obtaining an appraisal. However, a final credit decision or action should only occur after the regulated institution receives, reviews, and accepts the appraisal.

*21. What qualifications would constitute a "qualified and adequately trained individual" for the purpose of conducting appraisal reviews?*

**Answer:** Individuals who review appraisals as part of a regulated institution's internal compliance function should be independent of the transaction and possess the requisite education, expertise, and competence to perform the review commensurate with the complexity of the transaction.

## EVALUATION AND OTHER APPRAISAL TOPICS

*22. Can an otherwise qualified individual prepare an evaluation of a property securing a loan that will be approved by his/her direct supervisor? Can one officer perform an evaluation for another if they are both members of a loan committee, provided the evaluating officer abstains from voting? Could the lending officer or branch manager in a small, regulated institution perform the evaluation if he/she abstains from the final loan approval?*

**Answer:** To maintain independence, the individual preparing an evaluation should not directly report to someone involved in loan production. In a small, regulated institution where absolute lines of independence cannot be achieved, one officer may perform an evaluation for another as long as the evaluating officer abstains from the lending decision.

23. *Do the interagency guidelines apply only to loans in excess of $250,000? Is the $250,000 threshold the loan amount or the property value?*

**Answer:** The interagency guidelines apply to all real-estate-related financial transactions regardless of size or whether loans are for a regulated institution's own portfolio, held for sale, or held in asset-backed conduits. However, the agencies' appraisal regulations allow regulated institutions to use an appropriate evaluation of the real estate in lieu of an appraisal for transactions with a value of $250,000 or less, business loans $1 million or less, or subsequent transactions (transactions involving an existing extension of credit at the lending institution). The regulations define transaction value as the amount of the loan or extension of credit, not the value of the property. The interagency guidelines contain minimum standards for evaluation content and address the qualifications of individuals performing evaluations.

[Note: NCUA's business loan evaluation threshold is $250,000 or less. (12 CFR Part 722.3(b)(2)]

24. *Should a regulated institution comply with the independence requirements if an appraisal is not required by the agencies' appraisal regulations?*

*Answer:* A regulated institution should ensure independence in the ordering process for an appraisal even if the appraisal was not required under the agencies' appraisal regulations. Regulated institutions should also maintain independence for evaluations.

25. *Does a tax-assessment value from the local taxing authority constitute an evaluation? Can a loan officer who approves and/or recommends a loan conduct an evaluation if the market value that the officer develops in the evaluation does not exceed the tax-assessment value?*

**Answer:** A value from the taxing authority alone is insufficient to be considered an evaluation. An evaluation report should include calculations, supporting assumptions, and, if utilized, a discussion of comparable sales. If tax assessment information is used as part of an evaluation, the regulated institution should document the facts and analysis used to demonstrate that there is a valid correlation between the assessed values of the taxing authority and the property's market value. In addition, an evaluation should describe the real estate collateral, its condition, and its current and projected use.

A regulated institution should ensure that an individual who performs an evaluation is independent of the loan production function. Simply restricting the size of a transaction to less than the tax-assessed value alone does not comply with the agencies' appraisal regulations or the interagency guidelines, which address standards of independence. (See "Independence of the Appraisal and Evaluation Function" in the interagency guidelines.)

*26. The work-out plan on a $5 million problem loan calls for a regulated institution to receive an assignment of a $2 million note from the borrower's relative secured by a deed of trust on a different property. Is this financial transaction considered real-estate-related and is an appraisal required on the collateral property?*

**Answer:** Yes, this is considered a real-estate-related financial transaction. The agencies' appraisal regulations and interagency guidelines allow for an evaluation in lieu of an appraisal on new real estate collateral in certain loan workout situations depending on loan quality, collateral quality, and validity of an existing appraisal or evaluation. (See "Renewals, Refinancings and Other Subsequent Transactions" in the interagency guidelines.)

*27. What is the useful life of an appraisal?*

**Answer:** The useful life of an appraisal varies with market conditions and property type. The agencies allow a regulated institution to use an existing appraisal to support a subsequent transaction if the institution documents that the existing value estimate remains valid. Factors which could impact the value include the passage of time; the volatility of the local market; the availability of financing; the inventory of competing properties; improvements to, or lack of maintenance of, the subject property or competing surrounding properties; changes in zoning; or environmental contamination. (See "Valid Appraisals and Evaluations" in the interagency guidelines.)

*28. Can a regulated institution advance new funds without a new appraisal if the value of the total loan continues to be supported by an existing appraisal and is consistent with supervisory LTV limits? Does the age of the appraisal matter if the physical condition of the property and the market conditions have not changed?*

**Answer**: A regulated institution may use an existing appraisal or evaluation to support a subsequent transaction, as long as the credit file documents the facts and analysis that support the institution's conclusion that the appraisal or evaluation remains valid. Criteria for determining whether an existing appraisal or evaluation remains valid will vary depending upon the condition of the property and the marketplace and the nature of any subsequent transaction.

# APPENDIX 5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE WASHINGTON MUTUAL, INC.

SECURITIES LITIGATION

This Document Relates to: ALL ACTIONS

No. 2:08-md-1919 MJP
Lead Case No. C08-387 MJP

## DECLARATION OF SHARON SABBA FIERSTEIN, CPA

I, Sharon Sabba Fierstein, being duly sworn, depose and say:

1.     I am a Partner in the accounting firm of Marks Paneth & Shron LLP ("Marks Paneth"). I serve in the Litigation and Corporate Financial Advisory Services Group at the New York offices of Marks Paneth, located at 622 Third Avenue, New York, New York 10017. This Declaration is based on my personal knowledge concerning the matters stated herein, and I would testify to them, under oath, if called upon to testify before this Court.

2.     As set forth in my curriculum vitae, a copy of which is attached as Exhibit A to this Declaration, I am a certified public accountant ("CPA") licensed in the State of New York since 1984.

3.     I am currently the President of the New York State Society of CPAs and serve as a council member as a New York State delegate to the American Institute of CPAs. For nearly ten years, I served as the Executive Vice President, Treasurer and Chief Financial Officer of a mortgage banking company. Prior to that, I was an Audit Manager for Deloitte, Haskins & Sells (a

1

predecessor of Deloitte & Touche LLP), which included a two-year special assignment where I served as Secretary to the International Auditing Practices Committee for the International Federation of Accountants. In that position, I contributed to the design and drafting of International Auditing Guidelines and other technical papers.

4.    I was retained on an hourly, non-contingent basis by Lead Counsel, the firm of Bernstein Litowitz Berger & Grossmann LLP, to act as an accounting expert and consultant with respect to the accounting and auditing issues in this case.

5.    From April 2008 through August 5, 2008, I, and others at my firm under my supervision, worked closely with Lead Counsel to analyze Washington Mutual Inc.'s ("WaMu's" or the "Company's") financial statements from 2004 through the present. I reviewed, among other things, the Company's publicly-issued financial statements filed with the Securities and Exchange Commission ("SEC") for the years ended December 31, 2004, December 31, 2005, December 31, 2006, and December 31, 2007; all reported interim financial statements for the years 2004 through 2007, and the first quarter of 2008; detailed financial information for the quarter ended June 30, 2008 filed as an exhibit to a Form 8-K filed by WaMu with the SEC on July 22, 2008; the Company's press releases; certain Wall Street analysts' reports on WaMu; certain internal WaMu documents provided to me on a confidential basis by Lead Counsel; as well as the relevant authoritative accounting and auditing literature relating to, *inter alia*, the accounting for impairment of loans, loan loss reserves, and internal controls. I have not reviewed the Company's internal accounting documents or any other documents of the type that may later be made available through discovery and which would enable me to further evaluate WaMu's accounting practices, including WaMu's Allowance for Loan and Lease Losses ("Allowance"). In addition to the work on this matter noted

above, I reviewed the Consolidated Class Action Complaint (the "Complaint").

6.      In forming my opinion (discussed below), I considered relevant accounting rules and standards that public companies such as WaMu would have been required to consider in the preparation of their financial statements.  The Financial Accounting Standards Board ("FASB"), which has delegated authority from the SEC to promulgate GAAP for public companies, issued in 1978 Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("SFAS 5").  SFAS 5 indicates that companies must accrue losses as a charge to income when both (1) the information available indicates that it is probable that an asset is impaired and that it is probable that a future event will confirm the fact of loss, and (2) that the amount of loss can be reasonable estimated.  Further, the SEC provided guidance to WaMu and other registrants for accounting for losses when it issued in 2001 SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and Documentation Issues" ("SAB 102").  SAB 102 provides several factors that should be considered when accounting for loan losses, including "levels of and trends in delinquencies and impaired loans . . . trends in volume and terms of loans . . . . [and] effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices."  SAB 102 also advises that because "the allowance and provision for loan losses are significant elements of the financial statements. . . . it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses."  In addition, the American Institute of Certified Public Accountants' (AICPA) *Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies*, which was originally issued in 2004 and updated in 2007, instructs that if a faulty credit granting decision has been made, or loan credit

review procedures are inadequate or overly aggressive, a loss should be recognized at the date of loan origination.

7.    I based my opinion of WaMu's accounting practices during the Class Period, which is explained in greater detail below, on the information set forth above, and on my expertise in the field of accounting.

8.    Based upon my review of the information referred to above, it is my opinion that WaMu's methodology for accounting for its Allowance did not conform with Generally Accepted Accounting Principles ("GAAP") and SEC guidelines during the Class Period (October 17, 2005 through July 23, 2008) and that, based on my review of the allegations of the Complaint and certain of the internal WaMu documents referenced therein, WaMu lacked adequate internal controls over financial reporting with respect to WaMu's Allowance in, at least, the third and fourth quarters of 2005 and the first and second quarters of 2006. Furthermore, it is my opinion that the Company's violations of GAAP and SEC guidelines caused the Company, in its reported financial statements, to understate its Allowance, which in turn caused the Company to report overstated net income, overstated assets, and overstated diluted earnings per share throughout the Class Period.

9.    Based upon my review of the information described above, including information relating to the manner in which WaMu originated and underwrote its loans, it is my opinion that the Company did not appropriately evaluate its loans for impairment at origination or in subsequent reporting periods in compliance with GAAP and SEC guidelines. It is my understanding that the information set forth in the Complaint was uncovered through Lead Counsel's investigation regarding WaMu's lending practices; such information indicates that the Company's lending practices became increasingly permissive in the third quarter of 2005 and continued through at least

November 1, 2007. In particular, information in the Complaint alleging that the Company engaged in unlawful appraisal practices and maintained deficient underwriting and risk management policies and practices, as well as the Complaint's allegations related to the deficiencies in the Company's model for calculating loan losses (the "Loan Performance Risk Model") indicate, assuming the truth of those allegations, that WaMu's Allowance was understated throughout the Class Period.

10.     Based upon my review of the Complaint and certain internal WaMu documents referenced therein, it is also my opinion that the Company's internal controls over financial reporting with respect to WaMu's Allowance were deficient. In particular, and as discussed in the Complaint, an internal WaMu report that I reviewed indicates that management responsible for determining the Company's Allowance did not have an adequate methodology and sufficient data in order to calculate the Allowance in accordance with GAAP and SEC guidelines. Moreover, according to the internal WaMu documents I reviewed, certain of WaMu's deficient internal controls over financial reporting that related to its Allowance were not scheduled to be addressed for nine months – from the time they were identified in writing in September 2005 until June 30, 2006. However, my review of the Company's financial statements indicates that during that period, specifically for the third and fourth quarters of 2005 and the first and second quarters of 2006, the Company did not disclose those deficiencies and that the Company's internal controls over financial reporting were deficient.

I declare under penalty of perjury that the foregoing is true and correct.
Executed in New York, New York on August 5, 2008.

*Sharon Sabba Fierstein*
Sharon Sabba Fierstein, CPA

# EXHIBIT A

# SHARON SABBA FIERSTEIN, CPA
# CURRICULUM VITAE

## PROFESSIONAL EXPERIENCE

2004 to Date        **Marks Paneth & Shron LLP**

　　　　　　　　　　　Partner, Litigation & Corporate Financial Advisory Services

2002 to 2004        **Eastern Funding, LLC**

　　　　　　　　　　　Chief Financial Officer

1993 to 2002        **PW Funding Inc.**

　　　　　　　　　　　Executive Vice President, Treasurer and Chief Financial Officer

1990 to 1993        **Metropolitan Life Insurance Company**

1990 to 1992        Divisional Controller
1992 to 1993        Profit Manager

1981 to 1990        **Deloitte Haskins & Sells**

　　　　　　　　　　　Audit Manager (New York Office)

1986 to 1988        **International Federation of Accountants**

　　　　　　　　　　　Secretary to the International Auditing Practices Committee (secondment from Deloitte Haskins & Sells)

## PROFESSIONAL ACTIVITIES

American Institute of Certified Public Accountants:

2004 to Date        Member of Council (New York Delegate)
1996 to 1996        Member of BIEC Professional Issues Subcommittee
1993 to 1994        Member of Work/Life and Women's Initiatives Executive Committee

American Woman's Society of Certified Public Accountants:

1991 to 1992        Vice President and Member of Executive Committee of National Board of Directors
1989 to 1992        Member of National Board of Directors

# SHARON SABBA FIERSTEIN, CPA

## Professional Activities – (Continued)

| | |
|---|---|
| 1988 to 1989 | President of NYC Chapter |
| 1986 to 1989 | Member of Board of Directors of NYC Chapter |

New York State Society of Certified Public Accountants:

| | |
|---|---|
| 2008 to Date | President, Chairman of the Board of Directors and Executive Committee |
| 2007 to 2008 | President-Elect, Member of the Board of Directors and Executive Committee, Chairman of Quality Enhancement Policy Committee |
| 2005 to 2008 | Member of Financial Accounting Standards Committee |
| 2005 to 2008 | Member of Human Resources Committee |
| 2006 to 2007 | Vice President, Member of the Board of Directors and Executive Committee |
| 1999 to 2005 | Trustee of the Foundation for Accounting Education |
| 2002 to 2003 | Chairman of Task Force on Bylaws Revision |
| 2000 to 2002 | Secretary, Member of Board of Directors and Executive Committee |
| 2000 to 2002 | Chairman of Committee on Committee Operations |
| 1998 to 2000 | Chairman of Finance Committee |
| 1998 to 2002 | Member of Committee on Committee Operations |
| 1998 to 1999 | Member of Annual Leadership Conference Committee |
| 1997 to 1998 | Vice President and Member of Board of Directors |
| 1996 to 1998 | Chairman of Interactive Online Resource Committee |
| 1994 to 1997 | Member of Board of Directors and Executive Committee |
| 1993 to 1997 | Member of Chief Financial Officers Committee |
| 1991 to 1993 | Member of General Committee on Members in Public Practice, |
| 1991 to 1993 | Chairman of Advancement of Women in the Accounting Profession Committee |
| 1988 to 1991 | Member of Promoting CPA Careers Committee |

## COMMUNITY ACTIVITIES

National Association of Mothers' Centers

| | |
|---|---|
| 2002 to Date | Treasurer & Member of the Executive Committee |

Wesleyan University

| | |
|---|---|
| 1981 to Date | Member of Alumni Schools Committee |
| 2000 to 2001 | Chairman of Class of '81 20th Reunion Committee |

# SHARON SABBA FIERSTEIN, CPA

Woodbury Jewish Center

2001 to 2007                 Member of the Education Committee

## EDUCATION

New York University Stern School of Business - M.B.A., 1985

Wesleyan University - B.A. in Mathematics/Economics, 1981

     Charles E. Merrill Scholar, 1977 - 1978

## PROFESSIONAL CERTIFICATION

Certified Public Accountant, New York, 1984

## PROFESSIONAL MEMBERSHIPS

     Accountants Club of America
     American Institute of Certified Public Accountants
     American Woman's Society of Certified Public Accountants
     New York State Society of Certified Public Accountants

## AWARDS

2002  Recipient of Woman of Distinction in Business Award – Town of Oyster Bay
1999  Recipient of Outstanding CPA in Industry Award – New York State Society of Certified Public Accountants

# APPENDIX 6

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

IN RE WASHINGTON MUTUAL, INC.

SECURITIES LITIGATION

This Document Relates to:  ALL ACTIONS

No. 2:08-md-1919 MJP
Lead Case No. C08-387 MJP

DECLARATION OF CHAD COFFMAN, CFA

My name is Chad Coffman.  I am the President of Winnemac Consulting, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation.  My qualifications are set forth in the next section.

I have been asked by counsel for Plaintiffs to review their Consolidated Class Action Complaint ("Complaint") in regards to the Washington Mutual, Inc. ("WaMu") Securities Litigation and assess whether, in my opinion, assuming the truth of Plaintiffs' allegations, the Complaint has articulated an economically and logically sound basis for loss causation.  To be clear, I have not been asked to quantify or determine the extent of loss causation at this stage of the litigation.  A quantification of loss causation will require substantial factual and expert analysis with the benefit of discovery.  My analysis is limited to evaluating whether the Complaint provides a sufficient link between allegations of fraud and information associated with declines in price and thus establishes a coherent theory of loss causation that can be

1

proven or rebutted by the parties at trial. In my opinion it has. In addition to my review of the Complaint, for the purpose of this report I have reviewed selected analyst reports and stock price information. The next section presents my qualifications and the remainder of the report provides the basis for my opinion.

## QUALIFICATIONS

I hold a Bachelors Degree in Economics with Honors from Knox College and a Masters in Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three exams over three years that cover a wide variety of financial topics with a particular focus on valuation.

I, along with several others, founded Winnemac Consulting in March of this year. Prior to starting Winnemac Consulting, I was employed by Chicago Partners for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination and antitrust. I have been responsible for conducting loss causation, damages, and valuation analysis in some of the most high profile securities cases on record including Parmalat, Enron, Tyco, and WorldCom among others. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers and more recently I have been engaged by a prominent mediator (Retired Judge Daniel Weinstein) to provide neutral economic analysis and opinions in several securities class actions as well as other matters.

My qualifications are further detailed in my curriculum vitae, which is attached as Exhibit A. Winnemac Consulting is being compensated at an hourly rate for my work on this matter and my compensation is not contingent on the outcome of the case.

## BASIS FOR OPINION

I understand loss causation to be a combination of the "but-for" test and the "foresee-ability" test. In other words, would Plaintiffs have suffered the loss but-for Defendants' actions and was the loss a foreseeable consequence of their actions? The roles for economists in this

2

type of inquiry include evaluating the economic impact of the alleged fraud (in terms of how it would affect stock prices) and determining whether there is economic evidence to link later price declines (if any) to the revelation of the prior misstatements or omissions.

The Complaint details a series of fraud allegations, but in my mind there are two primary themes that capture many of them: (1) WaMu fraudulently influenced the appraisal process to obtain inflated asset appraisals, and (2) WaMu misrepresented the quality of its underwriting and loss reserving process. Plaintiffs assert that these fraudulent actions and misrepresentations caused the company's loan loss reserves to be knowingly and materially understated because the company faced materially greater risk of losses than disclosed. For example, if WaMu was relying on fraudulently inflated appraisal values, this would have the effect of overstating the value of collateral and understating loan to value ratios. These are important metrics used by practitioners in evaluating the quality of loan portfolios. In addition, if WaMu fraudulently overstated the quality of its underwriting and loss reserving standards, the market would underestimate expected credit losses. In both cases, the foreseeable consequence of the alleged fraud is that the Company, at some point, would have substantially higher than expected credit losses.

If we take Plaintiffs' allegations as well pled and true, then as a matter of economics it is clear that the market overvalued WaMu. The quantification of the extent to which WaMu was overvalued as a result of these alleged misstatements is a complex question that would be subject of expert analysis later in the litigation. However, it is clear that credit losses and loan loss reserves are important metrics in evaluating the performance of a lending institution. Even a cursory review of reports issued by securities analysts that covered WaMu, and the transcripts of WaMu's conference calls with securities analysts, reveals that analysts focused on credit losses and loan loss reserves as critical metrics in evaluating the company's financial performance and condition.[1]

---

[1] For example, in a report dated October 18, 2007, DA Davidson issued a report that lowered its purchase recommendation to "Underperform" from "Neutral" and observed that "Credit quality deterioration was the big news this quarter, and it appears credit trends will disrupt Q4 results as well" (See Exhibit B). Following the release of WaMu's financial results for the fourth quarter of 2007, Merrill Lynch lowered its estimates of WaMu's earnings and reported that "Credit remains the chief concern, likely delaying the return to profitability until Q2'09, based on our forecast for losses and related provisions" (See Exhibit C).

As in many securities fraud cases, the alleged corrective disclosures are not perfect mirror images of the alleged misstatements. In other words, WaMu never directly admits to either theme of Plaintiffs' fraud claims. Instead, over the second half of 2007 and first half of 2008, WaMu repeatedly disclosed deteriorating financial performance, specifically including substantial credit losses and increases in loan loss reserves. In addition, the New York Attorney General implicated WaMu as participating in fraudulent influence over appraisers. WaMu's stock price reacted negatively to a series of these announcements.

The Complaint clearly identifies dates which Plaintiffs allege represent corrective disclosures (see section titled "The Truth About WaMu's Financial Condition Begins to Emerge"). For example, the Complaint describes that after the close of trading on October 17, 2007, WaMu announced their financial results for the third quarter of 2007. WaMu's quarterly net income fell 72 percent from the same quarter a year earlier. The company cited a weaker housing market and disruptions in the capital markets as the reasons for the decline. As part of the announcement, the Company disclosed that it may have to set aside as much as $2.9 billion in loan loss provisions, up $1.2 billion from their July 2007 estimate of $1.7 billion. WaMu also announced that it would not be increasing its stock dividend for the first time in 12 years. WaMu's stock price responded to the news, by falling 7.71% from $33.07 per share on October 17, 2007 to $30.52 per share on October 18, 2007. I have undertaken a preliminary event study and determined that this price movement is highly statistically significant.[2]

An earnings announcement such as this contains a myriad of information and is not simply a revelation that WaMu engaged in fraudulent behavior. However, if Plaintiffs are able to prove, as they allege clearly in the Complaint, that the Company fraudulently withheld information from the market regarding its appraisal practices, underwriting standards and the credit quality of its customers, then there is a coherent economic and logical link between these misstatements and the stock price decline. This is because the foreseeable consequence of

---

[2] An event study is a procedure that statistically tests whether a particular change in price is sufficiently large, after controlling for market effects, that simple random variation can be ruled out as the cause of the price movements. In this case, I analyzed WaMu's stock price after controlling for general market movements (using the S&P 500) and industry price movements (using the S&P Supercomposite Banking Index). The change in WaMu's stock price on October 18, 2007, after controlling for market and industry effects, is far greater than the conventional threshold for statistical significance (i.e. less than 5% probability the change in price would occur by chance.)

lending money to less creditworthy individuals than disclosed to the market is, at some point, incurring larger than expected credit losses and the need to record greater loss reserves. The October 17, 2007 announcement specifically reveals substantially greater than expected increases in loss reserves. In my opinion, this portion of the announcement contributed materially to the price decline. This is supported by the comments of securities analysts immediately subsequent to the announcement.[3] This focus on credit losses and loss reserves as important valuation drivers is consistent with my own understanding and experience valuing these types of institutions.

The previous example is just one of a series of alleged corrective disclosures identified in the Complaint, but it highlights the direct and economically coherent loss causation argument Plaintiffs are pleading. The other alleged corrective disclosures are clearly detailed in the complaint and are either specific to the New York Attorney General's investigation of inflated appraisals (e.g. November 1, 2007) or underscore the weakening of WaMu's credit portfolio (e.g. December 11, 2007, March 27, 2008, and April 8, 2008, June 9, 2008). I have not engaged in a detailed analysis to determine whether each and every date included in the Complaint is appropriate, but I have satisfied myself that Plaintiffs' overall loss causation theory is sound.

I am mindful that Defendants may try to argue that some or all of the declines in the stock price on the announcements identified by Plaintiffs, such as the example above, represent losses that would have occurred regardless of the alleged fraud because of broader declines in the housing market and the economy in general. I concur that some fraction of the price decline on at least certain of the dates identified by Plaintiffs are likely due to these outside factors. Fact discovery and further expert analysis in this case will play an important role in understanding what proportion of losses are directly linked to, and a foreseeable consequence of, the alleged fraud and which are not. However, in my opinion, Plaintiffs have provided a coherent

---

[3] For example, a Credit Suisse analyst report dated October 18, 2007 stated "We are reducing our 2007 and 2008 EPS estimates to reflect higher loss provisions . . . We remain concerned about the earnings impact of the costs related to higher problem assets and reiterate our Neutral rating" (See Exhibit D). A Merrill Lynch analyst report dated the same day, "Most surprising was the outlook for higher credit costs in Q4'07, $1.2B, due to the rapidly deteriorating performance of its loan portfolio." The report concludes by stating, "We have lowered our '07 [earnings per share] estimate to $2.40 from $2.80, reflecting Q3 Actuals and WM's increased provision guidance. Our '08 estimate has been lowered to $2.60 from $3.45. *The revision largely reflects $3.8[Billion] of provision expenses vs. our prior expectation of $2.0[Billion]*" (See Exhibit E - emphasis added).

economic theory of how and why the alleged fraud would result in inflated prices for WaMu's securities and specific, logical, and economically coherent theory of causal linkage to information disclosures that resulted in declines in price – and thus losses for WaMu investors.

I declare under penalty of perjury that the aforesaid is true and correct.


Executed in Chicago, Illinois on August 5, 2008


Chad Coffman, CFA

# EXHIBIT A

CURRICULUM VITAE OF

CHAD W. COFFMAN

Winnemac Consulting, L.L.C.
One South Wacker Drive, Suite 3800
Chicago, IL 60606
Mobile:      (815) 382-0092
Email:       coffman@winnemac.com

## EMPLOYMENT:

### Winnemac Consulting, LLC
President (2008 - Current)

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**C.F.A.**   Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance,
Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## SELECTED EXPERIENCE:

Experience in Securities and Valuation Cases:

- Expert consultant for Citigroup/Salomon Smith Barney in various matters related to Jack
Grubman's analyst coverage of various companies.  This included supporting multiple experts at
high-profile arbitration where plaintiffs claimed $900 million in damages.  Arbitration panel
returned a verdict in favor of client (reported in Wall Street Journal).

**SELECTED EXPERIENCE** (CONT.):

- Expert damages consultant in dozens of 10b-5 and Section 11 securities litigation, including, but not limited to:
  - WorldCom
  - Enron
  - Tyco
  - Parmalat
  - Sears
  - Atlas Air
  - UnumProvident
  - XL Capital
  - Household Finance/HSBC
  - Dynegy
  - Anicom

- Served as neutral expert for mediator (Judge Daniel Weinstein) in multiple 10(b)-5 securities cases as well as futures manipulation case.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Expert consultant to large hedge fund that owned bonds in WorldCom. Responsible for directing analysis that led to favorable settlement of their claim in the bankruptcy.

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>. Filed report re: the fair value of Mr. Kuo's shares.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division.</u> Filed report re: fair value of Pallas shares.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant for Novartis regarding various labor related issues.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race and gender.

**SELECTED EXPERIENCE** (CONT.):

- Expert consultant for Farmers Insurance related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

- Testifying expert in Shirley Cohens v. William Henderson, Postmaster General, United States Postal Service.  United States District Court for the District of Columbia. C.A 1:00CV-1834 (TFH) – Filed report re: lost wages and benefits.

- Testifying expert in Richard Akins v. NCR Corporation.  Before the American Arbitration Association – Filed report re: lost wages.

Selected Experience in Antitrust, General Damages, and Other Matters:

- Expert consultant in high-profile, ongoing antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

- Expert consultant to CIB Marine for bank valuation study

- Played significant role in highly-publicized internal accounting investigation of two Fortune 500 companies.

**TEACHING EXPERIENCE:**

> KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
> KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, 191-204 (1998).

## PROFESSIONAL AFFILIATIONS:

Associate Member CFA Society of Chicago Partners
Associate Member CFA Institute
Phi Beta Kappa

## AWARDS:

1994 Ford Fellowship Recipient for Summer Research.
1993 Arnold Prize for Best Research Proposal.
1995 Knox College Economics Department Award.

## PERSONAL ACTIVITIES:

Pro bono consulting for Cook County State's Attorney's Office

# EXHIBIT B



## D.A. Davidson & Co.
member SIPC

**Institutional Equity Research**

# WASHINGTON MUTUAL, INC.
WM – NYSE

**October 18, 2007**

**Rating:**
## UNDERPERFORM↓

**Price:** (10/17/07) $33.07

**Price Targets:**
12-18 month: $29↓
5-year: $36↓

**Industry:**
Banks & Thrifts

**Jim Bradshaw**
503.603.3022
jbradshaw@dadco.com

**Jeff Rulis**
503.603.3025
jrulis@dadco.com

**Katherine Woods-Eliot**
Research Associate
503.603.3096
kwoods-eliot@dadco.com

| FY (Dec) | 2006A | 2007E | Y-O-Y Growth | 2008E | Y-O-Y Growth |
|---|---|---|---|---|---|
| Revenue ($B) | $14.6 | $14.6 | 0% | $16.2 | 11% |
| Previous | - | $14.8 | | $17.3 | |
| Price/Revenue ratio | 2.2x | 2.0x | | 1.8x | |
| EPS Revised | $3.64 | $2.35 | -35% | $2.60 | 10% |
| Previous | - | $2.63 | | $3.75 | |
| Price/EPS ratio | 9.1x | 14.1x | | 12.7x | |

| Quarterly Data: | EPS | EPS Previous | Revenue ($B) | Revenue Previous |
|---|---|---|---|---|
| 3/31/07A | $0.86 | - | $3.6 | - |
| 6/30/07A | $0.92 | - | $3.8 | - |
| 9/30/07A | $0.23 | $0.19 | $3.4 | NC |
| 12/31/07E | $0.32 | $0.66 | $3.8 | $4.1 |

| Valuation Data | | Trading Data | |
|---|---|---|---|
| Long-term growth rate (E) | 13% | Shares outstanding (M) | 876.0 |
| Equity/Assets (9/30/07) | 7.5% | Market Capitalization ($B) | $29.0 |
| Book value per share (9/30/07) | $27.21 | 52-week range | $31.27 - $46.38 |
| Tangible BV per share (9/30/07) | $16.78 | Average daily volume (3 mos.) (M) | 11.6 |
| Dividend (yield) | $2.24 (6.8%) | Float | 98% |
| Return on Equity (T-T-M) | 3.4% | Index Membership | S&P 500 |

### Credit Rapidly Softening, Taking A Cautious Approach.  Lowering Rating To UNDERPERFORM

- **It was a rough quarter for the company** with severe credit losses, high mark-to-market and other credit market disruption costs, and a cautious near-term outlook from management.  Reported EPS was $0.23, above our $0.19 estimate (consensus was a near-meaningless $0.27, within a range of $0.19-$0.83).  Operating income was actually worse than we feared, as the company only recorded a 4.5% tax rate in Q3 versus our 37.5% forecast, related to the sharp drop in income.

- **Credit quality deterioration was the big news this quarter**, and it appears credit trends will disrupt Q4 results as well.  The company reported a loan loss provision of $967 million, just below the $975 million figure we expected.  Non-performing assets increased from $4.02 billion to $5.45 billion during the quarter.

- **We are sharply lowering our EPS outlook** for the company given the uncertainty surrounding asset quality and revenue from home mortgage activities.  We were assuming 2007 EPS of $2.63 and $3.75 in 2008.  We are cutting these forecasts to $2.35 and $2.60, respectively.  The bulk of the cut is related to rising credit costs.

- **We are lowering our price target to $29 (from $37) and our rating from Neutral to UNDERPERFORM** given lower EPS estimates and our concern about credit quality.  The cash dividend offers some support to the share price, and the yield is above 6%.  The company does not seem to be in a strong position to support the dividend, fund asset growth, and buyback stock, however.  We assume share purchase is off the table for now, suggesting limited support for the stock in the interim.

**Company Description:**
Seattle, WA – Washington Mutual is the nation's largest thrift with approximately $330 billion in assets and more than 2,500 banking offices throughout the nation. The company, founded in 1889, offers primarily retail and commercial banking, along with mortgage loans and services.

---

**Please refer to pages 6-7 of this report for detailed disclosure and certification information.**

**D.A. Davidson & Co.**

**Price Chart**



Source: Thomson One

**All Around Rough Quarter**

Washington Mutual reported Q3 EPS of $0.23, slightly better than the $0.19 EPS figure we were expecting. The company recently guided net income down about 75% from the Q3:06 figure of $748 million, causing us to lower our forecast from $0.72 to $0.19 per share. Actual reported net income was $202 million, down about 73%.

It was a rough quarter for the company with severe credit losses, high mark-to-market and other credit market disruption costs, and a cautious near term outlook from management on the conference call following the earnings release. Operating income was actually worse than we feared, as the company only recorded a 4.5% tax rate in Q3 versus our 37.5% forecast, related to the sharp drop in income. Oddly enough, while it felt like a kitchen sink quarter, the company suggested that credit costs in Q4 are likely to rise even further.

**Narrower Spreads, Less Asset Growth Than Assumed**

Spread income was $2.01 billion during Q3, a drop of $20 million from Q2. We expected spread income, driven by improved NIM and more rapid balance sheet growth, to be almost $200 million higher. Instead, NIM fell in the quarter, to 2.86%, while we expected margins would rise about 5bp. The high cost of funding asset growth in the quarter, with funding mostly coming from FHLB and other short term borrowings linked to LIBOR, caused margin decay in the quarter. We anticipate that margins will lay flat in Q4 unless funding spreads improve quickly.

Average earning assets increased about $4 billion in the quarter to $283 billion while average assets rose about the same. The company shifted a large portion of loans (about $15 billion) from a held-for-sale category to held-for-investment, recognizing a loss of about $147 million. While we anticipated the transfer, we also assumed that current quarter production would ultimately end up on the company's balance sheet—but production volume fell sharply, keeping balance sheet growth more subdued than we expected. Home loan production per quarter has fallen from $41 billion during Q1 to $36 billion in Q2 to $26 billion in Q3. Most of the volume has been in conforming residential loans, as sub-prime and non-conforming production has stalled.

**Rapid Decline In Credit Quality**

Credit quality deterioration was the big news this quarter, and it appears credit trends will disrupt Q4 results as well. The company reported a loan loss provision of $967 million, just below the $975 million figure we expected. Non-performing assets increased from $4.02 billion to $5.45 billion during the quarter, 1.70% of average assets. This is one of the highest ratios in our universe. The company also recorded net loan losses of $421 million in the quarter, an increase of 55% from the Q2 pace.

The company's commercial loan book is performing well and accounted for only a small piece of the increase in NPAs, but virtually all the home loan categories saw an increase in delinquencies and loss rates. The company anticipates further deterioration in credit quality in Q4 given the rapid decline in home prices in most markets. This leads us to push our Q4 loan loss provision assumption from the $968 million level noted in Q3 to $1.25 billion, an increase of $250 million from our last forecast. This is the fourth time this year we have boosted loss expectations.

The increase in loan totals held in the company's investment portfolio also leads us to forecast higher provision rates in 2008, and we are lifting our loan loss provision assumption from $2.8 billion to $3.35 billion in 2008. Until credit markets return to more normal operations and housing prices stabilize, it is difficult to assess near-term loss severity, in our opinion.

**Numerous Mark-To-Market Charges Included In Q3 Results**

Fee income was $1.4 billion, falling about $380 million from Q2. In addition to the loss reported above on the loan transfer, the company also noted about $83 million in charges related to market disruptions in the sale and risk management activities. It also booked a $153 million mark-to-market loss on various trading assets, including the reduction of the carrying value of credit card and sub-prime residuals. In addition, the company recorded a $104 million charge related to an impairment of carrying value on investment grade mortgage securities. The positive mark on the company's mortgage servicing rights asset was $222 million during the quarter, and offset some of the other charges. All of these items, when aggregated, reduced EPS by about $0.19.

D.A. Davidson & Co.

**Low Tax Rate Helps Q3 EPS By $0.07**

Operating costs were $2.2 billion, $109 million higher than we expected. The company shuttered about 33 branch offices in Q3, but the net headcount figure was higher than we expected. We believe this is a timing issue. The company plans to open 50 new stores in Q4.

The tax rate was just 4.5% in Q3 versus our forecast 37.5% rate. We were expecting operating income of $288 million for Q3. The reported figure was $220 million, so operating results were softer than we expected. If the company had paid normal taxes in Q3, EPS would have been $0.16. The tax rate will revert back to a more normal level in Q4, assuming the company posts profits in line with our revised expectations.

**No Buyback, No Dividend Increase For Now**

The company left the cash dividend at $0.56 per quarter, breaking a long string of boosting the cash dividend each quarter. Management seems committed to maintaining this base for the time being, and has curtailed repurchasing shares for now. Management expects about $5 billion in asset growth in Q4. It appears there is sufficient capital to pay the dividend and support modest balance sheet growth for several more quarters, assuming loss rates do not materially ramp past the expected Q4 pace.

**EPS Is Disappearing**

We are sharply lowering our EPS outlook for the company, given the uncertainty surrounding asset quality and revenue from homer mortgage activities. We were assuming 2007 EPS of $2.63 and $3.75 in 2008. We are cutting these forecasts to $2.35 and $2.60, respectively. The bulk of the cut is related to rising credit costs.

**Cutting Rating From Neutral To UNDERPERFORM**

Over the last decade WM shares have traded at an average of 11.5x forward EPS within a range of 6.2x to more than 20x. We believe a forward EPS multiple of 10x-11x is appropriate at this juncture given credit and interest rate risks. This suggests a price target in the range of $27-$29 looking out to 2008 EPS. We are lowering our price target to $29 (from $37) given lower EPS estimates and our concern about credit quality. The cash dividend offers some support to the share price, and the yield is above 6%. But the company does not seem to be in a strong position to support the dividend, fund asset growth, and buyback stock. We assume share purchase is off the table for now, suggesting limited support for the stock in the interim. We are lowering our rating from Neutral to **UNDERPERFORM**.

Jim Bradshaw
Senior Research Analyst
503.603.3022

D.A. Davidson & Co.

**Washington Mutual, Inc.**
**Financial Data (In MM's, except PS)**
NYSE:WM FYE Dec

| Income Statement | 2005 | Q1:06 | Q2:06 | Q3:06 | Q4:06 | 2006 | Q1:07 | Q2:07 | Q3:07 | Q4:07e | 2007e | 2008e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest Income | $ 15,919 | $ 4,657 | $ 4,935 | $ 5,105 | $ 5,210 | $ 19,907 | $ 5,008 | $ 4,748 | $ 4,856 | $ 5,078 | $ 19,690 | $ 21,779 |
| Interest Expense | $ 7,701 | $ 2,540 | $ 2,875 | $ 3,158 | $ 3,212 | $ 11,785 | $ 2,927 | $ 2,714 | $ 2,842 | $ 3,025 | $ 11,508 | $ 12,767 |
| Net Interest Income | $ 8,218 | $ 2,117 | $ 2,060 | $ 1,947 | $ 1,998 | $ 8,122 | $ 2,081 | $ 2,034 | $ 2,014 | $ 2,053 | $ 8,182 | $ 9,012 |
| Loan Loss Provision | $ 316 | $ 82 | $ 224 | $ 166 | $ 344 | $ 816 | $ 234 | $ 372 | $ 967 | $ 1,250 | $ 2,823 | $ 3,345 |
| Inc. After Provision | $ 7,902 | $ 2,035 | $ 1,836 | $ 1,781 | $ 1,654 | $ 7,306 | $ 1,847 | $ 1,662 | $ 1,047 | $ 803 | $ 5,359 | $ 5,667 |
| Depositor Fees | $ 2,194 | $ 578 | $ 641 | $ 655 | $ 692 | $ 2,566 | $ 665 | $ 720 | $ 740 | $ 761 | $ 2,886 | $ 3,204 |
| Loan Servicing Fees, net | $ 946 | $ 537 | $ 462 | $ 256 | $ 472 | $ 1,727 | $ 419 | $ 637 | $ 748 | $ 769 | $ 2,573 | $ 2,728 |
| Securities, Annuities & Credit Card Fees | $ 1,006 | $ 290 | $ 241 | $ 248 | $ 266 | $ 1,045 | $ 261 | $ 282 | $ 305 | $ 311 | $ 1,159 | $ 1,252 |
| Other operating income | $ 654 | $ 238 | $ 179 | $ 127 | $ 180 | $ 724 | $ 120 | $ 191 | $ 7 | $ 195 | $ 513 | $ 554 |
| Gain on sale of loans | $ 847 | $ 157 | $ 184 | $ 217 | $ 64 | $ 622 | $ 149 | $ 66 | $ (169) | $ (125) | $ (79) | |
| Gain on sale of other assets/hedging | $ (241) | $ (75) | $ (129) | $ 67 | $ (82) | $ (219) | $ (73) | $ (138) | $ (252) | $ (125) | $ (588) | $ (510) |
| Total Other Income | $ 5,406 | $ 1,725 | $ 1,578 | $ 1,570 | $ 1,592 | $ 6,465 | $ 1,541 | $ 1,758 | $ 1,379 | $ 1,787 | $ 6,465 | $ 7,227 |
| Salaries & Benefits | $ 3,738 | $ 1,044 | $ 1,021 | $ 939 | $ 945 | $ 3,949 | $ 1,002 | $ 977 | $ 910 | $ 880 | $ 3,769 | $ 3,830 |
| Net Occupancy & Equipment | $ 1,523 | $ 392 | $ 435 | $ 408 | $ 476 | $ 1,711 | $ 376 | $ 354 | $ 371 | $ 355 | $ 1,456 | $ 1,614 |
| Regulatory Assessments | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DP Fees | $ 451 | $ 135 | $ 145 | $ 142 | $ 133 | $ 555 | $ 129 | $ 132 | $ 135 | $ 138 | $ 534 | $ 566 |
| Other operating expense | $ 2,106 | $ 625 | $ 650 | $ 714 | $ 722 | $ 2,711 | $ 626 | $ 702 | $ 775 | $ 755 | $ 2,858 | $ 3,029 |
| Non-recurring Expenses | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Amort. of Goodwill &CDI | $ 52 | $ 15 | $ 15 | $ 15 | $ 15 | $ 60 | $ 15 | $ 15 | $ 15 | $ 15 | $ 60 | $ 60 |
| RE owned operations | | | | | | | | | | | | |
| Total Other Expenses | $ 7,870 | $ 2,211 | $ 2,266 | $ 2,218 | $ 2,291 | $ 8,986 | $ 2,148 | $ 2,180 | $ 2,206 | $ 2,143 | $ 8,677 | $ 9,200 |
| Income B4 Taxes | $ 5,438 | $ 1,549 | $ 1,148 | $ 1,133 | $ 955 | $ 4,785 | $ 1,240 | $ 1,240 | $ 220 | $ 446 | $ 3,146 | $ 3,694 |
| Accounting Changes, Net | | | | | | | | | | | | |
| Applicable Taxes | $ 2,006 | $ 564 | $ 389 | $ 394 | $ 315 | $ 1,662 | $ 456 | $ 410 | $ 10 | $ 154 | $ 1,030 | $ 1,385 |
| Net Income | $ 3,432 | $ 985 | $ 759 | $ 739 | $ 640 | $ 3,123 | $ 784 | $ 830 | $ 210 | $ 292 | $ 2,116 | $ 2,309 |
| Extraordinary/Extother Item, Net | $ - | $ - | $ 8 | $ 9 | $ 418 | $ 435 | | | | | | |
| Income After Extraordinary | $ 3,432 | $ 985 | $ 767 | $ 748 | $ 1,058 | $ 3,558 | $ 784 | $ 830 | $ 210 | $ 292 | $ 2,116 | $ 2,309 |
| Income Attributable to Common | $ 3,432 | $ 985 | $ 767 | $ 748 | $ 1,050 | $ 3,550 | $ 777 | $ 822 | $ 202 | $ 285 | $ 2,086 | $ 2,281 |
| | | | | | | | | | | | | |
| Avg Shares Outstanding (FD) | 918.98 | 1003.46 | 975.50 | 967.38 | 955.82 | 975.54 | 899.71 | 893.09 | 876.00 | 878.00 | 886.70 | 878.00 |
| EPS (FD) | $ 3.73 | $ 0.98 | $ 0.79 | $ 0.77 | $ 1.10 | $ 3.64 | $ 0.86 | $ 0.92 | $ 0.23 | $ 0.32 | $ 2.35 | $ 2.60 |
| Dividends per Share | $ 1.90 | $ 0.50 | $ 0.51 | $ 0.52 | $ 0.53 | $ 2.06 | $ 0.54 | $ 0.55 | $ 0.56 | $ 0.56 | $ 2.21 | $ 2.24 |
| Payout Ratio | 50.9% | 50.9% | 64.9% | 67.3% | 48.2% | 56.6% | 62.5% | 59.8% | 242.9% | 172.4% | 93.9% | 86.2% |
| Book Value Per Share | $ 27.95 | $ 27.45 | $ 27.66 | $ 28.17 | $ 28.21 | $ 28.21 | $ 27.30 | $ 27.27 | $ 27.21 | $ 26.97 | $ 26.97 | $ 27.33 |
| Tangible Book Value Per Share | $ 19.60 | $ 18.80 | $ 19.00 | $ 19.32 | $ 18.74 | $ 18.74 | $ 17.11 | $ 16.93 | $ 16.78 | $ 16.54 | $ 16.54 | $ 16.90 |
| | | | | | | | | | | | | |
| **Balance Sheet (Avg Balances)** | | | | | | | | | | | | |
| Investments & other earning assets | $ 34,567 | $ 45,499 | $ 46,369 | $ 44,995 | $ 44,370 | $ 45,308 | $ 37,636 | $ 37,607 | $ 42,571 | $ 42,997 | $ 40,203 | $ 45,147 |
| Loans, Net | $ 260,197 | $ 262,326 | $ 266,870 | $ 267,832 | $ 270,414 | $ 266,861 | $ 258,064 | $ 242,229 | $ 240,692 | $ 243,099 | $ 246,021 | $ 255,254 |
| Total Earning Assets | $ 294,764 | $ 307,825 | $ 313,239 | $ 312,827 | $ 314,784 | $ 312,169 | $ 295,700 | $ 279,836 | $ 283,283 | $ 286,096 | $ 286,224 | $ 300,400 |
| Total Assets | $ 326,560 | $ 344,562 | $ 349,561 | $ 349,542 | $ 353,056 | $ 349,180 | $ 331,905 | $ 316,004 | $ 320,475 | $ 323,680 | $ 323,016 | $ 339,864 |
| Checking | $ 46,545 | $ 40,436 | $ 37,603 | $ 34,866 | $ 33,098 | $ 36,501 | $ 31,821 | $ 30,373 | $ 28,492 | $ 28,634 | $ 29,830 | $ 30,066 |
| MMDA | $ 42,549 | $ 44,816 | $ 48,095 | $ 49,144 | $ 53,314 | $ 48,842 | $ 54,862 | $ 58,969 | $ 57,377 | $ 57,664 | $ 57,218 | $ 60,547 |
| Time CD's | $ 62,107 | $ 73,182 | $ 79,541 | $ 90,001 | $ 93,415 | $ 84,035 | $ 91,631 | $ 84,330 | $ 80,719 | $ 81,123 | $ 84,451 | $ 85,179 |
| Sec Sold under Repo | $ 20,673 | $ 22,743 | $ 25,690 | $ 23,058 | $ 18,958 | $ 22,612 | $ 15,944 | $ 10,585 | $ 11,608 | $ 11,666 | $ 12,451 | $ 12,249 |
| Advances from FHLB | $ 68,703 | $ 66,995 | $ 60,862 | $ 52,886 | $ 46,005 | $ 56,687 | $ 36,051 | $ 22,063 | $ 34,128 | $ 34,299 | $ 31,635 | $ 36,014 |
| Other Borrowings | $ 21,585 | $ 26,636 | $ 26,229 | $ 27,815 | $ 34,420 | $ 28,778 | $ 32,808 | $ 39,886 | $ 40,567 | $ 40,770 | $ 38,508 | $ 42,808 |
| Total Int-Bearing Liabilities | $ 262,162 | $ 274,808 | $ 278,030 | $ 277,770 | $ 279,210 | $ 277,455 | $ 263,117 | $ 246,206 | $ 252,891 | $ 254,155 | $ 254,092 | $ 266,863 |
| Stockholders' Equity | $ 23,454 | $ 27,798 | $ 26,932 | $ 26,147 | $ 26,700 | $ 26,894 | $ 24,407 | $ 24,436 | $ 23,994 | $ 24,137 | $ 24,243 | $ 25,277 |
| | | | | | | | | | | | | |
| Net Chargeoffs | $ 244 | $ 105 | $ 116 | $ 154 | $ 136 | $ 511 | $ 183 | $ 271 | $ 421 | $ 939 | $ 1,814 | $ 2,745 |
| NCO/Avg. Loans | 0.09% | 0.16% | 0.17% | 0.23% | 0.20% | 0.19% | 0.28% | 0.45% | 0.70% | 1.55% | 0.74% | 1.08% |
| Loan Loss Reserve | $ 1,695 | $ 1,642 | $ 1,663 | $ 1,550 | $ 1,830 | $ 1,830 | $ 1,540 | $ 1,560 | $ 1,889 | $ 2,200 | $ 2,200 | $ 2,800 |
| LLR/End Period Loans | 0.74% | 0.68% | 0.68% | 0.64% | 0.72% | 0.72% | 0.71% | 0.73% | 0.80% | 0.91% | 0.91% | 1.05% |
| Non-Performing Loans (N/A & Restr) | $ 1,708 | $ 1,752 | $ 1,850 | $ 2,006 | $ 2,313 | $ 2,313 | $ 2,688 | $ 3,275 | $ 4,577 | $ 5,500 | $ 5,500 | $ 6,500 |
| OREO & Repo'd Property | $ 276 | $ 309 | $ 330 | $ 405 | $ 480 | $ 480 | $ 587 | $ 750 | $ 874 | $ 1,000 | $ 1,000 | $ 1,250 |
| Total Non-Performing Assets | $ 1,984 | $ 2,061 | $ 2,180 | $ 2,411 | $ 2,793 | $ 2,793 | $ 3,275 | $ 4,025 | $ 5,451 | $ 6,500 | $ 6,500 | $ 7,750 |
| NPA/Avg TA | 0.61% | 0.60% | 0.62% | 0.69% | 0.79% | 0.80% | 0.99% | 1.27% | 1.70% | 2.01% | 2.01% | 2.28% |
| LLR/Non-performing Loans | 99.24% | 93.72% | 89.89% | 77.27% | 70.47% | 70.47% | 57.29% | 47.63% | 41.27% | 40.00% | 40.00% | 43.08% |
| NPA/Equity & Reserves | 7.89% | 7.00% | 7.62% | 8.70% | 9.86% | 9.79% | 12.62% | 15.48% | 21.06% | 24.68% | 24.58% | 27.60% |
| | | | | | | | | | | | | |
| NIM (FTE) | 2.80% | 2.75% | 2.65% | 2.53% | 2.58% | 2.60% | 2.79% | 2.90% | 2.86% | 2.87% | 2.86% | 3.00% |
| Avg Rate on Earning Assets | 5.38% | 6.07% | 6.30% | 6.51% | 6.60% | 6.37% | 6.81% | 6.79% | 6.84% | 7.10% | 6.89% | 7.25% |
| Cost of Funds Supporting Assets | 2.58% | 3.32% | 3.65% | 3.98% | 4.02% | 3.77% | 4.02% | 3.89% | 3.98% | 4.23% | 4.03% | 4.25% |
| Efficiency ratio | 57.77% | 57.55% | 62.29% | 63.07% | 63.82% | 61.60% | 59.30% | 57.49% | 65.02% | 55.82% | 59.25% | 56.65% |
| ROAA | 1.05% | 1.14% | 0.88% | 0.85% | 0.68% | 1.19% | 1.02% | 0.94% | 1.04% | 0.25% | 0.35% | 0.65% |
| ROE | 14.63% | 14.17% | 11.39% | 11.44% | 15.73% | 13.20% | 12.73% | 13.46% | 3.37% | 4.73% | 8.61% | 9.02% |
| Avg Equity/Avg TA | 7.18% | 8.07% | 7.70% | 7.48% | 7.56% | 7.70% | 7.35% | 7.73% | 7.49% | 7.46% | 7.51% | 7.44% |
| **Loan Portfolio** | | | | | | | | | | | | |
| Residential | $ 135,290 | $ 144,001 | $ 145,701 | $ 141,185 | $ 118,204 | $ 118,204 | $ 111,061 | $ 106,145 | $ 123,145 | $ 125,682 | $ 125,682 | $ 138,250 |
| Residential Construction | $ 2,037 | $ 2,095 | $ 2,082 | $ 2,077 | $ 2,082 | $ 2,082 | $ 2,071 | $ 2,058 | $ 2,110 | $ 2,153 | $ 2,153 | $ 2,369 |
| Commercial Real Estate | $ 30,636 | $ 31,504 | $ 32,286 | $ 33,276 | $ 36,906 | $ 36,906 | $ 36,243 | $ 36,169 | $ 39,166 | $ 39,973 | $ 39,973 | $ 43,970 |
| Mfg Housing, 2nd's, & Consumer | $ 51,489 | $ 52,174 | $ 53,268 | $ 54,645 | $ 55,200 | $ 55,200 | $ 56,384 | $ 58,874 | $ 62,055 | $ 63,333 | $ 63,333 | $ 69,667 |
| Credit Card | $ 8,043 | $ 7,906 | $ 8,451 | $ 8,807 | $ 10,861 | $ 10,861 | $ 9,490 | $ 9,913 | $ 8,791 | $ 9,123 | $ 9,123 | $ 10,583 |
| Commercial | $ 2,137 | $ 2,024 | $ 1,715 | $ 1,775 | $ 1,707 | $ 1,707 | $ 1,772 | $ 1,835 | $ 1,865 | $ 1,903 | $ 1,903 | $ 2,094 |
| Total | $ 229,632 | $ 240,004 | $ 243,503 | $ 241,765 | $ 224,960 | $ 224,960 | $ 217,021 | $ 214,994 | $ 237,132 | $ 242,168 | $ 242,168 | $ 266,932 |

**D.A. Davidson & Co.**
Two Centerpointe Drive, Suite 400 • Lake Oswego, Oregon 97035 • (503) 603-3000 • (800) 755-7848 • www.dadavidson.com

Copyright D.A. Davidson & Co., 2007.  All rights reserved.

## Required Disclosures

D.A. Davidson & Co. expects to receive, or intends to seek, compensation for investment banking services from this company in the next three months.

D.A. Davidson & Co. is a full service investment firm that provides both brokerage and investment banking services. Jim Bradshaw, Jeff Rulis, and Katherine Woods-Eliot, the research analysts principally responsible for the preparation of this report, will receive compensation that is based upon (among other factors) D.A. Davidson & Co.'s investment banking revenue.  However, D.A. Davidson & Co.'s analysts are not directly compensated for involvement in specific investment banking transactions.

We, Jim Bradshaw, Jeff Rulis, and Katherine Woods-Eliot, attest that (i) all the views expressed in this research report accurately reflect our personal views about the common stock of the subject company, and (ii) no part of our compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this report.

## Ratings Information

| D.A. Davidson & Co. Ratings | Buy | Neutral | Underperform |
|---|---|---|---|
| Risk adjusted return potential | Over 15% total return expected on a risk adjusted basis over next 12-18 months | >0-15% return potential on a risk adjusted basis over next 12-18 months | Likely to remain flat or lose value on a risk adjusted basis over next 12-18 months |

| Distribution of Ratings (as of 9/30/07) | Buy | Hold | Sell |
|---|---|---|---|
| Corresponding Institutional Research Ratings and Distribution | Buy 38% | Neutral 57% | Underperform 5% |
| Corresponding Private Client Research Ratings and Distribution | Outperform 52% | Market Perform 40% | Underperform 8% |
| Distribution of Combined Ratings | 40% | 54% | 6% |

| Distribution of companies from whom D.A. Davidson & Co. has received compensation for investment banking services in last 12 mos. | | | |
|---|---|---|---|
| Institutional Coverage | 6% | 3% | 0% |
| Private Client Coverage | 0% | 10% | 0% |
| Distribution of Combined Investment Banking | 5% | 3% | 0% |



**D.A. Davidson & Co. Institutional Research Rating Scale (maintained since 7/9/02)**
Buy, Neutral, Underperform

WASHINGTON MUTUAL INCORPORATED

Currency = USD

| Date | Closing Price | Recommendation Change | Date | Closing Price | Price Target |
|---|---|---|---|---|---|
| | | | 10-Sep-2007 | 34.74 | 37.00 |
| | | | 02-Aug-2007 | 36.24 | 39.00 |
| | | | 17-Apr-2007 | 40.13 | 44.00 |
| | | | 19-Oct-2006 | 42.35 | 46.00 |
| | | | 19-Jul-2006 | 46.42 | 47.00 |
| | | | 18-Apr-2006 | 44.44 | 45.00 |
| | | | 18-Jan-2006 | 44.41 | 42.50 |
| | | | 19-Oct-2005 | 37.50 | 41.00 |
| | | | 22-Jul-2005 | 43.54 | 45.00 |
| | | | 20-Jan-2005 | 42.17 | 41.00 |

**D.A. Davidson & Co.**
**Two Centerpointe Drive, Suite 400 ● Lake Oswego, Oregon 97035 ● (503) 603-3000 ● (800) 755-7848 ● www.dadavidson.com**

Copyright D.A. Davidson & Co., 2007. All rights reserved.

Target prices are our Institutional Research Department's evaluation of price potential over the next 12-18 months and 5 years, based upon our assessment of future earnings and cash flow, comparable company valuations, growth prospects and other financial criteria. Certain risks may impede achievement of these price targets including, but not limited to, broader market and macroeconomic fluctuations and unforeseen changes in the subject company's fundamentals or business trends.

## Other Disclosures

Information contained herein has been obtained by sources we consider reliable, but is not guaranteed and we are not soliciting any action based upon it. Any opinions expressed are based on our interpretation of data available to us at the time of the original publication of the report. These opinions are subject to change at any time without notice. Investors must bear in mind that inherent in investments are the risks of fluctuating prices and the uncertainties of dividends, rates of return and yield. Investors should also remember that past performance is not necessarily an indicator of future performance and D.A. Davidson & Co. makes no guarantee, express or implied, as to future performance. Investors should note this report was prepared by D.A. Davidson & Co.'s Institutional Research Department for distribution to D.A. Davidson & Co.'s institutional investor clients and assumes a certain level of investment sophistication on the part of the recipient. Readers, who are not institutional investors or other market professionals, should seek the advice of their individual investment advisor for an explanation of this report's contents, and should always seek such advisor's advice before making any investment decisions. Further information and elaboration will be furnished upon request.

# EXHIBIT C

**Washington Mutual Inc**

Earnings Review · **SELL**

Equity | United States | Savings & Loans/Thrifts
18 January 2008

# Reiterate sell, No end in sight

**Merrill Lynch**

Kenneth Bruce · +1 415 676 3545
Research Analyst
MLPF&S
kenneth_bruce@ml.com

Randy M. Sternke, CFA · +1 415 676 3555
Research Analyst
MLPF&S
randy_sternke@ml.com

## Q4'07 loss worse than expected; Credit issues will linger

WM reported a Q4'07 EPS loss of $2.19, below our -$1.95 forecast, due to losses on trading and AFS securities. Credit remains the chief concern, likely delaying the return to profitability until Q2'09, based on our forecast for losses and related provisions. Maintain Sell rating. WM shares likely to remain under pressure as credit continues to erode and visibility is poor. Take-out seems unlikely, given uncertainty surrounding asset valuations despite strong deposit franchise value.

## Credit deteriorates further; No turn in sight

Credit erosion accelerated in the quarter and looks to be elevated through 2009, if not longer. Losses were 1.22% loans held for investment, up 51 bps from Q3'07, while NPAs were 2.17% vs. 1.65%. Reserves were 1.05% of loans and appear inadequate, in our view, as losses likely will grow in WM's credit card, 2nd lien, sub-prime and recent vintage pay-option ARM portfolios.

## Lowering EPS estimates on credit

Lowering EPS forecast due to higher credit charges. '08e goes to -$1.20 p.s. from -$0.12 and taking '09e to +$0.80 from +$2.70. WaMu continues to build reserves to improve its balance sheet strength and ease regulatory concerns, though we suspect investors remain skeptical about the value of WaMu balance sheet as housing values fall and losses build. Tangible BV of ~$16 p.s. remains under-pressure, in our view, as additional losses suggests YE'08 of about $14.30 p.s.

## Maintain Sell

The possible downside from problem credits is high and fundamentals are still deteriorating. We forecast GAAP losses through Q1'09 and investors are likely to question the value of WaMu's balance sheet, suggesting the meaningful discount to BV is warranted. Distressed financials typically witness trough multiples below 75% of BV, suggesting further downside risk to WM. Given WM's weak balance sheet and systemic issues in the mortgage market, a take-out seems unlikely in the near-term, despite the value in WM's retail franchise.

### Stock Data

| | |
|---|---|
| Price | US$12.46 |
| Investment Opinion | B-3-8 |
| Volatility Risk | MEDIUM |
| 52-Week Range | US$10.73-45.81 |
| Mrkt Val / Shares Out (mn) | US$10,825 / 868.8 |
| ML Symbol / Exchange | WM / NYS |
| Bloomberg / Reuters | WM US / WM.N |
| ROE (2008E) | -4.0% |
| Total Dbt to Cap (Dec-2007A) | 92.4% |
| Est. 5-Yr EPS / DPS Growth | 10.0% / 8.0% |



— WaMu — S&P 500 INDEX

### Quarterly Earnings Estimates

| | 2007 | 2008 |
|---|---|---|
| Q1 | 0.85A | -0.29E |
| Q2 | 0.91A | -0.28E |
| Q3 | 0.22A | -0.30E |
| Q4 | -2.19A | -0.23E |

### Estimates (Dec)

| (US$) | 2006A | 2007A | 2008E | 2009E | 2010 |
|---|---|---|---|---|---|
| EPS | 3.64 | (0.09) | (1.10) | 0.80 | NA |
| GAAP EPS | 3.64 | (0.09) | (1.10) | 0.80 | NA |
| EPS Change (YoY) | -2.4% | NM | NM | NM | NA |
| Consensus EPS (First Call: 14-Jan-2008) | | | (0.42) | 1.46 | 1.72 |
| Dividend Rate | 2.06 | 1.80 | 1.80 | 0.60 | NA |

### Valuation (Dec)

| | 2006A | 2007A | 2008E | 2009E | 2010 |
|---|---|---|---|---|---|
| P/E | 3.4x | NM | NM | 15.6x | NA |
| GAAP P/E | 3.4x | NM | NM | 15.6x | NA |
| Dividend Yield | 16.5% | 14.4% | 14.4% | 4.8% | NA |

Merrill Lynch does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of Merrill Lynch in the US can receive independent, third-party research on companies covered in this report, at no cost to them, if such research is available. Customers can access this independent research at http://www.ml.com/independentresearch or can call 1-800-637-7455 to request a copy of this research.
Refer to important disclosures on page 6 to 7. Analyst Certification on page 5.

10689004

 **Merrill Lynch**                              Washington Mutual Inc

18 January 2008

# *iQprofile*<sup>SM</sup> **Washington Mutual Inc**

## Income Statement Data (Dec)

| (US$ Millions) | 2006A | 2007A | 2008E | 2009E | 2010 |
|---|---|---|---|---|---|
| Net Interest Income | 8,122 | 8,176 | 8,602 | 9,019 | NA |
| % change | 3.0% | 0.7% | 5.2% | 4.8% | NA |
| Net Fee Income | 2,907 | 3,270 | 3,651 | 3,865 | NA |
| Securities Gains / (Losses) | (9) | (318) | 120 | 120 | NA |
| Total Operating Income | 14,523 | 14,219 | 15,668 | 16,789 | NA |
| Operating Expenses | (8,728) | (10,562) | (8,049) | (8,225) | NA |
| % change | 10.9% | 21.0% | -23.8% | 2.2% | NA |
| Provisions Expense | (816) | (3,107) | (8,404) | (6,893) | NA |
| % change | 270.9% | 280.8% | 170.5% | -18.0% | NA |
| Operating Pre-Tax Income | 4,979 | 550 | (784) | 1,671 | NA |
| Operating Net Income to Comm S/Hold. | 3,317 | 128 | (781) | 864 | NA |
| GAAP Net Income | 3,553 | (75) | (953) | 692 | NA |

## Balance Sheet Data (Dec)

| (US$ Millions) | 2006A | 2007A | 2008E | 2009E | 2010 |
|---|---|---|---|---|---|
| Total Assets | 346,288 | 327,913 | 322,678 | 322,758 | NA |
| Average Interest Earning Assets | 309,204 | 283,730 | 289,124 | 290,935 | NA |
| Total Gross Customer Loans | 268,300 | 247,218 | 247,362 | 247,658 | NA |
| % change | 2.6% | -7.9% | 0.1% | 0.1% | NA |
| Total Customer Deposits | 213,956 | 181,926 | 209,741 | 209,793 | NA |
| % change | 10.8% | -15.0% | 15.3% | 0% | NA |
| Tangible Equity | 18,076 | 17,297 | 15,823 | 15,907 | NA |
| Common Shareholders' Equity | 27,126 | 24,584 | 23,110 | 23,194 | NA |

## Key Metrics (Dec)

| (US$ Millions) | 2006A | 2007A | 2008E | 2009E | 2010 |
|---|---|---|---|---|---|
| Net Interest Margin | 2.63% | 2.88% | 2.98% | 3.10% | NA |
| Effective Tax Rate | 33.4% | 70.9% | 40.2% | 29.6% | NA |
| Loan / Deposit Ratio | 125.4% | 135.9% | 117.9% | 118.0% | NA |
| Tangible Common Equity / Assets | 5.2% | 5.3% | 4.9% | 4.9% | NA |
| ROA | 1.0% | 0% | -0.3% | 0.2% | NA |
| ROE | 12.9% | -0.3% | -4.0% | 3.0% | NA |
| RoTE | 19.7% | -0.4% | -6.0% | 4.4% | NA |
| Dividend Payout Ratio | 58.9% | 1,215.1% | NA | 70.4% | NA |
| Efficiency Ratio (Cost / Income Ratio) | 60.1% | 72.7% | 51.8% | 49.3% | NA |

## Quality of Earnings (Dec)

| (US$ Millions) | 2006A | 2007A | 2008E | 2009E | 2010 |
|---|---|---|---|---|---|
| Total Non-Interest Inc / Operating Inc | 44.1% | 42.5% | 45.1% | 46.3% | NA |
| NPLs plus Foreclosed Real Estate / Loans | 0% | 0% | 0% | 0% | NA |
| Loan Loss Reserves / NPLs | -0.61% | -1.04% | -2.28% | -2.69% | NA |
| Loan Loss Reserves / Total Loans | -0.60% | -1.03% | -2.23% | -2.62% | NA |

## Company Description

Washington Mutual Inc. (WM) is the largest US thrift-holding company and third-largest residential mortgage lender. WM is principally focused on mortgage lending/ servicing, and consumer/commercial banking, and operates more than 2600 branches nationally.

## Stock Data

| | |
|---|---|
| Average Daily Volume | 43,541,392 |
| Brokers Covered (FirstCall) | 17 |

2

 **Merrill Lynch**

18 January 2008

Washington Mutual Inc

**Q4'07 Key takeaways:**

- Shortfall to our estimates driven by losses in trading/AFS portfolio

- Credit continues to deteriorate; WM remains under-reserved

- Capital ratios supported by recent preferred offering; Should help forego "must-sell" scenario

- Buyers to remain reluctant as credit environment continues to erode and asset valuations remain at risk

Chart 1: POAs mostly reset after '09



Source: Company Presentation

## Q4 loss worse than expected; Maintain Sell

WaMu reported a $2.19 p.s. loss in Q4'07, $0.24 p.s. below our $1.95 p.s. loss estimate. WaMu pre-announced credit provisions in December, which accounted for most of the loss, though the downside to our forecast is due to impairments to WM's trading and available-for-sale securities portfolio. The losses included 1) $159M related to retained interest in credit card securitizations 2) $261M write down of securities and 3) $83M of trading losses by WM's broker-dealer.

As expected, Q4 results highlighted further deterioration in the credit environment and WM's relatively weak reserve. Excluding credit card related balances, NCOs and NPAs increased to 1.11% and 3.00% of related loans, while reserves finished at only 0.73%. This equates to a coverage ratio of just 0.24x NPAs. We expect reserve building will create further EPS headwinds in 2008, with a return to profitability unlikely until 2009. Based on recent data, we are beginning to think this credit cycle may have an even longer tail than we previously thought. The majority of WM's pay-option ARMs are expected to reset after '09 (see Chart 1).

## Maintain Sell; Take-out seems unlikely for now

We continue to rate WM shares Sell. At roughly 0.75x tangible common book value of ~$16 p.s. (TBV excluding preferred equity), WM shares remain over-valued, in our view, given that BV is positioned to erode. Troubled financials historically witness trough valuations of 0.65x – 0.75x TBV, largely due to the uncertainty of BV, suggesting further downside risk to WM shares. Valuations are likely will remain at sizeable discounts to cycle norms, until there is better visibility into the bottom of the housing market and WaMu's ability to navigate the current capital markets disruption.

A take-out does not seem likely in the near-term, in our view, despite heightened speculation. While WM has an attractively positioned retail footprint, the high level of uncertainty regarding asset valuations likely will leave buyers on the sidelines until the market shows signs of stability. Further, WM is not in a must sell position, in our view, as its deposit franchise and recent capital raises appear adequate enough to support WM's operations for the foreseeable future. However, if the operating environment worsens, a sale could become a more obvious choice to remedy the pain inflicted by the sins of the past.

## Credit cards add to the quarter; Losses to rise

WM's credit card segment continues to contribute positively to earnings, though rising credit costs likely will impede growth through 2008. The card segment added $0.11 p.s. to Q4'07 earnings, posting a 2.49% return on average owned assets. Related credit losses finished at 3.57% of average owned balances, down from 3.78% in Q3. Despite the slow down of losses, WM added $161M to the credit card reserves in expectation of higher losses in '08 and suggested its cards segment could witness losses in the range of 8.5% - 9.5%. This is well above industry norms of 6%, suggesting WaMu is bracing for meaningful credit erosion in light of the portfolio's unproven experience through a credit cycle.

## Revising EPS lower

We lowered our '08 EPS estimate to -$1.10 from -$0.12 and our '09 EPS estimate to $0.80 from $2.70. The revisions are a result of increased credit costs, which we now will approximate $15B through 2009 on roughly $11B in losses. We think a substantial reserve will remain in 2010, in anticipation of pay-option arm resets.

3

**Merrill Lynch**

Washington Mutual Inc

18 January 2008

**Spread income up 7% (alq) on higher asset base:** Earning assets grew 7% from Q3 while NIM compressed 1 bp on lower asset yields. Expect modest NIM compression in '08 as funding costs subside.

**Provisions up on further credit deterioration:** Provision expense finished at $1.5B in Q4, up from $967M in Q3. NCOs finished at 1.22% of loans, up 51 bps, and NPAs increased 52 bps to 2.17% of assets. Expect higher provisions to continue in '08 as credit metrics continue to worsen.

**Non-interest income down on impairments and lower contribution from credit cards:** Non-int inc fell 4% (ann.) from Q3. $528M of losses on trading and for-sale assets comprised the majority of the miss. Credit cards contributed $589M in the quarter, down from $627M in Q3.

**Non-interest expense up largely on goodwill impairment and 1x restructuring costs:** Core non-int expense was up 10% (ann.) from Q3 due to higher occupancy expense and increased expenses related to foreclosed assets.

**Tangible common book fell to $16.25 p.s., down from $16.54 p.s. in Q3:** Tier 1 capital, however, improved due to preferred equity issuance, finishing at 6.84% of average total assets and 7.02% of adjusted total assets

Table 1: WM Q4'07 earnings variance table

| | Q4'07 | Variance $ | Variance % | Q4'07-E | New Estimates 2008-E | New Estimates 2009-E |
|---|---|---|---|---|---|---|
| Avg. Earning Assets | $ 287,690 | -0.2% | -0.2% | $ 288,357 | $ 289,124 | $ 290,935 |
| NIM | 2.85% | -1.0 bp | | 2.86% | 2.98% | 3.10% |
| Net Interest Income | 2,047 | -0.7% | -0.7% | 2,062 | 8,602 | 9,019 |
| Provision Expense | (1,534) | -6.2% | -6.2% | (1,635) | (8,404) | (6,893) |
| SFR Mortgage Bank Inc. | 358 | 37.5% | 37.5% | 260 | 1,074 | 1,131 |
| Credit Card Services | 589 | 0.5% | 0.5% | 586 | 1,741 | 2,174 |
| Deposit & Banking Fees | 769 | 0.4% | 0.4% | 766 | 3,223 | 3,418 |
| Total Noninterest Income | 1,365 | | | (537) | 7,066 | 7,770 |
| | | | | | | |
| Compensation & Benefits | (877) | -22.4% | 22.4% | (1,130) | (3,210) | (3,200) |
| Occupancy & Equipment | (488) | 29.6% | 29.6% | (377) | (1,327) | (1,319) |
| Total Noninterest Exp. | (4,166) | 75.3% | 75.3% | (2,376) | (8,049) | (8,225) |
| Pretax Income | (2,353) | -7.3% | -7.3% | (2,539) | (956) | 1,499 |
| GAAP Net Income | (1,867) | 9.7% | 9.7% | (1,701) | (641) | 1,004 |
| GAAP EPS | $ (2.19) | 12.5% | 12.5% | $ (1.95) | $ (1.10) | $ 0.80 |
| Key Metrics: | | | | | 0 | 0 |
| ROAE | -36.69% | | | -31.87% | -3.22% | 5.25% |
| ROAA | -2.27% | | | -2.08% | -0.20% | 0.31% |
| Efficiency Ratio | 122.10% | | | 155.84% | 51.37% | 48.99% |
| Tan. Equity / Assets | 6.61% | 1.2 bp | | 6.60% | 0.00% | 0.00% |
| BVPS | $28.49 | -0.2% | -0.2% | $28.54 | $26.78 | $26.88 |
| TBVPS | $15.97 | -7.3% | -7.3% | $17.22 | $14.31 | $14.41 |

Source: Company Reports & Merrill Lynch Research

 **Merrill Lynch**

Washington Mutual Inc

18 January 2008

# Analyst Certification

I, Kenneth Bruce, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject securities and issuers. I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or view expressed in this research report.

### iQmethod℠ Measures Definitions

| Business Performance | Numerator | Denominator |
|---|---|---|
| Return On Capital Employed | NOPAT = (EBIT + Interest Income) * (1 - Tax Rate) + Goodwill Amortization | Total Assets – Current Liabilities + ST Debt + Accumulated Goodwill Amortization |
| Return On Equity | Net Income | Shareholders' Equity |
| Operating Margin | Operating Profit | Sales |
| Earnings Growth | Expected 5-Year CAGR From Latest Actual | N/A |
| Free Cash Flow | Cash Flow From Operations – Total Capex | N/A |

| Quality of Earnings | | |
|---|---|---|
| Cash Realization Ratio | Cash Flow From Operations | Net Income |
| Asset Replacement Ratio | Capex | Depreciation |
| Tax Rate | Tax Charge | Pre-Tax Income |
| Net Debt-To-Equity Ratio | Net Debt = Total Debt, Less Cash & Equivalents | Total Equity |
| Interest Cover | EBIT | Interest Expense |

| Valuation Toolkit | | |
|---|---|---|
| Price / Earnings Ratio | Current Share Price | Diluted Earnings Per Share (Basis As Specified) |
| Price / Book Value | Current Share Price | Shareholders' Equity / Current Basic Shares |
| Dividend Yield | Annualised Declared Cash Dividend | Current Share Price |
| Free Cash Flow Yield | Cash Flow From Operations – Total Capex | Market Cap. = Current Share Price * Current Basic Shares |
| Enterprise Value / Sales | EV = Current Share Price * Current Shares + Minority Equity + Net Debt + Other LT Liabilities | Sales |
| EV / EBITDA | Enterprise Value | Basic EBIT + Depreciation + Amortization |

iQmethod℠is the set of Merrill Lynch standard measures that serve to maintain global consistency under three broad headings: Business Performance, Quality of Earnings, and validations. The key features of iQmethod are: A consistently structured, detailed, and transparent methodology. Guidelines to maximize the effectiveness of the comparative valuation process, and to identify some common pitfalls.

iQdatabase® is our real-time global research database that is sourced directly from our equity analysts' earnings models and includes forecasted as well as historical data for income statements, balance sheets, and cash flow statements for companies covered by Merrill Lynch.

iQprofile℠, iQmethod℠ are service marks of Merrill Lynch & Co., Inc. iQdatabase®is a registered service mark of Merrill Lynch & Co., Inc.

**Merrill Lynch**                        Washington Mutual Inc

18 January 2008

# Important Disclosures

**WM Price Chart**



B : Buy, N : Neutral, S : Sell, PO : Price objective, NA : No longer valid

The Investment Opinion System is contained at the end of the report under the heading "Fundamental Equity Opinion Key". Dark Grey shading indicates the security is restricted with the opinion suspended. Light Grey shading indicates the security is under review with the opinion withdrawn. Chart current as of December 31, 2007 or such later date as indicated.

**Investment Rating Distribution: Financial Services Group (as of 01 Jan 2008)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships* | Count | Percent |
|---|---|---|---|---|---|
| Buy | 123 | 40.33% | Buy | 47 | 39.83% |
| Neutral | 161 | 52.79% | Neutral | 74 | 48.37% |
| Sell | 21 | 6.89% | Sell | 6 | 28.57% |

**Investment Rating Distribution: Global Group (as of 01 Jan 2008)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships* | Count | Percent |
|---|---|---|---|---|---|
| Buy | 1714 | 46.25% | Buy | 445 | 29.10% |
| Neutral | 1653 | 44.60% | Neutral | 454 | 30.55% |
| Sell | 339 | 9.15% | Sell | 67 | 21.82% |

* Companies in respect of which MLPF&S or an affiliate has received compensation for investment banking services within the past 12 months.

FUNDAMENTAL EQUITY OPINION KEY: Opinions include a Volatility Risk Rating, an Investment Rating and an Income Rating. VOLATILITY RISK RATINGS, indicators of potential price fluctuation, are: A - Low, B - Medium, and C - High. INVESTMENT RATINGS, indicators of expected total return (price appreciation plus yield) within the 12-month period from the date of the initial rating, are: 1 - Buy (10% or more for Low and Medium Volatility Risk Securities - 20% or more for High Volatility Risk securities); 2 - Neutral (0-10% for Low and Medium Volatility Risk securities - 0-20% for High Volatility Risk securities); 3 - Sell (negative return); and 6 - No Rating. INCOME RATINGS, indicators of potential cash dividends, are: 7 - same/higher (dividend considered to be secure); 8 - same/lower (dividend not considered to be secure); and 9 - pays no cash dividend.

---

MLPF&S or one of its affiliates acts as a market maker for the securities recommended in the report: WaMu.

The company is or was, within the last 12 months, an investment banking client of MLPF&S and/or one or more of its affiliates: WaMu.

MLPF&S or an affiliate has received compensation from the company for non-investment banking services or products within the past 12 months: WaMu.

The company is or was, within the last 12 months, a non-securities business client of MLPF&S and/or one or more of its affiliates: WaMu.

MLPF&S or an affiliate has received compensation for investment banking services from this company within the past 12 months: WaMu.

MLPF&S or an affiliate expects to receive or intends to seek compensation for investment banking services from this company within the next three months: WaMu.

MLPF&S together with its affiliates beneficially owns one percent or more of the common stock of this company. If this report was issued on or after the 10th day of the month, it reflects the ownership position on the last day of the previous month. Reports issued before the 10th day of a month reflect the ownership position at the end of the second month preceding the date of the report: WaMu.

MLPF&S or one of its affiliates is willing to sell to, or buy from, clients the common equity of the company on a principal basis: WaMu.

The company is or was, within the last 12 months, a securities business client (non-investment banking) of MLPF&S and/or one or more of its affiliates: WaMu.

The analyst(s) responsible for covering the securities in this report receive compensation based upon, among other factors, the overall profitability of Merrill Lynch, including profits derived from investment banking revenues.

 **Merrill Lynch**

Washington Mutual Inc

18 January 2008

# Other Important Disclosures

UK readers: MLPF&S or an affiliate is a liquidity provider for the securities discussed in this report.
MLPF&S or one of its affiliates has a significant financial interest in the fixed income instruments of the issuer. If this report was issued on or after the 10th day of a month, it reflects a significant financial interest on the last day of the previous month. Reports issued before the 10th day of a month reflect a significant financial interest at the end of the second month preceding the date of the report: WaMu.

**Information relating to Non-U.S. affiliates of Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S):**
MLPF&S distributes research reports of the following non-US affiliates in the US (short name: legal name): Merrill Lynch (France): Merrill Lynch Capital Markets (France) SAS; Merrill Lynch (Frankfurt): Merrill Lynch International Bank Ltd, Frankfurt Branch; Merrill Lynch (South Africa): Merrill Lynch South Africa (Pty) Ltd; Merrill Lynch (Milan): Merrill Lynch International Bank Limited; MLPF&S (UK): Merrill Lynch, Pierce, Fenner & Smith Limited; Merrill Lynch (Australia): Merrill Lynch Equities (Australia) Limited; Merrill Lynch (Hong Kong): Merrill Lynch (Asia Pacific) Limited; Merrill Lynch (Singapore): Merrill Lynch (Singapore) Pte Ltd; Merrill Lynch (Canada): Merrill Lynch Canada Inc; Merrill Lynch (Mexico): Merrill Lynch Mexico, SA de CV, Casa de Bolsa; Merrill Lynch (Argentina): Merrill Lynch Argentina SA; Merrill Lynch (Japan): Merrill Lynch Japan Securities Co, Ltd; Merrill Lynch (Seoul): Merrill Lynch International Incorporated (Seoul Branch); Merrill Lynch (Taiwan): Merrill Lynch Global (Taiwan) Limited; DSP Merrill Lynch (India): DSP Merrill Lynch Limited; PT Merrill Lynch (Indonesia): PT Merrill Lynch Indonesia; Merrill Lynch (KL) Sdn. Bhd.: Merrill Lynch (Malaysia); Merrill Lynch (Israel): Merrill Lynch Israel Limited; Merrill Lynch (Russia): Merrill Lynch CIS Limited, Moscow; Merrill Lynch (Turkey): Merrill Lynch Yatirim Bankasi A.S.; Merrill Lynch (Dubai): Merrill Lynch International Bank Ltd, Dubai Branch; MLPF&S (Zürich rep. office): MLPF&S Incorporated Zürich representative office.
This research report has been prepared and issued by MLPF&S and/or one or more of its non-U.S. affiliates. MLPF&S is the distributor of this research report in the U.S. and accepts full responsibility for research reports of its non-U.S. affiliates distributed in the U.S. Any U.S. person receiving this research report and wishing to effect any transaction in any security discussed in the report should do so through MLPF&S and not such foreign affiliates.
This research report has been approved for publication in the United Kingdom by Merrill Lynch, Pierce, Fenner & Smith Limited, which is authorized and regulated by the Financial Services Authority; has been considered and distributed in Japan by Merrill Lynch Japan Securities Co, Ltd, a registered securities dealer under the Securities and Exchange Law in Japan; is distributed in Hong Kong by Merrill Lynch (Asia Pacific) Limited, which is regulated by the Hong Kong SFC; is issued and distributed in Taiwan by Merrill Lynch Global (Taiwan) Ltd or Merrill Lynch, Pierce, Fenner & Smith Limited (Taiwan Branch); is issued and distributed in Malaysia by Merrill Lynch (KL) Sdn. Bhd., a licensed investment adviser regulated by the Malaysian Securities Commission; is issued and distributed in India by DSP Merrill Lynch Limited; and is issued and distributed in Singapore by Merrill Lynch International Bank Limited (Merchant Bank) and Merrill Lynch (Singapore) Pte Ltd (Company Registration No.'s F 06872E and 198602883D respectively). Merrill Lynch International Bank Limited (Merchant Bank) and Merrill Lynch (Singapore) Pte Ltd. are regulated by the Monetary Authority of Singapore. Merrill Lynch Equities (Australia) Limited, (ABN 65 006 276 795), AFS License 235132, provides this report in Australia. No approval is required for publication or distribution of this report in Brazil.
Merrill Lynch (Frankfurt) distributes this report in Germany. Merrill Lynch (Frankfurt) is regulated by BaFin.
**Copyright, User Agreement and other general information related to this report:**
Copyright 2008 Merrill Lynch, Pierce, Fenner & Smith Incorporated. All rights reserved. This research report is prepared for the use of Merrill Lynch clients and may not be redistributed, retransmitted or disclosed, in whole or in part, or in any form or manner, without the express written consent of Merrill Lynch. Merrill Lynch research reports are distributed simultaneously to internal and client websites eligible to receive such research prior to any public dissemination by Merrill Lynch of the research report or information or opinion contained therein. Any unauthorized use or disclosure is prohibited. Receipt and review of this research report constitutes your agreement not to redistribute, retransmit, or disclose to others the contents, opinions, conclusion, or information contained in this report (including any investment recommendations, estimates or price targets) prior to Merrill Lynch's public disclosure of such information. The information herein (other than disclosure information relating to Merrill Lynch and its affiliates) was obtained from various sources and we do not guarantee its accuracy. Merrill Lynch makes no representations or warranties whatsoever as to the data and information provided in any third party referenced website and shall have no liability or responsibility arising out of or in connection with any such referenced website.
This research report provides general information only. Neither the information nor any opinion expressed constitutes an offer or an invitation to make an offer, to buy or sell any securities or other investment or any options, futures or derivatives related to such securities or investments. It is not intended to provide personal investment advice and it does not take into account the specific investment objectives, financial situation and the particular needs of any specific person who may receive this report. Investors should seek financial advice regarding the appropriateness of investing in any securities, other investment or investment strategies discussed or recommended in this report and should understand that statements regarding future prospects may not be realized. Investors should note that income from such securities or other investments, if any, may fluctuate and that price or value of such securities and investments may rise or fall. Accordingly, investors may receive back less than originally invested. Past performance is not necessarily a guide to future performance. Any information relating to the tax status of financial instruments discussed herein is not intended to provide tax advice or to be used by anyone to provide tax advice. Investors are urged to seek tax advice based on their particular circumstances from an independent tax professional.
Foreign currency rates of exchange may adversely affect the value, price or income of any security or related investment mentioned in this report. In addition, investors in securities such as ADRs, whose values are influenced by the currency of the underlying security, effectively assume currency risk.
Officers of MLPF&S or one or more of its affiliates (other than research analysts) may have a financial interest in securities of the issuer(s) or in related investments.
**Merrill Lynch Research policies relating to conflicts of interest are described at http://www.ml.com/media/43347.pdf.**
Fundamental equity reports are produced on a regular basis as necessary to keep the investment recommendation current.
iQmethod, iQmethod 2.0, iQprofile, iQtoolkit, iQworks are service marks of Merrill Lynch & Co., Inc. iQanalytics®, iQcustom®, iQdatabase® are registered service marks of Merrill Lynch & Co., Inc.

7

# EXHIBIT D



18 October 2007
Americas/United States
**Equity Research**
Mortgage Finance / MARKET WEIGHT

# Washington Mutual Inc. (WM)

Rating **NEUTRAL***
Price (17 Oct 07) 33.07 (US$)
Target price (12M) 35.00 (US$)
52 week high - low 46.29 - 32.57
Market cap. (US$ m) 29,534.49
* Stock ratings are relative to the coverage universe in each analyst's or each team's respective sector.

**Research Analysts**

**Moshe Orenbuch**
212 538 6795
moshe.orenbuch@credit-suisse.com

**Kerry Hueston**
212 538 6704
kerry.hueston@credit-suisse.com

**EARNINGS**

## NPAs and Provisions Rising

- WaMu reported Q3 EPS of $0.23, $0.04 above our estimate and $0.04 below consensus. A lower tax rate added about $0.12 to headline EPS. The quarter included $300 million of write-downs partially offset by a $222 million write-up of the MSR (about $0.06 per share net). The company announced a $0.56 quarterly dividend, flat with 2Q. However, if the challenging operating environment persists into early 2008, we believe WaMu may have to re-examine its dividend policy.

- We continue to be concerned by the rate of credit deterioration across a number of WaMu's portfolios, which will likely constrain earnings for the remainder of 2007 and into 2008. Nonperforming assets climbed another 35% in the quarter to nearly $5.5 billion. Given that the reserve only grew $330 million coverage of NPLS fell sharply to 41% from 48% in the second quarter. The increase in NPAs was about $500 million more than we had expected, and we would expect that the pace of increase will remain high. WaMu raised its Q4 loss provision guidance by another $300 million to $1.1-1.3 billion, a full year provision nearly 2x their guidance at mid-year.

- Capital levels declined 46 bps to 5.61% as assets grew and earnings didn't cover the dividend. Based upon company guidance we estimate capital is likely to decline about another 20 bps in Q4.

- We are reducing our 2007 and 2008 EPS estimates to reflect higher loss provisions to $2.35 and $3.00. Our estimates already contemplated margin expansion and better mortgage banking profitability in 2008. The company will likely give 2008 guidance at its November 7th analyst day. We remain concerned about the earnings impact of the costs related to higher problem assets and reiterate our Neutral rating.

**Share price performance**

Daily Oct 18, 2006 - Oct 17, 2007, 10/18/06 = US$43.71

On 10/17/07 the S&P 500 index closed at 1,541.24.

**Financial and valuation metrics**

| Year | 12/06A | 12/07E | 12/08E |
|---|---|---|---|
| EPS (CS adj., US$) | 3.64 | 2.35 | 3.00 |
| Prev. EPS (US$) | | 2.45 | 3.15 |
| P/E (x) | 9.1 | 14.1 | 11.0 |
| P/E rel. (%) | 54.6 | 87.3 | 75.8 |
| Revenue (US$ m) | 14,500.0 | 14,702.5 | 16,414.2 |
| OCFPS (US$) | — | — | — |
| P/OCF (x) | — | — | — |
| P/BV (x) | 1.2 | 1.2 | 1.2 |
| ROE | 13.1% | 8.7% | 11.6% |

| | | | |
|---|---|---|---|
| Number of shares (m) | 893.09 | Dividend (current, US$) | 2.20 |
| BV/share (12/06A, US$) | 28.21 | Dividend yield | 6.7% |
| P/BV (x) | 1.2 | | — |

*Source: Company data, Credit Suisse estimates.*

| Quarterly EPS | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 2006A | 0.98 | 0.79 | 0.77 | 1.10 |
| 2007E | 0.86 | 0.92 | 0.23 | 0.34 |
| 2008E | | | | |

**IMPORTANT DISCLOSURES, ANALYST CERTIFICATIONS AND INFORMATION ON TRADE ALERTS AND ANALYST MODEL PORTFOLIOS ARE IN THE DISCLOSURE APPENDIX.** U.S. Disclosure: Credit Suisse does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the Firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of Credit Suisse in the United States can receive independent, third party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.credit-suisse.com/ir or call 1 877 291 2683 or email equity.research@credit-suisse.com to request a copy of this research.



18 October 2007

### Exhibit 1: WaMu's Q307 Earnings Highlights
*US$ in millions, unless otherwise stated*

| | Q3:06 | Q2:07 | Q3:07 | Q3:07E | Actual vs. Estimate | % change from prior Year | Quarter |
|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | |
| Net Interest income | 1,947 | 2,034 | 2,014 | 2,026 | -1% | 3% | -1% |
| Non-interest income | 1570 | 1758 | 1,379 | 1,430 | -4% | -12% | -22% |
| Non-interest expense | 2,184 | 2,138 | 2,153 | 2,148 | 0% | -1% | 1% |
| Provision | 166 | 372 | 967 | 975 | -1% | 483% | 160% |
| Net Income | 748 | 830 | 210 | 175 | 20% | -72% | -75% |
| EPS | $ 0.77 | $ 0.92 | $ 0.23 | $ 0.19 | 22% | -70% | -75% |
| Book Value Per Share | $ 27.65 | $ 27.27 | $ 27.21 | $ 26.76 | 2% | -2% | 0% |
| **Balance Sheet** | | | | | | | |
| Loan HFS | 23,720 | 19,327 | 7,586 | 11,053 | -31% | -68% | -61% |
| Loans HTM | 241,765 | 214,994 | 237,132 | 238,067 | 0% | -2% | 10% |
| Deposits | 210,882 | 201,380 | 194,280 | 199,096 | -2% | -8% | -4% |
| Equity | 26,458 | 24,210 | 23,965 | 23,681 | 1% | -9% | -1% |
| **Mortgage Banking** | | | | | | | |
| SF Loan Volume | 37,168 | 31,035 | 22,329 | 24,911 | -10% | -40% | -28% |
| Gain on Mtg. Loans | 119 | 192 | (222) | - | NA | -287% | -216% |
| Net Servicing (Exp.) Income | (1) | 108 | 383 | 296 | 30% | -38400% | 255% |
| Total Mortgage Revs. | 118 | 300 | 161 | 296 | -46% | 36% | -46% |
| MSR | 6,288 | 7,231 | 6,794 | 7,396 | -8% | 8% | -6% |
| Servicing Portfolio | 439,208 | 474,867 | 463,436 | 473,732 | -2% | 6% | -2% |
| MSR Cap. Rate | 1.43% | 1.52% | 1.47% | 1.56% | (10) | 3 | (6) |
| | | | | | | Change in bps | |
| **Profitability Ratios** | | | | | | | |
| Earning Asset (%) | 6.51% | 6.79% | 6.84% | 6.80% | 4 | 33 | 5 |
| Cost of Funds (%) | 4.48% | 4.42% | 4.46% | 4.44% | 2 | (2) | 4 |
| NIM (%) | 2.53% | 2.90% | 2.86% | 2.87% | (1) | 33 | (4) |
| Efficiency Ratio (%) | 62.10% | 56.38% | 63.45% | 62.16% | 129 | 136 | 707 |
| ROA (%) | 0.86% | 1.04% | 0.25% | 0.21% | 4 | (60) | (79) |
| ROE (%) | 11.38% | 13.48% | 3.35% | 2.78% | 57 | (802) | (1,012) |
| **Credit Quality** | | | | | | | |
| NPAs (%) | 0.69% | 1.29% | 1.61% | 1.63% | (2) | 93 | 32 |
| NCOs (%) | 0.25% | 0.50% | 0.74% | 1.00% | (25) | 49 | 24 |
| Loss Reserve (%) | 0.64% | 0.73% | 0.80% | 0.83% | (3) | 16 | 7 |

*Source: Company data, Credit Suisse estimates*

CREDIT SUISSE

18 October 2007

**Companies Mentioned**  *(Price as of 18 Oct 07)*
Washington Mutual Inc. (WM, $33.07, NEUTRAL, TP $35.00, MARKET WEIGHT)

# Disclosure Appendix

### Important Global Disclosures

I, Moshe Orenbuch, certify that (1) the views expressed in this report accurately reflect my personal views about all of the subject companies and securities and (2) no part of my compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this report.

*See the Companies Mentioned section for full company names.*

### 3-Year Price, Target Price and Rating Change History Chart for WM



———— Closing Price    ■ Target Price    ◇ Initiation/Assumption    ● Rating

O=Outperform; N=Neutral; U=Underperform; R=Restricted; NR=Not Rated; NC=Not Covered

| WM Date | Closing Price Price (US$) | Target Price Price (US$) | Rating | Initiation/ Assumption |
|---|---|---|---|---|
| 9/21/05 | 40.67 | 44 | NEUTRAL | X |
| 10/20/05 | 37.75 | 43 | | |
| 1/4/06 | 44.9 | 45 | | |
| 10/19/06 | 42.35 | 43 | | |
| 1/4/07 | 45.5 | 50 | | |
| 1/18/07 | 44.26 | 47 | | |
| 4/5/07 | 39.81 | 42 | | |
| 10/3/07 | 35.89 | 38 | | |
| 10/5/07 | 36.07 | 35 | | |

The analyst(s) responsible for preparing this research report received compensation that is based upon various factors including Credit Suisse's total revenues, a portion of which are generated by Credit Suisse's investment banking activities.

### Analysts' stock ratings are defined as follows***:

**Outperform:** The stock's total return is expected to exceed the industry average* by at least 10-15% (or more, depending on perceived risk) over the next 12 months.

**Neutral:** The stock's total return is expected to be in line with the industry average* (range of ±10%) over the next 12 months.

**Underperform**:** The stock's total return is expected to underperform the industry average* by 10-15% or more over the next 12 months.

*The industry average refers to the average total return of the analyst's industry coverage universe (except with respect to Asia/Pacific, Latin America and Emerging Markets, where stock ratings are relative to the relevant country index.

**In an effort to achieve a more balanced distribution of stock ratings, the Firm has requested that analysts maintain at least 15% of their rated coverage universe as Underperform. This guideline is subject to change depending on several factors, including general market conditions.

CREDIT SUISSE                                                                    18 October 2007

***For Australian and New Zealand stocks a 7.5% threshold replaces the 10% level in all three rating definitions, with a required equity return overlay applied.

**Restricted:** In certain circumstances, Credit Suisse policy and/or applicable law and regulations preclude certain types of communications, including an investment recommendation, during the course of Credit Suisse's engagement in an investment banking transaction and in certain other circumstances.

**Volatility Indicator [V]:** A stock is defined as volatile if the stock price has moved up or down by 20% or more in a month in at least 8 of the past 24 months or the analyst expects significant volatility going forward.

**Analysts' coverage universe weightings are distinct from analysts' stock ratings and are based on the expected performance of an analyst's coverage universe* versus the relevant broad market benchmark**:**
**Overweight:** Industry expected to outperform the relevant broad market benchmark over the next 12 months.
**Market Weight:** Industry expected to perform in-line with the relevant broad market benchmark over the next 12 months.
**Underweight:** Industry expected to underperform the relevant broad market benchmark over the next 12 months.
*An analyst's coverage universe consists of all companies covered by the analyst within the relevant sector.
**The broad market benchmark is based on the expected return of the local market index (e.g., the S&P 500 in the U.S.) over the next 12 months.

**Credit Suisse's distribution of stock ratings (and banking clients) is:**

|  | Global Ratings Distribution | |
|---|---|---|
| Outperform/Buy* | 45% | (57% banking clients) |
| Neutral/Hold* | 41% | (56% banking clients) |
| Underperform/Sell* | 12% | (51% banking clients) |
| Restricted | 2% | |

*For purposes of the NYSE and NASD ratings distribution disclosure requirements, our stock ratings of Outperform, Neutral, and Underperform most closely correspond to Buy, Hold, and Sell, respectively; however, the meanings are not the same, as our stock ratings are determined on a relative basis. (Please refer to definitions above.) An investor's decision to buy or sell a security should be based on investment objectives, current holdings, and other individual factors.

Credit Suisse's policy is to update research reports as it deems appropriate, based on developments with the subject company, the sector or the market that may have a material impact on the research views or opinions stated herein.

Credit Suisse's policy is only to publish investment research that is impartial, independent, clear, fair and not misleading. For more detail please refer to Credit Suisse's Policies for Managing Conflicts of Interest in connection with Investment Research: http://www.csfb.com/research-and-analytics/disclaimer/managing_conflicts_disclaimer.html

Credit Suisse does not provide any tax advice. Any statement herein regarding any US federal tax is not intended or written to be used, and cannot be used, by any taxpayer for the purposes of avoiding any penalties.

See the Companies Mentioned section for full company names.
**Price Target:** (12 months) for (WM)
**Method:** Our price target of $35 represents an absolute P/E ratio of roughly 11.5x our 2008 EPS estimate of $3.00, in line with its historical average.
**Risks:** A rapid rise in short-term interest rates, coupled with an inverted yield curve and rising credit losses would erode the profitability at Washington Mutual, in particular its WaMu Home Loans and Card Services operating units. This would negatively impact the earnings power of Washington Mutual and cause P/E multiple contraction, impeding achievement of our $35 target price.

See the Companies Mentioned section for full company names.
The subject company (WM) currently is, or was during the 12-month period preceding the date of distribution of this report, a client of Credit Suisse.
Credit Suisse provided investment banking services to the subject company (WM) within the past 12 months.
Credit Suisse provided non-investment banking services, which may include Sales and Trading services, to the subject company (WM) within the past 12 months.
Credit Suisse has managed or co-managed a public offering of securities for the subject company (WM) within the past 12 months.
Credit Suisse has received investment banking related compensation from the subject company (WM) within the past 12 months.
Credit Suisse expects to receive or intends to seek investment banking related compensation from the subject company (WM) within the next 3 months.
Credit Suisse has received compensation for products and services other than investment banking services from the subject company (WM) within the past 12 months.

**Important Regional Disclosures**

The analyst(s) involved in the preparation of this report have not visited the material operations of the subject company (WM) within the past 12 months.

Restrictions on certain Canadian securities are indicated by the following abbreviations: NVS--Non-Voting shares; RVS--Restricted Voting Shares; SVS--Subordinate Voting Shares.
Individuals receiving this report from a Canadian investment dealer that is not affiliated with Credit Suisse should be advised that this report may not contain regulatory disclosures the non-affiliated Canadian investment dealer would be required to make if this were its own report.
For Credit Suisse Securities (Canada), Inc.'s policies and procedures regarding the dissemination of equity research, please visit http://www.csfb.com/legal_terms/canada_research_policy.shtml.

As of the date of this report, Credit Suisse acts as a market maker or liquidity provider in the equities securities that are the subject of this report.

Principal is not guaranteed in the case of equities because equity prices are variable.

 CREDIT SUISSE

18 October 2007

Commission is the commission rate or the amount agreed with a customer when selling up an account or at anytime after that.

CS may have issued a Trade Alert regarding this security. Trade Alerts are short term trading opportunities identified by an analyst on the basis of market events and catalysts, while stock ratings reflect an analyst's investment recommendations based on expected total return over a 12-month period relative to the relevant coverage universe. Because Trade Alerts and stock ratings reflect different assumptions and analytical methods, Trade Alerts may differ directionally from the analyst's stock rating.

The author(s) of this report maintains a CS Model Portfolio that he/she regularly adjusts. The security or securities discussed in this report may be a component of the CS Model Portfolio and subject to such adjustments (which, given the composition of the CS Model Portfolio as a whole, may differ from the recommendation in this report, as well as opportunities or strategies identified in Trading Alerts concerning the same security). The CS Model Portfolio and important disclosures about it are available at www.credit-suisse.com/ti.

For Credit Suisse disclosure information on other companies mentioned in this report, please visit the website at www.credit-suisse.com/researchdisclosures or call +1 (877) 291-2683.

Disclaimers continue on next page.



18 October 2007
Americas/United States
**Equity Research**



# CREDIT SUISSE

This report is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or which would subject Credit Suisse, the Swiss bank, or its subsidiaries or its affiliates ("CS") to any registration or licensing requirement within such jurisdiction. All material presented in this report, unless specifically indicated otherwise, is under copyright to CS. None of the material, nor its content, nor any copy of it, may be altered in any way, transmitted to, copied or distributed to any other party, without the prior express written permission of CS. All trademarks, service marks and logos used in this report are trademarks or service marks or registered trademarks or service marks of CS or its affiliates.

The information, tools and material presented in this report are provided to you for information purposes only and are not to be used or considered as an offer or the solicitation of an offer to sell or to buy or subscribe for securities or other financial instruments. CS may not have taken any steps to ensure that the securities referred to in this report are suitable for any particular investor. CS will not treat recipients as its customers by virtue of their receiving the report. The investments or services contained or referred to in this report may not be suitable for you and it is recommended that you consult an independent investment advisor if you are in doubt about such investments or investment services. Nothing in this report constitutes investment, legal, accounting or tax advice or a representation that any investment or strategy is suitable or appropriate to your individual circumstances or otherwise constitutes a personal recommendation to you. CS does not offer advice on the tax consequences of investment and you are advised to contact an independent tax adviser. Please note in particular that the bases and levels of taxation may change.

CS believes the information and opinions in the Disclosure Appendix of this report are accurate and complete. Information and opinions presented in the other sections of the report were obtained or derived from sources CS believes are reliable, but CS makes no representations as to their accuracy or completeness. Additional information is available upon request. CS accepts no liability for loss arising from the use of the material presented in this report, except that this exclusion of liability does not apply to the extent that liability arises under specific statutes or regulations applicable to CS. This report is not to be relied upon in substitution for the exercise of independent judgment. CS may have issued, and may in the future issue, a trading call regarding this security. Trading calls are short term trading opportunities based on market events and catalysts, while stock ratings reflect investment recommendations based on expected total return over a 12-month period relative to the relevant coverage universe. Because trading calls and stock ratings reflect different assumptions and analytical methods, trading calls may differ directionally from the stock rating. In addition, CS may have issued, and may in the future issue, other reports that are inconsistent with, and reach different conclusions from, the information presented in this report. Those reports reflect the different assumptions, views and analytical methods of the analysts who prepared them and CS is under no obligation to ensure that such other reports are brought to the attention of any recipient of this report. CS is involved in many businesses that relate to companies mentioned in this report. These businesses include specialized trading, risk arbitrage, market making, and other proprietary trading.

Past performance should not be taken as an indication or guarantee of future performance, and no representation or warranty, express or implied, is made regarding future performance. Information, opinions and estimates contained in this report reflect a judgement at its original date of publication by CS and are subject to change without notice. The price, value of and income from any of the securities or financial instruments mentioned in this report can fall as well as rise. The value of securities and financial instruments is subject to exchange rate fluctuation that may have a positive or adverse effect on the price or income of such securities or financial instruments. Investors in securities such as ADR's, the values of which are influenced by currency volatility, effectively assume this risk.

Structured securities are complex instruments, typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved. The market value of any structured security may be affected by changes in economic, financial and political factors (including, but not limited to, spot and forward interest and exchange rates), time to maturity, market conditions and volatility, and the credit quality of any issuer or reference issuer. Any investor interested in purchasing a structured product should conduct their own investigation and analysis of the product and consult with their own professional advisers as to the risks involved in making such a purchase.

Some investments discussed in this report have a high level of volatility. High volatility investments may experience sudden and large falls in their value causing losses when that investment is realised. Those losses may equal your original investment. Indeed, in the case of some investments the potential losses may exceed the amount of initial investment, in such circumstances you may be required to pay more money to support those losses. Income yields from investments may fluctuate and, in consequence, initial capital paid to make the investment may be used as part of that income yield. Some investments may not be readily realisable and it may be difficult to sell or realise those investments, similarly it may prove difficult for you to obtain reliable information about the value, or risks, to which such an investment is exposed.

This report may provide the addresses of, or contain hyperlinks to, websites. Except to the extent to which the report refers to website material of CS, CS has not reviewed the linked site and takes no responsibility for the content contained therein. Such address or hyperlink (including addresses or hyperlinks to CS's own website material) is provided solely for your convenience and information and the content of the linked site does not in any way form part of this document. Accessing such website or following such link through this report or CS's website shall be at your own risk.

This report is issued and distributed in Europe (except Switzerland) by Credit Suisse Securities (Europe) Limited, One Cabot Square, London E14 4QJ, England, which is regulated in the United Kingdom by The Financial Services Authority ("FSA"). This report is being distributed in Germany by Credit Suisse Securities (Europe) Limited Niederlassung Frankfurt am Main regulated by the Bundesanstalt fuer Finanzdienstleistungsaufsicht ("BaFin"). This report is being distributed in the United States by Credit Suisse Securities (USA) LLC ; in Switzerland by Credit Suisse; in Canada by Credit Suisse Securities (Canada), Inc.; in Brazil by Banco de Investimentos Credit Suisse (Brasil) S.A.; in Japan by Credit Suisse Securities (Japan) Limited, a member of Japan Securities Dealers Association, The Financial Futures Association of Japan; elsewhere in Asia/Pacific by whichever of the following is the appropriately authorised entity in the relevant jurisdiction: Credit Suisse (Hong Kong) Limited, Credit Suisse Equities (Australia) Limited , Credit Suisse Securities (Thailand) Limited, Credit Suisse (Malaysia) Sdn Bhd, Credit Suisse Singapore Branch and elsewhere in the world by the relevant authorised affiliate of the above. Research on Taiwanese securities produced by Credit Suisse Taipei Branch has been prepared by a registered Senior Business Person.  Research provided to residents of Malaysia is authorised by the Head of Research for Credit Suisse Securities (Malaysia) Sdn. Bhd., to whom they should direct any queries on +603 2723 2020.

In jurisdictions where CS is not already registered or licensed to trade in securities, transactions will only be effected in accordance with applicable securities legislation, which will vary from jurisdiction to jurisdiction and may require that the trade be made in accordance with applicable exemptions from registration or licensing requirements. Non-U.S. customers wishing to effect a transaction should contact a CS entity in their local jurisdiction unless governing law permits otherwise. U.S. customers wishing to effect a transaction should do so only by contacting a representative at Credit Suisse Securities (USA) LLC in the U.S.

Please note that this report was originally prepared and issued by CS for distribution to their market professional and institutional investor customers. Recipients who are not market professional or institutional investor customers of CS should seek the advice of their independent financial advisor prior to taking any investment decision based on this report or for any necessary explanation of its contents. This research may relate to investments or services of a person outside of the UK or to other matters which are not regulated by the FSA or in respect of which the protections of the FSA for private customers and/or the UK compensation scheme may not be available, and further details as to where this may be the case are available upon request in respect of this report.

Any Nielsen Media Research material contained in this report represents Nielsen Media Research's estimates and does not represent facts. NMR has neither reviewed nor approved this report and/or any of the statements made herein.

Copyright 2007 CREDIT SUISSE and/or its affiliates.  All rights reserved.

**CREDIT SUISSE SECURITIES (USA) LLC**
United States of America: +1 (212) 325-2000

# EXHIBIT E

Washington Mutual Inc

# Credit to worsen; Downgrade to Sell

Rating Change          **SELL**

Equity | United States | Savings & Loans/Thrifts
18 October 2007



Kenneth Bruce          +1 415 676 3545
Research Analyst
MLPF&S
kenneth_bruce@ml.com

Randy M. Sternke, CFA          +1 415 676 3555
Research Analyst
MLPF&S
randy_sternke@ml.com

## Downgrade to Sell on continued credit weakness

Downgrade to Sell, as credit appears far worse than we anticipated, undermining WM's fundamentals and likely further weighing on valuation. Given material credit issues, which continue to erode, there is likely little support from a take-out, as we think few strategic buyers will be interested in stepping into a weak balance sheet. Strategic interest in WM's attractive deposit footprint and a decent yield had been the center-piece of our Neutral. Both appear at risk.

## Noisy Q3'07 finishes well-short of expectations

WM reported Q3'07 EPS of $0.23, largely in-line with its pre-announced short-fall, due to higher credit cost and 1x charges, though a $0.07 tax benefit suggests adj. EPS of $0.16. Most surprising was the outlook for higher credit costs in Q4'07, $1.2B, due to the rapidly deteriorating performance of its loan portfolio. Given the serial changes to guidance, investors are justified in assuming credit matters may be far worse than WM anticipates. Given the pace of non-performing asset growth, higher charge-offs and reserve building could persist for another year, or more. We think the results and unfavorable outlook will further embolden short-sellers and shake already nervous longs out of the stock.

## Valuation seems unattractive

WM still valued at 1.2x GAAP BV of $28 p.s. and 1.8x tangible book value of ~$18 p.s., well above other heavily mortgage exposed stocks. WM could witness 1x BV and 1.5x tangible, in our view, as a take-out premium is unwarranted and the dividend seems in jeopardy. Our revised '08 forecast suggests WM will barely earn its dividend, suggesting capital constraints are likely. On a valuation basis, this could prove to be a new trough, as WM has historically remained above BV. That said, WM strategy to grab higher-yields by bulking up on credit-risk looks to have positioned it poorly to weather a likely history-making downturn in housing. Timing is everything. We are late, but WM still has to work through the long-tail of credit, so downside remains, in our view.

### Stock Data

| | |
|---|---|
| Price | US$33.07 |
| Investment Opinion | B-2-7 to B-3-8 |
| Volatility Risk | MEDIUM |
| 52-Week Range | US$31.27-46.38 |
| Mrkt Val / Shares Out (mn) | US$28,731 / 868.8 |
| ML Symbol / Exchange | WM / NYS |
| Bloomberg / Reuters | WM US / WM.N |
| ROE (2007E) | 8.7% |
| Total Dbt to Cap (Sep-2007A) | 92.4% |
| Est. 5-Yr EPS / DPS Growth | 10.0% / 8.0% |



— WaMu — S&P 500 INDEX

### Quarterly Earnings Estimates

| | 2006 | 2007 |
|---|---|---|
| Q1 | 0.98A | 0.86A |
| Q2 | 0.79A | 0.92A |
| Q3 | 0.77A | 0.23A |
| Q4 | 1.11A | 0.35E |

### Estimates (Dec)

| (US$) | 2005A | 2006A | 2007E | 2008E | 2009E |
|---|---|---|---|---|---|
| EPS | 3.73 | 3.64 | 2.40 | 2.60 | 3.65 |
| GAAP EPS | 3.73 | 3.64 | 2.40 | 2.60 | 3.65 |
| EPS Change (YoY) | 14.8% | -2.4% | -34.1% | 8.3% | 40.4% |
| Consensus EPS (First Call: 15-oct-2007) | | | 2.75 | 3.50 | 4.40 |
| Dividend Rate | 1.90 | 2.06 | 2.22 | 2.28 | 2.38 |

### Valuation (Dec)

| | 2005A | 2006A | 2007E | 2008E | 2009E |
|---|---|---|---|---|---|
| P/E | 8.9x | 9.1x | 13.8x | 12.7x | 9.1x |
| GAAP P/E | 8.9x | 9.1x | 13.8x | 12.7x | 9.1x |
| Dividend Yield | 5.7% | 6.2% | 6.7% | 6.9% | 7.2% |

Merrill Lynch does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of Merrill Lynch in the US can receive independent, third-party research on companies covered in this report, at no cost to them, if such research is available. Customers can access this independent research at http://www.ml.com/independentresearch or can call 1-800-637-7455 to request a copy of this research.
Refer to important disclosures on page 6 to 7. Analyst Certification on page 5.

10662003

**Merrill Lynch**                          Washington Mutual Inc

18 October 2007

# *iQprofile*<sup>SM</sup> **Washington Mutual Inc**

## Income Statement Data (Dec)

| (US$ Millions) | 2005A | 2006A | 2007E | 2008E | 2009E |
|---|---|---|---|---|---|
| Net Interest Income | 7,886 | 8,122 | 8,207 | 8,824 | 8,965 |
| % change | 10.8% | 3.0% | 1.0% | 7.5% | 1.6% |
| Net Fee Income | 3,200 | 2,907 | 3,284 | 3,662 | 3,877 |
| Securities Gains / (Losses) | (82) | (9) | (57) | 120 | 120 |
| Total Operating Income | 13,527 | 14,523 | 14,782 | 16,279 | 17,044 |
| Operating Expenses | (7,870) | (8,728) | (8,542) | (8,803) | (9,320) |
| % change | 4.4% | 10.9% | -2.1% | 3.1% | 5.9% |
| Provisions Expense | (220) | (816) | (2,900) | (3,812) | (2,654) |
| % change | 5.3% | 270.9% | 255.4% | 31.4% | -30.4% |
| Operating Pre-Tax Income | 5,437 | 4,979 | 3,340 | 3,665 | 5,070 |
| Operating Net Income to Comm S/Hold. | 3,431 | 3,317 | 2,313 | 2,512 | 3,454 |
| GAAP Net Income | 3,431 | 3,553 | 2,132 | 2,340 | 3,282 |

## Balance Sheet Data (Dec)

| (US$ Millions) | 2005A | 2006A | 2007E | 2008E | 2009E |
|---|---|---|---|---|---|
| Total Assets | 343,119 | 346,288 | 330,858 | 331,191 | 332,035 |
| Average Interest Earning Assets | 294,764 | 309,204 | 285,257 | 297,841 | 298,822 |
| Total Gross Customer Loans | 261,519 | 268,300 | 258,252 | 258,464 | 259,124 |
| % change | 5.2% | 2.6% | -3.7% | 0.1% | 0.3% |
| Total Customer Deposits | 193,167 | 213,956 | 215,058 | 215,274 | 215,823 |
| % change | 11.2% | 10.8% | 0.5% | 0.1% | 0.3% |
| Tangible Equity | 18,981 | 18,076 | 14,722 | 15,081 | 16,295 |
| Common Shareholders' Equity | 27,279 | 27,126 | 23,784 | 24,143 | 25,357 |

## Key Metrics (Dec)

| (US$ Millions) | 2005A | 2006A | 2007E | 2008E | 2009E |
|---|---|---|---|---|---|
| Net Interest Margin | 2.68% | 2.63% | 2.88% | 2.96% | 3.00% |
| Effective Tax Rate | 36.9% | 33.4% | 30.8% | 31.5% | 31.9% |
| Loan / Deposit Ratio | 135.4% | 125.4% | 120.1% | 120.1% | 120.1% |
| Tangible Common Equity / Assets | 5.5% | 5.2% | 4.4% | 4.6% | 4.9% |
| ROA | 1.1% | 1.0% | 0.7% | 0.7% | 1.0% |
| ROE | 14.6% | 12.9% | 8.7% | 9.8% | 13.3% |
| RoTE | 18.1% | 19.7% | 14.5% | 15.5% | 20.1% |
| Dividend Payout Ratio | 49.5% | 58.9% | 83.0% | 78.9% | 59.9% |
| Efficiency Ratio (Cost / Income Ratio) | 57.8% | 60.1% | 57.6% | 54.5% | 55.1% |

## Quality of Earnings (Dec)

| (US$ Millions) | 2005A | 2006A | 2007E | 2008E | 2009E |
|---|---|---|---|---|---|
| Total Non-Interest Inc / Operating Inc | 41.7% | 44.1% | 44.5% | 45.8% | 47.4% |
| NPLs plus Foreclosed Real Estate / Loans | 0% | 0% | 0% | 0% | 0% |
| Loan Loss Reserves / NPLs | -0.65% | -0.61% | -0.99% | -1.20% | -1.38% |
| Loan Loss Reserves / Total Loans | -0.64% | -0.60% | -0.98% | -1.18% | -1.36% |

## Company Description

Washington Mutual Inc. (WM) is the largest US thrift-holding company and third-largest residential mortgage lender. WM is principally focused on mortgage lending/servicing, and consumer/commercial banking, and operates more than 2600 branches nationally.

### Table 1: Provision guidance increased...Again

| | 2007-Old | 2007-New | ML 2007-E |
|---|---|---|---|
| Avg. Assets | 5-7% | | -7.94% |
| NIM | 2.85-2.95% | | 2.85% |
| Provisions | $1.5-1.7B | $2.7-2.9B | $2.9B |
| Dep Fees | 12-14% | | 12.66% |
| Non-int Inc | $6.9-7.1B | $6.4-6.5B | $6.6B |
| Non-int Exp | | $8.4-8.5B | $8.5B |

Source: Company Reports & Merrill Lynch Research

### Chart 1: Breakdown of investment portfolio



- ■ Home Loans
- □ Subprime
- ▨ HELOC
- ▨ Construction
- ■ Multi-Family
- ▨ Credit Card
- ▨ Other

* Subprime category includes both home loans and HELOCs.
Source: Company Reports & Merrill Lynch Estimates

### Stock Data

| | |
|---|---|
| Average Daily Volume | 9,345,381 |
| Brokers Covered (FirstCall) | 18 |

**Merrill Lynch**                    Washington Mutual Inc

18 October 2007

**Q3'07 Key takeaways:**

- Pace of credit deterioration accelerating

- Credit outlook clouds earnings visibility

- Capital looks suspiciously low

- Poor quality balance sheet likely to keep suitors at bay

# Q3 highlights credit risk; Downgrading to Sell

WaMu reported Q3'07 EPS of $0.23, including a $0.07 tax benefit. Excluding the benefit, Q3 finished $0.04 below our estimate. More importantly, Q3 results highlighted the deteriorating credit environment and WM's relatively weak loss allowance. Excluding credit card related balances, NCOs and NPAs increased to 0.55% and 2.39% of related loans while reserves finished at only 0.63%. This equates to a coverage ratio of just 0.27x NPAs (see Table 2 for trends).

**Table 2: Credit trends worsen**

|  | Adjusted Q3'07 | Q3'07 | Q2'07 | Q1'07 | Q4'06 | Q3'06 |
|---|---|---|---|---|---|---|
| NCO / Loans | 0.60% | 0.55% | 0.35% | 0.20% | 0.16% | 0.12% |
| NPA / Loans | 2.35% | 2.39% | 1.96% | 1.57% | 1.30% | 1.03% |
| Reserves / Loans | 0.69% | 0.63% | 0.52% | 0.51% | 0.51% | 0.48% |
| Reserves / NPAs | 0.29 x | 0.27 x | 0.26 x | 0.33 x | 0.39 x | 0.46 x |

Excludes credit card related balances, NCOs and reserves (estimated at 5% of balances). Adjusted Q3'07 excludes $500M of restructured loans and $17B of recently transferred loans.
Source: Company Reports & Merrill Lynch Reseach

We are downgrading WM shares to sell in expectation that credit costs will continue to rise. The rapid turn in the U.S. housing market has pressured borrowers and, in our view, will lead WM to realize higher than expected losses. Visibility into the cycle trough is poor, as is illustrated by WM's serial changes to its provision guidance. However, WM's reserve will likely prove inadequate, in our view. This likely will impede EPS growth in '08 and threaten WM's dividend policy. We now estimate 2008 DPS to be $2.28, $0.10 below the $2.38 implied by WaMu's current policy. However, there is some risk to our dividend assumption, in our view, as tangible capital equity runs relatively low.

We expect WM shares to trade at book value, or at a slight discount, reflecting downside risk of 10 – 20%. The usual fly-in-the-ointment is a possible take-out, which we have assigned a $50 - $55 value. However, we do not think a buyout is likely, given the continued lack of visibility into a worsening credit/housing market.

**Earnings assets up 5% sequentially (ann.) due to $17B transfer and lower loans originated for sale:** Loans originated for sale fell to $14B (64% of production) from $29B (95% of production) in Q2. Available for sale balances also fell to $7.5B from $19.3B). Loans held for investment (ex Credit Card) increased $23B, largely due to pre-announced $17B transfer from AFS. Expect continued portfolioing of loans to drive growth until secondary mortgage market reopens. Average assets likely to finish below guidance range of down 5-7%.

**NIM compression due to higher cost borrowings:** NIM fell to 2.86% from 2.90% in Q2 despite average asset yields increasing 5 bps. Contraction due to larger dependence on high cost FHLB advances, offsetting a decline in lower cost deposits. Further, higher spread between 3m LIBOR and Fed funds makes borrowings relatively expensive. Expect NIM to finish '07 at the low end of 2.85-2.95% guidance.

**Reserves appear inadequate at 0.80% loans and 0.35% NPAs:** Stripping out estimated credit card related balances, reserves finish at 0.63% of loans and only 0.27x NPAs. We expect provision expense to continue to climb, possibly over WM's revised '07 guidance, and likely will continue to be a sizable headwind to earnings growth in 2008.

**GOS margin fell to -22 bps:** likely due the continued disruption in the non-conforming secondary mortgage market along with higher competition in the conforming market. Expect GOS income to remain low as WM retains the majority of its production.

**Operating expenses are low, but foreclosure expenses are increasing:** Higher foreclosures will not only increase credit costs but will add to non-interest expenses.

**De novo branch growth slows to a trickle:** WM added 10 branches while closing 33 in Q3, bring the YTD grand total up to -13 (27 new, 40 closed). WM expects to open 50 in Q4, short of stated '07 target of 100-125.

**No more repurchases.** Capital being retained to protect what is now a liquidating dividend.

**Table 3: Q3'07 actual vs. estimate: Lower tax rate added $0.07 p.s. vs. our estimate**

| ($ in Millions) | Actuals 3Q:07A | % Change Y/Y | % Change Q/Q | ML Ests 3Q:07E | Variation Dollar | Variation % | Comparables 3Q:06A | Comparables 2Q:07A |
|---|---|---|---|---|---|---|---|---|
| **Income Statement:** | | | | | | | | |
| Net interest income | $2,014 | 3% | -1% | $2,046 | -$32 | -2% | $1,947 | $2,034 |
| Provisions | 967 | 483% | 160% | 975 | -8 | -1% | 166 | 372 |
| SFR Mort. Bank | 161 | 36% | -46% | 127 | 34 | 27% | 118 | 300 |
| Total Non-interest income | 1,379 | -12% | -22% | 1,361 | 18 | 1% | 1,570 | 1,758 |
| Total Non-interest Expense | 2,191 | 0% | -4% | 2,191 | 0 | 0% | 2,184 | 2,278 |
| Net income | 210 | -72% | -75% | 183 | 27 | 15% | 748 | 830 |
| Diluted EPS | $0.23 | NA | -75% | $0.20 | $ 0.03 | 13% | $0.76 | $0.92 |
| **Operational Data:** | | | | | | | | |
| Avg. Earning Assets (bil) | $283.3 | -9% | -1% | $277.4 | $6 | 2% | $312.8 | $279.8 |
| WM Home Loan Orig. (bil) | 22.3 | -40% | -28% | 30.0 | -8 | -26% | 37.2 | 31.0 |
| Net Interest Margin | 2.86% | 15% | -1% | 2.95% | -9 bp | -3% | 2.49% | 2.90% |
| Estimated GOS (net of hedging) | -0.22% | -666% | -434% | 0.40% | -259 bp | -647% | 0.39% | 0.65% |
| Tang. Equity / Tang. Assets | 5.44% | -5% | -9% | 5.74% | -30 bp | -5% | 5.75% | 6.01% |
| ROAA | 0.26% | -69% | -75% | 0.23% | 3 bp | 12% | 0.84% | 1.05% |
| ROAE | 3.93% | -68% | -74% | 3.43% | 50 bp | 15% | 12.15% | 15.40% |
| NCO (ann.) / Avg. loans HFI | 0.71% | 204% | 55% | 0.71% | -1 bp | -1% | 0.23% | 0.46% |
| Efficiency Ratio | 63.45% | 7% | 1% | 62.01% | 145 bp | 2% | 62.10% | 56.38% |

Source: Company Reports & Merrill Lynch Estimates

 **Merrill Lynch**

Washington Mutual Inc

18 October 2007

### Credit cost rising; Reserve appears inadequate

Credit metrics continue to worsen against WM's weak $1.9B reserve. NCOs and NPAs finished Q3 at 0.71% and 2.30% of loans, respectively, versus only 0.86% of reserves. We expect NPAs and NCOs to continue to growth in 2008, making WM's fight to strengthen its reserve an uphill battle. Two areas of particular concern are WM's HELOC and subprime portfolios of $3.2B and $20B, respectively. Currently these portfolios contain $2.9B of combined NPAs.

### Revising estimates on higher credit costs

We have lowered our '07 estimate to $2.40 from $2.80, reflecting Q3 actuals and WM's increased '07 provision guidance. Our '08 estimate has been lowered to $2.60 from $3.45. The revision largely reflects $3.8B of provision expenses vs. our prior expectation of $2.0B. We expect WM to pay $2.28 p.s. of dividends in '08, $0.10 below WaMu's current run rate of +$0.01 per quarter.

 **Merrill Lynch**

Washington Mutual Inc

18 October 2007

# Analyst Certification

I, Kenneth Bruce, hereby certify that the views expressed in this research report accurately reflect my personal views about the subject securities and issuers. I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or view expressed in this research report.

*iQmethod℠* Measures Definitions

| Business Performance | Numerator | Denominator |
|---|---|---|
| Return On Capital Employed | NOPAT = (EBIT + Interest Income) * (1 - Tax Rate) + Goodwill Amortization | Total Assets – Current Liabilities + ST Debt + Accumulated Goodwill Amortization |
| Return On Equity | Net Income | Shareholders' Equity |
| Operating Margin | Operating Profit | Sales |
| Earnings Growth | Expected 5-Year CAGR From Latest Actual | N/A |
| Free Cash Flow | Cash Flow From Operations – Total Capex | N/A |
| **Quality of Earnings** | | |
| Cash Realization Ratio | Cash Flow From Operations | Net Income |
| Asset Replacement Ratio | Capex | Depreciation |
| Tax Rate | Tax Charge | Pre-Tax Income |
| Net Debt-To-Equity Ratio | Net Debt = Total Debt, Less Cash & Equivalents | Total Equity |
| Interest Cover | EBIT | Interest Expense |
| **Valuation Toolkit** | | |
| Price / Earnings Ratio | Current Share Price | Diluted Earnings Per Share (Basis As Specified) |
| Price / Book Value | Current Share Price | Shareholders' Equity / Current Basic Shares |
| Dividend Yield | Annualised Declared Cash Dividend | Current Share Price |
| Free Cash Flow Yield | Cash Flow From Operations – Total Capex | Market Cap. = Current Share Price * Current Basic Shares |
| Enterprise Value / Sales | EV = Current Share Price * Current Shares + Minority Equity + Net Debt + Other LT Liabilities | Sales |
| EV / EBITDA | Enterprise Value | Basic EBIT + Depreciation + Amortization |

*iQmethod℠* is the set of Merrill Lynch standard measures that serve to maintain global consistency under three broad headings: Business Performance, Quality of Earnings, and validations. The key features of iQmethod are: A consistently structured, detailed, and transparent methodology. Guidelines to maximize the effectiveness of the comparative valuation process, and to identify some common pitfalls.

*iQdatabase* ® is our real-time global research database that is sourced directly from our equity analysts' earnings models and includes forecasted as well as historical data for income statements, balance sheets, and cash flow statements for companies covered by Merrill Lynch.

*iQprofile℠, iQmethod℠* are service marks of Merrill Lynch & Co., Inc.*iQdatabase* ® is a registered service mark of Merrill Lynch & Co., Inc.

**Merrill Lynch**                    Washington Mutual Inc

18 October 2007

# Important Disclosures

**WM Price Chart**



B : Buy, N : Neutral, S : Sell, PO : Price objective, NA : No longer valid

The Investment Opinion System is contained at the end of the report under the heading "Fundamental Equity Opinion Key". Dark Grey shading indicates the security is restricted with the opinion suspended. Light Grey shading indicates the security is under review with the opinion withdrawn. Chart current as of September 30, 2007 or such later date as indicated.

**Investment Rating Distribution: Financial Services Group (as of 01 Oct 2007)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships* | Count | Percent |
|---|---|---|---|---|---|
| Buy | 108 | 38.85% | Buy | 45 | 44.55% |
| Neutral | 156 | 56.12% | Neutral | 67 | 45.27% |
| Sell | 14 | 5.04% | Sell | 4 | 28.57% |

**Investment Rating Distribution: Global Group (as of 01 Oct 2007)**

| Coverage Universe | Count | Percent | Inv. Banking Relationships* | Count | Percent |
|---|---|---|---|---|---|
| Buy | 1701 | 47.03% | Buy | 437 | 29.15% |
| Neutral | 1611 | 44.54% | Neutral | 425 | 29.11% |
| Sell | 305 | 8.43% | Sell | 58 | 21.09% |

* Companies in respect of which MLPF&S or an affiliate has received compensation for investment banking services within the past 12 months.

**FUNDAMENTAL EQUITY OPINION KEY:** Opinions include a Volatility Risk Rating, an Investment Rating and an Income Rating. VOLATILITY RISK RATINGS, indicators of potential price fluctuation, are: A - Low, B - Medium, and C - High. INVESTMENT RATINGS, indicators of expected total return (price appreciation plus yield) within the 12-month period from the date of the initial rating, are: 1 - Buy (10% or more for Low and Medium Volatility Risk Securities - 20% or more for High Volatility Risk securities); 2 - Neutral (0-10% for Low and Medium Volatility Risk securities - 0-20% for High Volatility Risk securities); 3 - Sell (negative return); and 6 - No Rating. INCOME RATINGS, indicators of potential cash dividends, are: 7 - same/higher (dividend considered to be secure); 8 - same/lower (dividend not considered to be secure); and 9 - pays no cash dividend.

MLPF&S or one of its affiliates acts as a market maker for the securities recommended in the report: WaMu.
The company is or was, within the last 12 months, an investment banking client of MLPF&S and/or one or more of its affiliates: WaMu.
MLPF&S or an affiliate has received compensation from the company for non-investment banking services or products within the past 12 months: WaMu.
The company is or was, within the last 12 months, a non-securities business client of MLPF&S and/or one or more of its affiliates: WaMu.
MLPF&S or an affiliate has received compensation for investment banking services from this company within the past 12 months: WaMu.
MLPF&S or an affiliate expects to receive or intends to seek compensation for investment banking services from this company within the next three months: WaMu.
MLPF&S together with its affiliates beneficially owns one percent or more of the common stock of this company. If this report was issued on or after the 10th day of the month, it reflects the ownership position on the last day of the previous month. Reports issued before the 10th day of a month reflect the ownership position at the end of the second month preceding the date of the report: WaMu.
MLPF&S or one of its affiliates is willing to sell to, or buy from, clients the common equity of the company on a principal basis: WaMu.
The company is or was, within the last 12 months, a securities business client (non-investment banking) of MLPF&S and/or one or more of its affiliates: WaMu.
The analyst(s) responsible for covering the securities in this report receive compensation based upon, among other factors, the overall profitability of Merrill Lynch, including profits derived from investment banking revenues.

6

 **Merrill Lynch**

Washington Mutual Inc

18 October 2007

# Other Important Disclosures

UK readers: MLPF&S or an affiliate is a liquidity provider for the securities discussed in this report.

MLPF&S or one of its affiliates has a significant financial interest in the fixed income instruments of the issuer. If this report was issued on or after the 10th day of a month, it reflects a significant financial interest on the last day of the previous month. Reports issued before the 10th day of a month reflect a significant financial interest at the end of the second month preceding the date of the report: WaMu.

**Information relating to Non-U.S. affiliates of Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S):**

MLPF&S distributes research reports of the following non-US affiliates in the US (short name: legal name): Merrill Lynch (France): Merrill Lynch Capital Markets (France) SAS; Merrill Lynch (Frankfurt): Merrill Lynch International Bank Ltd, Frankfurt Branch; Merrill Lynch (South Africa): Merrill Lynch South Africa (Pty) Ltd; Merrill Lynch (Milan): Merrill Lynch International Bank Limited; MLPF&S (UK): Merrill Lynch, Pierce, Fenner & Smith Limited; Merrill Lynch (Australia): Merrill Lynch Equities (Australia) Limited; Merrill Lynch (Hong Kong): Merrill Lynch (Asia Pacific) Limited; Merrill Lynch (Singapore): Merrill Lynch (Singapore) Pte Ltd; Merrill Lynch (Canada): Merrill Lynch Canada Inc; Merrill Lynch (Mexico): Merrill Lynch Mexico, SA de CV, Casa de Bolsa; Merrill Lynch (Argentina): Merrill Lynch Argentina SA; Merrill Lynch (Japan): Merrill Lynch Japan Securities Co, Ltd; Merrill Lynch (Seoul): Merrill Lynch International Incorporated (Seoul Branch); Merrill Lynch (Taiwan): Merrill Lynch Global (Taiwan) Limited; DSP Merrill Lynch (India): DSP Merrill Lynch Limited; PT Merrill Lynch (Indonesia): PT Merrill Lynch Indonesia; Merrill Lynch (KL) Sdn. Bhd.: Merrill Lynch (Malaysia); Merrill Lynch (Israel): Merrill Lynch Israel Limited; Merrill Lynch (Russia): Merrill Lynch CIS Limited, Moscow; Merrill Lynch (Turkey): Merrill Lynch Yatirim Bankasi A.S.; Merrill Lynch (Dubai): Merrill Lynch International Bank Ltd, Dubai Branch.

This research report has been prepared and issued by MLPF&S and/or one or more of its non-U.S. affiliates. MLPF&S is the distributor of this research report in the U.S. and accepts full responsibility for research reports of its non-U.S. affiliates distributed in the U.S. Any U.S. person receiving this research report and wishing to effect any transaction in any security discussed in the report should do so through MLPF&S and not such foreign affiliates.

This research report has been approved for publication in the United Kingdom by Merrill Lynch, Pierce, Fenner & Smith Limited, which is authorized and regulated by the Financial Services Authority; has been considered and distributed in Japan by Merrill Lynch Japan Securities Co, Ltd, a registered securities dealer under the Securities and Exchange Law in Japan; is distributed in Hong Kong by Merrill Lynch (Asia Pacific) Limited, which is regulated by the Hong Kong SFC; is issued and distributed in Taiwan by Merrill Lynch Global (Taiwan) Ltd or Merrill Lynch, Pierce, Fenner & Smith Limited (Taiwan Branch); is issued and distributed in Malaysia by Merrill Lynch (KL) Sdn. Bhd., a licensed investment adviser regulated by the Malaysian Securities Commission; is issued and distributed in India by DSP Merrill Lynch Limited; and is issued and distributed in Singapore by Merrill Lynch International Bank Limited (Merchant Bank) and Merrill Lynch (Singapore) Pte Ltd (Company Registration No.'s F 06872E and 198602883D respectively). Merrill Lynch International Bank Limited (Merchant Bank) and Merrill Lynch (Singapore) Pte Ltd. are regulated by the Monetary Authority of Singapore. Merrill Lynch Equities (Australia) Limited, (ABN 65 006 276 795), AFS License 235132, provides this report in Australia. No approval is required for publication or distribution of this report in Brazil.

Merrill Lynch (Frankfurt) distributes this report in Germany. Merrill Lynch (Frankfurt) is regulated by BaFin.

**Copyright, User Agreement and other general information related to this report:**

Copyright 2007 Merrill Lynch, Pierce, Fenner & Smith Incorporated. All rights reserved. This research report is prepared for the use of Merrill Lynch clients and may not be redistributed, retransmitted or disclosed, in whole or in part, or in any form or manner, without the express written consent of Merrill Lynch. Merrill Lynch research reports are distributed simultaneously to internal and client websites eligible to receive such research prior to any public dissemination by Merrill Lynch of the research report or information or opinion contained therein. Any unauthorized use or disclosure is prohibited. Receipt and review of this research report constitutes your agreement not to redistribute, retransmit, or disclose to others the contents, opinions, conclusion, or information contained in this report (including any investment recommendations, estimates or price targets) prior to Merrill Lynch's public disclosure of such information. The information herein (other than disclosure information relating to Merrill Lynch and its affiliates) was obtained from various sources and we do not guarantee its accuracy. Merrill Lynch makes no representations or warranties whatsoever as to the data and information provided in any third party referenced website and shall have no liability or responsibility arising out of or in connection with any such referenced website.

This research report provides general information only. Neither the information nor any opinion expressed constitutes an offer or an invitation to make an offer, to buy or sell any securities or other investment or any options, futures or derivatives related to such securities or investments. It is not intended to provide personal investment advice and it does not take into account the specific investment objectives, financial situation and the particular needs of any specific person who may receive this report. Investors should seek financial advice regarding the appropriateness of investing in any securities, other investment or investment strategies discussed or recommended in this report and should understand that statements regarding future prospects may not be realized. Investors should note that income from such securities or other investments, if any, may fluctuate and that price or value of such securities and investments may rise or fall. Accordingly, investors may receive back less than originally invested. Past performance is not necessarily a guide to future performance. Any information relating to the tax status of financial instruments discussed herein is not intended to provide tax advice or to be used by anyone to provide tax advice. Investors are urged to seek tax advice based on their particular circumstances from an independent tax professional.

Foreign currency rates of exchange may adversely affect the value, price or income of any security or related investment mentioned in this report. In addition, investors in securities such as ADRs, whose values are influenced by the currency of the underlying security, effectively assume currency risk.

Officers of MLPF&S or one or more of its affiliates (other than research analysts) may have a financial interest in securities of the issuer(s) or in related investments.

Merrill Lynch Research policies relating to conflicts of interest are described at http://www.ml.com/media/43347.pdf.

Fundamental equity reports are produced on a regular basis as necessary to keep the investment recommendation current.

iQmethod, iQmethod 2.0, iQprofile, iQtoolkit, iQworks are service marks of Merrill Lynch & Co., Inc. iQanalytics®, iQcustom®, iQdatabase® are registered service marks of Merrill Lynch & Co., Inc.