THE HONORABLE MARSHA J. PECHMAN

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| 9  IN RE WASHINGTON MUTUAL, INC. SECURITIES, DERIVATIVE & ERISA LITIGATION | No. 2:08-md-1919 MJP |
| 10 | **DEFENDANT KERRY K. KILLINGER'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** |
| 11 | |
| 12 | **NOTE ON MOTION CALENDAR: March 30, 2009** |
| 13 | |
| 14 | **ORAL ARGUMENT REQUESTED** |
| 15 | OD-KKK-1 |
| 16  IN RE WASHINGTON MUTUAL, INC. SECURITIES LITIGATION | Lead Case No. C08-387 MJP |
| 17 | |
| 18  This Document Relates To:  ALL CASES | |

19
20
21
22
23
24
25
26
27

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT .................................................................................................................... 2

I.   PLAINTIFFS DO NOT ADEQUATELY PLEAD THAT MR. KILLINGER
     MADE A FALSE OR MISLEADING STATEMENT. ........................................... 2

    A.   Plaintiffs Do Not Adequately Plead That Mr. Killinger's Statements
          Describing The Company's Underwriting Were False Or Misleading. .............. 5

    B.   Plaintiffs Do Not Adequately Plead That Mr. Killinger Made Any False
          Statements Related To Allegedly Inflated Appraisals. ........................................ 8

    C.   Plaintiffs Do Not Adequately Plead That Mr. Killinger's Descriptions Of
          WaMu's Credit Quality And Risk Management Were False Or Misleading. ........ 9

    D.   Mr. Killinger's Predictions Of The Effects Of The Housing Slowdown
          Cannot Be The Basis Of A Securities Fraud Claim. ........................................... 12

II.  MR. KILLINGER'S FORWARD-LOOKING STATEMENTS ARE
     PROTECTED BY THE REFORM ACT'S SAFE HARBOR DOCTRINE. ................... 14

III. PLAINTIFFS DO NOT DEMONSTRATE MR. KILLINGER MADE ANY
     STATEMENT WITH SCIENTER. ........................................................................ 16

    A.   Plaintiffs' Reference To Internal Reports Does Not Demonstrate Scienter. ........ 17

    B.   Plaintiffs' CWs Do Not Support An Inference Of Mr. Killinger's Scienter. ....... 19

    C.   Scienter Cannot Be Inferred From Plaintiffs' Accounting Allegations. ............... 21

    D.   Mr. Killinger's Compensation Structure Does Not Establish Motive. ................. 21

    E.   Scienter Cannot Be Inferred From Plaintiffs' Stock-Sale Allegations. ................ 21

CONCLUSION ................................................................................................................ 24

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

i

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*California Pub. Employees' Ret. Sys. v. Chubb Corp.,*
394 F.3d 126 (3d Cir. 2004)...................................................................................4, 6, 10

*Constr. Laborers Pension Trust v. Neurocrine Biosciences, Inc.,*
No. 07CV1111-IEG-RBB, 2008 WL 2053733 (S.D. Cal. May 13, 2008)......................21

*DeMarco v. DepoTech Corp.,*
149 F. Supp. 2d 1212 (S.D. Cal. 2001).........................................................................7

*Elliott v. Drugstore.com, Inc.,*
No. C04-CV-1474-RSM, slip op. (W.D. Wash. Oct. 19, 2005)....................................16

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,*
353 F.3d 1125 (9th Cir. 2004).............................................................................14, 15

*Fin. Acquisition Partners LP v. Blackwell,*
440 F.3d 278 (5th Cir. 2006).......................................................................................7

*Glazer Capital Mgmt., LP v. Magistri,*
– F.3d –, No. 06-16899, 2008 WL 5003306 (9th Cir. Nov. 26, 2008).....................19, 21

*Gold v. Morrice,*
No. CV07-00931 DDP, 2008 WL 467619 (C.D. Cal. Jan. 31, 2008) .............................3

*In re Calpine Corp. Sec. Litig.,*
288 F. Supp. 2d 1054 (N.D. Cal. 2003).......................................................................21

*In re Copper Mountain Sec. Litig.,*
311 F. Supp. 2d 857 (N.D. Cal. 2004).........................................................................14

*In re Daou Sys., Inc.,*
411 F.3d 1006 (9th Cir. 2005).................................................................................4, 10

*In re Daou Sys., Inc. Sec. Litig.,*
397 F.3d 704 (9th Cir. 2005).....................................................................................19

*In re Dot Hill Sys. Corp. Sec. Litig.,*
No. 06CV228 JLS, 2008 WL 4184616 (S.D. Cal. Sept. 2, 2008) ............................8, 12

*In re Hutchinson Tech., Inc. Sec. Litig.,*
536 F.3d 952 (8th Cir. 2008).......................................................................................4

*In re Impac Mortg. Holdings,Inc. Sec. Litig.,*
554 F. Supp. 2d 1083 (C.D. Cal. 2008).....................................................................8, 17

*In re Metawave Commc'ns Corp. Sec. Litig.,*
298 F. Supp. 2d 1056 (W.D. Wash. 2003)..................................................................4, 6

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

ii

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

*In re 2007 Novastar Fin., Inc., Sec. Litig.*,
    No. 07-0139-CV-W-ODS, 2008 WL 2354367 (W.D. Mo. June 4, 2008) ............... *passim*

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ............................................................................. *passim*

*In re Silicon Storage Tech., Inc Sec. Litig.*,
    No. C 05-0295 PJH, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ...................................24

*In re Tibco Software, Inc.*,
    No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ...............................24

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ......................................................................... *passim*

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ...................................................................................14, 15

*Limantour v. Cray Inc.*,
    432 F. Supp. 2d 1129 (W.D. Wash. 2006)..............................................................23

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) .........................................................................7, 18

*McGuire v. Dendreon Corp.*,
    No. C07-800MJP, 2008 WL 1791381 (W.D. Wash. April 18, 2008) ......................17, 22

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ......................................................................... *passim*

*New York State Teachers' Ret. Sys. v. Fremont Gen. Corp.*,
    No. 2:07-cv-05756-FMC-FFMX, 2008 WL 4812021
    (C.D. Cal. Oct. 28, 2008) ...................................................................3, 7, 8, 17

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...................................................................11, 12, 20

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ........................................................................ *passim*

*South Ferry LP, #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...............................................................................17, 18

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...............................................................................17

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ...............................................................................6

*Swartz v. Deutsche Bank*,
    C03-1252 MJP, 2008 WL 1968948 (W.D. Wash. May 2, 2008) ........................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)...............................................................................16

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

iii

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

*Tripp v. Indymac Fin. Inc.*,
      No. CV07-1635-GW, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007).........................10, 21

*Williams v. WMX Techs., Inc.*,
      112 F.3d 175 (5th Cir. 1997) .................................................................................................1

## STATUTES

15 U.S.C. § 77z-2(c)(1)(A) ................................................................................................14

15 U.S.C. § 78u-4(b) ..........................................................................................................17

15 U.S.C. § 78u-4(b)(1)(B) ..................................................................................................3

15 U.S.C. § 78u-4(b)(2) .................................................................................................16, 17

15 U.S.C. § 78u-5(c)(1)(A) ...............................................................................................14

15 U.S.C. § 78u-5(c)(1)(B) ...............................................................................................14

15 U.S.C. § 78u-5(c)(2) .....................................................................................................15

15 U.S.C. § 78u-5(i) ...........................................................................................................14

## RULES

Fed. R. Civ. P. 9(b) ....................................................................................................3, 5, 14

17 C.F.R. § 240.10b5-1(c) (2008)......................................................................................23

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

iv

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1      Kerry K. Killinger, former Chief Executive Officer of Washington Mutual, Inc. ("WaMu"

2  or "Company"), moves to dismiss the Consolidated Class Action Complaint ("Complaint" or "¶

3  _"). Plaintiffs assert claims against him for alleged violations of Section 10(b) of the Securities

4  Exchange Act of 1934, and Section 11 of the Securities Act of 1933. Although in this motion,

5  Mr. Killinger focuses on allegations against him in particular, he joins in the motions to dismiss

6  by the WaMu Officers, Director Defendants, Underwriter Defendants, and auditor Deloitte &

7  Touche LLP. Through this motion, and by adoption of the arguments addressed in more detail by

8  the other defendants, Mr. Killinger respectfully submits that the Complaint should be dismissed.

9                                    **INTRODUCTION**

10     The Complaint is 386 pages and 1,006 paragraphs long. It purports to be based on

11  information obtained from 89 so-called "Confidential Witnesses" ("CWs") – a number plaintiffs

12  call "unprecedented." ¶ 2. The paradox of this lawsuit, however, is that despite the Complaint's

13  bulk, it reduces to a few core allegations, which fail to provide the factual foundation necessary to

14  plead a claim under the Private Securities Litigation Reform Act of 1995 ("Reform Act" or

15  "PSLRA"). It takes a Herculean effort to unearth these core allegations, much less to match them

16  up with the statements plaintiffs challenge as false or misleading, and then to excavate the

17  corresponding allegations of scienter. Indeed, plaintiffs have made this task so difficult that it

18  suggests their real strategy is to bury the Court in volume, hoping the Court will assume that

19  somewhere within the vast Complaint, plaintiffs must have stated a claim. But courts are wise to

20  this tactic: A complaint can be "long-winded, even prolix, without pleading with particularity"; in

21  fact, such a style is "not an uncommon mask for an absence of detail." *Williams v. WMX Techs.*,

22  *Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). In this regard, the Complaint is similar to the one in *In re*

23  *2007 Novastar Financial, Inc., Securities Litigation*, where the plaintiff used lengthy allegations

24  to "create an illusion of detail and insinuate the existence of fraud," leading the court to conclude:

25  "One might be tempted to think that a complaint spanning more than 100 pages and consisting of

26  more than 200 paragraphs could not fail to be specific. The temptation is dangerous and must be

27  resisted." No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *2-3 (W.D. Mo. June 4, 2008).

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

1

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

After completing the laborious process of sifting through the Complaint, it is clear that plaintiffs do not state a claim against Mr. Killinger. Rather, plaintiffs' allegations amount to a classic claim of fraud by hindsight. Looking back upon the unprecedented deterioration of the nation's housing market, plaintiffs find fault with how WaMu was managed before the crisis. But plaintiffs fail to connect their vague allegations to any false or misleading statements by Mr. Killinger. They do not show – because they *cannot* show – any contemporaneous facts demonstrating that Mr. Killinger's statements were false or misleading when made. They also do not show – because they *cannot* show – any contemporaneous facts indicating that Mr. Killinger intended to deceive investors when he made these statements. Rather, the picture painted by Mr. Killinger's statements is a simple one: Mr. Killinger honestly told investors that he foresaw a downturn in the housing market. He told investors the Company was taking actions to weather this downturn. And he updated investors about the status of the Company and the decline of the market. Plaintiffs cannot craft a claim out of the fact that Mr. Killinger, along with the rest of the country, failed to predict the severity of the housing crash and the impact it would have on WaMu. Because plaintiffs have not presented contemporaneous facts showing that Mr. Killinger intentionally made a false or misleading statement, the claims against him should be dismissed.

## ARGUMENT

I.    **PLAINTIFFS DO NOT ADEQUATELY PLEAD THAT MR. KILLINGER MADE A FALSE OR MISLEADING STATEMENT.**

There is no dispute that throughout the Class Period, Mr. Killinger repeatedly discussed declining market conditions, the uncertainty they created, and the measures WaMu was taking to prepare for them. *See, e.g.*, ¶ 603; Ex. H at H-2.[1] ("[T]he housing market is clearly showing signs of slowing[.] … For WaMu, a slowdown in housing will no doubt lead to higher delinquencies and credit cost, and again, we factor that into our planning."). Despite these cautionary statements, plaintiffs allege Mr. Killinger made false and misleading statements about WaMu's

---

[1] All exhibits ("Ex. _") are attached to the Declaration of Claire L. Davis, and discussed in the Request for Judicial Notice filed herewith.

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

2

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  lending practices in advance of the mortgage crisis.  Plaintiffs, however, have not come close to

2  meeting the standards of the Reform Act, which requires plaintiffs to "specify each statement

3  alleged to have been misleading, [and] the reason or reasons why the statement is misleading."

4  15 U.S.C. § 78u-4(b)(1)(B).  For each challenged statement, plaintiffs must allege detailed facts

5  indicating the statement was false or misleading *when made*, rather than only in hindsight.

6  *Ronconi v. Larkin*, 253 F.3d 423, 430 & n.12 (9th Cir. 2001); *see also* Fed. R. Civ. P. 9(b).

7          Despite the Complaint's 154 pages of "substantive allegations" and 58 pages of allegedly

8  false statements – which quote from nearly every public statement Mr. Killinger and WaMu made

9  during the Class Period – plaintiffs make virtually no attempt to link their generalized allegations

10  to Mr. Killinger's statements.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049,

11  1070 (9th Cir. 2008) (dismissing complaint despite "voluminous" allegations and "a litany of

12  alleged false statements" where plaintiffs had not pleaded specific facts indicating falsity).

13  Plaintiffs do not attempt to describe the specific circumstances that existed *at the time of each*

14  *statement* that indicate the statement was false or misleading *when made*.  Instead, they follow

15  each section of block quotes with boilerplate paragraphs reciting the same general allegations, and

16  referring the Court to reasons for falsity "detail[ed] above."  *See, e.g.*, ¶¶ 565, 571, 585, 599, 604,

17  610, 617, 626, 645, 661-62, 674, 676, 685.  It falls to the Court and the defendants to patch these

18  allegations together to try to discern a coherent claim of securities fraud.  After completing this

19  puzzle, it becomes clear that plaintiffs have failed to identify which statements are false, and the

20  specific reasons for falsity – as other courts have found after piecing together similar complaints

21  filed by plaintiffs' counsel related to the current mortgage crisis.  *See New York State Teachers'*

22  *Ret. Sys. v. Fremont Gen. Corp.*, No. 2:07-cv-05756-FMC-FFMX, 2008 WL 4812021, at *4-5

23  (C.D. Cal. Oct. 28, 2008) (dismissing 175-page complaint after the court "scoured" it in an effort

24  to link its "disjointed" allegations, but still found it failed to adequately plead either falsity or

25  scienter); *Gold v. Morrice*, No. CV07-00931 DDP, 2008 WL 467619, *2-3 (C.D. Cal. Jan. 31,

26  2008) (dismissing lengthy and "meandering" complaint because it failed to identify which

27  statements were misleading and why).

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP                    3                    WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Plaintiffs do not bolster their Complaint through the sheer volume of CWs. While 89 CWs may seem significant, they must be viewed in context. WaMu employed more than *60,000* employees at the beginning of 2006 – in 2,140 retail banks, 487 lending stores, and 323 other offices, through 38 states. Ex. E at 2, 13. And almost all the Complaint's CWs worked in branch offices and not in WaMu's Seattle headquarters, and thus would be unlikely to have any personal knowledge of the Company's overall performance. *See California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 149-55 (3d Cir. 2004) (former employees who worked in branch offices were unlikely to have personal knowledge of Chubb's company-wide performance); *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 959-60 (8th Cir. 2008) (anecdotes from CWs about individual customers and specific plants are insufficient to demonstrate company-wide conditions). This is accentuated by the fact that only three CWs claim to have had *any* direct communications with Mr. Killinger, and none provides the specific details necessary to support a claim against him. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *see also In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1069 (W.D. Wash. 2003) (rejecting CW allegations that are "opinion, vague, and do not show any basis of personal knowledge").

Plaintiffs claim that virtually all of Mr. Killinger's public statements during the Class Period, as well as the Company's statements in its public filings and documents issued in connection with several securities offerings, were false or misleading. Once the Complaint is boiled down, the crux of its allegations is that all of these statements were false or misleading because they did not inform investors that WaMu's loan portfolio was allegedly compromised by lenient underwriting, inflated home appraisals, and a culture that emphasized loan quantity over quality. ¶¶ 2-3. Plaintiffs allege these practices thrived because WaMu's internal controls and risk management were "purposefully weakened" by "management at the highest levels," who concealed these "secret, unlawful and high-risk activities," and failed to account for them when setting WaMu's loan loss reserves. *Id.* But plaintiffs' allegations lack the specific facts the Reform Act and Rule 9(b) require. Instead, plaintiffs use general allegations to create "an illusion of detail and insinuate the existence of fraud." *Novastar*, 2008 WL 2354367, at *2-3. This is

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

4

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

insufficient.  Plaintiffs must do better than to assert nebulous allegations of wrongdoing

untethered to any allegedly false statement.  The Reform Act and Rule 9(b) – as well as basic

notions of fairness – require plaintiffs to specify which of Mr. Killinger's statements were false

and explain why they were false, based on detailed facts that existed at that time.  Plaintiffs have

not done so.  As a result, plaintiffs' claims against Mr. Killinger under Section 10(b) and Section

11 should be dismissed.

A.    **Plaintiffs Do Not Adequately Plead That Mr. Killinger's Statements Describing The Company's Underwriting Were False Or Misleading.**

Plaintiffs challenge nearly all of Mr. Killinger's Class Period statements related to the

Company's underwriting.  For example, they allege Mr. Killinger falsely stated that WaMu had

"tightened underwriting" and made changes in underwriting guidelines that "decreased [loan]

production volume by about half in the subprime area" during the middle of the Class Period.

¶ 634; *see also* ¶¶ 567, 657, 667, 670 (similar).  They also challenge Mr. Killinger's

characterization of the Company's underwriting as "disciplined and vigilant," "prudent and

appropriate," and "sound."  ¶¶ 559, 565, 670, 674, 699.  Similarly, plaintiffs allege the falsity of

statements by Mr. Killinger and WaMu that the Company sought to "mitigate" its credit risk

through compliance with underwriting standards and other measures.  ¶¶ 309, 580, 585, 909; *see*

*also* ¶¶ 642, 960 (similar).  In regard to the Option ARM portfolio, plaintiffs contend Mr.

Killinger and WaMu misled investors by stating that WaMu's policy after December 2005 was to

underwrite to the fully indexed rate.  ¶¶ 372-375, 623, 628, 640, 646, 881-83, 933.  Plaintiffs also

challenge statements about FICO scores, including that in May 2007, prime mortgages had an

average FICO score of 708.  ¶¶ 323, 603, 637, 677.  Plaintiffs claim these statements were false

because, according to some CWs, WaMu weakened risk management, made loans to borrowers

with poor credit, and caused underwriting to be "inappropriately permissive" and "dangerously

relaxed."  ¶¶ 83-125, 307-420, 565, 585, 599, 604, 610, 617-18, 626, 631, 645, 674, 935.

Plaintiffs' allegations are belied by objective and undisputed data contained in public

filings and documents cited in the Complaint, which shows that WaMu indeed had begun

"tightening" underwriting shortly after the Class Period, and continued to do so throughout the

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

5

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   period.  For example, WaMu decreased the volume of all new home loans 32% from $50.4 billion

2   in the last quarter of 2005 to $34.2 billion in the last quarter of 2006.  Ex. K at WM-11.  The

3   volume of its Option ARM loans fell 24% during the same time period, from $12.5 billion to $9.5

4   billion, while other short-term ARMs plummeted *99%* from $1.22 *billion* to only $13 *million*.  *Id.*

5   Meanwhile, the volume of WaMu's fixed rate loans dropped 66.5%, from $22 billion to $7.35

6   billion.  *Id.*  The tightening continued throughout the Class Period, as WaMu's subprime loan

7   originations decreased 80% from the third quarter of 2006 to the third quarter of 2007, falling

8   from $2.4 billion to $483 million.  Ex. Q at 5.  These objective numbers provide undisputed and

9   judicially noticeable evidence of the accuracy of Mr. Killinger's statements – that WaMu was

10  making changes to reduce the Company's exposure in case of a market slowdown.

11          Plaintiffs do not attempt to refute this data.  In fact, they do not provide any competing

12  data whatsoever.  Instead, based on the alleged opinions of a tiny number of unidentified WaMu

13  employees and a purported underwriting expert, plaintiffs suggest vaguely that WaMu's

14  underwriting was "lax" at all points in time during the Class Period.  These non-specific

15  allegations should not be accepted in the face of contradictory (and unchallenged) data contained

16  in the same documents on which plaintiffs rely in their Complaint.  *See Sprewell v. Golden State*

17  *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not … accept as true allegations

18  that contradict matters properly subject to judicial notice or by exhibit."); *Swartz v. Deutsche*

19  *Bank*, No. C03-1252 MJP, 2008 WL 1968948, at *5 (W.D. Wash. May 2, 2008) (court is not

20  bound to accept facts contradicted by documents referenced in complaint).  This is especially true

21  because the CWs do not allege specific facts that would lend them reliability, but instead relate

22  anecdotal experiences and opinions that fail to establish, as plaintiffs claim, that underwriting was

23  "relaxed" company-wide.  *See Chubb*, 394 F.3d at 149-55; *Metawave*, 298 F. Supp. 2d at 1069.

24          For example, plaintiffs make a half-hearted challenge to statements that WaMu's policy

25  was to underwrite loans to the "fully-indexed" interest rate, rather than lower rates, such as the so-

26  called "teaser" rate.  ¶¶ 372-375, 628, 646, 881-83, 933.  But the four CWs who are the source of

27  plaintiffs' allegations (CWs 1, 60-62) fail to even provide basic data for their own branch offices,

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP                                        6                        **WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   such as the volume of loans allegedly underwritten to the teaser rate, much less company-wide

2   data that would merit serious scrutiny of the challenged statements.  Similarly, plaintiffs present

3   no facts indicating the falsity of Mr. Killinger's statement that the *average* FICO score for prime

4   loans was 708 as of May 2007.  Plaintiffs never allege what the "true" *average* FICO score for

5   WaMu's prime loans was in May 2007, much less that it was materially different than what Mr.

6   Killinger represented.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002).

7          Plaintiffs' use of purported experts, who discuss loan-to-income ratio and other data from

8   a so-called "Peer Group," does not strengthen their allegations.  ¶¶ 418-420; Complaint Appendix

9   5-6.  Substantively, the data is irrelevant: Mr. Killinger did not directly compare WaMu's loan-to-

10  income ratio to that of WaMu's competitors, so he could not have made a statement inconsistent

11  with this data.  Procedurally, it is improper to disguise expert opinions as "facts" in an effort to

12  evade the Reform Act's pleading requirements: Courts have made clear that no additional weight

13  should be accorded to assertions simply because they are contained in an expert declaration

14  instead of – or in addition to – a plaintiff's complaint.  *See, e.g.*, *Fin. Acquisition Partners LP v.*

15  *Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006); *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d

16  1212, 1222 (S.D. Cal. 2001) ("Conclusory allegations and speculation carry no additional weight

17  merely because a plaintiff placed them within the affidavit of a retained expert.").

18         Plaintiffs also cannot demonstrate the falsity of Mr. Killinger's expressed beliefs about the

19  quality of WaMu's underwriting.  These statements are incapable of objective measurement, and

20  plaintiffs do not propose any standard by which to judge whether underwriting was "tightened,"

21  "disciplined and vigilant," "prudent and appropriate," or "sound," or whether WaMu was

22  "seek[ing]" to "mitigate" its credit risk.  These allegations fail as a result.  *See In re Vantive Corp.*

23  *Sec. Litig.*, 283 F.3d 1079, 1086-87 (9th Cir. 2002).  In *Vantive*, plaintiffs challenged statements

24  about Vantive's growth and the quality of its sales force.  *Id.*  The Ninth Circuit affirmed

25  dismissal, holding the complaint "le[ft] unclear what it would mean for Vantive to 'adequately

26  train' an employee, what 'sufficient numbers' of hirees would be, or what it meant for a

27  'substantial percentage' of people to quit." *Id.*  Recently, the *Fremont* court applied *Vantive* to

1    dismiss a similar challenge: "[A] failure to provide an objective measure against which allegedly

2    'false' statements can be compared or quantified renders generalized allegations insufficient

3    under the heightened [Reform Act] pleading standard."  2008 WL 4812021, at *6; *see also In re*

4    *Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096-97 (C.D. Cal. 2008) ("the

5    word 'solid,' when used to describe loan origination and acquisition, is too vague to be actionable

6    without allegations showing what Defendant" meant); *Novastar*, 2008 WL 2354367, at *3 ("the

7    Company may have changed or even weakened its internal controls or underwriting standards, but

8    this does not mean that those controls or standards were not 'strong' or 'effective'"); *In re Dot*

9    *Hill Sys. Corp. Sec. Litig.*, No. 06CV228 JLS, 2008 WL 4184616, at *8 (S.D. Cal. Sept. 2, 2008)

10   (subjective statement not actionable when plaintiffs do not indicate how it should be measured).

11   **B.    Plaintiffs Do Not Adequately Plead That Mr. Killinger Made Any False
        Statements Related To Allegedly Inflated Appraisals.**

12           Plaintiffs challenge statements concerning WaMu's appraisal process and its loan-to-value

13   ratios ("LTVs").  For example, plaintiffs cite statements in which Mr. Killinger and WaMu

14   mention the LTVs of WaMu's loan portfolio, note that LTVs are a "key determinant of future

15   performance" of loans, and indicate that WaMu was "comfortable" with its LTVs.  ¶¶ 139, 317,

16   581, 603, 616, 628, 643, 660, 677, 910, 912, 934, 936.  Plaintiffs also challenge statements

17   indicating certain LTVs improved in 2005, and that the Company closely monitored loans with

18   LTVs above 80 percent.  ¶¶ 140, 581-82, 643, 865, 910.  Plaintiffs further challenge Mr.

19   Killinger's September 2006 statement that there was a "very strong governance process" over

20   third-party appraisers.  ¶ 615.  Plaintiffs contend these statements were false because they did not

21   disclose that "WaMu secretly had pressured its appraisers to inflate the stated value of the homes

22   underlying these loans, thus manipulating the LTV ratios for WaMu's mortgages." ¶¶ 565, 571,

23   585, 599, 604, 610; *see also* ¶¶ 161-297, 587, 617, 626, 631, 645, 648, 661, 674, 680 (similar).

24           For all of the space plaintiffs devote to the appraisal allegations, they are easily addressed,

25   because plaintiffs do not demonstrate how any of Mr. Killinger's statements were rendered false

26   by these allegations.  The reason is simple: Plaintiffs do not allege what the "true" LTV ratio was

27   for WaMu's loan portfolio as a whole, or even that the "true" LTV ratio was materially different

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP                    8                    **WILSON SONSINI GOODRICH & ROSATI**
                                                                    701 Fifth Avenue, Suite 5100
                                                                    Seattle, WA  98104-7036
                                                                    Tel: (206) 883-2500
                                                                    Fax: (206) 883-2699

1    from what Mr. Killinger stated at any point in time.  Indeed, the Complaint does not allege the

2    inflation of a single, specific appraisal, much less the number of appraisals that were allegedly

3    inflated and to what degree, or that these allegedly inflated appraisals caused material

4    misstatements about the Company-wide loan portfolio.  *See Vantive*, 283 F.3d at 1090-91

5    (rejecting challenge to allegedly inflated revenue statements, because "there is no sufficient

6    allegation of the amounts by which revenues were allegedly overstated").

7           Plaintiffs also challenge Mr. Killinger's statement that there was a "very strong

8    governance process" over third-party appraisers.  ¶ 615.  However, they do not attempt to show

9    that third-party appraisers did *not* have a strong governance system at the time Mr. Killinger made

10   this statement in September 2006 – shortly after WaMu contracted out its appraisals.  Indeed, the

11   Complaint only alleges that as of *February 2007*, unidentified representatives of WaMu began to

12   "demand[]" that appraisals be performed by an approved list of appraisers.  ¶ 267.  Missing,

13   however, are any allegations about what WaMu had done to "corrupt" the appraisal process as of

14   the date of Mr. Killinger's statement, how the governance process had allegedly been weakened

15   as a result, and the condition of the governance process at that point in time.  Without these

16   details, plaintiffs cannot plead the falsity of Mr. Killinger's statement.

17   **C.    Plaintiffs Do Not Adequately Plead That Mr. Killinger's Descriptions Of WaMu's Credit Quality And Risk Management Were False Or Misleading.**

18          The Complaint challenges Mr. Killinger's statements about the Company's risk

19   management and the quality of its loan portfolio.  The Complaint alleges, for example, that Mr.

20   Killinger and WaMu made false statements when describing the Enterprise Risk Management

21   department and characterizing "proper credit management" as a "top priority" and when stating

22   that risk management was "on track" and "proactively managed," that WaMu "actively

23   manage[d]" credit risk for Option ARM loans, and that WaMu's credit quality was "good" and its

24   risk "contained."  ¶¶ 309, 557, 559, 564, 567, 574, 580, 616, 619, 640, 641, 699, 909.  Similarly,

25   plaintiffs allege that Mr. Killinger falsely described WaMu's loan portfolio and its various

26   components as "very good," "in good shape," "excellent," "high quality," and "strong," and as

27   delivering "attractive" returns, making WaMu "strong" and "well-positioned" to return to

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

9

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  profitability.  ¶¶ 309, 367, 567, 570, 576, 590, 592, 602-03, 613, 620, 622, 628-29, 634, 636, 652,

2  664, 677, 683; *see also* 567, 666 (similar).

3         Plaintiffs do not allege, however, that "proper credit management" was not "a top priority"

4  to Mr. Killinger, that WaMu did not "actively" manage risk, or that Mr. Killinger's descriptions

5  of the risk management process were false.  Nor do plaintiffs challenge the data that WaMu and

6  Mr. Killinger provided reflecting the characteristics of the Company's loan portfolio.  *See infra* at

7  11.  Instead, plaintiffs suggest that all Mr. Killinger's statements about risk management were

8  false for failure to disclose that a few former employees disagreed with changes made to WaMu's

9  risk management strategy, and thought this strategy was too "aggressive," or "just stupid."  ¶¶

10  111, 113.  However, the Complaint pleads no facts indicating these opinions were either accurate

11  or universal, or that Mr. Killinger even knew of them – much less that he agreed with them.  *See*

12  *Tripp v. Indymac Fin. Inc.*, No. CV07-1635-GW, 2007 WL 4591930, at *3 (C.D. Cal. Nov. 29,

13  2007) ("Plaintiffs have failed to allege that the individual Defendants shared these beliefs and

14  opinions or even that they were aware of them and found them to be reliable and justified.").

15         Nor do the opinions of three branch-level employees and one senior trainer (CWs 7, 12-

16  14) demonstrate the falsity of Mr. Killinger's statement that WaMu focused on "providing clear,

17  understandable disclosures for our customers."  ¶¶ 94-100, 622.  Plaintiffs allege that these four

18  CWs believed that WaMu "pushed" its loan products on uneducated borrowers.  From this

19  assertion plaintiffs surmise that it was "not unusual for WaMu to fail to educate borrowers on the

20  dangers of Option ARM loans."  ¶ 96.  Plaintiffs provide no support for this conclusion.  Indeed,

21  plaintiffs do not even attempt to define what they mean by "not unusual," much less do they

22  provide any basis to extrapolate from the observations of four CWs to demonstrate a company-

23  wide problem or policy.  At most, the allegations illustrate isolated problems that occurred in

24  *violation of* WaMu policy.  Without a much greater foundation for these allegations, the Court is

25  not in a position to seriously evaluate them.  *Daou*, 411 F.3d at 1015; *Chubb*, 394 F.3d at 149-55.

26         The Complaint also alleges that when WaMu's risk management process "identified

27  serious problems" in regard to "the Company's financial health, such warnings were ignored by

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP                                10

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   WaMu and the Officer Defendants." ¶ 570; *see also* ¶¶ 585, 599, 604, 610, 617, 626, 631, 645,

2   661, 674 (similar). This allegation appears to be based on accusations made by CW 17, who

3   refers to "Risk Reports" he says were distributed "probably on a weekly basis" to senior

4   executives – not including Mr. Killinger. ¶¶ 109-111. Based on CW 17, the Complaint claims

5   that these reports indicated WaMu was exceeding unspecified "risk parameters," and that its risk

6   metrics fell outside indeterminate "designated ranges," on unnamed occasions, in ways that are

7   unexplained. ¶¶ 110-11. This vague description reveals nothing about what these reports actually

8   said: what "serious problems" they allegedly identified, how the unnamed "Officer Defendants"

9   responded, or the dates of any such reports relative to Mr. Killinger's statements. Without such

10  details, the alleged existence of these reports provides no indication that Mr. Killinger "ignored"

11  warnings of "serious problems." *In re Silicon Graphics Inc. Sec. Litig*., 183 F.3d 970, 984-85

12  (9th Cir. 1999) ("*SGI*") (rejecting claims that internal reports alerted defendants to serious

13  problems, because plaintiffs failed to provide any details about these reports or their contents).

14        Plaintiffs also challenge Mr. Killinger's subjective opinions about the quality of WaMu's

15  loan portfolio. But once again, plaintiffs do not make the detailed allegations needed to evaluate

16  these subjective statements. *See supra* at 7-8. Plaintiffs also do not explain how Mr. Killinger's

17  opinions could possibly have misled investors, given that the grounds for his beliefs were openly

18  disclosed. In repeated conference calls in which Mr. Killinger expressed these opinions, investors

19  were simultaneously provided with detailed information about the loan portfolio – such as rates of

20  non-performing assets and delinquency, LTV ratios, and FICO scores. *See, e.g.*, Exs. C at 4; F at

21  F-3; I at 2,8; L at 9-10; M at 6-7; O at 4-5. With this data, the accuracy of which plaintiffs do not

22  challenge, investors were free to make up their own minds whether WaMu's loan portfolio was

23  "good" or bad, "strong" or weak, of "high quality" or low. Mr. Killinger cannot be, and in all

24  fairness should not be, held liable for sharing his belief in the quality of WaMu's portfolio, when

25  plaintiffs do not challenge the objective data on which that belief was based. *See, e.g.*, *Novak v.*

26  *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]s long as the public statements are consistent with

27  reasonably available data, corporate officials need not present an overly gloomy or cautious

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

11

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    picture of current performance and future prospects.").

2       Rather than challenge the actual data WaMu disclosed, plaintiffs attempt to allege the

3    falsity of Mr. Killinger's opinions by reference to information allegedly provided by CW 79.

4    Plaintiffs make the conclusory allegation that in advance of the September 2006 Investors' Day,

5    Mr. Killinger was aware of "the poor and degenerating credit quality" of WaMu's loans, but

6    nevertheless made optimistic statements, including that the Company was "well-positioned" for a

7    difficult market.  ¶¶ 613, 618.  Yet plaintiffs mischaracterize the statements they attribute to CW

8    79.  CW 79 merely indicates that Mr. Killinger and other WaMu officers participated in routine

9    preparation for an investor conference, which is commonplace at all public companies, and which

10   necessarily includes a discussion of the Company's strengths and weaknesses.  ¶¶ 487-494.  CW

11   79 does *not* claim Mr. Killinger lied about the quality of WaMu's loans – at no point does he

12   contend Mr. Killinger knew a loan category was of "poor quality," but nevertheless described it as

13   "good."  In fact, CW 79 said Mr. Killinger discussed "the need to *avoid* making any statements

14   that might give rise to liability under the federal securities laws."  ¶ 493 (emphasis added).

15      Plaintiffs also allege that statements "regarding the quality of the Company's credit risk

16   management" were false because WaMu caused its "risk management to deteriorate significantly"

17   and because the Company's incentive structure caused WaMu to "sell and approve riskier loans"

18   without "adequately considering the quality of such loans."  ¶¶ 565, 570, 571, 585, 599, 610, 626,

19   645, 661, 674; *see also* ¶¶ 604, 631 (similar).  These allegations amount to nothing more than

20   disagreements with WaMu's lending policy and generic criticisms of its loan products, the risks

21   of which were repeatedly disclosed.  *Dot Hill*, 2008 WL 4184616, at *11 (vague employee

22   complaints about management are insufficient to plead falsity).  Indeed, the fundamental flaw in

23   all these allegations (in addition to their being vague and factually unsupported) is that *they are*

24   *not inconsistent with any statement made by Mr. Killinger*.  As such, they are simply irrelevant.

25      **D.    Mr. Killinger's Predictions Of The Effects Of The Housing Slowdown Cannot
            Be The Basis Of A Securities Fraud Claim.**

26      Long before the collapse of the mortgage industry, Mr. Killinger repeatedly warned

27   investors of a likely slowdown, because he thought the housing market had become "very

1    speculative," and prices had "increased much too much in relation to inflation and the core

2    fundamentals." Ex. H at H-2. As Mr. Killinger noted in November 2005: "Now you have heard

3    my conservative voice on the housing markets for several quarters now. We were concerned that

4    housing prices appeared overextended in many markets around the country and we felt that the

5    housing market was likely to cool." ¶ 567, *see, e.g.*, ¶ 613, Ex. F at F-3 ("I've been kind of a

6    resident bear on housing prices [over the past year.]"). But although Mr. Killinger had long been

7    "pounding the table saying the housing market … was going to slow," he also said he could not

8    predict if it would be "a hard landing, a soft landing, or somewhere in between." Ex. H at H-2.

9    As it turns out, the "landing" was much harder than virtually *anyone*, including Mr. Killinger,

10   either imagined or predicted. *See, e.g.*, Ex. S at 1, 7-9, 11-12, 14 (Federal Reserve Chairman Ben

11   Bernanke admitting he underestimated the severity and effects of the mortgage crisis).

12   Plaintiffs hope the Court will just ignore the greater context of the country's financial

13   crisis, to support the theory that the difficulties faced by WaMu had nothing to do with the

14   nationwide collapse of the mortgage industry. In fact, plaintiffs go so far as to allege that Mr.

15   Killinger's statements predicting the downturn were false or misleading (¶¶ 567, 603, 613, 634,

16   964), and to imply that WaMu should have perfectly predicted the downturn's effects in setting its

17   loan loss reserves. ¶¶ 445, 470. Plaintiffs even challenge a number of statements Mr. Killinger

18   made disclosing WaMu's difficulties (¶¶ 681, 685, 690-91, 964), claiming that after market

19   conditions began to deteriorate, Mr. Killinger "falsely blam[ed] the Company's performance on

20   'weakening in the housing market' and 'capital markets disruption.'" ¶¶ 690, 698. They also

21   allege that Mr. Killinger lied when he said that the Company was "well prepared to weather the

22   more difficult credit environment" he predicted. ¶ 620; *see also* ¶¶ 559, 606, 613, 616, 633.

23   These allegations defy both common sense and the common experience of the nation.

24   Indeed, the meltdown of the mortgage industry is such an indisputable fact that it has been

25   recognized as properly subject to judicial notice. *Novastar*, 2008 WL 2354367, at *1. Of course,

26   plaintiffs are unable to plead any specific facts to support their contention that the decline in

27   WaMu's performance was unrelated to the weakening housing market, or to indicate that Mr.

1    Killinger was not being truthful when he predicted this downturn.  Plaintiffs also have not (and

2    cannot) plead any specific facts indicating that Mr. Killinger had "actual knowledge" of the falsity

3    of his statements when he predicted that WaMu was "well-prepared" to weather the weakening

4    market.  *See infra* at §§ II, III.   Rather, plaintiffs allege Mr. Killinger lied because he – along with

5    regulators, policymakers, financial analysts, and the CEOs of banks and mortgage companies

6    across the country – was unable to predict the severity of the economic crisis and the effect it

7    would have on WaMu.  This is not only fundamentally unfair, it is also clearly insufficient under

8    the Reform Act and Rule 9(b).  *See Ronconi*, 253 F.3d at 430 & n.12; s*ee also Novastar*, 2008

9    WL 2354367, at *4 ("companies (and their management) are not expected to be clairvoyant").

10   **II.    MR. KILLINGER'S FORWARD-LOOKING STATEMENTS ARE PROTECTED**
          **BY THE REFORM ACT'S SAFE HARBOR DOCTRINE.**

11

12        Both the Reform Act's "safe harbor" provision ("Safe Harbor") and the "bespeaks

13   caution" doctrine provide an independent basis to preclude liability for many of Mr. Killinger's

14   statements.  Under the Safe Harbor, dismissal is required if a forward-looking statement is

15   accompanied by meaningful cautionary language.  *See* 15 U.S.C. §78u-5(c)(1)(A); 15 U.S.C. §

16   77z-2(c)(1)(A).  Alternatively, if the cautionary language is insufficient, dismissal is still required

17   if a plaintiff fails to adequately plead that the speaker had contemporaneous "actual knowledge"

18   of its falsity.  15 U.S.C. § 78u-5(c)(1)(B).  Forward-looking statements include revenue

19   projections, discussions of objectives, predictions of economic performance, and related

20   statements. 15 U.S.C. § 78u-5(i).  Cautionary language need not include all factors, or even the

21   particular factor that caused a prediction to be inaccurate.  *See Employers Teamsters Local Nos.*

22   *175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir. 2004).  "Instead,

23   the warning must only mention *important* factors of similar significance to those actually

24   realized."  *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004).[2]

25   _____

26   [2] Similarly, under the "bespeaks caution" doctrine "'a court can rule . . . that defendants' forward-looking
     representations contained enough cautionary language or risk disclosure to protect the defendant against claims of
27   securities fraud.'" *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994) (citation omitted).

1    Many of Mr. Killinger's challenged statements, either on their face or when read in

2    context, are plainly forward-looking because they discuss WaMu's plans for future operations and

3    are predictions of future performance.  For example, plaintiffs challenge Mr. Killinger's estimates

4    of future loan loss reserves (¶¶ 678, 687, 696), his statement that "[l]ooking ahead … we believe

5    we can effectively manage our credit quality" (¶ 559), his belief that the Company is "very well

6    positioned" for the future (¶ 613), and his prediction that the Company can "expect the home loan

7    unit to get back to profitability … later in [2007]." (¶ 655).  (See list of forward-looking

8    statements in attached Appendix ("App."))  All of Mr. Killinger's written forward-looking

9    statements were accompanied by Reform Act warnings, while his oral forward-looking statements

10   included references to specific risk disclosures in the Company's Securities and Exchange

11   Commission ("SEC") filings.  *See, e.g.*, Exs. B at 1, 20; C at 1, 22; E at 2-5; G at 27, 48; J at 1,

12   47-48; N at 5-6.  These warnings are sufficient to invoke Safe Harbor protection.  *See* 15 U.S.C. §

13   78u-5(c)(2); *Clorox*, 353 F.3d at 1132-33.

14   The Company's SEC filings were replete with risk disclosures.  Although the Safe Harbor

15   does not require these risk factors to warn about the precise risk that came to pass, WaMu's risk

16   factors actually did so.  For example, the risk factors warned that if housing prices declined,

17   borrowers might have difficulty repaying loans, and "[a]s a result, the Company could experience

18   higher credit losses in its mortgage and loan portfolios, which could adversely affect our

19   earnings."  Exs. A at 3; E at 3 (similar).  The risk factors also warned that a decline in housing

20   prices could have a more serious effect on subprime borrowers, "who tend to have greater

21   vulnerability to such changes than prime borrowers, may be unable to repay their loans and the

22   credit performance of the Company's subprime portfolios could suffer, with a potential adverse

23   effect on earnings."  Ex. E at 4.  In addition to the Company's risk disclosures in its SEC filings,

24   Mr. Killinger made it clear in his public statements that WaMu's mortgage business could be

25   jeopardized by a slump in the housing market, and repeatedly made cautionary statements to

26   investors.  *See, e.g.*, Exs. F at F-3; M at 5, 9, 17-18; O at 1-5; I at 6-8.

27

Kerry K. Killinger's Motion to Dismiss
The Class Action Complaint [OD-KKK-1]
Master No.:  08-MD-1919 MJP

15

Wilson Sonsini Goodrich & Rosati
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    These risk factors, in addition to the other contemporaneous warnings by Mr. Killinger,

2    "warned investors of important factors that could cause the company's business to deviate from

3    its forecasts." *Elliott v. Drugstore.com, Inc.*, No. C04-CV-1474-RSM, slip op. at 8 (W.D. Wash.

4    Oct. 19, 2005) (Ex. V).  As a result, Safe Harbor and the "bespeaks caution" doctrine preclude

5    plaintiffs from basing a claim on any of Mr. Killinger's forward-looking statements.

6    **III.    PLAINTIFFS DO NOT DEMONSTRATE MR. KILLINGER MADE ANY**
     **STATEMENT WITH SCIENTER.**

7

8    Given that plaintiffs failed to plead facts showing any of Mr. Killinger's statements were

9    false or misleading, it necessarily follows that plaintiffs cannot plead facts showing Mr. Killinger

10   made such statements with scienter.  *Ronconi*, 253 F.3d at 429 (falsity and scienter are "generally

11   strongly inferred from the same set of facts").  Indeed, the Complaint contains *no facts* showing

12   Mr. Killinger possessed information inconsistent with any public statement, or supporting the

13   inference that he made any statement with fraudulent intent.  The Reform Act requires plaintiffs

14   to "state with particularity facts giving rise to a strong inference" that defendants made false

15   statements with either "intent to deceive" or "deliberate recklessness."  *SGI*, 183 F.3d at 974-75.

16   For an inference of fraudulent intent to be strong, it must be "cogent and at least as compelling as

17   any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues &*

18   *Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

19   Here, plaintiffs do not construct an inference of scienter that is even coherent, much less

20   one that is "cogent" and "compelling."  Given the disjointed nature of the allegations, this is not

21   surprising.  Oddly, the Complaint includes a freestanding section titled "Additional Allegations

22   Confirming the Officer Defendants' Scienter," which appears *before* the section listing challenged

23   statements.  At no point do plaintiffs make a serious attempt to tie their scienter allegations to any

24   false statements, instead relying on vague assertions that defendants meant to do *something*

25   wrong.  Plaintiffs thus beg the question: "Scienter as to what?"  The Reform Act requires

26   plaintiffs to *first* identify a false or misleading statement, and then "with respect to each act or

27   omission alleged to violate this chapter, state with particularity facts giving rise to a strong

1   inference that the defendant acted with the required state of mind." *SGI*, 183 F.3d at 975 (quoting

2   15 U.S.C. § 78u-4(b)(2)).  Disjointed allegations of scienter unmoored to any allegedly false

3   statement are insufficient.  *See Fremont*, 2008 WL 4812021, at *5 (dismissing a similar claim for

4   failure to "adequately plead scienter *in connection with* [allegedly false] statements") (emphasis

5   added).  Since plaintiffs do not construct a cogent inference of Mr. Killinger's alleged scienter,

6   they necessarily fail to show that this inference is as strong as the opposing, innocent inference:

7   Mr. Killinger honestly warned investors of the downturn, told them of preparations management

8   had made for the slowdown, and described the condition of WaMu as he understood it to be.

9          Even taken in piecemeal form, the Complaint's scienter allegations do not indicate that

10  Mr. Killinger possessed fraudulent intent.  Indeed, there are very few scienter allegations specific

11  to Mr. Killinger at all.  Rather, the vast majority are generic and conclusory claims regarding the

12  state of mind of the "Officer Defendants." *See, e.g.*, ¶¶ 482, 486-87, 500, 504, 511, 518, 530.

13  These collective references "do not facilitate a reasoned assessment of the statements and

14  knowledge attributable to the Individual Defendants." *Fremont*, 2008 WL 4812021, at *5.  Under

15  the Reform Act, plaintiffs "must show that *each* Individual Defendant had the requisite scienter."

16  *McGuire v. Dendreon Corp.*, No. C07-800MJP, 2008 WL 1791381, at *9 (W.D. Wash. April 18,

17  2008) (emphasis added); *see also* 15 U.S.C. § 78u-4(b) (requiring "a strong inference that *the*

18  defendant acted with the required state of mind") (emphasis added).  Plaintiffs must, but do not,

19  allege detailed facts that Mr. Killinger, *specifically*, acted with fraudulent intent in making a false

20  statement.  *See Impac*, 554 F. Supp. 2d at 1093 (PSLRA "'references to "the defendant" may only

21  reasonably be understood to mean "each defendant" in multiple defendant cases[.]'") (quoting

22  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004)).

23         **A.      Plaintiffs' Reference To Internal Reports Does Not Demonstrate Scienter.**

24         Plaintiffs assert that Mr. Killinger's scienter is established by various internal documents

25  purportedly received by the "Officer Defendants" or "senior management," which they claim

26  contradicted Mr. Killinger's statements.  ¶¶ 500-528.  These allegations fail at the outset because

27  plaintiffs must, but do not, "offer details that would bridge the gap between the existence of the

1  reports and actual knowledge on the part of the defendant." *South Ferry LP, #2 v. Killinger*, 542

2  F.3d 776, 783 (9th Cir. 2008). In fact, plaintiffs do not even allege that Mr. Killinger,

3  specifically, ever received any of the referenced documents. In addition to this fundamental

4  defect, plaintiffs do not describe any specific information contained in these reports, and thus

5  cannot use them to demonstrate scienter. *See Metzler*, 540 F.3d at 1068 ("corporate

6  management's general awareness of the day-to-day workings of the company's business does not

7  establish scienter – at least absent some additional allegation of specific information conveyed to

8  management and related to the fraud"). Plaintiffs merely describe the *types* of reports available,

9  not the *specific data* allegedly reported. ¶¶ 500-28. Occasional assertions that reports showed

10  negative "trends" (¶¶ 503, 507) or "rising levels" of defaults (¶ 516) are inadequate. As the Ninth

11  Circuit recognizes, "every sophisticated corporation uses some kind of internal reporting system,"

12  so "allowing a plaintiff 'to go forward with a case based on general allegations of "negative

13  internal reports" would expose all those companies to securities litigation whenever their stock

14  prices dropped.'" *Vantive*, 283 F.3d at 1088; *see also Lipton*, 284 F.3d at 1036 ("negative

15  characterizations of reports relied on by insiders, without specific reference to the contents of

16  those reports, are insufficient to meet the [Reform Act's] heightened pleading requirements").

17      In an attempt to fill this void, plaintiffs rely on the frequently rejected "core operations"

18  doctrine to assert that Mr. Killinger *must* have been aware of negative information about WaMu's

19  lending operations because of his position at the bank and extensive education and experience,

20  and because the alleged problems were "fundamental to WaMu's overall financial condition." ¶¶

21  482, 529, 536. As the Ninth Circuit recently recognized, however, "[w]here a complaint relies on

22  allegations that management had an important role in the company but does not contain additional

23  detailed allegations about the defendants' actual exposure to information, it will usually fall short

24  of the [Reform Act] standard." *South Ferry*, 542 F.3d at 784. To state the obvious, executives

25  cannot know every fact about their companies, especially in regard to large companies with

26  thousands of offices. Here, there are no allegations that Mr. Killinger received any non-public

27  information undermining his statements. As discussed above, plaintiffs fail to show the alleged

1    problems affected the Company as a whole, rather than just a few branch offices, and therefore

2    certainly cannot demonstrate that it is "absurd to suggest" that Mr. Killinger would have been

3    unaware of these alleged issues.  *See Glazer Capital Mgmt. LP v. Magistri*, – F.3d –, No. 06-

4    16899, 2008 WL 5003306, at *8 (9th Cir. Nov. 26, 2008) (to use the core operations doctrine to

5    infer scienter, it must be "absurd to suggest" that a defendant was unaware of the alleged facts).

6        **B.    Plaintiffs' CWs Do Not Support An Inference Of Mr. Killinger's Scienter.**

7        Plaintiffs assert that allegations made by their CWs establish a strong inference of Mr.

8    Killinger's scienter.  To support such an inference, the CWs must have *personal knowledge* that

9    Mr. Killinger was aware of specific facts inconsistent with his public statements.  *See In re Daou

10   Sys., Inc. Sec. Litig.*, 397 F.3d 704, 711 (9th Cir. 2005), *superseded on other grounds*, 411 F.3d

11   1006 (9th Cir. 2005).  None of these CWs do.  Indeed, only *three* of the Complaint's 89 CWs

12   claim to have had *any* contact with Mr. Killinger, and two of the three merely received company-

13   wide communications that may or may not have actually been from Mr. Killinger.  If anything,

14   this lack of specific allegations concerning Mr. Killinger *detracts* from any inference of scienter.

15       For example, CW 83 claims WaMu regularly held "Town Hall Meetings" with "corporate

16   executives, including [Mr.] Killinger," and that, beginning in late 2005, "WaMu corporate

17   executives [not necessarily Mr. Killinger] would update WaMu employees on the state of defaults

18   and reassure them that the Company was 'not going anywhere.'" ¶ 517.  These accounts include

19   no specific allegations regarding Mr. Killinger, and, in any case, are entirely consistent with Mr.

20   Killinger's predictions that WaMu would weather the downturn.  Similarly, CW 65 reported that

21   "[o]nce per quarter, either [Mr.] Killinger or [Mr.] Rotella would issue internal e-mails and pre-

22   recorded statements detailing the structure of the [underwriting] guidelines and explaining that the

23   company was changing the guidelines in an attempt to increase volume." ¶ 383.  CW 65 does not

24   provide any further details regarding the alleged communications, such as what *Mr. Killinger*

25   said, when he said it, and how and when, specifically, the guidelines changed. The mere fact that

26   WaMu's underwriting guidelines sometimes changed does not indicate Mr. Killinger was aware

27

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

19

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  of problems associated with the guidelines, and does not create any inference – let alone a strong

2  one – that Mr. Killinger knew any of his statements were false when made.

3      CW 79 is the *only* one of the 89 CWs alleged to have interacted directly with Mr. Killinger.

4  ¶¶ 488-94.  But ironically, although plaintiffs put a sinister spin on what CW 79 told them, CW

5  79's statements actually confirm Mr. Killinger's good faith: He told plaintiffs that "the Officer

6  Defendants specifically discussed the need to avoid making any statements that might give rise to

7  liability under the federal securities laws."  ¶ 493.  The most compelling inference is clearly that

8  when the defendants discussed the need to comply with the securities laws, it was because they

9  *meant to comply* with the securities laws.  This conclusion is consistent with the rest of what CW

10 79 did, and did not, tell plaintiffs.  What he *did not* tell them is any information that contradicts

11 Mr. Killinger's statements.  What he *did* tell them is a set of neutral facts not probative of Mr.

12 Killinger's scienter.  For example, CW 79 says Mr. Killinger discussed WaMu's financial health

13 and risk exposure, the effect of the mortgage crisis, and how to present information to investors at

14 an upcoming meeting.  ¶¶ 488, 492.  Far from being improper, this type of discussion is typical –

15 and indeed, necessary – at every public company.  It is both unremarkable and unexceptionable

16 that Mr. Killinger discussed positive and negative aspects of WaMu's business, as well as how best

17 to portray these factors to investors *without* making false or misleading statements in violation of

18 securities laws.  *See, e.g.*, *Novak*, 216 F.3d at 309 ("corporate officials need not present an overly

19 gloomy or cautious picture of current performance and future prospects").

20     Similar allegations were made in *Novastar*, where the court found:  "Management is

21 supposed to review results and search for ways to improve operations, and this customary

22 endeavor does not indicate an intent to deceive when positive information is disseminated."  2008

23 WL 2354367, at *4.  There, as here, the innocent explanation is far more compelling than the

24 nefarious inference: The "allegations are more consistent with a company and executives

25 confronting a deterioration in the business and finding itself unable to prevent it than they are with

26 a company and executives recklessly deceiving the investing community."  *Id.*

27

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

20

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

**C.    Scienter Cannot Be Inferred From Plaintiffs' Accounting Allegations.**

Plaintiffs' accounting allegations contain no evidence of Mr. Killinger's scienter.  ¶ 482.
Plaintiffs do not specify any information known to Mr. Killinger that would have caused him to
doubt WaMu's financial statements, including the adequacy of its loan loss reserves.  *See Indymac*,
2007 WL 4591930, at *3 (no inference of scienter where plaintiffs do not allege defendants shared
opinions of CWs who doubted adequacy of reserves).  Indeed, Mr. Killinger's confidence in the
accuracy of these statements was confirmed by WaMu's auditors, Deloitte & Touche, which, as
Plaintiffs concede, "issued unqualified opinions on the Company's financial statements and
management's assessment of internal controls."  ¶ 838.  The fact that none of these financials has
been restated also undermines any inference of scienter.  *Novastar*, 2008 WL 2354367, at *3
(rejecting accounting fraud claim; noting "it is noteworthy that nobody – the SEC, [the] auditors,
or anyone else – has suggested [the Company] should or must restate its financial reports").

**D.    Mr. Killinger's Compensation Structure Does Not Establish Motive.**

Plaintiffs' allegation that Mr. Killinger was motivated to commit fraud because he
received performance-based compensation fares no better.  ¶¶ 537-39.  As plaintiffs concede, Mr.
Killinger declined his performance-based bonus in 2007.  ¶ 537 n.6.  Moreover, courts have
repeatedly held that the mere motive to increase performance-based compensation, like other
routine business objectives, is insufficient.  *See Glazer*, 2008 WL 5003306, at *10 (evidence of a
personal profit motive in completing merger is insufficient, because it is present in almost every
transaction); *Constr. Laborers Pension Trust v. Neurocrine Biosciences, Inc.*, No. 07CV1111-
IEG-RBB, 2008 WL 2053733, at *7 (S.D. Cal. May 13, 2008) (motive to receive bonus
compensation does not support scienter); *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054,
1087 (N.D. Cal. 2003) (motive to increase pay is insufficient for a strong inference of scienter).

**E.    Scienter Cannot Be Inferred From Plaintiffs' Stock-Sale Allegations.**

Plaintiffs allege there is a strong inference of scienter because Mr. Killinger
"suspicious[ly]" sold stock during the Class Period.  ¶ 540.  As a threshold matter, plaintiffs'
stock sale allegations are undercut by the fact that none of the other defendants are alleged to have

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

21

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    sold stock.  *Id.*  This Court has recognized, and the Ninth Circuit has recently reaffirmed, that an

2    inference of scienter is undermined when equally knowledgeable insiders do not sell any of their

3    stock.  *Dendreon*, 2008 WL 1791381, at *9; *Metzler*, 540 F.3d at 1067 ("We typically require …

4    corroborative sales by other defendants [before] allow[ing] insider trading to support scienter.").

5        Even in isolation, Mr. Killinger's stock sales do not support scienter.  Like other investors,

6    officers sell stock for a multitude of non-fraudulent reasons – such as payment of college tuition,

7    charitable giving, and portfolio diversification.  *See Ronconi*, 253 F.3d at 435.  As a result,

8    allegations of stock sales, without much more, are not sufficient to show scienter.  *SGI*, 183 F.3d

9    at 974.  Rather, plaintiffs must plead facts showing sales were "'dramatically out of line with

10    prior trading practices'" and "'calculated to maximize the personal benefit from undisclosed

11    inside information,'" including the amount and percentage of shares sold, the timing of the sales,

12    and whether the sales were consistent with prior trading history.  *See Vantive*, 283 F.3d at 1095

13    (quoting *Ronconi*, 253 F.3d at 435).  Here, Mr. Killinger's allegedly suspicious sales represented

14    only a tiny percentage of his total holdings, were not suspiciously timed, and were consistent with

15    his prior trading history – and thus, cannot be used as evidence of fraudulent intent.

16        Although they identify the number of shares Mr. Killinger sold during the Class Period

17    (¶¶ 540-56), plaintiffs ignore well-established Ninth Circuit law by failing to put those sales in

18    context.  Most notably, plaintiffs fail to allege what portion of his holdings Mr. Killinger *retained*

19    through the Class Period.  This omission is not by accident: Mr. Killinger retained nearly all of his

20    stock holdings, and consequently suffered huge losses like all other WaMu investors.  Indeed, Mr.

21    Killinger retained 5,733,292 of his WaMu shares and exercisable options, not including an

22    additional 1,248,715 shares held in trust or restricted shares.  Ex. U at 24-25.  Therefore, Mr.

23    Killinger's Class Period sales of 301,688 shares amounted to only 5% of his total available

24    holdings.[3]  Retention of significant holdings is inconsistent with scienter.  *See, e.g.*, *Vantive*, 283

25

26        [3] Using the 5,733,292 shares and vested options reported as retained and adding the 301,688 shares that plaintiffs
     allege as suspiciously sold during the Class Period, the total number of shares that Mr. Killinger could have sold

27    during the Class Period is 6,034,980.  The 301,688 shares alleged in the Complaint represent just 5% of 6,034,980.

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

22

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   F.3d at 1094 (no scienter where CEO sold 13% of his holdings); *Ronconi*, 253 F.3d at 435 (no

2   scienter where CEO sold 10% of his holdings).  If Mr. Killinger had intended to cash in on fraud,

3   he would not have retained such substantial holdings only to watch his equity plummet.

4       Far from being "dramatically out of line," Mr. Killinger's Class Period stock sales were

5   also entirely consistent with his prior practices: He exercised options as they neared expiration

6   and promptly sold the acquired stock, while maintaining significant holdings.  For example, prior

7   to the Class Period, on January 22, 2002, Mr. Killinger exercised 50,000 options set to expire and

8   immediately sold the shares.  Ex. T at T-1-4.  Similarly, on January 28, 2004, Mr. Killinger

9   exercised 91,361 options about to expire and then sold the shares.  *Id*. at T-5.  Mr. Killinger

10  continued this practice during the Class Period in January 2006, when he exercised 216,893

11  options set to expire that week, and shortly thereafter set up a 10b5-1 plan to sell up to 150,000

12  shares.  Exs. D; T at T-7.

13      Further, Mr. Killinger's adoption of a 10b5-1 plan supports an inference that his sales

14  were not suspicious.  *See, e.g.*, *Metzler*, 540 F.3d at 1067 & n.11 (sales made through pre-set

15  trading plans may rebut an inference of scienter); *Limantour v. Cray Inc*., 432 F. Supp. 2d 1129,

16  1150-51 & n.9 (W.D. Wash. 2006) (use of 10b5-1 plan could raise an inference that sales were

17  not suspicious in timing).  As plaintiffs acknowledge, a 10b5-1 plan is a defense to insider trading

18  liability if entered into "before becoming aware" of inside information, and "in good faith and not

19  as part of a plan or scheme to evade" insider trading laws.  ¶¶ 548-56; 17 C.F.R. § 240.10b5-1(c).

20  Yet, without any factual foundation, plaintiffs characterize Mr. Killinger's institution and renewal

21  of his 10b5-1 plan as "suspicious."  ¶ 551.  As discussed above, plaintiffs do not allege Mr.

22  Killinger was *ever* in possession of inside information inconsistent with his public statements, let

23  alone that he possessed such information prior to instituting his 10b5-1 plan.  Nor can plaintiffs

24  allege that Mr. Killinger instituted his 10b5-1 plan to evade insider trading laws.  To the contrary,

25  Mr. Killinger's adoption of his 10b5-1 plan in February 2006 is entirely consistent with his

26  history of selling shares early in the year.  Since the initial plan lasted only through October 2006,

27  there was also nothing suspicious about renewing it when it expired.  *See* Ex. D; ¶ 550.

1    Finally, plaintiffs suggest scienter can be inferred because Mr. Killinger's sales occurred

2    "suspicious[ly]" at the same time WaMu was repurchasing stock.  ¶¶ 553-56.  But there are no

3    facts to indicate that WaMu's buy-back plan had anything to do with Mr. Killinger's stock sales.

4    Several months separated the announcement of the repurchase plan from the institution and

5    renewal of Mr. Killinger's 10b5-1 plan.  ¶¶ 550, 554-55.  If any inference can be drawn from the

6    repurchase program, it is that Mr. Killinger and other officers genuinely believed WaMu's stock

7    price did not accurately reflect its value and growth opportunities.  *See, e.g.*, *In re Tibco Software,*

8    *Inc.*, No. C 05-2146 SBA, 2006 WL 1469654, at *20-21 (N.D. Cal. May 25, 2006) (refusing to

9    infer scienter from allegations that two executives sold 2.3% and 17.2% of their holdings while

10   the company engaged in a stock repurchase program); *In re Silicon Storage Tech., Inc. Sec. Litig.*,

11   No. C 05-0295 PJH, 2006 WL 648683, at *18-19 (N.D. Cal. Mar. 10, 2006) (refusing to infer

12   scienter despite allegations of insider trading during company's stock repurchase program).

## CONCLUSION

13

14   For the foregoing reasons, the claims against Mr. Killinger under Sections 10(b) and 11

15   should be dismissed, as should the dependent claims under Sections 20(a) and 15.

16

17   Dated:  December 8, 2008

18                                       By:  s/ Barry M. Kaplan
                                              Barry M. Kaplan, WSBA #8661
19                                            Douglas W. Greene, WSBA #22844
                                              Daniel W. Turbow (*pro hac vice*)
20                                            Claire L. Davis, WSBA #39812
                                              **WILSON SONSINI GOODRICH & ROSATI**
21                                            Professional Corporation
                                              701 Fifth Avenue, Suite 5100
22                                            Seattle, WA  98104-7036
                                              Tel.:  (206) 883-2500
23                                            Fax:  (206) 883-2699
                                              Email: bkaplan@wsgr.com
24                                            Email: dgreene@wsgr.com
                                              Email: dturbow@wsgr.com
25                                            Email: cldavis@wsgr.com

26

27

KERRY K. KILLINGER'S MOTION TO DISMISS                24
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel.: (206) 883-2500
Fax: (206) 883-2699

# APPENDIX A
## Kerry Killinger's Forward-Looking Statements

- "*Looking ahead*, we believe we can effectively manage our credit quality by continuing to be disciplined and vigilant in our underwriting standards, our portfolio management, and our reserving methodology." Ex. B at 5; ¶ 559 (emphasis added).

- "Reflecting our positive outlook *for the future* and continued solid performance, I am pleased to announce that our board [of] directors one [sic] again increased the cash dividend[.]" Ex. C at 2; ¶ 575 (emphasis added).

- "Improving our operating efficiency, reducing the market volatility of our earnings and refocusing our Home Loans units on higher margin businesses *will increase* the core profitability of the Company. And this *will position us* even better for the leverage which is inherent in our business model *when the interest rate environment improves*." Ex. G at 29; ¶ 606 (emphasis added).

- "For WaMu, a slowdown in housing will no doubt lead to higher delinquencies and credit cost, and again, we factor that into our planning. However, … we began planning for this quite some time ago, took a number of defensive actions. And so, I believe that we are very well positioned, regardless of what happens in the housing market." Ex. H at H-2; ¶ 613.

- "The housing market is clearly weakening with the pace of housing price appreciation slowing in most regions of the country. We are also experiencing somewhat higher delinquencies and loan losses, however, we began preparing for this possibility quite some time ago and took defensive actions to strengthen our portfolio. So we believe we are *well prepared to weather* the more difficult credit environment." Ex. J at 3; ¶ 620 (emphasis added).

- "Our *outlook* for 2007 reflects the strategic actions we took in 2006 to prepare the company for the future, … Those decisive actions have *positioned us well to deliver* stronger operating performance in 2007.")." Ex. K at 99.1; ¶ 633 (emphasis added).

- "I think that we can certainly expect the home loan unit to get back to profitability and the current expectation for us is later in the year[.]" Ex. L at 12; ¶ 655.

- "[W]e *are targeting* a return to profitability by the end of the year[.]" Ex. N at 1; ¶ 664 (emphasis added),

- Statements predicting future levels of loan loss reserves and non-performing assets, including that they are "extremely difficult to accurately forecast." Ex. R at 6-7, 9-11; ¶¶ 678, 687, 696.

- "While we're disappointed with our anticipated third-quarter results, we *look forward* to an improved fourth quarter as we continue to see good operating performance." The press release added that "the company continues to have the liquidity and capital necessary to grow the company's businesses." Ex. P at 1; ¶ 683 (emphasis added).

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on December 8, 2008, I electronically filed the foregoing with the Clerk

3 of the Court using the CM/ECF system which will send notification of such filing to the following:

4   **Vahn Alexander**
  valexander@faruqilaw.com

5

  **Ronald L. Berenstain**
6   rberenstain@perkinscoie.com,
  docketsea@perkinscoie.com,
7   jstarr@perkinscoie.com

8   **Steve W. Berman**
  steve@hbsslaw.com,
9   heatherw@hbsslaw.com

10   **Jerald Bien-Willner**
  jerryb@blbglaw.com,
11   marionp@blbglaw.com,
  katiem@blbglaw.com

12
  **William Bishop, Jr**
13   bbishop@bwmlegal.com,
  atodakonzie@bwmlegal.com

14
  **Jeffrey C. Block**
15   jblock@bermanesq.com,
  vmcallister@bermanesq.com

16
  **Steven P. Caplow**
17   stevencaplow@dwt.com,
  susan.brye@wamu.net,
18   belenjohnson@dwt.com,
  jason.klein@wamu.net,
19   david.bourne@wamu.net

20   **Matthew A. Carvalho**
  mcarvalho@yarmuth.com,
21   smeyer@yarmuth.com

22   **Darius P. Chafizadeh**
  dchafizadeh@tpw.com
23
  **Edward W. Ciolko**
24   eciolko@sbtklaw.com,
  jwotring@sbtklaw.com
25
  **Kerry F. Cunningham**
26   kcunningham@tpw.com

27

**Lafcadio H. Darling**
ldarling@mikkelborg.com,
akim@mikkelborg.com,
fgaebler@mikkelborg.com,
jgwebster@Mikkelborg.com

**Corey E. Delaney**
cdelaney@tpw.com

**Jonathan Dickey**
jdickey@gibsondunn.com

**Dan Drachler**
ddrachler@zsz.com,
rpf@bernardmgross.com

**James J. Farrell**
james.farrell@lw.com,
anna.garcia@lw.com

**Robert Craig Finkel**
rfinkel@wolfpopper.com,
cdunleavy@wolfpopper.com

**Steven Bert Frank**
sfrank@frankfreed.com,
jpotter@frankfreed.com,
sromoff@frankfreed.com

**Charles W. Gerdes**
cgerdes@krv-lawfirm.com

**Jeffrey C. Grant**
jeffrey@aoki-sakamoto.com,
jule@aoki-sakamoto.com

**Deborah R. Gross**
debbie@bernardmgross.com

**Mark K. Gyandoh**
mgyandoh@sbtklaw.com

**Richard F. Hans**
rhans@tpw.com,
mmuller@tpw.com

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1

**Matthew D. Harrison**
matt.harrison@lw.com

2

**Robert I. Harwood**
rharwood@hfesq.com

3

4

**Hilary E. Hoover**
HHoover@perkinscoie.com,
hooverhe@yahoo.com,
docketsea@perkinscoie.com,
krobinson@perkinscoie.com,
jnorville@perkinscoie.com,
sknowles@perkinscoie.com

5

6

7

8

**Roy Laurence Jacobs**
Rjacobs@jacobsclasslaw.com

9

**C. Chad Johnson**
Chad@blbglaw.com

10

11

**Geoffrey M. Johnson**
gjohnson@scott-scott.com

12

**Christopher Steven Jones**
cjones@saxenawhite.com,
e-file@saxenawhite.com

13

14

**Nancy Kaboolian**
nkaboolian@abbeyspanier.com,
cdavila@abbeyspanier.com

15

16

**Reed R. Kathrein**
reed@hbsslaw.com,
nancyq@hbsslaw.com,
sf_filings@hbsslaw.com

17

18

19

**Michael J. Keane**
cgerdes@krv-lawfirm.com

20

**Bradley S. Keller**
bkeller@byrneskeller.com,
kwolf@byrneskeller.com

21

22

**Paul Kemnitzer**
paul@blbglaw.com

23

24

**Sarah Kimberly**
skimberly@kellerrohrback.com

25

**Dean Kitchens**
dkitchens@gilbsondunn.com

26

27

**James Abram Harrod, III**
jharrod@wolfpopper.com

**Sean C. Knowles**
sknowles@perkinscoie.com

**Paul J. Lawrence**
paul.lawrence@klgates.com,
michelle.jensen@klgates.com,
judy.goldfarb@klgates.com,
Dawn.taylor@klgates.com

**Gabrielle Levin**
aarias@gibsondunn.com,
glevin@gibsondunn.com

**David H. Leventhal**
dleventhal@faruqilaw.com,
abarinov@faruqilaw.com

**Derek W. Loeser**
dloeser@kellerrohrback.com,
chopkins@kellerrohrback.com

**Samuel Lutz**
samuel.lutz@lw.com,
liz.alvarez@lw.com

**Ann T. Marshall**
amarshall@bwmlegal.com,
atodakonzie@bwmlegal.com

**Christopher Cavallar Mason**
cmason@smythlaw.com

**Jofrey M. McWilliam**
jmcwilliam@byrneskeller.com,
lyoshinaga@byrneskeller.com

**Joseph H. Meltzer**
jmeltzer@sbtklaw.com

**Gabriel D. Miller**
gdmiller@stblaw.com

**Mary H. Mulhearn**
mmulhearn@tpw.com

**Multidistrict Litigation,
Jeffery N. Luthi**
panelmdl@ao.uscourts.gov

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1

2 **Shaunta Marie Knibb**
shaunta@smythlaw.com
3
**Barry Robert Ostrager**
4 bostrager@stblaw.com,
managingclerk@stblaw.com
5
**Laurence Paskowitz**
6 classattorney@aol.com

7 **Robert Jerrod Pfister**
rpfister@stblaw.com,
8 gdmiller@stblaw.com

9 **Erin Maura Riley**
eriley@kellerrohrback.com
10
**Samuel K. Rosen**
11 srosen@hfesq.com

12 **Hannah Greenwald Ross**
Hannah@blbglaw.com
13
**Shane T. Rowley**
14 srowley@faruqilaw.com

15 **Samuel H. Rudman**
Srudman@csgrr.com
16
**Stephen M. Rummage**
17 steverummage@dwt.com,
jeannecadley@dwt.com
18
**Tina Samanta**
19 tsamanta@gibsondunn.com

20 **Lynn Lincoln Sarko**
lsarko@kellerrohrback.com
21
**Maya Susan Saxena**
22 msaxena@saxenawhite.com,
amccook@saxenawhite.com
23
**David R. Scott**
24 drscott@scott-scott.com,
cmcgowan@scott-scott.com
25
**Gerald Harlan Silk**
26 amandaf@blbglaw.com

27

**Gretchen S. Obrist**
gobrist@kellerrohrback.com,
djones@kellerrohrback.com

**Jeffrey Alan Smyth**
jsmyth@smythlaw.com

**Richard A. Speirs**
rspeirs@zsz.com

**Peter Dexter St Phillips, Jr**
pstphillip@lowey.com

**Viviann C. Stapp**
viviann.stapp@lw.com,
sheila.wolohan@lw.com

**Karin Bornstein Swope**
kswope@kellerrohrback.com,
chopkins@kellerrohrback.com

**David F. Taylor**
DFTaylor@perkinscoie.com,
docketsea@perkinscoie.com,
KKlemperer@perkinscoie.com

**Roger M. Townsend**
rtownsend@bjtlegal.com,
kjohansen@bjtlegal.com

**Duncan Calvert Turner**
duncanturner@badgleymullins.com,
courtnotices@badgleymullins.com

**Andrew M. Volk**
andrew@hbsslaw.com,
dawn@hbsslaw.com,
genessa@hbsslaw.com

**Mary Kay Vyskocil**
mvyskocil@stblaw.com

**Peter Allen Wald**
peter.wald@lw.com,
john.eastly@lw.com

**Tyler Weaver**
tyler@hbsslaw.com,
dawn@hbsslaw.com

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.: 08-MD-1919 MJP

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1
**Katherine M. Sinderson**
katherine@blbglaw.com,
2
ellen@blbglaw.com

3
**Patrick J. Smith**
psmith@tpw.com
4

**Allyssa Jayne White**
5
awhite@badgleymullins.com

6
**Joseph Edward White**
jwhite@saxenawhite.com,
7
e-file@saxenawhite.com

8
**David J. Woll**
dwoll@stblaw.com
9

**Jess Gilbert Webster**
jgwebster@mikkelborg.com,
eservice@mikkelborg.com,
fgaebler@mikkelborg.com

**Robert B. Weiser**
rw@weiserlawfirm.com

**Richard C. Yarmuth**
yarmuth@yarmuth.com,
cegan@yarmuth.com

**Alfred G. Yates, Jr**
yateslaw@aol.com

10
and I hereby certify that I have caused to be mailed by United States Postal Service the document

to the following non CM/ECF participants:
11

12
Geoffrey Coyle Jarvis
Grant & Eisenhofer PA
Chase Manhattan Centre
13
1201 North Market Street
Wilmington, DE 19801
14

15
Dated:  December 8, 2008
16

17
s/ Barry M. Kaplan
Barry M. Kaplan, WSBA# 8661

18

19

20

21

22

23

24

25

26

27

KERRY K. KILLINGER'S MOTION TO DISMISS
THE CLASS ACTION COMPLAINT [OD-KKK-1]
Master No.:  08-MD-1919 MJP

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699