1

The Honorable Marsha J. Pechman

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
8
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

)

10   IN RE WASHINGTON MUTUAL, INC.        )
     SECURITIES, DERIVATIVE & ERISA       )    No. 2:08-md-1919 MJP
11   LITIGATION                           )
                                          )
12   _____      )
                                          )    Lead Case No. C08-0387 MJP
13                                        )
                                          )
14                                        )
                                          )    DECLARATION OF STEPHEN M.
15   IN RE WASHINGTON MUTUAL, INC.        )    RUMMAGE IN SUPPORT OF WAMU
     SECURITIES LITIGATION                )    OFFICERS' MOTION TO DISMISS
16                                        )    CONSOLIDATED AMENDED
     This Document Relates to:            )    SECURITIES COMPLAINT
17   ALL ACTIONS                          )
                                          )    **[OD-02]**
18                                        )    **Note on Motion Calendar**:
                                          )    March 30, 2009
19                                        )
                                          )    ***ORAL ARGUMENT REQUESTED***
20   _____      )

21          Stephen M. Rummage declares as follows:

22          1.      ***Identity of Declarant***.  I am a member of the firm of Davis Wright Tremaine

23   LLP, and one of the counsel of record for Melissa Ballenger, Thomas W. Casey, Ronald J.

24   Cathcart, Stephen J. Rotella, David C. Schneider, and John F. Woods (collectively, the

25   "WaMu Officers").  I make this declaration in support of the WaMu Officers' Motion to

26   Dismiss the Consolidated Amended Securities Complaint.  I have personal knowledge of the

27

DECLARATION OF STEPHEN M. RUMMAGE
[OD-02] —Page 1
Case No.  2:08-md-01919-MJP
Lead Case No. C08-0387-MJP

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
-and-
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700

1  matters stated in this declaration, and I could competently testify to them if called as a

2  witness.

3       2.     **Exhibit 1**.  I have attached as Exhibit 1 a true and correct copy of relevant

4  portions of Interagency *Guidance on Subprime Lending* (March 1, 1999), *in* Office of Thrift

5  Supervision (OTS), EXAMINATION HANDBOOK, APPENDIX A:  CONSUMER LENDING, SECTION

6  217.

7       3.     **Exhibit 2**.  I have attached as Exhibit 2 a true and correct copy of relevant

8  portions of OTS, et al., *Expanded Guidance for Subprime Lending Programs* (Jan. 31, 2001)

9  *available at* files.ots.treas.gov//25137.pdf (last visited Dec. 7, 2008).

10      4.     **Exhibit 3**.  I have attached as Exhibit 3 a true and correct copy of relevant

11  portions of Memorandum from Richard M. Riccobono, Deputy Director of OTS, to Chief

12  Executive Officers, dated February 2, 2001, *available at* files.ots.treas.gov//25137.pdf (last

13  visited Dec. 7, 2008).

14      5.     **Exhibit 4.**  I have attached as Exhibit 4 a true and correct copy of relevant

15  portions of Washington Mutual Inc.'s (the "Company's") Annual Report for the Fiscal Year

16  Ended December 31, 2004, filed with the Securities and Exchange Commission ("SEC") on

17  Form 10-K on March 14, 2005.

18      6.     **Exhibit 5.**  I have attached as Exhibit 5 a true and correct copy of the transcript

19  of the Company's Second Quarter 2005 Earnings Call, which took place on July 20, 2005.

20      7.     **Exhibit 6.**  I have attached as Exhibit 6 a true and correct copy of relevant

21  portions of the Company's press release, dated October 19, 2005.  Plaintiffs refer to this

22  document in Paragraphs 557-58 and 565 of their Consolidated Amended Complaint.

23      8.     **Exhibit 7.**  I have attached as Exhibit 7 a true and correct copy of relevant

24  portions of the Company's Quarterly Report for the Quarterly Period Ended September 30,

25  2005, filed with the SEC on Form 10-Q on or about November 4, 2005.

26

27

DECLARATION OF STEPHEN M. RUMMAGE
[OD-02] —Page 2
Case No.  2:08-md-01919-MJP
Lead Case No. C08-0387-MJP

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
-and-
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700

9.      *Exhibit 8*.  I have attached as Exhibit 8 a true and correct copy of relevant portions of the Company's Shelf Registration Statement dated December 30, 2005, filed with the SEC on Form S-3AR on January 9, 2006.

10.  *Exhibit 9*.  I have attached as Exhibit 9 a true and correct copy of relevant portions of the transcript from the Company's earnings conference call that took place on January 18, 2006.  Plaintiffs refer to this document in Paragraphs 367, 575, and 578 of their Consolidated Amended Complaint.

11.  *Exhibit 10*.  I have attached as Exhibit 10 a true and correct copy of relevant portions of the transcript from the Company's presentation at the Citigroup Financial Services Conference, delivered on January 31, 2006.  Plaintiffs refer to this document in Paragraphs 577 and 587 of their Consolidated Amended Complaint.

12.  *Exhibit 11.*  I have attached as Exhibit 11 a true and correct copy of relevant portions of the Company's Annual Report for the Fiscal Year Ended December 31, 2005, filed with the SEC on Form 10-K on March 15, 2006.

13.  *Exhibit 12.*  I have attached as Exhibit 12 a true and correct copy of relevant portions of the Company's Quarterly Report for the Quarterly Period Ended March 31, 2006, filed with the SEC on Form 10-Q on May 10, 2006.

14.  *Exhibit 13*.  I have attached as Exhibit 13 a true and correct copy of relevant portions of the transcript of the Company's earnings conference call that took place on July 19, 2006.  Plaintiffs refer to this document in Paragraphs 555, 605, and 608 of their Consolidated Amended Complaint.

15.  *Exhibit 14.*  I have attached as Exhibit 14 a true and correct copy of relevant portions of the Company's Quarterly Report for the Quarterly Period Ended June 30, 2006, filed with the SEC on Form 10-Q on August 9, 2006.

16.  *Exhibit 15*.  I have attached as Exhibit 15 a true and correct copy of relevant portions of the transcript from the Company's presentation at the Company's annual Investor

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
-and-
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700

1  Day conference that took place on September 6, 2006.  Plaintiffs refer to this document in

2  Paragraphs 487 and 612-615 of their Consolidated Amended Complaint.

3      17.    *Exhibit 16*.  I have attached as Exhibit 16 a true and correct copy of relevant

4  portions of the transcript from the Company's presentation at the Company's annual Investor

5  Day conference that took place on September 7, 2006.  Plaintiffs refer to this document in

6  Paragraphs 487 and 612-615 of their Consolidated Amended Complaint.

7      18.    *Exhibit 17.*  I have attached as Exhibit 17 a true and correct copy of relevant

8  portions of the Company's Quarterly Report for the Quarterly Period Ended September 30,

9  2006, filed with the SEC on Form 10-Q on November 9, 2006.

10     19.    *Exhibit 18.*  I have attached as Exhibit 18 a true and correct copy of relevant

11 portions of the Company's Annual Report for the Fiscal Year Ended December 31, 2006,

12 filed with the SEC on Form 10-K on March 1, 2007.

13     20.    *Exhibit 19*.  I have attached as Exhibit 19 a true and correct copy of relevant

14 portions of the Company's Annual Shareholders Meeting Presentation, delivered on April 17,

15 2007.  Plaintiffs refer to this document in Paragraphs 657 and 661 of their Consolidated

16 Amended Complaint.

17     21.    *Exhibit 20*.  I have attached as Exhibit 20 a true and correct copy of relevant

18 portions of the transcript of the Company's earnings call that took place on April 17, 2007.

19 Plaintiffs refer to this document in Paragraphs 654-56, 661, and 675 of their Consolidated

20 Amended Complaint.

21     22.    *Exhibit 21*.  I have attached as Exhibit 21 a true and correct copy of relevant

22 portions of the Company's Quarterly Report for the Quarterly Period Ended March 31, 2007,

23 filed with the SEC on Form 10-Q on May 10, 2007.

24     23.    *Exhibit 22.*  I have attached as Exhibit 22 a true and correct copy of an article

25 posted on Bloomberg.com by Jody Shenn & Sharon Crenson, "New York Subpoenas First

26 American Appraisal Unit" (May 22, 2007), *available at*

27

DECLARATION OF STEPHEN M. RUMMAGE
[OD-02] —Page 4
Case No. 2:08-md-01919-MJP
Lead Case No. C08-0387-MJP

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
-and-
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700

http://www.bloomberg.com/apps/news?pid=20601087&sid=ayO8AMw7nMPc&refer=home

(last visited Dec. 3, 2008).

24.     *Exhibit 23*.  I have attached as Exhibit 23 a true and correct copy of relevant portions of the Company's Quarterly Report for the Quarterly Period Ended June 30, 2007, filed with the SEC on Form 10-Q on August 9, 2007.

25.     *Exhibit 24.*  I have attached as Exhibit 24 a true and correct copy of relevant portions of the Company's press release, dated October 17, 2007.  Plaintiffs refer to this document in Paragraphs 687 and 690 of their Consolidated Amended Complaint.

26.     *Exhibit 25*.  I have attached as Exhibit 25 a true and correct copy of relevant portions of the Company's Form 424(B)(5) supplement to the Company's Prospectus dated January 9, 2006, filed with the SEC on October 29, 2007.

27.     *Exhibit 26*.  I have attached as Exhibit 26 a true and correct copy of relevant portions of the Company's Quarterly Report for the Quarterly Period Ended September 30, 2007, filed with the SEC on Form 10-Q on November 9, 2007.

28.     *Exhibit 27.*  I have attached as Exhibit 27 a true and correct copy of relevant portions of the Company's press release, dated December 10, 2007.  Plaintiffs refer to this document in Paragraphs 705 and 709 of their Consolidated Amended Complaint.

29.     *Exhibit 28*.  I have attached as Exhibit 28 a true and correct copy of relevant portions of the Company's Form 424(B)(5) supplement to the Company's Prospectus dated January 9, 2006, filed with the SEC on December 13, 2007.

30.     *Exhibit 29.*  I have attached as Exhibit 29 a true and correct copy of relevant portions of the Company's Annual Report for the Fiscal Year Ended December 31, 2007, filed with the SEC on Form 10-K on February 29, 2008.

31.     *Exhibit 30*.  I have attached as Exhibit 30 a true and correct copy of relevant portions of the Second Amended Consolidated Class Action Complaint filed in *Gold v. Morrice*, No. CV 07-00931 DDP (JTLx) (Pregerson, J.) (C.D. Cal. Apr. 30, 2008).

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
-and-
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700

1        I declare under penalty of perjury that the foregoing is true and correct to the best of

2    my knowledge.

3        Executed this 8th day of December, 2008, at Seattle, Washington.

4

5                                    */s/ Stephen M. Rummage*
                                  Stephen M. Rummage

DECLARATION OF STEPHEN M. RUMMAGE
[OD-02] —Page 6
Case No.  2:08-md-01919-MJP
Lead Case No. C08-0387-MJP

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
-and-
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700

## CERTIFICATE OF SERVICE

I hereby certify that on December 8th, 2008, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record who receive CM/ECF notification, and that the remaining parties shall be served in accordance with the Federal Rules of Civil Procedure.

DATED this 8th day of December, 2008.

Davis Wright Tremaine LLP
*Attorneys for Defendants*
   *Melissa Ballenger, Thomas W. Casey,*
   *Ronald J. Cathcart, Stephen J. Rotella,*
   *David C. Schneider, and John F. Woods*


By */s/ Steven P. Caplow*
   Steven P. Caplow, WSBA #19843
   Suite 2200
   1201 Third Avenue
   Seattle, Washington 98101-3045
   Telephone:   (206) 757-8018
   Fax:   (206) 757-7700
   E-mail: stevencaplow@dwt.com

DECLARATION OF STEPHEN M. RUMMAGE
[OD-02] —Page 7
Case No. 2:08-md-01919-MJP
Lead Case No. C08-0387-MJP

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
-and-
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700

# Exhibit 1

Exhibit 1 of 30                                                                                              Page 8

**Appendix A: Consumer Lending**                              **Section 217**

# Interagency Guidance on Subprime Lending

March 1, 1999

| Contents | Page |
|---|---|
| Background and Scope | 1 |
| Capitalization | 2 |
| Risk Management | 2 |
| Planning and Strategy | 2 |
| Staff Expertise | 3 |
| Lending Policy | 3 |
| Purchase Evaluation | 4 |
| Loan Administration Procedures | 4 |
| Loan Review and Monitoring | 5 |
| Consumer Protection | 5 |
| Securitization and Sale | 5 |
| Reevaluation | 7 |
| Examination Objectives | 7 |

**Background and Scope**

Insured depository institutions have traditionally avoided lending to customers with poor credit histories because of the higher risk of default and resulting loan losses. However, in recent years a number of lenders[1] have extended their risk selection standards to attract lower credit quality accounts, often referred to as subprime loans. Moreover, recent turmoil in the equity and asset-backed securities market has caused some non-bank subprime specialists to exit the market, thus creating increased opportunities for financial institutions to enter, or expand their participation in, the subprime lending business. The federal banking agencies have been monitoring this development and are providing guidance on this activity.

For the purposes of this guidance, "subprime lending" is defined as extending credit to borrowers who exhibit characteristics indicating a significantly higher risk of default than traditional bank lending customers.[2] Risk of default may be measured by traditional credit risk measures (credit/repayment history, debt to income levels, etc.) or by alternative measures such as credit scores. Subprime borrowers represent a broad spectrum of debtors ranging from those who have exhibited repayment problems due to an adverse event, such as job loss or medical emergency, to those who persistently mismanage their finances and debt obligations. Subprime lending does not include loans to borrowers who have had minor, temporary credit difficulties but are now current. This guidance applies to direct extensions of credit; the purchase of subprime

---

[1] The terms "lenders," "financial institutions," and "institutions," in this document refer to insured depository institutions and their subsidiaries.

[2] For purposes of this paper, loans to customers who are not subprime borrowers are referred to as "prime."

---

**Office of Thrift Supervision**          **January 2000**          **Examination Handbook    217A.1**

Exhibit 1 of 30                                                          Page 9

**Appendix A: Consumer Lending**                                        **Section 217**

loans from other lenders, including delinquent or credit impaired loans purchased at a discount; the purchase of subprime automobile or other financing "paper" from lenders or dealers; and the purchase of loan companies that originate subprime loans.

Due to their higher risk, subprime loans command higher interest rates and loan fees than those offered to standard risk borrowers. These loans can be profitable, provided the price charged by the lender is sufficient to cover higher loan loss rates and overhead costs related to underwriting, servicing, and collecting the loans. Moreover, the ability to securitize and sell subprime portfolios at a profit while retaining the servicing rights has made subprime lending attractive to a larger number of institutions, further increasing the number of subprime lenders and loans. Recently, however, a number of financial institutions have experienced losses attributable to ill-advised or poorly structured subprime lending programs. This has brought greater supervisory attention to subprime lending and the ability of insured depository institutions to manage the unique risks associated with this activity.

Institutions should recognize the additional risks inherent in subprime lending and determine if these risks are acceptable and controllable given the institution's staff, financial condition, size, and level of capital support. Institutions that engage in subprime lending in any significant way should have board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control these additional risks. Institutions that engage in a small volume of subprime lending should have systems in place commensurate with their level of risk. Institutions that began a subprime lending program prior to the issuance of this guidance should carefully consider whether their program meets the following guidelines and should implement corrective measures for any area that falls short of these minimum standards. If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound.

**Capitalization**

The federal banking agencies believe that subprime lending activities can present a greater than normal risk for financial institutions and the deposit insurance funds; therefore, the level of capital institutions need to support this activity should be commensurate with the additional risks incurred. The amount of additional capital necessary will vary according to the volume and type of subprime activities pursued and the adequacy of the institution's risk management program. Institutions should determine how much additional capital they need to offset the additional risk taken in their subprime lending activities and document the methodology used to determine this amount. The agencies will evaluate an institution's overall capital adequacy on a case-by-case basis through on-site examinations and off-site monitoring procedures considering, among other factors, the institution's own analysis of the capital needed to support subprime lending. Institutions determined to have insufficient capital must correct the deficiency within a reasonable timeframe or be subject to supervisory action. In light of the higher risks associated with this type of lending, the agencies may impose higher minimum capital requirements on institutions engaging in subprime lending.

**Risk Management**

The following items are essential components of a well-structured risk management program for subprime lenders:

**Planning and Strategy**. Prior to engaging in subprime lending, the board and management should ensure that proposed activities are consistent with the institution's overall business strategy and risk tolerances, and that all involved parties have properly acknowledged and addressed critical business risk issues. These issues include the costs associated with attracting and retaining qualified personnel, investments in the technology necessary to manage a more complex portfolio, a clear solicitation and origination strategy that allows for

---

217A.2     Examination Handbook                    January 2000                    Office of Thrift Supervision

Exhibit 1 of 30                                                                                    Page 10

# **Exhibit 2**

Exhibit 2 of 30                                                                 Page 11

**Office of the Comptroller of the Currency**
**Board of Governors of the Federal Reserve System**
**Federal Deposit Insurance Corporation**
**Office of Thrift Supervision**

| **Subject:** Subprime Lending | **Description:** Expanded Guidance for Subprime Lending Programs |
|---|---|

## Purpose of Guidance

The Office of the Comptroller of the Currency, the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision (the Agencies) are expanding previously issued examination guidance for supervising subprime lending activities.[1]  The Agencies continue to believe that responsible subprime lending can expand credit access for consumers and offer attractive returns.  However, we expect institutions to recognize that the elevated levels of credit and other risks arising from these activities require more intensive risk management and, often, additional capital.

This expanded guidance discusses supervisory expectations for the Allowance for Loan and Lease Losses (ALLL), regulatory capital, examination review of subprime activities, classification of risk, and documentation for re-aging, renewing, or extending delinquent accounts. This guidance also discusses regulatory expectations for the review and treatment of certain potentially abusive lending practices.

## Contents

Purpose of Guidance ................................................................................................... 1
Applicability of Guidance ........................................................................................... 2
Risk Management Expectations.................................................................................... 3
Allowance for Loan and Lease Losses (ALLL) and Capital Expectations ...................... 3
    ALLL Adequacy ...................................................................................................... 4
    Capital Adequacy ................................................................................................... 5
Examination Review and Analysis .............................................................................. 7
    Transaction-Level Testing ....................................................................................... 8
Classification Guidelines for Subprime Lending.......................................................... 8
    Individual Loans ..................................................................................................... 9
    Portfolios ............................................................................................................... 9
Required Documentation for Cure Programs .............................................................. 10
Predatory or Abusive Lending Practices..................................................................... 10
Summary.................................................................................................................... 11

---

[1] Interagency Guidance on Subprime Lending, March 1, 1999.

1

Exhibit 2 of 30                                                                                    Page 12

## Applicability of Guidance

This expanded guidance applies specifically to those institutions that have subprime lending programs with an aggregate credit exposure greater than or equal to 25% of tier 1 capital.[2]  Aggregate exposure includes principal outstanding and committed, accrued and unpaid interest, and any retained residual assets[3] relating to securitized subprime loans. The Agencies may also apply these guidelines to certain smaller subprime portfolios, in certain situations such as those experiencing rapid growth or,  or adverse performance trends, those administered by inexperienced management, and impacts from local or national economic conditions, or those where the activity is conducted with inadequate or weak controls,  or by inexperienced management, or other similar conditions.

This guidance is meant to intensify examination scrutiny of institutions that systematically target the subprime market through programs that employ tailored marketing, underwriting standards, and risk selection.  In accordance with previously issued guidance, such lending should be conducted in a segregated program, portfolio, and/or portfolio segment.  The term "**program**" refers to the process of acquiring on a regular or targeted basis, either through origination or purchase, subprime loans to be held in the institution's own portfolio or accumulated and packaged for sale.  The average credit risk profile of such programs or portfolios will likely display significantly higher delinquency and/or loss rates than prime portfolios**.**

**Exclusions -** For purposes of this guidance, subprime lending does not refer to individual subprime loans originated and managed, in the ordinary course of business, as exceptions to prime risk selection standards.  The Agencies recognize that many prime loan portfolios will contain such accounts.   Additionally, this guidance will generally not apply to: prime loans that develop credit problems after acquisition; loans initially extended in subprime programs that are later upgraded, as a result of their performance, to programs targeted to prime borrowers; and community development loans as defined in the CRA regulations that may have some higher risk characteristics, but are otherwise mitigated by guarantees from government programs, private credit enhancements, or other appropriate risk mitigation techniques.

The term "**subprime**" refers to the credit characteristics of individual borrowers. Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments, and bankruptcies.  They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories.  Subprime loans are loans to borrowers displaying one or more of these characteristics at the time of origination or purchase.  Such loans have a higher risk of default than loans to prime borrowers.  Generally, subprime borrowers will

---

[2] Tier 1 capital as defined in the Agencies' risk-based capital standards: 12 CFR part 3, Appendix A (OCC); 12 CFR part 208, Appendix A (Federal Reserve); Part 325, Appendix A (FDIC); 12 CFR 565.2(h) (OTS).
[3] Residual interests are on-balance sheet assets that represent interests (including beneficial interests) in transferred financial assets retained by a seller (or transferor) after a securitization or other transfer of financial assets; and are structured to absorb more than a pro rata share of credit loss related to the transferred assets through subordination provisions or other credit enhancement techniques.

Exhibit 2 of 30                                                                                          Page 13

display a range of credit risk characteristics that may include one or more of the following:

- Two or more 30-day delinquencies in the last 12 months, or one or more 60-day delinquencies in the last 24 months;
- Judgment, foreclosure, repossession, or charge-off in the prior 24 months;
- Bankruptcy in the last 5 years;
- Relatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood; and/or
- Debt service-to-income ratio of 50% or greater, or otherwise limited ability to cover family living expenses after deducting total monthly debt-service requirements from monthly income.

This list is illustrative rather than exhaustive and is not meant to define specific parameters for all subprime borrowers. Additionally, this definition may not match all market or institution specific subprime definitions, but should be viewed as a starting point from which the Agencies will expand examination efforts.

## Risk Management Expectations

The Agencies' March 1999 guidance outlined the risks associated with subprime lending, examination objectives for supervisory reviews, and the Agencies' expectations for risk management standards necessary to manage and control subprime lending activities.

Examiners should continue to carefully assess management's ability to administer the higher risk in subprime portfolios using the March 1999 Interagency Guidance and any supplemental Agency-specific guidelines issued in conjunction with that document. In particular, management's ability should be judged by the quality of the risk management and control processes in place, and more importantly, the extent to which management is adhering to those processes. When examiners determine that risk management practices are deficient, they should criticize management and initiate corrective action. Such actions may include formal or informal enforcement actions and/or a plan to achieve adequate capitalization. **When a primary supervisor determines that an institution's risk management practices are materially deficient, the primary supervisor may instruct the institution to discontinue its subprime lending programs.**

## Allowance for Loan and Lease Losses (ALLL) and Capital Expectations

Examiners should perform specific evaluations of the ALLL and regulatory capital allocated to support subprime lending programs. The total protection for subprime asset programs should consist of adequate levels of each component. Expectations for sound risk management programs include the ability to determine and quantify appropriate levels for each component.

3

Exhibit 2 of 30                                                                                     Page 14

that exhibit signs of credit weakness regardless of delinquency status.  An examiner may also classify retail portfolios, or segments thereof, where underwriting standards are weak and present unreasonable credit risk, and may criticize account management practices that are deficient.  Well-managed subprime lenders should recognize the heightened loss characteristics in their portfolios and internally classify their delinquent accounts well before the timeframes outlined in the interagency policy.

Individual Loans

Examiners should not automatically classify or place loans in special mention merely because they are subprime.  Rather, classifications should reflect the borrower's capacity and willingness to repay and the adequacy of collateral pledged.

Loans to borrowers that do not have the capacity to service their loans generally will be classified substandard.  Where repayment capacity is insufficient to support orderly liquidation of the debt, and the collateral pledged is insufficient to mitigate risk of loss, then a more severe classification and non-accrual is warranted.  Subprime loans that are past due 90 days, or more, should be classified at least substandard based on a reasonable presumption that their past due status is indicative of inadequate capacity and/or unwillingness to repay.  A more stringent classification approach may be appropriate based on the historical loss experience of a particular institution. Classification of other subprime loans as doubtful or loss will be based on examiners' analysis of the borrower's capacity to repay, and the quality of institution underwriting and account management practices as contained in the loan file or other documentation.

In some cases, the repayment of principal, interest, and fees on some subprime loans may be overly dependent on collateral pledged.  This occurs when risk of default is so high that an abundance of collateral is taken to mitigate risk of loss in the event of default. From a safety and soundness perspective the Agencies discourage lending solely on the basis of collateral pledged, and will generally classify such loans substandard.  Further, when the borrower does not demonstrate the capacity to service the loan from sources other than collateral pledged, the loan may be placed on non-accrual.

Portfolios

When the portfolio review or loan sample indicate serious concerns with credit risk selection practices, underwriting standards, or loan quality, examiners should consider classifying or criticizing the entire portfolio or segments of the portfolio.  Such a decision may be appropriate in cases where risk is inordinately high or delinquency reports reflect performance problems.  Some subprime lending portfolios may pose very high risk. These may include portfolios of unsecured loans, or secured high loan-to-value loans to borrowers who clearly exhibit inadequate capacity to repay the debt in a reasonable timeframe.  Most such portfolios should be classified at least substandard.

9

Exhibit 2 of 30                                                                                             Page 15

# Exhibit 3

Exhibit 3 of 30                                    Page 16

# 137



**Office of Thrift Supervision**

Department of the Treasury

1700 G Street, N.W., Washington, DC  20552 • (202) 906-6853

*Richard M. Riccobono*

*Deputy Director*

February 2, 2001

**MEMORANDUM FOR:**  Chief Executive Officers

**FROM:**  Richard M. Riccobono

**SUBJECT:**  **Expanded Guidance for Subprime Lending Programs**

On January 31, 2001, the Office of Thrift Supervision, along with the Office of the Comptroller of the Currency, the Federal Reserve Board, and the Federal Deposit Insurance Corporation (the Agencies), issued the attached guidance for examining and supervising federally insured depository institutions significantly engaged in subprime lending.  The attachment builds on the subprime lending guidance issued by the Agencies in March 1999, which outlined the risks inherent in subprime lending and the types of controls and risk management practices that are essential to mitigate such risks.  If conducted in a safe and sound manner, OTS believes that subprime lending can expand credit access for consumers while also offering attractive returns to the institution.

In addition to providing a more specific definition of the term subprime, this expanded guidance focuses on evaluating the adequacy of allowances for loan and lease losses (ALLL) and capital to support subprime lending programs.  Subprime lending programs are described in the guidance as strategies that systematically target the subprime market by employing tailored marketing, underwriting standards, and risk selection.  In focusing on targeted subprime programs, the guidance applies specifically to those institutions with a significant subprime credit exposure by establishing a threshold of 25% or more of an institution's Tier I regulatory capital as the starting point for greater supervisory scrutiny.

A key underlying principle in the guidance is that each subprime lender is responsible for quantifying the additional risks in its subprime lending activities and determining the appropriate amounts of ALLL and capital it needs to offset those risks.  The capital adequacy analysis should include a stress test of an institution's subprime loan pools to project performance over varying economic business and market conditions.  The institution is expected to fully document its methodology and analysis.

Examiners are directed to evaluate the capital adequacy of subprime lenders on a case-by-case basis, and encouraged to use judgment in determining the appropriate level of capital needed to support subprime lending activities.  Nonetheless, the guidance suggests that subprime portfolios

Exhibit 3 of 30                                                                                               Page 17

-2-

should be supported by capital equal to one and one-half to three-times greater than what is appropriate for prime assets of a similar type as a starting point.  This is not meant to imply that additional capital is always required.  Some subprime loans may be only marginally more risky than prime loans and, thus, may warrant increased supervisory scrutiny and monitoring, *but not necessarily additional capital.*  For instance, well-secured mortgage loans to individuals who experienced minor credit difficulties in the past may have no more credit risk than similar prime loans, provided adequate controls are in place.  Conversely, examiners may determine that institutions that originate or purchase high-risk subprime loan pools, such as unsecured loans, or loans to very high-risk borrowers, may need significantly higher levels of capital depending on the level and volatility of risk.  For this reason, we cannot over emphasize the need for proper judgment when internally assessing the adequacy of capital levels and whether additional capital is necessary.

The guidance also addresses the need for expanded examiner review of subprime portfolios, the classification of subprime loans, the need to establish prudent re-aging policies and cautionary guidance against predatory lending practices.  This guidance is effective immediately.  Please direct any questions concerning this policy to William Magrini by email: william.magrini@ots.treas.gov or by phone:  (202) 906-5744.

Attachment

Exhibit 3 of 30                                                                                                    Page 18

**Exhibit 4**

Exhibit 4 of 30                                    Page 19

QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2004**

**Commission File Number 1-14667**

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91-1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1201 Third Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(206) 461-2000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Litigation Tracking Warrants™ | NASDAQ |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐.

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒ No ☐..

Exhibit 4 of 30                                                                 Page 20

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2004:

**Common Stock – $33,368,030,966**[1]

[1] Does not include any value attributable to 6,000,000 shares held in escrow.

The number of shares outstanding of the issuer's classes of common stock as of February 28, 2005:

**Common Stock – 879,248,564**[2]

[2] Includes 6,000,000 shares held in escrow.

### Documents Incorporated by Reference

Portions of the definitive proxy statement for the Annual Meeting of Shareholders to be held April 19, 2005, are incorporated by reference into Part III.

Exhibit 4 of 30                                                                                     Page 21

constraints such as geographic barriers, rent control and zoning restrictions. For more detail on the products and services offered by our Commercial Group, of which multi-family lending is the most significant part, refer to Management's Discussion and Analysis – "Operating Segments."

## Available Information

We make our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to such reports filed pursuant to Section 13(a) or 15(d) of the Exchange Act, available free of charge on or through our website located at www.wamu.com/ir as soon as reasonably practicable after filing with the United States Securities and Exchange Commission.

The Company's Code of Conduct, which applies to all officers, directors and employees of the Company, and the Code of Ethics for Senior Financial Officers, which applies to the Company's Chief Executive Officer, Chief Financial Officer, Controller, and each business segment or business line chief financial officer and controller, as well as any waiver of our Code of Conduct or Code of Ethics for Senior Financial Officers, are disclosed on our website located at www.wamu.com/ir.

## Employees

At December 31, 2004, we had 52,579 employees, compared with 63,720 at December 31, 2003 and 55,200 at December 31, 2002, which included zero, 2,346 and 2,330 employees related to the Company's discontinued operations. During 2004, our number of employees decreased primarily due to the Company's cost containment initiative directed at reducing the fixed cost structure of the mortgage banking business through reduced employee headcount. During 2003, our number of employees increased substantially to accommodate the high refinancing activity in the earlier part of the year and the opening of new retail banking stores. We believe that we have been successful in attracting quality employees and that our employee relations are good.

## Factors That May Affect Future Results

Our Form 10-K and other documents that we file with the Securities and Exchange Commission have forward-looking statements. In addition, our senior management may make forward-looking statements orally to analysts, investors, the media and others. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs such as "will," "would," "should," "could" or "may."

Forward-looking statements provide our expectations or predictions of future conditions, events or results. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. We do not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements were made. There are a number of factors, many of which are beyond our control, which could cause actual conditions, events or results to differ significantly from those described in the forward-looking statements.

Some of these factors are described below.

*Volatile interest rates impact our mortgage banking business and could adversely affect our earnings.*

Changes in interest rates affect the mortgage banking business in complex and significant ways. Changes in interest rates can affect loan origination fees, gain from mortgage loans and loan servicing fees, which are the principal components of home loan mortgage banking income. When mortgage rates decline, we would generally expect loan volumes to increase as borrowers refinance, which leads to accelerated payoffs of mortgage loans in our servicing portfolio, which reduces the fair value of our mortgage servicing rights ("MSR"), and to increased loan origination fees and gain from mortgage loans, as our mix of originated mortgage loans generally shifts to saleable fixed-rate products. When mortgage rates rise, we

2

Exhibit 4 of 30                                                                                   Page 22

would generally expect loan volumes to decrease, which generally leads to reduced payoffs in our servicing portfolio, which increases the fair value of our MSR, and to reduced loan origination fees and gain from mortgage loans, as our mix or originated mortgage loans generally shifts to adjustable-rate products we hold in portfolio.

To mitigate changes in fair value of our MSR, we purchase and sell financial instruments, such as mortgage-backed securities and fixed-rate investment securities; enter into interest rate contracts and forward commitments to purchase or sell mortgage-backed securities, which tend to increase in value when mortgage rates decline and decrease in value when mortgage rates rise; and we adjust the mix and amount of such financial instruments or contracts to take into account the effects of different interest rate environments. Our management must exercise judgment in selecting the amount, type and mix of financial instruments and contracts to mitigate changes in fair value of our MSR. We cannot assure that the amount, type and mix of financial instruments and contracts we select will offset significant decreases in the value of the MSR and the Company's earnings could be adversely affected. Moreover, some of the risk management instruments we use may experience periods of illiquidity in the secondary markets, in which case our ability to effectively mitigate changes in the fair value of the MSR could be adversely affected.

Historically, the Company has held adjustable-rate mortgage ("ARM") loans in its portfolio; however, the industry-wide increase in the origination volume of adjustable-rate mortgages has facilitated the development of a secondary market for these products and has allowed us to sell a significant portion of our signature adjustable-rate mortgage, the Option ARM, into this market. The Company believes that secondary market prices offered for its Option ARM product may result in stronger gain from mortgage loans than its conforming fixed and hybrid products; therefore, a downturn in customer demand for this product or a prolonged period of secondary market illiquidity could have an adverse effect on the Company's earnings.

For further discussion of how interest rate risk, basis risk and prepayment risk are managed, refer to Management's Discussion and Analysis – "Market Risk Management."

*Rising unemployment or a decrease in housing prices could adversely affect our credit performance.*

The Company's credit performance has been strong, reflecting a generally favorable economic environment for real estate lending. The Company continually monitors changes in the economy, particularly unemployment rates and housing prices. If unemployment were to rise and either a slowdown in housing price appreciation or outright declines in housing prices were to occur, borrowers may be unable to repay their loans. As a result, the Company could experience higher credit losses in its mortgage loan portfolios, which could adversely affect our earnings.

*A continuing emphasis on subprime lending could negatively impact our business.*

The Company began accelerating purchases of subprime loans in 2003, increased its specialty mortgage finance portfolio significantly in 2004 and intends to continue to grow this portfolio in the future. The specialty mortgage finance portfolio has generally performed well as a result of a strong mortgage market, housing price appreciation and the Company's disciplined approach in re-underwriting these assets. However, if there were a downturn in the national economy or local economies where we do business, the credit performance of this portfolio could suffer, with a potential adverse effect on our earnings.

*The potential for negative amortization in the Option ARM product could have an adverse effect on the Company's credit.*

The Option ARM loan is a unique adjustable-rate mortgage that can provide the borrower with up to four payment options each month and an introductory rate of interest ("start rate") that is usually much lower than the loan's fully-indexed interest rate and will last from one month to five years, depending on the type of Option ARM selected by the borrower. The minimum monthly payment is a fully amortizing

3

Exhibit 4 of 30                                                                                           Page 23

federal funds rate. As a result this benchmark interest rate, which was at a modern-day historical low of 1.00% during the first half of the year, increased to 2.25% by the end of 2004. As our adjustable-rate loans and securities reprice to current market rates more slowly than our wholesale borrowing sources, we expect the net interest margin will contract further while the Company's interest-sensitive assets and liabilities adjust to the higher interest rate environment. The contraction is likely to be more significant if the Federal Reserve initiates further rate increases at a more accelerated pace, or if competitive conditions require the Company to increase rates offered on its deposit products.

Home loan mortgage banking income was $1.39 billion in 2004, a decrease of $587 million from $1.97 billion in 2003. As mortgage rates during 2004 stayed above the historical low levels reached during 2003, refinancing activity, which in 2003 was primarily comprised of fixed-rate mortgages that were sold in the secondary market, declined significantly. This resulted in a decline in gain from mortgage loans from $1.25 billion in 2003 to $649 million in 2004. During the latter part of 2003, higher long-term interest rates widened the interest rate differential between adjustable-rate mortgages and fixed-rate loan products, which shifted customer preferences for the financing of home purchases to adjustable-rate products. This change in customer preferences also continued throughout 2004, and resulted in a substantial increase in loan volume for the Company's signature adjustable-rate home loan product, the Option ARM. The strong customer demand for this product during 2004 allowed the Company to direct over $31 billion of Option ARM volume for sale to the secondary market, while still retaining a majority of the volume for the loan portfolio.

Continued strong levels of home sales, stable or rising home prices in most of the Company's markets and an upward-sloping yield curve fueled adjustable-rate mortgage growth in the total home loan portfolio, which increased from $113.02 billion at December 31, 2003 to $129.13 billion at December 31, 2004. In addition to the strong demand for adjustable-rate mortgages, the Company also grew its portfolio of purchased subprime home loans during 2004. This portfolio, which totaled $12.97 billion at the end of 2003, increased to $19.14 billion at December 31, 2004. Strong home equity loan and line of credit volume that was generated primarily through the Company's retail banking network was also a significant contributor to growth in our loan portfolio in 2004. Outstanding home equity loan and line of credit balances have increased by $16.00 billion, or 58%, since December 31, 2003.

We continue to grow our retail banking business by opening new stores and enhancing our product suite. Total transaction accounts, which consist of checking and savings accounts for consumers and small businesses, increased by nearly 1.3 million during 2004. We achieved our goal of opening 250 new stores during the year, and we plan to continue this pace of expansion by adding 250 more stores in our existing markets during 2005.

The Company achieved its target of holding 2004 noninterest expense essentially flat with expenses incurred during 2003. This goal was attained through a cost containment initiative that was launched in the fourth quarter of 2003. In 2004, this initiative was primarily directed at reducing the fixed cost structure of the mortgage banking business through employee headcount reductions and facilities closures. By the end of that year, this initiative had resulted in cumulative headcount reductions of approximately 10,000 with an additional 300 who had received termination notices as of that date. The primary components of noninterest expense that have been impacted by this initiative are compensation and benefits expense due to the headcount reductions and severance charges associated with those reductions, and occupancy and equipment expense due to facilities closures. As planned, the cost savings from this initiative have offset expenses incurred from the continuing expansion of the retail banking franchise.

Improving the cost structure of our mortgage banking business will continue to be an area of focus in the foreseeable future. Two significant milestones that streamlined the cost structure of this business occurred during the third quarter of 2004, when the Company completed its conversion of all home loan customer records onto a single servicing system and consolidated 12 mortgage banking loan fulfillment centers into the 34 remaining centers and reduced staffing levels at those remaining locations. The Company also announced in that quarter that the mortgage banking business will focus its activities in

15

Exhibit 4 of 30                                                                                                    Page 24

assisted living facilities, Small Business Administration loans and highly leveraged syndicated lending. This change in the loan portfolio composition was exacerbated by the downturn in the national economy, which continued to worsen following the events of September 11, 2001. From December 31, 2000 to the end of 2001, the Company's nonperforming assets increased from $896 million to $2.14 billion and net charge-offs increased from $74 million in 2000 to $177 million in 2001. To address these negative trends that displayed no signals of imminent change, the Company believed it was prudent to record a loan loss provision in 2001 of $426 million.

Although the national economy showed some intermittent signs of stabilizing performance in 2002, the overall climate was still one of significant uncertainty, as demonstrated by the continuing high levels of unemployment, distressed levels of consumer confidence and continuing concerns of housing price bubbles in some of the Company's real estate markets. After their substantial growth in 2001, nonperforming asset trends stabilized in 2002 but remained at elevated levels, decreasing slightly to $2.48 billion at December 31, 2002 after reaching a first quarter peak of $2.68 billion. Though the Company continued to provision at levels that exceeded net charge-offs as a result of the continuing economic malaise, the gap between these statistical measures had declined from $74 million in the first quarter of 2002 to $2 million by the fourth quarter of that year. This reflected the Company's cautious belief that, while the economy had not demonstrated signals of a sustained economic recovery, it at least did not appear to be deteriorating any further. This assessment was also evident in the quarterly trend of the allowance for loan and lease losses as a percentage of total loans held in portfolio. After growing steadily from 0.82% in the first quarter of 2001 to 1.08% in the second quarter of 2002, it stabilized during the remainder of that year, ending at 1.05% at December 31, 2002.

During 2003, nonperforming assets declined from $2.48 billion at the beginning of the year to $1.94 billion at December 31, 2003. Beginning in the fourth quarter of 2002, the Company initiated a program of periodically selling nonperforming assets in order to reduce its exposure to potential credit losses. This program continued throughout 2003 with the sale of $619 million of nonperforming loans and was substantially the reason for the decline in nonperforming assets. As the charge-offs that were sustained from the sales of these loans were, in general, at lower levels than the Company believes it would have incurred had these loans been allowed to season further, the sales had the effect of limiting the potential provisioning that these loans would otherwise have required.

As economic conditions improved during 2003, the Company's assessment of the economic climate progressed from one of continuing concern in the first quarter of 2003 to one of guarded optimism by the third quarter of that year. However, a discernable, positive trend was not evident until various economic statistics were released in the fourth quarter. Those statistics provided conclusive evidence that key economic indicators that affect the Company's credit risk profile had improved. Those indicators included a stable interest rate environment, a consistent pattern of stable or increasing housing prices, strong levels of residential home construction, lower unemployment levels, increasing capital expenditures, steady to improving corporate profits and stronger levels of exports from a weakening U.S. dollar. These favorable external factors were augmented by the Company's ability to sell its underperforming franchise finance loan portfolio in the fourth quarter of 2003 at a price that exceeded its carrying value by $82 million. As a result of all of these events, the Company determined that a $202 million reversal of the provision for loan and lease losses in the fourth quarter of 2003 was appropriate.

During 2004, strong loan portfolio growth, especially in the higher-risk purchased subprime portfolio, resulted in management recording a provision for loan and lease losses that exceeded net charge-offs by $74 million. However, as a reflection of the continuing favorable trend in key domestic economic indicators which facilitated a relatively benign credit environment throughout the year, the allowance for loan and lease losses as a percentage of loans held in portfolio declined from 0.71% at December 31, 2003 to 0.63% at December 31, 2004. The positive economic outlook was also affirmed by the Federal Reserve's decision to initiate a series of measured increases in the targeted Federal Funds rate during the second half of 2004, thus reducing the degree of stimulus that the Federal Reserve believes is necessary to sustain continuing economic growth.

48

Exhibit 4 of 30                                                                                   Page 25

**Management's Report on Internal Control Over Financial Reporting**

The management of Washington Mutual, Inc. and subsidiaries (the "Company") is responsible for the preparation, integrity and fair presentation of the Consolidated Financial Statements and all other information presented in this annual report. The Consolidated Financial Statements and the accompanying notes have been prepared by the Company in accordance with accounting principles generally accepted in the United States of America and, as such, include amounts based on informed judgments and estimates made by Management.

Management is responsible for establishing and maintaining effective internal control over financial reporting, including safeguarding of assets and reliability of financial records. The Company's internal control structure contains monitoring mechanisms, and actions are taken to correct deficiencies identified.

There are inherent limitations in the effectiveness of any internal control, including the possibility of human error and the circumvention or overriding of controls. Accordingly, even effective internal control can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control may vary over time.

Management assessed the effectiveness of the Company's internal control over financial reporting, including safeguarding of assets and reliability of financial records as of December 31, 2004. This assessment was based on criteria for effective internal control over financial reporting, including safeguarding of assets, described in "Internal Control – Integrated Framework," issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management believes that, as of December 31, 2004, the Company maintained effective internal control over financial reporting, including safeguarding of assets and reliability of financial records.

The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of the Company's management; it includes members with banking or related management experience, has access to its own outside counsel, and does not include any large customers of the Company. The Audit Committee is responsible for the selection of the independent registered public accounting firm. It meets periodically with management, the independent registered public accounting firm, and the internal auditors to ensure that they are carrying out their responsibilities. In addition to reviewing the Company's financial reports, the Audit Committee is also responsible for performing an oversight role by reviewing and monitoring the financial, accounting and auditing procedures of the Company. The independent registered public accounting firm and the internal auditors have full and free access to the Audit Committee, with or without the presence of Management, to discuss the adequacy of internal control over financial reporting and any other matters which they believe should be brought to the attention of the Audit Committee.

Management's assessment of the effectiveness of the Company's internal control over financial reporting has been audited by Deloitte & Touche LLP, independent registered public accounting firm, in accordance with the standards of the Public Company Accounting Oversight Board (United States). Their report appears on page 74.

By:     /s/  KERRY K. KILLINGER

Kerry K. Killinger
*Chairman and Chief Executive Officer*
*of Washington Mutual, Inc.*

/s/  THOMAS W. CASEY

Thomas W. Casey
*Executive Vice President and Chief Financial*
*Officer of Washington Mutual, Inc.*

73

Exhibit 4 of 30                                                                                      Page 26

# **Exhibit 5**

Exhibit 5 of 30                                                                                      Page 27

1 of 2 DOCUMENTS

Copyright 2005 Voxant, Inc.
All Rights Reserved.
Copyright 2005 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

July 20, 2005 Wednesday

**TRANSCRIPT:** 072005at.740

**LENGTH:** 11768 words

**HEADLINE:** Q2 2005 Washington Mutual Earnings Conference Call - Final

**BODY:**

   OPERATOR: Good afternoon and welcome to the Washington Mutual second quarter 2005 earnings conference call. [OPERATOR INSTRUCTIONS] Today's call is being recorded for replay purposes. The replay will be available approximately one hour after the call has ended today. The toll free number to access the replay is 800-925-4582. The toll or international number is (402)220-4182. This call is also being broadcast live and will be archived for 30 days on the Company's website. Now we will turn the call over to Mr. Alan Magleby, the Vice President, Investor Relations, to introduce today's call.

   ALAN MAGLEBY, VP, IR, WASHINGTON MUTUAL: Good morning and thank you for joining us today. I would like to welcome you to the Washington Mutual second quarter 2005 earnings conference call. I want to remind you that our presentation does contain some forward-looking statements concerning our financial conditions, results, and expectations and that there are a number of factors that may cause actual results in the future to be different from our current expectations. These factors include, among other things, changes in general business and economic conditions, competitive pressures in the financial service industry or legislative and regulatory changes that may impact our business. For additional factors, please see our press release and other documents filed with the SEC.

   I would also like to state that the subject matter discussed in today's call related to the proposed acquisition of Providian Financial Corporation has been addressed in the preliminary proxy statement prospectus filed with the SEC. We urge you to read the definitive proxy statement prospectus when it becomes available because it will contain important information. Information regarding the persons who may, under the rules of the SEC, be considered participants in the solicitation of Providian shareholders, in connection with proposed transaction, is included in the preliminary proxy statement prospectus, which is available now and will be included in definitive proxy statement prospectus and the other relevant documents filed with the SEC when they become available. With us today are Kerry Killinger, Chairman and CEO; Steve Rotella, President and Chief Operating Officer; and Tom Casey, Chief Financial Officer. At this time, I will turn the call over to Kerry.

   KERRY KILLINGER, CHAIRMAN, CEO, WASHINGTON MUTUAL: Thank you, Alan and good afternoon, everyone. Thanks for joining us for our second quarter earnings call. Earlier this afternoon we announced our second quarter net income of 844 million or $0.95 per diluted share. These earnings were up 73% on a per-share basis from $489 million or $0.55 per diluted share in the second quarter of last year. A net income of $1.7 billion or $1.97 per diluted share for the first six months of this year was up 53% on a per-share basis from the earnings from continuing operations in the first half of 2004. And the Board of Directors, again, increased the cash dividend by $0.01 per share to

Exhibit 5 of 30                                                                                            Page 28

Q2 2005 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire July 20, 2005 Wednesday

Now, specifically over the past 12 months, we've completed the integration of our mortgage servicing operations. We've closed retail mortgage banking offices in locations where we didn't have a retail banking presence. We substantially improved the number of loan serviced and closed per FTE and we reduced the operating expense in our Home Loans Group by close to $400 million on an annualized basis, as of the second quarter of this year with the -- compared with the same quarter of a year ago.

Over that time, we hired many leading professionals with mortgage expertise. Steve Rotella was hired as President and COO of Washington Mutual. Dave Schneider was hired as new President of our Home Loans Group; Taj Bindra as Head of our Mortgage Finance and Servicing Operations; Dr. Youyi Chen as Head of Mortgage Analysis and Prepayment Modeling; Steve Fortunato as CFO of Home Loans; and John Berens as Head of Mortgage Servicing. These additions, along with our existing team, now position us to go toe to toe with any competitor in the business. Furthermore, with other new hires, including Robert Williams as Treasurer and the strong Providian team of Joe Saunders, Tony Vuoto, and Warren Wilcox, I can say that this is the strongest management team we've ever had at WaMu and shows our commitment to creating a best in class management team that can deliver results for our shareholders.

I'd like to wrap up by welcoming two new Board members to our Board of Directors. Chuck Lillis a former CEO of MediaOne, current co-Founder and Managing Director of LoanTree Capital, Englewood, Colorado, joined our Board in June. Chuck brings telecommunications and private equity expertise to our Board. Second, Orin Smith, recently retired CEO of Starbucks joined our Board this month. Orin brings expertise in retailing, branding, financial, and operational expertise, as well. Now, with saying that, I'd now turn things over to Steve Rotella, our President and Chief Operating Officer for a more in-depth review of the business line. Steve?

STEVE ROTELLA, PRESIDENT, COO, WASHINGTON MUTUAL: Thank you, Kerry. As our strong second quarter results indicate, our business model continues to perform well. We're building momentum within each business line and increasingly across all units as we pursue several high value cross business initiatives which I'll come back to in a few minutes. In the retail bank, we increased net income by 20% year-over-year. We added 388,000 net new transaction accounts in the quarter. That's up 13% from the first quarter. And we became the number one home equity lender in our retail banking footprint.

In the Home Loan Groups, as Kerry mentioned, we continued to add industry leading talent, we delivered improvements in efficiency and productivity and we increased lending volume 17% from the first quarter. The commercial bank -- the Commercial Group, excuse me, continued its scale and efficiency leadership in the multi-family market and we set all-time record volumes at our subprime lender, Long Beach Mortgage Company.

I will now take a deeper look at each of our business lines. First, the retail bank. The net income of our retail bank totaled 579 million in the second quarter. Retail deposits grew $1.2 billion in the quarter and were up 5% from a year ago. Driven by new store openings and the continued success of our retail bank team in meeting customer needs, we opened 244,000 net new checking accounts in the quarter, that's up 28% from the same quarter in 2004. Now, included in that checking account growth number were 49,000 net new small business accounts. That's up 45% from last year's second quarter. We see big growth potential in banking relationships with small businesses and we will continue to drive for greater participation in this business segment.

Now, during the quarter, we opened 30 new retail banking stores in existing markets for a total of 59 through the first six months. As Kerry mentioned, competition for prime locations is strong. Nonetheless, we have a robust slate of store openings scheduled for the second half of this year. Our innovative retail store strategy continues to differentiate us from the competition but at the same time, we're maintaining a very disciplined investment approach. We now forecast the years openings to total between 200 and 225. We intend to continue strong expansion efforts in the future, but have not yet established a target for 2006.

Our lending volumes in home equity loans and lines of credit continued their strong pace, totaling about $11 billion

Exhibit 5 of 30                                                                                                      Page 29

Q2 2005 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire July 20, 2005 Wednesday

in the quarter, that's up 23% from the first quarter, which pushed our balances outstanding to 48 billion and that's a 34% increase in the past 12 months. As I noted earlier, we're number one in our footprint. As we expected, our noninterest income in the retail bank rebounded from 695 million in the first quarter of the year to 751 million in the second quarter, an 8% increase. These revenues were also up 7% from 703 million in the second quarter of last year. Higher depositor and other retail banking fees, which make up the largest portion of noninterest income drove this improvement.

I would note that during the first quarter, most of our peers experienced an absolute decline in fee income from the fourth quarter of 2004. While some of this was due to seasonally driven consumer-spending habits, it also reflected a trend toward lower overdraft and NSF charges per customer. The increase in depositor and other retail banking fees we saw in this, the second quarter, was primarily due to rebounding of consumer spending habits often seen in the second quarter. Finally in retail, a key metric we use to measure our performance in meeting the needs of our customers is our cross-sell ratio. We continued to see a cross-sell ratio increase. It was up to 6.02 in the second quarter compared to 5.79 a year ago.

Now, I'd like to shift to our Home Loans Group. Net income in the quarter was 209 million compared to 242 million in the first quarter. We continued our focus on the most profitable distribution channels, retail and wholesale, which combined for 75% of our loan volume during the quarter. Second quarter gain on sale results remains strong, but were slightly lower than the previous quarter as we experienced a slight shift in consumer preference to fixed rate products.

As I mentioned in the first quarter conference call, we believed it would be difficult to sustain the same level of gain on sale as the first quarter, if this shift were to occur and if the yield curve continued to flatten, which it did. We also continue to strengthen and improve our operating and risk management programs in home loans. There's a high level of discipline, oversight, and analytics around our MSR management program, which has produced stable results now for four consecutive quarters, which Tom will review in a few minutes. Our attention to credit quality and control is unwavering and we are very proud of our strong credit record and intend to maintain it. Our secondary market capabilities and results have been very good, part of our proactive risk management practices and lastly, we continue to refine our underwriting processes, including rolling out our automated enterprise decision engine across our mortgage operations to further improve consistency in loan pricing, as well as reduce operating costs and enhance cross-selling.

We also continued to improve our efficiency this quarter in home loans as loans originated per operations FTE increased 28% and loan service per FTE improved 38% from the second quarter of 2004. During the second quarter, we expanded our origination capabilities by adding 150 new loan consultants with the intention of more additions in the future. I'm also very pleased to add David Schneider to our strong team to head up our home loans business. David has an outstanding background and exceptional leadership experience in the mortgage banking industry as well as consumer lending, retail banking, and corporate finance. David will lead the already outstanding group of senior-level staff, which Kerry previously mentioned. This dynamic group of individuals has a combined 109 years of mortgage experience. I'm particularly proud of the strong team we've assembled internally and to external hires and I truly feel that we've created a mortgage team that will prove to be the best in the industry. The take away here is that our Home Loans Group is competitive and growing.

Our Commercial Group also posted solid results. Net income for the group is 151 million compared to 200 million in the previous quarter and I'd ask you to please note when you do your comparisons that in the first quarter there was a one-time gain of $59 million, recognized on the sale of real estate investment property. Our multi-family lending business continued its national leadership position in the quarter. Our multi-family lending volume of $2.5 billion was up 5% from the level in the same quarter a year earlier and 16% from the first quarter of 2005. During the first quarter of this year, we became the leading multi-family lender in the New York market. The key to our leadership position in multi-family and our success is simple: Our team continues to drive additional productivity from what we already believe is the low cost provider in the industry, which enables us to price very competitively while driving an excellent return for the Company. We expect to expand our presence in New York and other key markets, we've recently entered

Exhibit 5 of 30                                                                                                                Page 30

Q2 2005 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire July 20, 2005 Wednesday

along the East Coast to further our leadership position.

On the subprime front, Long Beach Mortgage Company produced record volume for the second straight quarter with total loan volume of 8.2 billion, which was more than double the volume from a year ago. In addition, delinquencies on loan service by Long Beach as a percentage of outstanding balances hit a five-year low. Over the past year, Long Beach has also significantly improved its operations and efficiency. We are now working on expanding their reach by adding new account executives, expanding fulfillment centers to accommodate volume and enhancing call centers and direct mail programs.

Let me turn to some cross-business initiatives, during the second half of 2005 and in 2006, we will be increasingly focused on positioning ourselves for additional growth across our businesses through several key initiatives. First, the sale of home equity loans to our first mortgage customers and through alternate distribution channels. There's a natural, fairly easy opportunity that to date has not been vigorously pursued but has great potential to add home equity volume and deepen relationships with customers. In fact, in the second quarter, that number was $1 billion, up 75% from last year and it's growing.

Increased sales of first mortgage loans to our nearly 2,000 retail banking stores. While we have been selling mortgages in our stores, our model has not been consistent nationally. And we see upside here. The delivery of subprime loans to appropriate customers who have been turned down by our prime mortgage or home equity applicants. This is a sizeable opportunity.

And leveraging our much-improved online banking capability. In May, we relaunched WaMu.com with improved ease of use, better organization and enhanced capability for direct marketing and selling of products. In the month of June, we were ranked number one by Gomez for response time. We've seen consistent growth in customer adoption and usage of online bill pay, which, as you know, is a great customer retention vehicle. We intend to accelerate delivery of enhanced functionality to drive even greater adoption by our customers. And, of course, acceleration of credit card offerings to our retail bank and home loans customers resulting from the Providian merger and also the sale of retail banking and mortgage products to current Providian cardholders.

To aid us in these efforts, we are rolling out our enterprise decision engine, a common credit decisioning engine to all businesses and real-time personalization, a new point of sale tool for our retail store and telephone service representatives that tailors information reflecting each customer's potential product needs. All of these initiatives are being actively worked and are in the various stages of implementation. As they progress, each will add to our growth.

Before I wrap up and turn it over to Tom, I'd like to follow up on a few of Kerry's comments about the upcoming merger with Providian. We are very excited and energized about this opportunity. In the few weeks since the announcement, both Washington Mutual and Providian have formed integration teams and I do want to emphasize that this integration effort is being conducted with minimal to no impact on our other business activities. In particular, there has been zero impact to our home loans business. Not one individual from the home loans business has been needed in the integration effort for Providian. All business groups related to the card integration have conducted many individual planning meetings, we held a full integration team meeting with about 75 key managers and support staff here in Seattle, initial business plans for day one conversion, post-merger operations, expected revenues and expenses have been drafted.

Joe Saunders and I are personally leading the joint integration team, meeting at least weekly to review progress and resolve any issues and I can assure you that we're off to a fast start to ensure a quick transition and maximization of the synergies. We are also developing special programs to market credit cards to Washington Mutual customers as soon as possible after the close of the transaction. We were attracted to Providian and their management team because of their nimbleness, outstanding customer analytics and risk management capabilities, which enable them to react and take advantage of a changing marketplace. So far we are even more convinced that this is a transformational opportunity for both firms with a strong cultural and customer fit. Our desire is to leverage the financial and administrative strength of

Exhibit 5 of 30                                                                                                    Page 31

# **Exhibit 6**

Exhibit 6 of 30                                                                                  Page 32

1 of 3 DOCUMENTS

Copyright 2005 Business Wire, Inc.
Business Wire

October 19, 2005 Wednesday 8:14 PM GMT

**DISTRIBUTION:** Business Editors

**LENGTH:** 22377 words

**HEADLINE:** Washington Mutual Announces Third Quarter 2005 Earnings; Diluted EPS Increased 21 Percent; Board of Directors Increases Cash Dividend

**DATELINE:** SEATTLE Oct. 19, 2005

**BODY:**

Washington Mutual, Inc. (NYSE:WM) today announced third quarter 2005 net income of $821 million, or $0.92 per diluted share, up 21 percent on a per share basis when compared with net income of $674 million, or $0.76 per diluted share, in the third quarter of 2004.

Washington Mutual's Board of Directors declared a cash dividend of 49 cents per share on the company's common stock, up from 48 cents per share in the previous quarter. Dividends on the common stock are payable on November 15, 2005 to shareholders of record as of October 31, 2005.

"Our solid third quarter earnings reflected excellent retail banking household growth driven by our long track record of industry leading customer service, as well as our ability to adjust to a challenging interest rate environment," said Kerry Killinger, chairman and chief executive officer. "The results also highlight our continued focus on balanced growth, earnings diversity and risk management."

Killinger added: "This month we welcomed Providian to the Washington Mutual family as our new Card Services Division. We continue to make outstanding progress on our integration efforts and I believe that we will look back on this acquisition as a transformational event for Washington Mutual."

On October 1, Washington Mutual completed its acquisition of Providian Financial in a stock and cash transaction valued at approximately $6.1 billion. For each share of Providian common stock, Providian stockholders received 0.4005 shares of Washington Mutual common stock and $2.00 in cash.

Key Results:

-- Total average assets of $327.29 billion in the third quarter of 2005 increased $6.45 billion, or 2 percent, from $320.85 billion in the second quarter of 2005 and increased $43.62 billion, or 15 percent, from $283.67 billion in the third quarter of 2004, reflecting continued strong asset generation;

-- The net interest margin declined to 2.61 percent in the third quarter from 2.66 percent in the second quarter of 2005 and 2.77 percent in the third quarter of 2004, reflecting the flattening of the yield curve and the impact of a 200 basis point increase in the Fed Funds rate over the past twelve months;

-- Net interest income of $1.92 billion in the third quarter of 2005 was down slightly from the second quarter of

Exhibit 6 of 30                                                                                                    Page 33

Washington Mutual Announces Third Quarter 2005 Earnings; Diluted EPS Increased 21 Percent; Board of Directors Increases Cash Dividend Business Wire October 19, 2005 Wednesday 8:14 PM GMT

Loan volume was $11.39 billion in the third quarter of 2005, a 3 percent increase from $11.04 billion in the second quarter of 2005 and a 60 percent increase from $7.10 billion in the third quarter of 2004. The increase in loan volume in the third quarter of 2005 was driven by record loan volume in Long Beach Mortgage Company and continued strong volumes in the multi-family lending business.

Average loans in the Commercial Group were $50.44 billion in the third quarter of 2005, up from $46.18 billion in the second quarter of 2005 and up $12.57 billion, or 33 percent, from the third quarter of 2004. Total average commercial deposits were $8.65 billion in the third quarter of 2005, up from both the prior quarter and last year's third quarter.

Washington Mutual Card Services

Washington Mutual Card Services is the company's newest business line -- the result of the acquisition of Providian Financial. As Providian was acquired on October 1, Providian's operating results are not included in Washington Mutual's third quarter financial statements, but will be reflected in Washington Mutual's fourth quarter results.

Company Updates

On September 20th, Washington Mutual announced the election of Thomas C. Leppert to its board of directors. Leppert, 51, is chairman of the board and chief executive officer of The Turner Corporation.

On October 18, Washington Mutual's board of directors approved a new company stock repurchase program. Under the new program, Washington Mutual may repurchase up to 100 million shares of common stock. There is no fixed termination date for the new program, and purchases may be made in the open market, through block trades, private transactions, or otherwise.

About Washington Mutual

With a history dating back to 1889, Washington Mutual is a retailer of financial services that provides a diversified line of products and services to consumers and commercial clients. At September 30, 2005, Washington Mutual and its subsidiaries had assets of $333.62 billion. Washington Mutual currently operates more than 2,500 retail banking, mortgage lending, commercial banking, and financial services offices throughout the nation. Washington Mutual's press releases are available at www.wamunewsroom.com.

Webcast information: A conference call to discuss the company's financial results will be held on Wednesday, October 19, 2005, at 5:00 p.m. EDT and will be hosted by Kerry Killinger, chairman and chief executive officer, Steve Rotella, president and chief operating officer, and Tom Casey, executive vice president and chief financial officer. The conference call is available by telephone or on the Internet. The dial-in number for the live conference call is 888-391-7808. Participants calling from outside the United States may dial 210-234-0006. The passcode "WaMu" is required to access the call. Via the Internet, the conference call is available on the Investor Relations portion of the company's web site at www.wamu.com/ir. A transcript of the prepared remarks will be on the company's web site for 30 days following the call. A recording of the conference call will be available after 7:00 p.m. EDT on Wednesday, October 19, 2005, through 2:59 a.m. EDT on Saturday, October 29, 2005. The recorded message will be available at 866-372-3813. Callers from outside the United States may dial 203-369-0252.

Forward Looking Statement

Our Form 10-K for 2004 and other documents that we filed with the Securities and Exchange Commission have forward-looking statements. In addition, our senior management may make forward-looking statements orally to analysts, investors, the media and others. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs such as "will," "would,"

Exhibit 6 of 30                                                                                                                          Page 34

Washington Mutual Announces Third Quarter 2005 Earnings; Diluted EPS Increased 21 Percent; Board of Directors
Increases Cash Dividend Business Wire October 19, 2005 Wednesday 8:14 PM GMT

"should," "could" or "may." Forward-looking statements provide our expectations or predictions of future conditions, events or results. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. We do not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements were made. There are a number of factors, many of which are beyond our control that could cause actual conditions, events or results to differ significantly from those described in the forward-looking statements. Some of these factors are:

-- Volatile interest rates impact the mortgage banking business and could adversely affect earnings;

-- Rising unemployment or a decrease in housing prices could adversely affect credit performance;

-- The potential for negative amortization in the option adjustable-rate mortgage product could have an adverse effect on the company's credit performance;

-- The company faces competition from banking and nonbanking companies;

-- Changes in the regulation of financial services companies and housing government-sponsored enterprises, and in particular, declines in the liquidity of the mortgage loan secondary market, could adversely affect business;

-- General business and economic conditions, including movements in interest rates, the slope of the yield curve and the potential overextension of housing prices in certain geographic markets, may significantly affect the company's business activities and earnings;

-- Negative public opinion could damage the company's reputation and adversely affect earnings; and,

-- Matters related to Washington Mutual Card Services, including, among others, risk related to integration of systems and the realization of expected growth opportunities.

WM-1

Washington Mutual, Inc.
Consolidated Statements of Income
(dollars in millions, except per share data)
(unaudited)

| | Quarter Ended | | | | |
|---|---|---|---|---|---|
| | Sept. 30, 2005 | June 30, 2005 | Mar. 31, 2005 | Dec. 31, 2004 | Sept. 30, 2004 |
| **Interest Income** | | | | | |
| Loans held for sale | $ 661 | $ 576 | $ 470 | $ 393 | $ 341 |
| Loans held in portfolio | 2,862 | 2,754 | 2,544 | 2,421 | 2,226 |
| Available-for-sale securities | 238 | 234 | 224 | 157 | 163 |

Exhibit 6 of 30                                                                 Page 35

# **Exhibit 7**

Exhibit 7 of 30                                                                                                    Page 36

Page 1 of 68

10-Q 1 a05-18521_110q.htm QUARTERLY REPORT PURSUANT TO SECTIONS 13 OR 15(D)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2005**

**Commission File Number 1-14667**

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91-1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1201 Third Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

**(206) 461-2000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ✕    No ○

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ✕    No ○

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2).  Yes ○    No ✕

The number of shares outstanding of the issuer's classes of common stock as of October 31, 2005:

**Common Stock – 986,709,911 [1][2]**

[1]  Includes 6,000,000 shares held in escrow.

[2]  Includes common shares issued in October, 2005 in conjunction with the Company's acquisition of Providian Financial Corporation.

http://www.sec.gov/Archives/edgar/data/933136/000110465905052815/a05-18521_110q....  11/25/2008

Exhibit 7 of 30                                                                                    Page 37

There have not been any changes in the Company's internal controls over financial reporting during the third quarter of 2005 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For additional discussion of the Company's internal controls over financial reporting, refer to the Company's 2004 Annual Report on Form 10-K, "Management's Report on Internal Control Over Financial Reporting."

**Critical Accounting Policies**

The preparation of financial statements, in accordance with accounting principles generally accepted in the United States of America, requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the Consolidated Financial Statements and accompanying Notes to the Consolidated Financial Statements. The Company believes that the judgments, estimates and assumptions used in the preparation of its Consolidated Financial Statements are appropriate given the facts and circumstances as of September 30, 2005.

Various elements of the Company's accounting policies, by their nature, are inherently subject to estimation techniques, valuation assumptions and other subjective assessments. In particular, the Company has identified two accounting policies that, due to the judgments, estimates and assumptions inherent in those policies, and the sensitivity of its Consolidated Financial Statements to those judgments, estimates and assumptions, are critical to an understanding of its Consolidated Financial Statements. These policies relate to the valuation of its MSR and the methodology that determines its allowance for loan and lease losses.

Management has discussed the development and selection of these critical accounting policies with the Company's Audit Committee. These policies and the judgments, estimates and assumptions are described in greater detail in the Company's 2004 Annual Report on Form 10-K in the "Critical Accounting Policies" section of Management's Discussion and Analysis and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

**Recently Issued Accounting Standards**

In December 2004, the Financial Accounting Standards Board ("FASB") issued a revised version of the original Statement of Financial Accounting Standards ("Statement") No. 123, *Accounting for Stock-Based Compensation*. Statement No. 123R, *Share-Based Payment*, supersedes Accounting Principles Board ("APB") Opinion No. 25, *Accounting for Stock Issued to Employees*. This Statement requires that the cost resulting from all share-based payment transactions be recognized in the financial statements. This Statement establishes fair value as the measurement objective in accounting for share-based payment arrangements and requires all entities to apply a fair value-based measurement method in accounting for share-based payment transactions with employees, except for equity instruments held by employee stock ownership plans. Effective January 1, 2003 and in accordance with the transitional guidance of Statement No. 148, *Accounting for Stock-Based Compensation – Transition and Disclosure*, the Company elected to prospectively apply the fair value method of accounting for stock-based awards granted subsequent to December 31, 2002. The Company will prospectively apply Statement No. 123R to its financial statements as of January 1, 2006. However, as the Company has already adopted Statement No. 148 and substantially all stock-based awards granted prior to its adoption will be fully vested by the end of this year, Statement No. 123R will not have a significant effect on the Consolidated Statements of Income or the Consolidated Statements of Financial Condition.

In March 2005, SEC Staff Accounting Bulletin No. 107 (''SAB 107'') was issued, which expresses views of the staff regarding the interaction between Statement No. 123R, *Share-Based Payment*, and certain SEC rules and regulations and provides the staff's views regarding the valuation of share-based payment

Exhibit 7 of 30                                                                                                    Page 38

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on November 4, 2005.

**WASHINGTON MUTUAL, INC.**

By:    <u>/s/ THOMAS W. CASEY</u>
           Thomas W. Casey
           *Executive Vice President and Chief Financial Officer*

65

Exhibit 7 of 30                                                                                                         Page 39

# **Exhibit 8**

Exhibit 8 of 30                                                                                                      Page 40

S-3ASR 1 wmis3wksiregistrationdec05v2.htm REGISTRATION STATEMENT
**As filed with the Securities and Exchange Commission on January 9, 2006**

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

————

## FORM S-3
**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

————

# WASHINGTON MUTUAL, INC.
(Exact name of Registrant as specified in its charter)

| **Washington** | **91-1653725** |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification Number) |

**1201 Third Avenue**
**Seattle, Washington 98101**
**(206) 461-2000**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

————

**Fay L. Chapman, Esq.**
**Washington Mutual, Inc.**
**1201 Third Avenue**
**Seattle, Washington 98101**
**(206) 461-8645**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copy to*:
**David R. Wilson, Esq.**
**Heller Ehrman LLP**
**701 Fifth Avenue, Suite 6100**
**Seattle, Washington 98104-7098**

————

**Approximate date of commencement of proposed sale to the public:** From time to time after the effective date of this registration statement as determined by market conditions.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 of the Securities Act of 1933, other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration number of the earlier effective registration statement for the same offering. ☐

If this Form is a registration statement pursuant to General Instruction I.D. or a post-effective amendment thereto that shall become effective upon filing with the Commission pursuant to Rule 462(e) under the Securities Act, check the following box. ☒

If this Form is a post-effective amendment to a registration statement filed pursuant to General Instructions I.D. filed to register additional securities or additional classes of securities pursuant to Rule 413(b) under the Securities Act, check the following box. ☐

————

## CALCULATION OF REGISTRATION FEE

| | | Proposed maximum | Proposed | Amount of |
|---|---|---|---|---|

Exhibit 8 of 30    Page 41

| Title of each class of securities to be registered[1] | Amount to be registered | offering price per unit | maximum aggregate offering price | registration fee |
|---|---|---|---|---|
| Debt Securities | | | | |
| Preferred Stock | (1) | (1) | (1) | (1) |
| Common Stock, no par value[2] | | | | |
| Depositary Shares | | | | |
| Total | | | | |

[1]  An indeterminate amount of securities to be offered at indeterminate prices is being registered pursuant to this registration statement. The Registrant is deferring payment of the registration fee pursuant to Rule 456(b) and is omitting this information in reliance on Rule 456(b) and Rule 457(r), except a registration fee of $113,260 was previously paid in connection with the Registration Statement on Form S-3 (No. 333-109921), which remains unutilized. Pursuant to Rule 457(p) under the Securities Act, the unutilized filing fee of $113,260 previously paid may be applied to the filing fee payable pursuant to this Registration Statement. Any additional registration fees will be paid subsequently on a pay-as-you-go basis.

[2]  Includes such indeterminate number of shares of common stock as may from time to time be issued upon conversion or exchange of debt securities, preferred stock or depositary shares registered hereunder, to the extent any of such securities are, by their terms, convertible into common stock. Also includes associated

Exhibit 8 of 30                                                                                                                              Page 42

"rights" to purchase shares of the Registrant's common stock which are not currently separable from the shares of Registrant's common stock and are not currently exercisable.

Exhibit 8 of 30

Page 43

PROSPECTUS



**Debt Securities**
**Preferred Stock**
**Depositary Shares**
———————————

This prospectus is part of a registration statement that we filed with the Securities and Exchange Commission using a "shelf" registration process. This means:

- we may sell any of the following securities from time to time:

  - debt securities

  - preferred stock

  - depositary shares

- we will provide a prospectus supplement each time we issue the securities; and

- the prospectus supplement will provide specific information about the terms of that issuance and also may add, update or change information contained in this prospectus.

We may also issue common stock upon conversion or exchange of any of the securities listed above. We will provide the specific terms of these securities in supplements to this prospectus. You should read this prospectus and the applicable prospectus supplement carefully before you invest.

The securities may be sold directly to investors, through agents designated from time to time or to or through underwriters or dealers. See "Plan of Distribution." If any underwriters are involved in the sale of any securities in respect of which this prospectus is being delivered, the names of such underwriters and any applicable commissions or discounts will be set forth in the applicable prospectus supplement. The net proceeds we expect to receive from such sale also will be set forth in the applicable prospectus supplement.

This prospectus may not be used to offer or sell any securities unless accompanied by a prospectus supplement.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**
———————————

The date of this prospectus is January 9, 2006.

Exhibit 8 of 30                                                                                           Page 44

## TABLE OF CONTENTS

|                                                          | Page |
|----------------------------------------------------------|------|
| About this Prospectus                                    | 3    |
| Where You Can Find Additional Information                 | 3    |
| Incorporation of Certain Documents by Reference          | 3    |
| Special Note Regarding Forward-Looking Statements        | 3    |
| The Company                                              | 3    |
| Use of Proceeds                                          | 3    |
| Ratio of Earnings to Fixed Charges                       | 3    |
| Description of Debt Securities                           | 3    |
| Description of Capital Stock                             | 3    |
| Description of Depositary Shares                         | 3    |
| Plan of Distribution                                     | 3    |
| Legal Matters                                            | 3    |
| Experts                                                  | 3    |

2

Exhibit 8 of 30

## ABOUT THIS PROSPECTUS

This prospectus is part of a "shelf" registration statement that we have filed with the Securities Exchange Commission (the "SEC"). By using a shelf registration statement, we may sell, at any time and from time to time, in one or more offerings, any combination of the securities described in this prospectus. The exhibits to our registration statement contain the full text of certain contracts and other important documents we have summarized in this prospectus. Since these summaries may not contain all the information that you may find important in deciding whether to purchase the securities we offer, you should review the full text of these documents. The registration statement and the exhibits can be obtained from the SEC as indicated under the heading "Where You Can Find Additional Information."

This prospectus only provides you with a general description of the securities we may offer. Each time we sell securities, we will provide a prospectus supplement that contains specific information about the terms of those securities. The prospectus supplement may also add, update or change information contained in this prospectus. You should read both this prospectus and any prospectus supplement together with the additional information described below under the heading "Where You Can Find Additional Information."

**We are not making an offer of these securities in any jurisdiction where the offer is not permitted. You should not assume that the information in this prospectus or a prospectus supplement is accurate as of any date other than the date on the front of the document.**

References in this prospectus to Washington Mutual, the Company, we, us and our are to Washington Mutual, Inc. (together with its subsidiaries) unless the context otherwise provides.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We file annual, quarterly and current reports and other information with the SEC. You may read and copy these reports and other information at the public reference room of the SEC at 100 F Street, N.E., Washington , D.C. 20549. You may also obtain copies of these documents by mail from the SEC reference room at prescribed rates. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. These reports and other information are also filed by us electronically with the SEC and are available at the SEC's website, www.sec.gov.

The indentures pursuant to which the debt securities will be issued require us to file reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Quarterly and annual reports will be made available upon request of holders of the debt securities, which annual reports will contain financial information that has been examined and reported upon by, with an opinion expressed by, an independent public or certified public accountant.

3

Exhibit 8 of 30                                                                                                 Page 46

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" the information we file with it, which means that we can disclose important information to you by referring you to another document that we filed with the SEC. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, until we sell all of the securities:

- Our Annual Report to Shareholders on Form 10-K for the fiscal year ended December 31, 2004;

- Our Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30, and September 30, 2005;

- Current Reports on Form 8-K and 8-K/A dated January 6, January 14, January 20, January 24, February 18, February 22, March 2, March 22, March 23, April 19, June 7, June 9, June 24, July 6, July 20, July 25, September 8, September 23, September 26, October 4 and October 27, 2005 and Items 1.01 and 9.01 and Exhibit 10.1 from the Current Reports on Form 8-K dated November 2 and December 23, 2005;

- The description of our capital stock contained in Item 5 of Current Report on Form 8-K dated November 29, 1994, and any amendment or report filed for the purpose of updating this description; and

- Form 8-A/12B dated February 8, 2001, as amended.

You may obtain a copy of these filings at no cost, by writing or telephoning us at 1201 Third Avenue, Seattle, Washington 98101, telephone (206) 461-3187, attention Investor Relations Department WMT0735.

You should rely only on the information contained or incorporated by reference in this prospectus, any supplemental prospectus or any pricing supplement. We have not authorized anyone to provide you with any other information. We are not making an offer of these securities in any state where the offer is not permitted. You should not assume that the information in this prospectus, any accompanying prospectus supplement or any document incorporated by reference is accurate as of any date other than the date on the front of the document.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus and the documents incorporated by reference contain certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to financial condition, results of operations, and other matters. Statements in this prospectus, including those incorporated by reference, that are not historical facts are "forward-looking statements" for the purpose of the safe harbor provided by Section 21E of the Exchange Act and Section 27A of the Securities Act of 1933, as amended (the "Securities Act"). Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words, such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs, such as "will," "should," "could," or "may."

Forward-looking statements provide our expectations or predictions of future conditions, events or results. They are not guarantees of future performance. By their nature forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. We do not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements were made. There are a number of factors, many of which are beyond our control, that could cause actual conditions, events or results to differ significantly from those described in the forward-looking statements. The factors are generally described in our most recent Form 10-K and Form 10-Q under the caption "Risk Factors."

4

Exhibit 8 of 30                                                                                                     Page 47

## THE COMPANY

With a history dating back to 1889, Washington Mutual is a financial services company committed to serving consumers and small- to medium-sized businesses. Based on our consolidated total assets at September 30, 2005, we were the largest thrift holding company in the United States and 7th largest among all U.S.-based bank and thrift holding companies.

Washington Mutual operates principally in California, Washington, Oregon, Illinois, Florida, Texas and the greater New York/New Jersey metropolitan area, and has operations in 31 other states. We manage and report information concerning the Company's activities, operations, products and services around four segments: the Retail Banking and Financial Services Group, the Home Loans Group (previously called the "Mortgage Banking Group"), the Commercial Group and, as of the quarter beginning October 1, 2005, Washington Mutual Card Services.

5

Exhibit 8 of 30                                                                                                    Page 48

## USE OF PROCEEDS

Unless otherwise specified in the applicable prospectus supplement, we will use the net proceeds from the sale of the securities for general corporate purposes. Examples of general corporate purposes include additions to working capital, repayment of existing debt, acquisitions, and office expansions.

## RATIO OF EARNINGS TO FIXED CHARGES

The following table sets forth our ratio of earnings to fixed charges for each of the periods indicated.

| | Year Ended December 31, | | | | | Nine Months Ended September 30, |
|---|---|---|---|---|---|---|
| **2000** | **2001** | **2002** | **2003** | **2004** | | **2005** |
| 1.30 | 1.60 | 2.03 | 2.29 | 1.90 | | 1.76 |

For purposes of this ratio, earnings consist of income before income taxes plus fixed charges. Fixed charges consist of interest expense on borrowings and deposits, and the estimated interest portion of rent expense.

6

Exhibit 8 of 30                                                                 Page 49

## DESCRIPTION OF DEBT SECURITIES

The following description of the debt securities sets forth the material terms and provisions of the debt securities to which any prospectus supplement may relate. The particular terms of the debt securities offered by any prospectus supplement (the "Offered Debt Securities") and the extent, if any, to which such general provisions may apply to the Offered Debt Securities, will be described in the prospectus supplement relating to such Offered Debt Securities. Accordingly, for a description of the terms of a particular issue of debt securities, reference must be made to both the prospectus supplement relating thereto and to the following description.

The debt securities will be our general obligations. In the event that any series of debt securities will be subordinated to other securities that we have outstanding or may incur, the terms of the subordination will be set forth in the prospectus supplement relating to the subordinated debt securities. Senior debt securities will be issued under the senior indenture dated as of August 10, 1999 between Washington Mutual, Inc. and The Bank of New York, as trustee, as supplemented by a first supplemental indenture dated as of August 1, 2002 and a second supplemental indenture dated as of November 20, 2002. References to the senior indenture in this prospectus will mean the senior indenture as supplemented. Subordinated debt securities will be issued under the subordinated indenture dated April 4, 2000 between us and The Bank of New York, as supplemented by the first supplemental indenture dated August 1, 2002, and a second supplemental indenture dated March 16, 2004. References to the subordinated indenture in this prospectus will mean the subordinated indenture as supplemented. Together the senior indenture and the subordinated indenture and the supplemental indentures thereto are called the "indentures."

We have summarized selected provisions of the indentures below. The senior indenture and form of subordinated indenture have been filed as exhibits to the registration statement filed with the SEC and you should read the indentures for provisions that may be important to you. Accordingly, the following summary is qualified in its entirety by reference to the provisions of the indentures. Unless otherwise specified, capitalized terms used in this summary have the meanings specified in the indentures.

### General

The indentures do not limit the aggregate principal amount of debt securities which may be issued under the indentures and provide that debt securities may be issued from time to time in one or more series. The indentures do not limit the amount of other indebtedness or debt securities, other than certain secured indebtedness as described below, which may be issued by us or our subsidiaries.

Unless otherwise provided in a prospectus supplement, the debt securities will be our unsecured obligations. The senior debt securities will rank equally with all other unsecured and unsubordinated indebtedness of ours. The subordinated debt securities will be subordinated in right of payment to the prior payment in full of all Senior Indebtedness including our senior debt securities as described below under "Subordination of Subordinated Debt Securities" and in the applicable prospectus supplement.

The debt securities are our obligations exclusively. Because our operations are currently conducted substantially through our subsidiaries, our cash flow and the consequent ability to service our debt, including the debt securities, are dependent upon the earnings of our subsidiaries and the distribution of those earnings to us, or upon loans or other payments of funds to us by our subsidiaries. Our subsidiaries are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due with respect to the debt securities or to make funds available therefor, whether by dividends, loans or other payments. In addition, the payment to us of dividends and certain loans and advances by our subsidiaries may be subject to certain statutory or contractual restrictions. Payments are contingent upon the earnings of the subsidiaries, and are subject to various business considerations.

The debt securities will be effectively subordinated to all liabilities, including deposits, of our subsidiaries. At September 30, 2005, our subsidiaries had $190.41 billion of deposits and $103.80 billion of debt outstanding. Any right we may have to receive assets of a subsidiary upon its liquidation or reorganization (and the consequent right of the holders of the debt securities to participate in those assets) will be effectively subordinated to the claims of that subsidiary's creditors, except to the extent that we are recognized as a creditor of a subsidiary, in which case our

7

Exhibit 8 of 30                                                                 Page 50

claims would still be subordinate to any security interests in the assets of the subsidiary and any liabilities of the subsidiary senior to liabilities held by us.

The debt securities may be issued in fully registered form without coupons ("registered securities") or in the form of one or more global securities (each a "Global Security"). Registered securities that are book-entry securities will be issued as registered Global Securities. Unless otherwise provided in the prospectus supplement, the debt securities will be only registered securities. The debt securities will be issued, unless otherwise provided in the prospectus supplement, in denominations of $1,000 or an integral multiple thereof for registered securities.

The prospectus supplement relating to the particular debt securities offered thereby will describe the following terms of the Offered Debt Securities:

(1)     the title of the Offered Debt Securities;

(2)     whether the Offered Debt Securities are senior debt securities or subordinated debt securities;

(3)     the percentage of principal amount at which the Offered Debt Securities will be issued;

(4)     any limit on the aggregate principal amount of the Offered Debt Securities;

(5)     the date or dates on which the Offered Debt Securities will mature and the amount or amounts of any installment of principal payable on such dates;

(6)     the rate or rates (which may be fixed or variable) per year at which the Offered Debt Securities will bear interest, if any, or the method of determining such rate or rates and the date or dates from which such interest, if any, will accrue;

(7)     the date or dates on which interest, if any, on the Offered Debt Securities will be payable and the regular record dates for such payment dates;

(8)     the terms of any sinking fund and the obligation, if any, of ours to redeem or purchase the Offered Debt Securities pursuant to any sinking fund or analogous provisions;

(9)     the portion of the principal amount of Offered Debt Securities that is payable upon declaration of acceleration of the maturity of the Offered Debt Securities;

(10)    whether the Offered Debt Securities will be issued in registered form without coupons, including temporary and definitive global form, and the circumstances, if any, upon which such Offered Debt Securities may be exchanged for Offered Debt Securities issued in a different form;

(11)    whether the Offered Debt Securities are to be issued in whole or in part in the form of one or more Global Securities and, if so, the identity of the depositary for such Global Security or Securities;

(12)    whether and under what circumstances we will pay additional amounts to any holder of Offered Debt Securities who is not a United States person in respect of any tax, assessment or other governmental charge required to be withheld or deducted and, if so, whether we will have the option to redeem rather than pay any additional amounts;

(13)    the place or places, if any, in addition to or instead of the corporate trust office of the trustee, where the principal, premium and interest with respect to the Offered Debt Securities shall be payable;

(14)    the terms, if any, upon which the debt securities of the series may be convertible into or exchanged for our common stock, preferred stock, other debt securities or other securities of any kind and the terms and conditions upon which such conversion or exchange shall be effected, including the initial conversion or exchange price or rate, the conversion or exchange period and any other additional provisions;

8

Exhibit 8 of 30                                                                                                          Page 51

(15) if the amount of principal, premium or interest with respect to the debt securities of the series may be determined with reference to an index or pursuant to a formula, the manner in which such amounts will be determined;

(16) any authenticating or paying agent, transfer agent or registrar;

(17) the applicability of, and any addition to or change in, the covenants and definitions then set forth in the indenture or in the terms then set forth in the indenture relating to permitted consolidations, mergers, or sales of assets; and

(18) certain other terms, including our ability to satisfy and discharge our obligations under an indenture with respect to the Offered Debt Securities.

No service charge will be made for any transfer or exchange of the debt securities except for any tax or other governmental charge.

Debt securities of a single series may be issued at various times with different maturity dates and different principal repayment provisions, may bear interest at different rates, may be issued at or above par or with an original issue discount, and may otherwise vary, all as provided in the indentures. The prospectus supplement for any debt securities issued above par or with an original issue discount will state any applicable material federal income tax consequences and other special considerations.

**Subordination of Subordinated Debt Securities**

Payment of the principal of (and premium, if any) and interest, if any, on the subordinated debt securities will be subordinate and junior in right of payment to the prior payment in full of all Senior Debt (as defined herein). At September 30, 2005, we had an aggregate par value of $7.60 billion in Senior Debt and a par value of $3.83 billion in debt securities subordinate to Senior Debt (exclusive of our subsidiaries). The subordinated indenture does not limit or restrict our ability to incur additional Senior Debt, but certain of our other debt instruments contain such limitations.

In the event of any sale pursuant to any judgment or decree in any proceeding by or on behalf of any holder, or of any distribution, division or application of all or any part of our assets to our creditors by reason of any liquidation, dissolution or winding up of us or any receivership, insolvency, bankruptcy or similar proceeding relative to us or our debts or properties, then the holders of Senior Debt shall be preferred in the payment of their claims over the holders of the subordinated debt securities, and such Senior Debt shall be satisfied in full before any payment or other distribution (other than securities which are subordinate and junior in right of payment to the payment of all Senior Debt then outstanding) shall be made upon the subordinated debt securities. In the event that any subordinated debt security is declared or becomes due and payable before its maturity because of an occurrence of an event of default (under circumstances not described in the preceding sentence), no amount shall be paid in respect of the subordinated debt securities in excess of current interest payments, except sinking fund payments or at maturity, unless all Senior Debt then outstanding shall have been paid in full or payments satisfactory to the holders thereof provided therefor. During the continuance of any default on Senior Debt, no payments of principal, sinking fund, interest or premium shall be made with respect to any Subordinated Debt Security if either (i) notice of default has been given to us, provided judicial proceedings are commenced in respect thereof within 120 days, or (ii) judicial proceedings shall be pending in respect of such default. In the event that any subordinated debt security is declared or becomes due and payable before maturity, each holder of Senior Debt shall be entitled to notice of same and shall be entitled to declare payable on demand any Senior Debt outstanding to such holder.

"Debt" is defined in the indentures to include all indebtedness of ours or any Consolidated Subsidiary representing money borrowed, except indebtedness owed to us by any Consolidated Subsidiary or owed to any Consolidated Subsidiary by us or any other Consolidated Subsidiary, and includes indebtedness of any other person for money borrowed when such indebtedness is guaranteed by us or any Consolidated Subsidiary. The term "Debt" shall be deemed to include the liability of ours or any Consolidated Subsidiary in respect of any investment or similar

9

Exhibit 8 of 30                                                                                    Page 52

certificate, except to the extent such certificates are pledged by purchasers as collateral for, and are offset by, receivables. "Senior Debt" is defined to mean all Debt of the Company except Subordinated Debt. "Subordinated Debt" is defined to mean Debt of ours which is subordinate and junior in right of payment to any other Debt of ours by the terms of the instrument creating or evidencing such Subordinate Debt and senior to the Junior Subordinated Notes. "Junior Subordinated Notes" is defined to mean our 8.36% Subordinated Notes due 2026, 8.375% Junior Subordinated Debentures due 2027, 8.206% Subordinated Deferrable Interest Debentures due 2027, and 5.375% Subordinated Defeasible Interest Debentures due 2041.

Subordinated debt securities will rank on a parity with all other Subordinated Debt other than the Junior Subordinated Notes. Subordinated debt securities are senior to the Junior Subordinated Note and to our common stock and preferred stock, and will be senior to any other class of capital stock which may be authorized.

## Exchange, Registration and Transfer

Registered securities (other than book-entry securities) of any series of Offered Debt Securities will be exchangeable for other registered securities of the same series and of a like aggregate principal amount and tenor of different authorized denominations.

Debt securities may be presented for exchange as provided above, and registered securities (other than book-entry securities) may be presented for registration of transfer (with the form of transfer endorsed thereon duly executed), at the office of the Security Registrar or at the office of any transfer agent designated by us for such purpose with respect to any series of debt securities and referred to in the prospectus supplement. No service charge will be charged for the transfer, but any tax or other governmental charge must be paid. Such transfer or exchange will be effected upon the Security Registrar or such transfer agent, as the case may be, being satisfied with the documents of title and identity of the person making the request. If a prospectus supplement refers to any transfer agents (in addition to the Security Registrar) initially designated by us with respect to any series of debt securities, we may at any time rescind the designation of any such transfer agent or approve a change in the location through which any such transfer agent acts, except that, if debt securities of a series are issuable solely as registered securities, we will be required to maintain a transfer agent in each Place of Payment for such series. We may at any time designate additional transfer agents with respect to any series of debt securities.

In the event of any redemption in part, we will not be required to:

- issue, register the transfer of or exchange debt securities of any series during a period beginning at the opening of business 15 days before any selection of debt securities of that series to be redeemed and ending at the close of business on if debt securities of the series are issuable only as registered securities, the day of mailing of the relevant notice of redemption; or

- register the transfer of or exchange any registered security, or portion thereof, called for redemption, except the unredeemed portion of any registered security being redeemed in part.

For a discussion of restrictions on the exchange, registration and transfer of Global Securities, see "Global Securities".

## Payment and Paying Agents

Unless otherwise provided in the prospectus supplement, payment of principal of (and premium, if any) and interest, if any, on registered securities will be made in U.S. dollars at the office of such Paying Agent or Paying Agents as we may designate from time to time, except that at our option payment of any interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register. Unless otherwise provided in a prospectus supplement, payment of any installment of interest on registered securities will be made to the Person in whose name such registered security is registered at the close of business on the Regular Record Date for such interest.

10

Exhibit 8 of 30                                                                                     Page 53

Unless otherwise provided in a prospectus supplement, the Corporate Trust Office of the trustee will be designated as our sole Paying Agent for payments with respect to Offered Debt Securities that are issuable solely as registered securities. Any Paying Agents outside the United States and any other Paying Agents in the United States initially designated by us for the Offered Debt Securities will be named in a prospectus supplement. We may at any time designate additional Paying Agents or rescind the designation of any Paying Agent or approve a change in the office through which any Paying Agent acts, except that, if debt securities of a series are issuable solely as registered securities, we will be required to maintain a Paying Agent in each Place of Payment for such series.

All moneys paid by us to a Paying Agent for the payment of principal of (and premium, if any) or interest, if any, on any debt security or coupon that remain unclaimed at the end of two years after such principal, premium or interest shall have become due and payable will be repaid to us and the holder of such debt security or coupon will thereafter look only to us for payment thereof.

## Global Securities

The debt securities of a series may be issued in whole or in part as one or more Global Securities that will be deposited with, or on behalf of, a depositary located in the United States (a "U.S. Depositary") or a common depositary located outside the United States (a "Common Depositary") identified in the prospectus supplement relating to such series. Global Securities will be issued in registered form, in either temporary or definitive form.

The specific terms of the depositary arrangement with respect to any debt securities of a series will be described in the Prospectus Supplement relating to such series. We anticipate that the following provisions will apply to all depositary arrangements with a U.S. Depositary or Common Depositary.

## Book-Entry Securities

Unless otherwise specified in a prospectus supplement, debt securities which are to be represented by a Global Security to be deposited with or on behalf of a U.S. Depositary will be represented by a Global Security registered in the name of such depositary or its nominee. Upon the issuance of a Global Security in registered form, the U.S. Depositary for such Global Security will credit, on its book-entry registration and transfer system, the respective principal amounts of the debt securities represented by such Global Security to the accounts of institutions that have accounts with such depositary or its nominee ("participants"). The accounts to be credited shall be designated by the underwriters or agents of such debt securities or by us, if such debt securities are offered and sold directly by us. Ownership of beneficial interests in such Global Securities will be limited to participants or persons that may hold interests through participants. Ownership of beneficial interests in such Global Securities will be shown on, and the transfer of that ownership will be effected only through, records maintained by the U.S. Depositary or its nominee for such Global Security or by participants or persons that hold through participants. The laws of some jurisdictions require that certain purchasers of securities take physical delivery of such securities in definitive form. Such limits and such laws may impair the ability to transfer beneficial interests in a Global Security.

So long as the U.S. Depositary for a Global Security in registered form, or its nominee, is the registered owner of such Global Security, such depositary or such nominee, as the case may be, will be considered the sole owner or holder of the debt securities represented by such Global Security for all purposes under the indenture governing such debt securities. Except as set forth below, owners of beneficial interests in such Global Securities will not be entitled to have debt securities of the series represented by such Global Security registered in their names, will not receive or be entitled to receive physical delivery of debt securities of such series in definitive form and will not be considered the owners or holders thereof under the indenture.

Payment of principal of (and premium, if any) and interest, if any, on debt securities registered in the name of or held by a U.S. Depositary or its nominee will be made to the U.S. Depositary or its nominee, as the case may be, as the registered owner or the holder of the Global Security representing such debt securities. We nor any trustee or Paying Agent, or the Security Registrar for such debt securities will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security for such debt securities or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

11

Exhibit 8 of 30                                                                                     Page 54

We expect that the U.S. Depositary for debt securities of a series, upon receipt of any payment of principal of (and premium, if any) or interest on permanent Global Securities, will credit participants' accounts on the date such payment is payable in accordance with their respective beneficial interests in the principal amount of such Global Securities as shown on the records of such Depositary. We also expect that payments by participants to owners of beneficial interests in such Global Security held through such participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in "street name", and will be the responsibility of such participants.

Unless and until it is exchanged in whole for debt securities in definitive form, a Global Security may not be transferred except as a whole by the U.S. Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor of such Depositary or a nominee of such successor. If a U.S. Depositary for debt securities in registered form is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within ninety days, we will issue debt securities in definitive registered form in exchange for the Global Security or Securities representing such debt securities. In addition, we may at any time and in our sole discretion determine not to have any debt securities in registered form represented by one or more Global Securities and, in such event, will issue debt securities in definitive registered form in exchange for the Global Security or Securities representing such debt securities. In any such instance, an owner of a beneficial interest in a Global Security will be entitled to physical delivery in definitive form of debt securities of the series represented by such Global Security equal in principal amount to such beneficial interest and to have such debt securities registered in the name of the owner of such beneficial interest.

### Absence of Restrictive Covenants

We are not restricted by either of the indentures from paying dividends or from incurring, assuming or becoming liable for any type of debt or other obligations or from creating liens on our property for any purpose. The indentures do not require the maintenance of any financial ratios or specified levels of net worth or liquidity. The indentures do not contain provisions which afford holders of the debt securities protection in the event of a highly leveraged transaction involving us.

### Merger and Consolidation

Each indenture provides that we, without the consent of the holders of any of the outstanding debt securities, may consolidate with or merge into any other corporation or transfer or lease our properties and assets substantially as an entirety to any Person or may permit any corporation to merge into us, provided that:

- the successor is a corporation organized under the laws of any domestic jurisdiction;

- the successor, if other than us, assumes our obligations under such indenture and the debt securities issued thereunder;

- immediately after giving effect to such transaction, no Event of Default and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing; and

- certain other conditions are met.

Each indenture provides that, upon any consolidation or merger or transfer or lease of our properties and assets of substantially as an entirety in accordance with the preceding paragraph, the successor corporation formed by such consolidation or into which we are merged or to which such transfer or lease is made shall be substituted for us with the same effect as if such successor corporation had been named as us. Thereafter, we shall be relieved of the performance and observance of all obligations and covenants of such indenture and the senior debt securities or subordinated debt securities, as the case may be, including but not limited to the obligation to make payment of the

12

Exhibit 8 of 30                                                                                                    Page 55

principal of (and premium, if any) and interest, if any, on all the debt securities then outstanding, and we may thereupon or any time thereafter be liquidated and dissolved.

**Satisfaction and Discharge**

Unless a prospectus supplement provides otherwise, we will be discharged from our obligations under the outstanding debt securities of a series upon satisfaction of the following conditions:

- we have irrevocably deposited with the trustee either money, or U.S. Government Obligations together with the predetermined and certain income to accrue thereon without consideration of any reinvestment thereof, or a combination of which (in the written opinion of independent public accountants delivered to the trustee), will be sufficient to pay and discharge the entire principal of (and premium, if any), and interest, if any, to Stated Maturity or any redemption date on, the outstanding debt securities of such series;

- we have paid or caused to be paid all other sums payable with respect to the outstanding debt securities of such series;

- the trustee has received an Officers' Certificate and an Opinion of Counsel each stating that all conditions precedent have been complied with; or

- the trustee has received (a) a ruling directed to us and the trustee from the United States Internal Revenue Service to the effect that the holders of the debt securities of such series will not recognize income, gain or loss for federal income tax purposes as a result of our exercise of our option to discharge our obligations under the indenture with respect to such series and will be subject to federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and discharge had not occurred or (b) an opinion of tax counsel to the same effect as the ruling described in clause (a) above and based upon a change in law.

Upon such discharge, we will be deemed to have satisfied all the obligations under the indenture, except for obligations with respect to registration of transfer and exchange of the debt securities of such series, and the rights of the holders to receive from deposited funds payment of the principal of (and premium, if any) and interest, if any, on the debt securities of such series.

**Modification of the Indenture**

Each indenture provides that we and the trustee thereunder may, without the consent of any holders of debt securities, enter into supplemental indentures for the purposes, among other things, of adding to our covenants, adding any additional Events of Default, establishing the form or terms of debt securities or curing ambiguities or inconsistencies in such indenture or making other provisions; provided such action shall not adversely affect the interests of the holders of any series of debt securities in any material respect.

Each indenture contains provisions permitting us, with the consent of the holders of not less than a majority in principal amount of the outstanding debt securities of all affected series (acting as one class), to execute supplemental indentures adding any provisions to or changing or eliminating any of the provisions of such indenture or modifying the rights of the holders of the debt securities of such series, except that no such supplemental indenture may, without the consent of the holders of all the outstanding debt securities affected thereby, among other things:

(1)     change the maturity of the principal of, or any installment of principal of or interest on, any of the debt securities;

(2)     reduce the principal amount thereof (or any premium thereon) or the rate of interest, if any, thereon;

13

Exhibit 8 of 30                                                                                                    Page 56

(3)     reduce the amount of the principal of Original Issue Discount Securities payable on any acceleration of maturity;

(4)     change our obligation to maintain an office or agency in the places and for the purposes required by such indenture;

(5)     impair the right to institute suit for the enforcement of any such payment on or after the applicable maturity date;

(6)     reduce the percentage in principal amount of the outstanding debt securities of any series, the consent of the holders of which is required for any such supplemental indenture or for any waiver of compliance with certain provisions of, or of certain defaults under, such indenture; or

(7)     with certain exceptions, to modify the provisions for the waiver of certain defaults and any of the foregoing provisions.

## Events of Default

An Event of Default in respect of any series of debt securities (unless it is either inapplicable to a particular series or has been modified or deleted with respect to any particular series) is defined in each indenture to be:

- failure to pay interest on such series of debt securities for 30 days after payment is due;

- failure to pay the principal of (or premium, if any) on such series of debt securities when due;

- failure to perform any other covenant in the indenture that applies to such series of debt securities for 90 days after we have received written notice of the failure to perform in the manner specified in the indenture;

- an event of default under any mortgage, indenture (including the indenture) or other instrument under which any debt of Washington Mutual, Inc. or any Principal Subsidiary Bank (defined below) shall be outstanding which default shall have resulted in the acceleration of such debt in excess of $75,000,000 in aggregate principal amount and such acceleration shall not have been rescinded or such debt discharged within a period of 30 days after notice;

- certain events of bankruptcy, insolvency or reorganization; and

- any other event of default provided for in such series of debt securities.

"Principal Subsidiary Bank" is defined in the indenture as each of Washington Mutual Bank (formerly known as Washington Mutual Bank, FA) and any other subsidiary bank the consolidated assets of which constitute 20% or more of the consolidated assets of Washington Mutual, Inc. and its subsidiaries. As of the date hereof, Washington Mutual Bank is our only Principal Subsidiary Bank.

If an Event of Default shall have happened and be continuing, either the trustee thereunder or the holders of not less than 25% in principal amount of the outstanding debt securities of such series may declare the principal of all of the outstanding notes to be immediately due and payable.

Each indenture provides that the holders of not less than a majority in principal amount of the outstanding debt securities of any series may direct the time, method and place of conducting any proceeding for any remedy available to the trustee thereunder, or exercising any trust or power conferred on such trustee, with respect to the debt securities of such series; provided that:

- such direction shall not be in conflict with any rule of law or with the indenture,

14

Exhibit 8 of 30                                                                                                                    Page 57

- the trustee may take any other action deemed proper that is not inconsistent with such direction and

- the trustee shall not determine that the action so directed would be unjustly prejudicial to the holders of debt securities of such series not taking part in such direction.

Each indenture provides that the holders of not less than a majority in principal amount of the outstanding debt securities of any series may on behalf of the holders of all of the outstanding debt securities of such series waive any past default under such indenture with respect to such series and its consequences, except a default (1) in the payment of the principal of (or premium, if any) or interest, if any, on any of the debt securities of such series or (2) in respect of a covenant or provision of such indenture which, under the terms of such indenture, cannot be modified or amended without the consent of the holders of all of the outstanding debt securities of such series affected thereby.

Each indenture contains provisions entitling the trustee thereunder, subject to the duty of the trustee during an Event of Default in respect of any series of debt securities to act with the required standard of care, to be indemnified by the holders of the debt securities of such series before proceeding to exercise any right or power under such indenture at the request of the holders of the debt securities of such series.

Each indenture provides that the trustee will, within 90 days after the occurrence of a default in respect of any series of debt securities, give to the holders of the debt securities of such series notice of all uncured and unwaived defaults known to it; provided, however, that, except in the case of a default in the payment of the principal of (or premium, if any) or any interest on, or any sinking fund installment with respect to, any of the debt securities of such series, the trustee will be protected in withholding such notice if it in good faith determines that the withholding of such notice is in the interests of the holders of the debt securities of such series; and provided, further, that such notice shall not be given until at least 30 days after the occurrence of an Event of Default regarding the performance of any covenant of ours under such indenture other than for the payment of the principal of (or premium, if any) or any interest on, or any sinking fund installment with respect to, any of the debt securities of such series. The term default for the purpose of this provision only means any event that is, or after notice or lapse of time, or both, would become, an Event of Default with respect to the debt securities of such series.

We will be required to furnish annually to the trustee a certificate as to compliance with all conditions and covenants under the indenture.

**Notices**

Notices to holders of registered securities will be given by mail to the addresses of such holders as they appear in the Security Register.

**Title**

We, the appropriate Trustee and any agent of ours or such Trustee may treat the registered owner of any registered security (including registered securities in global registered form) as the absolute owner thereof (whether or not such Debt Security or coupon shall be overdue and notwithstanding any notice to the contrary) for the purpose of making payment and for all other purposes.

**Governing Law**

New York law will govern the indentures and the debt securities.

15

Exhibit 8 of 30                                                                                              Page 58

## DESCRIPTION OF CAPITAL STOCK

The following descriptions are summaries of the material terms of our Amended and Restated Articles of Incorporation ("articles of incorporation"), our bylaws and applicable provisions of law. Reference is made to the more detailed provisions of, and such descriptions are qualified in their entirety by reference to, our articles of incorporation and bylaws, which are incorporated by reference in the registration statement that we filed with the SEC. You should read our articles of incorporation and bylaws for the provisions that are important to you.

Our articles of incorporation currently authorize 1,600,000,000 shares of common stock, no par value, and 10,000,000 shares of preferred stock, no par value. On November 30, 2005, we had 992,057,807 shares of common stock outstanding. There were no shares of preferred stock outstanding.

**Common Stock**

We do not intend to offer shares of our common stock pursuant to this prospectus except upon the conversion or exchange of debt securities or preferred stock that we offer under this prospectus.

Each share of common stock is entitled to one vote on all matters properly presented at a meeting of shareholders. Shareholders are not entitled to cumulative voting in the election of directors.

The number of our directors is determined by our bylaws. The bylaws currently set the number of directors at up to sixteen. Our board of directors is divided into three classes of as equal a number of directors as possible. The term of office of each class is three years, with each term expiring in a different year.

*Interested Stockholders.* Our articles of incorporation prohibit, except under certain circumstances, us (or any of our subsidiaries) from engaging in certain significant business transactions with a "major stockholder." A "major stockholder" is a person who, without the prior approval of our board of directors, acquires beneficial ownership of five percent or more of our outstanding voting stock. Prohibited transactions include, among others:

- any merger with, disposition of assets to, acquisition by us of the assets of, issuance of securities of ours to, or acquisition by us of securities of, a major stockholder;

- any reclassification of our voting stock or of any subsidiary beneficially owned by a major stockholder; or

- any partial or complete liquidation, spin off, split off or split up of us or any subsidiary.

The above prohibitions do not apply, in general, if the specific transaction is approved by:

- our board of directors prior to the major stockholder involved having become a major stockholder;

- a vote of at least 80% of the "continuing directors" (defined as those members of our board prior to the involvement of the major stockholder);

- a majority of the "continuing directors" if the major stockholder obtained unanimous board approval to become a major stockholder;

- a vote of 95% of the outstanding shares of our voting stock other than shares held by the major stockholder; or

- a majority vote of the shares of voting stock and the shares of voting stock owned by stockholders other than any major stockholder if certain other conditions are met.

16

Exhibit 8 of 30                                                                                                          Page 59

Our articles of incorporation also provide that during the time a major stockholder exists, we may voluntarily dissolve only upon the unanimous consent of our stockholders or an affirmative vote of at least two-thirds of our board of directors and the holders of at least two-thirds of the shares entitled to vote on such a dissolution and of each class of shares entitled to vote on such a dissolution as a class, if any.

*Shareholder Rights Plan.* We have adopted a shareholder rights plan (the "Rights Plan") which provides that one right to purchase 1/1,000th of a share of our Series RP preferred stock (the "Rights") is attached to each outstanding share of our common stock. The Rights have certain anti-takeover effects and are intended to discourage coercive or unfair takeover tactics and to encourage any potential acquiror to negotiate a price fair to all shareholders. The Rights may cause substantial dilution to an acquiring party that attempts to acquire us on terms not approved by our board, but they will not interfere with any merger or other business combination that is approved by our board.

The Rights are attached to the shares of our common stock. The Rights are not presently exercisable. At the time a party acquires beneficial ownership of 15% or more of the outstanding shares of our common stock or commences or publicly announces for the first time a tender offer to do so, the Rights will separate from the common stock and will become exercisable. Each Right entitles the holder to purchase 1/1,000th share of Series RP preferred stock, for an exercise price that is currently $200 per share. Once the Rights become exercisable, any Rights held by the acquiring party will be void and, for the next 60 days, all other holders of Rights will receive upon exercise of the Right that number of shares of our common stock having a market value of two times the exercise price of the Right. The Rights, which expire on January 4, 2011, may be redeemed by us for $0.001 per right prior to becoming exercisable. Until a Right is exercised, the holder of that Right will have no rights as a shareholder, including, without limitation, the right to vote or receive dividends.

**Preferred Stock**

In this section we describe the general terms that will apply to preferred stock that we may offer by this prospectus in the future. When we issue a particular series, we will describe the specific terms of the series of preferred stock in a prospectus supplement. The description of provisions of our preferred stock included in any prospectus supplement may not be complete and is qualified in its entirety by reference to the description in our articles of incorporation and our certificate of designation, which will describe the terms of the offered preferred stock and be filed with the SEC at the time of sale of that preferred stock. At that time, you should read our articles of incorporation and any certificate of designation relating to each particular series of preferred stock for provisions that may be important to you.

Our board of directors is authorized to provide for the issuance from time to time of preferred stock in series and, as to each series, to fix the designation, the dividend rate, whether dividends are cumulative, the preferences which dividends will have with respect to any other class or series of capital stock, the voting rights, the voluntary and involuntary liquidation prices, the conversion or exchange privileges, the redemption prices and the other terms of redemption, and the terms of any purchase or sinking funds applicable to the series. The terms of any series of preferred stock will be described in a prospectus supplement. Cumulative dividends, dividend preferences and conversion, exchange and redemption provisions, to the extent that some or all of these features may be present when shares of our preferred stock are issued, could have an adverse effect on the availability of earnings for distribution to the holders of common stock or for other corporate purposes.

### DESCRIPTION OF DEPOSITARY SHARES

We describe in this section the general terms of the depositary shares. We will describe the specific terms of the depositary shares in a prospectus supplement. The following description of the deposit agreement, the depositary shares and the depositary receipts is only a summary and you should refer to the forms of the deposit agreement and depositary share certificate that will be filed with the SEC in connection with any particular offering of depositary shares.

17

Exhibit 8 of 30                                                                                                    Page 60

**General**

We may offer fractional interests in preferred stock, rather than full shares of preferred stock. In that case, we will provide for the issuance by a depositary to investors of receipts for depositary shares, each representing a fractional interest in a share of a particular series of preferred stock.

The shares of any series of preferred stock underlying the depositary shares will be deposited under a separate deposit agreement between us and the depositary, which must be a bank or trust company having its principal office in the United States and having a combined capital and surplus of at least $50 million. The applicable prospectus supplement will set forth the name and address of the depositary. Subject to the terms of the deposit agreement, each owner of a depositary share will have a fractional interest in all the rights and preferences of the preferred stock underlying such depositary share. Those rights include any dividend, voting, redemption, conversion and liquidation rights.

The depositary shares will be evidenced by depositary receipts issued under the deposit agreement. If you purchase fractional interests in shares of the related series of preferred stock, you will receive depositary receipts as described in the applicable prospectus supplement. While the final depositary receipts are being prepared, we may order the depositary to issue temporary depositary receipts substantially identical to the final depositary receipts although not in final form. The holders of the temporary depositary receipts will be entitled to the same rights as if they held the depositary receipts in final form. Holders of the temporary depositary receipts can exchange them for the final depositary receipts at our expense.

**Withdrawal**

Unless otherwise indicated in the applicable prospectus supplement and unless the related depositary shares have been called for redemption, if you surrender depositary receipts at the principal office of the depositary, then you are entitled to receive at that office the number of shares of preferred stock and any money or other property represented by the depositary shares. We will not issue partial shares of preferred stock. If you deliver depositary receipts evidencing a number of depositary shares that represent more than a whole number of shares of preferred stock, the depositary will issue to you a new depositary receipt evidencing the excess number of depositary shares at the same time that the preferred stock is withdrawn. Holders of shares of preferred stock received in exchange for depositary shares will no longer be entitled to deposit those shares under the deposit agreement or to receive depositary shares in exchange for those shares of preferred stock.

**Dividends and Other Distributions**

The depositary will distribute all cash dividends or other cash distributions received with respect to the preferred stock to the record holders of depositary shares representing the preferred stock in proportion to the numbers of depositary shares owned by the holders on the relevant record date. The depositary will distribute only the amount that can be distributed without attributing to any holder of depositary shares a fraction of one cent. The balance not distributed will be added to and treated as part of the next sum received by the depositary for distribution to record holders of depositary shares.

If there is a distribution other than in cash, the depositary will distribute property to the holders of depositary shares, unless the depositary determines that it is not feasible to make such distribution. If this occurs, the depositary may, with our approval, sell the property and distribute the net proceeds from the sale to the holders of depositary shares.

**Conversion, Exchange and Redemption**

Unless otherwise specified in the applicable prospectus supplement, neither the depositary shares nor the series of preferred stock underlying the depositary shares will be convertible or exchangeable into any other class or series of our capital stock.

18

Exhibit 8 of 30    Page 61

If the series of the preferred stock underlying the depositary shares is subject to redemption, the depositary shares will be redeemed from the redemption proceeds, in whole or in part, of the series of the preferred stock held by the depositary. The redemption price per depositary share will bear the same relationship to the redemption price per share of preferred stock that the depositary share bears to the underlying preferred stock. Whenever we redeem preferred stock held by the depositary, the depositary will redeem, as of the same redemption date, the number of depositary shares representing the preferred stock redeemed. If less than all the depositary shares are to be redeemed, the depositary shares to be redeemed will be selected by lot or pro rata as determined by the depositary.

**Voting**

Upon receipt of notice of any meeting at which the holders of the preferred stock are entitled to vote, the depositary will mail Information about the meeting contained in the notice to the record holders of the depositary shares relating to the preferred stock. Each record holder of the depositary shares on the record date (which will be the same date as the record date for the preferred stock) will be entitled to instruct the depositary as to how the preferred stock underlying the holder's depositary shares should be voted.

The depositary will try, if practical, to vote the preferred stock underlying the depositary shares according to the instructions received. We will agree to take all action requested by and deemed necessary by the depositary in order to enable the depositary to vote the preferred stock in that manner. The depositary will not vote any preferred stock for which it does not receive specific instructions from the holders of the depositary shares relating to the preferred stock.

**Amendment and Termination of the Deposit Agreement**

We may amend the form of depositary receipt evidencing the depositary shares and any provision of the deposit agreement by agreement with the depositary at any time. Any amendment that materially and adversely alters the rights of the existing holders of depositary shares will not be effective, however, unless approved by the record holders of at least a majority of the depositary shares then outstanding. A deposit agreement may be terminated by us or the depositary only if:

- all outstanding depositary shares relating to the deposit agreement have been redeemed or converted into or exchanged for other securities; or

- there has been a final distribution on the underlying preferred stock in connection with our liquidation, dissolution or winding up and the distribution has been made to the holders of the related depositary shares

**Charges of Depositary**

We will pay all transfer and other taxes and governmental charges arising solely from the existence of the depositary arrangements. We will pay charges of the depositary in connection with its duties under the deposit agreement. Holders of depositary shares will pay transfer and other taxes and governmental charges and any other charges that are stated to be their responsibility in the deposit agreement.

**Miscellaneous**

The depositary will forward to the holders of depositary shares all reports and communications that we must furnish to the holders of the preferred stock.

Neither we nor the depositary will be liable if either of us is prevented or delayed by law or any circumstance beyond our control in performing our respective obligations under the deposit agreement. Our obligations and the depositary's obligations under the deposit agreement will be limited to performance in good faith of duties set forth in the deposit agreement. Neither we nor the depositary will be obligated to prosecute or defend any legal proceeding connected with any depositary shares or preferred stock unless satisfactory indemnity is furnished. We and the depositary may rely upon written advice of counsel or accountants, or information provided by persons

19

Exhibit 8 of 30                                                                                              Page 62

presenting preferred stock for deposit, holders of depositary shares or other persons believed to be competent and on documents believed to be genuine.

**Resignation and Removal of Depositary**

The depositary may resign at any time by delivering notice to us. We may also remove the depositary at any time. Resignations or removals will take effect upon the appointment of a successor depositary and its acceptance of the appointment. The successor depositary must be appointed within 60 days after delivery of the notice of resignation or removal.

## PLAN OF DISTRIBUTION

We may sell the securities being offered hereby: (i) directly to purchasers, (ii) through agents, (iii) through dealers, (iv) through underwriters, or (v) through a combination of any such methods of sale.

The distribution of the securities may be effected from time to time in one or more transactions either (i) at a fixed price or prices, which may be changed, (ii) at market prices prevailing at the time of sale, (iii) at prices related to such prevailing market prices, or (iv) at negotiated prices.

Offers to purchase the securities may be solicited directly by us or by agents designated by us from time to time. Any such agent, which may be deemed to be an underwriter as that term is defined in the Securities Act, involved in the offer or sale of the debt securities in respect of which this prospectus is delivered will be named, and any commissions payable by us to such agent will be set forth in the prospectus supplement relating to the offering of the securities. Unless otherwise indicated in the applicable prospectus supplement, any such agent will be acting on a best efforts basis for the period of its appointment.

If a dealer is utilized in the sale of the securities in respect of which this prospectus is delivered, we will sell the securities to the dealer, as principal. The dealer, which may be deemed to be an underwriter as that term is defined in the Securities Act, may then resell the securities to the public at varying prices to be determined by such dealer at the time of resale. Dealer trading may take place in certain of the securities, including securities not listed on any securities exchange.

If an underwriter or underwriters are utilized in the sale, we will execute an underwriting agreement with such underwriters at the time of sale to them and the names of the underwriters will be set forth in the applicable prospectus supplement, which will be used by the underwriters to make resales of the securities in respect of which this prospectus is delivered to the public. The obligations of underwriters to purchase securities will be subject to certain conditions precedent and the underwriters will be obligated to purchase all of the securities of a series if any are purchased.

Underwriters, dealers, agents and other persons may be entitled, under agreements that may be entered into with us, to indemnification against certain civil liabilities, including liabilities under the Securities Act, or to contribution with respect to payments that they may be required to make in respect thereof. Underwriters, dealers and agents may engage in transactions with, or perform services for, us in the ordinary course of business.

Except as indicated in the applicable prospectus supplement, the securities are not expected to be listed on a securities exchange, except for our common stock, which is listed on The New York Stock Exchange, and any underwriters or dealers will not be obligated to make a market in securities. We cannot predict the activity or liquidity of any trading in the securities.

## LEGAL MATTERS

The legality of the securities offered by this prospectus will be passed upon by Heller Ehrman LLP, Seattle, Washington. As of November 30, 2005, Heller Ehrman LLP and individual attorneys at the firm who participated in this transaction owned an aggregate of 12,992 shares of our common stock.

20

Exhibit 8 of 30                                                                                     Page 63

## EXPERTS

The auditors of the Issuer are Deloitte & Touche LLP ("Deloitte"), an independent registered public accounting firm, who have audited the Issuer's consolidated financial statements, without qualification, in accordance with generally accepted auditing standards in the United States of America for each of the financial periods ended December 31, 2004, 2003 and 2002, respectively, and who have audited management's report on the effectiveness of internal control over financial reporting for the year ended December 31, 2004. Deloitte's report on the Issuer's consolidated financial statements for the year ended December 31, 2003 includes an explanatory paragraph referring to the Issuer's adoption of Statement of Financial Accounting Standards (SFAS) No. 142, Goodwill and Other Intangible Assets, on January 1, 2002 and an explanatory paragraph referring to the Issuer's 2002 restatement of Note 2 to the consolidated financial statements. Deloitte's report on the Issuer's consolidated financial statements for the year ended December 31, 2002 includes an explanatory paragraph referring to the Issuer's adoption of a) SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities, as amended, on January 1, 2001, b) SFAS No. 142, Goodwill and Other Intangible Assets, on January 1, 2002, and c) SFAS No. 147, Acquisitions of Certain Financial Institutions, on October 1, 2002.

21

Exhibit 8 of 30                                                                                             Page 64

# PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14. Other Expenses of Issuance and Distribution.**

The estimated expenses to be paid by the Registrant in connection with the issuance and distribution of the securities being registered hereby is not known at this time.

**Item 15. Indemnification of Directors and Officers.**

Section 23B.08.320 of the Washington Business Corporation Act (the "Corporation Act") provides that the personal liability of directors to a corporation imposed by Section 23B.08.310 of the Corporation Act may be eliminated by the articles of incorporation of the corporation, except in the case of acts or omissions involving certain types of conduct. At Article XIII of its Restated Articles of Incorporation, the Registrant has elected to eliminate the liability of directors to the Registrant to the extent permitted by law. Thus, a director of the Registrant is not personally liable to the Registrant or its shareholders for monetary damages for conduct as a director, except for liability of a director (i) for acts or omissions that involve intentional misconduct by the director or a knowing violation of law by the director, (ii) for conduct violating Section 23B.08.310 of the Corporation Act, or (iii) for any transaction from which the director will personally receive a benefit in money, property or services to which the director is not legally entitled. If Washington law is amended to authorize corporate action that further eliminates or limits the liability of directors, then the liability of the Registrant's directors will be eliminated or limited to the fullest extent permitted by Washington law, as so amended.

Section 23B.08.560 of the Corporation Act provides that if authorized by (i) the articles of incorporation, (ii) a bylaw adopted or ratified by the shareholders, or (iii) a resolution adopted or ratified, before or after the event, by the shareholders, a corporation will have the power to indemnify directors made party to a proceeding, or to obligate itself to advance or reimburse expenses incurred in a proceeding, without regard to the limitations or indemnification contained in Section 23B.08.510 through 23B.08.550 of the Corporation Act, provided that no such indemnity shall indemnify any director (i) for acts or omissions that involve intentional misconduct by the director or a knowing violation of law by the director, (ii) for conduct violating Section 23B.08.310 of the Corporation Act, or (iii) for any transaction from which the director will personally receive a benefit in money, property or services to which the director is not legally entitled.

Pursuant to Article X of the Registrant's Restated Articles of Incorporation and Article VIII of the Registrant's Bylaws, the Registrant must, subject to certain exceptions, indemnify and defend its directors against any expense, liability or loss arising from or in connection with any actual or threatened action, suit or proceeding relating to service for or at the request of the Registrant, including without limitation, liability under the Securities Act. The Registrant is not permitted to indemnify a director from or on account of acts or omissions of such director which are finally adjudged to be intentional misconduct, or from or on account of conduct in violation of RCW 23B.08.310, or a knowing violation of the law from or on account of any transaction with respect to which it is finally adjudged that such director received a benefit in money, property or services to which he or she was not entitled. If Washington law is amended to authorize further indemnification of directors, then the Registrant's directors shall be indemnified to the fullest extent permitted by Washington law, as so amended. Also, pursuant to Article X of the Registrant's Restated Articles of Incorporation and Article VIII of the Registrant's Bylaws, the Registrant may, by action of the Board of Directors of the Registrant, provide indemnification and pay expenses to officers, employees and agents of the Registrant or another corporation, partnership, joint venture, trust or other enterprise with the same scope and effect as above described in relation to directors. Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the Registrant pursuant to the provisions described above, the Registrant has been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

II-1

Exhibit 8 of 30                                                                                                    Page 65

**Item 16. Exhibits.**

| Exhibit Number | Exhibits |
|---|---|
| 1.1+ | Form of Underwriting Agreement with respect to Debt Securities. |
| 1.2+ | Form of Underwriting Agreement with respect to other Securities. |
| 4.1+ | Form of Senior Debt Security. |
| 4.2+ | Form of Subordinated Debt Security. |
| 4.3 | Second Supplemental Indenture between Washington Mutual, Inc. and The Bank of New York, as Senior Trustee, dated November 20, 2002 (incorporated by reference to the Company's Current Report on Form 8-K filed November 25, 2002). |
| 4.4 | First Supplemental Indenture between Washington Mutual, Inc. and The Bank of New York, as Senior Trustee, dated August 1, 2002 (incorporated by reference to the Company's Current Report on Form 8-K filed November 25, 2002). |
| 4.5 | Second Supplemental Indenture between Washington Mutual, Inc. and The Bank of New York, as Subordinated Trustee, dated March 16, 2004 (incorporated by reference to the Company's Current Report on Form 8-K filed March 24, 2004). |
| 4.6 | First Supplemental Indenture between Washington Mutual, Inc. and The Bank of New York, as Subordinated Trustee, dated August 1, 2002 (incorporated by reference to the Company's Registration Statement on Form S-3 filed February 5, 2003. File No. 333-102991). |
| 4.7 | Washington Mutual, Inc.'s Standard Multiple-Series Indenture Provisions dated August 1, 2002 (incorporated by reference to the Company's Current Report on Form 8-K filed November 25, 2002). |
| 4.8+ | Form of Deposit Agreement. |
| 4.9+ | Form of Depositary Share Certificate. |
| 4.10+ | Form of Preferred Stock Certificate of Designations. |
| 4.11+ | Specimen certificate for shares of preferred stock. |
| 4.12 | Restated Articles of Incorporation of Washington Mutual, Inc., as amended (incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999). |
| 4.13 | Articles of Amendment to the Amended and Restated Articles of Incorporation of Washington Mutual, Inc., creating a class of preferred stock, Series RP (incorporated by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2000). |
| 4.14 | Restated Bylaws of Washington Mutual, Inc. (incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2003). |
| 4.15 | Rights Agreement relating to Washington Mutual, Inc.'s Stockholder Rights Plan (incorporated by reference to the Company's Current Report on Form 8-K filed January 8, 2001). |
| 4.16 | The Registrant will furnish upon request copies of all instruments defining the rights of holders of long-term debt instruments of Registrant and its consolidated subsidiaries. |
| 4.17 | Warrant Agreement dated as of April 30, 2001 (incorporated by reference to the Company's Registration Statement on Form S-3. File No. 333-63976). |
| 4.18 | 2003 Amended and Restated Warrant Agreement, dated March 11, 2003, by and between Washington Mutual, Inc. and Mellon Investor Services LLC (incorporated by reference to the Company's Current Report on Form 8-K filed March 12, 2003). |
| 5.1 | Opinion of Heller Ehrman LLP as to the legality of the securities being registered. |
| 12.1 | Statement re: Computation of Ratios of Earnings to Fixed Charges (incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005 and Annual Report on Form 10-K for the year ended December 31, 2004). |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Heller Ehrman LLP (contained in Exhibit 5.1). |
| 24.1 | Powers of Attorney (see page II-5). |
| 25.1 | Statement of Eligibility of Senior Trustee. |
| 25.2 | Statement of Eligibility of Subordinated Trustee. |

———————

II-2

Exhibit 8 of 30                                                                                    Page 66

+ To be filed as an exhibit to a Current Report on Form 8-K and incorporated by reference or by post-effective amendment.

**Item 17. Undertakings.**

The Registrant hereby undertakes:

(a)

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Securities and Exchange Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement;

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

provided, however, that paragraphs (i), (ii) and (iii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in periodic reports filed with or furnished to the Securities and Exchange Commission by the Registrant pursuant to Section 13 or Section 15(d) of the Exchange Act that are incorporated by reference in this registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) that is part of the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) That, for the purpose of determining liability under the Securities Act to any purchaser:

(i) Each prospectus filed by the Registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement; and

(ii) Each prospectus required to be filed pursuant to Rule 424(b)(2), (b)(5), or (b)(7) as part of a registration statement in reliance on Rule 430B relating to an offering made pursuant to Rule 415(a)(1)(i), (vii), or (x) for the purpose of providing the information required by Section 10(a) of the Securities Act shall be deemed to be part of and included in the registration statement as of the earlier of the date such form of prospectus is first used after effectiveness or the date of the first contract of sale of securities in the offering described in the prospectus. As provided in Rule 430B, for liability purposes of the issuer and any person that is at that date an underwriter, such date shall be deemed to be a new effective date of the registration statement relating to the securities in the registration statement to which that prospectus relates, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof. Provided, however, that no statement made in a registration statement or prospectus that is part of the

II-3

Exhibit 8 of 30                                                                                     Page 67

registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such effective date, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such effective date.

(5)     That, for the purpose of determining liability of the Registrant under the Securities Act to any purchaser in the initial distribution of the securities:

The Registrant undertakes that in a primary offering of securities of the Registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the Registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i)  Any preliminary prospectus or prospectus of the Registrant relating to the offering required to be filed pursuant to Rule 424;

(ii)  Any free writing prospectus relating to the offering prepared by or on behalf of the Registrant or used or referred to by the Registrant;

(iii)  The portion of any other free writing prospectus relating to the offering containing material information about the Registrant or its securities provided by or on behalf of the Registrant; and

(iv)  Any other communication that is an offer in the offering made by the Registrant to the purchaser.

(b)   that, for purposes of determining any liability under the Securities Act, each filing of the Registrant's annual report pursuant to section 13(a) or section 15(d) of the Exchange Act (and, where applicable, each filing of an employee benefit plan's annual report pursuant to section 15(d) of the Exchange Act) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof;

(c)   insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue;

(d)   to respond to requests for information that is incorporated by reference into this prospectus pursuant to Items 4, 10(b), 11 or 13 of this form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means. This includes information contained in documents filed subsequent to the effective date of the registration statement through the date of responding to the request.

II-4

Exhibit 8 of 30                                                                                                                              Page 68

## SIGNATURES

Pursuant to the requirements of the Securities Act, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Seattle, State of Washington, on this 30th day of December, 2005.

WASHINGTON MUTUAL, INC.

By:    /s/ Kerry K. Killinger
        Kerry K. Killinger
        Chairman and Chief Executive Officer

## POWER OF ATTORNEY

Each of the officers and directors of the Registrant whose signature appears below hereby constitutes and appoints Fay L. Chapman, Thomas W. Casey and Robert J. Williams, and each of them severally, his or her true and lawful attorney-in-fact, for him or her in any and all capacities, to sign any amendments (including post-effective amendments) to this registration statement and any new registration statement filed under Rule 462(b) of the Securities Act and amendments thereto, and to file the same, with exhibits thereto, and any other documents in connection therewith, with the Securities and Exchange Commission, and hereby ratifies and confirms all that said attorney-in-fact, or his or her substitute, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act, this registration statement has been signed below by the following persons in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ Kerry K. Killinger<br>Kerry K. Killinger | Chairman, Chief Executive Officer and Director (Chief Executive Officer) | December 20, 2005 |
| /s/ Thomas W. Casey<br>Thomas W. Casey | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | December 30, 2005 |
| /s/John F. Woods<br>John F. Woods | Senior Vice President & Controller (Principal Accounting Officer) | December 30, 2005 |
| /s/ Anne V. Farrell<br>Anne V. Farrell | Director | December 20, 2005 |
| /s/ Stephen E. Frank<br>Stephen E. Frank | Director | December 30, 2005 |
| /s/ Thomas C. Leppert<br>Thomas C. Leppert | Director | December 30, 2005 |

II-5

Exhibit 8 of 30                                                            Page 69

| /s/ Charles M. Lillis | Director | December 30, 2005 |
| Charles M. Lillis | | |
| /s/ Phillip D. Matthews | Director | December 20, 2005 |
| Phillip D. Matthews | | |
| /s/ Margaret Osmer McQuade | Director | December 30, 2005 |
| Margaret Osmer McQuade | | |
| /s/ Michael K. Murphy | Director | December 20, 2005 |
| Michael K. Murphy | | |
| /s/ Mary E. Pugh | Director | December 20, 2005 |
| Mary E. Pugh | | |
| /s/ William G. Reed, Jr. | Director | December 20, 2005 |
| William G. Reed, Jr. | | |
| /s/ Orin C. Smith | Director | December 30, 2005 |
| Orin C. Smith | | |
| /s/ James H. Stever | Director | December 20, 2005 |
| James H. Stever | | |
| /s/ Willis B. Wood, Jr. | Director | December 30, 2005 |
| Willis B. Wood, Jr. | | |

II-6

Exhibit 8 of 30                                                    Page 70

## EXHIBIT INDEX

| Exhibit Number | Exhibits |
|---|---|
| 1.1+ | Form of Underwriting Agreement with respect to Debt Securities. |
| 1.2+ | Form of Underwriting Agreement with respect to other Securities. |
| 4.1+ | Form of Senior Debt Security. |
| 4.2+ | Form of Subordinated Debt Security. |
| 4.3 | Second Supplemental Indenture between Washington Mutual, Inc. and The Bank of New York, as Senior Trustee, dated November 20, 2002 (incorporated by reference to the Company's Current Report on Form 8-K filed November 25, 2002). |
| 4.4 | First Supplemental Indenture between Washington Mutual, Inc. and The Bank of New York, as Senior Trustee, dated August 1, 2002 (incorporated by reference to the Company's Current Report on Form 8-K filed November 25, 2002). |
| 4.5 | Second Supplemental Indenture between Washington Mutual, Inc. and The Bank of New York, as Subordinated Trustee, dated March 16, 2004 (incorporated by reference to the Company's Current Report on Form 8-K filed March 24, 2004). |
| 4.6 | First Supplemental Indenture between Washington Mutual, Inc. and The Bank of New York, as Subordinated Trustee, dated August 1, 2002 (incorporated by reference to the Company's Registration Statement on Form S-3 filed February 5, 2003. File No. 333-102991). |
| 4.7 | Washington Mutual, Inc.'s Standard Multiple-Series Indenture Provisions dated August 1, 2002 (incorporated by reference to the Company's Current Report on Form 8-K filed November 25, 2002). |
| 4.8+ | Form of Deposit Agreement. |
| 4.9+ | Form of Depositary Share Certificate. |
| 4.10+ | Form of Preferred Stock Certificate of Designations. |
| 4.11+ | Specimen certificate for shares of preferred stock. |
| 4.12 | Restated Articles of Incorporation of Washington Mutual, Inc., as amended (incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 1999). |
| 4.13 | Articles of Amendment to the Amended and Restated Articles of Incorporation of Washington Mutual, Inc., creating a class of preferred stock, Series RP (incorporated by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2000). |
| 4.14 | Restated Bylaws of Washington Mutual, Inc. (incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2003). |
| 4.15 | Rights Agreement relating to Washington Mutual, Inc.'s Stockholder Rights Plan (incorporated by reference to the Company's Current Report on Form 8-K filed January  8, 2001). |
| 4.16 | The Registrant will furnish upon request copies of all instruments defining the rights of holders of long-term debt instruments of Registrant and its consolidated subsidiaries. |
| 4.17 | Warrant Agreement dated as of April 30, 2001 (incorporated by reference to the Company's Registration Statement on Form S-3. File No. 333-63976). |
| 4.18 | 2003 Amended and Restated Warrant Agreement, dated March 11, 2003, by and between Washington Mutual, Inc. and Mellon Investor Services LLC (incorporated by reference to the Company's Current Report on Form 8-K filed March 12, 2003). |
| 5.1 | Opinion of Heller Ehrman LLP as to the legality of the securities being registered. |
| 12.1 | Statement re: Computation of Ratios of Earnings to Fixed Charges (incorporated by reference to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005 and Annual Report on Form 10-K for the year ended December 31, 2004). |
| 23.1 | Consent of Deloitte & Touche LLP. |
| 23.2 | Consent of Heller Ehrman LLP (contained in Exhibit 5.1). |
| 24.1 | Powers of Attorney (see page II-5). |
| 25.1 | Statement of Eligibility of Senior Trustee. |
| 25.2 | Statement of Eligibility of Subordinated Trustee. |

II-7

Exhibit 8 of 30                                                                                              Page 71

+ To be filed as an exhibit to a Current Report on Form 8-K and incorporated by reference or by post-effective
  amendment.

II-8

Exhibit 8 of 30                                                                                          Page 72

# **Exhibit 9**

Exhibit 9 of 30                                                                                                   Page 73

2 of 3 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

January 18, 2006 Wednesday

**TRANSCRIPT:** 011806at.741

**LENGTH:** 9792  words

**HEADLINE:** Q4 2005 Washington Mutual Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon and welcome to the Washington Mutual's fourth quarter and full year 2005 earnings conference call. Today's call is being recorded for replay purposes. Replay will be available approximately one hour after the call has ended today. The toll-free number to access the replay is 800-395-6236. This call is also being webcast live and will be archived for 30 days on the company's website. [OPERATOR INSTRUCTION] Now I will turn the call over to Mr. Alan Magleby, Senior Vice President Investor Relations to introduce today's call.

ALAN MAGLEBY, SVP, INVESTOR RELATIONS, WASHINGTON MUTUAL: Good afternoon and thank you for joining us today. I would like to welcome you to the Washington Mutual fourth quarter and 2005 earnings conference call. I want to remind you that our presentation today may contain forward-looking statements concerning our financial conditions, results and expectations, and that there are a number of factors that may cause actual results in the future to be different from our current expectations. These factors include, among other things changes in general business and economic conditions, competitive pressures in the financial service industry or legislative and regulatory changes that may impact our business. For additional factors, please see our press release and other documents filed with the SEC. With us today are Kerry Killinger, Chairman and CEO, Steve Rotella, President and COO and Tom Casey, CFO. At this time I will turn the call over to Kerry.

KERRY KILLINGER, CEO, WASHINGTON MUTUAL: Thank you, Alan and good afternoon, everyone and thanks for joining us.

This afternoon I will review our performance for the fourth quarter and the full year of 2005. And as Alan mentioned joining me on the call will be Steve Rotella our President and COO and Tom Casey our CFO.

Before we get started, I would like to point out a couple changes we made this quarter to improve our communications with you. As I hope you saw on our website we have added charts and graphs to the prepared remarks to help illustrate our performance, and for the first time we have posted those comments in advance of the call so you can more easily follow our presentation.

With that, let's get started. Earlier this afternoon we announced another solid quarters earnings with net income of $865 million or $0.85 per diluted share. On a per share basis these earnings represented a 12% increase over last year's fourth quarter results and for the full year our net income totalled $3.4 billion or $3.73 per diluted share up 14% on a per share basis from 2004. Reflecting our positive outlook for the future and continued solid performance, I am pleased

Exhibit 9 of 30                                                                 Page 74

# **Exhibit 10**

Exhibit 10 of 30                                                                    Page 75

1 of 1 DOCUMENT

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

January 31, 2006 Tuesday

**TRANSCRIPT:** 013106aq.706

**LENGTH:** 6737  words

**HEADLINE:** Washington Mutual at Citigroup Financial Services Conference - Final

**BODY:**

STEVE ROTELLA, PRESIDENT, COO, WASHINGTON MUTUAL: That was tepid applause, but that's okay. Let's see what happens at the end. Anyway, thank you, Brad.

Great to be here. Good afternoon. It's my first Citi conference. Before I begin, I've been instructed by our legal department to make sure you are aware of the forward-looking statement -- one of the most interesting slides I have -- at the end of the presentation. As you know when you look at that, it kind of boils down to one point; and that is, we will not and cannot predict the future. But I would encourage you when I'm done to read through that carefully.

Anyway, let me start with a little bit about our high-level vision at Washington Mutual and talk about the Company. Our vision is to be the nation's leading retailer of financial services for consumers and small business. Let me stop and talk about why this is different and what makes us different. We do see the opportunity to create this leading retailer. In short, we are creating what we think is a unique consumer and small-business bank, serving millions of customers throughout this country.

Let me tell you what we are not. We're not trying to be all things to all people. We're not trying to create a financial conglomerate. We're not trying to be a financial services supermarket. We don't serve large corporate or multinational customers. Our Company is intensely focused on what we call the broad middle market; some people call it the mass middle market of consumers and small business across the country. We believe -- and after a year there, I believe -- that that's a pretty unique market position on national players of our size in the United States.

Now if you look at our businesses, we are already a leading player in a number of business lines. Let me just review this real quickly. We are the sixth-largest banking company in terms of assets, total deposits and retail stores. We're the third in the number of debit cards outstanding. We are a leading home equity lender. Up on the slide, it says fourth and that is true nationally. In our footprint, we actually rank number one or number two but fourth nationally. We're also the third-largest mortgage originator and servicer; the number one bank multi-family lender and servicer; now with the recent acquisition of Providian, which we've called Washington Mutual Card Services, the sixth-largest bank credit card issuer in the country.

Now, besides being in the right businesses -- and we do think when you consider the fact that we are after consumers and small business, we're in the right businesses -- we're also in the right locations. I have given you a map here that again summarizes where we are across the country. Our retail bank operates over 2,100 stores in 16 states.

Exhibit 10 of 30                                                                                           Page 76

Page 2
Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

Many of those locations are in the fastest-growing parts of the country or the most important parts of the country. Our lending operations are largely aligned with our retail network with over 400 home loans; Long Beach, which is our subprime operation; and multi-family lending offices in those states. We have wholesale correspondent and consumer direct, which is our telephone-based sales channels, serving customers in 49 states. And finally, we offer 24-by-7 telephone customer service coverage in what we think is an excellent online banking platform that's been improving throughout the year, an area we've been investing in and has been recognized as an industry leader for speed, reliability and security.

Now, turning to Washington Mutual and how it is evolving and we expect this evolution to continue, you can see here on this slide that we've been changing the mix of our assets pretty dramatically. We've done this and left our thrift legacy behind by expanding higher margin products, in particular, prime home equity, our multi-family business and subprime activities, while we retain more of those assets on our balance sheet. And then we are also limiting on our balance sheet the level of MSRs as a percentage of total equity in the Company to 25% on average. Of course, we believe we made a smart acquisition in Providian -- again, now Washington Mutual Card Services -- for a number of reasons, but one of those reasons is it helps diversify our balance sheet.

So, as you can see, the corollary to this is that our prime home loans and MBS percentage 1999, 76%; 40% at the end of '05. We expect that trend to continue. Card Services has added another profitable line of business. We continue to emphasize growth in retail banking, commercial and Card Services. So again, we expect this trend to go on. So, while we will continue to be intensely focused on the consumer and small business, we are also looking at our balance sheet and making sure we diversify our Company.

Now let me turn to our 5-year targets and our performance in '05. At the beginning of '05, we set new financial targets for the next 5 years. We set them with the intention of driving our Company to superior performance in our industry. Obviously, these targets then cascade down through the Company and set the goals for all of our people and the performance we are expecting from them. We knew these targets would not be easily attainable; some of them are long-term. But, it's important in the Company and we are working this way that we continuously look to improve the Company day by day to achieve these targets.

So first, our return on average common equity of 14.63% in '05 was up from 14.02. We're not yet at our target of high teens, but we expect to make good progress in '06 and continue forward as we execute our business plan to achieve those levels.

Second measure is double-digit earnings growth. Arguably, the most important thing we are focused on is growing our business. In '05, our earnings per share growth up 14%, so we felt very good about that. A very difficult target but one we are aggressively going after is our efficiency ratio, which we pegged at under 50% over this timeframe; you can see we are at 58.17%.

We did improve productivity across the Company in '05. If you excluded Card Services' expenses in the fourth quarter, we essentially held our expense base flat from '04 to '05 despite the fact that we added 220 new retail stores and expanded in other parts of the business. But to achieve that target, what we need to do and what we are doing is reshaping and moving the organization to a new level of productivity. And I will come back to that in a little while.

On the credit side, you can see we had a pretty good year. We feel like we are in good shape. We spent much of '05 however taking very proactive steps in the business to mitigate credit risks, including selling selected assets and selling subprime residuals. Finally, we ended with a capital ratio of 5.73%, well over our target of 5.5%. And that leads me to results in '05 with a little more detail.

You can see that average assets were up 15%. It was a successful year despite a flat yield curve for a good part of the year, which compressed rates of return for many investments. Although Fed funds increased 200 basis points over the course of the year, our margin compression was very controlled and we increased net interest income 11%. The

Exhibit 10 of 30                                                                 Page 77

Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

addition of Card Services' strong retail banking revenue and improved home loan operations pushed our non-interest income up 22% in 2005. As I mentioned before about expenses, continued expense control limited the increase in non-interest expense only 335 million or 4%. And of that, 268 million of the 335 was due to the addition of Card Services at the end of the year, so again fairly flat expenses year on year. The net result was an increase in net income of 19% and EPS of 14%. So, while we are pleased with these results overall, we are working very hard to improve our Company and accelerate progress across Washington Mutual. But, let me turn now to some of our individual businesses, and I will start with retail.

The story of the retail franchise is very positive. This is our biggest business, and we consider it the crown jewel of Washington Mutual. As you can see, net income of 2.5 billion was up 13%. However, let me point you to the blue bars on this chart. What's even more impressive to us is the contribution to net income of the core retail banking network grew by 39% to 1.5 billion. The contribution of that orange sector, which is our single-family residential portfolio and is included in the retail segment reporting, declined 13%. We expect this trend to reverse itself once short-term rates stabilize and our net interest margin recovers. But again, you can see our core franchise had a terrific year.

In addition, our account growth accelerated over the course of the year. We were very successful in opening new checking in households, and I will come back to that. We also delivered excellence growth in fee income with non-interest income up 11%. We grew average retail deposits 5% during the year, while minimizing the impact of rising market rates. Let me give you a little detail about that.

Year-over-year, our average costs of total deposits increased 77 basis points despite the fact the Fed increased rates 200 basis points. So, we think we did a pretty good job of managing our margins. Our home equity portfolio was up 16% and is now nearly $51 billion. Let me cover a couple of more points on retail and talk about our model.

Free checking is the anchor product in our retail franchise. It drives the retail bank in terms of household growth, and households are what ultimately drive the retail bank. Our strategy is pretty straightforward -- deliver the best free checking product both consumer and small business; deliver great service and by any measure, we do; and then meet customer needs with other products and services and cross-sell to those customers. Over the past 12 months, net new checking accounts grew 902,000 or 10%. We had a weak first quarter. Let me just tell you in the fourth quarter, our checking account growth was up 90% year on year, quarter to quarter. That growth led to an increase of 633,000 in retail banking households, up 8% for the year.

Now, you can also see this is an interesting parallel. Our stores outpaced the market in growth per store over the last 10 years with 43% growth in households over the 10 years versus flat for the industry. Our research shows that over 70% of our customers initially come to us because of free checking. And then, we grow that customer segment by cross-selling to them, and we think that continues to be the anchor strategy for retail and has been quite successful.

Let me turn to cards. You know that we purchased Providian and closed that deal October 1st. We are off to a great start in the card business. Our newest business, Card Services, the results in the fourth quarter were very strong with net income of 166 million; managed receivables ended the year at $20 billion, up 8%, continuing strong momentum from Providian. At the same time, credit losses as a percentage of receivables outstanding declined to 7.28% of outstanding loans from 9.98. And managed loans 30 days or more delinquent declined to 5.07 from 6.16. So, good growth in receivables, good credit performance -- off to a good start.

But let me tell you a little bit about the outlook for card, since it's our newest business. We've had absolutely excellent results from our initial cross-sell activities. This is actually a little bit dated. We've done roughly three or four direct marketing campaigns since the close in October. So, in 4 months, we've booked not 200,000 but over 220,000 new card accounts, indicating what we felt a latent demand in the Washington Mutual customer base for credit cards. Our response rates have been a lot higher than we anticipated and our acquisitions cost lower. The integration is on track. We are on track to achieve all of our milestones on time, and we should beat our initial estimates on cost saves.

Exhibit 10 of 30                                                                                                    Page 78

Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

We have a terrific management team led by Joe Saunders. I'm proud to say the whole management team is signed up, enthusiastic, going well. And we are now moving into Phase II in February. This next month, we're going to be launching in our retail stores a pre-approved pilot of credit cards, so our customers can walk in, they would be pre-approved for a card, will be able to do that at the point-of-sale. And we will be rolling that out across all of our retail centers in the second quarter, which is going to add some more fuel to that momentum.

We will then be adding cards as we go forward in our phones, over the Web and in other ways of dealing with our customers. So, in summary, we are extremely pleased with Card Services, and we are comfortable that we will meet or exceed the accretion estimates we projected for the acquisition.

Now, our Commercial Group. Our Commercial Group had a solid year, up 13%, $750 million in net income. Multi-family lending volumes was up 20%, pushing outstanding balances up 15%. Long Beach subprime lending grew 82% to 30 billion despite a very tough environment, which continues today. And, meanwhile, our cost to originate both in multi-family and in Long Beach were down pretty significantly year on year. So we're very pleased with those results. And I will come back to commercial in a minute and talk about some of the changes we've made structurally.

Finally, home loans -- in the home loans -- and let me define home loans. Up until recently, that was a prime-only home lending business. Rising short-term interest rates in the flat yield curve in '05 had an impact, driving our MSR hedging costs much higher during the fourth quarter of last year. Despite that impact, the Home Loans Group grew net income 15% to $742 million. We've also made significant progress over the past year. I am particularly proud of the fact as Brad mentioned that we've added a lot of experienced mortgage banking professionals to run that business. We'd put our teams toe to toe with any in the industry. We've reduced annual non-interest expense by nearly $350 million, while growing the number of loan consultants by 23%. And we are driving productivity with the number of loans serviced per FTE up 30%. However, it is a very challenging environment for mortgage banking right now. While we work our way through that environment, we're going to continue to improve the business, rethink it, diversify it, which I will come back to in another minute.

So, looking forward again, each business is focused on growth -- organic growth. And as you saw, we've got an experienced team and expect solid growth from all of our business units. In retail, we will continue to grow depositor and retail banking fees in the range of 10 to 12% by driving new household growth and increasing cross-sell ratios. We will do this by meeting customer needs with a simple set of products and great service anchored by free checking, and we are also getting much more granular and rigorous in how we manage our stores. We anticipate opening in the guidance we've given 150 to 200 new retail stores this year.

Now, in the card business -- and I've talked about this a little bit -- the key activity for us is to continue to run the business they had and then overlay it with our retail franchise. As you can see, we are off to a great start. What we expect to do as the year goes on is to have Washington Mutual cards with our brand by mail, in our stores, over the phone, over the Web and pre-approved in our stores to accelerate the growth in receivables in the card business, which is terrific for our Company. We expect the Commercial Group, which is highly efficient, to leverage their cost structure and grow their multi-family origination business and balances by penetrating existing markets further and selectively expanding into key new markets.

In home loans, we feel we are now positioned to increase market share. However, that market share will have particular emphasis on high-margin products that that group has not sold actively in the past. And, that includes prime home equity, Alt-A product, subprime product and other high-margin products, including cards down the road. So, we feel very good about our opportunities to grow despite a challenging environment in the Home Loans Group.

Now let me take this a little bit further and talk a little bit about cross business sales and the momentum we're picking up. So, in addition to the vertical growth in these businesses, we are selectively looking for cross-sell horizontally across these various businesses, putting a lot of focus on it, incorporating it into our business plans. So, just to take you through this -- in the retail bank, 8.5 million households, 2,100 retail banking stores. But we have yet to

Exhibit 10 of 30                                                                 Page 79

Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

really scratch the surface on credit card cross-sell. We are focused on that as I said before, and we think we're going to have a big year.

We originate first mortgages through our retail stores, but our model has not worked particularly well. We have refocused on that. We've put a new model in place; we are launching it. We expect to increase the volume of mortgage loans out of our retail branches. We don't today have a referral process. If a customer is turned down for a blemish on their credit and we could give them a subprime loan, they have in the past gone to a competitor. We're working on changing that.

So we're pursuing each one of these, each one of them taking off with a different level of momentum. In home loans, almost 5 million customers; serviced, 4.6 million. We add thousands of new customers every year. And we are focused particularly on the easiest form of cross-sell, which the Company has not been able to get a lot of traction on until recently, which is selling home equity loan origination stand alone and as a piggyback to the first mortgage. We're making good progress here, and we expect big things in this area this year.

Card Services, almost 10 million accounts. Besides cross-selling cards, we're beginning to experiment with selling Washington Mutual products to those customers in our footprint. And I might also note in another example of the value of the acquisition of this card business, we've taken their best-in-class direct marketing capabilities, their best-in-class information, their best-in-class efficiencies around mailing and printing. And we've consolidated all of our direct marketing for home equity, checking accounts and everything else we sell under Warren Wilcox, who runs marketing over in the Card Group. We think that's going to be efficient and effective for us in growing our business.

Now, let me turn from cross-selling to cross-business efficiency initiatives and get back to that efficiency ratio we're after. Let me just talk about these four major items that we're working on, and then I will give you some specifics. As we push this growth agenda, we're also taking steps to drive efficiency across the business and create a culture of productivity, best-in-class efficiency at Washington Mutual. The way I describe this is a reorganization of our middle and back office from one shape by historic acquisitions to an operation, driven by our core business activities across the country. The reorganization involves relocating resources from high-cost to low-cost locations and increasing our use of offshore resources where appropriate.

We are also using something we call OpEx; you can think of that as WaMu's version of Six Sigma. To drive efficiencies throughout the Company, we are increasing the focus on this. This helps us redesign processes, and it helps us keep operating costs flat for the past 3 years. It's a key tool along with aggressive sourcing and rigorous project management.

Of course, what would a presentation about efficiency be without a quick comment about technology? We believe we have a terrific technology infrastructure, but there's room for improvement in the way we prioritize the tools we deliver and how we use them in the Company.

So let me take these four items a step further and give you some specifics. These efficiency initiatives are gaining momentum. So the first one, which we noted at our fourth-quarter call, the initial wave of transfers to low-cost locations; 1,000 jobs will be relocated from California. We announced last June, the selection of San Antonio as the new regional operating center. It's a great environment for us, and we expect that to grow from the 1,000 here to 3,000 FTEs in San Antonio.

In addition, we are accelerating offshore activities. We currently utilize about 1,600 offshore FTEs. However, most of those were brought to us through the acquisition of Providian, which was active offshore. And we had a complement of technology personnel offshore. What we are now doing is going through the whole Company and sifting for areas that might be offshorable. We announced the fact that by the end of this year, we would have 3,000 FTE moved offshore and up to 6,000 by the end of next year.

In addition, I announced at the end of December, the restructure of the Commercial Group. We're moving our Long

Exhibit 10 of 30                                                                                                          Page 80

Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

Beach subprime operation and our Mortgage Banker Finance unit, both highly correlated to prime home loans together under the leadership of David Schneider. They are working through a very rigorous process of going through that integration that started at the beginning of this year. We expect some significant opportunities for efficiency and also cross-selling. In addition, we are using OpEx in every tool to review all processes in the Company, all business segments and all expense categories to boost efficiency over the duration of that 5-year plan I mentioned. So, I can tell you with certainty, we are committed to improving the efficiency ratio at Washington Mutual and improving our productivity.

So, key takeaways before we get into questions. We believe our model is sound, and our execution is improving and on target. Second, each of our businesses has shown solid growth, and we are focused on a small but critical set of cross-business initiatives that are going to add additional fuel to the growth we've got going within each business by leveraging our distribution channels. Third, we are driving higher levels of productivity. And fourth and perhaps most importantly, I believe we have the right management team. We are always looking to improve it, but we've made significant changes to our team, adding people from other large organizations who are used to dealing with complexity and large scale to the already strong team we had at Washington Mutual.

So, I guess in closing, we are pleased with the progress we've made as a Company in '05. I celebrated my 1-year anniversary about 2 weeks, 3 weeks ago. But we are committed to every day taking the Company to the next level with more focus, more execution, rigorous management for performance throughout the Company and continuing to drive Washington Mutual to a new level of performance.

So, with that, what I would love to do is leave you with the forward-looking statement, the most exciting slide I have, and then move to Q&A. Thank you very much.

UNIDENTIFIED SPEAKER: Any questions? Maybe I will get it started. Steve, I wonder if you can give us some thoughts about how to think about WaMu's model in the context of the rate environment. If the Fed is complete or near complete with their tightening cycle, what would be the implications across your businesses?

STEVE ROTELLA: I was kind of hoping you would ask that. You know, if you look historically at our business model, we believe that when the Fed stops raising short-term rates and in addition as the curve takes on a bit more of a positive slope, our net interest margin is going to expand because the assets we have are lagging those rate changes. And we would expect over about a 1-year timeframe for us to catch up. And a normalized NIM for us would be about 300 to 310. To put that in context in the full year of 2005, our net interest margin full year was 2.67. Our fourth quarter was 2.77, but that had the impact of the Card Services organization in it.

So I went through a whole number of initiatives we have, and those initiatives we're going to aggressively pursue regardless of what happens to the interest rate environment. It is imperative for us to do that. But, we do know that while we're doing that and improving the business, we would expect our NIM to snap back when the rate environment changes. Yes?

UNIDENTIFIED AUDIENCE MEMBER: (inaudible -- microphone inaccessible) On the branches you're opening this year, which are being planned, can you tell us a little bit about how metrics are developing? I mean in the past, you would have a certain number of days of profitability so forth. Is that actually changing with more and more branches being opened? Is it getting better sooner -- metrics in terms of deposit gathering and so forth?

STEVE ROTELLA: As I said, we are targeting 150 to 200 new stores this year. However, let me just state as I did at our Investor Day in October and November, we will not be bound by that set of numbers. It does give us a pretty wide range of flexibility. But, if conditions are such that we think we can build more on our schedule profitably, we will do that. If it means less, we will do that as well.

With that said, I do think the Company has had a good history of opening new stores and building them efficiently. We think the Occasio model we use is an efficient model if we build them more efficiently than most players, given the

Exhibit 10 of 30                                                                                                       Page 81

Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

way they are constructed. We have good success in getting them to breakeven in a time period we think is reasonable. With that said, we've worked in '05 to improve that. So a lot more granularity in thinking about where we want to locate our stores has occurred particularly in the first half of '05 and is really guiding us in setting out new stores. And just to give you kind of the qualitative view of that, our model is really one that works best in dense demographics in the mass middle market. As I said earlier, we're not a Company that is looking to segment our customers, create a big private banking operation. In fact, we have none. We're after the guys, who drive Toyotas and those kind of cars, not the BMW I drive. Those are our customers. We've refined our modeling and our targeting, defined the right locations and I would offer up that that's unusual for most national institutions. We think that's an underserved market.

Once we get into those markets and we put them in the right locations, it's up to us to execute. And execution involves a couple of things -- number one, launching the store effectively with some presale and pre-work in direct mail and brochures and opening day celebrations and sales campaigns. And again, that scenario we've improved significantly in '05, and we had some opportunity to improve.

Then the third one is to stay focused on what gets us to breakeven. What gets us to breakeven is not running around looking for home equity loans early on, even though we like them. And it's not running around looking to get deposits, even though we like them. It is getting checking accounts in households established in the store. We've got specific metrics for how many checking accounts we need, what market share we expect to get market by market. We are tracking those month by month progress against our actuals. If we're not hitting our actuals, we take remedial action. So, we think we've got a good model to open new stores and one that has been refined and improved from what was already a pretty good model in the past. Yes?

UNIDENTIFIED AUDIENCE MEMBER: I guess I have a question in regards to -- we've sat here in past years and heard your theory of where you saw the bank as being a mortgage lender, etc. Can you -- basically two questions -- can you tell us what the vision is of what you see the bank being today and a little bit more specifics on how you are hedging your mortgage portfolio now and whether it's working? Because it seems like you are reinventing yourself, but I'm always confused on where you are trying to get to.

STEVE ROTELLA: You know, I will try to answer that in the context of the fact that I'm the new guy sort of. I've been here a year and come from a different background. But, I understand your question, and I will try to answer it as best as I can. And if I stumble, my trusty friend here, Alan Magleby from Investor Relations, will correct me about past things.

I think I said earlier that the Company is leaving its thrift legacy behind. I think it's fair to say that Washington Mutual historically has been more of a traditional thrift although a big one with substantially its retail franchise gathering checking accounts and deposits and its mortgage lending operations. What we are doing is leaving that thrift legacy behind and I guess you can say becoming more bank like, however a different kind of bank. Again, one that is focused on consumer and small business.

So, what we're trying to do is create an earnings stream that's more diversified, that's more consistent and that has a higher component if you think about it of credit risk that we price more appropriately and manage correctly and a little lower level of market risk, which comes out of the mortgage business. And that, you can see from that chart I put up in terms of the asset evolution, I think is pretty clear. We continue to move in that direction.

But, as we do that, we're not going to try to diversify ourselves into things that are not in our strike zone. There are lots of things you could ask about or I could hypothesize about that are not in our strike zone, that we're not going to do just to diversify our model. What we're going to do is move ourselves from an asset standpoint to higher margin products, and we think we've gotten most of the tools we need to do that. It's a question of executing. And at the same time, we need to refocus our home loans business into one that's also bringing in high-margin assets and is focusing less on a percentage basis on assets that will create MSR or that have very thin margins. I don't know if that answered your question. But if not, follow-up and tell me.

Exhibit 10 of 30                                                                                                          Page 82

Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

On the hedging side, let me just mention that -- look, the Company went through some tough times back in '04 around hedging that MSR. I wasn't here at the time. I was running a different company's mortgage business. What I can say with certainty is we dramatically improved the people who are managing that asset, starting before I got here to today, and that's very important. It's a highly complex financial asset with a lot of moving pieces and parts, and you need people who understand it and people who are very technical. We've done that. Two, you need to have great models and we've improved our models, both prepaid models, valuation models. Three, we've continued to use quality control like BlackRock to take a look at our hedging strategies -- what we're doing, how we are doing it. They come in periodically, take a dive at it. Four, we've improved our outside -- inside Washington Mutual but outside oversight of that through our much stronger market risk function, independent audits, QC and so on and so forth all to get around controlling that asset as best we can.

And, I would tell you that today, I think we've got a risk management organization around the MSR asset that's very, very good. I wouldn't step out and say it's best in class, but I think it's very, very good. I'm not sure who best in class is. And I think the results over the last 6, 7 quarters reflect the fact that variation in the results have been related to the environment around us, not to the performance of the people hedging the asset.

Steps were taken in '04 to lower basis risk and hedge the asset differently, and we think we've been pretty successful. But, if you look at the quarterly numbers -- I'm going on here a little bit -- but in '05, performance actually was less positive as the year rolled on, primarily because the curve flattened out. And what that did to us is it raised the cost of options and other instruments we used to hedge the portfolio, and we lost the carry-on instruments that were hedging the portfolio.

So, we've lost income. Cost has gone up. It has caused deterioration in results, and we are in a very difficult environment for hedging that asset. But, net-net-net, bottom line if I were to answer that quickly, I think we're doing a very solid job of hedging that asset today. But, it is a volatile asset.

UNIDENTIFIED AUDIENCE MEMBER: Could you comment on your exposure to interest-only mortgages and exotic mortgages and what type of processes you have in place to mitigate the risk associated with these mortgages, especially with the interest rate environment right now and the overstretched U.S. consumer? How do you mitigate those risks?

STEVE ROTELLA: Let's separate that into two pieces. I'm not a big fan of the term exotic mortgages. It kind of makes me think we're out in the marketplace doing a fan dance with our mortgages or something like that. You have to separate interest-only from our option ARM product, which has been a flagship product for us, which is a little bit more complex product and I will come back to that.

Interest-only, I view as a pretty core product in the mortgage banking business. We offer 5 and 7-year interest-only products. They are fully amortizing products. Customers like them, particularly when they know that they're going to be going into a home where they may be moving or refinancing in that time period, they get a fixed rate over that period. I think we've probably -- Alan may help me here -- on the balance sheet, I think we've got under $10 billion of interest-only product and we could get the specific --

ALAN MAGLEBY, IR, WASHINGTON MUTUAL: A little over.

STEVE ROTELLA: A little over? Okay, a little over $10 billion. The credit quality on those products has been quite good. Consumers like them, and I personally believe it's a good product if you put the right customer into the product. It's always a question of suitability; it's not for everybody.

Our option ARM product, you know Washington Mutual has been in the business of offering option ARMs for a long, long time I think around 15 years. But, don't quote me on that. But I believe that's the case. So, unlike some other players, I think one thing in our favor is we have a lot of experience with the product. Two, I think we do a good job of trying to fit the right customer to that mortgage. And three, make sure that we disclose properly the various feature and

Exhibit 10 of 30                                                                                                              Page 83

Page 9
Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

function of the product.

We have a pretty substantial balance sheet of option ARM products. The LTV -- the average LTV in that portfolio is roughly 69% at inception and now stands at about 55% when you take into account appreciation of home prices. So, from a Washington Mutual perspective, an awful lot of those option ARMs were put on our balance sheet prior to '05, and they've benefited from appreciation. So we feel pretty good about the credit risk. In '05, we sold increasing percentages of our option ARM increasing as the year went on, particularly as the rate environment changed. Again, we feel pretty good about the position we have in option ARMs, about our servicing organization, their ability to collect on it.

Frankly, consumers, who are pretty savvy characters, understand that it's a good product for certain customers when they feel like it's time to refinance. It's not too hard to refinance mortgages these days. In fact, what's going on with the flat yield curve right now is customers are moving from ARM products to more intermediate-term and fixed-rate products, and we've seen the flow of applications and also refinances in ARM products change pretty dramatically with the change in the rate environment.

UNIDENTIFIED SPEAKER: I think we have time for one last question. No?

STEVE ROTELLA: I guess we'll go over there and maybe we can squeeze two quick ones in? But go ahead. Make it quick.

UNIDENTIFIED AUDIENCE MEMBER: (inaudible -- microphone inaccessible)

STEVE ROTELLA: Can I do what? I'm sorry.

UNIDENTIFIED AUDIENCE MEMBER: Could you divide your growth last year between how much is associated with de novo and how much was organic in your legacy locations?

STEVE ROTELLA: Let me tell you that we look at every branch individually. I mean I have 2,100 plus stores around the country, and every one of them has to be looked at within its MSA for how it's doing. Is it reaching its potential or not? So, the answer is, we can do it right down to the store level and cut it any way we want to but it's not information we disclose.

What I can tell you as you'd expect is new stores are going to have higher rates of household growth because they are new in the market, they are bringing in customers, they are establishing the core checking account. And more established store in a more established market is going to be more focused on cross-selling. So, if you look at the metrics we provide, we provide data on new account growth and cross-selling; both of them are growing. Your new account growth is going to tend to be in new stores. And I think that's about the best I can answer that. Do we have time for that last one, Brad?

UNIDENTIFIED SPEAKER: Sure. Let's squeeze it in.

UNIDENTIFIED AUDIENCE MEMBER: During your presentation, you talk about your interest in the checking account. But all development says that we use debit card and credit cards to (indiscernible) than they use the checking account. Can you elaborate to me what your strategy for the Company is capable of developing your Company's profitability going forward?

STEVE ROTELLA: Yes, I mean they are not inconsistent at all because the debit card is linked to the checking account. It's just a function of do you write it on a piece of paper or do you use a piece of plastic. We're very happy with consumers switching over to debit cards. As you saw, we are the third-largest issuer of debit cards in the United States. We encourage customers to use them, to buy and to have the money taken out of their accounts or use it to get cash back. So, that trend benefits us. We think it is a convenience for the customer. You know, we like it and we earn

Exhibit 10 of 30                                                                                                    Page 84

Washington Mutual at Citigroup Financial Services Conference - Final FD (Fair Disclosure) Wire January 31, 2006
Tuesday

interchange income on that.

In terms of credit cards, consumers use credit cards. We've got a credit card business. We're glad to be in the business. We are growing it dramatically. So, that will not change the fact that customers need that central account to put their pay checks in and their working cash flow that they use to buy things day to day. Whether they access it with plastic, over the Web or through paper, it's immaterial to us. There is a movement away from paper however. Thank you very much.

UNIDENTIFIED SPEAKER: Thank you, Steve.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** March 2, 2006

Exhibit 10 of 30    Page 85

# **Exhibit 11**

Exhibit 11 of 30

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2005**

**Commission File Number 1-14667**

# WASHINGTON MUTUAL, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91-1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1201 Third Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(206) 461-2000**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Litigation Tracking Warrants™ | NASDAQ |

Indicate by check mark if the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act. Yes ☒  No ☐.

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐  No ☒.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):  Large accelerated filer ☒  Accelerated filer ☐  Non-accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒.

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2005, based on the closing sale price as reported on the New York Stock Exchange:

**Common Stock—$35,345,279,226[1]**

[1] Does not include any value attributable to 6,000,000 shares held in escrow.

The number of shares outstanding of the issuer's classes of common stock as of February 28, 2006:

**Common Stock—992,254,791[2]**

[2] Includes 6,000,000 shares held in escrow.

**Documents Incorporated by Reference**

Portions of the definitive proxy statement for the Annual Meeting of Shareholders to be held April 18, 2006, are incorporated by reference into Part III.

Exhibit 11 of 30                                                                 Page 87

*Risks related to subprime lending.*

The Company remains committed to the subprime mortgage market and intends to increase the loan volume of its subprime mortgage business, Long Beach Mortgage Company, and to maintain the size of its purchased subprime home loan portfolio. A portion of the Company's Card Services portfolio is made up of subprime credit card loans and Card Services may continue to originate a portion of its credit card loans to subprime borrowers. If unemployment were to rise or either a slowdown in housing price appreciation or outright declines in housing prices were to occur, subprime borrowers, who tend to have greater vulnerability to such changes than prime borrowers, may be unable to repay their loans and the credit performance of the Company's subprime portfolios could suffer, with a potential adverse effect on earnings.

*Risks related to the integration of the Card Services business.*

The Company commenced its credit card operations as the result of the merger of Providian Financial Corporation into the Company in a transaction completed on October 1, 2005. The success of the merger will depend, in part, on the Company's ability to realize the anticipated benefits from the merger, such as accelerated growth, enhanced customer relationships and product and earnings diversification. One of the key factors in realizing the anticipated benefits of the merger will be the Company's ability to retain the management personnel from Providian who are leading the Card Services business. As the integration process for the Card Services business continues, it is possible that critical financial, growth or other objectives could be missed, key employees could be lost, or data, communications and other systems or operations could fail to be successfully combined. Integration efforts also divert management attention and resources away from other activities. Any failure to successfully integrate the Card Services business into the Company, loss of key management personnel or any significant delay or unanticipated diversion of resources in completing such integration, could adversely affect the Company's performance.

*Risks related to credit card operations.*

Credit card lending brings with it certain risks and uncertainties. These include the composition and risk profile of the Company's credit card portfolio and customers, and the Company's ability to continue growing the Company's credit card business. The success of the credit card business will also depend, in part, on the success of its product development, product rollout efforts and marketing initiatives, including the rollout of credit card products to the Company's existing retail and mortgage loan customers, and its ability to continue to successfully target creditworthy customers. Recent disputes involving the Visa and MasterCard networks, including their membership standards and pricing structures, could also result in changes that would be adverse to the credit card business. Changes in interest rates also affect the credit card business, including the costs associated with funding the credit card portfolio and the valuation of retained interests related to credit card securitizations.

*Changes in the regulation of financial services companies, housing government-sponsored enterprises and credit card lenders.*

Proposals for further regulation of the financial services industry are continually being introduced in Congress. The agencies regulating the financial services industry also periodically adopt changes to their regulations. Proposals that are now receiving a great deal of attention include consumer protection initiatives relating to bank overdraft practices, security of customer information, marketing practices, the Real Estate Settlement Procedures Act, nontraditional loan products including Option ARMs, credit card lending practices and predatory lending. In addition, there continues to be a focus on reform of the housing government-sponsored enterprises ("GSEs") including the federal home loan bank system. It is possible that one or more legislative proposals may be adopted or regulatory changes may be made that would have an adverse effect on the Company's business. For further discussion of the regulation of financial services, see "Regulation and Supervision."

4

*The Company faces competition from banking and nonbanking companies.*

The Company operates in a highly competitive environment and expects competition to continue as financial services companies combine to produce larger companies that are able to offer a wide array of financial products and services at competitive prices. In addition, customer convenience and service capabilities, such as product lines offered and the accessibility of services are significant competitive factors.

The Company's most direct competition for loans comes from commercial banks, other savings institutions, investment banking firms, national mortgage companies and other credit card lenders. Its most direct competition for deposits comes from commercial banks, other savings institutions and credit unions doing business in the Company's market areas. As with all banking organizations, the Company also experiences competition from nonbanking sources, including mutual funds, corporate and government debt securities and other investment alternatives offered within and outside of its primary market areas. In addition, technological advances and the growth of e-commerce have made it possible for non-depository institutions to offer products and services that were traditionally offered only by banks. Many of these competitors have fewer regulatory constraints and some have lower cost structures.

The Company also faces competition for talent. Its success depends, in large part, on its ability to hire and keep key people. Competition for the best people in most businesses in which the Company engages can be intense. If the Company is unable to attract and retain talented people, its business could suffer.

*General business and economic conditions, including movements in interest rates, the slope of the yield curve and the potential overextension of housing prices in certain geographic markets.*

The Company's business and earnings are sensitive to general business and economic conditions. These conditions include the slope of the yield curve, inflation, the money supply, the value of the U.S. dollar as compared to foreign currencies, fluctuations in both debt and equity capital markets, and the strength of the U.S. economy and the local economies in which the Company conducts business. Changes in these conditions may adversely affect its business and earnings. For example, when short-term interest rates rise, there is a lag period until adjustable-rate mortgages reprice. As a result, the Company may experience compression of its net interest margin with a commensurate adverse effect on earnings. Likewise, the Company's earnings could also be adversely affected when a flat or inverted yield curve develops, as this may inhibit the Company's ability to grow its adjustable-rate mortgage portfolio and may also cause margin compression. A prolonged economic downturn could increase the number of customers who become delinquent or default on their loans, or a rising interest rate environment could increase the negative amortization of Option ARM loans, which may eventually result in increased delinquencies and defaults. Rising interest rates could also decrease customer demand for loans. An increase in delinquencies or defaults could result in a higher level of charge-offs and provision for loan and lease losses, which could adversely affect earnings.

The Company's business and earnings are significantly affected by the fiscal and monetary policies of the federal government and its agencies. The Company is particularly affected by the policies of the Board of Governors of the Federal Reserve System, which regulates the supply of money and credit in the United States. Federal Reserve System policies directly and indirectly influence the yield on the Company's interest-earning assets and the cost of its interest-bearing liabilities. Changes in those policies are beyond the Company's control and difficult to predict.

*Negative public opinion impacts the Company's reputation.*

Reputational risk, meaning the risk to earnings and capital from negative public opinion, is inherent in the Company's business. Negative public opinion can result from the actual or perceived manner in which the Company conducts its business activities, which include its sales and trading practices, its loan origination and servicing activities, its retail banking and credit card operations, its management of actual

5

Exhibit 11 of 30                                                                                          Page 89

million, all of which resulted from the Company's new Card Services segment, and improved revenues from the Company's home loan banking operations. At December 31, 2005, total managed credit card receivables were approximately $19.96 billion, an increase of nearly $700 million during the fourth quarter of 2005. A significant portion of this increase was the result of cross-selling credit card products to the Company's retail banking customer base.

Revenue from sales and servicing of home mortgage loans, including the effects of all MSR risk management instruments, was $1.79 billion in 2005, an increase from $1.47 billion in 2004. The increase was primarily due to higher levels of gains from the sale of mortgage loans and originated mortgage backed securities, net of gains and losses from risk management instruments. This increase was fostered by the strength of the U.S. housing market, which fueled strong customer demand for fixed-rate mortgages and the Company's Option ARM portfolio. In particular, the sustained liquidity of the Option ARM product in the secondary market enabled the Company to sell approximately $48.13 billion of Option ARM volume during 2005, compared with $14.12 billion in 2004. The Company also sells substantially all of its fixed-rate and medium-term adjustable-rate home loan volume.

As the yield curve continued to flatten throughout 2005 (and ended the year virtually flat), the interest rate differential between short-term adjustable-rate loans, such as the Option ARM, and fixed-rate loans continued to compress, which increases the desirability of fixed-rate loan products. Accordingly, short-term adjustable-rate loans, as a percentage of total home loan volume, declined from 39% in the fourth quarter of 2004 to 26% in the final quarter of 2005, while fixed-rate loans, as a percentage of total home loan volume, increased from 32% to 44% during the same periods.

The Company recorded a provision for loan and lease losses of $316 million in 2005, compared with a provision of $209 million in 2004. Reflecting the higher risk profile associated with the unsecured, higher-yielding lending activities conducted by Card Services, the 2005 provision included $195 million that was related to the credit card portfolio in the fourth quarter. A relatively benign credit risk environment for the Company's real estate secured lending activities existed through most of 2005, reflecting the positive effects of a low mortgage interest rate environment, stable or appreciating housing prices in most of the Company's markets, and a relatively low national unemployment rate.

Depositor and other retail banking fees were $2.19 billion in 2005, a 10% increase from 2004. The growth was driven by strong increases in the number of retail checking accounts as well as an increase in debit card interchange and ATM-related income. The number of retail checking accounts at December 31, 2005 totaled approximately 9.9 million, compared with approximately 9.0 million at December 31, 2004, an increase of over 900,000 accounts. Total retail transaction accounts, which include checking, money market and savings accounts, increased by nearly 1.5 million in 2005.

The Company continues to grow its retail banking business by opening new stores and enhancing its products and services. The Company opened 210 new stores in 2005, and has established a target of opening between 150 and 200 new stores within its existing markets during 2006. Although the Company expects total noninterest expense to be higher in 2006 as a result of the continuing expansion of the retail banking franchise and the full-year effect of absorbing the Card Services Group into the Company's cost structure, those efforts will also be accompanied by rigorous expense management discipline and the implementation of operational efficiencies and productivity improvements, including the redeployment of certain back-office support operations to more cost-effective labor markets and the consolidation of other administrative support facilities.

**Critical Accounting Estimates**

The preparation of financial statements in accordance with the accounting principles generally accepted in the United States of America requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the

17

Exhibit 11 of 30                                                                                                          Page 90

Consolidated Financial Statements. Various elements of the Company's accounting policies, by their nature, involve the application of highly sensitive and judgmental estimates and assumptions. Some of these policies and estimates relate to matters that are highly complex and contain inherent uncertainties. In some instances, different estimates and assumptions could have been reasonably used to supplant those that were applied. Had those alternative estimates and assumptions been applied, the differences that may result from those alternative applications could have a material effect on the financial statements.

The Company has identified three accounting estimates that, due to the judgments and assumptions inherent in those estimates, and the potential sensitivity of its Consolidated Financial Statements to those judgments and assumptions, are critical to an understanding of its Consolidated Financial Statements. These estimates are: the fair value of certain financial instruments and other assets; derivatives and hedging activities; and the allowance for loan and lease losses and contingent credit risk liabilities.

Management has discussed the development and selection of these critical accounting estimates with the Company's Audit Committee. The Company believes that the judgments, estimates and assumptions used in the preparation of its Consolidated Financial Statements are appropriate given the facts and circumstances as of December 31, 2005. These judgments, estimates and assumptions are described in greater detail in subsequent sections of Management's Discussion and Analysis and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

The discussion below presents information about the nature of the Company's critical accounting estimates:

**Fair Value of Certain Financial Instruments and Other Assets**

A portion of the Company's assets are carried at fair value, including: certain retained interests from securitization activities (which are classified as trading assets), available-for-sale securities and derivatives. Mortgage servicing rights and loans held for sale are recorded at the lower of carrying value or fair value. For those that qualify as hedged items under fair value hedge accounting, their changes in fair value are recognized in earnings and offset the changes in fair value of derivatives used as hedge accounting instruments.

Fair value is defined as the amount at which a financial instrument could be exchanged in a hypothetical transaction between willing, unrelated parties, other than in a forced or liquidation sale. Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models that utilize market data inputs and other assumptions, such as loan prepayment speeds, forward interest rate yield curves, market volatilities and pricing spreads to determine their fair values. The degree of management judgment involved in determining the fair value of a financial instrument or other asset is dependent upon the availability of quoted market prices or observable market value inputs. For financial instruments that are actively traded in the marketplace or whose values are based on readily available market value data, little, if any, subjectivity is applied when determining the instrument's fair value. When observable market prices and data do not exist, significant management judgment is necessary to estimate fair value. In those cases, small changes in assumptions could result in significant changes in valuation.

The following financial instruments and other assets require the Company's most complex judgments and assumptions when estimating fair value:

*Mortgage Servicing Rights and Certain Other Retained Interests in Securitizations*

MSRs and certain other retained interests from securitization activities do not trade in an active, open market with readily quoted prices. Although sales do occur from time to time, the terms of such sales are generally not readily available. Consequently, the Company estimates the fair value of MSRs and certain other retained interests in securitization activities utilizing internal discounted cash flow models.

18

Exhibit 11 of 30                                                                 Page 91

**Five-Year Summary of Selected Financial Data**

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| | **(in millions, except per share amounts)** | | | | |
| **Income Statement Data** (for the year ended) | | | | | |
| Net interest income . . . . . . . . . . . . . . . . . . . | $ 7,886 | $ 7,116 | $ 7,629 | $ 8,129 | $ 6,492 |
| Provision for loan and lease losses . . . . . . . | 316 | 209 | 42 | 404 | 426 |
| Noninterest income . . . . . . . . . . . . . . . . . . | 5,738 | 4,612 | 5,850 | 4,469 | 3,176 |
| Noninterest expense . . . . . . . . . . . . . . . . . . . | 7,870 | 7,535 | 7,408 | 6,188 | 4,416 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . . . | 3,432 | 2,878 | 3,880 | 3,861 | 3,104 |
| Basic earnings per common share[1]: | | | | | |
| Income from continuing operations . . . . | 3.84 | 2.88 | 4.20 | 4.01 | 3.57 |
| Income from discontinued operations, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – | 0.46 | 0.09 | 0.08 | 0.07 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . | 3.84 | 3.34 | 4.29 | 4.09 | 3.64 |
| Diluted earnings per common share[1]: | | | | | |
| Income from continuing operations . . . . | 3.73 | 2.81 | 4.12 | 3.94 | 3.51 |
| Income from discontinued operations, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – | 0.45 | 0.09 | 0.08 | 0.07 |
| Net income . . . . . . . . . . . . . . . . . . . . . . . | 3.73 | 3.26 | 4.21 | 4.02 | 3.58 |
| Dividends declared per common share[1] . . | 1.90 | 1.74 | 1.40 | 1.06 | 0.90 |
| **Balance Sheet Data** (at year end) | | | | | |
| Securities . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 24,659 | $ 19,219 | $ 36,707 | $ 43,905 | $ 58,233 |
| Loans held for sale . . . . . . . . . . . . . . . . . . . | 33,582 | 42,743 | 20,837 | 39,623 | 27,574 |
| Loans held in portfolio. . . . . . . . . . . . . . . . | 229,632 | 207,071 | 175,150 | 143,028 | 126,396 |
| Mortgage servicing rights. . . . . . . . . . . . . . | 8,041 | 5,906 | 6,354 | 5,341 | 6,241 |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,298 | 6,196 | 6,196 | 6,213 | 2,116 |
| Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 343,839 | 307,918 | 275,178 | 268,225 | 242,468 |
| Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . | 193,167 | 173,658 | 153,181 | 155,516 | 106,946 |
| Securities sold under agreements to repurchase . . . . . . . . . . . . . . . . . . . . . . . . . | 15,532 | 15,944 | 28,333 | 16,717 | 39,447 |
| Advances from Federal Home Loan Banks . . . . . . . . . . . . . . . . . . . . . . . . . . . | 68,771 | 70,074 | 48,330 | 51,265 | 61,072 |
| Other borrowings . . . . . . . . . . . . . . . . . . . . | 23,777 | 18,498 | 15,483 | 14,712 | 9,925 |
| Stockholders' equity . . . . . . . . . . . . . . . . . . | 27,616 | 21,226 | 19,742 | 20,061 | 14,025 |
| **Supplemental Data** | | | | | |
| Loan volume: | | | | | |
| Home loans: | | | | | |
| Adjustable rate . . . . . . . . . . . . . . . . . . | $ 95,114 | $103,305 | $ 99,899 | $ 84,627 | $ 37,224 |
| Fixed rate . . . . . . . . . . . . . . . . . . . . . . . | 78,118 | 77,723 | 263,604 | 180,745 | 108,105 |
| Specialty mortgage finance[2] . . . . . . . . | 34,490 | 31,334 | 20,678 | 14,077 | 10,333 |
| Total home loan volume . . . . . . . . . . . . . | 207,722 | 212,362 | 384,181 | 279,449 | 155,662 |
| Total loan volume . . . . . . . . . . . . . . . . . . . | 261,157 | 266,733 | 432,245 | 309,419 | 172,951 |

[1] Restated for all stock splits.
[2] Represents purchased subprime loan portfolios and mortgages originated by Long Beach Mortgage Company.

24

Exhibit 11 of 30                                                          Page 92

2005 predominantly due to the purchase of mortgage-backed securities. Refer to Note 3 to the Consolidated Financial Statements – "Securities" for additional information on securities, classified by security type.

**Loans**

Total loans consisted of the following:

| | December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | | | (in millions) | | |
| Loans held for sale . . . . . . . . . . . . . . . . . . . . . . . | $ 33,582 | $ 42,743 | $ 20,837 | $ 39,623 | $ 27,574 |
| Loans held in portfolio: | | | | | |
| Loans secured by real estate: | | | | | |
| Home loans[1] . . . . . . . . . . . . . . . . . . . . . . . . . | 135,290 | 129,134 | 113,016 | 92,970 | 87,833 |
| Home equity loans and lines of credit . . . | 50,851 | 43,650 | 27,647 | 16,168 | 7,970 |
| Home construction[2] . . . . . . . . . . . . . . . . . | 2,037 | 2,344 | 2,220 | 1,949 | 2,602 |
| Multi-family[3] . . . . . . . . . . . . . . . . . . . . . . . | 25,601 | 22,282 | 20,324 | 18,000 | 15,608 |
| Other real estate[4] . . . . . . . . . . . . . . . . . . . | 5,035 | 5,664 | 6,649 | 7,986 | 6,089 |
| Total loans secured by real estate . . . . | 218,814 | 203,074 | 169,856 | 137,073 | 120,102 |
| Consumer: | | | | | |
| Credit card . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,043 | – | – | – | – |
| Other. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 638 | 792 | 1,028 | 1,663 | 2,009 |
| Commercial business . . . . . . . . . . . . . . . . . . | 2,137 | 3,205 | 4,266 | 4,292 | 4,285 |
| Total loans held in portfolio[5] . . . . . . . | $229,632 | $207,071 | $175,150 | $143,028 | $126,396 |

[1] Includes specialty mortgage finance loans, which are comprised of purchased subprime home loans and subprime home loans originated by Long Beach Mortgage Company and held in its investment portfolio. Specialty mortgage finance loans were $21.15 billion, $19.18 billion, $12.98 billion, $10.13 billion and $8.21 billion at December 31, 2005, 2004, 2003, 2002 and 2001.

[2] Represents loans to builders for the purpose of financing the acquisition, development and construction of single-family residences for sale and construction loans made directly to the intended occupant of a single-family residence.

[3] Includes multi-family construction balances of $632 million in 2005, $333 million in 2004, $325 million in 2003, $491 million in 2002 and $385 million in 2001.

[4] Includes other commercial real estate construction balances of $208 million in 2005, $277 million in 2004, $382 million in 2003, $469 million in 2002 and $608 million in 2001.

[5] Includes net unamortized deferred loan origination costs of $1.53 billion, $1.25 billion, $1.01 billion, $587 million and $433 million at December 31, 2005, 2004, 2003, 2002 and 2001.

Total home loans consisted of the following:

| | December 31, | |
|---|---|---|
| | 2005 | 2004 |
| | (in millions) | |
| Home loans: | | |
| Short-term adjustable-rate loans[1]: | | |
| Option ARMs[2] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 70,191 | $ 66,310 |
| Other ARMs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14,666 | 9,065 |
| Total short-term adjustable-rate loans . . . . . . . . . . . . . . . . . . . . . . . . . . | 84,857 | 75,375 |
| Medium-term adjustable-rate loans[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41,511 | 45,197 |
| Fixed-rate loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8,922 | 8,562 |
| Total home loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $135,290 | $129,134 |

[1] Short-term is defined as adjustable-rate loans that reprice within one year or less.

[2] The total amount by which the unpaid principal balance ("UPB") of Option ARM loans exceeded their original principal amount was $157 million and $11 million at December 31, 2005 and 2004.

[3] Medium-term is defined as adjustable-rate loans that reprice after one year.

36

Exhibit 11 of 30                                                                                    Page 93

During most of 2005, loans held for sale remained at elevated levels, with an average balance during 2005 of $44.85 billion compared with $29.72 billion during 2004. As the yield curve continued to flatten during 2005, it began to influence the product mix of loans originated, steering customers towards fixed-rate products, which the Company generally designates for sale. Additionally, during 2005 the Company designated approximately $43.97 billion of Option ARMs for sale, representing 70% of 2005 Option ARM volume, compared with $31.48 billion, or 47% of Option ARM volume in 2004.

The Company's loans held in portfolio increased $22.56 billion to $229.63 billion at December 31, 2005 from $207.07 billion at December 31, 2004. The increase was substantially due to the addition of the credit card portfolio from the Card Services Group and an increase in total home loan and home equity loans and lines of credit balances. Primarily all of the growth in the home loan and home equity loan and line of credit portfolios resulted from the origination of short-term adjustable-rate products. The Company's short-term adjustable-rate home loans, which were predominantly comprised of Option ARM loans, increased from $75.38 billion at December 31, 2004 to $84.86 billion at December 31, 2005.

Home, multi-family and other commercial real estate construction loans and commercial business loans by maturity date were as follows:

| | December 31, 2005 | | | |
| | Due Within One Year | After One But Within Five Years | After Five Years | Total |
|---|---|---|---|---|
| | | (in millions) | | |
| Home construction: | | | | |
| Adjustable rate | $ 829 | $ 88 | $ 1 | $ 918 |
| Fixed rate | 203 | 4 | 912 | 1,119 |
| Multi-family construction: | | | | |
| Adjustable rate | 251 | 220 | 2 | 473 |
| Fixed rate | 47 | 59 | 53 | 159 |
| Other commercial real estate construction: | | | | |
| Adjustable rate | 58 | 143 | 1 | 202 |
| Fixed rate | 4 | 2 | – | 6 |
| Commercial business: | | | | |
| Adjustable rate | 1,586 | 166 | 94 | 1,846 |
| Fixed rate | 28 | 205 | 58 | 291 |
| Total | $3,006 | $887 | $1,121 | $5,014 |

**Deposits**

Deposits consisted of the following:

| | December 31, | |
| | 2005 | 2004 |
|---|---|---|
| | (in millions) | |
| Retail deposits: | | |
| Checking deposits: | | |
| Noninterest bearing | $ 20,752 | $ 17,463 |
| Interest bearing | 42,253 | 51,099 |
| Total checking deposits | 63,005 | 68,562 |
| Savings and money market deposits | 36,664 | 36,836 |
| Time deposits | 40,359 | 27,268 |
| Total retail deposits | 140,028 | 132,666 |
| Commercial business deposits | 11,459 | 7,611 |
| Wholesale deposits | 29,917 | 18,448 |
| Custodial and escrow deposits[1] | 11,763 | 14,933 |
| Total deposits | $193,167 | $173,658 |

[1] Substantially all custodial and escrow deposits reside in noninterest-bearing checking accounts.

37

Exhibit 11 of 30                                                                    Page 94

The increase in noninterest-bearing retail checking deposits was driven by an increase in the number of individual and small business checking accounts. Interest-bearing checking deposits decreased as customers shifted from Platinum checking accounts to time deposits as a result of higher rates offered for these products. Wholesale deposits increased 62% from 2004, due predominantly to an increase in institutional investor certificates of deposit as well as brokered certificates of deposit acquired from Providian Financial Corporation.

Transaction accounts (checking, savings and money market deposits) comprised 71% of retail deposits at December 31, 2005, compared with 79% at year-end 2004. These products generally have the benefit of lower interest costs, compared with time deposits, and represent the core customer relationship that is maintained within the retail banking franchise. Deposits funded 56% of total assets at December 31, 2005 and 2004.

**Operating Segments**

The Company has four operating segments for the purpose of management reporting: the Retail Banking and Financial Services Group, the Home Loans Group (previously called the "Mortgage Banking Group"), the Card Services Group and the Commercial Group. The Retail Banking and Financial Services Group, the Home Loans Group and the Card Services Group are consumer-oriented while the Commercial Group serves commercial customers. In addition, the category of Corporate Support/Treasury and Other includes the community lending and investment operations as well as the Treasury function – which manages the Company's interest rate risk, liquidity, capital, borrowings, and a majority of the Company's investment securities. The Corporate Support function provides facilities, legal, accounting and finance, human resources and technology services.

During the fourth quarter of 2005, the Company announced its plans to reorganize its single family residential mortgage lending operations. This reorganization combined the Company's subprime mortgage origination business, Long Beach Mortgage Company, as well as its Mortgage Banker Finance lending operations within the Home Loans Group. This change in structure was effective as of January 1, 2006. The following discussion and presentation of financial results reflects the structure that was in place during 2005.

The Company serves the needs of 19.5 million consumer households through its 2,140 retail banking stores, 487 lending stores and centers, 3,747 ATMs, telephone call centers and online banking.

The principal activities of the **Retail Banking and Financial Services Group** include:

- Offering a comprehensive line of deposit and other retail banking products and services to consumers and small businesses;

- Originating, managing and servicing home equity loans and lines of credit;

- Providing investment advisory and brokerage services, sales of annuities, mutual fund management and other financial services; and

- Holding the Company's portfolio of home loans held for investment, excluding loans originated by Long Beach Mortgage Company (which are held by the Commercial Group).

Deposit products offered by the segment in all its stores include the Company's signature free checking and interest-bearing Platinum checking accounts, as well as other personal checking, savings, money market deposit and time deposit accounts.

Financial consultants provide investment advisory and securities brokerage services to the public while licensed bank employees offer fixed annuities. The Company's mutual fund management business offers investment advisory and mutual fund distribution services.

38

Exhibit 11 of 30                                                                                    Page 95

This segment's home loan portfolio consists of home loans purchased from both the Home Loans Group and secondary market participants. The segment also purchases and re-underwrites loans to subprime borrowers which are held in the home loan portfolio. Loans held in portfolio generate interest income and loan-related noninterest income, such as late fees and prepayment fees.

The principal activities of the **Home Loans Group** include:

- Originating and servicing home loans;

- Buying and selling home loans in the secondary market; and

- Selling insurance-related products and participating in reinsurance activities with other insurance companies.

Home loans are either originated in the retail and wholesale channels or are purchased from other lenders through the correspondent channel. The profitability of each channel varies over time and the Company's emphasis on each channel varies accordingly. The segment offers a wide variety of home loans, including:

- Fixed-rate home loans;

- Adjustable-rate home loans or "ARMs" (where the interest rate may be adjusted as frequently as every month);

- Hybrid home loans (where the interest rate is fixed for a predetermined time period, typically 3 to 5 years, and then converts to an ARM that reprices monthly or annually, depending on the product);

- Option ARM loans (for more details on Option ARMs, refer to Management's Discussion and Analysis – "Credit Risk Management"); and

- Government insured or guaranteed home loans.

From an enterprise-wide perspective, loans are either retained or sold. Loans which are sold generate gain or loss on sale as well as interest income from the time they are funded until the time they are sold, while loans held in portfolio generate interest income and ancillary noninterest income. Fixed-rate home loans, which subject the Company to more interest rate risk than other types of home loans, are generally sold as part of the Company's overall asset/liability risk management process. The decision to retain or sell other home loan products requires balancing the combination of additional interest income and the interest rate and credit risks inherent with holding loans in portfolio, with the size of the gain or loss that would be realized if the loans were sold. Such decisions are elements of the Company's capital management process.

For management reporting purposes, home loans originated by this segment are either transferred through inter-segment sales to the Retail Banking and Financial Services Group or are sold to secondary market participants, including the housing government-sponsored enterprises – such as the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the regional branches of the Federal Home Loan Banks. The premium received on inter-segment sales to the Retail Banking and Financial Services Group is based on prices available in the secondary market, adjusted for hedging costs.

The Home Loans Group typically retains the right to service all home loans, whether held for sale, sold to secondary market participants or held in portfolio by the Retail Banking and Financial Services Group. Mortgage servicing involves the administration and collection of home loan payments. In servicing home loans, the Company collects and remits loan payments, responds to borrower inquiries, applies the collected principal and interest to the individual loans, collects, holds and disburses escrow funds for payment of property taxes and insurance premiums, counsels delinquent customers, supervises

39

Exhibit 11 of 30                                                                                                    Page 96

foreclosures and property dispositions and generally administers the loans. In return for performing these functions, the Company receives servicing fees and other remuneration.

In addition to selling loans to secondary market participants, the Home Loans Group generates both interest income and noninterest income by acquiring home loans from a variety of sources, pooling and securitizing those loans, selling the resulting mortgage-backed securities to secondary market participants and providing ongoing servicing and bond administration for all securities issued.

The Home Loans Group makes insurance products available to its customers that complement the mortgage process, including private mortgage insurance, mortgage life insurance, flood, homeowners', earthquake and other property and casualty insurance. Other types of insurance products made available include accidental death and dismemberment and term and whole life insurance. This segment also manages the Company's captive reinsurance activities.

The principal activities of the **Card Services Group** include:

- Originating and servicing of credit card loans; and

- Providing other cardholder services.

The Card Services Group manages the Company's credit card operations, which target customers by leveraging the Company's retail banking distribution network and through direct mail solicitations, which serve as the Group's primary new customer acquisition channels, augmented by online and telemarketing activities and other marketing programs. In addition to credit cards, this segment markets a variety of cardholder service products to its customer base. These products, which may be originated within the Company or jointly marketed with others, include debt suspension, auto- and health-related services, credit-related services, and selected insurance products.

The principal activities of the **Commercial Group** include:

- Providing financing to developers and investors for the acquisition or construction of multi-family dwellings and, to a lesser extent, other commercial properties;

- Originating and servicing multi-family and other commercial real estate loans and either holding such loans in portfolio as part of its commercial asset management business or selling them in the secondary market;

- Providing financing and other banking services to mortgage bankers for the origination of residential mortgage loans; and

- Originating and servicing home loans made to subprime borrowers through the Company's subsidiary, Long Beach Mortgage Company.

The multi-family lending business, which accounts for a majority of the Group's revenues, is comprised of three key activities: originating and managing loans retained in the loan portfolio, servicing all originated loans, whether they are retained or sold, and providing ancillary banking services to enhance customer retention. Combining these three activities into one integrated business model has allowed the Commercial Group to become a leading originator and holder of multi-family loans. The Group's multi-family lending program has a market share of more than 20% in certain key cities along the west coast, is rapidly gaining market share in certain key cities on the east coast and is targeting similar success in other selected target markets.

As part of the Company's specialty mortgage finance operations, the Group also originates home loans to subprime borrowers through the broker network maintained by Long Beach Mortgage Company, a wholly-owned subsidiary of the Company. Such loans may be held in the Company's specialty mortgage finance home loan portfolio or sold to secondary market participants. The Company generally retains the servicing relationship on loans which it has sold.

40

Exhibit 11 of 30                                                                                  Page 97

**Commercial Group**

| | Year Ended December 31, | | | Percentage Change | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2005/2004 | 2004/2003 |
| | (dollars in millions) | | | | |
| **Condensed income statement:** | | | | | |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . | $ 1,371 | $ 1,314 | $ 1,307 | 4% | 1% |
| Provision for loan and lease losses. . . . . . . . . . | 7 | 41 | 99 | (83) | (59) |
| Noninterest income . . . . . . . . . . . . . . . . . . . . . . | 478 | 379 | 528 | 26 | (28) |
| Noninterest expense . . . . . . . . . . . . . . . . . . . . . . | 637 | 594 | 511 | 7 | 16 |
| Income from continuing operations before income taxes . . . . . . . . . . . . . . . . . . . . . . . . | 1,205 | 1,058 | 1,225 | 14 | (14) |
| Income taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . | 455 | 395 | 468 | 15 | (15) |
| Income from continuing operations. . . . . . . . . . | 750 | 663 | 757 | 13 | (13) |
| Income from discontinued operations, net of taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – | – | 87 | – | (100) |
| Net income. . . . . . . . . . . . . . . . . . . . . . . . | $ 750 | $ 663 | $ 844 | 13 | (21) |
| **Performance and other data:** | | | | | |
| Efficiency ratio[1] . . . . . . . . . . . . . . . . . . . . . . . . | 34.46% | 35.06% | 27.82% | (2) | 26 |
| Average loans . . . . . . . . . . . . . . . . . . . . . . . . . . | $47,147 | $37,916 | $34,731 | 24 | 9 |
| Average assets . . . . . . . . . . . . . . . . . . . . . . . . . . | 51,594 | 42,474 | 42,853 | 21 | (1) |
| Average deposits . . . . . . . . . . . . . . . . . . . . . . . . | 7,872 | 7,108 | 5,384 | 11 | 32 |
| Loan volume . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41,000 | 28,978 | 28,356 | 41 | 2 |
| Employees at end of period[2] . . . . . . . . . . . . . . | 4,182 | 3,385 | 5,824 | 24 | (42) |

[1]    The efficiency ratio is defined as noninterest expense divided by total revenue (net interest income and noninterest income).
[2]    Includes 2,346 employees reported as part of discontinued operations at December 31, 2003.

The increase in net interest income during 2005 was primarily due to higher average balances of loans held for sale, partially offset by higher funding costs due to rising short-term interest rates. The average balance of loans held for sale was $13.81 billion in 2005, compared with $6.28 billion in 2004.

The increase in noninterest income during 2005 was primarily due to increased trading securities income related to residual interests retained from securitizations conducted by Long Beach Mortgage Company and a $55 million gain from the sale of commercial mortgage-backed securities occurring in the fourth quarter of 2005. These increases in noninterest income were partially offset by lower gain from mortgage loans, net of risk management activities, which was affected by an increase in the Company's estimated liability to repurchase loans from previous whole loan sales that contained "early payment default" provisions. An early payment default occurs when the borrower fails to make the first post-sale payment due on the loan by a contractually specified date. Usually when such an event occurs, the fair value of the loan at the time of its repurchase is lower than the face value. In the fourth quarter of 2005, the Company experienced increased incidents of repurchases of early payment default loans sold by Long Beach Mortgage Company and this trend is expected to continue in the first part of 2006.

The increase in noninterest expense during 2005 was primarily due to higher compensation and benefits expense resulting from the growth in loan volume from Long Beach Mortgage Company. Long Beach Mortgage Company added 800 employees during 2005 to support its growing operations.

45

Exhibit 11 of 30                                                                                                    Page 98

**Credit Risk Management**

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed-upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, the contractual terms of the agreement and the availability and quality of collateral. For additional details on derivative counterparty credit risk see Management's Discussion and Analysis – "Derivative Counterparty Credit Risk."

The Finance Committee of the Board of Directors, by means of a broad set of policies and principles contained in the Company's Credit Policy, exercises oversight over the framework for the Company's credit risk management activities. The Credit Policy Committee, chaired by the Chief Credit Officer and comprised of senior management, evaluates and approves credit standards (including key features of residential loans) and is responsible for oversight of the credit risk management function.

The Credit Policy Committee's primary responsibilities include ensuring the adequacy of the Company's credit risk management infrastructure, overseeing credit risk management strategies and methodologies, monitoring conditions in real estate and other markets having an impact on lending activities, and evaluating and monitoring overall credit risk. The Chief Credit Officer's primary responsibilities include overseeing the work of the Credit Policy Committee, monitoring the credit quality of the Company's loan portfolio, determining the reasonableness of the Company's allowance for loan and lease losses, reviewing and approving large credit exposures, setting underwriting criteria for credit-related products and programs, and delegating credit approval authority.

On October 1, 2005, the Company acquired Providian Financial Corporation, a credit card lender. Credit card loans are generally unsecured and typically generate significantly higher delinquency rates and charge-offs than real estate secured loans. Consequently, the allowance for losses on credit card loans, expressed as a percentage of the credit card portfolio, is significantly higher than on real estate secured loans. Further discussion of credit risk in the Company's credit card loan portfolio can be found in Management's Discussion and Analysis – "Credit Card Loans."

Certain categories of residential loans held in the Company's portfolio, the most significant being Option ARM loans, have features that result in increased credit risk when compared to residential loans without these features. Loans with these features, to the extent material to the Company, as well as any compensating factors and mitigating circumstances that reduce the credit risk arising from these features, are discussed in more detail in the section of Management's Discussion and Analysis – "Features of Residential Loans."

50

Exhibit 11 of 30    Page 99

**Features of Residential Loans**

Certain residential loans have features that may result in increased credit risk when compared to residential loans without those features. Categories of loans within the Company's portfolio that have such features include loans with an option to defer the payment of interest (i.e., Option ARM home loans), home loans where the loan-to-value ratio is greater than 80 percent, home equity loans and lines of credit where the combined loan-to-value ratio is greater than 80 percent, and interest-only payment loans. The loan-to-value ratio measures the ratio of the original loan amount to the appraised value of the collateral at origination. The combined loan-to-value ratio measures the ratio of the original loan amount of the first lien product (typically a first lien mortgage loan) and the original loan amount of the second lien product (typically a second lien home equity loan or line of credit) to the appraised value of the collateral that underlies the loan the Company is originating.

In the underwriting of these loans, the Company usually considers compensating factors and mitigating circumstances that may serve to reduce the potential for increased credit risk arising from these features. Loan balances for these categories of loans and their relative significance as a percentage of total loans held in portfolio (excluding the allowance for loan and lease losses) at December 31, 2005, is presented in the table below:

| | Loan Balance (in millions) | As a % of Total Loans Held in Portfolio |
|---|---|---|
| Option ARM home loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $70,191 | 31% |
| Home loans without private mortgage insurance or government guarantees where the loan-to-value ratio at origination is greater than 80 percent. . . . . . | 9,012 | 4 |
| Home equity loans and lines of credit where the combined loan-to-value ratio at origination is greater than 80 percent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,312 | 5 |
| Interest-only home loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10,660 | 5 |

*Option ARM Home Loans*

Loan Features

The Option ARM product is an adjustable-rate mortgage loan that each month provides the borrower with the option to make a fully-amortizing, interest-only, or minimum payment. The minimum payment on an Option ARM loan is based on the interest rate charged during the introductory period. This introductory rate is usually significantly below the fully-indexed rate for loans with short duration introductory periods (which typically last for one or three months depending on the type of Option ARM loan selected by the borrower). The fully-indexed rate is calculated using an index rate plus a margin. Once the introductory period ends, the contractual interest rate charged on the loan increases to the fully-indexed rate and adjusts monthly to reflect movements in the index.

If the borrower continues to make the minimum monthly payment after the introductory period ends, the payment may not be sufficient to cover interest accrued in the previous month. In this case, the loan will "negatively amortize" as unpaid interest is deferred and added to the principal balance of the loan. The minimum payment on an Option ARM loan is adjusted on the loan's anniversary date but can only increase or decrease by a maximum of 7.5% on such date until a "recasting event" occurs.

Recasting events occur at least every 60 months, at which time a new minimum monthly payment is calculated without regard to any limits on the increase in amount that would otherwise apply under the annual 7.5% payment cap. This new minimum monthly payment is calculated to be sufficient to fully repay the principal balance of the loan, including any theretofore deferred interest, over the remainder of the loan term using the fully-indexed rate then in effect. A recasting event immediately occurs whenever the unpaid principal balance reaches 125% of the original loan balance or 110% of the original loan balance

54

Exhibit 11 of 30                                                                                                        Page 100

Option ARM product serves to limit the amount of negative amortization. The Company did not conduct risk mitigation activities that involved the use of insurance arrangements, credit default agreements or credit derivatives during 2005.

Impact of External Factors

Certain external factors have, over the last five years, contributed to a reduction in the credit risk inherent in the Option ARM portfolio. The two most significant economic factors affecting the Option ARM portfolio are prepayment rates, which operate to reduce the risk of payment shock in the portfolio caused by the 60-month recasting event, and changes in housing prices, which affect current loan-to-value ratios. The risk of payment shock is reduced because many Option ARM borrowers will prepay their loans prior to the occurrence of the first 60-month recasting event. Furthermore, credit risk usually diminishes when housing prices appreciate. Option ARM loans originated prior to 2005 have benefited from a longer period of housing price appreciation than loans originated in 2005; with such earlier originations accounting for 62% by balance and 71% by number of Option ARM loans held in portfolio at December 31, 2005, current loan-to-value ratios have generally improved  – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option.

*Home Loans with Loan-to-Value Ratios Greater Than 80 percent Without Private Mortgage Insurance or Government Guarantees*

Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. Credit risk is also reduced when the loan amount above 80 percent of the collateral value is guaranteed by the government or is insured under a policy of private mortgage insurance purchased by the borrower. This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure. At December 31, 2005, home loans held in portfolio with these features amounted to $9.01 billion and the weighted average loan-to-value ratio at origination of such loans was 88 percent.  Substantially all of these loans were made to subprime borrowers, including $6.91 billion of purchased subprime loans. Total home loans with these features accounted for 10% of the Company's home loan volume in 2005.

The Company actively monitors conditions in housing markets in which it has a concentration of home loans. Geographic concentrations are taken into account when deciding which home loans to sell in the secondary market. Only $604 million, or 0.4% of home loans held in portfolio at December 31, 2005, had no private mortage insurance or government guarantees and had loan-to-value ratios in excess of 90 percent at origination. The highest proportion of these loans was secured by properties in California, a market in which housing prices have generally appreciated over the last five years.

Typically, borrowers requesting financing with loan-to-value ratios of greater than 80 percent without government guarantees are required to purchase private mortgage insurance from a third party. In the event of default, the Company can recover losses from the private mortgage insurer. Alternatively, under certain loan programs, qualifying customers can elect to pay a higher interest rate to the Company in lieu of paying for private mortgage insurance. This higher interest rate is expected to compensate the Company for the incremental credit risk inherent in lending to borrowers without private mortgage insurance.

The Company seeks to mitigate credit risk in its purchased subprime loan portfolio by requiring minimum credit scores and by re-underwriting all such loans. Furthermore, with limited exceptions, the Company does not purchase loans through this program that have loan-to-value ratios of greater than 90 percent.

Exhibit 11 of 30                                                                                                    Page 101

EXHIBIT 31.1

## CERTIFICATION

I, Kerry K. Killinger, certify that:

1.  I have reviewed this annual report on Form 10-K of Washington Mutual, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 15, 2006

/s/ KERRY K. KILLINGER
Kerry K. Killinger
*Chairman and Chief Executive Officer*
*of Washington Mutual, Inc.*

Exhibit 11 of 30                                                                                                              Page 102

EXHIBIT 31.2

## CERTIFICATION

I, Thomas W. Casey, certify that:

1.  I have reviewed this annual report on Form 10-K of Washington Mutual, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 15, 2006

/S/ THOMAS W. CASEY
Thomas W. Casey
*Executive Vice President and Chief Financial Officer*
*of Washington Mutual, Inc.*

Exhibit 11 of 30                                                                                                          Page 103

**EXHIBIT 32.1**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: March 15, 2006                    By: /s/ KERRY K. KILLINGER

                                        Kerry K. Killinger
                                        *Chairman and Chief Executive Officer of*
                                        *Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 11 of 30                                                                                 Page 104

**EXHIBIT 32.2**

## WASHINGTON MUTUAL, INC.
### Certification of the Chief Financial Officer

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date:  March 15, 2006

By: /s/ THOMAS W. CASEY
Thomas W. Casey
*Executive Vice President and Chief Financial Officer of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 11 of 30                                                                                           Page 105

# **Exhibit 12**

Exhibit 12 of 30

Page 106

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM 10–Q
**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2006**
**Commission File Number 1–14667**

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91–1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1201 Third Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

**(206) 461–2000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. Large accelerated filer ☒    Accelerated filer ☐    Non–accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in 12b–2 of the Exchange Act.) Yes ☐    No ☒.

The number of shares outstanding of the issuer's classes of common stock as of April 28, 2006:
**Common Stock – 960,750,311**[1]
[1] Includes 6,000,000 shares held in escrow.

Exhibit 12 of 30                                                                 Page 107

quarter of 2005 to $16.52 billion in the first quarter of 2006, an increase of over 23%. These products substantially account for the $8.71 billion increase in the Company's home loan portfolio since the end of 2005.

The Company recorded a provision for loan and lease losses of $82 million in the first quarter of 2006, compared with $217 million in the fourth quarter of 2005 and $16 million in the first quarter of 2005. Reflecting the higher risk profile associated with the unsecured, higher–yielding credit card lending activities that the Company acquired from its purchase of Providian, the provision in the first quarter of 2006 included a provision of $105 million that was attributable to the credit card portfolio. This amount was down from $195 million in the fourth quarter of 2005, reflecting significantly lower credit card charge–offs. Credit card loss rates were affected by the fourth quarter 2005 change in consumer bankruptcy law. As the new bankruptcy law is generally more restrictive to consumers, bankruptcy filings increased before the new law was enacted. This had the effect of accelerating charge–offs in the fourth quarter, with a corresponding reduction in the first quarter of 2006. Excluding the credit card portfolio, the Company recorded a $23 million reversal in the provision for loan and lease losses in the most recent quarter, reflecting the continuation of a benign residential credit lending environment that was fostered by generally stable or appreciating housing prices in the Company's geographic markets, low unemployment rates and a relatively low mortgage interest rate environment.

The Company continues to grow its retail banking business by opening new stores and enhancing its array of products. During the first quarter of 2006, depositor and other retail banking fees were $578 million, an 18% increase from the same quarter of the prior year. The growth was driven by strong increases in the number of retail checking accounts, including strong customer responses to the Company's new free checking product. The number of retail checking accounts at March 31, 2006 totaled approximately 10.2 million, an increase of over 1 million accounts from the March 31, 2005 total of 9.2 million. Total retail transaction accounts, which include checking, money market and savings accounts, increased by over 1.7 million over this same period. Since the beginning of the year, the Company has opened 29 new stores, and has established a target of opening between 150 and 200 new stores within its existing markets during 2006. Although the Company expects total noninterest expense to be higher in 2006 than in 2005 as a result of the continuing expansion of the retail banking franchise and the full–year effect of absorbing the credit card operations acquired from Providian into the Company's cost structure, those efforts will also be accompanied by rigorous expense management discipline and the implementation of operational efficiencies and productivity improvements, including the redeployment of certain back office support operations to more cost–effective labor markets and the consolidation of other administrative support facilities.

On April 23, 2006 the Company and Commercial Capital Bancorp, Inc. ("CCB"), a multifamily and small commercial real estate lending institution located in Southern California, entered into a definitive agreement in which Washington Mutual, Inc. will acquire the outstanding shares of CCB in exchange for cash of $16.00 for each CCB share, which results in a preliminary transaction value of approximately $983 million. The acquisition is expected to be completed in the third quarter of 2006 and is subject to the approval of CCB shareholders and the Office of Thrift Supervision.

**Critical Accounting Estimates**

The preparation of financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the Consolidated Financial Statements. Various elements of the Company's accounting policies, by their nature, involve the application of highly sensitive and judgmental estimates and assumptions. Some of these policies and estimates relate to matters that are highly complex and contain inherent uncertainties. In some instances, different estimates and assumptions could have been reasonably used to supplant those that were applied. Had those alternative estimates and assumptions been applied,

29

Exhibit 12 of 30                                                                                                    Page 108

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on May 10, 2006.

**WASHINGTON MUTUAL, INC.**

By:     /s/ THOMAS W. CASEY
        Thomas W. Casey
        *Executive Vice President and Chief Financial*
        *Officer*

By:     /s/ JOHN F. WOODS
        John F. Woods
        *Senior Vice President and Controller*
        *(Principal Accounting Officer)*

60

Exhibit 12 of 30                                                                 Page 109

EXHIBIT 31.1

**CERTIFICATION**

I, Kerry K. Killinger, certify that:

1.       I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.       Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.       Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.       The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)      Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.       The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2006                                                        /s/ KERRY K. KILLINGER
                                                                          Kerry K. Killinger
                                                                          *Chairman and Chief Executive Officer*
                                                                          *of Washington Mutual, Inc.*

Exhibit 12 of 30                                                                          Page 110

**EXHIBIT 31.2**

## CERTIFICATION

I, Thomas W. Casey, certify that:

1.   I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.   Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.   Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)   Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2006                                     /s/ THOMAS W. CASEY
                                                       Thomas W. Casey
                                                       *Executive Vice President and Chief Financial Officer*
                                                       *of Washington Mutual, Inc.*

Exhibit 12 of 30                                                       Page 111

**EXHIBIT 32.1**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: May 10, 2006

By:     /s/ KERRY K. KILLINGER
        Kerry K. Killinger
        *Chairman and Chief Executive Officer*
        *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 12 of 30                                                                                                Page 112

**EXHIBIT 32.2**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: May 10, 2006                                    By:    /s/ THOMAS W. CASEY
                                                            Thomas W. Casey
                                                            *Executive Vice President and Chief Financial Officer*
                                                            *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 12 of 30                                    Page 113

# **Exhibit 13**

Exhibit 13 of 30

Page 114

1 of 2 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

July 19, 2006 Wednesday

**TRANSCRIPT:** 071906aa.746

**LENGTH:** 9040  words

**HEADLINE:** Q2 2006 Washington Mutual Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon and welcome to Washington Mutual's second quarter 2006 earnings conference call. At this time, all participants are in a listen-only mode. Today's call is being recorded for replay purposes. The replay will be available approximately one hour after the call has ended today. The toll free number to access the replay is 866-503-3181. This call is also being webcast live and will be archived for 30 days on the Company's website. Now, I will turn the call over to Alan Magleby, Senior Vice President Investor Relations, to introduce today's call.

ALAN MAGLEBY, SVP - INVESTOR RELATIONS, WASHINGTON MUTUAL INC.: Good morning and thank you for joining us today. I would like to welcome you to the Washington Mutual second quarter 2006 earnings conference call. I want to remind you that our presentation today may contain forward-looking statements concerning our financial conditions, results and expectations and that there are a number of factors that could cause actual results in the future to be different from our current expectations. These factors include, among other things, changes in general business and economic conditions, competitive pressures in the financial services industry, or legislative and regulatory changes that may impact our business. For additional factors, please see our press release and other documents filed with the SEC.

With us today are Kerry Killinger, Chairman and CEO, Steve Rotella, President and Chief Operating Officer, and Tom Casey, Chief Financial Officer. At this time, I will turn the call over to Kerry. Kerry?

KERRY KILLINGER, CHAIRMAN AND CEO, WASHINGTON MUTUAL INC.: Good afternoon and thank you for joining us for a review of our second quarter earnings as well as a discussion of the actions we announced today, which represent a major acceleration point in the ongoing transformation of our business. Earlier today we announced second quarter net income of $767 million or $0.79 per diluted share, which included an after-tax adjustment of $101 million or $0.10 per share to reflect today's announced sale price on $2.6 billion in mortgage servicing rights, and $52 million or $0.05 per share in after-tax restructuring charges associated with operating efficiency initiatives.

Now, excluding these items, earnings per share would have been $0.94 per share compared to $0.95 per diluted share in the second quarter a year ago. The second quarter results reflect strong performance, especially in our retail banking and Card Services groups. And our business model continues to perform well, even in what is quite challenging interest rate environment including a flat yield curve.

Now, since there were three important and transformational initiatives announced today, let me focus on them for

Exhibit 13 of 30                                                                                          Page 115

just a moment. Now, two of these initiatives had an impact which was negative on the second quarter earnings. While we expect the combined effect of all three initiatives will be to increase 2006 earnings, they're likely to cause our quarterly earnings to be more uneven than normal due to expected timing of sales and consolidation activities. But most importantly, we believe these actions will have a net positive effect on ongoing earnings and efficiency, including an improvement of approximately $0.05 to $0.10 per share in earnings in 2007.

Now, let's discuss these three initiatives. The first initiative we announced today was the pending sale of $2.6 billion in mortgage servicing rights to Wells Fargo. This sale significantly reduces our market risk profile and accelerates our winding down of certain non-strategic home loan products, such as governments and single service customer fixed-rate loans. This enhances our ability to focus on higher margin products like our option ARMs, home equity, Alt-A and subprime loans.

And the second quarter results reflect in after-tax reduction in the carrying value of our MSRs of $101 million to reflect this transaction. And when the MSR closes at the end of July, our MSR to stockholder equity ratio will fall from 35% at June 30th to approximately 25%.

And as part of the sale, Washington Mutual will also transfer its Milwaukee servicing operations and approximately 800 employees to Wells Fargo. And we expect to incur approximately $50 million after taxes in additional transaction and shutdown costs related to this sale, most of which will be incurred in the third quarter.

The second initiative is the announcement of our intention to exit the mutual fund management business. It is our plan to sell WM Advisors Inc., our subsidiary that provides investment management distribution and shareholder services for the WM Group of Funds. This decision is in keeping with our strategy to streamline our business model. The funds management business, while it generates net income of about $0.01 per quarter, is being presented this quarter as discontinued operations.

And if we are successful in selling the business, we expect to gain from the sale of the funds management business to be significant and more than offset the cost of the other initiatives announced today.

The third initiative is the acceleration of our operating efficiency initiatives. During the second quarter, we recorded $52 million in after-tax restructuring charges. It is our intention to accelerate our operating efficiency initiatives during the remainder of 2006. We expect these initiatives to include migrating more of our back office operations to lower-cost domestic locations, such as San Antonio and Jacksonville. We also expect to materially increase our offshore vendor positions to as many as 7500 by the end of 2007.

As a result of these efforts, we will be able to consolidate our remaining real estate footprint in higher cost markets to minimize our occupancy costs. These actions should position us well to further improve our operating efficiency. We have remained resolute in our intent to reach a 45% operating efficiency by the end of 2009.

Now, each of our business units is driving productivity initiatives that resulted in staffing reductions during the second quarter. Overall, total Company staffing declined by more than 4000 or 7% in the second quarter.

Now, I can't overemphasize the significance of these actions for us. Improving our operating efficiency, reducing the market volatility of our earnings and refocusing our Home Loans units on higher margin businesses will increase the core profitability of the Company. And this will position us even better for the leverage which is inherent in our business model when the interest rate environment improves.

Our Board of Directors recently completed its annual in-depth review of our strategic plan. They reviewed all of our key strategies for creating significant value for shareholders. And following the completion of that assessment, they concluded that execution of that plan would likely lead to creation of significant shareholder value, and they directed management to execute the plan.

Exhibit 13 of 30                                                                                                    Page 116

Q2 2006 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire July 19, 2006 Wednesday

better balance of credit and interest rate risk for the Company.

Shifting to non-interest expense, non-interest expense was up 26% year-over-year primarily due to the addition of Card Services. Non-interest expense increased 4% on a linked quarter basis primarily due to restructuring costs of $81 million incurred as part of our efficiency initiatives during the second quarter. Excluding this quarter's restructuring charges, non-interest expense was nearly flat on a linked quarter basis despite a $22 million increase in advertising related to WaMu Free Checking.

Kerry provided good detail on the acceleration of our efficiency measures which are focused on achieving our five-year financial operating efficiency target of less than 50%. Our operating efficiency ratio for the second quarter, excluding the MSR sale and restructuring charges, was 56.6%. This level was slightly lower on a linked quarter basis despite the net interest margin compression we experienced in the quarter. While we have a gap to close from the current level to achieve our goal, we're confident that our proactive initiatives combined with the snapback of the NIM, once rates stabilize will position us to meet our efficiency goal.

Let me take a moment to address capital management before I give you an update on our earnings drivers. At quarter end, our tangible capital ratio of 5.94% was well in excess of our target ratio of greater than 5.5%. Given our outlook on capital generation through earnings, our remixing of capital, and our expectations for current asset growth, the Board also approved a new 150 million share repurchase plan.

Now, let me walk you through our present thinking concerning our 6 earnings drivers and introduce a new driver related to our announced pension intention to sell our fund management business. Given the transactions we announced today, there are many moving parts that will affect our quarterly reported numbers. Overall, these actions will be about $0.05 to $0.10 accretive in 2007 and have been factored into our 2006 annual guidance that I will go through now.

Since January, our average assets are up 6% in 2005, which is at the lower end of our guidance range. We plan to continue the remixing of the balance sheet toward higher risk-adjusted assets like card receivables, subprime residential, and multifamily loans, but plan to constrain growth in our single family prime portfolio given the continued risk-adjusted returns we're seeing and our ability to repurchase our shares. Therefore, we are revising our asset growth guidance slightly downward to a range of 5 to 7%.

The Fed continued its pace of interest rate increases during the second quarter, and again the forward curve is anticipating another 25 basis points increase. Given this outlook and the competitive deposit pricing environment, we now believe our margins for the full year will come in about five basis points lower or in the range of 2.7 to 2.8%. But this driver is dependent on the movement of market interest rate, so we will continue to provide you our most updated guidance quarterly.

Credit quality continues to be strong. The second quarter provision reflects our asset growth and a slight uptick in charge-offs, so we're comfortable with our range of $650 million to $750 million.

Given our announced intention to sell our asset management business, beginning this quarter it is being reclassified as discontinued operations. So we're adding this is an earnings driver for the remainder of 2006. We expect the sale of this business will produce a significant gain that will more than offset the loss on the MSR sale and restructuring charges. And we have presented the asset manager business as discontinued operations. Accordingly, the revenue and expenses is extracted from the Company's ongoing business results.

For 2006, the fund management business is expected to generate approximately $250 million of non-interest income and $200 million in operating expense, resulting in a pre-tax net income of between $45 million and $50 million. So as you'll see in a minute, these adjustments do affect our drivers for non-interest income and non-interest expense.

Given the continued strong net new account growth and fee income driven by our new WaMu Free Checking

Exhibit 13 of 30                                                                 Page 117

Q2 2006 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire July 19, 2006 Wednesday

KERRY KILLINGER: Fred, remember in the first quarter call we announced that we had entered into an accelerated stock repurchase program. And the way that works is that we entered into it at the end of the first quarter and so the shares actually came out at the beginning of the quarter. Subsequently, throughout the quarter, those shares have been purchased back by the banker that we entered into the transaction with. And that is why you're seeing some of the capital growth in the quarter.

We would expect to get back down to our historical levels of capital. You see the confidence the Board has in renewing the share buyback program up to 150 million shares. And so I would expect with slower asset growth, earnings momentum, and the excess capital we have to date, our ability to continue to buyback stock throughout the rest of the year.

FRED CANNON: Yes, so -- just to be clear, so the accelerated stock repurchase at the end of the first quarter took you out of the market during the second quarter, but that limitation has essentially ended now?

KERRY KILLINGER: It will end in the third quarter.

OPERATOR: Bruce Harting, Lehman Brothers.

BRUCE HARTING, ANALYST, LEHMAN BROTHERS: Can you talk about the provisioning policy going forward and a fairly significant reserve build in this quarter? You talked a little bit about the credit card component on that, but can you reconcile those a little more so we can get a sense for the second half? Thanks.

KERRY KILLINGER: We're still comfortable with our guidance, Bruce, at 650 to 750 this quarter. We did have some asset growth and we did retain some additional credit cards, and so we did see a little in NPAs that we provisioned for, but our provision did exceed charge-offs this quarter. And we're going to continue to keep an eye on that and see how the environment changes, but we're not sending any signals. It's just our normal process that we are evaluating the risk of the assets we are retaining in providing accordingly.

OPERATOR: Ed Groshans, Fox-Pitt Kelton.

ED GROSHANS, ANALYST, FOX-PITT KELTON: Good evening everyone. With the sale of the MSR, are you making somewhat -- a strategic shift in how you're going to handle the originations of fixed-rate products going forward? I looking to sell those cash [whole] loans and not retain the servicing rights going forward?

KERRY KILLINGER: Hi Ed, no. That would not be a good conclusion. What we are doing, going back, and we have been talking about this for awhile, we're moving the Home Loans business here in several directions. One, we think we built a great management team here. Secondly, we have been driving very hard on efficiency. A number of actions were taken over the first half of the year to get the number of offices down and we also moved Long Beach together with Home Loans, took a lot of expense out there.

And we're moving towards a business that allows us to leverage our distribution in our retail stores and also leverages our home equity and subprime business, moving towards much more of a high margin business. However, we are still originating fixed-rate conforming business. It is a smaller percentage of our production than in the past. And we'll do that through the channels -- our retail, our broker channel and our telephone business.

We have also pushed hard and continue to work on creating servicing that goes on our books at a lower service fee, an [8] service fee in this case. And as you know, that's an industry topic. We're supportive of that and we have been able to do that in our fixed-rate securitizations.

ED GROSHANS: Okay, and just one clarification, the government securities, is that like Ginnie Maes that were sold?

Exhibit 13 of 30                                                                                    Page 118

Q2 2006 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire July 19, 2006 Wednesday

margin products I mentioned, even in some of the fixed areas.

As we adjusted some of our pricing there, it's generating some gain on sale. Subprime has also performed reasonably well this quarter. And so we're seeing across the board our margins expand across the product mix.

Your question on the MSR performance across the board, as I mentioned earlier, the cost of hedging was lower this quarter mostly due for a couple of things. One, we did have a pretty big squeeze in basis in the first quarter which we didn't see in the second quarter, and that is a pretty big delta quarter over quarter. As well as -- once rates went over 5%, the optionality or the convexity associated with those servicing is reduced, so the cost of hedging has reduced. Those are the two big drivers for the quarter.

BRAD BALL: So with lower [CPRs] going forward, would you expect your hedging performance to be better?

TOM CASEY: I would expect to, but I think the key is the volatility of [absolute] interest rates during the quarter. And I can't predict that, but we believe this transaction should reduce the overall quarterly volatility we see once the transaction is complete.

BRAD BALL: Thank you.

OPERATOR: Chris Brendler, Stifel Nicolaus.

CHRIS BRENDLER, ANALYST, STIFEL NICOLAUS: Thanks. Good afternoon. A couple questions on the mortgage side. The production in the subprime business looks to be down about 16%. Can you just comment on what you're seeing from a competitive standpoint on the subprime business? And then secondly, can you update us on your initiatives to sell -- cross sell more subprime through the branches and also cross sell more home equity outside the branches?

STEVE ROTELLA: Hi, Chris. Steve Rotella. Subprime market continues to be very competitive. We did see some improvement in gain on sale this quarter. Our volume was down. We -- obviously we're balancing volume and price and credit and we feel like we're in a good spot right now. We had a good quarter overall and we had a peak quarter if you go back in the fourth quarter of last year. And right now, we feel like we've got the right pricing and the right credit profile in the marketplace, so it's nothing unusual going on in terms of the volume that we've seen, other than market conditions and our own optimization of returns.

Second part of your question was? Sorry.

CHRIS BRENDLER: Subprime in the branches and home equity outside of --?

STEVE ROTELLA: We're not active in selling subprime in our retail branches right now. That is something would like to carefully pursue in the future. We had very good success in cross selling home equity through our mortgage business, substantial increases over the last two quarters. And that is in addition to the core home equity production which comes out of our retail stores, and I think in this quarter our portfolio of home equity loans was right about $53 billion.

CHRIS BRENDLER: You mentioned that you are sort of being a little more selective in the mortgage production, looking for the higher margin products. What would you consider to your sweet spot right now?

STEVE ROTELLA: Our option ARM product continues to be our flagship product.

CHRIS BRENDLER: Great, thanks.

OPERATOR: George Sacco, J.P. Morgan.

Exhibit 13 of 30                                                                                                      Page 119

# **Exhibit 14**

Exhibit 14 of 30                                                                                                    Page 120

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10−Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2006**

**Commission File Number 1–14667**

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91–1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1201 Third Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

**(206) 461–2000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non−accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. Large accelerated filer ☒  Accelerated filer ☐  Non−accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in 12b–2 of the Exchange Act.)  Yes ☐  No ☒.

The number of shares outstanding of the issuer's classes of common stock as of July 31, 2006:
**Common Stock – 963,488,129**(1)
(1) Includes 6,000,000 shares held in escrow.

Exhibit 14 of 30                                                                 Page 121

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**
**Restatement of Financial Statements**

    After announcing its earnings for the second quarter ended June 30, 2006, Washington Mutual, Inc. ("Washington Mutual" or the "Company") completed a comprehensive review and reconciliation of its current and deferred income tax accounts and concluded that a $337 million reduction to retained earnings was necessary, representing cumulative adjustments to net income recorded in prior periods up to and including 2001. No adjustments were made to net income or earnings per share for any of the periods from 2002 through June 30, 2006. The adjustments reflect corrections to the tax accounting records related to matters occurring prior to 2002 at the Company and predecessor companies, including H.F. Ahmanson & Co., Great Western Financial Corp. and American Savings Bank, which the Company acquired in the late 1990s. The adjustments arose primarily from inadequate tax records, delays in reconciling tax accounts and errors in recording the impact of certain tax payments and the income tax expense of the Company during those years. Accordingly, these adjustments affected the balance of retained earnings and certain tax accounts at December 31, 2001 and each period thereafter.

    The following table presents total stockholders' equity as previously reported in the Company's 2005 Form 10–K and as restated:

| December 31, | As Originally Reported | As Restated | Restatement Amount | Adjustment as a Percentage of Previously Reported Stockholders' Equity |
|---|---|---|---|---|
| | | (in millions) | | |
| 2005 | $ 27,616 | $ 27,279 | $ 337 | 1.2% |
| 2004 | 21,226 | 20,889 | 337 | 1.6 |
| 2003 | 19,742 | 19,405 | 337 | 1.7 |
| 2002 | 20,061 | 19,724 | 337 | 1.7 |
| 2001 | 14,025 | 13,688 | 337 | 2.4 |

    Net income in 2001 as previously reported in the Company's 2005 Form 10–K was $3.10 billion and basic and diluted earnings per share was $3.64 and $3.58 for the same period. Net income as restated for the year ended December 31, 2001 is $3.04 billion and the restated basic and diluted earnings per share for that period is $3.57 and $3.51.

**Discontinued Operations**

    In July 2006 the Company announced its exit from the mutual fund management business and subsequently entered into a definitive agreement to sell its subsidiary, WM Advisors, Inc. WM Advisors provides investment management, distribution and shareholder services to the WM Group of Funds. Accordingly, the results of its operations have been removed from the Company's results of continuing operations for all periods presented on the Consolidated Statements of Income and Note 8 to the Consolidated Financial Statements – "Operating Segments," and are presented in aggregate as discontinued operations. Assets and liabilities of WM Advisors have been reclassified to other assets and other liabilities on the Consolidated Statements of Financial Condition. The sale is expected to close in the fourth quarter of 2006.

**Cautionary Statements**

    The Company's Form 10–Q and other documents that it files with the Securities and Exchange Commission ("SEC") contain forward–looking statements. In addition, the Company's senior management may make forward–looking statements orally to analysts, investors, the media and others. Forward–looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates,"

32

or words of similar meaning, or future or conditional verbs such as "will," "would," "should," "could" or "may."

Forward–looking statements provide management's current expectations or predictions of future conditions, events or results. They may include projections of the Company's revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items, descriptions of management's plans or objectives for future operations, products or services, or descriptions of assumptions underlying or relating to the foregoing. They are not guarantees of future performance. By their nature, forward–looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. Management does not undertake to update forward–looking statements to reflect the impact of circumstances or events that arise after the date the forward–looking statements were made. There are a number of factors, many of which are beyond management's control or its ability to accurately forecast or predict their significance, which could cause actual conditions, events or results to differ materially from those described in the forward–looking statements. Significant among these factors are:

- Volatile interest rates impact the mortgage banking business;
- Rising interest rates, unemployment and decreases in housing prices;
- Risks related to the option adjustable–rate mortgage product;
- Risks related to subprime lending;
- Risks related to the integration of the Card Services business;
- Risks related to credit card operations;
- Changes in the regulation of financial services companies, housing government–sponsored enterprises and credit card lenders;
- The Company faces competition from banking and nonbanking companies;
- General business and economic conditions, including movements in interest rates, the slope of the yield curve and the potential overextension of housing prices in certain geographic markets; and
- Negative public opinion impacts the Company's reputation.

Each of these factors can significantly impact the Company's businesses, operations, activities, condition and results in significant ways that are not described in the foregoing discussion and which are beyond the Company's ability to anticipate or control, and could cause actual results to differ materially from the outcomes described in the forward–looking statements. These factors are described in greater detail in "Business – Factors That May Affect Future Results" in the Company's 2005 Annual Report on Form 10–K/A.

***Controls and Procedures***

**Disclosure Controls and Procedures**

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934.

33

Exhibit 14 of 30                                                                 Page 123

its existing markets. Also included in noninterest expense in the second quarter of 2006 are $81 million of charges associated with the Company's ongoing productivity and efficiency initiatives. These charges are primarily comprised of severance and facilities closure costs that were incurred as part of the Company's ongoing efforts to redeploy certain back–office support operations to more cost–effective labor markets and the consolidation of other administrative support facilities. The Company expects to incur additional charges in the second half of this year that will result from the continuing execution of productivity and efficiency initiatives, including workforce reductions and shutdown expenses that are both associated with the announced sale of the mutual fund asset management business and the partial sale of its mortgage loan servicing portfolio. The sale of the mutual fund business is anticipated to be completed before the end of this year, and the resulting gain is expected to more than offset the aforementioned charges.

On April 23, 2006 the Company and Commercial Capital Bancorp, Inc. ("CCB"), a multi–family and small commercial real estate lending institution located in Southern California, entered into a definitive agreement in which Washington Mutual, Inc. will acquire outstanding shares of CCB in exchange for cash of $16.00 for each CCB share, which results in a preliminary transaction value of approximately $983 million. The acquisition is expected to be completed early in the fourth quarter of 2006.

**Critical Accounting Estimates**

The preparation of financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the Consolidated Financial Statements. Various elements of the Company's accounting policies, by their nature, involve the application of highly sensitive and judgmental estimates and assumptions. Some of these policies and estimates relate to matters that are highly complex and contain inherent uncertainties. In some instances, different estimates and assumptions could have been reasonably used to supplant those that were applied. Had those alternative estimates and assumptions been applied, the differences that may result from those alternative applications could have a material effect on the financial statements.

The Company has identified three accounting estimates that, due to the judgments and assumptions inherent in those estimates, and the potential sensitivity of its Consolidated Financial Statements to those judgments and assumptions, are critical to an understanding of its Consolidated Financial Statements. These estimates are: the fair value of certain financial instruments and other assets; derivatives and hedging activities; and the allowance for loan and lease losses and contingent credit risk liabilities.

Management has discussed the development and selection of these critical accounting estimates with the Company's Audit Committee. The Company believes that the judgments, estimates and assumptions used in the preparation of its Consolidated Financial Statements are appropriate given the facts and circumstances as of June 30, 2006. These judgments, estimates and assumptions are described in greater detail in the Company's 2005 Annual Report on Form 10–K/A in the "Critical Accounting Estimates" section of Management's Discussion and Analysis and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

**Recently Issued Accounting Standards Not Yet Adopted**

**Refer to Note 1 to the Consolidated Financial Statements** – "Summary of Significant Accounting Policies."

36

Exhibit 14 of 30                                                                                           Page 124

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on August 9, 2006.

**WASHINGTON MUTUAL, INC.**

By:     /s/ THOMAS W. CASEY
        Thomas W. Casey
        *Executive Vice President and Chief Financial Officer*

By:     /s/ JOHN F. WOODS
        John F. Woods
        *Senior Vice President and Controller*
        *(Principal Accounting Officer)*

72

Exhibit 14 of 30                                                    Page 125

EXHIBIT 31.1

## CERTIFICATION

I, Kerry K. Killinger, certify that:

1.     I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)     Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006                             /s/ KERRY K. KILLINGER
                                                 Kerry K. Killinger
                                                 *Chairman and Chief Executive Officer*
                                                 *of Washington Mutual, Inc.*

Exhibit 14 of 30                                                                     Page 126

**EXHIBIT 31.2**

**CERTIFICATION**

I, Thomas W. Casey, certify that:

1.  I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)  Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2006

/s/ THOMAS W. CASEY
_____

Thomas W. Casey
*Executive Vice President and Chief Financial Officer*
*of Washington Mutual, Inc.*

Exhibit 14 of 30                                                                                                    Page 127

**EXHIBIT 32.1**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: August 9, 2006                               By:       /s/ KERRY K. KILLINGER
                                                                        Kerry K. Killinger
                                                                        *Chairman and Chief Executive Officer*
                                                                        *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 14 of 30                                                                                     Page 128

**EXHIBIT 32.2**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

    Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: August 9, 2006                By:    /s/ THOMAS W. CASEY

                                    Thomas W. Casey
                                    *Executive Vice President and Chief Financial Officer*
                                    *of Washington Mutual, Inc.*

    A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

# **Exhibit 15**

Exhibit 15 of 30                                                                                              Page 130

2 of 2 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

September 6, 2006 Wednesday

**TRANSCRIPT:** 090606ae.764

**LENGTH:** 16532  words

**HEADLINE:** WaMu's 2006 Investor Day - Event 1 - Final

**BODY:**

KERRY KILLINGER, CHAIRMAN AND CEO, WASHINGTON MUTUAL: Hi, everyone, and welcome to our WaMu annual investor event. I think I've had a chance to meet most of you, but I'm Kerry Killinger, Chairman and CEO of WaMu. Certainly on behalf of our management team, I'd like to welcome those of you in attendance here today to our new WaMu Center. This is, by the way, about a 1 million square foot facility which was recently completed on budget, on time. It's going to reduce our ongoing operating costs and will enable us to bring most of our Seattle employees all together under one roof.

And we had grown so fast over the years that we were spread out in 12 facilities. This allows us to bring everybody together, or most of the people in Seattle, so that we'll have much improved productivity, communications and, very important for us is reinforcement of the unique WaMu culture. So we're certainly proud of the facility and we certainly hope that you find it enjoyable as well.

I'd also like to welcome all the folks that are listening via the webcast and also those that have dialed in. I would note that the webcast will be archived on our investor relations website, along with our slide presentations.

So I'd like to begin by asking everyone first to read the forward statement that I know we have on the packet somewhere. There we go. Please commit that to memory and make my lawyers happy. We do have a very packed agenda planned for this afternoon and tomorrow.

We are going to kick off the sessions this afternoon with two major presentations. The first is going to come from David Schneider, President of our Home Loans Group, along with David Beck, who runs our WaMu Capital Markets Group. And after that presentation, again, we'll have a short question and answer, and then we'll follow that up with a second presentation from our marketing team, which includes [Gen] Smith, who heads up that team, and joining Gen is Rich Blunck, who is responsible for our e-commerce and Warren Wilcox, who heads our direct marketing for all across the company.

Now, tomorrow, we're going to reconvene at our leadership center out at what we call Cedarbrook for the presentations from myself. Then we'll have Steve Rotella, our President and Chief Operating Officer, James Corcoran, President of our Retail Bank, Joe Saunders, the President of our Card Services, Ron Cathcart, who heads up our enterprise risk management and our CFO, Tom Casey.

And we will begin tomorrow's session promptly at 8:00 a.m. Seattle time, or 11:00 a.m. for those of you on the east

Exhibit 15 of 30                                                                                                           Page 131

WaMu's 2006 Investor Day - Event 1 - Final FD (Fair Disclosure) Wire September 6, 2006 Wednesday

That said, we remain disciplined in this market and we're not going to stretch for volume, but we will be ready. If credit spreads widen and we see there's a buying opportunity, we'll take advantage of that.

Let's talk about our strategic objectives. Let me take you back to investor day 2005. What I said was the following. I said we were growing and competitive, so we were driving future growth with a focused business strategy. We were progressing towards best in class efficiency and maintaining an effective risk management.

2006, we have the strategy is very consistent with that, and we've already accomplished a great deal of that, and I'll head into some specifics here. As we look - and the words in 2006 are very similar to what we saw just on the prior slide in 2005. We're positioning the business for growth.

We've taken a number of steps to position for focused growth, but we have more to do. Specifically, we have three following objectives. We want to be a market leader on alternative or high-margin products. We want to be very clear about what we will and will not do, and I'll talk about some of those actions on the next slide. We're going to focus on creating a more stable earnings stream and lowering our volatility. The sale of the MSR was a good example of that. We're going to continue to focus on being an efficient operating structure, and we've taken a number of actions there. I'll go into details.

All of this is done while more closely aligning our business with the greater Washington Mutual. Over the past year, we've integrated business lines, taking the prime business, integrating Long Beach and the Mortgage Banker Finance in late December, gaining some synergies there. And recently we've incorporated home equity into the Home Loans, so we have a single residential real estate platform that really drives a great deal of efficiency and effectiveness.

We're also spending a lot of time leveraging the financial center network. I'll talk about our bank lending center program in a moment and focus on leveraging the products that we have through our distribution channels, specifically the home equity product.

Objective number one is to be a market leader in alternative products, focus on home equity, subprime, option ARM and all [day]. So why do we choose this focus? What led us to this decision? First of all, our customers led us to this decision in many ways.

Our customers have said that they don't prefer the government loan program anymore. We decided to exit that program. It was far too expensive for the amount of volume we were doing, and we simply didn't see the returns there.

Our customers also told us that fixed rate was less important to them, so we de-emphasized fixed rate. We'll still do fixed rate, but we won't chase market share in the fixed-rate business any longer. In addition, if you look at margins, and I showed you some of the industry margins, if you decompose those margins, it's clear that margins for fixed and government are far lower than for many other products.

So not only are our customers saying they don't prefer the products, but we're looking at the returns we're getting off of fixed and government and saying, that really doesn't make a lot of sense for us any longer. And, finally, if you look at fixed and government and compare it to the ARM products, the level of MSR you need to invest on your balance sheet for every fixed and government loan you produce is far higher than the level of MSR that's associated with shorter-duration ARM loans.

So it has the added benefit of reducing some of the MSR investment we have in our balance sheet, and thereby reducing some of our volatility. So, specifically, we have exited the government business. We've limited some of our fixed-rate production, focusing more on serving our customers with a more disciplined pricing approach. And we stopped the traditional correspondent loan-by-loan business. So we have gotten out of that business.

That business, for us, was 94% fixed and government, so it just didn't fit with our new objective of focusing in on some of the higher-margin products. We have refocused that correspondent business on the conduit loan by loan

Exhibit 15 of 30                                                                                                                    Page 132

# **Exhibit 16**

Exhibit 16 of 30

1 of 2 DOCUMENTS

Copyright 2006 Voxant, Inc.
All Rights Reserved.
Copyright 2006 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

September 7, 2006 Thursday

**TRANSCRIPT:** 090706ae.765

**LENGTH:** 33478  words

**HEADLINE:** WaMu's 2006 Investor Day - Event 2 - Final

**BODY:**

ALAN MAGLEBY, SVP, IR, WASHINGTON MUTUAL: Good morning, and welcome to day two of WaMu's annual investor event. My name is Alan Magleby, Senior Vice President of Investor Relations, and on behalf of the investor relations team, the management team and all of us at WaMu, I'd like to thank you for joining us today.

I'd also like to welcome those listening in this morning on our webcast and dial-ins, and just a reminder that today's webcast will be archived on our investor relations website, along with the slide presentations. We would like to welcome the folks in the room to our Cedarbrook Leadership Center, where we are looking forward to a great session this morning, following on from yesterday's kickoff event at WaMu Center.

Fortunately, the weather cooperated and it was a chamber of commerce afternoon and evening in Seattle for day one. If you look at your agenda, you will see that this morning you will hear from Kerry Killinger, our President and CEO, Steve Rotella, our President and Chief Operating Officer, and James Corcoran, our President of the Retail Banks.

We'll then take a short break, and following from that break, you will hear from Joe Saunders, President of our Card Services businesses, Ron Cathcart, who heads up Enterprise Risk Management, and closing the formal presentations will be Tom Casey, our CFO. Kerry will come back for a brief wrap-up and then we'll have formal Q&A for all of today's presenters. Before Kerry begins, I need to draw your attention to the forward-looking statement, which you can review at your leisure. As a reminder, please turn off your cell phones and pagers, and once again, thank you for joining us today.

So, with that, it's my pleasure to introduce our Chairman and CEO, Kerry Killinger.

KERRY KILLINGER, CHAIRMAN AND CEO, WASHINGTON MUTUAL: Thank you very much, Alan, and good morning, everyone, and certainly welcome again out to our Cedarbrook Leadership Center. I know a few of you were here a few years ago when you had a chance to hold an investor day here and glad we were able to come back.

I think we kicked it off yesterday with some very good presentations. I hope you enjoyed the presentations from David Schneider, David Beck, on the mortgage and capital market activities, and certainly with Genevieve Smith, Warren Wilcox and Richard Blunck on what we had going on on marketing, and some exciting things in the e-commerce arena. And certainly we had a great opportunity last night to visit with many of you on the dinner cruise, and again, we worked hard to have that weather turn out as nice as it did.

Exhibit 16 of 30                                                                                                  Page 134

WaMu's 2006 Investor Day - Event 2 - Final FD (Fair Disclosure) Wire September 7, 2006 Thursday

industry in growth right now, while maintaining strong credit quality, and again, Joe Saunders will be up here a little bit later. The key metrics in cards, managed receivables growth, the number of cards outstanding, the number of WaMu households with cars. And then we pay very close attention to the risk-adjusted margin, obviously 30-plus day delinquencies and net credit losses and, as in every business, the efficiency ratio.

Now, as you've heard, Card Services, we've used a lot of terms - home run, grand slam, they're on a roll. Since the acquisition closed a little less than a year ago, managed receivables have grown 9% and they grew 5% on a linked-quarter basis during the second quarter of this year. We have more than 10 million credit card customers at this time, and we've added more than 800,000 new WaMu accounts since we added Card Services less than a year ago, which exceeds our original projections. Today, 1.4 million WaMu households have our card and that leaves us with lots of potential.

When we announced the deal, there were some concerns expressed about how we would execute on the integration. I'm happy to report that it's gone smoothly, we've exceeded all of our projections and I'm officially announcing that it is complete. Not only that, but we've aggressively leveraged Card Services' best practices. You saw a little bit of this yesterday with Warren Wilcox, who's now running direct marketing for the whole company, but also in statement production, fraud prevention and a number of other areas.

This has been a great acquisition for the company, and later this morning, again, Joe will be up here to give you the outlook for Card Services and address the important topic of credit quality. Now let me turn to the Commercial Group, which is led by Al Brooks, right here in the front row, and a very experienced team of people. Al and his team are focused on expanding our multifamily leadership position and increasing our portfolio of this very attractive product. We've streamlined the process for lending on multifamily properties, and we're leveraging this platform in small commercial real estate lending as well.

The Commercial Group has used innovation and efficiencies to maintain what we believe is a competitive advantage, and they're currently driving solid growth and profits, with an efficiency ratio of just under 26% in the second quarter. And, they've maintained extremely strong credit performance over many years. The key metrics we look at in this business are portfolio balances, net interest margin, and again, efficiency ratio. And I'll come back to the CCBI acquisition in just a minute, which is the topic I highlighted here.

We're the leading bank multifamily lender in nearly all of our west coast and Midwest markets, and we're quickly moving up the ranks in our new markets on the east coast, particularly New York, which has strong upside potential for us. As I said, all of these markets tend to be large metropolitan markets with high housing cost barriers. Second quarter volume is up 3% year-over-year, and average loans outstanding increased 7% over that period.

Now let me turn to CCBI, which Kerry mentioned, a quick update on that. CCBI is the third-largest multifamily lender in California. Their shareholders approved the transaction at the end of July. We received regulatory approval from the OTS, and plan to close the transaction on schedule on October 1st. The acquisition is on track, and we believe it will be accretive in 2007, and it will further strengthen our number one position in California with the addition of a strong lending team.

Now, I'm also going to talk about Home Loans. We have significantly modified our strategy in this business. You've heard about that from Kerry. You heard about it from David Schneider last night. For those of you who were not there, let me restate the essence of our overall strategy. First, to target higher-margin products such as home equity, option ARM, Alt A and subprime. These products over time fit well with our desire to remix the balance sheet, but over the long term also generate superior gain on sale in the secondary markets.

Second, increasingly leverage our existing distribution channels, especially to our retail stores, with existing Home Loan products. And, third, align our servicing business with originations. The recent sale of that 2.6 billion of mortgage servicing rights, was a major strategic step in aligning servicing and production. We're committed to being a leader in

Exhibit 16 of 30                                                                                      Page 135

# Exhibit 17

Exhibit 17 of 30                                                                                    Page 136

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10–Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2006**

### Commission File Number 1–14667

# WASHINGTON MUTUAL, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91–1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1301 Second Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

**(206) 461–2000**

(Registrant's telephone number, including area code)
1201 Third Avenue, Seattle, Washington
(Registrant's former address)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. Large accelerated filer ☒ Accelerated filer ☐ Non–accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in 12b–2 of the Exchange Act.) Yes ☐ No ☒.

The number of shares outstanding of the issuer's classes of common stock as of October 31, 2006:

**Common Stock – 945,221,245**(1)

(1) Includes 6,000,000 shares held in escrow.

Exhibit 17 of 30                                    Page 137

**Summary Financial Data**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| | (dollars in millions, except per share amounts) | | | |
| **Profitability** | | | | |
| Net interest income | $ 1,947 | $ 2,005 | $ 6,123 | $ 5,977 |
| Net interest margin | 2.53% | 2.73% | 2.64% | 2.77% |
| Noninterest income | $ 1,570 | $ 1,208 | $ 4,786 | $ 3,572 |
| Noninterest expense | 2,184 | 1,860 | 6,551 | 5,407 |
| Net income | 748 | 821 | 2,501 | 2,567 |
| Basic earnings per common share: | | | | |
| Income from continuing operations | $ 0.78 | $ 0.94 | $ 2.59 | $ 2.93 |
| Income from discontinued operations | 0.01 | 0.01 | 0.03 | 0.04 |
| Net income | 0.79 | 0.95 | 2.62 | 2.97 |
| Diluted earnings per common share: | | | | |
| Income from continuing operations | 0.76 | 0.91 | 2.51 | 2.86 |
| Income from discontinued operations | 0.01 | 0.01 | 0.03 | 0.03 |
| Net income | 0.77 | 0.92 | 2.54 | 2.89 |
| Basic weighted average number of common shares outstanding (in thousands) | 941,898 | 866,541 | 954,062 | 865,571 |
| Diluted weighted average number of common shares outstanding (in thousands) | 967,376 | 888,495 | 981,997 | 888,184 |
| Dividends declared per common share | $ 0.52 | $ 0.48 | $ 1.53 | $ 1.41 |
| Return on average assets(1) | 0.86% | 1.00% | 0.96% | 1.07% |
| Return on average common equity(1) | 11.47 | 14.88 | 12.68 | 15.77 |
| Efficiency ratio(2)(3) | 62.09 | 57.88 | 60.05 | 56.62 |
| **Asset Quality (period end)** | | | | |
| Nonaccrual loans(4) | $ 1,987 | $ 1,465 | $ 1,987 | $ 1,465 |
| Foreclosed assets | 405 | 256 | 405 | 256 |
| Total nonperforming assets(4) | 2,392 | 1,721 | 2,392 | 1,721 |
| Nonperforming assets(4) to total assets | 0.69% | 0.52% | 0.69% | 0.52% |
| Restructured loans | $ 19 | $ 25 | $ 19 | $ 25 |
| Total nonperforming assets and restructured loans(4) | 2,411 | 1,746 | 2,411 | 1,746 |
| Allowance for loan and lease losses | 1,550 | 1,264 | 1,550 | 1,264 |
| Allowance as a percentage of total loans held in portfolio | 0.64% | 0.58% | 0.64% | 0.58% |
| **Credit Performance** | | | | |
| Provision for loan and lease losses | $ 166 | $ 52 | $ 472 | $ 99 |
| Net charge-offs | 154 | 31 | 375 | 107 |
| **Capital Adequacy (period end)** | | | | |
| Stockholders' equity to total assets | 7.58% | 6.68% | 7.58% | 6.68% |
| Tangible equity to total tangible assets(5) | 5.86 | 4.99 | 5.86 | 4.99 |
| Estimated total risk–based capital to total risk–weighted assets(6) | 11.10 | 10.56 | 11.10 | 10.56 |
| **Per Common Share Data** | | | | |
| Book value per common share (period end)(7) | $ 28.17 | $ 25.54 | $ 28.17 | $ 25.54 |
| Market prices: | | | | |
| High | 46.42 | 43.60 | 46.48 | 43.60 |
| Low | 41.47 | 39.22 | 41.47 | 37.78 |
| Period end | 43.47 | 39.22 | 43.47 | 39.22 |
| **Supplemental Data** | | | | |
| Total home loan volume(8) | 37,169 | 56,142 | 124,210 | 157,293 |
| Total loan volume | 49,368 | 70,732 | 159,309 | 197,865 |

(1)  Includes income from continuing and discontinued operations.
(2)  Based on continuing operations.
(3)  The efficiency ratio is defined as noninterest expense divided by total revenue (net interest income and noninterest income).
(4)  Excludes nonaccrual loans held for sale.
(5)  Excludes unrealized net gain/loss on available–for–sale securities and derivatives, goodwill and intangible assets (except MSR). Minority interests of $1.96 billion at September 30, 2006 are included in the numerator.
(6)  The total risk–based capital ratio is estimated as if Washington Mutual, Inc. were a bank holding company subject to Federal Reserve Board capital requirements.
(7)  Excludes six million shares held in escrow at September 30, 2006 and 2005.
(8)  Includes specialty mortgage finance loans, which are comprised of purchased subprime home loans and subprime home loans originated by Long Beach Mortgage. Specialty mortgage finance loan volumes were $7.79 billion and $8.41 billion for the three months ended September 30, 2006 and 2005 and $21.49 billion and $24.82 billion for the nine months ended September 30, 2006 and 2005.

37

Exhibit 17 of 30    Page 138

**Loans**

Loans held in portfolio consisted of the following:

| | September 30, 2006 | December 31, 2005 |
|---|---|---|
| | (in millions) | |
| Loans secured by real estate: | | |
| Home: | | |
| Short–term adjustable–rate loans[1]: | | |
| Option ARMs[2] | $ 64,822 | $ 70,191 |
| Other ARMs | 18,695 | 14,666 |
| Total short–term adjustable–rate loans | 83,517 | 84,857 |
| Medium–term adjustable–rate loans[3] | 47,740 | 41,511 |
| Fixed–rate loans | 9,928 | 8,922 |
| Total home loans[4] | 141,185 | 135,290 |
| Home equity loans and lines of credit | 54,364 | 50,851 |
| Home construction[5] | 2,077 | 2,037 |
| Multi–family | 27,407 | 25,601 |
| Other real estate | 5,869 | 5,035 |
| Total loans secured by real estate | 230,902 | 218,814 |
| Consumer: | | |
| Credit card | 8,807 | 8,043 |
| Other | 281 | 638 |
| Commercial | 1,775 | 2,137 |
| Total loans held in portfolio[6] | $ 241,765 | $ 229,632 |

(1)     Short–term is defined as adjustable–rate loans that reprice within one year or less.
(2)     The total amount by which the unpaid principal balance of Option ARM loans exceeded their original principal amount was $654 million at September 30, 2006 and $157 million at December 31, 2005.
(3)     Medium–term is defined as adjustable–rate loans that reprice after one year.
(4)     Includes specialty mortgage finance loans, which are comprised of purchased subprime home loans and subprime home loans originated by Long Beach Mortgage held in portfolio. Specialty mortgage finance loans were $20.08 billion and $21.15 billion at September 30, 2006 and December 31, 2005.
(5)     Represents loans to builders for the purpose of financing the acquisition, development and construction of single–family residences for sale and construction loans made directly to the intended occupant of a single–family residence.
(6)     Includes net unamortized deferred loan origination costs of $1.61 billion and $1.53 billion at September 30, 2006 and December 31, 2005.

50

Exhibit 17 of 30                                                                                                           Page 139

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on November 9, 2006.

**WASHINGTON MUTUAL, INC.**

By:    /s/ THOMAS W. CASEY

Thomas W. Casey
*Executive Vice President and Chief Financial Officer*

By:    /s/ JOHN F. WOODS

John F. Woods
*Senior Vice President and Controller*
*(Principal Accounting Officer)*

72

Exhibit 17 of 30                                                                                          Page 140

EXHIBIT 31.1

**CERTIFICATION**

I, Kerry K. Killinger, certify that:

1.        I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.        Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.        Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.        The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)        Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)        Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)        Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)        Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.        The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)        All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)        Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2006                    /s/ KERRY K. KILLINGER
                                          Kerry K. Killinger
                                          *Chairman and Chief Executive Officer*
                                          *of Washington Mutual, Inc.*

Exhibit 17 of 30                                                                    Page 141

EXHIBIT 31.2

CERTIFICATION

I,      Thomas W. Casey, certify that:

1.      I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.      Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.      Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)      Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2006                                        /s/ THOMAS W. CASEY
                                                             Thomas W. Casey
                                                             *Executive Vice President and Chief Financial Officer*
                                                             *of Washington Mutual, Inc.*

Exhibit 17 of 30                                        Page 142

**EXHIBIT 32.1**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: November 9, 2006                               By:    /s/ KERRY K. KILLINGER

                                                          Kerry K. Killinger
                                                          *Chairman and Chief Executive Officer*
                                                          *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 17 of 30                                                                     Page 143

EXHIBIT 32.2

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: November 9, 2006

By:    /s/ THOMAS W. CASEY
Thomas W. Casey
*Executive Vice President and Chief Financial Officer of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 17 of 30                                                                                                Page 144

# Exhibit 18

Exhibit 18 of 30                                                              Page 145

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549
## FORM 10–K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2006**

**Commission File Number 1–14667**

# WASHINGTON MUTUAL, INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Washington** | **91–1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1301 Second Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(206) 461–2000**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock | New York Stock Exchange |
| Depositary Shares | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Litigation Tracking WarrantsTM | NASDAQ |

Indicate by check mark if the registrant is a well–known seasoned issuer as defined in Rule 405 of the Securities Act. Yes ☒ No ☐.

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☒.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. (Check one): Large accelerated filer ☒    Accelerated filer ☐    Non–accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act). Yes ☐ No ☒.

The aggregate market value of voting stock held by non–affiliates of the registrant as of June 30, 2006, based on the closing sale price as reported on the New York Stock Exchange:

**Common Stock – $43,477,379,735**(1)

(1) Does not include any value attributable to 6,000,000 shares held in escrow.

The number of shares outstanding of the issuer's classes of common stock as of January 31, 2007:

**Common Stock – 889,034,725**(2)

(2) Includes 6,000,000 shares held in escrow.

**Documents Incorporated by Reference**

Portions of the definitive proxy statement for the Annual Meeting of Shareholders to be held April 17, 2007, are incorporated by reference into Part III.

Exhibit 18 of 30                                                                                                    Page 146

*Credit risk.*

Washington Mutual is one of the nation's largest lenders, and a deterioration in the credit quality of its loan portfolios can have a negative impact on its earnings resulting from increased provisioning for loan and lease losses and increased nonaccrual loans causing a decrease in interest–earning assets. Credit risk is the risk of loss due to adverse changes in a borrower's ability to meet its financial obligations on agreed upon terms. The overall credit quality of the Company's loan portfolios is impacted by the strength of the United States economy and local economies in which the Company conducts its lending operations. The Company continually monitors changes in the economy, particularly unemployment rates and housing prices, since these factors can impact the ability of the Company's borrowers to repay their loans. Economic trends that negatively affect housing prices and the job market could result in, among other things, deterioration in credit quality of the Company's loan portfolios.

The Company offers credit cards to its customers and retains certain credit card balances in its portfolio and securitizes and sells other credit card balances. Credit cards typically have smaller balances, shorter lifecycles and experience higher delinquency and charge–off rates than real estate secured loans. Account management efforts, seasoning and economic conditions, including unemployment rates and housing prices, affect the overall credit quality of the Company's credit card portfolio.

The Company originates and purchases from third–party lenders loans to higher risk borrowers through its subprime mortgage channel. The Company either holds such loans in portfolio or securitizes and sells them. Borrowers in the subprime mortgage channel tend to have greater vulnerability to changes in economic factors, such as increases in unemployment, a slowdown in housing price appreciation or declines in housing prices, than do other borrowers. Overcapacity and competitive market conditions in the subprime mortgage industry have negatively impacted the Company's business and could continue to do so in the future. The Company's subprime mortgage channel portfolio has performed within the Company's expectations in recent periods. The future performance of this loan portfolio could be negatively impacted by a variety of factors, including changes in the economic factors noted above, which negatively impact borrowers, as well as deterioration in the ability of third–party lenders who sold loans to the Company to continue to service or repurchase loans as required under the terms of their loan sale and servicing agreements with the Company. At December 31, 2006, loans in the subprime mortgage channel with an unpaid principal balance of \$8.78 billion were serviced by a single third–party lender. By value, this \$8.78 billion represented a majority of the balance of loans in the Company's subprime mortgage channel portfolio that were not serviced by the Company. In addition, as a seller of subprime mortgage channel loans, the Company began experiencing, in the fourth quarter of 2006, increased incidents in the absolute number of repurchase requests. Increased delinquencies of such loans could negatively impact the Company's ability to securitize and sell such loans.

Certain of the Company's loan products have features that may result in increased credit risk, as explained below.

The Company has increased its emphasis on home equity lending. Many borrowers elect to utilize accumulated equity in their homes by borrowing money through either a first or second lien home equity loan or line of credit. When the Company holds a second lien on a property which is subordinate to a first lien mortgage held by another lender, both the probability of default and severity of loss risk is generally higher than when the Company holds both the first and second lien positions. Home equity loans and lines of credit with combined loan–to–value ratios of greater than 80 percent also expose the Company to greater credit risk than home loans with loan–to–value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of risk is higher when borrowers have less equity in their homes.

The Company originates Option ARM loans for sale and securitization and for its home loan portfolio. Borrowers with Option ARM loans have the option of making minimum payments based on the

3

Exhibit 18 of 30                                                                                     Page 147

rate charged during the introductory period, which is generally lower than the fully–indexed rate. If, as permitted by the loan terms, borrowers continue to make minimum payments after the introductory period ends, those borrowers may experience negative amortization as unpaid interest is deferred and added to the principal amount of the loan. The risk that Option ARM borrowers will be unable to make increased loan payments as a result of negative amortization or as a result of the interest rate on the loan adjusting upward to the fully–indexed rate, both of which can occur simultaneously in certain situations, are the principal risks associated with the Option ARM product.

The Company originates interest–only loans that the Company either securitizes or holds in portfolio. Borrowers with interest–only loans are initially required to make payments that are sufficient to cover accrued interest. After a predetermined period (generally five years), the payments are reset to allow the loan to fully amortize over its remaining life. Borrowers with interest–only loans are impacted by unemployment, declining housing prices and reduced home price appreciation. Such economic trends could cause the credit performance of interest–only loans to deteriorate with a negative impact on the Company's results.

For further discussion of credit risk, see Management's Discussion and Analysis – "Credit Risk Management."

*Operational risk.*

The Company is exposed to many types of operational risk, including the risk of fraud by employees or outsiders, the risk of operational errors, including clerical or record–keeping errors or those resulting from faulty or disabled computer or telecommunications systems. Given the high volume of transactions at the Company, certain errors may be repeated or compounded before they are discovered and successfully corrected. The Company's dependence upon automated systems to record and process transactions may further increase the risk that technical system flaws or employee tampering with or manipulation of those systems will result in losses that are difficult to detect.

The Company may be subject to disruptions of its systems, arising from events that are wholly or partially beyond its control (including, for example, computer viruses or electrical or telecommunications outages), which may give rise to losses in service to customers and to financial loss or liability. The Company is further exposed to the risk that its external vendors may be unable to fulfill their contractual obligations (or will be subject to the same risk of fraud or operational errors by their respective employees as is the Company) and to the risk that the Company's (or its vendors') business continuity and data security systems prove to be inadequate. The Company relies on offshoring of services to vendors in foreign countries for certain functions and this creates the risk of incurring losses arising from unfavorable political, economic and legal developments in those countries.

The Company also faces the risk that the design of its controls and procedures may prove to be inadequate or are circumvented, thereby causing delays in detection of errors or inaccuracies in data and information. Although the Company maintains a system of controls designed to keep operational risk at appropriate levels, it is possible that any lapses in the effective operations of its controls and procedures could materially affect the Company's earnings or harm its reputation. In an organization as large and complex as Washington Mutual, lapses or deficiencies in internal control over financial reporting could be material to the Company.

The Company depends on the expertise of key personnel and faces competition for talent. Its success depends, in large part, on its ability to hire and retain key people. If the Company is unable to retain these people and to attract talented people to the Company, or if key people fail to perform properly, the Company's business may suffer. For further discussion of operational risks, see Management's Discussion and Analysis – "Operational Risk Management."

4

Exhibit 18 of 30                                                                                                                          Page 148

*Risks related to credit card operations.*

Credit card lending brings with it certain risks and uncertainties. These include the composition and risk profile of the Company's credit card portfolio and the Company's ability to continue growing the credit card business. The success of the credit card business will also depend, in part, on the success of its product development, product rollout efforts and marketing initiatives, including the rollout of credit card products to the Company's existing retail and mortgage loan customers, and its ability to continue to successfully target creditworthy customers. Recent disputes involving the Visa and MasterCard networks, including their membership standards and pricing structures, could also result in changes that would be adverse to the credit card business. Changes in interest rates also negatively affect the credit card business, including costs associated with funding the credit card portfolio.

*Changes in the regulation of financial services companies, housing government–sponsored enterprises and credit card lenders.*

Proposals for legislation further regulating the financial services industry are continually being introduced in Congress. The agencies regulating the financial services industry also periodically adopt changes to their regulations. Proposals that are now receiving a great deal of attention and could significantly impact the Company's business include changes to capital requirements, consumer protection initiatives relating to bank overdraft practices, security of customer information, marketing practices, nontraditional mortgage loan products including Option ARM loans and interest–only products, credit card lending practices, fees charged to merchants for credit and debit card transactions and predatory lending. In addition, there continues to be a focus on reform of the housing government–sponsored enterprises ("GSEs") including the federal home loan bank system. It is possible that one or more legislative proposals may be adopted or regulatory changes may be made that would have an adverse effect on the Company's business. For further discussion of the regulation of financial services, see "Regulation and Supervision."

*Competition from banking and nonbanking companies.*

The Company operates in a highly competitive environment and expects competition to continue as financial services companies combine to produce larger companies that are able to offer a wide array of financial products and services at competitive prices. In addition, customer convenience and service capabilities, such as product lines offered and the accessibility of services are significant competitive factors.

The Company's most direct competition for loans comes from commercial banks, other savings institutions, investment banking firms, national mortgage companies and other credit card lenders. Its most direct competition for deposits comes from commercial banks, other savings institutions and credit unions doing business in the Company's markets. As with all banking organizations, the Company also experiences competition from nonbanking sources, including mutual funds, corporate and government debt securities and other investment alternatives offered within and outside of its primary markets. In addition, technological advances and the growth of e–commerce have made it possible for non–depository institutions to offer products and services that were traditionally offered only by banks. Many of these competitors have fewer regulatory constraints and some have lower cost structures.

*General business, economic and market conditions.*

The Company's business and earnings are sensitive to general business and economic conditions. These conditions include the slope of the yield curve, inflation, the money supply, the value of the U.S. dollar as compared to foreign currencies, fluctuations in both debt and equity capital markets, and the strength of the U.S. economy and the local economies in which the Company conducts business. Changes in these conditions may adversely affect its business and earnings. For example, when short–term interest rates rise, there is a lag period until adjustable–rate mortgages reprice. As a result, the Company may

5

Exhibit 18 of 30                                    Page 149

experience compression of its net interest margin with a commensurate adverse effect on earnings. Likewise, the Company's earnings could also be adversely affected when a flat or inverted yield curve develops, as this may inhibit the Company's ability to grow its adjustable–rate mortgage portfolio and may also cause margin compression. A prolonged economic downturn could increase the number of customers who become delinquent or default on their loans, or a rising interest rate environment could increase the negative amortization of Option ARM loans, which may eventually result in increased delinquencies and defaults. Rising interest rates could also decrease customer demand for loans. An increase in delinquencies or defaults could result in a higher level of charge–offs and provision for loan and lease losses, which could adversely affect earnings. A reduction in the availability of secondary markets for our mortgage loan products could also negatively impact our earnings.

The Company's business and earnings are significantly affected by the fiscal and monetary policies of the federal government and its agencies. The Company is particularly affected by the policies of the Board of Governors of the Federal Reserve System (the "Federal Reserve"), which regulates the supply of money and credit in the United States. Federal Reserve policies directly and indirectly influence the yield on the Company's interest–earning assets and the cost of its interest–bearing liabilities. Changes in those policies are beyond the Company's control and are difficult to predict.

*Reputational risk.*

Reputational risk, meaning the risk to earnings and capital from negative public opinion, is inherent in the Company's business. Negative public opinion can result from the actual or perceived manner in which the Company conducts its business activities, which include its sales and trading practices, its loan origination and servicing activities, its retail banking and credit card operations, its management of actual or potential conflicts of interest and ethical issues, and its protection of confidential customer information. Negative public opinion can adversely affect the Company's ability to keep and attract customers. The Company takes steps to minimize reputation risk in the way it conducts its business activities and deals with its customers and communities.

*Each of the factors discussed in the preceding paragraphs can significantly impact the Company's businesses, operations, activities, condition and results in significant ways that are not described in the foregoing discussion and which are beyond the Company's ability to anticipate or control, and could cause actual results to differ materially from the outcomes described in the forward–looking statements.*

**Environmental Regulation**

The Company's business and properties are subject to federal and state laws and regulations governing environmental matters, including the regulation of hazardous substances and waste. For example, under the Federal Comprehensive Environmental Response, Compensation, and Liability Act and similar state laws, owners and operators of contaminated properties may be liable for the costs of cleaning up hazardous substances without regard to whether such persons actually caused the contamination. Such laws may affect the Company both as an owner or former owner of properties used in or held for its business, and as a secured lender on property that is found to contain hazardous substances or waste. The Company's general policy is to obtain an environmental assessment prior to foreclosing on commercial property. The Company may elect not to foreclose on properties that contain such hazardous substances or waste, thereby limiting, and in some instances precluding, the disposition of such properties.

**Regulation and Supervision**

The following discussion describes elements of the extensive regulatory framework applicable to savings and loan holding companies as well as federal savings associations. This regulatory framework is primarily intended for the protection of depositors, the federal deposit insurance fund and the banking system as a whole rather than for the protection of shareholders and creditors.

6

Exhibit 18 of 30                                    Page 150

Noninterest income totaled $6.38 billion in 2006, compared with $5.10 billion in the prior year. The increase is primarily due to the full year effect of consumer loan sales and servicing revenue and credit card fee income in 2006, which resulted from the Company's October 1, 2005 acquisition of Providian. The strong consumer response to the Company's new free checking product, which was launched early in 2006, also contributed to the growth in noninterest income, with depositor and other retail banking fees totaling $2.57 billion in 2006, a 17% increase from the 2005 total of $2.19 billion. Partially offsetting these increases was a significant decline in revenue from the Company's home mortgage loan operations. Revenue from sales and servicing of home mortgage loans, including the effects of all MSR risk management instruments, was $712 million, compared with $1.78 billion in 2005. The decline was associated with the flat–to–inverted yield curve that existed throughout 2006, which resulted in a significant increase in MSR risk management costs, as compared with 2005. Additionally, a 24% year–over–year decline in home loan volume in 2006, reflecting the slowdown in the housing market, along with an industry–wide decline in subprime mortgage secondary market performance during the latter part of the year, led to lower gain on sale results.

The provision for loan and lease losses was $816 million in 2006, a $500 million increase from the $316 million provision that was recorded in the prior year. This increase was substantially the result of the Company's entry into credit card lending that resulted from the Providian acquisition and the ensuing growth in the on–balance sheet credit card portfolio, which accelerated during the fourth quarter of 2006. On–balance sheet net credit card charge–offs as a percentage of the average credit card portfolio in 2006 were 3.08%, compared with an annualized fourth quarter 2005 net charge–off rate of 4.75%, reflecting a sharp reduction in charge–offs early in 2006 after the fourth quarter 2005 change in consumer bankruptcy law, and the sale of higher risk credit card accounts during the latter part of 2006. With the slowdown in the housing market, weaker credit performance in the Company's real–estate secured portfolios developed during the second half of 2006. Nonperforming assets, as a percentage of total assets, increased from 0.57% at December 31, 2005 to 0.80% at December 31, 2006, reflecting higher delinquency rates in the home loans, subprime mortgage channel and home equity portfolios. Early stage delinquencies continued to rise during the fourth quarter of 2006 as declines in home sales, longer marketing periods and growing inventories continued to exert downward pressure on the housing sector.

Noninterest expense totaled $8.81 billion in 2006, compared with $7.62 billion in the prior year. The increase was primarily due to a full year of credit card operating expenses after acquiring Providian in the fourth quarter of 2005, and costs associated with the expansion of the retail banking franchise. The Company's retail banking network increased from 2,140 stores at December 31, 2005 to 2,225 stores at the end of 2006.

On October 1, 2006 the Company completed its acquisition of Commercial Capital Bancorp, Inc. ("CCB") in a cash transaction with an initial purchase price of approximately $1 billion. CCB stockholders received $16.00 in cash for each share of CCB common stock. Most of the business activities of CCB are conducted through the Company's Commercial Group operating segment.

**Critical Accounting Estimates**

The preparation of financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the financial statements. Various elements of the Company's accounting policies, by their nature, involve the application of highly sensitive and judgmental estimates and assumptions. Some of these policies and estimates relate to matters that are highly complex and contain inherent uncertainties. It is possible that, in some instances, different estimates and assumptions could reasonably have been made and used by management, instead of those the Company applied, which might have produced different results that could have had a material effect on the financial statements.

20

Exhibit 18 of 30                                                                                              Page 151

The Company has identified three accounting estimates that, due to the judgments and assumptions inherent in those estimates, and the potential sensitivity of its financial statements to those judgments and assumptions, are critical to an understanding of its financial statements. These estimates are: the fair value of certain financial instruments and other assets; the determination of whether a derivative qualifies for hedge accounting; and the allowance for loan and lease losses and contingent credit risk liabilities.

Management has discussed the development and selection of these critical accounting estimates with the Audit Committee of the Company's Board of Directors. The Company believes that the judgments, estimates and assumptions used in the preparation of its financial statements are appropriate given the facts and circumstances as of December 31, 2006. These judgments, estimates and assumptions are described in greater detail in subsequent sections of Management's Discussion and Analysis and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

The discussion below presents information about the nature of the Company's critical accounting estimates:

**Fair Value of Certain Financial Instruments and Other Assets**

A portion of the Company's assets are carried at fair value, including: mortgage servicing rights, certain retained interests from securitization activities (which are classified as trading assets), available–for–sale securities and derivatives. In addition, loans held for sale are recorded at the lower of carrying value or fair value. Changes in fair value of those instruments that qualify as hedged items under fair value hedge accounting are recognized in earnings and offset the changes in fair value of derivatives used as hedge accounting instruments.

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models that utilize market data inputs where readily available and other assumptions, such as loan prepayment speeds, forward interest rate yield curves, market volatilities and pricing spreads to determine their fair values. The degree of management judgment involved in determining the fair value of a financial instrument or other asset is dependent upon the availability of quoted market prices or observable market value inputs. For financial instruments that are actively traded in the marketplace or whose values are based on readily available market value data, little, if any, subjectivity is applied when determining the instrument's fair value. When observable market prices and data are not readily available, significant management judgment often is necessary to estimate fair value. In those cases, different assumptions could result in significant changes in valuation.

The following financial instruments and other assets require the Company's most complex judgments and assumptions when estimating fair value:

*Mortgage Servicing Rights and Certain Other Retained Interests in Securitizations*

MSR and certain other retained interests from securitization activities do not trade in an active, open market with readily quoted prices. Although sales do occur from time to time, the terms of such sales are generally not readily available. Consequently, the Company estimates the fair value of MSR and certain other retained interests in securitization activities utilizing internal discounted cash flow models.

The discounted cash flow model for MSR calculates the present value of the expected future net cash flows of the servicing portfolio based on various assumptions, such as estimated future servicing costs, expected servicing portfolio prepayment speeds and discount rates that are commensurate with the risk profile of the serviced assets. This model is highly sensitive to changes in certain assumptions. Different expected prepayment speeds, in particular, can result in substantial changes in the estimated fair value of MSR. If actual prepayment experience differs materially from the expected prepayment speeds used in the Company's model, this difference would likely result in a material change in MSR fair value. While the

21

Exhibit 18 of 30                                                                                                                    Page 152

**Allowance for Loan and Lease Losses and Contingent Credit Risk Liabilities**

*Allowance for loan and lease losses*

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of the Company's borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable–rate loans and general economic conditions. Loans held in portfolio that are evaluated for collective impairment and loans held in portfolio that are individually reviewed for impairment but deemed not to be impaired may have both an allocated and unallocated allowance. Loans that are individually deemed to be impaired may only have an allocated allowance.

The allowance for loans evaluated for collective impairment is comprised of an allocated allowance that is computed for each portfolio based on specific loan portfolio metrics and an unallocated allowance that is computed based on certain environmental factors we believe are not adequately captured in the allocated allowance computations. Determining the adequacy of the allowance, particularly the unallocated allowance, is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance is comprised of an allowance for individually impaired loans, as well as an allowance for other individually unimpaired loans that share common risk characteristics that, in the aggregate, have incurred a probable loss on a collective basis. The determination of common risk factors that indicate a probable loss on a collective basis is complex and requires significant judgment by management about the shared risk characteristics that suggest a probable loss.

The allowance for loan and lease losses is reported within the Consolidated Statements of Financial Condition and the provision for loan and lease losses is reported within the Consolidated Statements of Income.

The estimates and judgments are described in further detail in the subsequent section of Management's Discussion and Analysis – "Credit Risk Management" and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

*Contingent Credit Risk Liabilities*

In the ordinary course of business, the Company sells loans to third parties and in certain circumstances, such as in the event of early or first payment default, retains credit risk exposure on those loans. The Company may also be required to repurchase sold loans when representations and warranties made by the Company in connection with those sales are breached. When a loan sold to an investor fails to perform according to its contractual terms, the investor will typically review the loan file to search for errors that may have been made in the process of originating the loan. If errors are discovered and it is determined that such errors constitute a violation of a representation or warranty made to the investor in connection with the Company's sale of the loan, then the Company will be required to either repurchase the loan or indemnify the investor for losses sustained if the violation had a material adverse effect on the value of the loan.

Reserves are established for the Company's exposure to the potential repurchase or indemnification liabilities described above as such liabilities are generally recorded at fair value. Throughout the life of these repurchase or indemnification liabilities, the Company may learn of additional information that can affect the assessment of loss probability or the estimation of the amounts involved. Changes in these assessments can lead to significant changes in the recorded reserves. Repurchase and indemnification

24

Exhibit 18 of 30                                                                                                    Page 153

**Loans**

Total loans consisted of the following:

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2005** | **2004** | **2003** | **2002** |
| | | | (in millions) | | |
| Loans held for sale | $ 44,970 | $ 33,582 | $ 42,743 | $ 20,837 | $ 39,623 |
| Loans held in portfolio: | | | | | |
| Loans secured by real estate: | | | | | |
| Home loans[1] | 99,479 | 114,144 | 109,950 | 100,043 | 82,842 |
| Home equity loans and lines of credit[1] | 52,882 | 50,840 | 43,648 | 27,644 | 16,167 |
| Subprime mortgage channel[2]: | | | | | |
| Home loans | 18,725 | 21,146 | 19,184 | 12,973 | 10,128 |
| Home equity loans and lines of credit | 2,042 | 11 | 2 | 3 | 1 |
| Home construction[3] | 2,082 | 2,037 | 2,344 | 2,220 | 1,949 |
| Multi–family[4] | 30,161 | 25,601 | 22,282 | 20,324 | 18,000 |
| Other real estate[5] | 6,745 | 5,035 | 5,664 | 6,649 | 7,986 |
| Total loans secured by real estate | 212,116 | 218,814 | 203,074 | 169,856 | 137,073 |
| Consumer: | | | | | |
| Credit card | 10,861 | 8,043 | – | – | – |
| Other | 276 | 638 | 792 | 1,028 | 1,663 |
| Commercial | 1,707 | 2,137 | 3,205 | 4,266 | 4,292 |
| Total loans held in portfolio[6] | $ 224,960 | $ 229,632 | $ 207,071 | $ 175,150 | $ 143,028 |

(1)     Excludes home loans and home equity loans and lines of credit in the subprime mortgage channel.
(2)     Represents mortgage loans purchased from recognized subprime lenders and mortgage loans originated under the Long Beach Mortgage name and held in the Company's investment portfolio.
(3)     Represents loans to builders for the purpose of financing the acquisition, development and construction of single–family residences for sale and construction loans made directly to the intended occupant of a single–family residence.
(4)     Includes multi–family construction balances of $740 million, $632 million, $333 million, $325 million and $491 million at December 31, 2006, 2005, 2004, 2003 and 2002.
(5)     Includes other commercial real estate construction balances of $414 million, $208 million, $277 million, $382 million and $469 million at December 31, 2006, 2005, 2004, 2003 and 2002.
(6)     Includes net unamortized deferred loan origination costs of $1.48 billion, $1.53 billion, $1.25 billion, $1.01 billion and $587 million at December 31, 2006, 2005, 2004, 2003, and 2002.

Total home loans held in portfolio, including those that reside in the subprime mortgage channel, consisted of the following:

| | December 31, | |
|---|---|---|
| | **2006** | **2005** |
| | (in millions) | |
| Home loans: | | |
| Short–term adjustable–rate loans[1]: | | |
| Option ARMs[2] | $ 63,557 | $ 71,201 |
| Other ARMs | 6,791 | 7,059 |
| Total short–term adjustable–rate loans | 70,348 | 78,260 |
| Medium–term adjustable–rate loans[3] | 26,232 | 33,029 |
| Fixed–rate loans | 2,899 | 2,855 |
| Subprime mortgage channel | 18,725 | 21,146 |
| Total home loans held in portfolio | $ 118,204 | $ 135,290 |

(1)     Short–term is defined as adjustable–rate loans that reprice within one year.
(2)     The total amount by which the unpaid principal balance of Option ARM loans exceeded their original principal amount was $888 million and $160 million at December 31, 2006 and 2005.
(3)     Medium–term is defined as adjustable–rate loans that reprice after one year.

34

Exhibit 18 of 30        Page 154

balances, the performance of these balances can affect the recorded values of retained interests. Because of this continued involvement, the Company uses a managed asset basis to evaluate historical performance and plan future operations. Managed financial information is derived by adjusting the GAAP financial information to add back securitized loan balances and related interest, fee income and provision for credit losses.

The principal activities of the **Commercial Group** include:  (1) providing financing to developers and investors for multi–family dwellings and, to a lesser extent, other commercial properties; (2) servicing multi–family and other commercial real estate loans and holding such loans in portfolio as part of its commercial asset management business; (3) providing limited deposit services to commercial customers; and (4) Internal Revenue Service Section 1031 exchange services to income property investors nationwide.

The principal activities of the **Home Loans Group** include:  (1) originating and servicing home loans; (2) managing the Company's capital market operations–which includes the buying and selling of all types of mortgage loans in the secondary market; (3) the fulfillment and servicing of the Company's portfolio of home equity loans and lines of credit; (4) originating and purchasing mortgage loans to higher risk borrowers through the subprime mortgage channel; (5) providing financing and other banking services to mortgage bankers for the origination of mortgage loans; and (6) making available insurance–related products and participating in reinsurance activities with other insurance companies.

The segment offers a wide variety of real–estate secured residential loan products and services primarily consisting of fixed–rate home loans, adjustable–rate home loans or "ARMs", hybrid home loans, Option ARM loans and mortgage loans to higher risk borrowers through the subprime mortgage channel. Loans are either held in portfolio by the Home Loans Group, sold to secondary market participants or transferred through inter–segment sales to the Retail Banking Group. The decision to retain or sell loans, and the related decision to retain or not retain servicing when loans are sold, involves the analysis and comparison of expected interest income and the interest rate and credit risks inherent with holding loans in portfolio, with the expected servicing fees, the size of the gain or loss that would be realized if the loans were sold and the expected expense of managing the risk related to any retained mortgage servicing rights.

As part of its capital market activities, the Home Loans Group also generates both interest income and noninterest income through its conduit operations. Under the conduit program, the Company purchases loans from other lenders, warehouses the loans for a period of time and sells the loans in the form of whole loans, private label mortgage–backed securities or agency–guaranteed securities. The Company recognizes a gain or loss at the time the loans are sold and receives interest income while the loans are held for sale. The Company also provides ongoing servicing and bond administration for all securities issued.

The principal activities of, and charges reported in, the **Corporate Support/Treasury and Other** category include:
- enterprise–wide management of the Company's interest rate risk, liquidity position and capital. These responsibilities involve managing a majority of the Company's portfolio of investment securities and providing oversight and direction across the enterprise over matters that impact the profile of the Company's balance sheet. Such matters include determining the optimal product composition of loans that the Company holds in portfolio, the appropriate mix of wholesale and capital markets borrowings at any given point in time and the allocation of capital resources to the business segments;
- community lending and investment activities, which help fund the development of affordable housing units in traditionally underserved communities;
- general corporate overhead costs associated with the Company's technology services, facilities, legal, human resources and accounting and finance functions;

38

Exhibit 18 of 30                                                                 Page 155

**Commercial Group**

| | Year Ended December 31, | | | Percentage Change | |
|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006/2005 | 2005/2004 |
| | (dollars in millions) | | | | |
| **Condensed income statement:** | | | | | |
| Net interest income | $ 677 | $ 731 | $ 874 | (7)% | (16)% |
| Reversal of allowance for loan and lease losses | (81) | (26) | (8) | 218 | 238 |
| Noninterest income | 94 | 195 | 143 | (52) | 36 |
| Noninterest expense | 255 | 240 | 321 | 7 | (25) |
| Income before income taxes | 597 | 712 | 704 | (16) | 1 |
| Income taxes | 229 | 269 | 266 | (15) | 1 |
| Net income | $ 368 | $ 443 | $ 438 | (17) | 1 |
| **Performance and other data:** | | | | | |
| Efficiency ratio | 33.20% | 25.89% | 31.55% | 28 | (18) |
| Average loans | $ 33,137 | $ 30,154 | $ 31,089 | 10 | (3) |
| Average assets | 35,471 | 33,197 | 34,568 | 7 | (4) |
| Average deposits | 2,611 | 2,592 | 3,802 | 1 | (32) |
| Loan volume | 12,854 | 11,231 | 12,575 | 14 | (11) |
| Employees at end of period | 1,409 | 1,319 | 1,405 | 7 | (6) |

The decrease in net interest income was substantially due to higher transfer pricing charges which more than offset increased interest income on a larger portfolio of multi–family loans. Average loan balances reflect the acquisition of Commercial Capital Bancorp on October 1, 2006. The increase in transfer pricing charges was due to rising short–term interest rates combined with a shift from adjustable–rate to fixed–rate and hybrid loans.

The reserve reversal in 2006 was primarily the result of a $69 million reduction in the allowance for loan and lease losses as a result of changes to multi–family loan loss assumptions. The reserve reversal in 2005 was the result of the runoff of higher risk commercial loans and growth in the portfolio of lower risk multi–family and commercial real estate loans.

Noninterest income decreased in 2006, compared with 2005, primarily due to a $59 million pretax gain on the sale of a real estate investment property and a $55 million gain on the sale of mortgage–backed securities during 2005.

The increase in noninterest expense during 2006 compared with 2005 reflects additional expenses related to the acquisition of Commercial Capital Bancorp and a reduction in contingent liability reserves incurred during 2005.

42

---

**Home Loans Group**

| | Year Ended December 31, | | | Percentage Change | |
|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006/2005 | 2005/2004 |
| | (dollars in millions) | | | | |
| **Condensed income statement:** | | | | | |
| Net interest income | $ 1,174 | $ 1,985 | $ 1,775 | (41)% | 12% |
| Provision for loan and lease losses | 189 | 110 | 70 | 71 | 57 |
| Noninterest income | 1,297 | 2,426 | 2,429 | (47) | – |
| Inter–segment expense | 58 | 42 | 23 | 39 | 84 |
| Noninterest expense | 2,302 | 2,608 | 2,752 | (12) | (5) |
| Income (loss) before income taxes | (78) | 1,651 | 1,359 | – | 21 |
| Income taxes (benefit) | (30) | 622 | 513 | – | 21 |
| Net income (loss) | $ (48) | $ 1,029 | $ 846 | – | 22 |
| **Performance and other data:** | | | | | |
| Efficiency ratio | 95.38% | 59.69% | 65.81% | 60 | (9) |
| Average loans | $ 47,518 | $ 64,919 | $ 45,495 | (27) | 43 |
| Average assets | 72,706 | 87,252 | 63,973 | (17) | 36 |
| Average deposits | 19,288 | 19,317 | 19,606 | – | (1) |
| Loan volume | 158,458 | 202,697 | 198,615 | (22) | 2 |
| Employees at end of period | 12,993 | 17,726 | 17,337 | (27) | 2 |

The decrease in net interest income was primarily due to lower average balances of loans held for sale as a result of decreased loan volumes. Also contributing to this decline was an increase to the loans transfer pricing charge that outpaced the increase of interest income on loans. The average balance of loans held for sale during 2006 totaled $26.68 billion, compared with $43.79 billion during 2005.

The increase in provision for loan and lease losses during 2006 was primarily due to growth in the portfolio of purchased home equity loans and higher levels of delinquencies in the subprime mortgage channel.

The decrease in noninterest income was substantially due to a less favorable MSR hedging environment in 2006 compared with 2005. Additionally, the gain from mortgage loans was lower due to the slowdown in the housing market and a decline in the secondary market performance of loans sold through the subprime mortgage channel. Changes in prepayment and loss assumptions on retained interests in mortgage loan securitizations also contributed to the decrease.

The decrease in noninterest expense was primarily due to a significant decline in employee headcount, as a result of the Company's efficiency initiatives.

43

Exhibit 18 of 30                                                                                     Page 156

Consolidated Financial Statements – "Summary of Significant Accounting Policies" and "Derivative Financial Instruments."

**Commitments, Guarantees and Contingencies**

The Company may incur liabilities under certain contractual agreements contingent upon the occurrence of certain events. A discussion of these contractual arrangements under which the Company may be held liable is included in Note 14 to the Consolidated Financial Statements – "Commitments, Guarantees and Contingencies." In addition, the Company has commitments and obligations under pension and other postretirement benefit plans as described in Note 21 to the Consolidated Financial Statements – "Employee Benefits Programs and Other Expense."

**Risk Management**

The Company is exposed to four major categories of risk: credit, liquidity, market and operational.

The Company's Chief Enterprise Risk Officer is responsible for enterprise–wide risk management. The Company's Enterprise Risk Management function oversees the identification, measurement, monitoring, control and reporting of credit, market and operational risk. The Company's Treasury function is responsible for the measurement, management and control of liquidity risk. The Internal Audit function, which reports to the Audit Committee of the Board of Directors, independently assesses the Company's compliance with risk management controls, policies and procedures.

The Board of Directors, assisted by the Audit and Finance Committees on certain delegated matters, oversees the Company's monitoring and controlling of significant risk exposures, including the Company's policies governing risk management. The Corporate Relations Committee of the Board of Directors oversees the Company's reputation and those elements of operational risk that impact the Company's reputation. Governance and oversight of credit, liquidity and market risks are provided by the Finance Committee of the Board of Directors. Governance and oversight of operational risks are provided by the Audit Committee of the Board of Directors. Risk oversight is also provided by management committees whose membership includes representation from the Company's lines of business and the Enterprise Risk Management function. These committees include the Enterprise Risk Management Committee, the Credit Risk Management Committee, the Market Risk Committee and the Operational Risk Committee.

Enterprise Risk Management works with the lines of business to establish appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance. Significant risk management policies approved by the relevant management committees are also reviewed and approved by the Board, Audit, and Finance Committees. Enterprise Risk Management also provides objective oversight of risk elements inherent in the Company's business activities and practices, oversees compliance with laws and regulations, and reports periodically to the Board of Directors.

Management is responsible for balancing risk and reward in determining and executing business strategies. In 2006, the Company reduced its exposure to market risk and correspondingly increased its tolerance for credit risk. Business lines, Enterprise Risk Management and Treasury divide the responsibilities of conducting measurement and monitoring of the Company's risk exposures. Risk exceptions, depending on their type and significance, are elevated to management or Board committees responsible for oversight.

**Credit Risk Management**

Credit risk is the risk of loss arising from adverse changes in a borrower's or counterparty's ability to meet its financial obligations under agreed–upon terms and exists primarily in lending and derivative portfolios. The degree of credit risk will vary based on many factors including the size of the asset or transaction, the credit characteristics of the borrower, features of the loan product or derivative, the contractual terms of the related documents and the availability and quality of collateral. Credit risk

46

Exhibit 18 of 30                                                                 Page 157

management is based on analyzing the creditworthiness of the borrower, the adequacy of underlying collateral given current events and conditions and the existence and strength of any guarantor support.

The Finance Committee of the Board of Directors, by means of a broad set of policies and principles contained in the Company's Enterprise Risk Management Policy, exercises oversight over the framework for the Company's credit risk management activities. The Credit Risk Management Committee, chaired by the Chief Credit Officer, is comprised of business line chief risk officers, and senior finance, treasury and portfolio management professionals. This Committee is responsible for management of the Company's credit risk within stated credit limits and portfolio performance metrics, to ensure alignment with the Company's credit risk appetite. The Credit Risk Management Committee is also responsible for developing credit policy and recommending credit concentration limits to the Enterprise Risk Management Committee, approving corporate credit standards, overseeing the delegation of credit authority and ensuring compliance with credit policy, standards and limits. The Chief Credit Officer's primary responsibilities include directing the activities of the Credit Risk Management Committee, monitoring the credit quality of the Company's loan portfolio, determining the reasonableness of the Company's allowance for loan and lease losses, reviewing and approving large credit exposures, and delegating credit approval authorities.

In 2006, the Finance Committee of the Board of Directors approved a set of credit risk concentration limits. These limits facilitate a more rigorous and quantitative framework that better enables the credit risk management function to proactively manage credit risk. As an example of proactively managing credit risk, from time to time the Company sells delinquent and nonperforming loans. These sales have had the effect of accelerating the liquidation of these assets, thereby enabling the Company to deploy its capital more effectively, while assisting the Company in reducing the ratio of nonperforming assets to total assets.

Many factors or loan attributes are used to predict and to monitor credit risk in the Company's real estate secured loan portfolios, including borrowers' debt–to–income ratios when loans are made, borrowers' credit scores, loan–to–value ratios and, with respect to residential loans, housing prices. The Company actively monitors changes in borrowers' credit scores, changes in loan–to–value ratios and housing price trends across the country. A slowdown in housing price appreciation or declines in housing prices will likely have the effect of increasing credit risk in the Company's real estate secured portfolios. The Company believes that loan–to–value ratios and credit scores are more predictive of future loan performance than are other loan factors and attributes.

Certain categories of residential loans held in the Company's portfolio, the most significant being Option ARM loans, have features that may result in increased credit risk when compared with residential loans without these features. Loans with these features, to the extent material to the Company, as well as any compensating factors and mitigating circumstances that reduce the credit risk arising from these features, are discussed in more detail in the section of Management's Discussion and Analysis – "Features of Residential Loans."

As noted above, loan–to–value ratios and borrowers' credit scores are key determinants of future loan performance. The Company has also observed that, when comparing portfolios of prime mortgage loans and portfolios of subprime mortgage channel loans that possess comparable credit scores and loan–to–value ratios, the subprime mortgage channel portfolios generally experience higher delinquencies and losses. Consequently, the Company separately reports the performance of its subprime mortgage channel portfolios, and its subprime mortgage channel operations are discussed in more detail in the section of Management's Discussion and Analysis – "Subprime Mortgage Channel."

In addition, the Company's credit card lending activities are discussed in Management's Discussion and Analysis – "Credit Card Loans."

47

Exhibit 18 of 30                                                                                                    Page 158

Loans held in portfolio (excluding the allowance for loan and lease losses) and nonaccrual loans, in each instance excluding credit card loans, by geographic concentration at December 31, 2006 were as follows:

| | California | | New York/New Jersey | | Florida | |
|---|---|---|---|---|---|---|
| | Portfolio | Nonaccrual | Portfolio | Nonaccrual | Portfolio | Nonaccrual |
| | (dollars in millions) | | | | | |
| Loans secured by real estate: | | | | | | |
| Home loans[1] | $ 45,812 | $ 153 | $ 11,258 | $ 96 | $ 9,700 | $ 79 |
| Home equity loans and lines of credit[1] | 27,889 | 120 | 4,207 | 19 | 4,559 | 15 |
| Subprime mortgage channel[2] | 4,819 | 225 | 2,307 | 149 | 1,906 | 78 |
| Home construction[3] | 1,180 | 15 | 66 | 1 | 108 | – |
| Multi–family | 20,404 | 8 | 4,825 | 23 | 421 | – |
| Other real estate | 3,606 | 11 | 1,035 | 3 | 65 | 1 |
| Total loans secured by real estate | 103,710 | 532 | 23,698 | 291 | 16,759 | 173 |
| Consumer. | 110 | – | 29 | – | 20 | – |
| Commercial | 400 | 2 | 222 | 3 | 140 | 1 |
| Total loans and nonaccrual loans held in portfolio | $ 104,220 | $ 534 | $ 23,949 | $ 294 | $ 16,919 | $ 174 |
| Loans and nonaccrual loans as a percentage of total loans and total nonaccrual loans | 49% | 23% | 11% | 13% | 8% | 8% |

(1)     Excludes home loans and home equity loans and lines of credit in the subprime mortgage channel.
(2)     Represents mortgage loans purchased from recognized subprime lenders and mortgage loans originated under the Long Beach Mortgage name and held in the Company's investment portfolio.
(3)     Represents loans to builders for the purpose of financing the acquisition, development and construction of single–family residences for sale and construction loans made directly to the intended occupant of a single–family residence.

49

Exhibit 18 of 30                                                                                      Page 159

**Credit Card Loans**

The Company offers a wide selection of credit cards to consumers and small businesses. Products offered include Washington Mutual–branded credit cards, as well as a variety of affinity and co–branded credit cards.

Credit cards provide borrowers with revolving, generally unsecured lines of credit that are used to make purchases and obtain cash advances primarily through VISA and MasterCard credit card networks. Credit card loans typically have smaller balances, shorter lifecycles and experience higher delinquency and loss rates than secured real estate loans. To offset the higher risk of loss inherent in unsecured credit card loans, interest rates and fees are generally structured to generate higher yields than secured real estate loans.

The Company selectively targets customers that are often underserved by large prime/superprime–oriented credit card issuers and who satisfy its underwriting criteria. The Company uses an automated underwriting process that includes an assessment of an applicant's credit profile and expected payment performance when reviewing credit card applications. With the acquisition of Providian Financial Corporation in 2005, the Company has increasingly leveraged cross–selling opportunities to customers with existing retail relationships.

Account management efforts, seasoning, and economic conditions all affect overall credit quality. The Company monitors customers' risk profiles regularly to optimize loss exposure over time and reserves the right under its credit card account agreement to change or terminate at any time, subject to applicable notice requirements, any terms, conditions, services, or features of the agreement. In cases where the customer fails to comply with the account agreement or presents a higher credit risk, the Company may restrict further use of the card, close the account, increase the interest rate, and/or pursue collection efforts.

Collection efforts are performed on accounts that are delinquent and for accounts that are current but over their credit limit. The Company uses a delinquency lifecycle strategy, in combination with behavior–driven approaches, consumer counseling, and consumer debt management programs, to manage delinquent accounts. Under the delinquency lifecycle strategy, the Company prioritizes collections to focus on delinquency status, with attention to customer events within each stage of delinquency.

**Features of Residential Loans**

Certain residential loans have features that may result in increased credit risk when compared with residential loans without those features. Categories of loans within the Company's portfolio that have such features include loans with an option to defer the payment of interest (i.e., Option ARM home loans), home loans where the loan–to–value ratio is greater than 80 percent, home equity loans and lines of credit where the combined loan–to–value ratio is greater than 80 percent, and interest–only payment loans. The loan–to–value ratio measures the ratio of the original loan amount to the appraised value of the collateral at origination. The combined loan–to–value ratio measures the ratio of the original loan amount of the first lien product (typically a first lien mortgage loan) and the original loan amount of the second lien product (typically a second lien home equity loan or line of credit) to the appraised value of the underlying collateral. Where the second lien product is a line of credit, the total commitment amount is used in the combined loan–to–value calculation.

51

Exhibit 18 of 30                                                                                    Page 160

Loans with these features accounted for 14% of the Company's home loan volume in 2006. Borrowers with interest–only loans generally have the highest credit ratings, lowest weighted average loan–to–value ratios at origination, and the most favorable delinquency statistics of all loan programs in the Company's home loan portfolio. Compared to fully–amortizing loan products, interest–only loans originated by the Company contain other restrictions such as lower maximum loan–to–value ratios and lower maximum loan levels. Borrowers with interest–only loans are also charged a higher interest rate to compensate for the potentially higher credit risk.

In 2006, the Company designated as held for sale a portion of its interest–only payment home loan originations held previously in its loan portfolio. This change had the effect of reducing the Company's held loan portfolio of such loans by $16.31 billion at December 31, 2006.

<u>Subprime Mortgage Channel</u>

Through its subprime mortgage channel, the Company originates, purchases and holds for investment, both home loans and home equity loans. Such loans are originated under the Company's Long Beach Mortgage name or are purchased from lenders who are generally recognized as lending to subprime borrowers ("Subprime Lenders"). As of December 31, 2006, subprime mortgage channel loans held for investment totaled $20.77 billion, of which $4.40 billion were originated under the Long Beach Mortgage name and $16.37 billion were purchased from Subprime Lenders.

As part of Long Beach Mortgage's underwriting process, loan application and appraisal packages are reviewed to ensure conformity with the Company's stated credit guidelines. Collateral appraisal information is also reviewed by a separate appraisal review group. Similarly, all purchases from Subprime Lenders must satisfy the Company's stated credit guidelines. The Company does not originate or purchase loan products with negative amortization features through its subprime mortgage channel.

In accordance with the Company's underwriting guidelines, borrowers with hybrid adjustable–rate home loans originated under the Long Beach Mortgage name, where the initial interest rate is fixed for 2 to 5 years, were qualified at the payment associated with the fixed interest rate charged in the initial contractual period. Such balances totaled $3.70 billion at December 31, 2006.

To compensate for the increased credit risk of loans in the subprime mortgage channel, the Company generally charges such borrowers a higher rate of interest than borrowers in the prime channel. The Company prices loans based on risk, evaluating various criteria including a borrower's mortgage payment history, FICO score, loan–to–value ratio, documentation type, and other risk elements.

Loans originated under the Long Beach Mortgage name are acquired through its broker network. Broker relationships are continuously monitored to mitigate credit risk and potential fraud stemming from broker practices. This includes the screening of new brokers and monitoring of broker performance for both delinquency and prepayment trends. Broker relationships can be terminated based on poor credit performance of the broker's originated loans. Fraud prevention and monitoring processes are used to detect high risk collateral and fraudulent borrowers.

Once subprime mortgage channel loans are funded, the Company employs an active portfolio management strategy and monitors borrowers' risk profiles and current loan–to–value ratios so as to limit long–term loss exposure.

Subprime mortgage channel loans are managed by a dedicated collections department with collectors experienced in subprime mortgage loan collections. Servicing activities for these loans emphasize direct contact with customers at early levels of delinquency status based on the customers' risk profile, and the Company uses automated telephone dialing and call distribution systems to increase the effectiveness of collection calls. Customized payment plans and work–out plans may be used to return delinquent loans to current status. When delinquent loans become 120 days contractually past due, the loan foreclosure

56

Exhibit 18 of 30                                                                                                              Page 161

process typically begins. Loans are restructured on a selective basis, so as to minimize loss during the collections and foreclosure process.

In 2006, the Company began making bulk purchases of home equity loans from Subprime Lenders through the conduit. At December 31, 2006, the Company held $2.04 billion of subprime mortgage channel home equity loans in its investment portfolio, including $66 million of home equity loans originated under the Long Beach Mortgage name. Purchases of home equity loans through the conduit may only be made through approved sellers. The Company monitors the performance of such loans against targets and ensures concentration limits are not breached.

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable–rate loans and general economic conditions. Determining the adequacy of the allowance, particularly the unallocated allowance, is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan and lease losses in future periods.

The allowance provides for incurred losses that are inherent in the loan portfolio. Losses are recognized when available information indicates that it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. Generally, borrowers are impacted by events that result in loan default and eventual loss well in advance of a lender's knowledge of those events. Examples of such loss–causing events for home loans are borrower job loss, divorce and medical crisis. An example for commercial real estate loans would be the loss of a major tenant.

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. However, the entire allowance (both the allocated component and the portion that remains unallocated) is available to absorb credit losses inherent in the total loan portfolio as of the balance sheet date.

Most loans are evaluated for loss on a collective basis under FASB Statement No. 5, *Accounting for Contingencies*. The allocated allowance for most loans (including home loans, home equity loans and lines of credit, credit card loans, and most commercial business, commercial real estate and multi–family loans) is determined using statistical forecasting models that estimate default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data. Management periodically reviews these models for reasonableness and updates the assumptions used in these models. Most commercial business, commercial real estate and multi–family loans are reviewed and assigned a risk grade. The loans are then categorized by their risk grade into pools, with each pool having a pre–assigned loss factor commensurate with the applicable level of estimated risk. Loss factors are then multiplied by the unpaid principal balance of loans in each pool to determine the allocated allowance applicable to that pool.

The Company also evaluates certain commercial business, commercial real estate and multi–family loans on an individual basis for impairment, as required by FASB Statement No. 114, *Accounting by Creditors for Impairment of a Loan*, and records an allowance for impaired loans as appropriate. Loans that are individually deemed to be impaired are excluded from other loan loss analyses so as to avoid double counting the loss exposure.

57

Exhibit 18 of 30                                                                                                                                              Page 162

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on March 1, 2007.

**WASHINGTON MUTUAL, INC.**

/s/ KERRY K. KILLINGER

Kerry K. Killinger
*Chairman and Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Company and in the capacities indicated on March 1, 2007.

| /s/ KERRY K. KILLINGER | **/s/ THOMAS W. CASEY** |
|---|---|
| Kerry K. Killinger<br>*Chairman and Chief Executive Officer;*<br>*Director (Principal Executive Officer)* | Thomas W. Casey<br>*Executive Vice President and Chief Financial*<br>*Officer (Principal Financial Officer)* |
| /s/ ANNE V. FARRELL | /s/ JOHN F. WOODS |
| Anne V. Farrell<br>*Director* | John F. Woods<br>*Senior Vice President and Controller*<br>*(Principal Accounting Officer)* |
| /s/ STEPHEN E. FRANK | /s/ REGINA MONTOYA |
| Stephen E. Frank<br>*Director* | Regina Montoya<br>*Director* |
| /s/ THOMAS C. LEPPERT | /s/ MARY E. PUGH |
| Thomas C. Leppert<br>*Director* | Mary E. Pugh<br>*Director* |
| /s/ CHARLES LILLIS | /s/ WILLIAM G. REED, JR. |
| Charles Lillis<br>*Director* | William G. Reed, Jr.<br>*Director* |
| /s/ PHILLIP D. MATTHEWS | /s/ ORIN C. SMITH |
| Phillip D. Matthews<br>*Director* | Orin C. Smith<br>*Director* |
| /s/ MICHAEL K. MURPHY | /s/ JAMES H. STEVER |
| Michael K. Murphy<br>*Director* | James H. Stever<br>*Director* |
| /s/ MARGARET OSMER MCQUADE | |
| Margaret Osmer McQuade<br>*Director* | |

77

Exhibit 18 of 30                                        Page 163

**WASHINGTON MUTUAL, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1:  Summary of Significant Accounting Policies**

*Basis of Presentation*

Washington Mutual, Inc. (together with its subsidiaries, "Washington Mutual", the "Company", "we", "us" or "our") is a consumer and small business banking company. We accept deposits from the general public, originate, purchase, service and sell home loans, credit card, home equity, multi–family and other commercial real estate loans, and, to a lesser extent, engage in certain commercial banking activities such as providing credit facilities and cash management and deposit services. We lend to both prime and subprime borrowers. We also market annuities and other insurance products, and offer securities brokerage services. In 2006, we sold our mutual fund management business.

The Consolidated Financial Statements include the accounts of Washington Mutual, Inc. and its majority–owned subsidiaries as well as those entities that are considered to be variable interest entities ("VIEs") in which we are the primary beneficiary. Investments in unconsolidated entities where we have the ability to exercise significant influence over the operations of the investee (which generally occurs when we hold at least 20% of the investee's voting common stock) are accounted for using the equity method of accounting. This includes interests in VIE's where we are not the primary beneficiary. Investments not meeting the criteria for equity method accounting are accounted for using the cost method of accounting. Investments in unconsolidated entities are included in other assets, and our share of income or loss is recorded in other noninterest income.

Our financial reporting and accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP"), which includes certain practices of the banking industry. All intercompany transactions and balances have been eliminated in preparing the consolidated financial statements.

*Reclassifications*

Certain amounts in prior periods have been reclassified to conform to the current period's presentation.

In particular, during 2006 we reclassified prepayment fees from noninterest income to interest income. The amounts reclassified totaled $332 million and $294 million for the years ended December 31, 2005 and 2004. Prepayment fees totaled $251 million for the year ended December 31, 2006.

Additionally, during 2006, we reclassified our allocable share of operating losses in low income housing partnerships from noninterest expense to other income. Operating losses reclassified totaled $48 million and $35 million for the years ended December 31, 2005 and 2004. Such losses totaled $95 million for the year ended December 31, 2006.

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management has made significant estimates in certain areas, including valuing certain assets, liabilities, and financial instruments, the determination of the allowance for loan and lease losses and derivatives and hedge accounting. Actual results could differ from those estimates.

89

Exhibit 18 of 30                                                                 Page 164

**EXHIBIT 31.1**

**CERTIFICATION**

I, Kerry K. Killinger, certify that:

1.    I have reviewed this annual report on Form 10–K of Washington Mutual, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2007

/s/ KERRY K. KILLINGER

Kerry K. Killinger
*Chairman and Chief Executive Officer*
*of Washington Mutual, Inc.*

Exhibit 18 of 30    Page 165

**EXHIBIT 31.2**

## CERTIFICATION

I, Thomas W. Casey, certify that:

1.      I have reviewed this annual report on Form 10–K of Washington Mutual, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2007                              /s/ THOMAS W. CASEY

Thomas W. Casey
*Executive Vice President and Chief Financial Officer*
*of Washington Mutual, Inc.*

Exhibit 18 of 30                              Page 166

**EXHIBIT 32.1**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: March 1, 2007

By:     /s/ KERRY K. KILLINGER
          _____
          Kerry K. Killinger
          *Chairman and Chief Executive Officer*
          *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 18 of 30                                                                                              Page 167

**EXHIBIT 32.2**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: March 1, 2007

By:  /s/ THOMAS W. CASEY

Thomas W. Casey
*Executive Vice President and Chief Financial Officer*
*of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 18 of 30     Page 168

# **Exhibit 19**

Exhibit 19 of 30                                                                                           Page 169

Annual Meeting of Shareholders

Kerry Killinger
Chairman and Chief Executive Officer

Exhibit 19 of 30                                                                                    Page 170

# Forward-looking statement

This presentation contains forward-looking statements, which are not historical facts and pertain to future operating results. These forward-looking statements are within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, statements about our plans, objectives, expectations and intentions and other statements contained in this document that are not historical facts. When used in this presentation, the words "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs, such as "will," "would," "should," "could," or "may" are generally intended to identify forward-looking statements. These forward-looking statements are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond our control. In addition, these forward-looking statements are subject to assumptions with respect to future business strategies and decisions that are subject to change. Actual results may differ materially from the results discussed in these forward-looking statements for the reasons, among others, discussed under the heading "Factors That May Affect Future Results" in Washington Mutual's 2006 Annual Report on Form 10-K include:

- Volatile interest rates and their impact on the mortgage banking business;
- Credit risk;
- Operational risk;
- Risks related to credit card operations;
- Changes in the regulation of financial services companies, housing government-sponsored enterprises and credit card lenders;
- Competition from banking and nonbanking companies;
- General business, economic and market conditions; and
- Reputational risk;

There are other factors not described in our 2006 Form 10-K and which are beyond the Company's ability to anticipate or control that could cause results to differ.

Exhibit 19 of 30                                                                                                      Page 171

# **Exhibit 20**

Exhibit 20 of 30                                                                                    Page 172

1 of 1 DOCUMENT

Copyright 2007 Voxant, Inc.
All Rights Reserved.
Copyright 2007 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

April 17, 2007 Tuesday

**TRANSCRIPT:** 041707aa.739

**LENGTH:** 10041  words

**HEADLINE:** Q1 2007 Washington Mutual Earnings Conference Call - Final

**BODY:**

OPERATOR: Good afternoon, and welcome to Washington Mutual's first quarter 2007 earnings call. All participants are in a listen only mode. After the presentation, we will conduct a question and answer session. Today's call is being recorded for replay purposes. The replay will be available approximately one hour after the call has ended today. The toll free number to access the replay is 866-469-5760. This call is also being Webcast live and will be archived for 30 days on the Company's website. Now I will turn the call over to Alan Magleby, Senior Vice President, Investor Relations to introduce today's call.

ALAN MAGLEBY, SVP IR, WASHINGTON MUTUAL: Good afternoon and thank you for joining us today. I would like to welcome you to Washington Mutual's first quarter 2007 earnings conference call. I want to remind you that our presentation today may contain forward-looking statements concerning our financial conditions, results, and expectations, and that there are a number of factors that may cause actual results in the future to be different from our current expectations. These factors include among other things, changes in general business and economic conditions, competitive pressures in the Financial Services industry, economic trends that negatively impact the Real Estate lending environment, or legislative and regulatory changes that may impact our business. For additional factors, please see our press release and other documents filed with the SEC. With us today are Kerry Killinger, Chairman and CEO, Steve Rotella, President and Chief Operating Officer, and Tom Casey, Chief Financial Officer. At this time, I will turn the call over to Kerry. Kerry?

KERRY KILLINGER, CHAIRMAN, CEO, WASHINGTON MUTUAL: Well, thanks, Alan. Good afternoon, everyone, and thank you, all, for joining us today as we review our first quarter 2007 results. As Alan mentioned, joining me today is Tom Casey, our CFO and our President, Steve Rotella who is going to be available to answer questions at the end of our remarks.

Now earlier today, at our annual shareholders meeting, we announced our first quarter net income of $784 million or $0.86 per share compared to $985 million or $0.98 per share in the first quarter of 2006. Now first quarter 2006 net income included an $85 million after-tax partial settlement related to the home savings goodwill litigation and $9 million from discontinued operations. Now earnings per share from continuing operations were up 30% from the fourth quarter of 2006, and reflecting these results in the Company's strong financial position, the Board once again increased the quarterly cash dividend for the 47th consecutive quarter by $0.01 to $0.55 per share.

While we're not at our full earnings potential, I am pleased with the solid results delivered by our team, despite a

Exhibit 20 of 30                                                                 Page 173

Page 2
Q1 2007 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire April 17, 2007 Tuesday

quarter that was challenged by a number of environmental factors. We had an inverted yield curve, and slowing housing markets and unprecedented deterioration in the subprime mortgage business. Now our performance demonstrates, I think, the continued strength of our diversified business model.

Now, we experienced very strong account growth and customer growth during the first quarter. In Retail Banking, net new checking accounts were up 82% on a linked quarter basis, and we added 782,000 new credit card accounts. During the first quarter, our net interest margin increased 21 basis points to 2.79%, reflecting the asset repositioning initiated in the fourth quarter and a continued upward repricing of our assets and the ongoing discipline in deposit pricing.

Now, in home loans which felt the brunt of the environmental challenges during the quarter, we were encouraged by improved performance in our prime lending business. However, the first quarter was a period of dramatic increases in subprime credit spreads, creating a very challenging environment for all market participants, and driving a loss of $113 million in home loans. The major contributors to this result were net losses on sales of subprime loans, part of which was from adjustments to reflect declines in market values of loans held for sale and a decrease in the value of the subprime mortgage residuals, which together totaled $164 million after-tax.

Now, I'll comment in more detail on the subprime mortgage environment and our overall credit quality thoughts in a few moments, but first, let me walk you through the first quarter's results of our efficiency initiatives and individual business operations.

On the efficiency front, the hard work of 2006 paid off at a 7% reduction in non-interest expense on a linked quarter basis. The progress of our efforts is reflected in the reduction of our annual expense run rate by approximately $700 million, or 8% to $8.4 billion, based on the first quarter of this year, compared to $9.1 billion annual run rate for the fourth quarter of 2005.

Now, when we embarked on our program to improve our efficiency, our focus was on driving greater productivity across the enterprise. It was to be more than just cost cutting exercise. So during 2006, while we reduced annual operating costs by $700 million, we also added $1.23 million net new checking accounts, opened 144 new retail stores, and added more than 3.2 million new credit card accounts, growing our managed card receivables by about 18%. Now, this was a bold initiative, and one of the larger efficiency programs ever embarked on by a top ten banking organization in the country.

Well, we have accomplished our goals, and have delivered the efficiencies and the growth outlined in that plan. This process was painful, as we reduced our employee base by about 18%. But it also means we are now positioned to efficiently grow our businesses. So while we remained disciplined on managing expenses and continuous improvement, our entire Management team is intensely focused on improving the revenues generated from our expense base. We believe there is excellent operating leverage in our Company, and we're working very hard to realize the full earnings potential for our shareholders.

Now, for a look at our businesses. Our largest and most profitable business, retail banking, continued its strong performance in the first quarter. Net income from continuing operations of $569 million was up 4% from the fourth quarter of 2006, and excluding the contribution from portfolio management was up 5% on a linked quarter basis and 21% from the same quarter a year ago. Now, I'm very pleased with the fast start that our retail banking team got off to, growing net new checking accounts by 328,000. Now, that pace was up 82% on a linked quarter basis, and the execution of our strategy of attracting new customers with our free checking product and then cross selling them other core banking products continues to be very successful.

Now, small business continues to be an attractive opportunity for us. During the first quarter, we grew those accounts by 58,000, up 68% on a linked quarter basis. Now, to insure that we maintain and deepen these customer relationships, we are adding experienced staff and attractive new services to support our small business clients. The key

Exhibit 20 of 30                                    Page 174

Q1 2007 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire April 17, 2007 Tuesday

point of the Retail Banking business model is the ongoing growth of depositor and Retail Banking fees, which were up 15% from the first quarter a year ago. After opening 55 new Retail Banking stores in the fourth quarter of 2006, and adding another 26 stores as part of the CCBI acquisition, we opened six stores in the first quarter.

As in prior years, we expect the largest portion of our new store openings to occur in the second half of the year. We have an annual goal of opening 1 million net new checking accounts each year, which requires a balance of strong growth by our current network of stores, our internet channel, which is WaMu.com and our call centers, complimented by the strategic addition of new stores. Now given the strong account growth produced by our existing outlets in the first quarter, we believe we can achieve our growth targets with new store openings in the range of 100 to 125 for the year.

The Card Services group delivered another strong performance in the first quarter, with net income for the quarter of $256 million, up 24% from $207 million in the same quarter a year ago, and 72% on a linked quarter basis. This performance was outstanding, but it was influenced by a higher than average level of securitizations during the quarter following very strong receivables growth in the fourth quarter.

The Card Services strategy of continuing to market nationally through its outstanding Direct Marketing capability & Partners program while also selling to WaMu retail customers continues to drive excellent results, and during the first quarter we added 782,000 new credit card accounts, of which about one-third came from the WaMu retail channel.

The credit card 30 plus day delinquencies of 5.15% were down slightly at quarter end, from 5.25% at the end of 2006. Net credit losses of 6.31% for the quarter increased from 5.84% on a linked quarter basis, but remained comfortably within our range of expected losses for this portfolio. So we were very pleased with the ongoing strong credit performance of the card portfolio. It reflects a strong credit culture of the team as well as the overall strength of the economy and particularly the low unemployment rates in most parts of the country. So we anticipate that as the economy slows both the delinquency and loss levels will increase somewhat in the coming quarters.

The commercial group continues to be successful in leveraging its low cost producer advantage to expand its leading position in multi-family lending. During the first quarter, net income increased 40% to $94 million compared to the same quarter a year ago. The strategic acquisition of CCBI last year added to both our origination capability and growth in our portfolio. This is reflected in the strong first quarter lending volumes of $3.7 billion, up 33% from last year's first quarter. The multi-family loan portfolio continues to exhibit outstanding quality, with non-performing loans of only 20 basis points at the end of the quarter and essentially no losses in the past five years.

The home loans group recorded a net loss of $113 million during the first quarter, compared to $122 million lost in the fourth quarter of 2006. The losses in both quarters were driven by the results in the subprime mortgage lending operations. While the subprime mortgage industry is going through a shake out period, we saw improvement and positive momentum in our prime home loans operations. Gain on sale of prime-based loans improved over the prior quarter. The demand for prime-based loans in the secondary market was strong. The margins higher than prior quarters and our application volume increased over the quarter. Now the progress in reducing our home loans cost structure and improving our efficiencies is starting to come through in our home loans performance. While the difficulty in the subprime sector is causing short-term volatility in our results, we believe that longer term, we will benefit from the shake out of weaker, irrational competitors. When combined with the positive trend in our prime business, we expect a return to profitability for home loans later in the year.

Well, I'll now turn it over to Tom to go into more detail on our financial performance.

TOM CASEY, EVP, CFO, WASHINGTON MUTUAL: Thank you, Kerry. As Kerry said, we are making good progress in all of our businesses, despite the short-term impact of the volatility in the subprime business. An important accomplishment during the first quarter was the 21 basis point increase in our net interest margin to 2.79%. The increase was driven primarily by three factors. First was the sale of $17.3 billion in low-yielding loans as part of our

Exhibit 20 of 30                                                                 Page 175

Q1 2007 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire April 17, 2007 Tuesday

balance repositioning initiated last quarter. Second was the repricing of our adjustable rate loans to higher rates and growth in higher yielding loan categories such as credit cards. And on the liabilities side of the balance sheet, we continue to be disciplined in our deposit pricing, which led to a two basis point decline in the cost of total interest bearing deposits during the quarter.

We feel very good about the strength of the margin in the first quarter, however the yield curve continues to be inverted with a spread between five year swaps and three-month LIBOR at negative 40 basis points. The forward yield curve at this time doesn't anticipate a decline in short-term rates until late in the year. Though while we are pleased with the NIM performance in the first quarter, we're still operating in a difficult environment and the NIM remains well below our long term target of 3 to 3.1%.

Average assets of $331.9 billion for the first quarter declined 6% on a link quarter basis due primarily to the completion of the asset repositioning we outlined during our fourth quarter call. The remaining decline reflects the normal run-off of single family residential loans that were not replaced with new production. Looking forward, we expect the opportunities for asset growth to remain limited as long as the current inverted yield curve environment persists.

As you're all well aware, the market for subprime loans continued to deteriorate during the first quarter as credit spreads for subprime lending portfolios became extremely wide. For example, BBB minus spreads increased from around 200 basis points in the fourth quarter to more than 900 basis points in March. Specifically, our results were impacted in two ways. First, loans held for sale. Loans held for sale are recorded at the lower cost of market value and were significantly impacted by lower liquidity in the secondary market.

In the first quarter, we recognized subprime losses on sales of loans, part of which was from adjustments to reflect declines in market values of loans held for sale totaling $164 million pre-tax. Second, subprime residuals. When subprime loans are sold, the seller typically retains a residual interest, which then must be carried on the balance sheet at fair value. Based on actual and estimates of future credit performance, we decreased the value of our subprime mortgage residuals by $88 million pre-tax during the first quarter.

At quarter end, the subprime residuals on the balance sheet were $105 million. Most of the losses in the subprime secondary market during the past two quarters were tied to the poor credit performance of loans originated during 2006, due to the competitive environment that existed during that period. While subprime credit spreads have remained wide during the first few weeks of April, we have successfully sold loans from our held for sale portfolio at prices that substantiate quarter end values we recorded.

As the first quarter progressed and many competitors exited the market, we continuously modified our subprime pricing and underwriting standards. For example, currently our subprime pricing has weighted average coupon of approximately 9% and we are not originating loans with a higher than 95% LTV. This improved pricing and stronger credit profile should help return profitability to this product going forward.

One additional factor that has plagued much of the industry during the first quarter was the recognition of higher reserves for loan repurchase obligations. We identified that risk and adjusted our reserves during the fourth quarter of last year. During the first quarter, we experienced a steady decline in first payment default and investor requests for loan repurchases have moderated. As a result, no material adjustment was necessary for the repurchase of reserves during the first quarter.

Now, I'll review our credit quality. In total, our non-performing assets as a percent of total assets was 1.02% at the end of the first quarter, up from 80 basis points at year-end. Accounting for about one-third of about seven basis points of the increase is the MPA ratio was the fact that period-ending total assets decreased 8% during the quarter. Net charge-offs for the quarter of $183 million were up $47 million from the fourth quarter. On WM 15, you can see that $30 million of the increase is from credit cards. The increase in credit card charge-offs primarily reflects a reduced level

Exhibit 20 of 30                                                                                      Page 176

Q1 2007 Washington Mutual Earnings Conference Call - Final FD (Fair Disclosure) Wire April 17, 2007 Tuesday

of charge-offs in the fourth quarter of 2006 due to the sale of higher risk loans from the portfolio in that quarter.

The remaining increase in charge-offs came from an increase in home equity and home loans. In the chart in your prepared remarks you can see that the subprime non-performing loans are over 7%. The increase is being driven by loans originated in 2006 that are performing below our expectations, including the transfer of approximately $110 million of subprime non-performing loans from loans held for sale. However, while we are seeing much higher delinquencies, actual charge-offs remain relatively stable. We continue to monitor this portfolio very carefully, and are proactively working with customers and making accommodations when appropriate to minimize losses.

As we look at our other portfolios, we are very comfortable with the continued strong quality they reflect, but because of the increased interest in credit risk this quarter, we have included our portfolio statistics at the end of our prepared remarks, which Kerry will discuss in a moment.

Moving on to the provision for loan losses. The provision totaled $234 million for the first quarter, down from $344 million in the previous quarter, primarily due to lower provision for credit cards. The credit card provision for the fourth quarter of $275 million reflected very strong total managed card receivable growth. Most of it was retained on the balance sheet. In comparison, the card provision of $106 million for the first quarter reflected flat managed receivable growth but a much higher level of card securitizations resulting in a reduction of on balance sheet receivables. Non-card provision for the loan losses was $128 million, up from $69 million in the prior quarter, primarily due to the downturn of the housing sector and the related increase in levels of net charge-offs.

During the quarter, net charge-offs for home loans and home equity both increased. Going forward, we expect both MPAs and charge-offs to increase somewhat as these portfolios continue to season and adjust to the slower housing market. However, overall, these portfolios are good quality and we expect them to perform well despite this less favorable market environment.

So now let me update you on our earnings drivers for 2007 given the current environment and our expectations for the remainder of the year. Given the 6% average asset decline during the first quarter and our expectation for continuation of the challenging interest rate environment, our bias is now toward the lower end of our guidance of zero to down 5%. So if we don't see asset growth opportunities, you can expect us to continue to buy back our stock throughout the rest of the year.

As I said earlier, the forward yield curve doesn't anticipate any decrease in short-term rates by the Fed until late in the year, so that will provide limited benefit for our NIM in 2007. That's about the same view we had when we last provided NIM guidance in January, so the NIM of 2.79% in the first quarter, we are maintaining our expected NIM in a range of 2.85 to 2.95%.

The further softening of the housing market and rising MPAs in the first quarter lead us to conclude that our guidance for credit provisioning should be increased. In particular, we anticipate a need to increase provisions for subprime and home equity loans where there is less loan to value protection. Therefore, we are raising our guidance range from 1.1 to $1.2 billion to our current range of 1.3 to $1.5 billion. Given our strong first quarter performance of deposit and other retail banking fees, up 15% over last year's first quarter, we continue to be comfortable with our guidance for deposit and other retail banking fees of 10 to 12%.

We expect the subprime market to remain somewhat volatile and are not anticipating subprime gain on sales recovered to normal levels in the near-term. However, the market demand for prime mortgage loans is strong and given our decision to sell loans rather than to grow assets, we expect good gain on sale from these products. Therefore, we are maintaining our non-interest income guidance of 6.7 to $6.9 billion for the year.

Operating expenses continue to be well controlled and we remain very comfortable with our full year guidance range of 8.4 to $8.5 billion for the year. I'll now turn it back over to Kerry for his summary comments.

Exhibit 20 of 30                                                                                                          Page 177

# **Exhibit 21**

Exhibit 21 of 30                                                                 Page 178

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10–Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2007**

**Commission File Number 1–14667**

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91–1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1301 Second Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

**(206) 461–2000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒   No   ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act.  Large accelerated filer ☒   Accelerated filer ☐   Non–accelerated filer   ☐.

Indicate by check mark whether the registrant is a shell company (as defined in 12b–2 of the Exchange Act.)  Yes ☐   No ☒.

The number of shares outstanding of the issuer's classes of common stock as of April 30, 2007:

**Common Stock – 888,408,367**(1)

(1)   Includes 6,000,000 shares held in escrow.

Exhibit 21 of 30                                                                                              Page 179

**WASHINGTON MUTUAL, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS – (Continued)**

retention of servicing responsibilities on the securitized balances, are reported as revenue from sales and servicing of consumer loans in noninterest income. Certain interests in the securitized balances are retained by the Company and are classified as trading assets on the balance sheet, with changes in the fair value of those retained interests recognized in current period earnings. The mix at any point in time between the amount of credit card balances held in the loan portfolio and those that have been securitized and sold is influenced by market conditions, the Company's evaluation of capital deployment alternatives and liquidity factors.

The Card Services Group acquires new customers primarily by leveraging the Company's retail banking distribution network and through direct mail solicitations, augmented by online and telemarketing activities and other marketing programs including affinity programs. In addition to credit cards, this segment markets a variety of other products to its customer base.

The Company evaluates the performance of the Card Services Group on a managed asset basis. Managed financial information is derived by adjusting the GAAP financial information to add back securitized loan balances and the related interest, fee income and provision for credit losses.

The principal activities of the **Commercial Group** include: (1) providing financing to developers and investors, or acquiring loans for the purchase or refinancing of multi–family dwellings and other commercial properties; (2) either holding multi–family and other commercial real estate loans in portfolio or selling these loans while retaining the servicing rights; (3) providing limited deposit services to commercial customers; and (4) providing Internal Revenue Service Section 1031 exchange services to income property investors.

In response to the current interest rate environment, customer preferences have been changing away from adjustable–rate loans towards hybrid and fixed–rate loans. Accordingly, and consistent with the Company's desire to manage its exposure to interest rate risk, the Commercial Group's business model has evolved and most hybrid and fixed rate multi–family and other commercial real estate loans are being directed to held for sale and subsequently sold.

The principal activities of the **Home Loans Group** include: (1) originating and servicing home loans; (2) managing the Company's capital market operations – which includes the buying and selling of all types of mortgage loans in the secondary market; (3) the fulfillment and servicing of the Company's portfolio of home equity loans and lines of credit; (4) originating and purchasing mortgage loans to higher risk borrowers through the subprime mortgage channel; (5) providing financing and other banking services to mortgage bankers for the origination of mortgage loans; and (6) making available insurance–related products and participating in reinsurance activities with other insurance companies.

The segment offers a wide variety of real–estate secured residential loan products and services primarily consisting of fixed–rate home loans, adjustable–rate home loans or "ARMs", hybrid home loans, Option ARM loans and mortgage loans to higher risk borrowers through the subprime mortgage channel. Such loans are either held in portfolio by the Home Loans Group, sold to secondary market participants or transferred through inter–segment sales to the Retail Banking Group. The decision to retain or sell loans, and the related decision to retain or not retain servicing when loans are sold, involves the analysis and comparison of expected interest income and the interest rate and credit risks inherent with holding loans in portfolio, with the expected servicing fees, the size of the gain or loss that would be realized if the loans were sold and the expected expense of managing the risk related to any retained mortgage servicing rights.

As part of its capital market activities, the Home Loans Group also generates both interest income and noninterest income through its conduit operations. Under the conduit program, the Company

12

Exhibit 21 of 30    Page 180

sale of lower–yielding home loans, the upward repricing of adjustable–rate loans and strong deposit pricing discipline, further contributed to the significant increase in the net interest margin from the fourth quarter of last year.

Noninterest income totaled $1.54 billion in the first quarter of 2007, compared with $1.64 billion in the first quarter of 2006. The decline was primarily the result of an industry–wide decline in subprime mortgage secondary market performance, which led to much lower gain on sale results and a decline in the fair value of trading assets retained from subprime mortgage securitizations. As the market environment for subprime mortgage loans continued to deteriorate during the quarter, credit spreads widened significantly. Accordingly, the values of the Company's subprime assets were adjusted downward to account for the much–higher yields required by the secondary market. Revenue from sales and servicing of home mortgage loans, which declined from $263 million in the first quarter of 2006 to $125 million in the first quarter of 2007, included losses of approximately $164 million in the first quarter of 2007 that resulted from both the sale of subprime mortgage loans and declines in the market values of subprime mortgage loans held for sale. Correspondingly, noninterest income results for trading assets, which declined from a net loss of $13 million in the first quarter of 2006 to a net loss of $108 million in the first quarter of 2007, included $88 million of downward adjustments to the value of trading assets retained from subprime mortgage securitizations. Noninterest income in the first quarter of 2006 included the partial settlement of the supervisory goodwill litigation lawsuit, which amounted to $134 million on a pre–tax basis.

Partially offsetting the decline in noninterest income were increases in revenue from sales and servicing of consumer loans and credit card fee income, which collectively increased by $101 million, or 20%, from the first quarter of 2006 as a result of strong growth in the Company's credit card loan portfolio and higher credit card securitization volume in the most recent quarter. Depositor and other retail banking fees also increased by $87 million, or 15%, from the first quarter of 2006, reflecting the continuing strong customer response to the Company's new free checking product, which was launched in March 2006. The number of noninterest–bearing checking accounts at March 31, 2007 totaled approximately 10.0 million, an increase of over approximately 1.4 million accounts from a year ago.

The Company recorded a provision for loan and lease losses of $234 million in the first quarter of 2007, compared with $82 million in the same quarter of last year and $344 million in the fourth quarter of 2006. The increase in the provision from the first quarter of 2006 is principally the result of the overall slowdown in the national housing market. Nonperforming assets, as a percentage of total assets, increased from 0.59% at March 31, 2006 to 1.02% at March 31, 2007, primarily reflecting higher delinquency rates in the subprime mortgage channel, home equity loans and lines of credit, and home loan portfolios. Declines in home sales transactions, longer marketing periods and growing inventories continued to exert downward pressure on the housing sector during the most recent quarter. The decrease in the provision from the fourth quarter of 2006 is primarily due to higher levels of credit card securitization activity during the first quarter of 2007, which resulted in a $1.37 billion decline in the credit card portfolio compared with December 31, 2006.

## Critical Accounting Estimates

The preparation of financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the financial statements. Various elements of the Company's accounting policies, by their nature, involve the application of highly sensitive and judgmental estimates and assumptions. Some of these policies and estimates relate to matters that are highly complex and contain inherent uncertainties. It is possible that, in some instances, different estimates and assumptions could reasonably have been made and used by management, instead of those the Company applied, which might have produced different results that could have had a material effect on the financial statements.

24

Exhibit 21 of 30                                                                 Page 181

Loans held for sale totaled $26.87 billion at March 31, 2007, a decrease of $18.10 billion from $44.97 billion at December 31, 2006. During the fourth quarter of 2006, the Company transferred $17.79 billion of lower–yielding, medium–term adjustable–rate home loans to loans held for sale. Substantially all of these loans were sold in the first quarter of 2007.

The Option ARM home loan portfolio continued to decline in the first quarter of 2007, reflecting the slowdown in the housing market and the flat–to–inverted yield curve interest rate environment, in which loan products indexed to longer–term interest rates are priced more favorably to borrowers than short–term adjustable–rate loans.

**Other Assets**

Other assets consisted of the following:

| | March 31, 2007 | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| Accounts receivable | $ 5,243 | $ 5,566 |
| Investment in bank–owned life insurance | 4,416 | 4,373 |
| Premises and equipment | 2,946 | 3,042 |
| Accrued interest receivable | 1,725 | 1,941 |
| Derivatives | 602 | 748 |
| Identifiable intangible assets | 508 | 556 |
| Foreclosed assets | 587 | 480 |
| Other | 3,359 | 3,231 |
| Total other assets | $ 19,386 | $ 19,937 |

**Deposits**

Deposits consisted of the following:

| | March 31, 2007 | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| Retail deposits: | | |
| Checking deposits: | | |
| Noninterest bearing | $ 24,400 | $ 22,838 |
| Interest bearing | 31,523 | 32,723 |
| Total checking deposits | 55,923 | 55,561 |
| Savings and money market deposits | 44,058 | 41,943 |
| Time deposits | 47,262 | 46,821 |
| Total retail deposits | 147,243 | 144,325 |
| Commercial business and other deposits | 17,741 | 15,175 |
| Brokered deposits: | | |
| Consumer | 18,995 | 22,299 |
| Institutional | 17,256 | 22,339 |
| Custodial and escrow deposits | 8,974 | 9,818 |
| Total deposits | $ 210,209 | $ 213,956 |

The increase in noninterest–bearing retail checking deposits was predominantly driven by the continuing customer account growth in the Company's new free checking product. Interest–bearing checking deposits decreased as customers shifted from Platinum checking accounts to time deposits and savings accounts as a result of higher rates offered for these products. Consumer and institutional brokered deposits decreased 19% from year–end 2006 as funding requirements from non–retail deposit sources diminished with the reduction in the size of the Company's balance sheet.

35

Exhibit 21 of 30                                                                 Page 182

**Nonaccrual Loans, Foreclosed Assets and Restructured Loans**

Loans, excluding credit card loans, are generally placed on nonaccrual status upon reaching 90 days past due. Additionally, individual loans in non–homogeneous portfolios are placed on nonaccrual status prior to becoming 90 days past due when payment in full of principal or interest is not expected. Management's classification of a loan as nonaccrual or restructured does not necessarily indicate that the principal or interest of the loan is uncollectible in whole or in part. Nonaccrual loans and foreclosed assets ("nonperforming assets") and restructured loans consisted of the following:

| | March 31, 2007 | December 31, 2006 |
|---|---|---|
| | (dollars in millions) | |
| Nonperforming assets and restructured loans: | | |
| Nonaccrual loans[1][2]: | | |
| Loans secured by real estate: | | |
| Home loans[3] | $ 690 | $ 640 |
| Home equity loans and lines of credit[3] | 297 | 231 |
| Subprime mortgage channel[4] | 1,503 | 1,283 |
| Home construction[5] | 41 | 27 |
| Multi–family | 60 | 46 |
| Other real estate | 52 | 51 |
| Total nonaccrual loans secured by real estate | 2,643 | 2,278 |
| Consumer | 1 | 1 |
| Commercial | 28 | 16 |
| Total nonaccrual loans held in portfolio | 2,672 | 2,295 |
| Foreclosed assets[6] | 587 | 480 |
| Total nonperforming assets | $ 3,259 | $ 2,775 |
| As a percentage of total assets | 1.02% | 0.80% |
| Restructured loans | $ 16 | $ 18 |
| Total nonperforming assets and restructured loans | $ 3,275 | $ 2,793 |

[1]    Nonaccrual loans held for sale, which are excluded from the nonaccrual balances presented above, were $195 million and $185 million at March 31, 2007 and December 31, 2006. Loans held for sale are accounted for at lower of aggregate cost or fair value, with valuation changes included as adjustments to noninterest income.

[2]    Credit card loans are exempt under regulatory rules from being classified as nonaccrual because they are charged off when they are determined to be uncollectible, or by the end of the month in which the account becomes 180 days past due.

[3]    Excludes home loans and home equity loans and lines of credit in the subprime mortgage channel.

[4]    Represents mortgage loans purchased from recognized subprime lenders and mortgage loans originated under the Long Beach Mortgage name and held in the investment portfolio.

[5]    Represents loans to builders for the purpose of financing the acquisition, development and construction of single–family residences for sale and construction loans made directly to the intended occupant of a single–family residence.

[6]    Foreclosed real estate securing Government National Mortgage Association ("GNMA") loans of $72 million and $99 million at March 31, 2007 and December 31, 2006 have been excluded. These assets are fully collectible as the corresponding GNMA loans are insured by the FHA or guaranteed by the VA.

The softening residential real estate market, the Company's exposure to higher risk loans in the subprime mortgage channel and an 8% decline in total assets have been the primary drivers behind the increase in nonperforming assets from 0.80% of total assets at December 31, 2006 to 1.02% of total assets at March 31, 2007. As inventories of unsold homes increased and housing prices softened, certain homeowners, particularly subprime borrowers who typically have less equity invested in their properties, have found it more difficult to make their mortgage payments and consequently both nonaccrual loans and foreclosed assets have increased.  In the first quarter of 2007, $97 million of Long Beach Mortgage nonaccrual home loans were transferred from held for sale to the subprime mortgage channel portfolio.

44

**Allowance for Loan and Lease Losses**

The allowance for loan and lease losses represents management's estimate of incurred credit losses inherent in the Company's loan and lease portfolios as of the balance sheet date. The estimation of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the interest rate climate as it affects adjustable–rate loans and general economic conditions.

The dynamics involved in determining inherent credit losses can vary considerably based on the existence, type and quality of the security underpinning the loan and the credit characteristics of the borrower. Hence, real estate secured loans are generally accorded a proportionately lower allowance for loan and lease losses than unsecured credit card loans held in portfolio. Similarly, loans to higher risk borrowers, in the absence of mitigating factors, are generally accorded a proportionately higher allowance for loan and lease losses. Certain real estate secured loans that have features which may result in increased credit risk when compared to real estate secured loans without those features are discussed in the Company's 2006 Annual Report on Form 10–K, "Credit Risk Management – Features of Residential Loans" and Note 5 to the Consolidated Financial Statements – "Loans and Allowance for Loan and Lease Losses – Features of Residential Loans."

In determining the allowance for loan and lease losses, the Company allocates a portion of the allowance to its various loan product categories based on an analysis of individual loans and pools of loans. The tools utilized for this determination include statistical forecasting models that estimate the default and loss outcomes based on an evaluation of past performance of loans in the Company's portfolio and other factors as well as industry historical loan loss data (primarily for homogeneous loan portfolios). Non–homogeneous loans are individually reviewed and assigned loss factors commensurate with the applicable level of estimated risk.

Refer to Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies" in the Company's 2006 Annual Report on Form 10–K for further discussion of the Allowance for Loan and Lease Losses.

45

Exhibit 21 of 30                                                                                                                                      Page 183

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on May 10, 2007.

**WASHINGTON MUTUAL, INC.**

By:     /s/ THOMAS W. CASEY

Thomas W. Casey
*Executive Vice President and Chief Financial Officer*

By:     /s/ MELISSA J. BALLENGER

Melissa J. Ballenger
*Senior Vice President and Controller*
*(Principal Accounting Officer)*

57

Exhibit 21 of 30                                                                 Page 184

**EXHIBIT 31.1**

## CERTIFICATION

I, Kerry K. Killinger, certify that:

1. I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2007

/s/ KERRY K. KILLINGER

Kerry K. Killinger
*Chairman and Chief Executive Officer*
*of Washington Mutual, Inc.*

Exhibit 21 of 30                                                                                          Page 185

EXHIBIT 31.2

## CERTIFICATION

I, Thomas W. Casey, certify that:

1.    I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)    Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 10, 2007

/s/ THOMAS W. CASEY
Thomas W. Casey
*Executive Vice President and Chief Financial Officer of Washington Mutual, Inc.*

Exhibit 21 of 30                                                                                                                    Page 186

EXHIBIT 32.1

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: May 10, 2007                                   By:          /s/ KERRY K. KILLINGER
                                                                  _____
                                                                  Kerry K. Killinger
                                                                  *Chairman and Chief Executive Officer*
                                                                  *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 21 of 30                                                              Page 187

EXHIBIT 32.2

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: May 10, 2007                                  By:        /s/ THOMAS W. CASEY
                                                                Thomas W. Casey
                                                                *Executive Vice President and Chief Financial Officer of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 21 of 30                                                                Page 188

# **Exhibit 22**

Exhibit 22 of 30                                                                                                   Page 189

**Bloomberg.com**



## New York Subpoenas First American Appraisal Unit (Update2)

Email | Print | A A **A**

By Jody Shenn and Sharon L. Crenson

May 22 (Bloomberg) -- New York Attorney General **Andrew Cuomo** issued a subpoena to the real estate appraisal unit of First American Corp. in his investigation of whether mortgage brokers pressured appraisers to inflate property values.

**First American**'s eAppraiseIT LLC, which values up to 15,000 homes a year in New York, was asked for information about appraisals performed throughout the state, President **Anthony Merlo Jr**., said in an interview today.

Cuomo, who took office in January, is investigating New York real estate practices after focusing on the $85 billion student- loan industry. The attorney general has issued subpoenas to appraiser Mitchell, Maxwell & Jackson Inc. and broker Manhattan Mortgage Co., the companies said on May 18.

``It's a very good thing, what the attorney general is doing,'' Merlo said. Cuomo's office was focused on ``who's exerting the pressure'' on appraisers, he said.

Rising foreclosures in the U.S. have spurred state officials to scrutinize firms from mortgage brokers to investment banks. The percentage of homes entering foreclosure hit an all-time high in the fourth quarter and the proportion of borrowers with poor or limited credit who were behind in payments on ``subprime'' loans was the most since 2002, according to the Washington-based Mortgage Bankers Association.

A borrower who gets a home loan based on an inflated appraisal and falls behind on payments would have difficulty selling or refinancing for enough to pay off the mortgage.

Pressure on Appraisers

In a study last year by Richfield, Ohio-based October Research Corp., 90 percent of appraisers said they felt influenced to write bogus appraisals. Four years ago, that number was 55 percent. Seventy-one percent said mortgage brokers asked them to do it.

Cuomo's predecessor as attorney general, **Eliot Spitzer**, is now New York's governor. He investigated conflicts of interest in Wall Street research, the mutual fund and insurance industries. Spitzer subpoenaed e-mails, internal documents and witness testimony to force monetary settlements and impose reforms.

Cuomo ``can make a lot of waves,'' said **Maurice Carroll**, director of the Quinnipiac University Polling Institute in Hamden, Connecticut. ``Going after bad guys is a very attractive political maneuver.''

Appraisal Rebuttals

The First American unit, based in Poway, California, does about 50,000 valuations a month nationwide, said Merlo. He said the company is cooperating with the attorney general's request for information. ``Our preliminary meeting and responses were very favorable,'' Merlo said.

Cuomo's office is also seeking information on appraisal rebuttals, in which consumers, loan officers or

Exhibit 22 of 30                                                                                                    Page 190

real estate agents try to get the stated values of homes raised, said **DeAnna McCann**, chief marketing officer at eAppraiseIT.

Those requests aren't improper provided they come with evidence that the valuation was incorrect, such as comparable home sales that an appraiser missed, McCann said.

The attorney general's office also is seeking information on how appraisal orders are placed.

First American provides title insurance, closing services, credit reports and home warranties. The company has a market value of $5.1 billion. The shares rose 57 cents to $52.73 in New York Stock Exchange composite trading today. The stock is up 30 percent this year.

Cuomo's Experience

Cuomo, the former head of the U.S. Department of Housing and Urban Development, in 2004 joined the advisory board of Amco, a Mayfield Heights, Ohio-based company that orders appraisals on behalf of lenders. Cuomo is no longer involved with the company.

Cuomo spokesman **Jeffrey Lerner** confirmed the subpoena was sent to eAppraiseIT. He declined to comment further. Lerner confirmed last week that the subpoenas had been sent to Mitchell, Maxwell & Jackson and Manhattan Mortgage. In March, Cuomo said at a press conference his office was investigating subprime lenders.

Y. **David Scharf**, an attorney at New York law firm Morrison Cohen LLP, who is representing Mitchell, Maxwell & Jackson, said last week his client has been told it's not a target of the investigation.

To contact the reporters on this story: **Jody Shenn** in New York at **jshenn@bloomberg.net**; **Sharon L. Crenson** in New York at **screnson@bloomberg.net**.

*Last Updated: May 22, 2007 18:42 EDT*



©2008 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

Exhibit 22 of 30                                                                                           Page 191

# **Exhibit 23**

Exhibit 23 of 30

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10–Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED JUNE 30, 2007**

**Commission File Number 1–14667**

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91–1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1301 Second Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

**(206) 461–2000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes  ☒  No  ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. Large accelerated filer  ☒    Accelerated filer  ☐    Non–accelerated filer  ☐.

Indicate by check mark whether the registrant is a shell company (as defined in 12b–2 of the Exchange Act.) Yes  ☐  No  ☒

The number of shares outstanding of the issuer's classes of common stock as of July 31, 2007:

**Common Stock – 870,584,006**(1)

(1)  Includes 6,000,000 shares held in escrow.

Exhibit 23 of 30                                                                                               Page 193

## Summary Financial Data

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (dollars in millions, except per share amounts) | | | |
| **Profitability** | | | | |
| Net interest income | $ 2,034 | $ 2,060 | $ 4,115 | $ 4,176 |
| Net interest margin | 2.90% | 2.65% | 2.85% | 2.70% |
| Noninterest income | $ 1,758 | $ 1,578 | $ 3,299 | $ 3,216 |
| Noninterest expense | 2,138 | 2,229 | 4,244 | 4,367 |
| Net income | 830 | 767 | 1,614 | 1,752 |
| Basic earnings per common share: | | | | |
| Income from continuing operations | $ 0.95 | $ 0.80 | $ 1.83 | $ 1.81 |
| Income from discontinued operations | — | 0.01 | — | 0.02 |
| Net income | 0.95 | 0.81 | 1.83 | 1.83 |
| Diluted earnings per common share: | | | | |
| Income from continuing operations | 0.92 | 0.78 | 1.78 | 1.75 |
| Income from discontinued operations | — | 0.01 | — | 0.02 |
| Net income | 0.92 | 0.79 | 1.78 | 1.77 |
| Basic weighted average number of common shares outstanding (in thousands) | 868,968 | 947,023 | 871,876 | 960,245 |
| Diluted weighted average number of common shares outstanding (in thousands) | 893,090 | 975,504 | 896,304 | 989,408 |
| Dividends declared per common share | $ 0.55 | $ 0.51 | $ 1.09 | $ 1.01 |
| Return on average assets | 1.05% | 0.88% | 1.00% | 1.01% |
| Return on average common equity | 13.74 | 11.82 | 13.36 | 13.28 |
| Efficiency ratio(1)(2) | 56.38 | 61.27 | 57.24 | 59.08 |
| **Asset Quality** (at period end) | | | | |
| Nonaccrual loans(3) | $ 3,275 | $ 1,830 | $ 3,275 | $ 1,830 |
| Foreclosed assets | 750 | 330 | 750 | 330 |
| Total nonperforming assets(3) | 4,025 | 2,160 | 4,025 | 2,160 |
| Nonperforming assets(3) to total assets | 1.29% | 0.62% | 1.29% | 0.62% |
| Allowance for loan and lease losses | $ 1,560 | $ 1,663 | $ 1,560 | $ 1,663 |
| Allowance as a percentage of loans held in portfolio | 0.73% | 0.68% | 0.73% | 0.68% |
| **Credit Performance** | | | | |
| Provision for loan and lease losses | $ 372 | $ 224 | $ 606 | $ 306 |
| Net charge-offs | 271 | 116 | 454 | 221 |
| **Capital Adequacy** (at period end) | | | | |
| Stockholders' equity to total assets | 7.75% | 7.45% | 7.75% | 7.45% |
| Tangible equity to total tangible assets(4) | 6.07 | 5.84 | 6.07 | 5.84 |
| Total risk-based capital to total risk-weighted assets(5) | 11.04 | 11.26 | 11.04 | 11.26 |
| Tier 1 capital to average total assets(5) | 6.09 | 6.24 | 6.09 | 6.24 |
| **Per Common Share Data** | | | | |
| Book value per common share (at period end)(6) | $ 27.27 | $ 27.31 | $ 27.27 | $ 27.31 |
| Market prices: | | | | |
| High | 44.41 | 46.48 | 45.56 | 46.48 |
| Low | 38.87 | 42.53 | 38.87 | 41.89 |
| Period end | 42.64 | 45.58 | 42.64 | 45.58 |
| **Supplemental Data** | | | | |
| Total home loan volume | 31,035 | 42,851 | 61,239 | 87,041 |
| Total loan volume(7) | 46,030 | 54,895 | 88,908 | 109,941 |

(1)     Based on continuing operations.

(2)     The efficiency ratio is defined as noninterest expense divided by total revenue (net interest income and noninterest income).

(3)     Excludes nonaccrual loans held for sale.

(4)     Excludes unrealized net gain/loss on available-for-sale securities and cash flow hedging instruments, goodwill and intangible assets (except MSR) and the impact from the adoption and application of FASB Statement No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans*. Minority interests of $2.94 billion for June 30, 2007 and $1.96 billion for June 30, 2006 are included in the numerator.

(5)     The capital ratios are estimated as if Washington Mutual, Inc. were a bank holding company subject to Federal Reserve Board capital requirements.

(6)     Excludes six million shares held in escrow.

(7)     Includes mortgage loans purchased from recognized subprime lenders and mortgage loans originated under the Long Beach Mortgage name of $2.45 billion and $8.20 billion for the three months ended June 30, 2007 and 2006, and $5.93 billion and $15.29 billion for the six months ended June 30, 2007 and 2006.

24

Exhibit 23 of 30                                                                 Page 194

**Loans**

Total loans consisted of the following:

| | June 30, 2007 | | December 31, 2006 | |
|---|---|---|---|---|
| | (in millions) | | | |
| Loans held for sale | $ | 19,327 | $ | 44,970 |
| Loans held in portfolio: | | | | |
| Loans secured by real estate: | | | | |
| Home loans(1) | $ | 88,543 | $ | 99,479 |
| Home equity loans and lines of credit(1) | | 55,776 | | 52,882 |
| Subprime mortgage channel(2): | | | | |
| Home loans | | 17,602 | | 18,725 |
| Home equity loans and lines of credit | | 2,855 | | 2,042 |
| Home construction(3) | | 2,058 | | 2,082 |
| Multi–family | | 29,290 | | 30,161 |
| Other real estate | | 6,879 | | 6,745 |
| Total loans secured by real estate | | 203,003 | | 212,116 |
| Consumer: | | | | |
| Credit card | | 9,913 | | 10,861 |
| Other | | 243 | | 276 |
| Commercial | | 1,835 | | 1,707 |
| Total loans held in portfolio(4) | $ | 214,994 | $ | 224,960 |

(1)     Excludes home loans and home equity loans and lines of credit in the subprime mortgage channel.

(2)     Represents mortgage loans purchased from recognized subprime lenders and mortgage loans originated under the Long Beach Mortgage name and held in the investment portfolio.

(3)     Represents loans to builders for the purpose of financing the acquisition, development and construction of single–family residences for sale and construction loans made directly to the intended occupant of a single–family residence.

(4)     Includes net unamortized deferred loan origination costs of $1.33 billion and $1.48 billion at June 30, 2007 and December 31, 2006.

Loans held for sale totaled $19.33 billion at June 30, 2007, a decrease of $25.64 billion from $44.97 billion at December 31, 2006, primarily due to the sale of approximately $17.5 billion of lower–yielding, medium–term adjustable–rate home loans during the first quarter of 2007.

35

Exhibit 23 of 30                                                                                           Page 195

**SIGNATURES**

    Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on August 9, 2007.

                                                    **WASHINGTON MUTUAL, INC.**

                                            By:     /s/ THOMAS W. CASEY
                                                    Thomas W. Casey
                                                    *Executive Vice President and Chief Financial Officer*

                                            By:     /s/ MELISSA J. BALLENGER
                                                    Melissa J. Ballenger
                                                    *Senior Vice President and Controller*
                                                    *(Principal Accounting Officer)*

60

Exhibit 23 of 30                                                                                    Page 196

EXHIBIT 31.1

### CERTIFICATION

I, Kerry K. Killinger, certify that:

1.    I have reviewed this quarterly report on Form 10 Q of Washington Mutual, Inc.;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a−15(f) and 15d−15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)    Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2007           /s/ KERRY K. KILLINGER

Kerry K. Killinger
*Chairman and Chief Executive Officer
of Washington Mutual, Inc.*

Exhibit 23 of 30                                                                                   Page 197

**EXHIBIT 31.2**

### CERTIFICATION

I, Thomas W. Casey, certify that:

1.     I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)     Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2007

/s/ THOMAS W. CASEY

Thomas W. Casey
*Executive Vice President and Chief Financial Officer of Washington Mutual, Inc.*

Exhibit 23 of 30                                                                                              Page 198

**EXHIBIT 32.1**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: August 9, 2007               By:     /s/ KERRY K. KILLINGER
                                           Kerry K. Killinger
                                           *Chairman and Chief Executive Officer*
                                           *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 23 of 30                                                                    Page 199

**EXHIBIT 32.2**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: August 9, 2007                         By:        /s/ THOMAS W. CASEY

                                                         Thomas W. Casey
                                                         *Executive Vice President and Chief Financial Officer*
                                                         *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 23 of 30                                                                            Page 200

# Exhibit 24

Exhibit 24 of 30

Page 201

23 of 46 DOCUMENTS

Copyright 2007 Business Wire, Inc.
Business Wire

October 17, 2007 Wednesday 8:05 PM GMT

**DISTRIBUTION:** Business Editors

**LENGTH:** 11500 words

**HEADLINE:** WaMu Reports Third Quarter Earnings Per Share of $0.23;
Declares Cash Dividend of 56 Cents

**DATELINE:** SEATTLE

**BODY:**

WaMu (NYSE:WM) announced today third quarter 2007 net income of $210 million, or $0.23 per diluted share, compared with net income of $748 million, or $0.77 per diluted share, in the third quarter of 2006. The company attributed the decline to a weaker housing market and disruptions in the capital markets.

"We're disappointed with our third quarter results but they reflect the increasingly difficult market conditions that are challenging the banking industry," said WaMu Chairman and Chief Executive Officer Kerry Killinger. "Despite these challenges, our Retail Banking, Card Services and Commercial businesses delivered good operating performance during the quarter, and we continued to adapt our Home Loans business to meet market conditions." Killinger added that the company remains focused on executing its long-term growth plans.

The company also announced its Board of Directors declared a quarterly cash dividend on the company's common stock of 56 cents per share.

THIRD QUARTER FINANCIAL SUMMARY AND HIGHLIGHTS

Selected Financial Information

| (in millions, except per share data) | Three Months Ended | | | | | |
| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| Income Statement | | | | | | |
| Net interest income | $ | 2,014 | $ | 2,034 | $ | 1,947 |
| Provision for loan and lease losses | | 967 | | 372 | | 166 |
| Noninterest income | | 1,379 | | 1,758 | | 1,570 |
| Noninterest expense | | 2,153 | | 2,138 | | 2,184 |
| Net income | | 210 | | 830 | | 748 |
| Diluted earnings | $ | 0.23 | $ | 0.92 | $ | 0.77 |

Exhibit 24 of 30                                                        Page 202

WaMu Reports Third Quarter Earnings Per Share of $0.23; Declares Cash Dividend of 56 Cents Business Wire October 17, 2007 Wednesday 8:05 PM GMT

| per common share | | | | | | |
|---|---|---|---|---|---|---|
| Balance Sheet | | | | | | |
| Total assets, end of period | $ | 330, 110 | $ | | 312, 219 | $ 348, 877 |
| Average total assets | | 320, 475 | | | 316, 004 | 349, 542 |
| Average interest-earning assets | | 283, 263 | | | 279, 836 | 312, 827 |
| Average total deposits | | 198, 649 | | | 206, 765 | 208, 912 |
| Performance Ratios | | | | | | |
| Return on average common equity | | 3.45% | | | 13.7% 4 | 11.4% 7 |
| Net interest margin | | 2.86 | | | 2.90 | 2.53 |
| Efficiency ratio | | 63.4 2 | | | 56.3 8 | 62.0 9 |
| Nonperforming assets/total assets | | 1.65 | | | 1.29 | 0.69 |
| Tangible equity/ total tangible assets | | 5.61 | | | 6.07 | 5.86 |

- Net interest margin of 2.86 percent reflects change in funding mix. The 4 basis point decline in the net interest margin from the second quarter was driven by an increase in the level of interest-earning assets funded by higher-cost wholesale borrowings. The increase in the margin from 2.53 percent in the third quarter of last year was primarily due to the upward repricing of the loan portfolio, which reflected the $17.5 billion sale of lower yielding, medium-term adjustable-rate home loans in the first quarter of 2007.
- Increase in provision reflects further weakness in the housing market. The quarter's provision increased to $967 million from $372 million in the prior quarter in response to higher delinquencies and impacts from recent house price trends, as well as the $22.1 billion, or 10 percent, growth in the company's loan portfolio during the quarter. The increase in the non-card portion of the provision to $644 million from $143 million in the second quarter was driven by further weakening in the housing market, primarily as it affects subprime and home equity loans.
- The company also increased the provision for loan losses for credit cards to $323 million from $229 million in the second quarter reflecting a higher level of delinquencies and a lower level of anticipated recoveries.
- Depositor and other retail banking fees continue to grow at double-digit pace. During the third quarter, the company added 310,000 net new checking accounts for year-to-date growth of over 1.0 million net new accounts, achieving in nine months its stated goal of adding more than one million net new checking accounts in 2007. The growth in WaMu Free CheckingTM helped drive, along with higher transaction fees, an increase in depositor and other retail banking fees of 13 percent from last year's third quarter.
- Noninterest income reflects capital markets disruption. Noninterest income during the third quarter was impacted by the following:
- Downward adjustments of $147 million related to $17 billion in home, multi-family and other commercial real estate loans that were transferred from held for sale to the company's investment

Exhibit 24 of 30                                                                                                    Page 203

WaMu Reports Third Quarter Earnings Per Share of $0.23; Declares Cash Dividend of 56 Cents Business Wire October 17, 2007 Wednesday 8:05 PM GMT

portfolio;
- Net losses of $153 million in the company's trading securities portfolio, including market valuation adjustments on capital markets assets, retained interests on credit cards and other residual interests; and,
- Impairment losses of $104 million on investment grade mortgage-backed securities designated as available for sale.
- Included in other noninterest income for the third quarter were losses, resulting from the decrease in interest rates, on derivatives economically hedging commercial real estate loans held for sale. The decline in total noninterest income was partially offset by strong third quarter results from MSR valuation and risk management.
- Disciplined expense management continues. The slight increase in third quarter's noninterest expense to $2.2 billion reflects increasing foreclosure related expenses offset by continuing productivity improvements.

THIRD QUARTER OPERATING SEGMENT RESULTS
Retail Banking Group
Selected Segment Information

| (in millions, except accounts and house-holds) | Three Months Ended September 30, 2007 | | June 30, 2007 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| Net interest income | $ | 1,302 | $ | 1,283 | $ | 1,260 |
| Provision for loan and lease losses | | 318 | | 91 | | 53 |
| Noninterest income | | 833 | | 819 | | 738 |
| Noninterest expense | | 1,155 | | 1,137 | | 1,079 |
| Net income | | 453 | | 559 | | 555 |
| Average loans | $ | 147,357 | $ | 149,716 | $ | 180,829 |
| Average retail deposits | | 144,921 | | 145,252 | | 139,954 |
| Net change in number of retail checking accounts | | 310,360 | | 406,243 | | 307,433 |
| Net change in retail households | | 161,000 | | 228,000 | | 256,000 |

- Solid operating results with a higher provision. The Retail Bank continued to perform well, which led to an increase in net interest income and a 13 percent year over year increase in depositor fees. The decline in net income was due to the increase in the provision related to both the home loan and home equity portfolios.
- Number of checking accounts up during the quarter. During the third quarter, the company added 310,000 net new checking accounts for year-to-date growth of over 1.0 million net new accounts, achieving in nine months its stated goal of adding more than one million net new checking accounts in 2007. The growth in WaMu Free CheckingTM also contributed to an increase in the number of retail households, up 2 percent from the end of the prior quarter and up 8 percent from a year earlier.

Card Services Group (managed basis)
Selected Segment Information
Three Months Ended

Exhibit 24 of 30                                                                 Page 204

Page 4

WaMu Reports Third Quarter Earnings Per Share of $0.23; Declares Cash Dividend of 56 Cents Business Wire October 17, 2007 Wednesday 8:05 PM GMT

| (in millions) | September 30, 2007 | | June 30, 2007 | | September 30, 2006 |
|---|---|---|---|---|---|
| Net interest income | $ | 689 | $ | 660 | $ 633 |
| Provision for loan and lease losses | | 611 | | 523 | 345 |
| Noninterest income | | 399 | | 393 | 343 |
| Noninterest expense | | 320 | | 300 | 294 |
| Net income | | 102 | | 141 | 207 |
| Average managed receivables | $ | 25,7 18 | $ | 24,2 34 | $ 21,7 06 |
| Period-end managed receivables | | 26,2 27 | | 24,9 87 | 22,2 34 |
| 30+ day managed delinquency rate | | 5.73% | | 5.11% | 5.53% |
| Managed net credit losses | | 6.37 | | 6.49 | 5.68 |

- Results reflect strong growth in receivables despite market disruption. Noninterest income was up slightly from the second quarter. The increase in fee income from larger receivables balances was mostly offset by a $65 million downward adjustment to the company's retained interests resulting from disruption in the capital markets. The increase in net interest income compared with prior periods reflected higher net finance charges from the higher balance of managed receivables. The increase in noninterest expense was driven by higher marketing costs which helped support the quarter's record account openings.
- Record new account growth. During the quarter, Card Services opened a record 945,000 new credit card accounts. Marketing to WaMu customers continues to be an important growth opportunity for Card Services and accounted for approximately one third of production. Period-end managed receivables of $26.2 billion were up 5 percent from the second quarter and up 18 percent from the prior year.
- Credit quality reflects higher level of delinquencies. Net credit losses of 6.37 percent were down slightly from the second quarter as the third quarter's substantial growth in managed receivables more than offset an increase in losses. At 5.73 percent of period-end managed receivables, the 30+ day managed delinquency rate was up from the prior quarter, due in part to seasonal trends. The quarter's strong growth in period-end managed receivables, higher level of delinquencies, and a lower level of anticipated recoveries led to the increase in the quarter's provision.

Commercial Group
Selected Segment Information

| (in millions) | Three Months Ended | | | | |
|---|---|---|---|---|---|
| | September 30, 2007 | | June 30, 2007 | | September 30, 2006 |
| Net interest | $ | 193 | $ | 195 | $ 159 |

Exhibit 24 of 30

WaMu Reports Third Quarter Earnings Per Share of $0.23; Declares Cash Dividend of 56 Cents Business Wire October 17, 2007 Wednesday 8:05 PM GMT

| | | | | |
|---|---|---|---|---|
| income | | | | |
| Provision for loan and lease losses | 12 | | 2 | (2 ) |
| Noninterest income | (34 ) | | 62 | 25 |
| Noninterest expense | 67 | | 74 | 60 |
| Net income | 54 | | 113 | 78 |
| Loan volume | $ 4,054 | $ | 4,348 | $ 3,104 |
| Average loans | 38,333 | | 38,789 | 32,414 |

- Decline in net income reflects capital markets pressure. Net income of $54 million was down from the prior quarter due to the decline in noninterest income and increase to the provision for loan losses. The $34 million loss in noninterest income was primarily due to a $21 million loss on sale of loans, net of hedging, compared with net gains in the second quarter of $63 million due to favorable hedging results. The increase in the provision was primarily due to the transfer of $2 billion of loans out of held for sale and into portfolio.
- Loan volume remains strong. Loan volume of $4.1 billion remained strong, down slightly from the record level in the second quarter as the company increased pricing in response to market conditions. The quarter's lower level of loan production contributed to the decline in noninterest expense from the second quarter.

Home Loans Group
Selected Segment Information

| (in millions) | Three Months Ended September 30, 2007 | | June 30, 2007 | | September 30, 2006 |
|---|---|---|---|---|---|
| Net interest income | $ 183 | $ | 215 | $ | 276 |
| Provision for loan and lease losses | 323 | | 101 | | 84 |
| Noninterest income | 184 | | 391 | | 314 |
| Noninterest expense | 554 | | 548 | | 528 |
| Net income (loss) | (34 )8 | | (37 ) | | (23 ) |
| Loan volume | $ 26,434 | $ | 35,857 | $ 41,241 |
| Average loans | 43,737 | | 43,312 | | 45,407 |

Exhibit 24 of 30                                                            Page 206

WaMu Reports Third Quarter Earnings Per Share of $0.23; Declares Cash Dividend of 56 Cents Business Wire October 17, 2007 Wednesday 8:05 PM GMT

- Housing weakness and capital markets disruption challenge Home Loans' profitability. The decline in net income was driven by lower noninterest income and higher credit costs.
- The company's gain on sale of home mortgage loans decreased from a gain of $192 million in the second quarter to a loss of $222 million. During the quarter, the company recorded a $139 million downward adjustment on the $15 billion of loans transferred from held for sale into the segment's portfolio.
- In addition, the company recorded a decrease in the value of its subprime residuals by $43 million to a balance of $37 million at the end of the quarter and recorded a loss of $62 million on trading securities associated with the company's capital markets activities as the position was marked down due to widening credit spreads and the market's reduced liquidity.
- Partially offsetting these items were strong results from MSR valuation and risk management of $222 million for the third quarter compared with a loss of $21 million in the prior quarter, reflecting the disruption in the capital markets and a slowdown in expected prepayments related to a weaker housing market, tighter underwriting standards across the industry, and higher nonconforming mortgage rates.
- The provision for loan losses increased to $323 million in the third quarter from $101 million in the prior quarter; the increase reflects rising delinquencies, home price trends, and the impact of nonconforming loans moved or added to the loan portfolio. The company retained most prime nonconforming loans in this segment rather than selling them.

- Drop in home loan volume reflects slowdown in housing and further credit tightening. Prime home loan volume was down 22 percent from the second quarter as refinance activity fell during the third quarter. Subprime mortgage production for the third quarter of only $483 million was down 80 percent from $2.4 billion in the prior quarter and down 95 percent from $9.4 billion a year ago.

COMPANY UPDATES

- On Oct. 16, Washington Mutual Bank consented to the issuance of an order by the Office of Thrift Supervision requiring the Bank to comply with the Bank Secrecy Act and to strengthen and improve its programs and controls for compliance with the Act and related laws and regulations. The order does not impose any fines or restrictions on the Bank's business activities or growth initiatives.
- On Oct. 16, WaMu's Board of Directors declared a cash dividend of 56 cents per share on the company's common stock. Dividends on the common stock are payable on Nov. 15, 2007 to shareholders of record as of Oct. 31, 2007. In addition to declaring a dividend on the company's common stock, the company will pay a dividend of $0.4041 per depository share of Series K Preferred Stock to be payable on Dec. 17, 2007 to holders of record on Dec. 3, 2007.
- On Oct. 1, WaMu implemented industry leading standards for mortgage brokers. The new program includes enhanced disclosure and a direct call program to every borrower who is represented by a broker prior to closing to review the key loan terms.
- On Sept. 24, John P. McMurray joined WaMu to serve as the company's Chief Credit Officer. He reports to Ron Cathcart, Chief Enterprise Risk Officer. McMurray, a mortgage industry veteran, most recently was Senior Managing Director and Chief Risk Officer at Countrywide Financial Corporation.
- On Nov. 7, WaMu will hold its 2007 Investor Day for analysts and institutional investors. The event, scheduled to begin at 8:00 a.m. and conclude by 12:30 p.m. ET, will be held in New York at the Sheraton New York Hotel and Tower.

ABOUT WAMU

WaMu, through its subsidiaries, is one of the nation's leading consumer and small business banks. At Sept. 30, 2007, WaMu and its subsidiaries had assets of $330.1 billion. The company has a history dating back to 1889 and its subsidiary banks currently operate approximately 2,700 consumer and small business banking stores throughout the nation. WaMu's press releases are available at http://newsroom.wamu.com.

Exhibit 24 of 30                                                                                                    Page 207

WaMu Reports Third Quarter Earnings Per Share of $0.23; Declares Cash Dividend of 56 Cents Business Wire October 17, 2007 Wednesday 8:05 PM GMT

## WEBCAST INFORMATION

A conference call to discuss the company's financial results will be held on Wednesday, Oct. 17, 2007, at 5:00 p.m. ET and will be hosted by Kerry Killinger, chairman and chief executive officer and Tom Casey, executive vice president and chief financial officer. The conference call is available by telephone or on the Internet. The dial-in number for the live conference call is 888-889-1955. Participants calling from outside the United States may dial 210-234-0002. The passcode "WaMu" is required to access the call. Via the Internet, the conference call is available on the Investor Relations portion of the company's web site atwww.wamu.com/ir. A transcript of the prepared remarks will be available on the company's web site prior to the call and archived for at least 30 days. A recording of the conference call will be available from 7:00 p.m. ET on Wednesday, Oct. 17, 2007, through 11:59 p.m. ET on Friday, Oct. 26, 2007. The recorded message will be available at 800-584-7315. Callers from outside the United States may dial 203-369-3816.

## CAUTIONARY STATEMENTS

This document contains forward-looking statements, which are not historical facts and pertain to future operating results. These forward-looking statements are within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, statements about our plans, objectives, expectations and intentions and other statements contained in this document that are not historical facts. When used in this presentation, the words "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs, such as "will," "would," "should," "could," or "may" are generally intended to identify forward-looking statements. These forward-looking statements are inherently subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond our control. In addition, these forward-looking statements are subject to assumptions with respect to future business strategies and decisions that are subject to change. Actual results may differ materially from the results discussed in these forward-looking statements for the reasons, among others, discussed under the heading "Factors That May Affect Future Results" in Washington Mutual's 2006 Annual Report on Form 10-K and "Cautionary Statements" in our Forms 10-Q for the quarters ended March 31, 2007 and June 30, 2007 which include:

- Volatile interest rates and their impact on the mortgage banking business;
- Credit risk;
- Operational risk;
- Risks related to credit card operations;
- Changes in the regulation of financial services companies, housing government-sponsored enterprises and credit card lenders;
- Competition from banking and nonbanking companies;
- General business, economic and market conditions;
- Reputational risk; and
- Liquidity risk.

There are other factors not described in our 2006 Form 10-K and Forms 10-Q for the quarters ended March 31, 2007 and June 30, 2007 which are beyond the Company's ability to anticipate or control that could cause results to differ.

WM-1

Washington Mutual, Inc.

Selected Financial Information

(dollars in millions, except per share data)

(unaudited)

| | Quarter Ended | | | | | Nine Months Ended | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Sept. 30, | June 30, | Mar. 31, | Dec. 31, | Sept. 30, | Sept. 30, | Sept. 30, |
| | 20 | 20 | 20 | 20 | 20 | 20 | 200 |

Exhibit 24 of 30                                                                 Page 208

# **Exhibit 25**

Exhibit 25 of 30                                                                                      Page 209

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities Offered | Maximum Aggregate Offering Price | Amount of Registration Fee[1] |
|---|---|---|
| 7.25% Subordinated Notes due November 1, 2017 | $500,000,000 | $15,350 |

(1) A filing fee of $15,350 has been calculated in accordance with Rule 457(r) of the Securities Act of 1933 in connection with the securities offered from Registration Statement No. 333-130929 by means of this prospectus supplement.

**Filed Pursuant to Rule 424(b)(5)**
**Registration Statement No. 333-130929**

**PROSPECTUS SUPPLEMENT**                    **TO PROSPECTUS DATED JANUARY 9, 2006**

## $500,000,000



# 7.250% Subordinated Notes due November 1, 2017

We will pay interest on the 7.250% subordinated notes due November 1, 2017 on each May 1 and November 1. The first interest payment will be made on May 1, 2008.

The notes will not be redeemable prior to their maturity. There will be no sinking fund for the notes. The notes will be unsecured.

The notes will be subordinate in right of payment to all our existing and future senior debt and rank on a parity with all of our other subordinated debt, other than junior subordinated notes as described herein. At June 30, 2007, we had issued and outstanding an aggregate principal amount of $5.9 billion in debt senior to the notes. The notes will also be effectively subordinated to all liabilities, including deposits, of our subsidiaries. At June 30, 2007, our subsidiaries had approximately $201.4 billion of deposits and $66.8 billion of debt outstanding.

The notes will not be listed on any securities exchange or automated inter-dealer quotation system.

*See "Risk Factors" beginning on page S-5 of this prospectus supplement and "Factors That May Affect Future Results" contained in our Annual Report on Form 10-K for the year ended December 31, 2006, incorporated by reference in this prospectus supplement, to read about important factors you should consider before buying the notes.*

|  | Per Note | Total |
|---|---|---|
| Initial public offering price(1) | 99.377% | $496,885,000 |
| Underwriting discount | 0.500% | $   2,500,000 |
| Proceeds to us, before expenses(1) | 98.877% | $494,385,000 |

(1) Plus accrued interest, if any, from November 1, 2007 if settlement occurs after that date.

The notes are expected to be delivered in book-entry form only through the facilities of The Depository Trust Company against payment in New York, New York on November 1, 2007.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus supplement or the prospectus to which it relates is truthful or complete. Any representation to the contrary is a criminal offense.**

*Joint Book-Running Managers*

# BARCLAYS CAPITAL

## CREDIT SUISSE

Exhibit 25 of 30                                                                 Page 210

# LEHMAN BROTHERS

# MORGAN STANLEY

*Co-Managers*

# CABRERA CAPITAL MARKETS, LLC

# KEEFE, BRUYETTE & WOODS

# THE WILLIAMS CAPITAL GROUP, L.P.

The date of this prospectus supplement is October 25, 2007.

Exhibit 25 of 30                                                                    Page 211

**Table of Contents**

| | Page |
|---|---|
| **Prospectus Supplement** | |
| About this Prospectus Supplement | S-1 |
| Incorporation of Certain Documents by Reference | S-1 |
| Special Note Regarding Forward-Looking Statements | S-1 |
| Washington Mutual, Inc. | S-2 |
| Use of Proceeds | S-3 |
| Ratio of Earnings to Fixed Charges | S-3 |
| Capitalization | S-4 |
| Risk Factors | S-5 |
| Certain Terms of the Notes | S-6 |
| Certain United States Federal Income Tax Consequences to Non-U.S. Holders | S-9 |
| Certain ERISA Considerations | S-11 |
| Underwriting | S-13 |
| Legal Matters | S-14 |
| Experts | S-14 |

| | Page |
|---|---|
| **Prospectus** | |
| About this Prospectus | 3 |
| Where You Can Find Additional Information | 3 |
| Incorporation of Certain Documents by Reference | 4 |
| Special Note Regarding Forward-Looking Statements | 4 |
| The Company | 5 |
| Use of Proceeds | 6 |
| Ratio of Earnings to Fixed Charges | 6 |
| Description of Debt Securities | 7 |
| Description of Capital Stock | 17 |
| Description of Depositary Shares | 19 |
| Plan of Distribution | 22 |
| Legal Matters | 22 |
| Experts | 22 |

You should rely only on the information that this prospectus supplement and the accompanying prospectus contain or incorporate by reference. We have not authorized anyone to provide you with information different from that contained in this prospectus supplement and the accompanying prospectus. We are offering to sell the notes, and seeking offers to buy the notes, only in jurisdictions where offers and sales are permitted. The information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus is accurate only as of their respective dates, regardless of the time of their delivery or any sale of the notes.

Exhibit 25 of 30    Page 212

## ABOUT THIS PROSPECTUS SUPPLEMENT

We provide information to you about the notes (referred to in the accompanying prospectus as "subordinated debt securities") in two documents — this prospectus supplement and the accompanying prospectus. Because the terms of the notes may differ from the general terms of the subordinated debt securities described in the accompanying prospectus, you should rely on the information in this prospectus supplement over contradictory information in the accompanying prospectus. You should read the accompanying prospectus and this prospectus supplement together for a complete description of the notes.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Securities and Exchange Commission, or SEC, allows us to "incorporate by reference" the information we file with it, which means that we can disclose important information to you by referring you to another document that we filed with the SEC. The information incorporated by reference is an important part of this prospectus supplement, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings we make with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), until we sell all of the notes:

- Our Annual Report on Form 10-K for the fiscal year ended December 31, 2006;

- Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2007 and June 30, 2007; and

- Our Current Reports on Form 8-K (in each case, other than information and exhibits "furnished" to and not "filed" with the SEC in accordance with SEC rules and regulations) filed on January 22, 2007, February 7, 2007, March 14, 2007, April 23, 2007, May 30, 2007, July 18, 2007, September 13, 2007 and October 17, 2007, and Current Report on Form 8-K/A furnished October 19, 2007.

You may obtain a copy of these filings at no cost, by writing or telephoning us at 1201 Third Avenue, Seattle, Washington 98101, telephone (206) 461-3187, attention Investor Relations Department WMT0735. You should specifically consider the description of our business in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006, the risks described under the caption "Factors That May Affect Future Results" contained therein and the risks described under the caption "Risk Factors" on page S-5.

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with any other information. We are not making an offer of the notes in any state where the offer is not permitted. You should not assume that the information in this prospectus supplement, the accompanying prospectus or any document incorporated by reference is accurate as of any date other than the date of this prospectus supplement.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus supplement and the accompanying prospectus contain or incorporate by reference forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words such as "expects", "anticipates", "intends", "plans", "believes", "seeks", "estimates", or words of similar meaning, or future or conditional verbs such as "will", "would", "should", "could" or "may".

Forward-looking statements provide management's current expectations or predictions of future conditions, events or results. They may include projections of our revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items, descriptions of management's plans or objectives for future operations, products or services, or descriptions of assumptions underlying or relating to the foregoing. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. Management does not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise

S-1

---

Exhibit 25 of 30                                                                                      Page 213

after the date the forward-looking statements were made. There are a number of factors, many of which are beyond management's control or its ability to accurately forecast or predict their significance, which could cause actual conditions, events or results to differ materially from those described in the forward-looking statements. Significant among these factors are the following:

- volatile interest rates and their impact on the mortgage banking business;

- credit risk;

- operational risk;

- risks related to credit card operations;

- changes in the regulation of financial services companies, housing government-sponsored enterprises and credit card lenders;

- competition from banking and nonbanking companies;

- general business, economic and market conditions; and

- reputational risk.

Each of the factors can significantly impact our businesses, operations, activities, condition and results in significant ways that are not described in the foregoing discussion and which are beyond our ability to anticipate or control, and could cause actual results to differ materially from the outcomes described in the forward-looking statements.

## WASHINGTON MUTUAL, INC.

With a history dating back to 1889, Washington Mutual, Inc. is a retailer of financial services to consumers and small businesses. Based on our consolidated total assets at June 30, 2007, we were the largest thrift holding company in the United States and seventh largest among all U.S.-based bank and thrift holding companies.

We operate principally in California, Washington, Oregon, Illinois, Florida, Texas and the greater New York/New Jersey metropolitan area, and have operations in 26 other states. We manage and report information concerning our activities, operations, products and services around four segments: the Retail Banking Group, the Card Services Group, the Home Loans Group and the Commercial Group.

### Recent Developments

On October 17, 2007, we announced our results of operations for the quarter ended September 30, 2007. Our net income was $210 million in the third quarter of 2007, compared with net income of $748 million in the third quarter of 2006 and $830 million in the second quarter of 2007.

Net interest income was $2.014 billion in the third quarter of 2007, compared with $1.947 billion in the third quarter of 2006 and $2.034 billion in the second quarter of 2007.

Non-performing assets were approximately $5.5 billion, or 1.65% of total assets, at September 30, 2007, compared with approximately $2.40 billion, or 0.69%, at September 30, 2006 and approximately $4.03 billion, or 1.29%, at June 30, 2007. The provision for loan and lease losses was $967 million in the third quarter of 2007, compared with $166 million in the third quarter of 2006 and $372 million in the second quarter of 2007. This resulted in our allowance for loan and lease losses increasing to $1.9 billion at September 30, 2007, up 21% from June 30, 2007.

Total assets at September 30, 2007 were $330.1 billion, compared to $348.9 billion at September 30, 2006 and $312.2 billion at June 30, 2007. Total loans held in portfolio, net of allowance for loan and lease losses at September 30, 2007, were $235.2 billion, compared to $240.2 billion at September 30, 2006 and $213.4 billion at June 30, 2007.

Exhibit 25 of 30                                                                 Page 214

Our results for the third quarter of 2007 reflect adverse developments in the mortgage lending business (and in the housing market more generally) and related volatility and liquidity constraints in the capital markets since June 30, 2007. It appears that those developments will be significantly worse and longer lasting than originally expected. The consequences for us have included:

- For the foreseeable future, we likely will have a higher level of non-performing assets leading to higher levels of provisions and charge-offs compared to periods prior to the second quarter of 2007.

- Disruptions in the capital markets continue to affect the ability of mortgage originators, including us, to sell mortgage loans to the capital markets through whole loan sales or any securitization format. Loans held in portfolio by us increased during the third quarter of 2007 as a result of its retention of loans that in the past we would have sold through whole loan sales or any securitization format. Such retained loans consist primarily of non-conforming loans.

For additional information regarding our results for operations for the quarter ended September 30, 2007, please see our press release, dated October 17, 2007, which was furnished to the SEC on Form 8-K on October 17, 2007 and Form 8-K/A furnished on October 19, 2007, both of which are incorporated by reference in this prospectus supplement. See "Where You Can Find Additional Information" in the accompanying prospectus.

## USE OF PROCEEDS

We anticipate that the net proceeds from the sale of the notes, before estimated expenses payable by us, will be $494,385,000. We will apply the proceeds from the sale of the notes for general corporate purposes, including providing funding to our subsidiaries. Until we use the proceeds from the sale of the notes for these purposes, we will use the net proceeds to reduce our short-term indebtedness or for temporary investments.

## RATIO OF EARNINGS TO FIXED CHARGES

The following table sets forth our ratio of earnings to fixed charges for each of the periods indicated.

|  | Year Ended December 31, | | | | | Six Months Ended June 30, |
| --- | --- | --- | --- | --- | --- | --- |
| 2002 | 2003 | 2004 | 2005 | 2006 | | 2007 |
| 2.02 | 2.28 | 1.89 | 1.68 | 1.40 | | 1.43 |

For purposes of this ratio, earnings consist of income from continuing operations before income taxes plus fixed charges. Fixed charges consist of interest expense on borrowings and deposits, the estimated interest portion of rent expense and preference security dividend requirements of our consolidated subsidiaries.

S-3

Exhibit 25 of 30                                                                                           Page 215

## CAPITALIZATION

The following table sets forth, on a consolidated basis, our capitalization as of September 30, 2007:

- on an actual basis; and

- as adjusted to give effect to the issuance and sale of the notes offered hereby.

You should read the following table together with our consolidated financial statements and notes thereto incorporated by reference into this prospectus supplement and the accompanying prospectus

| | As of September 30, 2007 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | ($ in millions) | |
| Deposits | $194,280 | $ 194,280 |
| Federal funds purchased and commercial paper | 2,482 | 2,482 |
| Securities sold under agreement to repurchase | 4,732 | 4,732 |
| Advances from Federal Home Loan Banks | 52,530 | 52,530 |
| Other borrowings | 40,887 | 41,387 |
| Other liabilities | 8,289 | 8,289 |
| Minority interests | 2,945 | 2,945 |
| Total liabilities | 306,145 | 306,645 |
| Stockholders' equity | | |
| Preferred stock | 492 | 492 |
| Common stock | — | — |
| Capital surplus — common stock | 2,575 | 2,575 |
| Accumulated other comprehensive loss | (390) | (390) |
| Retained earnings | 21,288 | 21,288 |
| Total stockholders' equity | 23,965 | 23,965 |
| Total liabilities and stockholder's equity | $330,110 | $ 330,610 |

S-4

Exhibit 25 of 30                                                                                     Page 216

## RISK FACTORS

Investing in the notes involves risks. You should consider carefully the information set forth in this section and all the other information provided to you or incorporated by reference in this prospectus supplement and the accompanying prospectus before deciding whether to invest in the notes.

### Risks Relating to the Company

Before investing in the notes, investors should consider the risk factors discussed under the caption "Factors That May Affect Future Results" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2006, which is incorporated by reference into this prospectus supplement.

### *Liquidity is essential to the Company's business.*

Our liquidity may be affected by an inability to access the capital markets or by unforeseen demands on cash. This situation may arise due to circumstances beyond our control, such as a general market disruption. During the first half of the year and continuing into the third quarter of 2007, there has been significant volatility in the subprime secondary mortgage market which has spread into markets for all other nonconforming residential mortgages. Since the latter part of July 2007, liquidity in the secondary market for nonconforming residential mortgage loans and securities backed by such loans has diminished significantly. While these market conditions persist, our ability to raise liquidity through the sale of mortgage loans in the secondary market will be adversely affected. We cannot predict with any degree of certainty how long these market conditions may continue or whether liquidity for nonconforming residential mortgages will improve, nor can we anticipate the impact such market conditions will have on loan origination volumes and gain on sale results during the remainder of the year.

### Risks Relating to the Offering

### *The notes will be subordinated to all of our senior debt and will be effectively subordinated to all the obligations of our subsidiaries, and our ability to service our debt will be dependent on the performance of our subsidiaries.*

The notes will be subordinated to all of our existing and future senior debt. In addition, the notes will be effectively subordinated to the liabilities, including deposits, of our subsidiaries. The incurrence of other indebtedness or other liabilities by any of our subsidiaries is not prohibited in connection with the notes and could adversely affect our ability to pay our obligations on the notes. As of June 30, 2007, our subsidiaries had $201.4 billion of deposits and $66.8 billion of outstanding debt (excluding intercompany liabilities and obligations of a type not required to be reflected on a balance sheet in accordance with generally accepted accounting principles) that would effectively have been senior to the notes. We anticipate that from time to time our subsidiaries will incur additional debt and other liabilities.

The notes will be exclusively our obligation. However, since we conduct a significant portion of our operations through our subsidiaries, our cash flow and our consequent ability to service our debt, including the notes, depend in part upon the earnings of our subsidiaries and the distribution of those earnings by those subsidiaries to us. The payment of dividends and the making of loans and advances to us by our subsidiaries are subject to statutory and contractual restrictions, depend upon the earnings of those subsidiaries and are subject to various business considerations.

We have not agreed to any financial covenants in connection with the notes. Consequently, we will not be required in connection with the notes to meet any financial tests, such as those that measure our working capital, interest coverage, fixed charges or net worth, in order to maintain compliance with the terms of the notes.

### *We cannot assure you that an active trading market will develop for the notes.*

Prior to this offering, there was no market for the notes. The notes will not be listed on any securities exchange or included in any automated quotation system. The underwriters have informed us that they intend

Exhibit 25 of 30                                                                                                                    Page 217

to make a market in the notes after this offering is completed. They may, however, cease their market making at any time without notice. The price at which the notes may trade will depend on many factors, including, but not limited to, prevailing interest rates, general economic conditions, our performance and financial results and markets for similar securities. Historically, the markets for debt such as the notes have been subject to disruptions that have caused substantial volatility in their prices. The market, if any, for the notes may be subject to similar disruptions which may have an adverse effect on the holders of the notes.

## CERTAIN TERMS OF THE NOTES

The 7.250% subordinated notes due November 1, 2017 will be subordinated debt securities as described in the accompanying prospectus. The following description of the particular terms of the notes offered hereby supplements and, to the extent inconsistent therewith, replaces the description of the general terms and provisions of the subordinated debt securities set forth in the accompanying prospectus. Capitalized terms used herein and not defined in this prospectus supplement shall have the meanings given to them in the accompanying prospectus or in the subordinated indenture referred to in this prospectus supplement.

### General

We will issue the notes under the subordinated indenture, dated as of April 4, 2000, between Washington Mutual, Inc. and The Bank of New York, as successor to Harris Trust and Savings Bank, as trustee (as supplemented by a first supplemental indenture, dated as of August 1, 2002, and a second supplemental indenture, dated as of March 16, 2004, collectively, the "indenture"). An officers' certificate will set forth the terms of the notes in accordance with the indenture. The notes will rank equally with all of our other unsecured and subordinated debt. See "Description of Debt Securities" in the accompanying prospectus for a description of the general terms and provisions of our subordinated debt securities, including the notes, issued under the indenture.

We may, without the consent of the holders of the notes, issue additional notes having the same ranking and the same interest rate, maturity and other terms (except for the public offering price and issue date) as the notes, provided that such additional notes do not have, for purposes of U.S. federal income taxation, a greater amount of original issue discount than the outstanding notes offered hereby have as of the date of the issue of such additional notes. Any of these additional notes, together with the notes offered hereby, will constitute a single series of notes under the indenture. No additional notes may be issued if an event of default has occurred with respect to the notes.

We will issue the notes only in registered form, in denominations of $2,000 and integral multiples of $1,000. We will pay principal and interest at the corporate trust office of the trustee in New York, New York or at such other office or agency that we will maintain for such purpose in New York, New York. At our option, we may pay interest by check mailed to the person entitled to payment at that person's address appearing on the register of the notes.

The notes will not be redeemable by us or repayable at the option of the holders prior to maturity. The notes will not be subject to any sinking fund.

The notes will initially be limited to a total principal amount of $500,000,000, and will mature on November 1, 2017.

The notes will bear interest from November 1, 2007 or from the most recent date to which we have paid or provided for interest, at the annual rate of 7.250%. We will pay interest semiannually on the notes on each May 1 and November 1, beginning on May 1, 2008, to the person in whose name the notes are registered at the close of business on April 15 or October 15 prior to the payment date.

We will compute interest on the notes on the basis of a 360-day year consisting of twelve 30-day months. If an interest payment date or the maturity date falls on a day that is not a business day, the payment will be made on the next business day as if it were made on the date the payment was due, and no interest will accrue on the amount so payable for the period from and after that interest payment date or the maturity date, as the case may be, to the date the payment is made.

S-6

Exhibit 25 of 30                                                                                          Page 218

**Subordination of Subordinated Debt Securities**

The notes will be subordinate and junior in right of payment to the prior payment in full of all of our senior debt. At June 30, 2007, we had issued and outstanding an aggregate principal amount of $5.9 billion in senior debt and $2.4 billion in subordinated debt (not including debt issued by our subsidiaries). The notes will rank on a parity with all other subordinated debt other than the junior subordinated notes described below. The notes will be senior to the junior subordinated notes and to our common stock and preferred stock, and will be senior to any other class of capital stock which may be authorized and issued.

The notes will be effectively subordinated to all liabilities, including deposits, of our subsidiaries. At June 30, 2007, our subsidiaries had approximately $201.4 billion of deposits and $66.8 billion of other debt outstanding, excluding trade payables, intercompany liabilities and liabilities of the type not required to be reflected on a balance sheet in accordance with generally accepted accounting principles that would rank senior or effectively senior to the notes. Any right we may have to receive assets of a subsidiary upon its liquidation or reorganization (and the consequent right of the holders of the notes to participate in those assets) will be effectively subordinated to the claims of that subsidiary's creditors, except to the extent that we are recognized as a creditor of a subsidiary, in which case our claims would still be subordinate to any security interests in the assets of the subsidiary and any liabilities of the subsidiary senior to liabilities held by us.

The indenture does not limit or restrict our ability to incur additional senior debt. In the event of any sale pursuant to any judgment or decree in any proceeding by or on behalf of any holder, or of any distribution, division or application of all or any part of our assets to our creditors by reason of any liquidation, dissolution or winding up of us or any receivership, insolvency, bankruptcy or similar proceeding relative to us or our debts or properties, then the holders of senior debt will be preferred in the payment of their claims over the holders of the notes, and such senior debt will be satisfied in full before any payment or other distribution (other than securities which are subordinate and junior in right of payment to the payment of all senior debt then outstanding) may be made upon the notes. If the notes are declared or become due and payable before their maturity because of an occurrence of an event of default (under circumstances not described in the preceding sentence), no amount may be paid in respect of the notes in excess of current interest payments, except at maturity, unless all senior debt then outstanding shall have been paid in full or payments satisfactory to the holders thereof have been provided for. During the continuance of any default on senior debt, no payments of principal or interest may be made with respect to the notes if either (i) notice of default has been given to us, provided judicial proceedings are commenced in respect of such default within 120 days, or (ii) judicial proceedings are pending in respect of such default. In the event that the notes are accelerated or otherwise become due and payable before maturity, each holder of senior debt will be entitled to notice of that event and will be entitled to declare payable on demand any senior debt outstanding to such holder, as provided in the senior indenture.

"Debt" is defined in the indenture to include all indebtedness of ours or any subsidiary representing deposits and money borrowed, except indebtedness owed to us by any subsidiary or owed to any subsidiary by us or any other subsidiary, and includes indebtedness of any other person for money borrowed when such indebtedness is guaranteed by us or any consolidated subsidiary. The term "debt" is deemed to include the liability of ours or any subsidiary in respect of any investment or similar certificate, except to the extent such certificates are pledged by purchasers as collateral for, and are offset by, receivables. "Senior debt" is defined to mean all debt of the company except subordinated debt. "Subordinated debt" consists of our 8.25% Subordinated Notes due 2010 and 4.625% Subordinated Notes due 2014 and any other debt of ours which is subordinated and junior in right of payment to any other debt of ours by the terms of the instrument creating or evidencing such subordinated debt and senior to the junior subordinated notes. "Junior subordinated notes" consists of our 5.375% Subordinated Deferrable Interest Debentures due 2041.

**Book-Entry, Delivery and Form**

The notes will be issued in the form of one or more fully registered global notes, the "global notes," which will be deposited with, or on behalf of, The Depository Trust Company, New York, New York, referred to herein as the "depositary" or "DTC," and registered in the name of Cede & Co., the depositary's nominee.

S-7

Exhibit 25 of 30                                                                                                          Page 219

Beneficial interests in the global notes will be represented through book-entry accounts of financial institutions acting on behalf of beneficial owners as direct and indirect participants in the depositary. Investors may elect to hold interests in the global notes held by the depositary through Clearstream Banking, *société anonyme,* "Clearstream, Luxembourg," or Euroclear Bank S.A./ N.V., as operator of the Euroclear System, the "Euroclear operator," if they are participants of such systems, or indirectly through organizations that are participants in such systems. Clearstream, Luxembourg and the Euroclear operator will hold interests on behalf of their participants through securities accounts in Clearstream, Luxembourg's and the Euroclear operator's names on the books of their respective depositaries, which in turn will hold such interests in securities accounts in the depositaries' names on the books of the depositary. Citibank, N.A. will act as depositary for Clearstream, Luxembourg and JPMorgan Chase Bank will act as depositary for the Euroclear operator, in such capacities, the "U.S. depositaries." Because holders will acquire, hold and transfer security entitlements with respect to the notes through accounts with DTC and its participants, including Clearstream, Luxembourg, the Euroclear operator and their participants, a beneficial holder's rights with respect to the notes will be subject to the laws (including Article 8 of the Uniform Commercial Code) and contractual provisions governing a holder's relationship with its securities intermediary and the relationship between its securities intermediary and each other securities intermediary between it and us, as the issuer. Except as set forth below, the global notes may be transferred, in whole and not in part, only to another nominee of the depositary or to a successor of the depositary or its nominee.

DTC has advised us as follows: DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants ("direct participants") deposit with DTC. DTC also facilitates the post-trade settlement among direct participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between direct participants' accounts. This eliminates the need for physical movement of securities certificates. Direct participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of direct participants of DTC and members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation and Emerging Markets Clearing Corporation (NSCC, FICC and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a direct participant, either directly or indirectly ("indirect participants"). DTC has Standard & Poor's highest rating: AAA. The DTC rules applicable to its participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that we believe to be reliable, but we take no responsibility for the accuracy thereof.

**Global Clearance and Settlement Procedures**

Initial settlement for the global notes will be made in immediately available funds. Secondary market trading between the depositary's participants will occur in the ordinary way in accordance with the depositary's rules and will be settled in immediately available funds using the depositary's Same-Day Funds Settlement System. Secondary market trading between Clearstream, Luxembourg customers and/or Euroclear participants will occur in the ordinary way in accordance with the applicable rules and operating procedures of Clearstream, Luxembourg and the Euroclear System and will be settled using the procedures applicable to conventional Eurobonds in immediately available funds.

S-8

Exhibit 25 of 30                                                                 Page 220

Cross-market transfers between persons holding directly or indirectly through the depositary on the one hand, and directly or indirectly through Clearstream, Luxembourg customers or Euroclear participants, on the other, will be effected through the depositary in accordance with the depositary's rules on behalf of the relevant European international clearing system by its U.S. depositary; however, these cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in the clearing system in accordance with its rules and procedures and within its established deadlines (European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its U.S. depositary to take action to effect final settlement on its behalf by delivering interests in the notes to or receiving interests in the notes from the depositary, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to the depositary. Clearstream, Luxembourg customers and Euroclear participants may not deliver instructions directly to their respective U.S. depositaries.

Because of time-zone differences, credits of interests in the notes received in Clearstream, Luxembourg or the Euroclear system as a result of a transaction with a depositary participant will be made during subsequent securities settlement processing and dated the business day following the depositary settlement date. Credits of interests or any transactions involving interests in the notes received in Clearstream, Luxembourg or the Euroclear System as a result of a transaction with a depositary participant and settled during subsequent securities settlement processing will be reported to the relevant Clearstream, Luxembourg customers or Euroclear participants on the business day following the depositary settlement date. Cash received in Clearstream, Luxembourg or the Euroclear System as a result of sales of interests in the notes by or through a Clearstream, Luxembourg customer or a Euroclear participant to a depositary participant will be received with value on the depositary settlement date but will be available in the relevant Clearstream, Luxembourg or Euroclear cash account only as of the business day following settlement in the depositary.

Although the depositary, Clearstream, Luxembourg and the Euroclear operator have agreed to the foregoing procedures in order to facilitate transfers of interests in the notes among participants of the depositary, Clearstream, Luxembourg and Euroclear, they are under no obligation to perform or continue to perform the foregoing procedures and these procedures may be changed or discontinued at any time.

## Notices

Notices to holders of the notes will be given by mailing such notices to each holder by first class mail, postage prepaid, at the respective address of each holder as that address appears upon our books. Notices given to the depositary, as holder of the global notes, will be passed on to the beneficial owners of the notes in accordance with the standard rules and procedures of the depositary and its direct and indirect participants, including Clearstream, Luxembourg and the Euroclear operator.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS

The following is a summary of certain United States federal income tax considerations for non-U.S. Holders (as defined below) material to the purchase, ownership and disposition of the notes. This summary does not describe all of the tax consequences that may be relevant to you in light of your particular circumstances. For example, it does not address considerations that may be relevant to you if you are an investor that is subject to special tax rules such as banks, thrifts, real estate investment trusts, regulated investment companies, insurance companies, dealers in securities or currencies, tax-exempt investors, holders that have a functional currency other than the U.S. dollar, or certain U.S. expatriates. It also does not discuss notes held as part of a hedge, straddle, conversion, "synthetic security" or other integrated transaction. This summary addresses only holders that purchase the notes in connection with their original issue at the issue price and that hold the notes as capital assets. It does not include any description of any alternative minimum tax consequences, federal estate tax consequences or the tax laws of any state or local government or of any foreign government that may be applicable to the notes.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "Code"), Treasury regulations, Internal Revenue Service ("IRS") rulings and pronouncements and administrative and judicial

S-9

Exhibit 25 of 30                                                                                    Page 221

decisions currently in effect, all of which are subject to change (possibly with retroactive effect) or possible differing interpretations.

**YOU SHOULD CONSULT WITH YOUR OWN TAX ADVISOR TO DETERMINE THE ANTICIPATED TAX CONSEQUENCES TO YOU OF HOLDING THE NOTES, INCLUDING THE TAX CONSEQUENCES UNDER UNITED STATES FEDERAL, STATE, LOCAL, AND NON-U.S. TAX LAWS AND POSSIBLE CHANGES IN TAX LAWS.**

For the purposes of this summary, you are a "U.S. Holder" if you own the notes and:

- You are a citizen or resident of the United States;

- You are a corporation (or other entity taxable as a corporation under U.S. income tax laws) created or organized in or under the laws of the United States or of any political subdivision of the United States;

- You are an estate the income of which is includable in gross income for United States federal income tax purposes regardless of its source; or

- You are a trust subject to the primary supervision of a United States court and the control of one or more United States persons, or a trust (other than a wholly owned grantor trust) that has made a valid election to be treated as a domestic trust despite not meeting the requirements described above.

You are a "Non-U.S. Holder" if you own the notes but are not a U.S. Holder.

If a partnership, including any entity treated as a partnership for U.S. federal income tax purposes, is a holder, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. A holder that is a partnership, and partners in such a partnership, should consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of the notes.

**Payments of Interest**

If you are a Non-U.S. Holder, payments of interest or premium (if any) on the notes made to you will be exempt from United States income and withholding taxes, unless:

- You hold the notes as part of a United States trade or business, in which case such income from the notes will be subject to United States federal income tax on a net income basis as if you were a U.S. Holder, and such income may also be subject to the branch profits tax if you are a corporation;

- You own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote, or you are a controlled foreign corporation related, directly or indirectly, to us through stock ownership; or

- You fail to provide to us the required certification that you are not a United States person or to provide your name and address or otherwise satisfy applicable documentation requirements.

**Sale, Redemption or Other Disposition**

If you are a Non-U.S. Holder, you will not be subject to United States federal income tax on gain realized on the sale, exchange, redemption or other disposition of the notes unless:

- Such gain is effectively connected with your conduct of a trade or business in the United States, in which case such gain will be subject to United States federal income tax on a net income basis as if you were a U.S. Holder, and such gain may also be subject to the branch profits tax if you are a corporation; or

- You are an individual holder present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

S-10

Exhibit 25 of 30                                                                                          Page 222

**Backup Withholding Tax and Information Reporting**

Certain "backup" withholding and information reporting requirements may apply to payments of principal, premium (if any) and interest on the notes and to certain payments of proceeds of the sale or other disposition of the notes made to non-corporate investors in the notes. Backup withholding and information reporting generally will not apply to payments made to a Non-U.S. Holder if you have provided the required certification under penalties of perjury that you are not a U.S. Holder or have otherwise established an exemption. Any amounts withheld under the backup withholding rules from a payment to you may be claimed as a credit against your U.S. federal income tax liability provided you furnish the required information to the IRS.

**CERTAIN ERISA CONSIDERATIONS**

The following is a summary of certain considerations associated with the purchase of the notes by employee benefit plans to which Title I of the U.S. Employee Retirement Income Security Act of 1974, as amended, which we refer to as ERISA, applies; plans, individual retirement accounts and other arrangements to which Section 4975 of the Code or provisions under any federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code, which we collectively refer to as Similar Laws, apply; and entities whose underlying assets are considered to include "plan assets" of such plans, accounts and arrangements (each of which we call a Plan).

Each fiduciary of a Plan should consider the fiduciary standards of ERISA or any applicable Similar Laws in the context of the Plan's particular circumstances before authorizing an investment in the notes. Accordingly, among other factors, the fiduciary should consider whether the investment would satisfy the prudence and diversification requirements of ERISA or any applicable Similar Laws and would be consistent with the documents and instruments governing the Plan.

Section 406 of ERISA and Section 4975 of the Code prohibit Plans subject to such provisions, which we call ERISA Plans, from engaging in certain transactions involving "plan assets" with persons that are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to the ERISA Plans. A violation of these "prohibited transaction" rules may result in an excise tax or other liabilities under ERISA and/or Section 4975 of the Code for those persons, unless exemptive relief is available under an applicable statutory or administrative exemption. Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA), certain church plans (as defined in Section 3(33) of ERISA) and foreign plans (as described in Section 4(b)(4) of ERISA) are not subject to the requirements of ERISA or Section 4975 of the Code, but may be subject to Similar Laws.

Prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code could arise if the notes were acquired by an ERISA Plan with respect to which we or any of our affiliates are a party in interest or a disqualified person. For example, if we are a party in interest or disqualified person with respect to an investing ERISA Plan (either directly or by reason of our ownership of our subsidiaries), an extension of credit prohibited by Section 406(a)(1)(B) of ERISA and Section 4975(c)(1)(B) of the Code between the investing ERISA Plan and us may be deemed to occur, unless exemptive relief were available under an applicable exemption (see below).

The United States Department of Labor has issued prohibited transaction class exemptions, or PTCEs, that may provide exemptive relief for direct or indirect prohibited transactions resulting from the purchase, holding or disposition of the notes. Those class exemptions include:

- PTCE 96-23 — for certain transactions determined by in-house asset managers;

- PTCE 95-60 — for certain transactions involving insurance company general accounts;

- PTCE 91-38 — for certain transactions involving bank collective investment funds;

- PTCE 90-1 — for certain transactions involving insurance company separate accounts; and

- PTCE 84-14 — for certain transactions determined by independent qualified professional asset managers.

S-11

Exhibit 25 of 30                                                                                                              Page 223

In addition, Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Code provide an exemption for the purchase and sale of securities where neither the issuer of the securities nor any of its affiliates have or exercise any discretionary authority or control or render any investment advice with respect to the assets of the ERISA Plan involved in the transaction and the ERISA Plan pays no more and receives no less than "adequate consideration" in connection with the transaction.

Because of the possibility that direct or indirect prohibited transactions or violations of Similar Laws could occur as a result of the purchase, holding or disposition of the notes by a Plan, the notes may not be purchased by any Plan, or any person investing the assets of any Plan, unless its purchase, holding and disposition of the notes will not constitute or result in a non-exempt prohibited transaction under ERISA or the Code or a violation of any Similar Laws. Any purchaser or holder of the notes or any interest in the notes will be deemed to have represented by its purchase and holding of the notes that either:

- it is not a Plan and is not purchasing the notes or interest in the notes on behalf of or with the assets of any Plan; or

- its purchase, holding and disposition of the notes or interest in the notes will not constitute or result in a non-exempt prohibited transaction under ERISA or the Code or a violation of any Similar Laws.

Due to the complexity of these rules and the penalties imposed upon persons involved in non-exempt prohibited transactions, it is important that any person considering the purchase of notes on behalf of or with the assets of any Plan consult with its counsel regarding the consequences under ERISA, the Code and any applicable Similar Laws of the acquisition, ownership and disposition of notes, whether any exemption would be applicable, and whether all conditions of such exemption have been satisfied such that the acquisition and holding of the notes by the Plan are entitled to full exemptive relief thereunder.

Nothing herein shall be construed as, and the sale of notes to a Plan is in no respect, a representation by us or the underwriters that any investment in the notes would meet any or all of the relevant legal requirements with respect to investment by, or is appropriate for, Plans generally or any particular Plan.

S-12

Exhibit 25 of 30                                                                 Page 224

# UNDERWRITING

Under the terms and subject to the conditions contained in an underwriting agreement dated October 25, 2007, we have agreed to sell to the underwriters named below, for whom Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Lehman Brothers Inc. and Morgan Stanley & Co. Incorporated are acting as representatives, the following respective principal amounts of notes:

| Underwriter | Principal Amount of Notes |
|---|---|
| Barclays Capital Inc. | $  112,500,000 |
| Credit Suisse Securities (USA) LLC | 112,500,000 |
| Lehman Brothers Inc. | 112,500,000 |
| Morgan Stanley & Co. Incorporated | 112,500,000 |
| Keefe, Bruyette & Woods, Inc. | 25,000,000 |
| Cabrera Capital Markets, LLC | 12,500,000 |
| The Williams Capital Group, L.P. | 12,500,000 |
| Total | $  500,000,000 |

The underwriters propose to offer the notes initially at the public offering price on the cover page of this prospectus supplement and may offer the notes to other dealers at that price less a concession of 0.300% of the principal amount per note. The underwriters and other dealers (if any) may reallow a discount of 0.150% of the principal amount per note on sales to other broker-dealers. After the initial offering, the underwriters may change the public offering price and concession.

The notes are a new issue of securities with no established trading market. One or more of the underwriters for the notes have advised us that they intend to make a market in the notes but are not obligated to do so and may discontinue market making at any time without notice. No assurance can be given as to the liquidity of the trading market for the notes.

In connection with the offering, the underwriters may purchase and sell the notes in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the underwriters of a greater number of notes than they are required to purchase in the offering. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the notes while the offering is in progress.

These activities by the underwriters may stabilize, maintain or otherwise affect the market price of the notes. As a result, the price of the notes may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the underwriters at any time. These transactions may be effected in the over-the-counter market or otherwise.

It is expected that delivery of the notes will be made against payment therefore on or about the date specified on the cover page of this prospectus supplement, which is the fifth business day following the date hereof. Under Rule 15c6-1 of the SEC under the Exchange Act, trades in the secondary market generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade the notes on any date prior to the third business day before delivery will be required, by virtue of the fact that the notes initially will settle on the fifth business day following the day of pricing ("T+5"), to specify an alternate settlement cycle at the time of any such trade to prevent a failed settlement and should consult their own advisor.

We estimate that our share of the total expenses of the offering, excluding underwriting discounts and commissions, will be approximately $100,000.

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended.

S-13

Exhibit 25 of 30                                                                                                 Page 225

In the ordinary course of business, certain of the underwriters and their affiliates have provided and may in the future continue to provide investment banking, commercial banking and/or other financial services to us and our subsidiaries for which they have received, and may in the future receive, compensation.

## LEGAL MATTERS

Heller Ehrman LLP, Seattle, Washington, will pass upon the validity of the notes for us. Sullivan & Cromwell LLP, New York, New York, will pass upon the validity of the notes for the underwriters. As of October 25, 2007, Heller Ehrman LLP and individual attorneys at the firm who participated in this transaction owned an aggregate of 12,192 shares of our common stock.

## EXPERTS

The financial statements and management's report on the effectiveness of internal control over financial reporting incorporated in this prospectus supplement by reference from the Company's Annual Report on Form 10-K for the year ended December 31, 2006 have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, which are incorporated herein by reference, and have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

S-14

Exhibit 25 of 30                                                                                                Page 226

PROSPECTUS



### Debt Securities
### Preferred Stock
### Depositary Shares

This prospectus is part of a registration statement that we filed with the Securities and Exchange Commission using a "shelf" registration process. This means:

▸ we may sell any of the following securities from time to time:

- debt securities

- preferred stock

- depositary shares

▸ we will provide a prospectus supplement each time we issue the securities; and

▸ the prospectus supplement will provide specific information about the terms of that issuance and also may add, update or change information contained in this prospectus.

We may also issue common stock upon conversion or exchange of any of the securities listed above. We will provide the specific terms of these securities in supplements to this prospectus. You should read this prospectus and the applicable prospectus supplement carefully before you invest.

The securities may be sold directly to investors, through agents designated from time to time or to or through underwriters or dealers. See "Plan of Distribution." If any underwriters are involved in the sale of any securities in respect of which this prospectus is being delivered, the names of such underwriters and any applicable commissions or discounts will be set forth in the applicable prospectus supplement. The net proceeds we expect to receive from such sale also will be set forth in the applicable prospectus supplement.

This prospectus may not be used to offer or sell any securities unless accompanied by a prospectus supplement.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is January 9, 2006.

Exhibit 25 of 30                                                                                                    Page 227

# Table of contents

|  | **Page** |
|---|---|
| About this Prospectus | **3** |
| Where You Can Find Additional Information | **3** |
| Incorporation of Certain Documents by Reference | **4** |
| Special Note Regarding Forward-Looking Statements | **4** |
| The Company | **5** |
| Use of Proceeds | **6** |
| Ratio of Earnings to Fixed Charges | **6** |
| Description of Debt Securities | **7** |
| Description of Capital Stock | **17** |
| Description of Depositary Shares | **19** |
| Plan of Distribution | **22** |
| Legal Matters | **22** |
| Experts | **22** |

2

Exhibit 25 of 30                                                                 Page 228

# About this prospectus

This prospectus is part of a "shelf" registration statement that we have filed with the Securities Exchange Commission (the "SEC"). By using a shelf registration statement, we may sell, at any time and from time to time, in one or more offerings, any combination of the securities described in this prospectus. The exhibits to our registration statement contain the full text of certain contracts and other important documents we have summarized in this prospectus. Since these summaries may not contain all the information that you may find important in deciding whether to purchase the securities we offer, you should review the full text of these documents. The registration statement and the exhibits can be obtained from the SEC as indicated under the heading "Where You Can Find Additional Information."

This prospectus only provides you with a general description of the securities we may offer. Each time we sell securities, we will provide a prospectus supplement that contains specific information about the terms of those securities. The prospectus supplement may also add, update or change information contained in this prospectus. You should read both this prospectus and any prospectus supplement together with the additional information described below under the heading "Where You Can Find Additional Information."

**We are not making an offer of these securities in any jurisdiction where the offer is not permitted. You should not assume that the information in this prospectus or a prospectus supplement is accurate as of any date other than the date on the front of the document.**

References in this prospectus to Washington Mutual, the Company, we, us and our are to Washington Mutual, Inc. (together with its subsidiaries) unless the context otherwise provides.

# Where you can find additional information

We file annual, quarterly and current reports and other information with the SEC. You may read and copy these reports and other information at the public reference room of the SEC at 100 F Street, N.E., Washington , D.C. 20549. You may also obtain copies of these documents by mail from the SEC reference room at prescribed rates. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. These reports and other information are also filed by us electronically with the SEC and are available at the SEC's website, www.sec.gov.

The indentures pursuant to which the debt securities will be issued require us to file reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Quarterly and annual reports will be made available upon request of holders of the debt securities, which annual reports will contain financial information that has been examined and reported upon by, with an opinion expressed by, an independent public or certified public accountant.

3

Exhibit 25 of 30                                                                   Page 229

# Incorporation of certain documents by reference

The SEC allows us to "incorporate by reference" the information we file with it, which means that we can disclose important information to you by referring you to another document that we filed with the SEC. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, until we sell all of the securities:

‣ Our Annual Report to Shareholders on Form 10-K for the fiscal year ended December 31, 2004;

‣ Our Quarterly Reports on Form 10-Q for the quarters ended March 31, June 30, and September 30, 2005;

‣ Current Reports on Form 8-K and 8-K/ A dated January 6, January 14, January 20, January 24, February 18, February 22, March 2, March 22, March 23, April 19, June 7, June 9, June 24, July 6, July 20, July 25, September 8, September 23, September 26, October 4 and October 27, 2005 and Items 1.01 and 9.01 and Exhibit 10.1 from the Current Reports on Form 8-K dated November 2 and December 23, 2005;

‣ The description of our capital stock contained in Item 5 of Current Report on Form 8-K dated November 29, 1994, and any amendment or report filed for the purpose of updating this description; and

‣ Form 8-A/12B dated February 8, 2001, as amended.

You may obtain a copy of these filings at no cost, by writing or telephoning us at 1201 Third Avenue, Seattle, Washington 98101, telephone (206) 461-3187, attention Investor Relations Department WMT0735.

You should rely only on the information contained or incorporated by reference in this prospectus, any supplemental prospectus or any pricing supplement. We have not authorized anyone to provide you with any other information. We are not making an offer of these securities in any state where the offer is not permitted. You should not assume that the information in this prospectus, any accompanying prospectus supplement or any document incorporated by reference is accurate as of any date other than the date on the front of the document.

# Special note regarding forward-looking statements

This prospectus and the documents incorporated by reference contain certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to financial condition, results of operations, and other matters. Statements in this prospectus, including those incorporated by reference, that are not historical facts are "forward-looking statements" for the purpose of the safe harbor provided by Section 21E of the Exchange Act and Section 27A of the Securities Act of 1933, as amended (the "Securities Act"). Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words, such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs, such as "will," "should," "could," or "may."

Forward-looking statements provide our expectations or predictions of future conditions, events or results. They are not guarantees of future performance. By their nature forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. We do not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements were made. There are a number of factors, many of which are beyond our control, that could cause actual conditions, events or results to differ significantly from those described in the forward-looking statements. The factors are generally described in our most recent Form 10-K and Form 10-Q under the caption "Risk Factors."

4

Exhibit 25 of 30                                                                                                      Page 230

**Table of Contents**

## The company

With a history dating back to 1889, Washington Mutual is a financial services company committed to serving consumers and small- to medium-sized businesses. Based on our consolidated total assets at September 30, 2005, we were the largest thrift holding company in the United States and 7th largest among all U.S.-based bank and thrift holding companies.

Washington Mutual operates principally in California, Washington, Oregon, Illinois, Florida, Texas and the greater New York/ New Jersey metropolitan area, and has operations in 31 other states. We manage and report information concerning the Company's activities, operations, products and services around four segments: the Retail Banking and Financial Services Group, the Home Loans Group (previously called the "Mortgage Banking Group"), the Commercial Group and, as of the quarter beginning October 1, 2005, Washington Mutual Card Services.

5

Exhibit 25 of 30                                                                                                   Page 231

## Use of proceeds

Unless otherwise specified in the applicable prospectus supplement, we will use the net proceeds from the sale of the securities for general corporate purposes. Examples of general corporate purposes include additions to working capital, repayment of existing debt, acquisitions, and office expansions.

## Ratio of earnings to fixed charges

The following table sets forth our ratio of earnings to fixed charges for each of the periods indicated.

| | Year ended December 31, | | | | | Nine Months Ended September 30, 2005 |
|---|---|---|---|---|---|---|
| **2000** | **2001** | **2002** | **2003** | **2004** | | |
| 1.30 | 1.60 | 2.03 | 2.29 | 1.90 | | 1.76 |

For purposes of this ratio, earnings consist of income before income taxes plus fixed charges. Fixed charges consist of interest expense on borrowings and deposits, and the estimated interest portion of rent expense.

6

Exhibit 25 of 30                                                                                      Page 232

# Description of debt securities

The following description of the debt securities sets forth the material terms and provisions of the debt securities to which any prospectus supplement may relate. The particular terms of the debt securities offered by any prospectus supplement (the "Offered Debt Securities") and the extent, if any, to which such general provisions may apply to the Offered Debt Securities, will be described in the prospectus supplement relating to such Offered Debt Securities. Accordingly, for a description of the terms of a particular issue of debt securities, reference must be made to both the prospectus supplement relating thereto and to the following description.

The debt securities will be our general obligations. In the event that any series of debt securities will be subordinated to other securities that we have outstanding or may incur, the terms of the subordination will be set forth in the prospectus supplement relating to the subordinated debt securities. Senior debt securities will be issued under the senior indenture dated as of August 10, 1999 between Washington Mutual, Inc. and The Bank of New York, as trustee, as supplemented by a first supplemental indenture dated as of August 1, 2002 and a second supplemental indenture dated as of November 20, 2002. References to the senior indenture in this prospectus will mean the senior indenture as supplemented. Subordinated debt securities will be issued under the subordinated indenture dated April 4, 2000 between us and The Bank of New York, as supplemented by the first supplemental indenture dated August 1, 2002, and a second supplemental indenture dated March 16, 2004. References to the subordinated indenture in this prospectus will mean the subordinated indenture as supplemented. Together the senior indenture and the subordinated indenture and the supplemental indentures thereto are called the "indentures."

We have summarized selected provisions of the indentures below. The senior indenture and form of subordinated indenture have been filed as exhibits to the registration statement filed with the SEC and you should read the indentures for provisions that may be important to you. Accordingly, the following summary is qualified in its entirety by reference to the provisions of the indentures. Unless otherwise specified, capitalized terms used in this summary have the meanings specified in the indentures.

**GENERAL**

The indentures do not limit the aggregate principal amount of debt securities which may be issued under the indentures and provide that debt securities may be issued from time to time in one or more series. The indentures do not limit the amount of other indebtedness or debt securities, other than certain secured indebtedness as described below, which may be issued by us or our subsidiaries.

Unless otherwise provided in a prospectus supplement, the debt securities will be our unsecured obligations. The senior debt securities will rank equally with all other unsecured and unsubordinated indebtedness of ours. The subordinated debt securities will be subordinated in right of payment to the prior payment in full of all Senior Indebtedness including our senior debt securities as described below under "Subordination of Subordinated Debt Securities" and in the applicable prospectus supplement.

The debt securities are our obligations exclusively. Because our operations are currently conducted substantially through our subsidiaries, our cash flow and the consequent ability to service our debt, including the debt securities, are dependent upon the earnings of our subsidiaries and the distribution of those earnings to us, or upon loans or other payments of funds to us by our subsidiaries. Our subsidiaries are separate and distinct legal entities and have no obligation, contingent or otherwise, to pay any amounts due with respect to the debt securities or to make funds available therefor, whether by dividends, loans or other payments. In addition, the payment to us of dividends and certain loans and advances by our subsidiaries may be subject to certain statutory or contractual restrictions.

7

Exhibit 25 of 30                                                    Page 233

Payments are contingent upon the earnings of the subsidiaries, and are subject to various business considerations.

The debt securities will be effectively subordinated to all liabilities, including deposits, of our subsidiaries. At September 30, 2005, our subsidiaries had $190.41 billion of deposits and $103.80 billion of debt outstanding. Any right we may have to receive assets of a subsidiary upon its liquidation or reorganization (and the consequent right of the holders of the debt securities to participate in those assets) will be effectively subordinated to the claims of that subsidiary's creditors, except to the extent that we are recognized as a creditor of a subsidiary, in which case our claims would still be subordinate to any security interests in the assets of the subsidiary and any liabilities of the subsidiary senior to liabilities held by us.

The debt securities may be issued in fully registered form without coupons ("registered securities") or in the form of one or more global securities (each a "Global Security"). Registered securities that are book-entry securities will be issued as registered Global Securities. Unless otherwise provided in the prospectus supplement, the debt securities will be only registered securities. The debt securities will be issued, unless otherwise provided in the prospectus supplement, in denominations of $1,000 or an integral multiple thereof for registered securities.

The prospectus supplement relating to the particular debt securities offered thereby will describe the following terms of the Offered Debt Securities:

(1)  the title of the Offered Debt Securities;

(2)  whether the Offered Debt Securities are senior debt securities or subordinated debt securities;

(3)  the percentage of principal amount at which the Offered Debt Securities will be issued;

(4)  any limit on the aggregate principal amount of the Offered Debt Securities;

(5)  the date or dates on which the Offered Debt Securities will mature and the amount or amounts of any installment of principal payable on such dates;

(6)  the rate or rates (which may be fixed or variable) per year at which the Offered Debt Securities will bear interest, if any, or the method of determining such rate or rates and the date or dates from which such interest, if any, will accrue;

(7)  the date or dates on which interest, if any, on the Offered Debt Securities will be payable and the regular record dates for such payment dates;

(8)  the terms of any sinking fund and the obligation, if any, of ours to redeem or purchase the Offered Debt Securities pursuant to any sinking fund or analogous provisions;

(9)  the portion of the principal amount of Offered Debt Securities that is payable upon declaration of acceleration of the maturity of the Offered Debt Securities;

(10) whether the Offered Debt Securities will be issued in registered form without coupons, including temporary and definitive global form, and the circumstances, if any, upon which such Offered Debt Securities may be exchanged for Offered Debt Securities issued in a different form;

(11) whether the Offered Debt Securities are to be issued in whole or in part in the form of one or more Global Securities and, if so, the identity of the depositary for such Global Security or Securities;

(12) whether and under what circumstances we will pay additional amounts to any holder of Offered Debt Securities who is not a United States person in respect of any tax, assessment or other governmental charge required to be withheld or deducted and, if so, whether we will have the option to redeem rather than pay any additional amounts;

8

Exhibit 25 of 30                                                    Page 234

(13) the place or places, if any, in addition to or instead of the corporate trust office of the trustee, where the principal, premium and interest with respect to the Offered Debt Securities shall be payable;

(14) the terms, if any, upon which the debt securities of the series may be convertible into or exchanged for our common stock, preferred stock, other debt securities or other securities of any kind and the terms and conditions upon which such conversion or exchange shall be effected, including the initial conversion or exchange price or rate, the conversion or exchange period and any other additional provisions;

(15) if the amount of principal, premium or interest with respect to the debt securities of the series may be determined with reference to an index or pursuant to a formula, the manner in which such amounts will be determined;

(16) any authenticating or paying agent, transfer agent or registrar;

(17) the applicability of, and any addition to or change in, the covenants and definitions then set forth in the indenture or in the terms then set forth in the indenture relating to permitted consolidations, mergers, or sales of assets; and

(18) certain other terms, including our ability to satisfy and discharge our obligations under an indenture with respect to the Offered Debt Securities.

No service charge will be made for any transfer or exchange of the debt securities except for any tax or other governmental charge.

Debt securities of a single series may be issued at various times with different maturity dates and different principal repayment provisions, may bear interest at different rates, may be issued at or above par or with an original issue discount, and may otherwise vary, all as provided in the indentures. The prospectus supplement for any debt securities issued above par or with an original issue discount will state any applicable material federal income tax consequences and other special considerations.

## SUBORDINATION OF SUBORDINATED DEBT SECURITIES

Payment of the principal of (and premium, if any) and interest, if any, on the subordinated debt securities will be subordinate and junior in right of payment to the prior payment in full of all Senior Debt (as defined herein). At September 30, 2005, we had an aggregate par value of $7.60 billion in Senior Debt and a par value of $3.83 billion in debt securities subordinate to Senior Debt (exclusive of our subsidiaries). The subordinated indenture does not limit or restrict our ability to incur additional Senior Debt, but certain of our other debt instruments contain such limitations.

In the event of any sale pursuant to any judgment or decree in any proceeding by or on behalf of any holder, or of any distribution, division or application of all or any part of our assets to our creditors by reason of any liquidation, dissolution or winding up of us or any receivership, insolvency, bankruptcy or similar proceeding relative to us or our debts or properties, then the holders of Senior Debt shall be preferred in the payment of their claims over the holders of the subordinated debt securities, and such Senior Debt shall be satisfied in full before any payment or other distribution (other than securities which are subordinate and junior in right of payment to the payment of all Senior Debt then outstanding) shall be made upon the subordinated debt securities. In the event that any subordinated debt security is declared or becomes due and payable before its maturity because of an occurrence of an event of default (under circumstances not described in the preceding sentence), no amount shall be paid in respect of the subordinated debt securities in excess of current interest payments, except sinking fund payments or at maturity, unless all Senior Debt then outstanding shall have been paid in full or payments satisfactory to the holders thereof provided therefor. During the continuance of any default on Senior Debt, no payments of principal, sinking fund, interest or premium shall be made with respect to any Subordinated Debt Security if either (i) notice of default has been given to us, provided judicial proceedings are commenced in respect thereof within 120 days,

9

Exhibit 25 of 30                                                                                                          Page 235

or (ii) judicial proceedings shall be pending in respect of such default. In the event that any subordinated debt security is declared or becomes due and payable before maturity, each holder of Senior Debt shall be entitled to notice of same and shall be entitled to declare payable on demand any Senior Debt outstanding to such holder.

"Debt" is defined in the indentures to include all indebtedness of ours or any Consolidated Subsidiary representing money borrowed, except indebtedness owed to us by any Consolidated Subsidiary or owed to any Consolidated Subsidiary by us or any other Consolidated Subsidiary, and includes indebtedness of any other person for money borrowed when such indebtedness is guaranteed by us or any Consolidated Subsidiary. The term "Debt" shall be deemed to include the liability of ours or any Consolidated Subsidiary in respect of any investment or similar certificate, except to the extent such certificates are pledged by purchasers as collateral for, and are offset by, receivables. "Senior Debt" is defined to mean all Debt of the Company except Subordinated Debt. "Subordinated Debt" is defined to mean Debt of ours which is subordinate and junior in right of payment to any Senior Debt of ours by the terms of the instrument creating or evidencing such Subordinate Debt and senior to the Junior Subordinated Notes. "Junior Subordinated Notes" is defined to mean our 8.36% Subordinated Notes due 2026, 8.375% Junior Subordinated Debentures due 2027, 9.33% Junior Subordinated Deferrable Interest Debentures due 2027, and 5.375% Subordinated Defeasible Interest Debentures due 2041.

Subordinated debt securities will rank on a parity with all other Subordinated Debt other than the Junior Subordinated Notes. Subordinated debt securities are senior to the Junior Subordinated Note and to our common stock and preferred stock, and will be senior to any other class of capital stock which may be authorized.

## EXCHANGE, REGISTRATION AND TRANSFER

Registered securities (other than book-entry securities) of any series of Offered Debt Securities will be exchangeable for other registered securities of the same series and of a like aggregate principal amount and tenor of different authorized denominations.

Debt securities may be presented for exchange as provided above, and registered securities (other than book-entry securities) may be presented for registration of transfer (with the form of transfer endorsed thereon duly executed), at the office of the Security Registrar or at the office of any transfer agent designated by us for such purpose with respect to any series of debt securities and referred to in the prospectus supplement. No service charge will be charged for the transfer, but any tax or other governmental charge must be paid. Such transfer or exchange will be effected upon the Security Registrar or such transfer agent, as the case may be, being satisfied with the documents of title and identity of the person making the request. If a prospectus supplement refers to any transfer agents (in addition to the Security Registrar) initially designated by us with respect to any series of debt securities, we may at any time rescind the designation of any such transfer agent or approve a change in the location through which any such transfer agent acts, except that, if debt securities of a series are issuable solely as registered securities, we will be required to maintain a transfer agent in each Place of Payment for such series. We may at any time designate additional transfer agents with respect to any series of debt securities.

In the event of any redemption in part, we will not be required to:

▸ issue, register the transfer of or exchange debt securities of any series during a period beginning at the opening of business 15 days before any selection of debt securities of that series to be redeemed and ending at the close of business on if debt securities of the series are issuable only as registered securities, the day of mailing of the relevant notice of redemption; or

▸ register the transfer of or exchange any registered security, or portion thereof, called for redemption, except the unredeemed portion of any registered security being redeemed in part.

10

Exhibit 25 of 30                                                                                                    Page 236

For a discussion of restrictions on the exchange, registration and transfer of Global Securities, see "Global Securities".

## PAYMENT AND PAYING AGENTS

Unless otherwise provided in the prospectus supplement, payment of principal of (and premium, if any) and interest, if any, on registered securities will be made in U.S. dollars at the office of such Paying Agent or Paying Agents as we may designate from time to time, except that at our option payment of any interest may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Security Register. Unless otherwise provided in a prospectus supplement, payment of any installment of interest on registered securities will be made to the Person in whose name such registered security is registered at the close of business on the Regular Record Date for such interest.

Unless otherwise provided in a prospectus supplement, the Corporate Trust Office of the trustee will be designated as our sole Paying Agent for payments with respect to Offered Debt Securities that are issuable solely as registered securities. Any Paying Agents outside the United States and any other Paying Agents in the United States initially designated by us for the Offered Debt Securities will be named in a prospectus supplement. We may at any time designate additional Paying Agents or rescind the designation of any Paying Agent or approve a change in the office through which any Paying Agent acts, except that, if debt securities of a series are issuable solely as registered securities, we will be required to maintain a Paying Agent in each Place of Payment for such series.

All moneys paid by us to a Paying Agent for the payment of principal of (and premium, if any) or interest, if any, on any debt security or coupon that remain unclaimed at the end of two years after such principal, premium or interest shall have become due and payable will be repaid to us and the holder of such debt security or coupon will thereafter look only to us for payment thereof.

## GLOBAL SECURITIES

The debt securities of a series may be issued in whole or in part as one or more Global Securities that will be deposited with, or on behalf of, a depositary located in the United States (a "U.S. Depositary") or a common depositary located outside the United States (a "Common Depositary") identified in the prospectus supplement relating to such series. Global Securities will be issued in registered form, in either temporary or definitive form.

The specific terms of the depositary arrangement with respect to any debt securities of a series will be described in the Prospectus Supplement relating to such series. We anticipate that the following provisions will apply to all depositary arrangements with a U.S. Depositary or Common Depositary.

## BOOK-ENTRY SECURITIES

Unless otherwise specified in a prospectus supplement, debt securities which are to be represented by a Global Security to be deposited with or on behalf of a U.S. Depositary will be represented by a Global Security registered in the name of such depositary or its nominee. Upon the issuance of a Global Security in registered form, the U.S. Depositary for such Global Security will credit, on its book-entry registration and transfer system, the respective principal amounts of the debt securities represented by such Global Security to the accounts of institutions that have accounts with such depositary or its nominee ("participants"). The accounts to be credited shall be designated by the underwriters or agents of such debt securities or by us, if such debt securities are offered and sold directly by us. Ownership of beneficial interests in such Global Securities will be limited to participants or persons that may hold interests through participants. Ownership of beneficial interests in such Global Securities will be shown on, and the transfer of that ownership will be effected only through, records maintained by the U.S. Depositary or its nominee for such Global Security or by participants or persons that hold through participants. The laws of some jurisdictions require that certain purchasers of securities take

**11**

Exhibit 25 of 30                                                                 Page 237

physical delivery of such securities in definitive form. Such limits and such laws may impair the ability to transfer beneficial interests in a Global Security.

So long as the U.S. Depositary for a Global Security in registered form, or its nominee, is the registered owner of such Global Security, such depositary or such nominee, as the case may be, will be considered the sole owner or holder of the debt securities represented by such Global Security for all purposes under the indenture governing such debt securities. Except as set forth below, owners of beneficial interests in such Global Securities will not be entitled to have debt securities of the series represented by such Global Security registered in their names, will not receive or be entitled to receive physical delivery of debt securities of such series in definitive form and will not be considered the owners or holders thereof under the indenture.

Payment of principal of (and premium, if any) and interest, if any, on debt securities registered in the name of or held by a U.S. Depositary or its nominee will be made to the U.S. Depositary or its nominee, as the case may be, as the registered owner or the holder of the Global Security representing such debt securities. We nor any trustee or Paying Agent, or the Security Registrar for such debt securities will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security for such debt securities or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

We expect that the U.S. Depositary for debt securities of a series, upon receipt of any payment of principal of (and premium, if any) or interest on permanent Global Securities, will credit participants' accounts on the date such payment is payable in accordance with their respective beneficial interests in the principal amount of such Global Securities as shown on the records of such Depositary. We also expect that payments by participants to owners of beneficial interests in such Global Security held through such participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in "street name", and will be the responsibility of such participants.

Unless and until it is exchanged in whole for debt securities in definitive form, a Global Security may not be transferred except as a whole by the U.S. Depositary for such Global Security to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor of such Depositary or a nominee of such successor. If a U.S. Depositary for debt securities in registered form is at any time unwilling or unable to continue as depositary and a successor depositary is not appointed by us within ninety days, we will issue debt securities in definitive registered form in exchange for the Global Security or Securities representing such debt securities. In addition, we may at any time and in our sole discretion determine not to have any debt securities in registered form represented by one or more Global Securities and, in such event, will issue debt securities in definitive registered form in exchange for the Global Security or Securities representing such debt securities. In any such instance, an owner of a beneficial interest in a Global Security will be entitled to physical delivery in definitive form of debt securities of the series represented by such Global Security equal in principal amount to such beneficial interest and to have such debt securities registered in the name of the owner of such beneficial interest.

## ABSENCE OF RESTRICTIVE COVENANTS

We are not restricted by either of the indentures from paying dividends or from incurring, assuming or becoming liable for any type of debt or other obligations or from creating liens on our property for any purpose. The indentures do not require the maintenance of any financial ratios or specified levels of net worth or liquidity. The indentures do not contain provisions which afford holders of the debt securities protection in the event of a highly leveraged transaction involving us.

12

Exhibit 25 of 30                                                                                    Page 238

## MERGER AND CONSOLIDATION

Each indenture provides that we, without the consent of the holders of any of the outstanding debt securities, may consolidate with or merge into any other corporation or transfer or lease our properties and assets substantially as an entirety to any Person or may permit any corporation to merge into us, provided that:

‣ the successor is a corporation organized under the laws of any domestic jurisdiction;

‣ the successor, if other than us, assumes our obligations under such indenture and the debt securities issued thereunder;

‣ immediately after giving effect to such transaction, no Event of Default and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing; and

‣ certain other conditions are met.

Each indenture provides that, upon any consolidation or merger or transfer or lease of our properties and assets substantially as an entirety in accordance with the preceding paragraph, the successor corporation formed by such consolidation or into which we are merged or to which such transfer or lease is made shall be substituted for us with the same effect as if such successor corporation had been named as us. Thereafter, we shall be relieved of the performance and observance of all obligations and covenants of such indenture and the senior debt securities or subordinated debt securities, as the case may be, including but not limited to the obligation to make payment of the principal of (and premium, if any) and interest, if any, on all the debt securities then outstanding, and we may thereupon or any time thereafter be liquidated and dissolved.

## SATISFACTION AND DISCHARGE

Unless a prospectus supplement provides otherwise, we will be discharged from our obligations under the outstanding debt securities of a series upon satisfaction of the following conditions:

‣ we have irrevocably deposited with the trustee either money, or U.S. Government Obligations together with the predetermined and certain income to accrue thereon without consideration of any reinvestment thereof, or a combination of which (in the written opinion of independent public accountants delivered to the trustee), will be sufficient to pay and discharge the entire principal of (and premium, if any), and interest, if any, to Stated Maturity or any redemption date on, the outstanding debt securities of such series;

‣ we have paid or caused to be paid all other sums payable with respect to the outstanding debt securities of such series;

‣ the trustee has received an Officers' Certificate and an Opinion of Counsel each stating that all conditions precedent have been complied with; or

‣ the trustee has received (a) a ruling directed to us and the trustee from the United States Internal Revenue Service to the effect that the holders of the debt securities of such series will not recognize income, gain or loss for federal income tax purposes as a result of our exercise of our option to discharge our obligations under the indenture with respect to such series and will be subject to federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and discharge had not occurred or (b) an opinion of tax counsel to the same effect as the ruling described in clause (a) above and based upon a change in law.

Upon such discharge, we will be deemed to have satisfied all the obligations under the indenture, except for obligations with respect to registration of transfer and exchange of the debt securities of such series, and the rights of the holders to receive from deposited funds payment of the principal of (and premium, if any) and interest, if any, on the debt securities of such series.

**13**

Exhibit 25 of 30                                                                                                                      Page 239

## MODIFICATION OF THE INDENTURE

Each indenture provides that we and the trustee thereunder may, without the consent of any holders of debt securities, enter into supplemental indentures for the purposes, among other things, of adding to our covenants, adding any additional Events of Default, establishing the form or terms of debt securities or curing ambiguities or inconsistencies in such indenture or making other provisions; provided such action shall not adversely affect the interests of the holders of any series of debt securities in any material respect.

Each indenture contains provisions permitting us, with the consent of the holders of not less than a majority in principal amount of the outstanding debt securities of all affected series (acting as one class), to execute supplemental indentures adding any provisions to or changing or eliminating any of the provisions of such indenture or modifying the rights of the holders of the debt securities of such series, except that no such supplemental indenture may, without the consent of the holders of all the outstanding debt securities affected thereby, among other things:

(1)   change the maturity of the principal of, or any installment of principal of or interest on, any of the debt securities;

(2)   reduce the principal amount thereof (or any premium thereon) or the rate of interest, if any, thereon;

(3)   reduce the amount of the principal of Original Issue Discount Securities payable on any acceleration of maturity;

(4)   change our obligation to maintain an office or agency in the places and for the purposes required by such indenture;

(5)   impair the right to institute suit for the enforcement of any such payment on or after the applicable maturity date;

(6)   reduce the percentage in principal amount of the outstanding debt securities of any series, the consent of the holders of which is required for any such supplemental indenture or for any waiver of compliance with certain provisions of, or of certain defaults under, such indenture; or

(7)   with certain exceptions, to modify the provisions for the waiver of certain defaults and any of the foregoing provisions.

## EVENTS OF DEFAULT

An Event of Default in respect of any series of debt securities (unless it is either inapplicable to a particular series or has been modified or deleted with respect to any particular series) is defined in each indenture to be:

‣ failure to pay interest on such series of debt securities for 30 days after payment is due;

‣ failure to pay the principal of (or premium, if any) on such series of debt securities when due;

‣ failure to perform any other covenant in the indenture that applies to such series of debt securities for 90 days after we have received written notice of the failure to perform in the manner specified in the indenture;

‣ an event of default under any mortgage, indenture (including the indenture) or other instrument under which any debt of Washington Mutual, Inc. or any Principal Subsidiary Bank (defined below) shall be outstanding which default shall have resulted in the acceleration of such debt in excess of $75,000,000 in aggregate principal amount and such acceleration shall not have been rescinded or such debt discharged within a period of 30 days after notice;

‣ certain events of bankruptcy, insolvency or reorganization; and

14

Exhibit 25 of 30                                                                                     Page 240

‣ any other event of default provided for in such series of debt securities.

"Principal Subsidiary Bank" is defined in the indenture as each of Washington Mutual Bank (formerly known as Washington Mutual Bank, FA) and any other subsidiary bank the consolidated assets of which constitute 20% or more of the consolidated assets of Washington Mutual, Inc. and its subsidiaries. As of the date hereof, Washington Mutual Bank is our only Principal Subsidiary Bank.

If an Event of Default shall have happened and be continuing, either the trustee thereunder or the holders of not less than 25% in principal amount of the outstanding debt securities of such series may declare the principal of all of the outstanding notes to be immediately due and payable.

Each indenture provides that the holders of not less than a majority in principal amount of the outstanding debt securities of any series may direct the time, method and place of conducting any proceeding for any remedy available to the trustee thereunder, or exercising any trust or power conferred on such trustee, with respect to the debt securities of such series; provided that:

‣ such direction shall not be in conflict with any rule of law or with the indenture,

‣ the trustee may take any other action deemed proper that is not inconsistent with such direction and

‣ the trustee shall not determine that the action so directed would be unjustly prejudicial to the holders of debt securities of such series not taking part in such direction.

Each indenture provides that the holders of not less than a majority in principal amount of the outstanding debt securities of any series may on behalf of the holders of all of the outstanding debt securities of such series waive any past default under such indenture with respect to such series and its consequences, except a default (1) in the payment of the principal of (or premium, if any) or interest, if any, on any of the debt securities of such series or (2) in respect of a covenant or provision of such indenture which, under the terms of such indenture, cannot be modified or amended without the consent of the holders of all of the outstanding debt securities of such series affected thereby.

Each indenture contains provisions entitling the trustee thereunder, subject to the duty of the trustee during an Event of Default in respect of any series of debt securities to act with the required standard of care, to be indemnified by the holders of the debt securities of such series before proceeding to exercise any right or power under such indenture at the request of the holders of the debt securities of such series.

Each indenture provides that the trustee will, within 90 days after the occurrence of a default in respect of any series of debt securities, give to the holders of the debt securities of such series notice of all uncured and unwaived defaults known to it; provided, however, that, except in the case of a default in the payment of the principal of (or premium, if any) or any interest on, or any sinking fund installment with respect to, any of the debt securities of such series, the trustee will be protected in withholding such notice if it in good faith determines that the withholding of such notice is in the interests of the holders of the debt securities of such series; and provided, further, that such notice shall not be given until at least 30 days after the occurrence of an Event of Default regarding the performance of any covenant of ours under such indenture other than for the payment of the principal of (or premium, if any) or any interest on, or any sinking fund installment with respect to, any of the debt securities of such series. The term default for the purpose of this provision only means any event that is, or after notice or lapse of time, or both, would become, an Event of Default with respect to the debt securities of such series.

We will be required to furnish annually to the trustee a certificate as to compliance with all conditions and covenants under the indenture.

15

Exhibit 25 of 30                                    Page 241

**NOTICES**

Notices to holders of registered securities will be given by mail to the addresses of such holders as they appear in the Security Register.

**TITLE**

We, the appropriate Trustee and any agent of ours or such Trustee may treat the registered owner of any registered security (including registered securities in global registered form) as the absolute owner thereof (whether or not such Debt Security or coupon shall be overdue and notwithstanding any notice to the contrary) for the purpose of making payment and for all other purposes.

**GOVERNING LAW**

New York law will govern the indentures and the debt securities.

16

Exhibit 25 of 30                                                                                    Page 242

# Description of capital stock

The following descriptions are summaries of the material terms of our Amended and Restated Articles of Incorporation ("articles of incorporation"), our bylaws and applicable provisions of law. Reference is made to the more detailed provisions of, and such descriptions are qualified in their entirety by reference to, our articles of incorporation and bylaws, which are incorporated by reference in the registration statement that we filed with the SEC. You should read our articles of incorporation and bylaws for the provisions that are important to you.

Our articles of incorporation currently authorize 1,600,000,000 shares of common stock, no par value, and 10,000,000 shares of preferred stock, no par value. On November 30, 2005, we had 992,057,807 shares of common stock outstanding. There were no shares of preferred stock outstanding.

**COMMON STOCK**

We do not intend to offer shares of our common stock pursuant to this prospectus except upon the conversion or exchange of debt securities or preferred stock that we offer under this prospectus.

Each share of common stock is entitled to one vote on all matters properly presented at a meeting of shareholders. Shareholders are not entitled to cumulative voting in the election of directors.

The number of our directors is determined by our bylaws. The bylaws currently set the number of directors at up to sixteen. Our board of directors is divided into three classes of as equal a number of directors as possible. The term of office of each class is three years, with each term expiring in a different year.

*Interested Stockholders.* Our articles of incorporation prohibit, except under certain circumstances, us (or any of our subsidiaries) from engaging in certain significant business transactions with a "major stockholder." A "major stockholder" is a person who, without the prior approval of our board of directors, acquires beneficial ownership of five percent or more of our outstanding voting stock. Prohibited transactions include, among others:

- any merger with, disposition of assets to, acquisition by us of the assets of, issuance of securities of ours to, or acquisition by us of securities of, a major stockholder;

- any reclassification of our voting stock or of any subsidiary beneficially owned by a major stockholder; or

- any partial or complete liquidation, spin off, split off or split up of us or any subsidiary.

The above prohibitions do not apply, in general, if the specific transaction is approved by:

- our board of directors prior to the major stockholder involved having become a major stockholder;

- a vote of at least 80% of the "continuing directors" (defined as those members of our board prior to the involvement of the major stockholder);

- a majority of the "continuing directors" if the major stockholder obtained unanimous board approval to become a major stockholder;

- a vote of 95% of the outstanding shares of our voting stock other than shares held by the major stockholder; or

- a majority vote of the shares of voting stock and the shares of voting stock owned by stockholders other than any major stockholder if certain other conditions are met.

17

Exhibit 25 of 30                                                                                           Page 243

Our articles of incorporation also provide that during the time a major stockholder exists, we may voluntarily dissolve only upon the unanimous consent of our stockholders or an affirmative vote of at least two-thirds of our board of directors and the holders of at least two-thirds of the shares entitled to vote on such a dissolution and of each class of shares entitled to vote on such a dissolution as a class, if any.

*Shareholder Rights Plan.* We have adopted a shareholder rights plan (the "Rights Plan") which provides that one right to purchase 1/1,000th of a share of our Series RP preferred stock (the "Rights") is attached to each outstanding share of our common stock. The Rights have certain anti-takeover effects and are intended to discourage coercive or unfair takeover tactics and to encourage any potential acquiror to negotiate a price fair to all shareholders. The Rights may cause substantial dilution to an acquiring party that attempts to acquire us on terms not approved by our board, but they will not interfere with any merger or other business combination that is approved by our board.

The Rights are attached to the shares of our common stock. The Rights are not presently exercisable. At the time a party acquires beneficial ownership of 15% or more of the outstanding shares of our common stock or commences or publicly announces for the first time a tender offer to do so, the Rights will separate from the common stock and will become exercisable. Each Right entitles the holder to purchase 1/1,000th share of Series RP preferred stock, for an exercise price that is currently $200 per share. Once the Rights become exercisable, any Rights held by the acquiring party will be void and, for the next 60 days, all other holders of Rights will receive upon exercise of the Right that number of shares of our common stock having a market value of two times the exercise price of the Right. The Rights, which expire on January 4, 2011, may be redeemed by us for $0.001 per right prior to becoming exercisable. Until a Right is exercised, the holder of that Right will have no rights as a shareholder, including, without limitation, the right to vote or receive dividends.

## PREFERRED STOCK

In this section we describe the general terms that will apply to preferred stock that we may offer by this prospectus in the future. When we issue a particular series, we will describe the specific terms of the series of preferred stock in a prospectus supplement. The description of provisions of our preferred stock included in any prospectus supplement may not be complete and is qualified in its entirety by reference to the description in our articles of incorporation and our certificate of designation, which will describe the terms of the offered preferred stock and be filed with the SEC at the time of sale of that preferred stock. At that time, you should read our articles of incorporation and any certificate of designation relating to each particular series of preferred stock for provisions that may be important to you.

Our board of directors is authorized to provide for the issuance from time to time of preferred stock in series and, as to each series, to fix the designation, the dividend rate, whether dividends are cumulative, the preferences which dividends will have with respect to any other class or series of capital stock, the voting rights, the voluntary and involuntary liquidation prices, the conversion or exchange privileges, the redemption prices and the other terms of redemption, and the terms of any purchase or sinking funds applicable to the series. The terms of any series of preferred stock will be described in a prospectus supplement. Cumulative dividends, dividend preferences and conversion, exchange and redemption provisions, to the extent that some or all of these features may be present when shares of our preferred stock are issued, could have an adverse effect on the availability of earnings for distribution to the holders of common stock or for other corporate purposes.

18

Exhibit 25 of 30                                                                                                        Page 244

# Description of depositary shares

We describe in this section the general terms of the depositary shares. We will describe the specific terms of the depositary shares in a prospectus supplement. The following description of the deposit agreement, the depositary shares and the depositary receipts is only a summary and you should refer to the forms of the deposit agreement and depositary share certificate that will be filed with the SEC in connection with any particular offering of depositary shares.

## GENERAL

We may offer fractional interests in preferred stock, rather than full shares of preferred stock. In that case, we will provide for the issuance by a depositary to investors of receipts for depositary shares, each representing a fractional interest in a share of a particular series of preferred stock.

The shares of any series of preferred stock underlying the depositary shares will be deposited under a separate deposit agreement between us and the depositary, which must be a bank or trust company having its principal office in the United States and having a combined capital and surplus of at least $50 million. The applicable prospectus supplement will set forth the name and address of the depositary. Subject to the terms of the deposit agreement, each owner of a depositary share will have a fractional interest in all the rights and preferences of the preferred stock underlying such depositary share. Those rights include any dividend, voting, redemption, conversion and liquidation rights.

The depositary shares will be evidenced by depositary receipts issued under the deposit agreement. If you purchase fractional interests in shares of the related series of preferred stock, you will receive depositary receipts as described in the applicable prospectus supplement. While the final depositary receipts are being prepared, we may order the depositary to issue temporary depositary receipts substantially identical to the final depositary receipts although not in final form. The holders of the temporary depositary receipts will be entitled to the same rights as if they held the depositary receipts in final form. Holders of the temporary depositary receipts can exchange them for the final depositary receipts at our expense.

## WITHDRAWAL

Unless otherwise indicated in the applicable prospectus supplement and unless the related depositary shares have been called for redemption, if you surrender depositary receipts at the principal office of the depositary, then you are entitled to receive at that office the number of shares of preferred stock and any money or other property represented by the depositary shares. We will not issue partial shares of preferred stock. If you deliver depositary receipts evidencing a number of depositary shares that represent more than a whole number of shares of preferred stock, the depositary will issue to you a new depositary receipt evidencing the excess number of depositary shares at the same time that the preferred stock is withdrawn. Holders of shares of preferred stock received in exchange for depositary shares will no longer be entitled to deposit those shares under the deposit agreement or to receive depositary shares in exchange for those shares of preferred stock.

## DIVIDENDS AND OTHER DISTRIBUTIONS

The depositary will distribute all cash dividends or other cash distributions received with respect to the preferred stock to the record holders of depositary shares representing the preferred stock in proportion to the numbers of depositary shares owned by the holders on the relevant record date. The depositary will distribute only the amount that can be distributed without attributing to any holder of depositary shares a fraction of one cent. The balance not distributed will be added to and treated as part of the next sum received by the depositary for distribution to record holders of depositary shares.

**19**

Exhibit 25 of 30                                                                                          Page 245

If there is a distribution other than in cash, the depositary will distribute property to the holders of depositary shares, unless the depositary determines that it is not feasible to make such distribution. If this occurs, the depositary may, with our approval, sell the property and distribute the net proceeds from the sale to the holders of depositary shares.

## CONVERSION, EXCHANGE AND REDEMPTION

Unless otherwise specified in the applicable prospectus supplement, neither the depositary shares nor the series of preferred stock underlying the depositary shares will be convertible or exchangeable into any other class or series of our capital stock.

If the series of the preferred stock underlying the depositary shares is subject to redemption, the depositary shares will be redeemed from the redemption proceeds, in whole or in part, of the series of the preferred stock held by the depositary. The redemption price per depositary share will bear the same relationship to the redemption price per share of preferred stock that the depositary bears to the underlying preferred stock. Whenever we redeem preferred stock held by the depositary, the depositary will redeem, as of the same redemption date, the number of depositary shares representing the preferred stock redeemed. If less than all the depositary shares are to be redeemed, the depositary shares to be redeemed will be selected by lot or pro rata as determined by the depositary.

## VOTING

Upon receipt of notice of any meeting at which the holders of the preferred stock are entitled to vote, the depositary will mail Information about the meeting contained in the notice to the record holders of the depositary shares relating to the preferred stock. Each record holder of the depositary shares on the record date (which will be the same date as the record date for the preferred stock) will be entitled to instruct the depositary as to how the preferred stock underlying the holder's depositary shares should be voted.

The depositary will try, if practical, to vote the preferred stock underlying the depositary shares according to the instructions received. We will agree to take all action requested by and deemed necessary by the depositary in order to enable the depositary to vote the preferred stock in that manner. The depositary will not vote any preferred stock for which it does not receive specific instructions from the holders of the depositary shares relating to the preferred stock.

## AMENDMENT AND TERMINATION OF THE DEPOSIT AGREEMENT

We may amend the form of depositary receipt evidencing the depositary shares and any provision of the deposit agreement by agreement with the depositary at any time. Any amendment that materially and adversely alters the rights of the existing holders of depositary shares will not be effective, however, unless approved by the record holders of at least a majority of the depositary shares then outstanding. A deposit agreement may be terminated by us or the depositary only if:

- all outstanding depositary shares relating to the deposit agreement have been redeemed or converted into or exchanged for other securities; or

- there has been a final distribution on the underlying preferred stock in connection with our liquidation, dissolution or winding up and the distribution has been made to the holders of the related depositary shares

## CHARGES OF DEPOSITARY

We will pay all transfer and other taxes and governmental charges arising solely from the existence of the depositary arrangements. We will pay charges of the depositary in connection with its duties under the deposit agreement. Holders of depositary shares will pay transfer and other taxes and

20

Exhibit 25 of 30                                                                                                    Page 246

governmental charges and any other charges that are stated to be their responsibility in the deposit agreement.

**MISCELLANEOUS**

The depositary will forward to the holders of depositary shares all reports and communications that we must furnish to the holders of the preferred stock.

Neither we nor the depositary will be liable if either of us is prevented or delayed by law or any circumstance beyond our control in performing our respective obligations under the deposit agreement. Our obligations and the depositary's obligations under the deposit agreement will be limited to performance in good faith of duties set forth in the deposit agreement. Neither we nor the depositary will be obligated to prosecute or defend any legal proceeding connected with any depositary shares or preferred stock unless satisfactory indemnity is furnished. We and the depositary may rely upon written advice of counsel or accountants, or information provided by persons presenting preferred stock for deposit, holders of depositary shares or other persons believed to be competent and on documents believed to be genuine.

**RESIGNATION AND REMOVAL OF DEPOSITARY**

The depositary may resign at any time by delivering notice to us. We may also remove the depositary at any time. Resignations or removals will take effect upon the appointment of a successor depositary and its acceptance of the appointment. The successor depositary must be appointed within 60 days after delivery of the notice of resignation or removal.

21

Exhibit 25 of 30                                                                                              Page 247

# Plan of distribution

We may sell the securities being offered hereby: (i) directly to purchasers, (ii) through agents, (iii) through dealers, (iv) through underwriters, or (v) through a combination of any such methods of sale.

The distribution of the securities may be effected from time to time in one or more transactions either (i) at a fixed price or prices, which may be changed, (ii) at market prices prevailing at the time of sale, (iii) at prices related to such prevailing market prices, or (iv) at negotiated prices.

Offers to purchase the securities may be solicited directly by us or by agents designated by us from time to time. Any such agent, which may be deemed to be an underwriter as that term is defined in the Securities Act, involved in the offer or sale of the debt securities in respect of which this prospectus is delivered will be named, and any commissions payable by us to such agent will be set forth in the prospectus supplement relating to the offering of the securities. Unless otherwise indicated in the applicable prospectus supplement, any such agent will be acting on a best efforts basis for the period of its appointment.

If a dealer is utilized in the sale of the securities in respect of which this prospectus is delivered, we will sell the securities to the dealer, as principal. The dealer, which may be deemed to be an underwriter as that term is defined in the Securities Act, may then resell the securities to the public at varying prices to be determined by such dealer at the time of resale. Dealer trading may take place in certain of the securities, including securities not listed on any securities exchange.

If an underwriter or underwriters are utilized in the sale, we will execute an underwriting agreement with such underwriters at the time of sale to them and the names of the underwriters will be set forth in the applicable prospectus supplement, which will be used by the underwriters to make resales of the securities in respect of which this prospectus is delivered to the public. The obligations of underwriters to purchase securities will be subject to certain conditions precedent and the underwriters will be obligated to purchase all of the securities of a series if any are purchased.

Underwriters, dealers, agents and other persons may be entitled, under agreements that may be entered into with us, to indemnification against certain civil liabilities, including liabilities under the Securities Act, or to contribution with respect to payments that they may be required to make in respect thereof. Underwriters, dealers and agents may engage in transactions with, or perform services for, us in the ordinary course of business.

Except as indicated in the applicable prospectus supplement, the securities are not expected to be listed on a securities exchange, except for our common stock, which is listed on The New York Stock Exchange, and any underwriters or dealers will not be obligated to make a market in securities. We cannot predict the activity or liquidity of any trading in the securities.

# Legal matters

The legality of the securities offered by this prospectus will be passed upon by Heller Ehrman LLP, Seattle, Washington. As of November 30, 2005, Heller Ehrman LLP and individual attorneys at the firm who participated in this transaction owned an aggregate of 12,992 shares of our common stock.

# Experts

The auditors of the Issuer are Deloitte & Touche LLP ("Deloitte"), an independent registered public accounting firm, who have audited the Issuer's consolidated financial statements, without qualification,

22

Exhibit 25 of 30                                                                                          Page 248

in accordance with generally accepted auditing standards in the United States of America for each of the financial periods ended December 31, 2004, 2003 and 2002, respectively, and who have audited management's report on the effectiveness of internal control over financial reporting for the year ended December 31, 2004. Deloitte's report on the Issuer's consolidated financial statements for the year ended December 31, 2003 includes an explanatory paragraph referring to the Issuer's adoption of Statement of Financial Accounting Standards (SFAS) No. 142, Goodwill and Other Intangible Assets, on January 1, 2002 and an explanatory paragraph referring to the Issuer's 2002 restatement of Note 2 to the consolidated financial statements. Deloitte's report on the Issuer's consolidated financial statements for the year ended December 31, 2002 includes an explanatory paragraph referring to the Issuer's adoption of a) SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities, as amended, on January 1, 2001, b) SFAS No. 142, Goodwill and Other Intangible Assets, on January 1, 2002, and c) SFAS No. 147, Acquisitions of Certain Financial Institutions, on October 1, 2002.

23

Exhibit 25 of 30                                                                                    Page 249

# Washington Mutual, Inc.

## $500,000,000

## 7.250% Subordinated Notes
## due November 1, 2017



*Joint Book-Running Managers*

## BARCLAYS CAPITAL

## CREDIT SUISSE

## LEHMAN BROTHERS

## MORGAN STANLEY

*Co-Managers*

## CABRERA CAPITAL MARKETS, LLC

## KEEFE, BRUYETTE & WOODS

## THE WILLIAMS CAPITAL GROUP, L.P.

Exhibit 25 of 30                                                          Page 250

# **Exhibit 26**

Exhibit 26 of 30

Page 251

QuickLinks  –– Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10–Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED SEPTEMBER 30, 2007**

**Commission File Number 1–14667**

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91–1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1301 Second Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

**(206) 461–2000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non–accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b–2 of the Exchange Act. Large accelerated filer ☒    Accelerated filer ☐    Non–accelerated filer ☐.

Indicate by check mark whether the registrant is a shell company (as defined in 12b–2 of the Exchange Act.) Yes ☐    No ☒.

The number of shares outstanding of the issuer's classes of common stock as of October 31, 2007:

**Common Stock – 868,722,736**[1]

[1]Includes 6,000,000 shares held in escrow.

Exhibit 26 of 30                                                                 Page 252

**Nine Months Ended September 30, 2007**

| | Retail Banking Group | Card Services Group[1] | Commercial Group | Home Loans Group | Corporate Support/ Treasury and Other | Reconciling Adjustments | | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Securitization[2] | Other | |
| | | | | (dollars in millions) | | | | |
| **Condensed income statement:** | | | | | | | | |
| Net interest income (expense) | $ 3,861 | $ 2,004 | $ 588 | $ 644 | $ (49) | $ (1,330) | $ 413[3] | $ 6,131 |
| Provision for loan and lease losses | 471 | 1,523 | 5 | 474 | (34) | (865) | – | 1,574 |
| Noninterest income (expense) | 2,404 | 1,267 | 41 | 736 | 16 | 465 | (251)[4] | 4,678 |
| Inter–segment revenue (expense) | 57 | (14) | – | (43) | – | – | – | – |
| Noninterest expense | 3,367 | 984 | 214 | 1,622 | 247 | – | – | 6,434 |
| Minority interest expense | – | – | – | – | 138 | – | – | 138 |
| Income (loss) before income taxes | 2,484 | 750 | 410 | (759) | (384) | – | 162 | 2,663 |
| Income taxes (benefit) | 901 | 276 | 150 | (261) | (157) | – | (47)[5] | 862 |
| Net income (loss) | $ 1,583 | $ 474 | $ 260 | $ (498) | $ (227) | $ – | $ 209 | $ 1,801 |
| **Performance and other data:** | | | | | | | | |
| Average loans | $ 150,731 | $ 24,527 | $ 38,586 | $ 46,733 | $ 1,377 | $ (13,635) | $ (1,388)[6] | $ 246,931 |
| Average assets | 160,559 | 27,010 | 40,946 | 64,212 | 43,450 | (12,036) | (1,388)[6] | 322,753 |
| Average deposits | 144,738 | n/a | 5,939 | 15,995 | 38,676 | n/a | n/a | 205,348 |

[1]    Operating results for the Card Services Group are presented on a managed basis as the Company treats securitized and sold credit card receivables as if they were still on the balance sheet in evaluating the overall performance of this operating segment.

[2]    The managed basis presentation of the Card Services Group is derived by adjusting the GAAP financial information to add back securitized loan balances and the related interest, fee income and provision for credit losses. Such adjustments to arrive at the reported GAAP results are eliminated within Securitization Adjustments.

[3]    Represents the difference between mortgage loan premium amortization recorded by the Retail Banking Group and the amount recognized in the Company's Consolidated Statements of Income. For management reporting purposes, certain mortgage loans that are held in portfolio by the Retail Banking Group are treated as if they are purchased from the Home Loans Group. Since the cost basis of these loans includes an assumed profit factor paid to the Home Loans Group, the amortization of loan premiums recorded by the Retail Banking Group reflects this assumed profit factor and must therefore be eliminated as a reconciling adjustment.

[4]    Represents the difference between gain from mortgage loans recorded by the Home Loans Group and gain from mortgage loans recognized in the Company's Consolidated Statement of Income.

[5]    Represents the tax effect of reconciling adjustments.

[6]    Represents the inter–segment offset for inter–segment loan premiums that the Retail Banking Group recognized upon transfer of portfolio loans from the Home Loans Group.

20

Exhibit 26 of 30                                                                                    Page 253

**Cautionary Statements**

The Company's Form 10–Q and other documents that it files with the Securities and Exchange Commission ("SEC") contain forward–looking statements. In addition, the Company's senior management may make forward–looking statements orally to analysts, investors, the media and others. Forward–looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs such as "will," "would," "should," "could" or "may."

Forward–looking statements provide management's current expectations or predictions of future conditions, events or results. They may include projections of the Company's revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items, descriptions of management's plans or objectives for future operations, products or services, or descriptions of assumptions underlying or relating to the foregoing. They are not guarantees of future performance. By their nature, forward–looking statements are subject to risks and uncertainties. These statements speak only as of the date made and management does not undertake to update them to reflect changes or events that occur after that date. There are a number of significant factors which could cause actual conditions, events or results to differ materially from those described in the forward–looking statements, many of which are beyond management's control or its ability to accurately forecast or predict. Significant among the factors are the following which are described in greater detail in "Business – Factors That May Affect Future Results" in the Company's 2006 Annual Report on Form 10–K:

- Volatile interest rates and their impact on the mortgage banking business;

- Credit risk;

- Operational risk;

- Risks related to credit card operations;

- Changes in the regulation of financial services companies, housing government–sponsored enterprises and credit card lenders;

- Competition from banking and nonbanking companies;

- General business, economic and market conditions; and

- Reputational risk.

Other significant factors are the following:

*Liquidity risk.*

Liquidity is essential to the Company's business. The Company's liquidity may be affected by an inability to access the capital markets or by unforeseen demands on cash. This situation may arise due to circumstances beyond the Company's control, such as a general market disruption. During 2007, there has been significant volatility in the capital markets. In the third quarter of 2007, this volatility led to a severe secondary mortgage market disruption resulting in an illiquid market for loans backed by nonconforming mortgage collateral. While these market conditions persist, the Company's ability to raise liquidity through the sale of mortgage loans in the secondary market will be adversely affected. The Company cannot predict with any degree of certainty how long these market conditions may continue, nor can it anticipate the degree of impact such market conditions will have on loan origination volumes and gain on sale results. In response to market conditions and events affecting the Company subsequent to the end of the quarter, (see Part II, Item 1 – "Legal Proceedings") several rating agencies have assigned a negative outlook to the Company. The Company cannot predict

25

Exhibit 26 of 30                                                                                    Page 254

whether rating agencies will take further negative actions with respect to the Company's outlook or credit ratings. Such actions could have the effect of increasing the Company's borrowing costs. For further discussion of liquidity, see Management's Discussion and Analysis – "Liquidity Risk and Capital Management."

*Valuation risk.*

A portion of the Company's assets are carried at fair value, including: mortgage servicing rights, trading assets including certain retained interests from securitization activities, available–for–sale securities and derivatives. Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models that utilize observable market data inputs to estimate their fair value. In certain cases observable market prices and data may not be readily available or availability may be diminished due to market conditions. In those cases, different assumptions could result in significant changes in valuation.

Each of the factors can significantly impact the Company's businesses, operations, activities, condition and results in significant ways that are not described in the foregoing discussion and which are beyond the Company's ability to anticipate or control, and could cause actual results to differ materially from the outcomes described in the forward–looking statements.

## Controls and Procedures

### Disclosure Controls and Procedures

The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or furnishes under the Securities Exchange Act of 1934.

Management reviews and evaluates the design and effectiveness of the Company's disclosure controls and procedures on an ongoing basis, which may result in the discovery of deficiencies, and improves its controls and procedures over time, correcting any deficiencies, as needed, that may have been discovered.

### Changes in Internal Control Over Financial Reporting

Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis, which may result in the discovery of deficiencies, some of which may be significant. Management changes its internal control over financial reporting as needed to maintain its effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal control over financial reporting. There have not been any changes in the Company's internal control over financial reporting during the third quarter of 2007 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. For management's assessment of the Company's internal control over financial reporting, refer to the Company's 2006 Annual Report on Form 10–K, "Management's Report on Internal Control Over Financial Reporting."

## Overview

Net income in the third quarter of 2007 was $186 million, a 75% decline from $748 million in the third quarter of 2006. The decline was largely the result of significant credit deterioration in the

Exhibit 26 of 30                                                                 Page 255

Company's single–family residential mortgage loan portfolio and significant disruptions in the capital markets, including the severe contraction in secondary mortgage market liquidity for nonconforming residential loan products.

Reflecting the significant credit deterioration, the Company recorded a provision for loan and lease losses of $967 million in the third quarter of 2007, compared with $166 million in the same quarter of the prior year. Growing inventories of unsold homes, rising foreclosure rates and a significant contraction in the availability of credit for nonconforming mortgage products exerted significant downward pressure on home prices in many parts of the country during the most recent quarter. Nationwide sales volume of existing homes in September 2007 was 19% lower than in September 2006, leading to a supply of unsold homes of approximately 10.5 months, a 44% increase from September 2006, while the national median sales price for existing homes declined by 4.2% between those same periods. With the downturn in the housing market, single–family residential mortgage delinquency levels have increased substantially and loss severity rates have grown significantly. These conditions resulted in an increase in the Company's nonperforming assets to total assets ratio from 0.69% at September 30, 2006 to 1.65% at September 30, 2007, while annualized net mortgage loan charge–offs as a percentage of the Company's average real estate loan portfolio increased from 0.12% in the third quarter of 2006 to 0.55% in the third quarter of 2007. The increase in loss severity rates was particularly evident in the subprime mortgage channel and home equity loans and lines of credit portfolios. With housing market conditions expected to deteriorate further, the Company expects that delinquencies and loss severities throughout its single–family residential mortgage portfolios will continue to increase in the fourth quarter of 2007.

Noninterest income for the third quarter of 2007 was $1.38 billion, compared with $1.57 billion in the third quarter of 2006. Deteriorating credit conditions also caused significant disruptions in the secondary mortgage market, which adversely affected the Company's noninterest income results. Credit quality concerns and market uncertainty prompted market participants to avoid purchasing mortgage investment products backed by nonconforming loan collateral. As a result of the severe contraction in secondary market liquidity, the Company transferred approximately $17 billion of real estate loans to its loan portfolio during the third quarter of 2007, which represented substantially all of the Company's nonconforming loans that had been designated as held for sale prior to the market disruption. A downward adjustment of $147 million was recorded on the transferred loans as a result of widening credit spreads that were induced by the illiquid market conditions. Widening credit spreads also reduced the value of the Company's trading assets related to mortgage loan and credit card securitizations, leading to a net loss of $153 million in the most recent quarter, while a $104 million impairment charge was recognized on certain available–for–sale, investment–grade mortgage–backed securities. The Company generally expects the market–induced adjustments recorded on the transferred loans and the investment–grade mortgage–backed securities will be accreted through interest income in future periods with the appropriate accounting for any further credit–related deterioration. Disruptions in the capital markets have persisted into the fourth quarter of 2007, with continuing illiquid market conditions for nonconforming loans.

Partially offsetting the losses were strong results from MSR valuation and risk management of $222 million for the third quarter of 2007, compared with a loss of $78 million in the same quarter of the prior year, as gains from the Company's MSR risk management instruments outpaced the decline in MSR fair value in the most recent quarter. While lower mortgage interest rates led to an overall increase in expected loan prepayment speeds, the detrimental effect to the MSR value from the increase was softened by the weakening housing market and the industry–wide contraction in home mortgage credit availability, both of which significantly reduced home loan refinancing volume.

Net interest income was $2.01 billion in the third quarter of 2007, compared with $1.95 billion in the same quarter of 2006. The increase was due to the expansion of the net interest margin, which increased from 2.53% to 2.86% between those periods. The increase was primarily due to the upward

27

Exhibit 26 of 30                                                                                                                    Page 256

Changes in the allowance for loan and lease losses were as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (dollars in millions) | | | |
| Balance, beginning of period | $ 1,560 | $ 1,663 | $ 1,630 | $ 1,695 |
| Allowance transferred to loans held for sale | (217) | (125) | (446) | (242) |
| Other | – | – | 7 | – |
| Provision for loan and lease losses | 967 | 166 | 1,574 | 472 |
| | 2,310 | 1,704 | 2,765 | 1,925 |
| Loans charged off: | | | | |
| Loans secured by real estate: | | | | |
| Home loans[1] | (52) | (12) | (108) | (34) |
| Home equity loans and lines of credit[1] | (104) | (8) | (188) | (19) |
| Subprime mortgage channel[2] | (146) | (47) | (289) | (88) |
| Home construction[3] | – | (3) | (2) | (3) |
| Multi–family | – | – | (1) | – |
| Other real estate | (1) | (2) | (2) | (4) |
| Total loans secured by real estate | (303) | (72) | (590) | (148) |
| Consumer: | | | | |
| Credit card | (120) | (98) | (322) | (254) |
| Other | (2) | (3) | (6) | (16) |
| Commercial | (20) | (6) | (44) | (19) |
| Total loans charged off | (445) | (179) | (962) | (437) |
| Recoveries of loans previously charged off: | | | | |
| Loans secured by real estate: | | | | |
| Home loans[1] | 1 | – | 3 | 1 |
| Home equity loans and lines of credit[1] | 3 | 2 | 9 | 6 |
| Subprime mortgage channel[2] | 1 | – | 13 | 2 |
| Multi–family | – | – | – | 1 |
| Other real estate | 2 | – | 3 | 2 |
| Total loans secured by real estate | 7 | 2 | 28 | 12 |
| Consumer: | | | | |
| Credit card | 14 | 16 | 45 | 34 |
| Other | – | 4 | 6 | 11 |
| Commercial | 3 | 3 | 7 | 5 |
| Total recoveries of loans previously charged off | 24 | 25 | 86 | 62 |
| Net charge–offs | (421) | (154) | (876) | (375) |
| Balance, end of period | $ 1,889 | $ 1,550 | $ 1,889 | $ 1,550 |
| Net charge–offs (annualized) as a percentage of average loans held in portfolio | 0.74% | 0.26% | 0.53% | 0.21% |
| Allowance as a percentage of loans held in portfolio | 0.80 | 0.64 | 0.80 | 0.64 |

[1] Excludes home loans and home equity loans and lines of credit in the subprime mortgage channel.

[2] Represents mortgage loans purchased from recognized subprime lenders and mortgage loans originated under the Long Beach Mortgage name and held in the investment portfolio.

[3] Represents loans to builders for the purpose of financing the acquisition, development and construction of single–family residences for sale and construction loans made directly to the intended occupant of a single–family residence.

56

Exhibit 26 of 30                                    Page 257

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on November 9, 2007.

**WASHINGTON MUTUAL, INC.**

By:     /s/  THOMAS W. CASEY

Thomas W. Casey
*Executive Vice President and Chief Financial Officer*

By:     /s/  MELISSA J. BALLENGER

Melissa J. Ballenger
*Senior Vice President and Controller (Principal Accounting Officer)*

71

Exhibit 26 of 30                                                                                                   Page 258

QuickLinks  –– Click here to rapidly navigate through this document

EXHIBIT 31.1

### CERTIFICATION

I, Kerry K. Killinger, certify that:

*1.*

I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

*2.*

Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

*3.*

Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

*4.*

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

*(a)*

Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

*(b)*

Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

*(c)*

Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

*(d)*

Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

*5.*

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

*(a)*

All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

*(b)*

Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2007

/s/  KERRY K. KILLINGER

Kerry K. Killinger
*Chairman and Chief Executive Officer of Washington Mutual, Inc.*

Exhibit 26 of 30                                                                                                                        Page 259

QuickLinks –– Click here to rapidly navigate through this document

EXHIBIT 31.2

**CERTIFICATION**

I, Thomas W. Casey, certify that:

1.

I have reviewed this quarterly report on Form 10–Q of Washington Mutual, Inc.;

2.

Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.

Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)

Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)

Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)

Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this quarterly report based on such evaluation; and

(d)

Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)

All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)

Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2007                                    /s/  THOMAS W. CASEY

                                                         Thomas W. Casey
                                                         *Executive Vice President and Chief Financial Officer*
                                                         *of Washington Mutual, Inc.*

Exhibit 26 of 30                                                    Page 260

QuickLinks  —— Click here to rapidly navigate through this document

**EXHIBIT 32.1**

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Executive Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: November 9, 2007                    By:      /s/  KERRY K. KILLINGER

                                                   Kerry K. Killinger
                                                   *Chairman and Chief Executive Officer of Washington Mutual, Inc.*
    A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 26 of 30                                                                                          Page 261

QuickLinks −− Click here to rapidly navigate through this document

EXHIBIT 32.2

**WASHINGTON MUTUAL, INC.**
**Certification of the Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: November 9, 2007                    By:    /s/  THOMAS W. CASEY

                                                 Thomas W. Casey
                                                 *Executive Vice President and Chief Financial Officer*
                                                 *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 26 of 30                                                                                           Page 262

**<u>Exhibit 27</u>**

Exhibit 27 of 30                                                                 Page 263

35 of 44 DOCUMENTS

Copyright 2007 Business Wire, Inc.
Business Wire

December 10, 2007 Monday 9:04 PM GMT

**DISTRIBUTION:** Business Editors

**LENGTH:** 1692 words

**HEADLINE:** WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend, Resize Home Loans Business and Cut Expenses to Fortify Capital Base

**DATELINE:** SEATTLE

**BODY:**

Washington Mutual, Inc. (NYSE:WM) announced today a series of actions designed to address the unprecedented challenges in the mortgage and credit markets by strengthening the company's capital and liquidity and accelerating the alignment of its Home Loans business with its retail banking operations.

These actions include:

- A capital offering of convertible preferred stock with aggregate proceeds of approximately $2.5 billion;
- A major reduction in company-wide noninterest expense of approximately $500 million for 2008 as a result of a substantial resizing of its Home Loans business and reduced corporate support expense; and
- A significant change in the strategic focus of its Home Loans business in response to a changed market.

In addition, the company said its Board of Directors intends to reduce the quarterly dividend rate to $0.15 per share from its most recent quarterly dividend rate of $0.56 per share.

"A substantial infusion of new capital, significant expense reductions, the major change in our home loans business, and our planned dividend reduction all combine to further fortify WaMu's strong capital and liquidity position," said WaMu Chairman and Chief Executive Officer Kerry Killinger. "These actions will also better position us to pursue various initiatives, particularly in our leading retail banking business -- which is at the core of our business strategy."

The company will generate approximately $3.7 billion of tangible equity as a result of the proposed capital issuance and the intended reduction in the common dividend in 2008.

The company believes these actions, together with a significant reduction in noninterest expense, should ensure that it has the financial strength to address difficult conditions in the credit and housing markets in 2008.

Resizing Home Loans Business to Adapt to Changed Conditions

WaMu remains committed to providing mortgage products to its customers. However, the mortgage market is undergoing a fundamental shift due to credit dislocation and a prolonged period of reduced capital markets liquidity. As a result, WaMu expects national mortgage originations to shrink to $1.5 trillion in 2008, down about 40 percent from an estimated $2.4 trillion this year.

Exhibit 27 of 30                                                                    Page 264

WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend, Resize Home Loans Business and Cut Expenses
to Fortify Capital Base Business Wire December 10, 2007 Monday 9:04 PM GMT

To reflect the changes in this market, WaMu will substantially adjust and resize its Home Loans business and also reduce corporate support expense.

WaMu will:

- Discontinue all remaining lending through its subprime mortgage channel;
- Close approximately 190 of 336 home loan centers and sales offices;
- Close nine Home Loans processing and call centers;
- Eliminate approximately 2,600 Home Loans positions, or about 22 percent of its Home Loans staff;
- Eliminate approximately 550 corporate and other support positions; and
- Close WaMu Capital Corp., its institutional broker-dealer business, as well as its mortgage banker finance warehouse lending operation.

These expense reduction steps will result in approximately $140 million in additional expenses in the fourth quarter. WaMu is targeting company-wide noninterest expense at or below $8.0 billion for 2008.

The resizing of its Home Loans business will be accompanied by an acceleration in WaMu's previously announced strategy to expand its focus on mortgage lending directly to customers through its retail banking stores and other retail distribution channels. It will also add bank loan consultants to support its profitable retail store network.

Non-cash Charge to Write Down Goodwill

As a result of the fundamental shift in the mortgage market and the actions the company is taking to resize its Home Loans business, WaMu will incur a fourth quarter after-tax charge of approximately $1.6 billion for the writedown of all the goodwill associated with the Home Loans business. This non-cash charge will result in a net loss for the fourth quarter of 2007, but will not affect the company's tangible or regulatory capital or liquidity.

Increasing Loan Loss Provision Ahead of Charge-Offs

Continued deterioration in the mortgage markets and declining housing prices have led to increasing fourth quarter charge-offs and delinquencies in the company's loan portfolio. As a result, the company now expects its fourth quarter provision for loan losses to be between $1.5 and $1.6 billion, approximately twice the level of expected fourth quarter net charge-offs.

The company currently expects its first quarter 2008 provision for loan losses to be in the range of $1.8 to $2.0 billion, reflecting an increase in provision well ahead of charge-offs, which are also expected to increase significantly during the quarter. The first quarter range reflects the company's current view that prevailing adverse conditions in the credit and housing markets will persist through 2008.

While difficult to predict, the company also currently expects quarterly loan loss provisions through the end of 2008 to remain elevated, generally consistent with its expectation for the first quarter of 2008. The company noted that there may be some additional variation depending on the level of credit card securitization activity during any quarter.

Capital Offering

As described above, the company has also commenced a capital offering of an aggregate of $2.5 billion in a new series of convertible preferred stock. Lehman Brothers, Morgan Stanley & Co., Credit Suisse and Goldman, Sachs & Co. are serving as joint book-running managers of the offering.

A copy of the final prospectus relating to the offering may be obtained by contacting:

Lehman Brothers Inc., c/o Broadridge, Integrated Distribution Services, 1155 Long Island Avenue, Edgewood, NY 11717, telephone: 1-888-603-5847 fax: 631-254-7140, or email: qiana.smith@broadridge.com

Exhibit 27 of 30                                                          Page 265

WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend, Resize Home Loans Business and Cut Expenses
to Fortify Capital Base Business Wire December 10, 2007 Monday 9:04 PM GMT

Or,

Morgan Stanley & Co. Incorporated, Prospectus Department, 180 Varick Street, 2nd Floor, New York, NY 10014,
telephone: 1-866-718-1649 or email: prospectus@morganstanley.com

Or,

Credit Suisse, Prospectus Department, One Madison Avenue, New York, NY 10010, telephone: 1-800-221-1037.

Or,

Goldman, Sachs & Co., Attn: Prospectus Department, 85 Broad Street, New York, NY 10004, telephone:
1-866-471-2526 or email: prospectus-ny@ny.email.gs.com

This announcement is neither an offer to sell nor a solicitation of offers to buy any of these securities in any
jurisdiction in which such an offer or solicitation is not authorized.

Filing of 8-K

The company has filed a Form 8-K with the SEC today containing additional details about the actions described
above. To access this filing, please visithttp://investors.wamu.com/irweblinkx/docs.aspx?iid=102028.

About WaMu

WaMu, through its subsidiaries, is one of the nation's leading consumer and small business banks. At Sept. 30,
2007, WaMu and its subsidiaries had assets of $330.1 billion. The company has a history dating back to 1889 and its
subsidiary banks currently operate approximately 2,700 consumer and small business banking stores throughout the
nation. WaMu's press releases are available athttp://newsroom.wamu.com.

Cautionary Statements

This document contains forward-looking statements, which are not historical facts and pertain to future operating
results. These forward-looking statements are within the meaning of the Private Securities Litigation Reform Act of
1995. These forward-looking statements include, but are not limited to, statements about our plans, objectives,
expectations and intentions and other statements contained in this document that are not historical facts. When used in
this presentation, the words "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of
similar meaning, or future or conditional verbs, such as "will," "would," "should," "could," or "may" are generally
intended to identify forward-looking statements. These forward-looking statements are inherently subject to significant
business, economic and competitive uncertainties and contingencies, many of which are beyond our control. In addition,
these forward-looking statements are subject to assumptions with respect to future business strategies and decisions that
are subject to change. Actual results may differ materially from the results discussed in these forward-looking
statements for the reasons, among others, discussed under the heading "Factors That May Affect Future Results" in
Washington Mutual's 2006 Annual Report on Form 10-K and "Cautionary Statements" in our Forms 10-Q for the
quarters ended March 31, 2007, June 30, 2007, and September 30, 2007, which include:

- Volatile interest rates and their impact on the mortgage
- banking business;
- Credit risk;
- Operational risk;
- Risks related to credit card operations;
- Changes in the regulation of financial services companies, housing government-sponsored enterprises
  and credit card lenders;

Exhibit 27 of 30                                                                                                    Page 266

WaMu to Raise $2.5 Billion in Additional Capital, Reduce Dividend, Resize Home Loans Business and Cut Expenses to Fortify Capital Base Business Wire December 10, 2007 Monday 9:04 PM GMT

- Competition from banking and nonbanking companies;
- General business, economic and market conditions;
- Reputational risk;
- Liquidity risk; and
- Valuation risk.

There are other factors not described in our 2006 Form 10-K and Forms 10-Q for the quarters ended March 31, 2007, June 30, 2007, and September 30, 2007, which are beyond the Company's ability to anticipate or control that could cause results to differ.

The company has filed a registration statement (including a prospectus) with the SEC for the offering of the convertible preferred stock to which this communication relates. Before you invest, you should read the prospectus in that registration statement, the prospectus supplement and other documents the company has filed with the SEC for more complete information about the company and the offering of convertible preferred stock. You may get these documents for free by visiting EDGAR on the SEC web site atwww.sec.gov. Alternatively, the company, any underwriter or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling Lehman Brothers Inc. toll free at 1-888-603-5847, Morgan Stanley & Co. Incorporated toll free at 1-866-718-1649, Credit Suisse toll free at 1-800-221-1037 or Goldman, Sachs & Co. toll free at 1-866-471-2526.

CONTACT: Washington Mutual, Inc.
Media Contact
Libby Hutchinson, 206-500-2770
libby.hutchinson@wamu.net
or
Investor Contact
Alan Magleby, 212-702-6955
alan.magleby@wamu.net

**URL:** http://www.businesswire.com

**LOAD-DATE:** December 11, 2007

Exhibit 27 of 30                                                                          Page 267

# **Exhibit 28**

Exhibit 28 of 30

Page 268

Table of Contents

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities Offered | Maximum Aggregate Offering Price | Amount of Registration Fee(1) |
|---|---|---|
| 7.75% Series R Non-Cumulative Perpetual Convertible Preferred Stock, no par value and liquidation preference $1,000 per share | $3,000,000,000 | $92,100 |

(1)  A filing fee of $92,100 has been calculated in accordance with Rule 457(r) of the Securities Act of 1933 in connection with the securities offered from Registration Statement No. 333-130929 by means of this prospectus supplement.

**Filed Pursuant to Rule 424(b)(5)**
**under the Securities Act of 1933**
**Registration Statement No. 333-130929**

**Prospectus Supplement to Prospectus Dated January 9, 2006**

# 3,000,000 Shares



# 7.75% SERIES R NON-CUMULATIVE PERPETUAL CONVERTIBLE PREFERRED STOCK

Washington Mutual, Inc. is offering 3,000,000 shares of our 7.75% Series R Non-Cumulative Perpetual Convertible Preferred Stock, referred to as the Series R Preferred Stock.

Dividends on the Series R Preferred Stock will be payable quarterly in arrears, when, as and if declared by our board of directors, at a rate of 7.75% per year on the liquidation preference of $1,000 per share. The dividend payment dates will the 15th day of each March, June, September and December, commencing on March 15, 2008, or the next business day if any such day is not a business day.

Dividends on the Series R Preferred Stock will be non-cumulative. If for any reason our board of directors does not declare full cash dividends on the Series R Preferred Stock for a dividend period, we will have no obligation to pay any dividends for that period, whether or not our board of directors declares dividends on the Series R Preferred Stock for any subsequent dividend period. However, with certain exceptions, if we have not declared, paid or set aside for payment full quarterly dividends on the Series R Preferred Stock for a particular dividend period, we may not declare or pay dividends on or redeem or purchase our common stock or other junior securities during the next succeeding dividend period.

Each share of the Series R Preferred Stock may be converted at any time, at the option of the holder, into 47.0535 shares of our common stock (which reflects an approximate initial conversion price of $21.25 per share of common stock) plus cash in lieu of fractional shares, subject to anti-dilution adjustments. The conversion rate will be adjusted as described herein upon the occurrence of certain make-whole acquisition transactions and other events.

The Series R Preferred Stock is not redeemable by us at any time. On or after December 18, 2012, if the closing price of our common stock exceeds 130% of the conversion price for 20 trading days during any consecutive 30 trading day period, including the last trading day of such period, ending on the trading day preceding the date we give notice of mandatory conversion, we may at our option cause some or all of the Series R Preferred Stock to be automatically converted into common stock at the then prevailing conversion rate.

Prior to this offering, there has been no public market for the Series R Preferred Stock. We have applied to list the Series R Preferred Stock on the New York Stock Exchange under the symbol "WM PrR," and expect trading in the Series R Preferred Stock to begin within 30 days of December 17, 2007, the original issue date. Our common stock is listed on the New York Stock Exchange under the symbol "WM." The last reported price of our common stock on December 11, 2007 was $17.42 per share.

The shares of Series R Preferred Stock are not savings accounts, deposits or other obligations of any bank and are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency.

**Investing in the shares of Series R Preferred Stock involves risks. See "Risk Factors" beginning on page S-11.**

|  | Per Share | Total |
|---|---|---|
| Price to the public | $ 1,000 | $3,000,000,000 |
| Underwriting discounts and commissions | $ 30 | $ 90,000,000 |
| Proceeds to Washington Mutual, Inc. (before expenses) | $ 970 | $2,910,000,000 |

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus supplement or the accompanying prospectus. Any representation to the contrary is a criminal offense.**

Exhibit 28 of 30                                                                                                                Page 269

The underwriters expect to deliver the shares of Series R Preferred Stock against payment in New York, New York on or about December 17, 2007.

**LEHMAN BROTHERS**                                                              **MORGAN STANLEY**

**CREDIT SUISSE**                                                              **GOLDMAN, SACHS & CO.**

BARCLAYS CAPITAL                                                                           CITI

DEUTSCHE BANK SECURITIES                                                              JPMORGAN

RBS GREENWICH CAPITAL                                                   UBS INVESTMENT BANK
BNY CAPITAL MARKETS, INC.
        CABRERA CAPITAL MARKETS, LLC
            KEEFE, BRUYETTE & WOODS
                RAMIREZ & CO., INC.
                    THE WILLIAMS CAPITAL GROUP, L.P.

December 11, 2007.

Exhibit 28 of 30                                                                           Page 270

Table of Contents

## SUMMARY

*This summary highlights information contained elsewhere, or incorporated by reference, in this prospectus supplement. As a result, it does not contain all the information that may be important to you. To understand this offering fully, you must read this entire prospectus supplement and the accompanying prospectus carefully, including the risk factors beginning on page S-11 and the documents incorporated by reference into this prospectus supplement and the accompanying prospectus.*

### Washington Mutual, Inc.

With a history dating back to 1889, Washington Mutual, Inc. is a retailer of financial services to consumers and small businesses. Based on our consolidated total assets at September 30, 2007, we were the largest thrift holding company in the United States and seventh largest among all U.S.-based bank and thrift holding companies. We operate principally in California, Washington, Oregon, Illinois, Florida, Texas and the greater New York/New Jersey metropolitan area, and have operations in 25 other states. As of September 30, 2007, we served the needs of approximately 19.9 million consumer households through 2,212 retail banking stores, 463 lending stores and centers, 3,968 ATMs, telephone call centers and online banking. As of September 30, 2007, on a consolidated basis, we had total assets of approximately $330 billion, total liabilities of approximately $306 billion, total deposits of approximately $194 billion and total stockholders' equity of approximately $24 billion.

Our earnings are primarily driven by lending to consumers and small businesses and by deposit-taking activities which generate net interest income, and by activities that generate noninterest income, including the sale and servicing of loans and the provision of fee-based services to our customers.

We operate through four main business segments: the Retail Banking Group, the Card Services Group, the Commercial Group and the Home Loans Group. The Retail Banking Group, the Card Services Group and the Home Loans Group are consumer-oriented, while the Commercial Group serves commercial customers.

*Retail Banking Group.* The principal activities of the Retail Banking Group include: (1) offering a comprehensive line of deposit and other retail banking products and services to consumers and small businesses; (2) holding both our portfolio of home loans held for investment and the substantial majority of our portfolio of home equity loans and lines of credit (but not our portfolio of mortgage loans to higher risk borrowers originated or purchased through the subprime mortgage channel); (3) originating home equity loans and lines of credit; and (4) providing investment advisory and brokerage services, sales of annuities and other financial services.

*Card Services Group.* The Card Services Group manages our credit card operations. The group's principal activities include (1) issuing credit cards; (2) either holding outstanding balances on credit cards in portfolio or securitizing and selling them; (3) servicing credit card accounts; and (4) providing other cardholder services. Credit card balances that are held in our loan portfolio generate interest income from finance charges on outstanding card balances, and noninterest income from the collection of fees associated with the credit card portfolio, such as performance fees (late, overlimit and returned check charges), annual membership fees and cash advance and balance transfer fees.

*Commercial Group.* The principal activities of the Commercial Group include: (1) providing financing to developers and investors for multi-family dwellings and, to a lesser extent, other commercial properties; (2) servicing multi-family and other commercial real estate loans and holding such loans in its portfolio as part of its commercial asset management business; and (3) providing limited deposit services to commercial customers.

*Home Loans Group.* The principal activities of the Home Loans Group include: (1) originating and servicing home loans; (2) originating and servicing home equity loans and lines of credit; (3) holding certain residential mortgages in its loan portfolio, including mortgage loans to higher risk borrowers that were offered

Exhibit 28 of 30                                                                                              Page 271

Table of Contents

through the subprime mortgage channel; and (4) making available insurance-related products and participating in reinsurance activities with other insurance companies.

We are incorporated in the state of Washington and are a savings and loan holding company. We own two banking subsidiaries as well as numerous nonbank subsidiaries. As a savings and loan holding company, we are subject to regulation by the Office of Thrift Supervision (the "**OTS**"). Our banking subsidiaries, Washington Mutual Bank and Washington Mutual Bank fsb, are subject to regulation and examination by the OTS (their primary federal regulator) as well as the Federal Deposit Insurance Corporation (the "**FDIC**"). Our principal business offices are located at 1301 Second Avenue, Seattle, Washington 98101.

**Recent Developments**

*Capital and Liquidity Strengthening Measures*

On December 10, 2007, we announced a series of measures designed to address the challenges we face from the continuing disruptions in the mortgage and capital markets by strengthening our capital and liquidity resources and accelerating the alignment of our Home Loans business with our Retail Banking operations. These measures include this offering as well as a planned major reduction in company-wide noninterest expense (such reduction estimated at approximately $500 million for 2008) as a result of a substantial resizing of our Home Loans business and reduced corporate support expense, together with a significant change in the strategic focus of our Home Loans business in response to a changed market.

In addition, our board of directors intends to reduce the quarterly dividend rate on our common stock to $0.15 per share from the most recent quarterly rate of $0.56 per share, which we anticipate will result in potential capital savings in 2008 of approximately $1.4 billion.

As previously announced, we believe that the mortgage market is undergoing a fundamental shift due to credit dislocation and a prolonged period of reduced capital markets liquidity. As a result, we expect national mortgage originations to shrink by approximately 40 percent in 2008 compared to 2007. To reflect the changes in this market, we will substantially adjust and resize our Home Loans business and also reduce corporate support expense. These actions include:

- discontinuing all remaining lending through our subprime mortgage channel;

- closing approximately 190 of our 336 home loan centers and sales offices,

- closing nine Home Loans processing and call centers,

- eliminating approximately 2,600 Home Loans positions, or about 22 percent of the Home Loans staff,

- eliminating approximately 550 corporate and other support positions, and

- closing WaMu Capital Corp., our institutional broker-dealer business, as well as our mortgage banker finance warehouse lending operation,

At the same time, we plan to accelerate our previously announced strategy to expand our focus on mortgage lending directly to customers through our retail banking stores and other retail distribution channels. We will also add bank loan consultants to support our retail store network.

As a result of the fundamental shift in the mortgage market and the actions we are taking to resize our Home Loans business, we will incur a fourth quarter after-tax charge of approximately $1.6 billion for the write-down of all the goodwill associated with the Home Loans business. This non-cash charge will not affect our tangible or regulatory capital or our liquidity.

*Financial Update*

*Loan Loss Provision.* Continued deterioration in the mortgage markets and declining housing prices have led to increasing fourth quarter charge-offs and delinquencies in our loan portfolio. As a result, we now expect our fourth quarter 2007 provision for loan losses to be between $1.5 and $1.6 billion, approximately twice the level of expected fourth quarter net charge-offs.

S-2

Exhibit 28 of 30    Page 272

Table of Contents

RISK FACTORS

*An investment in the Series R Preferred Stock or our common stock is subject to certain risks. You should carefully consider the risks described below, as well as the other information included or incorporated by reference into this prospectus supplement and the accompanying prospectus, including our financial statements and the notes thereto, before making an investment decision.*

### Risks Relating to Our Business

***If current market conditions persist, our ability to raise liquidity including through the sale of mortgage loans in the secondary market or otherwise may be adversely affected.***

Our liquidity may be affected by an inability to access the capital markets or by unforeseen demands on cash. This situation may arise due to circumstances beyond our control, such as a general market disruption. During the first nine months of this year and continuing into the fourth quarter of 2007, there has been significant volatility in the subprime secondary mortgage market which has spread into markets for all other nonconforming residential mortgages. Since the latter part of July 2007, liquidity in the secondary market for nonconforming residential mortgage loans and securities backed by such loans has diminished significantly. While these market conditions persist, our ability to raise liquidity through the sale of mortgage loans in the secondary market will be adversely affected. As a result of these conditions in the secondary mortgage markets, we have in recent periods retained for our own account substantially all of the nonconforming mortgage loans we originate or purchase. We cannot predict with any degree of certainty how long these market conditions may continue or whether liquidity for nonconforming residential mortgages will improve, although it is our current expectation that the existing turmoil in the secondary mortgage markets will continue to significantly and adversely affect loan origination volumes and gain on sale results during the remainder of 2007 and into 2008.

In addition, in response to market conditions and events affecting us, several rating agencies have recently downgraded or assigned a negative outlook to our credit ratings. For example, on December 11, 2007, our long-term credit ratings were downgraded by Moody's and Fitch and assigned a negative outlook by DBRS. We cannot predict whether the rating agencies will take further negative actions with respect to our credit ratings. Such actions could have the effect of increasing our borrowing costs, making it more difficult for our banking subsidiaries to attract institutional or wholesale deposits or otherwise making financing more difficult. This offering is intended to enhance our ability to meet our liquidity needs. However, we may not be able to raise the amount of capital we intend to raise in this offering, and, even if we do so, we cannot assure you that the proceeds of this offering will be adequate to meet our liquidity needs.

***Changes in interest rates may adversely affect our business, including net interest income and earnings.***

Like other financial institutions, we raise funds for our business by, among other things, borrowing money in the capital markets and from the Federal Home Loan Bank system and accepting deposits from depositors, which we use to make loans to customers and invest in debt securities and other interest-earning assets. We earn interest on these loans and assets and pay interest on the money we borrow and on the deposits we accept from depositors. Changes in interest rates, including changes in the relationship between short-term rates and long-term rates, may have negative effects on our net interest income and therefore our earnings. If the rate of interest we pay on our borrowings and deposits increases more than the rate of interest we earn on our assets, our net interest income, and therefore our earnings, would likely be adversely affected. Our earnings could also be negatively affected if the interest rates we charge on our earning assets fall more quickly than the rates we pay on our borrowings and deposits. Changes in interest rates and responses by our competitors to those changes may affect the rate of customer pre-payments for mortgages and other term loans and may affect the balances customers carry on their credit cards. These changes can reduce the overall yield on our assets. Changes in interest rates and responses by our competitors to these changes may also affect customer decisions to maintain balances in the deposit accounts they have with us. These changes may require us to replace withdrawn balances with higher-cost alternative sources of funding.

S-11

Exhibit 28 of 30                                                                                                                              Page 273

Table of Contents

In addition, changes in interest rates may affect our mortgage banking business in complex and significant ways. For example, changes in interest rates can affect gain from mortgage loans and loan servicing fees, which are the principal components of revenue from sales and servicing of home mortgage loans. When mortgage rates decline, the fair value of MSR asset generally declines and gain from mortgage loans tends to increase, to the extent we are able to sell or securitize mortgage loans in the secondary market. When mortgage rates rise, we generally expect loan volumes and payoffs in our servicing portfolio to decrease. As a result, the fair value of our MSR asset generally increases and gain from mortgage loans decreases. In recent periods, however, declines in general interest rates have not resulted in an increase in prepayment rates, due in part to the reduced liquidity in the mortgage markets making refinancing by borrowers more difficult.

As part of our overall risk management activities, we seek to mitigate changes in the fair value of our MSR asset by purchasing and selling financial instruments, entering into interest rate contracts and forward commitments to purchase or sell mortgage-backed securities and adjusting the mix and amount of such financial instruments or contracts to take into account the effects of different interest rate environments. The MSR asset and the mix of financial instruments used to mitigate changes in its fair value are not perfectly correlated. This imperfect correlation creates the potential for excess MSR risk management gains or losses during any period. Management must exercise judgment in selecting the amount, type and mix of financial instruments and contracts to mitigate changes in the fair value of our MSR. We cannot assure you that the amount, type and mix of financial instruments and contracts we select will fully offset significant changes in the fair value of the MSR, and our actions could negatively impact our earnings. Our reliance on these risk management instruments may be impacted by periods of illiquidity in the secondary markets, which could negatively impact the performance of the MSR risk management instruments. For further discussion of how interest rate risk, basis risk, volatility risk and prepayment risk are managed, see "Management's Discussion and Analysis of Financial Condition and Results of Operations — Market Risk Management" in our Annual Report on Form 10-K for the year ended December 31, 2006.

***We use estimates in determining the fair value of certain of our assets, which estimates may prove to be incorrect and result in significant changes in valuation.***

A portion of our assets are carried on our balance sheet at fair value, including: our MSR, trading assets including certain retained interests from securitization activities, available-for-sale securities and derivatives. Generally, for assets that are reported at fair value, we use quoted market prices or internal valuation models that utilize observable market data inputs to estimate their fair value. In certain cases, observable market prices and data may not be readily available or their availability may be diminished due to market conditions. We use financial models to value certain of these assets. These models are complex and use asset specific collateral data and market inputs for interest rates. We cannot assure you that we can properly manage the complexity of our models and valuations to ensure, among other things, that the models are properly calibrated, the assumptions are reasonable, the mathematical relationships used in the model are predictive and remain so over time, and the data and structure of the assets and hedges being modeled are properly input. Such assumptions are complex as we must make judgments about the effect of matters that are inherently uncertain. Different assumptions could result in significant changes in valuation, which in turn could result in significant changes in the dollar amount of assets we report on our balance sheet. We may in the future also elect to carry a portion of our liabilities at fair value, in which case the same risks as described above would also apply to our determinations of the fair values of such liabilities.

***Economic conditions that negatively affect housing prices and the job market have resulted, and may continue to result, in a deterioration in credit quality of our loan portfolios, and such deterioration in credit quality has had, and could continue to have, a negative impact on our business.***

Washington Mutual is one of the nation's largest lenders, and a deterioration in the credit quality of our loan portfolios can have a negative impact on our earnings resulting from increased provisioning for loan and lease losses and from increased nonaccrual loans, which could cause a decrease in our interest-earning assets. Credit risk is the risk of loss due to adverse changes in a borrower's ability to meet its financial obligations on agreed upon terms. The overall credit quality of our loan portfolios is impacted by the strength of the

S-12

Exhibit 28 of 30                                                                                          Page 274

**Table of Contents**

U.S. economy and local economies in which we conduct our lending operations as well as trends in residential housing prices. We continually monitor changes in the economy, particularly unemployment rates and housing prices, because these factors can impact the ability of our borrowers to repay their loans. Economic trends that negatively affect housing prices and the job market could result in, among other things, a deterioration in the credit quality of our loan portfolios. As previously announced, we believe that the U.S. mortgage market is undergoing a dramatic shift, and we expect that national origination volumes may decline by as much as 40 percent in 2008 compared to 2007. In addition, during the course of 2007 deteriorating trends in housing prices and economic conditions in many parts of the United States have resulted in significant increases in loan delinquencies and losses in our mortgage portfolios, which we expect to continue into 2008. We cannot assure you that housing prices, mortgage availability and economic conditions will not experience significant further deterioration in the future with further adverse effects on our operating results, business and financial condition.

We make various assumptions and judgments about the collectibility of our loan portfolios. In determining the amount of the allowance for loan losses, we review our loans and our loss and delinquency experience, and we evaluate present and foreseeable economic conditions and trends. If our assumptions are incorrect, our allowance for loan losses may be insufficient to cover probable incurred losses in our loan portfolios, resulting in additions to our allowance which would reduce our earnings in the period in which the additional provisions are taken. In addition, the OTS periodically reviews our allowance for loan losses and may require us to increase our provision for loan losses or recognize further loan charge-offs. As explained under "Summary — Recent Developments" in this prospectus supplement, we currently expect to increase the amount of our provision for loan losses in the fourth quarter of 2007 and in 2008. These amounts are based on, among other factors, our assumptions and forecasts for delinquency and default rates on our loan portfolios, and the amount of loans charged off, in those periods. These assumptions and forecasts may prove to be incorrect. If the actual delinquency and default rates and the actual amount of loans charged off in future periods prove to be higher than our current assumptions and forecasts, we may have to increase further our provision for loan losses. Any increase in our provision for loan losses, our allowance for loan losses or loan charge-offs could have a material adverse effect on our results of operations and financial condition.

We offer credit cards to our customers and retain certain credit card balances in our portfolio and securitize and sell other credit card balances. Credit cards typically have smaller balances, shorter lifecycles and experience higher delinquency and charge-off rates than real estate secured loans. Account management efforts, seasoning and economic conditions, including unemployment rates and housing prices, affect the overall credit quality of our credit card portfolio.

Until recently, we originated and purchased from third-party lenders loans to higher risk borrowers through our subprime mortgage channel. Borrowers in the subprime mortgage channel tend to have greater vulnerability to changes in economic and housing market factors, such as increases in unemployment, a slowdown in housing price appreciation or declines in housing prices, than do other borrowers. The performance of this loan portfolio in recent quarters has been, and in the future will likely continue to be, negatively impacted by a variety of factors, including changes in the economic factors noted above, which negatively impact borrowers.

***Certain of our loan products have features that may result in increased credit risk.***

We have significant portfolios of home equity loans, which are secured by a first or second lien on the borrower's property. When we hold a second lien on a property which is subordinate to a first lien mortgage held by another lender, both the probability of default and severity of loss risk is generally higher than when we hold both the first and second lien positions. Home equity loans and lines of credit with combined loan-to-value ratios of greater than 80 percent also expose us to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of risk is higher when borrowers have less equity in their homes.

We originate Option ARM loans for sale and securitization and for our home loan portfolio. Borrowers with Option ARM loans have the option of making minimum payments based on the rate charged during the

S-13

Exhibit 28 of 30                                                                                                    Page 275

# **Exhibit 29**

Exhibit 29 of 30

Page 276

QuickLinks –– Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10–K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2007**

**Commission File Number 1–14667**

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91–1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1301 Second Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(206) 461–2000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock | New York Stock Exchange |
| Depositary Shares each representing a 1/40,000th interest in a share of Series K Perpetual Preferred Non–Cumulative Floating Rate Stock | New York Stock Exchange |
| 7.75% Series R Non–Cumulative Perpetual Convertible Preferred Stock | New York Stock Exchange |

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Litigation Tracking Warrants™ | NASDAQ |

Indicate by check mark if the registrant is a well–known seasoned issuer as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐.

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.   Yes ☐   No ☒.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K.   ☒.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non–accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b–2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non–accelerated filer ☐
(Do not check if a smaller reporting company)          Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Exchange Act).   Yes ☐   No ☒.

The aggregate market value of voting stock held by non–affiliates of the registrant as of June 30, 2007, based on the closing sale price as reported on the New York Stock Exchange:

**Common Stock – $36,953,361,076[1]**
[1] Does not include any value attributable to 6,000,000 shares held in escrow.

The number of shares outstanding of the issuer's classes of common stock as of January 31, 2008:

**Common Stock – 882,557,330[2]**
[2] Includes 6,000,000 shares held in escrow.

### Documents Incorporated by Reference

Portions of the definitive proxy statement for the Annual Meeting of Shareholders to be held April 15, 2008, are incorporated by reference into Part III.

Exhibit 29 of 30                                                            Page 277

**Critical Accounting Estimates**

The preparation of financial statements in accordance with the accounting principles generally accepted in the United States of America ("GAAP") requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the financial statements. Various elements of the Company's accounting policies, by their nature, involve the application of highly sensitive and judgmental estimates and assumptions. Some of these policies and estimates relate to matters that are highly complex and contain inherent uncertainties. It is possible that, in some instances, different estimates and assumptions could reasonably have been made and used by management, instead of those the Company applied, which might have produced different results that could have had a material effect on the financial statements.

The Company has identified four accounting estimates that, due to the judgments and assumptions inherent in those estimates, and the potential sensitivity of its financial statements to those judgments and assumptions, are critical to an understanding of its financial statements. These estimates are: the fair value of certain financial instruments and other assets; the allowance for loan losses and contingent credit risk liabilities; other–than–temporary impairment losses on available–for–sale securities; and the determination of whether a derivative qualifies for hedge accounting.

Management has discussed the development and selection of these critical accounting estimates with the Audit Committee of the Company's Board of Directors. The Company believes that the judgments, estimates and assumptions used in the preparation of its financial statements are appropriate given the facts and circumstances as of December 31, 2007. The nature of these judgments, estimates and assumptions are described in greater detail in subsequent sections of Management's Discussion and Analysis and in Note 1 to the Consolidated Financial Statements – "Summary of Significant Accounting Policies."

The discussion below presents information about the nature of the Company's critical accounting estimates:

### Fair Value of Certain Financial Instruments and Other Assets

A portion of the Company's assets are carried at fair value, including: mortgage servicing rights, trading assets including certain retained interests from securitization activities, available–for–sale securities and derivatives. In addition, loans held for sale are recorded at the lower of cost or fair value. Changes in fair value of those instruments that qualify as hedged items under fair value hedge accounting are recognized in earnings and offset the changes in fair value of derivatives used as hedge accounting instruments.

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models to estimate their fair value. These models incorporate inputs such as forward yield curves, loan prepayment assumptions, market volatilities and pricing spreads utilizing market–based inputs where readily available. The degree of management judgment involved in estimating the fair value of a financial instrument or other asset is dependent upon the availability of quoted market prices or observable market value inputs. For financial instruments that are actively traded in the marketplace or whose values are based on readily available market value data, little judgment is necessary when estimating the instrument's fair value. When observable market prices and data are not readily available, significant management judgment often is necessary to estimate fair value. In those cases, different assumptions could result in significant changes in valuation.

During the latter half of 2007, deteriorating credit conditions caused significant disruptions in the secondary mortgage market. Credit quality concerns prompted market participants to avoid purchasing

19

Exhibit 29 of 30                                                                                                    Page 278

within the noninterest income caption "Revenue from sales and servicing of home mortgage loans" for home loans. Valuation adjustments for consumer loans held for sale are recorded under the noninterest income caption "Revenue from sales and servicing of consumer loans." Valuation adjustments for multi–family and commercial real estate loans held for sale are recorded under the noninterest income caption "Other income."

*Fair Value of Reporting Units and Goodwill Impairment*

Under FASB Statement No. 142, *Goodwill and Other Intangible Assets*, goodwill must be allocated to reporting units and tested for impairment. The Company tests goodwill for impairment at least annually or more frequently if events or circumstances, such as adverse changes in the business, indicate that there may be justification for conducting an interim test. Impairment testing is performed at the reporting unit level (which is the same level as the Company's four major operating segments identified in Note 26 to the Consolidated Financial Statements – "Operating Segments"). The first part of the test is a comparison, at the reporting unit level, of the fair value of each reporting unit to its carrying value, including goodwill. If the fair value is less than the carrying value, then the second part of the test is needed to measure the amount of potential goodwill impairment. The implied fair value of the reporting unit goodwill is calculated and compared with the actual carrying value of goodwill recorded within the reporting unit. If the carrying value of reporting unit goodwill exceeds the implied fair value of that goodwill, then the Company would recognize an impairment loss for the amount of the difference, which would be recorded as a charge against net income.

The fair value of the reporting units are determined primarily using discounted cash flow models based on each reporting unit's internal forecasts. In addition, analysis using market–based trading and transaction multiples, where available, is used to assess the reasonableness of the valuations derived from the discounted cash flow models.

For additional information regarding the carrying values of goodwill by operating segment, see Note 9 to the Consolidated Financial Statements – "Goodwill and Other Intangible Assets."

**Allowance for Loan Losses and Contingent Credit Risk Liabilities**

*Allowance for Loan Losses*

The allowance for loan losses represents management's estimate of incurred credit losses inherent in the Company's loan portfolio as of the balance sheet date. Determining the appropriateness of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain. Subsequent evaluations of the loan portfolio, in light of the factors then prevailing, may result in significant changes in the allowance for loan losses in future periods.

The estimate of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect a borrower's ability to meet his financial obligations, the estimated value of underlying collateral, general economic conditions, and the impact that changes in interest rates and unemployment levels have on a borrower's ability to repay adjustable–rate loans.

The Company allocates a portion of the allowance to the homogeneous loan portfolios and estimates this allocated portion using statistical estimation techniques. Loss estimation techniques used in statistical models are supplemented by qualitative information to assist in estimating the allocated allowance. When housing prices are volatile, lags in data collection and reporting increase the likelihood of adjustments being made to the allowance.

21

Exhibit 29 of 30                                                                                           Page 279

The following table presents MSR valuation and the corresponding risk management derivative instruments and securities during the years ended December 31, 2007 and 2006:

| | Year Ended December 31, | |
| | 2007 | 2006 |
| | (in millions) | |
|---|---|---|
| **MSR Valuation and Risk Management:** | | |
| Change in MSR fair value due to valuation inputs or assumptions | $ (157) | $ 299 |
| **Gain (loss) on MSR risk management instruments:** | | |
| Revaluation gain (loss) from derivatives | 358 | (636) |
| Revaluation gain (loss) from certain trading securities | 4 | (55) |
| Loss from certain available–for–sale securities | – | (1) |
| Total gain (loss) on MSR risk management instruments | 362 | (692) |
| **Total changes in MSR valuation and risk management** | $ 205 | $ (393) |

The following tables reconcile the gains (losses) on investment securities that are designated as MSR risk management instruments to loss on trading assets and loss on other available–for–sale securities that are reported within noninterest income during the years ended December 31, 2007 and 2006:

| | Year Ended December 31, | |
| | 2007 | 2006 |
| | (in millions) | |
|---|---|---|
| **Gain (loss) on trading assets resulting from:** | | |
| MSR risk management instruments | $ 4 | $ (55) |
| Other | (677) | (99) |
| Total loss on trading assets | $ (673) | $ (154) |

| | Year Ended December 31, | |
| | 2007 | 2006 |
| | (in millions) | |
|---|---|---|
| **Loss on other available–for–sale securities resulting from:** | | |
| MSR risk management instruments | $ – | $ (1) |
| Other | (319) | (8) |
| Total loss on other available–for–sale securities | $ (319) | $ (9) |

Gain from home mortgage loans and originated mortgage–backed securities, net of hedging and risk management instruments was $59 million in 2007, compared with $735 million in the prior year. Secondary market conditions for subprime mortgage loans rapidly deteriorated during the first half of 2007 in response to the weakening housing market. As credit risk concerns from rising subprime mortgage borrower defaults increased, credit spreads widened to reflect secondary market demands for higher risk premiums on subprime mortgage loans, which lowered the value of the loans to be sold. Credit concerns spread across the secondary market in the second half of 2007 as mortgage delinquencies and loss severities across all single–family residential borrower classes accelerated. This led to a severe contraction in risk tolerances among secondary market participants and resulted in an illiquid market for nonconforming home loans. With the absence of liquidity for such loans, home loan sales volume totaled only $17.38 billion in the last half of 2007, a 69% decline from $56.58 billion for the same period in 2006. The Company transferred into its held for investment portfolio approximately

31

Exhibit 29 of 30                                                                                          Page 280

$15 billion of single–family residential loans in the third quarter of 2007, which were substantially comprised of nonconforming products that had initially been designated as held for sale prior to the rapid contraction in secondary market liquidity. A $139 million downward adjustment on the transferred loans was recorded based on the lower of cost or fair value, reflecting the wider secondary market credit spreads that accompanied the market disruption.

The fair value changes in home mortgage loans held for sale and the offsetting changes in the derivative instruments used as fair value hedges are recorded within gain from home mortgage loans when hedge accounting treatment is achieved. Home mortgage loans held for sale where hedge accounting treatment is not achieved are recorded at the lower of cost or fair value. This accounting method requires declines in the fair value of these loans, to the extent such value is below their cost basis, to be immediately recognized within gain from home mortgage loans, but any increases in the value of these loans that exceed their original cost basis may not be recorded until the loans are sold. However, all changes in the value of derivative instruments that are used to manage the interest rate risk of these loans must be recognized in earnings as those changes occur.

In March 2006, the FASB issued Statement No. 156, *Accounting for Servicing of Financial Assets*, which amends Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, permitting for the first time an entity to report classes of servicing assets at fair value at each reporting date and to record changes in fair value of such reported classes of servicing assets in earnings in the period in which the changes occur. The Company applied Statement No. 156 to its financial statements on January 1, 2006 and elected to measure its mortgage servicing assets at fair value. Upon electing the fair value method of accounting for its mortgage servicing assets, the Company discontinued the application of fair value hedge accounting. Accordingly, beginning in 2006, all derivatives held for MSR risk management are treated as economic hedges, with valuation changes recorded as revaluation gain (loss) from derivatives economically hedging MSR. Additionally, upon the change from the lower of cost or fair value accounting method to fair value accounting under Statement No. 156, the calculation of amortization and the assessment of impairment were discontinued and the MSR valuation allowance was written off against the recorded value of the MSR. Those measurements have been replaced by fair value adjustments that encompass market–driven valuation changes and the runoff in value that occurs as scheduled loan payments are made over time, which are each separately reported.

Home mortgage loan servicing revenue decreased by $134 million for the year ended December 31, 2007, compared with 2006. The decrease was largely the result of the sale of $2.53 billion of mortgage servicing rights in July 2006. The decline was more than offset by a decrease in the rate of MSR fair value changes from loan payments of $291 million between the same years, as actual payment rates on the servicing portfolio decreased in 2007 due to significantly lower levels of refinancing activity.

MSR valuation and risk management results were a gain of $205 million in 2007, compared with a loss of $393 million in 2006. Although mortgage interest rates at the end of 2007 were at similar levels to those that existed at the beginning of the year, more significant fluctuations occurred over the course of 2007, which led to a modest decrease in MSR value of $157 million for the year. The decrease in value occurred primarily during the second half of 2007, as mortgage rates generally declined during that period, resulting in higher expected prepayment speeds. However, the impact of lower interest rates on projected MSR prepayment speeds was mitigated by a smaller increase in expected prepayment rates, reflecting diminished opportunities for borrowers to refinance during a period when the housing market is weakening, underwriting standards across the mortgage banking industry have tightened and rates for nonconforming loan products are higher. The performance of the MSR risk management instruments was adversely affected by the flat–to–inverted slope of the yield curve in 2006, which had the effect of increasing hedging costs.

32

Exhibit 29 of 30                                          Page 281

The value of the MSR asset is subject to prepayment risk. Future expected net cash flows from servicing a loan in the servicing portfolio will not be realized if the loan pays off earlier than expected. Moreover, since most loans within the servicing portfolio do not impose prepayment fees for early payoff, a corresponding economic benefit will not be received if the loan pays off earlier than expected. The fair value of the MSR is estimated from the present value of the future net cash flows the Company expects to receive from the servicing portfolio. Accordingly, prepayment risk subjects the MSR to potential declines in fair value. During the second quarter of 2007, the Company adopted an option–adjusted spread ("OAS") valuation methodology for estimating the fair value of substantially all of its MSR asset. This methodology projects MSR cash flows over multiple interest rate scenarios, and discounts those cash flows using risk–adjusted discount rates to arrive at an estimate of the fair value of the MSR asset. As the Company's OAS model was calibrated to the prior model's valuation results, the conversion to the new methodology did not result in a fair value adjustment to the Company's MSR asset upon its implementation.

*All Other Noninterest Income Analysis*

Revenue from sales and servicing of consumer loans increased $112 million for the year ended December 31, 2007, compared with 2006. While revenue from sales increased between the two periods as a result of a 50% increase in credit card securitization volume, revenue from servicing declined in 2007, when compared with 2006. This decline in servicing revenue was a result of realization of higher than originally estimated interest and fees charged on securitized loans and lower than originally estimated credit losses.

Depositor and other retail banking fees increased $326 million for the year ended December 31, 2007, compared with 2006, predominantly due to higher transaction fees and an increase in the number of noninterest–bearing checking accounts. The number of noninterest–bearing checking accounts at December 31, 2007 totaled approximately 11.0 million compared with approximately 9.6 million at December 31, 2006.

Credit card fees increased $141 million for the year ended December 31, 2007, compared with 2006, reflecting growth in the average balance of the credit card portfolio.

Securities fees and commissions increased $45 million for the year ended December 31, 2007, compared with 2006, due to an increase in the volume of mutual fund and annuity sales.

Loss on trading assets increased $519 million for the year ended December 31, 2007, compared with 2006. Similar to the way in which capital market disruptions affected the Company's mortgage banking results, the severe downturn in the housing market and rising levels of credit card delinquencies contributed to less favorable economic assumptions used to measure the value of trading assets retained from mortgage loan and credit card securitizations.

The Company recognizes impairment losses on available–for–sale securities through the income statement when it has concluded that a decrease in the fair value of a security is other than temporary. During the second half of 2007, the Company recognized charges totaling $375 million related to mortgage–backed securities where it determined that a decline in fair value below amortized cost represented an other–than–temporary condition.

The decrease in other income of $295 million for the year ended December 31, 2007, compared with 2006, primarily resulted from losses related to equity method investments and revaluation losses on derivatives held for risk management purposes. In addition, included in 2006 was a $149 million litigation award from the partial settlement of the Company's claim against the U.S. Government with regard to the Home Savings supervisory goodwill lawsuit.

33

Exhibit 29 of 30     Page 282

(3)
      Represents loans to builders for the purpose of financing the acquisition, development and construction of single–family residences for sale and construction loans made directly to the intended occupant of a single–family residence.

(4)
      Includes multi–family construction balances of $967 million, $740 million, $632 million, $333 million and $325 million at December 31, 2007, 2006, 2005, 2004 and 2003.

(5)
      Includes other commercial real estate construction balances of $812 million, $414 million, $208 million, $277 million and $382 million at December 31, 2007, 2006, 2005, 2004 and 2003.

(6)
      Includes net unamortized deferred loan costs of $1.45 billion, $1.88 billion, $1.96 billion, $1.87 billion and $1.55 billion at December 31, 2007, 2006, 2005, 2004 and 2003.

Due to the illiquid market, residential mortgage loans designated as held for sale at December 31, 2007 were largely limited to conforming loans eligible for purchase by the housing government–sponsored enterprises. The December 31, 2006 balance of loans held for sale included approximately $17.5 billion of medium–term adjustable–rate home loans which were transferred during the fourth quarter of 2006 from loans held in portfolio to loans held for sale. These loans were subsequently sold during the first quarter of 2007. In addition, as a result of the severe contraction in secondary market liquidity, the Company transferred approximately $17 billion of real estate loans to its loan portfolio during the third quarter of 2007, which represented substantially all of the Company's nonconforming loans that had been designated as held for sale prior to the market disruption.

Total home loans held in portfolio consisted of the following:

| | December 31, | | |
|---|---|---|---|
| | 2007 | | 2006 |
| | (in millions) | | |
| Home loans: | | | |
| Short–term adjustable–rate loans(1): | | | |
|    Option ARMs(2) | $ 58,870 | $ | 63,557 |
|    Other ARMs | 9,551 | | 6,791 |
|      Total short–term adjustable–rate loans | 68,421 | | 70,348 |
| Medium–term adjustable–rate loans(3) | 36,507 | | 26,232 |
| Fixed–rate loans | 5,459 | | 2,899 |
|    Home loans held in portfolio(4) | 110,387 | | 99,479 |
| Subprime mortgage channel | 16,092 | | 18,725 |
|    Total home loans held in portfolio | $ 126,479 | $ | 118,204 |

(1)
      Short–term adjustable–rate loans reprice within one year.

(2)
      The total amount by which the unpaid principal balance of Option ARM loans exceeded their original principal amount was $1.73 billion and $888 million at December 31, 2007 and 2006.

(3)
      Medium–term adjustable–rate loans reprice after one year.

(4)
      Excludes home loans in the subprime mortgage channel.

The home loans held in portfolio balance at December 31, 2007 increased $8.28 billion from December 31, 2006. The increase was due primarily to the transfer of approximately $15 billion of nonconforming home loans previously designated as loans held for sale prior to the market disruption experienced during the third quarter of 2007. Partially offsetting this increase was a decrease in Option ARM loans, reflecting the slowdown in the housing market and an interest rate environment in which loan products with longer repricing frequencies are priced more favorably than short–term adjustable–rate loans.

The balance of home equity loans and lines of credit at December 31, 2007, excluding home equity loans and lines of credit in the subprime mortgage channel, increased 15% from December 31, 2006 primarily due to growth in lines of credit.

38

collection of fees associated with the credit card portfolio, such as performance fees (late, overlimit and returned check charges) and cash advance and balance transfer fees.

The Card Services Group acquires new customers primarily by leveraging the Company's retail banking distribution network and through direct mail solicitations, augmented by online and telemarketing activities and other marketing programs including affinity programs. In addition to credit cards, this segment markets a variety of other products to its customer base.

The Company evaluates the performance of the Card Services Group on a managed asset basis. Managed financial information is derived by adjusting the GAAP financial information to add back securitized loan balances and the related interest, fee income and provision for credit losses.

The principal activities of the **Commercial Group** include: (1) providing financing to developers and investors, or acquiring loans for the purchase or refinancing of multi–family dwellings and other commercial properties; (2) either holding multi–family and other commercial real estate loans in portfolio or selling these loans while retaining the servicing rights; and (3) providing deposit services to commercial customers.

The principal activities of the **Home Loans Group** include: (1) the origination, fulfillment and servicing of home loans; (2) the origination, fulfillment and servicing of home equity loans and lines of credit; (3) managing the Company's capital markets operations, which includes the buying and selling of all types of real estate secured loans in the secondary market; and (4) holding the Company's held for investment portfolios of home loans, home equity loans and home equity lines of credit made to higher risk borrowers through the subprime mortgage channel.

During the fourth quarter of 2007, the Company announced that, in response to a fundamental shift in the home mortgage market due to credit dislocation and a prolonged period of reduced capital markets liquidity, it significantly changed the strategic focus of its Home Loans business to accelerate its alignment with the Company's retail banking operations. As part of these restructuring activities, the Company discontinued all remaining lending through its subprime mortgage channel, closed approximately 200 home loan locations, including 190 home loan centers and sales offices and nine home loans processing and call centers, eliminated approximately 2,600 positions in the Home Loans business, initiated the closure of WaMu Capital Corp., its institutional broker–dealer business, and began winding–down its mortgage banker finance warehouse lending operation.

The segment offers a wide variety of real estate secured residential loan products and services. Such loans are held in portfolio by the Home Loans Group, sold to secondary market participants or transferred through inter–segment sales to the Retail Banking Group. During the second half of 2007, loans that historically had been transferred to the held for investment portfolio within the Retail Banking Group were retained within the held for investment portfolio within the Home Loans Group. The decision to retain or sell loans, and the related decision to retain or not retain servicing when loans are sold, involves the analysis and comparison of expected interest income and the interest rate and credit risks inherent with holding loans in portfolio, with the expected servicing fees, the size of the gain or loss that would be realized if the loans were sold and the expected expense of managing the risk related to any retained mortgage servicing rights.

The principal activities of, and charges reported in, the **Corporate Support/Treasury and Other** category include:

- management of the Company's interest rate risk, liquidity position and capital. These responsibilities involve managing a majority of the Company's portfolio of investment securities and providing oversight and direction across the enterprise over matters that impact the profile of the Company's balance sheet. Such matters include determining the optimal product composition of loans that the Company holds in portfolio, the appropriate mix of wholesale and

41

Exhibit 29 of 30                                                                                                   Page 284

The unpaid principal balance ("UPB") of prime home equity loans and lines of credit held in portfolio at December 31, 2007, as shown in the immediately preceding table, included the following home equity loans and lines of credit in *junior lien* position:

| Combined Loan–to–Value Ratio at Origination [1] | Year of Origination | | | | | |
|---|---|---|---|---|---|---|
| | Pre–2005 | 2005 | 2006 | 2007 | Total UPB | % of Total |
| | (UPB in millions) | | | | | |
| Prime *junior lien* home equity loans and lines of credit: | | | | | | |
| ≤50% | $ 1,015 | $ 654 | $ 922 | $ 729 | $ 3,320 | 8% |
| >50–60% | 905 | 642 | 832 | 685 | 3,064 | 7 |
| >60–70% | 1,533 | 1,158 | 1,365 | 1,148 | 5,204 | 12 |
| >70–80% | 3,798 | 3,381 | 3,573 | 3,349 | 14,101 | 32 |
| >80–90% | 2,303 | 3,694 | 5,461 | 5,181 | 16,639 | 38 |
| >90% | 338 | 100 | 212 | 496 | 1,146 | 3 |
| Total prime *junior lien* home equity loans and lines of credit held in portfolio [2][3] | $ 9,892 | $ 9,629 | $ 12,365 | $ 11,588 | $ 43,474 | 100% |
| As a percentage of total UPB | 23% | 22% | 28% | 27% | 100% | |
| Average combined loan–to–value ratio at origination [1] | 73 | 76 | 77 | 78 | 76 | |
| Average estimated current combined loan–to–value ratio [1][4] | 54 | 68 | 75 | 78 | 69 | |

[1]   The combined loan–to–value ratio measures the ratio of the original loan amount of the first lien product (typically a first lien mortgage loan) and the original loan amount of the second lien product (typically a second lien home equity loan or line of credit) to the appraised value of the underlying collateral. Where the second lien product is a line of credit, the total commitment amount is used in calculating the combined loan–to–value ratio.

[2]   Excludes home equity loans in the subprime mortgage channel.

[3]   The Company has pool mortgage insurance that generally insulates it from the risk of default on certain prime home equity loans and lines of credit originated after March 2004 where the combined loan–to–value ratio at origination is greater than 90 percent. Contractual stop loss provisions limit the insurer's exposure to 10% of the outstanding loan balance for loans originated prior to December 31, 2006, and 8% for loans originated thereafter.

[4]   The average estimated current combined loan–to–value ratio reflects the UPB outstanding or commitment amount (in the case of lines of credit) at the balance sheet date, divided by the estimated current property value. Current property values are estimated using data from the September 30, 2007 OFHEO home price index.

*Option ARM Home Loans*

The Option ARM home loan product is an adjustable–rate mortgage loan that provides the borrower with the option each month to make a fully–amortizing, interest–only, or minimum payment. As described in greater detail below, the minimum payment is typically insufficient to cover interest accrued in the prior month and any unpaid interest is deferred and added to the principal balance of the loan. In the current housing market, the popularity of Option ARM loans has decreased and loan volumes have declined from $65.16 billion in 2005 to $42.59 billion in 2006 to $25.78 billion in 2007.

Loan Features

The minimum payment on an Option ARM loan is based on the interest rate charged during the introductory period. This introductory rate has usually been significantly below the fully–indexed rate. The fully–indexed rate is calculated using an index rate plus a margin. Once the introductory period ends, the contractual interest rate charged on the loan increases to the fully–indexed rate and adjusts monthly to reflect movements in the index.

55

Exhibit 29 of 30                                                                                                 Page 285

The table below provides geographic distribution of the Company's home loan Option ARM portfolio at December 31, 2007:

| | Portfolio | | Weighted Average Estimated Current Loan–to–Value Ratio |
|---|---|---|---|
| | (dollars in millions) | | |
| California | $ 28,956 | 49% | 66% |
| Florida | 7,605 | 13 | 66 |
| New York/New Jersey | 5,333 | 9 | 62 |
| Washington/Oregon | 2,186 | 3 | 62 |
| Illinois | 1,506 | 3 | 67 |
| Texas | 528 | 1 | 65 |
| Other | 12,756 | 22 | 69 |
| Total home loan Option ARMs held in portfolio | $ 58,870 | 100% | 66% |

*Subprime Mortgage Channel*

In the fourth quarter of 2007, the Company discontinued all lending in its subprime mortgage channel. This channel is comprised of loans originated under the Company's Long Beach Mortgage name or were purchased from lenders who were generally recognized as lending to subprime borrowers ("Subprime Lenders"). The Company did not originate or purchase loan products with negative amortization features through its subprime mortgage channel. The Company separately reports the performance of loans in its subprime mortgage channel as such loans generally experience higher delinquencies and net charge–offs than prime mortgage loans that possess comparable loan–to–value ratios and credit scores. To compensate for the increased credit risk of such loans, the Company generally charged such borrowers a higher rate of interest than borrowers in the prime channel. As of December 31, 2007, subprime mortgage channel loans held for investment totaled $18.62 billion, including $2.53 billion of home equity loans.

Subprime mortgage channel loans are managed by a dedicated collections department with collectors experienced in subprime mortgage loan collections. Servicing activities for these loans emphasize direct contact with customers at early stages of delinquency based on a customer's risk profile, and the Company uses automated telephone dialing and call distribution systems to increase the effectiveness of collection calls. Customized payment plans and work–out plans may be used to return delinquent loans to current status. When delinquent loans become 120 days contractually past due, the loan foreclosure process typically begins. Loans are restructured on a selective basis, so as to minimize loss during the collections and foreclosure process.

58

Exhibit 29 of 30      Page 286

and higher levels of delinquencies in the subprime mortgage channel. The decrease in noninterest income was substantially due to a less favorable MSR hedging environment in 2006 compared with 2005. Additionally, the gain from mortgage loans was lower due to the slowdown in the housing market and a decline in the secondary market performance of loans sold through the subprime mortgage channel. The decrease in noninterest expense was primarily due to a significant decline in employee headcount, as a result of the Company's efficiency initiatives.

### Corporate Support/Treasury and Other

The increase in net interest expense from 2005 to 2006 was due to increasing short–term interest rates which drove higher interest expense on FHLB borrowings, and a significant increase in the average balance of brokered certificates of deposit. The increase in noninterest income was primarily due to a litigation award of $149 million from the partial settlement of the Home Savings supervisory goodwill lawsuit, a gain of $74 million related to the transfer from held for investment to held for sale of $17.79 billion of medium–term adjustable–rate home loans and the associated derivatives executed to hedge that transaction and a $52 million increase in the cash surrender value of the Company's bank–owned life insurance. The increase in noninterest expense was predominantly due to charges of $315 million associated with the Company's productivity and efficiency initiatives and a charge of $67 million associated with the sale in 2006 of a significant portion of the Company's MSR. On December 31, 2006, the Company recognized a gain of $415 million, net of tax, upon completion of the sale of WM Advisors, Inc.

## Factors That May Affect Future Results

The Company's Form 10–K and other documents that it files with the Securities and Exchange Commission contain forward–looking statements. In addition, the Company's senior management may make forward–looking statements orally to analysts, investors, the media and others. Forward–looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs such as "will," "would," "should," "could" or "may."

Forward–looking statements provide management's current expectations or predictions of future conditions, events or results. They may include projections of the Company's revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items, descriptions of management's plans or objectives for future operations, products or services, or descriptions of assumptions underlying or relating to the foregoing. They are not guarantees of future performance. By their nature, forward–looking statements are subject to risks and uncertainties. These statements speak only as of the date made and management does not undertake to update them to reflect changes or events that occur after that date except as required by federal securities laws.

There are a number of significant factors which could cause actual conditions, events or results to differ materially from those described in the forward–looking statements, many of which are beyond management's control or its ability to accurately forecast or predict. Factors that might cause our future performance to vary from that described in our forward–looking statements include market, credit, operational, regulatory, strategic, liquidity, capital and economic factors as discussed in "Management's Discussion and Analysis" and in other periodic reports filed with the SEC. In addition, other factors besides those listed below or discussed in reports filed with the SEC could adversely affect our results

Exhibit 29 of 30                                                                                                    Page 287

and this list is not a complete set of all potential risks or uncertainties. Significant among the factors are the following:

*Economic conditions that negatively affect housing prices and the job market have resulted, and may continue to result, in a deterioration in credit quality of the Company's loan portfolios, and such deterioration in credit quality has had, and could continue to have, a negative impact on the Company's business.*

Washington Mutual is one of the nation's largest lenders, and deterioration in the credit quality of the Company's loan portfolios can have a negative impact on earnings resulting from increased provisioning for loan losses and from increased nonaccrual loans, which could cause a decrease in interest–earning assets. Credit risk incorporates the risk of loss due to adverse changes in a borrower's ability to meet its financial obligations on agreed upon terms. The overall credit quality of the Company's loan portfolios is particularly impacted by the strength of the U.S. economy and local economies in which the Company conducts its lending operations as well as trends in residential housing prices. The Company continually monitors changes in the economy, particularly unemployment rates and housing prices, because these factors can impact the ability of the Company's borrowers to repay their loans.

During 2007, the housing market in the United States (particularly in California and Florida, where properties securing approximately 48% and 10% of the Company's outstanding single–family residential mortgage loans are located) began to experience significant adverse trends, including accelerating price depreciation in some markets and rising delinquency and default rates. These conditions led to significant increases in loan delinquencies and credit losses in the Company's mortgage portfolios and higher provisioning for loan losses which has adversely affected the Company's earnings. The Company expects that housing prices will experience significant further deterioration in 2008 with further adverse effects on its operating results, business and financial condition. Furthermore, the Company expects that the onset of a recession either in the United States as a whole or in specific regions of the country, or the occurrence of a major natural or other disaster in the United States, would significantly increase the level of delinquencies and credit losses. Increases in credit costs would reduce the Company's earnings and adversely affect its capital position and financial condition.

The Company makes various assumptions and judgments about the collectibility of its loan portfolios when estimating the allowance for loan losses, which represents management's estimate of incurred credit losses inherent in the loan portfolio as of the balance sheet date. The estimate of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of borrowers, adverse situations that have occurred that may affect a borrower's ability to meet his financial obligations, the estimated value of underlying collateral, general economic conditions, and the impact that changes in interest rates and employment conditions have on a borrower's ability to repay adjustable–rate loans. Determining the appropriateness of the allowance is complex and requires judgment by management about the effect of matters that are inherently uncertain. The Company collects information on the performance of loans in its portfolios and routinely uses this information to recalibrate the formulaic models used in estimating the allowance for loan losses. Subsequent evaluations of the loan portfolio may reveal that estimated levels of loss severity used in estimating the allowance for loan losses differed significantly from actual experience, and in such circumstances the Company may have to record an increased provision for loan losses in subsequent periods thereby reducing earnings in those periods.

Until recently, the Company originated and purchased from third–party lenders loans to higher risk borrowers through its subprime mortgage channel. Borrowers in the subprime mortgage channel tend to have greater vulnerability to changes in economic and housing market factors, such as increases in unemployment, a slowdown in housing price appreciation or declines in housing prices, than do other borrowers. Additionally, the tightening of underwriting standards throughout the mortgage industry have significantly reduced the eligibility of borrowers to obtain credit, or to find credit on affordable terms. The performance of this loan portfolio in recent quarters has been, and in the future will likely

85

Exhibit 29 of 30                                                                                                                    Page 288

continue to be, negatively impacted by a variety of factors, including changes in the economic factors noted above, which negatively impact borrowers.

*The Company's access to market–based liquidity sources may be negatively impacted if market conditions persist or if further ratings downgrades occur. Funding costs may increase from current levels, and gain on sale may be reduced, leading to reduced earnings.*

While the Company actively manages its liquidity risk and maintains liquidity at least sufficient to cover all maturing debt obligations or other forecasted funding requirements over the next twelve months (see "Liquidity Risk and Capital Management"), the Company's liquidity may be affected by an inability to access the capital markets or by unforeseen demands on cash. This situation may arise due to circumstances beyond the Company's control, and is subject to the Company's and its subsidiaries' credit ratings as assigned by various nationally recognized statistical rating organizations ("NRSROs"). During 2007, disruptions in the capital markets substantially limited the ability of mortgage originators, including Washington Mutual, to sell mortgage loans to the capital markets through whole loan sales or securitization. As a result, the Company experienced a general loss of liquidity in most secondary markets for both its loan and asset–backed securities holdings, and this condition has persisted to the present time. The Company cannot forecast if or when either specific secondary markets or broader market liquidity conditions will see improvement from current stresses, although it is the Company's expectation that the existing turmoil in secondary loan and asset–backed securities markets may continue to affect its performance, described below, throughout 2008.

As a result of these conditions, secondary loan sales are currently limited primarily to sales of conforming loans to government–sponsored enterprises ("GSEs"), and the Company cannot predict when secondary markets for nonconforming loans, credit card receivables, and other loan assets will reopen. As such, the Company has in recent periods retained for its own account substantially all of the loans and receivables the Company has originated or purchased, other than conforming mortgage loans. The Company will generally be unable to recognize gains on sale, and may be required to establish reserves for loans that remain on its balance sheet, which may reduce earnings. In addition, the Company has taken steps to reduce or eliminate its origination of assets for which limited secondary market liquidity exists.

While the Company remains comfortable with its ability to fund mortgage loans (see "Liquidity Risk and Capital Management"), the Company's ability to sell conforming loans is dependent on its relationships with the GSEs. The Company presently sells a substantial portion of its conforming residential originations to the GSEs, primarily Freddie Mac. The ability of the GSEs to continue to purchase loans at current volume levels is dependent in part on their own capital positions and the levels of defaults in the portfolios underlying the mortgage–backed securities issued by the GSEs. The Company's liquidity and earnings could be adversely affected if the GSEs were unwilling to purchase the Company's residential loan products.

The Company has generally securitized a large portion of its credit card portfolio, which provided additional liquidity for the Company. Due to disruptions in the secondary market for credit card receivables, the Company is presently not able to securitize credit card receivables on terms it considers acceptable. As a result, the Company's liquidity will be adversely affected until the credit card securitization market normalizes. Additionally, the Company will be required to provide additional loss reserves for the credit card receivables that it retains in its portfolio, which will adversely affect earnings.

Current market conditions have also limited the Company's liquidity sources to secured funding outlets such as the Federal Home Loan Banks and repurchase agreements, and to FDIC–insured deposits originated through either brokers or through its branch network. Other sources of funding, such as medium–term notes, uninsured institutional deposits, and certain escrow balances have largely been closed to the Company. Many of these sources are ratings–sensitive, and due to recent negative

86

Exhibit 29 of 30                                                                 Page 289

ratings actions, the Company does not expect these sources to return as reliable sources of funding even if general market liquidity conditions improve until the Company's ratings improve. For example, institutional depositors generally require issuers to have the highest short–term ratings from at least one of the major rating agencies; however, as a result of recent actions, the Company and its banking subsidiaries are now generally in the second–highest short–term rating category.

The Company's rating profile remains "investment grade" as defined by NRSROs. No assurance can be given, however, that the Company will be able to retain an "investment grade" rating. The loss of investment grade ratings would likely result in further reductions in the sources of liquidity available to the Company; may result in increased collateral or margining requirements under derivative and repurchase agreements with counterparties, which could increase the Company's funding costs and further reduce its earnings and liquidity; and could adversely affect the Company's ability to conduct its normal business operations, in ways that could be material.

The Company's liquidity could also be adversely affected by unanticipated demands on its cash, such as having to repurchase securitized loans if it were found to have violated representations and warranties contained in the securitization agreements. In such event, the Company generally would be required to repurchase these loans or indemnify the investor for losses sustained. Since in most instances the repurchased loans would be in default, it is unlikely that the Company would be able to resell these loans in the secondary market. If the Company were required to repurchase a substantial amount of these loans, its liquidity and capital would be adversely affected as the amount of nonperforming assets on its balance sheet would increase.

*If the Company has significant additional losses, it may need to raise additional capital, which could have a dilutive effect on existing shareholders, and it may affect its ability to pay dividends on its common and preferred stock.*

The Company's primary subsidiary, Washington Mutual Bank, must maintain certain minimum capital ratios in order to remain a "well–capitalized" institution for regulatory purposes. While the Company believes it has sufficient capital for its operations (see "Liquidity Risk and Capital Management"), if the Bank is unable to meet its minimum capital ratios, the Company or the Bank would be forced to raise additional capital. No assurance can be given that sufficient additional capital would be available nor as to the terms on which capital would be available. If sufficient capital were not available, the Company would consider a variety of alternatives, including the sale of assets. Under such forced sale conditions, the Company may not be able to realize fair value for the assets sold. Other alternatives would include changing the Company's business practices or entering into equity transactions. Even if capital is available, the terms and pricing of such securities could be dilutive to existing shareholders and cause the price of the Company's outstanding securities to decline.

The Company depends on dividends, distributions and other payments from its banking and nonbanking subsidiaries to fund dividend payments on common and preferred stock and to fund all payments on its other obligations, including debt obligations. If the earnings of the Company's subsidiaries are not sufficient to make dividend payments to the Company while maintaining adequate capital levels, the Company may not be able to make dividend payments to its common or preferred shareholders.

*Changes in interest rates may adversely affect the Company's business, including net interest income and earnings.*

Like other financial institutions, Washington Mutual and its banking subsidiaries raise funds for the Company's business by, among other things, borrowing money in the capital markets and from the Federal Home Loan Bank system and accepting deposits from depositors, which the Company uses to make loans to customers and invest in debt securities and other interest–earning assets. The Company earns interest on these loans and assets and pays interest on the money it borrows and on the deposits it accepts from depositors. Changes in interest rates, including changes in the relationship between

87

Exhibit 29 of 30                                                                                                      Page 290

short–term rates and long–term rates, may have negative effects on the Company's net interest income and therefore its earnings. Changes in interest rates and responses by the Company's competitors to those changes may affect the rate of customer prepayments for mortgages and other term loans and may affect the balances customers carry on their credit cards. These changes can reduce the overall yield on the Company's assets. Changes in interest rates and responses by the Company's competitors to these changes may also affect customer decisions to maintain balances in the deposit accounts they have with the Company. These changes may require us to replace withdrawn balances with higher–cost alternative sources of funding.

In addition, changes in interest rates may affect the Company's mortgage banking business in complex and significant ways. For example, changes in interest rates can affect gain from mortgage loans and loan servicing fees, which are the principal components of revenue from sales and servicing of home mortgage loans. When mortgage rates decline, the fair value of the mortgage servicing rights ("MSR") asset generally declines and gain from mortgage loans tends to increase, to the extent the Company is able to sell or securitize mortgage loans in the secondary market. When mortgage rates rise, the Company generally expects loan volumes and payoffs in its servicing portfolio to decrease. As a result, the fair value of its MSR asset generally increases and gain from mortgage loans decreases. In recent periods, however, declines in general interest rates have resulted in slower increases in prepayment rates than in prior periods of declining interest rates, due in part to the reduced liquidity and tightened underwriting standards in the mortgage market making refinancing by borrowers more difficult.

As part of the Company's overall risk management activities, the Company seeks to mitigate changes in the fair value of its MSR asset by purchasing and selling financial instruments, entering into interest rate contracts and forward commitments to purchase or sell mortgage–backed securities and adjusting the mix and amount of such financial instruments or contracts to take into account the effects of different interest rate environments. The MSR asset and the mix of financial instruments used to mitigate changes in its fair value are not perfectly correlated. This imperfect correlation creates the potential for excess MSR risk management gains or losses during any period. Management must exercise judgment in selecting the amount, type and mix of financial instruments and contracts to mitigate changes in the fair value of the Company's MSR. The Company cannot assure that the amount, type and mix of financial instruments and contracts it selects will fully offset significant changes in the fair value of the MSR, and the Company's actions could negatively impact its earnings. The Company's reliance on these risk management instruments may be impacted by periods of illiquidity in the secondary markets, which could negatively impact the performance of the MSR risk management instruments. For further discussion of how interest rate risk, basis risk, volatility risk and prepayment risk are managed, see "Market Risk Management."

*Certain of the Company's loan products have features that may result in increased credit risk.*

The Company has significant portfolios of home equity loans, which are secured by a first or second lien on the borrower's property. When the Company holds a second lien on a property which is subordinate to a first mortgage held by another lender, both the probability of default and severity of loss risk is generally higher than when the Company holds both the first and second lien positions. Home equity loans and lines of credit with combined loan–to–value ratios of greater than 80 percent also expose the Company to greater credit risk than home loans with loan–to–value ratios of 80 percent or less at origination. This greater credit risk arises because, in general, both default risk and the severity of loss risk are higher when borrowers have less equity in their homes.

The Company originates Option ARM loans under which borrowers have the option of making minimum payments based on an interest rate that is lower than the fully–indexed rate. Borrowers who continue to make minimum payments will generally experience negative amortization as unpaid interest is capitalized and added to the principal amount of the loan. The minimum payment resets to a fully–amortizing payment at the earlier of five years from origination or when the amount of negative

88

---

Exhibit 29 of 30                                                                                                          Page 291

amortization reaches specified levels. The risk that Option ARM borrowers will be unable to make increased loan payments as a result of the minimum payment on the loan adjusting upward to a fully– amortizing payment is a key risk associated with the Option ARM product.

The Company originates interest–only loans that it either securitizes or holds in its portfolio. Borrowers with interest–only loans are initially required to make payments that are sufficient to cover accrued interest. After a predetermined period (generally five years), the payments are reset to allow the loan to fully amortize over its remaining life. Borrowers with interest–only loans are particularly affected by declining housing prices because there is no amortization of principal on the loans. Such economic trends could cause the credit performance of interest–only loans to deteriorate more rapidly than other types of loans with a negative impact on the Company's results. For further discussion of credit risk, see "Credit Risk Management."

Consistent with mortgage industry underwriting practices, loans underwritten with limited documentation of income, net worth or credit history are widely represented within the Company's single–family residential loan products. In particular, such practices are frequently applied to the origination of Option ARM products. Accordingly, approximately 75% of the Company's Option ARM portfolio was originated using a limited documentation standard. As limited documentation loans have a higher risk of default than loans with full documentation, a continued downturn in economic conditions or a further decrease in housing prices could result in higher default rates in the Company's loan portfolio.

*The Company uses estimates in determining the fair value of certain of our assets, which estimates may prove to be imprecise and result in significant changes in valuation.*

A portion of the Company's assets are carried on the balance sheet at fair value, including: the Company's trading assets including certain retained interests from securitization activities, available–for–sale securities, derivatives and MSR. Generally, for assets that are reported at fair value, the Company uses quoted market prices or internal valuation models that utilize observable market data inputs to estimate their fair value. In certain cases, observable market prices and data may not be readily available or their availability may be diminished due to market conditions. The Company uses financial models to value certain of these assets. These models are complex and use asset specific collateral data and market inputs for interest rates. Although the Company has processes and procedures in place governing internal valuation models and their testing and calibration, the Company cannot assure that it can properly manage the complexity of its models and valuations to ensure, among other things, that the models are properly calibrated, the assumptions are reasonable, the mathematical relationships used in the model are predictive and remain so over time, and the data and structure of the assets and hedges being modeled are properly input. Such assumptions are complex as the Company must make judgments about the effect of matters that are inherently uncertain. Different assumptions could result in significant changes in valuation, which in turn could affect earnings or result in significant changes in the dollar amount of assets reported on the balance sheet.

*The Company is subject to risks related to credit card operations, and this may adversely affect its credit card portfolio and its ability to continue growing the credit card business.*

Credit card lending brings with it certain risks and uncertainties. These include the composition and risk profile of the Company's credit card portfolio and the Company's ability to continue growing the credit card business. Credit cards typically have smaller balances, shorter lifecycles and experience higher delinquency and charge–off rates than real estate secured loans. Delinquencies and credit losses in the consumer finance industry generally increase during economic downturns or recessions. Likewise, consumer demand may decline during an economic downturn or recession. Account management efforts, seasoning and economic conditions, including unemployment rates and housing prices, affect the overall credit quality of the Company's credit card portfolio. The success of the credit card business also depends, in part, on the success of the Company's product development, product rollout efforts

89

Exhibit 29 of 30    Page 292

and marketing initiatives, including the rollout of credit card products to the Company's existing retail and mortgage loan customers, and the Company's ability to continue to successfully target creditworthy customers.

Recent disputes involving the Visa and MasterCard networks, including their membership standards and pricing structures, could also result in changes that would be adverse to the credit card business. Changes in interest rates can also negatively affect the credit card business, including costs associated with funding the credit card portfolio, as described above under "Changes in interest rates may adversely affect the Company's business, including net interest income and earnings."

*The Company is subject to operational risk, which may result in incurring financial and reputational losses.*

The Company is exposed to many types of operational risk, including the risk of fraud by employees or outsiders, the risk of operational errors, including clerical or record–keeping errors or those resulting from faulty or disabled computer or telecommunications systems. Given the Company's high volume of transactions, certain errors may be repeated or compounded before they are discovered and successfully corrected. The Company's dependence upon automated systems to record and process transactions may further increase the risk that technical system flaws or employee tampering with or manipulation of those systems will result in losses that are difficult to detect.

The Company may be subject to disruptions of its systems, arising from events that are wholly or partially beyond the Company's control (including, for example, computer viruses or electrical or telecommunications outages), which may give rise to losses in service to customers and to financial loss or liability. The Company is further exposed to the risk that its external vendors may be unable to fulfill their contractual obligations (or will be subject to the same risk of fraud or operational errors by their respective employees as we are) and to the risk that the Company's (or the Company's vendors') business continuity and data security systems prove to be inadequate. The Company relies on offshoring of services to vendors in foreign countries for certain functions and this creates the risk of incurring losses arising from unfavorable political, economic and legal developments in those countries.

The Company also faces the risk that the design of its controls and procedures may prove to be inadequate or are circumvented, thereby causing delays in detection of errors or inaccuracies in data and information. Although the Company maintains a system of controls designed to keep operational risk at appropriate levels, it is possible that any lapses in the effective operations of controls and procedures could materially affect earnings or harm the Company's reputation. In an organization as large and complex as Washington Mutual, lapses or deficiencies in internal control over financial reporting could be material to the Company.

In addition, the Company is heavily dependent on the strength and capability of its technology systems which it uses both to interface with its customers and to manage internal financial and other systems. The Company's ability to run its business in compliance with applicable laws and regulations is dependent on these infrastructures.

The Company depends on the expertise of key personnel and faces competition for talent. The Company's success depends, in large part, on its ability to hire and retain key people. If the Company is unable to retain these people and to attract talented people, or if key people fail to perform properly, the Company's business may suffer. For further discussion of operational risks, see "Operational Risk Management."

*The Company's failure to comply with laws and regulations could have adverse effects on the Company's operations and profitability.*

The Company operates in a regulated industry and is subject to a wide array of laws and regulations that apply to almost every element of its business, including banking, mortgage, securities, consumer lending and deposit laws and regulations. Failure to comply with these laws and regulations

90

Exhibit 29 of 30                                                                                   Page 293

could result in financial and operational penalties, including fines, restrictions on otherwise permissible activities and receivership. In addition, establishing systems and processes to achieve compliance with these laws and regulations may increase its costs and/or limit its ability to pursue certain business opportunities.

Effective October 17, 2007, Washington Mutual Bank consented to the issuance by the Office of Thrift Supervision ("OTS") of a cease and desist order requiring Washington Mutual Bank to comply with the Bank Secrecy Act ("BSA") and related BSA regulations and regulations governing suspicious activity reporting. Although no fines or restrictions on Washington Mutual Bank's activities have been imposed by the OTS, failure by the Company to comply with the terms of this order or other applicable laws and regulations could have a material adverse effect on the Company's business, financial condition or operating results through the imposition of additional sanctions.

The volume of claims and amount of damages and penalties claimed in litigation and regulatory proceedings against financial institutions remain high. Substantial legal liability or significant regulatory action against the Company and its subsidiaries could adversely affect the Company's financial results or cause reputational harm to the Company, which in turn could seriously harm its business prospects. For further discussion of pending legal actions that may affect the Company, see "Legal Proceedings."

*Changes in the regulation of financial services companies, housing government–sponsored enterprises and credit card lenders could adversely affect the Company.*

The banking and financial services industries, in general, are heavily regulated. Proposals for legislation further regulating the banking and financial services industry are continually being introduced in the United States Congress and in state legislatures. The agencies regulating the financial services industry also periodically adopt changes to their regulations.

Proposals that are now receiving a great deal of attention and could significantly impact the Company's business include changes to consumer protection initiatives relating to bank overdraft practices, security of customer information, marketing practices, nontraditional mortgage loan products including Option ARM loans and interest–only products, credit card lending practices, fees charged to merchants for credit and debit card transactions and mortgage lending and servicing practices. For instance, the Federal Reserve Board has proposed amendments to Regulation Z, which implements the Truth in Lending Act and the Home Ownership Equity Protection Act, to require new disclosures and restrict certain lending practices with regard to mortgage lending. The Federal Reserve Board has also proposed amendments to Regulation Z that would require changes to the format, timing, and content of credit card disclosures. Legislation calling for increased regulation of mortgage and credit card lending is also receiving serious consideration in Congress and in the state legislatures. In 2007, the U.S. House of Representatives passed legislation that would impose new responsibilities on mortgage lenders and restrict certain mortgage lending and servicing practices.

Policymakers are also considering a number of initiatives to assist borrowers who are having difficulty repaying their home loans. On December 5, 2007, President Bush proposed a plan for a five year moratorium on interest rate resets for certain subprime mortgages held by qualifying borrowers. Other public officials and private groups have proposed similar plans. The U.S. House of Representatives Judiciary Committee has reported out legislation that would allow judges to modify the terms of certain mortgages in Chapter 13 bankruptcies. On February 13, 2008, President Bush signed the Economic Stimulus Act of 2008 into law. Among other things, the legislation will raise the Federal Housing Administration ("FHA") loan limit to 125 percent of the area median house price (as determined by the Secretary of Housing and Urban Development) up to a maximum of $729,750 for loans approved by December 31, 2008, and will increase the Fannie Mae and Freddie Mac conforming loan limit to the same amount for loans originated between July 1, 2007 through December 31, 2008.

In addition, there continues to be a focus on reform of the regulatory oversight of the housing government–sponsored enterprises including the Federal Home Loan Bank system. The Company is

91

Exhibit 29 of 30                                                                                                                    Page 294

unable to predict whether any of these proposals will be implemented or in what form and what effect any such proposal could have on its business or operating results.

It is possible that one or more legislative proposals may be adopted or regulatory changes may be made that would have an adverse effect on the Company's business. For further discussion of the regulation of financial services, see "Regulation and Supervision" and Note 20 to the Consolidated Financial Statements – "Regulatory Capital Requirements and Dividend Restrictions."

*The Company's business and earnings are highly sensitive to general business, economic and market conditions, and continued deterioration in these conditions may adversely affect its business and earnings.*

The Company's business and earnings are highly sensitive to general business and economic conditions. These conditions include the strength of the U.S. economy and the local economies in which the Company conducts business, in particular the strength of national and local job markets, the level of interest rates, the slope of the yield curve, the level of inflation, the value of the U.S. dollar as compared to foreign currencies and fluctuations in the level or the volatility in debt, equity and housing markets. Changes in these conditions may adversely affect the Company's business and earnings. For example, when short–term interest rates rise, there is a lag period until adjustable–rate mortgages reprice. As a result, the Company may experience compression of its net interest margin with a commensurate adverse effect on earnings. Likewise, the Company's earnings could also be adversely affected when a flat or inverted yield curve develops, as this may inhibit its ability to grow its adjustable–rate mortgage portfolio and may also cause margin compression. A prolonged economic downturn could increase the number of customers who become delinquent or default on their loans. A rising interest rate environment could increase the negative amortization of Option ARM loans, which may eventually result in increased delinquencies and defaults. Rising interest rates could also decrease customer demand for loans.

The Company's business and earnings are significantly affected by the fiscal and monetary policies of the federal government and its agencies. The Company is particularly affected by the policies of the Federal Reserve Board, which regulates the supply of money and credit in the United States. Federal Reserve policies directly and indirectly influence the yield on the Company's interest–earning assets and the cost of its interest–bearing liabilities. Changes in those policies are beyond the Company's control and are difficult to predict.

*The Company may face damage to its professional reputation and business as a result of allegations and negative public opinion as well as pending and threatened litigation.*

Reputational risk, meaning the risk to earnings and capital from negative public opinion, is inherent in Washington Mutual's business. Negative public opinion can result from the actual or perceived manner in which the Company conducts its business activities, which include its sales and trading practices, its loan origination and servicing activities, its retail banking and credit card operations, its management of actual or potential conflicts of interest and ethical issues and its protection of confidential customer information. Negative public opinion can adversely affect the Company's ability to keep and attract customers. The Company cannot assure that it will be successful in avoiding damage to its business from reputational risk.

*The Company is subject to significant competition from banking and nonbanking companies.*

The Company operates in a highly competitive environment and expects competition to continue as financial services companies combine to produce larger companies that are able to offer a wide array of financial products and services at competitive prices with attractive terms. In addition, customer convenience and service capabilities, such as product lines offered and the accessibility of services, are significant competitive factors.

92

Exhibit 29 of 30                                                                                                                    Page 295

The Company's most direct competition for loans comes from commercial banks, other savings institutions, investment banking firms, national mortgage companies and other credit card lenders. The Company's most direct competition for deposits comes from commercial banks, other savings institutions and credit unions doing business in the Company's markets. As with all banking organizations, the Company also experiences competition from nonbanking sources, including mutual funds, corporate and government debt securities and other investment alternatives offered within and outside of the Company's primary markets. In addition, technological advances and the growth of e–commerce have made it possible for non–depository institutions to offer products and services that were traditionally offered only by banks. Many of these competitors have fewer regulatory constraints and some have lower cost structures.

In addition, the Company competes on the basis of transaction execution, innovation and technology. The Company's industry is subject to rapid and significant technological changes. In order to compete in the Company's industry, Washington Mutual must continue to invest in technologies across all of its businesses, including transaction processing, data management, customer interactions and communications and risk management and compliance systems. The Company expects that new technologies will continue to emerge, and these new services and technologies could be superior to or render the Company's technologies obsolete. The Company's future success will depend in part on its ability to continue to develop and adapt to technological changes and evolving industry standards. If the Company is not able to invest successfully in and compete at the leading edge of technological advances across all of its businesses, its revenues and profitability could suffer.

*Each of the factors discussed in the preceding paragraphs can significantly impact the Company's businesses, operations, activities, condition and results in significant ways that are not described in the foregoing discussion and which are beyond the Company's ability to anticipate or control, and could cause actual results to differ materially from the outcomes described in the forward–looking statements.*

**Financial Statements and Supplementary Data**

For financial statements, see Index to Consolidated Financial Statements on page 97.

**Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Other Information**

None.

93

Exhibit 29 of 30                                                                                    Page 296

WASHINGTON MUTUAL, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Investment Companies.* In February 2008, the FASB issued FSP SOP 07–1–1 which delays indefinitely the effective date of SOP 07–1. The delay is intended to allow the FASB staff time to consider a number of significant issues relating to the implementation of SOP 07–1. As a result, the FASB also determined that early adoption of SOP 07–1 would be prohibited.

On December 21, 2007, the SEC Staff Accounting Bulletin No. 110 ("SAB 110") was issued to permit entities, under certain circumstances, the continued use of the "simplified" method, in developing estimates of the expected term of "plain–vanilla" share options in accordance with Statement No. 123R, *Share–Based Payment*. SAB 110 amended SAB 107 to permit the use of the "simplified" method beyond December 31, 2007. We do not expect the application of SAB 110 to have a material effect on our Consolidated Financial Statements.

In February 2008, the FASB issued FSP FAS 140–3, *Accounting for Transfers of Financial Assets and Repurchase Financing Transactions*. The objective of this FSP is to provide implementation guidance on accounting for a transfer of a financial asset and repurchase financing. The FSP presumes that an initial transfer of a financial asset and a repurchase financing are considered part of the same arrangement (linked transaction) under Statement 140. However, if certain criteria are met, the initial transfer and repurchase financing shall not be evaluated as a linked transaction and shall be evaluated separately under Statement 140. FSP FAS 140–3 is effective for fiscal years beginning after November 15, 2008. The Company is currently evaluating the effect FSP FAS 140–3 will have on the Consolidated Financial Statements.

### Note 2:   Restructuring Activities

During the fourth quarter of 2007, the Company announced that, in response to a fundamental shift in the home mortgage market due to credit dislocation and a prolonged period of reduced capital markets liquidity, it significantly changed the strategic focus of its Home Loans business to accelerate its alignment with the Company's retail banking operations. As part of these restructuring activities, the Company discontinued all remaining lending through its subprime mortgage channel, closed approximately 200 home loan locations, including 190 home loan centers and sales offices and nine home loans processing and call centers, eliminated approximately 2,600 positions in the Home Loans business and approximately 150 positions in related corporate support functions, initiated the closure of WaMu Capital Corp., its institutional broker–dealer business, and began winding–down its mortgage banker finance warehouse lending operation.

In connection with these activities, the Company incurred restructuring charges during the fourth quarter of 2007 of $98 million, which consisted of $33 million in termination benefits, $35 million in lease terminations and other decommissioning costs, and $30 million in fixed asset write–downs. Charges for termination benefits were recorded in compensation and benefits and charges for lease terminations, other decommissioning costs and fixed asset write–downs were recorded in occupancy and equipment in the Consolidated Statements of Income. All of these charges were recorded to Corporate Support/Treasury and Other. The Company does not anticipate incurring any additional charges related to these restructuring activities subsequent to December 31, 2007.

As of December 31, 2007, there had been no cash paid related to termination benefits and lease terminations and other decommissioning costs. At December 31, 2007, the outstanding liability of the Home Loans restructuring charges was $68 million. The outstanding liability related to termination benefits and decommissioning costs is expected to be paid during the first quarter of 2008. The liability related to lease terminations is expected to be paid over the remaining terms of the leases, substantially all of which will be completed by December 31, 2011.

123

Exhibit 29 of 30                                                                                                    Page 297

QuickLinks  —– Click here to rapidly navigate through this document

EXHIBIT 31.1

**CERTIFICATION**

I, Kerry K. Killinger, certify that:

1.
I have reviewed this annual report on Form 10–K of Washington Mutual, Inc.;

2.
Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.
Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.
The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

    (a)
    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)
    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)
    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)
    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.
The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)
    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)
    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2008                                        /s/  KERRY K. KILLINGER

                                                              Kerry K. Killinger
                                                              *Chairman and Chief Executive Officer*
                                                              *of Washington Mutual, Inc.*

Exhibit 29 of 30                                                              Page 298

QuickLinks  –– Click here to rapidly navigate through this document

**EXHIBIT 31.2**

**CERTIFICATION**

I, Thomas W. Casey, certify that:

1.

I have reviewed this annual report on Form 10–K of Washington Mutual, Inc.;

2.

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)

Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)

Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)

Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)

Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)

All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)

Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 29, 2008                              /s/  THOMAS W. CASEY

                                                     Thomas W. Casey
                                                     *Executive Vice President and Chief Financial Officer*
                                                     *of Washington Mutual, Inc.*

Exhibit 29 of 30                                                      Page 299

QuickLinks  –– Click here to rapidly navigate through this document

EXHIBIT 32.1

**WASHINGTON MUTUAL, INC.**
**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Kerry K. Killinger, the Chief Executive Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

Date: February 29, 2008                              By:     /s/  KERRY K. KILLINGER

                                                             Kerry K. Killinger
                                                             *Chairman and Chief Executive Officer*
                                                             *of Washington Mutual, Inc.*

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 29 of 30                                                                                                    Page 300

QuickLinks  -– Click here to rapidly navigate through this document

EXHIBIT 32.2

**WASHINGTON MUTUAL, INC.**
**CERTIFICATION OF THE CHIEF FINANCIAL OFFICER**

Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, Thomas W. Casey, the Chief Financial Officer of Washington Mutual, Inc., does hereby certify that this report on Form 10–K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of Washington Mutual, Inc.

| | | |
|---|---|---|
| Date: February 29, 2008 | By: | /s/  THOMAS W. CASEY |
| | | Thomas W. Casey |
| | | *Executive Vice President and Chief Financial Officer* |
| | | *of Washington Mutual, Inc.* |

A signed original of this written statement required by Section 906 has been provided to Washington Mutual, Inc. and will be retained by Washington Mutual, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Exhibit 29 of 30                                                                                                                   Page 301

**Exhibit 30**

Exhibit 30 of 30    Page 302

1  BERNSTEIN LITOWITZ BERGER
       & GROSSMANN LLP
2  BLAIR A. NICHOLAS   (Bar No. 178428)
   (blairn@blbglaw.com)
3  TAKEO A. KELLAR   (Bar No. 234470)
   (takeok@blbglaw.com)
4  12481 High Bluff Drive, Suite 300
   San Diego, CA 92130
5  Tel:   (858) 793-0070
   Fax:   (858) 793-0323
6            -and-
   SALVATORE J. GRAZIANO
7  (sgraziano@blbglaw.com)
   HANNAH E. GREENWALD
8  (hannah@blbglaw.com)
   1285 Avenue of the Americas
9  New York, NY 10019
   Tel:   (212) 554-1400
10 Fax:   (212) 554-1444

11 Lead Counsel for Lead Plaintiff New
   York State Teachers' Retirement System
12

13            UNITED STATES DISTRICT COURT

14            CENTRAL DISTRICT OF CALIFORNIA

15

16 IN RE NEW CENTURY                  Case No.  2:07-cv-00931-DDP
                                      (JTLx)
17                                    (Lead Case)

18
                                      SECOND AMENDED
19                                    CONSOLIDATED CLASS
                                      ACTION COMPLAINT
20
21                                    JURY TRIAL DEMANDED

22

23                                    Judge:  Hon. Dean D. Pregerson

24                                      By Fax

25

26

27

28

─────────────────────────────────────────────
SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:07-cv-00931-DDP (JTLx)

Exhibit 30 of 30                                    Page 303

135.   Likewise, New Century denied second lien applicants much less often than did its peer subprime lending companies.  As Graph 6 below reflects, in both 2005 and 2006, New Century rejected such applicants 31% less often:



136.   Not surprisingly as a result of these practices, on December 6, 2007, The New York Times reported that New Century's mortgage loans resulted in some of the highest default rates in the industry:  "Loans made by New Century, which filed for bankruptcy protection in March, have some of the highest default rates in the industry – almost twice those of competitors like Wells Fargo and Ameriquest, according to data from Moody's Investor Services."   The undisclosed and increasingly "bad lending practices" at New Century in 2005 and 2006 are further revealed by numerous former employees with first-hand knowledge.

137. According to a former New Century Vice President, Corporate Finance employed by the Company from 2002 until April 2007 (CW 3), New Century began originating loans with "risky increased LTVs [loan to values],"

"80/20" or "piggy back" loans which required no borrower down payment, increased stated income loans and began to lower credit standards starting in 2003. In addition, according to the former Vice President, Corporate Finance, at that time, the Company also changed its practice with respect to stated income loans. Although the Company had always had the program, it was originally used primarily with self-employed borrowers. According to the former Vice President, Corporate Finance, starting in 2004-05, the Company began allowing riskier stated income loans for W-2 wage earners, who should have been able to verify their stated income, but did not.

138. According to a former New Century fraud investigator and senior loan underwriter employed by the Company from January 1999 until April 2007 and who examined numerous New Century mortgage loans ("CW 5"), New Century's problems began when it "started to abandon prudent underwriting guidelines" at the end of 2003 in order to "push more loans through" the system. According to the former employee, New Century, in effect, "stopped underwriting" and adopted an approach that the Company would be "okay if [it] could out run [its] delinquency rate" which eventually caught up with the Company.

139. According to a former New Century regional operations manager in Scottsdale, Arizona employed by the Company from August 2003 until December 2006 ("CW 6"), starting in the second half of 2003, there was a concerted effort at the Company to make as many loans as they could. According to the former employee, problem loans included stated income loans, and problem loans increased because the Company was "willing to accept them."

140. According to a former New Century regional unit manager employed by the Company from 2002 until April 2007 and responsible for auditing and overseeing the work of New Century underwriters and account executives ("CW 7"), New Century "did loosen up guidelines" and began doing more 100% financing or 80/20 loans and more stated income loans. According to the former

## XVIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment as follows:

A.      Determining that this action is a proper class action and certifying Lead Plaintiff, the New York State Teachers' Retirement System, and Plaintiffs Carl Larson and Charles Hooten as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

C.      Awarding rescission and/or rescissory damages in favor of Plaintiffs and the members of the Class;

D.      Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiffs and the other members of the Class;

E.      Awarding Plaintiffs and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

F.      Granting such other and further relief as the Court may deem just and proper.

Dated:  April 30, 2008

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

_Blair A. Nichols_

BLAIR A. NICHOLAS

BLAIR A. NICHOLAS
TAKEO A. KELLAR
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:  (858) 793-0323
          -and-

1

2  SALVATORE J. GRAZIANO
   HANNAH E. GREENWALD
3  1285 Avenue of the Americas
   New York, NY 10019
4  Tel:  (212) 554-1400
   Fax:  (212) 554-1444
5

6  Lead Counsel for The New York State
   Teachers' Retirement System and the Class
7

8  MARVIN L. FRANK
   Murray, Frank & Sailer LLP
9  275 Madison Avenue
   New York, NY 10016
10 Tel:  (212) 682-1818
   Fax:  (212) 682-1892
11 Counsel for Plaintiff Carl Larson
12

13 JEFFREY C. ZWERLING
   RICHARD A. SPEIRS
14 Zwerling, Schachter & Zwerling, LLP
   41 Madison Avenue
15 New York, NY 10010
   Tel:  (212) 223-3900
16 Fax:  (212) 371-5969
17 Counsel for Plaintiff Charles Hooten
18

19

20

21

22

23

24

25

26

27

28