

The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE WASHINGTON MUTUAL, INC.
SECURITIES & ERISA LITIGATION

)
)
)
)
)

No.   2:08-md-1919 MJP

IN RE WASHINGTON MUTUAL, INC.
SECURITIES LITIGATION

This Document Relates to:  ALL CASES

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Lead Case No. C08-387 MJP

LSP-1

**LEAD PLAINTIFF'S OMNIBUS
OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS AND
FOR JUDICIAL NOTICE**

*Note on Motion Calendar*:
March 30, 2009

Oral Argument Requested

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT ............................................................................................................. 5

I.     GENERAL PRINCIPLES APPLICABLE ON A MOTION TO DISMISS ...................... 5

    A.     Standards On A Motion To Dismiss ............................................................ 5

    B.     The Court Should Strike Documents Submitted By Defendants That Are Improper For Judicial Notice ...................................................................... 6

II.    PLAINTIFFS HAVE ADEQUATELY ALLEGED VIOLATIONS OF THE SECURITIES ACT ................................................................................................ 9

    A.     The Complaint States Primary Claims Under The Securities Act ......................... 9

    B.     The Pleading Requirements For Claims Under Sections 11 And 12(a)(2) ........... 10

        1.     The Securities Act Claims Do Not Sound In Fraud ................................. 11

        2.     Plaintiffs' Non-Fraud Securities Act Claims Should Be Sustained Even If They Are Found To Sound In Fraud ........................................... 14

    C.     Plaintiffs Have Standing To Assert Securities Act Claims For Each Offering .... 17

        1.     Lead Plaintiff Has Standing To Assert Securities Act Claims Related To The Offerings ................................................................................ 17

        2.     Brockton Is An Appropriate Named Plaintiff .......................................... 19

        3.     Plaintiffs Have Standing To Allege Violations Of Section 12(a)(2) ........ 21

    D.     The Offering Documents Contained Untrue Statements Of Material Fact And Omitted Material Facts ......................................................................... 23

        1.     Untrue Statements And Omissions About WaMu's Appraisal Practices .......................................................................................... 24

        2.     Untrue Statements And Omissions About WaMu's Underwriting Standards And Loan Quality ................................................................ 27

        3.     Untrue Statements And Omissions About WaMu's Financial Results And Condition .................................................................................... 32

        4.     Untrue Statements And Omissions About WaMu's Internal Controls ..... 42

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page i

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

5.    Deloitte Is Liable For The Misleading Financial Statements And Audit Opinions And For Its Misleading Certification Of WaMu's Internal Controls ................................................................... 43

E.    The Affirmative Defense Of "Negative Causation" Is Not A Proper Basis For Defendants To Seek Dismissal At The Pleading Stage ........................................ 45

1.    Defendants Cannot, On A Motion To Dismiss, Meet Their Burden Of Proving Negative Causation ................................................................... 45

2.    Defendants' Additional Cases And Arguments Do Not Support Dismissal For Negative Causation ........................................................... 52

III.   PLAINTIFFS HAVE ADEQUATELY ALLEGED VIOLATIONS OF THE EXCHANGE ACT ................................................................................... 54

A.    The Complaint States A Claim For Violations Of Section 10(b) Of The Exchange Act ................................................................................... 54

1.    The Complaint Appropriately Relies On Information From Knowledgeable Witnesses ................................................................. 56

2.    The Complaint Appropriately Relies On Expert Analyses ...................... 57

B.    The Complaint Alleges The 10(b) Defendants' False And Misleading Statements With Particularity ............................................................... 58

1.    Defendants' Materially False Statements And Omissions About WaMu's Lending Policies And Practices ................................................ 60

2.    Defendants' False And Misleading Statements Are Not Protected By The PSLRA Safe Harbor ........................................................................ 73

C.    The Complaint Raises A Strong Inference Of The 10(b) Defendants' Scienter ... 79

1.    WaMu's Improper Lending Practices And Accounting Violations Support A Strong Inference Of Scienter ................................................. 80

2.    WaMu's Appraisal Manipulations Support A Strong Inference Of Scienter ............................................................................................... 83

3.    WaMu's Defective Loan Underwriting And Risk Management Support A Strong Inference of Scienter ................................................. 89

4.    Defendants' Financial Motives Also Support A Strong Inference Of Scienter ............................................................................................. 102

5.    Defendants' Remaining Arguments Should Be Rejected ...................... 104

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page ii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

D.   The Complaint Sufficiently Alleges Loss Causation .......................................... 111

1.   Loss Causation Is Well Established In The Complaint .......................... 114

2.   Defendants Misconstrue The Case Law On Loss Causation And Mischaracterize The Complaint .............................................................. 118

IV.   THE COMPLAINT STATES CONTROL PERSON CLAIMS UNDER THE SECURITIES ACT AND THE EXCHANGE ACT ...................................................... 124

CONCLUSION ................................................................................................................ 128

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page iii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1
2
3
4

# TABLE OF AUTHORITIES

5
6

**Page(s)**

CASES

7

*In re Acceptance Ins. Cos. Sec. Litig.*,
423 F.3d 899 (8th Cir. 2005) ..................................................41

8
9

*Adam v. Silicon Valley Bancshares*,
884 F. Supp. 1398 (N.D. Cal. 1995) ..................................................44

10
11

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004)..................................................40, 46

12
13

*In re Adaptive Broadband Sec. Litig.*,
No. C 01-1092 SC, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ....................................34, 103

14

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)..................................................78

15
16

*In re Alamosa Holdings, Inc. Sec. Litig.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ..................................................53

17
18

*Alaska Elec. Pension Fund v. Adecco S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006),
*aff'd*, 256 Fed. App'x 74 (9th Cir. 2007)..................................................36

19
20

*Aldridge v. A. T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)..................................................35, 38, 64

21
22

*In re Am. Business Fin. Servs., Inc., Sec. Litig.*,
413 F. Supp. 2d 378 (E.D. Pa. 2005) ..................................................30

23
24

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..................................................43

25

*In re Anicom Inc. Sec. Litig.*,
No. 00 C 4391, 2001 WL 536066 (N.D. Ill. May 18, 2001) ..................................................101

26
27

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007)..................................................103

28

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page iv

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

2

*In re AOL Time Warner, Inc. Sec. Litig.,*
  503 F. Supp. 2d 666 (S.D.N.Y. 2007)......................................................................53

*In re Apple Computer Sec. Litig.,*
  886 F.2d 1109 (9th Cir. 1989) ...............................................................................68

*Atlas v. Accredited Home Lenders Holding Co.,*
  556 F. Supp. 2d 1142 (S.D. Cal. 2008)........................................................... *passim*

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................38, 90

*Azzolini v. Corts Trust II for Provident Financial Trust I,*
  No. 103CV1003, 2005 WL 3448053
  (E.D. Tenn. Dec. 14, 2005) ..................................................................................53

*Barrie v. Intervoice-Brite, Inc.,*
  409 F.3d 653 (5th Cir. 2005) ................................................................................60

*Batwin v. Occam Networks, Inc.,*
  No. CV 07-2750 CAS (SHx), 2008 WL 2676364
  (C.D. Cal. July 1, 2008) ......................................................................................17

*Bell Atl. Corp. v. Twombly,*
  127 S. Ct. 1955 (2007)....................................................................................6, 11

*Berson v. Applied Signal Tech., Inc.,*
  527 F.3d 982 (9th Cir. 2008) .......................................................................... *passim*

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.,*
  No. C06-1505 MJP, 2007 WL 3171435 (W.D. Wash. Oct. 26, 2007)...............54, 74, 75, 105

*In re Bradley Pharms., Inc. Sec. Litig.,*
  421 F. Supp. 2d 822 (D.N.J. 2006) .................................................................123, 124

*In re Bristol-Myers Squibb Co. Sec. Litig.,*
  586 F. Supp. 2d 148 (S.D.N.Y. 2008)....................................................................123

*In re Bristol-Myers Squibb Sec. Litig.,*
  No. Civ.A. 00-1990(SRC), 2005 WL 2007004 (D.N.J. Aug. 17, 2005) ...........................119

*Brody v. Transitional Hosps. Corp.,*
  280 F.3d 997 (9th Cir. 2002) ...............................................................................32

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page v

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) ...................................................................................124

*In re Cabletron Sys.*,
   311 F.3d 11 (1st Cir. 2002) ..........................................................................................98, 99

*In re Calpine Corp. Sec. Litig.*,
   288 F. Supp. 2d 1054 (N.D. Cal. 2003) ...............................................................................103

*Casella v. Webb*,
   883 F.2d 805 (9th Cir. 1989) ..............................................................................................10

*In re CBT Group PLC Sec. Litig.*,
   No. C-98-21014-RMW, 2000 WL 33339615 (N.D. Cal. Dec. 29, 2000) .............................42

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*,
   497 F.3d (5th Cir. 2007) ....................................................................................................102

*Chalverus v. Pegasystems, Inc.*,
   59 F. Supp. 2d 226 (D. Mass. 1999) ..............................................................................87, 94

*Chu v. Sabratek Corp.*,
   100 F. Supp. 2d. 815 (N.D. Ill. 2000) .................................................................................35

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................................................27

*Commc'ns Workers v. CSK*,
   525 F. Supp. 2d 1116 (D. Ariz. 2007) ...............................................................................79

*In re Computer Assocs. Class Action Sec. Litig.*,
   75 F. Supp. 2d 68 (E.D.N.Y. 1999) ...................................................................................35

*In re Compuware Sec. Litig.*,
   386 F. Supp. 2d 913 (E.D. Mich. 2005)..............................................................................53

*In re Connetics Corp. Sec. Litig.*,
   No. C 07-02940 SI, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)......................................87

*In re Converium Holding AG Sec. Litig.*,
   No. 04 Civ. 7897(DLC), 2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007) .......................34, 101

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page vi

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Constr. Laborers Pension Trust v. Nerocrine Biosciences, Inc.*,
   No. 07CV1111-IEG-RBB, 2008 WL 2053733
   (S.D. Cal. May 13, 2008) .................................................................................103

*Cooper v. Pickett*,
   137 F.3d 616 (9th Cir. 1998) .............................................................7, 35, 64, 68

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
   355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...............................................78, 103

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...................................................*passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...................................................*passim*

*In re Credit Acceptance Corp. Sec. Litig.*,
   50 F. Supp. 2d 662 (E.D. Mich. 1999)........................................................38, 39

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .................................................................*passim*

*In re DDi Corp. Sec. Litig.*,
   No. CV 03-7063 NM, 2005 WL 3090882 (C.D. Cal. July 21, 2005)............*passim*

*D.E. & J. Ltd. P'ship v. Conaway*,
   284 F. Supp. 2d 719 (E.D. Mich. 2003)..........................................................43

*Danis v. USN Commc'ns, Inc.*,
   121 F. Supp. 2d 1183 (N.D. Ill. 2000) ............................................................44

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
   2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ...................................................52

*Davidoff v. Farina*,
   2005 WL 2030501 (S.D.N.Y Aug. 22, 2005)................................................124

*DeMarco v. Depotech Corp.*,
   149 F. Supp. 2d 1212 (S.D. Cal. 2001)...........................................................58

*DSAM Global Value Fund v. Altris Software, Inc.*,
   288 F.3d 385 (9th Cir. 2002) ..........................................................................39

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page vii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005) ................................................................................................ *passim*

*Durning v. First Boston Corp.,*
    815 F.2d 1265 (9th Cir. 1987) ................................................................................ *passim*

*In re Enron Corp. Sec. Litig.,*
    206 F.R.D. 427 (S.D. Tex. 2002) ................................................................................21

*In re Enron Corp. Sec. Litig.,*
    Civ.A. H013624, 2005 WL 3504860 (N.D. Tex. Dec. 22, 2005) .................................25

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ..............................................................................................13, 39

*Falkowski v. Imation Corp.,*
    1309 F.3d 1123 (9th Cir. 2002) ...................................................................................25

*In re Faro Techs. Sec. Litig.,*
    534 F. Supp. 2d 1248 (M.D. Fla. 2007) .......................................................................83

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. 1995) ..................................................................................23, 78

*Feiner v. SS&C Techs.,*
    11 F. Supp. 2d 204 (D. Conn. 1998) ............................................................................38

*Fin. Acquisition Partners LP v. Blackwell,*
    440 F.3d 278 (5th Cir. 2006) .......................................................................................58

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    411 F. Supp. 2d 377 (S.D.N.Y. 2006) ..........................................................................51

*Fouad v. Isilon Sys., Inc.,*
    No. C07-1764 MJP, 2008 WL 5412397
    (W.D. Wash. Dec. 29, 2008) ................................................................................ *passim*

*Freedman v. Louisiana-Pacific Corp.,*
    922 F. Supp. 377 (D. Or. 1996) ...................................................................................26

*Freeland v. Iridium World Commcn's, Ltd.,*
    233 F.R.D. 40 (D.D.C. 2006) ................................................................................46, 119

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page viii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*In re Friedman's, Inc. Sec. Litig.*,
　385 F. Supp. 2d 1345 (N.D. Ga. 2005) ................................................................. 40

*Garber v. Legg Mason, Inc.*,
　537 F. Supp. 2d 597 (S.D.N.Y. 2008) ................................................................. 121

*Gerber v. Bowditch*,
　No. 05-10782-DPW, 2006 WL 1284232
　(D. Mass. May 8, 2006) ..................................................................................... 106

*In re Gilead Scis. Sec. Litig.*,
　536 F.3d 1049 (9th Cir. 2008) ........................................................... 6, 50, 117, 118

*Glazer Capital Mgmt., LP v. Magistri*,
　549 F.3d 736 (9th Cir. 2008) ....................................................................... 101, 128

*In re Glenfed, Inc. Sec. Litig.*,
　60 F.3d 591 (9th Cir. 1995) ............................................................................... 127

*Gold v. Morrice (New Century)*,
　2008 WL 467619 (C.D. Cal. Jan. 31, 2008) ......................................................... 55

*Goldstein v. MCI WorldCom*,
　340 F.3d 238 (5th Cir. 2003) ............................................................................... 34

*Gompper v. VISX, Inc.*,
　298 F.3d 893 (9th Cir. 2002) ............................................................................... 88

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
　896 F.2d 1542 (9th Cir. 1990) ............................................................................. 54

*Hanon v. Dataproducts Corp.*,
　976 F.2d 497 (9th Cir. 1992) ............................................................................... 68

*In re Hansen Natural Corp. Sec. Litig.*,
　527 F. Supp. 2d 1141 (C.D. Cal. 2007) ............................................................... 41

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
　189 F.3d 971 (9th Cir. 1999) ................................................................................. 7

*Herman & MacLean v. Huddleston*,
　459 U.S. 375 (1983) ............................................................................... 10, 17, 39

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page ix

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Hevesi v. Citigroup, Inc.*,
   366 F.3d 70 (2d Cir. 2004)................................................................................17

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) .....................................................................56, 57

*In re Hienergy Tech., Inc.*,
   NO. SACV04-1226DOC(JTLX), 2005 WL 3071250
   (C.D. Cal. Oct. 25, 2005).........................................................................128

*Howard v. Everex Sys. Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ..............................................................60, 100

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................6, 10, 16, 118

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008) .......................................................30

*In re Impax Laboratories, Inc., Sec. Litig.*,
   No. C 04-04802 JW, 2008 WL 1766943 (N.D. Cal. Apr. 17, 2008)..............21, 122

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) .........................................................7

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)...........................................................73

*In re Jenny Craig Sec. Litig.*,
   No. 92-0845-IEG (LSP), 1992 WL 456819 (S.D. Cal. Dec. 19, 1992)..................85

*In re Juniper Networks Inc., Sec. Litig.*,
   542 F. Supp. 2d 1037 (N.D. Cal 2008) ....................................................18, 20

*Kaplan v. Rose*,
   49 F.3d 1363 (9th Cir. 1994) .......................................................................68

*Khan Air, LLC v. United States Aircraft Ins. Group*,
   No. C05-0420L, 2005 WL 1838615 (W.D. Wash. Jul. 29, 2005)...........................6

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) .................................................38, 72

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page x

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*In re Leapfrog Enters., Inc. Sec. Litig.*,
   No. C-03-05421 RMW, 2005 WL 3801587 (N.D. Cal. Nov. 23, 2005) ................................18

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)...................................................................................51, 120, 121

*In re Levi Strauss & Co. Sec. Litig.*,
   527 F. Supp. 2d 965 (N.D. Cal. 2007) ............................................................................35, 36

*Levine v. Atricure, Inc.*,
   508 F. Supp. 2d 268 (S.D.N.Y. 2007)......................................................................46, 53, 56

*Lindner Dividend Fund v. Ernst & Young*,
   880 F. Supp. 49 (D. Mass. 1995) ....................................................................................122

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ................................................................................103, 108

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ............................................................................................117

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*")..............................................57, 82, 128

*McGuire v. Dendreon*,
   No. C07-800MJP, 2008 WL 1791381 (W.D. Wash. Apr. 18, 2008) ....................................60

*McGuire v. Dendreon Corp.*,
   No. C07-800MJP, 2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) ........................6, 118, 120

*In re McKesson HBOC Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..............................................................................52

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) .........................................................................................25

*In re Merrill Lynch & Co. Research Reports Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................................................52

*In re Metropolitan Sec. Litig.*,
   532 F. Supp. 2d 1260 (E.D. Wash. 2007) ...............................................................13, 14, 44

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xi

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Metzler Inv. GMBH v. Corinthian Colleges Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...................................................................... *passim*

*Middlesex Ret. Sys v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................100, 101

*Miller v. Thane Int'l, Inc.*,
   508 F.3d 910 (9th Cir. 2007) ...........................................................................54, 78

*Monroe v. Hughes*,
   31 F.3d 772 (9th Cir. 1994) ..............................................................................40, 44

*In re MobileMedia Sec. Litig.*,
   28 F. Supp. 2d 901 (D.N.J. 1998) ..........................................................................19

*In re Motorola Sec. Litig.*,
   505 F. Supp. 2d 501 (N.D. Ill. 2007) ....................................................................119

*In re Nat'l Golf Props. Sec. Litig.*,
   No. CV 02-1383GHK(RZX), 2003 WL 23018761
   (C.D. Cal. Mar. 19, 2003) ................................................................................18, 22

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal 2008) ........................................................ *passim*

*New Jersey v. Sprint Corp.*,
   314 F. Supp. 2d 1119 (D. Kan. 2004) ......................................................................44

*New York State Teachers Retirement Systems v. Fremont General Corp.*,
   No. 2:07-cv-05756-FMC-FFMx, 2008 WL 4812021 (C.D. Cal. 2008) ...........................66, 67

*No. 84 Employer-Teamster Jt. Council Pension Trust Fund v.*
  *Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...........................................................................73, 74

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ............................................................58, 83, 90, 98

*In re Openwave Sys. Sec. Litig.*,
   No. 07 Civ. 1309, 2007 WL 3224584 (S.D.N.Y. Oct. 31, 2007) ...........................83

*Panther Partners, Inc. v. Ikanos Commc'n, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) ....................................................................11

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Patel v. Parnes*,
  253 F.R.D. 531 (C.D. Cal. 2008) ........................................................................7

*In re Peoplesoft Sec. Litig.*,
  No. C 99-00472 WHA, 2000 WL 1737936 (N.D. Cal. May 25, 2000)....................98

*Plaine v. McCabe*,
  797 F.2d 713 (9th Cir. 1986) .....................................................................27, 73

*Plevy v. Haggerty*,
  38 F. Supp. 2d 816 (C.D. Cal. 1998) ...............................................................103

*In re PMA Capital Corp. Sec. Litig.*,
  No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ....................18, 29, 34, 42

*In re Portal Software, Inc. Sec. Litig.*,
  No. C-03-5138 VRW, 2006 WL 2385250 (N.D. Cal. Aug. 17, 2006)....................51

*In re Proquest Sec. Litig.*,
  527 F. Supp. 2d 728 (E.D. Mich. 2007).............................................................42

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ..................................................................76, 78

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)...............................................................34

*In re Reliance Sec. Litig.*,
  91 F. Supp. 2d 706 (D. Del. 2000)...................................................................91

*In re Resource Am. Sec. Litig.*,
  2000 WL 1053861 (E.D. Pa. July 26, 2000)..................................................61, 63

*Ritter v. Hughes Aircraft Co.*,
  58 F.3d 454 (9th Cir. 1995) ............................................................................7

*Robbins v. Hometown Buffet Inc.*,
  No. 94-1655-J (BTM), 1995 WL 908194 (S.D. Cal. Mar. 16, 1995)....................67

*Rombach v. Chang*,
  No. 00 CV 0958 SJ, 2002 WL 1396986 (E.D.N.Y. June 7, 2002).........................14

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..............................................................10, 13, 14

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xiii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Rosenbaum Capital, LLC v. McNulty*,
    549 F. Supp. 2d 1185 (N.D. Cal. 2008) ..........................................................57, 74

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ...................................................................16

*Rudolph v. UTStarcom*,
    No. C 07-04578 SI, 2008 WL 4002855 (N.D. Cal. Aug. 21, 2008)....................6, 80

*Ryan v. Flowserve*,
    245 F.R.D 560 (N.D. Tex. 2007) ..................................................................52

*Ryan v. Flowserve*,
    444 F. Supp. 2d 718, 725 (N.D. Tex. 2006) ...................................................52

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................... *passim*

*In re S. Pac. Funding Corp. Sec. Litig.*,
    83 F. Supp. 2d 1172 (D. Or. 1999) ..............................................................43

*Santa Fe Industries v. Green*,
    430 U.S. 462 (1977)......................................................................26, 27, 73

*In re Salomon Analyst*,
    350 F. Supp. 2d 477 (S.D.N.Y. 2004)...........................................................18

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)...........................................................72

*SEC v. Hawk*,
    No. 03:05-CV-00172-LRH-VPC, 2007 WL 2257321 (D. Nev. Aug. 3, 2007)....................127

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) .........................................................75

*In re Select Comfort Sec. Litig.*,
    No. Civ.99 884 DSD/JMM, 2000 WL 35529101 (D. Minn. Jan. 27, 2000) .........................21

*In re Seracare Life Scis., Inc. Sec. Litig.*,
    No. 05-CV-2335-H (CAB), 2007 WL 935583 (S.D. Cal. Mar. 19, 2007) .............................44

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
    No. C 05-0295 PJH, 2006 WL 648683 (N.D. Cal. Mar. 10 2006) .......................................104

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xiv

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*In re Software Toolworks Inc.*,
    50 F.3d 615 (9th Cir. 1994) ........................................................................40

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ........................................................13, 14, 44

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ...................................................................32

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005).......................................................................74

*In re Stone & Webster, Inc. Sec. Litig.*,
    424 F.3d 24 (1st Cir. 2005).......................................................................127

*Suez Equity Investor L.P. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)........................................................................120

*In re SupportSoft, Inc. Sec. Litig.*,
    2005 WL 3113082 (N.D. Cal. Nov. 21, 2005) ..........................................73

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006).....................................................................127

*In re Surebeam Corp. Sec. Litig.*,
    No. 03 CV 1721JM(POR), 2005 WL 5036360 (S.D. Cal. Jan. 3, 2005)................26

*Swartz v. Deutsche Bank*,
    No. C03-1252MJP, 2008 WL 1968948 (W.D. Wash. May 2, 2008) ....................125

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
    No. 07-0139-CV-W-ODS, 2008 WL 2354367
    (W.D. Mo. June 4, 2008) ......................................................................8, 41

*Tanne v. Autobytel, Inc.*,
    226 F.R.D. 659 (C.D. Cal. 2005) ...............................................................18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005).............20, 29, 117

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................128

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xv

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007).......................................................................................... *passim*

*In re Terayon Commc'ns Sys., Inc. Sec. Litig.*,
    No. C 00-01967 MHP, 2002 WL 989480 (N.D. Cal. Mar. 29, 2002) ......................90

*Thor Power Tool Co. v. Comm'r*,
    439 U.S. 522 (1979).................................................................................................41

*In re Thoratec Corp. Sec. Litig.*,
    No. C-04-03168 RMW, 2006 WL 1305226 (N.D. Cal. May 11, 2006)...............................78

*In re Tibco Software, Inc.*,
    No. 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ......................104

*In re Tyco Int'l, Ltd.*,
    No. MDL 02-1335-B, 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ......................27

*In re U.S. Bioscience Sec. Litig.*,
    806 F. Supp. 1197 (E.D. Pa. 1992) .......................................................................106

*United States ex. rel. Marchese v. Cell Therapeutics*,
    No. C06-168MJP, 2007 WL 2572347 (W.D. Wash. Sept. 6, 2007).........................8

*United States v. Morris*,
    80 F.3d 1151 (7th Cir. 1996) .................................................................................71

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ...................................................................................6

*In re Vantive Corp. Sec. Litig.*,
    110 F. Supp. 2d 1209 (N.D. Cal. 2000), *aff'd*, 283 F.3d 1079 (9th Cir. 2002) .............. *passim*

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ...............................................................11, 15, 16

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991).............................................................................................43

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ............................................................................23, 68

*Weinberg v. Atlas Air Worldwide Holdings*,
    216 F.R.D. 248 (S.D.N.Y. 2003) ..........................................................................20

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xvi

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Weiss v Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz 2007) ...........................................................................120, 121

*In re Wells Fargo Sec. Litig.*,
   12 F.3d 922 (9th Cir. 1993) ................................................................................. *passim*

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996)...............................................................................................23

*In re White Elec. Designs Corp. Sec. Litig.*,
   416 F. Supp. 2d 754 (D. Ariz. 2006) ...............................................................................25

*In re Williams Sec. Litig.*,
   339 F. Supp. 2d 1206 (N.D. Okla. 2003) ..........................................................................38

*In re Winstar Commc'ns*,
   No. CV 3014(GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .......................................123

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003).........................................................................18, 21

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) ...............................................................................40, 45, 119

*In re WRT Energy Sec. Litig.*,
   No. 96 Civ. 3611(JFK), 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005)..................................51

*In re WRT Energy Sec. Litig.*,
   No. 96 Civ. 3610(JFK), 2005 WL 3288142 (S.D.N.Y. Dec. 1, 2005) ...................................46

*Zucco Partners, LLC v. Digimarc Corp.*,
   No. 06-35758, 2009 WL 311070 (9th Cir. Feb. 10, 2009) ...............................................56, 111


**STATUTES AND RULES**

15 U.S.C. § 77k(a) ...............................................................................................................9, 13

15 U.S.C. § 77k(a)(4)..................................................................................................................44

15 U.S.C. § 77k(e) .......................................................................................................................46

15 U.S.C. § 77l(b) ........................................................................................................................46

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xvii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

15 U.S.C. § 78u-4(b)(1)(B) ................................................................................54

15 U.S.C. § 78u-4(b)(2) .....................................................................................54

15 U.S.C. § 78u-5(i)(1) ......................................................................................74

15 U.S.C. § 78u-5(c) ..........................................................................................73

15 U.S.C. § 78u-5(c)(1)(A) ................................................................................75

15 U.S.C. § 78u-5(c)(1)(B) ................................................................................73

15 U.S.C. § 78u-5(c)(1)(B)(i) ............................................................................76

17 C.F.R. § 230.405 .........................................................................................125

Fed. R. Civ. P. 12(d) ...........................................................................................9

Fed. R. Civ. P. 8(a) ....................................................................................... *passim*

Fed. R. Civ. P. 9(b) ....................................................................................... *passim*

Fed. R. Civ. P. 10b-5 ........................................................................................54

Fed. R. Civ. P. 10b5-1 .....................................................................................102

Fed. R. Civ. P. 12(b)(6) ................................................................................ *passim*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xviii

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

## TABLE OF FREQUENTLY USED TERMS
## DEFINED IN PLAINTIFFS' OPPOSITION

**10(b) Defendants** means Defendants Kerry K. Killinger, Thomas W. Casey, Ronald J. Cathcart, Stephen J. Rotella, and David C. Schneider.  ¶21-25.[1]

**Class Period** means the period from October 19, 2005 through July 23, 2008.  ¶¶5, 51.

**CRO Report** means the internal Washington Mutual, Inc. ("WaMu") document dated September 2005 and entitled "Corporate Risk Oversight Report: Allowance for Loan & Lease Losses Methodology of Washington Mutual Bank."  ¶450; ¶861.

**Allowance** means WaMu's Allowance for Loan and Lease Losses.  ¶¶63, 425; ¶856.

**Attorney General** means the Attorney General of the State of New York.

**LBM** means Long Beach Mortgage, a subprime mortgage division of WaMu.  ¶17.

**LPRM** means WaMu's Loan Performance Risk Model.  ¶446; ¶860.

**LTV** means loan-to-value ratio.  ¶¶1, 127; ¶864.

**NYAG Complaint** means the complaint filed on November 1, 2007 by the New York State Attorney General against First American Corp. and its subsidiary, eAppraiseIT.  ¶691; ¶871.

**Offering Documents** means WaMu's Registration Statement and August 2006, September 2006, October 2007, and December 2007 Offering Documents.  ¶817.

**Option ARM loans** means adjustable rate mortgage loans with the option to defer the payment of interest.  ¶74.

**OTS** means the Office of Thrift Supervision.  ¶15.

**Registration Statement** means the shelf registration statement WaMu filed with the SEC on Form S-3AR on January 9, 2006.  ¶817.

**ROV** means request for reconsideration of value.  ¶126; ¶868.

**Securities Act Defendants** means Defendants Kerry K. Killinger, Thomas W. Casey, and John F. Woods, the Director Defendants (identified in ¶¶825-37), the Underwriter Defendants (identified in ¶¶839-54), and Deloitte & Touche LLP (identified at ¶¶819, 838).

---

[1] All "¶__" citations refer to paragraphs in the Consolidated Class Action Complaint, docket #67.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page xix

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

**PRELIMINARY STATEMENT**

From 2005 until its demise in 2008, Washington Mutual, Inc. ("WaMu" or the "Company") was one of the United States' largest mortgage lenders. WaMu achieved this market dominance after the Company's most senior officers, led by Defendant Kerry Killinger ("Killinger"), WaMu's Chief Executive Officer and Chairman of the Board of Directors, aggressively transformed the Company from a low-risk, traditional savings and loan institution into a national leader in mortgage lending. ¶¶65-68, 299. Unbeknownst to investors, however, WaMu's transformation was fueled by the Company's origination of hundreds of billions of dollars worth of mortgage loans that were issued to borrowers who could not afford to repay the loans and collateralized by real estate with artificially inflated appraisal values.

Indeed, as the Company established itself as a market leader, WaMu's senior management, including Defendants Killinger; Stephen Rotella ("Rotella"), President and Chief Operating Officer; Thomas W. Casey ("Casey"), Chief Financial Officer; Ronald Cathcart ("Cathcart"), Chief Enterprise Risk Officer; and David Schneider ("Schneider"), President of the Home Loans business unit (collectively the "10(b) Defendants"), falsely assured investors that WaMu remained a conservative mortgage lender with rigorous underwriting standards and meaningful controls in place to protect against losses from borrower defaults. For example, the 10(b) Defendants told the investing public that WaMu was "disciplined and vigilant in [its] underwriting standards," employed "strong underwriting" and "conservative lending standards," had a "disciplined credit culture," used "effective risk management," and had "excellent . . . reserving methodologies in place." ¶¶559, 567, 612.

This appearance of prudent lending and financial growth created by these and similar statements, as well as WaMu's consistently strong reported financial results, enabled WaMu to conduct four public offerings of debt securities and preferred stock, raising nearly $5 billion during the period from October 19, 2005 through July 23, 2008 (the "Class Period"). ¶¶51, 817. These securities were offered to the public by means of untrue offering materials,

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 1

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

including the Company's false financial statements (the "Offering Documents"), and with the participation of WaMu's auditor, Defendant Deloitte & Touche LLP ("Deloitte"), the Underwriter Defendants (defined below at Section II.A and ¶¶839-54), and certain officers and directors of WaMu (collectively with Deloitte and the Underwriter Defendants, the "Securities Act Defendants").

In reality, the Company's publicly-reported financial results and assurances about its conservative lending practices – including those contained in the Offering Documents – were false. WaMu was anything but the responsible and conservative lender it portrayed itself to be. The Complaint provides extensive evidence, including the accounts of nearly 90 former employees of WaMu and related companies; information from numerous internal, non-public WaMu documents; and the results of detailed expert and statistical analyses, to demonstrate how WaMu's senior management caused the Company to abandon appropriate lending practices in order to originate an ever-increasing volume of loans and, in particular, its high-risk, but incredibly lucrative loan products such as the Company's flagship Option ARM loans *without regard for the borrower's ability to repay the loan*. Indeed, the former employees cited in the Complaint, while located in different offices throughout the country as well as headquarters, consistently recounted the same story: the goal at WaMu, established by senior management, including the 10(b) Defendants, was to do whatever was necessary to maximize loan volume *regardless of the borrower's credit history or the true value of the collateral underlying the loan*. These witnesses establish, among other things, that WaMu:

- Failed to examine borrowers' creditworthiness and, instead, provided loans to anyone who "had a pulse" in order to generate a high volume of lucrative – yet risky – mortgages. *E.g.*, ¶¶331, 352, 386, 399.

- Manipulated real estate appraisal values through a "corrupt" process by pressuring appraisers to inflate property values so WaMu could originate loans that would otherwise not have been approved. *E.g.*, ¶¶126-27, 132-33, 165, 174-75, 194, 242.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 2

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

- Failed to employ meaningful risk management controls and instead marginalized that crucial role as a "support" function for the sales people it was purportedly monitoring. *E.g.*, ¶¶106-08, 113, 115, 124.

- Inflated WaMu's reported net income by hundreds of millions of dollars by under-reserving for credit losses arising from WaMu's loans, in particular its portfolio of extremely high-risk adjustable rate mortgages. *E.g.*, ¶¶450-56, 467-72.

The truth about WaMu's lending practices and financial condition only started to come partially to light in October 2007, when the Company began to dramatically increase its loan loss reserve in response to mounting losses from its rapidly defaulting loans.  Over the next nine months, as the number of defaulting loans increased, WaMu continued to increase its loan loss provision by billions of dollars.  During this same time period, the New York Attorney General (the "Attorney General") filed a complaint detailing certain of WaMu's unlawful appraisal practices (the "NYAG Complaint"), analysts began questioning management's credibility and lending practices, investigations of the Company's conduct – including its appraisal and lending practices – were launched by the Securities and Exchange Commission (the "SEC") and the Office of Thrift Supervision (the "OTS"), and credit rating agencies repeatedly downgraded the Company.   ¶¶687-753.   Ultimately, the losses resulting from WaMu's lending and accounting practices were so severe that WaMu, after increasing its loan loss provision by nearly $12 billion from October 2007 through July 2008, could not remain viable.  On September 26, 2008, WaMu filed for liquidation in bankruptcy, marking the largest banking failure in United States history.

Despite the overwhelming evidence of unlawful conduct alleged by Plaintiffs, Defendants have moved to dismiss the Complaint.  In doing so, Defendants attempt to evade responsibility by mischaracterizing the applicable law, ignoring the vast bulk of the Complaint's detailed allegations, and asserting numerous factual contentions that are both unpersuasive and inappropriate at the pleading stage.  As explained below, Defendants'

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 3

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  arguments for dismissal are without merit and should be rejected.

2      For example, Defendants claim that market factors – unrelated to the specific allegations

3  of the Complaint – were the true cause of investors' massive losses and the Company's demise.

4  To make this argument, Defendants recast the Complaint as being focused solely on "subprime"

5  mortgages, about which they contend the Company warned investors.    This argument

6  disregards the detailed allegations of the Complaint and established case law.    The false

7  statements at issue in the Complaint primarily and specifically touted WaMu's purportedly

8  sound financial condition and conservative lending standards in the Company's "prime"

9  portfolio, including Option ARM loans, and the Complaint shows why those statements were

10  false without regard to the housing market or the conduct of other mortgage lenders.   Indeed,

11  this "blame the market" argument has been rejected by other courts that have refused to permit

12  defendants to use the current economic climate and the risks associated with subprime lending

13  as an excuse for their own misconduct.   *See, e.g., In re New Century,* 588 F. Supp. 2d 1206

14  (C.D. Cal 2008); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal.

15  2008) ("*Countrywide Sec.*") (both discussed *infra*).

16      The 10(b) Defendants also contend that Plaintiffs fail to allege that they acted with

17  scienter.   In making this argument, these Defendants again disregard the Complaint's well-pled

18  allegations.   In particular, the Complaint alleges that each of these Defendants was intimately

19  involved in WaMu's lending operations and, in fact, directed WaMu's abandonment of prudent

20  lending standards in order to maximize loan volume.   ¶482.   Similarly, Defendants claim that

21  the Complaint fails to allege falsity and loss causation because WaMu never restated its

22  financial results.   Such an argument is absurd.   First, it ignores the fact that WaMu is liquidating

23  pursuant to Chapter 11 of the Bankruptcy Code and, therefore, WaMu is not required – nor

24  would it make practical or financial sense – to restate its financial results.   In addition, the law

25  is clear that the lack of a restatement does not immunize Defendants from liability.

26      Defendants' other arguments are equally unavailing.   For instance, the Securities Act

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 4

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Defendants' argument that Plaintiffs' negligence claims under the Securities Act of 1933 (the "Securities Act") are subject to a fraud pleading standard also fails. Such an argument ignores the fact that those claims include no allegations of fraud and involve substantially different groups of Defendants than Plaintiffs' claims under the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants also wrongly argue that Plaintiffs lack standing to bring claims under the Securities Act. Defendants' argument ignores the Congressional intent in empowering a lead plaintiff to prosecute securities class actions and, at best, presents an issue for resolution on class certification. In any event, this issue is moot because additional Class representatives for the Securities Act claims are prepared to step forward, if necessary.

In sum, Defendants' arguments are meritless. The evidence of the Securities Act Defendants' negligence and the 10(b) Defendants' scienter is overwhelming, and the Complaint's detailed allegations are more than sufficient to state violations of both the Exchange Act and the Securities Act. Plaintiffs respectfully submit that Defendants' motions to dismiss should be denied in their entirety.

Lead Plaintiff respectfully refers the Court to the Complaint for a detailed discussion of the facts and to the Argument below for summaries of the Complaint's allegations relevant to the instant motions.

## ARGUMENT

## I.    GENERAL PRINCIPLES APPLICABLE ON A MOTION TO DISMISS

### A.    Standards On A Motion To Dismiss

On a motion to dismiss, a court must accept the plaintiffs' allegations as true and construe them in the light most favorable to the plaintiffs. *In re Daou Sys., Inc.,* 411 F.3d 1006, 1013 (9th Cir. 2005); *Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *2 (W.D. Wash. Dec. 29, 2008) (Pechman, J.) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007)). "[A] district court ruling on a motion to dismiss is not sitting as trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 5

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, courts "should not . . . generate an evidentiary record and then weigh evidence . . . to dismiss [a] complaint." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 995 (S.D. Cal. 2005) (internal quotations omitted). Dismissal is appropriate only where, viewed in its totality, a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1960 (2007); *Rudolph v. UTStarcom*, 2008 WL 4002855, at *1 (N.D. Cal. Aug. 21, 2008) ("even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings").

## B. The Court Should Strike Documents Submitted By Defendants That Are Improper For Judicial Notice

Defendant's Requests for Judicial Notice ("RJNs") should be denied. A court's review of a motion to dismiss under Rule 12(b)(6) is generally limited to the complaint's contents. *Khan Air, LLC v. United States Aircraft Ins. Group*, 2005 WL 1838615, at *1 (W.D. Wash. July 29, 2005). There are two narrow exceptions to this rule. The first applies only to documents that are central to, or form the basis of, a plaintiff's claims and upon which the plaintiff relies. *Immune Response*, 375 F. Supp. 2d at 995. The second applies to matters of public record, which are properly judicially noticed only if the information in them is "not subject to reasonable dispute." *United States v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003) (citations omitted). This Court has declined to "draw inferences in favor of Defendants from . . . judicially-noticeable facts." *McGuire v. Dendreon Corp.*, 2008 WL 5130042, *3 (W.D. Wash. Dec. 5, 2008) (Pechman, J.).

While they bemoan the Complaint's length, Defendants have submitted over 800 pages of materials extraneous to the Complaint that they urge the Court to consider. As highlighted below, the overwhelming majority of these materials – and therefore the arguments based on them – are inappropriate for consideration on a motion to dismiss and should be disregarded. Plaintiffs respectfully submit that the Court should strike all of Defendants' extraneous

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 6

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

submissions except for those ordinarily considered by courts in this context – *i.e.*, SEC filings, press releases, conference call transcripts, and accounting rules directly mentioned or relied upon in the Complaint. Even with respect to those documents, the Court should strike Defendants' arguments that assert the truth of disputed facts.

Among other things, Defendants improperly rely on the "truth" of numerous exhibits that (they contend) contradict the Complaint's allegations, including that WaMu's collapse was caused by an industry-wide mortgage crisis and broader financial upheaval, not by the fraud alleged in the Complaint (*e.g.*, OD Ex. 3; KK Ex. S; UW Ex. 22; DT Exs. 10, 12-13, 19, 21-27, 29-30, 35; KK Mot. at 13; DT Mot. at 8[2]). The Court should not consider such arguments, as the factual determinations they entail are improper at this stage. *See Cooper v. Pickett*, 137 F.3d 616, 622-23 (9th Cir. 1998) (excluding documents that the complaint referenced, but which defendants offered to show that allegations were "outright falsehoods"); *Patel v. Parnes*, 253 F.R.D. 531, 549 (C.D. Cal. 2008) (declining to take judicial notice of news articles about the housing market which did not pertain directly to defendant); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1161 n.7 (S.D. Cal. 2008) (refusing to take judicial notice of news articles regarding company and lending market, transcript of Federal Reserve chairman remarks, and documents concerning other companies). Defendants' arguments do not support consideration of these materials. *See, e.g.*, KK RJN at 6; DT RJN at 3-4. In fact, the cases they rely upon are chiefly summary judgment decisions (*e.g.*, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971 (9th Cir. 1999); *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454 (9th Cir. 1995); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005 (C.D. Cal. 2003)) or cases that held only that judicial notice was properly taken of information specifically relating to parties. *See Heliotrope*, 189 F.3d at 981 (news articles about defendant); *Ritter*, 58

---

[2]   Defendants' memoranda in support of their motions to dismiss the Complaint are herein referred to as: OD Mot. (WaMu Officers' Motion); KK Mot. (Kerry K. Killinger's Motion); DD Mot. (Outside Director Defendants' Motion); UW Mot. (Underwriter Defendants' Motion); and DT Mot. (Defendant Deloitte & Touche LLP's Motion).

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 7

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

F.3d at 458-59 (layoffs by defendant); *United States ex. rel. Marchese v. Cell Therapeutics*, 2007 WL 2572347, at *1-2 (W.D. Wash. Sept. 6, 2007) (statements by counsel of record). Defendants' other cases are similarly inapposite. For example, in *In re 2007 Novastar Financial, Inc., Securities Litigation*, the court actually declined to "take judicial notice of the impact of . . . industry-wide reversals on the Company." 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008).

In addition, Defendants rely upon defense counsel's purported summaries of voluminous information from SEC filings, press releases, and conference call transcripts. For example, both KK Mot. App. A and OD Mot. App. A (upon which the Underwriter Defendants also rely) purport to list the forward-looking statements made by WaMu and the Defendants. Similarly, OD Mot. App. B purports to list the allegedly false and misleading statements from the Complaint. These Appendices impermissibly excerpt and recast the language from underlying documents to create an impression that boilerplate "cautionary language" was more meaningful than the form in which it actually appeared, and recite Defendants' arguments why they believe statements are not actionable. *See Atlas v. Accredited*, 556 F. Supp. 2d at 1161 n.7 (counsel's table comparing forward-looking statements and risk disclosures improper for judicial notice on motion to dismiss); *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1213 n.8 (N.D. Cal. 2000) (a "document prepared by defense counsel that purports to compare the specific allegations in the [complaint] with the statements actually made by defendants . . . is not proper evidentiary material for the Court to consider at [motion to dismiss stage]"), *aff'd*, 283 F.3d 1079, 1091 (9th Cir. 2002). Defendants' Appendices also represent argument in excess of the page limits and should be stricken for that reason as well.

Accordingly, Plaintiffs respectfully request that the Court deny Defendants' RJNs and limit its review to the materials contained and directly referenced in the Complaint or properly subject to judicial notice. Should the Court consider Defendants' extraneous submissions or arguments based on them, Plaintiffs respectfully request that Defendants' motions to dismiss be

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 8

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

converted into motions for summary judgment with an opportunity for Plaintiffs to take discovery.  Fed. R. Civ. P. 12(d).

## II.    PLAINTIFFS HAVE ADEQUATELY ALLEGED VIOLATIONS OF THE SECURITIES ACT

### A.    The Complaint States Primary Claims Under The Securities Act

During the Class Period, WaMu conducted four offerings of securities.  As defined in the Complaint, the Offerings are: (i) the August 2006 Offering of $500 million of Floating Rate Notes and $400 million of 5.50% Notes; (ii) the September 2006 Offering of $500 million in Series K Stock; (iii) the October 2007 Offering of $500 million of 7.250% Notes; and (iv) the December 2007 Offering of $3 billion in Series R Stock.  ¶817.  The Class Period Offerings were conducted pursuant to a shelf registration statement dated January 9, 2006 and a prospectus and prospectus supplements that incorporated certain of WaMu's SEC filings (defined above as the "Offering Documents").  *Id.*  The Complaint alleges claims under §§ 11, 12(a)(2), and 15 of the Securities Act (the Complaint's Fourth, Fifth, and Sixth Claims for Relief, respectively) with respect to each Offering.

Section 11 provides a private cause of action against issuers, underwriters, auditors, every person signing a registration statement, and every person serving as a director of the issuer at the time of the filing of the part of the registration statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Plaintiffs' claims under § 11 are asserted against:  (a) the Officer Defendants who signed and controlled the content of the Registration Statement and the WaMu reports incorporated into the Offering Documents (Killinger, Casey, and Woods); (b) the Director Defendants, each of whom signed the Registration Statement (Farrell, Frank, Leppert, Lillis, Matthews, Murphy, Osmer-McQuade, Pugh, Reed, Smith, Stever, and Wood) or was a director at the time of the filing of the Offering Documents (Montoya); (c) Deloitte, which consented to its 2005 and 2006 audit opinions appearing in the Offering Documents; and (d) the Underwriter Defendants, which sold

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 9

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

securities in the Offerings to members of the Class (Goldman Sachs, Morgan Stanley, Credit Suisse, Deutsche Bank, Lehman Brothers, UBS, Banc of America, J.P. Morgan, Barclays, Keefe Bruyette, Cabrera Capital, Williams Capital, Citigroup, Greenwich, BNY, and Ramirez). The Complaint specifies which Underwriter Defendants sold securities in each Offering. ¶¶839-54, 904, 907, 931, 957, 974-77.

Section 12(a)(2) provides a private cause of action against anyone who offers or sells a security by means of a prospectus which "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a). Plaintiffs assert claims under § 12(a)(2) against the Underwriter Defendants.

Plaintiffs' claims under Securities Act § 15 are addressed in Section IV.

### B.    The Pleading Requirements For Claims Under Sections 11 And 12(a)(2)

Section 11 imposes a "stringent standard of liability." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). Fraud is not an element of a § 11 claim, nor are plaintiffs required to allege any sort of intentional, knowing, or reckless misconduct. *Id.* at 383; *Daou,* 411 F.3d at 1027. In addition, neither reliance nor loss causation is required to be pleaded by plaintiffs asserting § 11 claims. *Daou*, 411 F.3d at 1027, 1029 (loss causation); *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004) (reliance); *Immune Response,* 375 F. Supp. 2d at 1037-38 (reliance). Similarly, scienter is not an element of claims under § 12(a)(2). *See Casella v. Webb*, 883 F.2d 805, 809 (9th Cir. 1989); *Immune Response,* 375 F. Supp. 2d at 1038. Accordingly, a plaintiff "need only show a material misstatement or omission to establish his prima facie case," which "places a relatively minimal burden on a plaintiff." *Herman & MacLean*, 459 U.S. at 382.

Because fraud is not an element of a § 11 or 12(a)(2) claim, the pleading of a violation of these provisions generally requires only a short and plain statement of the claim under Rule 8(a) showing that the pleader is entitled to relief. *See In re DDi Corp. Sec. Litig.*, 2005 WL

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 10

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

3090882, at *9 (C.D. Cal. July 21, 2005). For a complaint to pass muster under Rule 8(a), a defendant need only be put on notice of the claims. *Tellabs*, 127 S. Ct. at 2507 (for non-fraud claims "the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (citations omitted)); *Daou*, 411 F.3d at 1027 ("where fraud is not an essential element of a claim . . . '[a]llegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).'" (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003)).

Notwithstanding this well-settled law, Defendants attempt to graft a heightened pleading standard onto §§ 11 and 12(a)(2) by contending that, in *Bell Atlantic v. Twombly*, the Supreme Court required "heightened pleading" under Rule 8(a). UW Mot. at 14 n.12; DT Mot. at 19. Defendants are wrong. In *Twombly*, the Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" 127 S. Ct. at 1964 (citations omitted). In fact, the Court expressly held that "we do not apply any 'heightened' pleading standard." *Id*. at 1973 n.14. Defendants' reliance on *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008) (UW Mot. at 14 n.12), is similarly misplaced. In that case, the court **correctly** applied Rule 8(a) to § 11 claims. *See id*. at 667-68. Based on the facts, the court dismissed the claims in *Panther* because they were based on technical and financial problems that occurred long after the offering, *see id*. at 669-73, unlike WaMu's bad underwriting, inflated appraisals, and misstated financial results throughout the Class Period here.

Thus, Rule 8(a) applies to Plaintiffs' Securities Act claims and, as detailed below, the Complaint easily satisfies Rule 8(a)'s notice pleading standards.

### 1.    The Securities Act Claims Do Not Sound In Fraud

Unable to seriously dispute that the Complaint sufficiently alleges that the Offering Documents contained untrue statements and omissions of material fact and thus satisfies Rule

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 11

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

8(a), the Securities Act Defendants contend that the Complaint's Securities Act claims "sound in fraud" and are therefore subject to the heightened pleading standards of Rule 9(b). Defendants are wrong.

Plaintiffs' Securities Act claims sound in negligence, not fraud. These claims affirmatively plead that the Securities Act Defendants acted negligently in not ensuring that the Offering Documents were materially accurate and complete. ¶985. Indeed, with the exception of Killinger and Casey, none of the other *thirty-five* Securities Act Defendants has been accused of fraud, and Plaintiffs have not alleged any § 10(b) claims against them. The Director Defendants even admit that "the Complaint divorces [them] entirely from the alleged fraud." DD Mot. at 17. The Complaint clearly distinguishes between the negligence and fraud claims, expressly disclaims all allegations of fraud in the Securities Act claims, and is organized in discreet sections and counts, with the Exchange Act claims in the first half (¶¶59-814) and the Securities Act claims in the second half (¶¶815-1004).

Moreover, contrary to Defendants' contention, the Securities Act claims do not rely on the same "unified course of fraudulent conduct" as the Exchange Act claims. DD Mot. at 10. The Exchange Act claims contain extensive allegations about fraudulent activity by the 10(b) Defendants and include numerous fraudulent statements by WaMu, Killinger, and Casey that are not part of the Offering Documents covered by the Securities Act claims (and fraudulent statements by Cathcart, Rotella, and Schneider, who are not Securities Act Defendants). ¶¶557-60, 567-77, 590-95, 602-07, 612-23, 628-37, 652-57, 664-71, 677-90, 693, 698-99, 705-07, 719-20, 733, 746. By contrast, the basis of Plaintiffs' §§ 11 and 12(a)(2) claims is that the Securities Act Defendants did not make "a reasonable investigation or possess[ ] reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects." ¶¶985, 994.

Despite the clear distinction between these claims, the Director Defendants compare certain Exchange Act allegations relating to WaMu's risk management, appraisals, and

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 12

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

underwriting standards with the Securities Act allegations relating to the Offering Documents'
disclosures about those aspects of WaMu's business in an attempt to demonstrate that the
Exchange Act and Securities Act claims allege a unified course of conduct.  DD Mot. at 13-16.
This comparison, however, does not demonstrate that the Securities Act claims sound in fraud.
Rather, ***all*** of the Exchange Act allegations cited by Defendants refer to fraudulent conduct by
WaMu and/or the 10(b) Defendants, ***not*** the Director Defendants, Deloitte, or the Underwriter
Defendants.  *Id.*

Similarly, Deloitte argues that the Securities Act claims sound in fraud because they
allege that Deloitte "disregard[ed]" WaMu's misstatements and made "untrue and misleading"
statements itself in its audit reports.  DT Mot. at 14.  This argument must fail, as "untrue and
misleading" tracks the statutory language verbatim, and "disregard" refers to negligence under
§ 11.  *See* 15 U.S.C. § 77k(a) ("untrue statement of a material fact or [omission of] a material
fact required to be stated [in the registration statement] or necessary to make the statements
therein not misleading"); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976) ("[E]xperts
such as accountants who have prepared portions of the registration statement are accorded a
'due diligence' defense.  In effect, this is a negligence standard.").  Similarly, the Underwriter
Defendants' repeated attempts to cast the Securities Act claims as "fraud," without argument,
do not make it so, either.  *See* UW Mot. at 5, 11, 15, 16, 20, 21.  The words "appraisal fraud,"
despite being presented to the Court by Defendants as a quotation from the Securities Act
allegations (UW Mot. at 14 ("Plaintiffs Fail To Plead Material Misstatements Relating To The
Alleged 'Appraisal Fraud'"), 15, 16), do not appear anywhere in the Securities Act allegations.

Defendants' arguments based on *Rombach v. Chang* (DT Mot. at 13), *In re Stac
Electronics Securities Litigation*, 89 F.3d 1399 (9th Cir. 1996) (DT Mot. at 13, 15; UW Mot.
14; DD Mot. at 10), and *In re Metropolitan Securities Litigation*, 532 F. Supp. 2d 1260 (E.D.
Wash. 2007) (UW Mot. At 14) also fail.  Unlike in those cases, Plaintiffs have meticulously
differentiated their claims and alleged bases for their Securities Act claims that do not rely on

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 13

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

allegations involving fraud.  In *Rombach*, the lower court decision upheld by the Second Circuit held that the complaint sounded in fraud where plaintiffs did "not assert any claim of negligence on the part of the [defendants], nor [did] they specify any basis for such a claim." *Rombach v. Chang*, 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002).  The Circuit held Rule 8(a) applied to claims against underwriters, where the complaint alleged that "each of the Underwriter Defendants owed to the purchasers of the [company's] shares . . . the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus." *Rombach*, 355 F.3d at 178; *see also Stac Elecs.*, 89 F.3d at 1405 n.2 (rejecting "nominal efforts" to disclaim fraud as a basis for § 11 claim where "no effort [was] made to show any other basis" for § 11 claim); *Metro.*, 532 F. Supp. 2d at 1278-79 (complaint sounds in fraud where "fraud and strict liability counts are virtually identical").

Accordingly, the Securities Act claims do not "sound in fraud," and they satisfy the applicable Rule 8(a) standard for notice pleading of negligence.

### 2. Plaintiffs' Non-Fraud Securities Act Claims Should Be Sustained Even If They Are Found To Sound In Fraud

Although claims under §§ 11 and 12(a)(2) "do not contain an element of fraud" and are normally subject to Rule 8(a) notice pleading, this Court has applied the sounds-in-fraud doctrine to such claims and required plaintiffs to satisfy the stricter pleading standard of Rule 9(b) where "plaintiff makes a 'wholesale adoption' of his securities fraud allegations for purposes of the Securities Act claim." *Fouad*, 2008 WL 5412397 at *3 (quoting *Daou,* 411 F.3d at 1027).  In doing so, this Court noted that the sounds-in-fraud doctrine serves the purposes of Rule 9(b) "to protect the reputation of a defendant accused of engaging in fraudulent conduct, to minimize strike suits and to provide detailed notice of a fraud claim."  *Id.* at *3.  Because the Securities Act negligence claims in this action are fully self-sufficient and do not involve a "wholesale adoption" of the fraud allegations, none of those purposes would be served by applying the sounds-in-fraud doctrine here.

However, should the Court determine that the sounds-in-fraud doctrine applies to the

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 14

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

instant case, it should only be applied to Killinger and Casey, as they are the **only two Defendants** who face both fraud and negligence allegations. *See Fouad*, 2008 WL 5412397, at *3 (heightened pleading standard applied to the six defendants who were also subject to allegations of fraud). There is no basis for applying the sounds-in-fraud doctrine to the rest of the Securities Act Defendants, who face no fraud allegations and therefore none of the reputational concerns protected by Rule 9(b). *Vess,* 317 F.3d at 1104 ("To require that non-fraud allegations be stated with particularity merely because they appear in a complaint alongside fraud averments . . . serves no similar reputation-preserving function, and would impose a burden on plaintiffs not contemplated by the notice pleading requirements of Rule 8(a)."). Nor can these Defendants credibly argue that this is a strike suit or that the Complaint fails to give appropriate notice of the claims against all of them.

*Countrywide Securities* is instructive in this respect. In that case, numerous defendants – none of whom were implicated in plaintiffs' fraud allegations – claimed that plaintiffs' Securities Act claims were based on fraudulent conduct, and thus subject to a heightened pleading standard. 588 F. Supp. 2d at 1162-63. But the court disagreed:

> Plaintiffs here do not rely on a unified course of fraudulent conduct against all Defendants. . . . Rather, . . . Plaintiffs describe a unified course of abandoning sound underwriting practices. No fraud lies in changed practices alone. The alleged fraudulent conduct . . . is distinct from this conduct. The fraud consists in intentionally misrepresenting Countrywide's underwriting practices.

> Not all Defendants are alleged to have participated in the fraud. The CAC clearly specifies which defendants participated in which allegedly fraudulent conduct. For example, Underwriter Defendants are nowhere implicated in fraudulent conduct. Neither are the vast majority of the individual Defendants. As to those Defendants who are implicated in fraud, the CAC provides additional particularized allegations. . . .

> Heightened pleading standards properly force plaintiffs to limit their fraud allegations to those participants who are likely to have acted fraudulently. . . .

> But it eviscerates § 11 to give all Defendants Rule 9(b) protection when (1) only certain defendants are expressly alleged to act fraudulently; (2) a complaint specifies unique, particularized facts as to those defendants; and (3) the particularized facts raise a scienter inference as to those defendants, but not all.

---

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 15

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Id.* at 1163. Thus, as in *Countrywide Securities,* this Court should reject Defendants' contention that the Complaint's Securities Act allegations against them sound in fraud. Should the Court find that Plaintiffs' non-fraud Securities Act claims are subject to Rule 9(b), the claims should still survive as the appropriate remedy is to strip away the fraud allegations, leaving the negligent misrepresentation allegations intact. *See Vess*, 317 F.3d at 1105 ("if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim. The court should then examine the allegations that remain to determine whether they state a claim.").

Even assuming, *arguendo,* that the Court were to conclude that these claims sound in fraud and must satisfy Rule 9(b), the Complaint easily meets this standard, as the false statements in the Offering Documents are alleged with the requisite particularity. *See* ¶¶909-28 (detailing untrue statements in August 2006 and September 2006 Offering Documents); ¶¶933-54 (same for October 2007 Offering Documents); ¶¶959-70 (same for December 2007 Offering Documents).

Lastly, the Court should reject Defendants' contention that if Rule 9(b) applies to Plaintiffs' non-fraud § 11 claims, then Plaintiffs must allege scienter (with particularity) in their § 11 claims. *See* DD Mot. at 17; *see also id.* at 18, 19 (arguing that Complaint fails to allege "intentional" misconduct by Director Defendants). Neither the Ninth Circuit nor this Court has ever held that if the sounds-in-fraud doctrine applies to § 11 claims, scienter becomes an element of those claims, and Defendants cite not one case for this frivolous argument. Rather, if the § 11 claims sound in fraud, Rule 9(b)'s pleading standard applies only to the normal element of untruth of the challenged statements. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009); *Daou*, 411 F.3d at 1028; *Fouad*, 2008 WL 5412397, at *4; *Immune Response*, 375 F. Supp. 2d at 1037-38.

The cases cited by the Director Defendants at pages 17-19 of their brief that apply the "group pleading" doctrine to Exchange Act claims are irrelevant to the § 11 claims. The group

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 16

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

pleading doctrine is used to determine responsibility for false statements under Exchange Act claims and is inapplicable to Securities Act claims because the Securities Act statutorily defines the actors responsible for untrue statements. To the extent that *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at \*19 (C.D. Cal. July 1, 2008), the only case Defendants cite in support of this particular theory, held that outside directors who signed a materially misleading registration statement are not liable under § 11, Plaintiffs respectfully submit that such a result is contrary to the clear language of the statute and controlling authority, including *Herman & MacLean*, *Daou* and *Fouad*.

### C.    Plaintiffs Have Standing To Assert Securities Act Claims For Each Offering

#### 1.    Lead Plaintiff Has Standing To Assert Securities Act Claims Related To The Offerings

Defendants contend that Plaintiffs lack standing to allege Securities Act claims, but Defendants' arguments are contrary to well-established law. Moreover, Defendants' arguments are rendered moot, as additional plaintiffs that purchased securities in the August 2006, September 2006, and December 2007 Offerings are ready and able to represent the Class at the class certification stage – which is the appropriate time to address this issue – or sooner, should the Court desire.

First, it is well-established that Lead Plaintiff need not have purchased every type of security at issue in order to prosecute each particular claim that the Class is able to assert. To require otherwise would ignore the very purpose of the lead plaintiff process of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the purpose of representing the Class, Lead Plaintiff need only sufficiently allege that it was injured as a result of Defendants' untrue statements. *See*, *e.g.*, *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 83 n.13 (2d Cir. 2004) ("[A]ny requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff – namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 17

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

a whole."); *In re Leapfrog Enters., Inc. Sec. Litig.*, 2005 WL 3801587, at *3 (N.D. Cal. Nov. 23, 2005) ("[L]ead plaintiffs need[] only to prove that they suffered a concrete injury because of defendants' wrongdoing, not *every* injury alleged by the class."); *In re PMA Capital Corp. Sec. Litig.*, 2005 WL 1806503, at *18 (E.D. Pa. July 27, 2005) ("Lead Plaintiffs may pursue claims on behalf of the entire class because they were appointed to oversee litigation on behalf of the class. The PSLRA does not require that the lead Plaintiffs have standing to sue on every available cause of action.").

Nevertheless, Defendants argue that the Securities Act claims on behalf of the Class should be dismissed because Lead Plaintiff did not purchase securities in the Offerings. UW Mot. at 6; DD Mot. at 9. The law is plainly to the contrary. "[T]he [PSLRA] does not require Lead Plaintiffs to have standing to assert all claims, only that they have the greatest financial stake in the action." *In re Nat'l Golf Props. Sec. Litig.*, 2003 WL 23018761, *1 (C.D. Cal. Mar. 19, 2003) (denying motion to dismiss § 11 claims where lead plaintiff did not have standing to assert those claims); *see also Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 669 (C.D. Cal. 2005) (appointing lead plaintiff without standing to assert all claims and rejecting standing challenges). Having been appointed by the Court to lead this litigation, Lead Plaintiff has standing to assert Securities Act claims, which arise out of the same circumstances as Lead Plaintiff's Exchange Act claims, on behalf of purchasers of all of WaMu's securities.

Moreover, Defendants' argument is a class certification issue, rather than an issue of standing. *See In re Juniper Networks Inc., Sec. Litig.*, 542 F. Supp. 2d 1037, 1052 (N.D. Cal 2008) ("Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification") (quoting *DDi*, 2005 WL 3090882, at *6); *In re Salomon Analyst*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004); *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 421 (S.D.N.Y. 2003) (lead plaintiff decision "not intended to substitute for the class certification process").

Furthermore, arguments against Lead Plaintiff's standing do not justify dismissal

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 18

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

because (1) Lead Plaintiff has already presented an additional plaintiff to represent the purchasers of securities in the Offerings, Brockton Contributory Retirement System ("Brockton"), which, as discussed in the following section, can represent all purchasers, and (2) Lead Plaintiff is prepared to present additional named plaintiffs to represent the Class for each of the Offerings. The additional plaintiffs include Pompano Beach Police and Firefighters' Retirement System ("Pompano Beach"), which bought Floating Rate Notes in the August 2006 Offering. Pompano Beach can represent all purchasers of securities from the August 2006 Offering, including those who purchased 5.50% Notes, because the identical Registration Statement and other Offering Documents were used to solicit and sell both series of notes. *See Countrywide Sec.*, 588 F. Supp. 2d at 1166 ("So long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' that (3) were false and misleading at each effective date, there is § 11 standing."); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 n.7 (D.N.J. 1998). The other named plaintiffs are Harlan Seymour, who purchased Series K Stock in or traceable to the September 2006 Offering, and the Police & Fire Retirement System of the City of Detroit ("Detroit P&F"), which purchased Series R Stock in or traceable to the December 2007 Offering. Thus, based on Pompano Beach's, Mr. Seymour's, and Detroit P&F's readiness to represent the Class with respect to each security offered in or traceable to the August 2006, September 2006, and December 2007 Offerings, Defendants' standing argument is moot and should be rejected.

### 2.    Brockton Is An Appropriate Named Plaintiff

Defendants make two arguments against Brockton's standing, both of which are meritless. First, Defendants argue that Brockton, which purchased 7.250% Notes on the October 2007 Offering, does not have standing to represent investors in the August 2006, September 2006, or December 2007 Offerings. UW Mot. at 6; DD Mot. at 9.

While this argument is moot because of the additional representative plaintiffs discussed above, as a purchaser on the October 2007 Offering, Brockton has standing to represent all

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 19

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Securities Act plaintiffs in the Class.  First, Brockton purchased WaMu securities pursuant to the exact same types of untrue statements regarding WaMu's lending and accounting practices as did the purchasers of the other Offerings.  *See Juniper Networks,* 542 F. Supp. 2d at 1052 ("Plaintiffs with a valid securities claim may represent the interests of purchasers of other types of securities in a class action where the alleged harm stems from the same allegedly improper conduct.") (citing *DDi,* 2005 WL 3090882); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 2148919, at *7-8 (S.D.N.Y. Sept. 6, 2005) (plaintiff had standing to sue on behalf of purchasers of different classes of securities since all class members "relied on the same repeated, material misstatements" in the various offering documents).  Second, Brockton purchased WaMu securities pursuant to the Registration Statement filed by WaMu with the SEC on Form S-3AR in January 2006 – the same shelf registration statement from which all the Offerings were issued.  Thus, since the same shelf registration statement was used for all the Offerings, Brockton has standing to represent all purchasers of the securities issued pursuant to the Registration Statement.  *See Countrywide Sec.*, 588 F. Supp. 2d at 1162 (finding § 11 standing where same registration statement and offering materials overlapped between offerings).  Finally, the October and December 2007 Offerings incorporated many of the same financial statements.  Thus, at a bare minimum, Brockton has standing to represent purchasers on the December 2007 Offering, as well.

Defendants next claim that Brockton improperly "bypassed the PSLRA notice provisions" and thus does not have standing to bring Securities Act claims on behalf of the Class.  UW Mot. at 6; DD Mot. at 9.  Defendants' contention that Brockton must be appointed by the Court to represent the Class, through the full PSLRA notice process, should be rejected.  As the Underwriter Defendants correctly note, the court in *Countrywide Securities* rejected this precise objection to a named plaintiff as a "meritless assertion."  588 F. Supp. 2d at 1157; *see also Weinberg v. Atlas Air Worldwide Holdings*, 216 F.R.D. 248, 254 (S.D.N.Y. 2003) ("[d]esignating multiple Lead Plaintiffs to represent each cause of action would fracture the

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 20

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

litigation and 'obstruct any efficient and controlled process.'") (quoting *In re Enron Corp. Sec. Litig.*, 206 F.R.D 427, 451 (S.D. Tex. 2002)).  Defendants' argument also ignores the facts that the Court: (i) appointed Lead Plaintiff to lead an action consolidating all cases "that allege violations of the Federal securities laws and arise out of the same facts," (Order, Docket #24); and (ii) consolidated the Brockton action with the current action because it "arises out of the same facts" (Order, Docket #40).  The Court-appointed Lead Plaintiff has performed its duties to "assess the causes of action available to the class, to plead those claims in the consolidated amended complaint, and to identify as named plaintiffs additional class representatives that were necessary to assert the claims."  *WorldCom*, 294 F. Supp. 2d at 422.

In making this argument, Defendants inexplicably cite to *In re Impax Laboratories, Inc., Securities Litigation,* 2008 WL 1766943 (N.D. Cal. Apr. 17, 2008).  UW Mot. at 7 n.8.  In that case, the court appointed a lead plaintiff to replace a plaintiff who had not demonstrated standing for ***any*** violation of the securities laws.  2008 WL 1766943, at *7-9.  The court rejected defendants' argument that the replacement required the PSLRA notice process:

> [T]he need to add representative plaintiffs may arise after a case has been initiated.  It would turn securities litigation into a game of snakes and ladders to hold that any time a new plaintiff is added, the action must "go back to square one" and recommence the PSLRA lead plaintiff selection process.

*Id.* at *8 (internal citation omitted).  Defendants' reliance on *In re Select Comfort Securities Litigation,* 2000 WL 35529101 (D. Minn. Jan. 27, 2000) (UW Mot. at 7 n.8) is also misplaced.  That case dealt with a consolidation order which specifically limited the amended complaint to "existing claims and classes of plaintiffs."  *Id.* at *6.  The consolidation order in this case had no such limits.

### 3.   Plaintiffs Have Standing To Allege Violations Of Section 12(a)(2)

In order to allege a violation of § 12(a)(2) of the Securities Act by the Underwriter Defendants, Plaintiffs must: (1) allege materially untrue statements in the Offering Documents, and (2) provide a "short and plain statement showing that the underwriter defendants are

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 21

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

statutory sellers and that plaintiffs purchased securities from them." *DDi*, 2005 WL 3090882, at *19. Plaintiffs satisfy this pleading burden. As discussed in Section II.F, the Complaint sufficiently alleges that the Offering Documents contained materially untrue and misleading statements. The Complaint further alleges that the Underwriter Defendants, through the Offerings, solicited and sold WaMu securities to members of the Class. ¶992. Finally, the Complaint alleges that Plaintiffs bring this claim on behalf of members of the Class that acquired WaMu securities in or traceable to the Offerings. ¶991. Nothing more is required to allege a § 12(a)(2) claim on behalf of the Class.

Nevertheless, the Underwriter Defendants dispute Plaintiffs' standing. As discussed above, both Lead Plaintiff and Brockton have standing to bring claims on behalf of the Class. *See Fouad*, 2008 WL 5412397, at *7-8 (where named plaintiff purchased securities in IPO, that "sufficiently establish[ed] standing for the plaintiff class"); *Nat'l Golf*, 2003 WL 23018761, at *2 (finding sufficient allegations of § 12(a)(2) violations where at least one named plaintiff purchased securities pursuant to untrue or misleading offering documents).

In addition, the Underwriter Defendants argue that Brockton does not have standing to bring § 12(a)(2) claims on behalf of itself or the Class because the Complaint does not contain the talismanic phrase that Brockton purchased "directly from" a specific Underwriter Defendant. UW Mot. at 7. However, the Complaint does allege that Brockton purchased "on the [October 2007] Offering." ¶14. The certification Brockton filed in conjunction with its initial complaint (2:08-CV-007851-MJP, Docket #1) makes clear that Brockton purchased the 7.25% Notes in the days immediately following the announcement of the October 2007 Offering and coincident with WaMu's filing of the final prospectus for this Offering. The timing of Brockton's purchases demonstrates that Brockton purchased the securities at issue on the October 2007 Offering from an Underwriter Defendant. Plaintiffs are not required, at this stage, to name the specific Underwriter Defendant from which Brockton purchased. *See DDi*, 2005 WL 3090882, at *19-20 ("Plaintiffs need not allege which underwriter sold securities to

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1] Master No: 2:08-md-1919 MJP Page 22

Bernstein Litowitz Berger & Grossmann LLP 1285 Avenue of the Americas New York, NY 10019 (212) 554-1400

each plaintiff"); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996) ("we do not find support in *Pinter* for the district court's statement that, in order to [allege that the underwriter defendants were § 12(a)(2) sellers], plaintiffs are required to allege which underwriter sold securities to which plaintiff").

Thus, the Class has standing to bring § 12(a)(2) claims.

### D. The Offering Documents Contained Untrue Statements Of Material Fact And Omitted Material Facts

A complaint may not be properly dismissed pursuant to Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless it is "so obvious that reasonable minds [could] not differ" as to the materiality of the misstatement. *Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir. 1995) (quoting *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)). Whether securities offering documents contained materially untrue statements is a mixed question of fact and law and is generally inappropriate for determination on a motion to dismiss. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

Here, the Complaint adequately alleges that the Offering Documents contained untrue statements of material facts and omitted to state material facts necessary to make the statements made not misleading. In particular, the Complaint alleges that the Offering Documents stated that WaMu adhered to strict underwriting guidelines and obtained independent appraisals to ensure conservative loan-to-value ratios, which was untrue. The Complaint also alleges that the Offering Documents stated that WaMu's net income, Allowance (defined below), and loan loss provision (among other financial metrics) were properly accounted for and that WaMu's internal controls were effective, which was also untrue. Indeed, as set forth below, the Complaint specifies each untrue statement in the Offering Documents and explains why each statement was untrue.

Nevertheless, the Securities Act Defendants contend that the Offering Documents contain no material misrepresentations or omissions. This is a fact question not appropriate for determination on the pleadings.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 23

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

### 1.    Untrue Statements And Omissions About WaMu's Appraisal Practices

The Offering Documents contained numerous untrue statements concerning WaMu's appraisal practices.  As alleged in the Complaint, WaMu's inflated appraisals gave the false appearance that the loan amount was much lower relative to the value of the collateral for the loan (the appraised home) than it actually was.  As a result, WaMu's loans had artificially low (*i.e.*, favorable) loan-to-value ("LTV") ratios, one of WaMu's key metrics as it was used by investors as a proxy for credit risk.  ¶864.  For example, the Offering Documents incorporated by reference WaMu's statements in its 2005 and 2006 Forms 10-K that "[l]oan-to-value ratios are a key determinant of future performance" and that WaMu managed its credit risk by managing its LTV ratios.  ¶¶910, 934.  The Complaint alleges that, in fact, the Offering Documents' statements about WaMu's use of LTV ratios in its underwriting as "key determinants of future performance" were untrue because WaMu inflated the appraisals of the real estate collateral for its loans, which materially misstated the LTV ratios and made the loans much riskier.  ¶¶912, 936, 959.  The Complaint – contrary to Defendants' mischaracterizations (*see* UW Mot. at 16) – includes specific facts demonstrating that WaMu routinely pressured appraisers to artificially inflate values **starting in 2005**.  *E.g.*, ¶¶867-69, 873-74 (statements of a Senior Appraisal Coordinator and loan consultant at WaMu, an in-house and later outside appraiser for WaMu, and an appraisal team manager for WaMu at one of WaMu's outside appraisal firms).  Thus, Defendants' argument that WaMu's improper appraisal practices began after the August and September 2006 Offerings fails.  The Complaint also alleges, based on the NYAG Complaint, that numerous emails between WaMu and eAppraiseIT show that WaMu frequently pressured eAppraiseIT to inflate home values.  ¶¶872.

The October 2007 Offering Documents were announced only six days before the NYAG Complaint, and the Complaint alleges that WaMu was aware of the imminent filing of that complaint, but failed to disclose the soon-to-be revealed facts concerning WaMu's pressure on third-party appraisers to inflate appraised values.  ¶954.  Thus, at the time of the October 2007

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 24

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Offering, WaMu's improper appraisal practices were undisclosed. The Underwriter Defendants, however, try to escape liability for these material omissions in the October 2007 Offering Documents by citing a May 22, 2007 news article, which they claim revealed WaMu's improper appraisal practices before that Offering. UW Mot. at 16 n.15. This argument suffers two fatal defects. First, it improperly relies on materials outside the Complaint and should be disregarded. *See* Section I.B. Second, it is simply wrong. While the article reported that the Attorney General issued a subpoena to First American, the article did not even mention WaMu (unlike the NYAG Complaint which discusses WaMu at length). The argument that WaMu's improper appraisal practices were disclosed to the market in May 2007 is therefore baseless.

In addition, Defendants wrongly contend that the Court should disregard the Complaint's allegations based on the NYAG Complaint because allegations relying, in part, on that complaint cannot form the basis of viable securities fraud claims. UW Mot. at 16 n.14 (citing *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003)). However, "[n]either § 11 nor § 12(a)(2) of the 1933 Act is governed by the heightened pleading standards of the PSLRA." *In re White Elec. Designs Corp. Sec. Litig.*, 416 F. Supp. 2d 754, 764 (D. Ariz. 2006) (citing *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002)). Even when more particularity is required, the Ninth Circuit permits allegations in a complaint so long as (i) plaintiff states with particularity the sources of the information alleged, and (ii) there are adequate corroborating details. *See Daou*, 411 F.3d at 1015. The Complaint's allegations about WaMu's inflated appraisals based on the NYAG Complaint are corroborated by numerous confidential witnesses, as discussed above, and are therefore clearly proper. The allegations in the NYAG Complaint are also based on numerous e-mails. *See New Century*, 588 F. Supp. 2d at 1221 ("The Court will allow the allegations drawn from the [Bankruptcy] Examiner's Report because the allegations are derived from documentary evidence that qualifies as a reliable source for pleading purposes."); *In re Enron Corp. Sec. Litig.*, 2005 WL 3504860, at *6 n.11 (N.D. Tex. Dec. 22, 2005) (same). The Ninth

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 25

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Circuit's decision in *Metzler Inv. GMBH v. Corinthian Colleges Inc.*, 540 F.3d 1049 (9th Cir. 2008) (UW Mot. at 15), is not to the contrary.  The court affirmed dismissal in that case because it determined that Plaintiffs' conclusory allegations of falsity were extraordinarily vague and made no concrete connection between alleged improprieties and the inaccuracy of the company's statements – not because plaintiffs' complaint was based on a governmental investigation.  *Id.* at 1071.

Lastly, the Underwriter Defendants seek to immunize themselves from liability by labeling WaMu's material untrue statements and omissions concerning the Company's appraisal practices as nothing more than mere "corporate mismanagement."  UW Mot. at 15. This is incorrect.  "The fact that Lead Plaintiffs' allegations could potentially state claims for corporate mismanagement or a breach of fiduciary duty does not negate the applicability of federal securities laws, if the statements in the Prospectus were materially false and misleading at the time they were made."  *In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, at *13 (S.D. Cal. Jan. 3, 2005) (sustaining § 11 claims against underwriter defendants); *see also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir. 1993) ("failure to recognize problem loans, thus understating the reserve, constitutes an actionable omission or misrepresentation of existing fact which cannot be dismissed as a mere matter of internal mismanagement, unsound business practice, or poor accounting judgment."); *Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 391 n.11 (D. Or. 1996) ("[A] complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement.") (internal citation and quotation marks omitted).

Defendants' reliance on *Santa Fe Industries v. Green*, 430 U.S. 462 (1977) (UW Mot. at 15), for the proposition that mere "internal corporate mismanagement" cannot form the basis of a securities law claim is misplaced.  Plaintiffs in *Santa Fe* alleged no false statements, but rather challenged a majority stockholder's squeeze-out merger.  *Id.* at 474.  The Supreme Court held

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 26

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

that "there was no 'omission' or misstatement in the information statement accompanying the notice of merger." *Id.; see Plaine v. McCabe*, 797 F.2d 713, 723 (9th Cir. 1986) (*Santa Fe* is inapplicable where plaintiff has "set forth specific items of information which she alleges were improperly omitted . . . or misrepresented."); *In re Tyco Int'l, Ltd.*, 2004 WL 2348315, at *3 (D.N.H. Oct. 14, 2004) ("[T]he decision [in *Santa Fe*] does not necessarily preclude a claim . . . which is based on the concealment of allegedly material information concerning corporate misconduct, rather than on the underlying misconduct itself."); *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375-76 (S.D.N.Y. 2004) (UW Mot. at 15 n.13) (no allegations that challenged business practices caused misstatement in disclosures).

A fair reading of the Complaint shows that this is not a case of second-guessing WaMu's business decisions. Rather, the Complaint identifies material facts contemporaneously misstated by the Offering Documents, which are actionable under §§ 11 and 12(a)(2). Accordingly, Defendants' "corporate mismanagement" defense is unfounded.

### 2.     Untrue Statements And Omissions About WaMu's Underwriting Standards And Loan Quality

The Complaint identifies numerous statements in the Offering Documents that presented WaMu's underwriting practices as prudent and conservative. For example, the August 2006 and September 2006 Offering Documents incorporated by reference WaMu's 2005 Form 10-K, which stated that "[t]he Company actively manages the credit risk inherent in its [prime] Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures." ¶909. The 2005 Form 10-K also stated that "[t]he Company seeks to mitigate the credit risk in [its subprime] portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans." *Id.* Similarly, the October 2007 and December 2007 Offering Documents incorporated by reference the 2006 Form 10-K, which repeated the same misstatements about WaMu's underwriting standards as set forth in WaMu's 2005 Form 10-K. ¶¶933, 959. The December 2007 Offering Documents also stated that

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 27

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   WaMu adopted "a set of credit risk concentration limits" in 2006, which "better enable[d] the

2   credit risk management function to proactively manage credit risk."  ¶960.

3        These statements were materially untrue because the Company was undermining its

4   underwriting standards, issuing loans that were increasingly unlikely to be repaid, and making

5   exceptions to its underwriting guidelines as a matter of course.  ¶¶877-85.  Indeed, far from

6   "ensuring compliance with underwriting standards," WaMu actually diluted its underwriting

7   standards and increased its exceptions to those standards starting at least as early as 2005 in

8   order to increase loan volume. *Id*.  The Complaint alleges specific facts demonstrating the

9   untruth of the Offering Documents' statements about WaMu's underwriting standards.  For

10  example, a former WaMu Underwriting Supervisor from 2005 to 2008 confirmed that WaMu's

11  underwriting guidelines allowed risky loans, and that WaMu readily made exceptions to the

12  guidelines to approve even riskier loans (¶878); a former WaMu Senior Underwriter confirmed

13  that exceptions were "part of the norm" and "were always approved" (*id.*); a former senior

14  underwriter and an internal WaMu document both indicated that WaMu underwrote Option

15  ARM loans to the initial low "teaser" rate, rather than the fully indexed rate as the Offering

16  Documents stated (¶¶881-83); and former WaMu employees confirmed that underwriters were

17  paid large bonuses based on loan volume regardless of credit quality and were deliberately not

18  told about loan delinquency data because senior management did not want underwriters to

19  tighten WaMu's lending standards (¶¶884-85).

20       Based on these allegations, there can be no question that the Offering Documents

21  contained actionable misstatements and material omissions regarding WaMu's underwriting

22  standards and loan quality.  Indeed, for a lending company, underwriting is fundamental

23  information, and statements about its loan standards and quality are clearly material to

24  reasonable investors.  *See Atlas v. Accredited*, 556 F. Supp. 2d at 1155 (denying lending

25  company's motion to dismiss and noting that "underwriting practices would be among the most

26  important information looked to by investors"); *In re Countrywide Fin. Corp. Derivative Litig.*,

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 28

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008) ("*Countrywide Deriv.*") (false statements included representations that Countrywide actively managed credit risk, applied more stringent underwriting standards for riskier loans such as ARMs, and only retained high credit quality mortgages in its loan portfolio); *PMA Capital*, 2005 WL 1806503, at *10 (misrepresentations regarding a company's underwriting practices are actionable); *Teamsters Local 445 v. Bombardier*, 2005 WL 2148919, at *12 (same). In addition, analysts and others repeatedly commented on Defendants' statements concerning these matters because this was important information to investors. *E.g.,* ¶¶573, 589, 601, 650.

In the face of these clear allegations that the Offering Documents misstated WaMu's underwriting practices and loan quality, Defendants argue that the Complaint fails to allege any material misstatements. This argument must be rejected.

*First,* Defendants argue that WaMu's statements about its underwriting standards and management of credit risk were merely "non-actionable statements of opinion" and "puffery." UW Mot. at 17. They are wrong. The Offering Documents' statements that WaMu "ensur[ed] compliance with underwriting standards" and other statements about the Company's credit risk management specifically described past performance and WaMu's underwriting controls. The statements addressed then-existing market concerns and thus, do not constitute "puffery" or mere statements of "opinion." These types of statements were recently found to be actionable in *Countrywide Derivative*, a similar case involving a mortgage lender. In that case, the court held that statements such as Countrywide was "well-positioned with a . . . high quality credit profile in our loan portfolio" and "Countrywide has . . . very strong discipline in the origination of subprime loans" were actionable. 554 F. Supp. 2d at 1053. Similarly, in *Countrywide Securities*, the court held that statements that Countrywide's systems "improve[d] consistency," "assess[ed] collateral adequacy," and sustained "underwriting standards" and a "quality control process" were actionable in light of the extreme alleged departures from the company's purported underwriting guidelines. *Countrywide Sec.*, 588 F. Supp. 2d at 1153; *see also New*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 29

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Century,* 588 F. Supp. 2d at 1226 ("repeated assurances of . . . strict underwriting practices" are actionable misstatements under the securities laws).

Despite the on-point decisions in *Countrywide* and *New Century*, the Underwriter Defendants nevertheless argue that the facts of those cases are distinguishable.  UW Mot. at 17. Specifically, Defendants contend that the complaints in those cases – unlike here – alleged that the companies' loan practices were "extreme departures" from their announced underwriting standards.  *Id.*  This argument completely disregards the allegations of the Complaint.  The Complaint explicitly alleges, based on the accounts of numerous confidential witnesses, that WaMu's actual practices directly contradicted the Company's announced underwriting and risk management practices.  *E.g.*, ¶¶877-85.

Defendants also cite to inapplicable cases in support of this argument. For example, Defendants rely on *In re Impac Mortgage Holdings, Inc. Securities Litigation*, 554 F. Supp. 2d 1083 (C.D. Cal. 2008) (UW Mot. at 17), where plaintiffs challenged defendants' statement that they expected "solid" loan originations.  *Id.* at 1096.  The court held that this statement was not false because Impac actually ***increased*** its loan portfolio and "Plaintiffs apparently confuse Defendant[]'s statements about the *quantity* of future loans for a statement about the *quality* of those loans."  *Id.* at 1100 (emphasis in original).  Here, the WaMu Offering Documents indisputably spoke to the ***quality*** of WaMu's loans, and the Complaint alleges copious details demonstrating why those qualitative statements were untrue when made.  Defendants' reliance on *In re American Business Financial Services, Inc., Securities Litigation*, 413 F. Supp. 2d 378 (E.D. Pa. 2005) (UW Mot. at 17), is also misplaced.  In that case, the challenged statements were – unlike here – vague and non-specific, and ultimately insignificant as defendants provided actual, hard loan delinquency data to the investing public.  *Id.* at 400-01.  In this case, the Complaint alleges specific facts showing that the Offering Documents materially misstated WaMu's underwriting practices and omitted the true data about the Company's loan quality. Any assertion that the truth about WaMu's lending practices was somehow disclosed through

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 30

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

its incomplete and misleading statements providing select data (such as purported average FICO scores and LTV ratios) about WaMu's loan portfolio (*e.g.*, KK Mot. at 11) also does not withstand scrutiny. Those disclosures failed to meaningfully reveal any of WaMu's true lending practices and are therefore do not correct any of Defendants' other material omissions and false statements. Moreover, the Complaint clearly disputes the accuracy of the loan portfolio information that WaMu provided and Plaintiffs' well-sourced allegations, must be accepted as true at this stage of the litigation. *E.g.*, ¶201 (confidential witness confirming that "for WaMu, *it was all about LTV*,' and therefore WaMu dictated appraisal values that it needed to satisfy the LTV ratios it desired"); ¶448 (LTV values were distorted by inflated appraisals); ¶¶324-29 (WaMu made regular FICO exceptions and treated FICO scores as low as 540 as "prime"). In any event, this is a question of fact not appropriate for resolution at the pleading stage.

**Second**, Defendants argue that the Offering Documents accurately described the types of loans WaMu originated and the risks associated with WaMu's loan practices. UW Mot. at 18. For example, Defendants suggest that, because the Offering Documents disclosed that WaMu made subprime loans and explained that "subprime borrowers 'may be unable to repay their loans and the credit performance of the Company's subprime portfolio could suffer,'" the Offering Documents disclosed the truth about WaMu's loans and lending practices. *Id.* Those statements, however, told investors nothing about the true quality of WaMu's subprime loans or the reasons why subprime borrowers would be unable to repay their loans – namely, WaMu's deviations from its stated underwriting standards and disregard for borrowers' creditworthiness. ¶¶877-85. Moreover, the mere fact that the Offering Documents disclosed WaMu's origination of Option ARM loans and made general statements about how certain of the Company's "residential loans might result in increased risk" (UW Mot. at 18) did not apprise investors that WaMu's Option ARM loans were routinely offered to high-risk borrowers and were underwritten to the initial low "teaser" rate, contrary to the Offering Documents' statement that

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 31

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

they were underwritten to the fully indexed rate.    ¶¶881-83.    Accordingly, the vague disclosures in the Offering Documents that the Company originated subprime and Option ARM loans, which "may" impact the Company's credit performance, were insufficient to inform investors about the truth of WaMu's lending practices.  Defendants' cited cases do not impact that result.  *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (UW Mot. at 19) (admittedly true  statements were not misleading because they did not affirmatively create an impression materially different from the truth); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1297-98 (9th Cir. 1998) (UW Mot. at 19) (prospectus was not misleading for failing to disclose sales decline during one quarter, which was normal seasonal decline and could not reasonably be understood as indicating a trend).

Accordingly, the Offering Documents contained actionable material misstatements and omissions about WaMu's underwriting standards and loan quality.

### 3.    Untrue Statements And Omissions About WaMu's Financial Results And Condition

Plaintiffs also allege that the Offering Documents materially misstated WaMu's financial condition.    ¶¶886-92.    As the Complaint explains, WaMu was required under generally accepted accounting principles ("GAAP") to evaluate on a regular basis the quality of the loans in its portfolio as part of the financial statement preparation process.  If the Company determined that the loans were impaired for any reason, including because of credit risk, it was required to increase, or "provision," its Allowance for Loan and Lease Losses ("Allowance") as a reserve against incurred and probable future losses inherent in the Company's loans held in portfolio.  ¶856.  Provisions to the Allowance reduced, dollar for dollar, WaMu's earnings, because such charges are recorded as an expense.  The Company's Loan Performance Risk Model (the "LPRM") was the key statistical model to predict loan losses, and thus provided the main input as to the appropriate amount by which to provision the Allowance.  ¶860.

Specifically, the Complaint alleges numerous facts demonstrating how WaMu's 2005-06 Forms 10-K and 2005-07 Forms 10-Q failed to comply with GAAP and, as a result,

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 32

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

how the incorporation of these financial statements into the Offering Documents rendered the Offering Documents materially untrue. ¶¶886-92; 913-23; 937-48; 962-66. For example, the Complaint alleges that the financial statements included in the August and September 2006 Offering Documents were materially untrue because they understated WaMu's Allowance and provision for loan losses and overstated the Company's net income, earnings per share, and assets as a result of the Company's undisclosed high-risk lending practices and the deterioration in the Company's loan quality. ¶¶892, 913-17. In particular, an internal WaMu document titled the Credit Risk Oversight Report (the "CRO Report") demonstrates that the LPRM, the key model for calculating the Allowance, did not properly account for losses on Option ARM loans until as late as June 30, 2006 and possibly later, which caused the Company's evaluation of incurred and probable loan losses to be materially understated. ¶¶890, 918. Furthermore, a former Assistant Vice President in WaMu's Risk Analytics Group from January 2006 to January 2008 confirmed that WaMu's LPRM did not reflect actual loan performance data for over 18 months prior to summer 2007, which caused the Company's estimated loan losses in 2006-07 to fail to take into account the deteriorating performance of its portfolio during that period (¶¶463, 862, 891). The Complaint alleges that the financial statements included in the October 2007 Offering Documents were materially untrue for the same reasons. ¶¶941-43.

Moreover, the Complaint quantifies the misstatements in the audited 2006 financials, alleging that for 2006, WaMu's Allowance was understated by at least $562 million, or over 40%; net income was overstated by at least $349 million, or 10%; and earnings per share were overstated by at least $0.35. ¶941. The October 2007 Offering Documents also included WaMu's unaudited financials for the first and second quarters of 2007, which understated its loss reserves by at least $398 million (or 63%) and $472 million (or 56%); overstated its net income by at least $164 million (or 21%) and at least $265 million (or 32%); and overstated its diluted earnings per share by at least $0.18 and $0.30, respectively. ¶942. The December 2007 Offering Documents included the same misleading financial statements (¶962), as well as

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 33

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

WaMu's third quarter 2007 financials (¶963), which also materially understated the Company's Allowance and overstated its net income and earnings per share (¶965).

The Complaint further alleges that the October and December 2007 Offering Documents were untrue because they attributed WaMu's poor financial results in the third quarter of 2007 to adverse developments in the housing, mortgage, and capital markets, rather than on what actually caused the Company's deteriorating financial condition. Namely, WaMu's own improper lending practices undermined the Company's financial condition by causing its Allowance to be materially understated and insufficient to protect against the losses resulting from its high-risk, poor-quality loans backed by inflated appraisals. ¶¶940-41, 944, 964-66.

Thus, the Complaint adequately alleges that the August 2006, September 2006, October 2007, and December 2007 Offering Documents contained material untrue statements and omissions about WaMu's financial results and compliance with GAAP. "[F]inancial statements that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 249 (5th Cir. 2003) (citing SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1)); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *12-13 (N.D. Cal. Apr. 2, 2002) (same); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 656 (S.D.N.Y. 2007) (statement that financial statements conformed with GAAP held to be actionable under securities laws when plaintiffs sufficiently alleged that financial statements did not conform with GAAP); *PMA Capital*, 2005 WL 1806503, at *16 ("[m]isleading statements regarding GAAP procedures are actionable").

Similarly, a mortgage lender's understatements of its loan loss reserves are material and actionable. *See New Century*, 588 F. Supp. 2d at 1226 (understated loan loss reserves actionable under securities laws); *Atlas v. Accredited*, 556 F. Supp. 2d at 1150-52, 1154-55 (same); *see also In re Converium Holding AG Sec. Litig.*, 2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007) (understatement of insurance loss reserves actionable).

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 34

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

### a. Quantification Of WaMu's Financial Misstatements Is Not Required

Tellingly, Defendants' response to these detailed allegations of financial misstatements in the Offering Documents is to simply ignore them and misconstrue the applicable legal standards. The Underwriter Defendants' primary argument with regard to the Company's misstatements of its financial condition is that Plaintiffs do not specify the precise amount by which the financial results were misstated. UW Mot. at 20. This argument fails.

*First*, a complaint need not specify the dollar amount of each misstatement in order to state a claim under the securities laws. *See, e.g.*, *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1998); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79 (1st Cir. 2002) (district court erred in granting motion to dismiss by relying "on the absence of specific figures regarding which transactions were misstated and by what amounts"); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d. 815, 821 (N.D. Ill. 2000) ("Although the plaintiffs have failed to allege . . . the dollar amounts by which Sabratek's financial statements have been misstated as a result of these transactions, the plaintiffs have alleged sufficient facts to meet their burden at this stage in litigation."); *In re Computer Assocs. Class Action Sec. Litig.,* 75 F. Supp. 2d 68, 73-74 (E.D.N.Y. 1999) (same).

*Second*, as noted above, the Complaint *does* allege specific, material dollar amounts misstated in both WaMu's audited annual and unaudited quarterly financials during the Class Period. ¶¶941-42. In this regard, the Complaint specifically – despite Defendants' bald contentions to the contrary (UW Mot. at 20 n.18) – ties the misstated amounts in WaMu's annual and quarterly financial statements to WaMu's failure to account for the increased risk of default that accompanied its departure from its lending standards, including its improper lending practices, the failure of its LPRM to account properly for losses on Option ARM loans, and its deteriorating loan portfolio in 2006-07. ¶¶941-43.

Defendants' reliance on *In re Vantive Corp. Securities Litigation*, 283 F.3d 1079 (9th Cir. 2002), and *In re Levi Strauss & Co. Securities Litigation*, 527 F. Supp. 2d 965 (N.D. Cal. 2007), is misplaced. UW Mot. at 20. Neither *Vantive* nor *Levi* supports Defendants' position

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 35

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

that a securities complaint must allege the precise amounts misstated in untrue financial statements. In *Vantive*, the court affirmed dismissal of allegations that the company improperly accelerated revenue recognition not only because the complaint failed to allege the "approximate amount" of the allegedly misstated revenue, but also because the revenue figures in the complaint actually contradicted plaintiffs' theory of accelerated revenue. 283 F.3d at 1091. Here, the Complaint alleges the approximate amounts by which WaMu's Allowance was understated and its net income and earnings per share were overstated and suffers from no contradictions. In *Levi*, the court dismissed accounting fraud claims based on alleged improper tax accounting because the IRS investigated but found no wrongdoing, among other reasons. 527 F. Supp. 2d at 985-87. Here, the allegations are quite different and investigations into WaMu's wrongdoing by the Justice Department, SEC, and OTS are ongoing.

Relatedly, Defendants contend that the Complaint's allegations about WaMu's material understatement of its loan loss reserves do not adequately specify the misstated amount and affected time period. UW Mot. at 21. This argument similarly fails. Indeed, as discussed above, Plaintiffs need not allege the precise amounts by which Defendants understated their loan loss reserves to state an actionable claim. *See also Wells Fargo*, 12 F.3d at 927 (rejecting argument that plaintiffs must allege specific circumstances establishing loan reserves). Defendants' suggestion that greater details are required at the pleading stage is based on their false statement that "the Ninth Circuit has made clear that Plaintiffs must satisfy a high pleading burden," including a requirement of pleading details about the understated amount of loan loss reserves. UW Mot. at 21 (citing *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815 (S.D. Cal. 2006), *aff'd*, 256 Fed. App'x 74 (9th Cir. 2007)). The decision cited by Defendants is ***not*** a decision of the Ninth Circuit, but rather of a district court. The Ninth Circuit's unpublished affirmance in *Adecco* rests entirely on scienter under § 10(b), and thus, has no bearing on whether Plaintiffs here have adequately pled untrue statements under §§ 11 and 12(a)(2). 256 Fed. App'x 74.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 36

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Lastly, Deloitte argues that WaMu's Allowance was properly "calculated based on a variety of historical and contemporaneous factors" and that "GAAP does not permit an Allowance to be overstated to compensate for future events." DT Mot. at 4-5. This argument ignores the Complaint's detailed allegations that WaMu's Allowance did not take into account the Company's historical and contemporaneous losses on Option ARM loans and other actual and available loan loss data during the Class Period. ¶¶861-62, 890-91, 918.

Under any pleading standard, the Complaint contains ample allegations concerning how WaMu's financials were misstated, including specific amounts of the misstatements, as well as the flaws in WaMu's internal loan loss estimation procedures. Thus, the Complaint's allegations that the Offering Documents materially misstated WaMu's Allowance and loan loss provisions are more than sufficiently pled. The *Countrywide Securities* decision does not hold otherwise. Contrary to Defendants' representation (UW Mot. at 22), the *Countrywide Securities* court actually **upheld** the majority of plaintiffs' allegations regarding misstated loan loss reserves. In fact, the court's opinion makes clear that the only allegations related to loan loss reserves that were dismissed related to Countrywide's reserves **before** its loose loan origination practices resulted in defaults and delinquencies. 588 F. Supp. 2d at 1178-82. By contrast, the Complaint here alleges untrue financial statements **only** for the time periods when (i) WaMu's lending practices had degenerated to such a degree that they impacted its financial statements; and (ii) Plaintiffs could provide internal documentation and witness statements that WaMu's financial statements were misstated. ¶¶859-92.

### b.  A Restatement Of Financial Results Is Not Required

The Underwriter Defendants also argue that they cannot be held liable for WaMu's materially misstated financials because "WaMu has never restated its financial statements, and [because Deloitte] has never withdrawn its audit opinions." UW Mot. at 20. That is not the law. The First Circuit has held:

> [T]he fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 37

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

> requirements of the PSLRA.  To hold otherwise would shift to accountants the responsibility that belongs to the courts.  It would allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements.

*Aldridge*, 284 F.3d at 83; *see also In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) ("the lack of a restatement did not mean that LDK only engaged in legitimate conduct"); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222 (N.D. Okla. 2003) (same); *Feiner v. SS&C Techs.*, 11 F. Supp. 2d 204, 210 (D. Conn. 1998) (same).

Moreover, the lack of a restatement is a particularly weak alibi for Defendants here, because, on September 25, 2008, the OTS declared WaMu's principal bank subsidiary insolvent and placed it in FDIC receivership and, on September 26, 2008, WaMu initiated liquidation proceedings pursuant to Chapter 11.  As a result of its bankruptcy, WaMu was not required to restate its prior financials, nor would such a costly undertaking make any sense.

For these reasons, WaMu's lack of restatement should not serve as a shield for the Defendants who remain in this case.  *Cf. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 487 (S.D.N.Y. 2004) (denying motion to dismiss claims based on reporting periods for which financials were not restated because "[t]he only reason that adjustments were never ultimately made on a quarterly basis was the company's inability to locate the supporting documentation that was necessary to do so").

Defendants' reliance on *In re Credit Acceptance Corp. Securities Litigation*, 50 F. Supp. 2d 662 (E.D. Mich. 1999) (UW Mot. at 24; DT Mot. at 20), for the proposition that a restatement is required for the Complaint's allegations concerning WaMu's financial misstatements to be sustained, is wholly misplaced.  In that case, unlike here, the only bases for the allegation that the company, which made loans for used cars, understated its loan loss reserve were: (i) a subsequent increase in the reserve resulting from implementation of new and improved accounting software, and (ii) testimony in a separate case that ***one of the 2,400*** dealerships with which the company did business engaged in improper sales practices.  *Id.* at

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 38

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

666, 676.  By contrast, the Complaint in this case alleges contemporaneous facts showing that the Allowance was materially understated when made.

### c. Defendants' Additional Arguments Do Not Support Dismissal Of The Securities Act Claims

Defendants' additional arguments also lack merit.

**First**, Deloitte and the Underwriter Defendants argue that liability under the Securities Act cannot arise from WaMu's alleged financial misstatements because the Complaint fails to allege that they acted with scienter.  UW Mot. at 21; DT Mot. at 15-16.  As discussed in Section II.D above, Plaintiffs have no burden to plead scienter for their Securities Act claims. *See Herman & MacLean*, 459 U.S. at 384.  Defendants' citation to *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002) (UW Mot. at 23), has no relevance to this argument, as that case concerned solely what "red flags" would suffice to allege an auditor's scienter under Exchange Act § 10(b), *see id.* at 389-91, and there is no scienter requirement under Securities Act §§ 11 and 12(a)(2), *see Herman & MacLean*, 459 U.S. at 382.  Thus, the Court should reject Defendants' contentions that Plaintiffs must allege: "how the Underwriter Defendants have any responsibility for such misstatement[s]"; "specific facts demonstrating that Deloitte 'disregarded' WaMu's purported misconduct"; or that "Deloitte had knowledge of such alleged misconduct."  UW Mot. at 21; DT Mot. at 15-16.

**Second**, Deloitte and the Underwriter Defendants argue that they cannot be held liable because they reasonably believed that the statements in the Offering Documents were true and complete. UW Mot. at 21; DT Mot. at 15-16.  Such an argument is improper at the pleading stage.   Under §§ 11(b)(3) and 12(a)(2), Defendants' claimed reasonable belief that the statements were true and complete (or claimed lack of knowledge that the statements were untrue and incomplete at the time of the Offerings) is an affirmative defense for which Defendants bear the burden of proof *at trial*.  *See Herman & MacLean*, 459 U.S. at 382; *Ernst & Ernst v. Hochfelder*, 425 U.S. at 208.  The Third Circuit has rejected precisely this precise position, holding that "an affirmative defense may not be used to dismiss a plaintiff's complaint

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 39

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

under Rule 12(b)(6)." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004); *see also In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1369 (N.D. Ga. 2005). Moreover, Defendants' cited cases (UW Mot. at 21; DT Mot. at 11) actually support the conclusion that a due diligence defense is not properly decided at the pleading stage. *See In re Software Toolworks Inc.*, 50 F.3d 615, 623-24 (9th Cir. 1994) (holding due diligence established on summary judgment where, after discovering "red flag," underwriters demanded explanation from auditor about its accounting, insisted on written confirmations of particular contracts, and confirmed auditor's accounting method with other accounting firms); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424 (9th Cir. 1994) (granting summary judgment after due diligence defense proven); *Monroe v. Hughes*, 31 F.3d 772, 774-75 (9th Cir. 1994) (same).

*Third*, contrary to the Underwriter Defendants' claims, Deloitte's audit opinions do not shield them from liability, nor do they constitute grounds for dismissal on a due diligence defense at the pleading stage. UW Mot. at 21. *Countrywide Securities* does not hold otherwise. There, the court dismissed the Securities Act claims against the underwriter defendants with respect to the financial misstatements at issue. 588 F. Supp. 2d at 1180-82. In doing so, the court noted that the only "red flags" proposed by plaintiffs were the company's loose lending practices. *Id.* at 1182. Notably, the court sustained plaintiffs' claims against the underwriter defendants for false statements related to loan origination and risk management practices. *Id.* Here, the Complaint alleges these red flags and more, including that, for each of the financial statements incorporated into the Offering Documents, the Company's fundamental model for predicting credit losses, the LPRM, was deeply and obviously flawed (¶¶860-62, 915, 917-18, 938, 941-53, 956, 965) and even minimal due diligence should have revealed such a material weakness. At best, the Underwriter Defendant's argument has raised issues of disputed fact.

*Fourth*, the Underwriter Defendants' argument that they cannot be liable because accounting for loan loss reserves "requires the exercise of judgment" (UW Mot. at 22-24) also should be rejected. It is well settled that misstatements and omissions regarding loan loss

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 40

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    reserves are actionable under the securities laws. *See, e.g., Wells Fargo*, 12 F.3d at 926

2    (rejecting argument that loan loss reserves are subjective and thus inactionable, noting "[t]here

3    is nothing unique about representations and omissions regarding loan loss reserves that removes

4    them from the purview of the antifraud provisions of the federal securities laws") (quoting

5    *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 276-77 (3d Cir. 1992)).

6        The cases on which Defendants rely in support of this argument are inapposite. *See In

7    re 2007 Novastar Fin., Inc. Sec. Litig.*, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) (UW

8    Mot. at 23) (dismissing fraud claims where "Plaintiff fails to identify a single false entry in the

9    Company's financial statements, nor does he identify the 'truth' that should have been

10    disclosed"); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1141, 1150, 1153 (C.D.

11    Cal. 2007) (UW Mot. at 23) (dismissing allegations of financial misstatements resulting from

12    stock option backdating where complaint did not specify backdated options grants or errors in

13    the financials and both the company's Special Committee and independent auditor concluded

14    no significant backdating occurred); *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903

15    (8th Cir. 2005) (UW Mot. at 23) (affirming summary judgment where plaintiffs' claims were

16    based entirely on statements made by defendants "***after*** the registration statement was issued")

17    (emphasis added). Here, the Complaint alleges, based on internal documents and confidential

18    witnesses, that WaMu's loan loss reserves were understated before the Offerings. *Thor Power*

19    *Tool Co. v. Comm'r*, 439 U.S. 522 (1979) (UW Mot. at 23) is simply inapplicable. There, the

20    Supreme Court rejected a taxpayer's argument that tax and financial accounting should be

21    presumed to be equivalent, noting in passing that GAAP allows a range of reasonable

22    alternatives. *Id.* at 544. *Thor* has no bearing on a financial accounting case like this one, where

23    Plaintiffs allege extensive details demonstrating that WaMu's accounting deviated materially

24    from any reasonable alternative.

25                    *    *    *

26        Thus, the Complaint adequately alleges that the Offering Documents contained untrue

---

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 41

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

statements and omitted material facts regarding WaMu's financial results and compliance with GAAP at the time of each Offering. *See DDi*, 2005 WL 3090882, at *12-13 (allegations that defendants' "accounting improprieties" caused prospectus to be "materially" misleading met Rule 8(a) pleading standards); *In re CBT Group PLC Sec. Litig.*, 2000 WL 33339615, at *4 (N.D. Cal. Dec. 29, 2000) (§ 11 violations were adequately pled where complaint alleged that registration statement contained financial misstatements).

### 4.    Untrue Statements And Omissions About WaMu's Internal Controls

The Complaint also alleges detailed facts demonstrating that the Offering Documents contained materially misstated Sarbanes-Oxley ("SOX") certifications, and other untrue statements regarding the effectiveness of WaMu's internal controls at the time of the Offerings. ¶¶924-28, 949-53, 967-70. For example, the Complaint alleges that WaMu relegated its risk management personnel to a secondary "support" role to loan production, rather than as a safeguard against bad lending. ¶859. The Complaint also alleges that, rather than have risk management report directly to the Board of Directors or an independent executive officer, WaMu placed Schneider in charge of both WaMu Home Loans' risk management and its lending operations, depriving risk management of any independence. ¶859. In addition, WaMu's LPRM did not appropriately analyze the risk of losses on Option ARM loans, and it did not reflect actual loan performance data for over 18 months until summer 2007. ¶¶860-62. Thus, the Offering Documents' statements that WaMu maintained effective internal controls were materially misleading.

Material misstatements regarding internal controls appearing in SOX certifications are actionable. *See In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (finding defendant's SOX certification as to adequacy of internal controls an actionable "false certification" when such controls were revealed to be inadequate); *PMA Capital Corp.*, 2005 WL 1806503, at *10 ("The Sarbanes-Oxley certifications are relevant because the Defendants claimed therein that all internal control deficiencies had been disclosed."); *see also In re S. Pac.*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 42

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Funding Corp. Sec. Litig.*, 83 F. Supp. 2d 1172, 1179 (D. Or. 1999) (denying motion to dismiss claims related to inadequate internal controls).

Defendants cite *D.E. & J. Ltd. Partnership v. Conaway*, 284 F. Supp. 2d 719 (E.D. Mich. 2003), for the proposition that certifications of internal controls are inactionable statements of opinion. UW Mot. at 24 n.20. As the cases above demonstrate, however, statements about internal controls are not merely opinions, but are statements of fact. In any event, "statements couched as opinion or belief may be actionable if the opinion is (1) known by the speaker to be false when made *or* (2) made without a reasonable basis in fact." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1027 (C.D. Cal. 2008) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093-94 (1991)) (emphasis added); *see also D.E. & J. Ltd. P'ship*, 284 F. Supp. 2d at 736 (acknowledging that statements of opinion may be actionable, but misstating *Virginia Bankshares* test as requiring **both** that speaker does not believe statement **and** that statement lacks reasonable basis).

Based on the detailed factual allegations in the Complaint, the representations and attestations regarding the effectiveness of WaMu's internal controls incorporated by reference into the Offering Documents are actionable.

### 5. Deloitte Is Liable For The Misleading Financial Statements And Audit Opinions And For Its Misleading Certification Of WaMu's Internal Controls

Deloitte audited WaMu's financial statements during the Class Period, consented to inclusion of its audit opinions in the Offering Documents, and is liable for the material misrepresentations contained in the financials and audit opinions. ¶¶838, 893-901, 920-23, 946-48. Deloitte also certified that WaMu "maintained, in all material respects, effective internal control over financial reporting" as of December 31, 2005 and 2006. ¶¶927, 951. Deloitte's certification of the effectiveness of WaMu's internal controls was materially untrue and misleading because, among other things, WaMu lacked adequate controls to ensure that its Allowance properly accounted for Option ARM loans and the actual deterioration in its loan

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 43

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

portfolio's performance in 2006-07.    ¶¶926-28, 952-53.    Section 11(a)(4) provides that an accountant is liable for material untruths and omissions in any part of the registration statement "prepared or certified" by the accountant.    15 U.S.C. § 77k(a)(4).    Accordingly, Deloitte is liable for its untrue certification of the effectiveness of WaMu's internal controls.

Deloitte cites *Monroe v. Hughes* as holding that auditors are liable only for untrue statements in the audited financial statements.    DT Mot. at 11.    That case, however, was decided in 1994, long before the Sarbanes-Oxley Act of 2002 established the requirement that auditors attest to the effectiveness of internal controls and expressly held that the auditor defendant there complied with all applicable disclosure requirements then in effect relating to internal controls.    *See* 31 F.3d at 774-75; *see also In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1294-95 (E.D. Wash. 2007) (denying motion to dismiss claims based on auditor's failure to disclose internal control deficiencies and distinguishing *Monroe* because auditor there took additional steps to ensure reliability of audit in light of deficient internal controls); *Adam v. Silicon Valley Bancshares*, 884 F. Supp. 1398, 1403-04 (N.D. Cal. 1995) (denying motion to dismiss claims against auditor based on inadequate loan loss reserve where auditor disregarded deficiencies in internal controls).    Deloitte also cites *Stac* (DT Mot. at 11), but there was no auditor defendant in *Stac*.    89 F.3d at 1401.

Deloitte's argument that it cannot be liable for its statements that its audits complied with GAAS should also be rejected.    The cases Deloitte cites are off point.    *See New Jersey v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1128, 1135 (D. Kan. 2004) (dismissing allegations where plaintiffs conceded that financial statements were accurate and complied with GAAP); *Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000) (granting summary judgment where plaintiff's expert admitted there were no material violations of GAAP or GAAS); *In re Seracare Life Scis., Inc. Sec. Litig.*, 2007 WL 935583, at *9 (S.D. Cal. Mar. 19, 2007) (dismissing claims against auditor where complaint did not adequately allege any errors in the audited financials).    In this case, the Complaint pleads numerous material misstatements in the

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 44

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

financials, including specific dollar amounts misstated in the 2006 financials audited by Deloitte. *E.g.*, ¶941.

Accordingly, the Complaint adequately alleges claims under § 11 against Deloitte.

### E. The Affirmative Defense Of "Negative Causation" Is Not A Proper Basis For Defendants To Seek Dismissal At The Pleading Stage

Defendants seek dismissal of Plaintiffs' Securities Act claims relating to the October 2007 and December 2007 Offerings on "negative causation" grounds – *i.e.*, that the Offering Documents, even if materially misstated, could not have caused the Class's losses. DD Mot. at 9-10; UW Mot. at 8-13. Defendants also seek dismissal on "negative causation" grounds of the Securities Act claims relating to all four Offerings, **but only** to the extent the claims are based on material misstatements in WaMu's audited annual financial statements. DT Mot. at 20-24. Defendants' negative causation arguments should be rejected.

Significantly, in making these arguments, Defendants largely concede causation with respect to the Securities Act claims relating to the 2006 Offerings. They do **not** argue that the Securities Act claims relating to the August 2006 and September 2006 Offerings should be dismissed on "negative causation" grounds to the extent the claims are based on material misstatements **other than** the audited annual financials, as those claims are. ¶¶908-912, 924-28.

### 1. Defendants Cannot, On A Motion To Dismiss, Meet Their Burden Of Proving Negative Causation

Under § 11, there "is effectively 'a factual presumption that any decline in value is caused by the misrepresentation in the registration statement.'" *Countrywide Sec.*, 588 F. Supp. 2d at 1170 (citations omitted); *see also DDi*, 2005 WL 3090882, at *14 (same) (citing *Casella*, 883 F.2d at 808).

A complaint asserting claims under §§ 11 and 12(a)(2) need not plead loss causation. *See Countrywide Sec.*, 588 F. Supp. 2d at 1170-01 (citing *Worlds of Wonder*, 35 F.3d at 1422). Rather, defendants bear the burden of proving that plaintiffs' loss "represents [something] other than the depreciation in value of such security resulting from such part of the registration

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 45

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    statement . . . not being true or omitting to state a material fact . . . ."  15 U.S.C. § 77k(e); *see*

2    *also* 15 U.S.C. § 77*l*(b) (same with respect to prospectus).  Thus, "'the defendant has a heavy

3    burden of proving that the decline in stock price was caused by factors other than the

4    misstatement(s) in the registration statement.'" *New Century*, 588 F. Supp. 2d at 1238 (citations

5    omitted); *see also Freeland v. Iridium World Commc'n's, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006)

6    (plaintiff's "failure to show loss causation is not fatal to §§ 11 and 12 claims because he does

7    not bear the burden of proof on loss causation vis-à-vis those claims"); *In re WRT Energy Sec.*

8    *Litig.*, 2005 WL 3288142, at *2 (S.D.N.Y. Dec. 1, 2005) (allowing plaintiffs to assert a § 11

9    claim for damages based on declines ***before*** the first alleged corrective disclosure because "[t]o

10   conclude otherwise places a burden of pleading loss causation on the plaintiffs, and removes the

11   burden of establishing negative causation from defendants, where it properly lies").

12          Additionally, the negative causation defense is a fact question, not appropriate for

13   adjudication on the pleadings.  *See Levine v. Atricure, Inc.*, 508 F. Supp. 2d 268, 272-73

14   (S.D.N.Y. 2007) ("Because an analysis of causation is often fact-intensive, negative causation

15   is generally established by a defendant on a motion for summary judgment or at trial"); *Adams*

16   *Golf*, 381 F.3d at 277 (negative causation defense "may not be used to dismiss a plaintiff's

17   complaint under Rule 12(b)(6)"); *Countrywide Sec.*, 588 F. Supp. 2d at 1170 (same).

18          Nonetheless, the Director and Underwriter Defendants argue that the Complaint

19   affirmatively establishes that there is no causal connection between the misstatements in the

20   October and December 2007 Offerings and the Class's losses, and Deloitte argues the same for

21   the August and September 2006 Offerings only to the extent the 2006 Offerings incorporated

22   WaMu's 2005 audited financial statements.  DD Mot. at 9-10; UW Mot. at 8-13; DT Mot. at

23   20-24.  These arguments should be rejected, because the Complaint alleges a link between the

24   misstatements in the Offering Documents and the Class's losses.  *See Countrywide Sec.*, 588 F.

25   Supp. 2d at 1170 (dismissal is only appropriate if, on face of complaint, court can find no link

26   between misstatements in offering documents and class's losses).

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 46

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

As discussed above in Section II.F.3, the Complaint alleges that, among other things, WaMu's Allowance was materially understated in the 2005 and 2006 audited financial statements, in violation of GAAP, because it did not take into account WaMu's poor underwriting and inflated appraisals (¶¶913-19, 932, 937, 941), and that the LPRM, the "key model" for computing WaMu's Allowance, was fundamentally flawed (¶¶918, 943). The Complaint also alleges that the Offering Documents' statements about WaMu's underwriting standards (¶¶909-11, 933, 935, 959-61), appraisal practices (¶¶912, 934, 936), and internal controls (¶¶924-28, 949-53, 967-70) were all materially misleading. Defendants cannot prove at the pleading stage that these fundamental errors in the Company's financial statements and other disclosures did not proximately cause Plaintiffs' losses. Indeed, all of the Offerings were followed by disclosures that revealed material misstatements in the Offering Documents about WaMu's Allowance (among other financial metrics), underwriting standards, appraisal practices, and internal controls.

For example, in late 2007, after the August and September 2006 Offerings, WaMu announced the first of many partial disclosures. Specifically, on October 17, 2007, WaMu announced that it expected its loan loss provision to grow to as much as $1.3 billion in the fourth quarter of 2007, marking the ***first*** in a series of partial disclosures about WaMu's enormous loan losses, which resulted directly from the Company's undisclosed abandonment of its stated underwriting standards, inflation of appraisals, and lack of effective internal controls. ¶687. Thereafter, on November 1, 2007, the Attorney General filed the NYAG Complaint, marking the ***first*** in a series of partial disclosures about WaMu's inflation of appraisals. ¶691. These announcements ***partly*** revealed the truth about the misstatements in the August and September 2006 Offering Documents and caused declines in the prices of the securities sold in those Offerings. *See* ¶752 (in response to the NYAG Complaint's disclosures about WaMu's appraisal practices, the Series K Stock sold in the September 2006 Offering fell a total of 13%, and WaMu's debt securities, including those offered in the August 2006 Offering, fell, on

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 47

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

average, 1%).

However, as detailed in the Complaint, neither of these disclosures came close to revealing the true extent of the inadequacy of WaMu's Allowance and improper lending practices and thus, these disclosures did not fully disclose the truth about the material misstatements in the August and September 2006 or October 2007 Offering Documents. Indeed, these disclosures of adverse information in October and November 2007 were (i) accompanied by false reassurances about the quality of WaMu's loan portfolio, misleading statements blaming WaMu's difficulties on external forces, and false denials of the Attorney General's revelations about WaMu's appraisal practices (¶¶690, 693); and (ii) later followed by additional partial disclosures (*e.g.*, ¶¶695-96, 704-17, 730).

Specifically, on November 7 and December 10, 2007 – ***after*** the October 2007 Offering, but before the December 2007 Offering – there were additional adverse disclosures about WaMu's improper appraisal practices and the insufficiency of its loan loss provision. *See* ¶¶695-96 (Attorney General announced expansion of investigation into WaMu's improper appraisal practices); ¶¶705-07 (WaMu announced that its fourth quarter 2007 loan loss provision would be $1.5 to $1.6 billion and disclosed other adverse information about its loan business). Similarly, ***after*** the December 2007 Offering, the series of partial disclosures continued until July 22, 2008. *E.g.*, ¶¶719-20 (January 17, 2008, WaMu announcement of net loss of $1.87 billion for 2007); ¶¶733-34 (April 8, 2008 Company announcement that it suffered a net loss of $1.1 billion for the First Quarter 2008 and was closing all of its home loan offices); ¶741 (June 9, 2008 UBS report estimating WaMu's losses would likely total close to $21.7 billion through 2011, 12.5% to 44% higher than the Company's previously provided loss guidance); ¶747 (July 22, 2008 Company announcement of increase in loan loss reserves by $3.74 billion to $8.46 billion).

These disclosures, as well as information disclosed to the market by analysts, rating agencies, news reports, and other sources, revealed many material facts that were misstated or

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 48

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

omitted in all the Offering Documents, including the October and December 2007 Offering Documents, and caused declines in the prices of the securities sold in all the Offerings. "Where, as here, a plaintiff alleges a complex series of misrepresentations and omissions over a long period of time, it is likely that some information came to the market, but the full extent of the decline attributable to the misrepresentations and omissions were not priced into the security until later, more significant disclosures." *Countrywide Sec.*, 588 F. Supp. 2d at 1172. For example, in response to analyst reports on July 14, 2008 revealing new information about the dire extent of WaMu's mortgage losses, the Series K stock fell 36%, the Series R stock fell 24%, and WaMu's debt securities (including the securities sold in the August 2006 and October 2007 Offerings) fell an average of 8%. ¶752. Overall, the 5.50% Notes fell almost 21% from October 18, 2007 (the day after the first partial corrective disclosure) to July 23, 2008; the Series K Stock fell 68% from October 17, 2007 to July 23, 2008; the 7.25% Notes fell almost 28% from the October 2007 Offering to July 23, 2008; and the Series R Stock fell 51% from the December 2007 Offering to July 23, 2008. ¶753.

This Court's recent decision in *Fouad* is instructive. In that case, this Court denied defendants' negative causation arguments, holding that plaintiffs plausibly alleged that the stock price drops after each of the disclosures were causally related to the misstated revenue figures set forth in the registration statement. 2008 WL 5412397, at *6. Significantly, in *Fouad,* none of the corrective disclosures specifically disclosed the timing or extent of the company's improper revenue recognition practices. Rather, the disclosures in that case – like here – involved announcements causally related to the financial misstatements at issue. For instance, the alleged corrective disclosures included that: (i) the company did not expect to meet its revenue projections for the quarter; (ii) the company's CEO and CFO planned to leave the company and the company would postpone announcing financial results for that quarter; and (iii) there was an investigation into the company's revenue recognition, all of which the Court held were plausibly connected to the revelation of the improper revenue recognition

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 49

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

practices that were reflected in the registration statement's revenue figures. *Id.* Similarly, the disclosures at issue here are causally linked to the misstatements in the Offering Documents.

Nevertheless, Defendants argue that "the October 2007 and December 2007 Offerings took place at a time when investors were explicitly aware of WaMu's financial difficulties and the rapidly deteriorating state of its mortgage loan business." UW Mot. at 8. This argument is baseless. The full truth about WaMu's misstated financial results and improper business practices was not publicly disclosed until months after the December 2007 Offering. Moreover, the market's awareness of general problems in the industry and of declining results at WaMu does not immunize Defendants for the materially incomplete and misleading disclosures in the Offering Documents, which were not corrected by WaMu's partial corrective disclosures prior to the 2007 Offerings. Indeed, courts have rejected similar arguments advanced by defendants in other recent mortgage-related securities actions. *See Countrywide Sec.*, 588 F. Supp. 2d at 1173-74 (rejecting argument that macroeconomic forces caused stock drop and sustaining Securities Act claims based on misstatements about lending standards).

Furthermore, Defendants' argument that *some* information about the mortgage industry's and WaMu's problems was publicly known prior to the 2007 Offerings, and therefore *any* information about problems in WaMu's mortgage business cannot have caused the drops in the 7.25% Notes and Series R Stock sold in those Offerings (UW Mot. at 8-13), defies common sense and basic economic logic, because these were new issues of securities that were obviously priced in the Offerings in light of what the market knew at the time of each Offering about the industry-wide and Company-specific problems. The later drops in these securities' prices can only have been caused by new information, and the Complaint alleges the specific previously misrepresented facts whose revelation after the Offerings caused the drops.

In any event, the extent to which macroeconomic forces impacted the price of WaMu securities, rather than the revelations of the true state of WaMu's lending and accounting practices, is a matter for the fact finder. *See Gilead*, 526 F.3d at 1057; *Countrywide Sec.*, 588

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 50

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

F. Supp. 2d at 1170.  In fact, *Lentell v. Merrill Lynch & Co.*, cited by Defendants in support of their attempt to attribute Plaintiffs' losses to an "industry-wide decline" (DT Mot. at 24), supports Plaintiffs.  396 F.3d 161, 174 (2d Cir. 2005) (cited at DT Mot. at 24) ("'[I]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'") (citation omitted).

Thus, the Complaint alleges that by misstating the truth concerning (i) the Company's reckless lending and underwriting practices, its lack of adequate internal controls, and its misstated financial statements and (ii) Deloitte's failure to audit WaMu's financial statements and internal controls in accordance with GAAS, Defendants misstated material facts in the Offerings, which proximately caused losses to investors.  Defendants' "negative causation" arguments should be denied under these circumstances.

Indeed, courts routinely reject "negative causation" arguments when the complaint on its face does not affirmatively establish such a defense.  For example, in *DDi*, 2005 WL 3090882, at *15, the court rejected a "negative causation" argument because: (i) the "[complaint] does not affirmatively assert that the alleged misrepresentations and omissions in the Prospectus were revealed only after the value of DDi common stock plummeted"; (ii) it was "unclear when the 'accounting improprieties' were revealed"; and (iii) it was not "apparent on the face" of the complaint that the stock's loss in value was caused by something other than the alleged misrepresentations and omissions in the prospectus.  *Accord In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *3-4 (N.D. Cal. Aug. 17, 2006) (denying motion "because the complaint on its face does not foreclose the possibility that defendants caused plaintiff's losses"); *In re WRT Energy Sec. Litig.*, 2005 WL 2088406, at *2 (S.D.N.Y. Aug. 30, 2005) (denying motion because "[defendants] cite nothing in the pleadings establishing some reason other than the alleged misstatements . . . for the drop in the value of WRT securities"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 383 (S.D.N.Y. 2006) (finding

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 51

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

that defendants could not meet the "heavy burden" of establishing negative causation on a motion to dismiss and sustaining § 11 claim because plaintiffs alleged facts sufficient to demonstrate material misstatements in prospectus).

In this case, even though not required for their §§ 11 and 12(a)(2) claims, Plaintiffs have alleged specific corrective disclosures which triggered immediate losses by revealing facts that had been misstated at the time of each of the Offerings. Thus, even if Plaintiffs were required to plead loss causation for their Securities Act claims – which they are not – the Complaint's allegations are more than sufficient to demonstrate proximate cause under applicable notice pleading standards.

### 2. Defendants' Additional Cases And Arguments Do Not Support Dismissal For Negative Causation

In further support of their negative causation defense, Defendants cite numerous inapposite cases and make unpersuasive arguments.

***First***, *Ryan v. Flowserve*, 245 F.R.D 560 (N.D. Tex. 2007) (DT Mot. at 22), actually supports Plaintiffs' position as, in that case, defendants' negative causation defense was ***rejected at the pleading stage***. In its decision on defendants' motion to dismiss, that court expressly rejected the same argument that the Defendants make here, which the court termed a "fact-for-fact pleading requirement." 444 F. Supp. 2d 718, 725 (N.D. Tex. 2006) (denying interlocutory appeal of denial of motion to dismiss). Only later at summary judgment, ***after*** expert testimony indicated that the market did not understand the alleged disclosures to be corrective, did the court rule in the defendants' favor. 245 F.R.D. at 578-82.

***Second***, Defendants rely on cases that are inapplicable because the losses in those cases occurred ***before*** any adverse disclosure was made, which the courts held precluded causation. *See In re Merrill Lynch & Co. Research Reports Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003) (DT Mot. at 21 n.6); *In re McKesson HBOC Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (DT Mot. at 20, 21 n.6); *Davidco Investors, LLC v. Anchor Glass Container Corp.*, 2006 WL 547989, at *25 (M.D. Fla. Mar. 6, 2006) (DT Mot. at 21 n.6). Defendants'

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 52

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

reliance on *Azzolini v. Corts Trust II for Provident Financial Trust I*, 2005 WL 3448053, at \*5 (E.D. Tenn. Dec. 14, 2005) (DT Mot. at 24), is similarly misplaced as, in that case, the court upheld defendants' negative causation challenge because the alleged misstatements were revealed **two years before** plaintiffs claimed they suffered any losses.

**Third,** Defendants rely on cases addressing the sufficiency of loss causation for claims asserted under § 10(b) of the Exchange Act, not application of the negative causation defense to Securities Act claims. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) (DT Mot. at 21) (further discussed at Section III.D); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007) (DT Mot. at 22); *In re Compuware Sec. Litig.*, 386 F. Supp. 2d 913, 919 (E.D. Mich. 2005) (DT Mot. at 24).

**Fourth**, Defendants cite *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005) (DT Mot. at 23), but that decision should be disregarded as erroneous. Indeed, according to Judge Holwell of the Southern District of New York, *Alamosa* was incorrectly decided because it "fail[ed] to recognize the possibility that declines in stock price prior to broad public disclosures may be reflective of leaking of relevant information into the marketplace." *Levine*, 508 F. Supp. 2d at 273 n.5. This "improperly ignores the presumption of causation." *Id.; see also Countrywide Sec.*, 588 F. Supp. 2d at 1172.

**Finally**, Defendants argue because (i) initial securities complaints were filed before the date that the Complaint alleges that the truth was fully disclosed, and (ii) an earlier action, consolidated with the current action, did not allege § 11 claims on the December 2007 Offering, negative causation exists with respect to the December 2007 Offering. UW Mot. at 10-11. However, the mere fact that some investors sued WaMu after the November disclosures or that an earlier plaintiff chose not to sue on the December 2007 Offering is irrelevant because this is not a statute of limitations motion. The issue here is not whether investors had reason to believe that WaMu had violated the federal securities laws when the NYAG Complaint was filed, but whether the market was entirely aware of Defendants' misrepresentations by

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 53

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

December 17, 2007. The Complaint establishes that the answer to that question is no, because numerous material facts about WaMu's results and operations were not disclosed until the end of the Class Period. In any event, the Complaint at issue on these motions is the operative complaint, superseding all prior complaints filed in the consolidated actions. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1546 (9th Cir. 1990) ("an amended pleading supersedes the original"); *DDi*, 2005 WL 3090882, at *8 ("the SAC has now superseded the CAC and is the operative complaint").

## III.    PLAINTIFFS HAVE ADEQUATELY ALLEGED VIOLATIONS OF THE EXCHANGE ACT

### A.    The Complaint States A Claim For Violations Of Section 10(b) Of The Exchange Act

The Complaint's claims under Exchange Act § 10(b) and Rule 10b-5 against the 10(b) Defendants are subject to the pleading requirements of Rule 9(b) and the PSLRA. *See In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, 2007 WL 3171435, at *2 (W.D. Wash. Oct. 26, 2007). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The PSLRA requires plaintiffs making § 10(b) claims to allege false or misleading statements by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *see also Tellabs*, 127 S. Ct. at 2508. The Ninth Circuit "recognize[s] that statements literally true on their face may nonetheless be misleading when considered in context." *Miller v. Thane Int'l, Inc.*, 508 F.3d 910, 916 (9th Cir. 2007). The PSLRA also requires a § 10(b) complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).

A complaint states a claim under § 10(b) when it alleges "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Daou*, 411 F.3d at 1014

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 54

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

2       The Complaint's allegations against the 10(b) Defendants are based on numerous

3   corroborating sources, including (1) 89 former employees of WaMu and related companies; (2)

4   internal, non-public WaMu documents obtained by Lead Plaintiff's investigation (¶¶99, 114-15,

5   328-29, 375, 450-56, 463, 476, 477-79); (3) correspondence, including emails, and other

6   documents involving WaMu that came to light through the Attorney General's investigation

7   into improper appraisal practices by WaMu and eAppraiseIT (¶¶261-73); (4) documents sent by

8   WaMu's regulators directly to the 10(b) Defendants concerning their legal obligations

9   regarding WaMu's lending operations (appraisals, ¶¶152-60; accounting, ¶425); (5) detailed

10  expert analyses of data available to the 10(b) Defendants concerning WaMu's appraisal (¶¶298-

11  306) and underwriting practices (¶¶418-19); (6) expert analysis of data concerning insider

12  selling at WaMu (¶¶541-47, 551-52); and (7) expert declarations concerning WaMu's

13  accounting (¶473; App. 5) and the Complaint's loss causation allegations (¶¶761-63; App. 6).

14      In the face of these detailed and cogent allegations, Defendants contend that the

15  Complaint is too long and complex. KK Mot. at 1, 3; OD Mot. at 4, 6-7, 20. The Complaint's

16  length and level of detail, however, are unavoidable results of the PSLRA's pleading standards

17  and the massive scope of Defendants' fraud. *See Countrywide Sec.*, 588 F. Supp. 2d at 1185-86

18  (denying motion to dismiss 416-page complaint in complex mortgage-related securities case

19  under Rule 8(a)(2)). Defendants cite *Gold v. Morrice (New Century)*, 2008 WL 467619 (C.D.

20  Cal. Jan. 31, 2008), in which the court initially dismissed a mortgage-related securities

21  complaint on the grounds of length and lack of clarity. OD Mot. at 6-7. Plaintiffs there,

22  however, then amended their complaint, and the court sustained the 375-page amended

23  complaint. *New Century*, 588 F. Supp. 2d at 1218. Although the complaint remained "truly

24  massive" and "extremely detailed and complex," the court held that dismissal for this reason

25  would be inappropriate because "a long and detailed complaint is not a work of 'puzzle

26  pleading' as a matter of law," and securities complaints must allege extensive details to satisfy

---

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 55

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

1    "stringent pleading requirements." *Id.* at 1219.

2    The scope, depth, and detail of the allegations based on Lead Plaintiff's investigation

3    are entirely consistent with the PSLRA's purposes. *See, e.g., Countrywide Sec.*, 508 F. Supp.

4    2d at 1186 (sustaining complaint based on witness statements, public sources, and internal

5    documents). In fact, the Complaint's detailed allegations – including particularized facts about

6    each of its sources – more than satisfy the PSLRA's requirements. *See Zucco Partners, LLC v.*

7    *Digimarc Corp.*, 2009 WL 311070, at *10 (9th Cir. Feb. 10, 2009) ("where a complaint relies

8    on both [confidential witnesses] and other factual information, such as documentary evidence,"

9    requirement for pleading corroborating information is relaxed "as long as the latter facts

10   provide an adequate basis for believing that the defendants' statements were false") (internal

11   quotations and citations omitted).

12   ### 1.    The Complaint Appropriately Relies On Information From Knowledgeable Witnesses

13   In the Ninth Circuit, a securities complaint may rely upon confidential witnesses if they

14   are described with "sufficient particularity to support the probability that a person in the

15   position occupied by the source would possess the information alleged and the complaint

16   contains 'adequate corroborating details.'" *Daou*, 411 F.3d at 1015 (citations omitted). That is

17   certainly so in the Complaint, which throughout (and in Appendix 1) describes each

18   confidential witness with specifics including company affiliation, title and position(s) held,

19   tenure, office location, job responsibilities, and reporting structure. Moreover, the Complaint

20   cites additional sources of information corroborating the confidential witness statements. *Id.*

21   ("[C]riteria for assessing reliability of confidential witnesses" include "the corroborative nature

22   of the other facts alleged (including from other sources)").

23   Nevertheless, the 10(b) Defendants attempt to undermine the devastating information

24   obtained from the percipient witnesses described and relied upon in the Complaint.

25   Defendants' arguments are baseless. For example, citing *Higginbotham v. Baxter Int'l, Inc.*,

26   495 F.3d 753 (7th Cir. 2007), Defendants question whether the confidential witnesses are lying

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 56

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

– or even exist at all.  OD Mot. at 18.  *Higginbotham* is contrary to the Ninth Circuit standard articulated in *Daou*, which requires only that the sources be described with "sufficient particularity" to support the inference that the individuals possessed the alleged information. *Daou*, 411 F.3d at 1015; *see also Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1192 (N.D. Cal. 2008) ("this [c]ourt is unwilling to abandon the binding Ninth Circuit precedent of *Daou* for the reasoning articulated by the Seventh Circuit in *Higginbotham*"). Even in the Seventh Circuit, *Higginbotham* was substantially modified by *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711-12 (7th Cir. 2008) ("*Tellabs II*") because "[t]he confidential sources listed in the complaint in this case, in contrast, are numerous and consist of persons who from the description of their jobs were in a position to know firsthand the facts to which they are prepared to testify."

As set forth below in Section III.C.5, the 10(b) Defendants' other challenges to the Complaint's confidential witnesses are equally unavailing because where defendants make "speculat[ive]" arguments in support of dismissal that are contrary to well-pleaded facts established by confidential witnesses, "these disputes must at least await discovery." *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 985 (9th Cir. 2008).

## 2.    The Complaint Appropriately Relies On Expert Analyses

The Complaint incorporates analyses and data provided by several experts in relevant fields.  Each analysis summarized in the Complaint or attached to it as a declaration under oath provides substantial particularized support for the Complaint's allegations.  These analyses include: (1) an examination of WaMu's appraisal values relative to its peers, performed by experts in banking regulation and mortgage finance, demonstrating that appraisal inflation was pervasive at WaMu (¶¶298-306, Chart 2-3); (2) an analysis by the same experts of WaMu's "loan to income values," a significant measure of credit risk relative to its peers (¶¶418-19, Chart 4); (3) an analysis by Sharon Fierstein, CPA, of publicly available information about WaMu and internal WaMu documents cited in the Complaint, concluding that "WaMu

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 57

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

materially under-provisioned its Allowance during the Class Period in a manner that is inconsistent with GAAP and SEC guidelines, and that WaMu lacked adequate internal controls during the Class Period" (¶473; *see also* Complaint App. 5 (Decl. of Ms. Fierstein)); and (4) an analysis by Chad Coffman, CFA, an expert on loss causation, economic damages, and securities valuation, analyzing publicly available information about WaMu and the Complaint's allegations and concluding that Plaintiffs have "provided a specific, logical and economically coherent theory of the causal linkage between the disclosures of the truth about WaMu, the resultant declines in the market prices of WaMu securities and the losses incurred by Plaintiff and the Class" (¶763; *see also* Complaint App. 6 (Decl. of Mr. Coffman)).

Defendants contend that the Complaint's objective expert analyses of WaMu's pervasive appraisal inflation and aggressive underwriting, and the expert declarations about WaMu's improper accounting and loss causation should be disregarded. KK Mot. at 7; DT Mot. at 17 n.5 (citing *DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212 (S.D. Cal. 2001), and *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006)). To the extent *DeMarco* can be read as supporting Defendants, it is contrary to the Ninth Circuit's later decision in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004), which held that a securities complaint properly included allegations based on plaintiffs' expert's analysis of Oracle's accounting. *Id.* at 1233-34. *DeMarco* itself denied defendants' motion to strike allegations in the complaint based on plaintiff's expert affidavit. *See* 149 F. Supp. 2d at 1222. *Blackwell* specifically allowed for the consideration of factual expert analysis and thus ***supports*** the consideration of the analysis included in the Complaint. 440 F.3d at 285-86.

### B.    The Complaint Alleges The 10(b) Defendants' False And Misleading Statements With Particularity

Consistent with the requirements of the PSLRA, the Complaint alleges in detail each false statement made by the 10(b) Defendants, as well as the specific reasons why each statement was false and misleading. In addition to the reasons why the Offering Documents

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 58

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

contained untrue statements (*see* Section II.F above) and the reasons in this section why other statements by the 10(b) Defendants were false, the allegations discussed in Section III.C regarding these Defendants' scienter are also relevant to their statements' falsity. *See Daou*, 411 F. 3d at 1015.

### a.    Killinger

Killinger made false and misleading statements during the Class Period by: (1) signing WaMu's false and misleading SEC filings, including SOX certifications attesting to the accuracy of the Company's financial statements (including compliance with GAAP) and maintenance of effective internal controls, from the third quarter of 2005 to the first quarter of 2008 (¶¶561-63, 578, 584, 598, 609, 625, 638, 644, 659, 673, 703, 723, 739); (2) participating in WaMu's conference calls with analysts and investors and shareholder meetings (¶¶559, 575-76, 592, 606, 620, 622-23, 634, 654-55, 657, 666-67, 670, 687, 720); (3) making statements in WaMu press releases (¶¶557, 574, 590, 633, 652, 664, 683); and (4) speaking at investor conferences (¶¶567, 602-03, 613, 615-16, 628-30, 636-37, 677-78, 696, 699).

### b.    Casey

Casey likewise made numerous false and misleading statements during the Class Period by: (1) signing WaMu's false and misleading SEC filings, including SOX certifications attesting to the accuracy of the Company's financial statements (including compliance with GAAP) and maintenance of effective internal controls, from the third quarter of 2005 to the first quarter of 2008 (¶¶561-63, 578, 584, 596, 598, 608-09, 624-25, 638, 644, 658-59, 672-73, 703, 723, 739); (2) participating in WaMu's conference calls with analysts and investors and shareholder meetings (¶¶560, 576, 593-94, 606, 621, 656, 657, 666, 668-69, 671, 687, 720); and (3) speaking at an investor conference (¶696).

### c.    Cathcart, Rotella, and Schneider

Cathcart, Rotella, and Schneider also made false and misleading statements during the Class Period by participating in conference calls with analysts and investors and shareholder meetings. *See* ¶¶612, 696 (Cathcart); ¶¶576-77, 595, 606, 614, 656, 696, 720 (Rotella); ¶¶567-

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 59

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

68, 613, 696, 699 (Schneider).

In addition to the false statements each 10(b) Defendant individually made, each is also liable for the false statements in WaMu publications and conference calls, under the presumption that documents such as WaMu's annual reports and press releases are "group published" and the product of their collective action. *See McGuire v. Dendreon Corp.*, 2008 WL 1791381, at *5 (W.D. Wash. Apr. 18, 2008). This presumption exists because "[k]ey corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements." *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000). Each 10(b) Defendant is also liable for the false statements made by other Defendants during conference calls in which he participated. "[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context." *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005).

### 1.    Defendants' Materially False Statements And Omissions About WaMu's Lending Policies And Practices

Throughout the Class Period, the 10(b) Defendants made false and misleading statements about WaMu's policies and practices regarding its core business: residential lending. They falsely described WaMu's lending practices as "disciplined" (¶559), "prudent" (¶569), and "selective" (¶656) and lauded its "strong underwriting," "conservative lending standards," "rigorous credit standards," and "disciplined credit culture" (¶612). The 10(b) Defendants' mantra of prudence and discipline was materially false and misleading, and their false descriptions of WaMu's core operations are actionable. *See, e.g., Countrywide Sec.*, 588 F. Supp. 2d at 1185-97 (finding false statements regarding mortgage company's lending practices actionable); *New Century*, 588 F. Supp. 2d at 1225-26 (same).

Contrary to the 10(b) Defendants' assertions that the Complaint only provides

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 60

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

insufficient or boilerplate reasons for the falsity of the alleged misstatements and omissions (*e.g.*, KK Mot. at 3; OD Mot. at 20), the Complaint, as explained below, sets forth specific reasons why the 10(b) Defendants' statements were false and misleading. *See* ¶¶565-66, 570-72, 585-88, 599-600, 604, 610-11, 617-18, 626-27, 631-32, 645-49, 661-62, 674-76, 680-81, 685, 690, 698-99, 703, 715, 720, 723, 733, 739, 746.

### a. Misstatements And Omissions About WaMu's Appraisal Policies And Practices

The 10(b) Defendants repeatedly misrepresented material facts and omitted material information about WaMu's appraisal practices and policies. These statements are actionable. *See Countrywide Sec.*, 588 F. Supp. 2d at 1149-53 (statements about collateral adequacy are actionable where complaint alleges that "appraisers were strongly encouraged to inflate appraisal values"); *In re Resource Am. Sec. Litig.*, 2000 WL 1053861, at *4 (E.D. Pa. July 26, 2000) (denying motions to dismiss where defendants failed to disclose the use of "artificial and contrived appraisals").

The Complaint alleges that the 10(b) Defendants are responsible for false and misleading statements about WaMu's use of LTV ratios in its underwriting as "key determinants of future performance." ¶581. These statements were materially false and misleading because, among other reasons, they omitted to state that WaMu's appraisals – which served as the bases for its LTV ratios – were systematically inflated. ¶¶126-306.

The 10(b) Defendants also made false statements about WaMu's use of purportedly independent appraisers and accurate LTV ratios to control credit risk. For example, at a 2006 Investor Day conference, the 10(b) Defendants claimed that WaMu's decision to use third-party appraisers gave the Company "better quality." ¶615. Killinger stated that there was a "strong governance process over the external appraisers." *Id*. As set forth in the Complaint, this statement was false. Similarly, in a WaMu press release responding to the NYAG Complaint detailing pervasive corruption in WaMu's appraisal practices, Defendants falsely stated: "We have absolutely no incentive to have appraisers inflate home values. In fact, inflated appraisals

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 61

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

are contrary to our interests. We use third-party appraisal companies to make sure that appraisals are objective and accurate." ¶693. The 10(b) Defendants also reassured the public that, based on WaMu's purportedly legitimate appraisals, the credit quality of its loans was sound. *E.g.*, ¶¶560, 595, 671.

The Complaint alleges specific facts demonstrating that WaMu routinely pressured both in-house and outside appraisers to artificially inflate values starting in 2005, based on multiple corroborating statements of confidential witnesses with direct knowledge of these undisclosed practices. ¶¶133, 161-260, 274-97. During the period when appraisals were performed in-house at WaMu, the 10(b) Defendants had a responsibility to institute and maintain policies to protect appraisers from pressure from WaMu salespeople (¶¶134-60), but production personnel consistently and increasingly contacted appraisers to demand higher values (¶¶169, 176).

When appraisals were outsourced to third-party companies, WaMu (in contravention of federal regulations) required those companies to use only appraisers from WaMu's hand-picked "proven appraiser" list, which was created and continually vetted by WaMu sales personnel. ¶¶165, 187-88, 209-19, 230, 236, 238, 241, 245, 251, 282, 284, 293. Further, the inappropriate direct contact between WaMu salespeople and appraisers continued after the outsourcing. ¶¶166, 172, 174-75, 204, 208, 227, 295. In these contacts, WaMu sales personnel pressured appraisers to "hit" the higher appraisal values that WaMu's loan production teams desired, including by causing appraisers repeatedly to "reconsider" values they had already determined. ¶¶165, 169, 176, 183, 189, 208, 234, 256, 276, 283. The Complaint also alleges, based on the NYAG Complaint, that numerous internal emails between WaMu and eAppraiseIT show that WaMu pressured eAppraiseIT to inflate its appraisals. ¶¶261-73. These undisclosed facts and others detailed in the Complaint made the 10(b) Defendants' statements about WaMu's appraisal policies and practices (including LTV ratios) materially false and misleading when made.

In addition, a careful, extensive analysis of data provided by WaMu and its peer lenders

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 62

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

to the U.S. Housing & Urban Development Department also shows that WaMu's appraisals were systematically inflated.    ¶¶298-306.    This detailed analysis of the extensive contemporaneous data that WaMu and its peers submitted annually shows that WaMu rarely denied loans based on "insufficient collateral" (*i.e.*, the appraised value of the property being insufficient for the loan amount) compared to its peers.    *Id.*    During the Class Period, on a controlled apples-to-apples (*i.e.*, census-tract to census-tract) basis (¶¶299-305), WaMu was ***twice to three times less likely*** than its peers to deny a loan based on "insufficient collateral" (¶301).    Thus, expert analysis of WaMu's data further reveals the Company-wide nature of WaMu's improper appraisal practices and underscores the materially misleading nature of Defendants' false statements and omissions about WaMu's appraisal policies and practices.

Killinger's challenges to the falsity of the 10(b) Defendants' statements about WaMu's appraisals mischaracterize the Complaint and controlling authority, and should be rejected. First, Killinger contends that the Complaint only alleges appraisal inflation beginning in February 2007.    KK Mot. at 9.    This contention ignores detailed allegations that WaMu's widespread appraisal manipulation began in-house starting in 2005 (¶¶161-96) and carried over to third-party appraisals in 2006.    ¶¶46, 50, 161-66 ("from the very initiation of outsourcing its appraisal work, WaMu corrupted the appraisal process by persisting in practices designed to increase appraisal values whenever necessary").    Similarly, Killinger's contention that the Complaint fails to show Company-wide appraisal inflation (KK Mot. at 8) also ignores the Complaint's detailed allegations.    Multiple witnesses explained in detail how WaMu successfully pressured appraisers to artificially "bring in" higher appraisal values through ROVs and other means.    ¶¶133, 161-260, 274-97.    Documents from the Attorney General's investigation into WaMu and eAppraiseIT corroborate these witness accounts.    ¶¶261-73.

Killinger also argues that Plaintiffs must allege WaMu's "true" LTV ratios.    KK Mot. at 8.    The Ninth Circuit's decision in *Vantive*, 283 F.3d 1079 (9th Cir. 2002), is inapplicable, as, contrary to Killinger's contention (KK Mot. at 9), that case did not hold that plaintiffs must

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 63

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

allege precise amounts of misstatements for claims to be sustained. But Defendants' attempt to saddle Plaintiffs with the impossible burden of alleging the true value of each appraisal during the Class Period, when the entire appraisal process is alleged in detail to have been corrupted, must be rejected. No authority supports such a requirement. To the contrary, the Ninth Circuit has held that transaction-by-transaction analysis is not required. *See Daou*, 411 F.3d at 1020 (rejecting transaction-by-transaction analysis of accounting allegations in favor of analyzing whether allegations were of "widespread and significant" activity); *see also Cooper*, 137 F.3d at 627 (specific amounts of misstatements not required); *Aldridge*, 284 F.3d at 79 (same). Moreover, Defendants' argument misses the point: Plaintiff's appraisal allegations concern disclosure about WaMu's business, and the alleged widespread, undisclosed, and improper appraisal practices were clearly material to investors, as demonstrated, *inter alia*, by the sharp drop in WaMu's stock when the Attorney General's office began to reveal some of these undisclosed facts. *See* Section III.D.

### b. Misstatements And Omissions About WaMu's Underwriting Policies And Practices

The 10(b) Defendants also made numerous false statements and material omissions concerning WaMu's underwriting policies and practices throughout the Class Period. In similar cases, courts have found misstatements regarding underwriting policies actionable. *See New Century*, 588 F. Supp. 2d at 1225; *Countrywide Sec.*, 588 F. Supp. 2d. at 1145-50; *Countrywide Deriv.*, 554 F. Supp. 2d at 1057. *See also* Section II.F (discussing additional cases).

In addition to the untrue statements about WaMu's underwriting in the Offering Documents (discussed in Section II.F), the 10(b) Defendants each made other false and misleading statements about the Company's underwriting. Killinger, for example, misled the public about WaMu's underwriting practices by claiming that: WaMu underwrote its Option ARM loans to the fully-indexed rate (¶¶367, 623); as of October 2005, WaMu "effectively manage[d its] credit quality" by being "disciplined and vigilant in [its] underwriting standards [and] portfolio management" (¶559); in November 2005, WaMu had "excellent processes,

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 64

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

policies, underwriting [standards] and reserving methodologies in place" (¶567); as of January 2007, WaMu had "tightened underwriting" (¶634); as of April 2007, WaMu had "tightened credit guidelines" and would "carefully manage [its] credit" (¶657); as of July 2007, the Company had been "tightening [its] underwriting" for two years (¶667); and in November 2007, WaMu's "risk [was] contained [and its] underwriting [was] sound" (¶699). Similarly, Casey misleadingly touted WaMu's "disciplined credit underwriting" (¶594) and claimed that WaMu was being "selective with [its] underwriting" (¶656).

The other 10(b) Defendants likewise misled the public. *See* ¶612 (Cathcart stated in September 2006, "At origination, WaMu focuses on an effective underwriting process and borrower disclosures" and "[w]ith respect to the borrower, the portfolio quality is very sound"); ¶576 (Rotella stated in January 2006 that WaMu underwrote its massive Option ARM portfolio to the fully indexed rate, claiming that this purported practice was an "important fact" and "an important thing to note from a credit perspective"); ¶595 (Rotella stated in April 2006 that the Company was "prudent in [its] credit extension"); ¶568 (Schneider claimed in November 2005 that WaMu "tightened the underwriting guidelines" for its Option ARM products); ¶613 (Schneider claimed in September 2006 that WaMu had "tightened up a number of [its subprime] underwriting guidelines"); ¶699 (Schneider in November 2007 touted WaMu's "prudent underwriting standards").

These statements, and others like them, were materially false and misleading because, at the time they were made, WaMu was actually lowering its underwriting standards, issuing loans that were unlikely to be repaid, and making exceptions to its underwriting guidelines as a matter of course. ¶¶70-72, 74-81, 83-102, 116-17, 125, 305-420. Further, in an undisclosed and extremely risky practice, the 10(b) Defendants actually caused the Company's underwriters to underwrite WaMu's adjustable rate loans (including Option ARM loans) to initial "teaser" rates, rather than the fully-indexed rates. ¶¶75, 364, 367. As one former Senior Underwriter described WaMu's underwriting standards, WaMu provided loans to any borrower who was

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 65

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

"breathing and had a heart beat." ¶399; *see also* ¶331 (former Senior Underwriter reported that "if you had a pulse, WaMu would give you a loan").  See Section II.F for a discussion of the Defendants' false statements about WaMu's underwriting in the Company's SEC filings that were incorporated in the Offering Documents.  Allegations in the Complaint based on expert analysis of data also confirm the Company-wide deficiencies in WaMu's underwriting that contradict Defendants' public statements.  ¶¶418-19, Chart 4.

In response to these detailed allegations, Defendants make several meritless arguments. *First*, Killinger disputes the evidentiary import of Plaintiffs' expert analysis set forth in ¶¶418-19, contending that he made no comparisons to other lenders that would justify comparing WaMu to its peers to evaluate the relative quality of its underwriting.  KK Mot. at 7.  This contention is false.  For example, in July 2007, Killinger promoted WaMu's leadership in the industry in "tightening underwriting."  ¶670; *see also* ¶613 (Schneider: "we're ahead of many of our competitors here" as result of "tightening . . . credit guidelines").  Further, WaMu sought to be a national mortgage-lending leader.  ¶65.  Those statements must refer to *something*, and the most reasonable inference is that WaMu was comparing itself to its competitors (*e.g.*, the Peer Group identified by Plaintiffs' mortgage industry experts (¶¶418-19)).  Moreover, it is simply not believable that Killinger did not intend to compare WaMu to other lenders.

*Second*, Killinger argues that statements about the quality of WaMu's lending practices must be quantified.  KK Mot. at 7-9.  This argument also fails.  *See Atlas v. Accredited*, 556 F. Supp. 2d at 1155 ("Although Defendants' allegedly false and misleading statements regarding Accredited's underwriting policies are not as easily quantified, as a mortgage lender, Accredited's underwriting practices would be among the most important information looked to by investors").  Defendants' citation to *New York State Teachers Retirement System v. Fremont General Corp.,* 2008 WL 4812021, at *6 (C.D. Cal. 2008), also does not support their position.  *See* OD Mot. at 6, 25; KK Mot. at 3.  The *Fremont* court found that the alleged misleading statements "were made in the context of express acknowledgments that Fremont was a

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 66

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

subprime lender," and thus, "given that Fremont was a subprime lender," the market knew that it engaged in loose underwriting practices that the plaintiffs alleged were hidden. 2008 WL 4812021, at *6. Here, the Complaint principally involves WaMu's prime loans, including its flagship Option ARM loans, about which Defendants made numerous false disclosures and misleading statements concerning the loans' true nature. *See*, *e.g.*, ¶¶568-69, 576, 580, 607, 622. In any event, *Fremont* is inconsistent with the weight of authority recognizing that lending companies cannot hide behind general descriptions of their business (such as "subprime") to conceal material facts about their core operations from investors. *See New Century*, 588 F. Supp. 2d. at 1226 (even in subprime lending, "basic standards of good lending" apply); *Countrywide Sec.*, 588 F. Supp. 2d at 1146 (finding false statements regarding subprime lending actionable).

     ***Third***, the 10(b) Defendants contend that their statements about WaMu's underwriting standards and credit quality were statements of optimism or mere "puffery" and are therefore inactionable under the securities laws. OD Mot. at 26-27. Defendants are wrong. Their statements about the Company's risk management and lending policies and practices, when viewed in context, were particularly material to investors. In fact, sophisticated securities analysts who covered WaMu relied heavily on these specific statements as important indicators of WaMu's financial health. *See, e.g.*, ¶¶573, 589, 601, 650. Facts about WaMu's loan origination policies and practices are fundamental information, and statements about their qualities are ***not*** immaterial as a matter of law, as reasonable investors would rely upon such statements. *See Countrywide Sec.*, 588 F. Supp. 2d at 1151-52, 1185 (false statements about the quality of a mortgage company's lending practices are material); *Atlas v. Accredited*, 556 F. Supp. 2d at 1149-50, 1154 (statements that Accredited's "underwriting procedures were better and more conservative" than other lenders and that "Accredited was committed to a disciplined approach that focused on credit quality" were actionable); *see also Robbins v. Hometown Buffet Inc.*, 1995 WL 908194, at *10 (S.D. Cal. Mar. 16, 1995) (what defendants label "puffery" is

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 67

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

really an issue of "materiality," and "the question of materiality of a statement is a question of fact"). In addition, the Ninth Circuit holds that statements of expectation, belief, and even "general expressions of optimism may be actionable under federal securities laws." *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 113 (9th Cir. 1989); *Cooper v. Pickett,* 137 F.3d at 620 ("business was strong"); *Kaplan v. Rose*, 49 F.3d 1363, 1375-76 (9th Cir. 1994) ("our competitive position remains strong . . . [d]emand for [a product] is strong and growing" and "[w]e . . . believe our outlook is bright"); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 502 (9th Cir. 1992) ("superior" performance); *Warshaw,* 74 F.3d at 957 ("'everything is going fine'"). See Section II.F for additional discussion supporting the conclusion that Defendants' statements were not mere puffery.

### c.   Misstatements And Omissions About WaMu's Risk Management Policies And Practices

The 10(b) Defendants also routinely made false statements about WaMu's risk management during the Class Period. For example, Company filings explained that:

> [WaMu's risk management department] works with the lines of business to establish appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance. Significant risk management policies approved by the relevant management committees are also reviewed and approved by the Audit and Finance Committees [of the Board]. Enterprise Risk Management also provides objective oversight of risk elements inherent in the Company's business activities and practices and oversees compliance with laws and regulations.

¶104.  Public statements touting the soundness of WaMu's risk management are actionable. *See Countrywide Sec.*, 588 F. Supp. 2d at 1153; *Countrywide Deriv.*, 554 F. Supp. 2d at 1057. Judge Coughenour found in *South Ferry LP #2 v. Killinger* that statements about WaMu's risk management, such as "We're very confident that our risk management is working here," were actionable.  399 F. Supp. 2d 1121, 1134 n.5 (W.D. Wash. 2005), *vacated in part on other grounds*, 542 F.3d 776. See Section II.F for additional discussion of Defendants' untrue statements regarding risk management that were incorporated into the Offering Documents and a more detailed discussion of relevant case law.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 68

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

In addition to the untrue statements about risk management in the Offering Documents, the 10(b) Defendants made numerous other false statements about this core aspect of WaMu's business. For example, at the beginning of the Class Period, Killinger announced WaMu's "continued focus" on risk management (¶557), later claiming, "I think proper credit management does not wait until there is a major problem and then say what do I do, running around with my – like my head's cut off. . . . And so I think good credit management is all about what do you before the problem is there." ¶567. Thereafter, Killinger repeatedly touted the Company's supposed foresight and careful planning in managing its credit risk. *E.g.*, ¶567 ("On credit risk. We have excellent processes, policies, underwritings, standards and reserving methodologies in place and they have served us very well for quite some time"). The other 10(b) Defendants joined in Killinger's efforts to promote WaMu's purportedly superior risk management. *E.g.*, ¶559 (Casey: "Our credit performance continues [to be] very good . . . . We continue to proactively manage our credit risk, and are taking steps now to reduce potential future exposure"); ¶576 (Casey: "Our credit quality continued to be strong for most of 2005, but we continued to proactively manage our portfolio to minimize credit risk understanding that a more difficult environment may be ahead of us"); ¶614 (Cathcart: "[W]e have been watching our credit profile diligently for the last two years, and we've been making strategic choices to prepare for the environment we currently find ourselves in"); ¶567 (Schneider: "In addition, we've maintained effective risk management processes. This is clearly a top priority for us. We've invested a significant amount in terms of talent and technology in building risk management").

In truth, starting in 2005, WaMu significantly weakened its risk management policies in order to be more "aggressive" and "push the envelope" (¶113) in its mortgage lending. ¶¶103-25. The Complaint details how the 10(b) Defendants systematically weakened WaMu's risk management policies and undermined those responsible for enforcing the policies. *Id*. For example, the Complaint alleges that CW17, Senior Vice President of WaMu's Enterprise Risk

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 69

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Management Group, repeatedly told Casey and Cathcart his concerns about WaMu's analysis of its risk, which were disregarded.  ¶¶106-11.  Other confidential witnesses stated that, at the start of the Class Period, senior WaMu executives announced that the Company planned to be more "aggressive" in its lending and accounting practices (¶113), and that, by mandate of an internal WaMu document, risk management would be a "customer service" group rather than a "regulatory burden" (¶115).  Similarly, other confidential witnesses described how WaMu subordinated its risk management function to work as support for the sales teams, and thus, rather than acting as a safeguard, risk management became a facilitator to "get things done" for the salespeople.  ¶¶124-25.  As also discussed in Section II.F, these and other allegations about WaMu's undisclosed policies and practices demonstrate WaMu's abandonment of risk management.

### d.    Misstatements And Omissions About WaMu's Financial Results And Condition

As discussed in detail in Section II.F, WaMu's annual and quarterly financial statements during the Class Period materially understated the Allowance and provision for loan losses and overstated WaMu's net income, earnings per share, and assets.  In *Wells Fargo*, the Ninth Circuit held:

> The shareholders contend that the allegation that Wells Fargo intentionally or recklessly understated its loan loss reserves in an effort to inflate corporate earnings (and therefore earnings per share), and then disseminated financial statements reflecting this misallocation to the public and to the SEC, states a claim under § 10(b) and Rule 10b-5.  Noting that a bank's loan loss reserve is set based on the risk of loss posed by the aggregate of a bank's loan transactions, the shareholders argue that the deliberate failure to recognize problem loans, thus understating the reserve, constitutes an actionable omission or misrepresentation of existing fact which cannot be dismissed as a mere matter of internal mismanagement, unsound business practice, or poor accounting judgment.

> The shareholders are correct.

12 F.3d at 926; *see also United States v. Morris*, 80 F.3d 1151, 1164 (7th Cir. 1996) ("Although we can agree with defendants that the estimation of probable losses in a large loan portfolio like

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 70

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    [the bank's] is more an art than a science, and that any two analyses of probable losses in the

2    same portfolio are unlikely to exactly correspond, representations by management about the

3    adequacy of reserves still may be fraudulent if they are knowingly false or misleadingly

4    incomplete.").

5        The 10(b) Defendants do not respond to the evidence in the Complaint showing that

6    WaMu's financial statements were false at the time they were issued.  Instead, Defendants

7    misstate and attempt to trivialize the Complaint's allegations.  For example, Defendants assert

8    that Plaintiffs do not allege "with particularity" why the statement that the Board issued a

9    dividend in the second quarter of 2006 was false or misleading.  OD Mot. at 25.  Plaintiffs

10   never alleged that this statement was false or misleading.  *Compare* ¶606 *with* ¶610-11.

11   Defendants further resort to hyperbole by contending that the Complaint labels "every financial

12   result ever uttered" as false.  OD Mot. at 24.  Instead, each Form 10-K and 10-Q filed during

13   the Class Period materially understated WaMu's Allowance and provision for loan losses and

14   overstated net income, earnings per share, and assets.  Plaintiffs challenge ***these specific***

15   ***misstatements*** in each WaMu filing.  *See*, *e.g.*, ¶¶611, 627, 649.

16       Defendants also erroneously contend Plaintiffs plead fraud by hindsight with respect to

17   WaMu's reserves.  OD Mot. at 30.  A similar argument was rejected by the Ninth Circuit in

18   *Wells Fargo*, 12 F.3d at 927 ("this is neither a case second-guessing decisions by management

19   nor one alleging 'fraud by hindsight'; rather, the shareholders have specifically identified facts

20   omitted by Wells Fargo").  Likewise, Plaintiffs have alleged that Defendants "knew of certain

21   'contingencies' which rendered [WaMu's] loan reserves 'inadequate' and failed to disclose this

22   information to purchasers of its stock."  *Id.*  Defendants failed to disclose that WaMu deviated

23   from its publicly-stated underwriting, appraisal, and risk-management policies, that WaMu's

24   accounting did not take these reckless practices into account, and that, as a result, WaMu's

25   financial statements were misstated.

26       In the end, Defendants are left only with the fact that, before collapsing into bankruptcy,

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 71

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

WaMu never restated its financials. OD Mot. at 23-24. However, as discussed in more detail in Section II.F, the lack of a restatement is no assurance that the financial statements were accurate and does not shield Defendants from liability. *See*, *e.g.*, *LDK Solar*, 584 F. Supp. 2d at 1245 ("the lack of a restatement did not mean that LDK only engaged in legitimate conduct").

### e. Misstatements And Omissions About WaMu's Internal Controls

The Complaint alleges that, contrary to Killinger's and Casey's repeated SOX certifications that WaMu's internal controls over financial reporting were effective, the controls were entirely inadequate. *E.g.*, ¶¶450-56, 474-81, 566, 588, 600, 611. Misstatements in SOX certifications of internal controls are actionable. *See New Century*, 588 F. Supp. 2d at 1226-27; *Countrywide Sec.*, 588 F. Supp. 2d at 1178; *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 390-91 (S.D.N.Y. 2007).

In addition to the numerous sources confirming that WaMu's loan origination policies were dangerously lax, the Complaint offers detailed internal reports and documentation demonstrating that WaMu's internal controls over financial reporting were inadequate. For example, the CRO Report in September 2005 – which was prepared by a WaMu team that was assembled to "forecast expected losses over the upcoming four years" (¶451) – demonstrated that the LPRM was unable to measure risk associated with negatively amortizing loans (such as Options ARMs), a material deficiency that the Company ***did not even plan to address until mid-2006***. ¶¶450-56. In the meantime, WaMu's financial statements were misstated. Similarly, throughout 2006 and well into 2007, the LPRM was never calibrated to reflect the increasing delinquencies from which WaMu's loans were suffering. ¶¶463-65. These fundamental failures in the LPRM resulted in WaMu's financial statements being materially misstated. The certifications of internal controls were therefore false when made.

The 10(b) Defendants ignore the Complaint's allegations related to internal controls. To the extent these Defendants rely on arguments about internal controls made by the Securities Act Defendants, those arguments are addressed in Section II.F.4.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 72

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

### f.     The Exchange Act Claims Allege Disclosure Violations, Not Mere Corporate Mismanagement

Like the Securities Act Defendants, the 10(b) Defendants, citing *Santa Fe*, seek to recast the Complaint as a mere disagreement with Defendants' business decisions that is not actionable under the federal securities laws.  OD Mot. at 21-22.  However, as discussed above in Section II.F.1, *Santa Fe* does not apply here because the Complaint "set[s] forth specific items of information which [Plaintiffs] allege[] were improperly omitted . . . or misrepresented."  *Plaine v. McCabe*, 797 F.2d at 723.

Indeed, the Complaint alleges that among other things, Defendants misrepresented the Company's financial results and conditions in violation of GAAP.  The 10(b) Defendants' mischaracterization of the Complaint cannot convert a claim of securities fraud into a claim of corporate mismanagement.  *See In re SupportSoft, Inc. Sec. Litig.*, 2005 WL 3113082, at *6 (N.D. Cal. Nov. 21, 2005) (denying motion because "[t]he problem with defendants' position . . . is that it miscasts the allegations in plaintiffs' complaint"); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003) (plaintiffs "are the masters of their complaint.").

### 2.     Defendants' False And Misleading Statements Are Not Protected By The PSLRA Safe Harbor

The PSLRA provides a limited safe harbor for certain "forward-looking statements." *See* 15 U.S.C. § 78u-5(c).  To qualify for that protection, a statement must be both "forward-looking" as defined by the PSLRA and accompanied by ***meaningful*** cautionary language identifying important factors that could cause actual results to materially differ.  *See* § 78u-5(c)(1)(A)(i); *No. 84 Employer-Teamster Jt. Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936-37 (9th Cir. 2003).  A statement made with actual knowledge of its falsity does not qualify for protection.  *See* 15 U.S.C. § 78u-5(c)(1)(B).

Here, the 10(b) Defendants' statements fail to qualify for protection at every level. Defendants assert that approximately 40 statements fall within the statutory safe harbor.  OD Mot. at 28 n.4, and App. A; KK Mot. App. A.  Defendants' appendices are not properly before

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 73

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

the Court, as discussed in Section I.B above. In any case, the statements at issue are not "forward-looking" within the meaning of the PSLRA; none was accompanied by meaningful cautionary language; and the Complaint more than adequately pleads that the 10(b) Defendants had actual knowledge of the falsity of the statements when made.

### a.    Defendants' False and Misleading Statements Are Not Forward-Looking

A statement that is not "forward-looking" is not protected. *No. 84 v. Am. W.*, 320 F.3d at 936; *Rosenbaum Capital, LLC*, 549 F. Supp. 2d at 1190. A statement is forward-looking within the meaning of the PSLRA only if it is a statement of (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) assumptions underlying or related to any of these issues. 15 U.S.C. § 78u-5(i)(1); *No. 84 v. Am. W.*, 320 F.3d at 936; *BP Prudhoe Bay*, 2007 WL 3171435, at *6-7.

Critically, the PSLRA does not insulate all statements that involve the future. Rather, even when a statement is in the future tense or refers to future performance, if it also functions as a statement of current conditions or expectations, or conveys actions already taken in anticipation of the future, it is not protected. *See, e.g., In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 212-13 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward looking aspects of the statement."); *S. Ferry*, 399 F. Supp. 2d at 1131, 1134 ("Statements couched in the future tense, but whose effect is to convey in for motion about the present" not protected).

Here, Defendants' statements at issue all conveyed information about steps supposedly *already* taken, and operational controls claimed to *already* be in place, in anticipation of a softening market and, because of these claimed past actions, Defendants represented that WaMu was *currently* well situated to absorb the downturn. *E.g.*, ¶567 (to prepare for the possibility of a cooling housing market "we elected to selectively reduce credit risk this year"); ¶¶576, 592, 595, 603 (touting "defensive actions" taken by WaMu in response to concerns

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 74

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

about "speculative activity" in the market); ¶¶613-14, 616 ("we have been preparing for a more difficult environment for some time"). Defendants contend that the truth of these and similar statements could only be ascertained in the future, thus constituting inactionable forward-looking statements. OD Mot. at 27. Defendants are wrong. The falsity of statements predicated on supposedly existing operational controls could be immediately discerned by the 10(b) Defendants at the time they made the statements, because the operational controls described in the statements did not exist. *See* ¶¶65-420, 486-535. These false and misleading statements trumpeting actions already taken and operations already in existence are not forward-looking. *E.g.*, ¶¶594, 595, 612.

### b. Defendants' Statements Lacked Meaningful Cautionary Language

Even assuming, *arguendo*, that any of the 10(b) Defendants' false and misleading statements were "forward looking," these statements cannot qualify for the PSLRA's safe harbor unless they were identified as such and accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A). "Meaningful" cautionary language must be more than boilerplate warnings and must do more than simply track the "usual suspects" of risk factors inherent to a company's business. *See In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 n.8 (C.D. Cal. 2003); *S. Ferry*, 399 F. Supp. 2d at 1136. Instead, the cautionary language must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement." *BP Prudhoe Bay*, 2007 WL 3171435, at *5. The meaningfulness of a risk disclosure can only be understood with reference to Defendants' knowledge of relevant factors. *SeeBeyond*, 266 F. Supp. 2d at 1166 n.8 ("a speaker with actual knowledge that a prediction is false or misleading must identify the basis for the misleading or false nature of the prediction, as surely this is an important factor that could – perhaps undoubtedly will – make actual results differ materially from those in the forward-looking statement").

Under this test, the "cautionary language" offered by Defendants is not meaningful.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 75

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

The litany of warnings Defendants advanced relate generally to the mortgage industry and its subprime component, not specifically to WaMu's lending practices. Thus, for example, Defendants warned that "as housing prices declined, borrowers might have difficulty repaying loans, and '[a]s a result, the Complaint could experience higher credit losses on its mortgage and loan portfolios, which could adversely affect our earnings.'" KK Mot. at 15 (citation omitted). Defendants knew that WaMu's predictions were subject to the heightened risks associated with, for example, its dangerous and undisclosed underwriting, appraisal, risk management, and financial accounting policies and practices, but Defendants did not warn investors that WaMu faced such unique risks. The generic industry-wide risks in Defendants' boilerplate risk factors were therefore not meaningful.

### c. Defendants' Statements Were Made With Actual Knowledge Of Their Falsity

A forward-looking statement is also outside the safe harbor if it is made with actual knowledge that it is false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i); *No. 84 v. Am. W.*, 320 F.3d 931. A forward-looking statement is actionably false if "the speaker is aware of undisclosed facts tending seriously to undermine the statements' accuracy." *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996). As discussed in Section III.C, the 10(b) Defendants' forward-looking statements, if any, were contrary to undisclosed facts known to the 10(b) Defendants regarding WaMu's then-current operations and procedures. Accordingly, the false and misleading statements alleged in the Complaint do not qualify for the safe harbor.

### d. The 10(b) Defendants Cannot Shield Themselves With A "Truth On The Market" Defense

Similar to their "safe harbor" argument above, the 10(b) Defendants attempt to escape liability for their false statements by contending that they publicly disclosed that WaMu made subprime loans and subprime loans had risks, and thus put investors on notice of the truth about WaMu's lending practices and loan quality. OD Mot. at 8-13; KK Mot. at 12-15. This argument should be rejected because it mischaracterizes the Complaint as being only about subprime lending and ignores Defendants' false statements about both WaMu's subprime and

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 76

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    prime loans.  Their disclosure of the obvious fact that part of WaMu's business was subprime

2    did not correct these false statements.

3         *First*, Defendants' argument mischaracterizes the Complaint as being exclusively about

4    subprime loans, when the Complaint's main focus is on WaMu's false statements about its

5    prime loans, particularly Option ARM loans. ¶¶312-75.  Subprime lending, while the subject of

6    numerous false statements by the 10(b) Defendants, was not WaMu's main lending activity.

7    *Compare* ¶17 ($20.77 billion subprime portfolio) *with* ¶74 ($99.5 billion prime portfolio).  The

8    Complaint includes detailed allegations of improper underwriting of WaMu's subprime loans

9    (¶376-411), but mischaracterizing the Complaint as alleging that Defendants "hid" WaMu's

10   subprime exposure (OD Mot. at 10-12) cannot immunize Defendants when most of their false

11   statements, and lending, related to prime loans.

12        *Second*, Defendants' argument ignores the Complaint's detailed allegations that even in

13   its subprime business, where lending criteria were obviously and avowedly looser than in prime

14   lending, WaMu systematically violated its own stated lending standards.    ¶¶376-411.

15   Defendants also falsely described many of WaMu's loans as "prime" when the borrowers'

16   credit scores were actually far below the industry minimum for a prime borrower, without

17   disclosing this material deviation from their stated policies.  ¶¶314-29.  "Even in the sub-prime

18   world, there must be a basis for distinction between loans to at-risk borrowers that meet basic

19   standards of good lending practice and loans that plainly do not."  *New Century*, 588 F. Supp.

20   2d. at 1226.  Simply disclosing that part of WaMu's business was subprime did not relieve

21   Defendants of their obligation to speak truthfully about that subprime business.

22        The 10(b) Defendants also argue that they warned of a possible housing market decline

23   during the Class Period, and the public was therefore warned about the dangers of investing in

24   WaMu.  OD Mot. at 1-2, 8-13, 21-22; KK Mot. at 2-3, 12-14.  These supposed cautionary

25   statements typically were accompanied by untrue statements about how well positioned WaMu

26   was to thrive in any downturn.  ¶¶567, 576, 603, 613-14, 620, 629-30, 634, 657, 666-70, 698-

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 77

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

99.  For example, at the shareholders meeting in April 2007, Killinger discussed "the softening housing market," but stated that WaMu had "tightened credit guidelines" and would "carefully manage [its] credit."  ¶657.  In light of these misleading disclosures, rather than a "truth on the market" defense, the 10(b) Defendants' argument amounts to *caveat emptor*, which is no defense at all.  *See, e.g.*, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (Congress sought in the securities laws "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry") (internal quotations and citation omitted).  "Before the 'truth-on-the-market' doctrine can be applied, the defendants must prove that the information that was withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insiders' one-sided representations.'"  *Provenz,* 102 F.3d at 1492-93 (citation omitted).  Defendants make no such proof here.

Moreover, Defendants' "truth on the market" theory depends on Defendants' contested factual assertion that market conditions caused WaMu's implosion, rather than the acts and omissions alleged in the Complaint.  But the adequacy of disputed disclosures should be resolved at the motion to dismiss stage only when their adequacy is "'so obvious that reasonable minds [could] not differ.'"  *Fecht*, 70 F.3d at 1081 (citation omitted).  "[T]he materiality of an omission is a question reserved for a jury unless 'reasonable minds could not differ' on the adequacy of the disclosure and the question is appropriate for resolution as a matter of law."  *In re CornerStone Propane Partners*, *L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1086 (N.D. Cal. 2005); *see also Miller*, 508 F.3d at 919.

In sum, WaMu's truth-on-the-market defense is improper at this stage of the proceedings, as "courts generally may not dismiss a complaint on the basis of a truth-on-the-market defense to a fraud-on-the-market theory."  *In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *10 (N.D. Cal. May 11, 2006); *see also Fecht*, 70 F.3d at 1081 ("[W]hether

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 78

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.").

### C.    The Complaint Raises A Strong Inference Of The 10(b) Defendants' Scienter

Defendants act with the requisite scienter when they act either intentionally or with deliberate recklessness. *See S. Ferry*, 542 F.3d at 782. A defendant is deliberately reckless if "he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort." *Howard*, 228 F.3d at 1064.

In *Tellabs*, the Supreme Court provided two key principles to guide courts in evaluating scienter. First, the Court rejected a piecemeal analysis and held that "the [appropriate] inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 127 S. Ct. at 2509 (emphasis in original); *see also S. Ferry*, 542 F.3d at 784 (in light of *Tellabs*, a court "should look to the complaint as a whole, not to each individual scienter allegation as *Silicon Graphics* suggests"). Second, *Tellabs* held that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" 127 S. Ct. at 2510 (citation omitted). Rather, a plaintiff adequately pleads scienter if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id.* In other words, "a tie goes to the Plaintiff." *Commc'ns Workers v. CSK*, 525 F. Supp. 2d at 1120.

As this Court has held, "[t]he Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement . . . . Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Fouad*, 2008 WL 5412397, at *8 (citing *S. Ferry,* 542 F.3d at 784). Scienter "may be pled and proven by reference to circumstantial evidence." *UTStarcom*, 2008 WL 4002855, at *2 (citing *In re*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 79

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Peoplesoft Sec. Litig.*, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000)); *see also No. 84 v. Am. West.*, 320 F.3d at 943-44.

Thus, a complaint should be sustained if, as here, considering the allegations as true and taken collectively, a reasonable person would consider the inference of scienter cogent and "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. The Complaint easily exceeds the applicable standards.

### 1. WaMu's Improper Lending Practices And Accounting Violations Support A Strong Inference Of Scienter

The fraud at WaMu pervaded all aspects of the Company's core residential lending business because the 10(b) Defendants were either directly complicit in, or deliberately disregarded, the Company's abandonment of appropriate underwriting and risk management, manipulation of appraisal values, targeting of high-risk borrowers, failure to protect against the losses caused by these improper lending practices, and failure to comply with GAAP and maintain adequate internal controls.

Recognizing that *all* of the facts alleged in the Complaint, when considered collectively, raise a strong inference of their scienter, the 10(b) Defendants ignore the majority of the Complaint's allegations. Instead, they attempt to diminish the significance of Plaintiffs' allegations by cherry-picking a few discreet allegations and arguing (unpersuasively) that each of those few allegations, on its own, is insufficient to support a strong inference of knowledge or deliberate recklessness. In so doing, Defendants fail to consider the *aggregate* effect of *all* the Complaint's scienter allegations, as the law requires. As made clear below, a holistic review of the totality of the facts pled in the Complaint more than satisfies Plaintiffs' burden to plead scienter as to each 10(b) Defendant.

The 10(b) Defendants also contend that Plaintiffs cannot sufficiently allege a strong inference of scienter because Plaintiffs do not tie each of them to the improper lending practices and accounting violations at WaMu. This argument is misplaced and ignores both the detailed allegations of the Complaint, which are explored below, and the critical fact that the misconduct

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 80

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

at issue took place as part of the Company's core operations. It simply is not plausible that the widespread fraud at WaMu was perpetrated at the center of the Company's residential lending business – *its primary business driver and the source of 70% of WaMu's income* (¶¶1, 59) – for nearly three years without the knowledge or reckless disregard of the 10(b) Defendants. Moreover, WaMu's home lending operations were the lynchpin in WaMu's plan to move into a "leading national position," an effort that was pushed by the 10(b) Defendants under Killinger's leadership with direct participation by, among others, Casey, as well as Rotella, Schneider and Cathcart, who were hired to run operations and risk management for the Company's lending business based on their extensive knowledge and experience in home lending and risk management. ¶¶65-66, 68, 536. It is thus absurd to suggest, as the 10(b) Defendants do, that they were not knowledgeable about WaMu's fraudulent lending and accounting practices which were unquestionably crucial to WaMu's core business.

In fact, the Ninth Circuit's decisions in *South Ferry* and *Berson* explicitly addressed this issue of whether scienter can be inferred based on facts relating to a company's core operations. The Ninth Circuit answered this question affirmatively, holding that "it would be absurd to suggest" that "management" could repeatedly, but ignorantly, make false and misleading representations to investors about subjects of significant importance to the company and shareholders. *See S. Ferry*, 542 F.3d at 785-86 ("[S]cienter can be satisfied where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."); *Berson*, 527 F.3d at 989 (same).

The recent *Countrywide Securities* decision, relying on this Ninth Circuit authority, is also on point. In that case, Judge Pfaelzer held that the complaint alleged the scienter of each officer defendant of a lending company because the alleged improper lending practices were "so fundamental" to the nature of the company's business that "it would be difficult to conclude" that the company's senior officers did not know about them. 588 F. Supp. 2d at 1194. Specifically, the court held: "the alleged underwriting quality and credit risk management

---

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 81

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

issues were so fundamental to Countrywide, and on such a broad scale, should have been so apparent that it would be difficult to conclude that those Defendants at the top levels of Countrywide management did not know what was going on." *Id*. (citation omitted).

In this case, as in *Countrywide Securities,* it would be implausible that WaMu's most senior officers, Killinger (CEO), Casey (CFO), Rotella (COO), Cathcart (Chief Enterprise Risk Officer), and Schneider (President of Home Loans), could have repeatedly spoken about the Company's underwriting, risk management, appraisal, and accounting practices – which were material aspects of WaMu's home lending business and critical to WaMu's financial condition – without being acutely aware of the widespread manipulations alleged in the Complaint. Indeed, the improper lending practices and accounting manipulations alleged in the Complaint went to the very heart of the Company's core business:  home lending.  *See Tellabs II,* 513 F.3d at 709 (holding that it was "exceedingly unlikely" that false statements about key parts of the company's business were the result of "merely careless mistakes at the management level . . . rather than of an intent to deceive or a reckless indifference to whether the statements were misleading," and "[t]hat no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's key products] knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity").

Furthermore, the Complaint's strong inference of the 10(b) Defendants' knowledge and/or reckless disregard for the falsity of their statements about each category of allegation is supported not only by their positions as senior officers and because of the importance of the undisclosed conduct to WaMu's core operations.  Rather, as set forth below, it is also supported by substantial allegations that refer to documents, expert analyses, and the accounts of nearly 90 witnesses that, taken together, raise a strong (indeed compelling) inference of the 10(b) Defendants' scienter.  *See, e.g., S. Ferry*, 542 F.3d at 785-86 (particularized allegations probative of scienter may be evaluated together with allegations of management's roles);

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 82

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Nursing Home Pension Fund v. Oracle*, 380 F.3d at 1232 (approving of witness evaluations, which "offer[ed] a substantial window into the financial health of the corporation"); *Countrywide Deriv.*, 554 F. Supp. 2d at 1058-59 (crediting the accounts of former employees at various levels as evidence of scienter, and finding that the confidential sources collectively "paint a compelling portrait of a dramatic loosening of underwriting standards in Countrywide branch offices across the United States"). Thus, based on the Complaint's allegations, the only inference to be drawn – and the most compelling inference – is that the 10(b) Defendants acted with scienter.

In response, the 10(b) Defendants offer no persuasive alternative inference that they acted innocently or negligently. Defendants' failure to propose an opposing plausible inference more credible than that alleged by Plaintiffs tips the scale even more in favor of finding a strong inference of scienter. *See In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1264 (M.D. Fla. 2007) ("In spite of a direct invitation to do so, [defendants] do not provide the Court with a 'plausible opposing inference' sufficient to counter the significant weight of the scienter inference that arises from the totality of the allegations."); *In re Openwave Sys. Sec. Litig.*, 2007 WL 3224584, at *10 (S.D.N.Y. Oct. 31, 2007) ("Defendants have not pointed to any 'competing inferences rationally drawn from the facts alleged'") (quoting *Tellabs*, 127 S. Ct. at 2504).

### 2. WaMu's Appraisal Manipulations Support A Strong Inference Of Scienter

WaMu's appraisal manipulations weigh heavily in favor of establishing the 10(b) Defendants' scienter. Appraisals are a core business function for a lending company (¶¶134-43), and it would be fanciful to imagine that the 10(b) Defendants – who, as set forth below, had an affirmative legal obligation to make sure that the Company's appraisals were fair and accurate – were unaware of WaMu's pervasive appraisal manipulation, which was undisclosed and totally inconsistent with Defendants' public statements. *See Berson,* 527 F.3d at 987-88.

During the Class Period, WaMu engaged in widespread, systematic appraisal

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 83

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

manipulation by pressuring both its in-house and third party appraisers to inflate values of the real estate used as loan collateral so that WaMu could originate ever greater loan volumes. ¶¶126-306. The Complaint details the high-level pressure exerted by senior WaMu executives on eAppraiseIT – one of WaMu's two outside appraisal providers, which was paid over $50 million to conduct over 260,000 appraisals for WaMu (¶164) – to engage in improper practices (¶¶197-273). WaMu similarly required inappropriate appraisal practices from its other outside appraisal provider, LSI. ¶¶274-97.

### (1) The 10(b) Defendants' Direct Legal Obligation To Monitor WaMu's Appraisals

The 10(b) Defendants' affirmative legal duties to ensure the independence and accuracy of WaMu's appraisals support a strong inference of scienter. ¶¶134-60. As discussed in the Complaint (but ignored by Defendants in their motions), federal regulations designed to ensure appraisal integrity and accuracy governed WaMu's appraisal practices. ¶¶137, 144-60. Those regulations existed because, as WaMu acknowledged, fair and accurate appraisals were fundamental to its operations. ¶¶139-40, 142, 693. The regulations required these same 10(b) Defendants to monitor, and if necessary correct, WaMu's lending operations to ensure compliance with substantive rules that were intended to prevent corrupt appraisals. ¶¶150-60. The 10(b) Defendants were unquestionably aware of these regulations. ¶153.

Indeed, before the start of the Class Period, on March 22, 2005, WaMu's regulator wrote to Killinger enclosing the OTS's 2005 Interagency Appraisal Guidelines (the "OTS Letter," Complaint App. 4). ¶153. The OTS Letter specifically required the 10(b) Defendants to personally establish and maintain appraisal policies and practices that complied with applicable regulations. ¶¶153-55. In particular, the OTS Letter stated: "Internal policies and procedures should ensure that . . . the savings association's appraisal and evaluation function is safeguarded from internal influence and interference from the loan production staff." ¶155. Furthermore, OTS's 2005 Interagency Appraisal Guidelines expressly mandated that, among other things, loan production staff should not select appraisers or be involved in developing or

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 84

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

maintaining lists of appraisers.    ¶157.    Despite the unambiguous nature of these crucial pronouncements, WaMu violated them and thus corrupted its appraisal process.

The 10(b) Defendants' direct and personal obligation to ensure that WaMu's appraisal policies and practices complied with these regulations and standards raises a compelling inference that the 10(b) Defendants were at least deliberately reckless with regard to the false and misleading statements and omissions they made concerning WaMu's appraisals and LTV ratios based on the appraisals.  *Cf. In re Jenny Craig Sec. Litig.*, 1992 WL 456819, at *1 (S.D. Cal. Dec. 19, 1992) (finding optimistic statements actionable in light of company's violation of regulations).

### (2)    Witness Accounts And Non-Public Documents Regarding WaMu's Appraisal Manipulation

The Complaint's allegations, which include numerous first-hand accounts by confidential witnesses who worked in various appraisal-related positions, as well as references to internal, non-public communications between WaMu and eAppraiseIT, demonstrate that the 10(b) Defendants knew about, or recklessly disregarded, the Company's pervasive appraisal manipulations in direct violation of their obligations under the governing regulations. For instance, according to confidential witnesses cited in the Complaint, WaMu's senior management was aware of the Company's dubious appraisal practices and of the WaMu "proven appraiser list" – the list of individual third-party appraisers who would provide WaMu with the desired property values.  ¶¶208, 211.  In fact, according to a former Regional Manager in WaMu's Appraisal Department, changes to WaMu's "proven appraiser list" were discussed at the ***highest levels of WaMu*** and eAppraiseIT (¶¶211-12).  Further, to make sure that WaMu was able to "hit" the desired property values, WaMu management met with eAppraiseIT and LSI to demand less resistance against their efforts to obtain higher appraisal values. ¶186. Accordingly, the Complaint's numerous first-hand witness accounts of WaMu's systematic wrongful appraisal policies and practices first-hand support a strong inference of the 10(b) Defendants' scienter.   ¶¶167-297.   *See Daou*, 411 F.3d at 1015 (concluding that multiple

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 85

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    witnesses' mutually consistent accounts strengthen the inference of scienter).

2         Moreover, multiple written communications between senior WaMu and eAppraiseIT

3    executives discussing undisclosed, wrongful appraisal practices have been uncovered by the

4    Attorney General.  These inculpating communications, alleged in the Complaint (¶¶261-73),

5    corroborate the witness accounts and provide further evidence of the 10(b) Defendants'

6    scienter.  For example, in a written communication dated August 9, 2006, eAppraiseIT's

7    President told WaMu executives that:

8         We need to address the ROV issue . . . . Many lenders in today's environment . . .
          have no ROV issue.  The value is the value. I don't know if WaMu production
9         will go for that . . . . The WaMu internal staff we are speaking with admonish us
          to be certain we solve the ROV issue quickly or we will all be in for some pretty
10        rough seas.

11   ¶264.  Witnesses have explained that ROVs, or "reconsiderations of value," were a widely used,

12   improper means of overriding accurate appraisals to obtain higher values.  *E.g.,* ¶¶165, 170,

13   185, 220-24.

14        Similarly, on May 29, 2007, eAppraiseIT's Executive Vice President discussed

15   eAppraiseIT's problems with WaMu in a letter to a WaMu senior executive as follows:

16        *[T]he sales group of WAMU began to insist they choose the appraisers mostly*
          *due to their concerns about 'low values.' eAppraiseIT encouraged WAMU to*
17        *resist these pressures if possible. However, WAMU decided to go with what*
          *came to be called the 'proven' list of appraisers recommended by sales.* . . . The
18        use of the 'proven' panel is challenging for eAppraiseIT . . . the possibility of
          collusion between the loan officers and appraisers is increased when eAppraiseIT
19        does not control the selection.  In addition, eAppraiseIT is concerned with any
          possible lender pressure or perception of lender pressure when the only way to get
20        on the WAMU 'proven' panel is through the loan officer.

21   ¶272 (emphasis added).  The only plausible inference to draw from these communications –

22   which detail WaMu's thinly-veiled threats to pull its business from eAppraiseIT if

23   eAppraiseIT's senior executives did not accede to WaMu's demands to violate appraisal

24   regulations – is that the 10(b) Defendants were involved in and/or aware of WaMu's improper

25   appraisal practices.

26        Defendants neither substantively address these and other grave allegations arising from

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 86

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

the documents quoted in the Complaint, nor offer any competing innocent inference. Instead, they attempt to brush aside the allegations sourced by these documents by labeling them mere claims of mismanagement (without addressing their substance) and accusing Plaintiffs of an improper "wholesale adoption" of the NYAG Complaint. OD Mot. at 22 (citing *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003)).

Neither of these assertions is correct, as the Complaint alleges particular, well-sourced facts such as emails and other communications quoted from the NYAG Complaint to demonstrate scienter, rather than relying on the mere existence of the NYAG Complaint or its legal theories or conclusions. The Complaint's inclusion of allegations based on the NYAG Complaint, along with other allegations based on witnesses and documents revealed by Lead Plaintiff's own investigation, is entirely appropriate. *See New Century*, 588 F. Supp. 2d at 1221 (denying motion to strike allegations based on bankruptcy examiner's report because report was based on underlying documents and plaintiffs also alleged facts revealed by their own investigation); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *4 (N.D. Cal. Aug. 14, 2008) (denying motion to strike allegations based on SEC complaint because plaintiffs also conducted their own investigation).

### (3)    Violations of WaMu's Stated Appraisal Policies

Well-sourced allegations in the Complaint also indicate that the 10(b) Defendants caused WaMu to violate applicable regulations and its own purported appraisal policies with frequent "Reconsiderations of Value" and by using hand-picked appraisers selected by WaMu's sales staff. *E.g.*, ¶¶275-77. WaMu committed "illegal" actions by submitting ROVs, improperly having sales personnel contact appraisers directly, and by WaMu loan officers improperly requesting to work with specific appraisers because "they knew each other." ¶¶185, 234, 276. "Courts have held that violation of a company's own policy supports an inference of scienter." *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) (citing *Provenz*, 102 F.3d at 1490); *see also New Century*, 588 F. Supp. 2d at 1229 (finding allegations

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 87

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

that "loan exceptions were commonly made for the otherwise unqualified" supportive of scienter).

### (4)    WaMu's Failed Request For Exemption From Appraisal Rules

Only a few months before the start of the Class Period, WaMu's Chief Credit Officer wrote to the OTS seeking exemption from appraisal regulations.  ¶¶483-85.  Together with the other detailed allegations concerning WaMu's appraisal practices (¶¶126-306), including specific instructions from the OTS to Killinger and WaMu's other officers and directors to ensure the Company's compliance with these regulations (¶¶144-60), WaMu's plea to its regulator for exemption from regulations which it later circumvented strongly supports an inference of scienter.

Defendants mischaracterize WaMu's letter to the OTS as the Complaint's "lead" scienter allegation.  OD Mot. at 27.  It is not.  Incredibly, they also question whether any of the Defendants "had a role (or even knew about) the request," which was made ***on behalf of WaMu*** by its ***Chief Credit Officer***.  OD Mot. at 16.  To suggest that the 10(b) Defendants would not have known about such a request borders on the absurd; in any event, even assuming none of them knew of WaMu's request to deviate from OTS regulations, that would only further support an inference of the 10(b) Defendants' reckless disregard for the true state of the Company's appraisal functions.

In addition, Defendants' reliance on *Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002), to suggest that WaMu's request does not support scienter is misplaced.  There, the gravamen of plaintiffs' action was that the defendants knew certain patents were invalid simply because there was a challenge to a single patent that they were "vigorously" defending.  *Id.* at 895-96.  Here, the Complaint alleges that Defendants were unable to obtain an exemption from appraisal regulations from their chief regulator (¶485), which was admittedly sought for a competitive advantage (OD Mot. at 16).  The Complaint alleges that WaMu proceeded to artificially inflate appraisals in violation of the regulations during the Class Period despite the

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 88

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

OTS's denial of WaMu's exemption request; WaMu's failed request helps to explain why, and strengthens the inference of the 10(b) Defendants' scienter. In contrast to Defendants' naked assertions of WaMu's good-faith dealings with the OTS, a senior WaMu manager, who worked directly with Casey and Cathcart, stated that "senior management at [WaMu] [we]re contemptuous of [the OTS]." ¶499.

### 3. WaMu's Defective Loan Underwriting And Risk Management Support A Strong Inference of Scienter

As set forth below, WaMu's pervasive abandonment of prudent underwriting and risk management practices supports a strong inference of the 10(b) Defendants' scienter. Indeed, the court in *New Century* considered allegations of high-risk mortgage lending and severely deficient loan underwriting sufficient evidence that the senior officers of the company acted with scienter in misleading investors:

> Several witnesses portray an underwriting system driven by volume and riddled with exceptions. They state that the goal was to "push more loans through", that "there was always someone to sign off on any loan," that nearly any loan was approved to meet its sales projections, and that exceptions were commonly made for the otherwise unqualified . . . . There are also indications that the compensation for sales reinforced the disregard for standards and quality as volume was linked to reward.
>
>          \*        \*        \*
>
> It is as plausible an inference as any other that the Officer Defendants were aware of the alleged pervasive company-wide practice of issuing loans of poor quality without complying with any basic set of underwriting standards . . . .The allegations are sufficient to infer a deliberately reckless set of statements telling the public one thing when New Century was doing something quite different – the loans were of poor, not great, quality; the underwriting was all but absent, not strict; and the internal controls were slack rather than searching . . . . The inference of deliberate recklessness as to false statements regarding loan quality and underwriting is at least as compelling as inferring that the Officer Defendants were simply unaware of New Century's practices when the statements were made, or taken by surprise when the market took an unexpected turn for the worse.

*New Century*, 588 F. Supp. 2d at 1229-30 (citations omitted); *see also Countrywide Sec.*, 588 F. Supp. 2d at 1189-96 (finding that complaint alleged scienter of each officer defendant of lending company based, in whole or part, on his position at the company); *Atlas v. Accredited*,

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 89

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

556 F. Supp. 2d at 1156 ("[T]he Court concludes that an inference of scienter is sufficiently supported by the Complaint's allegations regarding the frequency with which Defendants caused [the company's] underwriters' decisions rejecting risky loans and the degree to which [the company's] reserves were decreased compared to historic levels, at a time when according to generally accepted accounting principles such reserves should have been increased").

In addition, while touting WaMu's disciplined and prudent underwriting practices and the effectiveness of its risk management function, the 10(b) Defendants received numerous internal reports and/or had access to information that clearly documented the Company's loosen underwriting practices and deficient risk management. These, and numerous other allegations highlighted below, establish a strong inference that the 10(b) Defendants knew and/or recklessly disregarded that their statements about WaMu's underwriting and risk management were false and misleading when made.

### (1) The 10(b) Defendants' Receipt Of Critical Underwriting And Risk Management Information

The 10(b) Defendants' knowledge of and/or access to information contradicting their false and misleading public statements is sufficient to demonstrate a strong inference of scienter. *Nursing Home Pension Fund v. Oracle*, 380 F.3d at 1230 ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[I]f facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them"); *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, 2002 WL 989480, at *8 (N.D. Cal. Mar. 29, 2002) (scienter shown where complaint alleged defendants knew or had access to non-public information contradicting their public statements) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 724 (D. Del. 2000) (allegation that defendants had

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 90

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

knowledge of deteriorating loan portfolio while reassuring investors that loan loss reserves were sufficient adequately pled scienter).  Here, as in *Atlas v. Accredited*, "Plaintiffs' Complaint alleges in detail that Defendants during the class period knew about [the company]'s deviation from [its] underwriting standards and that Defendants therefore knew their public statements regarding [the company]'s compliance with those standards were false and misleading."  556 F. Supp. 2d at 1156.

The Complaint alleges specific facts demonstrating that reports and information about WaMu's undisclosed ineffective risk management and defective underwriting were provided directly to Cathcart, Casey, Rotella, and Schneider.  Evidence in the Complaint also establishes that Killinger received these reports and information, or at the very least had ready access to them, including reports detailing WaMu's violations of its lending risk guidelines that were delivered to the Board. ¶¶109-10, 500.  As the senior management of the Company, the 10(b) Defendants indisputably had access to pertinent information regarding WaMu's underwriting, risk management, loan origination, and loan performance.  *E.g.*, ¶¶106-11, 116, 119-20, 264, 272, 500-28, 534.

For example, according to CW18, a Vice President in WaMu's Commercial Risk Department, Cathcart received reports generated from regular audits of WaMu's underwriting guidelines conducted by the risk management group, which "review[ed] all aspects of WaMu's underwriting guidelines for risk."  ¶534.  CW18 explained that Cathcart was responsible for reporting the results of these audits to the other 10(b) Defendants and the Board.  *Id.*  However, Cathcart, Casey and Rotella, as well as the other 10(b) Defendants, undermined risk management and did nothing to correct the deficient and deteriorating standards uncovered by the individual risk managers.  ¶¶110-11, 116.  In this regard, CW17, Senior Vice President of WaMu's Enterprise Risk Management, explained that he told Casey and Cathcart that WaMu's Home Loans group was "violat[ing] the specific policies outlined by [WaMu's Risk Management] group," but that his pleas to Casey and Cathcart were "simply overruled."  ¶111.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 91

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

CW17 further described how Casey, Cathcart, and Rotella received regular "Risk Reports," which confirmed and specifically quantified the fact that the Company was exceeding risk parameters dictated by WaMu's own risk guidelines, but that they did nothing in response. ¶¶109-10.  Again, CW17 stated that Casey, Cathcart, and Rotella "simply ignore[d]" the direct and clear warnings that they received about the Company's risk management violations.  ¶110.

CW19, a former Compliance Manager, also confirmed Cathcart's and Schneider's failure to take any action to fix the Company's credit risk problems even though they were repeatedly told about the problems.  Specifically, CW19 described weekly staff meetings where the Senior Compliance Officer would "be very vocal" with Cathcart and Schneider about compliance and credit risk deficiencies, but Cathcart and Schneider refused to do anything. ¶119-20.

The 10(b) Defendants were also regularly informed about the details of WaMu's loan portfolio, including the number and severity of loans in default.  For instance, CW81, a Staff Accountant who "was involved in the generation and analysis of monthly, quarterly and yearly reports for specific loan types," confirmed that **senior management, and specifically Schneider, "were 'always aware' of what was occurring with respect to the overall loan portfolio**."  ¶509.  CW54 explained that monthly audits of WaMu's "prime loans" "certainly reached senior management, including Defendant Schneider."  ¶510.  Similarly, CW69, a Senior Underwriter, confirmed that senior management received information regarding first payment defaults.  Specifically, in early 2007, CW69 was assigned to track WaMu's first payment defaults for presentation to WaMu's senior management.  Significantly, the data showed that the first payment defaults resulted from poor underwriting.  ¶526.

In addition, CW84, a Senior Accountant who spent almost 20 years at WaMu, stated that the Company "tracked all aspects of the loans being processed by WaMu" with a database called Fidelity MSP.  ¶519.  Fidelity MSP was available to senior management and provided detailed information about the type of loan, the loan's status (such whether it was in default

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 92

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

and the principal amount outstanding), and the borrower, including financial and credit information. *Id*. Moreover, as explained by CW84 and CW15, loan defaults were regularly monitored and the negative trends occurring at WaMu were "well-known" within the Company. ¶¶507, 519. CW63, a National Underwriting Manager of WaMu's subprime division Long Beach Mortgage ("LBM"), also explained that Schneider, as a member of LBM's Executive Credit Policy Committee, received weekly recommendations on methods to reduce first payment defaults. ¶¶511-12. Based on these and other reports, starting in 2005 WaMu management, including the 10(b) Defendants, "knew about, but never acknowledged, the negative trends that were being witnessed concerning first payment defaults on WaMu's loans." ¶507.

The 10(b) Defendants also received extensive information about WaMu's underwriting practices, including changes and exceptions to the Company's policies. Indeed, the Complaint not only details numerous instances of lax underwriting standards (*e.g.,* ¶¶326, 351, 374, 384), but also alleges that the process for changing WaMu's underwriting guidelines was "regimented" and "dependent upon review and approval from ***WaMu senior management***." ¶532 (emphasis added). Each request for change was reviewed by WaMu's Credit Policy Committee, on which Schneider served. ¶¶512, 533. LBM's underwriting guidelines for subprime loans originated by WaMu went through a similar process, in which Schneider also participated. ¶535. WaMu's senior and corporate management also thoroughly tracked and reviewed exceptions to underwriting standards. ¶¶523-24.

While the information and reports described above more than demonstrate the 10(b) Defendants' knowledge of or reckless disregard for WaMu's defective risk management and underwriting practices, these reports represent a mere fraction of the information that was available to the 10(b) Defendants, which also included "tracking reports" detailing compliance issues, "Loan Loss Severity Reports" about WaMu's foreclosures, and other reports. *E.g.*, ¶¶120, 345, 361, 490, 500, 504, 513-15, 520-22.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 93

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

### (2)    Violations of WaMu's Supposed Underwriting and Risk Management Policies

The Complaint details pervasive violations of the Company's underwriting and risk management policies, which support a strong inference of the 10(b) Defendants' scienter.  *See New Century*, 588 F. Supp. 2d at 1229 (allegations that "loan exceptions were commonly made for the otherwise unqualified" support inference of scienter); *Chalverus*, 59 F. Supp. 2d at 235 (violation of company's own policy supports inference of scienter).

WaMu regularly violated its purported underwriting guidelines by allowing rampant exceptions to increase its loan volume.  *E.g.,* ¶¶86, 335, 340-41, 350, 384, 397.  Indeed, CW52, an underwriting team manager confirmed that "exceptions to the underwriting guidelines occurred 30-40% of the time."  ¶340.  According to CW51, a Senior Underwriter, exceptions to the Company's underwriting guidelines "were part of the norm. . . . [I]t was so commonplace to go outside of the guidelines" and the exceptions "were always approved" by management, "so it was just business as usual and something that they were comfortable with."  ¶338. Similarly, CW53, a Senior Loan Processor, explained that "[y]ou could pretty much get an exception on any loan you wanted" (¶341); CW5, a Senior Credit Quality Manager, explained that WaMu encouraged loan consultants to obtain exceptions to the underwriting guidelines whenever necessary to close more loans (¶339).   Indeed, as demonstrated by the extensive allegations in the Complaint, exceptions to WaMu's underwriting guidelines occurred regularly throughout the Company.  *E.g.,* ¶¶ 334-38, 386, 388, 397.

Moreover, exceptions were made to all types of underwriting requirements and were applied to all types of the Company's loans, including both prime and subprime loans.  *E.g.*, ¶¶342, 402.  For example, according to CW52, an Underwriting Team Manager, the types of exceptions "varied so much" from "accepting certain income documentation – or lack thereof – to credit score exceptions . . . there [were] tons of exceptions."  ¶340; *see also* ¶¶341, 399, 401. CW47, a longtime WaMu employee who served as a Negotiated Transaction Manager approving exceptions to loans, described how WaMu regularly made "FICO exceptions" on

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 94

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Option ARM loans, a supposedly "prime" product.  ¶326.  CW47 stated that until the summer of 2007, a borrower could receive a low-documentation Option ARM loan from WaMu with a 620 FICO score – which was far below the industry norm of 660 for a "prime" borrower. ¶¶326.

These statements about WaMu's institutionalized, bottom-of-the-barrel underwriting standards are consistent with internal, nonpublic WaMu documents obtained by Lead Plaintiff during its investigation.  In one stunning example, a WaMu internal document obtained by Lead Plaintiff's counsel instructed underwriters during the Class Period "that if a borrower applies for a '5/1 Amortizing ARM' and the borrower had a bankruptcy 'less than 4 years ago,' but has a FICO score of 621, WaMu will consider that borrower prime.  Even with a recent bankruptcy and a weak FICO score, WaMu would classify such borrowers as 'prime' based on its loose guidelines and to the exclusion of any other credit risk considerations (as explained above, a borrower with a FICO score below 660 is typically considered a subprime [borrower])."  ¶329. Similarly, a PowerPoint presentation, revised and updated in September 2007, made clear that "regardless of borrowers' credit history or actual potential to repay a loan, if the borrower WaMu targets for one its 'prime' loans has a FICO score over 619, that borrower would be considered a 'prime' borrower."  ¶328.

Not surprisingly, it was also well known within the Company that WaMu's undisclosed, shoddy underwriting resulted in the origination of low-quality, poorly performing loans. Specifically, CW47 described a meeting in 2003 with WaMu's former Home Loans Chief Credit Officer where it was predicted that, within five years, 85% of WaMu ARM borrowers would not be able to afford their mortgages.  ¶326.  In fact, according to CW66, an LBM Senior Underwriter, several WaMu employees contacted corporate headquarters about dubious practices involving underwriting exceptions, including issuing loans to unqualified borrowers. ¶¶387, 389-90.

Based on the extent and frequency of exceptions that WaMu made to its loans as well as

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 95

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    the reports tracking exceptions that senior management received (discussed above and in the

2    Complaint at ¶¶523-24), there can be no question that the 10(b) Defendants knew or recklessly

3    disregarded WaMu's grossly deficient underwriting.   As summed up by CW49, a Senior

4    Underwriter, "if you had a pulse, WaMu would give you a loan."  ¶331.

5        Similarly, it was well known within WaMu that the Company's lending practices

6    violated its risk-management policies.  In fact, Casey, Cathcart, and Rotella were specifically

7    informed of these violations.  For example, as discussed above, CW17 told Casey and Cathcart

8    that WaMu's Home Loans group was "violat[ing] the specific policies outlined by [WaMu's

9    Risk Management] group," but they disregarded his pleas to correct these violations.  ¶111.

10   Additionally, in early 2006, CW18 wrote to Rotella regarding his concerns about WaMu

11   management directing WaMu employees to "bend the rules" or "look the other way" and about

12   "lax and inappropriate risk policies."  ¶116.  Tellingly, while Rotella acknowledged receiving

13   CW18's concerns, WaMu fired CW18 after his whistle-blowing.  *Id.*  Casey's, Cathcart's, and

14   Rotella's failure to respond to these warnings is consistent with their other actions to

15   marginalize risk management.

16       The evisceration of risk management detailed in the Complaint, which reflects

17   institutional policy, rather than the whims of low-level employees, supports a strong inference

18   that these practices were dictated from WaMu's highest levels.  As detailed in the Complaint,

19   during the Class Period, the Company subordinated risk management to a support role for the

20   business units that it was purportedly monitoring.  *E.g.,* ¶¶105, 107-08, 113-15, 117-25, 498.

21   This is documented in an October 31, 2005 internal WaMu document, which was authored by

22   WaMu's then-Chief Compliance and Risk Oversight Officer and circulated to all WaMu risk

23   management personnel – including members of senior management – which directed that

24   "moving forward, risk management at WaMu must occupy a 'customer service'–type function,

25   rather than impose a 'regulatory burden' on other Company segments."  ¶¶114-15.

26       Accordingly, these rampant violations of supposed WaMu guidelines support a strong

---

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 96

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

inference of the 10(b) Defendants' scienter.

### (3)    Financial Rewards For Increasing Loan Volume

WaMu's employees also reported the significant compensation provided to all employees who originated high volumes of loans, which encouraged employees to "push" WaMu's risky loans on borrowers, even those who were unqualified. *E.g.*, ¶¶84-102, 412-17. The Complaint explains how this compensation structure was dictated and managed by the highest levels of the Company (¶417), and included rewarding underwriters based on the volume of loans closed, rather than loan quality (*e.g.*, ¶¶101, 415). Allegations of undisclosed volume-over-quality compensation structures like the one at WaMu support a strong inference of scienter. *See New Century*, 588 F. Supp. 2d at 1229 (finding scienter where "[t]here are also indications that the compensation for sales reinforced the disregard for standards and quality as volume was linked to reward") (citations omitted); *Countrywide Deriv.*, 554 F. Supp. 2d at 1059 (finding scienter where plaintiffs "also allege that the compensation structure promoted these practices by rewarding Company employees – from executives and management down to the underwriters – for increasing loan volume, but not for generating quality loans").

### (4)    The 10(b) Defendants' Boasts About Monitoring WaMu's Risks

The 10(b) Defendants represented to investors that they were able to monitor WaMu's lending business sufficiently to avoid potential problems. *E.g.,* ¶595 (Rotella stated that WaMu was "closely monitoring the credit quality of the Company's home loan portfolio through its enterprise risk management group"); ¶¶613-14 (At WaMu's 2006 Investor Day, attended by each of the 10(b) Defendants, Cathcart stated that "we have been watching our credit profile diligently for the last two years, and we've been making strategic choices to prepare for the environment we currently find ourselves in"); ¶¶620-21 (On WaMu's 3Q06 Earnings Call, in which at least Killinger and Casey spoke, Casey said: "We do reviews of our provision throughout the year and our [Allowance] every single quarter and this quarter was no different from any other quarter. We continue to look at all of our loss factors and the performance of

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 97

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

underlying portfolio and continually make adjustments."); ¶657 (During WaMu's 2007 annual shareholder's meeting, at which at least Killinger and Casey spoke, Casey reassured investors that the Company was being "very disciplined" in growing the Company's balance sheet and was monitoring trends in the housing market and in nonperforming assets "very closely" and would "continue to take proactive steps to effectively manage our risks.").

The Court should take the 10(b) Defendants' statements above at face value and infer scienter regarding the concealed problems that ultimately were revealed. *See Daou*, 411 F.3d at 1022 ("specific admissions from top executives . . . that they monitored portions of the company's database are factors in favor of inferring scienter"); *Nursing Home Pension Fund v. Oracle*, 380 F.3d at 1234-35 (same); *PeopleSoft*, 2000 WL 1737936, at *3 ("Senior management affirmatively touted its long-term 'high visibility'. . . . This same visibility can be presumed to have given them the ability to see the downturn before it was reported.").

### b. WaMu's Misstated Financial Statements And Ineffective Internal Controls Support A Strong Inference of Scienter

"'When significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves.'" *Daou*, 411 F.3d at 1016 (citation omitted). The Ninth Circuit has made clear that the pertinent question is not whether a complaint pleads each specific fraudulent transaction, but "[whether] plaintiffs have provided enough information for a court to discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id.* at 1020. In *Daou*, the Ninth Circuit overturned the dismissal by the district court (which had found plaintiffs' allegations insufficiently particularized) on the basis of confidential witness statements detailing widespread wrongdoing. *Id.*; *see also In re Cabletron Sys.*, 311 F.3d 11, 32 (1st Cir. 2002) (rejecting a "one-size-fits-all template" of pleading requirements for establishing scienter in connection with GAAP violations). Here, as set forth in Section III.B, Plaintiffs plead with

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 98

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

extensive particularity that Defendants artificially inflated the Company's income, in violation of GAAP, by understating its Allowance and provision for loan losses.  ¶¶445-46, 450-66.

Significantly, **none** of the 10(b) Defendants addresses the strong inference of scienter concerning WaMu's false financial reporting raised by a secret internal WaMu report dated September 2005, entitled "Corporate Risk Oversight Report: Allowance for Loan & Lease Losses Methodology of Washington Mutual Bank" (defined above as the "CRO Report").  *See* ¶¶450-56.  The CRO Report, which was prepared by a team charged with forecasting WaMu's expected losses over the upcoming four years, evaluated WaMu's model assumptions and controls, governance, and documentation and supporting policies for the Allowance.  *Id.*  It detailed many material deficiencies in the Allowance methodology, including that "[t]he predictive performance of Loan Performance Risk Model (LPRM) is untested on products with the potential to negatively amortize.  Given recent product and interest rate trends, negative amortization is a major and growing risk factor in our portfolio."  ¶452.  Thus, "WaMu's LPRM, the model upon which the Company estimated the credit losses for the loans in its portfolio and based its Allowance, did not account for the performance of the Company's Option ARM loans, which the Company knew to be generally high-risk loans."  ¶453.  ***Significantly, this meant that WaMu could not gauge or predict risk on its Option ARM loans, which made up over 50% of WaMu's total loan portfolio throughout the Class Period.*** ¶74.

Further supporting a strong inference of scienter, the CRO Report stated that it was to be "presented to management in writing" and that management was to "provide a written response."  ¶452.  The Complaint details WaMu management's response to the CRO Report in another secret document dated November 1, 2005.  ¶454.  WaMu's broken systems for controlling its risk and financial reporting would simply be "enhanced," with a target date of completion an amazing ***nine months*** after the problems were reported to WaMu's management.  ¶¶454-55.  In addition, the CRO Report and WaMu management's response to it documented

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 99

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

additional failures of WaMu's internal controls, including that those responsible for maintaining internal controls were disabled from accomplishing their required oversight functions, including lacking even adequate guidelines to perform their critical role.  ¶¶476-79.

These shocking allegations – based on internal WaMu documents – show the 10(b) Defendants' contemporaneous knowledge, or at the very least reckless disregard, of facts contrary to their public disclosures about WaMu's financial results and condition, particularly with regard to WaMu's flagship Option ARM loans.  In fact, additional allegations show that almost two years after the serious deficiencies documented in the CRO Report were made known to WaMu management, WaMu and the 10(b) Defendants still had not addressed the material systemic problems with WaMu's loan loss reserving.  ¶¶463-66.  Specifically, CW78, an Assistant Vice President in WaMu's Risk Analytics Group, discovered during Summer 2007 that the LPRM was materially flawed as it *consistently understated* loan delinquency when held up to WaMu's actual empirical data."  ¶465 (emphasis supplied).  CW78 was informed that "the LPRM had not been calibrated for almost eighteen months to reflect [WaMu's] actual loan performance data."  *Id.*  Once again, Defendants fail to address these devastating allegations that show their scienter.

### (1)    Killinger And Casey's False SOX Certifications

Killinger and Casey made false and misleading statements by signing SOX certifications attesting to the accuracy of WaMu's financial statements and the effectiveness of its internal controls, which also support a strong inference of scienter:

> For these [SOX] certifications to have any substance, signatories to the certifications must be held accountable for the statements.  *See Howard v. Everex*, 228 F.3d 1057, 1061 (9th Cir. 2000).  It would be wholly inappropriate to permit a signatory to evade liability because he/she did not prepare the financial report, as Defendants argue, on the ground that the signatory was unaware of the misstatements made therein.  To hold otherwise would effectively eviscerate the entire substance of 18 U.S.C. § 1350, the purpose of which is to ensure that regardless of who prepared the statements, the signatories are attesting to their accuracy and reliability.

*Middlesex Ret. Sys v. Quest Software Inc.,* 527 F. Supp. 2d  1164, 1189-90 (C.D. Cal. 2007).

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 100

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Allegations of signing false SOX certifications are probative of scienter "if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (citing *Garfield v. NDC Health Corp*., 537 F.3d 527, 544-45 (5th Cir. 2008)); *see also New Century*, 588 F. Supp. 2d at 1229-30 (allegations of deteriorating loan quality and underwriting and related internal audits "also give rise to a strong inference of scienter with respect to alleged misstatements regarding internal controls in the company . . . [because] [d]espite these causes for concern, the Officer Defendants repeatedly certified the internal controls in Sarbanes-Oxley certifications").

Defendants' argument that allegations of false SOX certifications cannot show scienter (OD Mot. at 32) misconstrues *Glazer*, which simply observed that allegations of false SOX certifications *alone* are insufficient. 537 F. 2d at 747. Here, an inference of Killinger and Casey's scienter is raised because at the same time they signed false SOX certifications, they knew or recklessly disregarded information showing that WaMu's reported financial statements were false and its internal controls were defective. *See* ¶¶442-81.

### (2) WaMu's Failure To Restate Its Financials Does Not Negate The Strong Inference Of Scienter

In response to these allegations, the 10(b) Defendants contend that there was no fraud because the Company's independent accountants offered unqualified opinions for WaMu's financial statements. *See* OD Mot. at 23-24. However, "[t]he fact that the financial statements were audited is insufficient to negate a finding of knowledge or deliberate recklessness." *Middlesex Ret. Sys.*, 527 F. Supp. 2d at 1190; *see also Converium*, 2007 WL 2684069, at *3 (arguments that "an unchallenged audit opinion by [the company's auditor]" undercut plaintiffs' claims are inappropriate "at this stage of the litigation [because] a court may not weigh the evidence that may be presented at trial.") (citation omitted). Moreover, Defendants' proclamation that Deloitte's "unqualified opinions still stand" rings hollow in light of the fact that WaMu is no longer a going concern, and is in fact liquidating; *In re Anicom Inc. Sec. Litig.*,

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 101

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

2001 WL 536066, at *5-6 (N.D. Ill. May 18, 2001) (finding scienter adequately alleged even though restatement was never issued because the company filed for bankruptcy).

*    *    *

Thus, the Complaint alleges facts raising a strong inference of the 10(b) Defendants' scienter regarding WaMu's underwriting, risk management, appraisals, financial misstatements, and internal controls, which were the subjects of the Defendants' false statements to the investing public.

### 4.    Defendants' Financial Motives Also Support A Strong Inference Of Scienter

The Complaint also alleges facts demonstrating the 10(b) Defendants' personal financial motivation to drive up WaMu's stock price in the short term, while disregarding long-term consequences. "[P]ersonal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 127 S. Ct. at 2511. The 10(b) Defendants pocketed a minimum of ***over $75 million in three years*** in annual compensation and bonuses while they engaged in the misconduct alleged in the Complaint, without even fully counting Cathcart and Schneider's compensation, which was not disclosed for each Class Period year. ¶¶537, 539.

Furthermore, Killinger took advantage of WaMu's fraudulently inflated stock price to sell over 300,000 shares of his WaMu stock, realizing over $13 million in profits through trading that was highly unusual in timing and amount. ¶¶540-46. Killinger's Class Period trading increased over 200% compared to a prior control period. ¶¶542-47. Killinger initiated stock sales under an SEC Rule 10b5-1 Plan well after he became aware of the hidden problems in WaMu's lending and financial results. ¶¶550-52. *See Countrywide Deriv.*, 554 F. Supp. 2d at 1069 (CEO's 10b5-1 plan no defense to insider trading because instituted and amended during the fraud). As the Fifth Circuit recently reasoned, defendants' "attempt to use the 10b5-1 Plan[s] as a non-suspicious explanation is flawed because, *inter alia*, [defendants] entered into the Plan[s] during the Class Period." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d at 554 (5th Cir. 2007) (rejecting defendants' argument and finding that insider

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 102

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  sales contributed to strong inference of scienter); *see also InfoSonics Corp. Deriv. Litig.,* 2007

2  U.S. Dist. LEXIS 66043, at *24-25 (S.D. Cal. Sept. 4, 2007) (whether trading plans were

3  legitimately adopted or were put in place after learning of material, nonpublic information

4  cannot be resolved at pleading stage).

5      The 10(b) Defendants contend that executive compensation, such as bonuses, can never

6  be a basis for inferring scienter.  OD Mot. at 17; KK Mot. at 21.  This argument is baseless.  A

7  compensation structure rewarding short-term financial results, like that here, strengthens the

8  inference of scienter when the complaint explains how defendants' motive is connected to the

9  fraud and there are other supporting facts showing conscious misbehavior.  *See, e.g.*, *No. 84 v.*

10  *Am. W.*, 320 F.3d at 944 (finding scienter where officer defendants' compensation was based

11  "principally on the company's financial performance"); *In re Adaptive Broadband Sec. Litig.*,

12  2002 WL 989478, at *15-16 (N.D. Cal. Apr. 2, 2002) (defendants' motive to dispose of their

13  stock at high prices supported inference of scienter "when read in light of the facts supporting

14  the deliberately reckless accounting[ ]violations").  In this way, the Complaint "distinguish[es]

15  motives common to corporations and executives generally from motives to commit fraud."

16  *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 678 (D. Colo. 2007).

17      The 10(b) Defendants rely on cases that are inapplicable, because they simply stand for

18  the unremarkable proposition that routine compensation and business motives are insufficient,

19  **standing alone**, to raise the requisite inference of scienter.  *See Lipton v. Pathogenesis Corp.*,

20  284 F.3d 1027, 1038 (9th Cir. 2002); *Constr. Laborers Pension Trust v. Nerocrine Biosciences,*

21  *Inc.*, 2008 WL 2053733, at *7 (S.D. Cal. May 13, 2008); *In re Calpine Corp. Sec. Litig.*, 288 F.

22  Supp. 2d 1054, 1087 (N.D. Cal. 2003); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 833 (C.D. Cal.

23  1998).  Likewise, Killinger's self-serving (and highly misleading) assertion that he "declined"

24  his 2007 performance-based bonus package (KK Mot. at 21) should be ignored, as that

25  substantial bonus was added to his post-retirement benefits.  ¶537 n.6.

26      Further, the most reasonable inference that can be drawn from WaMu's announcement

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 103

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

of two major stock buyback programs, in combination with Killinger's simultaneous sales of over 300,000 WaMu shares (¶¶553-56), is that Killinger used WaMu's stock buybacks to support WaMu's stock price so that he could profit further from his massive sales. *Countrywide Sec.*, 588 F. Supp. 2d at 1187 ("[The company's] buying could reasonably have augmented market demand, making it easier for insiders to find buyers and allowing more sales without depressing prices."). The cases Killinger cites are not to the contrary. *See In re Tibco Software, Inc.*, 2006 WL 1469654, at *20-21 (N.D. Cal. May 25, 2006) (complaint did not tie insider sales to stock repurchase plan); *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2006 WL 648683, at *18-19 (N.D. Cal. Mar. 10 2006) (same).

Finally, Killinger claims that because the other 10(b) Defendants are not specifically alleged to have sold WaMu stock during the Class Period, allegations of financial motive against him fail. KK Mot. at 21-22. This argument must be rejected. *See Tellabs*, 127 S. Ct. at 2511 (absence of stock sales by defendants during class period does not defeat strong inference of scienter); *Fouad*, 2008 WL 5412397, at *11 (defendants' stock purchases and absence of sales during class period were "not sufficient to overcome the strong inference of scienter created" by other allegations).

### 5.    Defendants' Remaining Arguments Should Be Rejected

Apart from their totally non-specific and self-evident contention that merely originating and servicing "subprime" mortgages is not securities fraud (*e.g.,* OD Mot. at 21), the 10(b) Defendants fail to address directly many of the allegations in the Complaint discussed above, which show that these Defendants knew and/or recklessly disregarded the truth about WaMu's core lending business (including weak underwriting of ***both*** subprime ***and*** prime loans, shoddy risk management, faulty appraisals, false financial reporting, and ineffective internal controls) at the time they made the false and misleading statements alleged in the Complaint. Their other arguments, addressed below, are equally unpersuasive.

### a.    The "WaMu Officers" Motion

Defendants attempt to mischaracterize a variety of allegations – including allegations

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 104

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

concerning the 10(b) Defendants' receipt of detailed internal reports about the Company's lending operations and other non-public information (OD Mot. at 17-20) – as concerning "motive and opportunity." Not so. The allegations pertaining to "motive and opportunity" involve the 10(b) Defendants' handsome, incentive-based compensation and Killinger's unusual stock sales, and are discussed in Section III.C.4, above. Defendants also use their straw man "motive and opportunity" argument to contend that the Complaint lacks a "viable theory of scienter." OD Mot. at 18. It is in fact the Defendants who lack a viable theory. Defendants "seem to insist motive is necessary, arguing that if Plaintiffs do not adequately explain why Defendants did what they did, intent to defraud cannot be proven. Defendants are incorrect." *BP Prudhoe Bay,* 2007 WL 3171435 at *3. In fact, there is no requirement that Plaintiffs allege a ***"theory"*** of scienter explaining why Defendants knowingly or recklessly failed to disclose material facts, rather than simply a strong inference of scienter raised by viewing the entire Complaint in context. *Tellabs*, 127 S. Ct. at 2509. In any event, Plaintiffs do allege facts, in addition to allegations concerning defendants' personal financial gain, that help explain the 10(b) Defendants' motive to commit fraud – they transformed WaMu into a nationally dominant mortgage lender at the cost of incurring enormous long-term risks for the sake of short-term gains. ¶¶65-73, 537-56.

In addition, Defendants – without reference to any particular allegations in the Complaint – state that a strong inference of scienter cannot be based on management's knowledge and experience alone. OD Mot. at 18. Contrary to Defendants' argument (OD Mot. at 18, citing opinions issued in 2003 and earlier), Plaintiffs do not contend that the 10(b) Defendants' experience ***alone*** raises a strong inference of scienter, but Defendants' experience is relevant as part of the totality of the Complaint's scienter allegations. *See Fouad,* 2008 WL 5412397, at *8 (citing *S. Ferry,* 542 F.3d at 784). Each of the 10(b) Defendants possessed many years of experience in mortgage lending, accounting, and/or risk management before the Class Period. ¶536. For example, Killinger had been with WaMu for 26 years. *Id.* Courts

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 105

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

have found that such in-depth experience is relevant to finding an inference of scienter.  *See Gerber v. Bowditch*, 2006 WL 1284232, *11-13 (D. Mass. May 8, 2006); *In re U.S. Bioscience Sec. Litig.*, 806 F. Supp. 1197, 1203-04 (E.D. Pa. 1992).  Moreover, as set forth above, the Complaint's allegations clearly go far beyond simply reciting Defendants' positions and experience in the Company.

Defendants' criticism of the Complaints' 89 witnesses likewise lacks merit.  OD Mot. at 18-20.  First, their initial contention that not a single witness claims to have personally given any 10(b) Defendants information contrary to their alleged misrepresentations is simply false. *See, e.g.* ¶¶110-11, 116, 120.  Regardless, such allegations are not required to allege scienter. *See, e.g., S. Ferry*, 542 F.3d at 785-86.  More specifically, confidential witnesses need not have been in a position to know facts "first-hand" so long as they are described with "sufficient particularity to support the probability" the witnesses were "in a position to infer" or "could reasonably deduce" the facts attributed to them.  *Berson*, 527 F.3d at 985 (finding it "entirely plausible" that confidential witnesses who were not in a position to "see the stop-work orders first-hand because they were 'engineers or technical editors' rather than managers" still "would know, or could reasonably deduce," that orders had been cancelled); *see also Countrywide Deriv.*, 554 F. Supp. 2d at 1060 (finding strong inference although witnesses had not "ever spoken or had other contact with any of the seven non-management directors . . . and none is alleged to have personal knowledge relating to the two management directors"); *LDK Solar*, 528 F. Supp. 2d at 1243 ("For pleading purposes, it is not necessary that the source have personal firsthand knowledge in a strict evidentiary sense. Rather, the source must be one whose context and access to critical information makes him or her reasonably reliable, such that his or her conclusions about the inner workings of the company are not speculative but reasonably informed").

Relying on two pre-*Tellabs* and pre-*South Ferry* district court decisions, Defendants attempt to undermine CW79 and CW80.  OD Mot. at 19.  In addition to failing to discuss the

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 106

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

context of the Complaint in drawing inferences, as is required, the 10(b) Defendants also wrench out incomplete portions of those witnesses' statements to the exclusion of additional potent allegations. Specifically, they fail to discuss that the 10(b) Defendants met to discuss highly detailed reports about the Company's loans, including discussing on numerous occasions the default and delinquency rates within the Company's loan portfolios, including WaMu's Option ARM and subprime loans (¶492) and that based on CW79's role in the Company and personal experience with Killinger and the other 10(b) Defendants, CW79 reported that these Defendants "were knowledgeable and involved in establishing and approving the Company's lending policies and guidelines." ¶495. Similarly, CW80, who as a Senior Vice President and head of accounting policy had "significant interaction" with Casey and Cathcart (¶497), stated that WaMu's risk management function "lacked independence, specifically because Defendant 'Casey appeared to exert greater influence over the loan loss process as opposed to it being independently managed[,]'" and "WaMu's 'reserving process was diminished as the finance function exerted greater control' and marginalized those who were qualified to analyze and calculate WaMu's reserves." ¶498. Even standing alone, these examples are significant indicators of knowing or at least reckless concealment of the truth by the 10(b) Defendants.

### b. Killinger Motion

Rather than directly address the Complaint's scienter allegations, including those concerning the information that Killinger reviewed or that was readily available to him, Killinger instead attempts to hide behind a misleading use of authority. Amazingly, Killinger cites *South Ferry* to claim that "plaintiffs must, but do not, 'offer details that would bridge the gap between the existence of the reports and actual knowledge on the part of the defendant.'" KK Mot. at 17-18. That is not *South Ferry*'s holding. Rather, Killinger quotes the portion of *South Ferry* that quoted the standard in *Silicon Graphics*, but Killinger fails to acknowledge that *South Ferry* actually modified *Silicon Graphics* in light of *Tellabs*: "[T]he Supreme Court's recent *Tellabs* decision also discusses the level of detail required under the PSLRA, and with its

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 107

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

controlling and persuasive weight, it suggests that perhaps *Silicon Graphics, Vantive*, and *Read-Rite* are too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright." *Id.* at 784. For the same reason, Killinger's citations to the pre-*Tellabs* decisions in *Vantive* and *Lipton* are unpersuasive. KK Mot. at 18.

Killinger's citation to *Metzler* is also unavailing, as here the allegations do not concern a simple "general awareness of the day-to-day workings of the company's business." KK Mot. at 18 (quoting *Metzler*, 540 F.3d at 1068). Rather, the Complaint contains numerous detailed allegations of "specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068; *see also Countrywide Sec.*, 588 F. Supp. 2d at 1189-96 (finding knowing misconduct of lending company's senior management based on their positions overseeing a lending company at which widespread, hidden conduct at odds with public statements was alleged).

Likewise, Killinger's claim that the 89 witnesses in the Complaint – many of whom worked in WaMu's corporate headquarters in Seattle (*e.g.*, CWs 17, 59, 78, 80) – report problems from "just a few branch offices" has no basis. KK Mot. at 19. Instead, the multiple witnesses' mutually consistent accounts strengthen the inference of scienter. *See Daou*, 411 F.3d at 1015. Indeed, the scope and breadth of the reports from WaMu's former employees supports a strong inference of scienter, with damning evidence from former employees emanating from **WaMu offices all over the country** (*e.g.*, ¶¶72, 84, 353 (Seattle and Bellevue, Washington); ¶176 (Florida), ¶178 (Pennsylvania), ¶191 (Maryland), ¶386 (Illinois), ¶392 (Texas), ¶396 (Oregon), ¶399 (California), ¶400 (Colorado)) **and various positions within the Company** (*e.g.*, ¶101 (First Vice President in charge of Investor Relations), ¶106 (Senior Vice President, Enterprise Risk Management), ¶¶117 (Senior Vice President, Compliance Manager), ¶122 (Vice President and Senior Credit Quality Manager), ¶207 (WaMu Regional Manager and later eAppraiseIT Senior Appraisal Manager), ¶237 (eAppraiseIT Appraiser), ¶275 (LSI Appraisal Management Team), ¶340 (Underwriting Team Manager), ¶372 (Retail Loan

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 108

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Consultant), ¶381 (Account Executive), ¶386 (Senior Underwriter), ¶496 (Senior Vice President for Accounting Policy)).  Furthermore, the Complaint provides reports from employees who had been with the Company for years, even decades (*e.g.*, ¶117 (1983-2007), ¶334 (1997-2007)), who confirmed WaMu's drastic, Company-wide deviation from responsible lending policies during the Class Period.

Notwithstanding their geographic dispersion and various roles within the company, these employees consistently described Company-wide improper lending policies and practices, including shoddy risk management and accounting violations.  In evaluating a complaint with similarly detailed reports from former employees (though far fewer than those in the Complaint), the *Countrywide Derivative* court observed:

> The Court finds that Plaintiffs' numerous confidential witnesses support a strong inference of a Companywide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards.  Supporting this Companywide inference, the confidential and non-confidential accounts cited in the Complaint (1) emanate from several geographic areas . . .; (2) span different levels of the Company hierarchy . . . ; and (3) remain consistent across different time periods . . . .  ***Strikingly, they tell what is essentially the same story – a  rampant disregard for underwriting standards – from markedly different angles.***

554 F. Supp. 2d at 1059 (emphasis added).  Similarly, the percipient witness accounts in the Complaint paint a consistent picture of the WaMu fraud.  The only reasonable inference is that the Company-wide practices they describe emanated from the 10(b) Defendants.

Killinger contends that the Complaint's confidential witness statements about reports to senior management do not adequately allege that Killinger knowingly made false statements (KK Mot. at 10-12), but he is wrong.  First, Killinger incorrectly asserts that the "Risk Reports" described in ¶¶109-11, which showed that WaMu was violating its loan risk guidelines, were distributed to "senior executives – not including Mr. Killinger."  KK Mot. at 11.  In fact, these reports were delivered to senior executives ***and the Board of Directors***, whose Chairman was Killinger.  ¶¶21, 109.  As explained above, many witnesses reported that numerous other reports indicating the falsity of Defendants' public statements were delivered to "senior

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 109

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

management" (¶¶114, 361, 488-94), and directives to degrade WaMu's underwriting and appraisal procedures were given by "senior management" (¶¶116-17, 179, 208, 495). The reasonable inference is that Killinger, as CEO, was part of senior management, received these reports, and was aware of these directives. In any event, Killinger's position in the Company, communications with the OTS about applicable appraisal regulations that WaMu secretly violated, access to undisclosed adverse information described in detail in the Complaint, and lengthy experience at WaMu, in combination with the pervasive, massive nature of the alleged WaMu fraud, support a strong inference of his scienter.

In addition, Killinger concedes that CW79 provided a "set of neutral facts." KK Mot. at 20. This is an important concession, because the facts stated by CW79 clearly bear on Killinger's knowledge of the intricate details of WaMu's lending business (¶¶487-95), and under *Tellabs*, a tie goes to the plaintiff. 127 S. Ct. at 2513. Here, though, the culpable and innocent inferences are not evenly balanced. When appropriately viewed in conjunction with the other allegations probative of scienter, the inference that Killinger knew or recklessly disregarded the true facts that were misstated and concealed during the Class Period is much stronger than any inference that his false statements and omissions of material facts were merely negligent.

In fact, the lone discernable attempt by Killinger to raise a competing inference of innocence or negligence concerning his false statements is woefully off-target. Killinger ascribes WaMu's decreasing loan volume starting in late 2005 to WaMu's supposed "tightening" of lending (rather than market forces, which Killinger and the other Defendants regularly scapegoat for other matters). KK Mot. at 6. However, Killinger apparently blinks past several inferences that his argument raises and that actually support Plaintiffs. First, it is noteworthy that Killinger admits that while WaMu's fixed-rate lending dropped by 66.5%, its Option ARM lending (which the Complaint alleges WaMu pushed at all costs) only fell 24%, and that the Option ARM originations ($9.5 billion) were greater in dollar amount than the

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 110

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

fixed-rate loans ($7.35 billion). Far from supporting any innocent inference that "WaMu was making changes to reduce the Company's exposure" (KK Mot. at 6), Killinger's argument actually shows that WaMu pushed risky Option ARM loans over other loans in the face of a weakening market in order to maintain its short-term profitability, consistent with the Complaint's allegations. *E.g.,* ¶¶94-98, 333 (WaMu loan personnel were required to "push" Option ARM loans at all costs).

        **c.    The Ninth Circuit's Recent Decision in *Zucco Partners, LLC v. Digimarc Corp.* Does Not Alter The Scienter Standard Or Analysis**

      The Ninth Circuit's decision in *Zucco Partners LLC v. Digimarc Corp.*, 2009 WL 311070 (9th Cir. Feb. 10, 2009), does not change the legal standards for scienter stated in *Berson* and *South Ferry* (*see, e.g.*, *id.* at *6, *15). *Zucco* is easily distinguished from *Berson*, *South Ferry* and this action on its unique facts. In *Zucco*, the alleged fraud involved a mere $2.7 million restatement related to esoteric accounting principles at a "fledgling" startup company (*id.* at *1-2), not the massive, Company-wide fraud alleged here involving a major, long-established bank's core home-lending operations. Furthermore, the *Zucco* complaint, which had been amended three times (*id.* at *3), was based on a limited investigation that relied upon several witnesses who were not even at the company at the time the alleged wrongdoing occurred (*id.* at *11), was not supported by any allegations sourced from documents (*id.* at *10), and relied on conclusory allegations, which "standing alone, [were] not enough." *Id.* at *12. The *Zucco* court rejected an inference of scienter based **solely** on SOX certifications, but did not change the prior law that such certifications, when false and accompanied by other allegations supporting scienter, are relevant to the holistic scienter analysis under *Tellabs*. *Id.* at *18. Thus, the *Zucco* complaint cannot be compared with the Complaint in this case, which should be sustained under the established scienter standards that remain unchanged by *Zucco*.

    **D.    The Complaint Sufficiently Alleges Loss Causation**

      In *Dura*, 544 U.S. at 346, the Supreme Court held that the standard for proving loss causation for Exchange Act claims is one of "proximate cause." That is, loss causation may be

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 111

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

proven at trial by demonstrating that defendants concealed or misrepresented a risk that later foreseeably materialized. *See id.* The *Dura* Court also held that in order to plead loss causation under § 10(b), a complaint simply must provide defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. Only notice pleading requirements apply to loss causation for Exchange Act claims. *Fouad*, 2008 WL 5412397, at *6 ("Rule 12(b)(6) dismissal is inappropriate 'so long as the complaint alleges facts that, if taken as true, plausibly establish loss causation.'") (quoting *Gilead*, 536 F.3d at 1057). Plaintiffs' allegations of loss causation meet the requirements of *Dura* and other relevant precedents.

The Complaint presents Plaintiffs' allegations of economic loss in a clear and straightforward manner. Throughout the Class Period, WaMu and the 10(b) Defendants made numerous material false statements and omissions about WaMu's business and accounting practices (including underwriting, risk management, appraisal practices, and internal controls) and financial results (including loan loss reserves), which resulted in artificial inflation of the price of WaMu securities. ¶¶557-746, 754-60. The Complaint details how, starting on October 17, 2007 (¶¶687-90), WaMu's true financial condition and lending practices, which had been concealed by WaMu and the 10(b) Defendants' material false statements and omissions, began to emerge. ¶¶687-753. The Complaint alleges analyst and market reaction to each of these disclosures (*id.*), and alleges that each disclosure that partially revealed to the market WaMu's true financial condition and lending practices caused the price of WaMu's securities to drop (¶¶688-89, 692, 694, 697, 702, 704, 708, 714, 716, 718, 724, 725-31, 734, 736, 742-43, 745, 750, 752).

The Complaint also explains that even after the truth about WaMu's financial health began to emerge, WaMu and the 10(b) Defendants attempted to mitigate the impact of those disclosures by continuing to mislead investors by, among other things, falsely stating that WaMu's underwriting and appraisal practices were sound, denying the Attorney General's

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 112

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

allegations of appraisal fraud, understating WaMu's loan losses, and falsely blaming WaMu's deteriorating financial results exclusively on external forces. *E.g.* ¶¶690, 693, 698-99, 715, 720, 746. In sum, "as the magnitude and severity of the Company's loss exposure caused by its improper lending and accounting practices and deficient risk management was revealed piecemeal to the investing public, the Company's stock price dropped from $33.07 per share [on October 17, 2007] to $4.65 per share [on July 23, 2008], a decline of more than 85%." ¶751.

In addition to the Complaint's allegations of economic loss, which sufficiently put Defendants on notice of Plaintiffs' theory, the Complaint provides an expert opinion that Plaintiffs' theory is logically and economically sound. ¶¶761-63; Complaint App. 6. Chad Coffman, CFA, an expert on loss causation, economic damages, and securities valuation, has opined that if Plaintiffs prove that Defendants "fraudulently withheld information from the market regarding [WaMu's] appraisal practices, underwriting standards and the credit quality of its customers, then there is a coherent economic and logical link between these misstatements and the stock price decline." Complaint App. 6 at 4. Because "credit losses and loss reserves" are "important valuation drivers" in evaluating companies like WaMu (¶763; Complaint App. 6 at 5) and directly depend on loan quality, Defendants' misstatements and omissions about WaMu's lending and accounting practices were directly related to the eventual stock price declines as the truth about the Company's loss reserves emerged.

Defendants nonetheless argue that the Complaint does not adequately allege loss causation under § 10(b). Defendants' arguments fail for two reasons. First, Defendants misconstrue the loss causation pleading requirement under *Dura* and other relevant case law. Second, Defendants ignore numerous factual allegations demonstrating that the adverse disclosures about WaMu were entirely foreseeable in light of, and proximately caused by, WaMu's inadequate risk management, reckless loan underwriting, inflation of appraisals, and inadequate loan loss reserves.

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 113

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

### 1.    Loss Causation Is Well Established In The Complaint

As discussed above, the Complaint details how each partial disclosure to the market concerning WaMu's true financial condition and lending practices led to a significant stock drop, while additional misrepresentations delayed the market's full understanding of the fraud until at least the end of the Class Period.  ¶¶687-753. Throughout the Class Period, Defendants made numerous materially false statements about WaMu's financial results and business practices.  ¶¶557-746.  Below are specific examples of the causal connection that the Complaint establishes between the 10(b) Defendants' material false statements and omissions and the Class's losses.

On October 19, 2005, Killinger said on a conference call that "we believe we can effectively manage our credit quality by continuing to be disciplined and vigilant in our underwriting standards, our portfolio management, and our reserving methodology."  ¶559. Thereafter, on July 18, 2007, Killinger responded to investors' and analysts' concerns about WaMu's position in the troubled housing market by falsely stating on a conference call that, starting over two years earlier, "we started to take actions to minimize our exposure, including tightening our underwriting."  ¶667.  For the reasons set forth in the Complaint (¶¶ 565-66, 674) and above in Section III.B, both these statements were false.  *See also* ¶¶567-72, 575-77, 592-95, 602-04, 606-07, 610, 612-18, 620-23, 626-32, 634-37, 654-57, 661, 666-71, 674-81 (similar false statements on other conference calls and at conferences).

These misstatements and omissions concealed the risk that WaMu would be forced to account for massive amounts of loan defaults as a result of the Company's improper lending practices, GAAP violations and internal control deficiencies.  This risk materialized in a series of massive increases in WaMu's Allowance, which materially affected the Company's financial results.  For example, after the close of trading on October 17, 2007, Casey and Killinger announced that, contrary to WaMu's October 5 assurances about its financial health and "improved fourth quarter," WaMu expected to increase its fourth-quarter provision to as much

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 114

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

as $1.3 billion and would not increase its dividend for the first time in 12 years.    ¶687. Analysts responded negatively to this announcement, with several issuing downgrades and one commenting that the 75% increase was "disconcerting." ¶688.   Seeking to prevent an even harsher market reaction, the 10(b) Defendants falsely blamed WaMu's performance on a "weakening in the housing market" and "capital markets disruption."    ¶690.   Despite Defendants' attempts to mitigate the impact of this disclosure, and even without complete disclosure of the truth about WaMu's improper lending, accounting, and risk management practices, WaMu's stock price tumbled almost 8%, on trading volume more than six times greater than the average daily trading volume during the Class Period before this announcement.  ¶689.

Similarly, the Complaint alleges that, when the Attorney General filed the NYAG Complaint, WaMu's stock fell almost 8% on volume approximately six times greater than its average daily volume during the Class Period before the first partial corrective disclosure. ¶692.   As further disclosures about WaMu's appraisal inflation emerged, including that the OTS and SEC were investigating WaMu's lending practices, WaMu's stock price repeatedly responded with significant declines on heavy volume. *E.g.*, ¶¶694-95, 697, 716.

Other disclosures partially revealing WaMu's lending practices and related true financial condition had similar effects.  For example, on January 17, 2008, a Gradient Analytics report stated that WaMu's loan loss provisions were insufficient to fully account for its nonperforming loans and that the Company could have to record an impairment charge of "as much as $15.3 billion." ¶717.  WaMu stock fell 7% in response to this news.  ¶718.  On March 3, 2008, Fitch Ratings downgraded $2.3 billion worth of WaMu mortgage securities, and WaMu stock fell more than 7.7%.   ¶724.  Likewise, on July 22, 2008, WaMu announced a $3.74 billion increase in its Allowance, largely because of changes in key assumptions used to estimate incurred losses in its loan portfolio, and a $2 billion increase in its nonperforming loans.  ¶747-48.  While WaMu tried to mitigate the news by announcing that it had "tightened

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 115

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    underwriting standards against our loan portfolio," WaMu's stock price fell 20% in one day.

2    ¶749-50.

3        These and the Complaint's other loss causation allegations are all more than sufficient

4    under *Dura*, Ninth Circuit law, and other relevant precedents, as the Complaint properly

5    connects Defendants' misrepresentations and omissions to the Class's damages.  *Daou* is

6    directly on point.  There, the Ninth Circuit held that allegations that "the price of Daou's stock

7    fell precipitously after defendants disclosed negative figures showing the company's true

8    financial condition" sufficiently alleged loss causation.  411 F.3d at 1026.  Plaintiffs there

9    alleged that defendants fraudulently inflated the price of the company's stock by prematurely

10   recognizing revenue.  *Id*. at 1012.  When the company's "true financial health, the result of

11   prematurely recognizing revenue before it was earned" was revealed, its stock price declined

12   and plaintiffs suffered losses.  *Id*. at 1026.

13       Other courts similarly have approved of allegations of economic loss materially similar

14   to those alleged here:

15       First, the Complaint alleges that Plaintiff and the other members of the putative
         class purchased Accredited stock in reliance on the specific statements of
16       Defendants as well as the integrity of the market price for Accredited's shares,
         which were publicly traded in large volumes on an efficient market.  Second, the
17       Complaint alleges that Accredited's stock was artificially inflated during the
         class period due to accounting improprieties that had the effect of overstating the
18       company's earnings and false and misleading statements concerning the
         company's lending practices.  Finally, Plaintiff asserts that Accredited's stock
19       price declined significantly when the truth was disclosed regarding Accredited's
         undisciplined lending practices.
20

21   *Atlas v. Accredited*, 556 F. Supp. 2d at 1157 (citations omitted).  *Countrywide Securities* also is

22   applicable:

23       Defendants here attack Plaintiffs' loss causation theories because Countrywide's
         corrective disclosures were made over an extended period of time and often in
24       combination with alleged further misrepresentations that dampened the
         disclosures' price effects.  The point, however, is that the price of Countrywide
25       securities dropped as the disclosures accumulated.  By the end, Countrywide
         stock, at least, had plummeted.  Most corrective disclosures correlate tightly with
26

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 116

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

declines, as is expected in an efficient market.    Plaintiffs identify these disclosures with particularity.

588 F. Supp. 2d at 1201; *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005) (allegation that misrepresented facts caused company's eventual bankruptcy sufficiently pleaded loss causation); *New Century*, 588 F. Supp. 2d at 1236 (disclosure of possible errors in earlier financial statements adequately alleged loss causation with respect to auditor); *Teamsters v. Bombardier*, 2005 WL 2148919, at *12 (loss causation adequately pleaded where company's misrepresentations about rigorous loan underwriting standards concealed risks that materialized when loans experienced high delinquencies, repossessions, and writeoffs, and rating agencies downgraded company).

*Gilead*, where the Ninth Circuit recently reversed the dismissal of Section 10(b) claims on loss causation grounds, also supports Plaintiffs here.    536 F.3d at 1057-58.    There, defendants made false statements about demand for a prescription drug where, unbeknownst to investors, the company was boosting demand through illegal off-label marketing.  *Id*. at 1051. When the FDA warned doctors that the drug was not intended for the purposes the company claimed, demand for the drug fell.  *Id.* at 1052-53.  The company's stock price actually rose in response to the FDA warning.    *Id*. at 1053.    However, several months later, the company reported disappointing financial results that were, according to the court, the "direct result" of the company's illegal off-label marketing even through the company did not attribute these results to the off-label marketing.    *Id*. at 1054.    The Ninth Circuit found that plaintiffs sufficiently alleged a causal chain from the off-label marketing, to the FDA warning, to the decreased demand, and finally to the disappointing financial results.  *Id*. at 1055-58.  The court held that "so long as the plaintiff alleges facts to support a theory [of loss causation] that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds."  *Id*. at 1057.

Accordingly, Plaintiffs have sufficiently alleged proximate cause for pleading purposes. In any event, loss causation in this disputed context is a jury question, not for resolution at the

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 117

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

pleading stage. *See Gilead*, 526 F.3d at 1057 (loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss") (citation omitted); *Immune Response*, 375 F. Supp. 2d at 1025 (whether "the alleged omissions and misstatements actually were the cause-in-fact of the price of [defendant's] stock raises an issue of fact and, as such, is a question properly reserved for a motion for summary judgment or for the trier of fact") (citation omitted).

### 2.    Defendants Misconstrue The Case Law On Loss Causation And Mischaracterize The Complaint

In response to Plaintiffs' well-pled allegations of loss causation, Defendants misconstrue the legal standard and disregard the Complaint's allegations. Defendants' efforts to impose a more stringent standard than the Supreme Court and Ninth Circuit have adopted and to rewrite the Complaint should be rejected. "A heightened pleading standard does not apply to loss causation." *McGuire*, 2008 WL 5130042, at *6-7. "[L]oss causation generally '[s]hould not prove burdensome for a plaintiff that actually suffered economic harm in connection with the purchase or sale of a security." *Countrywide Sec.*, 588 F. Supp. 2d at 1141.

### a.    Neither A Confession Nor A Restatement Is Required To Adequately Plead Loss Causation

Defendants offer several unavailing contentions in their effort to deny the Complaint's loss causation allegations. First, the 10(b) Defendants argue that the Complaint must include a "revelation" to the market of a "previously secret 'fraud.'" OD Mot. at 29 (quoting *Weiss v Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 946-47 (D. Ariz 2007)). However, "neither *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled." *Metzler v. Corinthian*, 540 F.3d at 1064. In *Daou*, the lower court dismissed the complaint in part because it did not allege any "negative public statements, announcements or disclosures at the time the stock price dropped that [d]efendants were engaged in improper accounting practices." 411 F.3d at 1026. In reversing the lower court, the Ninth Circuit determined that, even without any admissions of fraud by the defendant company, the link between the fraud and

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 118

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    the eventual negative financial results was sufficiently strong to allege loss causation. *Id.* at

2    1027. Contrary to Defendants' argument, a corrective disclosure need not be the "linguistic

3    mirror image" of the alleged fraud. *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004,

4    at *20 (D.N.J. Aug. 17, 2005); *see also In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1422

5    (9th Cir. 1994) (requiring mirror-image correction of each misrepresentation allows wrongdoers

6    to evade liability "by refusing to admit their falsity"); *In re Motorola Sec. Litig.*, 505 F. Supp.

7    2d 501, 544 (N.D. Ill. 2007) (rejecting "mirror image" standard, which "would provide an

8    expedient mechanism for wrongdoers to avoid securities fraud liability.")

9         Defendants also contend that Plaintiffs must demonstrate a "link" between each false

10   statement by Defendants and the Class's losses. OD Mot. at 31-32. This contention misstates

11   the loss causation standard. "The truth need not be revealed to the market through a single,

12   complete disclosure." *New Century*, 588 F. Supp. 2d at 1236 (citing *Daou*, 411 F.3d at 1026-

13   27); *see also Freeland v. Iridium World Commc'ns, Ltd.,* 233 F.R.D. 40, 47 (D.D.C. 2006)

14   ("[R]eading *Dura* to require proof of a complete, corrective disclosure [of prior misstatements]

15   would allow wrongdoers to immunize themselves with a protracted series of partial

16   disclosures."). Thus, Plaintiffs need not demonstrate that the corrective disclosures repudiated

17   specific statements by the 10(b) Defendants. Rather, it is sufficient that the earlier false

18   statements' subject matter was corrected in the market.

19        As set forth above, the 10(b) Defendants made false statements about WaMu's lending

20   and accounting practices that inflated the price of WaMu stock and concealed the risk that later

21   materialized in a series of disclosures about incurred loan losses that caused WaMu's stock

22   price to drop, causing losses to Plaintiffs. *See, e.g.,* ¶¶568, 576-77, 607, 612-13, 690, 698-99,

23   715, 723, 746. This is all that is required to allege loss causation. *See Daou*, 411 F.3d at 1026

24   (finding allegations that company's stock price "fell precipitously after defendants began to

25   reveal figures showing the company's true financial condition" sufficient); *Lentell v. Merrill*

26   *Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) ("to establish loss causation, 'a plaintiff must

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 119

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual

loss suffered'") (quoting *Suez Equity Investor L.P. Toronto-Dominion Bank*, 250 F.3d 87 (2d

Cir. 2001)) (emphasis in *Lentell*); *McGuire*, 2008 WL 5130042, at *10 (rejecting alternative

hypotheses proposed by defendants to sever the link between the misrepresentations plaintiffs

alleged and their economic loss because a plaintiff is only required to show that a

misrepresentation is a substantial cause of the loss, not the sole reason, and allegations that the

disclosure of previously concealed information caused a stock price decline were sufficient)

(citations omitted).

   Defendants' argument rests on two inapposite cases, *Metzler* and *Weiss*.  OD Mot. at 28-

29.  The loss causation allegations in *Metzler* were very different from those here.  The alleged

fraud in *Metzler* was defendant Corinthian Colleges' concealment of student loan fraud at its

numerous campuses.  540 F.3d at 1055-56.  The fraud, however, was only revealed *after* the

class period.  *Id.* at 1056.  The only two alleged corrective disclosures *during* the class period

were a news article that reported an investigation of possible loan fraud at one of Corinthian's

88 campuses, but also affirmatively stated that the investigation "does not affect the status of

other Corinthian schools," and a company press release that mentioned "higher than expected

[student] attrition," while also disclosing lower-than-expected earnings.  *Id.* at 1059.  The court

held that the complaint did not adequately plead loss causation because it did "not allege that

the [two alleged corrective disclosures] disclosed – or even suggested – to the market that

Corinthian was manipulating student enrollment figures company-wide"; Corinthian's stock

price recovered quickly after the first disclosure; and the lower-than-expected earnings were a

more plausible cause of the stock drop after the second disclosure than the passing reference to

student "attrition."  *Id.* at 1063, 1065.  By contrast, the series of partial corrective disclosures

here indisputably revealed severe, Company-wide problems in WaMu's core business.

   Similarly, in *Weiss* (OD Mot. at 29), the company's stock price dropped after an initial

brief disclosure of a voluntary internal investigation into stock options backdating, which was

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 120

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

simultaneous with disclosure of unrelated poor financial projections,.  527 F. Supp. 2d at 945.

However, less than a month later, when the company announced that the investigation had

uncovered stock options backdating and that, as a result, the company's prior financial

statements should not be relied upon, the company's stock price actually rose.  *Id*. at 946.  The

stock price also rose after the company filed a later restatement.  *Id*.  The court found that the

increase in stock price after the later, more explicit, disclosures cast doubt on the theory that the

losses suffered after the initial disclosure resulted from the announcement of an investigation,

rather than the concurrently announced poor projections.  *Id*. at 947.

By contrast, Plaintiffs here have demonstrated a sustained and material decline in

WaMu's stock price that resulted from disclosures directly related to the 10(b) Defendants'

false statements.  Unlike the alleged disclosures in *Corinthian* and *Weiss*, these disclosures did

not require a strained interpretation to realize their implications for WaMu's financial health.

Analysts repeatedly commented on, for example, the "increased level of legal and regulatory

risk for WaMu" as a result of the governmental investigations (¶700), that "questions about

WaMu's loan products, geographic concentration, and underwriting make it difficult to bracket

the downside" (¶712), and that due to the "numerous upward revisions to management's credit

expectations in the past couple of months . . . management's credibility is questionable" (¶713).

As explained above, Defendants' argument that a disclosure that definitively reveals the

falsity of the prior statements is required "as a matter of law" (OD Mot. at 30) also is flawed.

In fact, the cases they rely on do not support their argument.  In *Lentell*, what the court found

"fatal" was that there was no allegation that the market reacted negatively to the purported

fraud or that defendants misstated or omitted the risks that led to the loss.  396 F.3d at 175; *see*

*also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) (OD Mot. at 30)

(finding no loss causation for immaterial omissions that were not referenced in or related to the

alleged corrective disclosures, except in a positive fashion that did not signal fraud).  The court

in *Impax Laboratories*, 2007 WL 5076983, (OD Mot. at 30), later reconsidered its finding of no

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 121

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1    loss causation when the plaintiffs re-pled their complaint.  *See Impax Labs., Inc. Sec. Litig.*,

2    2008 WL 1766943 (N.D. Cal. Apr. 17, 2008).  In the later decision, the court held that plaintiffs

3    adequately alleged that the public had reason to believe that a disclosure that, on its face, related

4    only to one quarter could have an impact on earlier quarters, as well.  *Id.* at *10-13.  The court

5    did not demand "as a matter of law" that the alleged corrective disclosure announce the fraud to

6    the public, only that a causal connection be drawn between the underlying fraud and the

7    disclosures.  The courts in *2007 Novastar Financial,* 2008 WL 2354367, and *Lindner Dividend*

8    *Fund v. Ernst & Young*, 880 F. Supp. 49 (D. Mass. 1995), held that increases in reserves did not

9    mean that the earlier reserves were false when made, because the plaintiffs in those cases failed

10   to allege ***any*** contemporaneous facts indicating that the earlier reserves were erroneous.  2008

11   WL 2354367, at *3; 880 F. Supp. at 58-59.  That clearly is not the case here.

12       The 10(b) Defendants also contend that WaMu's disclosures regarding loss reserves do

13   not constitute corrective disclosures, because WaMu, before declaring bankruptcy, never

14   revised its prior reserve amounts or "suggest[ed] an error in prior financial reporting."  OD

15   Mot. at 30.  As discussed in Section II.F, a restatement or admission of accounting errors is not

16   necessary to find a corrective disclosure.  *Daou*, 411 F.3d at 1013 (sustaining claims even

17   though "Defendants counter that their method of accounting did not violate GAAP").

18       The 10(b) Defendants' arguments that WaMu's reserves increased because of market

19   turmoil (OD Mot. at 30) rely on purported facts that are contradicted by the Complaint's

20   allegations and are inappropriate for consideration on a motion to dismiss.  Furthermore,

21   contrary to the 10(b) Defendants' claim (OD Mot. at 32) and as noted above, a restatement or

22   corrected financial statements are not necessary to call into question Killinger's and Casey's

23   SOX certifications and Defendants' numerous other misstatements and omissions regarding

24   WaMu's financial statements and lending practices which helped to cause the Class's losses.

25   *See*, *e.g.*, *In re Winstar Commc'ns*, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006)

26   (rejecting argument that loss causation was not alleged where defendant company "never issued

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 122

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

a restatement or other corrective disclosure concerning the alleged accounting improprieties"). In any event, the 10(b) Defendants appear to confuse the element of scienter with loss causation (which is subject only to notice pleading under Rule 8(a)). *See* Section III.C (explaining significance of Killinger and Casey's false SOX certifications).

### b.    The Fact That WaMu Is Not A Defendant In The NYAG Complaint Does Not Immunize Defendants

The 10(b) Defendants further contend that, because WaMu was not a named defendant in the NYAG Complaint and has denied the allegations of wrongdoing, the filing of that lawsuit cannot serve as a corrective disclosure. OD Mot. at 31. As an initial matter, this argument (as well as the remainder of the 10(b) Defendants' Motion) ignores the later disclosures that the Attorney General had expanded his investigation into WaMu and that the OTS and SEC opened their own investigations into WaMu's appraisal practices, which disclosures caused additional losses to Plaintiffs. ¶¶694-95, 716.

Furthermore, as discussed above, there is no requirement that WaMu admit to fraud or be a named defendant in a prosecution before a corrective disclosure takes place. There is no specific requirement as to the type of disclosures that may reveal the truth, how specific a disclosure should be, or that the disclosure take a particular form. *See Dura*, 544 U.S. at 347; *Daou*, 411 F.3d at 1026-27; *New Century*, 588 F. Supp. 2d at 1236 ("[Defendant] argues that *Dura* requires Plaintiffs to plead a fact-for-fact corrective disclosure to sufficiently allege loss causation. The law does not clearly support this interpretation").

Moreover, courts commonly treat announcements of government investigations into the subject matter of the fraud as corrective disclosures. *See, e.g., In re Bristol-Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008) (finding loss causation from disclosure of governmental investigation and noting that "there is no requirement 'that [a corrective] disclosure take a particular form or be of a particular quality. . . . It is the exposure of the fraudulent representation that is the critical component of loss causation'") (quoting *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 243 (S.D.N.Y. 2006)); *In re Bradley*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 123

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

*Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (rejecting "rigid and dogmatic" argument that announcement of SEC investigation was not a corrective disclosure where announcement did not mention prior fraudulent statements); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 256 (D. Mass. 2006) (rejecting argument that announcement of SEC investigation was not a disclosure of earlier misleading statements). *Davidoff v. Farina*, 2005 WL 2030501 (S.D.N.Y Aug. 22, 2005), cited by Defendants in support of this argument (OD Mot. at 31), is not to the contrary. There, plaintiffs' proposed "corrective disclosure" was a single query during an analyst conference call as to whether the company recorded certain revenues and a denial by the company. *Id.* at *16. That denial is a far cry from the detailed NYAG Complaint.

Finally, the Defendants' argument ignores the fact that the Attorney General made clear to the public that "'Washington Mutual has not yet been sued [by the Attorney General] because of questions over federal jurisdiction'" (¶132), not because WaMu was not implicated in the alleged wrongdoing. *See also* ¶695 (announcement of expansion of the Attorney General's investigation to include loans sold by WaMu to Fannie Mae and Freddie Mac).

Analysts and investors clearly understood the NYAG Complaint's implications for WaMu, notwithstanding the fact that WaMu was not a named defendant. As noted above, the day the NYAG Complaint was announced, WaMu's stock price fell almost 8% overnight. ¶692. Further, analysts questioned WaMu's denial, noting that the NYAG Complaint "raises an issue of considerable risk to Washington Mutual," and that, if the allegations were true, WaMu could be required to set aside billions more in reserves to account for losses caused by the inflated appraisals. ¶694. In sum, the market appropriately understood that WaMu's lending practices were at the heart of the alleged appraisal misconduct.

## IV.    THE COMPLAINT STATES CONTROL PERSON CLAIMS UNDER THE SECURITIES ACT AND THE EXCHANGE ACT

Securities Act § 15 and Exchange Act § 20(a) both provide that a person or entity can be

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 124

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

held liable as a "control person" of a primary violator of the securities laws to the same extent as the primary violator.  Count VI asserts claims against Killinger, Casey, Ballenger, Woods, and the Director Defendants as control persons of WaMu under § 15.  Counts II and III assert claims against the 10(b) Defendants, WaMu officers Ballenger and Woods, and the Director Defendants (except Stever and Wood, who are not named in these counts) as control persons of WaMu under § 20(a).  For both § 15 and § 20(a) claims, Plaintiffs must simply allege that the defendant (1) exercised "control" over (2) a primary violator of the securities laws.  *See Fouad*, 2008 WL 5412397, at *11 (citing *Howard*, 228 F.3d at 1065).  The Rule 8 notice pleading standard applies to the Court's consideration of the "control" element of these claims.  *Id*. at 12.  The pleading burden has been met here, and, for the reasons below, Defendants' arguments in support of dismissing these claims should be rejected.

Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  "Whether a defendant is a control person is an intensely factual question, and ***a plaintiff will survive on a motion to dismiss on allegations that individual defendants, by virtue of their position, could and did control and influence the company***."  *Fouad*, 2008 WL 5412397, at *12 (emphasis added); *Swartz v. Deutsche Bank*, 2008 WL 1968948, at *17-19 (W.D. Wash. May 2, 2008) (Pechman, J.) (same).  In fact, Defendants concede that courts have held that mere general allegations of control based upon defendants' titles and responsibilities are sufficient to plead control at the motion to dismiss stage.  DD Mot. at 23 (citing *In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1087 (W.D. Wash. 2003)).  As this court has recognized, "director status 'is sort of a red light indicating the potential for day-to-day involvement in the company.'"  *Fouad*, 2008 WL 5412397, at *12 (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 139, 1397 (9th Cir. 1993)).

In view of these standards, the Complaint's allegations of control are more than

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 125

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1   sufficient.  In fact, the 10(b) Defendants and Ballenger and Woods **do not contest** that they

2   controlled WaMu within the meaning of §§ 15 and 20(a).  The Director Defendants' assertion

3   that the Complaint does not allege their control over WaMu lacks merit.

4        The Complaint alleges the Director Defendants controlled WaMu by serving on the

5   Board, signing the Registration Statement, and signing the 2005 and 2006 Forms 10-K that

6   were incorporated by reference into the Offering Documents.  ¶¶1001, 1003.  The Complaint

7   also alleges that Director Defendants (except Stever and Wood) controlled WaMu by serving

8   on the Board's Audit Committee and/or Finance Committee.  ¶¶30-40.  The Audit Committee

9   met with management and Deloitte to review WaMu's quarterly SEC filings and "the adequacy

10   of internal controls over financial reporting," and also regularly met with management to

11   discuss "significant risk exposures" and "the steps management has taken to monitor and

12   control such exposures."  ¶¶802-03.  The Finance Committee "monitor[ed] the development

13   and implementation of strategies that guide[d] the Company's financial management activities,

14   including capital, funds, liquidity, interest rate risk and credit risk management," received

15   reports on the housing market, and heard from outside experts, all in furtherance of the

16   committee's responsibilities for credit risk management and asset/liability management.  ¶¶806-

17   09.  Through these activities, among others described in the Complaint, members of the Audit

18   and Finance Committees influenced and controlled WaMu.  *See Fouad,* 2008 WL 5412397, at

19   *12 (finding control person allegations against directors based on committee membership

20   adequate because "[a]t the least, the Court can infer that this authority required direct

21   engagement in and awareness of management of the company").

22        Despite these ample allegations, the Director Defendants rely on numerous inapposite

23   cases to claim that the Complaint fails to allege control.  First, exactly as the defendants did in

24   *Fouad*, the Director Defendants wrongly rely on *In re Glenfed, Inc. Securities Litigation*, 60

25   F.3d 591, 593 (9th Cir. 1995).  DD Mot. at 22.  *Glenfed* did not address the pleading standard

26   for control person liability – instead, the court discussed the standard for the "group published

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 126

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

information" presumption for **primary liability**.  *Id.*; *see also Fouad,* 2008 WL 5412397, at *12 (finding defendants' reliance on *GlenFed* erroneous).  Second, Defendants list several cases where a recitation of a director's position alone was not sufficient to survive a motion to dismiss.  DD Mot. at 22-23.  As discussed above, the standard applied by those courts is not controlling and has not been followed by this Court, and in any event the Complaint goes much further than alleging "boilerplate allegations of responsibility."  DD Mot. at 22.

In addition, Defendants contend without any legal support that, due to WaMu's bankruptcy and the stay of litigation against the Company, the Court should dismiss the Complaint and require Plaintiffs to re-plead the control person claims without alleging WaMu's primary violations of the securities laws.  DD Mot. at 21.  Their argument is contrary to established law.  *See, e.g., In re Stone & Webster, Inc. Sec. Litig.*, 424 F.3d 24, 27 (1st Cir. 2005) (where litigation against bankrupt company was stayed and § 10(b) claims were dismissed against officers, officers could still be held liable under § 20(a) where complaint alleged § 10(b) violations by company).  Indeed, Plaintiffs are not even required to name the alleged primary violator as a defendant to state a control person claim.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285-86 (3d Cir. 2006) (vacating dismissal of control person claim where primary violator was bankrupt and not named as a defendant, noting "there is no requirement in the language of either [§ 15 or § 20(a)] that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants"); *see also SEC v. Hawk*, 2007 WL 2257321, at *3 (D. Nev. Aug. 3, 2007) ("the majority of courts to address the issue have concluded that it is not necessary to join the primary violator in an action against a control person") (citing cases).

As explained in detail above, the Complaint establishes that WaMu violated both the Securities Act and the Exchange Act.  WaMu, as the issuer, violated § 11 directly. Further, as the Director Defendants concede (DD Mot. at 21), WaMu could only act through its agents. *See also In re Hienergy Tech., Inc.*, 2005 WL 3071250, at *8 (C.D. Cal. Oct. 25, 2005).

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 127

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1  Therefore, the actions of WaMu's officers are imputed to the Company.  *Id.*; *see also Teamsters*

2  *Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)

3  (observing that "in most cases, the most straightforward way to raise [an inference of scienter]

4  for a corporate defendant will be to plead it for an individual defendant.").  Accordingly, the

5  10(b) Defendants' violations of the Exchange Act equate to primary liability for WaMu.

6  Furthermore, the Court may also look beyond the 10(b) Defendants' conduct and consider other

7  allegations in the Complaint to determine find a primary violation by WaMu.  *See, e.g., Glazer*

8  *Capital Mgmt.*, 549 F.3d at 744 ("there could be circumstances in which a company's public

9  statements were so important and so dramatically false that they would create a strong inference

10  that at least some corporate officials knew of the falsity upon publication") (citing *Tellabs II*,

11  513 F.3d at 710); *Tellabs II*, 513 F.3d at 710 ("it is possible to draw a strong inference of

12  corporate scienter without being able to name the individuals who concocted and disseminated

13  the fraud"); *Dynex Capital*, 531 F.3d at 195-196 (same).

14       Accordingly, the control person claims against the Director Defendants should be

15  sustained.  The control person claims against the 10(b) Defendants, Ballenger, and Woods (who

16  did not contest these claims) should similarly be sustained.

## CONCLUSION

18       For the foregoing reasons, Defendants' motions to dismiss should be denied.[3]

19

20

21

22

23

24

25

26

---

[3] As is customary, if the Court dismisses any of Lead Plaintiff's claims (and it should not), Lead Plaintiff should have the opportunity to replead.  Fed. R. Civ. P. Rule 15(a).

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 128

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

Dated:  February 23, 2009

Respectfully Submitted,

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP


By:  /s/  Chad Johnson
Chad Johnson (*pro hac vice*)
Hannah Ross (*pro hac vice*)
Jerald Bien-Willner (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019
Tel:     (212) 554-1400
Fax:     (212) 554-1444
Email: chad@blbglaw.com
            hannah@blbglaw.com
            jerryb@blbglaw.com
            katherine@blbglaw.com

*Counsel for Lead Plaintiff*
*Ontario Teachers' Pension Plan Board*
*and Lead Counsel for the Class*

BYRNES & KELLER LLP
Bradley S. Keller, WSBA# 10665
Jofrey M. McWilliam, WSBA# 28441
1000 Second Avenue, Suite 3800
Seattle, Washington  98104
Tel:     (206) 622-2000
Fax:     (206) 622-2522
Email: bkeller@byrneskeller.com
            jmcwilliam@byrneskeller.com

*Liaison Counsel for the Class*

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND FOR
JUDICIAL NOTICE [LSP-1]
Master No: 2:08-md-1919 MJP
Page 129

Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 554-1400

1

## CERTIFICATE OF SERVICE

2

    I hereby certify that on February 23, 2009, I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF system, which will send notification of such filing to the
3
e-mail addresses on the Court's Electronic Mail Notice list.

4

5                                        BERNSTEIN LITOWITZ BERGER &
                                         GROSSMANN LLP

6

7                                        By:  /s/  Chad Johnson
                                         Chad Johnson (*pro hac vice*)
8                                        Hannah Ross (*pro hac vice*)
                                         Jerald Bien-Willner (*pro hac vice*)
9                                        Katherine M. Sinderson (*pro hac vice*)
                                         1285 Avenue of the Americas
10                                       New York, New York  10019
                                         Tel:    (212) 554-1400
11                                       Fax:    (212) 554-1444
                                         Email: chad@blbglaw.com
12                                               hannah@blbglaw.com
                                                 jerryb@blbglaw.com
13                                               katherine@blbglaw.com

14

15                                       ***Counsel for Lead Plaintiff***
                                         ***Ontario Teachers' Pension Plan Board***
16                                       ***and Lead Counsel for the Class***
                                         BYRNES & KELLER LLP
17                                       Bradley S. Keller, WSBA# 10665
                                         Jofrey M. McWilliam, WSBA# 28441
18                                       1000 Second Avenue, Suite 3800
                                         Seattle, Washington  98104
19                                       Tel:    (206) 622-2000
                                         Fax:    (206) 622-2522
20                                       Email: bkeller@byrneskeller.com
                                                 jmcwilliam@byrneskeller.com
21

22                                       ***Liaison Counsel for the Class***

23

24

25

26

LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO                    Bernstein Litowitz Berger & Grossmann LLP
DEFENDANTS' MOTIONS TO DISMISS AND FOR                             1285 Avenue of the Americas
JUDICIAL NOTICE [LSP-1]                                                  New York, NY  10019
Master No: 2:08-md-1919 MJP                                                  (212) 554-1400