HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE WASHINGTON MUTUAL, INC. SECURITIES, DERIVATIVE & ERISA LITIGATION | No. 2:08-md-1919 MJP |
| | **DEFENDANT KERRY K. KILLINGER'S REPLY BRIEF IN SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **NOTE ON MOTION CALENDAR: March 30, 2009** |
| | **ORAL ARGUMENT: May 1, 2009** |
| | OD-KKK-1 |
| IN RE WASHINGTON MUTUAL, INC. SECURITIES LITIGATION | Lead Case No. C08-387 MJP |
| This Document Relates To:  ALL CASES | |

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.:  08-MD-1919 MJP

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

# TABLE OF CONTENTS

**Page**

I.   PLAINTIFFS HAVE NOT ADEQUATELY PLEADED FALSITY. ............................... 1

    A.   Plaintiffs do not adequately allege statements about underwriting were false. ........................................................................................................................... 2

    B.   Plaintiffs do not adequately allege the falsity of statements about appraisals. ............................................................................................................... 5

    C.   Plaintiffs do not adequately allege the falsity of statements related to risk management and adjustments made in anticipation of a market downturn. ........... 7

    D.   Plaintiffs do not adequately allege the falsity of WaMu's financial statements. ...................................................................................................... 10

II.   PLAINTIFFS DO NOT CREATE A STRONG INFERENCE OF SCIENTER. ............. 12

    A.   Plaintiffs misstate and incorrectly apply the law of scienter. ............................... 12

    B.   Plaintiffs do not create any inference of Mr. Killinger's scienter. ........................ 16

CONCLUSION .......................................................................................................... 18

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

-i-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Atlas v. Accredited Home Lenders Holding, Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008)................................................................2

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................13, 14, 15

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) .................................................................6

*Fouad v. Isilon Sys., Inc.*,
No. C07-1764 MJP, 2008 WL 5412397 (W.D. Wash. Dec. 29, 2008) ...........................17

*Glazer Capital Mgmt. LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ................................................13, 15

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002) ...............................................................16

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
No. 07-0139-CV-W-ODS, WL 2354367 (W.D. Mo. June 4, 2008)....................................3

*In re Charles Schwab Corp. Sec. Litig.*,
No. C 08-01510 WHA, WL 262456 (N.D. Cal. Feb. 4, 2009)....................................3, 6

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .........................................2, 10

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .........................................2, 10, 15, 16

*In re Credit Suisse First Boston Corp.*,
431 F.3d 36 (1st Cir. 2005) ...................................................................5

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ...............................................................6

*In re Downey Sec. Litig.*,
No. CV 08-3261-JFW, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ...............................4

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) .......................................................10

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......................................................5

*In re Metawave Commc'ns Corp. Sec. Litig.*,
No. C02-625R SM, slip op. (W.D. Wash. Mar. 25, 2009) ....................................5

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

-ii-

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

*In re New Century,*
        588 F. Supp. 2d 1206 (C.D. Cal. 2008). .................................................................2, 9

*In re Silicon Graphics Inc. Sec. Litig.,*
        183 F.3d 970 (9th Cir. 1999) ..........................................................................15, 16

*In re Vantive Corp. Sec. Litig.,*
        283 F.3d 1079 (9th Cir. 2002) ....................................................................6, 16, 17

*In re Watchguard Sec. Litig.,*
        No. C05-678LR, 2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ...................16

*In re Zumiez Inc. Sec. Litig.,*
        No. C07-1980-JCC, slip op. at *14-15 (W.D. Wash. Mar. 30, 2009) ...............3

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
        540 F.3d 1049 (9th Cir. 2008) ...................................................................1, 17

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
        380 F.3d 1226 (9th Cir. 2004) ...............................................................................6

*Patel v. Parnes,*
        253 F.R.D. 531 (C.D. Cal. 2008) ........................................................................18

*Pittleman v. Impac Mortgage Holdings, Inc.,*
        No. SACV 07-0970 AG, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009) ...............15

*Reese v. Malone,*
        No. C08-1008 MJP, 2009 WL 506820 (W.D. Wash. Feb. 27, 2009).................5

*Rubke v. Capitol Bancorp Ltd.,*
        551 F.3d 1156 (9th Cir. 2009) ........................................................................4, 5

*South Ferry LP, #2 v. Killinger,*
        542 F.3d 776 (9th Cir. 2008) ......................................................................13, 15

*Sprewell v. Golden State Warriors,*
        266 F.3d 979 (9th Cir. 2001) .................................................................................4

*Swartz v. Deutsche Bank,*
        No. C03-1252 MJP, 2008 WL 1968948 (W.D. Wash. May 2, 2008) ................1

*Tellabs, Inc. v. Makor Issues & Rights,*
        127 S. Ct. 2499 (2007).................................................................................16, 17

*Tripp v. Indymac Fin. Inc.,*
        No. CV 07-1635 GW, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ...............11

*Va. Bankshares, Inc. v. Sandberg,*
        501 U.S. 1083 (1991)............................................................................................4

*Zucco Partners, LLC v. Digimarc Corp.,*
        552 F.3d 981 (9th Cir. 2009) .....................................................................*passim*

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

-iii-

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1

2                                  **STATUTES**

3    15 U.S.C. § 78u-5(c)(1)(A) ...................................................................................10

4    Federal Rule of Civil Procedure 8(a) .........................................................................1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1    Kerry K. Killinger, former Chief Executive Officer of Washington Mutual, Inc. ("WaMu"

2  or "Company"), submits this brief in support of his Motion to Dismiss ("Mot. at _") the

3  Consolidated Class Action Complaint ("Complaint" or "CAC ¶ _"), and in reply to Plaintiff's

4  Omnibus Opposition to Defendants' Motions to Dismiss ("Opposition" or "Opp. at _").[1]

5    Plaintiffs' Opposition highlights the fundamental flaws of the Complaint.  Rather than

6  curing its defects, it propounds them, failing to lend any clarity or specificity to the Complaint's

7  vague and conclusory accusations.  Although the Opposition frequently refers to the Complaint's

8  "detailed allegations" (*see, e.g.*, Opp. at 2-5), it points only to unsupported opinions – instead of

9  being "detailed," the Complaint's allegations are merely numerous.  And the Opposition's

10  frequent claim that defendants "ignored" aspects of the Complaint is a testament only to its bulk,

11  not to its strength.  Plaintiffs thus "mistake[] quantity for quality."  *Metzler Inv. GMBH v.*

12  *Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008); *see also Swartz v. Deutsche Bank*,

13  No. C03-1252 MJP, 2008 WL 1968948, at *28 (W.D. Wash. May 2, 2008) (heightened pleading

14  standards do not excuse lack of "simplicity, directness and clarity" in compliance with FRCP

15  8(a)).  As this reply shows, despite the breadth of the Complaint plaintiffs fail to adequately plead

16  the central element of falsity, a flaw that is fatal to all claims against all defendants, under both the

17  Securities Act and the Securities Exchange Act.  This reply also demonstrates that plaintiffs

18  mischaracterize the law of scienter under Section 10(b) of the Exchange Act, and that with respect

19  to Mr. Killinger in particular, plaintiffs fail to plead *any* inference of scienter.

20  **I.    PLAINTIFFS HAVE NOT ADEQUATELY PLEADED FALSITY.**

21    Mr. Killinger's motion to dismiss addressed in substance all statements apparently

22  challenged by the Complaint (Mot. at 2-12).  This reply focuses on the allegedly false statements

23  specifically defended in the Opposition.  After combing through the more than 500 combined

24

25    [1] By agreement among defense counsel, Mr. Killinger uses three pages each for this reply from the page limits of
the WaMu Officer and the Outside Director defendants, so that he may file an 18-page brief to address issues of joint
26  relevance to these defendants without exceeding total page limitations.  In addition, Mr. Killinger explicitly adopts all
applicable arguments in the replies of the other defendants.  Other motions and replies are referred to as follows:
27  Outside Directors' Motion and Reply ("DD Mot. at _" and "DD Reply at _"); WaMu Officers' Motion ("OD Mot. at
__"); and Deloitte & Touche's Motion ("DT Mot. at _").

pages of the Complaint and Opposition, it remains clear that plaintiffs have failed to allege specific facts that demonstrate how *any* statement, by *any* defendant, was false or misleading when made. Such particularized facts are necessary to adequately plead all claims. DD Reply at 1-5; *see also* Opp. at 15 (conceding Rule 9(b) applies to all claims against Mr. Killinger).

As a substitute for specific facts to support their claims, plaintiffs rely heavily on the findings in other cases involving companies in the mortgage industry. Opp. at 60 (citing cases "finding false statements regarding mortgage company's lending practices actionable"); *see also, e.g.*, *id.* at 4, 28-30, 37, 50, 55-56, 61, 64, 67-68, 72. But plaintiffs cannot coast past a motion to dismiss on the coattails of unrelated claims found to be adequately pleaded. It is axiomatic that precedent should provide principles of interpretation, but reliance upon the *results* of so-called "similar" cases is misplaced. Claims of securities fraud turn on the unique facts of each case: what matters is what *these* defendants said, and the facts *these* plaintiffs plead. If anything, analysis of the cases to which plaintiffs cite only calls attention to the facts that are conspicuously absent here.

For instance, in *Countrywide*, plaintiffs pleaded extensive factual data (*e.g.*, decreasing FICO scores and increasing LTVs) indicating a quantifiable decline in underwriting standards in the face of a deteriorating market, contradicting defendants' public statements. *See In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1060-63 (C.D. Cal. 2008); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1192-94 (C.D. Cal. 2008). In *In re New Century*, objective data on delinquencies contradicted defendants' public statements, while the company conceded errors in its financials, leading to restatements and an audit committee investigation. 588 F. Supp. 2d 1206, 1210, 1215, 1228 (C.D. Cal. 2008). And in *Atlas v. Accredited Home Lenders Holding, Co.*, the auditor refused to approve the company's financials, requiring that its reserves be retroactively increased by $30 million. 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008). It is these sorts of facts that plaintiffs fail to allege in the Complaint.

### A.    Plaintiffs do not adequately allege statements about underwriting were false.

The Opposition confirms that the challenge to statements about underwriting is really a dispute over adjectives: Plaintiffs contest statements by several defendants that underwriting was

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

2

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    "disciplined," "vigilant," "prudent," "sound," "selective," "strong," "conservative," "rigorous,"

2    and, especially, "tightened."  Opp. at 1, 60, 64-66; ¶¶ 559, 568-69, 594-95, 612-13, 634, 656-57,

3    667, 670, 699.  Indeed, the Opposition makes only one assertion of falsity *not* based on an

4    adjective – the challenge to statements that WaMu underwrote Option ARMs to the fully-indexed

5    rate.  Opp. at 64-65; ¶¶ 367, 576, 612, 623.  Like the Complaint, the Opposition relies on vague

6    assertions from CWs that WaMu made "risky" loans, while emphasizing exaggerated claims that

7    exceptions were "always approved" and WaMu gave loans to anyone with a "heartbeat."  Opp. at

8    28, 65-66; ¶¶ 331, 399, 878, 881-83.  These allegations are insufficient for several reasons.

9        First, although most of plaintiffs' allegations are claims of omission, they do not point to a

10    single omitted fact that rendered defendants' statements misleading.  While plaintiffs contend

11    defendants "omitted the true data about the Company's loan quality," there is no indication what

12    this "true data" might be.  Opp. at 30; *see In re 2007 Novastar Fin.*, *Inc. Sec. Litig.*, No. 07-0139-

13    CV-W-ODS, 2008 WL 2354367, at *3 (W.D. Mo. June 4, 2008) (rejecting claim for failure to

14    "identify the 'truth' that should have been disclosed").  A handful of CWs from branch locations

15    allegedly assert that WaMu did not underwrite Option ARMs to the fully-indexed rate, but these

16    claims are devoid of any facts to indicate that this was a company-wide issue.  Mot. at 6-7; ¶¶ 367-

17    75; *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-01510 WHA, 2009 WL 262456, at *23

18    (N.D. Cal. Feb. 4, 2009) (plaintiffs must make allegations of irregularities sufficient to have a

19    material effect on the whole portfolio); *In re Zumiez Inc. Sec. Litig.*, No. C07-1980-JCC, slip op.

20    at *14-15 (W.D. Wash. Mar. 30, 2009) (CWs' anecdotal experiences with individual stores and

21    unsupported opinions about company-wide conditions "hardly raise an inference that the alleged

22    problems were widespread throughout the Company.") (Ex. EE).

23        Second, plaintiffs fail to examine the allegedly "false" adjectives in context.  Mot. at 5-6,

24    11.  Indeed, despite the Complaint's length, it strategically omits contextual facts that contradict

25    plaintiffs' allegations.  *Compare* ¶ 667 *with* Ex. M at M-4-5; ¶ 559 *with* Ex. B at B-2.  For

26    example, when Mr. Killinger said in July 2007 that WaMu had taken steps to "tighten[]"

27    underwriting and "minimize" risk exposure (Opp. at 65; ¶ 667), he described in detail what he

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.:  08-MD-1919 MJP

3

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

meant – such as that the Company had stopped originating subprime stated-income loans and most subprime ARMs. *See* Ex. M at M-5. When Mr. Killinger said in January 2007 that he thought WaMu had acted "prudent[ly]" to contain risk, he explained this at great length – including that WaMu had sold most of its subprime originations; moved from the sixth largest subprime originator nationwide to the tenth; and cut mortgage staff by 27%. Ex. W at W-2-3 (quoted in part at ¶ 634). Similarly, when defendants said that WaMu's loan portfolio was "sound," the context included specific metrics such as average FICO scores, loan-to-value ratios ("LTVs"), and non-performing assets. Mot. at 11. Plaintiffs do not discuss, let alone challenge, most of these facts. Without examining the full statements, plaintiffs cannot claim they were false or misleading.

Plaintiffs are misguided in characterizing these references to context as a "truth on the market" defense that cannot be considered at this stage. Opp. at 76-78. Defendants do not claim that data from outside sources neutralized allegedly false statements. Rather, this data was an integral part of many of the challenged statements, and was found in frequent, contemporaneous Company disclosures properly subject to judicial notice. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not … accept as true allegations that contradict matters properly subject to judicial notice. …"). Such information is directly probative of the core issue of whether plaintiffs identify any false or misleading statements. *In re Downey Sec. Litig.*, No. CV 08-3261-JFW, 2009 WL 736802, at *6 (C.D. Cal. Mar. 18, 2009) (claim that subprime loans represent 6% of loan portfolio was not false when "viewed in context" of full statement and other public filings). Thus, it is not only appropriate, but necessary, for the Court to consider the full context of statements in evaluating whether plaintiffs have adequately pleaded falsity.

Finally, plaintiffs ignore the standard for pleading the falsity of opinions, even though most of the statements they challenge regarding underwriting *are* opinions, *e.g.*, that underwriting is "disciplined," "prudent," "sound," "selective," "strong," "conservative," or "rigorous." In *Rubke v. Capitol Bancorp Ltd.*, the Ninth Circuit recently held that plaintiffs must plead specific facts alleging an opinion is "both objectively and subjectively false or misleading." 551 F.3d 1156, 1162 (9th Cir. 2009) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991)).

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

4

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   As *Capitol Bancorp* explains, this means plaintiffs must show not only that an opinion was untrue,

2   but also that it was not actually believed by the speaker. 551 F.3d at 1162; *see also In re*

3   *McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000); *In re Credit*

4   *Suisse First Boston Corp.*, 431 F.3d 36, 47 (1st Cir. 2005). Plaintiffs indicate they were aware of

5   *Capitol Bancorp* (Opp. at 16), but they go out of their way to ignore it, citing to one district court

6   decision misstating the standard, and denigrating another court for getting it right. *See* Opp. at 43.

7       It is not surprising, therefore, that plaintiffs do not even try to meet the *Capitol Bancorp*

8   standard. Plaintiffs do not plead that any of the challenged opinions were not sincerely believed –

9   and it is clear from the paucity of their scienter allegations that they could not make this showing.

10  Plaintiffs also fail to show objective falsity of the opinions, which are too vague to be actionable

11  absent a method of measurement. Mot. at 7-8; *Reese v. Malone*, No. C08-1008 MJP, 2009 WL

12  506820, at *6 (W.D. Wash. Feb. 27, 2009) ("'Cooperating' and 'doing more' are vague and

13  general terms, incapable of precise definition and difficult to disprove"). At most, plaintiffs allege

14  that some former WaMu employees disagreed with defendants – which is clearly inadequate to

15  plead either objective or subjective falsity. *Zucco Partners*, *LLC v. Digimarc Corp.*, 552 F.3d

16  981, 998 (9th Cir. 2009); *In re Metawave Commc'ns Corp. Sec. Litig.*, No. C02-625RSM, slip op.

17  at 8 (W.D. Wash. Mar. 25, 2009) (refusing to consider CWs' unfounded opinions about the falsity

18  of statements without factual details indicating the defendants shared those opinions) (Ex. X).

19      **B.**       **Plaintiffs do not adequately allege the falsity of statements about appraisals.**

20      The Opposition challenges a handful of statements about appraisals: disclosures of the

21  LTVs of various portfolios (Opp. at 62; ¶¶ 560, 595, 671); and statements that LTVs are a "key

22  determinant" of quality (Opp. at 24, 61; ¶¶ 581, 910, 912, 934, 936); that there was a "strong

23  governance process" over external appraisers, who were selected for "better quality" (Opp. at 61;

24  ¶¶ 614-15); and that WaMu had "no incentive" to inflate appraisals. Opp. at 61-62; ¶ 693.

25  Plaintiffs contend the alleged inflation of appraisals was so widespread that it rendered any

26  statement about appraisals misleading, citing for support vague assertions from CWs, such as "for

27  WaMu, it was all about LTV." Opp. at 31, 64 (citing ¶ 201). However, plaintiffs must, but do

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

5

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   not, show the alleged inflation of appraisals was significant enough to have a material effect on the

2   LTV of WaMu's vast residential lending portfolio – which consisted of $158 billion in loans at the

3   end of 2006.  Ex. Y at Y-5; *see Charles Schwab*, 2009 WL 262456, at *23 (plaintiffs do not

4   "plausibly" plead a "material misrepresentation" when they identify "only fourteen assets alleged

5   to have been mispriced out of a portfolio of hundreds if not thousands of assets").

6        The Opposition shrugs off this requirement as "impossible," claiming that defendants are

7   asserting that plaintiffs must "alleg[e] the true value of each appraisal."  Opp. at 64.  Defendants

8   assert no such thing.  Mot. at 8-9.  Plaintiffs do not quantify their allegations related to appraisals

9   in *any* manner:  Not only do they fail to allege the "true" value of WaMu's LTVs in *any* category,

10  they do not allege detailed facts about *a single instance* of appraisal inflation.  For example,

11  plaintiffs discuss requests for reconsideration as if they are inherently sinister, or even "illegal,"

12  but do not plead facts showing these requests actually led to any quantifiable inflation of appraisal

13  values, much less a material one.  Opp. at 62, 78.  Plaintiffs' inability to quantify their allegations

14  is fatal, as is shown by the very authority they cite.  Opp. at 64 (citing *In re Daou Sys., Inc.*, 411

15  F.3d 1006, 1020 (9th Cir. 2005) (plaintiffs must "show with particularity … whether [adjustments]

16  were material in light of the company's overall financial position"); *Cooper v. Pickett*, 137 F.3d

17  616, 627 (9th Cir. 1997) (pre-Reform Act; no need to allege amount *each* transaction was

18  overstated, because plaintiffs pleaded the *total* amount of overstatement)).[2]

19       As a substitute for quantification, plaintiffs cannot rely upon an "expert" evaluation of data

20  from the U.S. Department of Housing and Urban Development.  Opp. at 62-63; ¶¶ 298-306.

21  Securities fraud complaints can only be supported by detailed facts, not expert opinions.

22  Mot. at 7.  If courts consider "expert" statements at all, they may *only* consider *facts* in those

23  documents – not opinion or analysis.  *Id.*  Plaintiffs' authority is not to the contrary.  Opp. at 58

24  (citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233-34 (9th Cir.

_____

26     [2] Although plaintiffs claim that *In re Vantive Corp. Sec. Litig.* is inapplicable because it did not require
allegations of "precise amounts of misstatements" (Opp. at 64), *Vantive* is directly on point: It held that plaintiffs

27  could not state a similar claim based on overstatement of revenue, without providing at least the "basic detail" of the
"approximate amount" of the overstatement.  283 F.3d 1079, 1090-91 (9th Cir. 2002).

2004) (only considering facts contained in expert statement)).  Even if the data analysis is

considered, it is irrelevant to the claim of appraisal inflation.  At best, it makes an *ex ante*

comparison of reasons for denials among lenders, which could be affected by many unknown

factors, such as varying policies about how to record denials.  Opp. at 63; ¶¶ 298-306.[3]

Finally, plaintiffs do not allege contemporaneous facts showing there was no "strong

governance process" over external appraisers, or that defendants did not switch to third-party

appraisers to get "better quality."  Mot. at 9.  Although plaintiffs allege that WaMu "corrupted"

the outside appraisal process "from the very initiation of outsourcing," they include no facts to

support this claim, such as how the process was "corrupted" at the time the statements were made

in September 2006, or the strength then of the "governance process."  Opp. at 63.

### C. Plaintiffs do not adequately allege the falsity of statements related to risk management and adjustments made in anticipation of a market downturn.

The Opposition challenges statements describing the risk management system (Opp. at 68;

¶ 104); Mr. Killinger's opinion that good risk management means getting ahead of problems (Opp.

at 69; ¶ 567); statements indicating that WaMu "proactively manages credit risk" with "excellent"

and "effective" processes; and assertions that risk management is a "top priority" and "focus."

Opp. at 27-28, 64-65, 69; ¶¶ 557, 559, 567, 614, 909, 960.  Plaintiffs also challenge statements by

Messrs. Killinger and Cathcart that WaMu had "prepare[d]," made "strategic choices,"

"selectively reduce[d] credit risk," and taken "defensive actions" in anticipation of a possible

market downturn.  Opp. at 69, 74-75; ¶¶ 567, 576, 592, 595, 602, 613-14, 616.

Familiar flaws infect these allegations.  First, plaintiffs do not connect the statements they

challenge to the reasons they allege they are false.  For example, they do not explain why the

description of WaMu's risk management system was allegedly false.  Opp. at 68; ¶ 104.  When

plaintiffs do explain their falsity allegations, they are based largely on the complaints of a few

discontented former employees who criticize WaMu's risk analysis as "stupid," its structure as

---

[3] Similarly, the "expert" analysis of "Peer Group" data must be disregarded.  Mot. at 7; Opp. at 66; ¶¶ 418-19.
This data is meaningless without "expert" analysis that is improper at this stage, and without a detailed explanation of
the methodology used.  Even if considered, however, the data is not probative of falsity:  Plaintiffs do not point to any
statement that would be rendered false even if the improper "expert" testimony were accepted.  Opp. at 66.

1   inappropriate, and its staff as unqualified. Mot. at 10; Opp. at 42, 69-70; ¶¶ 111-19. However,

2   defendants' opinions that WaMu's risk management was "excellent" and "effective" are not

3   rendered false simply because some employees disagreed. Once again, plaintiffs make *no* effort to

4   show that defendants did not sincerely believe these opinions: They do not plead that

5   Mr. Killinger did not "*think* good credit management is all about what you do before the problem

6   is there," or that Mr. Casey did not believe WaMu's credit quality was "very good." Plaintiffs

7   also fail to provide any means to measure the objective falsity of these opinions. There is no

8   showing, for instance, that credit cannot be "very good" at the same time lending is "aggressive"

9   (Opp. at 69), and plaintiffs do not challenge the data supporting these statements. Mot. at 11;

10  Opp. at 30-31 (claiming to "clearly dispute[]" accuracy of the data, but not indicating how).

11          Plaintiffs also challenge statements detailing WaMu's preparations for an economic

12  downturn, alleging that defendants disingenuously blamed the economy for WaMu's difficulties.

13  Opp. at 74-5, 78; ¶¶ 690, 698. While the current economy has certainly caused the failure of

14  countless businesses in the absence of fraud, defendants hardly contend that the economy

15  *precludes* the existence of fraud. Opp. at 4. It is self-evident that the mortgage industry meltdown

16  affected lenders: A loan that is a good risk during a decade of unprecedented housing appreciation

17  may turn bad as the result of steep depreciation, a freeze in credit markets, and skyrocketing

18  unemployment. It defies common sense to assert that it was misleading for defendants to discuss

19  WaMu's difficulties in the context of the national crisis. Nor do plaintiffs offer facts to dispute the

20  data detailing the "defensive actions" WaMu took to prepare for a possible downturn. Mot. at 6

21  (subprime originations fell 80% from 3Q 2006 to 3Q 2007).

22          Although plaintiffs do not challenge the accuracy of this data, they assert that it raises

23  inferences that "actually support Plaintiffs." Opp. at 110. For example, plaintiffs claim, with no

24  support, that WaMu's decrease in loan volume *starting in 2005* was entirely the result of the very

25  market forces that they otherwise so studiously ignore. But WaMu made significant reductions in

26  mortgage originations as a matter of strategy well before the financial collapse – significantly

27  decreasing overall loan volume and the volume of subprime originations by the end of 2006. Mot.

1   at 6.  Plaintiffs complain that the origination of Option ARMs did not decline *enough*, asserting

2   that this shows "WaMu pushed risky Option ARM loans over other loans in the face of a

3   weakening market."  Opp. at 111.  This is a red herring.  WaMu did not start selling Option ARMs

4   during the Class Period – it had offered them for many years after acquiring California-based

5   lenders that had featured them for decades.  Ex. Z at Z-3; Ex. AA at AA-7.  Nonetheless, in

6   anticipation of a possible downturn, WaMu did decrease Option ARM originations by 24% from

7   2005 to 2006.  Mot. at 6.  Its fixed-rate loans dropped more dramatically because unlike fixed-rate

8   loans, Option ARMs were not offered through WaMu's subprime channel (Ex. AA at AA-8), and

9   the Company focused first on reducing subprime originations.

10          Plaintiffs also contend that the data supporting "defensive measures" is irrelevant because

11  it focuses on subprime loans, and they claim their falsity allegations relate primarily to prime

12  loans.  Opp. at 4, 75-77.  While plaintiffs may wish to discuss only prime loans, and specifically

13  Option ARMs, that is not what is referenced by the vast majority of the statements they challenge.

14  In fact, most of these statements encompass WaMu's entire mortgage lending business, and many

15  explicitly mention subprime lending.  *See, e.g.*, ¶¶ 613, 634, 657, 667, 670; Opp. at 65-66

16  (statements that WaMu "tightened" underwriting referring to subprime lending); ¶ 909; Opp. at 27

17  (WaMu "seeks to mitigate the credit risk" in its subprime portfolio).  Regardless, it is absurd to

18  suggest that defendants' statements regarding WaMu's "defensive actions" are not supported by

19  the fact that it downsized its subprime portfolio, which by definition poses a higher risk of default.

20  *See New Century*, 588 F. Supp. 2d at 1212 (describing risks of subprime lending).

21          To the extent that plaintiffs challenge defendants' statements because their *predictions*

22  concerning WaMu's readiness for the economic downturn were not ultimately accurate, such

23  statements are forward-looking statements protected by the Reform Act's Safe Harbor.  Mot. at

24  14-16; Mot. App. A; ¶¶ 559, 577, 593, 595; 607; 612-13, 620, 633, 656, 698-99.  All defendants'

25  statements predicting a "return to profitability," or anticipating future losses or earnings are

26  similarly protected.  ¶ 664; *see also, e.g.*, ¶¶ 568, 606, 655-56, 666, 683, 687.  Contrary to

27  plaintiffs' allegations, defendants do not contend that this protection applies to statements that

1    detailed defensive actions *already taken*, which as demonstrated *supra*, were objectively true.

2    Opp. at 74-75.  Plaintiffs further claim the Safe Harbor is not applicable because defendants

3    "knew" of undisclosed risks that rendered the warnings insufficient, and allegedly made the

4    statements with "actual knowledge" of falsity.  Opp. at 75-76.  As a matter of law, plaintiffs are

5    incorrect.  The Safe Harbor provides two alternate means of protection, if statements are *either*

6    (i) accompanied with meaningful cautionary language, *or* (ii) made without actual knowledge of

7    falsity.  15 U.S.C. § 78u-5(c)(1)(A).  Thus, "actual knowledge" of falsity does not preclude

8    protection if there is "meaningful cautionary language."  *In re Impac Mortg. Holdings, Inc. Sec.*

9    *Litig.*, 554 F. Supp. 2d 1083, 1098 (C.D. Cal. 2008).  Regardless, as discussed *infra*, plaintiffs

10   have not come close to pleading facts indicating any defendant had actual knowledge of falsity.

11           **D.      Plaintiffs do not adequately allege the falsity of WaMu's financial statements.**

12           The challenge to WaMu's allowance for loan loss reserves ("ALLL") is thinly-veiled

13   pleading by hindsight.  In light of the fact that WaMu drastically increased its ALLL in response

14   to rapidly worsening market conditions beginning in fall 2007, plaintiffs assert that WaMu should

15   have set aside more reserves earlier.  ¶¶ 917, 941.  But there is no evidence that WaMu's ALLL

16   was ever inadequate.  In all but one quarter of the Class Period, WaMu's provisions set aside to

17   augment the ALLL were sufficient to absorb its net charge-offs for that period, and total charge-

18   offs never exceeded the ALLL.  In 2005, provisions exceeded net charge-offs by $72 million; in

19   2006 by $306 million; in 2007 by $1.48 billion; and in the first half of 2008 by $4.68 billion.  Ex.

20   BB at BB-4; Ex. CC at CC-3; *see also* DT Mot. at 6-10 (WaMu's provisions tracked actual losses

21   and reflected market conditions).  By their nature, ALLL calculations are "not a science," but

22   involve subjective projections entitled to "reasonable deference." *Countrywide Sec. Litig.*, 588 F.

23   Supp. 2d at 1176-77 & n.56.  Even so, the data in this case indicates that WaMu set aside adequate

24   provisions even *after* the cataclysmic market shift.  "[A] substantial increase in loan loss reserves

25   due to market conditions is not evidence that the reserves stated in earlier statements were

26   inadequate." *Countrywide Deriv.*, 554 F. Supp. 2d at 1070 n.28 (citation omitted).

27           The adequacy of WaMu's ALLL is supported by the clean audits Deloitte & Touche gave

1   WaMu's financials during the Class Period, and the fact there was no restatement.  OD Mot. at 23-

2   24, ¶ 838.  Such circumstances weigh against a finding that financial statements were false.  *Tripp*

3   *v. Indymac Fin. Inc.*, No. CV 07-1635 GW, 2007 WL 4591930, at *5 (C.D. Cal. Nov. 29, 2007).

4   Plaintiffs' authority is not to the contrary, but only indicates that the lack of a restatement is not

5   *always* fatal to accounting claims.  Opp. at 37-38.  Finally, it is notable that plaintiffs do not allege

6   that the ALLL was ever questioned by the Office of Thrift Supervision, which routinely reviewed

7   WaMu's asset quality and ALLL methodology.  *Cf.* Ex. DD at DD-4.

8       In contending that WaMu should have increased reserves to prepare for possible future

9   defaults, plaintiffs show a fundamental misunderstanding of GAAP.  Loan loss reserves are not

10  savings for a rainy day – reserves cannot be increased to hedge against a possible economic

11  downturn or *potential* risks.  *Countrywide Sec.*, 554 F. Supp. 2d at 1070 n.31 (increasing reserves

12  to protect against future losses "might in *itself* violate GAAP").  Rather, the rule governing ALLL

13  mandates that an allowance should not be taken unless (i) it is *probable* that the loss has *already*

14  *occurred*, and (ii) the amount of loss can be reasonably estimated.  *Id.*; DT Mot. at 4; DT Ex. 6 at

15  ¶ 8; *see also* DT Ex. 1 at 8 (future losses should not be recognized even when probable, and it is

16  "inappropriate to consider possible or expected future trends that may lead to additional losses").

17      In fact, plaintiffs disregard GAAP at the same time they accuse defendants of violating it,

18  by asserting they can calculate the "true" ALLL using simple arithmetic that sets provisions at a

19  randomly-selected percentage of non-accrual loans.  ¶¶ 467-72.  Plaintiffs do not even pretend that

20  this method is supported by GAAP.  Non-accrual loans are loans that are ninety days past due, and

21  whether they result in losses depends on many factors, such as the LTV, market appreciation, and

22  the owners' ability to sell, refinance, or resume payments.  For these reasons, calculations of the

23  ALLL involve myriad complex factors.  DT Ex. 1 at 8; Ex. AA at AA-9 (explaining WaMu's

24  ALLL methodology).  Plaintiffs' "estimate" of the "true" ALLL is a transparent attempt to lend

25  the illusion of integrity to their effort to spread the losses of late 2007 and early 2008 around the

26  rest of the Class Period.  Plaintiffs try to bolster this illusion with a purported expert who opines

27  that "assuming the truth of [plaintiff's] allegations," WaMu's ALLL was understated.  *See*

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

11

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Complaint App. 5 at 5.  But plaintiffs' expert refers only to the Complaint's allegations.  She offers *no* facts, and expert *opinions* may not be considered at this stage.  *See supra* at 6.  Plaintiffs cannot satisfy the need for facts by conjuring numbers from thin air, or feign ignorance of the effect of market conditions:  The Court need not make factual findings to recognize that when the economy plummets, loan defaults will rise, and lenders will have greater losses.

Plaintiffs challenge WaMu's loan loss methodology based largely on mischaracterization of the "CRO Report."  Even according to the Complaint, the CRO Report found only that the Loan Performance Risk Model ("LPRM") was "untested" on products subject to negative amortization.  ¶ 452.  In response, plaintiffs allege that WaMu employees – none of them defendants – acknowledged that "*documentation of the validation* of the LPRM did not provide a specific analysis" of its ability to account for negative amortization, and responded that this *documentation* would be enhanced accordingly.  ¶¶ 454-55 (emphasis added).  The Complaint cites no facts supporting the conclusion that the LPRM "did not account for the performance" of Option ARMs, or caused WaMu to "knowingly fail[] to reserve" at appropriate rates. ¶¶ 453, 448.  Untested does not equal inadequate.  Plaintiffs do not allege the LPRM proved inadequate when tested; that the LPRM (as opposed to the "documentation of [its] validation") required enhancement; or that any change that might have been made materially affected the ALLL.  Finally, plaintiffs do not explain the relevance of their assertion that it took WaMu an "amazing" nine months to enhance its complex forecasting model.  ¶ 456.

## II.    PLAINTIFFS DO NOT CREATE A STRONG INFERENCE OF SCIENTER.

### A.    Plaintiffs misstate and incorrectly apply the law of scienter.

Plaintiffs try to satisfy the scienter requirements of Section 10(b) with a laundry list of conclusory claims of general wrongdoing, unconnected to any particular statement or any particular defendant.  Mot. at 16.  It is notable that the Opposition does not attempt to cure the Complaint's failure to provide this crucial link between (i) the challenged statements, and (ii) allegations that *each* defendant made *each* allegedly false statement with scienter.  Mot. at 16-17.  Rather, both the Complaint and the Opposition are conspicuously short on proper nouns, relying

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.:  08-MD-1919 MJP

12

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   instead on vague and collective allegations about "senior management," "senior executives,"

2   "management," and the "highest levels of WaMu." Opp. at 28, 84-89, 94. Plaintiffs essentially

3   concede they are unable to make particularized allegations of scienter, and try to compensate by

4   arguing for a legally unsupportable pleading standard. *Id*. at 79-82, 105.

5        To begin with, plaintiffs grossly misstate the "core operations" inference, by rearranging

6   words to maintain that the Ninth Circuit has held that "'it would be absurd to suggest' that

7   'management' could repeatedly, but ignorantly, make false and misleading representations to

8   investors about subjects of significant importance to the company and shareholders." Opp. at 81

9   (purporting to quote *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008)). By

10  this formulation, scienter would be automatic any time a defendant made a false statement on a

11  subject of importance to a company. But what *South Ferry* actually holds is nearly the opposite:

12  Allegations regarding management's role "may *conceivably*" satisfy the Reform Act without

13  supportive particularized facts, "in *rare* circumstances, where the *nature of the relevant fact* is of

14  such prominence that it *would be* '*absurd*' to suggest that management was without knowledge of

15  the matter." *South Ferry*, 542 F.3d at 786 (emphasis added). All other Ninth Circuit cases to

16  analyze the inference likewise emphasize that it is extremely difficult to invoke, and can be used

17  only where the allegations of falsity are so strong, and bear so directly upon the core operations of

18  a company, that *falsity* is "patently obvious," and it would be "absurd to suggest" key managers

19  were not aware of it. *Digimarc*, 552 F.3d at 1000; *Glazer Capital Mgmt. LP v. Magistri*, 549 F.3d

20  736, 746 (9th Cir. 2008); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008).

21       Plaintiffs do not approach the extraordinary allegations necessary to utilize the core

22  operations inference. Most fundamentally, they do not satisfy the threshold requirement that

23  allegations of falsity must be so overwhelming that they strongly imply scienter on their own.

24  *Digimarc*, 552 F.3d at 1000-01. Even if the Court were to find that plaintiffs have adequately

25  pleaded falsity, such a finding would necessarily be based not on statements of objective fact, but

26  on defendants' subjective evaluations, such as whether WaMu's ALLL was adequate, its lending

27  standards "tightened," or its loan portfolio "sound." It is extremely difficult to demonstrate these

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

13

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  sorts of subjective statements are false at all, and virtually impossible to show that their *falsity* is

2  "so apparent" it would be "absurd to suggest" management was unaware.

3        Indeed, plaintiffs do not assert the falsity of any objectively verifiable facts of the kind the

4  Ninth Circuit has found sufficient for the core operations inference.  For example, in *Applied*

5  *Signal*, the court applied the inference to a relatively small company, where the key circumstances

6  indicating falsity included that work was halted on more than $20 million worth of contracts for

7  the company's largest clients, reassigning 50-75 employees and turning one facility into a "ghost

8  town." *Applied Signal*, 527 F.3d at 988 and n.5; *see also Digimarc*, 552 F.3d at 1001.  Such facts

9  would not only be obvious to management, but to nearly anyone who worked at the company.  By

10  contrast, it would be "absurd to suggest" that the same is true here: that the most senior officers of

11  WaMu would necessarily be aware that an unspecified number of appraisals had been inflated at

12  some of WaMu's branch offices, or that an unspecified number of underwriters were disregarding

13  guidelines.  In *Digimarc*, the Court rejected the adequacy of similar facts to trigger the core

14  operations inference, even where *falsity had been admitted* through a restatement.  *Digimarc*, 552

15  F.3d at 1001 (misstatements were not "especially prominent facts," but instead errors that "would

16  not be immediately obvious to corporate management").  Unless the core operations inference is

17  thus limited to "the narrow exception to the general rule" as in *Applied Signal*, it will quickly

18  become the exception that *swallows* the rule, obliterating the intent of the Reform Act.  *Id.*

19        Not only are plaintiffs' falsity allegations weak, they also do not concern subjects so

20  central to the company that falsity would be apparent from its operations.  *South Ferry*, 542 F.3d

21  at 784-86.  Although plaintiffs characterize WaMu as a "lending company," it was actually a

22  national savings and loan with four major business units, including Retail Banking and Financial

23  Services, Card Services, and a Commercial Group.  Ex. AA at AA-3-5.  Plaintiffs misquote the

24  Complaint when they contend WaMu's residential lending generated 70% of its income (Opp. at

25  81) – the Complaint only asserts that 70% of WaMu's "net *interest* income" came from residential

26  lending.  ¶ 59 (emphasis added).  In reality, WaMu's *retail banking* generated most of its profits

27  and employed most of its employees.  Ex. Y at Y-2-3; *cf. Countrywide Sec.*, 588 F. Supp. 2d at

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.:  08-MD-1919 MJP

14

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    1144 (core operations inference applied when mortgage operations were 93% of earnings).

2        Even if mortgage lending were WaMu's "core operation," and even if there were clear

3 facts showing obvious falsity, it still would not follow that such *falsity* would be "patently

4 obvious" to WaMu's most senior officers. Two government agencies accounted for 80% of

5 Applied Signal's revenue, so it was reasonable to assume that the CEO and CFO would be aware

6 of problems with those contracts. 527 F.3d at 984. By contrast, WaMu had four major business

7 units, tens of thousands of employees in thousands of offices, millions of customers, and a net

8 income of $3.43 billion. Ex. AA at AA-2-5. Directly contrary to what is needed to apply the core

9 operations inference, it is again "absurd to suggest" that WaMu's most senior officers would be

10 personally involved with specific loans, appraisers, or underwriting standards and exceptions.

11        Further, if any manipulation of appraisals or underwriting did exist, it would be covert, and

12 unlikely to reveal itself in company-wide reports reflecting only overall loan metrics. *Digimarc*,

13 552 F.3d at 1001 (core operations inference does not apply when erroneous entries on financial

14 statements would not be visible to executives); *Glazer*, 549 F.3d at 746-47 (payments underlying

15 alleged misstatements were likely to be kept secret, and thus are not facts that it would be "hard to

16 believe" management did not know). By contrast, in *Countrywide*, the Complaint described a

17 detailed "exception processing system" that reflected extensive details about loan quality that

18 contradicted defendants' public statements. 588 F. Supp. 2d at 1147-48, 1190. Plaintiffs have

19 thus utterly failed to show that "the fraud at WaMu pervaded all aspects of the Company's core

20 residential lending business." Opp. at 80. At best, the Complaint suggests scattered problems

21 within a vast and complex Company. *Pittleman v. Impac Mortgage Holdings, Inc.*, No. SACV 07-

22 0970 AG, 2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009) (vague disagreements over approval

23 process do not indicate "exceedingly rare" case justifying core operations inference).

24        Neither do plaintiffs provide information to supplement the core operations inference.

25 *South Ferry*, 542 F.3d at 786 (inference may be supplemented with specific allegations of "actual

26 access" to information indicating falsity). Plaintiffs mention many reports, but do not show that

27 any of them contained facts contrary to defendants' public statements. Mot. at 18; *In re Silicon*

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

15

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1   *Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999) ("general allegations regarding

2   negative internal reports … do not give rise to a strong inference"); *compare Countrywide Sec.*,

3   588 F. Supp. 2d at 1148, 1190 (key managers specifically said they monitored system showing

4   detailed exception statistics central to falsity allegations). [4]  Even if any of the defendants were

5   alleged to have reviewed the CRO Report (they are not), plaintiffs' allegations would actually

6   *negate* any inference of scienter, since WaMu both commissioned the CRO report and created a

7   plan to address the concerns it raised.  *See In re Watchguard Sec. Litig.*, No. C05-678LR, 2006

8   WL 2927663, at *10 (W.D. Wash. Oct. 12, 2006) (no inference of scienter where defendant "took

9   steps to assess" and "improve its controls" during the class period).  The vague assertion that the

10  "10(b) Defendants" met regularly to discuss loan quality is also irrelevant, since plaintiffs do not

11  allege any information discussed at these meetings that was contrary to the challenged statements.

12          Conceding the individual inadequacy of their allegations, plaintiffs allege the sheer number

13  of their vague and ambiguous claims should be sufficient to plead scienter when viewed

14  "holistic[ally]."  Opp. at 79.  The concept that courts should consider scienter allegations

15  collectively is hardly novel.  *See, e.g.*, *Tellabs*, *Inc. v. Makor Issues & Rights*, *Ltd.* 127 S. Ct.

16  2499, 2509 (2007) (citing Ninth Circuit decision in *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th

17  Cir. 2002) for support that allegations be considered "collectively"); *Silicon Graphics*, 183 F.3d at

18  985 (evaluating scienter allegations in their "entirety").  Thus, the "holistic" approach does not

19  change previous law, and does not mean inadequate allegations will suffice merely because

20  plaintiffs offer them in bulk.  *Digimarc*, 552 F.3d at 1007 ("Although the allegations in this case

21  are legion, even together they are not as cogent or compelling as a plausible alternate inference").

22          **B.      Plaintiffs do not create any inference of Mr. Killinger's scienter.**

23          Plaintiffs do not allege a *single* fact indicating Mr. Killinger either knew, or disregarded

24  with deliberate recklessness, that any of his public statements was false.  Rather, the Opposition's

25

26          [4] Plaintiffs claim it is no longer true that "plaintiffs must, but do not, offer details that would bridge the gap
    between the existence of the reports and actual knowledge on the part of the defendant."  Opp. at 107; Mot. at 17-18
27  (quoting *South Ferry*'s summary of *Vantive*, 283 F.3d at 1087-88).  However, *Digimarc* makes clear that *South Ferry*
    did not change the law of scienter as developed by cases such as *Silicon Graphics* and *Vantive.* 552 F.3d at 1000-01.

1    scienter allegations are entirely conclusory.  *See, e.g.*, Opp. at 108 (alleging "the Complaint

2    contains numerous detailed allegations of 'specific information conveyed to management and

3    related to the fraud,'" but pointing to no such information).  Plaintiffs allege Mr. Killinger had

4    access to, and *could* have read, various internal reports, but fail to identify any fact in any report

5    contradicting his public statements.  Mot. at 17-19; Opp. at 109-10.  Plaintiffs do not dispute that

6    only three CWs allegedly had *any* contact with Mr. Killinger, or that only *one* allegedly interacted

7    with him directly – or that this interaction yielded no factual allegations that suggest wrongdoing.

8    Mot. at 19-20; Opp. at 110.  In apparent desperation, plaintiffs claim the "neutral facts" provided

9    by that one CW create an inference of scienter, because "a tie goes to the plaintiff."  Mot. at 20;

10   Opp. at 110.  But a fact that creates no inference at all does not generate a "tie" – to even count in

11   the analysis, a fact must first be probative of scienter.

12        Plaintiffs also fail to plead that Mr. Killinger had a motive to commit fraud.  Plaintiffs do

13   not dispute that Mr. Killinger sold only 5% of his available stock holdings during the lengthy class

14   period, and do not dispute that his pattern of sales was entirely consistent with his previous

15   trading.  Mot. at 21-24; Opp. at 104.  Plaintiffs also do not plead that any other defendants sold

16   stock.  Opp. at 104.  This weighs against a finding of scienter against *any* defendant.  Mot. at 21-

17   22.  The cases to which plaintiffs cite are consistent with this proposition, merely holding that

18   such facts do not *necessarily* defeat an inference of scienter created by other allegations.  Opp. at

19   104 (citing *Tellabs*, 127 S. Ct. at 2511; *Fouad v. Isilon Sys., Inc.*, No. C07-1764 MJP, 2008 WL

20   5412397 (W.D. Wash. Dec. 29, 2008)).  Finally, plaintiffs contend that Mr. Killinger instituted his

21   10b5-1 plan "well after he became aware of the hidden problems" at WaMu, but have not

22   specifically alleged that Mr. Killinger *ever* "became aware of … hidden problems," much less that

23   he did so on a specific date.  Opp. at 102.  Plaintiffs' assertion that Mr. Killinger set up his 10b5-1

24   plan during the Class Period is irrelevant, since *plaintiffs* defined the lengthy Class Period, and do

25   not connect its start date to any action by Mr. Killinger.  Opp. at 102-03; *Vantive*, 283 F.3d at

26   1093 (lengthy Class Period weighs against inference of scienter from stock sales).

27        The requirement that scienter allegations be considered collectively "cuts both ways."

*Metzler*, 540 F.3d at 1069.  Plaintiffs allegedly conducted a massive investigation.  If they have not found facts indicating Mr. Killinger's scienter, it is not for lack of trying – it is because there are no such facts.  Mr. Killinger repeatedly warned of a possible economic downturn, took steps to protect the Company, and disclosed financial difficulties – and watched his shares decline in value alongside other WaMu investors.  Mot. at 2, 17, 20.  Such facts indicate innocent conduct.  *Patel v. Parnes*, 253 F.R.D. 531, 559 (C.D. Cal. 2008) (weighs against scienter that company informed investors it was experiencing declines in sales, and that decreasing demand was likely to negatively impact earnings).  Not only do plaintiffs ignore this obvious opposing inference, they inexplicably contend that defendants fail to supply one.  *Compare* Mot. at 2, 17, 20, *with* Opp. at 110.  In contrast, plaintiffs depend on the volume of their allegations to compensate for the fact that they have not made a single particularized allegation that raises *any* inference – let alone a strong one – that Mr. Killinger intended to deceive investors with any of his public statements.  Before the Court considers these scienter allegations "holistically," it should first evaluate their strength individually.  *Digimarc*, 552 F.3d at 992.  Since none of plaintiffs' allegations contribute to an inference of scienter, they also fail to do so as a whole.  Zero plus zero is still zero.

### CONCLUSION

For the foregoing reasons, all claims against Mr. Killinger should be dismissed.

Dated:  March 30, 2009

By:  s/ Barry M. Kaplan
Barry M. Kaplan, WSBA #8661
Douglas W. Greene, WSBA #22844
Daniel W. Turbow (*pro hac vice*)
Claire L. Davis, WSBA #39812
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel.:  (206) 883-2500
Fax:  (206) 883-2699
Email: bkaplan@wsgr.com
Email: dgreene@wsgr.com
Email: dturbow@wsgr.com
Email: cldavis@wsgr.com

KERRY K. KILLINGER'S REPLY BRIEF ISO
HIS MOTION TO DISMISS [OD-KKK-1]
Master No.: 08-MD-1919 MJP

18

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel.: (206) 883-2500
Fax: (206) 883-2699

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that on March 30, 2009, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to all counsel

4

of record who receive CM/ECF notification and I hereby certify that I have mailed the foregoing

5

document by United States first class mail to the non- CM/ECF participants indicated on the

6

Court's Manual Notice List.

7

Dated:  March 30, 2009

8

9

s/ Barry M. Kaplan
Barry M. Kaplan, WSBA# 8661

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE [OD-KKK-1]
Master No.:  08-MD-1919 MJP                     1                     WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699