1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE
10

11   In re Washington Mutual, Inc. Securities,        Case No. 2:08-md-1919 MJP
     Derivative & ERISA Litigation
12

13   _____

14   IN RE WASHINGTON MUTUAL, INC.                    Lead Case No. C08-387 MJP
     SECURITIES LITIGATION
15                                                    ORDER ON DEFENDANTS'
16   This Document Relates to: ALL CASES              MOTIONS TO DISMISS

17

18          This matter comes before the Court on five motions to dismiss Plaintiffs' consolidated

19   class action complaint.  (Dkt. No. 67.[1])  The motions to dismiss have been filed by: (1)

20   Defendant Kerry Killinger (Dkt. No. 184); (2) Defendants Anne Farrell, Stephen Frank, Thomas

21   Leppert, Charles Lillis, Phillip Matthews, Regina Montoya, Michael Murphy, Margaret Osmer

22   McQuade, Mary Pugh, William Reed, Orin Smith, James Stever and Willis Wood, Jr.

23   (collectively, the "Outside Director Defendants") (Dkt. No. 187); (3) Defendants Goldman,

24   Sachs & Co. ("Goldman Sachs"), Morgan Stanley & Co. Inc. ("Morgan Stanley"), Credit Suisse

25

26   _____

27          [1]All citations to entries or filings on the docket refer to case number 2:08-md-1919 MJP.

     ORDER ON DEFENDANTS' MOTIONS TO DISMISS — 1

Securities (USA) LLC ("Credit Suisse"), Deutsche Bank Securities Inc. ("Deutsche Bank"), UBS Securities LLC ("UBS"), Banc of America Securities LLC ("Banc of America"), J.P. Morgan Securities Inc. ("J.P. Morgan"), Barclays Capital Inc. ("Barclays"), Keefe, Bruyette & Woods, Inc. ("Keefe Bruyette"), Cabrera Capital Markets LLC ("Cabrera Capital"), The Williams Capital Group, L.P. ("Williams Capital"), Citigroup Global Markets Inc. ("Citigroup"), Greenwich Markets, Inc. ("Greenwich"), BNY Capital Markets, Inc. ("BNY"), and Samuel A. Ramirez & Company Inc. ("Ramirez & Co.") (collectively, the "Underwriter Defendants")[2] (Dkt. No. 188); (4) Defendant Deloitte and Touche LLP ("Deloitte") (Dkt. No. 189); and (5) Defendants Thomas Casey, Stephen Rotella, Ronald Cathcart, David Schneider, John Woods, and Melissa Ballenger[3] (Dkt. No. 192).

Having reviewed the motions, Plaintiffs' omnibus response (Dkt. No. 229), Defendants' reply briefs in support of their motions (Dkt. Nos. 239, 240, 241, 243, 247), and all papers submitted in support thereof, and having heard oral argument from the parties on Friday, May 1, 2009 (see Dkt. No. 269), the Court makes the following rulings: (1) the Court ORDERS re-pleading of Counts One, Two and Three and directs Plaintiffs to file an amended complaint with a more definite statement of the grounds for their claims; (2) the Court DENIES Defendants' motions to dismiss Counts Four, Five and Six as to Plaintiffs' claims concerning WaMu's October 2007 securities offering; and (3) the Court GRANTS Defendants' motions to dismiss Counts Four, Five and Six as to Plaintiffs' claims regarding WaMu's August 2006, September 2006, and December 2007 securities offerings. The Court's reasoning is set forth below.

---

[2] Plaintiffs also name Lehman Brothers Inc. ("Lehman Bros") as an Underwriter Defendant. Lehman Bros filed for Chapter 11 bankruptcy protection on September 15, 2008, was subsequently dissolved, and has not joined in the Underwriter Defendants' motion to dismiss. (See Dkt. No. 188.)

[3] Together with Kerry Killinger, these defendants are referred to collectively as the "WaMu Officer Defendants."

**Procedural History**

On May 7, 2008, the Court consolidated three related securities class actions as part of a Multi-District Litigation proceeding against Defendants. (Dkt. No. 24.) The Court appointed the Ontario Teachers' Pension Plan Board ("Ontario Teachers") Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3). (Id.) Ontario Teachers and Named Plaintiff Brockton Contributory Retirement System ("Brockton") filed a Consolidated Class Action Complaint (the "Complaint") on August 5, 2008. (Dkt. No. 67.) Defendants filed their motions to dismiss on December 8, 2008, and the Court heard argument on these motions on May 1, 2009.

**Legal Standard and Judicial Notice**

On a 12(b)(6) motion to dismiss, the Court must assess the legal feasibility of the Complaint. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Accordingly, the Court accepts Plaintiffs' factual allegations as true and draws all reasonable inferences in Plaintiffs' favor. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). Dismissal is appropriate only where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

In deciding a motion to dismiss, a court may "generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007). A court may take judicial notice of facts that are "not subject to reasonable dispute," Fed. R. Evid. 201(b), as well as documents that are referred to in the complaint, that are central to the plaintiff's claims, and whose authenticity is undisputed. See, e.g., Branch v. Tunell, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 1119, 1127 (9th Cir. 2002). A court may also take judicial notice of public documents filed with the SEC, Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), records and reports of administrative bodies, Mack v. South Bay Beer Distributors, 798 F.2d 1279, 1282 (9th Cir. 1986), overruled on other grounds by Astoria Fed. Sav. and Loan Ass'n v. Solimino, 501

U.S. 104, 110-11 (1991), and accounting standards, <u>In re Asyst Tech., Inc. Derivative Litig.</u>, No. C-06-04669 EDL, 2008 WL 2169021, at *1 n.1 (N.D. Cal. May 23, 2008).

Here, the Officer Defendants have requested that the Court take judicial notice of a number of documents, mostly SEC filings, conference call transcripts, and WaMu's press releases.[4] (<u>See</u> Killinger's Requests for Judicial Notice (Dkt. Nos. 185, 245); Officer Defendants' Mtn (Dkt. No. 192 at 16).) Plaintiffs do not oppose consideration of these documents. (<u>See</u> Dkt. No. 229 at 26-27.) The Court grants the Officer Defendants' requests for judicial notice and will draw no inferences in favor of Defendants from judicially-noticed facts. <u>See</u> <u>McGuire v. Dendreon Corp.</u>, No. 07-800MJP, 2008 WL 1791381, at *4 (W.D. Wash. Apr. 18, 2008).

Defendant Deloitte has also requested that the Court take judicial notice of a number of documents in connection with the Securities Act claims. (<u>See</u> Dkt. No. 190.) Plaintiffs do not oppose consideration of the documents designated Lutz Exhibits 1-9, 11, 14-18, 20, 28, 31-34, and 36-39. (<u>See</u> Dkt. No. 229 at 26-27.) These consist of documents referenced in the complaint, SEC filings, administrative reports, and documentation of accounting standards. (<u>See</u> Dkt. No. 191.) The Court grants Deloitte's request for judicial notice of these documents and will draw no inferences in favor of Defendants from judicially-noticed facts. <u>See</u> <u>McGuire</u>, 2008 WL 1791381, at *4. Plaintiffs oppose consideration of Lutz Exhibits 10, 12-13, 19, 21-27, 29-30, and 35, a collection of administrative reports and newspaper articles pertaining to the recent economic downturn and deterioration of the housing market. (<u>See</u> Dkt. No. 191.) As discussed below, <u>see</u> Section II.C.2., these documents are not necessary to decide the issues presented in these motions and the Court declines to accord them judicial notice. <u>See</u> <u>In re 2007 Novastar Fin., Inc., Sec. Litig.</u>, No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *1 (W.D. Mo. June 4,

---

[4]Defendants also provide the Court with documents that summarize and categorize allegations contained in the Complaint. (<u>See, e.g.</u>, Dkt. Nos. 192-2, 192-3.) The Court has conducted an independent review of the Complaint in its consideration of these motions and relies only on the language and context contained in the Complaint itself.

2008) (taking judicial notice of the fact of industry reversals but not of the impact of those reversals).

## Discussion

Plaintiffs bring this action on behalf of a putative class of individuals who purchased securities issued by Washington Mutual, Inc. ("WaMu" or "the Company")[5] or its subsidiaries during the period between October 19, 2005 and July 23, 2008 (the "Class Period"). (¶ 51.)[6] The Complaint asserts claims under §§ 10(b) and 20(a) of the 1934 Securities and Exchange Act (the "Exchange Act") and Rule 10b-5 promulgated under § 10(b), and under §§ 11, 12(a)(2) and 15 of the 1933 Securities Act (the "Securities Act"). Not counting the appendices, Plaintiffs' Complaint is nearly 400 pages long, contains over 1000 paragraphs, and includes information from 89 confidential witnesses. Plaintiffs' first claim for relief does not appear until page 306 of the Complaint and is preceded by general background allegations concerning four types of allegedly improper activity during the Class Period: (1) deliberate and secret efforts to decrease the efficacy of WaMu's risk management policies (¶¶ 103-125); (2) corruption of WaMu's appraisal process (¶¶ 126-306); (3) abandonment of appropriate underwriting standards for WaMu loans (¶¶ 307-420); and (4) misrepresentation of financial results (¶¶ 421-481).

These allegations concern WaMu's home lending business, the "driving force" of WaMu's operations. (¶ 59.) Once issued to borrowers, WaMu's home loans were either sold to third parties or maintained in WaMu's investment portfolios as Company assets. (¶ 62.) WaMu was required to maintain, report, and periodically adjust a reserve amount for probable losses resulting from these loans (the "Allowance for Loan and Lease Losses" or "Allowance"). (¶ 63.)

---

[5]Plaintiffs' claims against WaMu were automatically stayed on September 30, 2008 when the Court received notice of WaMu's voluntary bankruptcy petition in the United States Bankruptcy Court for the District of Delaware, Case No. 08-CV-12229-MFW. (See Dkt. No. 153.)

[6]All paragraph citations refer to the Complaint (Dkt. No. 67).

Plaintiffs describe a secret effort to decrease the effectiveness of WaMu's risk management group during the Class Period by relegating the group to a "customer service" role. (¶ 103.)  Without effective policies for regulation, WaMu's risk management teams were unable to prevent the practice of irresponsible, volume-driven home lending and failed to function as an independent check against credit risk, allowing the Company to engage in improper underwriting practices and appraisal corruption.  (¶¶ 105-125.)

Plaintiffs allege that WaMu improperly pressured appraisers and used only hand-picked and pre-approved appraisers to ensure inflated appraisal values for their home loans.  (¶¶ 126-28, 167-218, 154-164.)  Inflated appraisals allowed WaMu to originate loans that had artificially low loan-to-value ("LTV") ratios, creating the illusion of lower credit risk.  (¶ 127.)  The Company publicly presented its low LTV ratios as an example of its protection against potential loss even as it under-reserved for loan losses on the basis of those ratios.  (¶¶ 127-31.)

Concurrent with the appraisal inflation, WaMu loosened its underwriting standards in an effort to increase the volume of its lending operations and profit margins.  (¶¶ 65-68, 307-08.)  These less-restrictive standards, resulting in increased credit risk, were applied to WaMu's prime and subprime lending practices.  (¶¶ 312-15.)  Confidential witnesses from different levels and locations of the Company corroborate the use of deficient standards and underwriting practices, such as granting loans to borrowers with low Fair Isaac Credit Organization ("FICO") credit scores, failing to request documentation or other verification of a borrower's stated income, and underwriting adjustable rate mortgages ("ARMs") at an introductory "teaser" rate instead of the fully-indexed rate.  (¶¶ 324-375.)  In particular, WaMu's Option ARM loan, classified by WaMu as a prime loan, has a variable interest rate that is periodically adjusted over the term of the loan; when underwritten improperly, the Option ARM presents a high credit risk because of the potential for negative amortization and default.  (¶¶ 74-78.)  Plaintiffs also allege that WaMu's underwriting standards for its subprime lending became nearly nonexistent as underwriters consistently allowed exceptions to increasingly permissive standards.  (¶¶ 376-411.)  WaMu

1    actively encouraged high-risk lending by compensating loan originators for loan volume without

2    regard to quality.  (¶¶ 83-102.)

3         Generally accepted accounting principles ("GAAP") and SEC regulations required

4    WaMu to "increase the Company's provisioning for its Allowance in a manner commensurate

5    with the decreasing quality of [its] home mortgage products."  (¶ 444.)  Instead, Plaintiffs allege

6    that WaMu under-reserved for its credit risk, thereby concealing its true financial state in

7    violation of GAAP and SEC regulations.  (¶¶ 421-58.)  Plaintiffs allege that WaMu's Loan

8    Performance Risk Model ("LPRM"), used to determine provisions for the Allowance, did not

9    take into account important credit risks, such as the potential for negative amortization posed by

10   WaMu's Option ARM loans and the increased credit risk inherent in WaMu's less-restrictive

11   underwriting standards and distorted LTV ratios.  (¶¶ 456-66.)  Because the Allowance was

12   directly linked to WaMu's net income and earnings per share, WaMu effectively misstated its

13   financial results by under-provisioning the Allowance and reporting artificially inflated net

14   income in each quarter during the Class Period.  (¶¶ 467-73.)

15        The above background allegations are presented in the first 176 substantive pages of the

16   Complaint.  Plaintiffs' remaining allegations will be discussed in the appropriate section below.

17   The Court will address Defendants' challenges to each of Plaintiffs' six counts in turn.

18   **I. PLAINTIFFS' EXCHANGE ACT CLAIMS**

19   **A. Count One: Section 10(b) of the Exchange Act**

20        Section 10(b) provides, in part, that it is unlawful "to use or employ in connection with

21   the purchase or sale of any security ... any manipulative or deceptive device or contrivance in

22   contravention of such rules and regulations as the [SEC] may prescribe...."  15 U.S.C. § 78j(b).

23   Rule 10b-5 makes it unlawful for any person to use interstate commerce:

24        (a) To employ any device, scheme, or artifice to defraud,
     (b) To make any untrue statement of a material fact or to omit to state a material
25   fact necessary in order to make the statements made, in the light of the
     circumstances under which they were made, not misleading, or

26

27

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Plaintiffs bring their 10(b) claims for securities fraud against Defendants Killinger, Casey, Rotella, Cathcart, and Schneider.  To state a claim, Plaintiffs must plead six elements as to each defendant:  (1) a strong inference of scienter, (2) a material misrepresentation or omission, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 341-42, 345 (2005).

The Complaint includes over 280 pages of allegations related to these claims, including a multitude of public statements by WaMu and the Officer Defendants and descriptions of improper conduct within the Company, supported by Confidential Witnesses and expert analysis.  (Dkt. No. 67 at 29-313.)  Yet, as discussed below, Plaintiffs have failed to organize and clearly identify allegations in support of each element of the 10(b) claims against each defendant.  In its own review of the Complaint, the Court has extracted from Plaintiffs' verbose and disordered pleading the following alleged facts that may be relevant to each claim.

<u>Kerry Killinger</u>

As WaMu's Chief Executive Officer, Defendant Killinger made numerous public statements about WaMu and its practices and performance.  The Complaint identifies as false certain statements assuring investors that WaMu was using strict underwriting standards during the Class Period.  On October 19 and November 15, 2005, Killinger publicly referenced WaMu's practice of "discipline[] and vigilan[ce] in our underwriting standards" (¶ 559), and the "excellent processes, policies, underwritings, standards and reserving methodologies in place" (¶ 567).

Additionally, the Complaint alleges that Killinger made a number of false statements assuring investors that WaMu had been taking "proactive defensive actions" as early as July 2005 in an effort to strengthen WaMu's loan portfolios in preparation for the softening housing

market.  (¶¶ 603, 613, 616, 620, 629.)  On a July 18, 2007 earnings call, Killinger stated that WaMu had been "tightening underwriting" over the past two years to defend against the risks of subprime lending.  (¶ 670.)  Again, on September 10, 2007, Killinger assured investors that, over two years earlier, WaMu had begun taking "proactive steps" to prepare for a decline in housing prices, including "a series of major underwriting changes in our home loans lending guidelines."  (¶ 677.)

Plaintiffs allege that these statements were false because, beginning in 2005, the Officer Defendants began secretly undermining the quality of WaMu's underwriting standards for both prime and subprime loans by making the approval requirements less restrictive.  (¶¶ 307, 381.)  These relaxed standards allowed WaMu to approve prime and subprime loans for borrowers who presented a greater risk of default and increased the number of allowable exceptions for borrowers who did not meet the criteria for creditworthiness.  (¶¶ 376-411.)  The more lenient guidelines allowed WaMu to increase the volume of its lending but compromised the quality of the approved loans.  (Id.)

Based on information from Confidential Witness 65 ("CW 65"), a Senior Underwriter for WaMu's subprime lending operation from 2004 through April 2007, the Complaint alleges that Killinger knew of and directed the implementation of the increasingly less-restrictive underwriting guidelines used by WaMu's subprime lending group.  (¶¶ 382-83.)  CW 65 alleges that either Killinger or WaMu Chief Operating Officer Stephen Rotella "would issue internal e-mails and pre-recorded statements [once per quarter] detailing the structure of the guidelines and explaining that the company was changing the guidelines in an attempt to increase volume."  (¶ 383.)  Additionally, relying on evidence from Confidential Witness 79 ("CW 79"), who worked directly for Defendant Cathcart and assisted the Officer Defendants in their preparation for WaMu's 2006 Investor Day, the Complaint alleges that Killinger was "knowledgeable and involved in establishing and approving the Company's lending policies and guidelines."  (¶¶ 488, 495.)

<u>Thomas Casey</u>

As WaMu's Chief Financial Officer, Casey was responsible for WaMu's accounting policies and for reporting financial results. Casey signed and certified a number of financial statements that Plaintiffs allege misrepresented WaMu's financial results, and falsely stated that WaMu maintained effective internal controls and was in compliance with GAAP.[7] Casey also told investors on October 18, 2006 that, in determining the provisions for the Allowance, WaMu "look[ed] at all our loss factors and the performance of underlying portfolio [sic] and continually ma[d]e adjustments." (¶ 621.) On July 18, 2007, Casey again discussed the Company's Allowance, stating that WaMu's provisioning for credit losses "ha[d] been building for quite some time" and "our provision models and our reserving model taken [sic] into account [charge-offs over time]." (¶ 668.)

Plaintiffs allege that these statements were false because WaMu had been improperly provisioning its Allowance and therefore overstated its net income and earnings per share. (¶¶ 424-28.) Because GAAP requires that the Allowance be reported as a reduction to assets, under-provisioning the Allowance resulted in false and misleading financial statements. (¶¶ 424, 427.) Plaintiffs allege that the Company's model for estimating its credit loss, the LPRM, did not properly account for WaMu's high-risk loans (specifically the Option ARM loans), causing the Company to under-provision its Allowance and misstate its financial results. (¶¶ 452-57, 463-465.)

Confidential Witness 80 ("CW 80"), a Senior Vice President for Accounting Policy at WaMu from June 2006 until November 2007, alleges that Casey knew "that the Company's risk management and accounting standards had dangerously deteriorated, with material effects on the

---

[7]<u>See</u> WaMu's Third Quarter 2005 Form 10-Q (¶¶ 561, 563), WaMu's 2005 Form 10-K (¶¶ 578, 584), WaMu's First Quarter 2006 10-Q (¶ 596) and First Quarter 2006 Form 10-Q/A (¶ 596), WaMu's Second Quarter 2006 Form 10-Q (¶¶ 608-09), WaMu's Third Quarter 2006 Form 10-Q (¶¶ 624-25), WaMu's 2006 Form 10-K (¶¶ 638-39, 644), WaMu's First Quarter 2007 Form 10-Q (¶¶ 658-59), WaMu's Second Quarter 2007 Form 10-Q (¶¶ 672-73), WaMu's Third Quarter 2007 10-Q (¶ 703), WaMu's 2007 Form 10-K (¶ 723), and WaMu's First Quarter 2008 Form 10-Q (¶ 739).

Company's financial statements." (¶ 496.) CW 80 believed that WaMu's accounting policies were improper and disapproved of Casey's direct involvement in the reserving process because the Allowance should have been independently managed. (¶¶ 497-98.) CW 80 states that his relationship with Casey "progressively worsened due to disputes over accounting policy." (¶ 497.)

Plaintiffs also allege that Casey received a weekly risk report, and one of those reports "specifically quantified the fact that the Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines." (¶¶ 109-10 (alteration in original).) Confidential Witness 17 ("CW 17"), a Senior Vice President of WaMu's Enterprise Risk Management group from August 2001 until September 2006, (¶ 106), alleges that Casey and Defendants Rotella and Cathcart chose to "simply ignore" warnings that risk in the subprime portfolio fell outside of designated ranges, (¶ 110). CW 17 further contends that he pleaded with senior management for corrective action regarding risk in the subprime portfolio, but Casey and Cathcart "simply overruled" his requests. (¶ 111.)

Stephen Rotella

The Complaint first alleges that Chief Operating Officer ("COO") Rotella falsely assured investors on May 9, 2006 that the Company was monitoring the quality of its loan portfolio through its Enterprise Risk Management group, which gave an "independent view of how [the Company was] doing on credit risk." (¶ 595 (alteration in original).) Plaintiffs allege that this statement was false because the risk management group had been deprived of its regulatory power and existed only to support WaMu's lending practices. Relying on Confidential Witness 17 ("CW 17"), a Senior Vice President in Enterprise Risk Management, Plaintiffs allege that in late 2005 WaMu's risk management group was relegated to an advisory role only and that warnings from risk management were "very much ignored." (¶ 108.) Plaintiffs also allege that an internal WaMu memorandum dated October 31, 2005 announced that the risk management

group was to "occupy a 'customer service' type function rather than impose a 'regulatory burden' on other Company segments." (¶ 115.)

Plaintiffs also allege that Rotella knew of risk management's inability to provide effective regulation at the time he made the false statement. In early 2006 after the October 31, 2005 memo had circulated, Confidential Witness 18 ("CW 18"), a Vice President in WaMu's Commercial Risk Department from April 2003 until June 2006, communicated to Rotella his "serious concerns about WaMu's increasingly lax and inappropriate risk policies." (¶¶ 112, 116.) Rotella acknowledged the written communication. (Id.) CW 17 alleges that, during 2006, Risk Reports were distributed weekly to Rotella, and one such report "specifically quantified the fact that the Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines," which Rotella chose to "simply ignore." (¶¶ 109-10 (alteration in original).)

CW 18 and Confidential Witness 20 ("CW 20"), a Division Finance Officer and Senior Manager of Internal Controls from 2002 until December 2007, provide additional allegations that Rotella knew the true nature of risk management's role at WaMu during the Class Period. (¶ 121.) The Complaint alleges that Rotella restructured the credit risk reporting responsibilities such that, as President and COO, Rotella himself "was charged with managing both loan production and risk management," which "[gave] control over the Company's profits and for the Company's risk management to the same person...." (Id.)

Second, the Complaint alleges that Rotella made false and misleading statements about WaMu's underwriting standards. Rotella told investors on April 17, 2007 that "[WaMu] ha[s] ... since the beginning of last year been tightening credit in [our subprime lending]." (¶ 656.) Plaintiffs allege that this statement is false because, since 2005, WaMu had been secretly undermining the quality of its underwriting standards for both prime and subprime loans by making the approval guidelines less restrictive. (¶¶ 307, 381.)

Relying on Confidential Witness 65 ("CW 65"), a Senior Underwriter for WaMu's subprime channel from 2004 through April 2007, the Complaint alleges that Rotella knew of and

directed the revision of guidelines in WaMu's subprime lending group. (¶¶ 382-83.) CW 65 alleges that Rotella or Killinger "would issue internal e-mails and pre-recorded statements [once per quarter] detailing the structure of the guidelines and explaining that the company was changing the guidelines in an attempt to increase volume." (¶ 383.) Additionally, relying on evidence from CW 79, who worked directly for Defendant Cathcart and assisted the Officer Defendants in their preparation for WaMu's 2006 Investor Day, the Complaint alleges that Rotella was "knowledgeable and involved in establishing and approving the Company's lending policies and guidelines." (¶¶ 488, 495.)

Plaintiffs also allege that WaMu achieved greater volume in lending by tying compensation for loan staff to loan quantity, not quality. (See ¶¶ 412-17.) CW18 asserts that "Rotella certainly was aware of, if not taking an active role in, decisions made to compensate WaMu employees based on loan volume without regard to credit quality." (¶ 417.)

### Ronald Cathcart

From the fourth quarter of 2005, Cathcart was the head of WaMu's Enterprise Risk Management group. (¶ 104.) Plaintiffs identify as false a series of statements Cathcart made in September 2006 regarding WaMu's Option ARM loan product. (¶ 322.) Cathcart told investors that WaMu's Option ARM loan product was "not made available to subprime borrowers" and the Option ARM portfolio had a weighted average FICO score of 708. (¶ 322.) Cathcart assured investors that the Option ARM portfolio quality was "very sound" and WaMu was "comfortable with this portfolio" because "at origination, WaMu focuses on an effective underwriting process and borrower disclosures...." (¶¶ 366, 612.) Cathcart also explained that, "[e]ven after maximum negative amortization and with no home price appreciation, the [Option ARM] portfolio should remain well secured and the borrower should have sufficient equity to refinance, should they choose to do so." (¶ 612.) Plaintiffs allege that these statements were false and misleading because WaMu was offering the Option ARM loan products to potentially

subprime borrowers with a FICO score as low as 540, and would underwrite the loans at the low introductory "teaser" rate instead of the loan's fully-indexed rate. (¶¶ 78, 83, 309, 323-24, 326.)

The Complaint describes Cathcart's role in the risk management group. Plaintiffs allege that, under Cathcart's leadership, WaMu "secretly discontinued appropriate risk management practices during the Class Period." (¶ 105.) According to CW 17, Senior Vice President of WaMu's Enterprise Risk Management group from August 2001 until September 2006, Cathcart restructured WaMu's risk management group such that its role "was supposed to be 'advisory' only" and the group no longer guarded against the credit risk of WaMu's lending practices. (¶ 108.)

The Complaint also alleges that Cathcart received a Risk Report in 2006 advising that "the Company was exceeding certain risk parameters as dictated by [WaMu's] risk guidelines," which Cathcart chose to "simply ignore." (¶¶ 109-110 (alteration in original).) CW 17 claims that Cathcart and Defendant Casey "simply overruled" CW 17's requests for corrective action regarding the Company's analysis of risk in the subprime portfolio. (¶ 111.) WaMu's Option ARM loans were considered a product of their prime lending business. (¶ 322.) According to Confidential Witness 19 ("CW 19"), a Senior Vice President and Compliance Manager at WaMu from 1997 to 2007, a Senior Compliance Officer from the Home Loans Group discussed with Cathcart and Schneider at weekly staff meetings "issues" concerning compliance and credit risk deficiencies, but Cathcart never acted on the issues presented. (¶ 120.)

David Schneider

Defendant David Schneider was President of the Home Loans Group during the Class Period. (¶ 25.) Plaintiffs identify as false Schneider's November 2005 comments labeling WaMu's risk management processes "effective" and "a top priority" and referencing WaMu's "tighten[ed] underwriting guidelines primarily around the investor property...." (¶¶ 567-68.) In September 2006 and November 2007, Schneider told investors that WaMu had appropriately reserved for subprime payment defaults, ( ¶ 378), and had tightened underwriting guidelines,

(¶¶ 613, 699), such that WaMu had "a 17 percentage point reduction in loans with LTVs higher than 80," (¶ 699).

The Complaint states that Defendant Schneider "had extensive control over risk management with the Home Loans Group." (¶ 121.) Plaintiffs allege that a Senior Compliance Officer from the Home Loans Group discussed with Schneider "issues" concerning compliance and credit risk deficiencies. (¶ 120.) Plaintiffs also allege that Schneider and his management team "were particularly focused on preserving [the subprime lending group's] growth" because it was WaMu's "golden child[.]" (¶ 380.)

### 1. Falsity and Scienter

Defendants argue that the 10(b) claims should be dismissed because the Complaint fails to allege a false or misleading statement and particularized facts giving rise to a strong inference of scienter. Because a 10(b) claim alleges fraud, Plaintiffs must plead with particularity "the circumstances constituting the fraud ...." Fed. R. Civ. P. 9(b). Additionally, under the Private Securities Litigation Reform Act ("PSLRA"), a plaintiff alleging securities fraud must "plead with particularity both falsity and scienter." In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084 (9th Cir. 2002) (citing Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)). The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b). The required state of mind is scienter, defined as "deliberate ... reckless[ness] or conscious misconduct." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).

The facts alleged in a complaint will give rise to a strong inference of scienter when the inference is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues and Rights, Ltd., 551 U.S. 308, 314 (2007). In evaluating whether the pleading supports a strong

inference of scienter, the Court must consider its allegations holistically, and "[v]ague or ambiguous allegations are properly considered as a part of a holistic review." South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008). Plaintiffs must plead specific allegations as to each defendant's state of mind. See Rudolph v. UTStarcom, 560 F. Supp. 2d 880, 891 (N.D. Cal. 2008) ("[P]laintiff must plead facts showing that each individual defendant acted with scienter....").

The Court's scienter analysis necessarily accompanies a review of the alleged false or misleading statements, because Plaintiffs must "adequately plead scienter in connection with those statements." New York State Teachers' Retirement Sys. v. Fremont Gen. Corp., No. 2:07-cv-05756-FMC-FFMx, 2008 WL 4812021, at *5 (C.D. Cal. Oct. 28, 2008). Indeed, the Ninth Circuit has observed that, because falsity and scienter "are generally strongly inferred from the same set of facts, ... the two requirements may be combined into a unitary inquiry under the PSLRA." In re Daou Sys., Inc., 411 F.3d 1006, 1016 (9th Cir. 2005) (internal quotation marks omitted). Therefore, to succeed at this stage of the 10(b) analysis, Plaintiffs' Complaint must set forth the following elements with particularity: (1) identification of a false or misleading statement made by each defendant; (2) allegations as to why that statement was false or misleading; and (3) allegations giving rise to a strong inference that, at the time the statement was made, the defendant knew the statement was false or misleading or was deliberately reckless as to the statement's falsity or misleading nature.

Plaintiffs' allegations concerning these elements are spread disjointedly throughout nearly 250 pages of the Complaint. (Dkt. No. 67 at 29-276.) Instead of addressing each defendant individually as the Court has done above, Plaintiffs organize their allegations in three broad sections, including a general section comprised of 150 pages of background allegations entitled "Factual Background and Substantive Allegations" (Dkt. No. 67 at 29-183), a section entitled "Additional Allegations Confirming the Officer Defendants' Scienter" (Dkt. No. 67 at 183-218), and a third entitled "Defendants' Materially Misleading Omissions and False

Statements" (Dkt. No. 67 at 218-276). Although each of these sections includes subheadings and internal organization, the structure primarily follows a narrative timeline and never offers a cohesive presentation of the required elements for securities fraud for each defendant.

Plaintiffs' first claim for relief, the 10(b) claim, finally appears on page 306 of the Complaint, stating, "Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein." (¶ 768.) This section does not contain a single paragraph reference to any of the preceding allegations and primarily speaks of the Officer Defendants as a group. Remarkably, Plaintiffs make no effort to connect a particular statement made by any defendant with allegations as to why that statement was false or misleading or with allegations of facts giving rise to a strong inference of scienter.

The heightened pleading standards applicable to a claim for securities fraud under Rule 9(b) and the PSLRA do not obviate a plaintiff's responsibility "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (alterations omitted). Instead, the heightened pleading standards serve to enhance this purpose by requiring that a plaintiff set forth the grounds for his claim with particularity. Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b). Plaintiffs' Complaint fails to meet this standard because it contains a number of structural deficiencies. The first 300 pages of the Complaint fail to organize and identify the allegations supporting securities fraud as to each defendant, contain no useful cross-references or paragraph citations to connect the relevant allegations, and appear to include numerous irrelevant allegations, thereby depriving Defendants of proper notice of the grounds for the 10(b) claims against them.

In evaluating the sufficiency of falsity and scienter allegations required for securities fraud claims, "courts have repeatedly lamented plaintiffs' counsels' tendency to place the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims." Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) (internal quotation marks, citations, and alterations omitted)

(gathering cases). The Ninth Circuit has described such "puzzle pleading" as "cumbersome almost to the point of abusiveness." <u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1554 (9th Cir. 1994). Here, Plaintiffs have left it to Defendants and the Court to piece together: (1) the allegedly false statements; (2) allegations as to why those statements are false or misleading; and (3) allegations of scienter.

In response to Defendants' challenges, Plaintiffs' counsel failed to address these structural deficiencies in their 150-page response brief. (Dkt. No. 229.) Instead, Plaintiffs' response brief mirrors the structure of the Complaint and generally discusses allegations against the Officer Defendants as a whole, forcing the reader to mine its pages for reference to the elements of securities fraud alleged against the individual defendants. (<u>See</u> <u>id.</u> at 79-122.) Having discovered from the Complaint and Plaintiffs' response brief that the 10(b) claims lacked cohesion, the Court specifically directed Plaintiffs' counsel to answer the following inquiry at oral argument:

> Addressing the Officer Defendants individually, identify each alleged misleading statement made by the defendant and <u>connect</u> each statement to specific allegations showing that the defendant knew the statement was false or was deliberately reckless as to its falsity at the time the statement was made.

(<u>See</u> Draft Transcript of Oral Arg., May 1, 2009 at 45-46, 56 (referring to the Court's April 29, 2009 email to the parties).) Despite receiving this directive two days in advance, Plaintiffs' counsel failed to prepare a response. Instead, when the Court suggested that Plaintiffs' counsel address the inquiry with specific references to the Complaint, he indicated that the relevant allegations were too numerous to identify even in three hours of argument.[8] (<u>Id.</u> at 56-57.)

---

[8]Plaintiffs' counsel stated:

> I can't produce [the information] in minutes. I can't produce it in a day, but I can produce it in a week or so. Something like that. Or less. But thereabouts. But the chart will be long. Because the number of statements is long. The number of factual bases are numerous. I can give you an example of what it would contain if that's helpful. But if I try to go through this, I won't even finish it this morning because there's so many statements and so many allegations. ... [T]hree hours wouldn't even

The Court remains mystified at counsel's failure to allege cohesive claims, submit helpful briefing, or prepare a response to the Court's inquiry in advance of oral argument. Plaintiffs' counsel cannot expect the Court to engage in the necessary analysis when counsel is not prepared to do so. Attorneys from Bernstein Litowitz Berger & Grossman LLP serve as lead counsel for Plaintiffs "subject to the approval of the Court." 15 U.S.C. § 78u-4(a)(3)(B); see Dkt. No. 24. If Plaintiffs' counsel are unable to rectify the problems identified in this Order when they file an amended complaint, the Court may be obligated to review whether counsel can adequately represent the proposed class. See Armbruster v. Cellcyte Genetics Corp., No. 08-0047RSL, 2008 WL 1929903, at *2 (W.D. Wash., Apr. 28, 2008) ( "The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the district court.").

Further, Plaintiffs' counsel's position that the Complaint contains an overwhelming number of relevant allegations only serves to underscore the need for proper structural organization and coherent pleading. Although the Complaint must be reviewed as a whole to determine its sufficiency, see South Ferry, 542 F.3d at 784, the "holistic review" standard set forth in Tellabs does not relieve Plaintiffs of their responsibility to put Defendants on notice of the claims against them and the grounds for those claims, see Twombly, 550 U.S. at 555. In light of Plaintiffs' failure to provide such notice, the Court orders Plaintiffs to submit a more definite statement in an amended complaint. See Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1275 (11th Cir. 2006) (finding that district courts must "sua sponte order re-pleading pursuant to Federal Rule of Civil Procedure 12(e) when a ... complaint fails to adequately link a cause of action to its factual predicates").

---

... cut it for the number of statements at issue in this case.

(Draft Transcript of Oral Arg., May 1, 2009 at 56-57.) Later in his argument, Plaintiffs' counsel was able to provide an example of an integrated set of 10(b) allegations against Defendant Casey, citing the relevant portions of the Complaint. (Id. at 75-78.)

**B. Counts Two and Three: Section 20(a) of the Exchange Act**

Defendants Killinger, Casey, Rotella, Cathcart, Schneider, Woods, and Ballenger concede that, if a primary violation is stated under Section 10(b), the control person claims against them must also survive. (See Draft Transcript of Oral Arg., May 1, 2009 at 2-3.)

The Court will consider the Section 20(a) claims for control person liability against the Outside Director Defendants after Plaintiffs file an amended complaint.

**II. PLAINTIFFS' SECURITIES ACT CLAIMS**

**A. Pleading Standard**

Rule 8(a) of the Federal Rules of Civil Procedure prescribes a notice-pleading standard for reviewing the sufficiency of a complaint, requiring "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. When dealing with allegations of fraud, Rule 9(b) imposes a heightened standard, requiring that "the circumstances constituting fraud or mistake ... be stated with particularity." Fed. R. Civ. P. 9(b). Under Rule 9(b), a plaintiff must plead his claim with "particularized allegations of the circumstances constituting fraud," which may include "[t]he time, place, and content of an alleged misrepresentation" in addition to "the circumstances indicating falseness." In re GlenFed, 42 F.3d at 1547-48. Ultimately, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false." Id. at 1548.

Although Plaintiffs plead their Securities Act claims under a theory of negligence, these claims will be held to the Rule 9(b) standard if the Complaint sounds in fraud or "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." In re Daou, 411 F.3d at 1027 (quoting Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1102 (9th Cir. Cal. 2003)). Rule 9(b) was enacted to protect the reputation of a defendant accused of engaging in fraudulent conduct, to minimize strike suits, and to provide detailed notice of a fraud claim. See In re Gilead, 536 F.3d at 1056; In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1405 (9th Cir. 1996). These goals would be thwarted if the Court were to apply the

more liberal pleading standard of Rule 8(a) to negligence allegations that are premised on the same conduct underlying Plaintiffs' fraud allegations.

Thus, "a § 11 or § 12(a)(2) claim must be plead with particularity when the facts underlying the misrepresentation at stake in the claim are said to be part of a fraud claim, as alleged elsewhere in the complaint." Wagner, 464 F.3d at 1278. The Section 11 claims against two of the Officer Defendants, Killinger and Casey, allege misrepresentations regarding much of the same conduct, identified by the Court above in Section I.A., forming the basis of Plaintiffs' fraud claims against them under the Exchange Act. Therefore, the Section 11 claims against Defendants Killinger and Casey necessarily allege fraudulent conduct and are subject to the heightened pleading requirement of Rule 9(b). However, because it is possible for a defendant to participate in the dissemination of fraudulent statements without awareness of the actual fraud, Rule 9(b) applies only to those defendants also accused in the underlying fraud. In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d at 1163 (stating that "it eviscerates § 11 to give all defendants Rule 9(b) protection when: (1) only certain defendants are expressly alleged to act fraudulently; (2) a complaint specifies unique, particularized facts as to those defendants; and (3) the particularized facts raise a scienter inference as to those defendants, but not all"). In this action, Defendants Killinger and Casey are the only parties charged with securities fraud in addition to the non-fraud claims under the Securities Act, and they alone receive 9(b) protection.[9]

The notice-pleading standard of Rule 8(a) applies to Plaintiffs' claims under Section 15 of the Securities Act. Because claims based on control person liability do not directly touch on circumstances that constitute fraud, Rule 9(b) does not apply to Plaintiffs' claims of control

---

[9]The Court is unpersuaded by Deloitte's argument that Plaintiffs' use of the verb "disregard" to characterize Deloitte's behavior constitutes an intimation of fraud. (Dkt. No. 189 at 20; Draft Transcript of Oral Arg., May 1, 2009 at 36.) Deloitte offers no compelling authority that "disregard" is a "word[ or] imputation[] ... classically associated with fraud" and the Court applies the Rule 8(a) standard to the claim against Deloitte. (Dkt. No. 189 at 20.)

person liability in Count Six.  See Siemers v. Wells Fargo and Co., No. 05-04518, 2006 WL 2355411, at *14 (N.D. Cal. Aug. 14, 2006) ("[Control] is not a circumstance that constitutes fraud.  Plaintiff is only required to assert fraud with particularity as to the primary violations.  At the control-person level, liability exists irrespective of the control person's scienter.") (citation omitted).

**B.  Standing**

A plaintiff class derives its standing from the standing of its named plaintiffs.  Congregation of Ezra Sholom v. Blockbuster, Inc., 504 F. Supp. 2d 151, 160 (N.D. Tex. 2007).  Section 11 grants standing to "any person acquiring [a] security" pursuant to a registration statement that misstates or omits a material fact.  15 U.S.C. § 77k(a).  A named plaintiff has Section 11 standing only as to the registration statement or statements that governed his purchase of securities.  Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1080 (9th Cir. 1999).  Similarly, a named plaintiff has standing under Section 12, 15 U.S.C. § 77l, only as to the prospectus or prospectuses governing his purchase.  J and R Marketing, SEP v. General Motors Corp., 549 F.3d 384, 389 (6th Cir. 2008) ("Because ... causes of action [under Section 11 and Section 12(a)(2)] are tied to an offering document or oral communication, only those who acquired securities in the offering to which the document or oral communication pertains have standing to sue.").

Plaintiffs allege misrepresentations in documents accompanying four offerings of WaMu securities.  (¶¶ 817-18.)  These offerings occurred in August 2006, September 2006, October 2007, and December 2007.  (¶ 817.)  The named plaintiff, Brockton, only purchased WaMu securities pursuant to the October 2007 Offering Documents, (¶ 14), and the plaintiff class currently has Section 11 standing as to the October 2007 offering only.  Plaintiffs claim that they can designate additional named plaintiffs to obtain standing as to the other three offerings, and are directed to amend their Complaint accordingly.

At present, the Court is limited to a review on the merits of the only offering for which Plaintiffs have standing, the October 2007 offering. The Court cannot consider the sufficiency of the Securities Act claims related to the August 2006, September 2006, and December 2007 offerings unless Plaintiffs are able to establish standing for those claims in an amended complaint.[10]

**C. Count Four: Section 11 of the Securities Act**

Plaintiffs bring their Section 11 claims against: (1) Officer Defendants Killinger, Casey, and Woods; (2) the Outside Director Defendants; (3) Deloitte; and (4) the Underwriter Defendants.

Section 11 creates a private remedy for any purchaser of a security if "any part of the registration statement … contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]" 15 U.S.C. § 77k(a). The claim "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Herman and MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).

To succeed on their Section 11 claims, Plaintiffs must demonstrate that: (1) the registration statement contained an omission or misstatement; and (2) the omission or misstatement would have misled a reasonable investor about the nature of his investment. In re Daou, 411 F.3d at 1028. To meet the heightened pleading requirement of Rule 9(b), Plaintiffs must "set forth an explanation as to why the statement or omission complained of was false or misleading." In re GlenFed, 42 F.3d at 1548.

---

[10]The Complaint's current allegations regarding the August 2006, September 2006, and December 2007 offerings are identical or substantially similar to those regarding the October 2007 offering.

1        1. <u>Alleged Misrepresentations</u>

2        Plaintiffs allege actionable misrepresentations concerning three areas of WaMu's lending

3    practices:  underwriting standards, internal controls, and reserves for anticipated loan losses (as

4    reflected in WaMu's financial statements).  The Section 11 claims based on these

5    misrepresentations survive dismissal and may proceed against Officer Defendants Killinger,

6    Casey, and Woods, the Outside Director Defendants,[11] and the Underwriter Defendants.  As

7    WaMu's auditor, Defendant Deloitte can be held liable for material misrepresentations by WaMu

8    that appear in those portions of the Offering Documents that Deloitte certified.  <u>Monroe v.</u>

9    <u>Hughes</u>, 31 F.3d 772, 774 (9th Cir. 1994).  Deloitte certified the financial statements

10   incorporated in the October 2007 Offering Documents, (¶¶ 946-47), and portions of the October

11   2007 Offering Documents pertaining to WaMu's internal controls, (¶¶ 949-53).  The Section 11

12   claims concerning financial statements and internal controls survive dismissal and may proceed

13   against Deloitte.

14       a. <u>Underwriting Standards</u>

15       Plaintiffs allege that the October 2007 Offering Documents contain this or a substantially

16   similar statement:  "The Company ... ensure[s] compliance with its underwriting standards" to

17   mitigate and manage credit risk.  (¶¶ 909, 933.)  Plaintiffs assert that this statement is "materially

18   false and misleading because the Company was, in fact, lowering its underwriting standards and

19   issuing loans that were increasingly unlikely to be repaid."  (¶935.)  Plaintiffs allege that WaMu

20   employed "extremely loose underwriting guidelines" to which it "routinely allowed exceptions

21   ...."  (¶ 877.)  Plaintiffs further assert that exceptions to the underwriting guidelines were "part

22   of the norm[,]" (¶ 878), and "[t]here were really no restrictions to approve a loan[,]" (¶ 880).

---

24       [11]The Outside Director Defendants argue that their signatures on the WaMu Offering
     Documents and their participation in WaMu Board committees are insufficient to expose them to
25   Section 11 liability.  However, they erroneously invoke the standard for "group pleading liability,"
     relevant only to fraud allegations subject to the heightened pleading standard under Rule 9(b).  The
26   Securities Act claims against the Outside Director Defendants are subject to the pleading standard
     set forth in Rule 8(a).

27

These allegations contradict WaMu's representation that it was mitigating credit risk through compliance with its underwriting standards, and indicate that WaMu was instead increasing credit risk by loosening and ignoring its underwriting standards.

Plaintiffs' allegations sufficiently "set forth what is false or misleading about [the] statement, and why it is false." In re GlenFed, 42 F.3d at 1548. Such disregard of underwriting standards, where the exceptions nearly swallow the rules, is tantamount to abandoning those standards. See In re Countrywide, 588 F. Supp. 2d at 1145-46 (finding that drastic changes in underwriting standards constituted a "loosen[ing of] underwriting guidelines to the point of nearly abandoning them"). If WaMu's lending environment was fraught with such extreme departure from any plausible conception of "standards," a statement that the Company followed underwriting standards to manage or mitigate credit risk would mislead a reasonable investor. See id. at 1153 (holding that misstatements about underwriting standards and quality are actionably misleading in the case of extreme departures "from any reasonable interpretation of 'quality' and 'standards'"). Plaintiffs describe with sufficient particularity the misleading nature of the statement and state a Section 11 claim for relief.

> b. Internal Controls

Plaintiffs allege that the October 2007 Offering Documents contain these or substantially similar statements by WaMu: (1) "[M]anagement believes that ... the Company maintained effective internal control over financial reporting[,]" (¶¶ 924, 949); and (2) "Management reviews and evaluates the design and effectiveness of the Company's internal control over financial reporting on an ongoing basis ... and changes its internal control over financial reporting as needed to maintain their effectiveness, correcting any deficiencies, as needed, in order to ensure the continued effectiveness of the Company's internal controls[,]" (¶¶ 925, 950). Plaintiffs also allege that the October 2007 Offering Documents include this or a substantially similar statement by Deloitte: "[I]n our opinion, the Company maintained, in all material respects, effective internal control over financial reporting ...." (¶¶ 927, 951.)

Under recent Ninth Circuit law, statements of opinion are actionable under Section 11 "only if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading." Rubke v. Capitol Bancorp Ltd, 551 F.3d 1156 (9th Cir. 2009). Plaintiffs present two opinion statements in support of their Section 11 claims: (1) the statement as to management's belief about WaMu's internal controls, (¶¶ 924, 949); and (2) the statement of Deloitte's opinion regarding internal controls, (¶¶ 927, 951). The Court need not address whether these statements meet the Rubke standard because Plaintiffs also plead an actionable non-opinion statement: Plaintiffs allege that Defendants misrepresented in the October 2007 Offering Documents that WaMu periodically adjusts its internal controls to maintain their effectiveness. (¶¶ 925, 950.)

The Complaint alleges this statement was false because the Company's Loan Performance Risk Model ("LPRM"), "the key model used by the Company to predict losses," failed to account for the high credit risk presented by WaMu's Option ARM loans and other loans allowing for negative amortization. (¶¶ 860-61.) Relying on CW 78, Plaintiffs assert that, "as of summer 2007, the LPRM had not been calibrated to reflect actual loan performance data for over *eighteen months*." (¶ 862 (emphasis in original).) In addition, Plaintiffs contend that Defendants not only neglected to review the effectiveness of WaMu's internal control, but also intentionally decreased the effectiveness of WaMu's risk management group during the Class Period, assigning risk management personnel a "secondary 'support' role to loan production[.]" (¶ 859.) In removing controls against risky lending, WaMu allowed a single officer to occupy two roles with conflicting purposes, as the supervisor of both the risk management personnel and the home lending operations. (Id.)

Misstatements about the adequacy of internal controls are actionable. In re New Century, 588 F. Supp. 2d at 1226. The allegations described above explain with particularity why the alleged misrepresentation concerning internal controls in WaMu's October 2007 Offering Documents was both false and misleading. See In re GlenFed, 42 F.3d at 1548. WaMu's

representation that it continually updated its internal controls to maintain their effectiveness is specifically contradicted by allegations that the Company intentionally decreased the regulatory power of the risk management group during the Class Period and failed to update its systems for predicting credit risk. (¶¶ 859-61.) Plaintiffs have stated a claim for relief under Section 11 against all Securities Act Defendants.

### c. Financial Statements

Plaintiffs allege that WaMu misstated its financial results in its October 2007 Offering Documents by under-provisioning its Allowance and overstating its net income and earnings per share. (¶¶ 892, 941-42.) GAAP and SEC guidelines required WaMu to provision for the Allowance at a rate commensurate with the Company's increasing credit risk. (¶¶ 887-88.) Yet Plaintiffs allege that WaMu failed to account for its practices of appraisal inflation, deficient underwriting, and ineffective internal controls when determining provisions for the Allowance, thereby misstating the Company's financial results. (¶¶ 886-892.) Although Allowance provisioning requires some exercise of judgment, allegations of misstatements regarding loan loss reserves are actionable under the Exchange Act. In re Wells Fargo Sec. Litig., 12 F.3d 922, 926 (9th Cir. 1993) ("There is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws."). It follows that such allegations are also actionable under the more permissive pleading standards of the Securities Act. See Herman and MacLean, 459 U.S. at 382 (summarizing the similarities between Section 11 and Section 10(b) claims and stating that 10(b) "requires a plaintiff to carry a heavier burden to establish a cause of action").

Plaintiffs meet the Rule 9(b) heightened pleading standard. Plaintiffs quantify the alleged misstatements in the October 2007 Offering Documents. They assert that WaMu under-provisioned its Allowance by over 40% in 2006, by at least 63% in the first quarter of 2007, and by at least 56% in the second quarter of 2007. (¶¶ 937-38, 941-42.) Plaintiffs allege overstatements of net income of at least 10%, 21%, and 32% for those periods, respectively.

(¶¶ 941–42.)  In re Daou, 411 F.3d at 1016-17 (finding that the approximate amount of financial misstatement is one of several facts that a plaintiff might plead to meet the requirements of Rule 9(b)).  In addition, Plaintiffs explain how the loan-related misconduct alleged throughout the Complaint caused the financial misstatements, providing a time-frame of the misconduct.  (¶¶ 886-92.)  Plaintiffs also name the Officer Defendants allegedly responsible for the conduct leading to the understatement of the Allowance.  See supra Section I.A.  In sum, these allegations adequately identify with particularity "the circumstances of the alleged fraud" resulting in the financial misstatements.  Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997).

> ### 2. Negative Causation

Loss causation is the "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss."  Dura Pharm., 544 U.S. at 342 (citation omitted).  Under Section 11, loss causation is an affirmative defense on which Defendants bear the burden of proof.  In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1422 (9th Cir. 1994).  Defendants argue that they have established negative causation – the absence of loss causation – meriting dismissal pursuant to Rule 12(b)(6).  This argument fails because "the complaint alleges facts that, if taken as true, plausibly establish loss causation."  In re Gilead, 536 F.3d at 1057 (reviewing loss causation allegations supporting a claim for securities fraud under 10(b)).

Plaintiffs allege that a series of public disclosures, beginning in October of 2007 and continuing until July of 2008, gradually and incrementally revealed previously undisclosed facts about WaMu's true financial condition.  (¶¶ 687-753.)  Plaintiffs further allege that the price of WaMu stock fell after each of these disclosures, and that the disclosures caused the drop in price by revealing information previously concealed by Defendants through their misrepresentations.  (Id.)  No single disclosure laid bare the full extent of WaMu's misstatements and omissions, and WaMu occasionally slowed the process by making new misrepresentations.  (Id.)

Because "the complaint on its face does not foreclose the possibility that defendants caused plaintiffs' losses," Defendants have not established negative causation.  In re Portal

Software, Inc. Sec. Litig., No. C-03-5138 VRW, 2006 WL 2385250, at *3-4 (N.D. Cal. Aug. 17, 2006).  Defendants argue that loss causation does not exist because the recent downturn in the housing market, not any disclosure regarding WaMu's financial health, caused WaMu's stock price to plummet.  However, Plaintiff is not required to show that WaMu's misrepresentations were the only cause of the stock decline.  In re Daou, 411 F.3d at 1025.  Although the market downturn may have affected WaMu stock prices, this does not foreclose the possibility that the alleged disclosures had an impact as well.

Deloitte additionally argues that the alleged disclosures did not expressly acknowledge under-provisioning of WaMu's loan loss Allowance, but this argument is unavailing.  Loss causation requires that the drop in WaMu stock price be "causally related" to WaMu's misrepresentations.  Id. at 1026.  A disclosure need not explicitly correct the prior misrepresentation.  If a disclosure reveals adverse information about WaMu's financial health that the misrepresentation had concealed, and this causes a drop in stock price, then the misstatement and the stock decline are causally related and loss causation exists.  See id. (drop in stock price was causally related to misrepresentations when drops followed revelations of company's true financial health, which improper revenue recognition had eroded).  Because Plaintiffs have sufficiently plead this causal connection, Defendants' motions to dismiss on the basis of negative causation must be denied.

**D.  Count Five: Section 12(a)(2) of the Securities Act**

Section 12(a)(2) of the Securities Act allows a person who purchased a security on the basis of a prospectus that included a material misstatement or omission to seek rescission of the transaction.  15 U.S.C. § 77*l*(a)(2).  Plaintiffs bring Section 12(a)(2) claims against the Underwriter Defendants.  As discussed above, Plaintiffs have adequately plead with particularity material misrepresentations pertaining to WaMu's underwriting standards, internal controls, and

loan loss reserves.[12]  Because Plaintiffs allege the same misstatements in the relevant prospectuses, Plaintiffs have satisfied the first element of their Section 12(a)(2) claims.

In addition, Plaintiffs must also plead that Defendants were sellers of the securities, and that Plaintiffs purchased the securities from Defendants.  In re Daou, 411 F.3d at 1028-29.  A "seller" is someone:  (1) who passes title to the securities; or (2) who solicits the sale of securities to serve his own financial interest or the financial interest of the securities' owner.  Pinter v. Dahl, 486 U.S. 622, 647-50 (1988).  Plaintiffs adequately allege that "the Underwriter Defendants, through public offerings, solicited and sold WaMu securities to members of the Class."  (¶ 992.)

The Complaint does not explicitly state that Plaintiffs purchased securities directly from any particular Underwriter Defendant, stating only that "Brockton purchased WaMu's 7.250% subordinated notes ... on the [October 2007 Offering]."  (¶ 14.)  However, Plaintiffs need not allege "which underwriter sold securities to each plaintiff" to state a claim under Section 12(a)(2).  In re DDi Corp. Sec. Litig., CV 03-7063 NM, 2005 WL 3090882, at *20 (C.D. Cal. July 21, 2005) (internal quotation marks omitted).  Plaintiffs have adequately stated Section 12(a)(2) claims against the Underwriter Defendants.

**E.  Count Six: Section 15 of the Securities Act**

Under Section 15 of the Securities Act, "[e]very person who ... controls any person liable under [Section 11 or Section 12 of the Securities Act] shall also be liable jointly and severally with and to the same extent as such controlled person...."  15 U.S.C. § 77o.  Plaintiffs bring control person claims under Section 15 against the Outside Director Defendants and against Officer Defendants Killinger and Casey.

To state a claim for control person liability, Plaintiffs must allege: (1) a primary violation of the securities laws; and (2) that the defendant exercised "control" over the primary violator.

---

[12]Plaintiffs' Section 12(a)(2) claims do not sound in fraud and need not satisfy Rule 9(b)'s heightened pleading standard.  See supra II.A.

Howard v. Everex Sys., 228 F.3d 1057, 1065 (9th Cir. 2000).  The SEC has defined "control" as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.

As discussed in Section II.C., Plaintiffs have sufficiently stated primary violations of Section 11 as to the October 2007 Offering.  Plaintiffs now allege that Defendants Killinger, Casey, and the Outside Director Defendants exercised control over WaMu.  Even though the claims against WaMu are currently stayed, Plaintiffs may state Section 15 claims against these defendants by establishing that they were control persons of WaMu.  See S.E.C. v. Hawk, No. 03:05-CV-00172-LRH-VPC, 2007 WL 2257321, at *3 (D. Nev. Aug. 3, 2007) ("[T]he majority of courts to address the issue have concluded that it is not necessary to join the primary violator in an action against a control person.").

Plaintiffs assert that the Outside Director Defendants controlled WaMu by signing the Offering Documents, (¶ 1003), serving on the Board, (¶¶ 1001, 1003), and participating in the Board's Audit Committee and/or Finance Committee, (¶¶ 30-40).  Plaintiffs successfully state a claim for control person liability against all Outside Director Defendants by alleging that, in a 2008 SEC filing, WaMu stated that "our entire board are and have been actively engaged in formulating and overseeing management's implementation of risk management policies." (¶ 810.)  Bare allegations of Outside Director status are not sufficient to establish control person liability, Arthur's Children's Trust v. Keim, 994 F.2d 1390, 1397 (9th Cir. 1993), but Plaintiffs' allegation goes beyond this to affirmatively link board membership to WaMu's primary violations.

In addition, every Outside Director Defendant except Stever and Wood served on the Audit Committee, the Finance Committee, or both.  (¶¶ 30-40.)  The Audit Committee reviewed "the adequacy of internal controls[,]" (¶ 802), and discussed "significant risk exposures ... and ... the steps that management has taken to monitor and control such exposures[,]" (¶ 803).  The

Finance Committee "approved and monitored the administration of policies addressing the Company's allocation of capital and the Company's management of market and credit risk ...." (¶ 806.) These responsibilities are related to the alleged primary violations. In conjunction with Board membership, committee-related responsibilities such as those alleged would establish control person status. See Fouad v. Isilon Sys., Inc., No. C07-1764 MJP, 2008 WL 5412397, at *10 (W.D. Wash. Dec. 29, 2008) (finding control person status when outside directors also served on committees related to primary violation).

Defendants Killinger and Casey do not challenge their status as control persons, and all Plaintiffs' Section 15 claims survive Defendants' motions to dismiss in their entirety.

**Conclusion**

Having determined that Plaintiffs have not met the required pleading standard for their Exchange Act claims, the Court ORDERS re-pleading of Counts One, Two and Three. Plaintiffs are directed to file an amended complaint with a more definite statement of the grounds for their claims. In the claims for securities fraud, the amended complaint must connect, for each defendant, the alleged statements made, why the statements were false or misleading, and facts giving rise to a strong inference of scienter.

Because Plaintiffs sufficiently plead the elements of their Securities Act claims as to the October 2007 securities offering only, Defendants' motions to dismiss Counts Four, Five and Six are DENIED as to that offering, and GRANTED as to the August 2006, September 2006, and December 2007 securities offerings. If Plaintiffs intend to proceed with Securities Act claims based on WaMu's August 2006, September 2006, and December 2007 securities offerings, they must name additional plaintiffs with standing for those claims.

1      Plaintiffs' amended complaint must be filed by Monday, June 15, 2009. Defendants must

2 bring any motions challenging the amended complaint by Friday, July 17, 2009. Plaintiffs must

3 file separate responses to any motions, not an omnibus response. The parties must meet the

4 briefing schedule and page-limit standards set forth in Local Civil Rules 7(d) and 7(e).

5      The clerk is directed to send a copy of this order to all counsel of record.

6      Dated: May 15, 2009

7

8                           _____

9                           Marsha J. Pechman

10                           U.S. District Judge