UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE WASHINGTON MUTUAL, INC. SECURITIES, DERIVATIVE & ERISA LITIGATION, | CASE NO. 2:08-md-1919 MJP **DEFENDANT KERRY K. KILLINGER'S MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** **NOTE ON MOTION CALENDAR:** August 25, 2009 **ORAL ARGUMENT REQUESTED** OD-KKK-3 Lead Case No. C08-387 MJP |
| IN RE WASHINGTON MUTUAL, INC. SECURITIES LITIGATION, This Document Relates To: ALL CASES | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 1

I.     PLAINTIFFS' ALLEGATIONS MUST BE VIEWED CRITICALLY IN LIGHT OF THE PLEADING STANDARDS FOR SECURITIES FRAUD ................................. 1

II.    PLAINTIFFS DO NOT ADEQUATELY PLEAD THAT MR. KILLINGER MADE A FALSE OR MISLEADING STATEMENT. ........................................ 5

      A.    Challenged statements about WaMu's underwriting and credit quality ................. 5

      B.    Challenged statements related to appraisals ........................................ 10

      C.    Challenged statements related to risk management ............................... 13

      D.    Challenged financial statements. ..................................................... 15

III.   PLAINTIFFS DO NOT CREATE ANY INFERENCE OF SCIENTER AGAINST MR. KILLINGER. ........................................................... 18

      A.    Plaintiffs provide no direct evidence of Mr. Killinger's scienter. ........................ 19

      B.    Plaintiffs do not show Mr. Killinger had a "motive" to engage in fraud. ............... 20

      C.    Plaintiffs fail to plead facts sufficient to apply the core operations inference ................................................................................... 22

      D.    Plaintiffs cannot counter the strong, competing inference of innocent intent. .......................................................................................... 23

CONCLUSION ............................................................................................................... 24

**KERRY K. KILLINGER'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT [OD-KKK-3]** MASTER NO.: 08-MD-1919 MJP

i

**WILSON SONSINI GOODRICH & ROSATI** 701 Fifth Avenue, Suite 5100 Seattle, WA 98104-7036 Tel: (206) 883-2500 Fax: (206) 883-2699

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009).................................................................................3, 12

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ....................................................................2, 3, 6

*DeMarco v. DepoTech Corp.*,
149 F. Supp. 2d 1212 (S.D. Cal. 2001) ..............................................................4

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ............................................................................16

*Glazer Capital Mgmt., LP, v. Magistri*,
549 F.3d 736 (9th Cir. 2008) .....................................................................20, 23

*In re 2007 Novastar Fin., Inc., Sec. Litig.*,
No. 07-0139-CV-ODS, 2008 WL 2354367 (W.D. Mo. June 4, 2008).............................24

*In re Charles Schwab Corp. Sec. Litig.*,
F.R.D., 2009 WL 262456 (N.D. Cal. Feb. 4, 2009)......................................8, 11

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal 2004) .................................................................3

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................16

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................................4

*In re Dot Hill Sys. Corp. Sec. Litig.*,
594 F. Supp. 2d 1150 (S.D. Cal. 2008)..............................................................7

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) .....................................................10, 14

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..............................................................2

*In re Metawave Commc'ns Corp. Sec. Litig.*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003)..........................................................4

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ..............................................................................3

*In re Tibco Software, Inc.*,
No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ................22

**KERRY K. KILLINGER'S MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT**
**[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

ii

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ............................................................ *passim*

*In re Washington Mutual, Inc. Sec., Deriv., & ERISA Litig.*,
    No. 2:08-MD-01919 MJP, C08-387 MJP, 2009 WL 1393679 (W.D.
    Wash. May 15, 2009) ................................................................ 1, 2, 5

*In re Watchguard Sec. Litig.*,
    No. C05-678LR, 2006 WL 2927663 (W.D. Wash. Oct. 12, 2006) ......................... 18

*In re Zumiez Inc. Sec. Litig.*,
    No. C07-1980 JCC, 2009 WL 901934 (W.D. Wash. Mar. 30, 2009) .............. 4, 8, 11

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ............................................................ 21

*McGuire v. Dendreon, Corp.*,
    No. C07-800 MJP, 2008 WL 1791381 (W.D. Wash. Apr. 18, 2008) ..................... 21

*McGuire v. Dendreon Corp.*,
    No. C07-800MJP, slip op. (W.D. Wash. May 21, 2009) .................................... 3

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................................ *passim*

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ............................................................ 3, 4, 21

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ............................................................ 2, 9, 10

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ............................................................ 4

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ............................................................ 22, 23

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001) ............................................................ 3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ............................................................ 4, 5

*Tripp v. Indymac Fin. Inc.*,
    No. CV07-1635 GW, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ................ 14, 16

*Zucco Partners LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................ *passim*

## STATUTES

15 U.S.C. § 78u-4(b) ............................................................ 2, 3

**KERRY K. KILLINGER'S MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT**
**[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

iii

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Kerry K. Killinger, former Chief Executive Officer of Washington Mutual, Inc. ("WaMu" or "Company"), moves to dismiss the claims against him in the Amended Consolidated Class Action Complaint ("Complaint" or "¶ _") for alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and Section 11 of the Securities Act of 1933, related to Mr. Killinger's public statements and statements from WaMu's public filings.

## INTRODUCTION

The reorganization of the Complaint illuminates its flaws. The first Consolidated Class Action Complaint was so disjointed that it was necessary to "mine its pages for reference to the elements of securities fraud alleged against the individual defendants." *In re Washington Mutual, Inc. Sec., Deriv., & ERISA Litig.*, No. 2:08-MD-01919 MJP, C08-387 MJP, 2009 WL 1393679, at *11 (W.D. Wash. May 15, 2009) ("Order"). Now that plaintiffs have nominally followed the Court's Order, it is clear that the structural shortcomings of the earlier complaint helped disguise its substantive deficiencies. Nowhere is this more obvious than in plaintiffs' continued failure to "allege cohesive claims" against Mr. Killinger. *Id.* at 19. Plaintiffs can reformat their allegations, but they cannot conjure facts that do not exist. Neither can they mask the fact that their allegations are based solely on hindsight. Plaintiffs want the Court to forget what this case is about, and focus on what it is *not* about: It is *not* about laying blame for the mortgage crisis, or evaluating strategic decisions at WaMu in the years preceding the crisis. This is a securities disclosure case. It is about whether Mr. Killinger made public statements that were false or misleading, and in regard to the Section 10(b) claims, whether he intended to do so. And when the Complaint is examined under the standards mandated by the Private Securities Litigation Reform Act of 1995 ("Reform Act"), and in light of the facts that existed *at the time of the challenged statements*, it is clear that it falls far short of stating a claim against Mr. Killinger.

## ARGUMENT

### I. PLAINTIFFS' ALLEGATIONS MUST BE VIEWED CRITICALLY IN LIGHT OF THE PLEADING STANDARDS FOR SECURITIES FRAUD.

The Complaint now features a section titled "Defendant Killinger's False and Misleading Statements," which devotes more than 100 pages to pleading a Section 10(b) claim against

**KERRY K. KILLINGER'S MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT**
**[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

1

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Mr. Killinger (¶¶ 43-356), in addition to another 51 pages on Section 11 claims (¶¶ 675-849). But the changes to the Complaint are merely cosmetic: Mr. Killinger may now have a long section with his name on it, but the allegations against him are no better. Rather, now that the Court has forced plaintiffs to specify the "facts" that support each allegation against each defendant, it is abundantly clear plaintiffs have no such facts. The Complaint still fails to identify precisely which portions of Mr. Killinger's statements are allegedly false or misleading. It then fails to correlate these statements with any detailed facts to show their supposed falsity. And the sections that supposedly establish Mr. Killinger's scienter say virtually nothing about Mr. Killinger at all, and offer no facts to support *any* inference – let alone the required strong inference – that he intentionally deceived the market. By contrast, the competing inference is much stronger: Mr. Killinger warned of the potential for a market slowdown and took action to strengthen WaMu, but like so many other respected executives, economists, and regulators, did not anticipate the severity of the global economic crisis. *See, e.g.*, Ex. DD at 6-9 (Federal Reserve Chairman Bernanke admitting he underestimated the severity and effects of the crisis).

In order to identify the systemic flaws in plaintiffs' claims, the Court need only ask the three questions on which it focused in its Order and during oral argument:

**First, what did Mr. Killinger say, precisely, that was false or misleading?** It is not enough for plaintiffs to generally reference lengthy quotations; they must "'specify each statement alleged to have been misleading.'" Order at *9 (quoting 15 U.S.C. § 78u-4(b)). If plaintiffs challenge a fact as inaccurate, that fact must be identified so it can be compared against specific facts alleged to indicate falsity. If plaintiffs challenge an opinion, rather than an objective fact, that opinion must be specifically identified and shown to be "*both* objectively *and* subjectively false or misleading." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (emphasis added). This means plaintiffs must show not only that the opinion was untrue, but also that it was not sincerely believed. *Id.*; *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000). On the other hand, if plaintiffs contend a statement was *misleading* due to omissions, then its context must also be considered to see if, when viewed

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

as a whole, it created "an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Similarly, an opinion can be "subjectively misleading" if the speaker omits material information in order to create a false impression. *McGuire v. Dendreon Corp.*, No. C07-800MJP, slip op. at 8 (W.D. Wash. May 21, 2009) (Ex. RR).

Finally, each statement must be considered as of the time it was made, rather than in retrospect. *Ronconi v. Larkin*, 253 F.3d 423, 430 & n.12 (9th Cir. 2001). This is crucial here, where plaintiffs rely on lessons learned from the worst recession in more than a generation to evaluate statements made years before. A loan portfolio that was "good" during a strong market might be described differently in the midst of a global economic crisis with plummeting housing prices, a credit freeze, and skyrocketing unemployment. But "'an inability to foresee the future does not constitute fraud.'" *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004) (citation omitted). Only facts that existed at the time of the statement are relevant. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999).

**Second, what detailed facts show the falsity of the challenged statements?** As the Supreme Court has made clear, even without enhanced pleading standards the Court need not accept the truth of plaintiffs' *conclusions*, but should focus on the *facts* they plead. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Neither should the Court accept unwarranted deductions, contradictory assertions, or allegations that conflict with readily verifiable facts. *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). Under the Reform Act, plaintiffs must plead *detailed facts* showing the reasons why each statement was misleading. 15 U.S.C. § 78u-4(b). For claims based on information and belief, as here, plaintiffs must "provide, in great detail, all the relevant facts forming the basis of [the] belief." *Silicon Graphics*, 183 F.3d at 985.

Mere opinions, inferences, and conclusions are not rendered sufficient because they are attributed to a purported "expert" or a confidential witness ("CW"). Rather, such allegations are held to the same standard as any other assertion, and may be credited only if they contain the

**KERRY K. KILLINGER'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT [OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

3

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

particularized facts required by the Reform Act. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (CW allegations must comply with the Reform Act); *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1222 (S.D. Cal. 2001) (expert opinions and conclusions should not be given any weight at this stage). The raw number of CWs[1] is irrelevant. Even if multiple CWs concur, it is insufficient "if the allegations themselves are not specific enough." *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1070 (W.D. Wash. 2003). *Each* CW allegation must therefore be carefully scrutinized. First, is the CW in a position to have first-hand knowledge of the information asserted? If a CW makes a claim about company-wide conditions, for example, plaintiffs must provide facts to indicate the CW was in a position to know this information first-hand, rather than through hearsay. *Digimarc*, 552 F.3d at 997; *In re Zumiez Inc. Sec. Litig.*, No. C07-1980 JCC, 2009 WL 901934, at *8 (W.D. Wash. Mar. 30, 2009). Second, does the CW assert detailed *facts*? The Court should disregard statements that are merely opinions, conclusions, or vague assertions. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1069-70 (9th Cir. 2008) (rejecting CW allegations that "point only to disagreement and questioning" within a company); *Metawave*, 298 F. Supp. 2d at 1069-70 (rejecting CW statements that are opinion, vague, or do not show personal knowledge).

Finally, as with any allegation, even if it is detailed and credible a statement from a CW must also be *relevant*. For every assertion made, plaintiffs must be able to answer the question: *How does this allegation, if true, render a statement either false or misleading?* Allegations of bad management or misguided policy are not relevant to a securities fraud case, *unless* these allegations somehow also show that a statement was false or misleading at the time it was made. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); *Ronconi*, 253 F.3d at 432 (facts only bear on falsity if they are "necessarily inconsistent" with challenged statements).

**Third, what particularized facts indicate that the challenged statements were made with an intent to mislead?** In addition to the above standards, a Section 10(b) claim must also

---

[1] Although still numbered 1-89, there are now 65 CWs – compared to about 60,000 employees WaMu had at one time, in 2,140 retail banks, 487 lending branches, and 323 other offices, through 38 states. Ex. K at 2, 13.

**KERRY K. KILLINGER'S MOTION TO DISMISS**     4
**AMENDED CLASS ACTION COMPLAINT**
**[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

"state with particularity" facts that indicate scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007). Plaintiffs must create a "strong inference" of fraudulent intent, or one that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference." *Id.* at 2505, 2509. Plaintiffs must make this showing for *each* defendant, "'in connection with'" *each* challenged statement. Order at *10 (citation omitted). CW statements that allegedly indicate scienter must be evaluated for credibility, sufficient detail, and relevance – specifically, whether they bear on a defendant's state of mind at the time the defendant made a challenged statement. *Digimarc*, 552 F.3d at 999. Thus, CW allegations that, at best, merely show a disagreement within a company about practices or policies are not relevant to scienter. *Metzler*, 540 F.3d at 1069.

## II. PLAINTIFFS DO NOT ADEQUATELY PLEAD THAT MR. KILLINGER MADE A FALSE OR MISLEADING STATEMENT.

### A. Challenged statements about WaMu's underwriting and credit quality

Plaintiffs challenge statements that describe underwriting policies (¶¶ 172, 174, 179-80, 184-85, 769), express opinions about WaMu's credit, underwriting standards, and portfolios (¶¶ 170-71, 173, 175-77, 180, 182-83), and assert that WaMu "tightened" underwriting and otherwise prepared for an anticipated economic downturn (¶¶ 171, 177, 181, 186-89).[2] Plaintiffs make *only one* specific allegation of falsity, challenging statements that WaMu's policy was to underwrite Option ARMs to the fully-indexed rate. ¶¶ 172, 179-80, 184. Plaintiffs generally allege all other statements were misleading because they did not mention that "WaMu had radically loosened its underwriting standards." ¶ 191; *see also* ¶¶ 169, 771, 795, 821.

***Plaintiffs omit crucial context***. Almost without exception, plaintiffs take Mr. Killinger's statements out of context, implying he made glib positive characterizations without supporting information, and omitted facts that weighed against his conclusions. As Appendix 1 illustrates, nothing could be further from the truth. In statement after statement, Mr. Killinger supported his characterizations and opinions with detailed information, and openly discussed negative facts of

---

[2] It is impossible to cover all the challenged statements in detail here. This motion contains all Mr. Killinger's substantive arguments. For the Court's convenience, however, Appendix 1 ("App. 1") lists every challenged statement, the relevant context as provided by exhibits, and a cross-reference to the applicable page of this motion.

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

5

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

which he was aware.  For example, plaintiffs challenge statements Mr. Killinger made in January 2007, indicating that WaMu had "tightened underwriting" and otherwise prepared for an economic slowdown. ¶ 181; Ex. S at 5, 11.  But plaintiffs omit Mr. Killinger's *explanation* of the steps taken, including cutting subprime production by half in 2006, taking WaMu from the sixth largest subprime originator to the tenth; selling 2004 and 2005 subprime originations and residuals to reduce that portfolio by $2.4 billion; selling most Option ARM originations; and cutting home loans staff by 27%.  *Id.*

Similarly, when plaintiffs quote Mr. Killinger's January 30, 2007 opinions about WaMu's loan portfolios (¶ 183), they ignore that Mr. Killinger also discussed detailed metrics and negative trends.  Ex. T.  For example, while Mr. Killinger did say he thought WaMu's overall credit was in "very good shape," plaintiffs omit that he also disclosed that "a softening of the economy and weakening credit environment pushed [WaMu's non-performing assets] up to about 80 basis points at the end of 2006," noting that despite this trend he expected to "keep the average at less than 1% over the five-year period." *Id.* at 3.  Likewise, in challenging Mr. Killinger's statement that the Option ARM portfolio was "very good," plaintiffs fail to mention that he explained that it had an average FICO score of 704, a loan–to–value ("LTV") at origination of 71%, and an estimated current LTV of 59% – and that it was a seasoned portfolio because WaMu had sold most of its Option ARM originations from the prior two years. *Id.* at 7. Plaintiffs also omit his disclosure that with "a rising interest rate environment, a high percentage of Option ARM borrowers are making minimum payments and deferring some interest," indicating negative amortization was 1.3% of the Option ARM portfolio's balance. *Id.*

It is vital that plaintiffs be forthright about the context of these statements because the Complaint's core claim is that Mr. Killinger's statements were misleading because they omitted information.  An omission only renders a statement misleading if it causes the statement to convey a materially false "impression of [the] state of affairs." *Brody*, 280 F.3d at 1006.  The Court cannot evaluate this "impression" unless it views *each* statement in context, looking at the facts cited to explain, support, and qualify the statement. *See* App. 1; Exs. A-AA.  Plaintiffs

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

6

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

ignore these facts because they cannot dispute them. For example, far from challenging the facts that Mr. Killinger used to illustrate his assertion that WaMu had "tightened underwriting," plaintiffs actually *corroborate* this assertion. The chart they use to show WaMu's alleged "aggressive lending," by comparing its loan-to-income ratios to other lenders, confirms that WaMu's underwriting *did* "tighten" – reflecting a steady improvement in the loan-to-income ratios of WaMu's loans, in contrast to the loosening standards of most other lenders. ¶¶ 238-39, ¶ 239 at Chart 2. This confirms the truthfulness of Mr. Killinger's statements, which are likewise supported by WaMu's public filings. Ex. CC at 12; EE at 12; FF at 13 (subprime originations fell from $34.5 billion in 2005 to $6.4 billion in 2007; Option ARM originations were $64.1 billion in 2005, $42.6 billion in 2006, and $23.9 billion in 2007; overall mortgage originations were $207.7 billion in 2005, $158.4 billion in 2006, and $100.9 billion in 2007).

*Plaintiffs fail to cite specific, credible facts that show contemporaneous falsity.* In the face of verifiable facts cited by Mr. Killinger and confirmed by their own Complaint, plaintiffs nonetheless insist that the above statements were somehow misleading for failure to make the fuzzy disclosure that underwriting was "dangerously lax." ¶ 198. They support this assertion with statements from CWs that are so vague and exaggerated as to be meaningless, and which merely indicate disapproval of WaMu's lending policies. *See, e.g.*, ¶ 202 ("[i]t was all about sell, sell, sell"); ¶ 214 ("if you had a pulse, WaMu would give you a loan"); ¶ 205 ("CW 12 was ...morally opposed to these 'risky' loans"). Plaintiffs essentially contend that Mr. Killinger could not have honestly believed that credit was "very good," because a few former employees now say they thought WaMu's loans were too "risky." ¶ 205. Such scattered opinions, augmented by hindsight and hyperbole, are clearly insufficient to state a claim. *Metzler*, 540 F.3d at 1069-70; *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1159 (S.D. Cal. 2008) (court will not credit a "litany of employee complaints about how [the company] was managed"). Even worse, few of these allegations are specific as to time, and plaintiffs do not attempt to link the dates of any allegations with the dates of any specific challenged statements. Such a failure is especially significant here, because WaMu's lending standards changed dramatically during the Class

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER No.: 08-MD-1919 MJP

7

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Period.  *Compare* Ex. F at 4 (2005 Form 10-K, indicating WaMu "intend[ed] to *increase* the loan volume of its subprime mortgage business") *with* Ex. S at 11 (Mr. Killinger's disclosure in early 2007 that WaMu had "*decreased* production volume by about half in the subprime area").

In support of their claim that WaMu "abandoned appropriate and asserted underwriting standards" (¶ 191), plaintiffs discuss only one specific underwriting standard that they seriously claim WaMu "asserted" and then "abandoned."[3]  Citing to statements from *three* retail loan consultants and *one* underwriter, all at branch offices (out of roughly 60,000 employees at 3,000 offices), plaintiffs assert that counter to various public statements (¶¶ 172, 179-80, 184, 793), it was a Company-wide policy until 2007 to underwrite Option ARM loans to the "teaser" rate, rather than to ensure borrowers could pay at the fully indexed rate.  ¶¶ 224-26, 741-42.[4] Plaintiffs do not cite any loan metrics or lending guidelines (as opposed to irrelevant *purchasing* guidelines) that corroborate this assertion.  Neither do they point to any pattern of default rates tied to this alleged practice.  Rather, they rely entirely on four branch-level employees who were clearly not in a position to have first-hand knowledge about Company-wide practices. *Zumiez*, 2009 WL 901934, at *9 (CWs' anecdotal experiences "hardly raise an inference that the alleged problems were widespread").  Since these CWs are in no position to contend it was a Company-wide practice to underwrite to the teaser rate, plaintiffs cannot allege that this supposed practice had a material effect on WaMu's loan portfolio.  *In re Charles Schwab Corp. Sec. Litig*., __F.R.D.__, 2009 WL 262456, at *23 (N.D. Cal. Feb. 4, 2009) (to show falsity, plaintiffs must make allegations of irregularities sufficient to have a material effect on the whole portfolio).  Indeed, the CWs do not provide detailed facts even for their own branch offices – they do not, for example, describe who announced this policy, how it was implemented, or how it impacted defaults.  Without such information, these allegations cannot be credited.

Plaintiffs also cannot fashion a falsity claim out of information repeatedly disclosed in

---

[3] The existence of underwriting "exceptions" cannot be interpreted as an abandonment of underwriting guidelines, since such exceptions are contemplated by the guidelines. *See* Ex. F at 54, 56.

[4] The lack of specificity, especially temporally, is also fatal to these allegations. Both WaMu and Mr. Killinger openly disclosed that at one time, WaMu underwrote Option ARMs to an "administratively set rate," which was sometimes lower than the fully indexed rate.  Ex. U at 54; Ex. L at 40-41.

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

8

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

the very documents they challenge.  Plaintiffs explain at great length why they disapprove of products such as Option ARMs, 100% LTV loans, subprime loans, and home equity loans (¶¶ 192-97, 213-14, 222), labeling them as "exotic and risky," despite the fact that many of these loans were proven products that had been around for decades.  *See* Ex. P at 9 (WaMu and the companies it acquired had more than 20 years' of experience with Option ARMs).  Most importantly, plaintiffs do not dispute that WaMu disclosed both the existence and the risks of these products – frequently and in detail.  *See, e.g.*, Ex. F at 4 (in the case of a rise in unemployment or a slowdown in housing appreciation, "subprime borrowers, who tend to have greater vulnerability to such changes . . . may be unable to repay their loans"); Ex. F at 5 ("A prolonged economic downturn could increase the number of customers who become delinquent or default on their loans, or a rising interest rate environment could increase the negative amortization of Option ARM loans which may eventually result in increased delinquencies and defaults."); *see also* Ex. F at 57-58; Ex. U at 3-4 (discussing risks of subprime loans, Option ARMs, home equity loans, and interest-only loans).  Similarly, plaintiffs are critical of steps WaMu took to increase loan volume early on in the Class Period.  ¶¶ 192, 196-97.  But this, too, was disclosed in filings referenced in the Complaint.  *See, e.g.*, Ex. F at 4 ("The Company . . . intends to increase the loan volume of its subprime mortgage business.").

***Plaintiffs fail to plead the falsity of opinions***.  Despite the fact that plaintiffs challenge many statements of opinion, they do not attempt to show that these opinions were "both objectively and subjectively false or misleading."  *Rubke*, 551 F.3d at 1162.  First, plaintiffs fail to effectively plead objective falsity.  For example, when Mr. Killinger said on September 13, 2006, that "I think on the credit front, we're in excellent shape" (¶ 177; Ex. M at 2), he supported his opinion with the fact that non-performing assets were at 62 basis points, and significantly below WaMu's long-term target of 100 basis points.  Ex. M at 2.  Plaintiffs do not offer any contemporaneous facts reflecting WaMu's credit quality at the time of the statement, much less any that conflict with the metrics Mr. Killinger provided.  Instead, they once again omit these inconvenient facts.  Further, plaintiffs do not provide a standard by which to judge whether credit

**KERRY K. KILLINGER'S MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT**
**[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

9

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

quality was "excellent," or otherwise. Without such a measure, plaintiffs cannot contend this statement was objectively false. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086-87 (9th Cir. 2002) (plaintiffs must provide an objective measure with which to judge allegedly false subjective statements).

Plaintiffs also do not contend that Mr. Killinger's opinions were *subjectively* false or misleading. *Rubke*, 551 F.3d at 1162. For example, they do not allege Mr. Killinger was not honestly voicing his opinion when he said WaMu's credit was in "excellent shape," and given the weakness of their scienter allegations, are obviously unable to seriously make this assertion. *See infra* pp. 18-20. Plaintiffs also do not, and cannot, assert that Mr. Killinger's statement was "subjectively misleading" because it failed to disclose facts weighing against his opinion. *Dendreon*, slip op. at 8 (Ex. RR). Here, again, context is critical: When Mr. Killinger said WaMu's credit was "in excellent shape," he also said that for the past two years he had taken a cautious outlook on the economy, that he thought the market was likely to slow or decline, and that he did not know if it was "going to be a soft landing, a hard landing or somewhere in between." Ex. M at 6-7. This frank discourse is antithetical to any attempt to mislead.

### B. Challenged statements related to appraisals

Plaintiffs challenge statements referencing LTV ratios of various portfolios (¶¶ 96-97, 100, 103), expressing Mr. Killinger's opinion about certain LTVs (¶¶ 99, 100, 103), observing the importance of LTVs as a "key determinant" of performance (¶¶ 96, 101-02, 770, 772, 794), and discussing the decision to outsource appraisals (¶ 98). Once again, plaintiffs fail to match the statements with facts demonstrating falsity. For instance, plaintiffs acknowledge that LTVs were a "key determinant" of loan performance (¶ 105), and do not allege that there was *not* a "strong governance process" over third-party appraisers in September 2006. *See* ¶¶ 98, 116-60.

Unable to identify a single false statement, plaintiffs make the far-fetched contention that every time a statement mentioned WaMu's appraisal process or LTVs, it should have disclosed that the LTVs were "*the product of* a corrupt appraisal process." ¶ 105; *see also* ¶¶ 95, 724, 772, 796 (similar). Plaintiffs' theory is thus contingent upon a showing that WaMu's LTVs were

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

10

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

materially affected (and thus "*the product of*") appraisal irregularities, but the Complaint does not come close to supporting this conclusory allegation. WaMu commissioned a massive number of appraisals during the Class Period – plaintiffs allege that at least 260,000 were performed by just one appraisal company. ¶ 120. Plaintiffs would thus have to show vast, systemic, and *effective* appraisal inflation to claim that alleged corruption had a material effect on LTVs. *Schwab*, 2009 WL 262456, at *23 (plaintiffs identify "only fourteen assets alleged to have been mispriced out of a portfolio of hundreds if not thousands"; such "sparse allegations" fail to "plausibly . . . plead a *material* misrepresentation"). But the Complaint offers no quantification of these allegations. None. Plaintiffs do not allege the inflation of a single, specific appraisal, much less indicate how many appraisals were inflated and to what degree, or how these allegedly inflated appraisals impacted WaMu's portfolio. *Vantive*, 283 F.3d at 1090-91 (rejecting allegations of inflated revenues because "there is no sufficient allegation of the amounts by which revenues were allegedly overstated"). Without such facts, plaintiffs cannot claim the alleged appraisal inflation had any material effect on Company LTVs, much less that it was significant enough to have a material effect on losses that occurred when housing prices plummeted. *See* Ex. GG at 3 (nationwide housing prices depreciated 17.5% by April 2008).

Lacking such facts, plaintiffs fall back on scattered CW allegations that do not provide any reliable evidence of Company-wide conditions. Of the CWs referenced in the appraisal section, only a handful contend that the alleged irregularities in the process resulted in *actual* appraisal inflation, and all of these CWs were *branch-level* employees at WaMu or outside appraisal companies. *See* ¶¶ 112-13, 137-38, 140, 145-46, 149, 727, 730 (CWs 9, 24, 29, 31, 35 and 42). These employees offer vague, anecdotal accounts, and do not indicate first-hand knowledge of Company-wide conditions. The closest plaintiffs come to a CW asserting appraisal inflation who has more than branch-level experience is CW 23, a regional manager for WaMu and later an area manager for eAppraiseIT. But CW 23 stops short of alleging actual appraisal inflation, and cites no specific facts about the extent, degree, or effect of any such inflation, even within his own region. *See* ¶¶ 114-15, 124-25, 128-34, 139-40, 145, 148, 164.

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

11

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

Plaintiffs try to buttress their allegations regarding appraisal inflation with documents from the complaint filed by the New York Attorney General against First American and eAppraiseIT. The conclusions of the New York Attorney General obviously do not constitute particularized facts. ¶ 107. And despite the irregularities alleged, none of the documents reproduced from that complaint indicate any material impact on WaMu's LTVs. ¶¶ 150-60, 731-32. Plaintiffs' "expert" analysis of loan data similarly fails to show systemic inflation of WaMu's appraisals, even setting aside the impropriety of using such expert analysis to oppose a motion to dismiss. ¶ 161; *supra* pp. 3-4. Although the analysis purports to compare reasons for mortgage denials between WaMu and peer companies, it lacks context that might make it meaningful – such as comparisons of other factors such as FICO scores or appraisal values in similar markets for similar homes. *See* Ex. HH at 2 (HMDA data does "not include many potential determinants of creditworthiness and loan pricing, such as the borrower's credit history, debt-to-income ratio, and the loan-to-value ratio"). Most significantly, this analysis fails to provide any underlying data on which its conclusions are based. *Iqbal*, 129 S. Ct. at 1950 (only facts, and not conclusions, are entitled to a presumption of truth at the motion-to-dismiss stage).

Finally, the appraisal claims are undermined by inconsistencies within the Complaint. Plaintiffs allege in the underwriting section that WaMu "radically loosened" its underwriting standards during the Class Period (¶ 191; ¶¶ 737-40 (similar)), and that underwriting exceptions were "always approved" (¶ 220), such that anyone with a "pulse" or a "heart beat" could get a loan (¶¶ 214, 236). Yet at the same time, plaintiffs assert that WaMu's loan officers relentlessly pushed appraisers to inflate values because it was necessary to make loans "work" that "otherwise never would have been approved at all." ¶¶ 106, 110, 727; *see also* ¶¶ 111, 117-18, 125-26, 138, 141, 148 (similar). The Court need not, and should not, accept as true inconsistent allegations within the same complaint. *Digimarc*, 552 F.3d at 1000. Either WaMu's underwriting guidelines were so loose as to be meaningless, or they were so stringent that WaMu's loan consultants had to push for high appraisals to get loans approved. Both cannot be true on a company-wide basis. Rather, the existence of these mutually exclusive assertions

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

12

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

suggests *neither* is true.  Plaintiffs rely almost entirely on the anecdotal experiences of a tiny percentage of former employees, and these inconsistent accounts do not establish widespread or pervasive practices at WaMu sufficient to show the falsity of Mr. Killinger's statements regarding *either* underwriting *or* appraisals.

### C.    Challenged statements related to risk management

Plaintiffs challenge disclosures describing the risk management process (¶¶ 47, 58, 820); statements that WaMu actively managed its risk and ensured compliance with underwriting standards (¶¶ 57-59); and Mr. Killinger's opinions on risk management.  ¶¶ 49-50.[5]  Plaintiffs allege these varied statements were misleading for failure to disclose that "WaMu had in fact weakened its risk management practices in order to increase loan volume."  ¶ 62.

As an initial matter, plaintiffs' allegations display a fundamental misunderstanding of the role of risk management.  Risk management does not set the level of risk tolerance for a Company – as WaMu disclosed, those sorts of broad policies are set by the Board.  ¶¶ 47, 78, 820.  Rather, as WaMu also disclosed, its risk management function *evaluates* risk, establishes *guidelines* to keep risk within parameters set by the Company's executives and directors, and *identifies* when risk exceeds those parameters.  Ex. U at 46; *see* ¶ 47.  Thus, plaintiffs' allegation that risk management was weakened to allow for increased loan volume is as nonsensical as it is irrelevant.  As WaMu disclosed, at certain points in time before the Class Period and at the beginning of the Class Period, it strategically took on more credit risk by making loans with higher expected risk-adjusted returns.  *Supra* at pp. 7-8.  Later in the Class Period, the Company took steps to reduce its credit risk exposure in response to an anticipated downturn.  *Id.*  Thus, when CWs complain about the Company's "aggressive" posture toward risk (¶¶ 64-66), they are merely voicing disagreement with the Company's frequently disclosed lending policies.

Plaintiffs emphasize the opinions of four former WaMu employees who now say that they disapproved of how the risk management function was run, one calling it "just stupid."

---

[5] Many of the challenged statements in this section do not really concern risk management, but are similar to the statements about loan quality and credit risk challenged in the underwriting section.  ¶¶ 48, 51-56, 60; *supra* at p. 5.

**KERRY K. KILLINGER'S MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT**
**[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

13

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

¶ 79, *see also* ¶¶ 65, 68, 69, 70-72 (CWs 17, 18, 19 and 21) (similar). First of all, plaintiffs fail to make allegations showing that the structure of WaMu's risk management was either inappropriate or unusual. As WaMu disclosed, it had risk management functions within each business unit, *in addition to* a Chief Enterprise Risk Officer and risk management organization *outside* those lines of business, to whom risk managers within each business unit also reported. Ex. U at 46. More importantly, plaintiffs do not, and cannot, tie their vague allegations to any challenged statement. The CWs' opinions of how the Company should have been run are irrelevant: Without specific facts indicating that Mr. Killinger was not only aware of these opinions, but *agreed with them*, they have no bearing on the truth of *his* opinions. *Tripp v. Indymac Fin. Inc.*, No. CV07-1635 GW, 2007 WL 4591930, at *3 (C.D. Cal. Nov. 29, 2007); *Impac Mortgage*, 554 F. Supp. 2d at 1095 (falsity not shown by allegations from former employees that management was "uncooperative" and ignored their suggestions). And far from alleging that WaMu's disclosures regarding risk management were false, plaintiffs make contradictory claims that *confirm the accuracy* of those disclosures: Plaintiffs allege statements regarding risk management were false for failure to disclose a "initiative to move the risk management functions down into [WaMu's] business units" (¶¶ 69-70, 72), at the same time they challenge a statement disclosing that risk management "works with the lines of business" (¶ 47).

Finally, plaintiffs' risk management allegations are patently inconsistent with the allegations they make elsewhere. After describing the ways in which risk management was allegedly "weakened," "abandoned," and "undermined" (¶¶ 62, 64, 65), plaintiffs make scienter allegations throughout the Complaint that are premised upon the *strength* of WaMu's risk management. Plaintiffs describe numerous reports that allegedly informed management about WaMu's level of risk in great detail (¶¶ 78, 88-93, 247-51, 261, 263-64), allege that managers were "well-informed" about WaMu's risk level and held regular meetings to discuss it (¶¶ 80-85), and describe projects where WaMu employees did extensive analysis of specific risks (¶¶ 89, 92, 252-60, 262). Although irrelevant to scienter (*see infra* at pp. 19-20), these allegations indicate that far from being "weakened," WaMu's risk management was robust.

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

14

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

**D.      Challenged financial statements**

The Complaint challenges statements announcing WaMu's financial results (¶¶ 267, 271-72, 274-75, 277-78, 280, 283-84, 286-88, 290, 773-77, 801-02, 823, 825), as well as certifications of these results and related internal controls (¶¶ 268-69, 271-73, 275, 278, 281, 284-85, 287, 289, 784-86, 809-10, 827, 829).[6]  In addition, plaintiffs challenge statements by Mr. Killinger describing the reserving process and indicating his opinion of WaMu's reserves and reserving methodologies (¶¶ 270, 276, 279, 282, 290).

Although plaintiffs suggest that WaMu set its allowance for loan loss reserves ("ALLL") in violation of GAAP (¶¶ 292, 305), the crux of their allegations is that WaMu's ALLL was inadequate because it failed to account for loosened underwriting standards and inflated appraisals.  *See, e.g.*, ¶¶ 294, 297-99, 301-02, 306-07, 325-26, 329, 345, 716-18, 746, 749, 752, 801.  As such, the financial allegations depend on plaintiffs having made adequate allegations related to underwriting and appraisals (which they fail to do), quantifying those allegations (which they do not even attempt to do), and then demonstrating that these alleged practices had a material effect on appropriate reserving (which is impossible to do in the absence of any quantification).  Plaintiffs do not dispute that in the absence of these alleged irregularities, the Company's provisioning was appropriate.  ¶ 306 (provisions were "only appropriate" for a portfolio not affected by alleged problems with risk management, appraisals, and underwriting).

Beyond this fundamental flaw, plaintiffs face an uphill battle to plead that WaMu's ALLL was inadequate during the Class Period, because WaMu's provisions – the amount by which WaMu increased its ALLL each quarter – *exceeded* net charge-offs for every quarter of the Class Period except one.  *See* Ex. II at 12; JJ at 12.  This sign of appropriate reserving is bolstered by the fact that WaMu's financial statements were audited and certified by Deloitte & Touche, reviewed by the Office of Thrift Supervision, and never restated.  Such circumstances weigh against a finding of falsity.  *Indymac*, 2007 WL 4591930, at *5.  Nevertheless, plaintiffs

---

[6] Although plaintiffs make separate allegations regarding internal controls, these claims are derivative of claims regarding risk management and financial statements.  The only independent support plaintiffs cite are issues noted in the CRO Report – and plaintiffs do not assert these issues were not addressed by mid-2006.  ¶¶ 332-35; *infra* at 18.

**KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

15

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

contend that because WaMu had to dramatically increase its reserves in late 2007 and 2008, the ALLL before this point must have been fraudulent. ¶ 307. They are wrong both as a matter of law and accounting. As a matter of law, a "substantial increase in loan loss reserves due to market conditions is not evidence that the reserves stated in earlier statements were inadequate." *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1070 n.28 (C.D. Cal. 2008); *DiLeo v. Ernst & Young*, 901 F.2d 624, 626-27 (7th Cir. 1990) ("For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner."). Plaintiffs strain credibility when they allege that WaMu's increase in its ALLL in late 2007 was *not* due to market conditions, given that similar increases in reserves were taking place at the same time throughout the industry. Ex. KK at 1-2 (noting "[r]ecord-high loan loss provisions" industry-wide, beginning fourth quarter 2007). As a matter of accounting, it is inappropriate to use ALLL as a hedge against future losses or possible downturns. Instead, GAAP mandates an allowance may not be taken unless (i) it is *probable* the loss has *already occurred*, and (ii) the amount of loss can be reasonably estimated. Ex. LL at ¶ 8; Ex. MM at 8 (it is "inappropriate to consider possible or expected future trends" in calculating ALLL). In fact, upping reserves to protect against future losses "might in *itself* violate GAAP." *Countrywide*, 588 F. Supp. 2d at 1070 n.31.

To lend their hindsight-based allegations the appearance of rigor, plaintiffs propose a reserving methodology that calculates the ALLL based on a randomly selected ratio to non-accrual loans. *See* ¶ 326 ("proper" ALLL equates to 81.58% of WaMu's non-accrual loans each quarter). Plaintiffs do not even pretend that this method comports with GAAP. Whether non-accrual loans – loans ninety or more days past due – will result in losses depends on many factors, such as the LTV of those loans, the condition of the housing market, and the owners' ability to sell, refinance, or resume payments. Because of these complexities, ALLL calculations must account for myriad factors, not just a single factor. Ex. U at 57-58 (explaining WaMu's complex method for calculating ALLL, including unallocated reserves).

Even worse for plaintiffs, a consistent application of their methodology *contradicts* their

**KERRY K. KILLINGER'S MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT**
**[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

16

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

own conclusions.  Plaintiffs concede that their methodology would have mandated *lower* levels of reserving during 2005 and 2008, when WaMu's ALLL was *greater* than 81.58% of non-accrual loans.  ¶¶ 326-27; *see also* ¶ 320 at Chart 5.  What they *do not* say is that applying their methodology during the first two quarters of 2006 would have resulted in lower reserves than those that actually existed – and very different results than those plaintiffs represent.  *See* App. 2 (showing full details of calculations).  During the first quarter of 2006, for example, plaintiffs' methodology would have resulted in a $230 million *decrease* in WaMu's actual ALLL, rather than the $90 million increase plaintiffs claim – a discrepancy of $320 million.  App. 2; ¶ 326 at Chart 6.  All told, in the first three quarters of 2006, the results of plaintiffs' methodology diverges from their allegations by $720 million. These discrepancies make it clear that this "quantification" of alleged deficiencies in WaMu's ALLL is a mirage, which the Court should disregard.  At a *minimum*, plaintiffs cannot maintain their accounting allegations for 2005 (when they concede actual reserves exceeded their so-called "appropriate" reserves), or for the first two quarters of 2006, when their methodology results in lower reserves than WaMu's actual ALLL.

Next, plaintiffs make various challenges to WaMu's loan loss methodology.  Plaintiffs assert that during the summer of 2007, CW 78 was "informed" that WaMu's Loan Performance Risk Model ("LPRM") had not been calibrated for roughly eighteen months.  ¶¶ 321-23, 722, 751.  This allegation should be disregarded because it is hearsay from an unknown source.  *Digimarc*, 552 F.3d at 996-97.  Even if considered, the allegation is irrelevant because plaintiffs do not supply facts with which it can be evaluated.  What constitutes "calibration" of the LPRM?  How often should it have been done?  To what degree, if any, did the alleged lack of calibration affect reserving levels?  Without the answers to these questions, the allegation is meaningless.

Plaintiffs' remaining challenges to WaMu's methodology rest on mischaracterizations of the contents of the "CRO Report."  Plaintiffs assert that the CRO report "revealed that WaMu's loss model was materially deficient" because it found that the LPRM "did not account for the performance of the Company's Option ARM loans."  ¶ 310-11; *see also* ¶¶ 308, 313-14, 721, 750, 778, 803 (similar).  These assertions are belied by the actual content of the CRO Report,

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

which indicates only that the LPRM was "untested" on products subject to negative amortization, such as Option ARMs. ¶ 310; Ex. NN at 4. The CRO Report further notes that "it is recommended that the *validation* be expanded *to confirm* that predicted losses from the model are reasonably higher for loan products with a negative amortization feature." *Id*. In response to this report, risk officers acknowledged that "documentation of validation of the LPRM did not provide a specific analysis" of its ability to account for negative amortization, and agreed to enhance this *documentation*. Ex. OO at 7; ¶ 313. That the LPRM did not provide sufficient "documentation" of its "validation" *does not* mean it "did not account for the performance of the Company's Option ARM loans," or that this had any affect *whatsoever* on reserving during the Class Period. Indeed, the CRO Report was issued in September 2005 – a month before the start of the Class Period – and plaintiffs do not dispute that WaMu planned to address the above concerns by June 2006. ¶ 308; Ex. OO at 7. Notably, plaintiffs do not claim the enhancements yielded any material changes to the LPRM, much less that this concern resulted in inadequate reserves between September 2005 and June 2006, when overall provisions greatly exceeded losses. Neither do plaintiffs explain how this issue could have had any effect on reserving in the two years of the Class Period *after* it was addressed.

Indeed, plaintiffs' allegations regarding the CRO report actually *negate* any inference of fraud. The report was commissioned by WaMu *before* the Class Period. And while plaintiffs inexplicably take exception to the time taken to develop complex validated data in response to the report's concerns, they do not dispute that management issued a prompt response and proposed to address concerns within a year. ¶ 335. Contrary to plaintiffs' spin, the fact that WaMu commissioned the CRO Report demonstrates the effectiveness of its risk management, and a good faith attempt to correct any issues with its reserving methodology. *In re Watchguard Sec. Litig*., No. C05-678LR, 2006 WL 2927663, at *10 (W.D. Wash. Oct. 12, 2006) (cannot infer fraudulent intent where defendant "took steps to assess its controls during the class period").

## III.  PLAINTIFFS DO NOT CREATE ANY INFERENCE OF SCIENTER AGAINST MR. KILLINGER.

Given plaintiffs' failure to plead facts showing any of Mr. Killinger's statements were

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

18

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

false or misleading, it necessarily follows that they cannot plead facts showing Mr. Killinger made such statements with scienter. Beyond this fundamental flaw, what is most striking about plaintiffs' scienter allegations against Mr. Killinger is the lack of them. The sections purporting to establish Mr. Killinger's scienter make very few specific allegations about him, instead relying upon allegations related to other defendants, other WaMu employees, or unspecified "senior management" or "corporate management." *See, e.g.*, ¶¶ 79, 90, 93, 115, 122, 164, 167, 212, 216, 241-42, 244-51, 257-61, 264, 339-40, 247-49. On the rare occasions when scienter allegations are made against Mr. Killinger specifically, they are nonetheless devoid of any facts to suggest he made any statement with knowledge that it was false. Such allegations clearly fail to meet the Reform Act requirement that plaintiffs must plead scienter with detailed facts, in regard to each defendant and for each challenged statement. *See supra* at pp. 4-5.

### A. Plaintiffs provide no direct evidence of Mr. Killinger's scienter

In boilerplate language, plaintiffs make a token contention that Mr. Killinger "knew, or was reckless in disregarding, the facts above that rendered his statements ... false and misleading at the time he made them." ¶¶ 162, 337; *see also* ¶¶ 75, 240 (similar). But plaintiffs fail to identify any such facts that Mr. Killinger allegedly knew. Instead, their scienter allegations are largely devoted to alleging the existence of various reports containing unspecified facts regarding WaMu's risk profile, delivered to various people at the Company. ¶¶ 78, 88, 90-91, 93. Plaintiffs do not allege the specific content of a single report that contradicts a single statement by Mr. Killinger – much less that Mr. Killinger ever read such a report. Without such information, allegations of negative internal reports are insufficient to create an inference of scienter. *Vantive*, 283 F. 3d at 1087-88 (since "every sophisticated corporation uses some kind of internal reporting system," allowing such claims would "expose all those companies to securities litigation whenever their stock prices dropped").

In addition, none of the CWs claims to have heard Mr. Killinger make a single comment, or express a single opinion, contrary to his public statements. Neither does a single CW claim to have told Mr. Killinger that the information he released, or was about to release, was incorrect.

**KERRY K. KILLINGER'S MOTION TO DISMISS**
**AMENDED CLASS ACTION COMPLAINT**
**[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

19

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1  Indeed, only three CWs claim to have had *any* direct contact with Mr. Killinger, and two of the

2  three merely received company-wide communications that may or may not have actually been

3  from him. ¶¶ 230, 242, 246 (CWs 65, 83). CW 79 is the *only* one who claims to have interacted

4  directly with Mr. Killinger, but CW 79 does not offer a single fact supportive of Mr. Killinger's

5  scienter. ¶¶ 80-87. To the contrary, CW 79's claims weigh *against* an inference of scienter:

6  According to CW 79, Mr. Killinger conscientiously prepared for an investor conference (¶¶ 81-

7  84), responded to risk reports by adjusting strategy (¶ 86); and "discussed the need to avoid

8  making any statements that might give rise to liability under the federal securities laws" (¶ 85).

9  Although plaintiffs put a sinister spin on these innocent facts, they do not explain how

10  conscientious preparation, responsiveness to information, or a stated intention to tell the truth are

11  indicative of fraudulent intent.

### B. Plaintiffs do not show Mr. Killinger had a "motive" to engage in fraud

13  Plaintiffs resort to pleading that Mr. Killinger had the "motive and opportunity" to

14  engage in fraud because of his bonuses and stock sales. ¶¶ 346-55. Even if they were pleaded

15  adequately (they are not), and involved facts probative of scienter (they do not), such "motive

16  and opportunity" allegations are inadequate, without more, to establish a strong inference of

17  scienter. *Digimarc*, 552 F.3d at 998, 1005. To start with, plaintiffs' claims about Mr. Killinger's

18  performance-based bonuses create no inference of scienter, since most executives receive similar

19  incentives, and such facts exist in nearly every case. *Glazer Capital Mgmt., LP*, *v. Magistri*, 549

20  F.3d 736, 748 (9th Cir. 2008). And as plaintiffs concede, Mr. Killinger declined his $1.2 million

21  bonus in 2007. ¶ 346. The fact that Mr. Killinger met the criteria for a bonus in 2007, and yet

22  refused it, weighs against an inference that he engaged in fraud because of that bonus.

23  As a threshold matter, plaintiffs' stock sale allegations also cannot create an inference of

24  scienter because plaintiffs do not connect those allegations to any challenged statements.

25  *Vantive*, 283 F.3d at 1093 (stock sales are only probative "when those sales are able to be related

26  to the challenged statements"). As in *Vantive*, "the class period alleged is so long, and the

27  virtually identical allegations recycled throughout the complaint so many times, that it becomes

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER No.: 08-MD-1919 MJP

20

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with [scienter]." As a result, plaintiffs do not meet their burden under the Reform act to "provide a clear context" from which fraud can be inferred. *Id*.

To the contrary, the context of the stock sales weighs *against* scienter. First, none of the other defendants are alleged to have sold stock (¶¶ 349-50), and "'[o]ne insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with [the fraudulent inference].'" *McGuire v. Dendreon Corp.*, No. C07-800 MJP, 2008 WL 1791381, at *9 (W.D. Wash. Apr. 18, 2008) (quoting *Ronconi*, 253 F.3d at 436). Further, to create an inference of scienter, plaintiffs must plead facts showing sales were "'dramatically out of line with prior trading practices,'" considering the amount and percentage of shares sold, the timing of the sales, and prior trading history. *Vantive*, 283 F.3d at 1095. None of these factors exist here. Although plaintiffs identify the number of shares Mr. Killinger sold, and allege the percentage by which his sales reportedly increased (¶¶ 348-49), they fail to discuss the *percentage of his holdings* that Mr. Killinger sold. This omission is understandable, since Mr. Killinger sold *only 5%* of his shares during the lengthy Class Period. *See* Ex. PP at 24-25 (adding the 5,733,292 shares and vested options retained to the 300,000 shares plaintiffs allege Mr. Killinger sold, the total is 6,033,292, of which 300,000 shares constitutes 5%). The sale of such a small proportion of stock, especially over a Class Period of nearly three years, is inconsistent with scienter. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (the fact that a CEO "'held onto most of [his company's] stock and incurred the same large losses' as plaintiff" negates an inference of scienter); *Vantive*, 283 F.3d at 1092, 1094 (no scienter where CEO sold 13% of his holdings, especially given lengthy class period). In addition, far from being "dramatically out of line," Mr. Killinger's Class Period stock sales are consistent with his prior practice of exercising options as they neared expiration and promptly selling the acquired stock. *See* Ex. QQ (Mr. Killinger exercised 50,000 options set to expire on January 22, 2002, and immediately sold the shares, and did the same with 91,361 options on January 28, 2004. During the Class Period, on January 2006, he

**KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

21

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

1    exercised 216,893 options set to expire, and then set up a 10b5-1 plan.).  Thus viewed in context,

2    Mr. Killinger's stock sales do not create any inference of scienter.  *Metzler*, 540 F.3d at 1067 (no

3    inference of scienter when only one defendant sold significant holdings, those holdings were

4    only 37% of his stock, and he sold options as they vested, consistent with his previous pattern).

5          Further, Mr. Killinger's adoption of a 10b5-1 plan undermines scienter.  *See, e.g.*,

6    *Metzler*, 540 F.3d at 1067 & n.11 (sales made through pre-set trading plans may rebut scienter).

7    Yet plaintiffs allege, without foundation, that Mr. Killinger's 10b5-1 plan was "suspicious,"

8    going so far as to claim that Mr. Killinger "*suspiciously* instituted his 10b5-1 Plans around four

9    months after the start of the Class Period," ignoring the fact that *plaintiffs* chose when the Class

10   Period began, and have not tied this date to any action on the part of Mr. Killinger.  ¶ 352.  In

11   addition, plaintiffs do not allege Mr. Killinger was *ever* in possession of inside information

12   inconsistent with his statements, let alone that he possessed such information prior to instituting

13   his 10b5-1 plan.  Finally, plaintiffs suggest scienter can be inferred because of WaMu's stock

14   repurchase program.  ¶¶ 353-55.  But plaintiffs assert no connection between the repurchase

15   program and Mr. Killinger's sale of a tiny percentage of his stock, and several months separated

16   the announcement of the repurchase plan from the institution and renewal of Mr. Killinger's

17   10b5-1 plan.  ¶¶ 353-55.  In similar circumstances, stock repurchase programs have been held to

18   "negate a finding of scienter."  *See, e.g.*, *In re Tibco Software, Inc*., No. C 05-2146 SBA, 2006

19   WL 1469654, at *20-21 (N.D. Cal. May 25, 2006) (no scienter where two executives sold 2.3%

20   and 17.2% of their holdings while the company engaged in a stock repurchase program).

21       **C.**    **Plaintiffs fail to plead facts sufficient to apply the core operations inference**

22         Plaintiffs foreshadow that they will once again rely on the "core operations inference" to

23   compensate for their lack of scienter allegations against Mr. Killinger, making various allusions

24   to the "importance of residential lending" to WaMu.  ¶¶ 168, 265; *see also* ¶¶ 242, 343 (similar).

25   Residential lending was not WaMu's "core business."  Ex. F at 1, 38-40 (WaMu had four

26   business units, including Retail Banking, Card Services, and a Commercial Group).  But even

27   setting aside this point, the core operations inference has no place here.  It applies only in

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

22

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

extremely rare circumstances, where the allegations of falsity are so strong, and bear so directly upon the core operations of a company, that it would be "absurd to suggest" that key managers were not aware of them. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). Plaintiffs do not come close to making this showing. Indeed, plaintiffs have failed to plead *any* clearly identifiable "facts" that show falsity – instead, the vast majority of their allegations are that Mr. Killinger misled investors because he failed to disclose vague information such as the alleged "loosen[ing]" of "underwriting standards." ¶ 191. These general assertions are based largely on unspecified information allegedly contained in various reports, and anecdotal stories and opinions related by a tiny percentage of WaMu's former employees. Even if the Court were to rule these allegations are sufficient to demonstrate falsity, they do not constitute the type of concrete, knowable "facts" of which it is "absurd to suggest" that Mr. Killinger was unaware.

In fact, just the opposite is true. It would be "absurd to suggest," for example, that the CEO of a national savings and loan with roughly 60,000 employees in nearly 3,000 offices would be personally involved with choosing appraisers, or supervising the interaction between appraisers and loan officers. And if any manipulation of appraisals did occur, it would be unlikely to be revealed in company-wide reports, to which plaintiffs vaguely allege Mr. Killinger had "access." *Glazer*, 549 F.3d at 746-47 ("surreptitious nature" of transactions that allegedly indicated falsity created "an equally strong inference that [they] would have deliberately been kept secret–even within the company"); *Digimarc*, 552 F.3d at 1000-01 (declining to apply the core operations inference because the erroneous entries would not be operationally visible to executives). If plaintiffs once again seek to apply the core operations inference, they *must* (1) identify the *specific* factual information on which they base their allegations of falsity, and (2) explain *why* it is "absurd to suggest" that Mr. Killinger did not possess that specific information.

### D. Plaintiffs cannot counter the strong, competing inference of innocent intent

The dearth of scienter allegations against Mr. Killinger lends strength to the obvious, opposing inference: Plaintiffs cannot find any evidence that Mr. Killinger lied, because he *did not lie*. This inference is supported by other circumstances indicating Mr. Killinger's innocent

KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]
MASTER NO.: 08-MD-1919 MJP

23

WILSON SONSINI GOODRICH & ROSATI
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699

intent. Since joining the Company in 1982, Mr. Killinger devoted nearly his entire professional life to building WaMu, and his professional reputation was tied to its success. Mr. Killinger repeatedly warned investors that the housing market might weaken, discussing this concern in great detail starting long before the Class Period. In response to this concern, Mr. Killinger took a number of measures to strengthen WaMu's position – measures that were frequently disclosed, and the veracity of which plaintiffs have not challenged. And over a nearly three-year Class Period, Mr. Killinger sold only 5% of his stock, so that when the feared slowdown became a meltdown, he lost 95% of the equity he held, after building it for the previous 25 years. These are not the actions of someone out to make a quick profit at the expense of his Company's future. To the contrary, they confirm that Mr. Killinger did his best to save the Company he helped to build, in the face of an unprecedented economic collapse far more severe than anyone predicted. This reality is far "more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than [it is] with a company and executives recklessly deceiving the investing community." *In re 2007 Novastar Fin., Inc., Sec. Litig.*, No. 07-0139-CV-ODS, 2008 WL 2354367, at *4 (W.D. Mo. June 4, 2008).

<u>**CONCLUSION**</u>

For the foregoing reasons, the claims against Mr. Killinger under Sections 10(b) and 11, and the dependent claims under Sections 20(a) and 15, should be dismissed *with prejudice*.

Dated: July 17, 2009

By:  s/ Barry M. Kaplan
Barry M. Kaplan, WSBA #8661
Douglas W. Greene, WSBA #22844
Daniel W. Turbow (*pro hac vice*)
Claire L. Davis, WSBA #39812
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel.:  (206) 883-2500
Fax:  (206) 883-2699
Email: bkaplan@wsgr.com
Email: dgreene@wsgr.com
Email: dturbow@wsgr.com
Email: cldavis@wsgr.com

**KERRY K. KILLINGER'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT [OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

24

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax:(206) 883-2699

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record who receive CM/ECF notification, and I hereby certify that I have mailed the foregoing document by United States first class mail to the non-CM/ECF participants indicated on the Court's Manual Notice List.

Dated:  July 17, 2009

s/ Barry M. Kaplan
Barry M. Kaplan, WSBA# 8661

**KERRY K. KILLINGER'S MOTION TO DISMISS
AMENDED CLASS ACTION COMPLAINT
[OD-KKK-3]**
MASTER NO.: 08-MD-1919 MJP

**WILSON SONSINI GOODRICH & ROSATI**
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Tel: (206) 883-2500
Fax: (206) 883-2699