1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   | In re Washington Mutual, Inc. Securities,          CASE NO.: 2:08-md-1919 MJP
     | Derivative & ERISA Litigation

11                                                       LEAD CASE NO. C08-387 MJP

12   | IN RE WASHINGTON MUTUAL, INC.                      ORDER ON CLASS
     | SECURITIES LITIGATION                              CERTIFICATION

13
     | This relates to: ALL CASES
14

15

16       This matter comes before the Court on Plaintiffs' motion for class certification.  (Dkt.

     No. 588.[1])  The Court has reviewed the motion, the responses (Dkt. Nos. 639, 645, 646, 647,
17
     659, 663), the reply (Dkt. No. 702), the surreply (Dkt. No. 715), and all papers related to the
18
     briefing, and the Court heard oral argument on September 24, 2010.  The Court GRANTS in part
19
     and DENIES in part Plaintiffs' motion.
20
                                          **Background**
21
         Plaintiffs seek to certify one class in their action against Defendants that includes:
22

23   _____

24       [1] All references to the docket are to 08-md-1919 unless otherwise noted.

1

2

> All persons and/or entities who purchased or otherwise acquired securities issued by WaMu and its subsidiaries and that traded on an efficient market, during the period from October 19, 2005 through July 23, 2008 (as defined above the "Class Period") and were damaged thereby (the "Class").

3

4

(Amended Consolidated Complaint ("Compl.") ¶ 870 (Dkt. No. 293).)  Plaintiffs propose

excluding from the Class:

5

6

7

8

9

10

11

> (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of WaMu, the Auditor Defendant, or any of the Underwriter Defendants during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged herein; (vi) TPG Capital and other purchasers of equity securities issued by WaMu in connection with the $7 billion capital issuance pursuant to the agreements entered into by and among TPG Capital and WaMu and other investors, announced by the Company on April 8, 2008 (the "TPG Deal"), to the extent that such purchasers exercised distinct rights and diligence opportunities afforded them in connection with the TPG Deal; and (vii) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

12

(Id.)

13

14

15

16

17

18

19

20

The named Plaintiffs/proposed class representatives include four pension funds and one individual investor: (1) Lead Plaintiff Ontario Teachers' Pension Plan Board ("Ontario"), which purchased 5,484,937 shares of WaMu common stock; (2) Plaintiff Pompano Beach Police and Firefighters' Retirement System ("Pompano"), which purchased 210,000 shares of WaMu's Floating Rate Notes; (3) Plaintiff Brockton Contributory Retirement System ("Brockton"), which purchased WaMu's 7.250% Notes; (4) Plaintiff Police and Fire Retirement System of the City of Detroit ("Detroit") purchased 791 shares of WaMu Series R Preferred stock; and (5) Plaintiff Harlan Seymour purchased 800 shares of WaMu Series K Preferred Stock.

21

22

23

The claims and allegations related to Plaintiffs' case are laid out in detail in the Court's previous orders.  (See Dkt. No. 381.)  The Court does not address them separately here.

24

**Judicial Notice**

The Underwriter Defendants ask the Court to take judicial notice of (1) stock prices, (2) filings with the SEC, (3) various news articles, analyst reports, rating agency reports, press releases, earnings call transcripts and administrative reports, (4) other complaints, and (5) other documents referenced in the complaint. (Dkt. No. 650.) The Court takes judicial notice of the stock prices, the filings with the SEC, and the documents referenced in the complaint. The Court also takes notice of the news articles, etc. solely for the purpose of getting "an indication of what information was in the public realm at the time." Von Saher v. Norton Simon Museum of Art, 592 F.3d 954, 960 (9th Cir. 2010). The Court also takes notice of the other complaints filed in cases that are part of the MDL.

Deloitte asks the Court to take notice of historical prices of the Series K stock. (Dkt. No. 665.) The Court takes notice of these historical prices. Killinger asks the Court to take notice of: (1) documents referenced in the complaint, (2) other filings in this case, and (3) published notices to investors, analyst reports, and media articles. (Dkt. No. 641.) The Court takes notice of the documents and other case filings. The Court takes notice of the news articles, etc., only as an indication of what information was public at the time. Von Saher, 592 F.3d at 960.

**Analysis**

Defendants attack each Plaintiff's propriety as class representatives and challenge the length of the proposed Class Period. The Court addresses each class representative before turning to the question of class period.

A.     Standard

Rule 23 "provides a one-size-fits-all formula for deciding the class-action question." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 130 S.Ct. 1431, 1437 (2010). A class

action may be maintained if the party seeking certification meets all four criteria in Rule 23(a)
and at least one of the three categories of Rule 23(b).  Rule 23(a) requires the Court to find that:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or
> defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the
> class.

Fed. R. Civ. P. 23(a).  Plaintiffs here seek certification under Rule 23(b)(3), which requires the
Court to find that "the questions of law or fact common to class members predominate over any
questions affecting only individual members, and that a class action is superior to other available
methods for fairly and efficiently adjudicating the controversy. . . ."  Relevant to the 23(b)(3)
inquiry are four additional factors:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already
> begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in
> the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The Ninth Circuit recently reaffirmed that "at the class certification stage, while Eisen [v.
Carlisle & Jacquelin, 417 U.S. 156 (1974)] prohibits a court from making determinations on the
merits that do not overlap with the Rule 23 inquiry, district courts must make determinations that
each requirement of Rule 23 is actually met."  Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 590
(9th Cir. 2010) (en banc).  This is to be a "rigorous analysis to ensure that the prerequisites of
Rule 23 have been satisfied."  Id. at 594. The Ninth Circuit rejected a "significant proof"
requirement to be imposed on a plaintiff seeking certification of a class.  Id. at 595.

B.    Numerosity

1    Defendants do not dispute that Plaintiffs satisfy this element.  The Court finds there

2  sufficient evidence that joinder of all members of the proposed class is impractical.  As this

3  MDL itself evidences there are a substantial number of affected parties.  WaMu stock and

4  securities were heavily traded and widely available.  (See Dkt. No. 588 at 25 (noting that during

5  the proposed class period, WaMu's daily average trading volume was 18 million shares).)

6  Plaintiffs have satisfied this element.  Fed. R. Civ. P. 23(a)(1).

7  C.    Common questions of law and fact

8    To satisfy the commonality inquiry under Rule 23(a)(2) Plaintiffs must "establish

9  common questions of law and fact, and answering those questions is the purpose of the merits

10 inquiry, which can be addressed at trial and at summary judgment."  Dukes, 603 F.3d at 594

11 (emphasis in original).

12   Defendants do not dispute that common legal and factual issues underlie Ontario's

13 claims.  (See Dkt. No. 702 at 12.)  Plaintiffs have shown that there are common questions of fact

14 regarding the alleged fraudulent statements and omissions made by Defendants and the various

15 common questions of law that will go into determining the merits of Plaintiffs' claims.  (Dkt. No.

16 588 at 15-17.)  The Court finds this element satisfied.

17 D.    Ontario

18   Ontario Teachers' Pension Plan Board ("Ontario") purchased 5,484,937 shares of WaMu

19 common stock from December 15, 2005 through April 8, 2008.  (Dkt. No. 293 at 277.)  Ontario

20 made seven of its twenty-two purchases of WaMu common stock directly and its investment

21 manager, Brandes Investment Partners ("Brandes") made the balance.  The Officer Defendants

22 attack Ontario's typicality and adequacy and certain other issues that overlap with predominance

23 issues.

24

1           1.     <u>Typicality</u>

2           The "test of typicality is whether other members have the same or similar injury, whether

3    the action is based on conduct which is not unique to the named plaintiffs, and whether other

4    class members have been injured in the same course of conduct." <u>Hanon v. Dataproducts Corp.</u>,

5    976 F.2d 497, 508 (9th Cir. 1992) (quotation and citation omitted).  Under the rule's permissive

6    standards, "representative claims are 'typical' if they are reasonably co-extensive with those of

7    absent class members; they need not be substantially identical." <u>Hanlon v. Chrysler Corp.</u>, 150

8    F.3d 1011, 1020 (9th Cir. 1998). Typicality can be destroyed where "a putative class

9    representative is subject to unique defenses which threaten to become the focus of the litigation."

10   <u>See</u> <u>In re THQ, Inc. Sec. Litig.</u>, No. 00-1783AHM(EX), 2002 WL 1832145, at *4 (C.D. Cal.

11   Mar. 22, 2002).

12          Ontario's claims and injuries are typical of the class.  Ontario made purchases of WaMu

13   common stock throughout the class period and suffered losses as WaMu's purportedly improper

14   acts were disclosed to the market.  Although two purchases stand out as odd in their timing, as

15   explained below, they do not render Ontario atypical.  The injury Ontario suffered is the alleged

16   to be the same as the injury suffered by the proposed class as a whole.  The Court engages in a

17   more thorough analysis of typicality by examining Defendants' three arguments that Ontario

18   lacks typicality: (1) Ontario is excluded from its own class definition; (2) Ontario cannot rely on

19   the fraud on the market presumption and is therefore an atypical purchaser; and (3) Ontario is not

20   typical because it purchased shares after the fraud was disclosed.

21          a.   <u>Class definition</u>

22

23

24

1    The Officer Defendants argue Ontario has excluded itself the class because it purchased

2    stock through a private offering of WaMu stock by TPG Capital on April 8, 2008 (the "TPG

3    Deal").  This argument is unavailing.

4        Plaintiffs' class excludes from it "TPG Capital and other purchasers of the equity

5    securities issued by WaMu in connection with the $7 billion capital issuance pursuant to the

6    agreement entered into, by and among TPG Capital and WaMu and other investors, announced

7    by the Company on April 8, 2008 (the 'TPG Deal'), to the extent that such purchasers exercised

8    distinct rights and diligence opportunities afforded them in connection with the TPG Deal."

9    (Dkt. No. 293 at ¶ 870 (emphasis added).)

10       Ontario disputes that it had distinct rights or had extra diligence opportunities.  The

11   record shows Brandes had certain distinct diligence rights with regard to the TPG deal.  Brandes'

12   30(b)(6) deponent, Michael Hutchens, stated that he had "discussion with WaMu management

13   regarding the rationale for the offering."  (Hutchens Dep. 37 at 2-7.)  However, Brandes received

14   no special information from or had any special conversations with TPG.  (Hutchens Dep. at 43:8-

15   13.)  From the record before the Court, it appears that Brandes had distinct diligence

16   opportunities with regard to the TPG Deal.   While Brandes had such opportunities, it does not

17   appear to have had or exercise any distinct rights with regard to the purchase.  To be excluded

18   from the class definition, the party has to have exercised both distinct rights and diligence

19   opportunities.  Finding no evidence of Brandes having distinct rights, the Court concludes

20   Ontario has not excluded itself from the proposed class.

21           b.   Access to WaMu information

22

23

24

1    The Officer Defendants urge the Court to find Ontario atypical because it may not have

2    relied on the integrity of the market to make two purchases and because Brandes performed its

3    own valuation of WaMu stock.  The arguments are not successful.

4    As an initial matter, Defendants argue that Brandes' knowledge is imputed to Ontario

5    given that Brandes had full discretionary authority to make purchases of WaMu stock for

6    Ontario.  (See Dkt. No. 646 at 20 (citing In re Enron Corp. Sec. Litig., 206 F.R.D. 427, 456 (S.D.

7    Tex. 2002)).)  Plaintiffs do not challenge this concept.  The Court finds it proper to look to

8    Brandes' knowledge and actions with regard to those purchases made on Ontario's behalf where

9    Ontario gave Brandes full discretion.

10   A purchaser of stock is entitled to a presumption that she relied on the integrity of the

11   market.  Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988).  A defendant may rebut the

12   presumption: "Any showing that severs the link between the alleged misrepresentation and either

13   the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be

14   sufficient to rebut the presumption of reliance."  Id.  "[O]ne way to rebut the fraud-on-the-market

15   theory is to show that the plaintiff would have bought his stock at the same price had he known

16   the information that was not disclosed or misrepresented."  Hanon, 976 F.2d at 507; Blackie v.

17   Barrack, 524 F.2d 891, 906 (9th Cir. 1975) (defendant can rebut presumption "by proving that an

18   individual plaintiff purchased despite knowledge of the falsity of a representation, or that he

19   would have, had he known of it").

20   Whether or not a named plaintiff relied on the integrity of the market is generally not an

21   issue relevant to class certification.  The Ninth Circuit has instructed that "the defense of non-

22   reliance is not a basis for denial of class certification."  Hanon, 976 F.2d at 509.  Only where

23   questions as to a plaintiff's reliance on the integrity of the market threaten to become the focus of

24

1   litigation is a plaintiff likely atypical.  Id. at 508.  Defendants ignore this rule, but instead cite to

2   a host of out-of-circuit district court for the proposition that a plaintiff is atypical where it trades

3   on inside, non-public information and thus doesn't rely on the integrity of the market.  (Dkt. No.

4   646 at 20-21.)  The Court is not persuaded that these cases have any relevance to Ontario, but

5   considers them anyway.

6           In certain extreme circumstances the quality and timing of the plaintiff's contact with

7   corporate insiders might become the focus of the litigation and make the plaintiff atypical.  Two

8   cases cited by Defendants illustrate this point.  In Grace v. Perception Tech. Corp., 128 F.R.D.

9   165 (D. Mass. 1989), the court found one proposed plaintiff atypical where he purchased ninety

10  percent of his stock after having a "frank discussion" with two corporate officers and other

11  named plaintiffs only purchased stock after becoming privy to "a lot of information" that was not

12  publically known.  Id. at 169.  Similarly, in Blank v. Jacobs, No. 03-CV-2111, 2009 WL

13  3233037, at *5-6 (E.D.N.Y. Sept. 30, 2009), where one of the lead plaintiffs purchased seventy-

14  three percent of its shares after an incident affecting the stock price and after the plaintiff

15  received direct reassurances about the stock's value from the company's management.

16          Ontario's acquisition of stock on December 11, 2007 does not threaten to become the

17  focus of litigation.  The records suggests that Brandes participated in a private call with WaMu

18  management in early December prior to Ontario's acquisition of WaMu stock.  (Hutchens Dep.

19  at 77-80.)  However, Brandes was "over-the-wall," meaning that it could not trade on WaMu

20  stock until this information was released publically.  (Hutchens Dep. at 103.)  Ontario did not

21  purchase WaMu shares until the information Brandes acquired became publicly available.

22  (Hutchens Dep. at 105 (noting that the purchases made were done "after the price decline in

23  conjunction with the announcement of the offering).)  The Court notes, too, that this was simply

24

ORDER ON CLASS CERTIFICATION- 9

1   one of twenty-two purchases of WaMu stock by Ontario.  The record here is a far cry from <u>Grace</u>

2   and <u>Blank</u>, where the plaintiffs acquired the majority of their stock in admitted reliance on

3   material, non-public information and reassurances obtained from insiders.  The Court does not

4   find this one purchase to render Ontario atypical.  This one purchase is not likely to become the

5   focus of litigation.  <u>Hanon</u>, 976 F.2d at 509.

6          Ontario's purchase of WaMu stock through the TPG deal does not ruin typicality.  The

7   record does show that Brandes had "discussions with WaMu management" prior to engaging in

8   the TPG deal.  (Hutchens Dep. at 37.)  What exact information was gleaned or whether this

9   influenced the purchase is not at all clear.  As explained above, Brandes had no special contact

10  with TPG itself and Hutchens explained Brandes relied largely on publically available

11  documents.  (Hutchens Dep. 37 at 2-7.)  While Ontario acquired over fifty-percent of its WaMu

12  stock, the size alone is not determinative of typicality.  This purchase is unlike those in <u>Blank</u>

13  and <u>Grace</u>, where the plaintiffs' purchases were clearly motivated by extensive contact with

14  insiders and access to material non-public information.  Though the Court finds the timing of

15  Ontario's purchase of stock through the TPG Deal odd, it does not find that it threatens to

16  become the focus of litigation.  This is particularly so given Ontario's consistent and repeated

17  purchases of WaMu stock.  <u>See</u> <u>In re Connetics Corp. Sec. Litig.</u>, 257 F.R.D. 572, 576-78 (N.D.

18  Cal. 2009) (noting that an investor's strategy in share acquisition should not affect typicality,

19  even if shares are acquired after the fraud is purportedly revealed).  None of Ontario's purchases

20  of WaMu stock, including Ontario's "basket trade," threatens to become the focus of litigation.

21  The Court continues to find Ontario to satisfy typicality.

22          Brandes' evaluations and discounting of WaMu's stock does not make Ontario an

23  atypical investor.  Undervaluing or second-guessing the price of a stock does not render a

24

ORDER ON CLASS CERTIFICATION- 10

1   plaintiff per se atypical.  See In re REMEC Inc. Sec. Litig., 702 F. Supp. 2d 1202, 1263 (S.D.

2   Cal. 2010) (finding the presumption of reliance proper even where the particular investor thinks

3   the current price is too high or too low).  Here, Defendants have shown that Brandes performed

4   its own assessments of WaMu's value, discounted some publicly available information, and

5   generally looked to acquire stocks at low value.  (See, e.g., Sunder Dep. at 140-42.)  Defendants

6   do not show that Brandes did not rely on the public statements made by Defendants or was

7   somehow knowledgeable about the specific practices alleged in this action to be improper.  See

8   McGuire v. Dendreon Corp., No. C07-800MJP, 2010 WL 2196109, at *4-5 (W.D. Wash. May

9   27, 2010) (Plaintiff's "beliefs about the way the stock market functions do not render him an

10   atypical representative.").  That Brandes thought there was "froth" in the real estate appraisal

11   market is not the same as Brandes knowing Defendants were engaged in the appraisal

12   manipulation alleged in the complaint.  See REMEC, 702 F. Supp. 2d at 1263.  This is not a

13   defect to typicality.

14        The Court does not address the question of whether WaMu stock was traded on an

15   efficient market.  That inquiry is better addressed at a later stage, after discovery.  See Basic, 485

16   U.S. at 249 n.29 (noting that proof of "whether securities are traded on a well-developed,

17   efficient, and information-hungry market" is "a matter for trial"); In re Applied Micro Circuit

18   Corp. Sec. Litig., 2003 U.S. Dist LEXIS 14492, at *10-12 (S.D. Cal. July 10, 2003) (rejecting an

19   attack to the fraud on the market presumption because a market's efficiency is inherently factual

20   and not proper for determination on a motion for class certification).

21          c.  Purchases after disclosures

22        Defendants argue that Ontario is atypical because it made many purchases after WaMu

23   began to reveal its "true condition."  The complaint states that the true condition of WaMu

24

1   trickled out slowly and was not fully disclosed by a date certain within the proposed Class

2   period.  (See Dkt. No. 293 at 174-200.)  Defendants essentially ask the Court to make a factual

3   determination as to when WaMu's purported fraud was fully disclosed and find that Ontario is

4   atypical because it should have known better than to buy WaMu stock as late as it did.  The

5   Court will not undertake such a factually-specific inquiry on what is a reaching argument by

6   Defendants.  Courts facing similar arguments have rejected Defendants' position.  See In re

7   Connetics, 257 F.R.D. at 576 (rejecting the argument that "a plaintiff is atypical if it buys stock

8   after the disclosure of an alleged fraud").  Here, Ontario purchased over 22 million dollars worth

9   of WaMu stock after it asked to be appointed lead plaintiff, calling into question the coordination

10  between those who are monitoring the portfolio for potential litigation and those charged with

11  purchasing.  While this may be an uncomfortable fact to explain to the fact finder, it is not

12  disqualifying of a potential lead plaintiff.  Even though plaintiff's counsel assumes he may never

13  to have to explain it because "these cases never go to trial," the court is called a "trial court" for a

14  reason.

15          2.      Adequacy

16          "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and

17  their counsel have any conflicts of interest with other class members and (2) will the named

18  plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Hanlon, 150

19  F.3d at 1020.  Some courts have denied class certification when "'the class representatives had

20  so little knowledge of and involvement in the class action that they would be unable or unwilling

21  to protect the interest of the class against the possibly competing interest of the attorneys.'"

22  Buus v. WaMu Pension Plan, 251 F.R.D. 578, 587 (W.D. Wash. 2008) (quoting Kelley v. Mid-

23  America Racing Stables, Inc., 139 F.R.D. 405, 409 (W.D. Okla. 1990)).  However, the Supreme

24

ORDER ON CLASS CERTIFICATION- 12

1    Court has affirmed class certification even where the named plaintiff "knew nothing about the

2    content of the suit," <u>Surowitz v. Hilton Hotels Corp.</u>, 383 U.S. 363, 372 (1966), but did know . . .

3    that she had put over $2,000 of her hard-earned money into Hilton Hotel stock [and] that she was

4    not getting her dividends," <u>id.</u> at 370.  This Court has found a class representative adequate

5    where she had reviewed the complaint before it was filed and was able to summarize what the

6    litigation was about, but did not know she participated in the pension plan that was the subject of

7    the litigation, was confused about which plan she participated in, and was unsure of what relief

8    she wanted.  <u>Buus</u>, 251 F.R.D. at 587.  A lack of sophistication is not a bar to being a class

9    representative.  <u>Id.</u>

10         The Officers attack Ontario's adequacy as a representative because of purportedly

11   misleading statements made in the motion for class certification.  (Dkt. No. 646 at 17.)  They

12   contend that Ontario incorrectly stated it purchased all of its WaMu shares on the New York

13   Stock Exchange when Ontario actually purchased over 2.6 million through the private TPG Deal.

14   (<u>Id.</u> at 19.)  Ontario owns up to its error and argues correctly that it is not material to class

15   certification.

16         Ontario explains that it did purchase 2.6 million WaMu shares in a private offering, and

17   that it properly listed this trade on its certification filed in the complaint.  (Dkt. No. 702 at 14.)  It

18   is true that the trade is listed in the certification, but nowhere in the complaint is it made clear

19   that the purchase was private.  Plaintiffs somehow expected the reader to note when Ontario

20   made the purchase and link that to the one paragraph out of 877 that shows the sale of shares on

21   that date was private.  Be that as it may, Defendants have not shown that the certification

22   requires this information.  The Court is satisfied that Plaintiffs' error is harmless and it does not

23

24

ORDER ON CLASS CERTIFICATION- 13

1    present an issue showing inadequacy.  See Danis v. USN Commc'ns., Inc., 189 F.R.D. 391, 397

2    n.3 (N.D. Ill. 1999).  The Court rejects this attack on Ontario's adequacy.

3           The remainder of the record suggests that Ontario is an adequate class representative.

4    Defendants have not shown that Ontario and counsel have conflicts or that Ontario will not

5    prosecute the action vigorously.  See Hanlon, 150 F.3d at 1020.  Ontario is knowledgeable of the

6    litigation, has provided its assistance, and assures the Court it will represent the class diligently.

7    The Court finds Ontario to be an adequate class representative.

8    E.    Pompano Beach Police & Firefighters Retirement System

9           The Director Defendants attack Pompano's typicality and adequacy.

10          1.    Typicality

11          The Director Defendants argue Pompano lacks typicality because it relied on its

12   investment advisor and did not read the registration statement issued with the WaMu securities it

13   bought.  The argument lacks merit.

14          The Directors admit that an investor may rely on a third-party investment advisor and that

15   such reliance will not preclude class certification.  (Dkt. No. 647 at 24.)  In spite of this, the

16   Directors press that argument that even if Pompano can rely on the decision made by its

17   investment manager, Standish Mellon, Pompano must show Standish Mellon read and relied on

18   WaMu's registration statements.  (Id. at 25.)  This misses the mark.  By statute, the plaintiff need

19   not have read the offering materials to prove liability for § 11 claims.  15 U.S.C. § 77k(a).

20   Pompano pursues just such claims and Defendants' arguments are without merit.  The Court

21   rejects Defendants' attack to Pompano's typicality.

22          Reviewing the materials submitted, the Court finds Pompano typical.  The injuries

23   Pompano claims to have suffered are typical of the class and there are no unique defenses

24

1    Pompano appears to face that might become the focus of the litigation.  <u>Hanon</u>, 976 F.2d at 508-

2    09.  The Court finds Pompano satisfies the typicality requirement.

3           2.    <u>Adequacy</u>

4           Defendants argue that Pompano is so unfamiliar with the claims and facts of the case that

5    it is not a proper representative.  The record does not support this assertion.

6           The Director Defendants have not demonstrated Pompano is merely a puppet of counsel

7    or that it is unable or unwilling to serve the class.  At best Defendants have shown that

8    Pompano's 30(b)(6) deponent was unsure of several specifics about the WaMu securities

9    Pompano purchased.  This does not show that Pompano is unfamiliar with the case or that it is

10   not able and willing to assist in the prosecution of the matter.  The Director Defendants confuse

11   knowledge of the initial investment with knowledge of the litigation.  The relevant inquiry is

12   whether the plaintiff is knowledgeable of the litigation and the process, rather than the minutiae

13   of the investment.  <u>See</u> <u>Buus</u>, 251 F.R.D. at 587.  Pompano's representative made clear that he is

14   knowledgeable of the general facts underlying the action and the procedural posture of the case.

15   (O'Connell Dep. at 58-59, 157, 170-73, 181.)  The Court finds Pompano to be an adequate

16   representative.

17          The Director Defendants argue Pompano cannot represent the Class because it was

18   pressured by counsel at Bernstein Litowitz Berger & Grossman LLP to join in the litigation.

19   Bernstein Litowitz provides "portfolio monitoring" for Pompano, wherein the firm gains access

20   to Pompano's financial information in order to ensure Pompano fulfills its fiduciary duties by

21   litigating where in cases where its investments declined due to improper activity.  Out of this

22   prior relationship and the influence of Sugarman & Susskind, P.A., Bernstein Litowitz asked

23   Pompano to join in this litigation.  Having reviewed the audio recording and transcript of

24

1   Plaintiffs' counsel's sales pitch to Pompano to join this case, the Court is leery of the relationship

2   between Pompano and counsel.  (See Dkt. No. 703-7.)  While Bernstein Litowitz's tactics in

3   recruiting Pompano strike the Court as unseemly, the firm's relationship with Pompano does not

4   defeat class certification.  See Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.,

5   2004 U.S. Dist. LEXIS 27008, at *13-14 (C.D. Cal. May 27, 2004) (rejecting an attack to

6   adequacy that focused in part on a portfolio monitoring relationship).  Pompano's board

7   considered counsel's offer, asked questions, and joined in the action freely by taking a vote.

8   (Dkt. No. 702 at 26.)  There is no indication that Pompano is buying this lawsuit or that it has

9   failed to abide by any court rulings.  Cf. Buus, 251 F.R.D. at 587.  Pompano is an adequate

10  representative.

11  F.    Brockton Contributory Retirement System

12        The Director Defendants attack Brockton's typicality, claiming that it failed to retain

13  audio recordings of its board meetings.  They also attack Brockton's adequacy because Brockton

14  has abdicated its role to the attorneys.  Neither argument defeats certification.

15        1.    Typicality

16        The Director Defendants accuse Brockton of destroying audio recordings of Brockton

17  board meetings.  This purported destruction does not threaten to become the focus of the

18  litigation or an issue adverse to Brockton's typicality.

19        Neither of the two cases Defendants cite for the proposition that destruction of evidence

20  makes a plaintiff atypical are on point.  The first case, Levine v. Berg, 79 F.R.D. 95 (D.C.N.Y.

21  1978), has nothing to do with destruction of documents and is irrelevant. The second case,

22  Falcon v. Phillips Elecs. N. Am. Corp., 304 F. App'x 896, 897 (2d Cir. 2008), is an unpublished

23  Second Circuit memorandum decision that is also off point.  In Falcon, the court affirmed the

24

1    district court's decision that a plaintiff was inadequate in a product liability case where the

2    plaintiff's husband purchased the set and disposed of the set.  Id.  The court reasoned that the

3    plaintiff "will likely have much more difficulty showing design defect than would someone who

4    could produce the product for examination." Id. at 897.

5          Here, Brockton implemented a policy of destroying the recordings of board meetings

6    roughly a year to a year and a half prior to May 20, 2010.  (Hanna Dep. at 183.)  At the time,

7    Brockton was not a party to this litigation and it does not appear the policy is directed at

8    spoliation of relevant evidence.  (Id.)  According to Brockton's deponent, Harold Hanna,

9    meeting minutes are prepared from the audio tapes and Hanna's own notes before the tapes are

10    destroyed.  The information thus remains largely available, and Hanna's "copious notes" appear

11    also to be available.  (Id. at 180.)  Hanna also testified that since Brockton became involved in

12    this suit, Brockton employees have been informed they must preserve documents.  (Id. at 30.)

13    Defendants' argument that he did not do so in writing is just a distraction.  Brockton's recording

14    retention policy in no way threatens to become a focus of the litigation.  Brockton is a typical

15    plaintiff.  Its injuries are common to the class and Defendants have failed to present any genuine

16    issue unique to Brockton that might detract from the prosecution of the case.

17         2.    Adequacy

18          The record does not support the Director Defendants' argument that Brockton lacks

19    sufficient knowledge of the case to be an adequate representative.  Brockton has demonstrated its

20    knowledge about WaMu's alleged misdeeds, the posture of this litigation, and the importance of

21    its role.  (See Hanna Dep. at 149-52, 157-160.)  Whether or not the Brockton's deposition

22    designee knew the details of the types of securities Brockton purchased is not relevant to

23    Brockton's adequacy.  It shows nothing as to whether Brockton can or has assisted in the case

24

1    and will represent the class.  Hanlon, 150 F.3d at 1020.  The record suggests Brockton is

2    adequate.  Defendants also attack the relationship between Bernstein Litowitz and Brockton as

3    evidence that Brockton was pressured into joining the litigation and abdicating its role.  There is

4    no evidence Brockton did not freely enter into the litigation or that it does not take its roles

5    seriously.

6    G.      Police & Fire Retirement System of the City of Detroit

7            The Underwriter Defendants attack Detroit's typicality on the theory that Detroit is

8    subject to unique defenses regarding negative causation and being an in-and-out trader.

9    Defendants also attack Detroit's adequacy.  Neither argument has merit.

10           1.      Typicality

11           The Underwriter Defendants argue Detroit is subject to unique defenses because it sold

12   its Series R WaMu securities after some of the purported fraud was disclosed, but before any

13   new corrective disclosures were made.  (Dkt. No. 645 at 20.)  They also argue Detroit is not

14   typical because of its trading history in unrelated WaMu securities.  (Id.)  Neither argument has

15   merit.

16           First, Plaintiffs correctly contend that the purchase of stock after a partial disclosure is

17   not a defect to typicality.  (Dkt. No. 702 at 39); see, e.g., In re UTStarcom, Inc. Sec. Litig., No.

18   C04-04908 JW, 2010 WL 1945737, at *6 (N.D. Cal. May 12, 2010).  Plaintiffs maintain that

19   there was a partial disclosure on December 21, 2007 after Detroit purchased its Series R

20   securities, but before it sold the shares.  As was the case when Defendants moved for dismissal,

21   this is an issue of fact that the Court will not resolve at this stage of the litigation.  (See Dkt. No.

22   381 at 36.)  It is not a basis on which to find Detroit atypical.  Second, Detroit's trading in other

23   WaMu securities does not raise unique defenses to its trading in the sole security for which it is a

24

1    class representative.  Nothing about these purchases shows Detroit did not rely on the integrity of

2    the market.  Detroit's motivation to buy and sell other WaMu securities might have differed

3    wildly from its reason to acquire the securities at issue in this litigation.  Detroit's investment

4    strategy is not a reason to bar certification on the basis of atypicality.  See In re Connetics, 257

5    F.R.D. at 576 (a plaintiff's investment strategy is not a reason to find him atypical).

6         Detroit has shown that it is a typical member of the proposed class who suffered injuries

7    typical of the class.  See Hanon, 976 F.2d at 508-09.  There are no unique defenses apparent to

8    the Court that threaten to become the focus of litigation.  The Court finds Detroit satisfies

9    typicality.

10        2.    Adequacy

11        The Underwriter Defendants argue first that Detroit is a professional plaintiff that it has

12   abdicated its role to class counsel.  (Dkt. No. 645 at 16-17.)  They highlight that Detroit has been

13   appointed lead plaintiff in forty securities actions in the past ten years and lead plaintiff in seven

14   cases in the last three years.  Detroit's history as a lead plaintiff seems only to highlight how

15   often courts have found it to be a proper plaintiff.  The record does not suggest that Detroit is

16   distracted from this litigation or that it cannot keep up with the demands on its resources.  The

17   Court finds nothing inadequate about Detroit given its past litigation history.

18        Defendants also argue that the certification Detroit filed in the complaint omits one case

19   it was lead plaintiff and that it mischaracterized another.  Detroit explains correctly that the one

20   "omitted" case was in fact consolidated with another that is listed on the certification.  The Court

21   finds nothing misleading about certification as to the second case.

22        Defendants next accuse Detroit of being unfamiliar with the litigation to the point of

23   abdicating its role to class counsel.  (Dkt. No. 645 at 17-18.)  The Underwriters selectively quote

24

1    Detroit's representative, Walter Stampor, and make it appear as though he never reviewed any of

2    the documents related to the litigation, and was not even aware of why he was being deposed.

3    Mr. Stampor testified, however, that Detroit reviewed the performance of the WaMu securities it

4    purchased prior to joining the suit (Stampor Dep. at 34-35), Detroit supplied information for and

5    reviewed the complaint before it was filed (id. at 52-53), Stampor was knowledgeable of who the

6    defendants are (id. at 39), counsel has updated Detroit on the litigation (id. at 49), and Stampor

7    verified interrogatory responses (id. at 59).  This shows an active role in the litigation and a

8    willingness to participate.  Detroit has demonstrated that it is an adequate class representative.

9          The Underwriters final attack to Detroit's adequacy is that Detroit destroys documents

10   needed to prosecute the litigation.  Mr. Stampor, however, testified that he acted on his counsel's

11   advice to preserve all relevant documents and provide them when requested.  (Stampor Dep. at

12   379-80.)  Even when asked potentially misleading questions, Mr. Stampor clarified that only

13   irrelevant documents were destroyed in the ordinary course of business.  (See, e.g., id. at 379-

14   80.)  Tellingly, the Underwriter Defendants have not brought a discovery motion on this issue.

15   The Underwriters also dredge up the fact that one ex-officio member of the Detroit board

16   pleaded guilty to corruption and that there are investigations into two other past board members.

17   (Id. at 313-17.)  As Mr. Stampor clarified, however, the charges were unrelated to the pension

18   fund and this issue is not relevant to class certification.  (See id. at 316-17.)

19         Detroit has demonstrated that it is an engaged and active class representative and that it

20   will serve the class adequately.

21   H.    Harlan Seymour

22         Defendant Deloitte & Touche ("Deloitte") argues that Harlan Seymour has not suffered

23   any damages that are compensable under § 11 and that he cannot establish standing or represent

24

ORDER ON CLASS CERTIFICATION- 20

1   a class of similarly situated purchasers. The Court agrees. Seymour lacks standing to pursue his

2   claims.  The Court DENIES Plaintiffs' motion for class certification as to Seymour and

3   DISMISSES Seymour for lack of standing.  Plaintiffs cannot pursue § 11 claims for those who

4   purchased WaMu Series K stock in the September 2006 offering.

5         Damages may be calculated three ways § Section 11 of the Securities Act.  Only one of

6   these ways is relevant to Seymour's claims: "the difference in between the amount paid for the

7   securities . . . and the value thereof as of the time such suit was brought."  15 U.S.C. § 77k(e),

8   (e)(1).  The parties dispute the date when the suit was brought.  Defendants argue that the date

9   should be May 13, 2008, when the Brockton filed its complaint.  At least one court has

10  calculated the date of filing the complaint, regardless of any amendment.  See Pierce v. Morris,

11  2006 U.S. Dist. LEXIS 57366, at *17-18 (N.D. Tex. Aug., 15, 2006) (reasoning that if the date

12  of filing could be extended by any amendment or by simply waiting, the plaintiff could

13  manufacture damages).  Plaintiffs offer no case law to rebut this, but instead argue that because

14  Seymour was not a plaintiff until the amended complaint was filed on June 15, 2009, the Court

15  should use that date.  The Court is persuaded by the reasoning in Pierce that the proper date is the

16  filing of the first complaint seeking relief for the same alleged misconduct.

17        The first complaint filed in this case that appears to pursue § 11 claims related to the

18  September 2006 offering was filed on May 13, 2008.  See In re Washington Mutual, Inc., Sec.,

19  Derivative, & ERISA Litig., C08-751 MJP, Dkt. No. 1 at 4 (W.D. Wash. May 13, 2008).  The

20  complaint states it is "a placeholder complaint to preserve Securities Act rights, claims, and/or

21  damages of class members who purchased securities" in the September 2006 offering.  Id. at 4.

22  The Court realizes that Seymour was not a party to that suit and was not a named Plaintiff in the

23  MDL at the time the complaint was filed.  However, § 77k(e)(1) refers to the time "such suit was

24

1    brought," and a suit pursuing § 11 claims related to the 2006 offering was filed on May 13, 2008

2    expressly to be a placeholder for persons like Seymour.  The Court also notes that Seymour

3    joined this litigation largely to remedy Plaintiffs' failure to include a named plaintiff who

4    purchased Series K WaMu stock that as part of the September 2006 offering.  Allowing Plaintiffs

5    to use June 15, 2009 as the date suit was brought for damages would essentially permit the same

6    sort of damage shopping that the court noted in Pierce.  2006 U.S. Dist. LEXIS 57366, at *18.

7    The proper date to measure § 11 damages as to Seymour is May 13, 2008.

8            Deloitte correctly argues that damages are calculated in this case as the difference

9    between the price paid and the price on the date the suit was filed.  The Ninth Circuit has held

10   that "damages must be 'measured by the difference between the amount paid for the security and

11   its price at either the time it was sold or the date the Section 11 claim was filed.'"  In re

12   Broderbund/Learning Co. Sec. Litig., 294 F.3d 1201, 1204 (9th Cir. 2002) (quoting Miller v.

13   Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1421 (9th Cir.1994)).  Plaintiffs do

14   not cite either case, but rely instead on the express language of § 77k(e)(1) to argue the urge the

15   Court must inquire as to the "value" of the stock, not the market price.  Plaintiffs also refer to a

16   Second Circuit decision where the court held "the term 'value' in section 11(e) was intended to

17   mean the security's true value after the alleged misrepresentations are made public."  McMahan

18   & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995).  While the Court is

19   sympathetic to Plaintiffs' argument, it cannot ignore binding Ninth Circuit authority.  The Court

20   therefore measures damages from the price paid for the stock and the price when the suit was

21   filed.

22          Because Seymour's Series K WaMu stock was worth more on the date of purchase than

23   on the date this suit was filed, he lacks standing.  Seymour acquired the stock for $6 share just 8

24

ORDER ON CLASS CERTIFICATION- 22

1    days before the proposed Class Period ends.  The price of the same stock at closing on August 5,

2    2008 was $7.80.  (Dkt. No. 664-4 at 3.)  As applied, Seymour's stock was worth more at the time

3    the suit was filed than at the time of purchase.  Seymour cannot prove he suffered any injury or

4    damages and he therefore has no standing.  The Court DISMISSES Seymour from the action for

5    lack of standing and DENIES certification of a class inclusive of § 11 claims for those who

6    purchased WaMu Series K stock made available through the September 2006 offering.  Because

7    Seymour is not a class representative, the Court does not reach the issue of actual reliance

8    pressed by the Underwriter Defendants.  (See Dkt. No. 645 at 26-27.)

9    I.      Predominance

10           Having considered the Rule 23(a) factors as to all named Plaintiffs, the Court turns to

11   predominance as to all Plaintiffs except Seymour.  The Court finds predominance satisfied.

12           Predominance is present when common questions of law or fact predominate over

13   individual questions, and a class action is superior to other available methods of adjudication.

14   Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1188-89 (9th Cir. 2001).  "Implicit in the

15   satisfaction of the predominance test is the notion that the adjudication of common issues will

16   help achieve judicial economy." Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir.

17   1996).  To measure superiority, the Court must consider the four factors of Rule 23(b)(3): (1) the

18   interest of each member in "individually controlling the prosecution or defense of separate

19   actions"; (2) "the extent and nature of any litigation concerning the controversy already

20   commenced by or against members of the class"; (3)  "the desirability or undesirability of

21   concentrating the litigation of the claims in the particular"; and (4) "the likely difficulties in

22   managing a class action."  Economy and efficiency are usually considered the most important

23   elements of the inquiry.  Zinser, 253 F.3d at 1190.

24

ORDER ON CLASS CERTIFICATION- 23

1    Plaintiffs have met their burden as to predominance.  They have shown that common

2    questions of fact and law touch on all absent class members.  The Court has addresses issues of

3    commonality and typicality in far greater detail above and will not provide a separate analysis.

4    The Court also finds that judicial economy and efficiency are best served by proceeding as a

5    class action.  The MDL before this court has highlighted this fact.  The litigation as a whole has

6    moved through a substantial number of issues in a manner that is likely more efficient and

7    effective than if each case was prosecuted separately.  There is little case to be made that

8    individual actions would be more efficient or better for class members, and Defendants have

9    made no accusation.  The Court has essentially consolidated 26 separate cases into one MDL,

10    which highlights the desirability in proceeding through one class action.  To this end, the Court

11    finds the difficulties in managing this case to be reasonable and not a defect to predominance.

12    Plaintiffs have satisfied their burden as to predominance.  The Court therefore certifies

13    the class as requested by Plaintiffs and as laid out in paragraph 870 of their amended

14    consolidated class action complaint.  (Dkt. No. 293.)  The Court separately addresses the class

15    period below.

16    J.    Negative Causation

17    The Underwriter Defendants argue that the Court should exclude all plaintiffs who sold

18    stock prior to any disclosures from WaMu, and that no one who purchased the Series R

19    certificates in the December 2007 offering can pursue claims against WaMu.  These arguments

20    are untenable.

21    This Court held in McGuire, No. C07-800MJP, Dkt. No. 160 at 13, that in-and-out

22    traders are appropriately included in a class.  The Court so concluded after considering the

23    Second Circuit's rejection of in-and-out traders in a class and a survey of relevant in-circuit

24

1   authority.  Id.  As was the case in <u>McGuire</u>, the Court remains convinced that the inquiry into

2   loss causation is inappropriate at class certification stage.  Id. at 15 ("<u>Dura</u> does not affect the

3   class definition at the class certification stage.")  The Court applies this standard and rejects

4   Defendants' negative causation arguments.  The issue is not ripe or proper at this stage of the

5   litigation.  The Court notes that the class definition excludes those who did not suffer any

6   damages, which at this point is sufficient to address the issue.

7   K.        <u>End of Class Period</u>

8            Both Defendant Killinger and the Underwriter Defendants argue that the Court should

9   shorten the class period.  The Defendants rely on expert reports to sustain their arguments, which

10  Plaintiffs confront with their own experts.  The results of the arguments lead the Court to the

11  rather inevitable conclusion that resolution of the issue requires determining disputed issue of

12  material facts.  This is not the role of the Court on class certification.  To the extent that the class

13  period length is intertwined with the merits of the class certification motion, the Court has dealt

14  with those arguments above.  <u>See</u> <u>Dukes</u>, 603 F.3d at 590 (noting that determinations as to the

15  merits of the claims are not the province of the Court unless they overlap with Rule 23 factors).

16  L.        <u>Motion to Strike</u>

17           Deloitte asks the Court to strike the inclusion of new arguments in Plaintiffs' reply.  (Dkt.

18  No. 715.)  The Court is not convinced that there are new arguments made in reply.  To the extent

19  that there may be such arguments, the Court has considered Deloitte's arguments in response.

20  The Court therefore DENIES the motion to strike and has considered the argument Deloitte

21  makes in its surreply.

22  M.        <u>Class Counsel</u>

23

24

1       The Court appoints Bernstein Litowitz Berger & Grossman LLP as class counsel.[2]  The

2   Court is content that Bernstein Litowitz has satisfied all four elements of Rule 23(g)(1)(A).

3   However, the Court is alarmed by the prospect that other firms may claim fees related to this

4   litigation who have provided very little service to the Class.  The briefing on class certification

5   has revealed that two firms, Sugarman & Susskind, P.A., and Saxena White appear only to be

6   shepherding plaintiffs to Bernstein Litowitz.  The Court cautions that no fees will be awarded

7   unless actual legal work is done by an individual lawyer to further the present litigation, and any

8   fee sharing relationship will be closely scrutinized.

9                                              **Conclusion**

10      The Court finds that a class should be certified in this action.  The Court GRANTS in part

11   the motion for class certification.  The Class is certified as proposed in the second consolidated

12   amendment complaint at paragraph 870.  (Dkt. No. 293 at 271.)  The Class is only as broad as

13   there are named plaintiffs who have standing to pursue the claims remaining in the complaint.

14   Because the Court DISMISSES Plaintiff Seymour for lack of standing, the Court excludes from

15   the class any individual pursuing § 11 claims related to the Series K WaMu stock from the

16   September 2006 offering.  In this small part, the Court DENIES in part the motion for class

17   certification.  The Court approves the proposed Class Period from October 19, 2005 to July 23,

18   2008, leaving open the issue for the parties to explore through discovery, dispositive motions,

19   and trial.  The Court appoints Bernstein Litowitz as class counsel.

20   \\

21   \\

22

23

24      [2] As Plaintiffs' counsel pointed out in oral argument, other potential counsel withdrew from consideration, leaving the Court with little choice in the appointment.

1    The clerk is ordered to provide copies of this order to all counsel.

2    Dated this 12th day of October, 2010.

3

4

5    _____
     Marsha J. Pechman
6    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON CLASS CERTIFICATION- 27